IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
CASE No. _____

LAN LI, an individual; YING TAN, an individual;
TAO  XIONG, an individual; JUNQIANG FENG,
an individual; RAN CHEN, an individual; XIANG
SHU, an individual; HAO LOU, an individual;
XIANG CHUNHUA, an individual; KUANG
YAOPING, an individual; BEI ZHU, an individual;
QIONG DENG, an individual; QIONGFANG ZHU,
an individual; ZHILING GAN, an individual;
CUILIAN LI, an individual; YULONG TANG, an
individual; LILI ZHANG, an individual;
SHUANGYUN WANG, an individual; WENHAO
ZHANG, an individual; SHA SHI, an individual;
LIYAN FENG, an individual; SHAOQING ZENG,
an individual; MIN CUI, an individual; RUJI LI, an
individual; QINGYUN YU, an individual; LING LI,
an individual; YINGJUN YANG, an individual;
BAOPING LIU, an individual; DAQIN WENG, an
individual; XIAOPING ZHANG, an individual;
SHAOPING HUANG, an individual; YI ZHAO, an
individual; CHANGYUE LIU, an individual;
YAJUN KANG, an individual; CHENGYU GU, an
individual; YAN CHEN, an individual;
DONGSHENG ZHU, an individual; RUJING WEI,
an individual; ZHAOHUI LI, an individual;
JUEWEI ZHOU, an individual; MIN LI, an
individual; CHUNNING YE, an individual;
HONGRU PAN, an individual; FENG GUO, an
individual; ZHENG YU, an individual; TINGTING
SUN, an individual; XIAO SUN, an individual;
YAWEN LI, an individual; TONGHUI LUAN, an
individual; LI ZHANG, an individual; YUANBO
WANG, an individual; SHU JIANG, an individual;
and YING FEI, an individual; LI DONGSHENG, an
individual; MOHAMMAD ZARGAR, an individual;
SHAHRIAR EBRAHIMIAN, an individual; REZA
SIAMAK NIA, an individual; SARA SALEHIN, an
individual; and SANAZ SALEHIN, an individual;

     Plaintiffs,

v.

JOSEPH WALSH, an individual;
JOSEPH WALSH, JR., an individual;
J. MARCUS PAYNE, an individual;
DAVID DERRICO, an individual;
SOUTH ATLANTIC REGIONAL CENTER, LLC,
a Florida limited liability company;
USREDA, LLC, a Delaware limited liability
company;
JJW CONSULTANCY, LTD., a foreign company;
FANG CHENG, an individual;
KEVIN WRIGHT, an individual;
DAVID LEVINSON, an individual;
ROBERT MATTHEWS, an individual;
MARIA A/K/A MIA MATTHEWS, an individual;
GERRY MATTHEWS, an individual;
RYAN BLACK, an individual;
PALM HOUSE, LLC, a Delaware limited liability
company;
160 ROYAL PALM LLC, a Florida limited liability
company;
PALM HOUSE PB, LLC, a Florida limited liability
company;
MIRABIA, LLC, a Delaware limited liability
company;
BONAVENTURE 22, LLC, a Florida limited
liability company;
Alibi LLC, a Delaware limited liability company;
Alibi LTD., a Cayman Islands company;
NICHOLAS LAUDANO, an individual;
NEW HAVEN CONTRACTING SOUTH, INC., a
Florida corporation;
BOTTICELLI ADVISORS, LLC, a Florida limited
liability company;
NJL DEVELOPMENT GROUP LLC, a Delaware
limited liability company;
ALI HERISCHI, an individual;
HERISCHI & ASSOCIATES LLC, a Maryland
limited liability company;
ALI SOLTANI, an individual;
WASHINGTON MARKETING, LLC, a Maryland
limited liability company;
LESLIE ROBERT EVANS, an individual;
LESLIE ROBERT EVANS & ASSOCIATES, P.A.,
a Florida professional association;
KK-PB FINANCIAL, LLC, a Florida limited
liability company; and

PALM HOUSE HOTEL, LLLP, a Florida limited
liability limited partnership;

       Defendants.

_____/

## COMPLAINT SEEKING DAMAGES AND PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

Plaintiffs, LAN LI, YING TAN, TAO XIONG, JUNQIANG FENG, RAN CHEN, XIANG SHU, HAO LOU, XIANG CHUNHUA, KUANG YAOPING, BEI ZHU, QIONG DENG, QIONGFANG ZHU, ZHILING GAN, CUILIAN LI, YULONG TANG, LILI ZHANG, SHUANGYUN WANG, WENHAO ZHANG, SHA SHI, LIYAN FENG, SHAOQING ZENG, MIN CUI, RUJI LI, QINGYUN YU, LING LI, YINGJUN YANG, BAOPING LIU, DAQIN WENG, XIAOPING ZHANG, SHAOPING HUANG, YI ZHAO, CHANGYUE LIU, YAJUN KANG, CHENGYU GU, YAN CHEN, DONGSHENG ZHU, RUJING WEI, ZHAOHUI LI, JUEWEI ZHOU, MIN LI, CHUNNING YE, HONGRU PAN, FENG GUO, ZHENG YU, TINGTING SUN, XIAO SUN, YAWEN LI, TONGHUI LUAN, LI ZHANG, YUANBO WANG, SHU JIANG, YING FEI, and LI DONGSHENG (collectively, the "Chinese Victims"), along with MOHAMMAD ZARGAR, SHAHRIAR EBRAHIMIAN, REZA SIAMAK NIA, SARA SALEHIN and SANAZ SALEHIN (collectively, the "Iranian Victims") (collectively, the Chinese Victims and Iranian Victims will be referred to as the "Plaintiffs"), file this Complaint Seeking Damages and Preliminary and Permanent Injunctive Relief and sue Defendants, JOSEPH WALSH, JOSEPH WALSH, JR., J. MARCUS PAYNE, DAVID DERRICO, SOUTH ATLANTIC REGIONAL CENTER, LLC, USREDA, LLC, JJW CONSULTANCY, LTD., FANG CHENG, KEVIN WRIGHT, DAVID LEVINSON, ROBERT MATTHEWS, MARIA A/K/A MIA MATTHEWS, GERRY MATTHEWS, RYAN BLACK, PALM HOUSE LLC, 160 ROYAL PALM LLC, PALM HOUSE PB, LLC, MIRABIA, LLC, BONAVENTURE 22, LLC,

ALIBI LLC, ALIBI LTD., NICHOLAS LAUDANO, NEW HAVEN CONTRACTING SOUTH, INC., BOTTICELLI ADVISORS, LLC, NJL DEVELOPMENT GROUP LLC, ALI HERISCHI, HERISCHI & ASSOCIATES LLC, ALI SOLTANI, WASHINGTON MARKETING, LLC, and KK-PB FINANCIAL, LLC (collectively, the "Bad Actors"), along with LESLIE ROBERT EVANS, LESLIE ROBERT EVANS & ASSOCIATES, P.A., and PALM HOUSE HOTEL, LLLP (collectively, the Bad Actors, Leslie Robert Evans, Leslie Robert Evans & Associates, P.A., and Palm House Hotel, LLLP shall be referred to as the "Defendants"), and allege:

## INTRODUCTION

1.      Plaintiffs are the victims of a $50,000,000 fraud, theft, and conspiracy, in which a web of individuals, primarily based in Palm Beach County, Florida, preyed on foreign nationals desirous of leaving foreign countries, such as China and Iran, to provide their families with the opportunity for a better life in the United States through the EB-5 program.

2.      The Bad Actors conspired to fraudulently induce Plaintiffs to each invest $500,000, plus a $40,000 "administrative fee," into a purported Palm Beach real estate project, known as the "Palm House Hotel" which, in reality, was nothing more than a façade pursuant to which Plaintiffs' funds were stolen and distributed among the conspirators.

3.      Plaintiffs' funds were supposed to be held in an escrow account unless and until their I-526 immigration petitions were approved by the United States government.

4.      If and when Plaintiffs' I-526 petitions were approved, the funds were only supposed to be used to create at least 10 full-time jobs for qualifying U.S. workers, in this case by:

   (a)      finishing the renovation and development of an existing luxury hotel structure in Palm Beach;

   (b)      serving Palm Beach County by seeking to create jobs and increase U.S. exports by developing an upscale resort hotel; and

(c)     creating at least 790 direct and indirect jobs to support the EB-5 guidelines and the number of investors sought.

5.      However, Plaintiffs' funds were not held in the escrow account.  Instead, contrary to all of the written and oral representations, Plaintiffs' funds were improperly transferred from the escrow account to other accounts and pillaged for the personal pleasure of the conspirators.

6.      Virtually none of Plaintiffs' funds were used develop the property, no jobs were created, and no EB-5 visas were issued to any of the Plaintiffs.  Accordingly, over 80 foreigners are now unable to leave their respective countries and have lost their entire lifesavings.

7.      Instead, the Bad Actors stole Plaintiffs' funds and used them to:

(a)     purchase multiple homes, investment properties, a 151 foot yacht that cost almost $6,000,000, payoff millions of dollars of personal debt (including more than $266,000 in personal back taxes), luxury cars, vacations, and other accoutrements of a life of luxury;

(b)     grease all the wheels that furthered the criminal scheme, including using licensed attorneys who held a fiduciary duty to help fraudulently induce investments.

8.      Adding insult to grave injury, the Bad Actors have kept Plaintiffs in the dark, engaging in a practice of lulling, and have used the legal system to placate Plaintiffs and to cover up their conduct by bringing neutered, passive claims against one another and not seeking criminal prosecution.  While this may give the appearance -- to the press and to the courts -- that justice is being pursued, in reality the legal "actions" have done nothing to right the wrongs or return the funds, and are being controlled by the Bad Actors using the stolen funds of the EB-5 investors.  As a result, these actions, purportedly to help and on behalf of the victims, have actually hurt them and served as obstacles to their attempts to obtain visas, discover what happened, and ultimately seek redress.  Meanwhile the legal "actions" have resulted in almost no action whatsoever -- no criminal prosecutions, no asset forfeitures, and no meaningful injunctions.

9.     These legal "actions" have served to perpetuate the criminal scheme, whereby the Bad Actors have shamelessly boxed out the victims while they continue to dissipate the assets and have the legal claims relating to their criminal conduct adjudicated on the merits.  Upon information and belief, the Bad Actors are in the process of negotiating a final distribution of Plaintiffs' stolen funds among themselves, with the end game of representing such an agreement as a "mediation settlement" of all the claims.

10.     Plaintiffs come to this Court, with clean hands, seeking assistance in their pursuit for redress, justice, and the cessation of Defendants' continued use of their stolen funds.

11.     Plaintiffs, the true victims, now ask the Court, among other things, to immediately enter injunctions freezing and preserving what remains of their funds, dissolve and pierce the limited partnership and any other entities that have been or continue to be used to perpetrate fraud on Plaintiffs and others, and to enter all appropriate orders so that they can pursue their rights against all persons that received the stolen funds, benefited from the stolen funds, and/or actively conspired with or aided and abetted those that did.

12.     The fraudulent scheme operated as follows:

(a)     The Bad Actors preyed on Chinese and Iranian investors seeking a path to United States residency for themselves and their minor children.

(b)     The Bad Actors fraudulently obtained $500,000, plus $40,000 in administrative fees, from each foreign investor through the sale of alleged equity interests in Palm House Hotel, LLLP, a Florida limited liability partnership that would be involved in the development of the Palm House Hotel, claiming that the investment would qualify them under the EB-5 program administered by United States Citizenship and Immigration Services.

(c)     The Bad Actors materially, indeed crucially, represented, among other things, that:

(i)     There was a 100% guaranty for the return of Plaintiffs' investment and fees in the event their I-526 petition is denied;

(ii)     100% of Plaintiffs' funds would be held in escrow until their Form I-526 immigration petitions were approved by the United States government;

(iii)    A "limited number" of 79 equity interests would be sold in Palm House Hotel, LLLP at the price of $500,000 each, plus $40,000 in administrative fees;

(iv)     Plaintiffs' funds would be exclusively invested in the Palm House Hotel to create jobs by helping to finish the renovation and development, which was near completion;

(v)      The Palm House Hotel would be open for business by the "Season" of 2013/2014, and was 80-90% completed prior to Plaintiffs' investments;

(vi)     The funds would create 930 jobs, more than the required 790 full-time jobs for the offering;

(vii)    Plaintiffs' funds would be the third and final source of funds.  The EB5 funds were in addition to an equity investment by the developer in excess of $22,000,000 and a bank loan (by a bank that had done full due diligence justifying such a loan) in excess of $29,000,000.  Accordingly, Plaintiffs' funds constituted less than 50% of the project funding;

(viii)   Plaintiffs' funds would be held in escrow, and were not yet needed, because the developer's investment in excess of $22,000,000 and a bank loan in excess of $29,000,000 was being used for construction and renovation;

(ix)     Plaintiffs' funds would not be taken from the escrow account, and would not be used, unless and until the developer's investment in excess of $22,000,000 and the bank funds in excess of $29,000,000 had been used at the project;

(x)      The real property at issue was currently worth $110,000,000-$137,000,000 (the current value representation varied, depending on what the Bad Actors believed a particular Plaintiff wanted to hear) before completion, which made the investment "one of the safest EB-5 offerings from a Job Creation and Investment position."

(vii)    I-526 immigration petitions for the Palm House Hotel project had already been approved by the United States government for the initial investors;

(viii)    An insurance policy was purchased by the Developer that guaranteed that construction of the Palm House Hotel project would be completed;

(ix)    The local government guaranteed that construction of the Palm House Hotel project would be completed, and that this would be the last 5-star hotel property they would allow on Palm Beach;

(x)    The developer, Robert Matthews, was a famous real estate developer in the United States;

(xi)    Each investor's investment would be fully secured by the real property at issue and by the State of Florida pursuant to a UCC form. As there would be 79 rooms and 79 investors, each investor would be given a UCC security interest in an individual room; and

(xii)    Donald Trump and Bill Clinton would serve on the Palm House Hotel advisory board and would assist with any issues related to construction and also play a key role in recruiting celebrities and dignitaries to the club. Celebrities such as Tony Bennett, Celine Dion, Bill Koch, and Eric Schmidt were already members of the hotel club.

(e)    The Bad Actors targeted investors with children between the ages of 18 and 21 because, under the EB-5 program, applicants have the right to apply for a green card for themselves, their spouse, and unmarried children under 21. Once the investor's funds were stolen and time continued to pass without the issuance of an I-526 petition approval, the Bad Actors would use the fact that the investor's child had "aged out" to silence the investor, perpetrate the continuing fraud, and prevent the investor from seeking redress or judicial assistance. The Bad Actors threatened the investors that, if the Palm House Hotel investment was interfered with or terminated, because the investor's child was no longer under 21, they would no longer be able to obtain a green card through their parent and would need to obtain their own EB-5 visa through at an additional cost of $500,000.

(f)    As to any Plaintiff brave enough to question or demand the return of their investment, they were fraudulently told that all was well, that additional appeals of the application process were in place, that the country's foremost immigration attorney had been hired to prosecute the appeals, and that all was well with the construction of the hotel, thereby further lulling Plaintiffs and falsely allowing the Bad Actors to deny any rights to reimbursement. In truth, of course, the money was gone, no jobs were created, the federal government had closed the appeals, the immigration attorney was not retained to prosecute any appeals, the I-526 immigrant petitions were never issued, and the list of lies is virtually endless.

13.     The representations made to induce Plaintiffs' investments into the Palm House Hotel project were mostly lies, calculated to induce investments by needy, trusting, unsuspecting foreigners with $500,000 seeking to send their children to the United States for an education and the opportunity to pursue a life with more opportunities than those afforded to them in China and Iran.

14.     The 100% guaranty was not worth the paper it was printed on.  Plaintiffs' I-526 petitions were all denied, yet their funds were never returned.

15.     Instead of holding Plaintiffs' funds in escrow until their Form I-526 immigration petitions were approved, the funds were immediately stolen, distributed among the conspirators, and used for their self-indulgences.

16.     The conspirators did not sell 79 purported equity interests in Palm House Hotel, LLLP.  Despite registering this offering for only 79 units, they perpetrated this fraud on over 90 unsuspecting foreign investors (it is not known whether the scheme is continuing).

17.     Plaintiffs' funds were not exclusively used to help finish the renovation and development of the Palm House Hotel.  Instead the funds were used for unlawful purposes.

18.     The hotel was nowhere near completion, let alone anywhere close to capable of being open for business by the "Season" of 2013/2014.  As of the filing of the Complaint, it remains a dangerous nuisance and a desolate construction wasteland, accruing fines of $2,000 per day from the Town of Palm Beach.

19.     Plaintiffs' funds were not used to create 10 full-time jobs for each $500,000 advanced, which was the only purpose for the funds to come to the United States.  Further, the fact that at least 93, as opposed to 79 interests were sold, prevented that from occurring even if the project was not a complete charade.

20.     Plaintiffs' funds were not in addition to an equity investment by the developer in excess of $22,000,000 and a bank loan in excess of $29,000,000, so that Plaintiffs' funds constituted less than 50% of the project funding.  There was no bank loan, there was no developer's equity, and there was no other source of funds.

21.     The real property was not worth $110,000,000-$137,000,000.  Indeed, the property had been purchased out of foreclosure for $10,000,100, and was recently described by a court-appointed receiver as "circling the drain."

22.     No investor's I-526 immigration petition for the Palm House Hotel project was ever approved by the United States government.  While the Bad Actors had provided a written notice of approval for the project, the notice was fraudulent and did not relate to the Palm House Hotel project.

23.     There was no insurance policy that guaranteed the completion of construction of the Palm House Hotel project.  The Bad Actors had fraudulently represented that certain documentation was an American surety bond guaranteeing performance when, in reality, it was not.

24.     The local government never guaranteed the completion of construction of the Palm House Hotel or certified it as a 5-star property.  Instead, the local government was imposing significant fines against the property.

25.     Robert Matthews is not a famous real estate developer in the United States.

26.     Each investor's investment was not fully secured by the real property or the State of Florida.  In fact, a secret, unrecorded mortgage in the amount of $27,468,750 was granted to the prior developer of the project in August 2013, which was not recorded until March 28, 2014 -- seven (7) months after it was granted -- and after almost all Plaintiffs had undertaken their due

diligence and wired their investments for the project.   A mortgage to secure Plaintiffs' interest in the real property was not recorded until October 2014, after whatever equity existed in the project had been subsumed by the prior developer's secret mortgage.

27.     Bill Clinton and Donald Trump are not on the Palm House Hotel advisory board, and there is no such board.

## PARTIES, JURISDICTION, AND VENUE

28.     This action involves, among other things, common law and securities fraud, theft, conspiracy, breach of fiduciary duty, and racketeering that was perpetrated on Plaintiffs to obtain each of their investments and "administrative fees" of $500,000 and $40,000, respectively.

29.     This action also relates to the unlawful conduct of additional defendants who, among other things, (i) aided and abetted the primary wrongdoers in their acts of fraud and theft from Plaintiffs; (ii) were unjustly enriched by their unauthorized receipt of Plaintiffs' funds; (iii) were the recipients of fraudulent transfers; or (iv) were otherwise independently engaged in unlawful acts.

30.     Plaintiffs are foreign nationals that were fraudulently induced to each invest $500,000, plus $40,000 in administrative fees, based on the representations made by Joseph Walsh, Joseph Walsh, Jr., J. Marcus Payne, Kevin Wright, David Levinson, Robert Matthews, South Atlantic Regional Center, LLC, USREDA, LLC, JJW Consultancy Ltd., Ali Herischi, Herischi & Associates LLC, Ali Soltani, and Washington Marketing LLC.

31.     Palm House Hotel, LLLP ("Palm House") is a Florida limited liability limited partnership with its principal place of business in Palm Beach County, Florida.  Plaintiffs were fraudulently induced to each invest $500,000 into Palm House in exchange for an interest, the false promises of United States EB-5 visas, and the ultimate return of their investment, with interest.

32.     Joseph Walsh ("Walsh") is an individual who, upon information and belief, resides in Palm Beach County, Florida, and is otherwise *sui juris.*  Walsh served as a general partner of Palm House until July 2016, and owns and/or operates and/or controls South Atlantic Regional Center, LLC and USREDA, LLC.   Upon information and belief, Walsh was the criminal mastermind behind the Palm House Hotel fraudulent scheme, and organized all the players and their respective roles.    Walsh and his accomplices made material, false representations to Plaintiffs that induced them to provide and continue with their investments.  Further, Walsh arranged to provide legal services, through his company USREDA, to Plaintiffs in connection with the processing of their EB-5 visa applications.  This served several purposes for the Bad Actors.  It provided a lawyer's blessing to all of the documentation, and ensured that outside lawyers would not be hired by the non-English speaking investors.

33.     Joseph Walsh, Jr. ("Walsh Jr.") is an individual who resides in Palm Beach County, Florida, and is otherwise *sui juris.*  Walsh Jr. is the son of Walsh and owns and/or operates and/or controls South Atlantic Regional Center, LLC, USREDA, LLC, and JJW Consultancy, Ltd.  Walsh Jr. and his accomplices made material, false representations to Plaintiffs that induced them to provide and continue with their investments.  As of the filing of this Complaint, Walsh Jr. continues to make such misrepresentations.

34.     J. Marcus Payne ("Payne") is an individual who, upon information and belief, resides in Canada and is otherwise *sui juris.*  Payne is an attorney, served as a general partner of Palm House until July 2016, and owns and/or operates and/or controls South Atlantic Regional Center, LLC and USREDA, LLC.    Payne and his accomplices made material, false representations to Plaintiffs that induced them to provide their investments.  Payne is subject to personal jurisdiction in Florida because he operated, conducted, engaged in, or carried on a

business or business venture in this state and/or committed a tortious act within this state and/or is engaged in substantial and not isolated activity within the State of Florida.

35.     David Derrico ("Derrico") is an individual who resides in Palm Beach County, Florida, and is otherwise *sui juris.*  Derrico was the attorney for Walsh, Walsh Jr., SARC and USREDA, and helped draft the fraudulent documentation used in the scheme.

36.     South Atlantic Regional Center, LLC ("SARC") is a Florida limited liability company with its principal place of business in Palm Beach County, Florida.  SARC is a regional center approved by the United States Citizenship and Immigration Services ("USCIS").  Walsh, Walsh Jr., and Payne represented to Plaintiffs that SARC was the general partner of Palm House (it was not).  SARC made material, false representations to Plaintiffs that induced them to provide their investments.  SARC was intended to, and did, influence Plaintiffs to trust and rely upon it rather than hire outside advisors who might ask difficult questions, make difficult demands, or discover the fraudulent scheme that was being perpetrated.

37.     USREDA, LLC, is a Delaware limited liability company with its principal place of business in Palm Beach County, Florida ("USREDA").  USREDA acted as a law firm and contracted to provide legal immigration services to the Chinese Victims regarding the EB-5 Visa program.  USREDA guaranteed the approval of any I-526 application it completed and the return of all service fees in the event of denial.  USREDA made material, false representations to the Chinese Victims that induced them to provide their investments.  USREDA was intended to, and did, influence the Chinese Victims to trust and rely upon it rather than hire outside advisors and attorneys who might ask difficult questions, make difficult demands, or discover the fraudulent scheme that was being perpetrated.

38.     JJW Consultancy, Ltd. is a foreign entity through which Walsh and Walsh, Jr. made material, false representations to the Chinese Victims that induced them to provide and continue with their investments.  JJW Consultancy, Ltd. is subject to personal jurisdiction in Florida because it operated, conducted, engaged in, or carried on a business or business venture in this state and/or committed a tortious act within this state and/or is engaged in substantial and not isolated activity within the State of Florida and/or operated merely as a corporate front for the fraudulent actions of Walsh and Walsh Jr.

39.     Fang Cheng ("Cheng") is an individual who, upon information and belief, resides in Hong Kong, and is otherwise *sui juris.*  Cheng works for Walsh and Walsh Jr., and her job is to fraudulently induce Chinese investors into their EB-5 investment schemes.  Cheng made substantial material, false representations that were integral in inducing the Chinese Victims to provide their investments.  Cheng is subject to personal jurisdiction in Florida because she operated, conducted, engaged in, or carried on a business or business venture in this state and/or committed a tortious act within this state and/or is engaged in substantial and not isolated activity within the State of Florida.

40.     Kevin Wright ("Wright") is an individual who, upon information and belief, resides in Palm Beach County, Florida, and is otherwise *sui juris.*  Wright served as a key agent for Walsh, Walsh Jr., Payne, South Atlantic Regional Center, LLC, USREDA, LLC, and Robert Matthews, making substantial material, false representations that were integral in inducing the Chinese Victims to provide and continue with their investments.  Wright proclaims to be a professional EB-5 program writer and economic analyst, having completed over 650 business plans and 500 economic impact studies, with a 100% USCIS approval success rate.  Wright, among others, was brought into the scheme to add credibility, as the investors were told that

Wright was an established, well-known EB-5 economist. Wright is subject to personal jurisdiction in Florida because he operated, conducted, engaged in, or carried on a business or business venture in this state and/or committed a tortious act within this state and/or is engaged in substantial and not isolated activity within the State of Florida.

41.     David Levinson ("Levinson") is an individual who, upon information and belief, resides in California, and is otherwise *sui juris*. Levinson served as a key agent for Walsh, Walsh Jr., Payne, South Atlantic Regional Center, LLC, USREDA, LLC and Robert Matthews, making substantial material, false representations that were integral in inducing the Chinese Victims to provide their investments. Levinson speaks fluent Chinese and was the "mouthpiece" for many of the fraudulent statements made to the Chinese Victims. Levinson is subject to personal jurisdiction in Florida because he operated, conducted, engaged in, or carried on a business or business venture in this state and/or committed a tortious act within this state and/or is engaged in substantial and not isolated activity within the State of Florida.

42.     Ali Herischi is an internationally recognized attorney, frequently appears on international television to discuss Iranian politics and issues relating to political refugees and, upon information and belief, resides in Bethesda, Maryland, and is otherwise *sui juris*. Mr. Herischi and his law firm, Herischi & Associates LLC, served as a key agent for Walsh, Walsh Jr., Payne, South Atlantic Regional Center, LLC, and USREDA, LLC, and Robert Matthews, making substantial material, false representations that were integral in inducing the Iranian Victims to provide and continue their investments[1]. Mr. Herischi speaks fluent Farsi and was the "mouthpiece" for the fraudulent statements made to the Iranian Victims. Mr. Herischi gave presentations on the Palm House Hotel project, strongly dissuaded the Iranian Victims from

---

[1] During the period in which Herischi was promoting and soliciting investors for the Palm House Hotel project, his office voicemail message, in Farsi, said: "You have reached the Palm House Hotel project, please leave your name, message, and phone number and we will call you back as soon as possible."

pursuing other investment opportunities, and assured the Iranian Victims that the project was legitimate.  In exchange for his delivery of the Iranian Victims into the fraudulent scheme, Mr. Herischi and his law firm received, among other things, an undisclosed secret kickback of $40,000 per investor.  Mr. Herischi later admitted his involvement in a letter.  Mr. Herischi and his law firm, Herischi & Associates LLC, are subject to personal jurisdiction in Florida because they operated, conducted, engaged in, or carried on a business or business venture in this state and/or committed a tortious act within this state.

43.     Ali Soltani is an individual who, upon information and belief, resides in Washington, DC, and is otherwise *sui juris*.  Soltani worked for Ali Herischi, as his business development manager, and made substantial material, false representations that were integral in inducing the Iranian Victims to provide their investments.  Soltani also travelled to Iran to meet with the Iranian Victims in furtherance of inducing them to make their investments in the Palm House Hotel project.  Soltani is subject to personal jurisdiction in Florida because he operated, conducted, engaged in, or carried on a business or business venture in this state and/or committed a tortious act within this state and/or is engaged in substantial and not isolated activity within the State of Florida.

44.     Washington Marketing, LLC is a Maryland limited liability company that was used by Walsh, Walsh Jr., Payne, South Atlantic Regional Center, LLC, Ali Herischi and Ali Soltani to defraud the Iranian Victims.  Upon information and belief, this entity was used to funnel the secret, undisclosed kickbacks of $40,000 per investor that were paid to Ali Herischi and his law firm, Herischi & Associates LLC, for each Iranian Victim that they delivered into the Palm House Hotel fraud.  Washington Marketing, LLC is subject to personal jurisdiction in

Florida because it operated, conducted, engaged in, or carried on a business or business venture in this state and/or committed a tortious act within this state.

45.     Palm House, LLC is a Delaware limited liability company that was formed to complete the renovations and development of the Palm House Hotel.   Upon approval of Plaintiffs' Form I-526 immigration petitions, Palm House was supposed to loan Plaintiffs' money to Palm House LLC so that it could complete the development of the hotel and pay off the purported $29,000,000 bank loan.   In return, Palm House was supposed to obtain a first mortgage on the real property that fully secured the debt.

46.     Robert Matthews is an individual who, upon information and belief, resides in Palm Beach County, Florida, and is otherwise *sui juris.*  Robert Matthews represented himself as the developer of the Palm House Hotel project, and claimed to be in charge of Palm House, LLC and the construction and renovation of the Palm House Hotel.  Robert Matthews stole several million dollars of Plaintiffs' money, using it to purchase real property and a 151' yacht with his wife (which he named ALIBI), among other things.  Robert Matthews met with the Chinese Victims' immigration agents in Palm Beach, and helped induce the Chinese Victims to provide their investments.

47.     Maria a/k/a Mia Matthews is an individual who, upon information and belief, resides in Palm Beach County, Florida, and is otherwise *sui juris.*  Maria a/k/a Mia Matthews is the wife of Robert Matthews and, along with him, stole several million dollars of Plaintiffs' money, using it to purchase a 151' yacht, among other things.  Maria a/k/a Mia Matthews met with the Chinese Victims' immigration agents in Palm Beach, and helped induce the Chinese Victims to provide their investments.

48.     Gerry Matthews is an individual who, upon information and belief, resides in Connecticut, and is otherwise *sui juris*. Gerry Matthews is the brother of Robert Matthews, an owner of Palm House LLC, and was instrumental in allowing Robert Matthews to access and steal several million dollars of Plaintiffs' money. Gerry Matthews is subject to personal jurisdiction in Florida because he operated, conducted, engaged in, or carried on a business or business venture in this state and/or committed a tortious act within this state.

49.     Ryan Black is an individual who, upon information and belief, resides in Palm Beach County, Florida, and is otherwise *sui juris*. Ryan Black is/was an owner of Palm House LLC. Upon information and belief, Ryan Black was involved in the conspiracy to steal millions of dollars of Plaintiffs' money.

50.     160 Royal Palm LLC is a Florida limited liability company and the owner of the real property located at 160 Royal Palm Way, Palm Beach, Florida, upon which the Palm House Hotel is located. This company is owned entirely by Palm House, LLC, which purchased the membership interests from Glenn Straub in 2013. As consideration, 160 Royal Palm LLC granted a $27,468,750 mortgage to Straub's entity, Defendant KK-PB Financial LLC, which was kept secret and not recorded until March 28, 2014, after most of the Plaintiffs had conducted their due diligence and made their investments.

51.     Palm House PB, LLC is a Florida limited liability company that, upon information and belief, was formed for the purpose of hiding and stealing Plaintiffs' money. One or more bank accounts were opened in the name of Palm House PB, LLC, and Plaintiffs' stolen money was transferred to such accounts and then used to purchase a 151 foot yacht, among other things.

52.     Mirabia, LLC, is a Delaware limited liability company.  Upon information and belief, Robert Matthews used this entity to hide and steal Plaintiffs' money and to purchase investment property near the Palm House Hotel.

53.     Bonaventure 22, LLC is a Florida limited liability company that, upon information and belief, Maria a/k/a Mia Matthews used to hide and steal Plaintiffs' money.

54.     Alibi Ltd. is a Cayman Islands company and Alibi LLC is a Delaware limited liability company.   Maria a/k/a Mia Matthews used these companies to hide and steal Plaintiffs' money and to purchase a 151' yacht that cost approximately $6,000,000.

55.     Leslie Robert Evans is an attorney based in Palm Beach, Florida.  Mr. Evans and his law firm, Leslie Robert Evans & Associates, P.A. (together, the "Evans Defendants"), accepted a transfer of Plaintiffs' funds into their trust account after they were stolen from the escrow account at PNC Bank.  The Evans Defendants then distributed Plaintiffs' funds to persons and accounts selected by the conspirators, and paid themselves compensation to do so.

56.     Nicholas Laudano ("Laudano") is an individual who, upon information and belief, resides in Palm Beach County, Florida, and is otherwise *sui juris.*  Laudano held himself out as the general contractor on the Palm House Hotel project, and entered into a construction contract to build the project.  Laudano runs two (2) pizza restaurants, and is not a licensed general contractor.  Laudano received and accepted Plaintiffs' stolen funds, and aided and abetted Robert Matthews and Maria a/k/a Mia Matthews in their theft of millions of dollars of Plaintiffs' money.

57.     New Haven Contracting South, Inc., is a company owned and operated by Laudano, and entered into a construction contract to build the Palm House Hotel project. Laudano used this entity to receive, accept, and steal millions of dollars of Plaintiffs' money.

58.     NJL Development Group, LLC and Botticelli Advisors, LLC are entities that Laudano used to steal Plaintiffs' money for the purpose of purchasing a mansion in Connecticut on behalf of and/or for the benefit of Robert Matthews and Maria a/k/a Mia Matthews.  Botticelli Advisors, LLC is a Florida limited liability company and the managing member of NJL Development Group, LLC, a Delaware limited liability company.

59.     KK-PB Financial, LLC is a Florida limited liability company owned and/or controlled by Glenn Straub, the former owner of 160 Royal Palm LLC, which owns the real property on which the Palm House Hotel is located.  Mr. Straub sold his interest in 160 Royal Palm LLC in August 2013 of $10.00 USD, and received a mortgage for $27,468,750 in favor of KK-PB Financial, LLC, as consideration.  However, KK-PB Financial, LLC did not record its mortgage until seven (7) months later, on March 28, 2014, which created the façade that the real property was unencumbered by such a debt and that Plaintiffs would, indeed, obtain a first mortgage on the real property that fully secured their investment once the purported bank loan was paid off.  Further, KK-PB Financial, LLC improperly benefited from the scheme by receiving transfers of Plaintiffs' stolen money.

60.     As described above, this Court has personal jurisdiction over Defendants because they participated in tortious acts directed towards Florida, do sufficient business in Florida, have sufficient minimum contacts with Florida, and/or otherwise intentionally avail themselves of the Florida consumer market through the promotion of their services.  This purposeful availment renders the exercise of jurisdiction by this Court over Defendants permissible under traditional notions of fair play and substantial justice.

61.     Claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the

SEC, 17 C.F.R. §240.10b-5.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

62.     The Court also has jurisdiction under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962, and supplemental state law jurisdiction.

63.     In connection with the conduct alleged herein, the Bad Actors, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the United States mails and interstate telephone communications.

64.     Venue is proper in this forum pursuant to 28 U.S.C. § 1391, 15 U.S.C. §78aa, and 18 U.S.C. §1965 because a substantial part of the acts, transactions, and events giving rise to the claims occurred, and a substantial part of property that is the subject of the action is situated, in Palm Beach County, Florida.   Additionally, SARC, USREDA, Walsh, Walsh Jr., Robert Matthews, Maria a/k/a Mia Matthews, and Laudano are residents of Palm Beach County, Florida, and transact business in Palm Beach County, Florida, and the other individual Defendants either reside in Palm Beach County, Florida, transacted in substantial business activities in Palm Beach County, Florida, or had an agent in Palm Beach County, Florida.

65.     With the exception of service of the civil theft demand letter necessary for treble damages in connection with a civil theft damages claim, all conditions precedent to this action have been performed, have occurred or have been waived.  Plaintiffs reserve the right to amend this complaint to seek treble damages after the requisite period of time has passed with respect to their civil theft demand letter pursuant to Chapter 772 of the Florida Statutes.

66.     Plaintiffs have retained the undersigned counsel to represent them in this action and have agreed and obligated to pay a reasonable fee for their services.

## GENERAL ALLEGATIONS

### EB-5 Visa Program in General

67.     The Immigrant Investor Program, more commonly known as the EB-5 program, was created by the Immigration Act of 1990.  Congress established the EB-5 program to stimulate the U.S. economy by giving immigrant investors the opportunity to permanently live and work in the United States after they have invested in a new commercial enterprise (''NCE'').  In the case of an NCE that is located in a Targeted Employment Area ("TEA"), *i.e.,* either a rural area or an area beset by high unemployment, the required equity investment need only be $500,000.

68.     In 1993, Congress created the Immigrant Investor Pilot Program to increase interest in the EB-5 visa program. This new pilot program established EB-5 Regional Centers ("Regional Centers"), which are entities that receive special designation from the United States Citizenship and Immigration Services ("USCIS") to administer EB-5 investments and create jobs.  Public and private entities may apply to the USCIS for approval as an EB-5 Regional Center.

69.     EB-5 visa programs administered by a Regional Center provide more flexibility, because the immigrant investor who invests in such a program is permitted to take credit not only for direct jobs created in the NCE but also "indirect jobs" created outside the NCE in a job creating enterprise ("JCE"), such as a construction contracting firm that builds an improvement for the NCE.  In addition, the immigrant investor need not handle the day-to-day management of the NCE or even necessarily live in the region where the NCE is located.

70.     By necessity, investments into an EB-5 program are "closed-ended," available only to a specified number of investors, and that number is tied to the number of direct or

indirect jobs created by the investment. If too few jobs are created with the money invested, the immigrant will not be able to become a permanent resident in the United States.

## EB-5 Practice and Procedure

71.     Under the EB-5 program, the immigrant investor first applies for an immigrant visa by submitting a Form I-526, Immigrant Petition for Alien Entrepreneur.  USCIS' approval of the Form I-526 is conditioned upon the immigrant's investment of the requisite amount of money in an NCE that satisfies the applicable legal requirements.  Upon approval of the Form I-526 petition, the immigrant investor may either: (1) file the appropriate form to adjust their status to a conditional permanent resident within the United States; or (2) file an application to obtain an EB-5 visa for admission to the United States.  Upon the approval of the application or upon entry into the United States with an EB-5 immigrant visa, the EB-5 investor and derivative family members will be granted conditional permanent residence for a two-year period.

72.     To remove the conditional resident status, the immigrant investor must file a Form I-829, Petition by Entrepreneur to Remove Conditions, ninety days before the two-year anniversary of the granting of the EB-5 investor's conditional resident status. USCIS' approval of the Form I-829 is conditioned upon proof that the immigrant investor's investment has created at least ten full-time jobs in the NCE or JCE. If an insufficient number of jobs was created, the foreign national is subject to removal from the United States.

## EB-5 Program at the Palm House Hotel

73.     SARC held itself out as an EB-5 Regional Center, headquartered in Palm Beach County, Florida, and claimed to specialize in investment-based immigration services.

74.     SARC was approved by USCIS to serve as a Regional Center, which allowed EB-5 investors to take credit for direct and indirect jobs and not be involved in the day-to-day operation of the NCE.

75.     SARC was operated and controlled by Walsh, Walsh, Jr., and Payne.

76.     USREDA was an entity that claimed to specialize in providing legal immigration services regarding the EB-5 Visa program, held itself out as a law firm, and required clients to sign engagement letters for its services.  It charged clients $15,000.00 USD to file a 526 petition and an additional $5,000.00 USD to file an 829 petition.

77.     USREDA was operated and controlled by Walsh, Walsh, Jr., and Payne.

78.     SARC, USREDA, Walsh, Walsh Jr., Payne, and Robert Matthews retained Levinson and Wright to help them sell the Palm House Hotel fraud to the Chinese Victims.

79.     Levinson is experienced in EB5 marketing and is fluent in Chinese, including the various accents used in certain provinces.  Levinson understands the Chinese culture, the Chinese investment process, and the various investment features and safeguards that Chinese investors typically seek when making investments.  Levinson used this knowledge and his sales skills to help swindle the Chinese Victims.  Levinson also hosted potential investors in Florida and provided tours of the Palm House project.

80.     Wright is known in China as an exceptional EB-5 economist, and someone that has been instrumental in the approval of many EB-5 programs.  Wright does not speak Chinese, and his statements were translated to the Chinese Victims by Levinson and others.  In his presentations, Wright used his experience and reputation to give his strong endorsement to the Palm House Hotel project, Walsh and his accomplices, and Robert Matthews, which carried great weight in China.  Wright also hosted potential investors in Florida and provided tours of the Palm House project.

81.     Beginning in 2013, Walsh, Walsh Jr., Cheng, Wright and Levinson went to China to solicit the Chinese Victims regarding the EB-5 program at the Palm House Hotel.

82.     SARC, USREDA, Walsh, Walsh, Jr., Payne, and Robert Matthews retained Ali Herischi to help them sell the Palm House Hotel fraud to the Iranian Victims.

83.     Ali Herischi is an attorney, based in Washington, DC, that is well known to Iranians in both the United States and Iran.  Herischi speaks fluent Farsi, and frequently appears on international television to speak about Iranian political and refugee issues.  Herischi holds himself out as an advocate for Iranians seeking a better life in the United States, and has built a law practice on that basis.  Herischi understands the Iranian culture, the Iranian investment process, and the various investment features and safeguards that Iranian investors typically seek when making investments.  Herischi used this knowledge, his Iranian heritage, and the fact that he was a well-respect attorney among the Iranian community (and could therefore be trusted), to help swindle the Iranian Victims.

84.     Beginning in 2013, Ali Herischi, his business development manager, Ali Soltani, and Washington Marketing, LLC solicited the Iranian Victims regarding the EB-5 program at the Palm House Hotel.  This included co-hosting investment seminars and meeting with potential investors in luxurious hotels in Dubai.

85.     During the Palm House Hotel solicitations, Plaintiffs were provided with three (3) items:

(a)     Frequently Asked Questions (the "FAQ").  A true and correct copy of the FAQ provided to the Chinese Victims and Iranian Victims is attached as Exhibits "A" and "B," respectively;

(b)     Sales Brochure (the "Sales Brochure").  A true and correct copy of the Sales Brochure provided to the Chinese Victims and Iranian Victims is attached as Exhibits "C" and "D," respectively; and

(c)     Signature Booklet (the "Signature Booklet").  A true and correct copy of the Signature Booklet provided to the Chinese Victims and Iranian Victims is attached as Exhibits "E" and "F," respectively.  Collectively, the FAQ, Sales Brochure, and Signature Booklet will be referred to as the "Offering Documents."

86.     While the Signature Booklet contained signature pages for a Private Placement Memorandum (the "PPM") and a Palm House limited partnership agreement (the "Palm House Limited Partnership Agreement"), Plaintiffs were not provided with copies of the full documents until after they made their investments, and after they demanded them when it was becoming more and more clear that something was wrong.  Copies of the PPM and Limited Partnership Agreement provided to Plaintiffs are attached as Exhibits "G" and "H," respectively.

87.     Additionally, during the Palm House Hotel solicitations, the Chinese Victims were provided with a writing claiming that an I-526 petition for an early Palm House Hotel investor had been approved by USCIS, thereby assuring the Chinese Victims that, if they invested in the project, they too would soon obtain approval (the "USCIS Approval"), a true and accurate copy is attached as Exhibit "I."

88.     The representations in the Offering Documents, the PPM, the Palm House Limited Partnership Agreement, and the USCIS Approval were originally made by Walsh, Walsh Jr., Payne, and David Derrico on behalf of their companies, SARC and USREDA.

89.     JJW Consultancy Ltd., Cheng, Wright, and Levinson adopted and sold the representations in the Offering Documents and the USCIS Approval when selling the Palm House Hotel project to the Chinese Victims.

90.     Ali Herischi, Herischi & Associates LLC, Ali Soltani, and Washington Marketing LLC adopted and sold the representations in the Offering Documents when selling the Palm House Hotel project to the Iranian Victims.

**Nefarious Lies**

91.     SARC, USREDA, Walsh, Walsh Jr., Payne, Derrico, JJW Consultancy Ltd., Cheng, Wright, Levinson, Ali Herischi, Herischi & Associates LLC, Ali Soltani, Washington

Marketing LLC and Robert Matthews each made material, knowingly false representations to induce Plaintiffs to invest into the project.

92.     Further, SARC, USREDA, Walsh, Walsh Jr., Payne, Derrico, JJW Consultancy Ltd., Cheng, Wright, Levinson, Ali Herischi, Herischi & Associates LLC, Ali Soltani, Washington Marketing LLC and Robert Matthews each withheld material information that they had a duty to disclose.

93.     Each limited partnership unit in Palm House required a minimum investment of $500,000, plus an administrative fee of $40,000.

94.     Any subscription funds received from Plaintiffs were to be held in a special escrow account (the "Escrow Account").

95.     Among the many misrepresentations, Plaintiffs were promised that their monies would be held in the Escrow Account and released to Palm House, LLC only if and when their I-526 applications were approved by USCIS (the "Escrow Representation").

96.     The Escrow Representation was made to Plaintiffs several times, and in several documents.

97.     The Escrow Representation was made to Plaintiffs in the PPM.  See Exhibit G at p. 15, 37, 38, and 41.

98.     The Escrow Representation was made to Plaintiffs in the Limited Partnership Agreement.  See Exhibit H at p. 6.

99.     The Escrow Representation was made in the loan agreement between Palm House and Palm House LLC (the "Loan Documents," attached as Exhibit "J"), where Palm House, LLC, on the one hand, and Walsh, SARC, and Palm House, on the other hand, agreed that the loan was dependent on USCIS' approval of Plaintiffs' I-526 petitions.  See Exhibit J at p.1.

100.    If an investor's I-526 application was denied by USCIS, the investor was promised that they would receive their money back within 90 days of the official denial notice.

101.    There were many other knowingly false representations in the Offering Documents, including but not limited to:

(a)    There was a 100% guaranty for the return of Plaintiffs' investment and fees in the event their I-526 petition is denied;

(b)    There would be a maximum of 79 limited partnership units offered in Palm House;

(c)    They were seeking, in total, a $39,5000,000.00 investment into Palm House, which was equal to the maximum of 79 limited partnership units being offered at $500,000 each;

(d)    USREDA guaranteed the approval of any I-526 application it completed and the return of all service fees in the event of denial;

(e)    SARC was the general partner of Palm House;

(f)    The developer had already invested $22,000,000 of their own equity into the project;

(g)    There was a bridge loan from a bank, in the amount of $29,500,000, to allow continuation of the construction while the EB-5 money was raised;

(h)    The EB-5 investment represents only 43% of the total investment in the project;

(i)    The project was in progress, "very near completion," and would be complete for "Season" of 2013/2014;

(j)    The Palm House Hotel would be the last 5-star hotel to be approved by the local government on Palm Beach;

(k)    Investors need not worry about any potential delays in building or regulatory issues;

(l)    Bill Clinton, Donald Trump, Celine Dion, Bill Koch, and Eric Schmidt would be a part of the Palm House Hotel advisory board;

(m)    The real property at issue, on which the Palm House Hotel was being renovated, was presently worth over $110,000,000 before completion.  "This makes the Palm House Hotel one of the safest EB5 offerings from a Job Creation and Investment position."

(n)     The job count for the Palm House project is 953 jobs, while the project needs only 790 jobs, so over 20% more jobs will be created than required by law;

(o)     The investor's visa would be approved in less than 6 months; and

(p)     "The investor need not worry if the project will perform and meet the rigid standards required by the USCIS."

102.     Armed with the Offering Documents, the USCIS Approval, presentations, and whatever oral representations they deemed necessary for a sale, SARC, USREDA, Walsh, Walsh Jr., Payne, Derrico, JJW Consultancy, Ltd., Cheng, Wright, Levinson, Ali Herischi, Herischi & Associates LLC, Ali Soltani, Washington Marketing LLC and Robert Matthews sold the fraud that is the Palm House Hotel project.

103.     Beginning in 2013, SARC, USREDA, Walsh, Walsh Jr., Payne, Derrico, JJW Consultancy, Ltd., Cheng, Wright, Levinson, and Robert Matthews fraudulently induced the Chinese Victims to provide their investments.

104.     In China, SARC, USREDA, Walsh, Walsh Jr., JJW Consultancy, Ltd., Cheng, Wright, and Levinson made presentations to the Chinese Victims using the Offering Documents, the USCIS Approval, presentation materials, and oral statements.

105.     In China, SARC, USREDA, Walsh, Walsh Jr., JJW Consultancy, Ltd., Cheng, Wright, and Levinson used a PowerPoint presentation that contained knowingly false representations to fraudulently induce the Chinese Victims (the "PowerPoint Presentation").  A true and correct copy of the PowerPoint Presentation is attached as Exhibit "K."

106.     SARC, USREDA, Walsh, Walsh Jr., JJW Consultancy, Ltd., Cheng, Wright, and Levinson represented to the Chinese Victims that the statements in the Offering Documents were true and accurate.

107.     SARC, USREDA, Walsh, Walsh Jr., JJW Consultancy, Ltd., Cheng, Wright, and Levinson also made oral, materially false statements to the Chinese Victims.

108.     In their solicitations to the Chinese Victims, SARC, USREDA, Walsh, Walsh Jr.,

JJW Consultancy, Ltd., Cheng, Wright, and Levinson stated that:

(a)     There was a 100% guaranty for the return of Plaintiffs' investment and fees in the event their I-526 petition is denied;

(b)     100% of Plaintiffs' funds would be held in escrow until their Form I-526 immigration petitions were approved by the United States government;

(c)     A "limited number" of 79 equity interests would be sold in Palm House Hotel, LLLP at the price of $500,000 each, plus $40,000 in administrative fees;

(d)     Plaintiffs' funds would be exclusively invested in the Palm House Hotel to create jobs by helping to finish the renovation and development, which was near completion;

(e)     The Palm House Hotel would be open for business by the "Season" of 2013/2014, and was 80-90% completed prior to Plaintiffs' investments;

(f)     The funds would create more than 10 full-time jobs for each $500,000 advanced;

(g)     Plaintiffs' funds were in addition to an equity investment by the developer in excess of $22,000,000 and a bank loan in excess of $29,000,000, so that Plaintiffs' funds constitute less than 50% of the project funding;

(h)     Plaintiffs' funds would be held in escrow, and were not yet needed, because the developer's investment in excess of $22,000,000 and a bank loan in excess of $29,000,000 was being used for construction;

(i)     Plaintiffs' funds would not be taken from the escrow account, and would not be used, unless and until the developer's investment in excess of $22,000,000 and the bank funds in excess of $29,000,000 had been used at the project;

(j)     The real property at issue was currently worth $110,000,000-$137,000,000 (the current value representation varied, depending on what the Bad Actors believed a particular Plaintiff wanted to hear) before completion, which made the investment "one of the safest EB-5 offerings from a Job Creation and Investment position."

(k)     I-526 immigration petitions for the Palm House Hotel project had already been approved by the United States government;

(l)     An insurance policy guaranteed that construction of the Palm House Hotel project would be completed;

(m)     The local government guaranteed that construction of the Palm House Hotel project would be completed, and that this would be the last 5-star hotel property allowed on Palm Beach;

(n)     The developer, Robert Matthews, was a famous real estate developer in the United States, equivalent in status to Donald Trump;

(o)     Each investor's investment would be fully secured by the real property at issue and by the State of Florida pursuant to a UCC form[2];

(p)     Donald Trump and Bill Clinton would serve on the Palm House Hotel advisory board;

(q)     If an investor's application was denied by USCIS, they would receive their money back immediately;

(r)     The general contractor, Laudano, was an experienced and famous hotel developer, and had developed luxury hotels around the United States;

(s)     The project would have a net profit in excess of $7,000,000, and would easily refund the investors' money;

(t)     Inga Moore, a famous hotel designer and the winner of the Top Hotel Designer of 2013, had designed the Palm House Hotel; and

(u)     Niklaus Leuenberger, with 30 years of management experience in luxury hotels around the world, had agreed to manage the Palm House Hotel.

109.    The Bad Actors made representations to the Chinese Victims' immigration agents with the understanding and intent that they would relay the representations to the Chinese Victims and that the Chinese Victims would rely upon those representations.

110.    After the presentations in China, the Chinese Victims' immigration agents came to Palm Beach, Florida, to inspect the project and meet with Robert Matthews, Levinson, and Wright.

111.    In Palm Beach, Robert Matthews, Levinson, and Wright were instrumental in sealing the deal with the Chinese Victims.

---

[2] Attached as Exhibit "L" is a copy of the UCC form.

112.     In Palm Beach, Robert Matthews, Levinson and Wright showed the Chinese Victims' immigration agents the plans for the project, and represented that the funds would be exclusively used to help finish the renovation and development.

113.     In Palm Beach, Robert Matthews, Levinson and Wright reiterated that the Chinese Victims' funds would remain in escrow until their I-526 petitions were approved, and that they were using the proceeds of a construction loan in the meantime.

114.     In Palm Beach, Robert Matthews, Levinson and Wright showed the Chinese Victims' immigration agents Robert Matthews' home, represented that it was worth over $40,000,000, that he was a successful and famous developer on par with Donald Trump, that he was married to a famous American movie star (Defendant Maria a/k/a Mia Matthews), that he was the head of several charitable organizations, and that he was a trustworthy and honorable person deserving of their business.

115.     In Palm Beach, Robert Matthews, Levinson and Wright took the Chinese Victims' immigration agents to a charity event at Mar-a-Lago, introduced them to Donald Trump, and arranged for them to take pictures with Donald Trump in an effort to further create the façade that Robert Matthews was an important, wealthy, and trustworthy member of American society and on par with Donald Trump.

116.     In Palm Beach, Robert Matthews, Levinson and Wright staged the Palm House Hotel work site, hiring "workers" to be present at the site in order to create the appearance that work was actually being performed.  Plaintiffs subsequently learned that this was merely an acting job, and that the "workers" were hired for appearances only.

117.     In Palm Beach, Robert Matthews, Levinson and Wright represented to the Chinese Victims' immigration agents that the project had all necessary permits and approvals,

that there were no regulatory issues, and that the project would be completed in approximately 6 months.

118.   Robert Matthews, Levinson and Wright never disclosed that the project was being fined $2,000 per day, since February 2013, by the Town of Palm Beach.

119.   Robert Matthews, Levinson and Wright never disclosed that Laudano, the purported general contractor, was unqualified to perform the work at the Palm House Hotel and was not even a licensed general contractor.

120.   Beginning in 2013, SARC, USREDA, Walsh, Walsh Jr., Payne, Derrico, Ali Herischi, Herischi & Associates LLC, Ali Soltani, and Washington Marketing LLC fraudulently induced the Iranian Victims to provide their investments.

121.   In the Middle East and in Washington, DC, Walsh, Ali Herischi, Herischi & Associates LLC, Ali Soltani, and Washington Marketing LLC made presentations to the Iranian Victims using the Offering Documents, presentation materials, and oral statements.

122.   Walsh, Ali Herischi, Herischi & Associates LLC, Ali Soltani, and Washington Marketing LLC represented to the Iranian Victims that the statements in the Offering Documents were true and accurate.

123.   Walsh, Ali Herischi, Herischi & Associates LLC, Ali Soltani, and Washington Marketing LLC also made oral, materially false statements to the Iranian Victims.

124.   In their solicitations to the Iranian Victims, Walsh, Ali Herischi, Herischi & Associates LLC, Ali Soltani, and Washington Marketing LLC stated that:

   (a)   There was a 100% guaranty for the return of their Plaintiffs' investment and fees in the event their I-526 petition is denied;

   (b)   100% of Plaintiffs' funds would be held in escrow until their Form I-526 immigration petitions were approved by the United States government;

(c)     A "limited number" of 79 equity interests would be sold in Palm House Hotel, LLLP at the price of $500,000 each, plus $40,000 in administrative fees;

(d)     Plaintiffs' funds would be exclusively invested in the Palm House Hotel to create jobs by helping to finish the renovation and development, which was near completion;

(e)     The Palm House Hotel would be open for business by the "Season" of 2013/2014, and was 80-90% completed prior to Plaintiffs' investments;

(f)     The funds would create more than 10 full-time jobs for each $500,000 advanced;

(g)     Plaintiffs' funds were in addition to an equity investment by the developer in excess of $22,000,000 and a bank loan in excess of $29,000,000, so that Plaintiffs' funds constitute less than 50% of the project funding;

(h)     Plaintiffs' funds would be held in escrow, and were not yet needed, because the developer's investment in excess of $22,000,000 and a bank loan in excess of $29,000,000 was being used for construction;

(i)     Plaintiffs' funds would not be taken from the escrow account, and would not be used, unless and until the developer's investment in excess of $22,000,000 and the bank funds in excess of $29,000,000 had been used at the project;

(j)     The real property at issue was currently worth $110,000,000-$137,000,000 (the current value representation varied, depending on what the Bad Actors believed a particular Plaintiff wanted to hear) before completion, which made the investment "one of the safest EB-5 offerings from a Job Creation and Investment position."

(k)     The local government guaranteed that the Palm House Hotel project would be the last 5-star hotel property allowed on Palm Beach;

(n)     The developer, Robert Matthews, was a famous real estate developer in the United States;

(o)     Each investor's investment would be fully secured by the real property at issue;

(p)     Donald Trump and Bill Clinton would serve on the Palm House Hotel advisory board;

(q)     If an investor's application was denied by USCIS, they would receive their money back immediately;

(r)     With the U.S. Green Card, they would enjoy free education in all public colleges and universities;

(s)     As one of the exceptional features of the Palm House project, an investor's $500,000 investment would secure the approval of two (2) I-526 applications, which could be used for in-laws and other distant family members; and

(t)     Because of the United States sanctions against Iran, the Iranian Victim's money was even more secure, as their money could not be touched without approval from OFAC, and would be used last, rendering it an even safer investment.

125.     Wright, Levinson, Ali Herischi, and Ali Soltani used high pressure, boiler room sales tactics to persuade the Chinese Victims and Iranian Victims, respectively, to invest in the Palm House Hotel project instead of other EB-5 investments, claiming that the Palm House Hotel project was safe and secure, that Walsh, Robert Matthews and their accomplices were trustworthy and had a great record of success, that the opportunity would be gone if they didn't wire funds immediately, that they had great expertise and were looking out for their best interests, and that the alternative EB-5 investment opportunities were much riskier.

126.     Wright, Levinson, Herischi, and Soltani preyed on the trust reposed in them by the Chinese Victims and Iranian Victims, respectively, to drive Plaintiffs into the Palm House Hotel project.

**Plaintiffs are Fraudulently Induced to Invest in the Palm House EB-5 Offering**

127.     In reliance on the Offering Documents, the USCIS Approval, the PowerPoint Presentation, and the oral representations described above, each of the Chinese Victims provided $500,000 for a limited partnership unit in Palm House, along with an administrative fee of $40,000.

128.     In reliance on the Offering Documents and the oral representations described above, each of the Iranian Victims provided $500,000 for a limited partnership unit in Palm House, along with an administrative fee of $40,000.

129.     Many of the Plaintiffs also paid USREDA a legal fee of between $15,000-$20,000.

130.    Each of the Plaintiffs received confirmation that their $500,000 investment and $40,000 administrative fee had been received.

131.    In providing their money, Plaintiffs relied upon the representation that there was a 100% guaranty for the return of their investment and fees in the event their I-526 petition was denied.

132.    In providing their money, Plaintiffs relied upon the Escrow Representation, and understood that their money would be held in escrow unless and until USCIS approved their Form I-526 Petition.

133.    In providing their money, Plaintiffs relied upon the representation that if their I-526 petition was denied, their funds would be returned within 90 days.

134.    In providing their money, Plaintiffs relied upon the representation that only 79 limited partnership units in Palm House would be offered. This representation was material because, if there were too many investors, not enough jobs would be created per investor and they would be unable to obtain the EB-5 visas.  Further, this information was relied upon in calculating each investors' ability to obtain a return on their investment.

135.    In providing their money, Plaintiffs relied upon the representation that their funds would be exclusively invested in the Palm House Hotel to create jobs by helping to finish the renovation and development.

136.    In providing their money, Plaintiffs relied upon the representation that USREDA guaranteed the approval of any I-526 application it completed and that it would return all service fees in the event of denial.

137.    In providing their money, Plaintiffs relied upon the representation that SARC was the general partner of Palm House.

138.    In providing their money, Plaintiffs relied upon the representation that their funds were in addition to an equity investment by the developer in excess of $22,000,000 and a bank loan in excess of $29,000,000, so that Plaintiffs' funds constituted less than 50% of the project's funding.  Plaintiffs relied upon the fact that a bank conducted significant due diligence on the viability of the project prior to giving a $29,000,000 loan.

139.    In providing their money, Plaintiffs relied upon the representation that their funds would be held in escrow, and were not yet needed, because the developer's investment in excess of $22,000,000 and a bank loan in excess of $29,000,000 were being used for construction.

140.    In providing their money, Plaintiffs relied upon the representation that their funds would not be taken from the escrow account, and would not be used, unless and until the developer's investment in excess of $22,000,000 and the bank funds in excess of $29,000,000 had been used at the project.

141.    In providing their money, Plaintiffs relied upon the representation that a bank had provided funding in excess of $29,000,000, that these funds were being used for ongoing construction at the project, and that a bank had undertaken due diligence on the project.

142.    In providing their money, Plaintiffs relied upon the representation that their funds would be used exclusively to develop the hotel and create at least ten (10) jobs per investor.

143.    In providing their money, Plaintiffs relied upon the representation that the project was in progress, "very near completion," and would be complete for "Season" of 2013/2014.

144.    In providing their money, Plaintiffs relied upon the representation that the Palm House Hotel would be the last 5-star hotel to be approved on Palm Beach.

145.    In providing their money, Plaintiffs relied on the representation that they need not worry about any potential delays in building or regulatory issues, that all required permits and

documents were already obtained by the Town of Palm Beach, and if there were any issues the Advisory Board Members, such as Bill Clinton, would handle the local government.

146.   In providing their money, Plaintiffs relied upon the representation that famous people, such as Bill Clinton, Celine Dion, Bill Koch, and Eric Schmidt, had given their endorsement to the project by choosing to be a part of the Palm House Hotel advisory board.

147.   In providing their money, Plaintiffs relied upon the representation that the property was presently worth over $110,000,000 before completion, which therefore made the Palm House Hotel one of the safest EB-5 offerings from a Job Creation and Investment position.

148.   In providing their money, Plaintiffs relied upon the representation that the job count for the Palm House project was 953 jobs, while the project needed only 790 jobs.

149.   In providing their money, Plaintiffs relied upon the representation that their visa would be approved in less than 6 months.

150.   In providing their money, Plaintiffs relied upon the representation that they need not worry if the project will perform and meet the rigid standards required by the USCIS.

151.   In providing their money, Plaintiffs relied upon the representation that the developer, Robert Matthews, was a famous real estate developer in the United States.

152.   In providing their money, Plaintiffs relied upon the representation that each investor's investment would be fully secured by the real property at issue.

153.   In providing their money, the Chinese Victims relied upon the representation that investors in the Palm House Hotel project had already had their I-526 immigration petitions approved by USCIS, which assured them that their application would be approved, too, if they simply invested.

154.    In providing their money, the Chinese Victims relied upon the representation that an insurance policy guaranteed that construction of the Palm House Hotel project would be completed.[3]

155.    In providing their money, the Chinese Victims relied upon the representation that the local government had guaranteed that construction of the Palm House Hotel project would be completed.

156.    In providing their money, the Chinese Victims relied upon the representation that the developer, Robert Matthews, was a famous, top 10 real estate developer in the United States, equal in status and accomplishment to Donald Trump, and had completed several luxury hotel developments around the world, including in Bora Bora, New York City, and Mexico.

157.    In providing their money, the Chinese Victims relied upon the representation that the general contractor, Laudano, was an experienced and famous hotel developer, and had developed luxury hotels around the United States.

158.    In providing their money, the Chinese Victims relied upon the representation that the project would have a net profit in excess of $7,000,000, and would easily refund their money.

159.    In providing their money, the Chinese Victims relied upon the representation that Inga Moore, a famous hotel designer and the winner of Top Hotel Designer in 2013, had designed the Palm House Hotel.

160.    In providing their money, the Chinese Victims relied upon the representation that Niklaus Leuenberger, with 30 years of management experience in luxury hotels around the world, had agreed to manage the Palm House Hotel.

---

[3] The Chinese Victims were defrauded by the use of an AIA construction contract and the logo for Chinese insurance company, AIA, which is a subsidiary of AIG.  The Chinese Victims were told that the document was an insurance contract that guaranteed the completion of the project, when in reality it was a construction contract.  The con-artists used the logo of the Chinese insurance company to help commit the fraud.

161.    In providing their money, the Iranian Victims relied upon the representation that with a United Stated green card, they would enjoy free education in all public colleges and universities.

162.    In providing their money, the Iranian Victims relied upon the representation that as one of the exceptional features of the Palm House project, an investor's $500,000 investment would secure the approval of two (2) I-526 applications, which could be used for in-laws and other distant family members.

163.    In providing their money, the Iranian Victims relied upon the representation that because of the United States sanctions against Iran, the Iranian Victim's money was even more secure, as their money could not be touched without approval from OFAC, and would be used last, rendering it an even safer investment.

**Plaintiffs' I-526 Applications are Denied by USCIS**

164.    Plaintiffs were approved as accredited investors and their petitions were accepted within SARC's program for the Palm House investment.

165.    Plaintiffs diligently submitted all necessary paperwork in conjunction with their Form I-526 Petitions, asserting eligibility based on an investment in a Regional Center through Palm House and SARC.

166.    Plaintiffs' Form I-526 Petitions were denied by USCIS.  A copy of the denial is attached as Exhibit "M."

167.    Plaintiffs' Form I-526 Petitions were denied by USCIS for failure to establish by a preponderance of the evidence that the Form I-526 Petitions complied with the applicable legal requirements.

168.    USCIS cited the following deficiencies: (1) inconsistencies in the documents from Palm House; (2) insufficient number of full-time positions created by the project; (3) dispute over ownership of the project's property; and (4) insufficient evidence of bridge financing.

169.    The deficiencies cited by USCIS were based on actions taken and documents provided by Palm House, and over which Plaintiffs had no control.

170.    Plaintiffs demanded the return of their funds.

171.    In response to Plaintiffs' demands, no funds were returned to Plaintiffs.

172.    Instead, Walsh, Walsh Jr., Payne, SARC, USREDA, JJW Consultancy Ltd., Wright, Levinson, Herischi, and Herischi & Associates LLC engaged in an ongoing fraud intended to lull Plaintiffs into not bringing legal action, reporting the activities to law enforcement, or otherwise seeking to protect their interests.

173.    Walsh, Walsh Jr., Payne, SARC, USREDA, JJW Consultancy Ltd., Wright, Levinson, Herischi, and Herischi & Associates LLC threatened investors that if they took action to recoup their funds or otherwise affect the operation of the project, they would need to find a new EB-5 project and, now that the investor's child was no longer under 21 years old, they would lose the opportunity to obtain a United States visa through the parent's investment.

174.    Walsh, Walsh Jr., Payne, SARC, USREDA, JJW Consultancy Ltd., Wright, Levinson, Herischi, and Herischi & Associates LLC threatened Plaintiffs that if they took action to recoup their funds or otherwise affect the operation of the project, they would jeopardize the ability of other families to come to the United States under the Palm House Hotel project.

175.    Walsh, Walsh Jr., Payne, SARC, USREDA, JJW Consultancy Ltd., Wright, Levinson, Herischi, and Herischi & Associates LLC misrepresented to Plaintiffs that USCIS had

made a mistake, that one of the top immigration attorneys in the United States had been hired to appeal USCIS's denial decision, and that they were certain it would get reversed.

176.    Walsh, Walsh Jr., Payne, SARC, USREDA, JJW Consultancy Ltd., Wright, Levinson, Herischi, and Herischi & Associates LLC misrepresented both the character and status of pending litigation in the states courts of Florida.

177.    Walsh, Walsh Jr., Payne, SARC, USREDA, JJW Consultancy Ltd., Wright, Levinson, Herischi, and Herischi & Associates LLC misrepresented that the pending litigation was being used to try to resume construction on the property in order to strengthen the USCIS appeal and that it was nearly done.

178.    Walsh, Walsh Jr., Payne, SARC, USREDA, JJW Consultancy Ltd., Wright, Levinson, Herischi, and Herischi & Associates LLC misrepresented that the litigation was brought because the developer and the contractor had made changes to the plans and specifications of the Palm House Hotel project without getting necessary governmental approvals.

179.    Walsh, Walsh Jr., Payne, SARC, USREDA, JJW Consultancy Ltd., Wright, Levinson, Herischi, and Herischi & Associates LLC misrepresented that the litigation had been resolved and that the project was proceeding as planned.

180.    Walsh, Walsh Jr., Payne, SARC, USREDA, JJW Consultancy Ltd., Wright, Levinson, Herischi, and Herischi & Associates LLC misrepresented that there were no problems with the Palm House Hotel project, and all that Plaintiffs needed to do was wait.

181.    Walsh Jr. was integral in lulling the Chinese Victims into a state of inactivity while the fraud continued, making additional, egregious fraudulent misrepresentations.

182.    Walsh Jr. lulled the Chinese Victims by misrepresenting that the EB-5 approvals were on track, and that the Chinese Victims did not understand the USCIS letter because the issues were being addressed in "U.S. English legal speak" or "attorney speak."

183.    Walsh Jr. lulled the Chinese Victims by misrepresenting that the appointment of a receiver in the litigation ensured that once the government issued necessary approvals, the construction would re-start, which would occur within a few months.

184.    Walsh Jr. lulled the Chinese Victims by misrepresenting that the Palm House Hotel would be open within 6 months.

185.    Walsh Jr. lulled the Chinese Victims by misrepresenting that the Palm House Hotel property was not in foreclosure.

186.    Walsh Jr. lulled the Chinese Victims by misrepresenting that they had spent $3,000,000 protecting investors' investments in the Palm House Hotel project.

187.    Walsh Jr. lulled the Chinese Victims by misrepresenting that the Town of Palm Beach's fines, which were accruing at $2,000/day, would be waived by 90-95% at the conclusion of the project.

188.    Walsh Jr. lulled the Chinese Victims by misrepresenting that 100% of the $39,500,000 EB-5 money raised was actually used for construction at the Palm House Hotel.

189.    Walsh Jr. lulled the Chinese Victims by misrepresenting that the SEC had already investigated the developer of the Palm House Hotel project.

190.    Walsh Jr. lulled the Chinese Victims by misrepresenting that the SEC and other authorities had investigated the Palm House Hotel project and found no issues.

191.    Walsh Jr. lulled the Chinese Victims by misrepresenting that no lies were made to induce the Chinese Victims' investment in the Palm House Hotel project.

192.     Walsh Jr. lulled the Chinese Victims by misrepresenting that the investors in the Palm House Hotel project would get EB-5 visas because all the money was spent at the project.

193.     Walsh Jr. lulled the Chinese Victims by misrepresenting that the Bad Actors did not do anything inappropriate with Plaintiffs' money, which had been raised truthfully and under the laws of the SEC and EB-5, and it was deployed under those laws.

194.     Walsh Jr. lulled the Chinese Victims by misrepresenting that USCIS will approve the I-526 petitions.

195.     Walsh Jr. lulled the Chinese Victims by misrepresenting that the Palm House Hotel, in its current state, was worth $93,000,000-$100,000,000.

196.     Walsh Jr. lulled the Chinese Victims by misrepresenting that the Palm House Hotel, once completed, would be worth $144,000,000.

197.     Walsh Jr. lulled the Chinese Victims by misrepresenting that the Palm House Hotel's value would more than cover the two (2) mortgages, which included the $27,500,000 mortgage in favor of Defendant KK-PB Financial LLC.

198.     Walsh Jr. lulled the Chinese Victims by misrepresenting that it would take $16,000,000 to complete the Palm House Hotel project.

199.     Walsh Jr. lulled the Chinese Victims by misrepresenting that $10,000,000 of the investors' money was still on hand, and available to complete the Palm House Hotel project.

200.     In an effort to further lull Plaintiffs, as recently as November 2016, Walsh, Walsh, Jr., Payne, SARC, and USREDA were still representing to Plaintiffs that the real property at issue, with construction stopped, was currently worth approximately $100,000,000, and that it would be worth $140,000,000 when stabilized.

201.    Plaintiffs hired legal counsel to investigate Palm House, the project, and the individuals involved.  The findings were shocking.

**The Fraud and Theft are Discovered**

202.    Upon investigation, Plaintiffs discovered that a seemingly endless laundry list of fraudulent representations were perpetrated upon them in furtherance of obtaining and stealing their money.

203.    Palm House was not a legitimate EB-5 project, but rather a façade and vehicle pursuant to which a group of conspirators stole over $40,000,000 from over 90 foreign nationals seeking EB-5 visas and a better life for their families in the United States.

204.    Plaintiffs have discovered that their funds were not held in the Escrow Account.

205.    Instead, contrary to all of the written and oral representations, Plaintiffs' funds were quickly transferred from the Escrow Account to other accounts and pillaged for the personal pleasure of the conspirators.

206.    Virtually none of Plaintiffs' funds were used at the project, and no jobs were created.

207.    Plaintiffs have learned that, shortly after receipt, their funds were wrongfully moved from the Escrow Account, to other accounts, and then disbursed and distributed among the conspirators and used to:

    (a)    purchase multiple homes, investment property, a 151 foot yacht that cost almost $6,000,000, a luxury car, vacations, and other accoutrements of a life of luxury;

    (b)    pay personal debts, including more than $266,000 in personal back taxes; and

    (c)    grease all the wheels that furthered the criminal scheme, including a licensed attorney that helped fraudulently induce the Iranian Victims' investments.

208.    Each of the representations described hereinabove were knowingly false or misleading.

209. Most of the representations within the Offering Documents were knowingly false or misleading.

210. The representations that there was a 100% guaranty for the return of Plaintiffs' investment and fees in the event their I-526 petition was denied were knowingly false.

211. The representations that Plaintiffs' funds would be held in escrow unless and until USCIS approved their I-526 applications were knowingly false.

212. The representations that Plaintiffs would receive their money back upon an official denial of their I-526 applications by USCIS were knowingly false.

213. The representations that Plaintiffs' funds would be returned within 90 days of denial of their I-526 applications were knowingly false.

214. The representations that a maximum of 79 interests in Palm House would be sold were knowingly false. Plaintiffs have discovered that at least 90 units were sold, violating the necessity that investments into an EB-5 program be "closed-ended," available only to a specified number of investors, and which number is tied to the number of direct or indirect jobs created by the investment. In other words, had the project even progressed as represented, there would have likely been too few jobs created per investor to provide the number of EB-5 visas that were promised.

215. The representations that the funds would be exclusively invested in the Palm House Hotel to create jobs by helping to finish the renovation and development were knowingly false. Virtually none of the funds were used at the project.

216. The representations that USREDA guaranteed the approval of any I-526 application it completed and that it would return all service fees in the event of denial were knowingly false.

217.   The representations that SARC was the general partner of Palm House were knowingly false.  According to records kept by the Florida Secretary of State, Walsh and Payne were the general partners of Palm House and served in that role until they resigned in July 2016.

218.   Plaintiffs' investigation has revealed that the representations that the developer had "invested" $22,000,000 of their own equity into the project were misleading and knowingly false.  In truth, the prior owner did some work on the hotel and may have incurred expenses to acquire ($10 million) and work on the property ($12 million) totaling $22 million.  However, no "equity" was invested by the developer, as they acquired the property with little or no cash paid.  Instead, the developer manipulated the sale to enable it to claim to be the prior owner – the "developer" -- that had invested $22 million.   In truth, they acquired the prior developer's interest in 160 Royal Palm LLC, which owned the property, but then gave the prior owner a $27,000,000+ mortgage as payment.  Rather than "equity," the developer's interests were under water.

219.   The representations that Plaintiffs' funds were in addition to an equity investment by the developer in excess of $22,000,000 and a bank loan in excess of $29,000,000, so that Plaintiffs' funds constitute less than 50% of the project funding were knowingly false.  There was no bank loan.  Further, there was no "equity investment" by the developer; the developer acquired the property with little or no cash paid, and gave the prior owner a note and mortgage for over $27,000,000 as consideration.

220.   The representations that a bank had provided funding in excess of $29,000,000 and that the bank had undertaken due diligence on the project prior to making the loan were knowingly false.  There was no bank loan, and no due diligence undertaken by any bank.

221.    The representations that Plaintiffs' funds would be held in escrow, and were not yet needed, because construction was being funded by the developer's investment and the bank loan, were knowingly false.  The funds were quickly removed from the Escrow Account, and there was no bank loan or developer's investment.

222.    The representations that the funds would create 10 full-time jobs for each $500,000 advanced were knowingly false.

223.    The representations that the project was in progress, "very near completion," and would be complete for "Season" of 2013/2014 were knowingly false.  The project is in such disrepair that the receiver is currently working with the Town of Palm Beach to try to address hazards causing threats to public safety.

224.    The representations that the Palm House Hotel would be the last 5-star hotel to be approved on Palm Beach by the local government were knowingly false.

225.    The representations that Plaintiffs need not worry about any potential delays in building or regulatory issues were knowingly false.

226.    The representations that celebrities like Bill Clinton, Celine Dion, Bill Koch, and Eric Schmidt had decided to become members of the Palm House advisory board were knowingly false.

227.    The representations that the property at issue was presently worth over $110,000,000 before completion were knowingly false.  Upon information and belief, the property was worth less than $20,000,000.

228.    The representations that the job count for the project was 953 jobs were knowingly false.

229.    The representations that Plaintiffs' visas would be approved within 6 months were knowingly false.

230.    The representations that Plaintiffs need not worry if the project will perform and meet the rigid standards required by USCIS were knowingly false.

231.    The representations that the developer, Robert Matthews, was a famous real estate developer in the United States, equal in status and accomplishment to Donald Trump, and that he had completed several luxury hotel developments around the world, including in Bora Bora, New York City, and Mexico, were knowingly false.

232.    The representations that each investor's investment would be fully secured by the real property at issue were knowingly false.

233.    The representations that investors in the Palm House Hotel project had already had their I-526 immigration petitions approved were knowingly false.  No investor in the project ever had their I-526 petition approved.

234.    The representations that an insurance policy guaranteed that construction of the Palm House Hotel project would be completed were knowingly false.  The purported insurance policy was nothing more than a form construction agreement.

235.    The representations that the local government had guaranteed that construction of the Palm House Hotel project would be completed were knowingly false.  Instead, the Town of Palm Beach had been assessing a fine of $2,000 per day, since February 2013, which was not disclosed to Plaintiffs prior to making their investments.

236.    The representations that the general contractor, Laudano, was an experienced and famous hotel developer, and had developed luxury hotels around the United States were knowingly false.

237.    The representations that the project would have a net profit in excess of $7,000,000, and would easily refund the investors' money, were knowingly false.  There was never an intent to make a "profit" at the Palm House Hotel project or refund Plaintiffs' investment.

238.    The representations that Inga Moore, a famous hotel designer and the winner of the Top Hotel Designer of 2013, had designed the Palm House Hotel were knowingly false.

239.    The representations that Niklaus Leuenberger, with 30 years of management experience in luxury hotels around the world, had agreed to manage the Palm House Hotel were knowingly false.

240.    The representations that investors, with a United States green card, could enjoy free education at all public colleges and universities were knowingly false.

241.    The representations that investors could secure the approval of a second I-526 petition approval based on their $500,000 investment were knowingly false.

242.    In sum, the Palm House Hotel was a systemic fraud, based on myriad, intentional, material misrepresentations intended to dupe unsuspecting, needy foreign investors.

243.    The Palm House Hotel was a necessary façade, used to enable to the fraudulent scheme that bilked foreign investors with the promise of EB-5 visas and security for their investments.

**Defendants' Receipt of Stolen Funds**

244.    Plaintiffs have determined, by investigating the money trail, that SARC, USREDA, Walsh, Walsh Jr., Payne, Derrico, JJW Consultancy Ltd., Cheng, Wright, Levinson, Ali Herischi, Herischi & Associates LLC, Ali Soltani, and Washington Marketing LLC were parties to a conspiracy to steal Plaintiffs' funds with several persons involved with the project,

including Robert Matthews, Maria a/k/a Mia Matthews, Gerry Matthews, Ryan Black, Nicholas Laudano and entities that they own and/or control.

245.    Plaintiffs wired their money into the Escrow Account at PNC Bank.

246.    The Bad Actors conspired to and moved Plaintiffs' money from the Escrow Account to a second account at PNC Bank (the "Second PNC Account").

247.    Once Plaintiffs' funds were moved to the Second PNC Account, upon information and belief, SARC, USREDA, Walsh, Walsh Jr., Payne, Derrico, JJW Consultancy Ltd., Cheng, Wright, Levinson, Ali Herischi, Herischi & Associates LLC, Ali Soltani, and Washington Marketing LLC quickly transferred the funds to other accounts and used them for non-allowable purposes, siphoning off millions of dollars for personal expenses and investments.

248.    Once Plaintiffs' funds were moved to the Second PNC Account, upon information and belief, SARC, USREDA, Walsh, Walsh Jr., Payne, Derrico, JJW Consultancy Ltd., Cheng, Wright, Levinson, Ali Herischi, Herischi & Associates LLC, Ali Soltani, and Washington Marketing LLC used the funds to pay off participants in the criminal scheme.

249.    From the Second PNC Account, the Bad Actors conspired to and moved about $35,000,000 of Plaintiffs' money to accounts belonging to:

(a)    Defendant Leslie Robert Evans

(b)    Defendant KK-PB Financial LLC

(c)    Galle Law Group

(d)    Defendant New Haven Contracting South, Inc.

(e)    Defendant USREDA

(f)    Defendant 160 Royal Palm Way LLC

250.    Further, upon information and belief, the Bad Actors conspired to and moved about $15,000,000 from the Second PNC Account to an account in the name of Palm House LLC

controlled by attorney Robert Leslie Evans and the law firm Robert Leslie Evans & Associates, P.A. (the "Evans Account").

251.    Once Plaintiffs' funds were moved to the Evans Account, upon information and belief, Gerry Matthews, Robert Matthews, Maria a/k/a Mia Matthews, Ryan Black, and Nicholas Laudano quickly transferred the funds to other accounts and used them for non-allowable purposes, siphoning off millions of dollars for personal expenses and investments.

252.    Once Plaintiffs' funds were moved to the Evans Account, Gerry Matthews, Robert Matthews, Maria a/k/a Mia Matthews, Ryan Black, and Nicholas Laudano used the funds to pay off other participants in the criminal scheme.

253.    As purported owners and/or managers and/or agents of Palm House LLC, Gerry Matthews, Robert Matthews, Maria a/k/a Mia Matthews, and Ryan Black knew that none of Plaintiffs' funds could be used unless and until Plaintiffs' I-526 Petitions had been approved by USCIS.

254.    The Loan Documents specifically stated that the loan to Palm House LLC was dependent on USCIS' approval of Plaintiffs' I-526 petitions.

255.    While none of Plaintiffs' I-526 petitions were approved, Palm House LLC, Gerry Matthews, Robert Matthews, Maria a/k/a Mia Matthews, and Ryan Black took Plaintiffs' money anyway, further demonstrating their criminal intent.

256.    Further, SARC, Walsh, and Payne owed Plaintiffs a fiduciary duty to protect their funds, and not allow their release, unless and until their I-526 petitions were approved by USCIS.

257.    From the Evans Account, Plaintiffs have determined that Robert Matthews, Maria a/k/a Mia Matthews, Gerry Matthews, Ryan Black, and Nicholas Laudano used several entities to help them transfer, hide, and receive Plaintiffs' funds, including:

(a)    New Haven Contracting South, Inc., a company owned and operated by Nicholas Laudano, which entered into a construction contract to build the project, and which was used to receive, divert and steal millions of dollars of Plaintiffs' money instead of use the funds at the project.

(b)    Palm House, LLC, an entity purportedly formed to complete the renovations at the project, the purported borrower of the loan proceeds from Palm House, and which was used to receive, divert and steal millions of dollars of Plaintiffs' money.

(c)    Palm House PB, LLC, an entity that, upon information and belief, was formed for the purpose of receiving, hiding and stealing Plaintiffs' money and did, in fact, use Plaintiffs' funds to purchase items such as a $5,750,000, 151 foot yacht.

(d)    NJL and Botticelli, entities that Nicholas Laudano used to purchase a Connecticut mansion -- with Plaintiffs' funds -- on behalf of and/or for the benefit of Robert Matthews and Maria a/k/a Mia Matthews.

(e)    160 Royal Palm LLC, owned completely by Palm House LLC, is the owner of the real property at issue, which benefitted from the use of Plaintiffs' funds.

(f)    Mirabia, LLC, an entity that, upon information and belief, received stolen funds to purchase investment property near the Palm House Hotel.

(g)    Bonaventure 22, LLC, an entity that, upon information and belief, received stolen funds.

(h)    Alibi LLC and Alibi LTD. were entities that Maria a/k/a Mia Matthews used to steal Plaintiffs' money and purchase a $5,750,000, 151 foot yacht.

258.    Other persons received improper transfers or were unjustly enriched as a result of the theft of Plaintiffs' funds.  These include Leslie Robert Evans and his law firm, Leslie Robert Evans & Associates, P.A., who paid themselves compensation from Plaintiffs' funds while they assisted the bad actors in their theft and dissipation of the funds.

259.    The Bad Actors acted with willful, reckless, grossly negligent and malicious intent in taking the actions alleged hereinabove.

260.    As a result of the Bad Actors' willful, reckless, grossly negligent and malicious conduct, they are libel for exemplary and punitive damages.

**Where Things Stand Now**

261.     Subsequent to the theft and distribution of Plaintiffs' funds, the Bad Actors brought lawsuits against each other, asserting weak and/or neutered claims, with the goal of creating yet another façade -- that they were actually attempting to pursue the claims, recoup the stolen money, and make Plaintiffs whole.

262.     In reality, however, the pretend litigation is merely furthering the conspiracy, whereby the Bad Actors are attempting to extinguish (i.e. "settle") the claims of wrongdoing on the merits while they continue to hide and dissipate Plaintiffs' funds and lull Plaintiffs into a state of inaction.

263.     Meanwhile, the Palm House Hotel is a wasting property and, in the words of the Court-appointed receiver, "circling the drain."

264.     Defendants, and entities they own and/or control, continue to use and enjoy Plaintiffs' stolen funds.

265.     No Plaintiff has received an EB-5 visa, or an I-526 petition approval.

266.     Many of the Bad Actors continue in their criminal conduct, seeking additional victims for their EB-5 schemes.

267.     SARC, Walsh and Walsh Jr. are now offering a similar project to foreign investors—to refurbish an old hotel—called the Greystone in Miami.

268.     Levinson and Wright are still making presentations in China, attempting to swindle more victims into whatever United States EB-5 program they are paid to sell.

269.     Ali Herischi admitted his role in the scheme and his receipt of secret, undisclosed kickbacks, despite owing a fiduciary duty to be a neutral attorney to the Iranian Victims.  See Exhibit "N."

270.    Plaintiffs, now unable to enter the United States, are in need of some good news and a helping hand.  Most investors are of average means and had to spend their entire lifesavings or take high interest bank loans to afford this investment.

271.    Plaintiffs ask the Court for all necessary and appropriate relief, in law and equity, so that they may attempt to recover their stolen funds and begin rebuilding their lives.

**COUNT I – Injunctive Relief Against All Defendants Under Fla. Stat. §§812.035(1),(6)**

272.    Plaintiffs adopt and re-allege the allegations set forth in paragraphs 1 through 271 as if fully stated fully herein.

273.    Each Plaintiff provided $500,000 plus $40,000 for administrative fees.  Further, certain Plaintiffs also provided $15,000 for legal services.

274.    Walsh is guilty of theft in violation of §812.014(1)(a), Fla. Stat., as he knowingly obtained or used, or endeavored to obtain or use, the property of Plaintiffs with intent to, either temporarily or permanently deprive the Plaintiffs of a right to the property or a benefit from the property.

275.    Alternatively, Walsh is guilty of theft in violation of §812.014(1)(b), Fla. Stat., as he knowingly obtained or used, or endeavored to obtain or use, the property of Plaintiffs with intent to, either temporarily or permanently appropriate the property to his own use or to the use of any person not entitled to the use of the property.

276.    Walsh stole Plaintiffs' property from the Escrow Account and transferred it to the Second PNC Account and the Evans Account for distribution among his conspirators, the Bad Actors, which include Walsh Jr., Payne, Derrico, Cheng, Kevin Wright, David Levinson, Robert Matthews, Maria a/k/a Mia Matthews, Gerry Matthews, Ryan Black, Nicholas Laudano, Ali Herischi, Ali Soltani, KK-PB Financial LLC, and entities they own and/or control.

277.     The Bad Actors either engaged in such activities in concert with Walsh, aided and abetted the illicit actions, or are otherwise unlawfully in possession of the property of Plaintiffs.

278.     By Walsh's actions, Plaintiffs have been deprived of the right and benefit to their property.

279.     Walsh, acting in conspiracy with the other Bad Actors, has misappropriated Plaintiffs' property for his own use and the use of the other Bad Actors, which use they are not entitled to receive.

280.     Walsh's actions have been taken with the criminal intent to deprive Plaintiffs of their property, and Walsh's actions are in direct violation of §812.014 of the Florida Statutes.

281.     The Bad Actors have taken and are taking actions to dissipate the funds and other assets which were obtained, in whole or in part, by using the funds stolen from Plaintiffs.

282.     In the absence of immediate injunctive relief, Plaintiffs will suffer irreparable damage and harm and there is, and will continue to be, an immediate danger of significant loss and continued harm to Plaintiffs.

283.     It is clearly in the public interest to enter immediate temporary injunctive relief and permanent injunctive relief restraining Walsh, the other Bad Actors, and anyone else that has received Plaintiffs' stolen property from secreting or disposing of Plaintiffs' funds and from disposing of real property obtained or improved through the use of unlawfully obtained proceeds. The entry of an injunction will serve to enforce the legal rights of Plaintiffs and will promote the public interest by restraining Walsh and the other Bad Actors from engaging in such unlawful conduct, and by preventing them from further benefiting from the unlawful conduct.

WHEREFORE, pursuant to Florida Statutes §§812.035(1),(6), Plaintiffs seek a preliminary and permanent injunction restraining Walsh, the other Bad Actors, and their agents,

relatives, family members, servants, employees and attorneys (including the Evans Defendants) and those persons in active concert or participation with them or who have received or retained any of the proceeds of Walsh's actions who receive actual notice of the injunction from disposing of or secreting any proceeds of Walsh's alleged illegal activity, from disposing of or secreting any assets that may reasonably contain or be proceeds of Walsh's alleged illegal activity, from disposing of or secreting any property or real property that may reasonably have been purchased with proceeds of Walsh's alleged illegal activity and, further, from impairing, transferring, disposing, or otherwise diminishing the value of any such property, or from stripping the equity of such property via mortgages or otherwise.  Plaintiffs further request that the Court freeze any accounts in which the Bad Actors and/or any entity they own and/or control has an interest, and impose by temporary and permanent injunctive relief a constructive trust upon the proceeds of Walsh's illegal conduct and grant Plaintiffs such other and further relief which may be appropriate under the circumstances.

## COUNT II – Dissolution of Palm House Hotel LLLP

284.    Plaintiffs adopt and re-allege the allegations set forth in paragraphs 1 through 271 as if fully stated fully herein.

285.    Palm House is a Florida limited liability limited partnership and is governed by the Florida Revised Uniform Limited Partnership Act of 2005, which is contained in Florida Statutes Chapter 620.

286.    Plaintiffs are limited partners in Palm House.

287.    Pursuant to Fla. Stat. §620.1802, on application by a partner, the circuit court may order the dissolution of a limited partnership if it is not reasonably practicable to carry on the activities of the limited partnership in conformity with the partnership agreement.

288.    As described above, despite the myriad representations in the Offering Documents and the Palm House Limited Partnership Agreement that Plaintiffs' funds will remain in escrow unless and until their I-526 applications were approved by USCIS, Walsh stole the money and thereafter distributed it among his conspirators.

289.    With all the funds now stolen from the Escrow Account, and the Palm House Hotel project exposed as nothing more than a façade for a massive criminal scheme, it is not reasonably practicable to carry on the activities of the limited partnership.

290.    Additionally, it is necessary to remove the Bad Actors who perpetrated the fraud and theft on Plaintiffs from the management of Palm House, as they are now purporting to pursue legal claims and seek redress -- for their own criminal wrongdoing -- on behalf of Palm House.  However, this litigation is merely a continuation of the fraud, in which the Bad Actors are attempting to cleanse their own conduct by bringing weak and/or neutered claims against each other, with the apparent plan of "settling" them on the merits with little to no benefit to the actual victims, Plaintiffs.

291.    Further, the current management of Palm House has proven that they cannot be trusted, as they have defrauded and lulled Plaintiffs for years with lies that all was well, even mischaracterizing the character and nature issues in the pending litigation.

292.    Walsh, Payne and SARC should be removed from the wind up of Palm House and the prosecution of legal claims on behalf of Palm House.

293.    New, independent decision makers and counsel that will actually pursue justice on behalf of the victims should be installed at Palm House.

294.    Accordingly, pursuant to Fla. Stat. §620.1803(4), on the basis of the good cause demonstrated herein, Plaintiffs ask the Court to order judicial supervision of the winding up of

Palm House, and the appointment of a person to wind up Palm House's activities, including the prosecution of claims on behalf of Palm House.

295.    Alternatively, dissolution and wind up of Palm House is appropriate under Article X of the Palm House Limited Partnership Agreement.

WHEREFORE, pursuant to §620.1802 and §620.1803 of the Florida Statutes, Plaintiffs seek the dissolution and wind up of Palm House Hotel LLLP, judicial supervision of the wind up, the appointment of a person to wind up Palm House's activities, including the prosecution of claims on behalf of Palm House, and such other and further relief as the Court deems just and proper.

### COUNT III – Conversion Against All Defendants (excluding Palm House)

296.    Plaintiffs adopt and re-allege the allegations set forth in paragraphs 1 through 271 as if fully stated fully herein.

297.    The Bad Actors and Evans Defendants' improper taking and retention of property and payments which belong to Plaintiffs gives rise to a claim for conversion in that the Bad Actors and Evans Defendants have, without authorization, asserted dominion and control over the funds which are the specifically identifiable property of Plaintiffs and are or were the property of Plaintiffs and which were owned or payable to Plaintiffs.  The Bad Actors and Evans Defendants' conversion is inconsistent with Plaintiffs' rights and ownership to said property.

298.    The payments and property wrongfully converted by the Bad Actors and Evans Defendants are specific and identifiable.

299.    By virtue of the Bad Actors and Evans Defendants' repeated and continued misappropriation and conversion of Plaintiffs' property, they have caused Plaintiffs substantial damage.

300.    Many of the Plaintiffs have made a demand for the return of their property, but the funds have not been returned.  Moreover, a demand for the return of Plaintiffs' funds would be futile.  The Bad Actors and Evans Defendants have been confronted with the fact that they stole and converted Plaintiffs' property, but have failed to return all of the property to Plaintiffs.

WHEREFORE, Plaintiffs demand judgment against the Bad Actors and Evans Defendants for damages, punitive damages, costs, interest, prejudgment interest, and such other and further relief which is necessary and just under the circumstances.  Further, Plaintiffs request that the Court impose, by temporary and permanent injunctive relief, a constructive trust upon the proceeds of the Bad Actors and Evans Defendants' wrongful conduct.

### COUNT IV – Fraud in the Inducement Against SARC, USREDA, Walsh, Walsh Jr., Payne, Derrico, JJW Consultancy Ltd., Cheng, Wright, Levinson, and Robert Matthews

301.    The Chinese Victims adopt and re-allege the allegations set forth in paragraphs 1 through 271 as if fully stated fully herein.

302.    As specifically described above, SARC, USREDA, Walsh, Walsh Jr., Payne, and Derrico made knowingly false statements concerning material facts in the Offering Documents and the USCIS Approval.

303.    JJW Consultancy Ltd., Cheng, Wright, and Levinson adopted and sold the representations in the Offering Documents and the USCIS Approval when selling the Palm House Hotel project to the Chinese Victims.

304.    In China, SARC, USREDA, Walsh, Walsh Jr., JJW Consultancy, Ltd., Cheng, Wright, and Levinson also used the PowerPoint Presentation, which contained knowingly false statements concerning material facts, when they sold the Palm House Hotel project to the Chinese Victims.

305.    Additionally, as specifically described above, Wright, Levinson and Robert Matthews made knowingly false oral statements concerning material facts when they sold the Palm House Hotel project to the Chinese Victims in Palm Beach.

306.    SARC, USREDA, Walsh, Walsh Jr., Payne, Derrico, JJW Consultancy, Ltd., Cheng, Wright, Levinson, and Robert Matthews knew that their representations were false, and intended that the Chinese Victims rely upon the representations and be induced by them to invest their money into Palm House.

307.    SARC, USREDA, Walsh, Walsh Jr., Payne, JJW Consultancy, Ltd., Cheng, Derrico, Wright, Levinson, and Robert Matthews knew that there was no intention to hold the Chinese Victims' funds in the Escrow Account unless and until their I-526 applications were approved by USCIS.

308.    The notion of an escrow was intended to enable the fraud and theft by giving the Chinese Victims the assurance that their money was safe, and that it would only be used if and when their I-526 application for an EB-5 visa was approved, and then only after approximately $50,000,000 in developer funding and bank financing had been used.

309.    Instead, there was no developer equity, there was no bank loan, the I-526 applications were properly denied, no jobs were created at Palm House, and the Chinese Victims' funds were stolen from the Escrow Account.

310.    The Chinese Victims relied upon these representations and have been damaged.

WHEREFORE, the Chinese Victims demand judgment against SARC, USREDA, Walsh, Walsh Jr., Payne, Derrico, JJW Consultancy Ltd., Cheng, Wright, Levinson, and Robert Matthews for damages, punitive damages, costs, interest, prejudgment interest, and such other and further relief which is necessary and just in the circumstances.

## COUNT V – Fraud in the Inducement Against SARC, USREDA, Walsh, Walsh Jr., Payne, Derrico, Ali Herischi, Herischi & Associates LLC, Ali Soltani, and Washington Marketing LLC

311.    The Iranian Victims adopt and re-allege the allegations set forth in paragraphs 1 through 271 as if fully stated fully herein.

312.    As specifically described above, SARC, USREDA, Walsh, Walsh Jr., Payne, and Derrico made knowingly false statements concerning material facts in the Offering Documents.

313.    Ali Herischi, Herischi & Associates LLC, Ali Soltani, and Washington Marketing LLC adopted and sold the representations in the Offering Documents when selling the Palm House Hotel project to the Iranian Victims.

314.    Additionally, Walsh, Ali Herischi, Herischi & Associates LLC, Ali Soltani, and Washington Marketing LLC made knowingly false oral statements concerning material facts when they sold the Palm House Hotel project to the Iranian Victims.

315.    Ali Herischi and Herischi & Associates LLC also failed to disclose to their clients, the Iranian Victims, that they were receiving secret, undisclosed kickbacks of $40,000 for each investor they delivered into the Palm House Hotel project.

316.    SARC, USREDA, Walsh, Walsh Jr., Payne, Derrico, Ali Herischi, Herischi & Associates LLC, Ali Soltani, and Washington Marketing LLC knew that their representations were false, and intended that the Iranian Victims rely upon the representations and be induced by them to invest their money into Palm House.

317.    SARC, USREDA, Walsh, Walsh Jr., Payne, Derrico, Ali Herischi, Herischi & Associates LLC, Ali Soltani, and Washington Marketing LLC knew that there was no intention to hold the Iranian Victims' funds in the Escrow Account unless and until their I-526 applications were approved by USCIS.

318.    The notion of an escrow was intended to enable the fraud and theft by giving the Iranian Victims the assurance that their money was safe, and that it would only be used if and when their I-526 application for an EB-5 visa was approved, and then only after approximately $50,000,000 in developer funding and bank financing had been used.

319.    Instead, there was no developer equity, there was no bank loan, the I-526 applications were properly denied, no jobs were created at Palm House, and the Iranian Victims' funds were stolen from the Escrow Account.

320.    The Iranian Victims relied upon these representations and have been damaged.

WHEREFORE, the Iranian Victims demand judgment against SARC, USREDA, Walsh, Walsh Jr., Payne, Derrico, Ali Herischi, Herischi & Associates LLC, Ali Soltani, and Washington Marketing LLC for damages, punitive damages, costs, interest, prejudgment interest, and such other and further relief which is necessary and just in the circumstances.

### COUNT VI – Fraud Against SARC, USREDA, Walsh, Walsh Jr., Payne, JJW Consultancy Ltd., Cheng, Wright and Levinson

321.    The Chinese Victims adopt and re-allege the allegations set forth in paragraphs 1 through 271 as if fully stated fully herein.

322.    As specifically described above, after the Chinese Victims provided their investments in Palm House, Walsh, Walsh Jr., Payne, SARC, USREDA, JJW Consultancy Ltd., Cheng, Wright and Levinson engaged in an ongoing fraud intended to lull the Chinese Victims into not bringing legal action, not reporting the Palm House project to law enforcement, and not otherwise seeking to protect their interests or disrupt the criminal scheme.

323.    Among the many knowingly false statements concerning material facts that Walsh, Walsh Jr., Payne, SARC, USREDA, JJW Consultancy Ltd., Cheng, Wright and Levinson made to the Chinese Victims:

(a) USCIS had made a mistake, that one of the top 500 attorneys in the United States had been hired to appeal USCIS's denial decision, and that they were certain it would get reversed.

(b) There were no problems with the Palm House Hotel project, and all the Chinese Victims need to do is wait.

(c) The Palm House Hotel would be open within 6 months.

(d) The Palm House Hotel real property was not in foreclosure.

(e) 100% of the EB-5 money raised was actually used for construction at the Palm House Hotel.

(f) The SEC had already investigated the developer of the Palm House Hotel project.

(g) The SEC had investigated the Palm House Hotel project and found it "to be clean."

(h) The Palm House Hotel, in its current state, was worth $93,000,000-$100,000,000.

(i) The Palm House Hotel, once completed, would be worth $144,000,000.

(j) The Palm House Hotel's value would more than cover the two (2) mortgages, which included the $27,500,000 mortgage in favor of Defendant KK-PB Financial LLC.

324. Walsh, Walsh Jr., Payne, SARC, USREDA, JJW Consultancy Ltd., Cheng, Wright and Levinson knew that their representations were false, and intended that the Chinese Victims rely upon the representations and be induced by them to not take action to disrupt the criminal scheme.

325. The Chinese Victims relied upon these representations and have been damaged.

WHEREFORE, the Chinese Victims demand judgment against Walsh, Walsh Jr., Payne, SARC, USREDA, JJW Consultancy Ltd., Cheng, Wright and Levinson for damages, punitive damages, costs, interest, prejudgment interest, and such other and further relief which is necessary and just in the circumstances.

## COUNT VII – Fraud Against SARC, USREDA, Walsh, Walsh Jr., Payne, Ali Herischi and Herischi & Associates LLC

326.    The Iranian Victims adopt and re-allege the allegations set forth in paragraphs 1 through 271 as if fully stated fully herein.

327.    As specifically described above, after the Iranian Victims provided their investments in Palm House, SARC, USREDA, Walsh, Walsh Jr., Payne, Ali Herischi and Herischi & Associates LLC made knowingly false statements concerning material facts and engaged in an ongoing fraud intended to lull the Iranian Victims into not bringing legal action, not reporting the Palm House project to law enforcement, and not otherwise seeking to protect their interests or disrupt the criminal scheme.

328.    Among the many knowingly false statements concerning material facts that SARC, USREDA, Walsh, Walsh Jr., Payne, Ali Herischi and Herischi & Associates LLC made to the Iranian Victims:

(a)    USCIS had made a mistake, that one of the top 500 attorneys in the United States had been hired to appeal USCIS's denial decision, and that they were certain it would get reversed.

(b)    That the litigation in Florida was undertaken to try to strengthen the USCIS appeal and that they were "nearly there"

(c)    That the litigation in Florida was brought because the developer and the contractor had made changes to the plans and specifications of the Palm House Hotel project without getting necessary governmental approvals.

(d)    There were no problems with the Palm House Hotel project, and all the Iranian Victims need to do is wait.

329.    SARC, USREDA, Walsh, Walsh Jr., Payne, Ali Herischi and Herischi & Associates LLC knew that their representations were false, and intended that the Iranian Victims rely upon the representations and be induced by them to not take action to disrupt the criminal scheme.

330.    The Iranian Victims relied upon these representations and have been damaged.

WHEREFORE, the Iranian Victims demand judgment against SARC, USREDA, Walsh, Walsh Jr., Payne, Ali Herischi and Herischi & Associates LLC for damages, punitive damages, costs, interest, prejudgment interest, and such other and further relief which is necessary and just in the circumstances.

## COUNT VIII -  Aiding and Abetting Fraud Against Robert Matthews, Maria a/k/a Mia Matthews, Gerry Matthews, Ryan Black, and Nicholas Laudano

331.    Plaintiffs adopt and re-allege the allegations set forth in paragraphs 1 through 271 and 301 through 320 as if fully stated fully herein.

332.    As specifically described above, SARC, USREDA, Walsh, Walsh Jr., Payne, Derrico, JJW Consultancy Ltd., Wright, Levinson, Ali Herischi, Herischi & Associates LLC, Ali Soltani, and Washington Marketing LLC committed a fraud against Plaintiffs.

333.    Robert Matthews, Maria a/k/a Mia Matthews, Gerry Matthews, Ryan Black, and Nicholas Laudano had knowledge that a fraud had been committed upon Plaintiffs.

334.    Robert Matthews, Maria a/k/a Mia Matthews, Gerry Matthews, Ryan Black, and Nicholas Laudano knowingly aided and abetted the commission of the fraud against Plaintiffs.

335.    Robert Matthews, Maria a/k/a Mia Matthews, Gerry Matthews, Ryan Black, and Nicholas Laudano knew that the loan to Palm House LLC was conditioned on the approval of Plaintiffs' I-526 petitions.

336.    Robert Matthews, Maria a/k/a Mia Matthews, Gerry Matthews, Ryan Black, and Nicholas Laudano knew that the loan to Palm House LLC was supposed to be used solely for the renovation and development of the Palm House Hotel.

337.    Robert Matthews, Maria a/k/a Mia Matthews, Gerry Matthews, Ryan Black, and Nicholas Laudano substantially assisted or encouraged SARC, USREDA, Walsh, Walsh Jr.,

Payne, Derrico, JJW Consultancy Ltd., Wright, Levinson, Ali Herischi, Herischi & Associates LLC, Ali Soltani, and Washington Marketing LLC to commit fraud as alleged herein and profited therefrom.

338.     Plaintiffs were damaged by the actions of Robert Matthews, Maria a/k/a Mia Matthews, Gerry Matthews, Ryan Black, and Nicholas Laudano.

WHEREFORE, Plaintiffs demand judgment against Robert Matthews, Maria a/k/a Mia Matthews, Gerry Matthews, Ryan Black, and Nicholas Laudano, jointly and severally, for damages, punitive damages, costs, interest, prejudgment interest, and such other relief as the Court deems proper.

## COUNT IX – Breach of Fiduciary Duty Against SARC, Walsh, and Payne

339.     Plaintiffs adopt and re-allege the allegations set forth in paragraphs 1 through 271 as if fully stated fully herein.

340.     Walsh and Payne owed Plaintiffs a fiduciary duty and other implied duties arising from their service as general partners of Palm House, including the duties of loyalty and care.

341.     SARC also owed Plaintiffs a fiduciary duty and other implied duties, including the duties of loyalty and care, as it purported to act as the general partner on behalf of Palm House.

342.     Moreover, Plaintiffs reposed their trust and confidence in SARC, Walsh, and Payne, which they accepted.  Plaintiffs were dependent on SARC, Walsh, and Payne and their purported expertise in the United States EB-5 visa program, and SARC, Walsh, and Payne knowingly undertook and accepted the duty to advise, counsel, and protect Plaintiffs.

343.     Walsh, Payne and SARC's duty of loyalty included the duty to account and hold as trustee any property derived by the general partner in the conduct of the limited partnership's activities.

344.     Walsh, Payne and SARC's duty of care included the duty to refrain from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law.

345.     Walsh, Payne and SARC, by stealing and/or allowing Plaintiffs' funds to be stolen from the Escrow Account, in derogation of the written and oral representations that the funds would be held in escrow pending USCIS' approval of Plaintiffs' I-526 applications, breached their fiduciary duties to Plaintiffs.

346.     Walsh, Payne and SARC's knowingly false statements concerning material facts about the Palm House Hotel project, including statements regarding the status of construction, the status of the I-526 petitions, and the status and nature of pending litigation, breached their fiduciary duties to Plaintiffs.

347.     Walsh, Payne, and SARC's breach of their fiduciary duties have caused Plaintiffs substantial damage.

WHEREFORE, Plaintiffs demand judgment against SARC, Walsh, and Payne for damages, punitive damages, costs, interest, prejudgment interest, and such other relief as the Court deems proper.

**COUNT X – Breach of Fiduciary Duty Against Herischi and Herischi & Associates LLC**

348.     The Iranian Victims adopt and re-allege the allegations set forth in paragraphs 1 through 271 as if fully stated fully herein.

349.    Ali Herischi and his law firm, Herischi & Associates LLC, were the attorneys and advisors for the Iranian Victims.

350.    As part of the attorney-client relationship, Herischi and Herischi & Associates LLC were in a fiduciary relationship with the Iranian Victims and owed the Iranian Victims a fiduciary duty.

351.    The Iranian Victims reposed their trust and confidence in Herischi and Herischi & Associates LLC, which they accepted.   The Iranian Victims were dependent on Herischi and Herischi & Associates LLC and their purported expertise in the United States EB-5 visa program, and Herischi knowingly undertook the duty to advise, counsel, and protect the Iranian Victims.

352.    The Iranian Victims trusted Herischi and Herischi & Associates LLC to look out for their best interests and to provide truthful and fully disclosed advice.

353.    Herischi and Herischi & Associates LLC, however, made knowingly false statements concerning material facts to the Iranian Victims to induce them to invest in the Palm House Hotel project.

354.    Further, Herischi and Herischi & Associates LLC received secret, undisclosed kickbacks of $40,000 per investor in return for delivering the Iranian Victims into the Palm House Hotel fraud.

355.    Herischi and Herischi & Associates LLC later admitted their breach of fiduciary duty in a letter in which confessed that they had received secret kickbacks and were parties to an undisclosed "referral arrangement."

356.    Herischi and Herischi & Associates LLC's breach of fiduciary duty has caused the Iranian Victims substantial damage.

WHEREFORE, the Iranian Victims demand judgment against Herischi and Herischi & Associates LLC for damages, punitive damages, costs, interest, prejudgment interest, and such other relief as the Court deems proper.

## COUNT XI – Aiding and Abetting Breach of Fiduciary Duty Against Robert Matthews, Maria a/k/a Mia Matthews, Gerry Matthews, Ryan Black, and Nicholas Laudano

357.    Plaintiffs adopt and re-allege the allegations set forth in paragraphs 1 through 271 and 339 through 347 as if fully stated fully herein.

358.    SARC, Walsh, and Payne owed Plaintiffs fiduciary duties.

359.    SARC, Walsh, and Payne breached their fiduciary duties to Plaintiffs.

360.    Robert Matthews, Maria a/k/a Mia Matthews, Gerry Matthews, Ryan Black, and Nicholas Laudano had knowledge that SARC, Walsh, and Payne breached their fiduciary duties to Plaintiffs, including the duty to hold Plaintiffs' funds in the Escrow Account unless and until their I-526 applications were approved.

361.    Robert Matthews, Maria a/k/a Mia Matthews, Gerry Matthews, Ryan Black, and Nicholas Laudano knowingly aided and abetted the commission of the breach of fiduciary duty against Plaintiffs.

362.    Robert Matthews, Maria a/k/a Mia Matthews, Gerry Matthews, Ryan Black, and Nicholas Laudano substantially assisted or encouraged SARC, Walsh, and Payne to breach their fiduciary duties.

363.    Plaintiffs were damaged by the actions of Robert Matthews, Maria a/k/a Mia Matthews, Gerry Matthews, Ryan Black, and Nicholas Laudano.

WHEREFORE, Plaintiffs demand judgment against Robert Matthews, Maria a/k/a Mia Matthews, Gerry Matthews, Ryan Black, and Nicholas Laudano, jointly and severally, for

damages, punitive damages, costs, interest, prejudgment interest, and such other relief as the Court deems proper.

## COUNT XII - Avoidance of Fraudulent Transfers Pursuant to Fla. Stat. §726.105 (1)(a) Against All Defendants (excluding Palm House)

364.    Plaintiffs adopt and re-allege the allegations set forth in paragraphs 1 through 271 as if fully stated fully herein.

365.    Walsh, without the knowledge, consent, or approval of Plaintiffs, stole Plaintiffs' funds and distributed them to Walsh's conspirators and their entities.

366.    Under Florida Statute § 726.105(1)(a), a transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation with the actual intent to hinder, delay, or defraud and creditor of the debtor.

367.    As the funds and assets at issue were stolen by Walsh from Plaintiffs, Plaintiffs have claims against Walsh which pre-dated the fraudulent transfers and are "Creditors" within the meaning of § 726.102(4), Fla. Stat.

368.    Walsh is a "Debtor" within the meaning of § 726.102(6), Fla. Stat.

369.    At the time Defendants received the transfers as set forth herein, there existed significant, unpaid claims of the Plaintiffs against Walsh.

370.    The transfers were made with the actual intent to hinder, delay, and defraud Plaintiffs as creditors of Walsh.

371.    The transfers were made under circumstances demonstrating an unlawful intent as set forth in §726.105(2), Fla. Stat., because, among other things: (i) the transfers were to insiders; (ii) the transfers were concealed; (iii) the debtor retained control over many of the transferred

assets; (iv) the transfer was of substantially all of the debtor's assets; (v) the debtor removed or concealed assets; and (vi) the debtor absconded.

372.    Florida Statutes § 726.108 provides that, in an action for relief against a transferee under § 726.105, a creditor may obtain:

      a.    avoidance of the transfer to the extent necessary to satisfy the creditor's claim;

      b.    an attachment or other provisional remedy against the asset transferred or other property of the transferee in accordance with applicable law;

      c.    an injunction against further disposition by the transferee of the asset transferred or of other property;

      d.    appointment of a receiver to take charge of the asset transfer or other property; or

      e.    any other relief the circumstances may require.

373.    In addition to the relief available to the Plaintiffs under Florida Statute § 726.108, Plaintiffs also are entitled to a money judgment equal to the value of the assets transferred including pre-judgment interest.

WHEREFORE, Plaintiffs respectfully requests that the Court enter judgment in favor of Plaintiffs and against Defendants (excluding Palm House) in an amount equal to the value of the assets transferred from Walsh to Defendants, and award Plaintiffs pre-judgment interest and any other remedies the Court deems just and proper including, without limitation, and any or all of the remedies provided under Florida Statutes Chapter 726.

## COUNT XIII - Avoidance of Fraudulent Transfers Pursuant to Fla. Stat. §726.105 (1)(b) Against All Defendants (excluding Palm House)

374.    Plaintiffs adopt and re-allege the allegations set forth in paragraphs 1 through 271 as if fully stated fully herein.

375.     Walsh, without the knowledge, consent, or approval of Plaintiffs, stole Plaintiffs' funds and distributed them to Walsh's conspirators and their entities.

376.     Under Florida Statutes § 726.105(1)(b), a transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor: (i) was engaged or was about to engage in a business or transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (ii) intended to incur, or believed or reasonably should have believed that he or she would incur debts beyond his or her ability to pay as they became due.

377.     As the funds and assets at issue were stolen by Walsh from Plaintiffs, Plaintiffs have claims against Walsh which pre-dated the fraudulent transfers and are "Creditors" within the meaning of § 726.102(4), Fla. Stat.

378.     Walsh transferred Plaintiffs' funds to Defendants without receiving a reasonably equivalent value in exchange.

379.     Walsh's theft from Plaintiffs were so significant that he believed, or reasonably should have believed, that the debts he was incurring or had incurred as a result of these thefts were beyond his capacity to repay and knew or should have known at the time he made the transfers to his conspirators and their entities that he would be unable to pay back what was owed to Plaintiffs.

380.     Walsh is a Debtor within the meaning of § 726.102(6), Fla. Stat.

381.     At the time Defendants received the transfers as set forth herein, there existed significant, unpaid claims of Plaintiffs against Walsh.

382.     Florida Statutes § 726.108 provides that, in an action for relief against a transferee under § 726.105, a creditor may obtain:

   a.     avoidance of the transfer to the extent necessary to satisfy the creditor's claim;

   b.     an attachment or other provisional remedy against the asset transferred or other property of the transferee in accordance with applicable law;

   c.     an injunction against further disposition by the transferee of the asset transferred or of other property;

   d.     appointment of the receiver to take charge of the asset transfer or other property; or

   e.     any other relief the circumstances may require

383.     In addition to the relief available to Plaintiffs under Florida Statutes §726.108, Plaintiffs also are entitled to a money judgment equal to the value of the assets transferred including pre-judgment interest.

WHEREFORE, Plaintiffs respectfully requests that the Court enter judgment in favor of Plaintiffs and against Defendants (excluding Palm House) in an amount equal to the value of the assets transferred from Walsh to Defendants, awarding pre-judgment interest, and any other remedies the Court deems just and proper including, without limitation, any or all of the remedies provided for under Florida Statutes Chapter 726.

### COUNT XIV - Avoidance of Fraudulent Transfers Pursuant to Fla. Stat. §726.106 Against All Defendants (excluding Palm House)

384.     Plaintiffs adopt and re-allege the allegations set forth in paragraphs 1 through 271 as if fully stated fully herein.

385.     Walsh, without the knowledge, consent, or approval of Plaintiffs, stole Plaintiffs' funds and distributed them to Walsh's conspirators and their entities.

386.     Under Florida Statutes § 726.106, a transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at the time or the debtor became insolvent as a result of the transfer or obligation.

387.     As the funds and assets at issue were stolen by Walsh, from Plaintiffs, Plaintiffs have claims against Walsh which pre-dated the fraudulent transfers and are "Creditors", within the meaning of § 726.102(4), Fla. Stat.

388.     Walsh is a "Debtor" within the meaning of § 726.102(6), Fla. Stat.

389.     At the time the Defendants received the transfers as set forth herein, there existed significant, unpaid claims of Plaintiffs against Walsh.

390.     The transfers made by Walsh were made without receiving a reasonably equivalent value in exchange for the transfer and Walsh, because of the amounts stolen from Plaintiffs, was insolvent or became insolvent as a result of these transfers.

391.     Florida Statute § 726.108 provides that, in an action for relief against a transferee under § 726.106, a creditor may obtain:

    a.    avoidance of the transfer to the extent necessary to satisfy the creditor's claim;

    b.    an attachment or other provisional remedy against the asset transferred or other property of the transferee in accordance with applicable law;

    c.    an injunction against further disposition by the transferee of the asset transferred or of other property;

    d.    appointment of a receiver to take charge of the asset transfer or other property; or

    e.    any other relief the circumstances may require.

392.     In addition to the relief available to the Plaintiffs under Florida Statute § 726.108, Plaintiffs also are entitled to a money judgment equal to the value of the assets transferred including pre-judgment interest.

WHEREFORE, Plaintiffs respectfully requests that the Court enter judgment in favor of Plaintiffs and against Defendants (excluding Palm House) in an amount equal to the value of the assets transferred from Walsh to Defendants, and award Plaintiffs pre-judgment interest and any other remedies the Court deems just and proper including, without limitation, any or all of the remedies provided for under Florida Statutes Chapter 726.

**COUNT XV –Violation of Florida Securities and Investor Protection Act, Fla. Stat. §517.011 et seq. Against SARC, USREDA, Walsh, Walsh Jr., Payne, Derrico, Cheng, Wright, Levinson, and Robert Matthews**

393.     The Chinese Victims adopt and re-allege the allegations set forth in paragraphs 1 through 271 as if fully stated fully herein.

394.     This is an action for violations of the Florida Securities and Investor Protection Act ("FSIPA"), Fla. Stat. Section 517.011 et seq.

395.     Pursuant to Fla. Stat. Section 517.301(1)(a), it is unlawful and a violation of FSIPA for a person, in connection with the rendering of any investment advice or in connection with the offer, sale, or purchase of any investment or security, including any security exempted under the provisions of Section 517.051 and including any security sold in a transaction exempted under the provisions of Section 517.061, directly or indirectly:

(a)     to employ any device, scheme, or artifice to defraud;

(b)     to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(c)     to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a person.

396.     It is also unlawful to knowingly and willfully falsify, conceal, or cover up, by any trick, scheme, or device, a material fact, make any false, fictitious, or fraudulent statement or representation, or make or use any false writing or document, knowing the same to contain any false, fictitious, or fraudulent statement or entry.  Fla. Stat. Section 517.301(1)(c).

397.     Pursuant to Fla. Stat. Section 517.211(2), any person purchasing or selling a security in violation of Section 517.301, and every director, officer, partner, or agent of or for the purchaser or seller, if the director, officer, partner, or agent has personally participated or aided in making the sale or purchase, is jointly and severally liable to the person selling the security to or purchasing the security from such person in an action for rescission, if the plaintiff still owns the security, or for damages, if the plaintiff has sold the security.

398.     A purchaser may recover the consideration paid for the security or investment, plus interest thereon at the legal rate, less the amount of income received by the purchaser on the security or investment, in addition to an award of prevailing party attorneys' fees.  See Fla. Stat. Section 517.211(3).

399.     SARC, USREDA, Walsh, Walsh Jr., Payne, Derrico, Cheng, Wright, Levinson, and Robert Matthews employed a scheme to defraud the Chinese Victims into making an investment in Palm House.

400.     SARC, USREDA, Walsh, Walsh Jr., Payne, Derrico, Cheng, Wright, Levinson, and Robert Matthews obtained the Chinese Victims' money by means of untrue statements of material facts, including the Escrow Representation.

401.     SARC, USREDA, Walsh, Walsh Jr., Payne, Derrico, Cheng, Wright, Levinson, and Robert Matthews engaged in transactions, practices and a course of business that operated as a fraud on the Chinese Victims.

402.     SARC, USREDA, Walsh, Walsh Jr., Payne, Derrico, Cheng, Wright, Levinson, and Robert Matthews acted with scienter, and knew that their representations were false, and intended that the Chinese Victims rely upon the representations and be induced by them to invest their money into Palm House.

403.     SARC, USREDA, Walsh, Walsh Jr., Payne, Derrico, Cheng, Wright, Levinson, and Robert Matthews knew there was no intention to hold the Chinese Victims' funds in the Escrow Account unless and until their I-526 applications were approved by USCIS.

404.     The Chinese Victims relied upon the representations of SARC, USREDA, Walsh, Walsh Jr., Payne, Derrico, Cheng, Wright, Levinson, and Robert Matthews in making their investments into Palm House, and have been damaged.

405.     The Chinese Victims tender their investments in Palm House.

406.     SARC, USREDA, Walsh, Walsh Jr., Payne, Derrico, Cheng, Wright, Levinson, and Robert Matthews all participated or aided in making the sale of the Palm House investment to the Chinese Victims that resulted in a direct harm to the Chinese Victims.

WHEREFORE, the Chinese Victims respectfully request that the Court enter judgment in favor of the Chinese Victims and against SARC, USREDA, Walsh, Walsh Jr., Payne, Derrico, Cheng, Wright, Levinson, and Robert Matthews, jointly and severally, for rescission, attorneys' fees pursuant to Fla. Stat. Section 517.211, interest, costs, and such other relief that the Court deems just and proper including, without limitation, any or all of the remedies provided for under the Florida Securities and Investor Protection Act, Fla. Stat. Section 517.011 et seq.

## COUNT XVI –Violation of Florida Securities and Investor Protection Act, Fla. Stat. §517.011 et seq. Against SARC, USREDA, Walsh, Walsh Jr., Payne, Derrico, and Herischi

407.     The Iranian Victims adopt and re-allege the allegations set forth in paragraphs 1 through 271 as if fully stated fully herein.

408.    This is an action for violations of the Florida Securities and Investor Protection Act ("FSIPA"), Fla. Stat. Section 517.011 et seq.

409.    Pursuant to Fla. Stat. Section 517.301(1)(a), it is unlawful and a violation of FSIPA for a person, in connection with the rendering of any investment advice or in connection with the offer, sale, or purchase of any investment or security, including any security exempted under the provisions of Section 517.051 and including any security sold in a transaction exempted under the provisions of Section 517.061, directly or indirectly

(a)    to employ any device, scheme, or artifice to defraud;

(b)    to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(c)    to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a person.

410.    It is also unlawful to knowingly and willfully falsify, conceal, or cover up, by any trick, scheme, or device, a material fact, make any false, fictitious, or fraudulent statement or representation, or make or use any false writing or document, knowing the same to contain any false, fictitious, or fraudulent statement or entry.  Fla. Stat. Section 517.301(1)(c).

411.    Pursuant to Fla. Stat. Section 517.211(2), any person purchasing or selling a security in violation of Section 517.301, and every director, officer, partner, or agent of or for the purchaser or seller, if the director, officer, partner, or agent has personally participated or aided in making the sale or purchase, is jointly and severally liable to the person selling the security to or purchasing the security from such person in an action for rescission, if the plaintiff still owns the security, or for damages, if the plaintiff has sold the security.

412.    A purchaser may recover the consideration paid for the security or investment, plus interest thereon at the legal rate, less the amount of income received by the purchaser on the

security or investment, in addition to an award of prevailing party attorneys' fees.  See Fla. Stat. Section 517.211(3).

413.    SARC, USREDA, Walsh, Walsh Jr., Payne, Derrico, and Herischi employed a scheme to defraud the Iranian Victims into making an investment in Palm House.

414.    SARC, USREDA, Walsh, Walsh Jr., Payne, Derrico, and Herischi obtained the Iranian Victims' money by means of untrue statements of material facts, including the Escrow Representation.

415.    SARC, USREDA, Walsh, Walsh Jr., Payne, Derrico, and Herischi engaged in transactions, practices and a course of business that operated as a fraud on the Iranian Victims.

416.    SARC, USREDA, Walsh, Walsh Jr., Payne, Derrico, and Herischi acted with scienter, and knew that their representations were false, and intended that the Iranian Victims rely upon the representations and be induced by them to invest their money into Palm House.

417.    SARC, USREDA, Walsh, Walsh Jr., Payne, Derrico, and Herischi knew there was no intention to hold the Iranian Victims' funds in the Escrow Account unless and their I-526 applications were approved by USCIS.

418.    The Iranian Victims relied upon the representations of SARC, USREDA, Walsh, Walsh Jr., Payne, Derrico, and Herischi in making their investments into Palm House, and have been damaged.

419.    The Iranian Victims tender their investments in Palm House.

420.    SARC, USREDA, Walsh, Walsh Jr., Payne, Derrico, and Herischi all participated or aided in making the sale of the Palm House investment to the Iranian Victims that resulted in a direct harm to the Iranian Victims.

WHEREFORE, the Iranian Victims respectfully request that the Court enter judgment in favor of the Iranian Victims and against SARC, USREDA, Walsh, Walsh Jr., Payne, Derrico, and Herischi, jointly and severally, for rescission, attorneys' fees pursuant to Fla. Stat. Section 517.211, interest, costs, and such other relief that the Court deems just and proper including, without limitation, any or all of the remedies provided for under the Florida Securities and Investor Protection Act, Fla. Stat. Section 517.011 et seq.

## COUNT XVII – Unjust Enrichment Against All Defendants

421.    Plaintiffs adopt and re-allege the allegations set forth in paragraphs 1 through 271 as if fully stated fully herein.

422.    As a result of the unlawful actions of Walsh, Plaintiffs have conferred a benefit on Defendants in the form of assets taken from Plaintiffs and given to Defendants or by Defendants' acquisition of assets or real property acquired using funds unlawfully obtained from Plaintiffs.

423.    Defendants were aware of the benefits conferred on them by Plaintiffs, and have been unjustly enriched by the benefits.

424.    Defendants voluntarily accepted and retained the benefits conferred on them.

425.    The circumstances are such that it would be inequitable for Defendants to retain the benefits obtained by them as a result of the actions of Walsh and the Bad Actors.

WHEREFORE, Plaintiffs respectfully requests that the Court enter judgment in favor of Plaintiffs and against Defendants for the value of the benefits wrongfully obtained by Defendants, awarding and imposing upon Defendants a constructive trust upon the proceeds of the wrongful and/or illegal activities, imposing equitable relief requiring Defendants to turn over the assets obtained using the funds unlawfully taken from Plaintiffs, and granting such other and further relief as the Court deems just and proper.

**COUNT XVIII – Violation of Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §501.201 et seq., Against All Defendants (excluding Palm House and the Evans Defendants)**

426.     Plaintiffs adopt and re-allege the allegations set forth in paragraphs 1 through 271 as if fully stated fully herein.

427.     After SARC, USREDA, Walsh, Walsh Jr., Payne, Derrico, Wright, Levinson, Robert Matthews, and Herischi committed securities fraud, the Bad Actors committed separate, independent, unfair and deceptive acts against Plaintiffs.

428.     The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") broadly prohibits all "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade of commerce." § 501.204(1), Fla. Stat.

429.     The Bad Actors engaged in trade and/or commerce within the meaning of FDUTPA.

430.     Plaintiffs were consumers under FDUTPA.

431.     The Bad Actors engaged in deceptive and unfair trade practices in violation of FDUTPA, as more fully explained above, including but not limited to:

(a)      Removing Plaintiffs' funds from the Escrow Account before Plaintiffs' I-526 petitions were approved by USCIS;

(b)      Upon information and belief, engaging in a scheme whereby Plaintiffs' funds were moved between accounts before being deposited in a trust account controlled by the Evans Defendants, in an attempt to hide the fact that the funds belonged to Plaintiffs;

(c)      Providing Plaintiffs' funds to Palm House LLC before Plaintiffs' I-526 petitions were approved by USCIS;

(d)      Using Plaintiffs' funds for non-allowable purposes, i.e. purposes not related to the renovation or development of the Palm House Hotel;

(e)      Engaging in a systematic scheme to loot Plaintiffs' funds, transfer and hide them among multiple accounts, distribute them among the conspirators and entities they owned and/or controlled, and use them to purchase goods, real property and other items to personally benefit the Bad Actors; and

(f)     Continually lulling and lying to Plaintiffs about the status of the Palm House Hotel project, the status and character of the litigation relating to the project, the status of the I-526 petition approvals, and such other frauds and falsehoods that were told to Plaintiffs while their funds were stolen and dissipated, in an effort to prevent Plaintiffs from bringing a lawsuit, alerting law enforcement or otherwise interfering with the Bad Actors' scheme.

432.     Plaintiffs suffered actual economic damages as a direct result of the Bad Actors' deceptive and unfair trade practices.

433.      Plaintiffs are also entitled to recover their attorneys' fees pursuant to Fla. Stat. Section 501.2105.

WHEREFORE, Plaintiffs respectfully requests that the Court enter judgment in favor of Plaintiffs and against the Bad Actors for damages, interest, costs, attorneys' fees pursuant to Fla. Stat. Section 501.2105, and such other relief that the Court deems just and proper.

## COUNT XIX – Equitable Accounting Against All Defendants

434.     Plaintiffs adopt and re-allege the allegations set forth in paragraphs 1 through 271 as if fully stated fully herein.

435.     A fiduciary relationship existed between Plaintiffs and Palm House, Walsh, Payne, and SARC.

436.     Further, the fraud and theft perpetrated upon Plaintiffs was an extensive, complex transaction, whereby Plaintiffs' funds were transferred between and among many accounts, laundered through numerous entities, and ultimately used for personal, inappropriate purposes.

437.     Plaintiffs' funds, which were transferred from the Escrow Account without any authorization from Plaintiffs, and the subsequent unauthorized transfers and transactions involving these funds, are so involved and complicated that a remedy at law is insufficient to administer complete justice.

438.     Plaintiffs are entitled to receive information regarding transactions involving any of the funds traceable to Plaintiffs.

439.     Plaintiffs have requested information on the transfers of their funds, transactions involving their funds, and the present location of their funds, which has not been provided.

WHEREFORE, Plaintiffs respectfully request that this Court order Defendants to provide a full and complete accounting of their finances, operations, and transactions involving any funds traceable to Plaintiffs, provide Plaintiffs with the location and amount of all accounts containing any funds traceable to Plaintiffs, provide Plaintiffs with the location and description of all property purchased with any funds traceable to Plaintiffs, impose a constructive trust over all amounts and profits to which Plaintiffs are determined to be entitled to, and to grant such other and further relief as the Court deems just and proper.

## COUNT XX – Civil Conspiracy Against All Defendants (excluding Palm House and the Evans Defendants)

440.     Plaintiffs adopt and re-allege the allegations set forth in paragraphs 1 through 271 as if fully stated fully herein.

441.     The Bad Actors are parties to a conspiracy.

442.     There was an agreement between the Bad Actors to do an unlawful act or to do a lawful act by unlawful means, there were overt acts in furtherance of the conspiracy, and Plaintiffs were damaged as a result of acts done under the conspiracy.

443.     As described above, the basis of the conspiracy is a fraud and theft of approximately $50,000,000 of Plaintiffs' money, which are independent torts that give rise to causes of action if committed by one person.

444.   The Bad Actors entered into a conspiracy and acted in concert to market a fraudulent investment scheme to Plaintiffs, steal their money, and then distribute and dissipate the money among themselves.

445.   The Bad Actors acted with the full knowledge and awareness that the investment scheme was designed to fraudulently procure and steal Plaintiffs' funds under the guise of an EB-5 visa investment opportunity.

446.   The Bad Actors acted contrary to law, acted according to a predetermined and commonly understood plan of action for the purpose of obtaining Plaintiffs' funds, and took overt acts in furtherance of the conspiracy.

447.   There was a meeting of minds between and among the Bad Actors to commit the unlawful acts alleged herein.

448.   Plaintiffs have suffered damage as a result of the conspiracy.

WHEREFORE, Plaintiffs respectfully requests that the Court enter judgment in favor of Plaintiffs and against the Bad Actors for damages, interest, cost, and such other relief that the Court deems just and proper.

## COUNT XXI – Constructive Fraud Against All Defendants (excluding Palm House and the Evans Defendants)

449.   Plaintiffs adopt and re-allege the allegations set forth in paragraphs 1 through 271 as if fully stated fully herein.

450.   A duty to Plaintiffs under a confidential or fiduciary relationship has been abused.

451.   An unconscionable or improper advantage has been taken of Plaintiffs.

452.   As specifically described above, a fraudulent scheme was perpetrated upon Plaintiffs, based upon knowingly false statements concerning material facts and concealment.

453. Plaintiffs relied upon the knowingly false statements concerning material facts and concealment, were induced to provide their investments, and have been damaged.

454. The fraudulent scheme perpetrated upon Plaintiffs was wrongful, and equitable interference is justified under these circumstances.

WHEREFORE, Plaintiffs demand judgment against the Bad Actors for damages, costs, interest, prejudgment interest, and such other and further relief which is necessary and just in the circumstances.

## COUNT XXII – Piercing the Corporate Veil Against SARC, USREDA and JJW Consultancy, Ltd.

455. Plaintiffs adopt and re-allege the allegations set forth in paragraphs 1 through 271 as if fully stated fully herein.

456. The corporate veils of SARC, USREDA, and JJW Consultancy, Ltd. should be pierced and Plaintiffs should be allowed to recover against their stockholders.

457. As described above, SARC, USREDA, and JJW Consultancy, Ltd. were employed for fraudulent or misleading purposes.

458. SARC, USREDA, and JJW Consultancy, Ltd. were the alter ego or mere instrumentality of their stockholders.

459. SARC, USREDA, and JJW Consultancy, Ltd. were employed in the fraudulent scheme as a means of creating an official, reputable looking façade, when in reality Walsh, Walsh Jr., Payne and others merely used these entities as their alter ego or as mere instrumentalities for their litany of lies, fraudulent representations, and other criminal acts.

460. Upon information and belief, the corporate formalities of SARC, USREDA, and JJW Consultancy, Ltd. were not respected, and money was moved in and out of these entities in furtherance of the criminal scheme described above.

WHEREFORE, Plaintiffs request that the Court pierce the corporate veils of SARC, USREDA, and JJW Consultancy, Ltd., award a judgment against those stockholders in favor of Plaintiffs for damages, costs, interest, prejudgment interest, and such other and further relief which is necessary and just under the circumstances.

## COUNT XXIII – Equitable Lien Against Robert Matthews

461.    Plaintiffs adopt and re-allege the allegations set forth in paragraphs 1 through 271 as if fully stated fully herein.

462.    Plaintiffs seek the imposition of a lien on Robert Matthews' home, located at 101 Casa Bendita, Palm Beach, Florida 33480 (the "Home").

463.    As described above, Robert Matthews used fraud, misrepresentation, and deception to secure Plaintiffs' investments in the Palm House Hotel project.

464.    Once Plaintiffs' investments in the Palm House Hotel project were obtained, Robert Matthews stole and used Plaintiffs' money to pay the mortgage on the Home.

465.    Once Plaintiffs' investments in the Palm House Hotel project were obtained, Robert Matthews stole and used Plaintiffs' money to pay the property taxes on the Home.

466.    A lien on the Home in favor of Plaintiffs is appropriate to prevent unjust enrichment or other inequities.

WHEREFORE, Plaintiffs request that the Court impose an equitable lien in favor of Plaintiffs on the home of Robert Matthews, located at 101 Casa Bendita, Palm Beach, Florida 33480, and grant such other and further relief which is necessary and just under the circumstances.

## COUNT XXIV – Equitable Lien Against 160 Royal Palm LLC and KK-PB Financial, LLC

467.    Plaintiffs adopt and re-allege the allegations set forth in paragraphs 1 through 271 as if fully stated fully herein.

468.    Since 2009, 160 Royal Palm, LLC has owned the real property located at 160 Royal Palm Way, Palm Beach, Florida, upon which the Palm House Hotel is located (the "Real Property").

469.    Glenn Straub was the prior developer of the Palm House Hotel, and owned and/or controlled 160 Royal Palm, LLC.

470.    Glenn Straub sold his ownership interest in 160 Royal Palm, LLC in 2013 to Palm House, LLC.

471.    Palm House, LLC is owned and/or controlled by Ryan Black, Gerry Matthews and Robert Matthews.

472.    In exchange for conveying the membership interests in 160 Royal Palm LLC, Glen Straub's company, KK-PB Financial LLC, received little to no cash and a mortgage in the principal amount of $27,468,750 (the "Mortgage").

473.    Straub and KK-PB Financial LLC were aware that Palm House, LLC intended to offer an EB-5 visa program at the Palm House Hotel, and that they intended to obtain foreign investors in the project.

474.    Straub and KK-PB Financial LLC were aware that potential investors at the Palm House Hotel would seek security in exchange for their investment.

475.    Straub and KK-PB Financial LLC were aware that potential investors at the Palm House Hotel would seek security for their investment in the form of a mortgage on the Real Property.

476. Straub and KK-PB Financial LLC were aware that potential investors at the Palm House Hotel would likely perform due diligence and ascertain whether the Real Property provided adequate security for their investment.

477. Upon information and belief, Straub and KK-PB Financial LLC were informed that the foreign investors were told that there was a $29,500,000 bank loan and mortgage against the property, and that those funds were being used to create jobs and continue the construction.

478. Upon information and belief, Straub and KK-PB Financial LLC were informed that the foreign investors were told that their investments would be used to pay off the $29,500,000 bank loan, at which time they would receive a first mortgage on the Real Property.

479. Upon information and belief, Straub and KK-PB Financial LLC were informed that the foreign investors would be told that their investments would be fully secured by the Real Property.

480. Upon information and belief, Straub and KK-PB Financial LLC intentionally failed to record their Mortgage for almost seven (7) months to create the façade to potential foreign investors that the Real Property was unencumbered by his mortgage, which was in excess of $27,000,000.

481. Upon information and belief, Straub and KK-PB Financial LLC recorded the Mortgage on March 28, 2014, only after being informed that most of the Plaintiffs had already performed their due diligence, signed their documentation, and wired their investments to be used at the Palm House Hotel project.

482. It is inconceivable why the holder of a mortgage in excess of $27,000,000 would fail to record it, other than to help defraud Plaintiffs into believing they would be receiving adequate security in the Real Property upon the loan being made to Palm House, LLC.

483.    Straub and KK-PB Financial LLC conspired with and/or enabled the Bad Actors to fraudulently sell the Palm House investment opportunity to Plaintiffs.

484.    It was never disclosed to Plaintiffs that a prior mortgage in favor of the prior owner/developer existed on the Real Property.

485.    The Bad Actors represented to Plaintiffs that the only loan on the project was a bank loan, which was being used to create jobs and continue the construction.

486.    Further, Straub and KK-PB Financial LLC impermissibly benefitted from their conduct by collecting payments on the Mortgage from Plaintiffs' funds.

487.    Upon information and belief, Straub and KK-PB Financial LLC received other benefits from the fraudulent scheme.

488.    Plaintiffs seek the imposition of a lien on the Real Property, prior in interest to the Mortgage.

489.    Such a lien on the Real Property in favor of Plaintiffs is appropriate to prevent unjust enrichment or other inequities.

WHEREFORE, Plaintiffs request that the Court impose an equitable lien in favor of Plaintiffs on the real property located at 160 Royal Palm Way, Palm Beach, Florida, upon which the Palm House Hotel is located, that such lien be higher priority than the recorded mortgage held by KK-PB Financial LLC, and grant such other and further relief which is necessary and just under the circumstances.

### COUNT XXV – Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against SARC, USREDA, Walsh, Walsh Jr., Payne, Derrico, Wright, Levinson, Robert Matthews and Ali Herischi

490.    Plaintiffs adopt and re-allege the allegations set forth in paragraphs 1 through 271 as if fully stated fully herein.

491. SARC, USREDA, Walsh, Walsh Jr., Payne, Derrico, Wright, Levinson, Robert Matthews and Ali Herischi carried out a plan, scheme, and course of conduct that was intended to, and did (i) deceive Plaintiffs, as alleged herein; and (ii) cause Plaintiffs to purchase limited partnership interests in Palm House. In furtherance of this unlawful scheme, SARC, USREDA, Walsh, Walsh Jr., Payne, Derrico, Wright, Levinson, Robert Matthews, and Ali Herischi took the actions set forth hereinabove.

492. These defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices and a course of business which operated as a fraud and deceit upon purchasers of Palm House's limited partnership units in violation of Section 10(b) of the Exchange Act and Rule 10b-5. These defendants are sued as primary participants in the wrongful and illegal conduct charged herein.

493. SARC, USREDA, Walsh, Walsh Jr., Payne, Derrico, Wright, Levinson, Robert Matthews, and Ali Herischi, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a course of conduct to conceal adverse material information about the Escrow Account, the status of construction at the project, and the funds available for construction at the project, among other things, as specific herein.

494. These defendants each employed devices, schemes and artifices to defraud and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of the value of investing in Palm House, which included the making of, or the participation in the making of, untrue statements of material facts about the Palm House Hotel

project and omitting to state material facts necessary in order to make the statements made not misleading.

495.     SARC, USREDA, Walsh, Walsh Jr., Payne, Derrico, Wright, Levinson, Robert Matthews, and Ali Herischi's primary liability arises from the following facts, among others: (i) they were high-level officers within Palm House and/or high-level players in the scheme to sell foreign investors limited partnership interests in Palm House; (ii) they, by virtue of their responsibilities and activities as high-level players in the scheme, were privy to and participated in the creation, development and publication of Palm House's sales, marketing, projections and/or reports; and (iii) they were aware of Palm House's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

496.     SARC, USREDA, Walsh, Walsh Jr., Payne, Derrico, Wright, Levinson, Robert Matthews, and Ali Herischi had actual knowledge of the misrepresentations and omissions of material facts set for herein, or acted with severely reckless disregard for the truth, in that each failed to ascertain and disclose such facts, even though such facts were available to them.  Such defendants' material misrepresentations and/or omissions were done knowingly or with deliberate recklessness and for the purpose and effect of concealing information regarding Palm House's true status as a façade and vehicle for a massive fraud and theft.

497.     As a result of the dissemination of materially false and misleading information and failure to disclose material facts, as set forth herein, Palm House appeared to be a legitimate investment opportunity for foreigners seeking a path to United States residency via an EB-5 visa. In ignorance of the fact that Palm House's securities were merely a façade for a criminal scheme, Plaintiffs invested their money into Palm House and were damaged thereby.

498.     At the time of said misrepresentations and omissions, Plaintiffs were ignorant of their falsity and believed them to be true.  Had Plaintiffs known of SARC, USREDA, Walsh, Walsh Jr., Payne, Derrico, Wright, Levinson, Robert Matthews, and Ali Herischi's fraudulent practices, Plaintiffs would not have purchased or otherwise acquired their securities in Palm House.

499.     By virtue of the foregoing, SARC, USREDA, Walsh, Walsh Jr., Payne, Derrico, Wright, Levinson, Robert Matthews, and Ali Herischi have each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

500.     As a direct and proximate result of SARC, USREDA, Walsh, Walsh Jr., Payne, Derrico, Wright, Levinson, Robert Matthews, and Ali Herischi's wrongful conduct, Plaintiffs suffered damages in connection with their respective purchases of limited partnership interests in Palm House.

WHEREFORE, Plaintiffs respectfully requests that the Court enter judgment in favor of Plaintiffs and against SARC, USREDA, Walsh, Walsh Jr., Payne, Derrico, Wright, Levinson, Robert Matthews, and Ali Herischi for damages, injunctive relief, interest, cost, attorneys' fees, and such other relief that the Court deems just and proper.

## COUNT XXVI – Violations of Section 20(a) of the Exchange Act Against SARC, USREDA, Walsh, Walsh Jr., Payne, Derrico, Wright, Levinson, Robert Matthews and Ali Herischi

501.     Plaintiffs adopt and re-allege the allegations set forth in paragraphs 1 through 271 and 491 through 500 as if fully stated fully herein.

502.     SARC, USREDA, Walsh, Walsh Jr., Payne, Derrico, Wright, Levinson, Robert Matthews, and Ali Herischi acted as controlling persons of Palm House within the meaning of Section 20(a) of the Exchange Act as alleged herein.

503.    By virtue of their high-level positions within Palm House and/or high-level positions within the scheme to sell foreign investors limited partnership interests in Palm House, participation in and/or awareness of Palm House's operations, and/or intimate knowledge of Palm House's fraudulent practices and Palm House's actual statue and true prospects, SARC, USREDA, Walsh, Walsh Jr., Payne, Derrico, Wright, Levinson, Robert Matthews, and Ali Herischi had the power to influence and control, and did influence and control, directly or indirectly, the decision making of Palm House, including the content and dissemination of the various statements which Plaintiffs contend were false and misleading.

504.    SARC, USREDA, Walsh, Walsh Jr., Payne, Derrico, Wright, Levinson, Robert Matthews, and Ali Herischi were provided with, or had unlimited access to, copies of Palm House's reports, sales materials, brochures, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

505.    In addition, SARC, USREDA, Walsh, Walsh Jr., Payne, Derrico, Wright, Levinson, Robert Matthews, and Ali Herischi had direct involvement in the day-to-day operations of Palm House and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein and exercised the same.

506.    As set forth above, SARC, USREDA, Walsh, Walsh Jr., Payne, Derrico, Wright, Levinson, Robert Matthews, and Ali Herischi each violated Section 10(b) and Rule 10b-5 by their acts and omissions.  By virtue of their controlling positions, they are liable pursuant to Section 20(a) of the Exchange Act.

507.    As a direct and proximate result of SARC, USREDA, Walsh, Walsh Jr., Payne, Derrico, Wright, Levinson, Robert Matthews, and Ali Herischi's conduct, Plaintiffs suffered damages in connection with their purchases of Palm House's securities.

WHEREFORE, Plaintiffs respectfully requests that the Court enter judgment in favor of Plaintiffs and against SARC, USREDA, Walsh, Walsh Jr., Payne, Derrico, Wright, Levinson, Robert Matthews, and Ali Herischi for damages, injunctive relief, interest, cost, attorneys' fees, and such other relief that the Court deems just and proper.

## COUNT XXVII –Violation of RICO, 18 U.S.C. 1962(c) Against the Bad Actors

508.    Plaintiffs adopt and re-allege the allegations set forth in paragraphs 1 through 271 as if fully stated fully herein.

509.    After SARC, USREDA, Walsh, Walsh Jr., Payne, Derrico, Wright, Levinson, Robert Matthews, and Ali Herischi committed securities fraud, the Bad Actors engaged in separate, independent racketeering activity to the detriment of Plaintiffs.

510.    The Bad Actors were employed by and associated with an illegal enterprise, and conducted and participated in that enterprise's affairs, through a pattern of racketeering activity consisting of numerous and repeated uses of the interstate mails and wire communications to execute a scheme to defraud, all in violation of RICO, 18 U.S.C. § 1962(c).

511.    The RICO enterprise, which engaged in, and the activities of which affected, interstate and foreign commerce, was comprised of an association in fact of entities and individuals that included the Bad Actors.

512.    The members of the RICO enterprise had a common purpose: to increase and maximize their profits by illegally diverting funds that they knew belonged to Plaintiffs for improper and unauthorized purposes.  The Bad Actors shared the bounty of their enterprise by sharing the illegal profits generated by the joint scheme.

513.    The Bad Actors conducted and participated in the affairs of this RICO enterprise through a pattern of racketeering activity that projects into the future, lasted more than one year, and that consisted of numerous and repeated violations of federal mail and wire fraud statutes, which prohibit the use of any interstate or foreign wire or mail facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.   The RICO enterprise functioned over a period of years as a continuing unit and maintained an ascertainable structure separate and distinct from the pattern of racketeering activity alleged herein.

514.    SARC, USREDA, Walsh, Walsh Jr., and Robert Matthews directed and controlled the enterprise's affairs, as more fully explained above, including but not limited to:

(a)    Removing Plaintiffs' funds from the Escrow Account before Plaintiffs' I-526 petitions were approved by USCIS;

(b)    Engaging in a scheme whereby Plaintiffs' funds were moved between accounts before being deposited in a trust account controlled by the Evans Defendants, in an attempt to hide the fact that the funds belonged to Plaintiffs;

(c)    Providing Plaintiffs' funds to Palm House LLC before Plaintiffs' I-526 petitions were approved by USCIS;

(d)    Using Plaintiffs' funds for non-allowable purposes, i.e. purposes not related to the renovation or development of the Palm House Hotel;

(e)    Engaging in a systematic scheme to loot Plaintiffs' funds, transfer and hide them among multiple accounts, distribute them among the conspirators and entities they owned and/or controlled, and use them to purchase goods, real property and other items to personally benefit the Bad Actors; and

(f)    Continually lulling and lying to Plaintiffs about the status of the Palm House Hotel project, the status and character of the litigation relating to the project, the status of the I-526 petition approvals, and such other frauds and falsehoods that were told to Plaintiffs while their funds were stolen and dissipated, in an effort to prevent Plaintiffs from bringing a lawsuit, alerting law enforcement or otherwise interfering with the Bad Actors' scheme.

515.    The Bad Actors used the mails and wires in furtherance of the scheme to defraud. The Bad Actors provided materials to investors using the mails and wired investor funds among various accounts.

516.    As described hereinabove, as part of and in furtherance of the scheme to defraud, the Bad Actors made material omissions and misrepresentations to Plaintiffs with the intent to deceive them.

517.    For the purpose of executing the scheme to defraud, the Bad Actors sent, mailed, and transmitted, or caused to be sent, mailed, or transmitted, in interstate or foreign commerce investment materials and numerous wire transfers misappropriating Plaintiffs' funds.

518.    Because the scheme was not disclosed, and as a result of the Bad Actors' conduct and participation in the racketeering activity alleged herein, Plaintiffs could take no action to avoid the misuse and embezzlement of their funds, causing Plaintiffs to suffer damages in the form of the loss of their investments.

519.    The proceeds from the enterprise included the $500,000 "investment" plus the $40,000 in "administrative fees" paid by each Plaintiff.

WHEREFORE, Plaintiffs respectfully requests that the Court enter judgment in favor of Plaintiffs and against the Bad Actors for damages, treble damages, attorneys' fees, interest, cost, injunctive relief ordering the Bad Actors to divest themselves of any interest, direct or indirect, in the enterprise; imposing reasonable restrictions on the future activities or investments of the Bad Actors, prohibiting the Bad Actors from engaging in the same type of endeavor as the enterprise engaged in, ordering the dissolution of the enterprise, making due provision for the rights of innocent persons, including Plaintiffs, and such other relief that the Court deems just and proper.

## COUNT XXVIII –Violation of RICO, 18 U.S.C. 1962(d) Against the Bad Actors

520.    Plaintiffs adopt and re-allege the allegations set forth in paragraphs 1 through 271 and 509 through 519 as if fully stated fully herein.

521.    At all relevant times, the Bad Actors were associated with the enterprise and agreed and conspired to violate 18 U.S.C. §1962(d).

522.    The Bad Actors agreed to conduct and participate, directly and indirectly, in the conduct and affairs of the enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. §1962(d).

523.    The Bad Actors committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof, including but not limited to the acts set forth above.

524.    As a result of the Bad Actors' violations of 18 U.S.C. § 1962(d), Plaintiffs suffered damages in the form of loss of their investments.

WHEREFORE, Plaintiffs respectfully requests that the Court enter judgment in favor of Plaintiffs and against the Bad Actors for damages, treble damages, attorneys' fees, interest, cost, injunctive relief ordering the Bad Actors to divest themselves of any interest, direct or indirect, in the enterprise; imposing reasonable restrictions on the future activities or investments of the Bad Actors, prohibiting the Bad Actors from engaging in the same type of endeavor as the enterprise engaged in, ordering the dissolution of the enterprise, making due provision for the rights of innocent persons, including Plaintiffs, and such other relief that the Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs demand a trial by jury on all issues so triable.

Dated this 14th day of November, 2016.

/s/ Keith E. Sonderling

**G. JOSEPH CURLEY**
Florida Bar No. 571873
Email:  jcurley@gunster.com
**KEITH E. SONDERLING**
Florida Bar No. 57386
Email:  ksonderling@gunster.com
**DEVIN RADKAY**
Florida Bar No. 41976
Email:  dradkay@gunster.com
GUNSTER, YOAKLEY & STEWART, P.A.
777 South Flagler Drive, Suite 500 East
West Palm Beach, FL 33401-6194
(561) 655-1980/Facsimile (561) 655-5677
*Attorneys for Plaintiffs*

WPB_ACTIVE 7352790.5