**Palm House Hotel, LLLP** *Strictly Confidential*





# Palm House Hotel, LLLP

## Private Placement Memorandum



*NOTE TO PROSPECTIVE SUBSCRIBERS*

By accepting this document you agree to maintain in confidence the information set forth in this document, together with any other non-public information regarding the Partnership, obtained from the Partnership or its agents, during the course of the proposed offering and to return this document to the Partnership in the event that you do not elect to participate in the offering.

# Private Placement Memorandum

This document serves as a record of my receipt of the Private Placement Memorandum dated 12/02/2012, for Palm House Hotel, LLLP, a Florida Limited Liability Limited Partnership (the "Partnership"). I received a copy of the Private Placement Memorandum, containing an investment summary, business summary, accredited investor questionnaire and subscription agreement.

I understand that this offering has not been registered with the Florida division of securities, the U.S. Securities and Exchange Commission ("SEC") or any other foreign securities agency and is not required to be so registered.

I agree to maintain in confidence the information set forth in this document, together with any other non-public information regarding the Partnership, obtained from the Partnership or its agents, during the course of the proposed offering and to return this document to the Partnership in the event that I do not elect to participate in the offering.

_____

Investor Name

_____

Investor Signature

_____

Date

# Private Placement Memorandum Summary

## FOR PALM HOUSE HOTEL, LLLP

# $39,500,000.00

| Securities Offered: | 79 Limited Partnership Units |
| --- | --- |
| Unit Price: | **$500,000.00** |
| Offering: | **$39,500,000.00** |
| Administrative Fee: | **$40,000.00** |

The Partnership is offering (the "Offering") to sell limited partner units in the Partnership ("Units") to Investors for $39,500,000. The Minimum Investment is $500,000. The administrative fee is $40,000.

Neither the Florida division of securities or the U.S. Securities and Exchange Commission, nor any other regulatory body, whether U.S. or foreign, has approved or disapproved these Units or passed upon the accuracy or adequacy of this Memorandum. Any representation to the contrary is a criminal offense.

This Memorandum does not constitute an offer or solicitation of Units in any jurisdiction in which such offer or solicitation is not authorized. No action has been taken to permit the distribution of this Memorandum in any jurisdiction other than countries determined by the General Partner. Accordingly, this Memorandum may not be used for the purpose of, and does not constitute, an offer or solicitation by anyone in any jurisdiction or in any circumstances in which such offer or solicitation is not authorized or to any person to whom it is unlawful to make such offer or solicitation.

Neither the delivery of this Memorandum nor the placing, allotment, or issue, of any Units shall under any circumstances create any implication or constitute any representation that the information given in this Information Memorandum is correct as of any time subsequent to the date hereof. This Memorandum provides a summary of information relevant to investing in the Partnership.

THESE ARE SPECULATIVE UNITS WHICH INVOLVE A HIGH DEGREE OF RISK. ONLY THOSE INVESTORS WHO CAN BEAR THE LOSS OF THEIR ENTIRE INVESTMENT SHOULD INVEST IN THESE UNITS.

# Table of Contents

Private Placement Memorandum ................................................................................. 1

    Private Placement Memorandum ........................................................................... 2

    Private Placement Memorandum Summary ........................................................... 3

    Table of Contents .................................................................................................. 4

    Limited Partner Units ("Units") ............................................................................. 5

    Jurisdictional Notes .............................................................................................. 8

    Statement to EB5 Investors ................................................................................ 10

    Summary of the Business .................................................................................... 12

    THE OFFERING TERM SHEET ............................................................................... 14

    Investor Suitability Standards ............................................................................. 19

    Use of Proceeds ................................................................................................. 22

    Return on Investment ......................................................................................... 23

    Management of the Partnership .......................................................................... 26

    Summary of the General Risk Factors ................................................................. 30

    Summary of Loan Terms ..................................................................................... 37

    Summary of Limited Partnership Agreement ....................................................... 38

    Availability of Additional Information .................................................................. 42

    Business Plan Summary ...................................................................................... 43

## ATTACHMENTS

Business Plan
Economic Analysis
Limited Partnership Agreement
Loan Documents
Investor Questionnaire and Subscription Agreement
Escrow Agreement
Operations & Marketing Plan

### Palm House Hotel, LLLP

# Limited Partner Units ("Units")

THIS PRIVATE PLACEMENT MEMORANDUM (THIS "MEMORANDUM") IS PROVIDED ON A CONFIDENTIAL BASIS SOLELY FOR THE INFORMATION OF THE RECIPIENT NAMED ABOVE SO THAT SUCH RECIPIENT MAY CONSIDER AN INVESTMENT IN THE UNITS OF THE PARTNERSHIP. IT IS NOT INTENDED FOR USE BY ANY OTHER PERSON.

THIS MEMORANDUM MAY NOT BE REPRODUCED OR PROVIDED TO OTHERS WITHOUT THE PRIOR WRITTEN PERMISSION OF THE GENERAL PARTNER OF THE PARTNERSHIP. BY ACCEPTING DELIVERY OF THIS MEMORANDUM, EACH PROSPECTIVE INVESTOR AGREES TO KEEP CONFIDENTIAL ALL OF THE INFORMATION CONTAINED IN THIS MEMORANDUM THAT IS NOT ALREADY IN THE PUBLIC DOMAIN AND TO USE THIS MEMORANDUM SOLELY FOR PURPOSES OF EVALUATING A POSSIBLE INVESTMENT IN THE PARTNERSHIP. NO PROSPECTIVE INVESTOR MAY DISCUSS THE CONTENTS OF THE MEMORANDUM WITH ANY PERSON OTHER THAN ITS PROFESSIONAL ADVISERS.

THIS MEMORANDUM DOES NOT PURPORT TO BE ALL-INCLUSIVE OR TO CONTAIN ALL THE INFORMATION THAT A PROSPECTIVE INVESTOR MAY DESIRE IN EVALUATING THE PARTNERSHIP. PROSPECTIVE INVESTORS SHOULD NOT CONSTRUE THE CONTENTS OF THIS MEMORANDUM AS LEGAL, TAX, INVESTMENT OR OTHER ADVICE. EACH INVESTOR SHOULD MAKE ITS OWN INQUIRIES AND CONSULT ITS OWN ADVISERS AS TO THE PARTNERSHIP AND THIS OFFERING AND AS TO LEGAL, TAX AND RELATED MATTERS CONCERNING THIS INVESTMENT. THE PARTNERSHIP, THE GENERAL PARTNER OR ANY OF THEIR RESPECTIVE AFFILIATES IS NOT MAKING ANY REPRESENTATION OR WARRANTY REGARDING THE LEGALITY OF AN INVESTMENT IN THE UNITS BY ANY INVESTOR OR ABOUT THE INCOME OR OTHER TAX CONSEQUENCES OF SUCH AN INVESTMENT.

IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE ENTITY CREATING THE UNITS OFFERED AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS OF AN INVESTMENT IN THE UNITS. THE UNITS OFFERED HEREBY HAVE NOT BEEN RECOMMENDED BY THE U.S. SECURITIES AND EXCHANGE COMMISSION, ANY STATE SECURITIES COMMISSION OR ANY OTHER SECURITIES COMMISSION OR REGULATORY AUTHORITY OF ANY JURISDICTION IN ANY COUNTRY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE UNITS OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR SECURITIES AUTHORITY IN OTHER JURISDICTION AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE ACT AND SUCH LAWS. THE UNITS OFFERED HEREBY ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE ACT, PURSUANT TO REGISTRATION THEREUNDER OR EXEMPTION THEREFROM, AND AS PERMITTED UNDER OTHER APPLICABLE SECURITIES LAWS. THE TRANSFERABILITY OF UNITS IS FURTHER RESTRICTED UNDER THE PARTNERSHIP'S PARTNERSHIP AGREEMENT (AS MAY BE AMENDED, MODIFIED, SUPPLEMENTED OR RESTATED FROM TIME TO TIME, THE "PARTNERSHIP AGREEMENT").

## ADDITIONAL CONSIDERATIONS

AN INVESTOR GENERALLY WILL NOT BE PERMITTED TO RESIGN OR OTHERWISE WITHDRAW, IN WHOLE OR IN PART, FROM THE PARTNERSHIP. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF AN INVESTMENT IN THE UNITS FOR AN EXTENDED PERIOD OF TIME.

INVESTMENT IN THE UNITS WILL INVOLVE RISKS DUE TO, AMONG OTHER THINGS, THE NATURE OF THE PARTNERSHIP'S INVESTMENTS AND BUSINESS ACTIVITIES. INVESTORS SHOULD HAVE THE FINANCIAL ABILITY, SOPHISTICATION AND WILLINGNESS TO ACCEPT THE RISKS AND LACK OF LIQUIDITY, WHICH ARE CHARACTERISTICS OF THE INVESTMENT DESCRIBED IN THIS MEMORANDUM.

CERTAIN INFORMATION CONTAINED IN THIS MEMORANDUM HAS BEEN OBTAINED BY THE GENERAL PARTNER FROM SOURCES DEEMED RELIABLE BY THE GENERAL PARTNER. HOWEVER, THE GENERAL PARTNER CANNOT GUARANTEE THE ACCURACY OF SUCH INFORMATION AND HAS NOT INDEPENDENTLY VERIFIED SUCH INFORMATION.

SUCH INFORMATION NECESSARILY INCORPORATES SIGNIFICANT ASSUMPTIONS AND ESTIMATES AS WELL AS FACTUAL MATTERS. THE GENERAL PARTNER WILL PROVIDE TO EACH PROSPECTIVE INVESTOR, OR SUCH PROSPECTIVE INVESTOR'S AGENT, DURING THIS OFFERING AND PRIOR TO THE SALE OF ANY UNITS OFFERED HEREBY TO SUCH PROSPECTIVE INVESTOR, THE OPPORTUNITY TO ASK QUESTIONS OF THE GENERAL PARTNER CONCERNING ANY ASPECT OF THE INVESTMENT AND TO OBTAIN ANY ADDITIONAL INFORMATION, TO THE EXTENT THE GENERAL PARTNER POSSESSES SUCH INFORMATION OR CAN ACQUIRE IT WITHOUT UNREASONABLE EFFORT OR EXPENSE.

CERTAIN STATEMENTS MADE THROUGHOUT THIS DOCUMENT THAT ARE NOT HISTORICAL FACTS MAY CONTAIN FORWARD-LOOKING STATEMENTS REGARDING THE PARTNERSHIP'S FUTURE PLANS, OBJECTIVES AND EXPECTED PERFORMANCE. SUCH FORWARD-LOOKING STATEMENTS INCLUDE STATEMENTS THAT USE FORWARD-LOOKING TERMINOLOGY SUCH AS "MAY", "WILL", "SHOULD", "EXPECT", "ANTICIPATE", "PROJECT", "ESTIMATE", "INTEND", "CONTINUE", OR "BELIEVE", OR THE NEGATIVES THEREOF, OR OTHER VARIATIONS THEREON, OR COMPARABLE TERMINOLOGY.

FORWARD-LOOKING STATEMENTS ARE BASED ON ASSUMPTIONS THAT THE GENERAL PARTNER BELIEVES ARE REASONABLE, BUT ARE SUBJECT TO A WIDE RANGE OF RISKS AND UNCERTAINTIES. ACTUAL RESULTS MAY DIFFER FROM THOSE EXPRESSED OR IMPLIED BY SUCH FORWARD-LOOKING STATEMENTS.

INFORMATION RESPECTING PRIOR PERFORMANCE OF OTHER INVESTMENTS IS NOT NECESSARILY INDICATIVE OF ACTUAL RESULTS TO BE OBTAINED BY THE PARTNERSHIP. NOTHING CONTAINED HEREIN IS, OR SHOULD BE RELIED ON AS, A PROMISE OR REPRESENTATION AS TO THE FUTURE PERFORMANCE OF THE PARTNERSHIP.

*CONSIDERATION CONCLUSION*

THIS MEMORANDUM IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE SUBSCRIPTION AGREEMENT RELATED THERETO, THE PARTNERSHIP AGREEMENT AND ALL OTHER RELEVANT AGREEMENTS (IF ANY) PERTAINING TO AN INVESTMENT IN, OR THE OPERATION OF, THE PARTNERSHIP, IN EACH CASE AS MAY BE AMENDED, MODIFIED, SUPPLEMENTED OR RESTATED FROM TIME TO TIME. COPIES OF SUCH DOCUMENTS WILL BE MADE AVAILABLE UPON REQUEST AND SHOULD BE REVIEWED PRIOR TO PURCHASING ANY UNIT. NO PERSON HAS BEEN AUTHORIZED IN CONNECTION WITH THIS OFFERING TO GIVE ANY INFORMATION OTHER THAN AS CONTAINED IN THIS MEMORANDUM. NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

STATEMENTS IN THIS MEMORANDUM ARE MADE AS OF 12/02/2012, UNLESS STATED OTHERWISE. NEITHER THE DELIVERY OF THIS MEMORANDUM AT ANY TIME NOR ANY SALE HEREUNDER SHALL UNDER ANY CIRCUMSTANCES CREATE AN IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AS OF ANY OTHER TIME SUBSEQUENT TO SUCH DATE. THE GENERAL PARTNER AND ITS AFFILIATES RESERVE THE RIGHT TO MODIFY ANY OF THE TERMS OF THE OFFERING AND THE UNITS DESCRIBED HEREIN.

THE UNITS ARE OFFERED SUBJECT TO THE RIGHT OF THE GENERAL PARTNER TO REJECT ANY SUBSCRIPTION IN WHOLE OR IN PART. IF THE GENERAL PARTNER REJECTS A SUBSCRIPTION, THE PROSPECTIVE INVESTOR WILL BE NOTIFIED AS SOON AS PRACTICAL.

THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER OR SOLICITATION IN ANY COUNTRY, STATE OR OTHER JURISDICTION IN WHICH SUCH AN OFFER OR SOLICITATION IS UNLAWFUL.

ALL "$" AND "DOLLAR" REFERENCES IN THIS MEMORANDUM ARE TO U.S. DOLLARS.


* * * * *

FOR MORE INFORMATION PLEASE CONTACT THE PARTNERSHIP.

* * * * *

Please direct all inquiries regarding the Partnership to:


Palm House Hotel, LLLP

197 S. Federal Highway, Suite 200
Boca Raton, FL  33432
Telephone: (561) 282-6102

# Jurisdictional Notes

Prospective Investors are not to construe the contents of this document or any prior subsequent communications from the Offeror as legal or tax advice. Each Investor must rely on his own representative for legal, income tax and related matters concerning this investment.

This document is Confidential and contains proprietary information. It is intended for the exclusive use of the recipient.

PROJECTIONS MAY BE CONTAINED IN THIS MEMORANDUM AND ANY OTHER PROJECTIONS THAT DO NOT CONFORM TO THOSE IN THIS OFFERING DOCUMENT SHOULD BE DISREGARDED.

EVERY INVESTOR SHOULD BE AWARE THAT THE PARTNERSHIP HAS NO OBLIGATION, NOR DOES IT INTEND TO REPURCHASE THE UNITS FROM INVESTORS IN THE EVENT THAT, FOR ANY REASON, AN INVESTOR WISHES TO TERMINATE THE INVESTMENT.

## FOREIGN (NON-USA) JURISDICTION

THESE UNITS HAVE NOT BEEN REGISTERED, FILED WITH, OR OTHERWISE APPROVED BY ANY FOREIGN (NON-USA) REGULATORY AGENCY. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

A non-US person or entity considering an investment in the Partnership should consult his/her or its own tax advisors with respect to the specific tax consequences to such person of such an investment under United States federal, state and local income tax laws, and with respect to the treatment of income and gain from such investment under the tax laws of any foreign jurisdiction in which such person or entity is subject to tax.

THIS CONFIDENTIAL OFFERING MEMORANDUM DOES NOT SET FORTH COMPLETE INFORMATION RELATING TO THE TAX EFFECTS OF AN INVESTMENT IN THE PARTNERSHIP. EACH PROSPECTIVE INVESTOR SHOULD CONSULT WITH ITS OWN COUNSEL, ACCOUNTANTS OR OTHER ADVISORS AS TO THE US FEDERAL (AS WELL AS STATE AND LOCAL) TAX CONSEQUENCES OF ITS INVESTMENT IN THE PARTNERSHIP, WHICH MAY DIFFER SUBSTANTIALLY FOR DIFFERENT TYPES OF TAXPAYERS (INDIVIDUALS, CORPORATIONS, ETC.) IN PARTICULAR, INVESTMENT IN THE PARTNERSHIP BY ENTITIES SUBJECT TO ERISA AND BY OTHER TAX-EXEMPT ENTITIES REQUIRES SPECIAL CONSIDERATION. TRUSTEES OR ADMINISTRATORS OF SUCH ENTITIES ARE URGED TO CAREFULLY REVIEW THE MATTERS DISCUSSED IN THIS MEMORANDUM.

## NOTICE TO RESIDENTS OF ALL STATES

THE UNITS OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE ACT OR THE SECURITIES LAWS OF ANY STATE AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE ACT AND APPLICABLE STATE LAWS. THE UNITS ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE ACT AND APPLICABLE STATE LAWS PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. THE UNITS HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SEC, ANY STATE SECURITIES COMMISSION OR OTHER REGULATORY AUTHORITY, NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING OR THE ACCURACY OR ADEQUACY OF THIS OFFERING MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

### *CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING STATEMENTS*

The Memorandum includes "forward-looking statements" within the meaning of Section 27A of the Act and Section 21E of the Securities Exchange Act of 1934 which represent our expectations or beliefs concerning future events that involve risks and uncertainties, including those associated with our ability to obtain financing for our current and future operations. All statements other than statements of historical facts included in the Memorandum including, without limitation, the statements under "Business" and elsewhere herein, including the Documents incorporated by reference, are forward-looking statements.

Although we believe that the expectations reflected in such forward-looking statements are reasonable, we cannot assure you that such expectations will prove to have been correct. Important factors that could cause actual results to differ materially from our expectations ("Cautionary Statements") are disclosed in the Memorandum, including without limitation, in connection with the forward-looking statements included in the Memorandum. All subsequent written and oral forward-looking statements attributable to us or persons acting on its behalf are expressly qualified in their entirety by the Cautionary Statements.

--------------------

THE FORWARD LOOKING STATEMENTS INCLUDED HEREIN ARE ALSO BASED ON CERTAIN CURRENT BUDGETING CONSIDERATIONS AND OTHER ASSUMPTIONS RELATING TO THE PARTNERSHIP'S ABILITY TO OBTAIN RETURNS FOR ITS INVESTORS, SUCCESSFULLY MARKET ITS SERVICES, PROCURE SUFFICIENT CAPITAL TO EXPAND OPERATIONS AND MAINTAIN STRICT REGULATORY PROCEDURES WHILE CONDUCTING BUSINESS. ASSUMPTIONS RELATING TO THE PROCEEDING AND FOREGOING INFORMATION INVOLVE JUDGMENTS THAT ARE DIFFICULT TO PREDICT ACCURATELY AND ARE SUBJECT TO NUMEROUS FACTORS WHICH MAY MATERIALLY AFFECT THE PARTNERSHIP'S RESULTS.

BUDGETING, INVESTMENT AND OTHER MANAGERIAL DECISIONS ARE SUBJECTIVE AND ARE THUS SUSCEPTIBLE TO INTERPRETATIONS AND PERIODIC REVISIONS BASED ON ACTUAL EXPERIENCE AND BUSINESS DEVELOPMENTS, THE IMPACT OF WHICH MAY CAUSE THE PARTNERSHIP TO ALTER BUDGETS AND AMEND STRATEGIES, ANY OR ALL OF WHICH MAY MATERIALLY AFFECT THE PARTNERSHIP'S RESULTS.

THE FOREGOING CONSIDERATIONS, AS WELL AS A VARIETY OF OTHER FACTORS NOT SET FORTH HEREIN, COULD CAUSE THE PARTNERSHIP'S ACTUAL RESULTS AND EXPERIENCE TO DIFFER WIDELY OR MATERIALLY FROM THE ANTICIPATED RESULTS OR OTHER EXPECTATIONS IN THE PARTNERSHIP'S FORWARD LOOKING STATEMENTS.

**Palm House Hotel, LLLP**                                    *Strictly Confidential*

# Statement to EB5 Investors

1) The Project will be located in Florida, within one or more Targeted Employment Areas (TEAs). Therefore, pursuant to EB-5 guidelines, EB-5 Investors must invest a minimum amount of $500,000.00.

2) The management and staffing projections for the Project show that the Project will create sufficient new direct and indirect jobs to support the number of investors sought. Please refer to the attached business plan and economic analysis for further information.

3) EB-5 guidelines require the investment to be at risk. Investors should consult their own counsel and/or independent advisor for recommendations about this investment.

-----------------------------

IF YOU LIVE OUTSIDE THE UNITED STATES, IT IS YOUR RESPONSIBILITY TO FULLY OBSERVE THE LAWS OF ANY RELEVANT TERRITORY OR JURISDICTION OUTSIDE THE UNITED STATES CONNECTED WITH ANY PURCHASE OF UNITS, INCLUDING OBTAINING REQUIRED GOVERNMENTAL OR OTHER CONSENTS OR OBSERVING ANY OTHER REQUIRED LEGAL FORMALITIES IN RELATION TO THE PARTNERSHIP.

## *EB-5 VISA: CASE PROCESSING PROCEDURES*

For applicants outside the United States:
- The applicant first makes a qualifying investment
- The applicant files a Form I-526 petition (and supporting documents) with USCIS.
- The U.S. Department of State's National Visa Center processes the EB-5 immigrant visa through the local U.S. consular post with jurisdiction over the place of residence.
- The applicant uses the EB-5 immigrant visa to enter the United States, which commences the two-year conditional lawful permanent resident status.
- Approximately 21 months later, the applicant must file a Form I-829 to remove the conditional status.
- The applicant must provide supporting documents to establish that they have satisfied all EB-5 qualifying conditions.
- Upon approval, a new ten-year unconditional green card is issued.

For applicants having lawful non-immigrant status within USA and staying in USA:
- The applicant first makes a qualifying investment
- The applicant files a Form I-526 petition (and supporting documents) with USCIS.
- On approval of Form I-526, the applicant files a Form I-485 (Application to Register Permanent Residence or Adjust Status).
- Upon approval of the Form I-485, the applicant is granted a conditional lawful permanent resident status, which is valid for two years.
- Approximately 21 months later, the applicant must file a Form I-829 to remove the conditional status.
- The applicant must provide supporting documents to establish that they have satisfied all EB-5 qualifying conditions.
- Upon approval, a new ten-year unconditional green card is issued.

*Strictly Confidential*

## *PATRIOT ACT RIDER*

EACH POTENTIAL INVESTOR HEREBY REPRESENTS AND WARRANTS THAT IT: (I) IS NOT, NOR IS IT ACTING AS AN AGENT, REPRESENTATIVE, INTERMEDIARY OR NOMINEE FOR, A PERSON IDENTIFIED ON THE LIST OF BLOCKED PERSONS MAINTAINED BY THE OFFICE OF FOREIGN ASSETS CONTROL, U.S. DEPARTMENT OF TREASURY; AND (II) HAS COMPLIED WITH ALL APPLICABLE U.S. LAWS, REGULATIONS, DIRECTIVES, AND EXECUTIVE ORDERS RELATING TO ANTI-MONEY LAUNDERING , INCLUDING BUT NOT LIMITED TO THE FOLLOWING LAWS: (1) THE UNITING AND STRENGTHENING AMERICA BY PROVIDING APPROPRIATE TOOLS REQUIRED TO INTERCEPT AND OBSTRUCT TERRORISM ACT OF 2001, PUBLIC LAW 107-56, AND (2) EXECUTIVE ORDER 13224 (BLOCKING PROPERTY AND PROHIBITING TRANSACTIONS WITH PERSONS WHO COMMIT, THREATEN TO COMMIT, OR SUPPORT TERRORISM) OF SEPTEMBER 23, 2001.

# Summary of the Business

The Partnership offers its Investors projected returns with yearly distributions.

1. The General Partner of the Partnership is South Atlantic Regional Center, LLC ("General Partner"). The Managers of the General Partner have a successful history of commercial development, construction, retail, and management experience.

2. Timeline for acquisition of funding is anticipated for early 2013. Construction has commenced using bridge financing, and EB-5 funding is required to complete remodeling work on the facility.

3. The Partnership anticipates that the Project will be open for business by the end of 2014.

4. Anticipated project costs will be $91,000,000. See "Use of Proceeds."

5. The Project shall provide substantial benefits to the regional economy that exceeds the strict USCIS requirements for job creation that will allow a foreign Investor to qualify for an EB-5 Immigration Visa.

6. The Offering provides the Investors with a projected annual dividend.


## SUMMARY OF PARTNERSHIP AND HOTEL PROJECT

The Hotel Project will seek to accomplish the following:

1. The Partnership will loan funds to the Borrower, with such funds derived from either: (i) foreign Investors through the EB-5 program; or (ii) U.S. Investors. The Borrower will develop and build the Project (please review the Business Plan Summary herein for more details).

2. The Project will serve the greater Florida primary market area (Palm Beach County) by seeking to create jobs and increase U.S. exports by developing a high-end resort hotel.

3. A more detailed description of the Project is included in the full business plan.

4. The Partnership, through investment in the Project, offers the foreign and U.S. investor excellent projected returns with yearly cash distributions. The Investors shall collectively own 99% of the Partnership, and the General Partner shall own 1% of the Partnership.

5. The Partnership is projecting a five (5) year ROI based upon: a one-quarter of one percent (0.25%) preferred non-cumulative annual dividend. These ROI calculations show an annualized rate of return of 0.25%, with an overall ROI of 1.25%. Please review the Return on Investment section in the full business plan for details of the anticipated distributions.

6. Projected dividends and net profits will be distributed to the Investors not less frequently than annually.

7. As determined by the General Partner of the Partnership, in its sole discretion, between the end of the fifth year and seventh year of the operation of the Project, the Partnership will either: (i) market the Project for sale, and the pro rata share of the profits realized from the sale (if any) will

be distributed to the Partners of the Partnership (including the Investors up to the amount of their then-current investment); or (ii) the General Partner or Partnership may repurchase the interests of each EB-5 Investor for an amount equal to the net capital invested by each EB-5 Investor, if the General Partner has sufficient funds to do so.

8.  Upon sale of all of the assets of the Partnership and/or liquidation of the Partnership, the net proceeds (after normal and customary costs of sale) shall be distributed as follows: (i) the Investors shall each receive a pro rata share of the net proceeds, up to a maximum of the net sums invested by each of them in the Partnership; (ii) to the extent there are excess proceeds, such proceeds shall be distributed to the General Partner.

# THE OFFERING TERM SHEET

*This summary of certain provisions of this Memorandum is intended only for convenient reference. It is not intended to be complete and is qualified in its entirety by the more detailed information contained elsewhere in this Memorandum and in the Exhibits hereto. The full text of this Memorandum, and the Exhibits, should be read in detail and understood by each potential Investor. The term "Investor" shall mean persons or entities receiving this Memorandum.*

**THE PARTNERSHIP:** The Partnership is a Florida Limited Liability Limited Partnership. Its principal office is located at: 197 S. Federal Highway, Suite 200, Boca Raton, FL 33432; Telephone: (561) 282-6102. The Partnership is offering for sale Units of limited partnership interests to Accredited Investors pursuant to the EB-5 Program.

**SECURITIES:** Units of limited partnership interests in the Partnership shall be issued to Investors in this Offering, with one (1) Unit issued for each $500,000 investment. The Offering hereunder is 79 Units.

**THE GENERAL PARTNER:** South Atlantic Regional Center, LLC is the general partner of the Partnership. The initial Managers of the General Partner and summary background information regarding the Managers of the General Partner appears in the section entitled "Management Team."

The General Partner shall provide overall management and supervision of the Partnership.

**BORROWER:** Palm House, LLC ("Borrower") is a Delaware limited liability company. Borrower seeks financing from the Partnership in order to operate a business involving the renovation and development of a high-end resort hotel. See "Use of Proceeds" below.

**EB-5 REGIONAL CENTER SPONSORSHIP:** The Project is sponsored by South Atlantic Regional Center (SARC) (the "Regional Center"), a Florida limited liability company. The Regional Center has been approved by the U.S. Citizenship and Immigration Services ("USCIS") to serve as an approved regional center under the EB-5 Immigrant Investor Pilot Program to establish and solicit investment from foreign investors in U.S. businesses for the purposes of creating U.S. jobs.

**COMPOSITION OF PARTNERSHIP:** The Partnership will be composed of: (i) the General Partner, which will own a 1% interest in the Partnership and (ii) Limited Partners, which will collectively own a 99% interest in the Partnership.

**Palm House Hotel, LLLP** *Strictly Confidential*

| | |
|---|---|
| *UNITS OFFERED:* | One (1) Limited Partnership Unit (i.e. 1%) will be owned by affiliates of the individuals or Persons who are the Managers of the General Partner ("Promoter Limited Partnership Units"), and 79 Limited Partnership Units (i.e. 99%) (all rounded to the nearest one percent (1%)) will be offered to Investors.

The Partnership is offering for sale up to 79 Limited Partnership Units, for a total offering of $39,500,000. Payment for Units of the Partnership must be paid in cash, upon subscription. |
| *MINIMUM INVESTMENT:* | $500,000.00, for one (1) Unit. |
| *USE OF PROCEEDS:* | The Partnership will loan ("Loan") the proceeds of this Offering to the Borrower to partially finance the acquisition, development, and operation of the Project. The Partnership will make the Loan to Borrower on the terms set forth in the Loan Documents attached hereto. See Capital Requirements and Estimated Use of Proceeds and Summary of Loan Terms below. |
| *TERMS OF THE OFFERING:* | All subscription funds received from Investors will be paid to a special escrow account ("Escrow Account") maintained by a reputable bank ("Escrow Bank") under the control of the bank or another entity ("Escrow Agent") as defined in the Escrow Agreement. The Escrow Agent may invest the subscription funds in investment grade debt instruments of the United States government. All interest earned on the Escrow Account will be the property of the Partnership unless the Offering is unsuccessful, in which event each potential Investor will receive its pro rata share of the income earned, less administrative and other similar costs.

To maintain complete security in the payment process for the investor and the partnership, subscription funds will be wired into the Escrow Bank and held in Escrow under the terms set forth in the Escrow Agreement. Separately, the $40,000 administration fee is also wired to the Escrow Bank. The Escrow Account will be released to the Partnership at such time as (a) the Investor's I-526 application is approved by the USCIS, or (b) as defined in the Escrow Agreement. In the event that a subscription is not accepted, the subscription funds paid by such potential Investor, together with interest earned thereon, if any, shall be promptly returned to the potential Investor. |
| *TERM PERIOD:* | The term of the existence of the Partnership will be as set forth in the Partnership Agreement. |
| *DISTRIBUTIONS / DIVIDENDS:* | The General Partner will determine, in its sole discretion, the amount, timing (not less than annually) and form of distributions by the Partnership, if any.

The Partnership may not make any distributions: (1) In |

violation of the Partnership Agreement; (2) If after the distribution: (a) It would not be able to pay its debts as they become due in the ordinary course of it's activities; or (b) Its total assets would be less than the sum of its total liabilities plus the amount that would be needed, if it was dissolved, wound up and terminated at the time of the distribution to satisfy the preferential rights upon dissolution, winding up and termination of partners whose preferential rights are superior to those of persons receiving the distribution.

The Partnership may base a determination that a distribution is not prohibited under subsection (2) on financial statements prepared on the basis of accounting practices and principles that are reasonable in the circumstances or on a fair valuation or other method that is reasonable in the circumstances.

Distributions of funds from operations of the Partnership shall be made in the following order of priority:

1. To the EB-5 Investors until the annual distributions to those Investors equals one-quarter of one percent (0.25%) of the capital invested by each EB-5 Investor ("EB-5 Preferred Return").

2. The balance to the General Partner.

It is the intention of the Partnership to refinance the project after the fifth year of operations. In such event, the Partnership and/or the General Partner or their designees may repurchase the interests of each EB-5 Investor for an amount equal to the net capital invested by each EB-5 Investor, if they have sufficient funds to do so.

The rules and regulations governing the EB-5 Pilot Program prohibit the return of an EB-5 Investor's investment prior to the approval of the Investor's I-829 petition. See "EB-5 Immigration Disclosures and Risk Factors" and "Risk Factors."

**RESTRICTIONS ON RESALE:**

The Investor(s) who purchase any Units pursuant to this Offering will be restricted from selling, transferring, pledging or otherwise disposing of any Units due to restrictions under securities laws and the Partnership Agreement.

**HOW TO INVEST:**

Each Investor must execute and deliver the Subscription Agreement attached hereto.

**WHO MAY INVEST:**

The Units of the Partnership are being offered pursuant to this Memorandum solely to persons who are "accredited investors" as defined in Regulation D promulgated under the Act. See the Accredited Investor Suitability Questionnaire attached hereto.

Palm House Hotel, LLLP                                                    *Strictly Confidential*

| | |
|---|---|
| *INVESTOR SUITABILITY:* | This Offering will be made pursuant to exemptions from registration provided by Section 4(2) of the Act, Regulation D promulgated thereunder, and exemptions available under applicable state securities laws and regulations. Persons desiring to invest in the Partnership will be required to make certain representations and warranties regarding their financial condition in the Subscription Agreement attached hereto. Such representations include, but are not limited to, certification that the Investor is an accredited Investor under SEC regulations. The Partnership reserves the right to reject any Subscription in whole, or in part, in its sole discretion. See "Suitability Standards." |

THE SUBSCRIPTION AGREEMENT INCLUDES CERTAIN REPRESENTATIONS AND WARRANTIES OF THE INVESTOR ON WHICH THE PARTNERSHIP WILL RELY IN DETERMINING WHETHER TO ACCEPT THE SUBSCRIPTION. PROSPECTIVE INVESTORS ARE URGED TO READ THE SUBSCRIPTION AGREEMENT CAREFULLY AND, TO THE EXTENT THEY DEEM APPROPRIATE, TO DISCUSS THE SUBSCRIPTION AGREEMENT, THIS MEMORANDUM AND THEIR PROPOSED INVESTMENT IN THE UNITS WITH THEIR LEGAL OR OTHER ADVISORS.

*ADMINISTRATIVE FEES:*   EB-5 participants will be required to pay a $40,000 administrative fee. Any other administrative or other fees paid to any party in connection with the sale of Units pursuant to this Offering shall not be paid out of the proceeds of Capital Contributions of EB-5 participants. This administrative fee is in addition to any fees paid by Investors for the preparation of USCIS applications, forms, or paperwork.

*RISK FACTORS:*   The Units offered hereby involve a high degree of risk. See "Risk Factors" set forth in the Memorandum.

*TAX RISKS:*   Investment in the Partnership involves substantial tax risks. Although the primary motive of Investors should be for current income and/or long-term appreciation, state and federal legislatures and tax authorities may alter and change the permissible deductions that may be taken with respect to the Project and its income, and may change the tax rates to less favorable rates. In addition, the state and federal tax authorities may be more likely to audit taxpayers with higher incomes or partnership income or loss. Since Investors generally fall into this category, the Partnership also has an increased risk of being audited. Such an examination could result in adjustments to items that are related to the Partnership. Investors and/or the Partnership may incur legal or other professional expenses in connection with such audit or the adjustments resulting from such audit. The Partnership has not obtained a legal opinion or ruling from any tax authority regarding any tax aspects of the Project, the Partnership or its business. The

tax risks include, without limitation, the following: (i) Changes in federal income tax laws; (ii) Partnership status; (iii) Taxable income in excess of distributions; (iv) Allocation of tax items among Limited Partners; (v) Allocation of purchase price; (vi) Partnership termination; (vii) At risk limitations; (viii) Risk of audit; (ix) Profit objective; and (x) Limitations on passive losses. This tax discussion is not tax advice to Investors. Each Investor is advised to consult with his or her own tax advisor regarding the tax consequences of investing in the Partnership. See "Risk Factors" below.

*RESIDENCY RISKS:*

Neither the Partnership nor the General Partner guarantees that any EB-5 participant will be granted conditional or permanent residency in the United States as a result of their purchase of Units of the Partnership. Each Investor must evaluate and accept the risk that he/she may not be granted residency in the United States after making their capital contribution and being admitted as a Limited Partner of the Partnership.

*SUBSCRIPTIONS:*

Investors who wish to subscribe for the Units may do so by executing the Subscription Agreement attached hereto and delivering the completed materials and payment for the Units to the Partnership. A subscription may not be considered for acceptance unless it is completely filled out and properly executed and is accompanied by payment in full for the Units which are being purchased. **Subscriptions accompanied by payment in the form of a personal check, if accepted, will be so accepted conditioned upon and subject to clearance of the check and the Units will not be delivered until the check clears.** Funds accompanying any subscription not accepted by the Partnership will be promptly returned to the Investor without interest thereon or deduction therefrom.

*AVAILABILITY OF FUNDS:*

All proceeds from the sale of Units once the escrow conditions have been satisfied will be delivered directly to the Partnership and be available for use by the Partnership for Partnership purposes, at its discretion.

*RESALE OF UNITS:*

There is no market for the Units. It is not anticipated or intended that one will develop. This is a non-liquid investment. (See "Risk Factors" — there is no market for the Partnership's Units.) Further, there are substantial restrictions on private and/or public resale.

*REPORTS TO LIMITED PARTNER:*

The Partnership will furnish financial statements to Limited Partners annually.

**Palm House Hotel, LLLP**                                                    *Strictly Confidential*

# Investor Suitability Standards

INVESTMENT IN THE UNITS OF Palm House Hotel, LLLP INVOLVES A HIGH DEGREE OF RISK AND IS SUITABLE ONLY FOR THOSE INVESTORS WHO HAVE SUBSTANTIAL FINANCIAL RESOURCES IN RELATION TO THEIR INVESTMENT AND WHO UNDERSTAND THE PARTICULAR RISK FACTORS OF THIS INVESTMENT. IN ADDITION, INVESTMENT IN THE UNITS IS SUITABLE ONLY FOR AN INVESTOR WHO DOES NOT NEED LIQUIDITY IN THE INVESTMENT AND IS WILLING TO ACCEPT RESTRICTIONS ON THE TRANSFER OF THE UNITS.

No Registration or Secondary Market
The Units have not been registered under the Act but are being offered and sold in reliance upon exemptions from registration contained in Sections 4(2) and 4(6) of the Act as interpreted by the Securities and Exchange Commission (the "Commission") and in Rule 506 of Regulation D promulgated thereunder ("Regulation D"). See "STATUS OF UNITS UNDER SECURITIES LAWS; RESTRICTED UNITS".

There will be no secondary market for the Units subsequent to this Offering. See "RISK FACTORS". For the foregoing and other reasons, a purchase of Units is suitable only for Investors of substantial net worth who (I) are willing to purchase a high risk investment, (ii) can afford to hold their Units for an indefinite period and do not anticipate that they will be required to sell their Units in the foreseeable future, and (iii) have sufficient net worth to sustain a total loss of their investment in the Partnership in the event that such loss should occur.

Investor Suitability

Subject to the right of the Partnership to sell Units to Accredited Investors, Units will be sold only to those Investors who submit an Offeree Questionnaire in the form attached hereto establishing to the satisfaction of the Partnership that:

1.      The Investor is an "Accredited Investor," as defined as follows:

      (i)      a natural person who, either individually or jointly with his/or her spouse, has a minimum net worth of $1,000,000 (net worth shall be determined exclusive of primary residence), or who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year.

      (ii)      any other Accredited Investor, as defined by Regulation D or the SEC.

2.      The Accredited Investor has such knowledge and experience in financial and business matters that he/she/it is able to evaluate the merits and risks of an investment in the Units.

3.      The Accredited Investor has the financial ability to bear the economic risk of an investment in the Units, adequate means of providing for his current needs and personal contingencies, and no need for liquidity in an investment in the Units.

4.      The Accredited Investor is acquiring the Units for his own account for investment and not with a view to resale or distribution.

Investor Suitability (Regulation S)

The Company's Units will also only be offered to those investors who are not a "U.S. person" as defined by Rule 902(k) under Regulation S, which include:

    (i) Any natural person resident in the United States;

    (ii) Any partnership or corporation organized or incorporated under the laws of the United  States;

    (iii) Any estate of which any executor or administrator is a U.S. person;

    (iv) Any trust of which any trustee is a U.S. person;

    (v) Any agency or branch of a foreign entity located in the United States;

    (vi) Any non-discretionary account or similar account (other than an estate or trust) held by a  dealer or other fiduciary for the benefit or account of a U.S. person;

    (vii) Any discretionary account or similar account (other than an estate or trust) held by a  dealer or other fiduciary organized, incorporated, or (if an individual) resident in the United  States; and

    (viii) Any partnership or corporation if:

        (A) Organized or incorporated under the laws of any foreign jurisdiction; and

        (B) Formed by a U.S. person principally for the purpose of investing in securities not registered under the Act, unless it is organized or incorporated, and owned, by accredited investors (as defined in Rule 501(a)) who are not natural persons, estates or trusts.

Please study the terms of the Subscription Agreement, this Memorandum and all related documents carefully before you decide to subscribe for Units.

The Partnership will review all subscription documents and will not accept subscriptions from any person or entity who does not represent that he/it complies with the applicable standards specified above.

**PROSPECTIVE INVESTORS ARE NOT TO CONSTRUE THE CONTENTS OF THIS MEMORANDUM OR ANY OTHER COMMUNICATIONS FROM THE PARTNERSHIP OR ANY OF ITS MANAGERS, EMPLOYEES, ACCOUNTANTS OR LEGAL COUNSEL AS LEGAL OR TAX ADVICE. EACH INVESTOR SHOULD CONSULT HIS OR HER OWN COUNSEL AND ACCOUNTANT AS TO LEGAL AND TAX MATTERS AND RELATED MATTERS CONCERNING HIS OR HER INVESTMENT.**

The Partnership reserves the right to reject the subscription of any prospective Investor at any time prior to acceptance and to refund, without interest thereon and without any deduction there from, any funds paid to the Partnership by such prospective Investor.

### STATUS OF UNITS UNDER SECURITIES LAWS: RESTRICTED UNITS

Investors will have no right to require registration of the Units comprising their Units under the 1933 Act or any state securities laws, and such registration is neither contemplated nor likely. In addition, the Partnership will not make public such information as would permit an Investor to transfer his or her Units pursuant to the provisions of Rule 144 promulgated under the 1933 Act.

The Units are "restricted" as that term is defined in Rule 144 under the Act and, as a result, are subject to substantial restrictions upon transfer or resale. The Units may, absent registration, in the future be sold only in compliance with Rule 144 or other exemption from registration under the Act, the availability of which must be established to the satisfaction of the Partnership, unless the Units are covered by an effective registration statement under the Act.

Prospective Investors will be required to represent to the Partnership that they understand that:

a) The Units have not been registered under the Act or under the securities laws of any state. They will not be able to sell or transfer any of the Units unless they are registered or sold pursuant to an exemption from registration under the Act and under applicable state securities laws, the availability of which exemptions may never occur and, if they do, are to be established to the satisfaction of the Partnership;

b) Neither the Partnership nor any affiliate has made any representation concerning future registration of the Units, except for compliance with an exemption from registration;

c) Since the Units cannot be readily sold, Investors must be prepared to bear the economic risk of the investment indefinitely;

**Palm House Hotel, LLLP**                                                          *Strictly Confidential*

# Use of Proceeds

The net proceeds to be received by the Partnership from the sale of the Units offered hereby, after deducting the anticipated expenses of the Offering, are estimated to be $39,500,000.00, assuming the maximum sale of the Units offered hereby, of which there can be no assurance.

The amounts actually expended for each purpose may vary significantly depending upon a number of factors. The Partnership reserves the right to reallocate the proceeds of this Offering in response to a variety of factors and related contingencies.

### ESTIMATED USE OF NET PROCEEDS

Although the Partnership has broad discretion to adjust the application and allocation of the net proceeds of this Offering in order to address changed circumstances and opportunities, the Partnership intends to loan the proceeds of this Offering to Borrower for the uses described in this Offering Memorandum.

In order to achieve its objectives as described herein, the Borrower seeks financing to operate a business involving the renovation and development of a high-end resort hotel.

As further described in the Summary of Loan Terms below, Borrower is required to create 10 new full-time direct, indirect, and induced jobs for each $500,000 advanced under the Loan within two and one half years of the First Advance.

# Return on Investment

The Partnership has prepared the following projections based upon projected revenue and the return on investment which may be paid to an EB-5 Investor ("ROI").

For illustration purposes, the following table shows the ROI for an EB-5 Investor based upon a $500,000.00 investment.

The ROI projections concerning the estimated operating results of the Partnership have been prepared by the management of the General Partner. These projections are based on certain assumptions which may, or may not, prove to be inaccurate and which are subject to future conditions that may be beyond the control of the Partnership, such as the general industry and market conditions. The Partnership may experience unanticipated costs or lower revenues than forecast. There is no assurance that the results which are illustrated in the ROI projections will, in fact, be realized by the Partnership.

| ASSUMPTIONS | |
| --- | --- |
| Total Initial Investment | $500,000.00 |
| Annual Preferred Dividend to EB-5 Investor | 0.25% |
| Equity of EB-5 Investor | 1.25% |

The Partnership is projecting a five (5) year ROI based upon: (i) a one-quarter of one percent (0.25%) preferred dividend for the first five years; (ii) annual distributions of cash flow from operations; and (iii) the distribution to be paid to the EB-5 Investor upon the refinancing of the Project at the end of the fifth (5th) year of operations of the Project.

The projected ROI of an EB-5 Investor is as follows:

(i)    ***0.25% annual return***. Each Investor will be entitled to receive a 0.25%, non-cumulative, annual preferred distribution based on their initial investment of $500,000.00. The preferred return shall be paid prior to calculating and making any additional distributions and/or dividends to the other Investors and/or Partners. The annual preferred dividend to be paid to all of the Investors (based upon a total investment of $39,500,000.00) is $21,250 per year or $1,250 per Investor per year. The non-cumulative preferred return will begin to accrue on the first day that the Project is open for business to the public and will be paid annually until the assets of the Partnership are sold. The total projected preferred return for an EB-5 Investor making a $500,000.00 investment is $6,250.

(ii)   ***Bonus Distribution***. Each Investor shall have the opportunity to participate in the profitability of the commercial enterprise funded by this Offering. Should Palm House, LLC (the "Borrower") achieve certain performance goals, Investors shall receive bonus distributions. Specifically, (a) if the Project is commercially successful enough that Palm House, LLC is able to sell the Project for $110,000,000 or more before repayment of Investor contributions, then Investors shall be entitled to an additional bonus distribution totaling 5% of the amount invested, or (b) if the Project is commercially successful enough that Palm House, LLC is able to sell the Project for $130,000,000 or more before repayment of Investor contributions, then Investors shall be entitled to an additional bonus distribution totaling 10% of the amount invested.

(iii)    ***Bonus Benefits.*** In addition to the distributions discussed herein, Investors shall additionally be entitled to certain benefits related to the Project. Once the hotel is operational, and subject to availability, Investors will be entitled to receive a complimentary one week hotel stay each year during the term of the investment. This hotel stay benefit accrues only to each Investor, and is not transferrable. As an additional bonus benefit, once the hotel's membership club is operational, Investors shall be entitled to join that membership club, and shall receive a discount of 50% off the normal price of membership. This benefit is subject to the terms of the Membership Club Rules. Exercise of these bonus benefits is at each Investor's option.

(iv)    ***Annual Distribution****.* After the payment of the annual preferred return to the EB-5 Investors, the net cash flow from operations will be distributed to the General Partner.

(v)    ***Distribution upon Sale or Liquidation.*** It is contemplated that the Project will be refinanced after the fifth year of operations, and Units repurchased from Limited Partners at that time.

Upon sale of all of the assets of the Partnership and/or liquidation of the Partnership, the net proceeds (after normal and customary costs of sale) shall be distributed as follows: (i) the Investors shall each receive a pro rata share of the net proceeds, up to a maximum of the net sums invested by each of them in the Partnership; (ii) to the extent there are excess proceeds, such proceeds shall be distributed to the General Partner.

The General Partner shall own 1% of the Partnership. The Investors shall collectively own 99% of the Partnership (rounded to the nearest one percent).

The following total ROI is based on an EB-5 investment of $500,000.00 and is in addition to the potential return of the $500,000.00 initial investment.

| Individual ROI | |
| --- | --- |
| 0.25% preferred non-cumulative annual dividend | $6,250 |
| Annual Additional Distributions | - |
| Property Sale | - |
| *TOTAL ROI* | **$6,250** |

The total ROI is based on a 0.25% preferred non-cumulative annual dividend. These ROI calculations show an annualized rate of return of 0.25%, with an overall ROI of 1.25%.

## ROI DISCLOSURES

Profits of the Borrower, if any, will be used first to pay operating expenses and service debts and obligations of the Borrower. Any remaining profits will be used to establish reserves required by law, in addition to those deemed necessary by the General Partner in its sole discretion, for maintenance, capital improvements, and structural repairs to the Project. Any remaining profits may be available for distribution to Partners in accordance with the LP Agreement (attached).

Proceeds of this Offering do not include Administrative Fees. Offering Expenses, commissions, and fees incurred in connection with this Offering shall be paid from the proceeds of Administrative Fees and not from EB-5 Capital Contributions.

The General Partner determines in its sole discretion the amount, if any, timing and form of any distribution of profits by the Partnership.

The Partnership shall not make a distribution (i) if after such distribution liabilities of the Partnership, other than liabilities to Partners on account of their Partnership Interests (as defined in the LP Agreement), exceed the fair value of the assets of the Partnership, (ii) to EB-5 Limited Partners, other than distributions from Available Cash Flow, prior to the fifth anniversary date of the EB-5 Limited Partner's admission as a Partner of the Partnership. After the fifth anniversary date of the EB-5 Limited Partner's admission as a Partner, the foregoing restriction shall no longer apply, to the extent such distribution is prohibited under the Act. See Summary of Limited Partnership Agreement below.

The rules and regulations governing the Pilot Program prohibit the return of an EB-5 investor's investment prior to the approval of the Investor's I-829 application. Accordingly, it is possible that neither Preferred Returns nor return of capital will be made to any EB-5 Limited Partner of the Partnership prior to the end of the fifth year after the closing of this Offering or his/her investment, whichever is later. See EB-5 Immigration Disclosures and Risk Factors above.

An EB-5 Limited Partner's interest in the Partnership shall automatically terminate without further action upon repayment of his/her Capital Contribution and all accrued Preferred Returns. See LP Agreement.

**Refinance, Repayment and Extension of the Loan.** The terms of the Loan require the Borrower to use commercially reasonable efforts to refinance and repay the Loan after the end of the fifth year from the First Advance (as defined in the Loan Documents) thereunder. If Borrower is unable to refinance the Loan, it may extend the term of the Loan for one or more additional five year terms during which it shall continue to make principal and interest payments to the Partnership on the balance of the Loan. See Summary of Loan Terms below.

# Management of the Partnership

## SARC MANAGEMENT

PRINCIPAL

Joseph J. Walsh                              **South Atlantic Regional Center, LLC,** *Managing Member*

Joseph J. Walsh was born and raised in Chicago. Mr. Walsh has managed and owned both public and private corporations in the US. Canada and the UK. Mr. Walsh started his career in Marketing and Advertising, though he was formally educated as an Electrical Engineer. He founded and served as President and CEO of several startup computer and graphics firms that he brought to the public markets in the late 1990s and early 2000s. He subsequently managed several successful mergers of public companies and has extensive experience in merger and acquisition strategy and law. His experience extends not only in the technical realm but to the intricacies of U.S. Securities and Exchange laws. Mr. Walsh brings a wealth of knowledge and expertise to South Atlantic Regional Center with over thirty years of experience in marketing, development and process engineering.

## PALM HOUSE, LLC MANAGEMENT

Robert V. Matthews

Robert V. Matthews is the chairman of Matthews Ventures Holdings, LLC.

MVH is a diversified holding company with interests in real estate, hotels, software, manufacturing and construction. The companies also provide funding for start up businesses, as well as the acquisition of existing businesses in various market segments.  Founded in 1982, the MVH companies are comprised of seasoned professionals with extensive experience in banking, hospitality, and construction.

Over the past several years, like many U.S. Developers, Matthews' companies were battered by the financial collapse.  The group has weathered the storm and returned with an organization that is much more agile and refined.  The exposure has produced an organization that is well educated in navigating the distressed asset financial process and this knowledge has allowed us access to a substantial number of undervalued assets.

Matthews Ventures Holdings, based in Palm Beach, is currently working on over $600 Million worth of product under development ranging from condos to hotels both here in Florida as well as throughout the United States.  In keeping with the goal of the company to develop one of kind properties in luxury destinations, all of the MVH products will be five star facilities upon completion. MVH is the principal of both HIG Acquisitions LLC, a private equity fund that is acquiring strategic international 5 star hospitality assets for re-positioning and Matthews Hospitality Group, a consortium of luxury properties under development.

As a venture capitalist Matthews was named Entrepreneur of the Year in 1993. He has controlled numerous companies over the past twenty five years including FMP, Echelon Engineering and Construction, Bentley Churchill, and Stromberg Software. He also holds minority shares in several other companies.


Ryan Black

Ryan Black began his career with Kriti Management, the U.S. office of the Vardinoyannis family, one of Europe's wealthiest families and the largest industrial group in Eastern Europe.  As Executive Vice President of Kriti Management, he over saw the allocation and investment of over 200M in capital across multiple asset classes in the U.S. and South America.

In 2009, Mr. Black left Kriti to serve as the Chief Operating Officer of Jumeirah South America and to advise the Cabot family on their investments in Argentina and Brazil.  He spent a year working for the group prior to their withdrawal from the South American market.

In 2010 R. Black Global was formed to serve as an investment vehicle sourcing attractive investment opportunities for a variety of international high net worth families, funds, and corporations.

In 2012 alone, R. Black Global, on behalf of clients, has closed 3 transactions totaling 83 million dollars worth of investment.  Transactions this year to date include:

•        A 500,000 square foot development parcel in New York, NY

•        A portfolio of 385 improved lots in Reno, NV

•        A portfolio of 24 condos in Irvine, CA

In addition to the above closed transactions, R. Black Global, through controlled entities, has in excess of 25 million in hospitality assets under contract and has a stalking horse offer in excess of 30 million, in backup position, on a large residential development opportunity outside of San Francisco, CA.

R. Black Global acts as an investment sourcing entity and operating partner for assets acquired.  With substantial international equity structuring experience, we have been able carve out a substantial equity allotment from multiple sources by advising and establishing tax effective investment structures for international investors.


Eduardo V. Miranda

Mr. Miranda currently serves as a Senior Associate with Metro 1 Properties in Miami, Florida, a commercial brokerage and real estate advisory services company. There, he represents buyers and sellers in commercial real estate transactions including hotel, industrial, multi-family, and land. He also performs due diligence and financial feasibility analysis on proposed acquisitions for clients, produced

and distributed offering memoranda for property dispositions, and represented retail tenants in site selection and lease execution.

Prior to that, Mr. Miranda served as the Development Manager for Oto Development, LLC, a hotel development group based in Fort Lauderdale, Florida. His duties there included directing the development efforts of Marriott, Hilton, and Hyatt branded select service hotels from site selection, due diligence, and acquisition, through design development, permitting, construction, FF&E coordination and hotel opening. He also negotiated and managed all contracts and purchase orders, coordinated design and construction teams during project origination and implementation, collaborated with brand representatives to ensure brand standards were achieved, and developed project budgets of approximately $75 million for new hotels and evaluated feasibility of proposed projects.

Mr. Miranda also served as Acquisition and Development Consultant for Luxury Development Consultants, Inc., where he performed due diligence and financial feasibility analysis on proposed acquisitions and developments. Prior to that, he served as Vice President of Development at Boca Resorts Inc. (now LXR Luxury Resorts, an affiliate of The Blackstone Group), where he managed over $200 million in development spending on numerous resort enhancements including the renovation of existing facilities in Boca, Fort Lauderdale, and Naples, including restaurants, bars, retail outlets, pools, meeting rooms, and guest rooms, as well as new construction projects including a golf clubhouse, luxury spa, and a 112 room guestroom tower with flexible meeting space at the Boca Resort, a golf course in Naples, and a state of the art floating dock marina at Bahia Mar in Fort Lauderdale. He also served as an Operations / Financial Analyst at The Breakers Palm Beach, Inc., a luxury hotel on Palm Beach Island. His duties there included controlling the financial performance of the 670-acre Breakers West residential development and its country club operations.

Mr. Miranda earned a Master of Science in Hotel and Food Service Management from Florida International University in 1994. He also earned a Bachelor of Science in Industrial and Systems Engineering from the University of Florida in 1992. The is a Licensed Real Estate Salesperson in the state of Florida.


Gerry D. Matthews

Mr. Matthews is a Licensed Real Estate Broker at Matthews Commercial Properties, where he has served for over a decade. MCP specializes in the sales and leasing of commercial, industrial, office and retail space throughout Connecticut; it has completed over 1,000 transactions since 2001 and earned the Co-Star Power Broker Award 2003-2011 top 20 brokerage firms in Ct / Westchester county N.Y.

Prior to that, Mr. Matthews served as a Licensed Real Estate Agent with Giglio & Krasney Commercial Real Estate for 6 years, where he worked directly with clients to search, locate and procure property that met their requirements, and developed successful marketing campaigns for the disposition of clients' properties.

Before that, Mr. Matthews served as Executive Vice President at Connecticut Factors, Inc. for 13 years. There, he supervised and coordinated personnel in the renovation of commercial office, and industrial buildings, ranging in size from 25,000 to 385,000 square feet, as well as several condominium and multi-family conversion projects. He also instituted maintenance and management programs for nine commercial office buildings totaling over 700,000 square feet and six condominium conversions and multi-family projects totaling 276 units, and attained necessary materials, bids and proposals for projects.

Concurrently, Mr. Matthews also served by gubernatorial appointment as the Real Estate Commissioner with the State of Connecticut Department of Consumer Protection from 1997 to 2003. There, he was tasked to uphold, interpret and enforce the laws governing the Real Estate industry in Connecticut. His division had jurisdiction over 20,000 brokers, agents, and property managers licensed in the State of Connecticut.


## PROJECT PARTNERS

ECONOMIC CONSULTANT

Dr. Michael K. Evans                     **Evans, Carroll & Associates, Inc**., *Chairman*

Dr. Evans is the Chairman of Evans, Carroll & Associates (formerly Evans Economics), which has been providing economic forecasting and consulting to clients since 1981. The firm, based in Boca Raton, Florida, specializes in economic analysis for EB-5 programs, economic impact studies of development projects and new construction, models of state and local tax receipts, impact of current and proposed government legislation, and construction of econometric models for individual industries and companies. As Chief Economist for the American Economics Group from 2000 to the present, Dr. Evans has also built a comprehensive state modeling system that provides economic analysis for a variety of consulting projects. Previously Dr. Evans was founder and president of Chase Econometric Associates (1970–80), and served as Clinical Professor of Economics at Kellogg Graduate School of Management, Northwestern University (1996–99) and Assistant and Associate Professor of Economics, Wharton School, University of Pennsylvania (1964–69). Dr. Evans holds a Ph. D. in Economics from Brown University.

# Summary of the General Risk Factors

Before investing in the Units, prospective Investors should be aware that there are risks, including those described below, which may affect the Partnership's business, financial condition or results of operations. Prospective Investors should consider carefully these risk factors together with all of the other information included in this Memorandum before deciding to purchase any Units.

An investment in the Units involves a certain degree of risk, including, but not limited to the following. For a more detailed description of the risks involved in an investment in the Units see RISK FACTORS below.

• The Units are illiquid and should only be purchased if the Investor is willing to hold the Units for an indefinite period of time.

• Identifying, completing, and realizing profits in the target market has from time to time been highly competitive, and involves a high degree of uncertainty.

• Many of the Partnership's competitors for investments are far larger than the Partnership, may have greater financial resources than the Partnership, and may have management personnel with more experience than the Managers of the General Partner.

• The Partnership's business or services may fail to perform as expected, and capital expenditures may exceed estimates.

• The Partnership may be forced to alter the design of, and services rendered at, the Project after expending resources to determine feasibility.

• The Partnership's revenues are subject to changes in regional economic conditions, including levels of employment and discretionary disposable income, consumer confidence, and may be affected by changes in legislation.

---------------------------------------

### *EB-5 IMMIGRATION DISCLOSURES AND RISK FACTORS*

The U.S. Congress created the employment-based fifth preference ("EB-5") immigrant visa category in 1990 for immigrants who invest in and manage U.S. commercial enterprises that benefit the U.S. economy. Each investment needs to create or save at least 10 full-time jobs for U.S. workers.

A description of the requirements and processes of the EB-5 Program are based on information obtained by the Partnership from third parties who the Partnership believes are reliable. However, there can be no assurance that such information is accurate or current or that it includes all of the risks relating to U.S. immigration laws or the EB-5 Program (see below).

Investors in this Offering who have subscribed for Units with the intention of applying for a U.S. green card through investment in the Partnership should be aware of certain risk factors relating to immigration to the United States, the EB-5 Program and its administration. An Investor who purchases Units with the intention of obtaining a conditional and permanent green card is encouraged, along with his or her advisors, to make his or her own independent review of the EB-5 Program and the various immigration risk factors relating to the process in obtaining a conditional and permanent residency status to determine if an investment in the Units is a suitable approach for him/her.

THE PARTNERSHIP MAKES NO REPRESENTATION OR WARRANTY OF ANY KIND CONCERNING WHETHER AN INVESTMENT IN THE PARTNERSHIP WILL MEET THE REQUIREMENTS OF THE EB-5 PROGRAM OR OTHER U.S. IMMIGRATION REQUIREMENTS.  NO ASSURANCES CAN BE GIVEN THAT AN INVESTMENT IN THE PARTNERSHIP WILL RESULT IN AN IMMIGRANT INVESTOR RECEIVING AN EB-5 VISA OR CONDITIONAL OR PERMANENT RESIDENT STATUS.

**Palm House Hotel, LLLP**                                        *Strictly Confidential*

### RISKS RELATED TO THE EB-5 PROGRAM

#### General Immigration Risks

Congress and/or USCIS may change the law, regulations, or interpretations of the law, including the EB-5 Program, without notice and in a manner that may be detrimental to an Investor and/or the Partnership. Investors who obtain conditional or permanent residence status must intend to make the United States their primary residence. Permanent residents who continue to live abroad risk revocation of their conditional or permanent residence status. The process of obtaining conditional and permanent resident status involves numerous factors and circumstances that are not within the control of the Partnership. These include an Immigrant Investor's history and quotas established by the United States government limiting the number of immigrant visas available to qualified individuals seeking conditional or permanent resident status under the EB-5 Program.

#### Job Allocation Among EB-5 Foreign Investors

The Partnership shall take such action to meet the objective of allocating to each Investor a minimum number of ten (10) direct and/or indirect and/or induced full-time equivalent positions for qualifying employees created by the Project due to the Partnership's investment in the Project on the following basis: The assignment of full-time equivalent positions for qualifying employees created by the Project shall be allocated to members of the Partnership based on the sequential order of the date that each member entered the United States on an EB-5 Visa.

#### Use of Immigration Attorney and Processing Time

The filing of an I-526 Petition by an Investor with the USCIS should be done by a qualified U.S. immigration attorney. As of the date of this document, the USCIS is taking approximately six months to approve (or deny) an I-526 Petition. It is impossible to predict USCIS processing times. Once approved, the case will be forwarded to the U.S. State Department's National Visa Center and then to a U.S. Consulate selected by the Investor for processing or, if the Investor is already in the U.S., the Investor may adjust his or her status to that of conditional permanent resident. It may, however, take an additional six months or longer for a U.S. Consulate to process the I-526 Petition, or for the USCIS to adjust an Investor's status, and issue a conditional green card. Investors should not physically move to the United States until their visa has been issued.

Management estimates that the Project will create a sufficient number of direct jobs. Each Investor in the Partnership who will petition for permanent residency in the U.S. under the EB-5 Program must demonstrate that the Project created at least 10 direct jobs in order to qualify for permanent residency status under the EB-5 Program.

There is no assurance that the assumptions upon which the job creation totals are based are accurate or that the actual number of direct employees will be close to the number predicted. Depending upon the disparity there may be insufficient employment to remove conditional visa status, resulting in a delay or denial of permanent residency for any Investor.

#### Proving Lawful Source of Funds

As part of the I-526 Petition, an Investor must present to the USCIS clear documentary evidence of the source of the funds invested and that the funds belong to the Investor. Generally, the Investor can satisfy the source of funds requirements by submitting documents showing that he or she has a level of income from legal sources that would yield sufficient funds for the investment. The USCIS generally requires copies of income tax returns to satisfy the source of funds requirement. For Investors who do not have such records, there may be other records that can be provided to the USCIS by an Investor to demonstrate that the investment funds came from legal sources. All such matters regarding the Investor's I-526 Petition should be discussed with his or her immigration counsel.

### Policymaking Position

The EB-5 Program requires an Investor to hold a policymaking or management position within the Partnership. The Partnership believes that each Investor, as a limited partner of the Partnership, is provided with the powers and duties under the Partnership Agreement sufficient to meet the USCIS requirement that an Immigrant Investor is actively participating in policymaking or management of a new commercial enterprise.

### Chinese Governmental Action.

The government of the People's Republic of China ("PRC") (the expected home country source of Investors) may restrict or suspend entirely participation by its nationals in the EB-5 Program as violative of (a) the PRC's Securities Laws, (b) the PRC's foreign exchange controls, and/or (c) the current prohibition on Chinese nationals investing overseas in an individual capacity, rather than through enterprises. Moreover, the PRC may promulgate new laws or regulations in the future that restrict or prohibit participation in the EB-5 Program. Finally, the PRC has not approved this private placement; although in the past it has been assumed that a lack of action on particular offerings by the PRC is tantamount to their tacit approval, in the future, it cannot be assured that the PRC will not restrict or prohibit foreign private placements in general or the Offering in particular. Similar political risks apply to any other country from which a prospective Investor who seeks to transfer funds is a citizen, lawful permanent resident, or is otherwise domiciled.

### Targeted Employment Area Designation.

The Partnership believes that the Project is located in a "TEA." The Partnership bases this belief on the TEA Designation Memorandum, attached hereto. While USCIS may rely on the TEA Designation Memorandum, USCIS may also choose to defer to state governmental authorities for an ultimate decision on whether the Project is located in a TEA. In such an event, the Partnership believes that the state would consider the Project to be in a TEA based on the evidence supported by the TEA Designation Memorandum, but that is not certain. Moreover, even if USCIS determines that the Project is currently located in a TEA, demographic shifts could cause the loss of TEA status to the census tract where the Project is located. If the Project is not in a TEA, then Investors in Interests seeking a green card pursuant to the Pilot Program would have to invest a minimum of one million dollars ($1,000,000). Therefore, if the census tract's "TEA" status is lost, it could become difficult or impossible for the Partnership to raise additional funds from EB-5 Investors. If the Partnership is unable to raise sufficient funds, the risk factor "Risks Due to Failure to Raise Adequate Capital" will also apply.

### At-Risk Investment

An Investor's investment must be at risk to qualify for the EB-5 Program. As part of the green card application, an Investor must show evidence that he or she has placed the required amount of capital at risk for the purpose of generating a return on the capital placed at risk. The Partnership believes that an investment in the Units will place an Investor's investment in the Partnership at risk because there is no assurance that the business of the Partnership will be able to return any Investor's investments in the Units at any time, or ever. Purchase of a Unit does not guarantee conditional or permanent residency in the United States. Furthermore, no assurance can be given that conditions to residency under the EB-5 Program will be removed.

THE PARTNERSHIP MAKES NO REPRESENTATION OR WARRANTY OF ANY KIND CONCERNING WHETHER AN INVESTMENT IN THE PARTNERSHIP WILL MEET THE REQUIREMENTS OF THE EB-5 PROGRAM OR OTHER U.S. IMMIGRATION REQUIREMENTS. NO ASSURANCES CAN BE GIVEN THAT AN INVESTMENT IN THE PARTNERSHIP WILL RESULT IN ANY INVESTOR RECEIVING A VISA OR CONDITIONAL OR PERMANENT RESIDENT STATUS.

### Timing of investment

The EB-5 program procedures requires an investor to <u>first</u> make a qualifying investment, and <u>then</u> file a Form I-526 petition (and supporting documents) with USCIS. The applicant must thus be prepared for situations where—if the application is denied—he or she would have incurred irrecoverable expenses on

foreign exchange transfer and then getting the investment returned. The investor might also have disposed of some valuable asset to arrange liquid funds in the first place and would be required to look for new investment assets. The investor should factor in expenses and costs and losses that he or she might incur while going through sale and purchase of assets. From the time that the investor makes the investments and time he or she receives the money back, the investor will need to factor in the lost interest in the process.

## OTHER RISK FACTORS

### RISKS RELATED TO OUR BUSINESS AND INDUSTRY

#### General Economic Conditions

The investment strategy of the Partnership is based in large part upon the success and results of the markets in general. Changes in the general economic conditions (including economic downturns), securities markets, and changes in tax codes and other governmental regulations may affect the value of the Partnership's investments.

#### Operating History

Palm House Hotel, LLLP has no operating history. As a result, we have no operating history to aid in assessing our future prospects. We will encounter risks and difficulties as an early-stage Partnership in a rapidly evolving, and often volatile, investment market. We may not be able to successfully address these risks and difficulties, which could materially harm our business and operating results.

The Partnership is a new business with no operating history upon which Investors may base an evaluation of its potential future performance. As a result, there can be no assurance that it will be able to develop consistent revenue sources, or that its operations will become profitable even if it is able to allocate the funds raised in this Offering in accordance with its business plan. The Partnership and its prospects must be considered in light of the risks, expenses and difficulties frequently encountered by entities in an early stage of development. Such risks include, but are not limited to, an evolving business model, developing the business plan and the management of its growth, property acquisition and development, the successful operating and maintaining of a commercial real estate Project. The Partnership must, among other things, locate investment assets, purchase investment assets at reasonable values, develop investment assets on a profitable basis, respond to economic and market variables outside the control of the Partnership, conduct adequate due diligence, respond to competitive developments and continue to attract, retain and motivate qualified employees and operate and maintain its facilities. There can be no assurance that the Partnership will be successful in meeting these challenges and addressing such risks and the failure to do so could have a materially adverse effect on the Partnership's business, results of operations and financial condition.

#### Management of Growth

The Project will experience growth in its operations, which will place significant demands on our management, operational, and financial infrastructure. If the Partnership does not effectively manage growth, the quality of services could suffer, which could negatively affect the Project and its operating results. To effectively manage growth, the Partnership will need to continue to improve its operational, financial and management controls and its reporting systems and procedures. These systems enhancements and improvements may require significant capital expenditures and management resources. Failure to implement these improvements could hurt the Project's ability to manage growth and its financial condition.

#### Competition

The Partnership will compete for investments with numerous other investments, many of which have substantially greater financial resources, research and marketing capabilities, operating histories and

greater name recognition than does the Partnership.

### Construction Risks

The Project may involve construction and/or renovation of existing buildings. Construction and renovation costs may exceed projected levels; similarly, the time for construction and renovation may exceed projections. Such cost overruns or delays may imperil the timing and profitability of the project. Further, necessary permits may take longer than anticipated to acquire, or may be denied entirely. For existing units, the condition of those units may be worse than expected, the units may contain asbestos, or they may require extensive work or even demolition and reconstruction.

### Natural Disasters; Weather

Construction, development, leasing, or operation may be delayed, prevented, or adversely affected by inclement weather or other acts of God. Florida is located in an area at high risk for hurricanes and other natural disasters and natural disaster-related damage. Buildings, fixtures, and other Project assets may be damaged or destroyed by natural disasters.

### Government Regulation Risks

The hospitality industry is regulated by both state and federal governments. Adverse changes in government regulations, taxes, or incentive programs could impact the feasibility, profitability, or even the legality of the project.

### Hospitality Industry Risks

The business operations of the Borrower involve the operations of a luxury hotel facility, including high-end ancillary services. The profitability of such an enterprise is dependent upon the tourism market in the area, as well as the general economy and consumer spending patterns. Furthermore, the ultimate profitability of the project may be influenced by the South Florida real estate market, which may be volatile. These macroeconomic factors are outside of Management's control.

### RISKS RELATED TO MANAGEMENT

### Reliance on Management

The General Partner has sole responsibility and authority for all decisions in connection with the management of and investments made by the Partnership. Limited Partners will have a limited right to participate in the management of the Partnership. The capital required by the Partnership to commence operations and carry on its business is being sought entirely from the proceeds of the Offering.

**The Partnership's success is highly dependent on the experience and industry knowledge of the management team, which members have limited experience in the operation of a Project of this type or with the EB-5 program.**

The General Partner was only recently formed and has no operational history to date. The Partnership is dependent entirely on the efforts of the management team of the General Partner for strategic business direction. The principals of the General Partner have limited experience in managing a Project of this type, and as a result, their ability to be effective managers, or otherwise operate the business in a manner that maximizes profitability for the Partnership is questionable. None of the Investors will have the right to vote on or approve any of the investments or business decisions to be made by the Partnership. Prospective Investors who are unwilling to delegate sole discretion to the General Partner in this manner should not invest in the Partnership.

Because the General Partner will have sole discretion in structuring the Partnership's business model, the risk profile and exposure of this Partnership will ultimately be determined by the General Partner. The Partnership's success depends on the General Partner's ability to execute its business model and plan.

The General Partner, and consequently the Partnership, is currently dependent on the continued service and active advisory efforts of the principals of the General Partner (see "Management Team"). If any of their services with the General Partner were to cease or lapse for any reason, the Partnership may be adversely affected if such services were not otherwise provided by Persons of equal or greater talent or experience.

### Potential Conflicts of Interest

Certain conflicts of interest may arise from the fact that the Managers of the General Partner will continue to be involved in business pursuits which require their time, attention and energies and which may conflict with the business of the Partnership. The Managers of the General Partner may also act in management and advisory capacities for other entities. Therefore, conflicts of interest may arise in the allocation of their time to the management and administration of the Partnership and such other entities.

### RISKS RELATED TO THIS OFFERING

### No Assurance of Liquidity; Restrictions on Transfer

There is currently no market for the Units, and a market in the Units is not expected to develop in the future. The Units are not redeemable and cannot be assigned; transferred; pledged; encumbered or otherwise disposed of without the consent of the General Partner and in compliance with applicable provisions of the Partnership Agreement and applicable securities laws. As a result, purchasers must bear the economic risk of their investments for the life of the Partnership. A purchase of Units should be considered only by sophisticated and accredited Investors financially able to maintain their investment and who can afford to lose all or a substantial part of their investment.

Transferability of the Units is restricted and Investors will not be able to liquidate their investment in the event of an emergency. Additionally, the Units may not be readily acceptable as collateral for loans (to the extent permitted by the Partnership Agreement). Accordingly, purchase of the Units must be considered a long-term, illiquid investment.

### Private Offering Exemption

The Units are being offered in reliance upon a non-public offering exemption provided under the Act, Regulation D promulgated thereunder. The Partnership has used its best efforts to assure compliance with the requirements of these various registration and qualification exemptions. Since compliance with the securities statutes is highly technical and often difficult, there is no assurance that a court reviewing the facts and circumstances of the Offering might not determine later that one or more of the applicable exemption provisions was not properly complied with. Should it be determined that the Partnership failed to comply with the requirements of the Act or any applicable exemption and a sufficient number of Investors were to seek rescission, the Partnership could face financial demands which could adversely affect its ability to continue to conduct business which, in turn, could result in adverse consequences to both rescinding and non-rescinding Investors.

### Liability and Indemnification of the General Partner

The General Partner is in a fiduciary relationship with the Limited Partners of the Partnership. As such, the General Partner is required to exercise good faith and integrity in their conduct of the Partnership's affairs. However, their responsibility is limited by provisions of the Subscription Agreement and Partnership Agreement which exculpate the General Partner and their affiliates from liability to the Partnership where the General Partner act (or fail to act) not in violation of the Subscription Agreement and Partnership Agreement and without gross negligence, fraud or willful violation of law. As a result, a Limited Partner may have a more limited right of action than it would have had in the absence of such provisions. The Subscription Agreement and Partnership Agreement also provides that the Partnership will indemnify the General Partner and their respective affiliates from any liability or loss suffered by virtue of the General Partner acting in such capacity, except in the case of violation of the Subscription Agreement and Partnership Agreement or of gross negligence, fraud or willful violation of law.

### *Projections; Forward Looking Information*

Management has prepared projections regarding Palm House Hotel, LLLP's anticipated financial performance. The Partnership's projections are hypothetical. Financial projections concerning the estimated operating results of the Partnership have been prepared by the Partnership's management. These projections may be based on certain assumptions which may prove to be inaccurate and which are subject to future conditions that may be beyond the control of the Partnership, such as the general industry conditions. The Partnership may experience unanticipated costs or lower revenues than forecasted. There is no assurance that the results which may be illustrated in financial projections would in fact be realized by the Partnership. The financial projections have been prepared by management of the Partnership in consultation with experts in the field and the Partnership's independent certified public accountants. However, since the financial projections are based upon numerous assumptions, which may or may not prove to be true, neither the independent experts or the independent certified public accountants or counsel to the Partnership can provide any level of assurance with respect to them.

Many of these risks are described elsewhere herein. For all of the foregoing reasons, actual results may vary materially from the Forward Looking Statements and there is no assurance that the assumptions used are necessarily the most likely. Additionally, when used in this memorandum, the words "believes," "anticipates," "intends," "expects," "plans," as well as similar words are intended to identify forward-looking statements. All such statements are based on the Partnership's expectations and are subject to a number of risks and uncertainties, many of which are beyond the Partnership's control. In light of these risks and uncertainties, there can be no assurance that the forward-looking statements contained herein will in fact occur. The Partnership does not undertake any obligation to publicly release the results of any revisions to these forward-looking statements that may be made to reflect any future events or circumstances.

### *Risks Due to Failure to Raise Adequate Capital*

Management intends to close this Offering with the requisite number of investors to achieve the full offering amount. However, this can not be guaranteed. A failure to secure full funding could endanger the success of the Project. Failure of the Partnership to raise the full offering amount could negatively impact the Project Company's ability to finance and develop the Project. If the Partnership fails to raise the full offering amount and is therefore unable to loan such amount to the Project Developer, to secure the balance of any funds required for the Project, the Project Developer will be required to seek a larger than expected amount from alternative capital sources, including institutional investors and non EB-5 investors, among others. Furthermore, it is possible that the Project Developer will fail to raise the additional capital, or that, even if the Partnership succeeds in raising the full offering amount and loans such amount to the Project Developer, such proceeds, plus any additional capital raised, will be inadequate to satisfy all capital requirements, or that such financing may be untimely procured, requiring the Project Developer to obtain alternative financing, including short- and long-term debt financing, or equity financing, in addition to the Partnership's loan to the Project Developer. The terms of such alternative financing may be better or worse for the Project Developer than the terms of the loan from the Partnership, and may result in subsequent investors in the Project Developer having superior rights to those of the Partnership.

# Summary of Loan Terms

**Purpose**. Prior to the closing of the first Unit offered hereunder, the Partnership will enter into a Loan Agreement (the "Loan") with Borrower. The proceeds of the Loan will be used to partially finance the acquisition, development and operation by Borrower of the Project.

**Amount**. The Loan amount will be up to $39,500,000, depending upon the number of Units sold in this Offering. Whether or not the maximum Loan amount is advanced, the Borrower may seek alternative and additional financing.

**Term; Repayment**. The balance of all Advances and all accrued unpaid interest on the Loan shall be repaid as follows. Upon and after the First Advance hereunder, Borrower shall make payments of interest only on the outstanding principal balance of all Advances at the rate per annum of 0.25% until expiration of 5 years from the First Advance (the "Initial Term"). Upon the expiration of the Initial Term, the outstanding principal balance of all Advances and all accrued interest then outstanding shall be due. Borrower shall make commercially reasonable efforts to repay the outstanding principal balance of all Advances and all accrued unpaid interest thereon after the expiration of the Initial Term. If Borrower cannot refinance such amounts on commercially reasonable terms prior to the end of the Initial Term, Borrower may extend the term of this Note for one or more additional five year periods (each an "Extension Period"), provided Borrower is not in default. During each Extension Period (a) the interest rate shall remain at 0.25%, and (b) Borrower shall make principal and interest payments on the outstanding principal balance of all Advances and all accrued unpaid interest thereon then outstanding, calculated by amortizing the outstanding balance thereof over 15 years at the rate of interest set forth below. Interest shall be computed on the basis of a 365 day year and actual days elapsed. Upon default or after judgment has been rendered on this Note, the unpaid principal of all Advances shall bear interest at a rate which is two (2%) percent per annum greater than that which would otherwise be applicable.

The Borrower may not, without the Partnership's prior express written consent, prepay the Note prior to the expiration of five years from the First Advance. Thereafter, Borrower may prepay this Note, in whole or in part, at any time, without penalty or premium, and without prior written consent of the Partnership.

**Disbursement**. Disbursements of Loan proceeds will be made to Borrower from time to time upon approval of Investor I-526 Petitions and in accordance with the Escrow Agreement. It shall be a condition of each advance that as of such time there shall not have been a material adverse change in the operations, assets or financial condition of the Borrower and its subsidiaries, taken as a whole.

**Promissory Note and Loan Collateral**. The Borrower will issue a Promissory Note with full recourse to the Borrower. The Loan may be secured by a lien on collateral of Borrower.

**Senior Debt**. Borrower may incur other debt and in connection therewith, grant security interests senior to those granted to the Partnership under the Loan Agreement.

**Loan Documents**. The Partnership has issued a Commitment Letter to Borrower, a copy of which is available upon request. The Promissory Note and Loan and Security Agreement to be executed by each Borrower are available for review upon request.

# Summary of Limited Partnership Agreement

The rights and obligations of the Partners of the Partnership will be governed by the Limited Partnership Agreement ("LP Agreement"), attached to this Offering Memorandum. It is recommended that each prospective investor read the entire LP Agreement. The following is a brief summary of some of the provisions of the LP Agreement. The summary below and all statements made elsewhere in this Offering Memorandum relating to the LP Agreement are qualified in their entirety by reference to the LP Agreement.

### PURPOSES (ARTICLE 1, LP AGREEMENT)

The purposes of the Partnership shall be to engage in any lawful acts or activities for which limited liability companies may be formed under the Act, including for the purpose of investing in Qualifying Investments under the EB-5 Pilot Program.

### CAPITAL CONTRIBUTIONS (ARTICLE 2, LP AGREEMENT)

Each Limited Partner's capital contribution must be paid at the time such Limited Partner subscribes to purchase Units in this Offering and shall be paid in USD cash. Each Investor's Capital Contribution will be credited to his/her Capital Account. Terms governing the maintenance of Capital Accounts are set forth in the LP Agreement. An EB-5 Limited Partner shall be conditionally accepted to the Partnership upon receipt by the Partnership of his/her Capital Contribution and the Administrative Fee. The Capital Contribution shall be released from escrow and delivered to the Partnership upon the USCIS approval of the I-526 Petition for such conditionally accepted EB-5 Limited Partner, in accordance with the Escrow Agreement. Upon release of the Capital Contribution to the Partnership, an EB-5 Limited Partner shall be admitted to the Partnership.

### ALLOCATION OF PROFITS AND LOSSES (ARTICLE 3, LP AGREEMENT)

Profits and Losses for each fiscal year shall be allocated as follows: (a) first, to the Partners in accordance with their Adjusted Capital Contributions, payable in proportion to the unpaid amounts thereof; and (b) the balance, to the Partners in accordance with the Percentage Interests.

### DISTRIBUTIONS (ARTICLE 3, LP AGREEMENT)

Available Cash Flow, if any, shall be distributed annually as follows: (a) to Partners in payment of Mandatory Distributions (See Section 3.6 of the LP Agreement); (b) then to EB-5 Limited Partners pro rata in accordance with each EB-5 Limited Partner's Adjusted Capital Contribution in an amount up to each EB-5 Limited Partner's Preferred Return, less amounts due to the Partnership; (c) then to EB-5 Limited Partners pro rata in accordance with each EB-5 Limited Partner's Adjusted Capital Contribution in an amount up to each EB-5 Limited Partner's Adjusted Capital Contribution; (d) then to Partners pro rata in accordance with each Partner's Adjusted Capital Contribution in an amount up to each Partner's Adjusted Capital Contribution; and (e) then to Partners in accordance with their Percentage Interests in the Partnership.

The rules and regulations governing the Pilot Program prohibit the return of an EB-5 investor's investment prior to the approval of the Investor's I-829. Accordingly, the Partnership shall not make distributions to EB-5 Limited Partners, other than distributions from Available Cash Flow in amounts not exceeding their

respective EB-5 Minimum Capital Requirement prior to that time. After such date the foregoing restriction shall no longer apply.

### MANAGEMENT (ARTICLE 4, LP AGREEMENT)

the Partnership operates under the direction of a General Partner. The General Partner has full and complete authority, power and discretion to manage and control the business and affairs, including the management and operation of the Partnership, to make all decisions regarding the business and affairs of the Partnership, in its sole discretion, and to perform any and all other acts incident to or customary for the business. Limited Partners have limited rights to take part in the management of, or to bind, the Partnership.

### TAX WITHHOLDING (ARTICLE 4, LP AGREEMENT)

The General Partner is authorized to withhold any sums required by the Internal Revenue Code even if such withholding conflicts with any of the terms and conditions of this Agreement or otherwise affects distributions, allocations or payments to the Partners. In the event that the General Partner learns of a withholding obligation subsequent to the distribution to which the withholding obligation relates, the General Partner will issue an invoice to the Partner. If the invoice is not paid within sixty (60) days, the General Partner will charge the amount against the Partner's Capital Account.

### INDEMNIFICATION (ARTICLE 5, LP AGREEMENT)

The Partnership may indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, or investigative, including all appeals (other than an action, suit or proceeding by or in the right of the Partnership) by reason of the fact that he is or was a partner, officer or employee of the Partnership, or is or was serving at the request of the Partnership as a Partner, trustee, officer or employee of another company, partnership, joint venture, trust or other enterprise, against expenses, judgments, decrees, fines, penalties and amounts paid in settlement actually and reasonably incurred by him in connection with such action, suit or proceeding if he acted in good faith and in a manner which he reasonably believed to be in or not opposed to the best interests of the Partnership and, with respect to any criminal action or proceeding, had no reasonable cause to believe his conduct was unlawful. Expenses of each person indemnified may be paid by the Partnership in advance of the final disposition of such action, suit or proceeding as authorized by the General Partner upon receipt of an undertaking to repay such amount unless it shall ultimately be determined that he is entitled to be indemnified by the Partnership.

### VOTING (ARTICLE 7, LP AGREEMENT)

On any matter presented to the Partners for their vote, each Limited Partner shall have one vote for each Unit owned by him. The following actions shall require the approval of Limited Partners holding a majority of the then outstanding Units: (i) any modification to this LP Agreement materially changing the rights of the Limited

Partners; and (ii) dissolution of the Partnership prior to the end of the fifth year after admission of the last EB-5 Limited Partner.

### TRANSFER RESTRICTIONS (ARTICLE 8, LP AGREEMENT).

No EB-5 Limited Partner may voluntarily transfer any interest or rights in his/her Units without consent of the General Partner. Additional restrictions on transfer of Units are described in the LP Agreement. No Limited Partner shall have the right or power to Voluntarily Withdraw from the Partnership. If any Partner intends to transfer his or her Units or any part thereof to any person or entity, after obtaining required

approval, such Partner shall give written notice to the Partnership of his intention so to transfer. Thereupon, the Partnership, then the General Partners, then the Limited Partners shall have an option to purchase such Units at Fair Market Value (as defined in the LP Agreement).

### TERMINATION OF INTEREST (ARTICLE 9, LP AGREEMENT)

The Partnership Interest of each EB-5 Limited Partner shall be terminated by (a) dissolution of the Partnership as provided in the LP Agreement and distribution of the proceeds of liquidation to EB-5 Limited Partners in accordance herewith; (b) the Agreement of an EB-5 Limited Partner, or his/her personal representative, and the General Partner; (c) the return of the Capital Contributions and payment of all accrued Preferred Returns to such EB-5 Limited Partner.

### DISSOLUTION AND TERMINATION (ARTICLE 10, LP AGREEMENT).

The Partnership shall be terminated and dissolved upon the first to occur of the following: If the Partnership then has any EB-5 Partners (a) upon vote of a Majority-In-Interest of the Partners; or (b) upon the sale of all or substantially all the assets of the Partnership; and if there are then no EB-5 Partners of the Partnership (a) upon vote of the General Partner, or (b) upon sale of all or substantially all of the assets of the Partnership.

## INCOME TAX CONSIDERATIONS

Each Investor is responsible for obtaining his or her own tax advice with respect to the federal, state and local income and other possible tax consequences of his/her investment in the Partnership, and no tax advice will be provided hereunder or at any time in the future. However, as a general rule, a resident alien of the United States will be taxed on all of his or her worldwide income and will be required to file a United States income tax return. In addition, if an alien is not a resident of the United States but has United States source income he or she generally will be subject to taxation in the United States on such income, and such income may be subject to withholding and/or reporting on a United States income tax return. All Investors in this Offering should seek professional tax advice prior to investing in this Offering.

## SUBSCRIPTION PROCEDURE AND PLAN OF DISTRIBUTION

### SUBSCRIPTION PROCEDURE

To subscribe to purchase Units in this Offering, a subscriber must transmit the following to the Partnership prior to the termination of this Offering, as follows:

1.      Subscriptions Funds for Units ($500,000 per Unit subscribed for) shall be paid by a wire transfer to the Partnership Escrow Account established by each subscriber of Units with the Partnership according to the wire instructions provided by the Partnership.

2.      Administrative Fees ($40,000 per Investor) shall be paid by wire transfer to the Partnership according to the wire instructions provided by the Partnership.

3.      Executed counterpart signature page to the Partnership EB-5 Escrow Agreement (attached hereto);

4.      Executed counterpart signature page to the LP Agreement (attached hereto);

5.      Executed complete Subscription Agreement (attached hereto);

6.      Executed and complete Investor Questionnaire.

The subscription period will begin on the date of this Offering Memorandum and will continue until the Offering is sold or the Offering is terminated by the Partnership.

All subscription proceeds received from subscribers for Units shall be deposited in the Partnership Escrow Account established for subscription funds pending filing of subscriber I-526 Petitions. Upon notice of approval of each subscriber's I-526 Petition, his/her subscription funds will be transferred to the Partnership and advanced to Borrower as part of the Loan. A subscriber of Units shall have no right to revoke or withdraw his/her subscription after filing of his/her I-526 Petition.

If a subscriber's I-526 Petition is denied by USCIS for reasons within the control of the Partnership, then subscriber's subscription proceeds shall be returned to subscriber without interest or deduction. If a subscriber's I-526 Petition is denied by USCIS for reasons beyond the control of the Partnership or due to subscriber providing false or misleading information to USCIS or the Partnership, then subscriber's subscription proceeds shall not be returned to subscriber but shall remain committed to the Project in accordance with this Offering. In such case, subscriber will be admitted as a Limited Partner of the Partnership and will be issued Units subject to the terms of the LP Agreement as if his/her I-526 Petition was approved. All interest accrued on funds deposited in the Partnership Escrow Account belong to the Partnership.

### PLAN OF DISTRIBUTION

The Units will be offered to prospective investors by the Partnership, and/or its duly authorized agents. Fees and commissions of such agents may be paid by the Partnership from Administrative Fees. Prospective investors are limited to qualified non-U.S. citizens seeking permanent residence in the United States through the EB-5 Program who are Accredited Investors (as defined in the Act). The Units are offered subject to the Partnership's rights to withdraw the Offering at any time without notice and/or to reject any subscription. This Offering may be terminated if events have occurred, which in the General Partner's sole judgment, make it impracticable or inadvisable to proceed with, continue or consummate the Offering described herein. There is no assurance that all or any of the Units will be sold. If the Offering is terminated the Partnership Escrow Agreement provides for the prompt return to the investors of their subscription funds, without interest. Administrative Fees are not refundable for any reason.

# Availability of Additional Information

EACH PROSPECTIVE INVESTOR WILL BE GIVEN AN OPPORTUNITY TO ASK QUESTIONS OF AND RECEIVE ANSWERS FROM MANAGEMENT OF THE PARTNERSHIP CONCERNING THE TERMS AND CONDITIONS OF THIS OFFERING AND TO OBTAIN ANY ADDITIONAL INFORMATION, TO THE EXTENT THE PARTNERSHIP POSSESSES SUCH INFORMATION OR CAN ACQUIRE IT WITHOUT UNREASONABLE EFFORTS OR EXPENSE, NECESSARY TO VERIFY THE ACCURACY OF THE INFORMATION CONTAINED IN THIS MEMORANDUM. IF YOU HAVE ANY QUESTIONS WHATSOEVER REGARDING THIS OFFERING, OR DESIRE ANY ADDITIONAL INFORMATION OR DOCUMENTS TO VERIFY OR SUPPLEMENT THE INFORMATION CONTAINED IN THIS MEMORANDUM, PLEASE WRITE OR CALL THE PARTNERSHIP.

<u>Palm House Hotel, LLLP</u>

197 S. Federal Highway, Suite 200
Boca Raton, FL  33432
Telephone: (561) 282-6102

# *SECTION II*

## Business Plan Summary

Palm House Hotel, LLLP                                                                 *Strictly Confidential*

## EXECUTIVE SUMMARY

### THE PROJECT OVERVIEW

The Borrower, Palm House, LLC, intends to secure a Loan from the Limited Partnership, using such funding to serve as Developer for the job-creating enterprise known as the Hotel Project. To that end, the Limited Partnership is soliciting investors under the EB-5 Immigrant Investor Program (EB-5 Program), which grants lawful conditional and permanent resident status in the United States to foreign investors who make qualifying investments (Qualifying Investments) under the provisions of 8 U.S.C. 1153 (b) (5) (A) (i)-(iii), (C) (the "Act"). In order to take advantage of the EB-5 Program, foreign investors must invest in the Limited Partnership and complete the required immigration procedures. All Qualifying Investments must be invested in projects structured to create at least 10 full time direct jobs for qualified U.S. workers, as set forth in the EB-5 Program.

### PROJECT SUMMARY

The Project developer seeks financing to operate a business involving the renovation and development of a high-end resort hotel.

The Project developer will focus on extensively renovating and refurbishing an existing hotel structure on the island of Palm Beach in South Florida. The hotel will be remodeled as a 79-room, high-end resort hotel offering ancillary services (such as food and beverage, spa, salon, membership club, etc.).

Of course, the EB-5 program's primary focus is job creation. Palm House Hotel, LLLP is excited to be an important factor in investing in the creation of new jobs. The project described herein will provide a beneficial impact to the community, provide jobs, and provide a boost to the local and national economies.

### EMPLOYMENT

The economic analysis conducted, using the latest USCIS-approved complex software programs and diagnostic models available (RIMS II), justifies the feasibility of the project by proving the economic benefits of the Hotel Project to all areas of the local economy and confirms that the Hotel Project not only meets but exceeds the United States employment generation requirements of the USCIS:

| Table A.  Summary of Employment and Revenue Estimates | | | |
|---|---|---|---|
| Activity | Expenditure/Revenues ($ million) | Final Demand Multiplier | Total Jobs |
| Hard Construction Costs | 32.297 | 17.5636 | 567.2 |
| Soft Costs | 6.188 | 16.315 | 101.0 |
| Purchases of FF&E * | 2.5 | 7.9957 | 20.0 |
| Hotel Operations | 14.36 | 17.5069 | 251.4 |
| Membership Fees * | 2.0 | 7.046 | 14.1 |
| **Total** | **75.413** | | **953.7** |
| * Indirect and Induced effects only | | | |

**Palm House Hotel, LLLP**                                                    *Strictly Confidential*

The econometric analysis quantifying the Hotel Project benefits to the state and local economy is a project specific analysis validating the Hotel Project opportunity and is included with the business plan.

*FINANCES*

| | |
|---|---:|
| **Number of rooms** | **79** |
| **Available room-nights** | 28,835 |
| **Occupancy rate** | 61.0% |
| **Occupied room-nights** | 17,589 |
| **Average Daily Rate** | $522.50 |
| **RevPAR** | $318.73 |
| **Room Revenue** | **$9,190,435** |
| | |
| **Ancillary Revenue (F&B, etc.)** | $5,169,620 |
| | |
| **Total Revenue** | **$14,360,055** |
| | |
| **Total Expenses** | $8,497,550 |
| | |
| **EBITDA** | **$5,862,505** |

The above summation of the projected Year 2 (stabilized) income and expenses of the Hotel Project indicates that the Developer is well managed in the proper uses of cash flow to grow the concern through the judicious monitoring of variable and fixed costs resulting in profitability within a short time frame, allowing the Hotel Project to provide the projected return on investment to the investor/limited partner. Please see the full Business Plan and its attachments for the 5 year Pro Forma detail supporting the projections.

The foreign investor can have confidence that the Hotel Project will create the necessary number of jobs and economic benefits to assure the foreign investor that their application for residence status is and will continue in good standing.

The Hotel Project has the expertise and experience of Palm House, LLC's management to further validate the high level of confidence that the goals and projections will be realized (please see the profiles in the Management section of the business plan).