UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 16-81871-CIV-MARRA

LAN LI, an individual, et al,

Plaintiffs,

vs.

JOSEPH WALSH, an individual, et al,

Defendants.

_____/

## OPINION AND ORDER

This cause is before the Court upon Defendants Joseph Walsh, Joseph Walsh, Jr. and JJW

Consultancy, Ltd.'s Motion to Dismiss Complaint or for More Definite Statement (DE 146).

The Court has carefully considered the Motion and is otherwise fully advised in the premises.

I. Background

According to the Complaint, the allegations of which the Court must accept as true for

purposes of this motion, Plaintiffs are the victims of a $50 million fraud, theft, and conspiracy, in

which a web of individuals, primarily based in Palm Beach County, Florida, preyed on foreign

nationals desirous of leaving foreign countries, such as China and Iran, to provide their families

with the opportunity for a better life in the United States through the EB-5 program. (Compl. ¶

1.)  The "Bad Actors"[1] conspired to fraudulently induce each Plaintiff to invest $500,000, plus a

$40,000 "administrative fee," into a purported Palm Beach real estate project, known as the

"Palm House Hotel" which was simply a mechanism to steal Plaintiffs' funds and distribute

them among the conspirators. (Compl. ¶ 2.) Plaintiffs' funds were supposed to be held in an

_____

[1] The Complaint uses the term "Bad Actors"

escrow account unless and until their I-526 immigration petitions[2] were approved by the United

States government. (Compl. ¶ 3.)  If and when Plaintiffs' I-526 petitions were approved, their

funds were supposed to be used to create at least 10 full-time jobs for qualifying U.S. workers, in

this case by:

> (a) finishing the renovation and development of an existing luxury hotel structure in
> Palm Beach;
> (b) serving Palm Beach County by seeking to create jobs and increase U.S. exports
> by developing an upscale resort hotel; and
> (c) creating at least 790 direct and indirect jobs to support the EB-5 guidelines and
> the number of investors sought.

(Compl. ¶ 4.)

However, Plaintiffs' funds were not held in the escrow account. Instead, Plaintiffs' funds

were transferred from the escrow account to other accounts for the benefit of the conspirators.

(Compl.  ¶ 5.)  Virtually none of Plaintiffs' funds were used to develop the property, no jobs

were created, and no EB-5 visas were issued to any of the Plaintiffs. (Compl. ¶ 6.)

The Bad Actors stole Plaintiffs' funds and used them to:

> (a) purchase multiple homes, investment properties, a 151 foot yacht that cost almost
> $6,000,000, payoff millions of dollars of personal debt (including more than
> $266,000 in personal back taxes), luxury cars, vacations, etc.;

> (b) pay others to further the criminal scheme, including using licensed
> attorneys who held a fiduciary duty to help fraudulently induce investments.

(Compl. ¶ 7.)

The fraudulent scheme operated as follows:

> (a) The Bad Actors preyed on Chinese and Iranian investors seeking a path to
> United States residency for themselves and their minor children.

---

[2] Under the EB-5 program, an immigrant investor applies for an immigrant visa by
submitting a Form I-526. (Compl. ¶ 71.)

(b) The Bad Actors fraudulently obtained $500,000, plus $40,000 in administrative fees, from each foreign investor through the sale of alleged equity interests in Palm House Hotel, LLLP, a Florida limited liability partnership that would be involved in the development of the Palm House Hotel, claiming that the investment would qualify them under the EB-5 program administered by United States Citizenship and Immigration Services.

(c) The Bad Actors represented, among other things, that:

(i) There was a 100% guaranty for the return of Plaintiffs' investment and fees in the event their I-526 petition was denied;

(ii) 100% of Plaintiffs' funds would be held in escrow until their Form I-526 immigration petitions were approved by the United States government;

(iii) A "limited number" of 79 equity interests would be sold in Palm House Hotel, LLLP at the price of $500,000 each, plus $40,000 in administrative fees;

(iv) Plaintiffs' funds would be exclusively invested in the Palm House Hotel to create jobs by helping to finish the renovation and development, which was near completion;

(v) The Palm House Hotel would be open for business by the "Season" of 2013/2014, and was 80-90% completed prior to Plaintiffs' investments;

(vi) The funds would create 930 jobs, more than the required 790 fulltime jobs for the offering;

(vii) Plaintiffs' funds would be the third and final source of funds. The EB5 funds were in addition to an equity investment by the developer in excess of $22,000,000 and a bank loan (by a bank that had done full due diligence justifying such a loan) in excess of $29,000,000. Accordingly, Plaintiffs' funds constituted less than 50% of the project funding;

(viii) Plaintiffs' funds would be held in escrow, and were not yet needed, because the developer's investment in excess of $22,000,000 and a bank loan in excess of $29,000,000 was being used for construction and renovation;

(ix) Plaintiffs' funds would not be taken from the escrow account, and would not be used, unless and until the developer's investment in excess

3

of $22,000,000 and the bank funds in excess of $29,000,000 had been used at the project;

(x) The real property at issue was currently worth $110,000,000-$137,000,000 (the current value representation varied, depending on what the Bad Actors believed a particular Plaintiff wanted to hear) before completion, which made the investment "one of the safest EB-5 offerings from a Job Creation and Investment position."

(xi) I-526 immigration petitions for the Palm House Hotel project had already been approved by the United States government for the initial investors;

(xii) An insurance policy was purchased by the Developer that guaranteed that construction of the Palm House Hotel project would be completed;

(xiii) The local government guaranteed that construction of the Palm House Hotel project would be completed, and that this would be the last 5-star hotel property they would allow on Palm Beach;

(xiv) The developer, Robert Matthews, was a famous real estate developer in the United States;

(xv) Each investor's investment would be fully secured by the real property at issue and by the State of Florida pursuant to a UCC form. As there would be 79 rooms and 79 investors, each investor would be given a UCC security interest in an individual room; and

(xvi) Donald Trump and Bill Clinton would serve on the Palm House Hotel advisory board and would assist with any issues related to construction and also play a key role in recruiting celebrities and dignitaries to the club. Celebrities such as Tony Bennett, Celine Dion, Bill Koch, and Eric Schmidt were already members of the hotel club.

(d) The Bad Actors targeted investors with children between the ages of 18 and 21 because, under the EB-5 program, applicants have the right to apply for a green card for themselves, their spouse, and unmarried children under 21. Once the investor's funds were stolen and time continued to pass without the issuance of an I-526 petition approval, the Bad Actors would use the fact that the investor's child had "aged out" to silence the investor, perpetrate the continuing fraud, and prevent the investor from seeking redress or judicial assistance. The Bad Actors threatened the investors that, if the Palm House Hotel investment was interfered with or terminated, because the investor's child was no longer under 21, they would no longer be able to obtain a green card through their parent and would need to obtain their own EB-5 visa at an additional cost of

4

$500,000.

(e) When any Plaintiff questioned or demanded the return of their investment, they were told that all was well, that additional appeals of the application process were in place, that the country's foremost immigration attorney had been hired to prosecute the appeals, and that all was well with the construction of the hotel, thereby further lulling Plaintiffs and allowing the Bad Actors to deny any rights to reimbursement.

(Compl. ¶12.)

Plaintiffs' I-526 petitions were all denied, yet their funds were never returned and were not held in escrow until their Form I-526 immigration petitions were approved. (Compl. ¶¶ 14-15.)  The Bad Actors  did not sell 79 purported equity interests in Palm House Hotel, LLLP. Despite registering this offering for only 79 units, they perpetrated this fraud on over 90 unsuspecting foreign investors. (Compl. ¶16.)  Plaintiffs' funds were not exclusively used to help finish the renovation and development of the Palm House Hotel. Instead the funds were used for unlawful purposes. (Compl. ¶17.)  The hotel was nowhere near completion, let alone anywhere close to capable of being open for business by the "Season" of 2013/2014. As of the filing of the Complaint, it is a construction site, accruing fines of $2,000 per day from the Town of Palm Beach. (Compl. ¶18.)  Plaintiffs' funds were not used to create 10 full-time jobs for each $500,000 advanced, which was the only purpose for the funds to come to the United States. Further, the fact that at least 93, as opposed to 79 interests were sold, prevented that from occurring. (Compl. ¶19.)

Plaintiffs' funds were not in addition to an equity investment by the developer in excess of $22,000,000 and a bank loan in excess of $29,000,000, so that Plaintiffs' funds constituted less than 50% of the project funding. There was no bank loan, there was no developer's equity, and there was no other source of funds. (Compl. ¶20.)  The real property was

not worth $110,000,000-$137,000,000. Indeed, the property had been purchased out of foreclosure for $10,000,100. (Compl. ¶21.)

No investor's I-526 immigration petition for the Palm House Hotel project was ever approved by the United States government. While the Bad Actors had provided a written notice of approval for the project, the notice was fraudulent and did not relate to the Palm House Hotel project. (Compl. ¶22.) There was no insurance policy that guaranteed the completion of construction of the Palm House Hotel project. The Bad Actors represented that certain documentation was an American surety bond guaranteeing performance when, in reality, it was not. (Compl. ¶23.) The local government never guaranteed the completion of construction of the Palm House Hotel or certified it as a 5-star property. Instead, the local government was imposing significant fines against the property. (Compl. ¶24.)

Robert Matthews is not a famous real estate developer in the United States. (Compl. ¶25.) Each investor's investment was not fully secured by the real property or the State of Florida. In fact, a secret, unrecorded mortgage in the amount of $27,468,750 was granted to the prior developer of the project in August 2013, which was not recorded until March 28, 2014 -- seven (7) months after it was granted -- and after almost all Plaintiffs had undertaken their due diligence and wired their investments for the project. A mortgage to secure Plaintiffs' interest in the real property was not recorded until October 2014, after whatever equity existed in the project had been subsumed by the prior developer's secret mortgage. (Compl. ¶ 26.) Bill Clinton and Donald Trump are not on the Palm House Hotel advisory board, and there is no such board. (Compl. ¶27.)

Defendant Joseph Walsh ("Walsh") served as a general partner of Palm House until July

2016.  Walsh owns and/or operates and/or controls South Atlantic Regional Center, LLC and USREDA, LLC ("USREDA").  Walsh arranged to provide legal services, through his company USREDA, to Plaintiffs in connection with the processing of their EB-5 visa applications. (Compl. ¶32.)  Joseph Walsh, Jr. ("Walsh Jr.") is the son of Walsh and owns and/or operates and/or controls Defendant JJW Consultancy, Ltd. ("JJW") (Compl. ¶33.)

SARC held itself out as an EB-5 Regional Center, claiming to specialize in investment-based immigration services.  (Compl.¶ 73.)  SARC was operated and controlled by Walsh, Walsh Jr. and others.  (Compl. ¶75.)  USREDA was an entity that claimed to specialize in providing legal immigration services regarding the EB-5 Visa program, held itself out as a law firm, and required clients to sign engagement letters for its services. (Compl. ¶ 76.)  USREDA was operated and controlled by Walsh, Walsh Jr. and others.  (Compl. ¶77.)

Beginning in 2013, Walsh, Walsh Jr. and other Defendants went to China to solicit Chinese Plaintiffs regarding the EB-5 program at the Palm House Hotel. (Compl. ¶81.)  SARC, USREDA, Walsh, Walsh, Jr., and others retained Defendant Ali Herischi to help them sell the Palm House Hotel fraud to the Iranian Victims. (Compl.¶ 82.)

During the Palm House Hotel solicitations, Plaintiffs were provided with three (3) items:

(a) Frequently Asked Questions (the "FAQ");
(b) Sales Brochure (the "Sales Brochure"); and
(c) Signature Booklet (the "Signature Booklet")

(Compl. ¶85; Ex. A, B, C, D, E, F, DE 1.)[3]

---

[3] Collectively, the FAQ, Sales Brochure, and Signature Booklet will be referred to as the "Offering Documents."

7

While the Signature Booklet contained signature pages for a Private Placement

Memorandum (the "PPM") and a Palm House limited partnership agreement (the "Palm House

Limited Partnership Agreement"), Plaintiffs were not provided with copies of the full documents

until after they made their investments, and after they demanded them when it was becoming

more and more clear that something was wrong. (Compl. ¶86; Ex. G and H, DE 1.)  The

representations in the Offering Documents, the PPM, the Palm House Limited Partnership

Agreement, and the USCIS Approval were originally made by Walsh, Walsh Jr. and others on

behalf of the companies, SARC and USREDA.  (Compl. ¶88.)  JJW Consultancy Ltd., and others

adopted and made the representations in the Offering Documents and the USCIS Approval when

selling the Palm House Hotel project to the Chinese Plaintiffs. (Compl. ¶89.)  There were many

knowingly false representations in the Offering Documents. (Compl. ¶101.)  SARC, USREDA,

Walsh, Walsh Jr., JJW and others made presentations in China to the Chinese Plaintiffs using the

Offering Documents. (Compl. ¶104.)  These Defendants also used a Powerpoint presentation that

contained false representations to induce the Chinese Plaintiffs. (Compl. ¶105.)  These

Defendants also made other false representations to the Chinese Plaintiffs. (Compl. ¶108.)

Also in 2013, SARC, USREDA, Walsh, Walsh Jr. and others fraudulently induced the

Iranian Plaintiffs to provide their investments. (Compl. ¶120.)  Walsh and others made

presentations to the Iranian Plaintiffs using the offering documents, presentation materials, and

oral statements and made false statements. (Compl. ¶¶ 121-24.)

Plaintiffs relied upon these false statements in providing their money. (Compl.  ¶¶127-

163.)  After Plaintiffs submitted their paperwork in support of their Form I-526 Petitions, the

United States Citizenship and Immigration Services ("USCIS") denied the petitions. (Compl.

¶166; Ex. M, DE 1.)  The USCIS cited the following deficiencies: (1) inconsistencies in the

documents from Palm House; (2) insufficient number of full-time positions created by the

project; (3) dispute over ownership of the project's property; and (4) insufficient evidence of

bridge financing. (Compl. ¶168.)  Plaintiffs demanded the return of their funds, but no funds

were returned to Plaintiffs. (Compl. ¶¶170-71.)  Walsh, Walsh Jr., USREDA, JJW and others

made threats to investors if they sought to recoup their funds and made misrepresentations to lull

the investors into a state of inactivity. (Compl. ¶¶173-200.)

Upon investigation, Plaintiffs discovered that Palm House was not a legitimate EB-5

project and that their funds were not held in the Escrow Account. (Compl. ¶¶202-04.)  Plaintiffs'

funds were quickly transferred from the Escrow Account to other accounts used by Defendants.

(Compl. ¶¶205, 207.)  Virtually none of Plaintiffs' funds were used at the project, and no jobs

were created. (Compl. ¶ 206.)

Plaintiffs wired funds into an escrow account at PNC Bank and the Bad Actors moved

these funds into a second account at PNC. (Compl. ¶246.)  Upon information and belief, SARC,

USRED, Walsh, Walsh Jr., and others transferred the funds to other accounts and used them for

non-allowable purposes and moved them to accounts of other Defendants. (Compl. ¶¶247, 249-

58.)

The Complaint [4] seeks injunctive relief against all Defendants under Florida Statute

8812.035(1), (6) (count one); conversion against all Defendants (excluding Palm House) (count

three); fraud in the inducement against Walsh, Walsh Jr., JJW and others (count four); fraud in

---

[4] The Court excludes counts not brought against the Defendants bringing the instant
motion.

the inducement against Walsh, Walsh Jr. and others (count five); fraud against SARC, USREDA, Walsh, Walsh Jr., JJW and others (count six); fraud against Walsh, Walsh Jr. and others (count seven); breach of fiduciary duty against Walsh and others (count nine); avoidance of fraudulent transfers pursuant to Florida Statute 726.105(1)(a) against all Defendants excluding Palm House (counts twelve-fourteen); a violation of Florida Securities and Investor Protection Act, Florida Statute 517.011 et seq. against Walsh, Walsh Jr. and others (counts fifteen-sixteen); unjust enrichment against all Defendants (counts seventeen); a violation of the Florida Deceptive and Unfair Trade Practices Act, Florida Statute §501.201 against all Defendants (count eighteen); equitable accounting against all Defendants (count nineteen); civil conspiracy against all Defendants (excluding Palm House and the Evans Defendants) (count twenty); constructive fraud against all Defendants (excluding Palm House and Evans Defendants) (count twenty-one); piercing the corporate veil against JJW and others (count twenty-two); violations of the Section 10(b) of the Exchange Act and Rule 10b-5 against Walsh, Walsh Jr. and others (count twenty-five); violations of Section 20(a) of the Exchange Act against Walsh, Walsh Jr. and others (count twenty-six); violation of RICO, 18 U.S.C. 1962(c) against Bad Actors (count twenty-seven) and a violation of RICO, 18 U.S.C. 1962(d) against the Bad Actors (count twenty-eight).

Defendants Walsh, Walsh, Jr. and JJW move to dismiss on the following grounds: (1) the claim for injunctive relief fails as Plaintiffs have an adequate remedy at law; (2) Plaintiffs' fraud claims improperly lump numerous defendants together and fail to specify the time and place of each alleged fraudulent representation; (3) the conversion claim fails to identify what funds or property were converted and the escrow agreement negates Plaintiffs' claim; (4) the claim for a constructive trust fails to identify any specific res and improperly seeks

a constructive trust over the Walsh Defendants' general assets; (5) the alternative claim for

dissolution of the limited partnership is contrary to the terms of the agreement; (6) the breach of

fiduciary duty claim fails because it is a derivative claim that the individual partners lack

standing to assert; (7) the fraudulent transfer claims do not identify a transfer of assets or

property of the alleged debtor; (8) the claim for equitable accounting fails because no fiduciary

duty is owed by the Walsh Defendants; (9) the conspiracy claims fail because the fraud and theft

claims fail; (10) the constructive fraud claim fails to allege a fiduciary relationship; (11) the

piercing the corporate veil claim does not identify the alleged stockholders and is conclusory;

(12) the civil RICO claims are barred and (13) Plaintiffs lack standing to assert a RICO claim.

## II.  Legal Standard

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires "a short and plain statement

of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2). The Supreme

Court has held that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not

need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his

'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the

elements of a cause of action will not do. Factual allegations must be enough to raise a right to

relief above the speculative level." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)

(internal citations omitted).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 129 S.

Ct. 1937, 1949 (2009) (quotations and citations omitted). "A claim has facial plausibility when

the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." <u>Id.</u>  Thus, "only a complaint that states a plausible claim for relief survives a motion to dismiss." <u>Id.</u> at 1950.  When considering a motion to dismiss, the Court must accept all of the plaintiff's allegations as true in determining whether a plaintiff has stated a claim for which relief could be granted. <u>Hishon v. King & Spalding</u>, 467 U.S. 69, 73 (1984).

### III. Discussion

### A. Injunctive Relief under Florida Statute 812.035(1), (6) (count one)

Defendants contend that equitable relief is only available when there is no adequate remedy at law available.  Plaintiffs identify the specific funds and the trust res as the $500,000.00 investment and the $40,000.00 administrative fee paid by each Plaintiff.

To the extent the underlying claims can be proven, and it can be further demonstrated that these Defendants possess the funds or have possession, custody or control of assets or other property acquired with the funds, this claim is viable pursuant to Florida Statute § 812.035(6).

### B.  Dissolution of Palm House Hotel LLLP (count two)

Defendants point to section 7.6 of the Limited Partnership Agreement attached to the Complaint which provides that dissolution of the company cannot occur before the end of the fifth year after admission of the last EB-5 Limited Partner.  The Court cannot resolve this issue on a motion to dismiss as it requires a factual inquiry not appropriate at this stage of the proceeding.

### C.  Conversion (count three)

Defendants claim that the term "Bad Actors" wrongfully groups separate and distinct people and legal entities, and the conversion claim does not specifically identify what property

or monies of Plaintiffs were converted by Walsh Jr. and JJW.

Under Florida law, the elements of conversion are "(1) an act of dominion wrongfully asserted; (2) over another's property; and (3) inconsistent with his ownership therein." Special Purpose v. Prime One, 125 F. Supp .2d 1093, 1099–1100 (S.D. Fla.2000) (citing Warshall v. Price, 629 So.2d 903, 904 (Fla. 1993)).  A defendant must possess the property in order to convert the property.  Medinis v. Swan, 955 So. 2d 595, 597 (Fla. Dist. Ct. App. 2007).

The section of the Complaint labeled "receipt of stolen funds" (Compl. ¶¶ 244-257) does not identify which  particular Defendant possessed the funds, only that Defendants were part of the overall scheme.  Plaintiffs should amend the Complaint to remedy this deficiency.  As such, the conversion count is dismissed without prejudice against these Defendants.

D.  Common law fraud (counts four-seven)

Defendants contend that the allegations raised in the common law fraud claims fall short of the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure.  Specifically, Defendants demand that the Complaint must provide the date, time and place of the fraud.  While the Court recognizes these type of details satisfy the Rule 9(b) pleading requirements, the Eleventh Circuit has acknowledged that alternative means are also available to satisfy the rule. Durham v. Business Management Associates, 847 F.2d 1505, 1512 (11th Cir. 1988).  With respect to these particular Defendants, the Court finds that the Complaint adequately alleges the actions of Walsh, Walsh Jr. and JJW as it relates to the alleged fraud.   While the actual count may not identify each action of each Defendant, the factual section of the Complaint makes adequate allegations as to these particular Defendants to support the fraud counts.

13

### E.  Breach of Fiduciary Duty against Walsh (count nine)

Defendant Walsh argues that this claim is negated by Palm House Hotel's Limited Partnership Agreement attached to the Complaint because Walsh is not a general partner and therefore owes no fiduciary duties to Plaintiffs, who are limited partners.  Walsh also states that this is a derivative claim and therefore Plaintiffs lack standing.  In making the first argument, Walsh points to the terms of the Limited Partnership Agreement attached to the Complaint, whereas Plaintiffs point to annual registrations with the State of Florida wherein Walsh is identified as a general partner.   The Court finds that such an analysis requires a factual inquiry that is inappropriate at the motion to dismiss stage.  Next, the Court rejects the standing argument because  Plaintiffs state that their claim is not based on corporate waste, but instead on the theft of their money.

### F.  Fraudulent Conveyance Claims (counts twelve-fourteen)

Defendants move to dismiss these claims on the grounds that these claims impermissibly lump together Defendants and fail to identify any specific transfer of assets, funds or property of Walsh (the alleged debtor) to other Defendants.

The Court agrees with Defendants.  There are no specific facts alleged highlighting an identifiable asset or a date of transfer.  See In re Stewart, 280 B.R. 268, 285-86 (M.D. Fla. 2001) (denying default judgment on fraudulent transfer claim when the complaint fails to provide specific facts).  Indeed, Plaintiffs do not contest this and state instead that Defendants refuse to provide discovery to allow Plaintiffs to plead these facts.  The Court recognizes that these types of claims are asserted against a person or entity that did not deal directly with the plaintiff, however, the proper approach is to dismiss without prejudice these claims until Plaintiff has

14

enough evidence to allow the claims to be brought in good faith.  To the extent that Plaintiffs claims it is unable to obtain discovery from Defendants, Plaintiffs should bring appropriate motions before the Court.

> G.  Violations of Federal and State Securities Law (counts fifteen, sixteen, twenty-five and twenty-six)

Defendants move to dismiss the securities fraud claims against Walsh and Walsh Jr. for failure to plead the claims pursuant to Rule 9(b).  The Court adopts its discussion supra set forth in the section on the common law fraud claims.  Reading the Complaint as a whole, the Court finds that the Complaint adequately alleges securities fraud on the part of Defendants Walsh and Walsh Jr.

> H. Equitable Accounting (count nineteen)

Defendants move to dismiss this Count because there is no fiduciary relationship and no complicated transactions have been pled.  With respect to the fiduciary relationship argument, the Court adopts its discussion supra which held that a resolution of this issue requires a factual inquiry.  Next, "to state a claim for an equitable accounting, the plaintiff must allege that the contract demands between litigants involve extensive or complicated accounts and it is not clear that the remedy at law is as full, adequate and expeditious as it is in equity."  Bankers Trust Realty, Inc. v. Kluger, 672 So. 2d 897, 898 (Fla. Dist. Ct. App. 1996).  The Court finds that this count is adequately pled and the Court cannot determine the level of complexity of the account until a factual record is developed.

> I.  Unjust Enrichment (count twenty-seven)

Defendants challenge this claim because no unjust enrichment claim can lie when there is no claim that the limited partnership agreement is invalid.   As this Court stated in Matorella v.

Deutsche Bank Nat. Trust Co., 931 F. Supp. 2d 1218, 1227-28 (S.D. Fla. 2013):

> [A] party may plead in the alternative for relief under an express contract and for unjust enrichment. But unjust enrichment may only be pleaded in the alternative where one of the parties asserts that the contract governing the dispute is invalid. . . . In addition, it is not upon the allegation of the existence of a contract, but upon a showing that an express contract exists that the unjust enrichment count fails. Until an express contract is proven, a motion to dismiss a claim for unjust enrichment on these grounds is premature.

Id. (Internal citations omitted).

Here, the Complaint alleges that Plaintiffs were provided with signature pages, but not the full documents until after they made their investments. (Compl. ¶86.) Thus, this allegation negates that the agreement was valid. Furthermore, the Complaint alleges that the representations in the limited partnership agreement were originally made by Walsh, and Walsh Jr. on behalf of their companies, SARC and USREDA. (Compl. ¶88.) If the agreement is valid, it may only be valid as to the companies but not to Walsh, Walsh Jr. and JJW. For these reasons, the Court denies the motion to dismiss the unjust enrichment claim.

### J.  Civil Conspiracy (count twenty)

Defendants move to dismiss the civil conspiracy claim because such a claim relies upon an independent tort, and the Complaint fails to state claims for fraud and theft.

Under Florida law, in order to state a claim for civil conspiracy, a plaintiff must allege: "(a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy." Phillip Morris USA, Inc. v. Russo, 175 So. 3d 681, 686 n.9 (Fla. 2015) (citing Raimi v. Furlong, 702 So. 2d 1273, 1284 (Fla. Dist. Ct. App. 1997)). A civil conspiracy derives from the underlying claim that forms the basis of the conspiracy,

a claim that is found not to be actionable cannot serve as the basis for a conspiracy claim. American United Life Ins. Co. v. Martinez, 480 F.3d 1043, 1067 (11ᵗʰ Cir. 2007); Behrman v. Allstate Ins. Co., 388 F. Supp. 2d 1346, 1353 (S.D. Fla. 2005) (citing Posner v. Essex Ins. Co., 178 F.3d 1209, 1217 (11th Cir. 1999)).

Here, Plaintiffs rely upon tort claims which the Court has found viable.  Hence, the Court denies Defendant's motion to dismiss this claim.

K.  Constructive Fraud (count twenty-one)

Defendants Walsh Jr. and JJW move to dismiss this count because there are no facts that Walsh Jr. or JJW occupied any position of trust or confidence.

Constructive fraud exists where a duty under a confidential or fiduciary relationship has been abused, or where an unconscionable advantage has been taken.  Linville v. Ginn Real Estate Co., LLC, 697 F. Supp. 2d 1302, 1309 (M.D. Fla. 2010); Levy v. Levy, 862 So. 2d 48, 53 (Fla. Dist. Ct. App. 2003).

While Walsh Jr. and JJW correctly note that they are not named in the breach of fiduciary duty count, that does not mean there is no basis to allege a count for constructive fraud.  Here, the Complaint alleges that Plaintiffs are foreign nationals who desired to provide their families with an opportunity for a better life in the United States through the EB-5 program.  While the vast majority of cases of constructive fraud involve a fiduciary relationship, the Florida Supreme Court has explained that "[c]onstructive fraud is simply a term applied to a great variety of transactions which equity regards as wrongful . . .It is not necessary that there should have been a fiduciary relation between the parties, nor that it be positively shown that the one was not left to act upon his own free will, in order to constitute constructive fraud; but inadequacy of consideration, coupled with such

17

a degree of mental weakness as would justify the inference that advantage had been taken of that

weakness, will furnish sufficient ground for equitable interference." Douglas v. Ogle, 85 So 243,

244 (Fla. 1920) (internal quotation marks and ellipses omitted).

Based on the allegations, the Court finds that the Complaint alleges that an

unconscionable advantage has been taken against Plaintiff by Walsh, Walsh Jr. and JJW.

L.  Piercing the Corporate Veil (count twenty-two)

Defendant JJW seeks to dismiss this count.  The Court agrees and relies upon Regal v.

Butler & Hosch, P.A., No. 15–CIV–61081, 2015 WL 11198248, at * 2 (S.D. Fla. Oct. 8, 2015)

in support:

> [W]hile "Florida courts permit alter ego allegations to be pled as a distinct cause of
> action," federal courts are generally averse to the practice. See Oginsky v. Paragon
> Properties of Costa Rica LLC, 784 F. Supp. 2d 1353, 1373 (S.D. Fla. 2011) (citing
> Acadia Partners, L.P. v. Tompkins, 759 So. 2d 732, 740 (Fla. Dist. Ct. App. 2000);
> Tara Prods., Inc. v. Hollywood Gadgets, Inc., Case No. 09–CV–61436, 2010 WL
> 1531489, at *9 (S.D. Fla. April 16, 2010)). In federal practice, "[a]lter ego is not a
> separate cause of action for which relief can be granted; rather, alter ego serves as
> a theory to impose liability on an individual for the acts of a corporate entity." Tara
> Productions at *9 (citing Acadia Partners at 740). While Plaintiffs may be able to
> utilize the doctrine to assert liability . . . it may not be plead as a distinct cause of
> action. See id. (dismissing alter ego count with prejudice but allowing plaintiff to
> plead allegations regarding alter ego liability in the body of the complaint and
> connect the same to other claims); Raimbeault v. Accurate Mach. & Tool, LLC, No.
> 14–CIV–20136, 2014 WL 5795187, at *9 (S.D. Fla. Oct. 2, 2014) (same); see also
> Peacock v. Thomas, 516 U.S. 349, 354 (1996) ("Piercing the corporate veil is not
> itself an independent cause of action, but rather is a means of imposing liability on
> an underlying cause of action."

For this reason, the Court will dismiss this as a separate count, but permit Plaintiffs to

plead allegations regarding alter ego liability in the body of the Complaint.

M.  RICO claims (counts twenty-seven and twenty-eight)

Defendants claim Plaintiffs, who are Chinese and Iranian nationals, lack standing to

18

assert RICO claims because a RICO private action does not have territorial reach under RJR

Nabisco Inc. v. European Community, 136 S. Ct. 2090, 2111 (2016).  Specifically, the United

States Supreme Court stated that a civil RICO plaintiff must "allege and prove a domestic injury

to business or property and does not allow for recovery for foreign injuries." Id. Here, there are

no allegations demonstrating that the economic impact on Plaintiffs was felt in United States or

that Plaintiffs were working, traveling or doing business in the United States. See Absolute

Activist Value Master Fund Ltd. v. Devine, No. 15-cv-328, 2017 WL 519066, at *19–20 (M.D.

Fla. Feb. 8, 2017) (finding that foreign corporate plaintiffs suffered their economic injuries

where they were located, not where the RICO predicate acts occurred);; City of Almaty,

Kazakhstan v. Ablyazov, No. 15-cv-5345, ——F. Supp. 3d ——, 2016 WL 7756629, at *9

(S.D.N.Y. Dec. 23, 2016) (foreign plaintiffs did not suffer a domestic injury because they did not

hold assets, maintain business operations or have any other presence in the United States);

Tatung Co., Ltd. v. Shu Tze Hsu, o.: SA CV 13-1743 (DOC) (ANx), 2016 WL 6683201, at *7

(C.D. Cal. Nov. 14, 2016) (courts must look to whether the plaintiff was working, traveling, or

doing business in the United States when injured); Exeed Indus., LLC v. Younis, No.15 C 14,

2016 WL 6599949, at *3 (N.D. Ill. Nov. 8, 2016) (finding that foreign plaintiffs did not suffer a

domestic injury despite the fact that the illegally obtained funds were used to purchase land in

the United States); Bascuñan v. Daniel Yarur ELS Amended ComplaintA, No. 15-CV-2009

(GBD), 2016 WL 5475998, at *4 (S.D.N.Y. Sept. 28, 2016) (courts must look at who became

poorer and where they became poorer in deciding where the economic impact was felt); but see

Akishev v. Kapustin, No. 13-cv-7152, 2016 WL 7165714, at *5–8 (D.N.J. Dec. 8, 2016) (finding

a domestic injury where the plaintiffs never left their foreign country but used internet to find

19

United States business that made fraudulent misrepresentations).  Furthermore, even when the majority of RICO conduct took place in the United States, that does not mean a plaintiff has suffered a domestic injury.  <u>Glock v. Glock</u>, No. 1:14-CV-3249-TWT, 2017 WL 1049448, at * 7 (N.D. Ga. Mar. 20, 2017), <u>appeal</u> <u>filed</u>, Apr. 7, 2017.

Here, the majority of the alleged RICO conduct took place in the foreign countries where Plaintiffs received the alleged false information and induced to invest their money and are now unable to come to the United States.  Even accepting Plaintiffs' claim that the basis of the RICO claim occurred in the United States because Defendants moved the money around in the United States and diverted funds from the Palm House real estate project, that does not change the fact that the injury was felt by Plaintiffs in their home countries.

For these reasons, the Court dismisses this claim and finds that amendment would be futile.

IV.  Conclusion

Accordingly, it is hereby **ORDERED AND ADJUDGED** that Defendants Walsh, Joseph

Walsh, Jr. and JJW'S Motion to Dismiss Complaint or for More Definite Statement (DE 146) is

**GRANTED IN PART AND DENIED IN PART.**  Plaintiffs are granted leave to amend the

Complaint consistent with the directives in this Order.

**DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County,

Florida, this 22nd day of July, 2017.

_____
KENNETH A. MARRA
United States District Judge

21