UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 16-81871-CIV-MARRA

LAN LI, an individual, et al,

Plaintiffs,

vs.

JOSEPH WALSH, an individual, et al,

Defendants.

_____/

**OPINION AND ORDER**

This cause is before the Court upon Defendants' Ali Herischi and Herischi & Associates,

LLC's Motion to Compel Arbitration, or Alternatively, Motion to Dismiss or for More Definite

Statement (DE 104).  The Court has carefully considered the Motion and is otherwise fully

advised in the premises.

I.  Background

According to the Complaint, Plaintiffs are the victims of a $50 million fraud, theft, and

conspiracy, in which a web of individuals, primarily based in Palm Beach County, Florida,

preyed on foreign nationals desirous of leaving foreign countries, such as China and Iran, to

provide their families with the opportunity for a better life in the United States through the EB-5

program. (Compl. ¶ 1.)  The "Bad Actors"[1] conspired to fraudulently induce each Plaintiff to

each invest $500,000, plus a $40,000 "administrative fee," into a purported Palm Beach real

estate project, known as the "Palm House Hotel" which simply a mechanism to steal Plaintiffs'

funds and distribute them among the conspirators. (Compl. ¶ 2.) Plaintiffs' funds were supposed

_____

[1] The Complaint uses the term "Bad Actors"

to be held in an escrow account unless and until their I-526 immigration petitions[2] were

approved by the United States government. (Compl. ¶ 3.)  If and when Plaintiffs' I-526 petitions

were approved, the invested funds were supposed to be used to create at least 10 full-time jobs

for qualifying U.S. workers, in this case by:

> (a) finishing the renovation and development of an existing luxury hotel structure in
> Palm Beach;
> (b) serving Palm Beach County by seeking to create jobs and increase U.S. exports
> by developing an upscale resort hotel; and
> (c) creating at least 790 direct and indirect jobs to support the EB-5 guidelines and
> the number of investors sought.

(Compl. ¶ 4.)

However, Plaintiffs' funds were not held in the escrow account. Instead, Plaintiffs' funds

were transferred from the escrow account to other accounts for the benefit of the conspirators.

(Compl.  ¶ 5.)  Virtually none of Plaintiffs' funds were used develop the property, no jobs were

created, and no EB-5 visas were issued to any of the Plaintiffs. (Compl. ¶ 6.)

The Bad Actors stole Plaintiffs' funds and used them to:

> (a) purchase multiple homes, investment properties, a 151 foot yacht that cost almost
> $6,000,000, payoff millions of dollars of personal debt (including more than
> $266,000 in personal back taxes), luxury cars, vacations, etc.;

> (b) pay others to further the criminal scheme, including using licensed
> attorneys who held a fiduciary duty to help fraudulently induce investments.

(Compl. ¶ 7.)

The fraudulent scheme operated as follows:

> (a) The Bad Actors preyed on Chinese and Iranian investors seeking a path to
> United States residency for themselves and their minor children.

---

[2] Under the EB-5 program, an immigrant investor applies for an immigrant visa by
submitting a Form I-526. (Compl. ¶ 71.)

(b) The Bad Actors fraudulently obtained $500,000, plus $40,000 in administrative fees, from each foreign investor through the sale of alleged equity interests in Palm House Hotel, LLLP, a Florida limited liability partnership that would be involved in the development of the Palm House Hotel, claiming that the investment would qualify them under the EB-5 program administered by United States Citizenship and Immigration Services.

(c) The Bad Actors represented, among other things, that:

(i) There was a 100% guaranty for the return of Plaintiffs' investment and fees in the event their I-526 petition was denied;

(ii) 100% of Plaintiffs' funds would be held in escrow until their Form I-526 immigration petitions were approved by the United States government;

(iii) A "limited number" of 79 equity interests would be sold in Palm House Hotel, LLLP at the price of $500,000 each, plus $40,000 in administrative fees;

(iv) Plaintiffs' funds would be exclusively invested in the Palm House Hotel to create jobs by helping to finish the renovation and development, which was near completion;

(v) The Palm House Hotel would be open for business by the "Season" of 2013/2014, and was 80-90% completed prior to Plaintiffs' investments;

(vi) The funds would create 930 jobs, more than the required 790 fulltime jobs for the offering;

(vii) Plaintiffs' funds would be the third and final source of funds. The EB5 funds were in addition to an equity investment by the developer in excess of $22,000,000 and a bank loan (by a bank that had done full due diligence justifying such a loan) in excess of $29,000,000. Accordingly, Plaintiffs' funds constituted less than 50% of the project funding;

(viii) Plaintiffs' funds would be held in escrow, and were not yet needed, because the developer's investment in excess of $22,000,000 and a bank loan in excess of $29,000,000 was being used for construction and renovation;

(ix) Plaintiffs' funds would not be taken from the escrow account, and would not be used, unless and until the developer's investment in excess

3

of $22,000,000 and the bank funds in excess of $29,000,000 had been
used at the project;

(x) The real property at issue was currently worth $110,000,000-
$137,000,000 (the current value representation varied, depending on what
the Bad Actors believed a particular Plaintiff wanted to hear) before
completion, which made the investment "one of the safest EB-5 offerings
from a Job Creation and Investment position."

(xi) I-526 immigration petitions for the Palm House Hotel project had
already been approved by the United States government for the initial
investors;

(xii) An insurance policy was purchased by the Developer that guaranteed
that construction of the Palm House Hotel project would be completed;

(xiii) The local government guaranteed that construction of the Palm
House Hotel project would be completed, and that this would be the last 5-
star hotel property they would allow on Palm Beach;

(xiv) The developer, Robert Matthews, was a famous real estate developer
in the United States;

(xv) Each investor's investment would be fully secured by the real
property at issue and by the State of Florida pursuant to a UCC form. As
there would be 79 rooms and 79 investors, each investor would be given a
UCC security interest in an individual room; and

(xvi) Donald Trump and Bill Clinton would serve on the Palm House
Hotel advisory board and would assist with any issues related to
construction and also play a key role in recruiting celebrities and
dignitaries to the club. Celebrities such as Tony Bennett, Celine Dion, Bill
Koch, and Eric Schmidt were already members of the hotel club.

(d) The Bad Actors targeted investors with children between the ages of 18 and 21
because, under the EB-5 program, applicants have the right to apply for a green
card for themselves, their spouse, and unmarried children under 21. Once the investor's
funds were stolen and time continued to pass without the issuance of an I-526 petition
approval, the Bad Actors would use the fact that the investor's child had "aged out" to
silence the investor, perpetrate the continuing fraud, and prevent the investor from
seeking redress or judicial assistance. The Bad Actors threatened the investors that, if the
Palm House Hotel investment was interfered with or terminated, because the investor's
child was no longer under 21, they would no longer be able to obtain a green card
through their parent and would need to obtain their own EB-5 visa at an additional cost of

4

$500,000.

(e) When any Plaintiff questioned or demanded the return of their investment, they were told that all was well, that additional appeals of the application process were in place, that the country's foremost immigration attorney had been hired to prosecute the appeals, and that all was well with the construction of the hotel, thereby further lulling Plaintiffs and allowing the Bad Actors to deny any rights to reimbursement.

(Compl. ¶12.)

Plaintiffs' I-526 petitions were all denied, yet their funds were never returned and were not held in escrow until their Form I-526 immigration petitions were approved. (Compl. ¶¶ 14-15.) The Bad Actors did not sell 79 purported equity interests in Palm House Hotel, LLLP. Despite registering this offering for only 79 units, they perpetrated this fraud on over 90 unsuspecting foreign investors. (Compl. ¶16.) Plaintiffs' funds were not exclusively used to help finish the renovation and development of the Palm House Hotel. Instead the funds were used for unlawful purposes. (Compl. ¶17.) The hotel was nowhere near completion, let alone anywhere close to capable of being open for business by the "Season" of 2013/2014. As of the filing of the Complaint, it is a construction site, accruing fines of $2,000 per day from the Town of Palm Beach. (Compl. ¶18.) Plaintiffs' funds were not used to create 10 full-time jobs for each $500,000 advanced, which was the only purpose for the funds to come to the United States. Further, the fact that at least 93, as opposed to 79 interests were sold, prevented that from occurring. (Compl. ¶19.)

Plaintiffs' funds were not in addition to an equity investment by the developer in excess of $22,000,000 and a bank loan in excess of $29,000,000, so that Plaintiffs' funds constituted less than 50% of the project funding. There was no bank loan, there was no developer's equity, and there was no other source of funds. (Compl. ¶20.) The real property was

5

not worth $110,000,000-$137,000,000. Indeed, the property had been purchased out of foreclosure for $10,000,100. (Compl. ¶21.)

No investor's I-526 immigration petition for the Palm House Hotel project was ever approved by the United States government. While the Bad Actors had provided a written notice of approval for the project, the notice was fraudulent and did not relate to the Palm House Hotel project. (Compl. ¶22.)  There was no insurance policy that guaranteed the completion of construction of the Palm House Hotel project. The Bad Actors represented that certain documentation was an American surety bond guaranteeing performance when, in reality, it was not. (Compl. ¶23.)  The local government never guaranteed the completion of construction of the Palm House Hotel or certified it as a 5-star property. Instead, the local government was imposing significant fines against the property. (Compl. ¶24.)

Robert Matthews is not a famous real estate developer in the United States. (Compl. ¶25.) Each investor's investment was not fully secured by the real property or the State of Florida. In fact, a secret, unrecorded mortgage in the amount of $27,468,750 was granted to the prior developer of the project in August 2013, which was not recorded until March 28, 2014 -- seven (7) months after it was granted -- and after almost all Plaintiffs had undertaken their due diligence and wired their investments for the project. A mortgage to secure Plaintiffs' interest in the real property was not recorded until October 2014, after whatever equity existed in the project had been subsumed by the prior developer's secret mortgage. (Compl. ¶ 26.)  Bill Clinton and Donald Trump are not on the Palm House Hotel advisory board, and there is no such board. (Compl. ¶27.)

Ali Herischi is an internationally recognized attorney.  He and his law firm Herischi &

Associates LLC, served as a key agent for other Defendants who made substantial material, false representations that were integral in inducing the Iranian victims to provide and continue their investments.  Mr. Herischi speaks fluent Farsi and was the "mouthpiece" for the fraudulent statements made to the Iranian Plaintiffs. Mr. Herischi gave presentations on the Palm House Hotel project, strongly dissuaded the Iranian Plaintiffs from pursuing other investment opportunities, and assured the Iranian Plaintiffs that the project was legitimate. In exchange for his delivery of the Iranian Plaintiffs into the fraudulent scheme, Mr. Herischi and his law firm received, among other things, an undisclosed secret kickback of $40,000.00 per investor. (Compl. ¶ 42.)

Several Defendants retained Mr. Herischi to help them sell the Palm House Hotel fraud to the Iranian Plaintiffs. (Compl. ¶ 82.)  Along with other Defendants, Mr. Herischi solicited these Plaintiffs regarding the EB-5 program at the Palm House Hotel.  This included co-hosting investment seminars and meeting with potential investors in hotels in Dubai.  (Compl. ¶ 84.)

During the Palm House Hotel solicitations, Plaintiffs were provided with three (3) items:

(a) Frequently Asked Questions (the "FAQ");
(b) Sales Brochure (the "Sales Brochure"); and
(c) Signature Booklet (the "Signature Booklet")

(Compl. ¶85; Ex. A, B, C, D, E, F, DE 1.)[3]

While the Signature Booklet contained signature pages for a Private Placement Memorandum (the "PPM") and a Palm House limited partnership agreement (the "Palm House

_____

[3] Collectively, the FAQ, Sales Brochure, and Signature Booklet will be referred to as the "Offering Documents."

Limited Partnership Agreement"), Plaintiffs were not provided with copies of the full documents until after they made their investments, and after they demanded them when it was becoming more and more clear that something was wrong. (Compl. ¶86; Ex. G and H, DE 1.)  Mr. Herischi and Herischi & Associates LLC, adopted and made the representations in the Offering Documents when selling the Palm House Hotel project to the Iranian Victims. (Compl. ¶90.) There were many knowingly false representations in the Offering Documents. (Compl. ¶101.)

Also in 2013,  Mr. Herischi and Herischi & Associates LLC and others fraudulently induced the Iranian Plaintiffs to provide their investments. (Compl. ¶120.)  Mr. Herischi and Herischi & Associates LLC and others made presentations to the Iranian Plaintiffs using the offering documents, presentation materials, and oral statements and made false statements. (Compl. ¶¶ 121-24.)   Plaintiffs relied upon these false statements in providing their money. (Compl.  ¶¶128-163.)

After Plaintiffs submitted their paperwork in support of their Form I-526 Petitions, the United States Citizenship and Immigration Services ("USCIS") denied the petitions. (Compl. ¶166; Ex. M, DE 1.)  The USCIS cited the following deficiencies: (1) inconsistencies in the documents from Palm House; (2) insufficient number of full-time positions created by the project; (3) dispute over ownership of the project's property; and (4) insufficient evidence of bridge financing. (Compl. ¶168.)  Plaintiffs demanded the return of their funds, but no funds were returned to Plaintiffs. (Compl. ¶¶170-71.)

Upon investigation, Plaintiffs discovered that Palm House was not a legitimate EB-5 project and that their funds were not held in the Escrow Account. (Compl. ¶¶202-04.)  Plaintiffs' funds were quickly transferred from the Escrow Account to other accounts used by Defendants.

(Compl. ¶¶205, 207.)  Virtually none of Plaintiffs' funds were used at the project, and no jobs were created. (Compl. ¶ 206.)

Plaintiffs wired funds into an escrow account at PNC Bank and the Bad Actors moved these funds into a second account at PNC. (Compl. ¶246.)   Mr. Herischi and Herischi & Associates LLC and others transferred the funds to other accounts and used them for non-allowable purposes and moved them to accounts of other Defendants. (Compl. ¶¶247, 249-58.) Ali Herischi admitted his role in the scheme and his receipt of the money. (Compl. ¶ 269.)

The Complaint [4] seeks injunctive relief against all Defendants under Florida Statute 8812.035(1), (6) (count one); conversion against all Defendants (excluding Palm House) (count three); fraud in the inducement against Mr. Herischi, Herischi & Associates LLC and others (count five); fraud against Mr. Herischi, Herischi & Associates LLC and others (count seven); breach of fiduciary duty against Mr. Herischi and Herischi & Associates LLC (count ten); avoidance of fraudulent transfers pursuant to Florida Statute 726.105(1)(a) against all Defendants (excluding Palm House) (counts twelve-fourteen); a violation of Florida Securities and Investor Protection Act, Florida Statute 517.011 et seq. against Mr. Herischi and Herischi & Associates LLC and others (count sixteen); unjust enrichment against all Defendants (count seventeen); a violation of the Florida Deceptive and Unfair Trade Practices Act, Florida Statute 501.201 against all Defendants (count eighteen); equitable accounting against all Defendants (count nineteen); civil conspiracy against all Defendants (excluding Palm House and the Evans Defendants) (count twenty); constructive fraud against all Defendants (excluding Palm House and Evans Defendants) (count twenty-one); violations of the Section 10(b) of the Exchange Act

---

[4] The Court excludes counts not brought against Defendants bringing the instant motion.

and Rule 10b-5 against Mr. Herischi and others (count twenty-five); violations of Section 20(a) of the Exchange Act against Mr. Herischi and others (count twenty-six); violation of RICO, 18 U.S.C. 1962(c) against Bad Actors (count twenty-seven) and a violation of RICO, 18 U.S.C. 1962(d) against the Bad Actors (count twenty-eight).

Defendants[5] move to compel arbitration on the basis that the Iranian Plaintiffs signed an engagement letter (which is attached to the Complaint) with Defendants with an arbitration clause. Defendants also claim that the express terms of that engagement letter precludes the claims asserted against them. Defendants move to dismiss the Complaint for failure to state a claim on the following grounds: (1) the Complaint improperly lumps Defendants together; (2) there is no basis for the equitable relief sought in counts one and nineteen; (3) the conversion claim does not identify which Plaintiffs made the demand for return of their property and to which Defendants; (4) the fraud claims are not pled with particularity as required by Rule 9(b); (5) Defendants cannot be held liable for violations of securities laws for their role in providing traditional legal services; (6) the fraudulent transfer claims fail to identify a specific transfer made to Defendants or that they are insiders; (7) the claims for breach of fiduciary duty and constructive fraud claims fail because the relationship established by the engagement letter excluded a fiduciary relationship; (8) the unjust enrichment claim does not plead the necessary elements against Defendants; (9) the FDUTPA claim cannot proceed because these Defendants did not act in Florida; (10) the civil conspiracy claim fails because the underlying tort claims fail to state a cause of action and (11) the RICO claims are improperly pled and the statute does not

---

[5] For ease of reference, Mr. Herischi and Herischi & Associates, LLC will be referred to as "Defendants" for the purpose of this Order. Other Defendants will be referenced by name when necessary.

10

have extraterritorial reach.

    II.  Legal Standard

    Rule 8(a)(2) of the Federal Rules of Civil Procedure requires "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2). The Supreme Court has held that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal citations omitted).

    "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quotations and citations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.  Thus, "only a complaint that states a plausible claim for relief survives a motion to dismiss." Id. at 1950.  When considering a motion to dismiss, the Court must accept all of the plaintiff's allegations as true in determining whether a plaintiff has stated a claim for which relief could be granted. Hishon v. King & Spalding, 467 U.S. 69, 73 (1984).

III. Discussion

A. Motion to Compel Arbitration

The Court rejects Defendants' argument that Plaintiffs must arbitrate their claims based on the language in the engagement letter attached to the Complaint.  Mr. Hirischi is a member of the Maryland bar and is seeking to compel arbitration in Maryland.  As Plaintiffs correctly point out, Maryland law bars an attorney from using a retainer agreement containing an arbitration clause for prospective claims unless the client is represented by independent counsel in connection with the retainer agreement.  See Maryland Rules of Professional Conduct 19-301.8(h)[6]; Opinion 90-12, Maryland State Bar Association's Committee on Ethics  ("before a lawyer can enter into a written agreement with a client providing for the submission to arbitration of all disputes arising out of the attorney-client relationship, the client must be represented by independent counsel in connection with that written agreement").[7]  Lastly, as the parties seeking to compel arbitration, Defendants bear the burden to show an agreement to arbitrate exists.  See Wexler v. Solemates Marine, Ltd., No. 16-cv-62704, 2017 WL 979212, at *

---

[6]        (h) An attorney shall not:

(1) make an agreement prospectively limiting the attorney's liability to a client for malpractice unless the client is independently represented in making the agreement; or

(2) settle a claim or potential claim for such liability with an unrepresented client or former client unless that person is advised in writing of the desirability of seeking and is given a reasonable opportunity to seek the advice of independent legal advice in connection therewith.

MRPC 19-301.8(h).

[7] Defendants do not challenge this Maryland rule or opinion or provide conflicting authority.

4 (S.D. Fla. Mar. 17, 2017); Seth v. Rajagopalan, No. 12-Civ-61040, 2013 WL 11927712, at * 8

(S.D. Fla. Jan. 25, 2013). Defendants have failed to present evidence to demonstrate Plaintiffs

had independent counsel. Based on this record, the Court finds no basis to compel arbitration.

### B.  Engagement Letter

Likewise, the Engagement Letter does not preclude Plaintiffs proceeding with their suit

against Defendants. According to Defendants, Plaintiffs' reliance on any misrepresentation by

Defendants inconsistent with the plain terms of the Engagement Letter is unreasonable. This

position, however, is inconsistent with Florida law. In Global Quest, LLC v. Horizon Yachts,

Inc. et al., 849 F.3d 1022 (11th Cir. 2017), the Eleventh Circuit recently examined a fraud claim

wherein there was an "as is" clause in the contract:

> [A]n as is clause does not bar a plaintiff from bringing a fraud claim. Specifically, the
> Florida Supreme Court in Oceanic Villas held that where an agreement is procured by
> fraud or misrepresentation every part of the contract is vitiated because it is well settled
> that a party can not contract against liability for his own fraud.

Global Quest, 849 F.3d at 1027 (citing Oceanic Villas, 4 So. 2d at 690) (internal quotation marks

and brackets omitted).

Based on this precedent, the Court finds that the language of the Engagement Letter does

not prevent Plaintiffs from pursuing their claims.[8]

### C.  Injunctive Relief and Equitable Accounting (counts one and nineteen)

Defendants contend that equitable relief is only available when there is no adequate

remedy at law available, that these counts improperly lump Defendants together, that Plaintiffs

do not plead a state law civil theft claim or RICO claim, that the relief sought is too broad and

---

[8] Defendants reassert this argument for the claims of breach of fiduciary duty and
constructive fraud (counts ten and twenty-one), which the Court rejects.

Plaintiffs have not identified a specific res.

To the extent these Defendants possess the funds or have purchased items with these funds that can be traced, the first count is viable pursuant to Florida Statute § 812.035(6), given the allegations throughout the Complaint.  If it is discovered that these Defendants do not have the funds or items purchased with those funds and obtained through the alleged illegal activity, then money damages, and not the injunctive relief sought in count one, are appropriate.

"[T]o state a claim for an equitable accounting, the plaintiff must allege that the contract demands between litigants involve extensive or complicated accounts and it is not clear that the remedy at law is as full, adequate and expeditious as it is in equity."  Bankers Trust Realty, Inc. v. Kluger, 672 So. 2d 897, 898 (Fla. Dist. Ct. App. 1996).  The Court finds that this count is adequately pled and the Court cannot determine the level of complexity of the account until a factual record is developed.

Lastly, reading the Complaint as a whole, the Court finds it provides adequate allegations against these specific Defendants to support counts one and nineteen.

D.  Conversion (count three)

Under Florida law, the elements of conversion are "(1) an act of dominion wrongfully asserted; (2) over another's property; and (3) inconsistent with his ownership therein."  Special Purpose v. Prime One, 125 F. Supp .2d 1093, 1099–1100 (S.D. Fla.2000) (citing Warshall v. Price, 629 So.2d 903, 904 (Fla. 1993)).

Defendants argue that this count fails to allege how they intentionally converted each Plaintiffs' property to their own use.  Plaintiffs respond that an intent to deprive is not required to state a claim for conversion and, in any event, the Complaint pleads that the funds in their

possession belong to Plaintiffs and Defendants are wrongfully withholding those funds  It is true that there is a split of authority among Florida courts as to whether a party must intend to deprive another its property to state a claim for conversion.  See, e..g.,  Small Business Admin. v. Echevarria, 864 F. Supp. 1254, 1262 (S.D. Fla. 1994) (discussing the split in Florida law).  The Court, however, does not need to address this issue at this time.  The Court believes a decision on whether or not intent is an element of conversion can be deferred until summary judgment or trial, especially since discovery may reveal evidence of intent.

E.  Fraud claims (counts five, seven, sixteen, twenty-five and twenty-six)

Defendants contend that the allegations raised in the common law fraud claims fall short of the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure.  Specifically, Defendants demand that the Complaint must provide the date, time and place of the fraud.  While the Court recognizes these type of details satisfy the Rule 9(b) pleading requirements, the Eleventh Circuit has acknowledged that alternative means are also available to satisfy the rule. Durham v. Business Management Associates, 847 F.2d 1505, 1512 (11th Cir. 1988).  With respect to these particular Defendants, the Court finds that the Complaint adequately alleges the actions of Defendants as it relates to the alleged fraud.  While the actual count may not identify each action of each Defendant, the factual section of the Complaint makes adequate allegations as to these particular Defendants to support the fraud counts.

With respect to the counts relating to securities fraud, Defendant rely upon Bailey v. Trenam Simmons, Kemker, Scharf, Barkin, Frye & O'Neill, P.A., 938 F. Supp. 825 (S.D. Fla. 1996) for the position that an attorney providing standard legal services cannot be liable for securities fraud.  Id. at 828.  The Court, however, finds this case unhelpful to Defendants.  Based

on the allegations, Defendants are not being sued for legal services provided to Plaintiffs.

Instead, the Complaint alleges that the sale of securities in Palm House was part of the overall

fraudulent scheme and that Defendants sought to financially benefit.  Based on these allegations,

the Bailey case is unpersuasive.

F.  Fraudulent Transfer (counts twelve-fourteen)

Defendants seek to dismiss these claims on the grounds that they fail to identify a

specific transfer made to them and do not allege they are insiders.  Plaintiffs respond that these

claims do not allege Defendants are insiders, but subsequent transferees because they received

stolen funds.

Plaintiffs must re-plead these claims as they are unclear and inconsistent with the

arguments made by Plaintiffs in their response memorandum.  Although Plaintiffs state that they

are not alleging that Defendants are insiders, the Complaint alleges otherwise. (Compl. ¶ 371.)

Given that many Defendants are referenced in these counts, the Complaint should identify what

role each Defendant possessed with respect to these claims.

Thus, these claims are dismissed with leave to amend.

G.  Unjust Enrichment (count seventeen)

To state a claim for unjust enrichment, the following elements must be met:  "(1) a

benefit conferred upon a defendant by the plaintiff, (2) the defendant's appreciation of the

benefit, and (3) the defendant's acceptance and retention of the benefit under circumstances that

make it inequitable for him to retain it without paying the value thereof." Vega v. T–Mobile

USA, Inc., 564 F.3d 1256, 1274 (11th Cir. 2009) (citing Rollins, Inc. v. Butland, 951 So.2d 860,

876 (Fla. Dist. Ct. App. 2006)); Della Ratta v. Della Ratta, 927 So.2d 1055, 1059 (Fla. Dist. Ct.

App.2006) (same).

Defendants contend that none of these elements have been pled against them because these Defendants have had no contact at all with the vast majority of Plaintiffs and there is no showing that Plaintiffs conferred any benefit on Defendants.

Reading the Complaint as a whole, the Court concludes that it properly pleads that Defendants had contact with the Iranian Plaintiffs as part of the fraudulent scheme,[9] Defendants worked with other Defendants in a conspiracy to steal Plaintiffs' money and Plaintiffs wired their money into the escrow account at PNC Bank, thereby allowing the funds to be distributed to numerous Defendants, including the instant Defendants.  To the extent Defendants are complaining that they did not receive a direct benefit, this Court has recognized that an unjust enrichment claim may go forward where a benefit is conferred through an intermediary, finding that  direct contact, or privity, is not the equivalent of conferring a direct benefit.  Aceto Corp. v. TherapeuticsMD, Inc., 953 F. Supp. 2d 1269, 1288 (S.D. Fla. 2013); see also Williams v. Wells Fargo Bank, N.A., No. No. 11–21233–CIV, 2011 WL 4901346 (S.D. Fla. Oct. 14, 2011) ("just because the benefit conferred by [the] [p]laintiffs on the [d]efendants did not pass directly from the [p]laintiffs to the [d]efendants—but instead passed through a third party—does not preclude an unjust-enrichment claim. Indeed to hold otherwise would be to undermine the equitable purpose of unjust enrichment claims.")

Accordingly, this claim may proceed against these Defendants with respect to the Iranian Plaintiffs.

---

[9] The Court agrees with Defendants that the Complaint did not plead that they had contact with every Plaintiff.  Reading the Complaint as a whole, it pleads that they had contact with the Iranian Plaintiffs only.

18

H.  FDUPTA claim (count eighteen)

Defendants move to dismiss this Count on the basis that FDUTPA only applies to actions that occurred within the state of Florida.  See, e.g., Carnival Corp. v. Rolls-Royce PLC, No. 08-23318-CIV, 2009 WL 3861450, at * (S.D. Fla. Nov. 17, 2009) (citing Millennium Communications & Fulfillment, Inc. v. Office of Attorney General, 761 So.2d 1256, 1262 (Fla. 3d DCA 2000) (stating that purpose of FDUTPA is to prohibit unfair and deceptive practices which have transpired within the territorial boundaries of the state of Florida)).   Plaintiffs do not dispute this legal proposition, but claim that the Complaint adequately alleges conduct by Defendants in Florida.

A review of the citations provided by Plaintiffs as to Florida conduct by Defendants, who are residents of Maryland, reference various new facts that are not contained in the Complaint. The Court will Plaintiffs leave to amend this count to clarify Defendants' actions in Florida that give rise to liability under FDUTPA.

I.  Civil Conspiracy (count twenty)

Defendants move to dismiss the civil conspiracy claim because such a claim relies upon an independent tort, and the Complaint fails to state claims for fraud and theft.

Under Florida law, in order to state a claim for civil conspiracy, a plaintiff must allege: "(a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy." Phillip Morris USA, Inc. v. Russo, 175 So. 3d 681, 686 n.9 (Fla. 2015) (citing Raimi v. Furlong, 702 So. 2d 1273, 1284 (Fla. Dist. Ct. App. 1997)).   A civil conspiracy derives from the underlying claim that forms the basis of

19

the conspiracy, a claim that is found not to be actionable cannot serve as the basis for a conspiracy claim. American United Life Ins. Co. v. Martinez, 480 F.3d 1043, 1067 (11th Cir. 2007); Behrman v. Allstate Ins. Co., 388 F. Supp. 2d 1346, 1353 (S.D. Fla. 2005) (citing Posner v. Essex Ins. Co., 178 F.3d 1209, 1217 (11th Cir. 1999)).

Here, Plaintiff relies upon its tort claims which the Court has found viable.  Hence, the Court denies Defendant's motion to dismiss this claim.

J.  RICO claims (counts twenty-seven and twenty-eight)

The Court adopts its reasoning set forth in the Court's Order on the Motion to Dismiss of Defendants Joseph Walsh, Joseph Walsh, Jr. and JJW Consultancy, Ltd. as the basis to dismiss these claims.  Thus, the RICO claims are dismissed without leave to amend because amendment would be futile.

IV. Conclusion

Accordingly, it is hereby **ORDERED AND ADJUDGED** that Defendants' Ali Herischi and Herischi & Associates, LLC's Motion to Compel Arbitration, or Alternatively, Motion to Dismiss or for More Definite Statement (DE 104) is **GRANTED IN PART AND DENIED IN PART**.  Plaintiff is granted leave to amend consistent with the directives in this Order.

**DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 22nd day of July, 2017.

_____

KENNETH A. MARRA
United States District Judge