UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 16-81871-CIV-MARRA

LAN LI, an individual, et al,

Plaintiffs,

vs.

JOSEPH WALSH, an individual, et al,

Defendants.
_____/

**OPINION AND ORDER**

This cause is before the Court upon Defendant Ryan Black's Motion to Dismiss (DE 96). The Court has carefully considered the Motion and is otherwise fully advised in the premises.

I. Background

According to the Complaint, Plaintiffs are the victims of a $50 million fraud, theft, and conspiracy, in which a web of individuals, primarily based in Palm Beach County, Florida, preyed on foreign nationals desirous of leaving foreign countries, such as China and Iran, to provide their families with the opportunity for a better life in the United States through the EB-5 program. (Compl. ¶ 1.) The "Bad Actors"[1] conspired to fraudulently induce each Plaintiff to each invest $500,000, plus a $40,000 "administrative fee," into a purported Palm Beach real estate project, known as the "Palm House Hotel" which was simply a mechanism to steal Plaintiffs' funds and distribute them among the conspirators. (Compl. ¶ 2.) Defendant Ryan Black ("Defendant") is the owner of Palm House LLC. (Compl. ¶ 49.)  Palm House LLC is a company formed to complete the renovations and development of the Palm House Hotel.

---

[1] The Complaint uses the term "Bad Actors"

(Compl. ¶ 45.)

Plaintiffs' funds were supposed to be held in an escrow account unless and until their I-526 immigration petitions[2] were approved by the United States government. (Compl. ¶ 3.) If and when Plaintiffs' I-526 petitions were approved, the invested funds were supposed to be used to create at least 10 full-time jobs for qualifying U.S. workers, in this case by:

> (a) finishing the renovation and development of an existing luxury hotel structure in Palm Beach;
> (b) serving Palm Beach County by seeking to create jobs and increase U.S. exports by developing an upscale resort hotel; and
> (c) creating at least 790 direct and indirect jobs to support the EB-5 guidelines and the number of investors sought.

(Compl. ¶ 4.)

However, Plaintiffs' funds were not held in the escrow account. Instead, Plaintiffs' funds were transferred from the escrow account to other accounts for the benefit of the conspirators. (Compl. ¶ 5.) Virtually none of Plaintiffs' funds were used to develop the property, no jobs were created, and no EB-5 visas were issued to any of the Plaintiffs. (Compl. ¶ 6.)

The Bad Actors stole Plaintiffs' funds and used them to:

> (a) purchase multiple homes, investment properties, a 151 foot yacht that cost almost $6,000,000, payoff millions of dollars of personal debt (including more than $266,000 in personal back taxes), luxury cars, vacations, etc.;
>
> (b) pay others to further the criminal scheme, including using licensed attorneys who held a fiduciary duty to help fraudulently induce investments.

(Compl. ¶ 7.)

The fraudulent scheme operated as follows:

---

[2] Under the EB-5 program, an immigrant investor applies for an immigrant visa by submitting a Form I-526. (Compl. ¶ 71.)

2

(a) The Bad Actors preyed on Chinese and Iranian investors seeking a path to United States residency for themselves and their minor children.

(b) The Bad Actors fraudulently obtained $500,000, plus $40,000 in administrative fees, from each foreign investor through the sale of alleged equity interests in Palm House Hotel, LLLP, a Florida limited liability partnership that would be involved in the development of the Palm House Hotel, claiming that the investment would qualify them under the EB-5 program administered by United States Citizenship and Immigration Services.

(c) The Bad Actors represented, among other things, that:

> (i) There was a 100% guaranty for the return of Plaintiffs' investment and fees in the event their I-526 petition was denied;
>
> (ii) 100% of Plaintiffs' funds would be held in escrow until their Form I-526 immigration petitions were approved by the United States government;
>
> (iii) A "limited number" of 79 equity interests would be sold in Palm House Hotel, LLLP at the price of $500,000 each, plus $40,000 in administrative fees;
>
> (iv) Plaintiffs' funds would be exclusively invested in the Palm House Hotel to create jobs by helping to finish the renovation and development, which was near completion;
>
> (v) The Palm House Hotel would be open for business by the "Season" of 2013/2014, and was 80-90% completed prior to Plaintiffs' investments;
>
> (vi) The funds would create 930 jobs, more than the required 790 fulltime jobs for the offering;
>
> (vii) Plaintiffs' funds would be the third and final source of funds. The EB5 funds were in addition to an equity investment by the developer in excess of $22,000,000 and a bank loan (by a bank that had done full due diligence justifying such a loan) in excess of $29,000,000. Accordingly, Plaintiffs' funds constituted less than 50% of the project funding;
>
> (viii) Plaintiffs' funds would be held in escrow, and were not yet needed, because the developer's investment in excess of $22,000,000 and a bank loan in excess of $29,000,000 was being used for construction and renovation;

(ix) Plaintiffs' funds would not be taken from the escrow account, and would not be used, unless and until the developer's investment in excess of $22,000,000 and the bank funds in excess of $29,000,000 had been used at the project;

(x) The real property at issue was currently worth $110,000,000-$137,000,000 (the current value representation varied, depending on what the Bad Actors believed a particular Plaintiff wanted to hear) before completion, which made the investment "one of the safest EB-5 offerings from a Job Creation and Investment position."

(xi) I-526 immigration petitions for the Palm House Hotel project had already been approved by the United States government for the initial investors;

(xii) An insurance policy was purchased by the Developer that guaranteed that construction of the Palm House Hotel project would be completed;

(xii) The local government guaranteed that construction of the Palm House Hotel project would be completed, and that this would be the last 5-star hotel property they would allow on Palm Beach;

(xiv) The developer, Robert Matthews, was a famous real estate developer in the United States;

(xv) Each investor's investment would be fully secured by the real property at issue and by the State of Florida pursuant to a UCC form. As there would be 79 rooms and 79 investors, each investor would be given a UCC security interest in an individual room; and

(xvi) Donald Trump and Bill Clinton would serve on the Palm House Hotel advisory board and would assist with any issues related to construction and also play a key role in recruiting celebrities and dignitaries to the club. Celebrities such as Tony Bennett, Celine Dion, Bill Koch, and Eric Schmidt were already members of the hotel club.

(d) The Bad Actors targeted investors with children between the ages of 18 and 21 because, under the EB-5 program, applicants have the right to apply for a green card for themselves, their spouse, and unmarried children under 21. Once the investor's funds were stolen and time continued to pass without the issuance of an I-526 petition approval, the Bad Actors would use the fact that the investor's child had "aged out" to silence the investor, perpetrate the continuing fraud, and prevent the investor from seeking redress or judicial assistance. The Bad Actors threatened the investors that, if the Palm House Hotel investment was interfered with or terminated, because the investor's

child was no longer under 21, they would no longer be able to obtain a green card through their parent and would need to obtain their own EB-5 visa at an additional cost of $500,000.

(e) When any Plaintiff questioned or demanded the return of their investment, they were told that all was well, that additional appeals of the application process were in place, that the country's foremost immigration attorney had been hired to prosecute the appeals, and that all was well with the construction of the hotel, thereby further lulling Plaintiffs and allowing the Bad Actors to deny any rights to reimbursement.

(Compl. ¶12.)

Plaintiffs' I-526 petitions were all denied, yet their funds were never returned and were not held in escrow until their Form I-526 immigration petitions were approved. (Compl. ¶¶ 14-15.) The Bad Actors did not sell 79 purported equity interests in Palm House Hotel, LLLP. Despite registering this offering for only 79 units, they perpetrated this fraud on over 90 unsuspecting foreign investors. (Compl. ¶16.) Plaintiffs' funds were not exclusively used to help finish the renovation and development of the Palm House Hotel. Instead the funds were used for unlawful purposes. (Compl. ¶17.) The hotel was nowhere near completion, let alone anywhere close to capable of being open for business by the "Season" of 2013/2014. As of the filing of the Complaint, it is a construction site, accruing fines of $2,000 per day from the Town of Palm Beach. (Compl. ¶18.) Plaintiffs' funds were not used to create 10 full-time jobs for each $500,000 advanced, which was the only purpose for the funds to come to the United States. Further, the fact that at least 93, as opposed to 79 interests were sold, prevented that from occurring. (Compl. ¶19.)

Plaintiffs' funds were not in addition to an equity investment by the developer in excess of $22,000,000 and a bank loan in excess of $29,000,000, so that Plaintiffs' funds constituted less than 50% of the project funding. There was no bank loan, there was no

5

developer's equity, and there was no other source of funds. (Compl. ¶20.) The real property was not worth $110,000,000-$137,000,000. Indeed, the property had been purchased out of foreclosure for $10,000,100. (Compl. ¶21.)

No investor's I-526 immigration petition for the Palm House Hotel project was ever approved by the United States government. While the Bad Actors had provided a written notice of approval for the project, the notice was fraudulent and did not relate to the Palm House Hotel project. (Compl. ¶22.) There was no insurance policy that guaranteed the completion of construction of the Palm House Hotel project. The Bad Actors represented that certain documentation was an American surety bond guaranteeing performance when, in reality, it was not. (Compl. ¶23.) The local government never guaranteed the completion of construction of the Palm House Hotel or certified it as a 5-star property. Instead, the local government was imposing significant fines against the property. (Compl. ¶24.)

Robert Matthews is not a famous real estate developer in the United States. (Compl. ¶25.) Each investor's investment was not fully secured by the real property or the State of Florida. In fact, a secret, unrecorded mortgage in the amount of $27,468,750 was granted to the prior developer of the project in August 2013, which was not recorded until March 28, 2014 -- seven (7) months after it was granted -- and after almost all Plaintiffs had undertaken their due diligence and wired their investments for the project. A mortgage to secure Plaintiffs' interest in the real property was not recorded until October 2014, after whatever equity existed in the project had been subsumed by the prior developer's secret mortgage. (Compl. ¶ 26.) Bill Clinton and Donald Trump are not on the Palm House Hotel advisory board, and there is no such board. (Compl. ¶27.)

Plaintiffs wired funds into an escrow account at PNC Bank and the Bad Actors moved these funds into a second account at PNC. (Compl. ¶246.) Once moved, several Defendants, including Defendant, transferred the funds to other accounts, used them for personal expenses and investments and paid off other participants in the scheme. (Compl. ¶ ¶ 251-52.) Defendant, however, knew that none of these funds could be used unless and until Plaintiffs' I-526 Petitions had been approved by USCIS. (Compl. ¶ 253.) Several Defendants, including Defendant, used several entities to help them transfer and hide Plaintiffs' funds, including Palm House, LLC. (Compl. ¶ 257.)

The Complaint[3] seeks injunctive relief against all Defendants under Florida Statute 8812.035(1), (6) (count one); conversion against all Defendants (excluding Palm House) (count three); aiding and abetting fraud against Defendant and others (count eight); aiding and abetting breach of fiduciary duty against Defendant and others (count eleven); avoidance of fraudulent transfers pursuant to Florida Statute 726.105(1)(a) against all Defendants (excluding Palm House) (counts twelve-fourteen); unjust enrichment against all Defendants (count seventeen); a violation of the Florida Deceptive and Unfair Trade Practices Act, Florida Statute §501.201 against all Defendants (excluding Palm House and Evans Defendants)(count eighteen); equitable accounting against all Defendants (count nineteen); civil conspiracy against all Defendants (excluding Palm House and the Evans Defendants) (count twenty); constructive fraud against all Defendants (excluding Palm House and Evans Defendants) (count twenty-one); violation of RICO, 18 U.S.C. §1962(c) against Bad Actors (count twenty-seven) and a violation of RICO, 18 U.S.C. §1962(d) against the Bad Actors (count twenty-eight).

---

[3] The Court excludes counts not brought against Defendant bringing the instant motion.

In moving to dismiss, Defendant makes the following arguments: (1) Defendant is barely mentioned in most counts of the Complaint; (2) the Complaint does not allege fraud with specificity; (3) the Complaint does not allege the necessary elements of conversion against Defendant; (4) there are no allegations showing how Defendant assisted in the fraud or breach of fiduciary duty; (5) the fraudulent transfer claims impermissibly lumps Defendants; (6) there is no factual support that Defendant received any funds deposited by Plaintiffs; (7) Plaintiffs have not alleged a deceptive act or unfair practice by Defendant; (8) the equitable claims are improper because Plaintiffs have an adequate remedy at law; (9) the civil conspiracy claim incorporates the infirm fraud claims and (10) the RICO claims fail to state a claim.

II.  Legal Standard

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Supreme Court has held that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal citations omitted).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quotations and citations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." Id.  Thus, "only a complaint that states a plausible claim for relief survives a motion to dismiss." Id. at 1950.  When considering a motion to dismiss, the Court must accept all of the plaintiff's allegations as true in determining whether a plaintiff has stated a claim for which relief could be granted. Hishon v. King & Spalding, 467 U.S. 69, 73 (1984).

### III. Discussion

With respect to the Defendant Black's motion, the Court finds that the Complaint does not improperly lump him together with other Defendants with respect to his participation on the "back end" of the alleged scheme.  Specifically, his role in allegedly transferring the ill-gotten funds. (Compl. ¶¶ 251-53, 257) However, with respect to his role as to the entire scheme, including the representations made to Plaintiffs and the description of Defendant as a "Bad Actor," the Court finds that the allegations improperly lump Defendant in with other Defendants who allegedly made the misrepresentations and participated in the "front end" of the scheme. See Court Appointed Receiver of Lancer Offshore, Inc. v. Citco Group Ltd., No. 05–60080–CIV, 2011 WL 1233126, at * 2 (S.D. Fla. Mar. 30, 2011) ("This lumping technique creates confusion and make the analysis of the complaint unnecessarily burdensome,' and results in . . . making accusations that are 'just not accurate. ") (internal quotation marks omitted).  Thus, when analyzing the various counts lodged against Defendant, the Court will keep this in mind.

### A.  Injunctive Relief (count one)

Defendant contends there are no facts alleged to support this count.  The Court finds that under Florida Statute § 812.035(6), if Plaintiffs can show that this Defendant possesses the allegedly stolen funds or has purchased items with these funds that can be traced, this claim is

viable.

B.  Conversion (count three)

Under Florida law, the elements of conversion are "(1) an act of dominion wrongfully asserted; (2) over another's property; and (3) inconsistent with his ownership therein." Special Purpose v. Prime One, 125 F. Supp. 2d 1093, 1099–1100 (S.D. Fla.2000) (citing Warshall v. Price, 629 So.2d 903, 904 (Fla. 1993)).

Here, the Complaint alleges that Defendant took funds that did not belong to him and used them for personal expenses and investments and paid off other participants in the scheme. (Compl. ¶¶ 251-52.)  Thus, the Complaint properly alleges conversion against Defendant.

C.  Aiding and Abetting Fraud and Fiduciary Duty (counts eight and eleven)

To state a cause of action for aiding and abetting fraud,[4] a plaintiff must allege "(1) there existed an underlying fraud; (2) the defendant had knowledge of the fraud; and (3) the defendant provided substantial assistance to advance the commission of the fraud." ZP No. 54 Ltd. Partnership v. Fidelity and Deposit Co. of Maryland, 917 So. 2d 368, 372 (Fla. Dist. Ct. App. 2005).

A claim for aiding and abetting a breach of fiduciary duty requires: (1) a fiduciary duty on the part of the primary wrongdoer; (2) a breach of this fiduciary duty; (3) knowledge of the breach by the alleged aider and abettor and (4) the aider and abettor's substantial assistance or encouragement of the wrongdoing. Bruhl v. Price Waterhousecoppers Intern., 03–23044–CIV, 2007 WL 983263, at * 10 (S.D. Fla. Mar. 27, 2007). To satisfy the substantial assistance

---

[4] "[N]o Florida court has explicitly recognized a cause of action for aiding and abetting fraud, [but] Florida courts have assumed that the cause of action exists."  Freeman v. JPMorgan Chase Bank, N.A., ---- F.3d ----, 2017 WL 128002, at * 6 (11th Cir. Jan. 13, 2017).

element, a plaintiff must allege (1) recklessness and a duty to disclose the breach or (2) conscious intent. <u>Court Appointed Receiver of Lancer Offshore, Inc. v. Citco Group, Ltd.</u>, 05–60080–CIV, 2011 WL 1233106, at * 9 (S.D. Fla. Mar. 30, 2011).

The Complaint does not plead facts to support these claims against Defendant. Other than allegedly moving and transferring funds, it is unclear what relationship Defendant had with other Defendants. The Court dismisses this claim and will allow Plaintiffs to amend the Complaint to re-plead.

### D. Fraudulent Conveyance Claims (counts twelve-fourteen)

Defendant seeks to dismiss these claims on the grounds that they fail to identify a specific transfer made to them and do not allege Defendant is an insider. Plaintiffs must re-plead these claims as they are unclear. Given that many Defendants are referenced in these counts, the Complaint should identify what role each Defendant possessed with respect to these claims. Thus, these claims are dismissed with leave to amend.

### E. Unjust Enrichment (count eighteen)

To state a claim for unjust enrichment, the following elements must be met: "(1) a benefit conferred upon a defendant by the plaintiff, (2) the defendant's appreciation of the benefit, and (3) the defendant's acceptance and retention of the benefit under circumstances that make it inequitable for him to retain it without paying the value thereof." <u>Vega v. T–Mobile USA, Inc.</u>, 564 F.3d 1256, 1274 (11th Cir. 2009) (citing <u>Rollins, Inc. v. Butland</u>, 951 So.2d 860, 876 (Fla. Dist. Ct. App. 2006)); <u>Della Ratta v. Della Ratta</u>, 927 So.2d 1055, 1059 (Fla. Dist. Ct. App. 2006) (same).

Defendant moves to dismiss, claiming there is "no factual support for any claim that

Black received any funds." (DE 96 at 13.)  At this stage in the proceeding, however, the Court must accept Plaintiffs' version of the facts, and based on that version, this claim is viable.

### F.  FDUTPA claim (count eighteen)

FDUTPA declares unlawful any "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1). "[T]here are three elements that are required to be alleged to establish a claim pursuant to the FDUTPA: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." Martorella v. Deutsche Bank Nat'l. Trust Co., 931 F. Supp. 2d 1218 (S.D. Fla. 2013) (citations omitted).

Here, the only allegations against Defendant is that he is a "Bad Actor" that participated in the scheme and moved Plaintiffs' funds.  There are no specific allegations against Defendant that identifies how he engaged in an unfair practice towards Plaintiffs.  Thus, this claim is dismissed. Plaintiff may re-plead this claim.

### G.  Equitable Accounting (count nineteen) and Constructive Fraud (count twenty-one)

Defendant contends that Plaintiffs have an adequate remedy at law and these claims should be dismissed.  "[T[o state a claim for an equitable accounting, the plaintiff must allege that the contract demands between litigants involve extensive or complicated accounts and it is not clear that the remedy at law is as full, adequate and expeditious as it is in equity." Bankers Trust Realty, Inc. v. Kluger, 672 So. 2d 897, 898 (Fla. Dist. Ct. App. 1996).  The Court finds that this is adequately pled and the Court cannot determine the level of complexity of the account until a factual record is developed.

Constructive fraud exists where a duty under a confidential or fiduciary relationship has

been abused, or where an unconscionable advantage has been taken.  Linville v. Ginn Real Estate Co., LLC, 697 F. Supp. 2d 1302, 1309 (M.D. Fla. 2010); Levy v. Levy, 862 So. 2d 48, 53 (Fla. Dist. Ct. App. 2003).  Here, it is unclear what relationship Defendant had with Plaintiffs other than allegedly moving and transferring their funds.  Based on this lack of clarity, the Court dismisses this claim and will allow Plaintiffs to amend the Complaint to re-plead.

> H.  Civil Conspiracy

Under Florida law, in order to state a claim for civil conspiracy, a plaintiff must allege: "(a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy." Phillip Morris USA, Inc. v. Russo, 175 So. 3d 681, 686 n.9 (Fla. 2015) (citing Raimi v. Furlong, 702 So. 2d 1273, 1284 (Fla. Dist. Ct. App. 1997)).  A civil conspiracy derives from the underlying claim that forms the basis of the conspiracy, a claim that is found not to be actionable cannot serve as the basis for a conspiracy claim. American United Life Ins. Co. v. Martinez, 480 F.3d 1043, 1067 (11th Cir. 2007); Behrman v. Allstate Ins. Co., 388 F. Supp. 2d 1346, 1353 (S.D. Fla. 2005) (citing Posner v. Essex Ins. Co., 178 F.3d 1209, 1217 (11th Cir. 1999)).

Here, is unclear what relationship Defendant had with other Defendants, and what agreement he entered into with those Defendants.  Thus, this count is dismissed against Defendant and Plaintiffs may re-plead.

<u>I.  RICO claims (counts twenty-seven and twenty-eight)</u>

The Court adopts its reasoning set forth in the Court's Order on the Motion to Dismiss of Defendants Joseph Walsh, Joseph Walsh, Jr. and JJW Consultancy, Ltd. as the basis to dismiss these claims.  Thus, the RICO claims are dismissed without leave to amend because amendment would be futile.

<u>IV.  Conclusion</u>

Accordingly, it is hereby **ORDERED AND ADJUDGED** that Defendant Ryan Black's Motion to Dismiss (DE 96) is **GRANTED IN PART AND DENIED IN PART**.  Plaintiff is granted leave to amend consistent with the directives in this Order.

**DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 22nd day of July, 2017.

_____
KENNETH A. MARRA
United States District Judge