UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 16-81871-CIV-MARRA

LAN LI, an individual, et al,

Plaintiffs,

vs.

JOSEPH WALSH, an individual, et al,

Defendants.

_____/

**OPINION AND ORDER**

This cause is before the Court upon Defendant KK-PB Financial, LLC's Motion to

Dismiss Complaint (DE 80).  The Court has carefully considered the Motion and is otherwise

fully advised in the premises.

I. Background

According to the Complaint, Plaintiffs are the victims of a $50 million fraud, theft, and

conspiracy, in which a web of individuals, primarily based in Palm Beach County, Florida,

preyed on foreign nationals desirous of leaving foreign countries, such as China and Iran, to

provide their families with the opportunity for a better life in the United States through the EB-5

program. (Compl. ¶ 1.)  The "Bad Actors"[1] conspired to fraudulently induce each Plaintiff to

invest $500,000, plus a $40,000 "administrative fee," into a purported Palm Beach real estate

project, known as the "Palm House Hotel" which was simply a mechanism to steal Plaintiffs'

funds and distribute them among the conspirators. (Compl. ¶ 2.) Plaintiffs' funds were supposed

_____

[1] The Complaint uses the term "Bad Actors"

to be held in an escrow account unless and until their I-526 immigration petitions[2] were

approved by the United States government. (Compl. ¶ 3.)  If and when Plaintiffs' I-526 petitions

were approved, the funds were supposed to be used to create at least 10 full-time jobs for

qualifying U.S. workers, in this case by:

> (a) finishing the renovation and development of an existing luxury hotel structure in
> Palm Beach;
> (b) serving Palm Beach County by seeking to create jobs and increase U.S. exports
> by developing an upscale resort hotel; and
> (c) creating at least 790 direct and indirect jobs to support the EB-5 guidelines and
> the number of investors sought.

(Compl. ¶ 4.)

However, Plaintiffs' funds were not held in the escrow account. Instead, Plaintiffs' funds

were transferred from the escrow account to other accounts for the benefit of the conspirators.

(Compl.  ¶ 5.)  Virtually none of Plaintiffs' funds were used develop the property, no jobs were

created, and no EB-5 visas were issued to any of the Plaintiffs. (Compl. ¶ 6.)

The Bad Actors stole Plaintiffs' funds and used them to:

> (a) purchase multiple homes, investment properties, a 151 foot yacht that cost almost
> $6,000,000, payoff millions of dollars of personal debt (including more than
> $266,000 in personal back taxes), luxury cars, vacations, etc.;

> (b) pay others to further the criminal scheme, including using licensed
> attorneys who held a fiduciary duty to help fraudulently induce investments.

(Compl. ¶ 7.)

The fraudulent scheme operated as follows:

> (a) The Bad Actors preyed on Chinese and Iranian investors seeking a path to
> United States residency for themselves and their minor children.

---

[2] Under the EB-5 program, an immigrant investor applies for an immigrant visa by
submitting a Form I-526. (Compl. ¶ 71.)

(b) The Bad Actors fraudulently obtained $500,000, plus $40,000 in administrative fees, from each foreign investor through the sale of alleged equity interests in Palm House Hotel, LLLP, a Florida limited liability partnership that would be involved in the development of the Palm House Hotel, claiming that the investment would qualify them under the EB-5 program administered by United States Citizenship and Immigration Services.

(c) The Bad Actors represented, among other things, that:

(i) There was a 100% guaranty for the return of Plaintiffs' investment and fees in the event their I-526 petition is denied;

(ii) 100% of Plaintiffs' funds would be held in escrow until their Form I-526 immigration petitions were approved by the United States government;

(iii) A "limited number" of 79 equity interests would be sold in Palm House Hotel, LLLP at the price of $500,000 each, plus $40,000 in administrative fees;

(iv) Plaintiffs' funds would be exclusively invested in the Palm House Hotel to create jobs by helping to finish the renovation and development, which was near completion;

(v) The Palm House Hotel would be open for business by the "Season" of 2013/2014, and was 80-90% completed prior to Plaintiffs' investments;

(vi) The funds would create 930 jobs, more than the required 790 fulltime jobs for the offering;

(vii) Plaintiffs' funds would be the third and final source of funds. The EB5 funds were in addition to an equity investment by the developer in excess of $22,000,000 and a bank loan (by a bank that had done full due diligence justifying such a loan) in excess of $29,000,000. Accordingly, Plaintiffs' funds constituted less than 50% of the project funding;

(viii) Plaintiffs' funds would be held in escrow, and were not yet needed, because the developer's investment in excess of $22,000,000 and a bank loan in excess of $29,000,000 was being used for construction and renovation;

(ix) Plaintiffs' funds would not be taken from the escrow account, and would not be used, unless and until the developer's investment in excess

3

of $22,000,000 and the bank funds in excess of $29,000,000 had been used at the project;

(x) The real property at issue was currently worth $110,000,000-$137,000,000 (the current value representation varied, depending on what the Bad Actors believed a particular Plaintiff wanted to hear) before completion, which made the investment "one of the safest EB-5 offerings from a Job Creation and Investment position."

(xi) I-526 immigration petitions for the Palm House Hotel project had already been approved by the United States government for the initial investors;

(xii) An insurance policy was purchased by the Developer that guaranteed that construction of the Palm House Hotel project would be completed;

(xiii) The local government guaranteed that construction of the Palm House Hotel project would be completed, and that this would be the last 5-star hotel property they would allow on Palm Beach;

(xiv) The developer, Robert Matthews, was a famous real estate developer in the United States;

(xv) Each investor's investment would be fully secured by the real property at issue and by the State of Florida pursuant to a UCC form. As there would be 79 rooms and 79 investors, each investor would be given a UCC security interest in an individual room; and

(xvi) Donald Trump and Bill Clinton would serve on the Palm House Hotel advisory board and would assist with any issues related to construction and also play a key role in recruiting celebrities and dignitaries to the club. Celebrities such as Tony Bennett, Celine Dion, Bill Koch, and Eric Schmidt were already members of the hotel club.

(d) The Bad Actors targeted investors with children between the ages of 18 and 21 because, under the EB-5 program, applicants have the right to apply for a green card for themselves, their spouse, and unmarried children under 21. Once the investor's funds were stolen and time continued to pass without the issuance of an I-526 petition approval, the Bad Actors would use the fact that the investor's child had "aged out" to silence the investor, perpetrate the continuing fraud, and prevent the investor from seeking redress or judicial assistance. The Bad Actors threatened the investors that, if the Palm House Hotel investment was interfered with or terminated, because the investor's child was no longer under 21, they would no longer be able to obtain a green card through their parent and would need to obtain their own EB-5 visa at an additional cost of

4

$500,000.

(e) When any Plaintiff questioned or demanded the return of their investment, they were told that all was well, that additional appeals of the application process were in place, that the country's foremost immigration attorney had been hired to prosecute the appeals, and that all was well with the construction of the hotel, thereby further lulling Plaintiffs and allowing the Bad Actors to deny any rights to reimbursement.

(Compl. ¶12.)

Plaintiffs' I-526 petitions were all denied, yet their funds were never returned and were not held in escrow until their Form I-526 immigration petitions were approved. (Compl. ¶¶ 14-15.) The Bad Actors did not sell 79 purported equity interests in Palm House Hotel, LLLP. Despite registering this offering for only 79 units, they perpetrated this fraud on over 90 unsuspecting foreign investors. (Compl. ¶16.) Plaintiffs' funds were not exclusively used to help finish the renovation and development of the Palm House Hotel. Instead the funds were used for unlawful purposes. (Compl. ¶17.) The hotel was nowhere near completion, let alone anywhere close to capable of being open for business by the "Season" of 2013/2014. As of the filing of the Complaint, it is a construction site, accruing fines of $2,000 per day from the Town of Palm Beach. (Compl. ¶18.) Plaintiffs' funds were not used to create 10 full-time jobs for each $500,000 advanced, which was the only purpose for the funds to come to the United States. Further, the fact that at least 93, as opposed to 79 interests were sold, prevented that from occurring. (Compl. ¶19.)

Plaintiffs' funds were not in addition to an equity investment by the developer in excess of $22,000,000 and a bank loan in excess of $29,000,000, so that Plaintiffs' funds constituted less than 50% of the project funding. There was no bank loan, there was no developer's equity, and there was no other source of funds. (Compl. ¶20.) The real property was

not worth $110,000,000-$137,000,000. Indeed, the property had been purchased out of foreclosure for $10,000,100. (Compl. ¶21.)

No investor's I-526 immigration petition for the Palm House Hotel project was ever approved by the United States government. While the Bad Actors had provided a written notice of approval for the project, the notice was fraudulent and did not relate to the Palm House Hotel project. (Compl. ¶22.)  There was no insurance policy that guaranteed the completion of construction of the Palm House Hotel project. The Bad Actors represented that certain documentation was an American surety bond guaranteeing performance when, in reality, it was not. (Compl. ¶23.)  The local government never guaranteed the completion of construction of the Palm House Hotel or certified it as a 5-star property. Instead, the local government was imposing significant fines against the property. (Compl. ¶24.)

Robert Matthews is not a famous real estate developer in the United States. (Compl. ¶25.) Each investor's investment was not fully secured by the real property or the State of Florida. In fact, a secret, unrecorded mortgage in the amount of $27,468,750 was granted to the prior developer of the project in August 2013, which was not recorded until March 28, 2014 -- seven (7) months after it was granted -- and after almost all Plaintiffs had undertaken their due diligence and wired their investments for the project. A mortgage to secure Plaintiffs' interest in the real property was not recorded until October 2014, after whatever equity existed in the project had been subsumed by the prior developer's secret mortgage. (Compl. ¶ 26.)  Bill Clinton and Donald Trump are not on the Palm House Hotel advisory board, and there is no such board. (Compl. ¶27.)

KK-PB Financial, LLC ("Defendant") is a Florida limited liability company owned

and/or

controlled by Glenn Straub, the former owner of 160 Royal Palm LLC,[3] which owns the real

property on which the Palm House Hotel is located.  Mr. Straub was the prior developer of Palm

House and sold his ownership interest in 160 Royal Palm LLC to Palm House, LLC.[4]  Mr. Straub

sold his interest in 160 Royal Palm LLC in August 2013 for $10.00, and received a mortgage for

$27,468,750.00 in favor of Defendant, as consideration. (Compl. ¶ 59.)

Defendant did not record its mortgage until seven (7) months later, on March 28, 2014,

which created the appearance that the real property was unencumbered by such a debt and that

Plaintiffs would obtain a first mortgage on the real property that fully secured their investment

once the purported bank loan was paid off. (Compl. ¶ 59.)  Throughout the scheme, the Bad

Actors told the Chinese Plaintiffs that the Palm House Hotel's value would more than cover the

two (2) mortgages, which included the $27,500,000.00 mortgage in favor of Defendant. (Compl.

¶ 323(j).)

Straub and Defendant were aware that Palm House, LLC intended to offer an EB-5 visa

program at the Palm House Hotel, and that they intended to obtain foreign investors in the

project. (Compl. ¶ 473.)  Straub and Defendant were aware that potential investors at the Palm

House Hotel would seek security in exchange for their investment in the form of a mortgage on

the Real Property. (Compl.  ¶¶ 474-75.)

---

[3] 160 Royal Palm LLC is also a Defendant. This company is owned entirely by Palm House, LLC which purchased the membership interests from Glenn Straub in 2013. (Compl. ¶ 50.)

[4] Palm House, LLC is a Delaware limited liability company that was formed to complete renovations and development of the Palm House Hotel. (Compl. ¶ 45.)

Straub and Defendant knew that potential investors at the Palm House Hotel would likely perform due diligence and ascertain whether the Real Property provided adequate security for their investment. (Compl. ¶476.)   Upon information and belief, Straub and Defendant knew that the foreign investors were told that there was a $29,500,000 bank loan and mortgage against the property, and that those funds were being used to create jobs and continue the construction. (Compl. ¶ 477.)  Straub and Defendant knew that the foreign investors were told that their investments would be used to pay off that bank loan, at which time they would receive a first mortgage on the Real Property. (Compl. ¶ 478.)  Straub and Defendant also knew that the foreign investors would be told that their investments would be fully secured by the Real Property. (Compl. ¶ 479.)   Straub and Defendant intentionally failed to record their Mortgage for almost seven months to create the façade to potential foreign investors that the Real Property was unencumbered by the mortgage, which was in excess of $27,000,000. (Compl. ¶ 480.)  Straub and Defendant recorded the Mortgage on March 28, 2014, only after being informed that most of the Plaintiffs had already performed their due diligence, signed their documentation, and wired their investments to be used at the Palm House Hotel project. (Compl. ¶481.)

It was never disclosed to Plaintiffs that a prior mortgage in favor of the prior owner/developer existed on the Real Property. (Compl.  ¶484.)   The Bad Actors represented to Plaintiffs that the only loan on the project was a bank loan, which was being used to create jobs and continue the construction. (Compl.  ¶ 485.) Further, Straub and Defendant impermissibly benefitted from their conduct by collecting payments on the mortgage from Plaintiffs' funds. (Compl.  ¶ 486.)

Plaintiffs wired funds into an escrow account at PNC Bank and the Bad Actors moved

these funds into a second account at PNC. (Compl. ¶246.)  From the second PNC account, the

Bad Actors conspired to move about $35 million into accounts belonging to several entities,

including Defendant. (Compl. ¶249.)

      The Complaint[5] seeks injunctive relief against all Defendants under Florida Statute

8812.035(1), (6) (count one); conversion against all Defendants (excluding Palm House) (count

three); avoidance of fraudulent transfers pursuant to Florida Statute 726.105(1)(a) against all

Defendants (excluding Palm House) (counts twelve-fourteen); unjust enrichment against all

Defendants (count seventeen); a violation of the Florida Deceptive and Unfair Trade Practices

Act, Florida Statute §501.201 against all Defendants (excluding Palm House and Evans

Defendants) (count eighteen); equitable accounting against all Defendants (count nineteen); civil

conspiracy against all Defendants (excluding Palm House and the Evans Defendants) (count

twenty); constructive fraud against all Defendants (excluding Palm House and Evans

Defendants) (count twenty-one); equitable lien against 160 Royal Palm LLC and Defendant

(count twenty-four); violation of RICO, 18 U.S.C. §1962(c) against Bad Actors (count twenty-

seven) and a violation of RICO, 18 U.S.C. §1962(d) against the Bad Actors (count twenty-eight).

      Defendant moves to dismiss the Complaint on the following grounds: (1) the Complaint

lumps together Defendants; (2) the Complaint does not meet the heightened pleading

requirements under Rule 9(b); (3) the claim for injunctive relief is not properly pled; (4) the

conversion claim does not allege the necessary elements; (5) Defendant is simply a mortgage

holder and did not obtain a benefit to sustain an unjust enrichment claim; (6) damages are not

recoverable under FDUTPA; (7) there is no need for an equitable accounting given money

---

[5] The Court excludes counts not brought against Defendant bringing the instant motion.

damages are available; (8) Defendant is not liable for conspiracy because Defendant obtained the mortgage months before Plaintiffs became involved in the EB-5 Program; (9) a constructive fraud claim cannot exist without a showing of a fiduciary relationship; (10) an equitable lien is inappropriate without adequate allegations of fraud and (11) a mortgage holder is not liable under RICO.

## II.  Legal Standard

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Supreme Court has held that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal citations omitted).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quotations and citations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. Thus, "only a complaint that states a plausible claim for relief survives a motion to dismiss." Id. at 1950. When considering a motion to dismiss, the Court must accept all of the plaintiff's allegations as true in determining whether a plaintiff has stated a claim for which relief could be granted. Hishon v. King & Spalding, 467

U.S. 69, 73 (1984).

III. Discussion

With respect to the Defendant moving to dismiss herein, the Court finds that the Complaint does not improperly lump Defendants together.  Reading the Complaint as a whole, it adequately alleges specific allegations against this particular Defendant to allow it to respond to the Complaint.  Indeed, the Complaint identifies the exact role this Defendant allegedly played in the alleged fraud; namely, obtaining a secret mortgage on the Palm House property to convince Plaintiffs of the false representation that the property had adequate security to obtain Plaintiffs' funds.  To be sure, Defendant strenuously disagrees with this version of the facts, and states it is simply the holder of the mortgage of the Palm House Hotel property, had no relationship with Plaintiffs or made any representations to Plaintiffs.  At this early stage of the proceedings, however, the Court must accept Plaintiffs' version of the facts as true.

Moreover, with respect to the allegations of fraud, the Court rejects Defendant's argument that the Complaint must provide the date, time and place of the fraud. While the Court recognizes these type of details satisfy the Rule 9(b) pleading requirements, the Eleventh Circuit has acknowledged that alternative means are also available to satisfy the rule.  Durham v. Business Management Associates, 847 F.2d 1505, 1512 (11th Cir. 1988).  With respect to this particular Defendant, the Court finds that the Complaint adequately alleges the actions of Defendant as it relates to the alleged fraud.   While the actual count may not identify each action of each Defendant, the factual section of the Complaint makes adequate allegations as to this particular Defendant. With that in mind, the Court turns to the arguments relating to specific counts.

11

A.  Injunctive Relief (count one)

Defendant contends that equitable relief is only available when substantial threat of irreparable injury and a substantial likelihood of success on the merits are shown.          The Court finds that under Florida Statute § 812.035(6), if Plaintiffs can show that this Defendant possesses the allegedly stolen funds or has purchased items with these funds that can be traced, this claim is viable.

B.  Conversion (count three)

Under Florida law, the elements of conversion are "(1) an act of dominion wrongfully asserted; (2) over another's property; and (3) inconsistent with his ownership therein." Special Purpose v. Prime One, 125 F. Supp .2d 1093, 1099–1100 (S.D. Fla.2000) (citing Warshall v. Price, 629 So.2d 903, 904 (Fla. 1993)).

Defendant claims there is a failure to allege any of these elements as they relate to their role as a mortgage holder on the Palm House Property.  Plaintiffs, however, allege Defendant was part of a fraudulent scheme and obtained stolen funds. As discussed supra, the Court must accept Plaintiffs' version of the facts, and based on that version, a claim for conversion is properly pled.

C. Fraudulent Conveyance Claims (counts twelve-fourteen)

Defendant seeks to dismiss these claims on the grounds that they fail to identify a specific transfer made to them and do not allege Defendant is an insider.  Plaintiffs respond that these claims do not allege Defendant is an insider, but a subsequent transferee because it received stolen funds.

Plaintiffs must re-plead these claims as they are unclear.  Given that many Defendants are

referenced in these counts, the Complaint should identify what role each Defendant possessed with respect to these claims.  Thus, these claims are dismissed with leave to amend.

D.  Unjust Enrichment (count eighteen)

To state a claim for unjust enrichment, the following elements must be met:  "(1) a benefit conferred upon a defendant by the plaintiff, (2) the defendant's appreciation of the benefit, and (3) the defendant's acceptance and retention of the benefit under circumstances that make it inequitable for him to retain it without paying the value thereof." Vega v. T–Mobile USA, Inc., 564 F.3d 1256, 1274 (11th Cir. 2009) (citing Rollins, Inc. v. Butland, 951 So.2d 860, 876 (Fla. Dist. Ct. App. 2006)); Della Ratta v. Della Ratta, 927 So.2d 1055, 1059 (Fla. Dist. Ct. App.2006) (same).

Defendant contends that none of these elements have been pled against it because it was solely a mortgage holder on the Palm House Property.  As explained supra, the Court must accept Plaintiffs' version of the facts, and based on that version, a claim for unjust enrichment is properly pled.

E.  FDUTPA claim (count eighteen)

Defendant moves to dismiss this claim on the sole basis that Plaintiffs cannot establish actual damages, as required under FDUPTA.  Actual damages is defined as "the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties." Baptist Hosp., Inc. v. Baker, 84 So. 3d 1200, 1204 (Fla. Dist. Ct. App. 2012); Rodriguez v. Recovery Performance & Marine, LLC, 38 So. 3d 178, 180 (Fla. Dist. Ct. App. 2010).

13

Plaintiffs allege they suffered actual damages as a result of the Bad Actors' deception. At this stage in the proceeding, Plaintiffs have adequate alleged they suffered actual damages. [6]

F.  Equitable Accounting (count nineteen)

Defendant contends that Plaintiffs have an adequate remedy at law and this claim should be dismissed.  "[T[o state a claim for an equitable accounting, the plaintiff must allege that the contract demands between litigants involve extensive or complicated accounts and it is not clear that the remedy at law is as full, adequate and expeditious as it is in equity."  Bankers Trust Realty, Inc. v. Kluger, 672 So. 2d 897, 898 (Fla. Dist. Ct. App. 1996).  The Court finds that this is adequately pled and the Court cannot determine the level of complexity of the account until a factual record is developed.

G.  Civil Conspiracy (count twenty)

Defendant moves to dismiss the civil conspiracy claim because such a claim relies upon an independent tort, and Defendant did not do anything unlawful.

Under Florida law, in order to state a claim for civil conspiracy, a plaintiff must allege: "(a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy." Phillip Morris USA, Inc. v. Russo, 175 So. 3d 681, 686 n.9 (Fla. 2015) (citing Raimi v. Furlong, 702 So. 2d 1273, 1284 (Fla. Dist. Ct. App. 1997)).   A civil conspiracy derives from the underlying claim that forms the basis of the conspiracy, a claim that is found not to be actionable cannot serve as the basis for a

---

[6] As to Defendant's argument that privity is required for a FDUTPA claim, see Barnext Offshore, Ltd. v. Farretti Group USA, Inc., No. 10–23869–CIV, 2012 WL 1570057, at * 9 (S.D. Fla. May 2, 2012) (privity is not required for FDUTPA claim).

conspiracy claim. <u>American United Life Ins. Co. v. Martinez</u>, 480 F.3d 1043, 1067 (11th Cir. 2007); <u>Behrman v. Allstate Ins. Co.</u>, 388 F. Supp. 2d 1346, 1353 (S.D. Fla. 2005) (citing <u>Posner v. Essex Ins. Co.</u>, 178 F.3d 1209, 1217 (11th Cir. 1999)).

Here, Plaintiffs rely upon  viable tort claims for theft and fraud.  Hence, the Court denies Defendant's motion to dismiss this claim.

<u>F. Constructive Fraud (count twenty-one)</u>

Defendant move to dismiss this count because there are no facts that it occupied any position of trust or confidence.

Constructive fraud exists where a duty under a confidential or fiduciary relationship has been abused, or where an unconscionable advantage has been taken.  <u>Linville v. Ginn Real Estate Co., LLC</u>, 697 F. Supp. 2d 1302, 1309 (M.D. Fla. 2010); <u>Levy v. Levy</u>, 862 So. 2d 48, 53 (Fla. Dist. Ct. App. 2003).

While Defendant correctly notes that they are not named in the breach of fiduciary duty count, that does not mean there is no basis to allege a count for constructive fraud.  Here, the Complaint alleges that Plaintiffs are foreign nationals who desired to provide their families with an opportunity for a better life in the United States through the EB-5 program.  While the vast majority of cases of constructive fraud involve a fiduciary relationship, the Florida Supreme Court has explained that "[c]onstructive fraud is simply a term applied to a great variety of transactions which equity regards as wrongful . . .It is not necessary that there should have been a fiduciary relation between the parties, nor that it be positively shown that the one was not left to act upon his own free will, in order to constitute constructive fraud; but inadequacy of consideration, coupled with such a degree of mental weakness as would justify the inference that

15

advantage had been taken of that weakness, will furnish sufficient ground for equitable interference." Douglas v. Ogle, 85 So 243, 244 (Fla. 1920) (internal quotation marks and ellipses omitted).

Based on the allegations, the Court finds that the Complaint alleges that an unconscionable advantage has been taken against Plaintiffs by Defendant.

G.  Equitable Lien (count twenty-four)

Defendant moves to dismiss this count, arguing that the Complaint fails to plead the element of fraud as it relates to Defendant and therefore there is no equitable basis for a lien.  As discussed supra, the Court must accept Plaintiffs' version of the facts, and based on that version, Defendant is part of the fraudulent scheme, thus making equitable relief appropriate.

H.  RICO claims (counts twenty-seven and twenty-eight)

The Court adopts its reasoning set forth in the Court's Order on the Motion to Dismiss of Defendants Joseph Walsh, Joseph Walsh, Jr. and JJW Consultancy, Ltd. as the basis to dismiss these claims.  Thus, the RICO claims are dismissed without leave to amend because amendment would be futile.

IV.  Conclusion

Accordingly, it is hereby **ORDERED AND ADJUDGED** that Defendant KK-PB Financial, LLC's Motion to Dismiss Complaint (DE 80) is **GRANTED IN PART AND DENIED IN PART**.  Plaintiff is granted leave to amend the Complaint consistent with the

16

directives of this Order.

       **DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County,

Florida, this 22nd day of July, 2017.

                        _____
                        KENNETH A. MARRA
                        United States District Judge