IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

PALM HOUSE HOTEL, LLLP, a Florida
limited liability limited partnership,

      Plaintiff,

vs.

CASE NO. 502015CA014480XXXXMB

DIVISION: AB

ROBERT MATTHEWS, MARIA SNEDEN
MATTHEWS a/k/a MIA MATTHEWS,
NICHOLAS LAUDANO, JENNIFER JADE
YU, LESLIE ROBERT EVANS, LESLIE
ROBERT EVANS & ASSOCIATES, P.A., a
Florida professional association, NEW
HAVEN CONTRACTING SOUTH, INC., a
Florida corporation; ALIBI, LLC, a Delaware
limited liability company, ALIBI, LTD, a
Cayman Islands corporation; MIRABIA,
LLC, a Delaware limited liability company;
BOTTICELLI ADVISORS, LLC, a dissolved
Florida limited liability company; 160
ROYAL PALM, LLC, a Florida limited
liability company; PALM HOUSE PB, LLC,
a dissolved Florida limited liability company,
NJL DEVELOPMENT GROUP, LLC, a
Delaware limited liability company;
BONAVENTURE 22, LLC, a dissolved
Florida limited liability company, and PALM
HOUSE, LLC, a Delaware limited liability
company,

      Defendants.            /

## FOURTH AMENDED COMPLAINT
## (AMENDING COUNT IV ONLY)

Plaintiff, PALM HOUSE HOTEL, LLLP, hereby sues Defendants, ROBERT

MATTHEWS, MARIA SNEDEN MATTHEWS a/k/a MIA MATTHEWS; NICHOLAS

LAUDANO, JENNIFER JADE YU, LESLIE ROBERT EVANS, LESLIE ROBERT EVANS &

ASSOCIATES, P.A., a Florida professional association, NEW HAVEN CONTRACTING

SOUTH, INC., a Florida corporation, ALIBI, LLC, a Delaware limited liability company, ALIBI LTD, a Cayman Islands corporation, MIRABIA, LLC, a Delaware limited liability company, BOTICCELI ADVISORS, LLC, a dissolved Florida limited liability company, 160 ROYAL PALM, LLC, a Florida limited liability company, PALM HOUSE PB, LLC, a dissolved Florida limited liability company, NJL DEVELOPMENT GROUP, LLC, a Delaware limited liability company, BONAVENTURE 22, LLC, a dissolved Florida limited liability company, and PALM HOUSE, LLC, a Delaware limited liability company, and states as follows:

**JURISDICTIONAL ALLEGATIONS:**

1.     This is an action for damages in excess of $15,000.00, exclusive of interests, costs, and attorneys' fees.

2.     This Court has jurisdiction pursuant to FLA. STAT. §§ 726.108, 772.103, 772.104 and 26.012.

3.     Venue in Palm Beach County, Florida is proper because the activities giving rise to the causes of action stated herein occurred in this county.

**THE PARTIES AND THEIR AGENTS**

4.     Plaintiff, PALM HOUSE HOTEL, LLLP ("PHH"), is the lender to Defendants, Palm House, LLC ("PALM HOUSE") and 160 ROYAL PALM, LLC, and holder of a Note executed by PALM HOUSE and a Mortgage executed by 160 ROYAL PALM and recorded in the Official Records in and for Palm Beach County (collectively, the "Loan").  Over $36 million in loan proceeds was advanced by Plaintiff under the Loan (the "Loan Funds") in several installments on various dates subsequent to the execution of the Note through wire transfers to the Trust Account of Defendant, LESLIE ROBERT EVANS & ASSOCIATES, P.A.

Page 2 of 46

5.     Ryan Black ("Black") is a member, and the former Managing Member, of PALM HOUSE.[1]

6.     PALM HOUSE is a Delaware limited liability company, and is the sole member of 160 ROYAL PALM. It is joined in this action as it may claim an interest in the Loan Funds that are the subject of this action and because part of the relief sought herein is to pierce PALM HOUSE'S corporate veil.

7.     Gerry Matthews is not a named Defendant in this action at this time but purports to hold a 99% member interest in PALM HOUSE. As set forth in greater detail below, Gerry Matthews holds such ownership interest in name only and solely on behalf of his brother, Defendant, ROBERT MATTHEWS, pursuant to a power of attorney and verbal agreements.

8.     Defendant, ROBERT MATTHEWS ("ROBERT"), is Gerry Matthew's brother and Gerry Matthew's agent. On information and belief, ROBERT is not formally listed as having a membership interest in PALM HOUSE or the Hotel (defined elsewhere herein) under any PALM HOUSE Operating Agreement, but at all relevant times to this action, held beneficial ownership as evidenced by a power of attorney executed by his brother Gerry Matthews and through verbal agreements with his brother. At all relevant times, ROBERT exercised all of the rights and privileges of ownership of PALM HOUSE and 160 ROYAL PALM through his brother Gerry Matthews, who was subject to his complete control and direction.

---

[1] Black was the Managing Member of PALM HOUSE until October 20, 2014, when the majority member, Gerry Matthews, removed him as Managing Member so as to prevent Black from entering the premises and discovering evidence of the fraudulent scheme set forth in this Complaint.

9.     Defendant, MARIA SNEDEN MATTHEWS a/k/a MIA MATTHEWS ("MARIA"), is ROBERT's wife.  She has no ownership interest in 160 ROYAL PALM, PALM HOUSE or the Hotel, nor is she involved in any manner with the Hotel project.

10.     Defendant, NICHOLAS LAUDANO ("LAUDANO"), is the owner of Defendant NEW HAVEN CONTRACTING SOUTH, INC., a Florida corporation which was the general contractor for construction of the Hotel.[2]

11.     Defendant, NEW HAVEN CONTRACTING SOUTH, INC., a Florida corporation ("NHC"), is a company owned and operated by Defendant LAUDANO and was the company charged with the Hotel construction.

12.     Defendant, JENNIFER JADE YU ("YU"), is or was ROBERT's personal assistant.  She has no ownership interest in 160 ROYAL PALM, PALM HOUSE or the Hotel.

13.     Defendant, 160 ROYAL PALM, LLC, a Florida limited liability company ("160 ROYAL PALM"), is the owner of the Hotel located at 160 Royal Palm Way, on the island of Palm Beach, Florida.

14.     Defendant, LESLIE ROBERT EVANS ("EVANS"), is a licensed Florida attorney who was charged with maintaining the Loan funded by PHH in his law firm's attorney's trust account and overseeing disbursement of the Loan for the sole purpose of funding the development of the Hotel Project by 160 ROYAL PALM.

15.     Defendant, LESLIE ROBERT EVANS & ASSOCIATES, P.A., a Florida professional association (the "EVANS FIRM"), is a Florida professional association which

---

[2] On information and belief, NHC, despite acting as the general contractor for the Hotel Project, was unlicensed during all or part of the time that it performed general contracting services for the Hotel Project.

Defendant EVANS owns and operates. The Loan Funds were maintained in the EVANS FIRM's client trust account.

16. At all relevant times, EVANS and the EVANS FIRM were aware of Plaintiff's loan agreement with PALM HOUSE and that such loan agreement restricted the use of the Loan Funds to the renovation and construction of the Hotel Project as set forth in the Business Plan referenced below.

17. Defendant, ALIBI, LTD. ("CAYMAN ALIBI"), is a Cayman Islands corporation. Defendant ROBERT is the president of CAYMAN ALIBI. Defendant CAYMAN ALIBI purchased a one-hundred fifty-one (151) foot yacht (the "Yacht") immediately upon formation. This Court has long-arm jurisdiction over CAYMAN ALIBI because this action arises out of its commission of tortious acts within the State of Florida (*see* FLA. STAT. § 48.193(1)(b)) or its commission of tortious acts that resulted in injury in the State of Florida (*see* FLA. STAT. § 48.193(1)(b)). CAYMAN ALIBI maintains certain minimum contacts with the State of Florida and/or caused injury and engaged in certain wrongful conduct within the State of Florida, such that the maintenance of this action does not offend traditional notions of fair play and substantial justice.

18. Defendant, ALIBI, LLC ("ALIBI US"), is a Delaware limited liability company and it was formed on the same day as CAYMAN ALIBI. Defendant MARIA was the sole and managing member of ALIBI US. All interests in CAYMAN ALIBI were transferred to ALIBI US upon formation, including ownership of the Yacht.[3] This Court has long-arm jurisdiction over said Defendant because this action arises out of its commission of tortious acts within the

_____

[3] As more specifically explained below, it is the Plaintiff's belief that the entire interests were subsequently transferred to Defendant Botticelli.

State of Florida (*see* FLA. STAT. § 48.193(1)(b)) or its commission of tortious acts that resulted in injury in the State of Florida (*see* FLA. STAT. § 48.193(1)(b)). ALIBI US maintains certain minimum contacts with the State of Florida and/or caused injury and engaged in certain wrongful conduct within the State of Florida, such that the maintenance of this action does not offend traditional notions of fair play and substantial justice.

19.     Defendant, MIRABIA, LLC ("MIRABIA"), is a Delaware limited liability company. MIRABIA's Manager is Defendant EVANS and its original sole member was Defendant YU. On information and belief, MIRABIA was at all times beneficially owned by ROBERT. MIRABIA purchased a parcel of real property located at 149 Brazilian Avenue, Palm Beach, Florida, located adjacent to the Hotel which purchase was funded in part with $1,000,000 of diverted Loan Funds. This Court has long-arm jurisdiction over MIRABIA because this action arises from MIRABIA's: (a) commission of tortious acts within the State of Florida (*see* FLA. STAT. § 48.193(1)(b)) or commission of tortious acts that resulted in injury in the State of Florida (*see* FLA. STAT. § 48.193(1)(b)); or (b) this action arises from MIRABIA's ownership of real property in the State of Florida at 149 Brazilian Avenue, Palm Beach, Florida. MIRABIA maintains certain minimum contacts with the State of Florida and/or caused injury and engaged in certain wrongful conduct within the State of Florida, such that the maintenance of this action does not offend traditional notions of fair play and substantial justice.

20.     Defendant, BOTTICELLI ADVISORS, LLC ("BOTTICELLI"), is a dissolved Florida limited liability company. BOTTICELLI's Managing Member is Craig T. Galle. BOTTICELLI is the Managing Member of Defendant NJL.

21.     Defendant, NJL DEVELOPMENT GROUP, LLC ("NJL"), is a Delaware limited liability company which maintains an office in Palm Beach County, Florida. NJL's sole and

managing Member is BOTTICELLI. Pursuant to authorization from Defendant BOTTICCELLI, NJL purchased Defendant ROBERT's former home located at 115 Lower Church Hill Road in Washington Depot, Connecticut, at a foreclosure sale with diverted Loan Funds. This Court has long-arm jurisdiction over NJL because this action arises from either NJL's commission of tortious acts within the State of Florida (*see* FLA. STAT. § 48.193(1)(b)) or commission of tortious acts that resulted in injury in the State of Florida (*see* FLA. STAT. § 48.193(1)(b)) or this action arises from NJL's operating, conducting, engaging in, or carrying on business or business venture in this state or having an office or agency in this state (*see* FLA. STAT. § 48.193(1)(a)(1)). NJL, whose managing member was at all relevant times a Florida limited liability company, maintains certain minimum contacts with the State of Florida, including an office in Palm Beach, Florida, and/or caused injury and engaged in certain wrongful conduct within the State of Florida, such that the maintenance of this action does not offend traditional notions of fair play and substantial justice.

22.     Defendant, PALM HOUSE PB, LLC ("PHPB"), is a dissolved Florida limited liability company. PHPB was organized in 2012. Its Manager was Defendant EVANS.

23.     Defendant, BONAVENTURE 22, LLC ("BONAVENTURE"), is a dissolved Florida limited liability company. BONAVENTURE was organized in 2011. Its Manager was MARIA.

24.     For ease of understanding, many elements of these highly complex transactions, which have no bearing on the suit presented here, are being omitted.

### FACTUAL BACKGROUND

25.     The Hotel which is the subject of this action was acquired at foreclosure sale in 2009 by 160 ROYAL PALM. In or about August 2013, PALM HOUSE purchased the

membership interests of 160 ROYAL PALM and thereby acquired 100% ownership of 160 ROYAL PALM.

26.     PALM HOUSE acquired the entity that is the owner of the property[4] for the specific purpose of renovating the existing Hotel to construct an exclusive club/hotel (the "Hotel") to be known as the Palm House Hotel and Club (the "Hotel Project").

27.     160 ROYAL PALM received the monies necessary for the purchase of the real property from its sole member, PALM HOUSE.

28.     Black, as Managing Member, gave Defendant EVANS a Limited Power of Attorney to enable EVANS to sign the real property closing documents.   Attached hereto as "Exhibit A" is a true and correct copy of the Limited Power of Attorney.

29.     The Limited Power of Attorney was only valid for thirty (30) days.

30.     PALM HOUSE, in anticipation of assisting 160 ROYAL PALM with the Hotel acquisition, entered into a loan agreement and executed a Promissory Note in favor of Plaintiff PHH in the principal amount of $39.5 million in or around January 2014 (the "Loan").   Attached hereto as "Exhibit B" is a true and correct copy of the Loan Agreement, including the Business Plan referenced in the Loan Agreement.

31.     Under the terms of the Loan Agreement, PHH would advance funds to PALM HOUSE for the specific purpose of development of the Hotel Project as set forth in the Business Plan which purposes primarily involved the demolition, construction, renovation and remodeling of the Hotel.

---

[4] The acquisition was financed by a mortgage granted in favor of KK-PB Financial, LLC ("KK-PB"), an entity controlled by Glen Straub ("Straub") who is related to the principals of PHH. Neither Straub nor KK-PB are a party to this action.

32.     Under the terms of the Loan Agreement, no funds were to be distributed other than for the development of the Hotel Project or for the purposes set forth in the Business Plan.

33.     The representation in the Loan documents (Exhibit B) as to how the loan proceeds would be used was a material representation that was false when made, as PALM HOUSE had no intention of so limiting the use of the Loan Funds in accordance with the Loan Agreement.

34.     PALM HOUSE knew or should have known of the falsity of such representation and made such representation with the intention of inducing Plaintiff to enter into the Loan.

35.     Plaintiff justifiably relied on said representation in making the Loan and would not have made the Loan had it known that such representation was false.

36.     As the Loan Funds were obtained through fraud or false pretenses, as a matter of law, no valid transfer of ownership of the Loan Funds ever occurred and the Loan Funds remained the property of Plaintiff as lender.

37.     The EVANS FIRM was entrusted with receiving Loan Funds from PHH and distributing such funds to PALM HOUSE.

38.     The funds were to be placed in and distributed from the EVANS FIRM's attorney trust account (the "Trust Account") for the benefit of 160 ROYAL PALM by way of PALM HOUSE.  As set forth below, the Loan Funds were, in fact, deposited into the Trust Account at a time when EVANS and the EVANS FIRM knew the purpose of and restrictions on the Loan Funds.

39.     Despite the funds being for the benefit of 160 ROYAL PALM by way of PALM HOUSE, and despite ROBERT not being listed as having a membership interest in these entities

in their respective Operating Agreements, Defendant EVANS placed ROBERT's name on the Trust Account. *See,* Chart Depicting the Trust Account, attached hereto as "Exhibit C."[5]

40.     PALM HOUSE entered into an Operating Agreement in conjunction with the anticipated acquisition of the Hotel by 160 ROYAL PALM (the "OA"). A true and correct copy of the OA is attached hereto as "Exhibit D."

41.     Pursuant to the OA, Black was appointed as the initial Manager of PALM HOUSE.

42.     Pursuant to the OA, Black was to be responsible for the day-to-day operations of PALM HOUSE for a brief period.

43.     Pursuant to the OA, any expenditure over $50,000.00 was to be approved by all members of PALM HOUSE.

44.     Pursuant to the OA, after Black's brief period of day-to-day oversight concluded, the duty of managing the day-to-day operations of PALM HOUSE was to be passed on to the majority, non-Manager member, Gerry Matthews.

45.     Pursuant to the OA, all Major decisions required a vote of all members.

46.     Pursuant to the OA, "Major" decisions included "the expenditure of, or the incurrence of any indebtedness or contractual obligation … in excess of $50,000."

47.     Pursuant to the OA, distribution to any member or "related party" required unanimous consent of the members.

48.     Pursuant to the OA, only the Managing Member had authority to open bank accounts and determine authorized users.

---

[5] On information and belief the Operating Agreements for these entities were prepared by Defendant EVANS.

49.     Pursuant to the OA, after the non-managing Member commenced day-to-day operations, either Member would be able to sign approved banking checks.

50.     Pursuant to the OA, the majority of the Members of PALM HOUSE could vote to remove the Managing Member.

51.     Because Gerry Matthews, as ROBERT's straw man, had a 99% membership interest in PALM HOUSE and the Managing Member had an ownership interest of only 1% of PALM HOUSE, Gerry Matthews could remove Black as Managing Member at any time he or ROBERT wanted.

52.     Pursuant to the OA, Gerry Matthews could, at any time, demand that Black sell his 1% interest to Gerry Matthews for $220,000.00.

53.     At no time prior to December 2015 did Gerry Matthews demand that Black sell his 1% interest to him.

54.     PALM HOUSE entered into a Standard Form AIA Construction Contract with Defendant NHC on January 3, 2014 (the "Construction Contract). A true and correct copy of the Construction Contract is attached hereto as "Exhibit E." [6]

55.     Pursuant to the Construction Contract, NHC was to complete the Hotel Project for the total amount of $35,750,000.00.

56.     The Construction Contract provided that all funds were to be used *exclusively for the construction of the Hotel*, except for $2,600,000.00 which was to be allocated to construction of a spa, and $2,500,000.00 which was to be allocated for construction of a restaurant to be included as part of the Hotel Project.

---

[6] The AIA Agreement is actually dated as of January, *2013*, but this is a scrivener's error as the document was not signed until 2014.

57.     Pursuant to the Construction Contract, progress payments would only be payable upon completion of identified work under the construction bid.  Such payments were to be calculated by a set formula.

58.     Although the work was begun, the Hotel Project is nowhere near completion, and the Loan Funds are virtually depleted.

59.     When Gerry Matthews took over the duties of the day-to-day management of PALM HOUSE, he installed his brother, ROBERT, as his agent.  This was a mere legal fiction since ROBERT owned and controlled PALM HOUSE.

60.     ROBERT requested that Black provide him and his wife, MARIA, with ATM cards and signature authority on PALM HOUSE's account.

61.     Black denied the request.

62.     ROBERT and MARIA then proceeded to open up their own bank account in the name of 160 ROYAL PALM with Regions Bank.

### THE SCHEME

63.     After the advance of the Loan Funds to EVANS, ROBERT, along with others, began a course of conduct intended to defraud PHH and steal the Loan Funds.

64.     ROBERT commenced a series of transfers from the Trust Account directly to the Regions checking account for his own use and benefit.

65.     ROBERT would request, and EVANS and the EVANS FIRM would approve, frequent and substantial transfers from the Trust Account directly to ROBERT and MARIA's bank account.

66.     EVANS, at multiple times, transferred funds out of the Trust Account which did not go either to the development of the Hotel Project or PALM HOUSE but, instead, were directed to persons or entities completely unrelated to the Hotel Project. *See*, Exhibit C.

67.     For example, on December 27, 2013, EVANS transferred $266,064.60 directly to the Palm Beach County Tax Collector's Office to pay for ROBERT and MARIA's *personal* real estate taxes.

68.     On January 9, 2014, EVANS transferred $12,452.05 directly to Dovenmuehle Mortgage Company for payment of ROBERT and MARIA's residential mortgage.

69.     On June 6, 2014, EVANS transferred $1,000,000 to MIRABIA which was used the same day as a deposit on MIRABIA's $5.8 million purchase of the lot adjacent to the Hotel located at 149 Brazilian Avenue.

70.     Between March 4, 2014, and April 8, 2014, EVANS transferred a total of $5,999,021 to Deutsche Bank for payment of indebtedness owed by ROBERT.

71.     The EVANS Defendants additionally routinely transferred large disbursements directly to the Regions account without requiring any documentation relating to the withdrawal amount.

72.     For example, despite little progress on the Hotel Project, the EVANS Defendants transferred the following amounts directly to the Regions account under the authority of ROBERT.[7]

| Date | Amount |
|------|--------|
| 09/03/2013 | $2,580,000.00 |
| 09/03/2013 | $ 150,920.08 |

---

[7] This is by no means a complete list.  Plaintiff reserves the right to amend these figures after appropriate discovery.

| Date | Amount |
|------|--------|
| 01/10/2014 | $ 100,000.00 |
| 01/17/2014 | $1,000,000.00 |
| 01/28/2014 | $ 200,000.00 |
| 02/10/2014 | $ 300,000.00 |
| 03/14/2014 | $ 350,000.00 |
| 03/17/2014 | $ 100,000.00 |
| 03/19/2014 | $ 250,00.00 |
| 04/09/2014 | $ 500,000.00 |
| 04/29/2014 | $1,250,000.00 |
| 05/12/2014 | $1,000,000.00 |

73.     Additionally, ROBERT and MARIA had the following amounts transferred into the Regions account which are attributed to Loan Funds.

| Date | Amount |
|------|--------|
| 02/20/2014 | $ 500,000.00 |
| 02/26/2014 | $ 500,000.00 |
| 04/16/2014 | $1,000,000.00 |
| 04/29/2014 | $1,000,000.00 |
| 05/13/2014 | $1,000,000.00 |
| 06/03/2014 | $1,000,000.00 |
| 06/19/2014 | $1,000,000.00 |
| 06/24/2014 | $ 750,000.00 |
| 07/01/2014 | $ 750,000.00 |
| 07/10/2014 | $ 750,000.00 |
| 07/18/2014 | $ 750,000.00 |
| 08/11/2014 | $ 500,000.00 |

*See*, Summary of Regions checking account attached hereto as Composite "Exhibit F."

74.     The above figures are simply a representation and, to Plaintiff's knowledge and belief, there are additional Loan Funds which may have been transferred to the Regions account or other Defendants' accounts.

75.     Bank records for the Regions account reflect a total deposit amount between the months of January 2014 and August 2014 in excess of $16,000,000.00.

76.     Of this over $16,000,000.00 amount, more than $8,500,000 was "paid" to Defendants NHC and LAUDANO.

77.    However, on information and belief, a substantial portion of the $8.5 million-plus did not go into development of the Hotel Project. It is anticipated that discovery will show that the funds expended on the Hotel Project were substantially less than $8.5 million.

78.    Although YU was hired by ROBERT as ROBERT's personal assistant, LAUDANO, through NHC, regularly made payments from the Loan Funds to YU even though YU did not perform services for LAUDANO.

79.    As part of the scheme to defraud Plaintiff, Defendant LAUDANO used funds transferred by ROBERT to repurchase ROBERT's previously-foreclosed home at 115 Lower Church Hill Road in Washington Depot, Connecticut (the "Connecticut Property").

80.    Specifically, attached hereto as Composite "Exhibit G" are documents reflecting how this action in furtherance of the conspiracy was achieved. These documents show the following:

      a.    BOTTICELLI was formed in 2012.

      b.    ROBERT's Connecticut home was foreclosed in early 2014.

      c.    In February 2014, Defendant LAUDANO formed NJL. In the Certificate of Formation, NJL designated BOTTICELLI as its managing member.

      d.    On February 11, 2014, BOTTICELLI, in its capacity as Managing Member of NJL, issued a "Resolution of Botticelli Advisors, LLC" which granted LAUDANO the rights and authority to "bid[] on and execut[e] any and all documents on behalf of NJL ... in connection with the auction, purchase and sale of the real property and improvements known as 115 Lower Church Hill."[8]

---

[8] On information and belief, NJL, as winning bidder, positively affirmed that it had no relationship with the previously-foreclosed owner.

e.     The funds for the purchase of The Connecticut Property came directly from 160 ROYAL PALM, either through direct or indirect transfer to NHC or NJL.  Exhibit G includes a true and correct copy of a Domestic Wire Transfer Request/Authorization by which $845,000.00 was wired from the Regions account to NHC for the benefit of "115 Lower Churchill [sic]." Exhibit G also includes a "Winning Bidder Confirmation" wherein NJL lists its address as being in Boynton Beach, Florida.

81.     Additionally, on May 27, 2014, a check in the amount of $1,100,000 was issued on the Regions account payable to BONAVENTURE, a company owned by MARIA and ROBERT.

82.     Further, between November 15, 2013, and September 1, 2014, a total of $2,207,851.81 was paid from the Regions account to pay for non-construction expenses (excluding Yacht purchase and Yacht expenses) of ROBERT.

83.     On or about June 18, 2014, ROBERT or MARIA, on behalf of CAYMAN ALIBI, purchased the Yacht with funds advanced by PHH for the construction and renovation of the Hotel Project.

84.     Further, between June 10, 2014, and September 3, 2014, a total of $2,272,728.33 was paid from the Regions account to pay for the purchase of the Yacht and related expenses.

85.     ROBERT has testified (at his deposition taken in a pending mortgage foreclosure action brought by KK-PB) to the following facts concerning the yacht:

- The yacht was purchased using funds from the second mortgage held by PHH.

- The yacht was not placed in the name of 160 Royal Palm but in the name of an offshore entity [CAYMAN ALIBI] owned by MARIA.

- Approximately $1.5 million to $2 million of the Loan Funds were used for the purchase of the yacht.

86.     On December 17, 2015, an action was filed in federal court asserting a maritime lien against the Yacht by Plaintiff, Ryan Cowell, as assignee of HBA International.

87.     Thereafter, Ryan Black, derivatively, as a member of and on behalf of PALM HOUSE, intervened in the federal court action and filed a complaint against CAYMAN ALIBI, ROBERT and MARIA.

88.     In connection with the filing of these claims, Black sought the issuance of a warrant of arrest of the vessel in question. Before the federal court ruled on the motion for a warrant of arrest, and in lieu of the arrest of the vessel, the parties to the action stipulated to the deposit of the proceeds of the sale of the vessel into the registry of the Court to stand as security for Black's claim.

89.     Pursuant to a Joint Stipulation and Order on Joint Stipulation, funds from the sale of the Yacht in the amount of $2,323,179.95 were initially deposited in the Registry of the federal court (the "Sale Proceeds"). Thereafter, pursuant to a temporary injunction order entered by this Court, the Sale Proceeds were transferred to an account established by the court appointed Receiver for the Hotel Project, Cary Glickstein of Ironwood Construction Services.

90.     There is no genuine dispute that the $2,323,179.95 in Sale Proceeds are an asset of PALM HOUSE and 160 ROYAL PALM. In fact, ROBERT has testified in the pending mortgage foreclosure action that these funds were for the benefit of 160 ROYAL PALM and PALM HOUSE and the Hotel Project.

91.     A summary of the funds disbursed from either the EVANS FIRM'S IOTA Trust Account or from 160 ROYAL PALM's account at Regions Bank for the benefit of ROBERT and/or MARIA or to pay their personal expenses is set forth below:

| Date(s) | Amount | Purpose | Account |
|---|---|---|---|
| 12/27/2013 | $ 266,064.60 | PBC Tax Collector | IOTA |
| 5/13/2014 | $ 845,000.00 | 115 Lower Church Hill - NJL | Regions |
| 4/29/2014 | $ 2,650,000.00 | 115 Lower Church Hill - New Haven South | Regions |
| 6/6/2014 | $ 1,000,000.00 | 149 Brazilian Lot - Mirabia LLC | IOTA |
| 3/4/2014 - 4/18/2014 | $ 5,599,021.10 | Deutsche Bank Collections | IOTA |
| 11/15/2013 - 9/1/2014 | $ 2,207,851.81 | Bob's Non Construction Expenses - Excl. Yacht Purchase and Expenses | Regions |
| 5/27/2014 | $ 1,100,000.00 | Bonaventure 22 | Regions |
| 6/10/2014 - 9/3/2014 | $ 2,272,728.33 | Yacht Purchase and Expenses | Regions |
| 1/2/2014 - 8/25/2014 | $ 8,512,000.00 | Payments made to New Haven South for "Construction Work"[9] | |
| **TOTAL** | **$24,452,665.84** | | |

92.   On or about June 18, 2014, CAYMAN ALIBI was formed as a Cayman Islands corporation under the direction and request of ROBERT. *See*, documents attached hereto as Composite "Exhibit H."

93.   On June 18, 2014, ROBERT, on behalf of CAYMAN ALIBI and as its President, purchased the Yacht, a Marine Vessel named "D'Natalin," for the purchase price of $5,750,000.00.

94.   On June 18, 2014, ROBERT, on behalf of CAYMAN ALIBI, the "Owning Entity for Vessel," paid a $1,000,000.00 deposit for the Yacht, which was renamed the "Alibi."

95.   The $1,000,000.00 was provided by Defendants EVANS and the EVANS FIRM out of Loan Funds.

---

[9] On information and belief, part of this sum was for construction services or work actually performed, albeit by an <u>unlicensed</u> general contractor.

96. On July 11, 2014, Defendant ROBERT entered into a loan agreement and mortgage for the balance of the Yacht's purchase price.

97. The loan agreement was between Harlan Ltd., a Cayman Islands Corporation, and CAYMAN ALIBI.

98. Attached to the loan agreement are the following relevant documents which set forth the fraudulent nature of the transaction, as well as the clear intent of ROBERT and MARIA to convert Plaintiff's funds into personal property, namely the Yacht, with no interest held at all by the Hotel:

    a. Written resolution transferring "the one subscriber share" in CAYMAN ALIBI to ALIBI US.

    b. ALIBI US's Articles of Organization, also filed on June 18, 2014 (the same date upon which all of the activities set forth above relating to the formation of CAYMAN ALIBI were performed). The Articles of Organization reveal that the sole and managing member of ALIBI US was Defendant MARIA. The Operating Agreement for ALIBI US was signed by Defendant MARIA.

    c. A share transfer agreement effectuating the transfer described above.

    d. A "Source of Funds" Affidavit wherein Defendant MARIA falsely declares that she is "one of the owners of a privately held hotel development group; details on the company can be found on this website: http://palmhousehotel.com. The source of [her] funds is [her] income from this company."[10]

---

[10] MARIA has never had any ownership or income interest in the Hotel Project.

> e. A copy of MARIA's unauthorized business card which falsely asserts that she is a "principal" of the Palm House Hotel.
>
> f. A copy of ROBERT's unauthorized business card which falsely asserts that ROBERT is the President and CEO for the Palm House Hotel.
>
> g. A copy of MARIA and ROBERT's utility bill for their private home.

99. Immediately after CAYMAN ALIBI's formation, the company transferred its only share to Defendant MARIA through ALIBI US.

100. On February 28, 2012, Defendant EVANS formed Defendant PHPB.

101. On August 25, 2014, MARIA and YU opened a bank account (the "Alibi Bank Account") for CAYMAN ALIBI, also at Regions Bank. *See*, Account Package for CAYMAN ALIBI, a true and correct copy of which is attached hereto as Composite "Exhibit I."

102. The name on the Alibi Bank Account is PHPB. *See*, copies of checks paid regarding "Alibi" which are attached hereto as Composite "Exhibit J."

103. ALIBI US thereafter assigned all of its interest in ALIBI US to BOTTICELLI on June 20, 2014.[11] *See*, "Exhibit K" attached hereto.

104. Until as late as October 19, 2014, ROBERT, MARIA, YU, and EVANS continued to expend Loan Funds in connection with the payment of costs associated with the Alibi yacht. *See*, "Exhibit L" attached hereto.

105. The Construction Contract contained no provision for the purchase or maintenance of a Yacht for the Hotel Project.

---

[11] The Plaintiff has an un-signed transfer, but believes that the signed copy will be obtained via discovery. As described above, the Defendants affirmatively shut Plaintiff out of the Property on October 20, 2014, as soon as they realized that the Plaintiff was on to their fraudulent activities.

106.   The conspiracy has not been limited to just the Yacht or the fraudulent re-purchase of ROBERT's Connecticut home.

107.   A review of the bank records contained in Exhibit F reveals that, in addition to the Yacht and the Connecticut Home, Defendants ROBERT and MARIA have wrongfully converted in excess of an additional $5,000,000.00 in Loan Funds to their personal use.  Funds in the Regions account have been paying for their mortgage, insurance, vacations, shopping, and other personal expenses.

108.   The Loan Funds have also been fraudulently used by 160 ROYAL PALM to purchase a new Maserati automobile for MARIA's exclusive use.

109.   Additionally, on information and belief, Defendant EVANS has been fraudulently signing documents on behalf of 160 ROYAL PALM as "Ryan Black under [an alleged] Power of Attorney."  *See*, true and correct copies of fraudulently signed documents assembled as Composite "Exhibit M" attached hereto.[12]

---

[12] The documents attached as part of Exhibit M are only some of the documents which Plaintiff has been able to obtain at the time of the filing of this Fourth Amended Complaint.  On information and belief, future discovery will disclose that Defendant EVANS, on behalf of the other Defendants, has routinely executed documents on behalf of PALM HOUSE by fraudulently representing that he had the authority to do so under the limited POA.  The documents in Exhibit M include: (1) a restaurant licensing agreement dated May 2014 wherein PALM HOUSE grants to Le Cirque Restaurant an exclusive license to operate a restaurant at the Hotel – the agreement required a payment of $122,000 immediately, and future payment according to a sliding-scale percentage in the restaurants' gross receipts; (2) a reservation escrow agreement between 160 Royal Palm and Chicago Title by which 160 ROYAL PALM sought to establish an escrow account to hold deposits for anticipated sales of condominium units as part of the Hotel Project – the Hotel Project never included sales of condominium units and, in fact, such a sale was prohibited under the local zoning ordinances; (3) an "I-526 Denial $40,000 Administrative Fee Refund Agreement" dated March 24, 2014; and (4) the Construction Contract referenced herein, whereby PALM HOUSE commits to a payment in excess of $35,000,000.  Note that the date on the AIA Agreement contains a scrivener's error reflecting the date of January 2, 2013; however, the agreement was, in fact, not executed until January 2, 2014.  Each of these documents were executed well after the limited POA had expired, and each

110.    The Plaintiff has retained the undersigned law firm to prosecute this action and is obligated to pay said law firm a reasonable attorneys' fee.

### Count I - Tortious Interference with Loan Agreement
### (Against ROBERT, EVANS and the EVANS FIRM)

111.    Plaintiff hereby adopts and re-alleges Paragraphs 1 through 110 as if fully and completely stated herein.

112.    This is an action for damages in excess of fifteen thousand dollars ($15,000.00) against Defendants ROBERT, EVANS and the EVANS FIRM for their concerted actions in tortiously interfering with Plaintiff's loan agreement with PALM HOUSE.

113.    As alleged above and herein, Defendants engaged in a wide variety of misconduct which resulted in the diversion of substantial monies advanced by Plaintiff under its Loan with PALM HOUSE.

114.    At all relevant times, said Defendants were aware of Plaintiff's Loan Agreement with PALM HOUSE and that such agreement restricted the use of the Loan Funds to the development of the Hotel Project as set forth in the Business Plan.

115.    Defendants, ROBERT, EVANS and the EVANS FIRM, by their conduct as set forth above in causing Loan Funds to be used for purposes not authorized under the Loan Agreement, intentionally and unjustifiably caused PALM HOUSE to breach its obligations under the Loan, including its obligation, as set forth in the loan agreement, to use all monies advanced under the loan for the purpose of development of the Hotel Project in accordance with the Business Plan.

---

agreement created financial liability on behalf of PALM HOUSE.

116.    As a direct and proximate result of said Defendants' intentional interference with Plaintiff's loan agreement with PALM HOUSE, Plaintiff has been damaged.   Specifically, PALM HOUSE has been deprived of over $16 million in Loan Funds that would otherwise have been used for the development of the Hotel Project, has been unable to complete the Hotel Project, lacks the ability to repay the subject Loan, has defaulted under the Loan Agreement and, as a consequence, Plaintiff has been deprived of the benefits of the loan agreement and the value of the security for its Mortgage (*i.e.* the land and improvements constituting the Hotel Project) has been substantially impaired.

117.    As a further direct and proximate result of Defendants' wrongful acts, Plaintiff has been further damaged in that it has been required to incur attorneys' fees to institute legal action in Palm Beach County Circuit Court against PALM HOUSE to attempt to collect the indebtedness represented by the Loan and such attorneys' fees and costs are recoverable as an element of damages in this action under the wrongful act doctrine.

WHEREFORE, Plaintiff demands judgment for damages against Defendants ROBERT, EVANS and the EVANS' FIRM, jointly and severally, together with interest and costs.

### Count II – Violation of Florida RICO Act (FLA. STAT. §§ 772.103(1) & 895.01, *et seq.*) (Against Defendants ROBERT and MARIA)

118.    Plaintiff hereby adopts and re-alleges Paragraphs 1 through 110 as if set out fully and completely in this Count.

119.    This is an action pursuant to FLA. STAT. §§ 772.103(1) and 895.01, *et seq.*, asserting a statutory right of action against Defendants ROBERT and MARIA for their conduct of, or participation in, an enterprise through a pattern of racketeering activity in violation of Chapters 772 and 895, Florida Statutes.

120.    Florida's RICO (Racketeer Influenced and Corrupt Organization) Act ("Florida RICO Statute") provides that it is unlawful for any person to "conspire … [to] receive[] any proceeds derived directly or indirectly from a pattern of criminal activity." The RICO Statute requires that such activity be conducted through an enterprise.

121.    Over a substantial period, ROBERT and MARIA have, with criminal intent, received proceeds derived, directly or indirectly, and have benefitted from a pattern of criminal activity (as defined in FLA. STAT. § 772.102(4)) and racketeering activity (as defined in FLA. STAT. § 895.02(4)), all in violation of FLA. STAT. §§ 772.103(1) and 895.01, *et seq.*

**Predicate Acts**

122.    "Pattern of criminal activity" is defined as:

> … [E]ngaging in at least two incidents of criminal activity that have the same or similar intents, results, accomplices, victims, or methods of commission or that otherwise are interrelated by distinguishing characteristics and are not isolated incidents; provided that the last of such incidents occurred within 5 years after a prior incident of criminal activity. For the purposes of this chapter, the term "pattern of criminal activity" shall not include two or more incidents of fraudulent conduct arising out of a single contract or transaction against one or more related persons.

FLA. STAT. § 772.102(4).

123.    The criminal activity alleged in this case was not the making of the Loan to PALM HOUSE, but the repeated acts of theft and wire fraud, 18 U.S.C. § 1343, and multiple acts of forgery (FLA. STAT. § 831.02) that commenced months *after* the making of the Loan, including multiple thefts and diversion of Loan Funds for the personal benefit of ROBERT and other Defendants.

124.    The predicate acts alleged herein are related in that they had the same or similar purposes, results, participants, victims, or methods of commission, or otherwise were interrelated by distinguishing characteristics and were not isolated events.

125.    The predicate acts alleged herein were executed in a continuous manner over an extended period of time and the activities engaged in by Defendants ROBERT and MARIA constituted their regular manner of doing business.

126.    "Criminal activity" is defined as activity which is chargeable as a crime under various Florida statutory provisions.   Included in this list are crimes for theft, fraudulent practices, and forgery. *See* FLA. STAT. § 772.102(1)(a).

127.    "Enterprise" is defined as a group of individuals and/or businesses. FLA. STAT. § 772.102(3).

128.    Defendants CAYMAN ALIBI, ALIBI US, NHC, NJL, BOTTICELLI, 160 ROYAL PALM, PHPB, the EVANS FIRM, and the group of individuals consisting of the individual Defendants named in this Complaint, constitute an "enterprise" under FLA. STAT. §§ 772.103(3) and 895.03(3).

129.    Illicit proceeds of the enterprise were invested in Florida and Connecticut real property previously identified in this Complaint and in the "enterprise" as that term is defined in the preceding paragraph. FLA. STAT. §§ 772.103(1) and (2) and 895.03(1) & (2).

130.    As set forth in greater detail above, ROBERT and MARIA knowingly conducted and/or participated, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of FLA. STAT. § 812.014 (which makes it a crime to knowingly obtain or use the property of another with intent to permanently deprive another person of a right to the property or a benefit from the property) by causing the

Loan Funds provided by Plaintiff and intended for the development of the Hotel Project to be diverted and used for their own personal benefit, and through a pattern of racketeering activity consisting of repeated acts of theft and wire fraud, 18 U.S.C. § 1343.[13]  *See* FLA. STAT. § 772.102(1)(b). All of such actions were undertaken by ROBERT and MARIA with felonious intent.

131. As set forth above, Defendant ROBERT controlled the operation and management of 160 ROYAL PALM.

132. In particular, after having knowingly converted Loan Funds received by 160 ROYAL PALM to their own control, ROBERT and MARIA used said unlawfully-gained proceeds to fund their lavish lifestyle, make payments to their lenders and to conceal their unlawful activity.

133. The foregoing conduct constitutes a violation of FLA. STAT. § 772.103(3), which makes it unlawful for any person "[e]mployed by, or associated with, any enterprise to conduct or participate, directly or indirectly, in such enterprise through a pattern of criminal activity."

---

[13] 18 U.S.C. § 1343 provides for criminal penalties against:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice .... .

Here, ROBERT and MARIA caused EVANS and/or his firm to transfer Loan Funds in manners illegally benefitting them and impairing the value of Plaintiff's loan with knowledge that such funds were required to be used for development of the Hotel Project. Either the interstate mails or interstate wire service (which includes the use of the Internet, telephone or facsimile) were used in the implementation of this fraudulent diversion of Loan Funds scheme. Because the transfer of money from either the Trust Account or Regions Bank for purposes unrelated to development of the Hotel Project were integral to the success of the overall scheme, these transactions were designed to promote the unlawful activity of wire fraud.

134.    ROBERT and MARIA participated in the operation and management, directly or indirectly, in such enterprise through a pattern of criminal activity and conspired or endeavored to violate the provisions of FLA. STAT. §§ 772.103(1), (2), (3) & (4) and 895.03(1) & (2).

135.    As a direct and proximate result of the above-described acts and violations of FLA. STAT. §§ 772.103 and 895.03, Plaintiff has suffered actual damages and injury to its business and property.

136.    Defendants, ROBERT and MARIA are liable to Plaintiff for treble damages, together with all costs of this action, plus reasonable attorneys' fees, and equitable relief, all as provided under Chapters 772.104 and 895, Florida Statutes.

137.    The total principal amount advanced under the loan was in excess of $36 million.

WHEREFORE, Plaintiff demands judgment against Defendants ROBERT and MARIA, both jointly and severally, for general damages; damages in the amount of three times the actual damages sustained by the Plaintiff; reasonable attorneys' fees and costs; and for such other and further relief, in law or in equity, as this Court deems just and proper under the circumstances.

### Count III - Florida RICO Conspiracy
### (Against All Defendants)

138.    Plaintiff hereby adopts and re-alleges Paragraphs 1 through 110 as if set out fully and completely in this Count.

139.    This is a cause of action pursuant to FLA. STAT. §§ 772.101, *et seq*.

140.    Defendants have violated FLA. STAT. § 772.103 and Plaintiff is entitled to civil remedies under FLA. STAT. § 772.104.

141.    Florida's RICO Statute provides that it is unlawful for any person to "conspire …

[to] receive[] any proceeds derived directly or indirectly from a pattern of criminal activity."

The RICO Statute requires that such conduct be conducted through an enterprise.

142.    "Pattern of criminal activity" is defined as:

… [E]ngaging in at least two incidents of criminal activity that have the same or similar intents, results, accomplices, victims, or methods of commission or that otherwise are interrelated by distinguishing characteristics and are not isolated incidents; provided that the last of such incidents occurred within 5 years after a prior incident of criminal activity.  For the purposes of this chapter, the term "pattern of criminal activity" shall not include two or more incidents of fraudulent conduct arising out of a single contract or transaction against one or more related persons.

FLA. STAT. § 772.102(4).

143.    "Criminal activity" is defined as activity which is chargeable as a crime under various Florida statutory provisions.   Included in this list are crimes for theft, fraudulent practices, and forgery. *See* FLA. STAT. § 772.102(1)(a).

144.    "Enterprise" is defined as a group of individuals and/or businesses. FLA. STAT. § 772.102(3).

145.    Defendants CAYMAN ALIBI, ALIBI US, NHC, NJL, BOTTICELLI, 160 ROYAL PALM, PHPB, the EVANS FIRM, and the group of individuals consisting of the individual Defendants named in this Complaint, constitute an enterprise under FLA. STAT. §§ 772.103(3) and 895.03(3).

146.    Illicit proceeds of the enterprise were invested in Florida and Connecticut real property previously referenced in this Complaint and the enterprise. FLA. STAT. §§ 772.103(1) & (2) and 895.03(1) & (2).

147.    The foregoing conduct constitutes a violation of Fla. Stat. § 772.103(3), which makes it unlawful for any person "employed by, or associated with, any enterprise to conduct or

participate, directly or indirectly, in such enterprise through a pattern of criminal activity." Defendants have also conducted, and have conspired to conduct, the affairs of Defendant 160 ROYAL PALM and the Trust Account established for Defendant ROBERT through a pattern of criminal activity in violation of FLA. STAT. § 772.103(3).

148.   The individual defendants, ROBERT, MARIA, LAUDANO, YU and EVANS, participated in the operation and management, directly or indirectly, in such enterprise through a pattern of criminal activity and conspired or endeavored to violate the provisions of FLA. STAT. §§ 772.103(1), (2), (3) & (4) and 895.03(1) & (2).

149.   Defendants each knew of, agreed to, and acted in furtherance of the common and overall objective of the conspiracy as specifically set forth above, and did conspire together to violate the provisions of Florida's RICO Statute, as their activities have amounted to fraud, theft, forgery and wire fraud or conspiracy to commit wire fraud.

150.   The foregoing conduct constitutes a violation of FLA. STAT. § 772.103(3), which makes it unlawful for any person "[e]mployed by, or associated with, any enterprise to conduct or participate, directly or indirectly, in such enterprise through a pattern of criminal activity." Defendants and their agents, associates and representatives, have conducted, and have conspired to conduct, the affairs of an enterprise through a pattern of criminal activity in violation of FLA. STAT. § 772.103(3).

151.   As a direct and proximate result of the above described acts and violations of FLA. STAT. §§ 772.103 and 895.03, Plaintiff has suffered actual damages and injury to its business and property.

152.    Defendants are liable to Plaintiff for treble damages, together with all costs of this action, plus reasonable attorneys' fees, and equitable relief, all as provided under FLA. STAT. 772.104 and 895.

153.    The total principal amount advanced under the loan before the discovery of the fraud was in excess of $36 million.

WHEREFORE, Plaintiff demands judgment against all Defendants and each of them for general damages; damages in the amount of three times the actual damages sustained by the Plaintiff; reasonable attorneys' fees and costs; and for such other and further relief, in law or in equity, as this Court deems just and proper under the circumstances.

### Count IV – Conspiracy to Convert Loan Funds
### (Against All Defendants)

154.    Plaintiff hereby adopts and re-alleges Paragraphs 1 through 110 as if fully and completely set forth herein.

155.    This is an action for conspiracy to convert the Loan Funds provided by Plaintiff.

156.    As set forth above, each of the Defendants converted or assisted in the conversion of the Loan Funds.

157.    As the Loan Funds were obtained by fraud based on the misrepresentations contained in the Loan Documents (as alleged in paragraphs 33 through 35 herein), the Funds remained the property of the Plaintiff.

158.    Each of the Defendants were parties to a civil conspiracy.

159.    Commencing sometime in 2013, ROBERT hatched a plan to convert the Loan Funds to his own benefit, and the benefit of his wife, MARIA.

160.    Commencing sometime in 2013, ROBERT entered into a conspiracy with each of the Defendants to achieve this objective.

161.    As the conspiracy pertains to Defendants, EVANS and the EVANS firm, in or about late 2013, ROBERT conspired with EVANS to wrongfully obtain access to Loan Funds received by the EVANS firm that were to be used for the purposes set forth in the Loan documents and have EVANS authorize and approve transfers out of the EVANS firm's trust account of millions of dollars for non-loan related purposes as detailed with particularity in paragraphs 72 and 73 above.

162.    Defendants EVANS and the EVANS firm at all relevant times had knowledge that the Loan Funds represented funds loaned by PHH to Palm House for the Hotel Project.

163.    In furtherance of the conspiracy, and to accomplish the objectives of the conspiracy, Defendants EVANS and the EVANS firm committed overt acts, among others, in furtherance of said conspiracy on December 27, 2013, January 9, 2014, and between March 4, 2014 and April 8, 2014 by approving or causing the transfers of Loan Funds from the EVANS FIRM's Trust Account (via either checks or wire transfers) for non-Loan related purposes, including without limitation: (a) the transfer of over $266,000 to pay ROBERTS' personal real estate taxes, (b) the transfer of over $12,000 to pay ROBERT's personal mortgage obligation, (c) the transfer of over $5.9 million to pay ROBERT's personal indebtedness to Deutsch Bank, and (d) the transfer of $845,000 to repurchase a home owned by Robert in Connecticut (*See* ¶ ¶ 67, 68,  70, 79, 80).  Numerous wire transfer requests were personally signed by EVANS who at all relevant times was the managing partner of the EVANS FIRM.

164. On information and belief, EVANS and/or the EVANS FIRM also used Loan Funds to pay themselves compensation or received compensation from ROBERT for their participation in the conspiracy.

165. In furtherance of the conspiracy, and to accomplish the objectives of the conspiracy, the remaining Defendants committed at least one overt act in furtherance of the conspiracy when they conspired to re-purchase ROBERT's Connecticut Home with Plaintiff's Loan Funds.

166. The remaining Defendants committed another overt act in furtherance of the conspiracy when they conspired to divert Loan Funds into Defendant PHPB, Defendant 160 ROYAL PALM, and Defendant BOTTICELLI for the purpose of purchasing the Yacht in the name of a company owned by MARIA.

167. Together, ROBERT, MARIA, YU, LAUDANO, CAYMAN ALIBI, ALIBI US, NHC, NJL, BOTTICELLI, 160 ROYAL PALM, PHPB, EVANS, and the EVANS FIRM conducted their activities as an enterprise, and used their business enterprises to wrongfully convert the Loan Funds.

168. Defendants' conspiracy and their respective overt acts caused Plaintiff to suffer damages.

169. At all relevant times, Defendants were aware of Plaintiff's loan agreement with PALM HOUSE and that such loan agreement restricted the use of the Loan Funds for the development of the Hotel Project as set forth in the Business Plan.

170. Defendants are joint tortfeasors causing indivisible injury, and are jointly and severally liable for the acts of each conspirator.

WHEREFORE, Plaintiff respectfully requests this Honorable Court to enter judgment for damages against the Defendants, pre- and post-judgment interest, and such other and further relief as this Court deems just and proper.

### Count V – Fraudulent Transfer under Fla. Stat. §§ 726.105(1)(b) and 726.108(a)-(c) (Against ROBERT, MARIA, NHC, BONAVENTURE, MIRABIA, CAYMAN ALIBI AND ALIBI US)

171.    Plaintiff hereby adopts and re-alleges Paragraphs 1 through 35 and 37 through 110 as if fully and completely stated herein.

172.    This is an action against Defendants, ROBERT, MARIA, NHC, BONAVENTURE, MIRABIA, CAYMAN ALIBI and ALIBI US to recover fraudulent transfers pursuant to FLA. STAT. §§ 726.105(1)(b) and 726.108(1)(a)-(c).

173.    By virtue of the Loan, Plaintiff was at all relevant times a creditor of PALM HOUSE with standing to assert a claim for relief under Chapter 726 of the Florida Statutes, the Florida Uniform Fraudulent Transfer Act ("FUFTA").

174.    The above-described transfers of funds to Defendants, constituted transfers of assets of the debtor, PALM HOUSE, to said Defendants:

    a.    within four years prior to the filing of this complaint;

    b.    without receiving a reasonably equivalent value in exchange for the transfer; and

    c.    where PALM HOUSE intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to repay or where PALM HOUSE was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.

175.    ROBERT and MARIA were the persons for whose benefit the transfers were made and, therefore, are personally liable for the value of such transfers made for their benefit under FLA. STAT. § 726.109(2).

176.   By reason of the foregoing, such transfers are avoidable under FLA. STAT. §§ 726.105(1)(b) and 726.108(a)-(c).

177.   Pursuant to FLA. STAT. § 726.108 (1)(b), PHH is also entitled to a constructive trust on the transferred assets (including the Sales Proceeds generated from the sale of the Yacht) until such time as Defendants return sufficient assets to PALM HOUSE and 160 ROYAL PALM so that the assets may be used to satisfy the amount owed to PHH under the Loan.

WHEREFORE, Plaintiff demands judgment against Defendants ROBERT, MARIA, NHC, MIRABIA, BONAVENTURE, CAYMAN ALIBI and ALIBI US finding that such transfers were fraudulent and avoiding such transfers pursuant to FLA. STAT. §§ 726.105(1)(b) and 726.108(a)-(c), including continuing the appointment of a receiver to take charge of the assets transferred (including, but not limited to, continuing to have the Receiver retain possession of the Sales Proceeds pending further order of the Court); granting an injunction enjoining 160 ROYAL PALM, PALM HOUSE and the foregoing Defendants from engaging in any further disposition of the Loan Funds fraudulently transferred; imposing a constructive trust on the assets transferred, including the Sales Proceeds, for damages; and granting such other relief as the Court deems just and proper.   Plaintiff further demands judgment against Defendants, ROBERT and MARIA, as authorized under FLA. STAT. § 726.109(2) as the persons for whose benefit the transfers were made.

### Count VI – Fraudulent Transfer under FLA. STAT. §§ 726.105(1)(a) and 726.108(a)-(c)
### (Against ROBERT, MARIA, NHC, CAYMAN ALIBI, ALIBI US, BONAVENTURE and MIRABIA)

178.   Plaintiff hereby adopts and re-alleges Paragraphs 1 through 35 and 37 through 110 as if fully and completely stated herein.

179.   This is an action to recover fraudulent transfers pursuant to FLA. STAT.

§§ 726.105(1)(a) and 726.108(a)-(c).

180. By virtue of the Loan, Plaintiff was at all relevant times a creditor of PALM HOUSE with standing to assert a claim for relief under Chapter 726 of the Florida Statutes, the Florida Uniform Fraudulent Transfer Act ("FUFTA").

181. The above-described transfers of funds to Defendants constituted transfers of assets of the debtor, PALM HOUSE, to said Defendants:

      a.    within four years prior to the filing of this complaint;

      b.    with actual intent to hinder, delay or defraud any creditors of PALM HOUSE and its wholly-owned subsidiary, 160 ROYAL PALM;

      c.    as to the transfers to ROBERT each transfer was to a *de facto* insider;

      d.    the transfer was of substantially all of PALM HOUSE's assets;

      e.    PALM HOUSE was insolvent or became insolvent shortly after the transfer was made;

      f.    occurred at a time when PALM HOUSE had been sued or threatened with suit; and

      g.    the transfer occurred shortly after a substantial debt was incurred.

182. ROBERT and MARIA were the persons for whose benefit the transfers were made and, therefore, are personally liable for the value of such transfers made for their benefit under FLA. STAT. § 726.109(2).

183. By reason of the foregoing, such are avoidable under FLA. STAT. §§ 726.105(1)(b) and 726.108(a)-(c).

184. Pursuant to FLA. STAT. § 726.108 (1)(b), PHH is also entitled to a constructive trust on the transferred assets (including the Sales Proceeds generated from the sale of the Yacht) until such time as Defendants return sufficient assets to PALM HOUSE and 160 ROYAL PALM so that the assets may be used to satisfy the amount owed to PHH under the Loan.

WHEREFORE, Plaintiff demands judgment against Defendants ROBERT, MARIA, CAYMAN ALIBI, ALIBI US, NHC, BONAVENTURE and MIRABIA finding that such transfers were fraudulent and avoiding such transfers pursuant to FLA. STAT. §§ 726.105(1)(a) and 726.108(a)-(c), including the appointment of a receiver to take charge of the assets transferred (including, but not limited to, continuing to have the Receiver retain possession of the Sales Proceeds pending further order of the Court); granting an injunction enjoining 160 ROYAL PALM, PALM HOUSE and the foregoing Defendants from engaging in any further disposition of the Loan Funds fraudulently transferred; imposing a constructive trust on the assets transferred, including the Sales Proceeds, for damages; and granting such other relief as the Court deems just and proper.  Plaintiff further demands judgment against Defendants, ROBERT and MARIA, as authorized under FLA. STAT. §726.109(2) as the persons for whose benefit the transfers were made.

### Count VII – Alter-Ego/Veil Piercing
### (Against ROBERT)

185.    Plaintiff hereby adopts and re-alleges Paragraphs 1 through 110 as if fully and completely stated herein.

186.    This is an action to pierce the corporate veil of PALM HOUSE.

187.    Gerry Matthews holds, in name only, a 99% member interest in PALM HOUSE. He is the brother of ROBERT.

188.    The real owner of the 99% member interest in PALM HOUSE is ROBERT. Gerry Matthews holds his 99% interest in name only and solely as a strawman for his brother pursuant to a written power of attorney.  ROBERT has used PALM HOUSE's assets for his own

personal benefit and has effectively controlled the bank accounts and other assets of PALM HOUSE and its subsidiary 160 ROYAL PALM.

189. ROBERT has claimed in his sworn answers to interrogatories in this case that he has an ownership interest in PALM HOUSE through his brother (who holds a 99% membership interest in PALM HOUSE) and pursuant to a power of attorney between him and his brother and verbal agreements.

190. By virtue of the foregoing, ROBERT stands in the shoes of his brother, Gerry Matthews (who holds the actual 99% membership interest for the benefit of ROBERT), and must be treated as a member of PALM HOUSE for purposes of this veil-piercing claim.

191. ROBERT is also the individual who directs and controls the activities of PALM HOUSE and 160 ROYAL PALM and who retained his personal attorneys, EVANS and the EVANS FIRM, to perform services for PALM HOUSE and/or its subsidiary 160 ROYAL PALM.

192. ROBERT dominated and controlled PALM HOUSE to such an extent that this limited liability company's independent existence was, in fact, non-existent. ROBERT was, in fact, the alter ego of PALM HOUSE and he used it as a device to perpetrate a fraud upon Plaintiff and other creditors.

193. Adherence to the fiction of the separate existence of PALM HOUSE as an entity distinct from ROBERT would permit an abuse of the corporate privilege and would sanction fraud and promote injustice.

194. PALM HOUSE has been a mere instrumentality of ROBERT's fraudulent scheme to convert Loan Funds for the benefit of himself and his wife, MARIA.

195.    PALM HOUSE was used fraudulently for the improper purpose of obtaining Loan Funds from Plaintiff so that such funds could be diverted to or for the benefit of ROBERT and his wife, MARIA, despite PALM HOUSE having represented in the Loan documents that such funds would be used for the sole purpose of development of the Hotel Project.

196.    The fraudulent or improper use of PALM HOUSE by ROBERT caused injury to the Plaintiff in that millions of dollars in monies loaned by Plaintiff to fund the development of the Hotel Project were used for ROBERT's personal benefit and PALM HOUSE has defaulted on its loan with Plaintiff and the value of the security for Plaintiff's mortgage (*i.e.* the land and improvements constituting the Hotel Project) has been substantially impaired.

WHEREFORE, Plaintiff respectfully requests that judgment be entered against Defendant ROBERT finding that the corporate veil of PALM HOUSE should be pierced; that ROBERT is the alter-ego of PALM HOUSE and should be held personally liable for PALM HOUSE's liabilities, including sums owed on its Promissory Note; and granting Plaintiff any and all other relief deemed equitable and just.

## Count VIII – Conversion
## (Against ROBERT)

197.    Plaintiff hereby adopts and re-alleges Paragraphs 1 through 110 as if fully and completely stated herein.

198.    This is an action for damages in excess of fifteen thousand dollars ($15,000.00) against Defendant ROBERT for common law conversion.

199.    Each transfer of funds from the trust account established by Defendant EVANS for his client ROBERT was authorized or directed by ROBERT.

200. Each transfer of funds into and out of the account at Regions Bank was authorized, directed by, or effected for the benefit of ROBERT.

201. As the Loan Funds were obtained by fraud, the Loan Funds remained the property of the Plaintiff.

202. The funds improperly transferred or used for the benefit of ROBERT were, at all relevant times, specifically identifiable funds loaned by Plaintiff for the specific purpose of development of the Hotel Project as set forth in the Business Plan.

203. By authorizing the transfers from the Trust Account and Regions Account, as described above, and misappropriating Loan Funds for his personal use and benefit, ROBERT wrongfully asserted dominion and control over Plaintiff's property.

204. ROBERT assumed and exercised the right of ownership over these earmarked funds without any authorization to do so and in derogation of the rights of Plaintiff and without legal justification. ROBERT has also assumed and exercised the right of ownership of certain personal property in which Plaintiff has a security interest (including computers) without legal justification.

205. ROBERT retains these funds and personal property unlawfully without consent of Plaintiff.

206. ROBERT has wrongfully converted these specific and readily-identifiable funds and used such funds for his own personal purposes.

207. As a result of ROBERT's conversion of these funds and other property, Plaintiff has been damaged.

WHEREFORE, Plaintiff demands judgment for damages against Defendant ROBERT, together with interest and costs.

## Count IX - Aiding and Abetting Conversion
## (Against Defendants EVANS and the EVANS FIRM)

208.    Plaintiff hereby adopts and re-alleges Paragraphs 1 through 110 as if fully and completely stated herein.

209.    This is an action for damages in excess of fifteen thousand dollars ($15,000.00) against Defendants EVANS and the EVANS FIRM (collectively the "EVANS Defendants") for aiding and abetting in ROBERT's conversion of a substantial portion of the Loan Funds provided by Plaintiff for the specific purpose of development of the Hotel Project.

210.    As alleged herein, ROBERT has wrongfully asserted dominion and control over the Loan Funds by misappropriating millions of dollars of same for his personal use and benefit and/or for the benefit of MARIA, causing financial injury and damage to the Plaintiff in a like amount.

211.    As the Loan Funds were obtained by fraud, the Loan Funds remained the property of the Plaintiff.

212.    As set forth above, EVANS was charged with maintaining the Loan funded by Plaintiff in his firm's trust account and overseeing disbursement of the Loan Funds to 160 ROYAL PALM for the sole purpose of development of the Hotel Project as set forth in the Business Plan.

213.    By accepting such responsibility, the EVANS Defendants owed a duty to Plaintiff to refrain from disbursing the Loan Funds for purposes inconsistent with the terms of the Loan.

214.    At all relevant times, the EVANS Defendants had knowledge that these specifically-identifiable Loan Funds were intended and required by the Loan Agreement to be used solely for foregoing purposes by 160 ROYAL PALM. Furthermore, as a matter of law, a

lawyer receiving funds from a third party and depositing the funds into his trust account has a duty to exercise reasonable diligence to determine for what purpose that third party had provided the funds, before disbursing the funds. *The Florida Bar v. Marrero*, 157 So. 3d 1020, 1026 (Fla. 2015), *reh'g denied* (Feb. 18, 2015).

215.   The EVANS Defendants provided substantial assistance to ROBERT in converting Loan Funds to his personal use and benefit by establishing a Trust Account in ROBERT's name instead of the name of 160 ROYAL PALM, the owner of the property for whose benefit the Loan Funds were disbursed and a client of the EVANS Defendants, by allowing Loan Funds to be deposited into such Trust Account, and by authorizing the disbursement of such Loan Funds for the personal benefit of ROBERT, all to the financial detriment of the Plaintiff.

216.   On information and belief, EVANS further provided substantial assistance to ROBERT's misappropriation of property by forging Black's signature on various documents and/or signing Black's name under an expired Power of Attorney as alleged herein.

217.   As a direct and proximate result of the EVANS Defendants' aiding and abetting ROBERT in his conversion of the Loan Funds, Plaintiff has been damaged.

218.   By virtue of the foregoing, the EVANS Defendants are liable for all damages actually and proximately caused to Plaintiff through the conversion of Loan Funds undertaken by ROBERT through the use of the Trust Account.

WHEREFORE, Plaintiff demands judgment for damages against Defendants EVANS and the EVANS FIRM, both jointly and severally, together with interest and costs.

## Count X - Unjust Enrichment
## (Against ROBERT, MARIA, CAYMAN ALIBI, LAUDANO, BONAVENTURE and NHC)

219. Plaintiff hereby adopts and re-alleges Paragraphs 1 through 110 as if fully and completely stated herein.

220. This is an action for damages in excess of fifteen thousand dollars ($15,000.00) against Defendants ROBERT, MARIA, CAYMAN ALIBI, LAUDANO, BONAVENTURE and NHC (collectively referred to as the "MATTHEWS Defendants") for unjust enrichment.

221. Defendant ROBERT has retained millions of dollars of the fraudulently obtained Loan Funds.

222. As the Loan Funds were obtained by fraud, the Loan Funds remained the property of the Plaintiff.

223. Defendants CAYMAN ALIBI and MARIA have retained a Yacht (and now claim ownership of the proceeds from the subsequent sale of said Yacht) that was purchased in substantial part with over $2 million in Loan Funds, without Plaintiff's knowledge or consent, and titled in the name of CAYMAN ALIBI, of which MARIA is the sole member and managing member.

224. Defendants, NHC and LAUDANO have retained certain excess payments made to them from the foregoing funds (far in excess of the value of any construction services they may have provided in connection with NHC purporting to act as the general contractor for the Hotel Project) in an amount to be determined through discovery.

225. Plaintiff has unwittingly conferred a benefit on the MATTHEWS Defendants in that its monies (the Loan Funds) were knowingly and willingly accepted or used by Defendants to obtain property.

226. The MATTHEWS Defendants had knowledge of the benefits unwittingly conferred upon them by Plaintiff.

227. Under the circumstances, it would be inequitable for the MATTHEWS Defendants to retain such benefits without paying the value thereof to Plaintiff.

WHEREFORE, Plaintiff demands judgment for damages against Defendants ROBERT, MARIA, CAYMAN ALIBI, LAUDANO, BONAVENTURE and NHC, jointly and severally, together with interest and costs.

### Count XI– Civil Theft
### (Against MARIA and LAUDANO)

228. Plaintiff hereby adopts and re-alleges Paragraphs 1 through 110 as if fully and completely stated herein.

229. This is an action for damages in excess of fifteen thousand dollars ($15,000.00) against Defendants MARIA and LAUDANO.

230. This is an action for civil theft pursuant to Fla. Stat. § 772.11 against Defendants MARIA and LAUDANO.

231. Defendants MARIA and LAUDANO, with felonious intent, did knowingly obtain or use, or endeavored to obtain or use, Loan Funds earmarked for the development of the Hotel Project which they unlawfully caused to be diverted for their own personal benefit and/or for the use of persons not entitled to the use of such funds, and they did deprive Plaintiff of a right to such property or a benefit from such property.

232. Defendants MARIA and LAUDANO violated the provisions of FLA. STAT. § 812.014(1) ("Theft"), by virtue of their acts as enumerated herein.

233.     Defendants MARIA and LAUDANO's theft of property was committed with felonious intent.

234.     Plaintiff has satisfied the requirement in FLA. STAT. § 772.11 for pre-suit demand. A true and correct copy of the civil theft letters sent to Defendant MARIA via hand-delivery and to Defendant, LAUDANO by Certified Mail, return receipt requested, and copies of the delivery confirmation and Return of Service are attached hereto as Composite "Exhibit N."

235.     Plaintiff has been injured by the criminal theft committed by Defendants MARIA and LAUDANO.

236.     Plaintiff is entitled to an award of attorneys' fees and costs incurred in bringing this action, pursuant to FLA. STAT. § 772.11.

237.     Plaintiff also is entitled to a treble damages award pursuant to FLA. STAT. § 772.11.

WHEREFORE, Plaintiff demands judgment against Defendants MARIA and LAUDANO awarding: (a) general and compensatory damages; (b) treble damages pursuant to FLA. STAT. § 772.11; and (c) costs and reasonable attorneys' fees; along with such other relief the Court deems just and proper.

**Demand for Jury Trial**

Plaintiff hereby demands trial by jury on all issues triable as a matter of right.

Dated: May 24, 2017

WEISS, HANDLER & CORNWELL, PA
*Attorneys for Plaintiff*
One Boca Place, Suite 218-A
2255 Glades Road
Boca Raton, FL 33431
Telephone: (561) 997-9995
Facsimile: (561) 997-5280


By:_____
HENRY B. HANDLER
Florida Bar No. 259284
hbh@whcfla.com
jn@whcfla.com
filings@whcfla.com
DAVID K. FRIEDMAN
Florida Bar No. 307378
dkf@whcfla.com
jh@whcfla.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished in compliance with Rule 2.516, Florida Rules of Judicial Administration, via X eService Portal to Rachel Studley, Esq. Attorneys for Defendants Leslie Robert Evans and Leslie Robert Evans & Associates, P.A., 515 N Flagler Drive, Suite 1600, West Palm Beach, FL 33401 at wpbcrtpleadings@wickersmith.com; Christopher W. Kammerer, Esq. and John F. Mariani, Esq. of Kammerer Mariani, PLLC, Attorneys for Matthews Defendants, 1601 Forum Place, Suite 500, West Palm Beach, FL 33401, at ckammerer@kammerermariani.com and jmariani@kammerermariani.com; Gregg J. Glickstein, Esq., Attorney for Receiver Cary Glickstein, 54 S Boca Raton Boulevard, Boca Raton, FL 33432 at ghgpa@bellsouth.net; Jeffrey A. Backman, Esq. and Rachel E. Walker, Esq. of Greenspoon, Marder P.A., Attorney for Nicholas J. Laudano, New Haven Contracting South, Inc. and NJL Development, 200 East Broward Blvd., Suite 1800, Ft. Lauderdale, Florida, 33301, at Jeffrey.Backman@gmlaw.com and Rachel.Walker@gmlaw.com with copy to Khia.Joseph@gmlaw.com and Gerard Joseph Curley, Jr., Esq., Keith E. Sonderling, Esq. and Devin Sean Radkay, Esq., of Gunster, Yoakley & Stewart, P.A., Attorneys for Intervenors, 777 South Flagler Dr., Suite 500 East, West Palm Beach, FL 33401-6194 at jcurley@gunster.com; ksonderling@gunster.com; cstgeorge@gunster.com, and dradkay@gunster.com; with copies to mjadotte@gunster.com; tboske@gunster.com; crossodivita@gunster.com, on this 25ᵗʰ day of May, 2017.

WEISS, HANDLER & CORNWELL, PA
*Attorneys for Plaintiff*
One Boca Place, Suite 218-A
2255 Glades Road
Boca Raton, FL 33431
Telephone: (561) 997-9995
Facsimile: (561) 997-5280

By:_____
HENRY B. HANDLER
Florida Bar No. 259284
hbh@whcfla.com
jn@whcfla.com
filings@whcfla.com
DAVID K. FRIEDMAN
Florida Bar No. 307378
dkf@whcfla.com
jh@whcfla.com



# LOAN DOCUMENTS

Palm House, LLC
214 Brazilian Ave., Suite 200
Palm Beach, FL  33480
(561) 832-8288

Dear Sirs,

We are pleased to inform you that Palm House Hotel, LLLP ("Lender") has approved your loan request. The loan ("Loan") is being made to Palm House, LLC, a Delaware limited liability company of 214 Brazilian Ave., Suite 200, Palm Beach, FL 33480 ("Borrower") to assist in the establishment of its commercial for-profit business within the Regional Center Territory (defined below) pursuant to the U.S. EB-5 Immigrant Investor Program ("Program").

The Borrower understands that the making of the Loan described herein is dependent upon the successful offering of Units of limited partnership interests by the Lender pursuant to the Program, including approval by the United States Citizenship and Immigration Services ("USCIS") of Alien Entrepreneur Petitions (I-526) pursuant to Section 203(b)(5) of the Immigration and Nationality Act, as amended. Lender agrees to make a Loan, subject to such conditions, and on the following terms and conditions:

Regional Center Territory:   Palm Beach County, Florida, USA.

Borrower:                          Palm House, LLC, a Delaware limited liability company of 214 Brazilian Ave., Suite 200, Palm Beach, FL 33480.

**EXHIBIT B**

| | |
|---|---|
| **Principal Loan Amount:** | Minimum Loan Amount of $500,000<br>Maximum Loan Amount of $39,500,000 |
| **Closing and First Advance:** | The Loan shall be closed ("Closing Date") upon the date that the Minimum Loan Amount is available for advance (also referred to herein as the "First Advance"). |
| **Term:** | 5 years from the First Advance ("Maturity"). |
| **Interest Rate:** | Four and 22/100ths percent (4.22%) per annum. Interest shall be computed on the basis of a 365 day year and actual days elapsed. Upon default or after judgment has been rendered on this Note, the unpaid principal of all Advances shall bear interest at a rate which is two (2%) percent per annum greater than that which would otherwise be applicable. |
| **Payment:** | The balance of all Advances and all accrued unpaid interest thereon shall be repaid as follows: |

(1)     Borrower shall make interest only payments monthly on the balance of all Advances until the expiration of five years from the First Advance;

(2)     Upon Maturity, Borrower shall pay the then outstanding balance of all Advances and all accrued unpaid interest thereon.

(3)     Borrower shall make commercially reasonable efforts to repay the outstanding principal balance of all Advances and all accrued unpaid interest thereon upon Maturity (the "Initial Term"). If Borrower cannot refinance such amounts on commercially reasonable terms, or at all, within 30 days of the expiration of the Initial Term, or any Extension Period (as defined below), Borrower may, upon written notice to Lender, and in its sole discretion, extend the Maturity date for an additional one year period (each an "Extension Period"). During each Extension Period, Borrower shall make principal and interest payments on the outstanding principal balance of all Advances and all accrued unpaid interest thereon then outstanding. Principal and interest payments shall be calculated by amortizing the balance of all Advances and all accrued unpaid interest thereon over 15 years at the Interest Rate set forth above.

(4)     Borrower's obligation to make commercially reasonable efforts to repay the outstanding principal balance of all Advances and all accrued unpaid interest thereon after Maturity shall

continue thereafter until the balance of the Loan and all unpaid interest thereon is repaid in full.

Estimated Use of Proceeds: The proceeds of this Loan will be used for Palm House, LLC to develop the Project (described in the accompanying Business Plan), in Florida.

Pre-payment: The Borrower may not, without Lender's prior express written consent, prepay this Note prior to Maturity. Thereafter, Borrower may prepay this Note, in whole or in part, at any time, without penalty or premium, and without prior written consent of Lender.

Collateral: The Borrower shall execute in favor of the Lender a Loan and Security Agreement and Promissory Note (altogether the "Loan Documents") and provide Lender with a security interest in all assets of the Borrower as security for the satisfaction of the Loan (collectively, the "Collateral").

Loan Advance: The Loan shall be advanced to the Borrower from time to time as it becomes available to Lender and in accordance with the requirements of the Project (each an "Advance"). It shall be a condition of each advance that as of such time there shall not have been a material adverse change from the date of this commitment in the operations, assets or financial condition of the Borrower or its affiliates (considered as a whole).

Job Requirement: The Borrower must create and maintain a minimum of ten (10) new full-time direct and/or indirect jobs per EB-5 investor through the end of two and one half (2.5) years from the date of the latest Advance.

The total number of direct jobs will be supplied by the Borrower. The Borrower shall provide at six (6) month intervals the most recent quarterly DE-34 Employment Reports and Form I-9 Employment Eligibility Verification forms for each new employee reported. Using the direct jobs number, as verified by these documents, the total number of indirect jobs shall be calculated using the appropriate economic model (IMPLAN or RIMS II) and resulting employment multiplier, which demonstrates that for each direct job created, additional indirect jobs are created. Reference to Borrower's Economic Analysis shall confirm indirect employment creation.

Remedies: If the Borrower shall fail to repay the Loan in accordance with the terms of the Loan Agreement, Lender shall have the right, at its

sole option, to declare the Loan in default and exercise remedies under the Loan Documents, including, but not limited to, foreclosure.

Reporting:

The Borrower shall provide to Lender semi-annual unaudited statements in connection with the operations of the Borrower, no later than 30 days after the end of each semi-annual period and shall provide unaudited, accountant reviewed financial statements no later than 120 days after the Borrower's fiscal year-end. The Borrower shall provide at six (6) month intervals the most recent quarterly DE-34 Employment Reports and Form I-9 Employment Eligibility Verification forms for each new employee reported.

Satisfaction of Conditions:

The Borrower shall be obligated to draw down the Loan and shall use all reasonable best efforts to satisfy the conditions of advance thereof.

Documentation:

The Note, the documentation of the Collateral and such other documents as the Lender may require shall be in form satisfactory to the Lender and supported by such legal opinions as the Lender may require.

All of Lender's reasonable costs of preparing, reviewing and recording such documents shall be to the Borrower's account.

**[SIGNATURE PAGE FOLLOWS]**

**Palm House Hotel, LLLP**
By South Atlantic Regional Center, LLC, its General Partner

By: _____       Dated: _____ / / 2/ _____ , 20 /3
       Joseph J. Walsh
       Managing Member

ACCEPTED
**Palm House, LLC**

By: _____       Dated: 1 / 20 / _____ , 20 1 3
Name: _____ Ryan Black _____
Title: _____ Managing Member _____
                 New York

STATE OF FLORIDA:
                      New York
COUNTY OF PALM BEACH:

On this, the 21st day of January _____ , 20 13 before me, the undersigned officer, personally appeared Ryan Black _____ who acknowledged himself to be the President of Palm House, LLC, a Delaware limited liability company of 214 Brazilian Ave., Suite 200, Palm Beach, FL 33480, and that he as President, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of the company by himself as President. IN WITNESS WHEREOF, I have hereunto set my hand and notarial seal.

Sylvia Bloomfield

SYLVIA BLOOMFIELD
Notary Public, State of New York
No. 01BL6060027
Qualified in Queens County
Certificate filed in New York County
Commission Expires June 11, 20 15

Notary Public
My Commission Expires: June 11, 2015

# LOAN AND SECURITY AGREEMENT

LOAN AND SECURITY AGREEMENT dated as of _____ , 20___ between **Palm House Hotel, LLLP** (the "Lender") a Florida limited partnership of 197 S. Federal Highway, Suite 200, Boca Raton, FL 33432, and **Palm House, LLC** (the "Borrower") a Delaware limited liability company of 214 Brazilian Ave., Suite 200, Palm Beach, FL 33480. In order to induce the Lender to advance money or grant other financial accommodations on one or more occasions to the undersigned Borrower, the undersigned Borrower represents, warrants, covenants to and agrees with the Lender as follows:

**1. Definitions.** For purposes of this Agreement, unless the context clearly requires otherwise, in addition to the terms defined elsewhere herein, the following terms shall have the meanings set forth below:

*Advances* means the Borrower's Advances with the Lender referred to in Section 2.1 infra.

*Affiliate* means any person and/or entity, which directly or indirectly controls, or is controlled by, or is under common control, with the Borrower.

*Agreement* means this Loan and Security Agreement.

*Bank* means any other financial institution and/or third party providing credit or account services to Borrower in connection with the property.

*Collateral* means the Collateral described in Section 3, infra.

*Collateral Account* means the account of Borrower with the Lender established under Section 8.2 (c) infra.

*Control* shall be deemed to exist if any person, entity or corporation, or combination thereof, shall have possession, directly and/or indirectly, of the power to direct the management and/or policies of the Borrower or any person, entity, or corporation deemed to be an Affiliate of the Borrower, and shall be deemed to include any holder of 50 % or more of any stock or other interest in the Borrower or in any person, entity or corporation deemed to be an Affiliate of the Borrower, whether such holding is direct or indirect.

*Deposit* means any deposits, credits, securities, interests, participations, shares, collateral or property of the Borrower at any time now or thereafter in the possession, custody, safekeeping or control of or in transit to the Bank, or any other holder for the purpose of securing Inventory financing of Borrower, and the proceeds thereof.

*Deposit Accounts* means all deposit accounts maintained by the Borrower with the Bank for the purpose of financing renovation, expansion, furniture and fixtures of Borrower, and the proceeds thereof.

*Events of Default* shall have the meaning given such term in Section 8 of this Agreement infra.

*Indebtedness* means the total of all obligations of the Borrower to the Lender, whether current or long-term, including without limitation, guaranties, endorsements, or other arrangements whereby responsibility is assumed for the obligations of others.

*Inventory* means all inventory, including, without limitation, all inventory in the possession of others or in transit, all goods held for sale or lease or to be furnished under contracts for service or which have been so furnished, and completed and unshipped merchandise, and all products and proceeds (including insurance and condemnation proceeds) of the foregoing, as defined by the Uniform Commercial Code of the State of Florida, whether presently owned or hereafter acquired.

*Legal Requirements* means all applicable present and future statutes, laws, ordinances, rules and/or regulations of any governmental authority, all orders, writs, injunctions, decrees and judicial decisions and all covenants which bind or materially affect the Borrower or any part of its assets.

*Loan Account* means the accounting as to the Loans issued by the Lender pursuant to Section 2.2 infra.

*Loan Documents* means the following documents collectively: (i) This Agreement; (ii) Each Promissory Note of the Borrower to the Lender, including the Note (collectively the "Notes") evidencing the indebtedness for the Loan; (iii) All other documents and instruments heretofore or hereafter executed by the Borrower in favor of the Lender relating to the Loans, including any guaranty, pledge, security and/or subordination agreement and related Uniform Commercial Code financing statements; and (iv) In each case, the term "Loan Documents" and any reference herein to any particular Loan Document shall mean and include all amendments, modifications, replacements, renewals or extensions of any and all such documents, whenever executed.

*Loans* means: (i) Advances evidenced by the Note; and (ii) Any other loans made by the Lender to the Borrower after the date of this Agreement.

*Note* means the Borrower's Promissory Note evidencing indebtedness for Advances.

*Obligations* means all liabilities, duties and/or obligations now or hereafter owing from the Borrower to the Lender of whatever kind or nature, whether or not currently contemplated at the time of this Agreement, whether such obligations be direct or indirect, absolute or contingent or due or to become due, including all obligations of the Borrower, actual or contingent, in respect to the letters of credit or Lender's acceptances issued by the Lender for the account of, or guaranteed by, the Borrower, including, without limitation all obligations of any partnership or joint venture as to which the Borrower is or may become, liable, which term shall include all accrued interest and/or all costs and expenses, including reasonable attorneys' fees, costs and expenses relating to the appraisal and/or valuation of assets and all reasonable costs and expenses incurred or paid by the Lender in exercising, preserving, defending, collecting, enforcing or protecting any of its rights under the Obligations or in any litigation arising out of the transactions evidenced by the Obligations.

*Required Permits* means all permits, licenses, approvals, consents and waivers necessary pursuant to any Legal Requirement to be obtained from, or made by, any governmental authority for the ownership by the Borrower of its assets or for the conduct of its business.

*Termination Date* shall have the meaning set forth in Section 2.1 infra.

## 2. Loans.

### 2.1 Advances.

(a)   Pursuant to this Agreement, and upon satisfaction of the conditions precedent in Section 5 hereof, during the period from the date hereof until the fifth anniversary of the date of the last Advance hereunder (as such date may be extended in writing from time to time, in the Lender's sole and absolute discretion, the "Termination Date"), the Lender shall make advances and the Borrower may borrow under this Agreement; provided, however, that the aggregate amount of all Advances at any one time outstanding shall not exceed $39,500,000 USD.

(b)   All Advances under this Agreement shall be evidenced by the Note, shall bear interest and shall be due and payable in full on the Termination Date.

### 2.2   Loan Account.

(a)   The Lender shall maintain an accounting (the "Loan Account") on its books to record: (i) all Loans; (ii) all payments made by the Borrower; and (iii) all other appropriate debits and credits as provided in this Agreement with respect to the Obligations. All entries in the Loan Account shall be made in accordance with the Lender's customary accounting practices as in effect from time to time. Borrower irrevocably waives the right to direct the application of any and all payments at any time or times thereafter received by the Lender from or on behalf of Borrower, and the Borrower hereby irrevocably agrees that the Lender shall have the continuing exclusive right to apply and to reapply any and all payments received at any time or times after the occurrence and during the continuance of an Event of Default against the Obligations in such manner as the Lender may deem advisable.

(b)   The balance in the Loan Account, as set forth on the Lender's most recent printout or other written statement, shall be presumptive evidence of the amounts due and owing to the Lender by Borrower; provided, however, that any failure to so record or any error in so recording shall not affect the payment of the Obligations. Any periodic statement prepared by the Lender setting forth the principal balance of the Loan Account and the calculation of interest due thereon shall be subject to subsequent adjustment by the Lender but shall, absent manifest errors or omissions, be presumed final, conclusive and binding upon the Borrower, and shall constitute an account stated unless within thirty (30) days after receipt of such statement, the Borrower shall deliver to the Lender its written objection thereto specifying the error or errors, if any, contained in such statement. In the absence of a written objection delivered to the Lender as set forth above, the Lender's statement of the Loan Account shall be presumptive evidence against the Borrower of the amount of the Obligations and the burden of proof to show manifest errors or omissions shall be on the Borrower.

**3.  Grant of Security Interest; Obligations Secured.** The Borrower hereby grants to the Lender a subordinated security interest in all of the Borrower's present and future right, title and interest in real property, furniture and fixtures, inventory, deposit accounts and reserve bank accounts, lease reserve accounts wherever located and whether now existing or hereafter created or arising collectively called the "Collateral." Lender's security interest in the Collateral shall be subordinated only to the security interest therein of the Bank. The security interest in the Collateral granted herein is to secure the payment and performance of the Obligations. Lender is hereby authorized by Borrower to file any and all documents with the appropriate authorities as necessary to authenticate and/or perfect the security interests granted herein.

**4.  Representations and Warranties.** The Borrower hereby represents and warrants to the Lender (which representations and warranties will survive the delivery of this Agreement and the making of any advances of any Loan and shall be deemed to be continuing until all Loans are fully paid and this Agreement is terminated) that:

(a)  (i) The Borrower is, and will continue to be, duly organized and validly existing; the Borrower is in good standing under the laws of the State of Florida; (ii) the Borrower is qualified and in good standing to do business in all other jurisdictions in which the property owned, leased or operated by it or the nature of the business conducted by it makes such qualification necessary; (iii) the Borrower has the power to execute and deliver this Agreement and each Loan Document and to borrow hereunder; and (iv) the Borrower has all Required Permits, without unusual restrictions or limitations, to own, operate and lease its properties and to conduct the business in which it is presently engaged, all of which are in full force and effect.

(b)  The making and performance by the Borrower of this Agreement and the Loan Documents have been authorized by all necessary corporate action by its Board of Directors. The execution and delivery of this Agreement and the other Loan Documents, the consummation of the transactions herein and therein contemplated, the fulfillment of or compliance with the terms and provisions hereof and thereof, (i) are within its powers, (ii) will not violate any provision of law or of its organizational documents, or (iii) will not result in the breach of, or constitute a default under, or result in the creation of any lien, charge or encumbrance upon any property or assets of the Borrower pursuant to any indenture or Lender loan or credit agreement (other than pursuant to this Agreement and the other Loan Documents) or other agreement or instrument to which the Borrower is a party. To the Borrower's knowledge, no approval, authorization, consent or other order or registration or filing with any governmental body is required in connection with the making and performance of this Agreement.

(c)  Subject to any limitations stated therein or in connection therewith, all information furnished, or to be furnished, by the Borrower pursuant to the terms hereof is, or will be at the time the same is furnished, accurate and complete in all material respects necessary to make the information furnished, in the light of the circumstances under which such information is furnished, not misleading.

(d)  The Borrower is in material compliance with all Legal Requirements applicable to it, its property or the conduct of its business, including, without limitation, those pertaining to or concerning the employment of labor, employee benefits, public health, safety and the environment.

(e)  No proceedings by or before any private, public or governmental body, agency or authority and no litigation is pending, or, so far as is known to the Borrower, its officers or directors, or threatened against the Borrower, except such as are disclosed in any addendums attached hereto.

(f)  No Event of Default has occurred and no event has occurred, or is continuing, which, pursuant to the provisions of Section 8, with the lapse of time and/or the giving of a notice specified therein, would constitute such an Event of Default.

(g)  The Borrower shall use the proceeds of each Advance hereunder for purposes set forth in its business plan, including general commercial purposes related to job creation, purchase of the building, and furniture, fixtures, and equipment, provided that no part of such proceeds will be used, in whole or in part, for the purpose of purchasing or carrying any "margin stock" as such term is defined in Regulation U of the Board of Governors of the Federal Reserve System.

(h)  This Agreement and all other Loan Documents, upon the execution and delivery thereof, will be legal, valid, binding and enforceable obligations of the Borrower as the case may be, in accordance with the terms of each; provided, however, that the Borrower's representation as to enforceability is qualified to the extent that enforcement of the rights and remedies created by this Agreement and the Loan Documents may be subject to applicable bankruptcy, insolvency, reorganization or similar laws affecting the rights of creditors and secured parties generally, and does not apply with respect to the availability of the remedy of specific performance, injunctive relief or any other equitable remedy.

(i)  The Borrower has good and marketable title to its properties and assets, including all of the Collateral, subject to no mortgage, pledge, lien, security interest, encumbrance or other charge which is not set forth in any addendums attached hereto.

(j)  The Borrower has filed all tax returns and reports required to be filed by it with all federal, state or local authorities and has paid in full, or made adequate provision for the payment of, all taxes, interest, penalties, assessments or deficiencies shown to be due or claimed to be due on or in respect of such tax returns and reports.

(k)  The Borrower conducts its business solely in its own name without the use of a trade name or the intervention of, or through, any other entity of any kind, other than as disclosed on any addendums attached hereto. All books and records relating to the assets of the Borrower are located at the Borrower's chief executive office and its other places and locations where its assets are located.

(l)  The Borrower and any of the Borrower's tenants have not given, nor have they received, any notice that: (i) there has been a release, or there is a threat of release, of toxic substances, oil or hazardous wastes on or from any real property owned or operated by the Borrower; (ii) the Borrower or any tenants may be, or is, liable for the costs of cleaning up or responding to a release of any toxic substances, oil or hazardous wastes; or (iii) any of such real property is subject to a lien for any liability arising from costs incurred in response to a release of toxic substances, oil or hazardous wastes.

**5.   Conditions Precedent.**

**5.1   Conditions to Initial Advance.** In addition to any other conditions contained in this Agreement, the initial advance shall be subject to the following conditions precedent:

(a)   *Proof of Action.* The Lender shall have received such documents evidencing the Borrower's power to execute and deliver this Agreement and the other Loan Documents as the Lender or its counsel shall request.

(b)   *The Notes and Loan Documents.* The Borrower shall have delivered to the Lender the Notes, this Agreement, the other Loan Documents and such other documents as the Lender may request.

(c)   *Liens to be Discharged.* The Lender shall be satisfied with arrangements made to pay, discharge and terminate debt owed, and security interests granted by, the Borrower to non-permitted debt and security interest holders.

**5.2   Conditions to Every Advance.** In addition to all other conditions contained in this Agreement, every advance shall be subject to the following conditions precedent that:

(a)   *No Event of Default.* No Event of Default has occurred and no event shall have occurred, or be continuing, which, pursuant to the provisions of Section 8, with the lapse of time and/or the giving of a notice as specified therein, would constitute an Event of Default.

(b)   *No Material Adverse Change.* There shall have been no material adverse change (as determined by the Lender) in the assets, liabilities, financial condition or business of the Borrower since the date of any financial statements delivered to the Lender before or after the date of this Agreement.

(c)   *Representations and Warranties.* That the representations and warranties contained in Section 4 hereof and in each other Loan Document shall be true and correct in all material respects. Any request for a borrowing shall be deemed a certification by the Borrower as to the truth and accuracy in all material respects of the representations and warranties contained in Section 4 infra and in each other Loan Document as of the date of such request.

**6.   Affirmative Covenants.** The Borrower covenants and agrees that from the date hereof until payment in full of all Loans and the performance of all Borrower's obligations hereunder, and under all other Loan Documents, is complete and this Agreement shall have terminated, unless the Lender otherwise consents in writing, the Borrower shall:

(a)   Comply with all terms and conditions of this Agreement and the other Loan Documents and pay all material debts of the Borrower before the same shall become delinquent.

(b)   The Borrower shall deliver to the Lender: (i) within 30 days after the close of each fiscal year, a balance sheet of the Borrower as of the close of each fiscal year and statements of income and retained earnings for that portion of the fiscal year-to-date then ended, prepared in conformity with GAAP; (ii)(1) within 90 days after the close of each fiscal year of the Borrower, in accountant-prepared draft form, and (2) within 30 days of completion, in final, unaudited

accountant reviewed form, financial statements ("Financial Statements"), including, a balance sheet as of the close of such year and statements of income and retained earnings and cash flows for the year then ended, prepared in conformity with GAAP, applied on a basis consistent with that of the preceding year or containing disclosure of the effect on financial position or results of operations of any change in the application of accounting principles during the year; (iii) the other financial reports, if any, delivered to the owners of the Borrower, and upon request, such other information about the financial condition, business and operations of the Borrower, as the Lender may from time to time, reasonably request; and (iv) promptly upon becoming aware of any Event of Default, or any event which with the giving of notice or the passage of time would constitute an Event of Default, notice thereof, in writing. The Lender may modify or waive the performance of this section (b) in its sole discretion.

(c)  (i) Keep its properties insured against fire and other hazards (so called "All Risk" coverage) in amounts and with companies satisfactory to the Lender to the same extent and covering such risks as is customary in the same or a similar business, but in no event in an amount less than the full insurable value thereof, which policies shall name the Lender as additional insured as its interest may appear, (ii) maintain public liability coverage against claims for personal injuries or death, and (iii) maintain all worker's compensation, employment or similar insurance as may be required by applicable law. Such All Risk property insurance coverage shall provide for a minimum of 30 days' written notice to the Lender of cancellation or modification. The Borrower agrees to deliver copies of all of the aforesaid insurance policies to the Lender. In the event of any loss or damage to any of its assets, including any collateral securing any Loan, the Borrower shall give prompt written notice to the Lender and to Borrower's insurers of such loss or damage and shall promptly file proofs of loss with said insurers.

(d)  Comply with all Legal Requirements, including without limitation, those pertaining to or concerning the employment of labor, employee benefits, public health, safety and the environment. The Borrower shall pay all taxes, assessments, governmental charges or levies, or claims for labor, supplies, rent and other obligations made against the Borrower or any of its properties which, if unpaid, might become a lien or charge against it or any of its properties, except liabilities being contested in good faith with the prior written consent of the Lender and against which, if requested by the Lender, the Borrower shall maintain reserves in amount and in form (book, cash, bond or otherwise) satisfactory to the Lender.

(e)  Maintain its chief executive office, principal places of business and locations of assets at the locations set forth in this Agreement. The Borrower shall promptly give the Lender written notice of any change in any of such addresses. All business records of the Borrower, including those pertaining to all Collateral, shall be kept at the said chief executive office of the Borrower, unless prior written consent of the Lender is obtained to a change of location.

(f)  Allow the Lender, by or through any of its officers, agents, attorneys, or accountants designated by it, for the purpose of ascertaining whether or not each and every provision hereof and of any other Loan Document is being performed and for the purpose of examining and appraising the assets of the Borrower and the records relating thereto, to enter the offices of the Borrower to examine or inspect any of the properties, books and records or extracts therefrom and to make copies thereof and to discuss the affairs, finances and accounts thereof with the

Borrower and its accountants, at such reasonable times with advance notice to Borrower and as often as the Lender may reasonably determine. The Borrower will reimburse the Lender for all costs associated with its examination, appraisals and audits.

(g)  Promptly advise the Lender of the commencement, or threat of litigation, including arbitration proceedings and any proceedings before any governmental agency, which might have a material adverse effect upon the assets, liabilities, financial condition or business of the Borrower.

(h)  Promptly notify the Lender in writing of (i) any enforcement, cleanup, removal or other action instituted or threatened against the Borrower by any federal, state, county or municipal authority or agency pursuant to any public health, safety or environmental laws, rules, ordinances and regulations, (ii) any and all claims made or threatened by any third party against the Borrower or any real property owned or operated by any of them relating to the existence of, or damage, loss or injury from any toxic substances, oil or hazardous wastes or any other conditions constituting actual or potential violations of such laws, rules, ordinances or regulations and (iii) any enforcement or compliance action, instituted or threatened or claim made or threatened by any federal or state authority relating to the employment of labor or employee benefits.

(i) Continue to conduct the business of the Borrower as presently conducted, maintain its existence and maintain its properties in good repair, working order and operating condition. The Borrower shall promptly notify the Lender of any event causing material loss or unusual depreciation in the value of the business assets of the Borrower and the amount of same.

(j) The Borrower will notify the Lender promptly upon Borrower's entry into any transaction with any federal, state or local governmental entity which would give rise to an account receivable which would be subject to the Federal Assignment of Claims Act, or any other comparable federal, state or local legal requirement (herein a "Government Account") and the Borrower will execute all such instruments and take all such action as may be reasonably requested by the Lender so that all moneys due, or to become due, thereunder will be effectively assigned to the Lender and notice thereof given to such account debtor in accordance with the Federal Assignment of Claims Act, or any other comparable federal, state or local legal requirement.

(k) (i) The Borrower will keep the Collateral in good order and repair, will not waste or destroy the Collateral or any part thereof and will not knowingly use the Collateral in violation of any applicable Legal Requirement or any policy of insurance thereon. The Borrower will notify the Lender in writing promptly upon its learning of any event, condition, loss, damage, litigation, administrative proceeding or other circumstance which may materially and adversely affect the assets, liabilities, financial condition or business of the Borrower or the Lender's security interest in the Collateral. In the event that the Lender shall reasonably determine that there has been any loss, damage or material diminution in the value of the Collateral, the Borrower will, whenever the Lender requests, pay to the Lender such amount as the Lender shall have reasonably determined represents such loss, damage or material diminution in value (any such payment not to affect the Lender's security interest in such Collateral). (ii) Without limiting the generality of

the foregoing, the Borrower shall notify the Lender promptly of any claim or dispute that may materially affect the value of the Borrower's Accounts.

(l) The Borrower will, at such intervals as the Lender may request, notify the Lender, in a form satisfactory to the Lender, of all Collateral which has come into existence since the date hereof or the date of the last such notification, whichever is later.

(m) At its option, but without obligation to do so, the Lender may discharge taxes, liens, security interests or other encumbrances at any time levied or placed on the Collateral; may place and pay for insurance on the Collateral; may order and pay for the repair, maintenance and preservation of the Collateral; and may pay any fees for filing or recording such instruments or documents as may be necessary or desirable to perfect the security interest granted herein. The Borrower agrees to reimburse the Lender on demand for any payment made, or any expense incurred, by the Lender pursuant to the foregoing authorization, and all such payments and expenses shall constitute part of the principal amount of Obligations hereby secured and shall bear interest at the highest rate payable on the Obligations of the Borrower to the Lender.

(n) Deliver to Lender, and or its nominee(s), all information requested by it, or them, in connection with their reporting obligations to the U.S. Citizenship and Immigration Services and reasonably related to compliance with the EB-5 Immigrant Investor Pilot Program.

**7. Negative Covenants.** The Borrower covenants and agrees that until payment is made in full on all Loans, the performance of all Borrower's obligations hereunder and under all other Loan Documents is complete and this Agreement shall have terminated, unless the Lender otherwise consents in writing, the Borrower shall not directly or indirectly:

(a) Sell, lease, pledge, transfer or otherwise dispose of all or any of its assets (other than the disposition of inventory in the ordinary course of its business as presently conducted, or the sale of obsolete equipment or equipment no longer usable in the conduct of the Borrower's business), whether now owned or hereafter acquired except for liens or encumbrances required or permitted hereby or by any Loan Document.

(b) Make or consent to a material change in the ownership or capital structure of the Borrower, or make a material change in the management of the Borrower or in the manner in which the business of the Borrower is conducted.

**8. Events of Default; Remedies.**

**8.1 Events of Default.** The occurrence of any of the following events, for any reason whatsoever, shall constitute an "Event of Default" hereunder:

(a)  (i) Failure to make due payment of principal and/or interest on any Loan provided such failure continues for a period of five (5) business days or (ii) failure by the Borrower, or any Affiliate, to make due payment of any other liability or obligation owing by the Borrower, or any Affiliate, to the Lender, now existing or hereafter incurred, whether direct or contingent (herein, "Other Lender Debt"), provided such failure continues for a period of five (5) business days; or

(b)  Failure by the Borrower to observe or perform any covenant contained in (i) this Agreement, or any of their respective obligations under any other Loan Document or (ii) any document or instrument evidencing, securing or otherwise relating to any Other Lender Debt provided that if said failure is curable, it continues for a period of ten (10) days; or

(c)  Any representation or warranty made by the Borrower to the Lender or any statement, certificate or other data furnished by any of them in connection herewith or with any other Loan Document proves at any time to be incorrect in any material respect; or

(d)  A judgment or judgments for the payment of money shall be rendered against the Borrower, which shall remain unsatisfied and in effect for a period of sixty (60) days without a stay of execution; or

(e)  Any levy, seizure, attachment, execution or similar process shall be issued or levied on any of the Borrower's property, which process could have a material adverse effect on the business of the Borrower in the Lender's reasonable judgment; or

(f)  The Borrower shall (i) apply for or consent to the appointment of a receiver, conservator, trustee or liquidator of all or a substantial part of any of its assets; (ii) be unable, or admit in writing its inability, to pay its debts as they mature; (iii) file or permit the filing of any petition, case, arrangement, reorganization, or the like under any insolvency or Bankruptcy law, or the adjudication of it as Bankrupt, or the making of an assignment for the benefit of creditors or the consenting to any form of arrangement for the satisfaction, settlement or delay of debt or the appointment of a receiver for all or any part of its properties; or (iv) take any action for the purpose of effecting any of the foregoing; or

(g) An order, judgment or decree shall be entered, or a case shall be commenced, against the Borrower, without the application, approval or consent of the Borrower by, or in, any court of competent jurisdiction, approving a petition or permitting the commencement of a case seeking reorganization or liquidation of the Borrower or appointing a receiver, trustee, conservator or liquidator of the Borrower, or of all or a substantial part of its assets and the Borrower, by any act, indicates its approval thereof, consent thereto, or acquiescence therein, or, in any event, such order, judgment, decree or case shall continue unstayed, or undismissed, and in effect for any period of ninety (90) consecutive days; or

(h)  The Borrower shall dissolve or liquidate, or be dissolved or liquidated, or cease to exist legally, or merge or consolidate with, or be merged or consolidated with or into any other entity; or

(i)   Failure by the Borrower to pay or perform any other Obligation, whether contingent or otherwise, or if any such other Obligation shall be accelerated, or if there exists any event of default under any instrument, document or agreement governing, evidencing or securing such other Obligation; or

(j)   The Lender reasonably believes that any material adverse change in the assets, liabilities, financial condition or business of the Borrower has occurred since the date before or after the date of this Agreement; or

(k)   The Borrower sells, liquidates, transfers or otherwise disposes of an asset not in strict accordance with the terms of this Loan Agreement; or

(l)   If at any time the Lender reasonably believes in good faith that the prospect of payment of any Obligation or the performance of any agreement of the Borrower is materially impaired, or that there is such a change in the assets, liabilities, financial condition or business of the Borrower as the Lender believes in good faith materially impairs the Lender's security or increases its risk of non-collection, or the Borrower fails to create (i) the required number of jobs under the commitment letter of even date herewith (the "Commitment Letter") or (ii) the conditions required for such job creation have not been satisfied, if the Borrower is not required to create direct jobs.

**8.2 Remedies.**

(a)   Upon the occurrence of any Event of Default, and at any time thereafter, the availability of advances hereunder shall, at the option of the Lender, be deemed to be automatically terminated and the Lender, at its option, may declare one or more, or all, of the Loans outstanding hereunder, together with accrued interest thereon and all applicable late charges and surcharges and all other liabilities and obligations of the Borrower to the Lender, to be forthwith due and payable, whereupon the same shall become forthwith due and payable; all of the foregoing without presentment or demand for payment, notice of non-payment, protest or any other notice or demand of any kind, all of which are expressly waived by the Borrower.

(b)   The Lender shall have the following additional rights and remedies:

(i)   All of the rights and remedies of a secured party under the Uniform Commercial Code or any other applicable law or at equity, all of which rights and remedies shall be cumulative and non-exclusive, to the extent permitted by law, in addition to any other rights and remedies contained in this Agreement, any other Loan Document or in any document, instrument or agreement evidencing, governing or securing the Obligations.

(ii)   The right to (1) take possession of the Collateral, without resort to legal process and without prior notice to Borrower, and for that purpose Borrower hereby irrevocably appoints the Lender its attorney-in-fact to enter upon any premises on which the Collateral or any part thereof may be situated and remove the Collateral therefrom, or (2) require the Borrower to assemble the Collateral and make it available to the Lender in a place to be designated by the Lender, in its sole discretion, or (3) instruct the Bank, without further consent of Borrower, to transfer the balance of all deposit accounts of Borrower to Lender and to thereafter treat

Lender as the owner of such deposit accounts and the Bank's customer with respect to such deposit account. The Borrower shall make available to the Lender all premises, locations and facilities necessary for the Lender's taking possession of the Collateral or for removing or putting the Collateral in saleable form.

(iii) The right to sell or otherwise dispose of all or any part of the Collateral by one or more public or private sales. The Lender will give the Borrower at least five (5) business days' prior written notice of the time and place of any public sale thereof, or of the time after which any private sale or any other intended disposition (which may include, without limitation, a public sale or lease of all or part of the Collateral) is to be made. The Borrower agrees that five (5) business days is a reasonable time for any such notice. The Lender, its employees, attorneys and agents may bid and become purchasers at any such sale, if public, and may purchase at any private sale any of the Collateral that is of a type customarily sold on a recognized market or which is subject to widely distributed standard price quotations. Any public or private sale shall be free from any right of redemption, which the Borrower hereby waives and releases. If there is a deficiency after such sale and the application of the net proceeds from such sale, the Borrower shall be responsible for the same, with interest.

(iv) The right, after an Event of Default shall have occurred (and Borrower irrevocably appoints the Lender as attorney-in-fact for the Borrower for this purpose, such appointment being coupled with an interest), upon notice to Borrower and without resort to legal process, to notify the persons liable for payment of all accounts (as defined in the Uniform Commercial Code) at any time and direct such persons to make payments directly to the Lender, and to perform all acts the Borrower could take to collect on such accounts, including, without limitation, the right to notify postal authorities to change the address for delivery, open mail, endorse checks, bring collection suits, and realize upon Collateral securing such accounts. At the Lender's request, all bills and statements sent by the Borrower to the persons liable for payments of such accounts shall state that they have been assigned to, and are solely payable to, the Lender, and Borrower shall direct persons liable for the payment of such accounts to pay directly to the Lender any sums due or to become due on account thereof.

(v) The right from and after an Event of Default, from time to time without demand or notice, and without being required to look first to any other Collateral to apply and set off any or all of the Deposits against any and all Obligations even though such Obligations are unmatured.

(c) Collateral Account. Upon an Event of Default:

(i) The Borrower shall direct each of its creditors and/or customers that all payments or other distributions of whatever kind made to the Borrower shall be made to a post office box designated by the Lender (the "Lock Box"). The Lender shall have sole access to the Lock Box, and is hereby authorized by the Borrower to open all mail addressed to the Lock Box, and to apply all proceeds received therein, as herein provided. If Borrower should receive itself any such payments, the Borrower shall hold all such collections in trust for the Lender without commingling the same with other funds of the Borrower and will promptly, on the day of receipt thereof, transmit such collections to the Lender in the identical form in which

they were received by the Borrower, with such endorsements as may be appropriate, accompanied by a report, in a form approved by the Lender, showing the amount of such collections and such other information as the Lender may require.

(ii)  All collections in the form of cash, checks or other demand remittances so received by, or transmitted to, the Lender shall upon receipt by the Lender be credited to the Collateral Account established hereunder, subject to subsection (c) below. Each such credit shall be conditional upon final payment to the Lender of all items giving rise to such credit, and, if any item is not so paid, the credit for such item shall be reversed whether or not the item has been returned and the amount thereof, in the Lender's discretion may be charged to any operating account of Borrower with the Lender. All collections in the form of notes, drafts, acceptances or other instruments not payable on demand shall be delivered by the Borrower to the Lender. When such items are collected, the amount thereof shall be credited by the Lender to the Collateral Account, with appropriate notice to the Borrower. Until such items are collected, the Borrower will not, without the consent of the Lender, make any entry on its books or records indicating that the same were received in payment of the receivable giving rise thereto.

(iii)  At such intervals as the Lender may deem appropriate, the Lender shall charge and apply the full amount then on deposit in the Collateral Account in reduction or payment of Borrower's Loan Account, such application to be subject to the final payment in cash of all items theretofore credited to such Collateral Account.

**9.  Lien and Set Off.** The Borrower hereby gives the Lender a lien and right of set off for all of Borrower's liabilities and obligations to the Lender upon and against all Collateral now or hereafter in the possession, custody, safekeeping or control of the Lender or in transit to it.

**10.  Miscellaneous.**

**10.1  Certain Waivers.** Borrower hereby waives diligence, demand, presentment for payment, notice of nonpayment, protest and notice of dishonor, and hereby agrees to any extension or delay in the time for payment or enforcement, to renewal of any Loan and to any substitution or release of any Collateral, all without notice and without any effect on their liabilities. Any delay on the part of the Lender in exercising any right hereunder, or under any other Loan Document which may secure any Loan, shall not operate as a waiver of any such right, and any waiver granted for one occasion shall not operate as a waiver in the event of a subsequent default. The Lender may revoke any permission or waiver previously granted to Borrower, such revocation to be effective prospectively when given, whether given orally or in writing. The rights and remedies of the Lender shall be cumulative and not in the alternative, and shall include all rights and remedies granted herein, in any other Loan Document and under all applicable laws.

LENDER AND BORROWER IRREVOCABLY WAIVE ALL RIGHTS TO A TRIAL BY JURY IN ANY PROCEEDING HEREAFTER INSTITUTED BY OR AGAINST THE LENDER OR BORROWER IN RESPECT TO THIS AGREEMENT, THE NOTES OR ANY OTHER LOAN DOCUMENT.

BORROWER (i) ACKNOWLEDGES THAT THE TRANSACTION OF WHICH THIS AGREEMENT IS A PART IS A COMMERCIAL TRANSACTION AND (ii) TO THE EXTENT PERMITTED BY ANY STATE OR FEDERAL LAW, WAIVES ANY RIGHT TO PRIOR NOTICE OF, AND A HEARING ON, THE RIGHT OF ANY HOLDER OF THE NOTES, TO ANY REMEDY OR COMBINATION OF REMEDIES THAT ENABLES SAID HOLDER, BY WAY OF ATTACHMENT, FOREIGN ATTACHMENT, GARNISHMENT OR REPLEVIN, TO DEPRIVE THE BORROWER OF ANY OF THEIR PROPERTY, AT ANY TIME, PRIOR TO FINAL JUDGMENT IN ANY LITIGATION INSTITUTED IN CONNECTION WITH THIS AGREEMENT.

**10.2 Notices.** All notices, requests or demands to or upon a party to this Agreement shall be given or made by the other party hereto in writing, in person or by depositing in the mail, postage prepaid, return receipt requested, addressed to the addressee at the address set forth herein as the Borrower's chief executive office or to such other addresses as such addressee may have designated in writing to the other party hereto.

**10.3 Expenses; Additional Documents.** The Borrower will pay all taxes levied or assessed upon the principal sum of the advances made against the Lender, all fees of the Lender for its Lock-Box services and all other fees provided herein, and all expenses arising out of the preparation, amendment, waiver, modification, protection, collection and/or other enforcement of this Agreement, or any other Loan Document, or of any Collateral or security interest now or hereafter granted to secure the Loans or mortgage, security interest or lien, granted hereunder or under any other Loan Document (including, without limitation, attorneys' fees). The Borrower will, from time to time, at its sole expense, execute and deliver to the Lender all such other and further instruments and documents, and take or cause to be taken all such other and further action as the Lender shall request in order to effect and confirm or vest more securely all rights contemplated by this Agreement or any other Loan Document.

**10.4 Addendums.** Any Addendums that are attached hereto are and shall constitute a part of this Agreement.

**10.5 Governing Law; Consent to Jurisdiction.** This Agreement, the other Loan Documents and the rights and obligations of the parties hereunder, and thereunder, shall be construed and interpreted in accordance with the laws of the State of Florida, USA. The Borrower agrees that the execution of this Agreement and the other Loan Documents, and the performance of the Borrower's obligations hereunder, and thereunder, shall be deemed to have a Florida situs and the Borrower shall be subject to the personal jurisdiction of the courts of Florida with respect to any action the Lender or its successors or assigns may commence hereunder or thereunder. Accordingly, the Borrower hereby specifically and irrevocably consents to the jurisdiction of the courts of Florida with respect to all matters concerning this Agreement, the other Loan Documents, the Notes or the enforcement of any of the foregoing.

**10.6 Survival of Representations.** All representations, warranties, covenants and agreements herein contained or made in writing in connection with this Agreement shall survive the execution and delivery of the Loan Documents and shall continue in full force and effect until all amounts payable on account of all Loans, the Loan Documents and this Agreement shall have been paid in full and this Agreement has been terminated.

**10.7  Integration; Severability; Successors.** This Agreement is the final, complete and exclusive statement of the terms governing this Agreement. If any provision of this Agreement shall to any extent be held invalid or unenforceable, then only such provision shall be deemed ineffective and the remainder of this Agreement shall not be affected. The provisions of this Agreement shall bind the heirs, executors, administrators, assigns and successors of the Borrower and shall inure to the benefit of the Lender, its successors and assigns.

**10.8  Determinations as to Compliance.** All documents and assurances of any type related to the fulfillment of any condition or compliance with any provision hereof or of any other Loan Document and all other matters related to the Loans are subject to the prior approval and satisfaction of the Lender, its counsel and other consultants.

**10.9  Termination of this Agreement.** This Agreement shall terminate upon the written agreement of the parties hereto to the termination of any privilege of the Borrower to take advances and/or full and final payment of all amounts with respect to all Loans or amounts otherwise due hereunder and under the other Loan Documents.

**10.10 Attorney's Fees.** Lender shall be entitled to recover all reasonable attorney's fees and expenses incurred by it in connection with enforcement of this Loan Agreement, including costs of collection.

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, the undersigned executes this Agreement as an instrument under seal as of the date first set forth above.

LENDER

**Palm House Hotel, LLLP**

By South Atlantic Regional Center, LLC, its General Partner

By: _____

       Joseph J. Walsh

       Managing Member

Dated: __1 / 21_____, 20 _13_

BORROWER

**Palm House, LLC**

By: _____

Name: _Ryan Black_

Title: _Managing Member_

Dated: _1/20/_____, 20 _13_

## PROMISSORY NOTE

_____, 20___

For value received, **Palm House, LLC** (the "Borrower"), a Delaware limited liability company of 214 Brazilian Ave., Suite 200, Palm Beach, FL 33480, hereby promises to pay to the order of **Palm House Hotel, LLLP,** a Florida limited partnership of 197 S. Federal Highway, Suite 200, Boca Raton, FL 33432 (the "Lender"), or at such other address as the holder hereof may designate, the principal amount of all advances made by the Lender to the Borrower hereunder, in lawful money of the United States. This Note evidences the Borrower's indebtedness under a Loan and Security Agreement with Lender (the "Loan Agreement"), as may be amended from time to time. During the period from the date hereof until the fifth anniversary ("Termination Date") of the date of the first Advance hereunder ("First Advance"), the Lender may make advances ("Advances") from time to time thereunder and the Borrower may borrow; provided, however, that the aggregate amount of all advances at any one time outstanding shall not exceed $39,500,000 USD; and provided, further, that the Lender's obligation to make advances and the Borrower's right to borrow are subject to the terms, conditions and limitations contained in this Note and the Loan Agreement.

The outstanding principal of all Advances hereunder will bear interest at the rate per annum of 4.22%. Interest shall be computed on the basis of a 365 day year and actual days elapsed. Upon default or after judgment has been rendered on this Note, the unpaid principal of all Advances shall bear interest at a rate which is two (2%) percent per annum greater than that which would otherwise be applicable.

The balance of all Advances and all accrued unpaid interest thereon shall be repaid as follows. Upon and after the First Advance hereunder, Borrower shall make payments of interest only on the outstanding principal balance of all Advances at the rate set forth above and until expiration of 5 years from the First Advance hereunder (the "Initial Term").

Upon the Termination Date, and within 30 days thereafter, the outstanding principal balance of all Advances and all accrued interest then outstanding shall be due. Borrower shall make commercially reasonable efforts to repay the outstanding principal balance of all Advances and all accrued unpaid interest thereon after the Termination Date. If Borrower cannot sell or refinance such amounts on commercially reasonable terms, or at all, prior to the end of the Initial Term, Borrower may, upon written notice to Lender and in Borrower's sole discretion, extend the term of this Note for an additional one year period (each an "Extension Period") subject to all other terms of this Note and the Loan Agreement and provided Borrower is not otherwise in default hereunder. During each Extension Period, Borrower shall make interest payments on the outstanding principal balance of all Advances and all accrued unpaid interest thereon then outstanding.

All payments hereunder shall be applied first to the payment of interest on the unpaid principal of all Advances outstanding under this Note, and then to the balance on account of the principal of all Advances due under this Note.

Borrower shall pay Lender a late charge of five (5%) percent of any amount due to the Lender which is not paid or reimbursed by the Borrower within 5 business days of the due date thereof to defray the extra cost and expense involved in handling such delinquent payment and the increased risk of non-collection. The minimum late charge shall be $100.00.

If at any time, the rate of interest, together with all amounts which constitute interest and which are reserved, charged or taken by the Lender as compensation for fees, services or expenses incidental to the making, negotiating or collection of any advance evidenced hereby, shall be deemed by any competent court of law, governmental agency or tribunal to exceed the maximum rate of interest permitted to be charged by the Lender to the Borrower, then, during such time as such rate of interest would be deemed excessive, that portion of each sum paid attributable to that portion of such interest rate that exceeds the maximum rate of interest so permitted shall be deemed a voluntary prepayment of principal.

The Borrower may not, without Lender's prior express written consent, prepay this Note prior to the expiration of the Initial Term. Thereafter, Borrower may prepay this Note, in whole or in part, at any time, without penalty or premium, and without prior written consent of Lender.

Upon the happening of any Event of Default (as defined in the Loan Agreement), all Advances outstanding hereunder, together with accrued interest thereon, shall, at the option of the Lender, accelerate and become immediately due and payable and any privilege of the Borrower to take or request advances hereunder shall terminate without demand or notice of any kind. Failure to exercise such option shall not constitute a waiver of the right to exercise the same in the event of any subsequent default. This Note has been executed and delivered in accordance with the Loan Agreement of even date herewith between the Borrower and the Lender, incorporated herein by reference, which sets forth further terms and conditions upon which the entire unpaid principal hereof and all interest hereon may become due and payable prior to the Termination Date, and generally as to further rights of the Lender and duties of the Borrower. All advances made by the Lender to the Borrower shall be evidenced by the books and records of the Lender which shall be conclusive, absent manifest error.

The Borrower agrees to pay all taxes levied or assessed upon the outstanding principal against any holder of this Note and to pay all reasonable costs, including attorneys' fees, costs relating to the appraisal and/or valuation of assets and all other costs for expenses incurred in the collection, protection, defense, preservation, and/or enforcement of this Note or any endorsement of this Note or in any litigation arising out of the transactions of which this Note or any endorsement of this Note is a part.

The Borrower hereby gives the Lender a lien and right of set off for all of Borrower's liabilities and obligations subject to any priority liens of record upon and against all the deposits, credits, collateral and property of the Borrower, now or hereafter in the possession, custody, safekeeping or control of the Lender or in transit to it. At any time, without demand or notice, and without being required to look first to any other security, the Lender may set off the same, or any part thereof, and apply the same to any obligation of the Borrower even though unmatured.

THE LENDER AND THE BORROWER IRREVOCABLY WAIVE ALL RIGHT TO A TRIAL BY JURY IN ANY PROCEEDING HEREAFTER INSTITUTED BY OR AGAINST THE LENDER OR THE BORROWER IN RESPECT TO THIS NOTE OR ARISING OUT OF ANY DOCUMENT, INSTRUMENT OR AGREEMENT EVIDENCING, GOVERNING OR SECURING THIS NOTE, INCLUDING THE AFORESAID AGREEMENT.

THE BORROWER (1) ACKNOWLEDGES THAT THE LOAN EVIDENCED BY THIS NOTE IS PART OF A COMMERCIAL TRANSACTION AND (2) TO THE EXTENT PERMITTED BY ANY STATE OR FEDERAL LAW, WAIVES THE RIGHT BORROWER MAY HAVE TO PRIOR NOTICE, OF AND A HEARING ON, THE RIGHT OF ANY HOLDER OF THIS NOTE TO ANY REMEDY OR COMBINATION OF REMEDIES THAT ENABLES SAID HOLDER, BY WAY OF ATTACHMENT, FOREIGN ATTACHMENT, GARNISHMENT OR REPLEVIN, TO DEPRIVE THE BORROWER OF ANY OF BORROWER'S PROPERTY, AT ANY TIME, PRIOR TO FINAL JUDGMENT IN ANY LITIGATION INSTITUTED IN CONNECTION WITH THIS NOTE.

The Borrower hereby waives diligence, demand, presentment for payment, notice of nonpayment, protest and notice of protest, and notice of any renewals or extensions of this Note, and all rights under any statute of limitations, and agrees that the time for payment of this Note may be changed and extended at the Lender's sole discretion, without impairing the Borrower's liability hereon, and further consents to the release of all, or any part, of the security for the payment hereof at the discretion of the Lender. Any delay on the part of the Lender in exercising any right hereunder shall not operate as a waiver of any such right, and any waiver granted for one occasion shall not operate as a waiver in the event of any subsequent default.

The making of an advance at any time shall not be deemed a waiver of, or consent, agreement or commitment to or by the Lender to the making of any future advance to the Borrower.

If any provision of this Note shall, to any extent, be held invalid or unenforceable, then only such provision shall be deemed ineffective and the remainder of this Note shall not be affected.

This Note shall bind the heirs, executors, administrators, successors and assigns of the Borrower and shall inure to the benefit of the Lender, its successors and assigns.

This Note is secured in accordance with the terms of the Loan Agreement of even date herewith between the Lender and the Borrower, and by other security.

This Note is executed as a sealed instrument and shall be governed by, and construed in accordance with, the laws of the State of Florida, USA.

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, the undersigned executes this Agreement as an instrument under seal as of the date first set forth above.

LENDER

**Palm House Hotel, LLLP**

By South Atlantic Regional Center, LLC, its General Partner

By: _____  Dated: __1__/__21_____, 20_13_

       Joseph J. Walsh
       Managing Member

BORROWER

**Palm House, LLC**

By: _Ryan Black_____  Dated: _January 20_, 20_13_

Name: _____

Title: _____Managing Member_____

       _New York_

STATE OF ~~FLORIDA~~ :
    _New York_
COUNTY OF ~~PALM BEACH~~:

On this, the _20th_ day of _January_____ , 20_13_ before me, the undersigned officer, personally appeared ___Ryan Black_____, who acknowledged himself to be the President of Palm House, LLC, a Delaware limited liability company of 214 Brazilian Ave., Suite 200, Palm Beach, FL 33480, and that he as President, being authorized to do so, executed the foregoing instrument freely and voluntarily for the purposes therein contained by signing the name of the company in his capacity as President. IN WITNESS WHEREOF, I have hereunto set my hand and notarial seal.

SYLVIA BLOOMFIELD
Notary Public, State of New York
No. 01BL6060027
Qualified in Queens County
Certificate filed in New York County
Commission Expires June 11, 20_15_

Notary Public
My Commission Expires: _June 11, 2015_

# SOUTH ATLANTIC REGIONAL CENTER



## PALM HOUSE, LLC

## PALM HOUSE HOTEL, LLLP

---

## Palm House Hotel Project

Seeking **$39,500,000** in EB-5 funding

## CONFIDENTIAL BUSINESS REVIEW

### NOTICE

The information presented in this document is highly sensitive and confidential and is presented for investment purposes only. This Confidential Business Review and the information presented is confidential and no part of it shall be disclosed to others except as authorized by the prior written consent of Palm House. This Confidential Business Review cannot be reproduced, in whole or in part, or used in any other manner without the prior written consent of Palm House.

**The information contained in this confidential business review is being presented to give investors a thorough understanding of the Project known as the Palm House Hotel Project.**

For Further Information, Contact:
Joseph J. Walsh, Sr.
Tel: (561) 282-6102
Email: info@sarceb5.com

The contact address of SARC is 197 S. Federal Highway, Suite 200, Boca Raton, FL 33432.

# TABLE OF CONTENTS

**1.0 EXECUTIVE SUMMARY** ........................................................................................................ **4**

1.1 DESCRIPTION OF THE COMPANY ....................................................................................... 4
1.2 VENTURE OVERVIEW ........................................................................................................ 5
1.3 CORPORATE STRUCTURE ................................................................................................... 6
1.4 PATH OF FUNDS ............................................................................................................... 7
1.5 MISSION STATEMENT ........................................................................................................ 8
1.6 IMPLEMENTATION OF BUSINESS PLAN .............................................................................. 8
1.7 FINANCIAL ....................................................................................................................... 9
1.8 SOURCES OF PROCEEDS .................................................................................................... 9
1.9 USE OF PROCEEDS ......................................................................................................... 10
1.10 PROJECTED RETURN ON INVESTMENT ........................................................................... 10
1.11 FOREIGN INVESTOR RETURN ON INVESTMENT .............................................................. 10
1.12 MANAGEMENT, STAFF, AND EMPLOYEES ...................................................................... 10
1.13 *MATTER OF HO* COMPLIANCE ...................................................................................... 10

**2.0 GLOSSARY OF TERMS** ...................................................................................................... **13**

2.1 KEY DEFINITIONS .......................................................................................................... 13
2.2 OTHER DEFINITIONS ...................................................................................................... 13

**3.0 PALM HOUSE HOTEL PROJECT** ....................................................................................... **16**

3.1 PROJECT OVERVIEW ....................................................................................................... 17
3.2 PROJECT DESCRIPTION ................................................................................................... 18
3.3 GUESTROOMS AND ARCHITECTURAL PLANS .................................................................. 24
3.4 THE PRIVATE CLUB ....................................................................................................... 29
3.5 PROJECT SITE ................................................................................................................. 31

**4.0 FINANCIAL** ....................................................................................................................... **36**

4.1 GENERAL ....................................................................................................................... 36
4.2 INVESTMENT SUMMARY ................................................................................................. 36
4.3 INVESTMENT TIMELINE .................................................................................................. 36
4.4 SOURCES OF PROCEEDS .................................................................................................. 37
4.5 USE OF PROCEEDS ......................................................................................................... 38
4.6 RETURN ON INVESTMENT ............................................................................................... 42
4.7 FOREIGN INVESTOR RETURN ON INVESTMENT ............................................................... 48
4.8 METHOD OF FINANCING ................................................................................................. 49
4.9 CAUTIONARY STATEMENTS REGARDING PROJECTIONS .................................................. 50

**5.0 EMPLOYMENT AND STAFFING** ........................................................................................ **52**

5.1 JOB DESCRIPTIONS ......................................................................................................... 52
*Accounting* ........................................................................................................................ 53
*Administrative & General* .................................................................................................. 54
*Bell Staff* .......................................................................................................................... 54
*Beverage* ........................................................................................................................... 55
*Business Center* ................................................................................................................. 56
*Cafeteria* ........................................................................................................................... 56
*Food - Banquets* ................................................................................................................ 56
*Food - Casual Restaurant* .................................................................................................. 58
*Food - Catering* ................................................................................................................. 59
*Food - Kitchen* .................................................................................................................. 60
*Food - Room Service / Honor Bar* ..................................................................................... 62

*Front Desk*..........................................................................................................................63
*Garage*..............................................................................................................................65
*Housekeeping*...................................................................................................................65
*Human Resources*.............................................................................................................66
*Information Systems*..........................................................................................................67
*Laundry*............................................................................................................................68
*Marketing*.........................................................................................................................68
*Purchasing - Food*............................................................................................................70
*Repairs & Maintenance*....................................................................................................70
*Reservations*.....................................................................................................................72
*Rooms*..............................................................................................................................73
*Security*.............................................................................................................................73
*Spa*...................................................................................................................................74
*Stewarding*.......................................................................................................................76
*Telecommunications*.........................................................................................................77

**6.0 MANAGEMENT** ...................................................................................................**78**
6.1 SARC MANAGEMENT.....................................................................................................78
6.2 PALM HOUSE, LLC MANAGEMENT..................................................................................78
6.3 PROJECT PARTNERS.......................................................................................................81

**7.0 HOSPITALITY INDUSTRY** ...................................................................................**82**
7.1 MARKET ANALYSIS.........................................................................................................82
7.2 COMPETITIVE MARKET DISCUSSION..............................................................................90
7.3 SUPPORT FOR FINANCIAL PROJECTIONS.......................................................................93
7.4 SUPPORT FOR PRIVATE CLUB FINANCIALS.....................................................................94

**8.0 REGIONAL INFORMATION** ................................................................................**97**
8.1 MIAMI–FORT LAUDERDALE–POMPANO BEACH, FL MSA ................................................97
8.2 PALM BEACH COUNTY....................................................................................................98
8.3 THE TOWN OF PALM BEACH.........................................................................................101

**9.0 PARTNERSHIP INFORMATION** ........................................................................**103**
9.1 OFFICE OF THE PARTNERSHIP......................................................................................103
9.2 STRUCTURE OF THE PARTNERSHIP...............................................................................103
9.3 ADVANTAGES OF A LIMITED PARTNERSHIP...................................................................103
9.4 FLEXIBLE PROFIT DISTRIBUTION..................................................................................103
9.5 KEY FEATURES.............................................................................................................104
9.6 FLOW-THROUGH TAXATION.........................................................................................104
9.7 INDEPENDENT ADVICE.................................................................................................104

**10.0 EB-5 INVESTOR AND REGIONAL CENTER INFORMATION** ...........................**105**
10.1 REGIONAL CENTERS...................................................................................................105
10.2 IMMIGRANT INVESTORS: TWO CHOICES, ONE GOAL...................................................105
10.3 WHAT IS THE MINIMUM INVESTMENT?.......................................................................106
10.4 JOB CREATION REQUIREMENT....................................................................................106
10.5 ROLE OF FOREIGN INVESTORS AS LIMITED PARTNERS.................................................106
10.6 POTENTIAL INVESTMENT HURDLES & RISK MITIGATION .............................................107
10.7 QUALIFYING FOR GREEN CARD STATUS.......................................................................107

# 1.0 EXECUTIVE SUMMARY

| | |
|---|---|
| **The Project** | Palm House Hotel, LLLP (the "Partnership") will use EB-5 capital to loan money to Palm House, LLC (the "Company"), which will finance, construct, develop, and operate a luxury hotel in the Region. This facility will be located in Palm Beach, Florida, which is in a Targeted Employment Area. |
| **EB-5 Investment Offering Organization and Structure** | The Partnership will accept 79 EB-5 investors as limited partners with all the rights and responsibilities accorded under the Uniform Limited Partnership Act as adopted by the State of Florida in satisfaction of the "policy formulation" requirement of 8 C.F.R. 204.6(j)(5)(iii). The Partnership will loan money to the Company, which will own and manage the luxury hotel. |
| **Project Costs and Capitalizations** | The total project costs amount to approximately $91,000,000. The Partnership will raise $39,500,000 in EB-5 capital and $51,500,000 in other funding. A complete description of the capitalization and the sources & uses of funds is available in the "Financial" section of this document. |
| **Project Development & Schedule** | A complete development schedule of 12–18 months is projected for the new facility. The full requisite employment needed for EB-5 investors will be available before the I-829 petitions will be submitted. |
| **Project Job Creation** | According to the included Economic Analysis, the Project will create 953.7 permanent jobs. |
| **TEA Designation** | As verified by the Florida Department of Economic Opportunity on November 14, 2012, the project is located in Census tract 35.02, which qualifies as a Targeted Employment Area (TEA). Therefore the minimum EB-5 investment amount is reduced to $500,000 per investor. |
| **Job Creation Sufficiency** | The total job creation (953.7 jobs) created is sufficient for a project located in a TEA (79 investors or 790 jobs). |
| **Return on Investment** | EB-5 investors will be offered a projected 0.25% per annum return on investment, paid from profits of the commercial enterprise. |

## 1.1 Description of the Company

The Company, Palm House, LLC ("Palm House"), is a Delaware company that will serve as the developer of the project known as the Palm House Hotel Project. Palm House will operate in conjunction with the South Atlantic Regional Center ("SARC"). Palm House will apply to the

Limited Partnership for loans to provide capital for the development of the business of the Company. The Limited Partnership will be the Lender of the EB-5 investor funds.

## 1.2 Venture Overview



SARC is an approved United States Citizenship and Immigration Service (USCIS) designated EB-5 Regional Center (approval receipt number W09001240), based in Boca Raton, Florida, that has as its geographical area three counties in Florida: Palm Beach, Broward, and Dade Counties. These counties are shown on the map below.



*Map showing the location of the Counties comprising the Region*

The following is an overview of how the Regional Center will operate under the EB-5 Program.

**1.3 Corporate Structure**

The name of the Regional Center is South Atlantic Regional Center ("SARC"). The Regional Center oversees and advises the EB-5 process, ensures compliance with USCIS regulations, manages the Limited Partnership directly as the General Partner, and handles USCIS filing requirements (such as I-924A filings).

The developer and owner of the Palm House Hotel Project will be Palm House, LLC ("Palm House"), a Delaware limited liability company, which will borrow investor funds from the lender, Palm House Hotel, LLLP ("PHH, LLLP"), for job-creating purposes.

PHH, LLLP will be comprised of its General Partner, SARC, and each of the foreign investors as its Limited Partners, as shown in the figure below. With the proposed EB-5 investment structure, each of the foreign investors will be a Limited Partner in PHH, LLLP, thereby allowing the foreign investors to make a qualified investment in a "new commercial enterprise" and fulfill the requirements necessary to obtain approval for permanent residency pending the conditional two-year time period.

## South Atlantic RC

The RC oversees and advises the Project, the EB-5 process, and the associated entities

## Palm House Hotel, LLLP

| General Partner: SARC | The Partnership loans money to the Company for job-creating purposes | Limited Partners: Each EB-5 Investor |

## Palm House, LLC

(The "Company")
Owner and Developer of the Project

Uses $39.5M in EB-5 funds and other funding to develop the Project

## Palm House Hotel

A 79-room ultra-luxury hotel and resort located on Palm Beach Island, Florida.

*Corporate Structure*

**1.4 Path of Funds**

The creation of jobs for PHH, LLLP results from the investment of EB-5 capital into Palm House, LLC, a new commercial enterprise. As more fully described in the Economic Analysis attached hereto, the jobs will result from EB-5 capital expended as described herein.

**Limited Partnership**
- Formation of special purpose entity to organize 79 EB-5 investors and pool $39.5M of EB-5 capital.
- SARC will serve as General Partner.

**Path of Funds**
- The Regional Center conducts its internal due diligence regarding the lawful source of funds.
- Capital will be placed in escrow pending the filing of the I-526 visa petitions.

**Investment of Capital**
- The Limited Partnership will loan the money to the Company, which will be responsible for the development of the Project.
- The full EB-5 Capital Raise is placed at risk in accordance with the budget listed in the "Financial" section of this document over the 5 year period following the release of money from Escrow.

**Job Creation**
- Money is spent within the first 24 months of operation in accordance with the details provided herein, creating the jobs described in the "Employment" section.
- Based on the Economic Analysis attached hereto, the Project **will create 953.7 permanent jobs.**

**Verification**
- The Regional Center will prepare evidence of EB-5 capital expenditures and revenues generated over the 2-year conditional period of residency for use as part of the Form I-829 Removal of Conditions to validate the required job creation.

## 1.5 Mission Statement

The mission of South Atlantic Regional Center is to obtain funding for development of various profitable ventures within Targeted Employment Areas (TEAs) located within the geographical area of the Regional Center (the "Region"). Such projects are projected to include hospitality, restaurants, manufacturing, and other facilities in the Region.

Specifically, the Company plans to build, develop, and operate a luxury hotel in Palm Beach, Florida (the Palm House Hotel). Further details of this project can be found in the "Palm House Hotel Project" section of this Confidential Business Review.

## 1.6 Implementation of Business Plan

The Company will focus on developing a luxury hotel in Palm Beach, Florida (the focus of this Confidential Business Review). The Company believes the timing is right to leverage the Company's knowledge, the skills and experience of its management team, and its access to capital through the EB-5 Program, in order to develop the Project at a profit.

The Palm House Hotel is being developed as an ultra-premium luxury hotel and resort, on the island of Palm Beach, Florida. Only half a block from the ocean and a few blocks from world-famous Worth Avenue, the Palm House Hotel is ideally located, and will be ideally developed and operated by the project Developer to provide its guests with the ultimate luxury experience.

Of course, the EB-5 program's primary focus is job creation. Palm House Hotel, LLLP is excited to be an important factor in investing in the creation of new jobs. The project described herein will provide a beneficial impact to the community, provide jobs, and provide a boost to the local and national economies.

## 1.7 Financial

The Company anticipates that it will be able to operate a luxury hotel in the Region on a profitable basis.

Value Proposition for EB-5 Investment Opportunity

The Company has uniquely positioned itself to leverage both its availability to capital via the EB-5 Program and expertise in the hospitality industry. The Company has identified a neighborhood and market needs that are being under-served or ignored completely. The Company is optimally positioned to exploit this market opportunity through the obtainment of capital investment development funds through the EB-5 program.

## 1.8 Sources of Proceeds

The amount of funds anticipated to be received on account of the Offering is **$39,500,000**. The Company's principal method of obtaining such funds will be by offering Units in PHH, LLLP to EB-5 Investors pursuant to the EB-5 Program, which limited partnership will in turn make loans to Palm House. Such activities will operate to grant lawful conditional and permanent resident status in the United States to foreign investors who make qualifying investments under the Immigration Act and EB-5 Program.

Under the EB-5 Pilot Program: (i) qualified foreign investors must make a qualifying investment in a new enterprise and complete the required immigration procedures; and (ii) a qualifying investment must be invested in a project which creates at least ten (10) full time direct and/or indirect jobs for qualified U.S. workers for each $500,000 invested when such investments are made within a targeted employment area. The subject project will create a sufficient number of full time direct and/or indirect jobs such that the investments in the subject project will qualify as qualifying investments under the EB-5 Program.

Please see the econometric analysis attached to this Confidential Business Review that: (i) quantifies the benefits of the Company to the state and local economy; and (ii) demonstrates that each investment in PHH, LLLP will create at least ten (10) full time direct and/or indirect jobs for qualified U.S. workers for each $500,000 invested by each EB-5 Investor.

Please see the discussion of the EB-5 opportunity and EB-5 Program and requirements appearing in the "EB-5 Investor and Regional Center Information" section of this Confidential Business Review.

## 1.9 Use of Proceeds

The proceeds will be used to develop the Palm House Hotel Project within the Region. The Company plans to begin with the development of a facility in the Region very similar in scope, financing, employment creation, and structure to this Confidential Business Review. Future facilities developed through the Company will be similar in scope, execution, financing, creation of employment, and economic impact on the area.

Please see the "Financial" section of this Confidential Business Review for more information.

## 1.10 Projected Return on Investment

Based upon the pro forma financial projections, it is anticipated that the Company will generate significant returns on investment.

The projected earnings before interest, taxes, depreciation, and amortization (EBITDA) for the first year of operation are $5,141,587, for the second year are $5,862,505, for the third year are $6,676,634, for the fourth year are $7,337,635, and for the fifth year are $7,251,401. For a more detailed breakdown, please see the "Financial" section of this document.

## 1.11 Foreign Investor Return on Investment

The return on the investment for each investor is projected at 0.25% per annum, paid from profits from the commercial enterprise. Investors are projected to receive a 0.25% simple interest payment annually until such time as the investment has been returned to the investors.

## 1.12 Management, Staff, and Employees

The Management of the Company is experienced in the areas of finance and development, and has partnered with experts in the hospitality field. Together, the Company and its partners and consultants have the expertise to execute its business strategy.

The Company will employ a staff of highly trained, respected, and dedicated managers and support staff to operate the facilities it develops.

Please see the "Management" and "Employment and Staffing" section of this Confidential Business Review for more information.

## 1.13 *Matter of Ho* Compliance

This Confidential Business Review is compliant with the standards of *Matter of Ho*, 22 I&N Dec. 206 (Assoc. Comm., 1998) (pg. 9), which states:

"A comprehensive business plan as contemplated by the regulations should contain, at minimum, a description of the business, its products and/or services, and its objectives.

The plan should contain a market analysis, including the names of competing businesses and their relative strengths and weaknesses, a comparison of the competition's products and pricing structures, and a description of the target market/prospective customers of the new commercial enterprise. The plan should list the required permits and licenses obtained. If applicable, it should describe the manufacturing or production process, the materials required, and the supply sources. The plan should detail any contracts executed for the supply of materials and/or the distribution of products. It should discuss the marketing strategy of the business, including pricing, advertising, and servicing. The plan should set forth the business's organizational structure and its personnel's experience. It should explain the business's staffing requirements and contain a timetable for hiring, as well as job descriptions for all positions. It should contain sales, cost, and income projections and detail the bases therefore. Most importantly, the business plan must be credible."

As such, this business plan contains the following:

- A comprehensive business plan as contemplated by the regulations should contain, at minimum, a description of the business, its products and/or services, and its objectives. (See Section 3.)

- A market analysis, including the names of competing businesses and their relative strengths and weaknesses (See Section 7)

- A comparison of the competition's products and pricing structures (See Section 7.2)

- A description of the target market/prospective customers of the new commercial enterprise (See Sections 7.1 and 8.2)

- The plan should list the required permits and licenses obtained (See Section 4.3)

- If applicable, it should describe the manufacturing or production process, the materials required, and the supply sources. (N/A)

- The plan should detail any contracts executed for the supply of materials and/or the distribution of products (N/A)

- It should discuss the marketing strategy of the business, including pricing, advertising, and servicing. (See Section 3.2, 3.3, and 4.6)

- The plan should set forth the business's organizational structure and its personnel's experience. (See Sections 1.3 and 6)

- It should explain the business's staffing requirements and contain a timetable for hiring, as well as job descriptions for all positions. (See Section 5)

- It should contain sales, cost, and income projections and detail the bases therefore. (See Section 4.6)

- The business plan, as presented is extremely credible based upon solid management with years of experience, conservative projections, detailed market and competitive analysis, and demonstrates management's solid understanding of the project and market landscape.

## <u>2.0 GLOSSARY OF TERMS</u>

The following definitions and terms shall apply in this Confidential Business Review unless otherwise specifically provided to the contrary.

### 2.1 Key Definitions

Company – Palm House, LLC ("Palm House"), a Delaware limited liability company that will own and develop the Palm House Hotel Project. The "Company" and "Palm House" are one and the same entity and are used interchangeably in this Confidential Business Review.

Limited Partnership – Palm House Hotel, LLLP ("PHH, LLLP"), a Florida limited partnership, which will consist of SARC as its General Partner, and each of the foreign investors who purchase a Unit in the Limited Partnership as its Limited Partners. The Limited Partnership will aggregate EB-5 investor funds and loan them to the Company for job-creating purposes.

General Partner – The general partner of the Limited Partnership is SARC, a Florida limited liability company that also serves as the Regional Center.

Regional Center – South Atlantic Regional Center, LLC, d/b/a South Atlantic Regional Center ("SARC"), a Florida limited liability company, which will function as the Regional Center. The Regional Center will oversee and advise the Project, the EB-5 process, and the associated entities.

Project – The Palm House Hotel Project. An undertaking to develop a luxury hotel in the Region.

Region – Consists of three counties in Florida: Palm Beach, Broward, and Dade Counties (see map in "Executive Summary"). These counties include the city of Palm Beach.

### 2.2 Other Definitions

EB-5 Investor – An Alien Entrepreneur who is an Investor and is seeking to obtain a visa pursuant to the Immigration Act.

EB-5 Limited Partner – A limited partner in Palm House Hotel, LLLP ("PHH, LLLP"), with certain rights, powers and duties normally granted to limited partners under the Uniform Limited Partnership Act, who is admitted to the PHH, LLLP in accordance with the EB-5 Immigrant Investment Program and USCIS policy memoranda and Administrative Appeals Office precedent decisions governing the EB-5 Program.

EB-5 Program – There are two distinct EB-5 pathways for an alien investor to gain lawful permanent residence, the Basic Program and the Regional Center Pilot Program. Both programs require that the alien investor make a capital investment of either $500,000 or $1,000,000 (depending on whether the investment is in a TEA or not) in a new commercial enterprise located within the United States. The new commercial enterprise must create or preserve 10 full-time jobs for qualifying U.S. workers within two years of the alien investor's admission to the

United States as a Conditional Permanent Resident (CPR). When making an investment in a new commercial enterprise affiliated with a USCIS-designated regional center under the Regional Center Pilot Program, an alien investor may satisfy the job creation requirements of the program through the creation of either direct or indirect jobs. Notably, an alien investing in a new commercial enterprise under the Basic Program may only satisfy the job creation requirements through the creation of direct jobs. If the regional center proposal bases its predictions regarding the number of direct or indirect jobs that will be created through EB-5 investments in the regional center, in whole or in part, by offering investment opportunities to EB-5 investors with the reduced $500,000 threshold, then the Targeted Employment Areas (TEAs), Rural Areas (areas with populations under 20,000 people) and areas of high unemployment (areas with unemployment rates 150% or more of the national rate), should be identified. Note: An alien filing a regional center affiliated Form 1-526 must still establish that the investment will be made in a TEA at the time of filing of the alien's Form 1-526 petition, or at the time of the investment, whichever occurs first, to qualify for the reduced $500,000 capital investment threshold.

High Unemployment Area – A geographical area which has experienced unemployment of at least 150 percent of the national average rate. See INA § 203(b)(5)(B)(ii).

Immigration Act – The Immigration Act at 8 USC 1153(b)(5)(A)(i)-(iii), (B)(i)-(iii), (C)(i)-(iii) and (D).

Investor – A prospective purchaser of a Unit in PHH, LLLP. If an Investor purchases a Unit in PHH, LLLP, such Investor shall thereafter be referred to as a Limited Partner.

Limited Partner – A Limited Partner in PHH, LLLP.

Management – The Managers of the Company, described in more detail in the "Management" section of this Confidential Business Review.

Minimum EB-5 Investment – $500,000.00 (US) for each Unit purchased.

Offering – The offering of Units in PHH, LLLP pursuant to the Private Placement Memorandum.

Partnership Agreement – The Limited Partnership Agreement of Palm House Hotel, LLLP, as the same may be amended from time to time. All definitions utilized in the Partnership Agreement are incorporated herein by reference.

Person – Any individual, firm, partnership, corporation, limited liability company, or any other form of legal entity.

Preferred Return – The Preferred Return to be paid to each Limited Partner as more particularly described in the "Return on Investment" section of this Confidential Business Review.

Project Documents – (a) Partnership Agreement; (b) Confidential Business Review; and (c) Agreement for Sale and Purchase (together with attached Exhibits).

ROI – Return on investment.

Rural Area (a "RA") – A geographical area located both outside of a Metropolitan Statistical Area ("MSA") and outside of a city or town having a population of 20,000 or more based on the most recent decennial census of the United States. See INA § 203(b)(5)(B)(iii) and 8 CFR §204.6(j)(6)(i).

Targeted Employment Area (a "TEA") – A Rural Area, a defined term, or an area designated by the state as a High Unemployment Area, a defined term.

Unit – A limited partnership unit in Palm House Hotel, LLLP, which will be offered under Regulation S to foreign nationals outside the U.S. at a purchase price of $500,000.00 each.

## 3.0 PALM HOUSE HOTEL PROJECT

Contained in the "Financial" section of this Confidential Business Review is a detailed description of the finances for the Palm House Hotel Project, currently being developed by the Company.



## THE PALM HOUSE
A Luxury Condominium Hotel and Spa on Palm Beach

| PROJECT SPECIFICATIONS<br>Luxury Hotel and Resort | |
| --- | --- |
| Project | Construction and operation of a luxury hotel. |
| Project Location | Palm Beach Island, Palm Beach County, Florida, which is within the geographic area of the RC |
| Project Elements | Luxury Hotel<br>• 79 guest rooms offering 5-star luxury accomodations<br>• Food and beverage services<br>• Salon and spa<br>• Private membership club<br>• 4 stories (3 above ground, 1 underground)<br>• 92,546 square feet of space (44,430 for guest rooms)<br>• 66,000-square foot site |
| Industry Clusters | Nonresidential Building Construction: NAICS Code 2362<br>Architectural, Engineering, and Related Services: NAICS Code 5413<br>Traveler Accommodation: NAICS Code 7211 |

### 3.1 Project Overview



The Company will focus on developing a luxury hotel in Palm Beach, Florida (the focus of this Confidential Business Review). The Company believes the timing is right to leverage the Company's knowledge, the skills and experience of its management team, and its access to capital through the EB-5 Program, in order to develop the Project at a profit.

The Palm House Hotel is being developed as an ultra-premium luxury hotel and resort, on the island of Palm Beach, Florida. Only half a block from the ocean and a few blocks from world-famous Worth Avenue, the Palm House Hotel is ideally located, and will be ideally developed and operated by the project Developer to provide its guests with the ultimate luxury experience.

Of course, the EB-5 program's primary focus is job creation. Palm House Hotel, LLLP is excited to be an important factor in investing in the creation of new jobs. The project described herein will provide a beneficial impact to the community, provide jobs, and provide a boost to the local and national economies.

## 3.2 Project Description



*Artist's rendering of completed fountain, fitness center, cabanas, and pool area*

On the island of Palm Beach, just steps from the ocean in sunny South Florida, the project Developer was able to acquire an existing hotel in a prime location. Just off Worth Avenue, the epicenter for luxury and wealth in the southeastern United States, the project site held great opportunity as an ultra high-end luxury resort.

Sensing this opportunity, the project Developer began an undertaking to finance, remodel, renovate, and operate a world-class hotel and resort—the Palm House Hotel.

The Company (through an affiliated entity) already owns the subject property, having purchased it in August 2006. At that time, an older hotel existed on the property, which would need to be completely remodeled to the standards of a new, modern, 5-star hotel that would compete with the best resorts in the world.



*Aerial view of the property and existing hotel, before current renovations*

In preparation for securing EB-5 funding, the Developer spent years of time and tens of millions of dollars of its own equity to begin extensive remodeling of the existing hotel, in order to modernize it and bring it up to a 5-star luxury level. The Developer has invested substantial funding to prepare architectural plans, renderings of the proposed renovations, finances and planning, and to start remodeling. Additionally, the Developer was able to get the site plan improvements approved by the Town of Palm Beach Planning, Zoning, & Building Department, making it the last of only five luxury (5-star) hotels on the coveted island of Palm Beach itself.

Since the extensive renovations, remodeling, and construction activity would take several years, this activity was started using bridge financing and the Developer's own equity in anticipation of receiving the EB-5 funding necessary to complete renovations and begin hotel operations.

Below are current photographs of the ongoing construction at the property, including work being performed on the underground garage, the outdoor pool area, and remodeling of the lobby, interior spaces, and guestrooms.



*Current state of pool area construction (Nov 2012), with Joe Walsh, President of SARC*



*Current state of garage construction (Nov 2012), with Joe Walsh and Bob Matthews, chairman of Matthews Ventures Holdings, LLC*



*Completed remodeled bathroom in guestroom*



*Completed remodeled guestroom*



*Palm House Hotel robe with monogram*



*Guestroom partially remodeled (as of Nov 2012)*



*Current view (Nov 2012) of front of Palm House Hotel, from Royal Palm Way*



*Computer rendering of completed pool area, cabanas, and guestrooms with balconies*

## 3.3 Guestrooms and Architectural Plans



*Architectural rendering of front of hotel*

The Palm House Hotel will encompass a full service hotel and private club, containing 92,546 square feet, of which 44,430 is contained in 79 guestrooms in two inter-connected buildings. The smallest guestrooms are 415 square feet, large even for the typical luxury hotel room; suites range in size up to 1,054 square feet.



*Architectural rendering of main floor: lobby, guestrooms, spa, and pool area*

The 79 guestrooms will contain a mix of large standard guest rooms, suites, and mini-suites, to accommodate the needs of every guest.

| Unit # | QT | Unit Description | SF per Unit | Total SF. |
|--------|-----|------------------|-------------|-----------|
| **Hotel Units SF** | | | | |
| **First floor** | | | | |
| A | 1 | Large One Bedroom | 949 | 949 |
| B | 1 | Studio | 475 | 475 |
| C L | 1 | One Bedroom | 734 | 734 |
| C R | 1 | One Bedroom | 689 | 689 |
| D | 1 | One Bedroom | 870 | 870 |
| E | 5 | Studio | 475 | 2,375 |
| E1 | 1 | Studio | 475 | 475 |
| N | 1 | One Bedroom plus den | 960 | 960 |
| F | 2 | One Bedroom | 792 | 1,584 |
| F1 | 1 | One Bedroom | 782 | 782 |
| G | 8 | Studio | 379 | 3,032 |
| G1 | 2 | Studio | 379 | 758 |
| G2 | 1 | Studio | 415 | 415 |
| **Second floor** | | | | |
| A | 1 | Large One Bedroom | 949 | 949 |
| B | 1 | Studio | 475 | 475 |
| C L | 1 | One Bedroom | 734 | 734 |
| C R | 1 | One Bedroom | 689 | 689 |
| D | 1 | One Bedroom | 990 | 990 |
| E | 5 | Studio | 475 | 2,375 |
| E1 | 1 | Studio | 475 | 475 |
| N | 1 | One Bedroom plus den | 960 | 960 |
| F | 3 | One Bedroom | 792 | 2,376 |
| F1 | 1 | One Bedroom | 782 | 782 |
| G | 8 | Studio | 379 | 3,032 |
| G1 | 2 | Studio | 379 | 758 |
| H | 1 | Studio | 576 | 576 |
| **Third floor** | | | | |
| J | 1 | Studio | 605 | 605 |
| K | 6 | Large Studio | 579 | 3,474 |
| L | 1 | Large Studio | 1,054 | 1,054 |
| M1 | 1 | One Bedroom | 676 | 676 |
| M2 | 1 | One Bedroom | 839 | 839 |
| M3 | 1 | One Bedroom | 843 | 843 |
| G | 8 | Studio | 379 | 3,032 |
| G1 | 2 | Studio | 379 | 758 |
| F | 3 | One Bedroom | 792 | 2,376 |
| F1 | 1 | One Bedroom | 796 | 782 |
| F2 | 1 | One Bedroom | 722 | 722 |
| **Total SQ. FT** | | | | 44,430 |
| | | Indicates lockout room to create two hotel rooms | | |

*Breakdown of guestroom types and square footage*

Appointments within the guest rooms will include two closets with European closet systems, five-fixture bathrooms, wet bar and entry foyer, in-room safes; most units will have terraces. Guest amenities include state-of-the-art audio/visual components including flat panel HD/LCD televisions, stereo / CD players and Wi-Fi (high speed Internet) connectivity, iPod and docking station, minimum four phones; all rooms have automated controls for draperies, lights and sound system.

Five-fixture bathrooms include steam shower and spa tub. Baths will also have Seura recessed TVs behind the mirror.

Furnishings for guestrooms and all common areas include a mix of built-in and free-standing custom-made pieces utilizing natural woods and high-end fabrics. Wet bar with granite tops; appliances are to be Míele or equal. The Míele speed oven, a microwave / convection combination was provided as typical. Wet bars to be equipped with fine china and crystal, Hermés or equal. Other appliances include integrated drawer refrigeration, Sub-Zero or similar; Sub-Zero 700 BC combination drawers were provided as typical. Minibar to be Bartech automatic system or equal; Bartech W32 model was provided as typical.

All soft goods to be Pratesi or equal. 18-piece bath products are expected to be high-end brand, named or private label, Kiehl's or equal.



*Architectural plans of hotel lobby*

| | A/C Sq. Ft. | Terrace SF |
|---|---|---|
| Parking 1 (next to laundry) | 9,383 | |
| Parking 2 (salon entrance) | 11,683 | |
| kitchen restaurant | 2,545 | |
| Salon & spa | 3,629 | |
| fitness center | 3,167 | |
| hotel service (funcion space) | 520 | |
| Lobby | 1,224 | |
| restaurant | 3,047 | 1,339 |
| function space | 4,367 | |
| parking function space | 3,990 | |
| Dining Room | 4,561 | 1,642 |
| terrace function space | | 1,968 |
| TOTAL COMMON AREA SF | 48,116 | 2,981 |

*Breakdown of other hotel facilities and square footage*

The remaining 48,116 square feet includes a full-service restaurant, event / function space, lounge, salon and spa, lobby, offices, fitness center and other common areas. The hotel contains three levels above grade and one below.



*Artist's rendering, overhead view of pool and spa areas*



*Architectural rendering of pool and spa facilities*

For additional architectural renderings, please see Attachment E.

## 3.4 The Private Club



*Artist's rendering, main lobby*

The property will feature a unique private social club, where the most prominent figures in civic, commercial, financial and social life would gather together to socialize.

Located in Palm Beach, the Palm House Hotel and Club will include exquisite spaces and amenities that provide an elegant destination for our members. Spectacular interiors will create an atmosphere that is stylish and chic, yet consistent with our locale on an island steeped in history and tradition.

The food and beverage facilities shall be second to none with restaurant breakfast, lunch, and dinner service available seven days a week. Club members and their special guests will gain access to world-class facilities similar only available to a select few. Facilities and membership will rival Annabel's of London. Residents and members have house accounts and have the option of having their own private bottles available to them in the restaurant. A full staff will be on site 24 hours a day to anticipate and deliver the finest standard of personal service and comfort to residents and their guests.

The Developer believes the property will have all the requisite features: location, amenity package, and trophy quality luxury, to make The Palm House Club one of the most prestigious and exclusive private clubs in the world.

Member facilities and amenities include:

- Hawker Jet 850 X P
- 100' Yacht
- Rolls Royce Ghost
- 24hr concierge, doorman and valet underground parking
- Traditional European spa, health club, and pool
- Climate controlled wine cellar with a collection of the world's finest wines.
- Cigar bar and humidor
- Business center with 24hr reception and conference rooms
- Games rooms; billiards, cards
- Catering services and event planning for private meetings, events or functions
- Personal shopping and delivery services, including groceries, cleaners, pharmacies, etc.
- Cabaret/ Ballroom
- Private Dining Room
- Chef's Table
- Bar/Lounge
- Library/ Reading Lounge
- Bowling Parlor
- Hair Salon/ Blow Bar
- Yoga/ Pilates Studio
- Private Screening Room

Reciprocal Access and Privileges:

- Hong Kong (proposed)
- New York, NY (proposed)
- Hollywood, CA (proposed)
- Aspen, CO (proposed)

## 3.5 Project Site



*Artist's rendering of completed front entrance on Royal Palm Way*

The project site is in Palm Beach County, Florida, in the center of the Region served by SARC.

The project site is located at 160 Royal Palm Way, Palm Beach, Florida, an exceptional location for a high-end luxury hotel and resort. The Property's location in the Town of Palm Beach benefits from having one of the highest concentrations of wealth in the world, making real estate ownership on the island extremely attractive. Given the degree of disposable income of Palm Beach residents and visitors, the Property has the potential to deliver significant additional income from the Food & Beverage operations.



*Map overview of Project Site*

The Property is also ideally located on Royal Palm Way, only half a block from the ocean and less than five blocks from Worth Avenue, which is one of the world's most high end retail areas.



*Worth Avenue*

Legal Description

Lots 31 to 33, Block F of the ROYAL PARK ADDITION, recorded in Plat Book 4, Page 1 of the land records of Palm Beach County. Source: Deed; OR Book 20776, Page 1540.



*Close-up map detail of Project Site*

<u>Zoning/ Land Use</u>

The subject zoning is zoned C-B, Commercial and Offices, by the Town of Palm Beach, Florida. The C-B classification's purpose is "...to create an environment especially suited to a group of professional and administrative offices compatible in appearance with single- family housing." The classification limits building area to 2,000 square feet gross leasable area (GLA); however, also provides that "any commercial establishment with greater than 2,000 square feet GLA are permitted provided the Town Council has found that the proposed use is town serving." Further, the subject has existing approvals for both the major reconstruction underway as of date of value and for future condominium conversion.



*2011 Site Survey by G.C.Y., Inc. (see Attachment E)*

Site Size, Shape, Access & Easements

The Subject site is a rectangular parcel that contains 66,000 square feet or 1.65 Palm Beach acres (40,000 square feet per PB acre) or 1.51 acres. The property has 300 feet of frontage on and access from Royal Palm Way on its north and is 220 feet deep. It is approximately 3⁄4 block from the ocean.

Utilities

All public utilities are available to the Subject Property with water and sewer provided by the City of West Palm Beach, telephone by BellSouth, and electricity by FPL.

Topography

The Subject parcel is relatively level and at or near grade of the adjacent Royal Palm Way roadway improvements. There were no apparent drainage problems at the time of inspection.

# 4.0 FINANCIAL

## 4.1 General

Due to its numerous business advantages, Management believes that: (i) the Palm House Hotel Project will be profitable; and (ii) each Limited Partner will achieve a reasonable return on its investment.

The Company anticipates that it will be able to operate the Project on a profitable basis and distribute dividends and net cash flow not less frequently than annually.

Specific financial figures discussed herein refer to the Palm House Hotel Project, a development to be located in the Region. Additional potential developments will be analyzed by Management for profitability, suitability, and job creation in a similar fashion.

Please see the pro forma financial projections below for further details.

## 4.2 Investment Summary

The Palm House Hotel Project seeks to construct and develop a luxury hotel in Palm Beach, Florida. It is described more thoroughly in the preceding section.

The Limited Partnership will pool EB-5 investor funds, which it will loan to the Company. The Company will use those funds to develop the Project, which will create both direct and indirect jobs.

A project timeline, sources and uses of funds for the Project, and pro forma financial information are included herein.

## 4.3 Investment Timeline

| PALM HOUSE HOTEL PROJECT TIMELINE | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Year 0 | | | | Year 1 | | | | Year 2 | | | | Year 3 | | |
| | | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 |
| Administrative Phase | | | | | | | | | | | | | | | | | |
| Design Phase | | | | | | | | | | | | | | | | | |
| Approvals & Permits | | | | | | | | | | | | | | | | | |
| Construction & Renovation | | | | | | | | | | | | | | | | | |
| Hotel Operations | | | | | | | | | | | | | | | | | |

**Admin. & Design Phase**   Non-EB-5 funds deployed (no jobs created)

**Construction Phase**   EB-5 funds combined with other funding, construction jobs created:   **688.2**

**Operation Phase**   All funds have been deployed, jobs created from operations:   **265.5**

*Palm House Hotel Project Investment Timeline*

The project Developer acquired the property in August 2006. Since construction and full renovation would take several years, the Developer used a combination of its own equity and bridge loan financing to acquire the property and begin renovations, which have been ongoing.

The project now needs EB-5 funding to complete renovations and remodeling, and for start-up operational costs necessary to open for business.

As evidenced by the numerous architectural plans and computer renderings included herein and attached (Attachment E), the administrative and design phase of the project has been completed.

Construction has been ongoing, and has already taken longer than two years (see hard costs already spent, Attachments C and F). Construction is projected to continue for another 12–18 months after EB-5 funding is obtained, with the hotel opening for business in early 2014.

Approvals & Zoning

On June 12, 2007, the property was approved for a zoning waiver to convert the existing hotel to a condominium hotel with restaurant, spa, and other uses. Please see the zoning approval letter from the Town of Palm Beach Planning, Zoning, & Building Department, attached as Attachment A.

## 4.4 Sources of Proceeds

One method being utilized by the Company to obtain investment funds is by offering Units in PHH, LLLP to EB-5 Investors pursuant to the EB-5 Program, which grants lawful conditional and permanent resident status in the United States to foreign investors who make qualifying investments under the Immigration Act and EB-5 Program.

As required by the EB-5 Program: (i) qualified foreign investors must invest in PHH, LLLP and complete the required immigration procedures, and (ii) a qualifying investment must be invested in a project that creates at least ten (10) full time direct and/or indirect jobs for qualified U.S. workers for each $500,000 invested. The Company will employ a sufficient number of full-time direct employees and/or cause the creation of indirect jobs (evidenced by an approved econometric study) in order to assure a qualifying investment under the EB-5 Program.

Please see the econometric analysis included with this Confidential Business Review that: (i) quantifies the benefits of the Company to the state and local economy, and (ii) demonstrates that the Company will create at least ten (10) full-time direct and/or indirect jobs for qualified U.S. workers for each $500,000 invested by each EB-5 Investor.

Palm House Hotel Project, Sources of Proceeds

A total investment of $91,000,000 is anticipated for the Palm House Hotel Project, a luxury hotel to be located in the Region. The sources of the proceeds for this project are as follows:

| Source of Funds | Amount | Percentage |
|---|---|---|
| EB-5 Capital: | $39,500,000 | 43.4% |
| Developer Equity: | $22,000,000 | 24.2% |
| Bank Financing: | $29,500,000 | 32.4% |
| TOTAL: | $91,000,000 | 100% |

The bank financing referenced above is in the form of a mortgage on the property taken out by the Developer. This financing may be replaced with bridge financing or financing from another source.

## 4.5 Use of Proceeds

The proceeds received from the Offering will be used to help finance the development of the Palm House Hotel Project, a $91,000,000 project located in Palm Beach County, Florida. The breakdown of fund uses is below:

| Use of Funds | Amount |
|---|---|
| Land Acquisition Cost: | $29,000,000 |
| Construction (Hard Costs): | $34,684,500 |
| Soft Costs: | $9,201,268 |
| Furniture, Fixtures, & Equipment: | $4,500,000 |
| Interest & Carrying Costs: | $4,690,186 |
| Start-Up Operational Expenses: | $7,924,273 |
| Other / Contingency: | $999,773 |
| TOTAL: | $91,000,000 |

The project Developer has already made a substantial equity investment in the Project, and has spent substantial sums to acquire the property, pay interest, taxes, and carrying costs, and to begin construction and remodeling work. See a list of incurred expenses as Attachment F.

Land Acquisition Cost

The land was purchased by a company owned by the Developer in August 2006 for $29,000,000; the transfer was recorded in OR Book 20776, Page 1540 of the Palm Beach County land records as a non-real estate transaction with a $10 consideration. (See Palm House Hotel & Private Club Appraisal, by Callaway & Price, Inc., attached as Attachment B, page 31.)

Hard Construction Costs

Hard construction costs are listed below and presented in more detail in Attachment C.

| DESCRIPTION OF WORK | VALUE |
|---|---|
| Site work | $725,000 |
| Waterproofing | $320,000 |
| Landscaping | $175,000 |

| | |
|---|---|
| Hardscape | $85,000 |
| Demolition | $725,000 |
| Concrete | $1,650,000 |
| Masonry | $1,350,000 |
| Structural Steel | $625,000 |
| Exterior stucco | $420,000 |
| Precast | $675,000 |
| Exterior paint | $185,000 |
| Balcony Rails | $155,000 |
| Exterior Façade and Trim | $125,000 |
| Roofing | $625,000 |
| Windows and Doors-Exterior | $1,700,000 |
| Interior trim -Doors, and Hardware | $505,000 |
| Lobby | $750,000 |
| Unit Drywall | $575,000 |
| Unit framing | $1,380,000 |
| Unit painting | $195,000 |
| Millwork | $800,000 |
| Unit Bathroom Tile | $1,350,000 |
| Tile Flooring in Units | $650,000 |
| FFE | $1,250,000 |
| Unit Appliances | $250,000 |
| Corridor Flooring | $110,000 |
| Labor/cleaning | $550,000 |
| Function Room Building | $1,500,000 |
| Spa Allowance | $2,000,000 |
| Pool and Water feature | $300,000 |
| Function Room Interior Fit Out | $350,000 |
| Laundry/back of house | $65,000 |
| Banquet room Food Service Equip. | $125,000 |
| 1st floor dining | $800,000 |
| Restaurant Allowance | $1,500,000 |
| Elevators | $700,000 |
| Sprinkler | $550,000 |
| HVAC | $1,650,000 |
| Plumbing | $1,363,500 |
| Fire Protection | $375,000 |
| Electrical | $2,150,000 |
| Audio/video | $960,000 |
| **Hard Costs Subtotal:** | **$32,293,500** |
| | |
| *Contingency* | *$2,391,000* |
| **TOTAL** | **$34,684,500** |

Excluding contingency costs, the total comes to $32,293,500, which divided by 79 rooms equates to about $408,778 per room. This puts the costs on the upper end of the "Luxury Hotels and Resorts" category in the HVS chart below. Considering the Palm House Hotel's ultra-premium, high-end luxury branding and amenities (above the average hotel in the "luxury" category), this cost is in line with others in the industry.

| 2011 | Land | Building and Site Improvements | Soft Costs | FF&E | Pre-Opening and Working Capital | Total |
|---|---|---|---|---|---|---|
| **Budget/Economy Hotels** | | | | | | |
| Average | $11,100 | $52,300 # | $4,400 # | $8,300 # | $3,000 # | $67,200 |
| Median | $10,600 | $47,600 # | $2,200 # | $8,300 # | $2,900 # | $54,300 |
| Allocation | 14% | 66% | 10% | 11% | 3% | |
| **Midscale Hotels w/o F&B** | | | | | | |
| Average | $22,200 | $73,500 # | $11,100 # | $9,800 # | $4,100 # | $100,900 |
| Median | $11,600 | $65,000 # | $8,100 # | $9,500 # | $2,800 # | $84,600 |
| Allocation | 14% | 67% | 10% | 10% | 5% | |
| **Extended-Stay Hotels** | | | | | | |
| Average | $12,200 | $81,400 # | $11,300 # | $13,000 # | $3,300 # | $135,500 |
| Median | $10,900 | $71,400 # | $9,900 # | $13,400 # | $2,400 # | $108,700 |
| Allocation | 12% | 67% | 9% | 12% | 4% | |
| **Midscale Hotels w/ F&B** | | | | | | |
| Average | $13,900 | $79,100 # | $13,200 # | $12,400 # | $3,800 # | $120,800 |
| Median | $10,200 | $65,200 # | $10,400 # | $11,600 # | $3,000 # | $103,600 |
| Allocation | 13% | 65% | 11% | 12% | 3% | |
| **Full-Service Hotels** | | | | | | |
| Average | $15,500 | $125,400 # | $22,200 # | $22,700 # | $6,900 # | $212,300 |
| Median | $12,100 | $113,800 # | $14,000 # | $18,600 # | $5,700 # | $159,300 |
| Allocation | 12% | 64% | 12% | 12% | 4% | |
| **Luxury Hotels and Resorts** | | | | | | |
| Average | $79,800 | $356,100 # | $133,800 # | $55,100 # | $20,800 # | $610,500 |
| Median | $81,500 | $308,800 # | $88,600 # | $58,900 # | $18,700 # | $549,000 |
| Allocation | 17% | 59% | 14% | 10% | 4% | |
| Source: HVS | | | | | | |

*HVS 2011 Hotel Survey showing hotel development costs*

<u>Soft Costs</u>

A breakdown of soft construction costs is detailed below.

| | |
|---|---|
| CM Preconstruction | $375,000 |
| CM Fee | $1,937,980 |
| CM Construction Staff | $614,000 |
| Indirect Cost/General Conditions | $512,290 |
| Arch./Engineers/Design/Consultant | $549,298 |
| Project Admin/Management | $1,100,000 |
| Developer Fee | $1,100,000 |
| **Subtotal Soft Costs:** | **$6,188,568** |
| | |
| *Contingency (5%)* | *$340,350* |
| Building Permit $16/1000 | $225,000 |
| License/Permits | $50,000 |
| Security/Fire Alarm | $25,000 |
| Accounting | $45,000 |
| Consulting | $120,000 |
| Information Technology | $80,000 |
| Transportation | $25,000 |
| Utilities | $52,000 |
| Marketing/Advertising | $400,000 |
| Travel/Entertainment | $150,000 |
| Maintenance | $40,000 |
| Taxes | $240,000 |
| Legal | $150,000 |
| Insurance | $175,000 |
| Public Relations | $145,000 |
| Title/Records | $105,000 |
| Third Party Costs | $65,000 |
| Intangible Taxes | $120,000 |
| Misc Closing Costs | $120,000 |
| Contingency (5%) | $340,350 |
| | |
| **TOTAL SOFT COSTS** | **$9,201,268** |

Soft costs total $9,201,268, which equates to about $116,472 per room (79 rooms), which is right in line with soft costs of luxury hotels, listed with a median of $88,600 and average of $133,800 on the HVS chart above.

Furniture, Fixtures, and Equipment

FF&E costs include room furnishings (such as beddings, desks, chairs, lamps, flat-screen televisions, refrigerators and mini-bars, etc.) as well as lobby and other furnishings (chairs, couches, desks, chandeliers, etc.).

These costs are projected at $4,500,000, or approximately $56,962 per room (79 rooms). This is in line with FF&E costs of luxury hotels, listed with a median of $55,100 and average of $58,900 on the HVS chart above.

<u>Start-Up Operational Expenses (Working Capital)</u>

The project Developer has budgeted $7,924,273 towards start-up operational expenses of the hotel, which is enough to cover expenses for Year 1 of operations. By that time, operational revenues are projected to be sufficient to cover operational expenses.

**4.6 Return on Investment**

Based upon the pro forma financial projections (included as Attachment D and excerpted below), it is anticipated that the Company will generate significant returns on investment.

The projected earnings before interest, taxes, depreciation, and amortization (EBITDA) for the first year of operation are $5,141,587, for the second year are $5,862,505, for the third year are $6,676,634, for the fourth year are $7,337,635, and for the fifth year are $7,251,401.

| Palm House Hotel Proforma Income Statements 79 Keys (Rooms) | Year 1 2014 | Year 2 2015 | Year 3 2016 | Year 4 2017 | Year 5 2018 |
|---|---|---|---|---|---|
| *Operating Statistics* | | | | | |
| Available Room Nights (ARN) | 28,835 | 28,835 | 28,835 | 28,835 | 28,835 |
| Occupied Room Nights (ORN) | 16,724 | 17,589 | 18,166 | 18,743 | 18,454 |
| **Occupancy %** | **58.0%** | **61.0%** | **63.0%** | **65.0%** | **64.0%** |
| **Average Daily Rate (ADR)** | **$500.00** | **$522.50** | **$551.24** | **$573.29** | **$590.49** |
| RevPAR | $290.00 | $318.73 | $347.28 | $372.64 | $377.91 |
| RevPAR Growth | NA | 9.91% | 8.96% | 7.30% | 1.42% |
| *Revenue* | | | | | |
| Rooms | $ 8,362,150 | $ 9,190,435 | $10,013,808 | $10,744,975 | $10,897,058 |
| Food & Beverage | 3,762,968 | 4,135,696 | 4,506,214 | 4,835,239 | 4,903,676 |
| Spa / Salon / Fitness Center | 668,972 | 735,235 | 801,105 | 859,598 | 871,765 |
| Other Income | 271,770 | 298,689 | 325,449 | 349,212 | 354,154 |
| **Total Revenue** | **13,065,859** | **14,360,055** | **15,646,575** | **16,789,023** | **17,026,653** |
| Total Revenue Growth | NA | 9.91% | 8.96% | 7.30% | 1.42% |
| *Departmental Expenses* | | | | | |
| Rooms | 1,254,323 | 1,352,181 | 1,431,428 | 1,513,792 | 1,527,765 |
| Food & Beverage | 3,010,374 | 3,225,843 | 3,379,660 | 3,529,724 | 3,726,794 |
| Spa / Salon / Fitness Center | 434,832 | 463,198 | 488,674 | 550,143 | 575,365 |
| Other Income | 135,885 | 140,384 | 146,452 | 153,653 | 152,286 |
| **Total Departmental Expenses** | **4,835,413** | **5,181,606** | **5,446,214** | **5,747,312** | **5,982,210** |
| Departmental Expense Ratio | 37% | 36% | 35% | 34% | 35% |
| *Undistributed Operating Expenses* | | | | | |
| Administration & General | 720,875 | 753,314 | 787,214 | 822,638 | 859,657 |
| Sales & Marketing | 576,700 | 602,652 | 629,771 | 658,111 | 687,725 |
| Energy Costs / Utilities | 250,865 | 275,713 | 297,567 | 320,829 | 330,108 |
| Maintenance | 432,525 | 451,989 | 472,328 | 493,583 | 515,794 |
| **Total Undist. Oper. Expenses** | **1,980,965** | **2,083,668** | **2,186,879** | **2,295,160** | **2,393,285** |
| **Gross Operating Profit** | **6,249,482** | **7,094,782** | **8,013,482** | **8,746,551** | **8,651,158** |
| Gross Operating Profit Margin | 48% | 49% | 51% | 52% | 51% |
| **Total Management Fees** | **391,976** | **466,702** | **521,031** | **545,643** | **510,800** |
| *Other Deductions* | | | | | |
| Property Taxes | 216,263 | 224,913 | 233,910 | 243,266 | 252,997 |
| Insurance Expense | 173,010 | 181,661 | 190,744 | 200,281 | 210,295 |
| **Total Other Deductions** | **389,273** | **406,574** | **424,653** | **443,547** | **463,291** |
| **Net Operating Profit** | **5,468,233** | **6,221,506** | **7,067,798** | **7,757,361** | **7,677,067** |
| Net Operating Profit Margin | 42% | 43% | 45% | 46% | 45% |
| **Reserve for Replacement** | **326,646** | **359,001** | **391,164** | **419,726** | **425,666** |
| **Projected EBITDA / NOI** | **$ 5,141,587** | **$ 5,862,505** | **$ 6,676,634** | **$ 7,337,635** | **$ 7,251,401** |

*Palm House Hotel 5-year pro forma financial projections*

Year 1

Room revenue is based on 79 rooms (28,835 room-nights), at an occupancy rate of 58% (16,724 occupied room-nights), and an average daily rate (ADR) of $500 per night. This equates to Revenue Per Available Room (RevPAR) of $290.00, and total room revenue of $8,362,150.

Additional revenue comes mainly from food and beverage sales, which is projected at 45% of room revenue, or $3,762,968. Revenue from the spa, salon, and fitness center is projected at 8% of room revenue, or $668,972. And other income, from retail (hotel gift shop), telephones, and event space rental is projected at 3.25% of room revenue, or $271,770. This brings total revenue to $13,065,859.

Expenses include departmental expenses ($4,835,413), undistributed operating expenses ($1,980,965), management fees ($391,976), other deductions ($389,273), and reserve for replacement ($326,646). Total expenses are $7,924,273, leaving EBITDA of $5,141,587.

Year 2

Room revenue is based on 79 rooms (28,835 room-nights), at an occupancy rate of 61% (17,589 occupied room-nights), and an average daily rate (ADR) of $522.50 per night. This equates to Revenue Per Available Room (RevPAR) of $318.73, and total room revenue of $9,190,435.

Additional revenue comes mainly from food and beverage sales, which is projected at 45% of room revenue, or $4,135,696. Revenue from the spa, salon, and fitness center is projected at 8% of room revenue, or $735,235. And other income, from retail (hotel gift shop), telephones, and event space rental is projected at 3.25% of room revenue, or $298,689. This brings total revenue to $14,360,055.

Expenses include departmental expenses ($5,181,606), undistributed operating expenses ($2,083,668), management fees ($466,702), other deductions ($406,574), and reserve for replacement ($359,001). Total expenses are $8,497,550, leaving EBITDA of $5,862,505.

| Number of rooms | 79 |
|---|---|
| Available room-nights | 28,835 |
| Occupancy rate | 61.0% |
| Occupied room-nights | 17,589 |
| Average Daily Rate | $522.50 |
| RevPAR | $318.73 |
| Room Revenue | $9,190,435 |
| | |
| Ancillary Revenue (F&B, etc.) | $5,169,620 |
| | |
| Total Revenue | $14,360,055 |
| | |
| Total Expenses | $8,497,550 |
| | |
| EBITDA | $5,862,505 |

*Year 2 Summary Pro Forma*

Support for Year 2 Revenue Projections

While the "Palm Beach" market has hundreds of hotels listed, almost all of them are not actually on the island but are in West Palm Beach, Riviera Beach, Manalapan, etc. there are only four 5-star hotels actually in Palm Beach: The Breakers, Four Seasons, Ritz-Carlton, and the Brazilian Court (see Section 7.2). While there is some elasticity in the "5-star" rating, the amenities at other hotels claiming to fit into this category are not up to the level at these four hotels.

Posted rates for these four hotels start at an average of $525 per night but that figure is somewhat misleading for two reasons: only a relatively few rooms in each hotel are available at the lowest rate, and rooms during high season (January-March) are generally available only at much higher prices. For example, a search of the website for the Breakers and the Four Seasons Hotel in Palm Beach on November 21, 2012, for a wide variety of dates during the first quarter of 2013 revealed either that no rooms were available at all, or that the minimum quoted rates were all above $1,000. For this reason, the first year price of $522.50 per night for the Palm Hotel is quite conservative; it also takes into account the fact that rates are usually about $100 per night lower during the summer months.

The next question is the issue of the occupancy rate, which the developer has assumed to be 61%. This is a very conservative figure, as the occupancy rate for Palm Beach hotels, according to Smith Travel Research and the Palm Beach County Tourism Department (see below) is usually 70% on an annual basis. This figure is well below the 78% figure that is generally considered to indicate a shortage of hotel rooms. However, the seasonal swings for Palm Beach County are much wider than most locations, as shown next in Table 9-2 (note: no separate figures are available for 5-star hotels in Palm Beach).  While the average annual rate is 70%, the rate rises above 86% in February and March; and as already noted, as of November, 2012, the 5-star hotels in Palm Beach are almost completely sold out for February and March 2013.

| Month | Rate |
|-------|------|
| October | 65.8 |
| November | 72.9 |
| December | 67.5 |
| January | 76.9 |
| February | 86.2 |
| March | 86.6 |
| April | 75.1 |
| May | 67.4 |
| June | 66.9 |
| July | 62.7 |
| August | 59.1 |
| September | 54.3 |

*Hotel Occupancy Rates by Month, Palm Beach County, 5-Year Average*
*Source:  Report on Palm Beach County Tourism*

According to HVS, "As a rule of thumb, in a typical commercial market, where demand is high Monday through Thursday and drops considerably on weekends, a strong stabilized level of occupancy would be 70 percent. Under such circumstances, an area-wide occupancy rate of 78

percent would probably produce a significant amount of un-accommodated demand. If, on the other hand, most of the lodging facilities in the area were operating with an occupancy level of around 60 percent, the un-accommodated demand would probably be negligible."[1]

A final factor to be considered is that space is extremely limited on Palm Beach Island, and it is very unlikely that any more hotels will be built in the city. As a result, occupancy rates are likely to be relatively high in the coming years, with little or no chance of other hotels being opened right in the city.

Considering the 70% Palm Beach County hotel occupancy rate and the limited supply of comparable properties in the immediate area, the 61% occupancy rate forecasted by the developer in Year 2 is conservative and likely to be obtained or exceeded.

## 2012 RevPAR Forecast By Chain-Scale



| Chain-Scale | 2011 | 2012F | 2013F |
|---|---|---|---|
| Luxury (Ritz-Carlton, Four Seasons) | 11.2% | 6.0% | 7.5% |
| Upper-Upscale (Marriott, Hilton) | 6.6% | 6.5% | 5.9% |
| Upscale (Courtyard, Hyatt Place) | 8.0% | 7.4% | 8.6% |
| Upper-Midscale (Hampton, H.I.) | 8.6% | 4.8% | 4.7% |
| Midscale (Best Western, LaQuinta) | 3.0% | 3.2% | 3.7% |
| Economy (Days Inn, Red Roof) | 6.0% | 4.6% | 5.2% |
| All Hotels | 8.2% | 5.8% | 6.6% |

Source: PKF Hospitality Research, March-May 2012 *Hotel Horizons*® report.

11

As the hotel market and national economies recover, hotel performance indicators (such as ADR, occupancy rate, and RevPAR) are expected to continue to increase. As shown in the chart above, luxury hotels significantly outperformed all other categories in 2011, posting 11.2% increases in

---

[1] Source: page 8-14 of the  HVS Hotel Investments Handbook, written by Steven Rushmore, founder of HVS.

RevPAR. Further, they are projected to outperform the national average in 2012 and 2013, by posting healthy RevPAR gains of 6.0% and 7.5%, respectively.

Smith Travel Research (STR) agrees, showing that luxury hotels posted not only the largest RevPAR increases of any hotel category in 2011, but also the largest ADR increases as well (see chart below).[2]



Also see Sections 7.2 and 7.3 for a competitive analysis supporting the financial projections used above. Each of the comparable hotels listed there have in-season rates that start over $500 and range well over $1,000 per night. Off-season rates are only slightly more affordable, ranging from about $300 to $750 or more. Combined, the average rates of comparable properties easily supports the conservative $522.50 full-year ADR used in the Year 2 projections above.

Finally, please see the Palm House Hotel & Private Club Appraisal, by Callaway & Price, Inc., attached as Attachment B, which offers detailed support for the ADR and occupancy rate projections used above.

Support for Other Revenue

According to the Smith Travel Research survey shown below, hotel room rates for full service hotels generated 64% of the total hotel bill in 2011, so this percentage is used to estimate ancillary revenues. Based on hotel room revenues of $9.19 million, the total revenue figure would be $14.36 million ($9.19M is 64% of $14.36M).

---

[2] Source: STR Host 2012 Report (U.S. Hotel Operating Statistics Study, Report for the Year 2011).

| | 2011 Full-Service Hotels | | |
|---|---|---|---|
| Occupancy (of Sample) | 68.5% | | |
| Average Size Of Property (Rooms) | 290 | | |
| Average Daily Rate | $153.81 | | |
| | Ratio to Sales | Per Available Room | Per Occupied Room Night |
| **REVENUE** | | | |
| Rooms | 64.0% | $37,939 | $153.81 |
| Food | 18.8 | 11,126 | 45.11 |
| Beverage | 5.4 | 3,184 | 12.91 |
| Other Food & Beverage | 4.8 | 2,821 | 11.44 |
| Telecommunications | 0.5 | 278 | 1.13 |
| Other Operated Departments | 4.4 | 2,610 | 10.58 |
| Rentals & Other Income | 1.9 | 1,122 | 4.55 |
| Cancellation Fee | 0.2 | 137 | 0.55 |
| **Total Revenue** | 100.0% | $59,217 | $240.08 |

*Hotel Revenues by Major Function, Full-Service Hotels*
*Source: Smith Travel Research, U.S. Hotel Operating Statistics Study, Report for the Year 2011*

Private Membership Club Revenue

The private membership club (detailed above in Section 3.4) will also generate revenue for the project. These private memberships will initially be sold for approximately $150,000 to $250,000 each (discounts may be offered in certain circumstances from the base price of $250,000). Using an average figure of $200,000, the developer is conservatively estimating selling at least 10 club memberships in the next two years, bringing in an additional $2,000,000 in revenue.

Also see Section 7.4 for a competitive analysis supporting the club membership projections above.

**4.7 Foreign Investor Return on Investment**

Return for foreign investors will be as specified in the Partnership Agreement. The return on the investment for each investor is projected to be 0.25% per annum, paid from profits from the commercial enterprise. Investors are projected to receive a simple 0.25% interest payment annually. Current projections call for five years worth of payments.

Exit Strategy

The Company's strategy to repay the Partnership's Loan, thereby allowing the Partnership to return capital invested in the Offering to Investors, is to sell or refinance the Project at the end of year five (5). There is no guarantee that such a sale or refinance will be consummated on acceptable terms, if at all. The purchase of the Units is a long-term investment.

**4.8 Method of Financing**

The Company intends to raise the capital necessary to achieve the Company's purposes by offering Limited Partnership Units in PHH, LLLP to EB-5 Investors.

It is anticipated that a substantial number of investors will be Alien Entrepreneurs ("EB-5 Investors") desiring to take advantage of the EB-5 Program offered pursuant to the Immigration Act. The EB-5 Program permits a qualified EB-5 Investor to obtain U.S. permanent residency (*i.e.*, a "green card") for such EB-5 Investor and members of his/her immediate family within two (2) years after making a passive investment of $1,000,000 (or $500,000 in a qualified Regional Center).

Under Section 203(b)(5) of the Immigration Act, immigrant visas are available to qualified foreign individuals seeking permanent resident status on the basis of an investment of capital in a new commercial enterprise which qualifies under the EB-5 Program.

The EB-5 Program provides for the issuance of conditional or temporary (*i.e.*, 24 months) green cards to a qualified foreign investor and its family that invests a minimum of $1,000,000 (U.S.) in a new commercial enterprise that creates at least ten (10) full-time permanent jobs for United States workers.

If the new commercial enterprise creates the jobs required by the EB-5 Program, unconditional or permanent green cards will be issued after the expiration of the twenty-four (24) month conditional or temporary residency status period.

The investment is required to be maintained for a period of not less than five (5) years.

The EB-5 Program is, in the opinion of the Company, the most flexible investor immigration program in the world because it has no requirements regarding age, business training, experience, or language skills.

As a permanent resident, provided that he/she is physically present in the United States for at least 180 days after issuance of a green card and/or has obtained a Reentry Permit, if necessary, before departing from the United States, a green card holder and his/her family are free to return to their country of origin for business or personal purposes, as long as he/she maintains a residence in the United States and can maintain business and professional interest in his/her country of origin or, subject to the regulations of his/her country of origin, elsewhere.

The EB-5 Program allows qualified foreign investors a great deal of flexibility and freedom because it does not require them to manage their U.S. investment on a daily basis, but, rather, only requires them to be "actively engaged" in the commercial enterprise. This requirement is satisfied by the EB-5 Investor becoming a limited partner in a limited partnership. A limited partner has no personal liability in excess of his/her investment in the new commercial enterprise, which means that he/she can make a capital investment as a limited partner and then pursue other professional and/or personal interests and activities as he/she deems appropriate.

If a qualified foreign investor and/or his/her family elects to become citizens of the United States, the period after the issuance of conditional permanent residence status is credited against the five (5) year period required to be spent as a permanent resident in the United States in order to qualify to be eligible to be a United States citizen.

Upon receipt of conditional permanent resident status, a qualified foreign investor and his/her family (i.e. spouse and children under the age of 21 at the time of application) are entitled to the same benefits as all other lawful permanent residents of the United States, including:

- Living and working anywhere in the United States.
- No employment authorization required to accept employment in the United States.
- Ability to develop and operate one or more businesses in the United States.
- Ability to sponsor relatives to acquire green cards.
- Freedom to travel within and outside of the United States and return to the United States without obtaining an additional visa or authorization.
- Educational benefits afforded to permanent residents of the United States, such as, admission to state universities at resident costs.
- Qualify to become a citizen of the United States after he/she has been a permanent resident for more than five (5) years.

## 4.9 Cautionary Statements Regarding Projections

The forward-looking statements included herein are also based on certain current budgeting considerations, and other assumptions relating to the ability of the Company to obtain returns for the investors in PHH, LLLP, successfully market its services, procure sufficient capital to expand operations, and maintain strict regulatory procedures while conducting business. Assumptions relating to the proceeding and foregoing information involve judgments by the Company that are difficult to predict accurately and are subject to numerous factors that may materially affect the Company's results.

Budgeting, investment, and other managerial decisions are subjective and are thus susceptible to interpretations and periodic revisions based on actual experience and business developments. The impact of such revisions may cause the Company to alter budgets and amend strategies, any or all of which may materially affect the Company's results.

The foregoing considerations, as well as a variety of other factors not set forth herein, could cause the actual results and experience of the Company to differ widely or materially from the anticipated results or other expectations in the forward-looking statements.

The Company has prepared projections regarding the anticipated financial performance of the Project. The projections are hypothetical and may be based on certain assumptions that may prove to be inaccurate and that are subject to future conditions that may be beyond the control of the Company, such as the general industry conditions. The Company may experience unanticipated costs or lower revenues than forecasted. There are no assurances that the results that may be shown in the projections would in fact be realized by the Company. The projections

have been prepared by the Company in consultation with experts in the field. However, since the projections are based upon numerous assumptions, which may or may not prove to be true, neither the independent experts or counsel to the Company can provide any level of assurance with respect to any of them.

Many of these risks are described in the PPM and such statements are incorporated herein by reference.

For all of the foregoing reasons, actual results may vary materially from the forward-looking statements and there are no assurances that the assumptions used are necessarily the most likely to occur. Additionally, when used in this memorandum, the words "believes," "anticipates," "intends," "expects," "plans," "projects," as well as similar words are intended to identify forward-looking statements. All such statements are based on the Company's expectations and are subject to a number of risks and uncertainties, many of which are beyond the Company's control. In light of these risks and uncertainties, there can be no assurance that the forward-looking statements contained herein will in fact occur. Neither the Company, SARC, nor Palm House Hotel, LLLP undertakes any obligation to publicly release the results of any revisions to these forward-looking statements that may be made to reflect any future events or circumstances.

# 5.0 EMPLOYMENT AND STAFFING

It is anticipated that the Palm House Hotel Project will create approximately 953.7 direct and indirect full-time employment positions by the third year of operation.

An econometric analysis of the Palm House Hotel Project by Evans, Carroll & Associates, Inc. that discusses the benefits to the area economy, its population, and households and the statistical confirmation of the USCIS requirements for EB-5 immigration visa approval is included with this Confidential Business Review.

| Table A.  Summary of Employment and Revenue Estimates | | | |
|---|---|---|---|
| Activity | Expenditure/Revenues ($ million) | Final Demand Multiplier | Total Jobs |
| Hard Construction Costs | 32.293 | 17.5636 | 567.2 |
| Soft Costs | 6.188 | 16.315 | 101.0 |
| Purchases of FF&E * | 2.5 | 7.9957 | 20.0 |
| Hotel Operations | 14.36 | 17.5069 | 251.4 |
| Membership Fees * | 2.0 | 7.046 | 14.1 |
| Total | 75.413 | | 953.7 |
| * Indirect and Induced effects only | | | |

Excluding contingency costs, total hard construction costs come to $32,293,500 (see Section 4.5).

Soft costs counted as eligible for EB-5 job creation calculations are the CM Preconstruction, CM Fee, CM Staff, General Conditions, Architects / Engineers / Designers / Consultant, Project Administration, and the Developer Fee. These total $6,188,568 (see Section 4.5).

Furniture, fixtures, and equipment costs total $4,500,000. However, in an effort to be conservative, only $2,500,000 of FF&E expenses were counted for EB-5 job creation purposes.

Second-year operational revenue of the hotel is projected at $14,360,055 (see Section 4.6 for details).

Additionally, $2,000,000 is projected to come from membership dues. At approximately $200,000 to $250,000 per member, this conservative estimate projects only 8–10 members in the first 2 years of operations.

## 5.1 Job Descriptions

Below is a list of the types of job positions that will be created by development and operation of a luxury resort hotel like the Palm House Hotel.

**Accounting**

Accountant

General Summary: Perform accounting and budgeting duties.

Essential Job Responsibilities:

1.     Track income and expenses.
2.     Keep accounting records and files.
3.     Project profits, losses, and other accounting metrics.

Compensation: As determined by Management.

----------

Accounts Receivable Supervisor

General Summary: Manage accounts receivable and ensure payment.

Essential Job Responsibilities:

1.     Track accounts receivable.
2.     Follow-up with overdue accounts and collect funds owed.
3.     Maintain records and receipts.

Compensation: As determined by Management.

----------

Controller

General Summary: Supervise accounting and financial issues.

Essential Job Responsibilities:

1.     Supervise accountant and other financial department employees.
2.     Oversee budgeting, financing, and accounting record-keeping.
3.     Help design financial strategy.

Compensation: As determined by Management.

----------

Human Resources Manager

General Summary: Oversee employment and other human resources functions.

Essential Job Responsibilities:

1.    Perform hiring, termination, and other employment functions.
2.    Perform human resources functions, including employment issues, benefits, complaints, training, and other functions.

Compensation: As determined by Management.

**----------**

## Administrative & General

<u>General Manager</u>

General Summary: Oversee general operations of the hotel.

Essential Job Responsibilities:

1.    Oversee directors and manage department heads.
2.    Direct policy for the hotel, make operational and management decisions.

Compensation: As determined by Management.

**----------**

<u>Administrative Assistant</u>

General Summary: Perform clerical tasks and assist assigned manager / supervisor.

Essential Job Responsibilities:

1.    Answer phones, schedule appointments, mail letters, and other secretarial functions.
2.    Assist in filing, paperwork, and other clerical functions.

Compensation: As determined by Management.

**----------**

## Bell Staff

<u>Bell / Luggage Attendant</u>

General Summary: Assist guests with luggage.

Essential Job Responsibilities:

1.      Greet guests as they enter the hotel; hold doors.
2.      Carry guest luggage to rooms.

Compensation: As determined by Management.

----------

<u>Concierge</u>

General Summary: Assist guests.

Essential Job Responsibilities:

1.      Welcome guests and answer guest questions.
2.      Assist guests in providing information, making reservations, acquiring tickets, booking spa treatments or other guest services, and providing recreational advice.

Compensation: As determined by Management.

----------

**Beverage**

<u>Bartender</u>

General Summary: Serve drinks to patrons at hotel bar areas.

Essential Job Responsibilities:

1.      Take orders and mix and serve drinks to guests.
2.      Check identification, ensure proper age of guests before serving alcohol, and ensure patron safety by limiting overly intoxicated drinkers.
3.      Clean up bar area.

Compensation: As determined by Management.

----------

<u>Server</u>

General Summary: Serve food and drinks to patrons.

Essential Job Responsibilities:

1. Take orders for guests seated away from the bar area.
2. Serve drinks and bar food, as necessary.

Compensation: As determined by Management.

---------- 

## Business Center

Business Center Attendant

General Summary: Operate the business center.

Essential Job Responsibilities:

1. Assist guests in using the business center.
2. Maintain business center equipment.

Compensation: As determined by Management.

---------- 

## Cafeteria

Cafeteria Attendant

General Summary: Bus tables and serve food in the cafeteria.

Essential Job Responsibilities:

1. Serve food in cafeteria.
2. Bus tables.

Compensation: As determined by Management.

---------- 

## Food - Banquets

Banquet Manager

General Summary: Oversee banquet staff.

Essential Job Responsibilities:

1.       Oversee banquet staff.
2.       Organize banquet room usage.
3.       Maximize banquet room revenue.
4.       Assist clients and handle client issues.

Compensation: As determined by Management.

----------

Banquet Captain

General Summary: Ensure smooth daily operation of banquet rooms.

Essential Job Responsibilities:

1.       Oversee banquet staff.
2.       Organize and schedule banquet hall preparation, set-up, and clean-up.
3.       Schedule timing of food service and clean-up.
4.       Oversee bar and drink orders operations.

Compensation: As determined by Management.

----------

Banquet House Attendant

General Summary: Serve banquet guests, assist in banquet room preparation and clean-up.

Essential Job Responsibilities:

1.       Prepare banquet rooms for guests.
2.       Arrange tables, seating, bar, buffet table, dance floor, podium, etc.
3.       Serve guest needs.
4.       Assist in clean-up of banquet rooms.

Compensation: As determined by Management.

----------

Banquet Server

General Summary: Serve banquet guests.

Essential Job Responsibilities:

1.       Take food and drink orders for banquet guests.

2.      Bring dishes, silverware, linens, napkins, etc. to tables.
3.      Serve food, and remove soiled guest dishes.

Compensation: As determined by Management.

----------

**Food - Casual Restaurant**

Director of Outlets

General Summary: Oversee restaurant departmental operations.

Essential Job Responsibilities:

1.      Oversee operation of restaurant and restaurant employees.
2.      Set work schedules, menu, pricing, and make other management and administrative decisions.
3.      Ensure profitable restaurant operations.

Compensation: As determined by Management.

----------

Outlet Supervisor

General Summary: Manage daily restaurant operations and oversee staff.

Essential Job Responsibilities:

1.      Manage and supervise restaurant employees.
2.      Set server schedules, utilize manpower, and ensure efficient guest service.
3.      Greet guests and handle any guest complaints or issues.

Compensation: As determined by Management.

----------

Greeter

General Summary: Greet guests, take reservations, and seat guests.

Essential Job Responsibilities:

1.      Greet guests, hold doors, enter guest names on waiting list as necessary.
2.      Take reservations.

3.      Seat guests and provide menus.

Compensation: As determined by Management.

---------- 

Server

General Summary: Serve restaurant guests.

Essential Job Responsibilities:

1.      Take food and drink orders.
2.      Answer questions about the food or menu items.
3.      Serve restaurant guests.

Compensation: As determined by Management.

---------- 

Bus Attendant

General Summary: Assist servers in table clean-up.

Essential Job Responsibilities:

1.      Bring bread, water, condiments, and other items to tables.
2.      Assist servers as necessary.
3.      Serve guests as necessary.
4.      Clear tables and clean soiled dishware, glasses, and silverware.

Compensation: As determined by Management.

---------- 

**Food - Catering**

Director of Catering

General Summary: Oversee catering department operations.

Essential Job Responsibilities:

1.      Oversee operations and profitability of catering department.
2.      Oversee catering employees and scheduling.
3.      Create price lists and special promotions and market catering services.

Compensation: As determined by Management.

----------

Administrative Assistant

General Summary: Perform clerical tasks and assist assigned manager / supervisor.

Essential Job Responsibilities:

1.      Answer phones, schedule appointments, mail letters, and other secretarial functions.
2.      Assist in filing, paperwork, and other clerical functions.

Compensation: As determined by Management.

----------

Catering / Convention Services Manager

General Summary: Oversee catering operations.

Essential Job Responsibilities:

1.      Handle catering reservations and scheduling.
2.      Handle convention reservations, scheduling, and room reservations.

Compensation: As determined by Management.

----------

Executive Meeting Specialist

General Summary: Assist clients in reserving rooms and supplies for meetings.

Essential Job Responsibilities:

1.      Handle meeting room reservations and scheduling.
2.      Ensure necessary equipment is present in meeting rooms, as required.
3.      Prepare and clean up meeting rooms.

Compensation: As determined by Management.

----------

**Food - Kitchen**

<u>Executive Chef</u>

General Summary: Oversee food preparation services.

Essential Job Responsibilities:

1.      Direct procurement of food and supplies.
2.      Create menu and individual dishes.
3.      Oversee chefs and kitchen staff.
4.      Procure necessary kitchen / cooking equipment.
5.      Ensure food safety, taste, and presentation.
6.      Cook meals and special orders as necessary.

Compensation: As determined by Management.

----------

<u>Sous Chef</u>

General Summary: Assist Executive Chef and manage other kitchen employees.

Essential Job Responsibilities:

1.      Assist executive chef.
2.      Oversee cooks, bakers, and other kitchen employees.
3.      Prepare ingredients for Executive Chef.
4.      Cook ingredients, meals, and special orders as necessary.

Compensation: As determined by Management.

----------

<u>Baker</u>

General Summary: Bake bread, desserts, and other food items.

Essential Job Responsibilities:

1.      Bake food: bread, desserts, special orders, etc.
2.      Assist cooks and chefs as necessary.

Compensation: As determined by Management.

----------

Cook

General Summary: Cook and prepare food.

Essential Job Responsibilities:

1.      Prepare ingredients.
2.      Cook food.
3.      Ensure proper food presentation and temperature.
4.      Assist chefs as necessary.

Compensation: As determined by Management.

---------

**Food - Room Service / Honor Bar**

Honor Bar Attendant

General Summary: Restock room honor bars.

Essential Job Responsibilities:

1.      Procure liquor and food in appropriate quantities.
2.      Check for use of room honor bars, and restock and replenish as necessary.

Compensation: As determined by Management.

---------

Asst. Outlet Manager

General Summary: Oversee room service operations and staff.

Essential Job Responsibilities:

1.      Oversee room service operations, staff, and food.
2.      Schedule employees and food deliveries.
3.      Set menu items and prices.
4.      Assist in fulfilling guest orders as necessary.

Compensation: As determined by Management.

---------

Outlet Supervisor

General Summary: Supervise kitchen and server staff and ensure prompt room service delivery.

Essential Job Responsibilities:

1.    Oversee room service orders and fulfillment.
2.    Manage, schedule, and oversee kitchen and server staff.
3.    Ensure prompt food service delivery.
4.    Handle guest complaints and issues.

Compensation: As determined by Management.

----------

Server

General Summary: Prepare and deliver food, serve guests, and fulfill room service orders.

Essential Job Responsibilities:

1.    Take guest orders for room service.
2.    Help prepare food, ingredients, side orders, etc.
3.    Arrange and deliver guest food, drink orders, condiments, napkins, etc.
4.    Assist guests and handle guest requests.

Compensation: As determined by Management.

----------

**Front Desk**

Director of Front Office

General Summary: Oversee front desk operations and staff.

Essential Job Responsibilities:

1.    Oversee and schedule front desk employees.
2.    Administer front desk operations.
3.    Set front desk policy and guest services policy.
4.    Greet special guests, handle guest complaints, and address guest issues as necessary.

Compensation: As determined by Management.

----------

Front Desk Managers / Supervisors

General Summary: Oversee daily front desk operations and employees, handle guest relations.

Essential Job Responsibilities:

1.      Oversee front desk staffing and employees.
2.      Assist employees, make management decisions, handle special circumstances, etc.
3.      Greet and assist guests as necessary.

Compensation: As determined by Management.

----------

Front Desk Agent

General Summary: Handle guest greeting, check-in, check-out, and reservations.

Essential Job Responsibilities:

1.      Staff front desk and greet guests.
2.      Handle guest requests or issues.
3.      Take guest reservations, answer phones, answer guest questions, etc.
4.      Perform guest check-in and provide room keys.
5.      Handle payment, special charges, deposits, and guest check-out.
6.      Assist guests as necessary.

Compensation: As determined by Management.

----------

Rapid Response Attendant

General Summary: Assist guests, deliver towels, and other general guest services needs.

Essential Job Responsibilities:

1.      Respond to guest complaints, deliver towels, toiletries, pillows, cots, or other items to guests, etc.
2.      Respond to guest calls to fix or operate room equipment, simple plumbing issues, missing room items, etc.
3.      Generally handle guest issues, complaints, or questions as appropriate. Provide prompt in-room guest service when called upon.

Compensation: As determined by Management.

----------

**Garage**

Garage Supervisor

General Summary: Oversee garage and valet parking operations and employees.

Essential Job Responsibilities:

1.      Schedule and oversee valet employees.
2.      Ensure guest and guest property safety in the garage and valet area.
3.      Arrange for most efficient vehicle parking and retrieval operations.

Compensation: As determined by Management.

----------

Valet / Parking Attendant

General Summary: Greet guests at curbside, park vehicles, and provide parking ticket stubs.

Essential Job Responsibilities:

1.      Greet guests arriving at curbside, open doors, etc.
2.      Take guest vehicles and park them safely.
3.      Provide parking ticket stubs and securely store guest vehicle keys.
4.      Accept parking ticket stubs and retrieve client vehicles.

Compensation: As determined by Management.

----------

**Housekeeping**

Director of Housekeeping

General Summary: Oversee housekeeping operations.

Essential Job Responsibilities:

1.      Oversee housekeeping services and employees.
2.      Set employee scheduling.
3.      Set laundry rates and services menu.
4.      Ensure procurement and maintenance of laundry equipment and supplies.

Compensation: As determined by Management.

---------- 

Housekeeping Manager

General Summary: Oversee daily housekeeping operations and employees.

Essential Job Responsibilities:

1.      Schedule and oversee housekeeping employees.
2.      Handle special guest requests and issues.

Compensation: As determined by Management.

---------- 

House / Room / Public Area Attendants

General Summary: Assist guests, clean towels and linens, clean guest rooms and public areas.

Essential Job Responsibilities:

1.      Perform rounds and clean guest rooms.
2.      Collect soiled towels, pillows, linens, etc.
3.      Replace soiled guest room items with laundered items, restock toiletries, toilet paper, tissues, etc.
4.      Clean guest rooms, empty garbage, etc.
5.      Clean public areas, return used pool towels, mop floors, clean bathrooms, etc.

Compensation: As determined by Management.

---------- 

**Human Resources**

Director of Human Resources

General Summary: Oversee human resources department and make employee policy decisions.

Essential Job Responsibilities:

1.      Oversee hotel employment and staffing.
2.      Oversee payroll issues, hiring and firing, and employee benefits.
3.      Oversee employee training programs.
4.      Create hotel employee policy and ensure its proper implementation.

Compensation: As determined by Management.

----------

Human Resources Coordinator

General Summary: Work with Director of Human Resources and handle employee issues.

Essential Job Responsibilities:

1.  Implement employment policy decisions.
2.  Assist employees with human resources issues: payroll, training, complaints, benefits questions, etc.
3.  Assist Director of Human Resources as necessary.
4.  Work with Director of Human Resources to respond to employee questions and complaints.

Compensation: As determined by Management.

----------

**Information Systems**

Manager of Information Technology

General Summary: Oversee information technology department and equipment.

Essential Job Responsibilities:

1.  Determine necessary technology hardware and software.
2.  Procure and maintain technology equipment: computers, servers, printers, scanners, fax machines, cellular phones, etc. Procure necessary software, software licensing, and updates.
3.  Develop employee I.T. training materials.
4.  Assist employees with technology issues and answer employee questions.
5.  Develop back-up plan, anti-virus and other security precautions, and data retention policies, and ensure safety and validity of electronic data. Ensure security of client financial and personal data.
6.  Upgrade and replace equipment as necessary.
7.  Allocate equipment as necessary.

Compensation: As determined by Management.

----------

**Laundry**

<u>Laundry / Valet Supervisor</u>

General Summary: Oversee laundry department operations and employees.

Essential Job Responsibilities:

1.      Handle laundry employee and staffing issues, scheduling, etc.
2.      Procure necessary laundry equipment and supplies.
3.      Handle special guest issues as necessary.

Compensation: As determined by Management.

---------

<u>Laundry / Valet Attendant</u>

General Summary: Launder soiled guest articles.

Essential Job Responsibilities:

1.      Launder soiled guest linens, towels, pillows, etc.
2.      Operate and maintain laundry equipment and supplies.
3.      Perform paid garment laundering services, if any.
4.      Launder employee uniforms, if necessary.

Compensation: As determined by Management.

---------

**Marketing**

<u>Director of Sales & Marketing</u>

General Summary: Oversee marketing department and employees.

Essential Job Responsibilities:

1.      Oversee marketing program, advertising, and client outreach efforts.
2.      Oversee marketing department employees and scheduling.
3.      Communicate with prospective clients, answer questions, and market hotel services.
4.      Maximize the occupancy and the average daily rate of the hotel.

Compensation: As determined by Management.

----------

Director of Group Sales

General Summary: Oversee group sales operations.

Essential Job Responsibilities:

1.    Communicate with prospective clients and handle client issues / requests.
2.    Handle group sales rates and issues.
3.    Assist the Director of Sales & Marketing in sales operations including: reserving meetings and conferences, coordinating wedding groups, general administrative functions, and arranging sales blitzes and giveaways.

Compensation: As determined by Management.

----------

Leisure Travel Sales Manager

General Summary: Oversee leisure travel marketing efforts.

Essential Job Responsibilities:

1.    Communicate with prospective clients, answer questions, and market hotel services.
2.    Handle client issues / requests.
3.    Create leisure travel marketing plan, advertising, discounts, etc.

Compensation: As determined by Management.

----------

Administrative Assistant

General Summary: Perform clerical tasks and assist assigned manager / supervisor.

Essential Job Responsibilities:

1.    Answer phones, schedule appointments, mail letters, and other secretarial functions.
2.    Assist in filing, paperwork, and other clerical functions.

Compensation: As determined by Management.

----------

Sales Manager

General Summary: Market hotel services.

Essential Job Responsibilities:

1. Communicate with prospective clients via phone, email, direct mail, social networking, etc. in order to market hotel services.
2. Handle client calls, requests, complaints, etc.

Compensation: As determined by Management.

----------

**Purchasing - Food**

<u>Purchasing Supervisor</u>

General Summary: Oversee food procurement and safety.

Essential Job Responsibilities:

1. Order fresh food and ingredients for kitchen, banquet, catering, dining, and room services functions.
2. Oversee food supply levels, freshness, and safety.
3. Ensure efficient food procurement and reasonable procurement costs.

Compensation: As determined by Management.

----------

<u>Receiving Agent</u>

General Summary: Receive and allocate food supplies.

Essential Job Responsibilities:

1. Receive incoming food supplies.
2. Allocate food supplies to various hotel departments (kitchen, banquet, restaurant, catering, etc.).
3. Ensure incoming food freshness and safety.

Compensation: As determined by Management.

----------

**Repairs & Maintenance**

Director of Engineering

General Summary: Oversee engineering department and employees.

Essential Job Responsibilities:

1.      Maintain and protect hotel physical plant assets.
2.      Oversee employees, scheduling, and maintenance plan.

Compensation: As determined by Management.

----------

Engineer

General Summary: Maintain and repair hotel physical plant assets.

Essential Job Responsibilities:

1.      Ensure proper operation of hotel physical plant assets: hotel structure and façade; integrity of floors, walls, and ceiling; the furniture, fixtures, and equipment (FF&E); electrical transformers and equipment; water distribution and sewage; the heating-ventilation-air conditioning system (HVAC); the fire alarm system and fire safety components; the vertical transportation system (elevators); utility management such as electrical, gas, steam, and water; kitchen and laundry equipment; and lighting and sound systems.
2.      Maintain above-listed facilities, equipment, and systems.

Compensation: As determined by Management.

----------

General Maintenance Laborer

General Summary: Perform general building maintenance tasks.

Essential Job Responsibilities:

1.      Maintain building equipment and facilities.
2.      Change light bulbs and air filters, perform minor electrical or wiring or fixtures work, paint and touch-up small holes or scuffs, perform general maintenance, aesthetic, and repair work.

Compensation: As determined by Management.

----------

Groundskeeper

General Summary: Maintain external hotel grounds and landscaping.

Essential Job Responsibilities:

1.    Maintain cleanliness and aesthetics of external hotel grounds.
2.    Maintain landscaping: water lawns, mow grass, trim hedges, etc.

Compensation: As determined by Management.

----------

**Reservations**

Reservations Manager

General Summary: Oversee reservations department operations and employees.

Essential Job Responsibilities:

1.    Schedule reservations staffing.
2.    Develop reservations procedures, plans, and pricing.
3.    Oversee reservations issues and employees.

Compensation: As determined by Management.

----------

Director of Revenue Management

General Summary: Ensure profitable hotel reservations operation.

Essential Job Responsibilities:

1.    Set pricing plans, discounts, group rates, and other factors to maximize revenue.
2.    Ensure target occupancy rates, RevPAR, and other metrics.
3.    Track income and accounts receivable and maintain files.

Compensation: As determined by Management.

----------

Reservations Agent

General Summary: Take customer reservations and group reservations.

Essential Job Responsibilities:

1.    Communicate with prospective guests and take advance reservations.
2.    Handle reservation changes, cancellations, etc.

Compensation: As determined by Management.

----------

**Rooms**

Director of Operations

General Summary: Oversee hospitality services department and employees.

Essential Job Responsibilities:

1.    Oversee functioning of hospitality department and VIP guest services.
2.    Oversee hospitality staffing and scheduling.
3.    Oversee hospitality employees.
4.    Assist high-profile guests as necessary, handle special guest requests.

Compensation: As determined by Management.

----------

Hospitality Attendant

General Summary: Assist VIP guests and special guest requests.

Essential Job Responsibilities:

1.    Serve food, drinks, hors d'oeuvres, and cocktails at executive guest lounges or on executive club floors.
2.    Set up and tear down all food and beverage items, light housekeeping, dishwashing, and clean up in between shifts, as necessary.
3.    Serve executive / VIP guests and handle special requests as necessary.

Compensation: As determined by Management.

----------

**Security**

Director of Security

General Summary: Oversee security of hotel premises for guests and guest property.

Essential Job Responsibilities:

1.  Create overall hotel security plan to ensure safety of guests, guest property, rooms, common areas, garage, grounds, etc.
2.  Procure, plan placement, and monitor usage of security equipment including video cameras.
3.  Oversee security staff.

Compensation: As determined by Management.

----------

Security Officer

General Summary: Patrol grounds and ensure safety of guests and guest property.

Essential Job Responsibilities:

1.  Patrol hotel grounds, common areas, parking lot, etc.
2.  Assist guests as necessary.
3.  Respond to disturbances or emergencies.
4.  Ensure guest and guest property safety.

Compensation: As determined by Management.

----------

**Spa**

Director of Spa Operations

General Summary: Oversee spa department, facilities, and employees.

Essential Job Responsibilities:

1.  Oversee functioning of spa facilities.
2.  Create menu of spa guest services, pricing, scheduling and availability, etc.
3.  Oversee procurement of necessary spa facilities and equipment.
4.  Oversee spa personnel and scheduling.

Compensation: As determined by Management.

----------

Retail Manager

General Summary: Manage retail storefront locations and operations.

Essential Job Responsibilities:

1.      Oversee development of retail store spaces.
2.      Manage tenants, rents, signage, etc.
3.      Handle tenant-related issues.

Compensation: As determined by Management.

----------

Front Desk Supervisor

General Summary: Oversee spa reservations desk operation and employees.

Essential Job Responsibilities:

1.      Schedule spa reservations / services desk staffing and oversee employees.
2.      Assist employees, perform managerial tasks, and handle special requests or situations.
3.      Assist guests as necessary.

Compensation: As determined by Management.

----------

Attendant

General Summary: Staff spa reservations / services desk, assist guests in scheduling spa services, and perform various spa services.

Essential Job Responsibilities:

1.      Staff spa reservations / services desk and assist guests.
2.      Schedule guest spa services.
3.      Answer questions, explain services, handle payment and refunds, and handle guest issues.
4.      Answer phones and take reservations as necessary.
5.      Perform other spa services, such as facials, hair/nail service, manicures and pedicures, exfoliation, etc.

Compensation: As determined by Management.

----------

<u>Guest Services Coordinator</u>

General Summary: Serve guests by planning, implementing, and evaluating spa services.

Essential Job Responsibilities:

1. Plan and schedule guest spa services and answer guest questions.
2. Assist in implementation of spa services, handle special quest requests, and ensure optimal guest experience.
3. Coordinate spa staff.

Compensation: As determined by Management.

----------

<u>Massage Therapist</u>

General Summary: Perform massage therapy and other spa services on guests.

Essential Job Responsibilities:

1. Perform massage therapy and provide massage sessions to guests.
2. Perform other spa services, such as facials, hair/nail service, manicures and pedicures, exfoliation, etc.

Compensation: As determined by Management.

----------

**Stewarding**

<u>Stewarding Supervisor</u>

General Summary: Oversee dining operations and staff; perform maître d' functions.

Essential Job Responsibilities:

1. Oversee customer experience in hotel restaurants and dining facilities.
2. Perform guest services, greet guests, perform special services (presenting special meals or desserts), etc.
3. Serve as sommelier and present fine wines to customers for tasting approval.
4. Oversee stewards and dining room staff.
5. Ensure exceptional customer service and customer satisfaction.

6.      Resolve customer complaints about food or dining service.

Compensation: As determined by Management.

---------- 

Steward

General Summary: Assist Stewarding Supervisor and assist restaurant customers.

Essential Job Responsibilities:

1.      Schedule reservations (in person, by phone, and over the Internet).
2.      Assist Stewarding Supervisor in providing exceptional customer service and ensuring customer satisfaction.
3.      Greet guests, confirm reservations, and seat guests.
4.      Handle special guest requests and issues.
5.      Ensure proper presentation of tables and restaurant décor.

Compensation: As determined by Management.

---------- 

**Telecommunications**

Telephone Attendant

General Summary: Answer telephones, answer questions, and provide customer service.

Essential Job Responsibilities:

1.      Answer incoming telephone calls.
2.      Answer guest questions.
3.      Route phone calls to the appropriate department, front desk, or rooms.

Compensation: As determined by Management.

# 6.0 MANAGEMENT

## 6.1 SARC Management

PRINCIPAL
Joseph J. Walsh                    SOUTH ATLANTIC REGIONAL CENTER, LLC, *Managing Member*

Joseph J. Walsh was born and raised in Chicago. Mr. Walsh has managed and owned both public and private corporations in the US. Canada and the UK. Mr. Walsh started his career in Marketing and Advertising, though he was formally educated as an Electrical Engineer. He founded and served as President and CEO of several startup computer and graphics firms that he brought to the public markets in the late 1990s and early 2000s. He subsequently managed several successful mergers of public companies and has extensive experience in merger and acquisition strategy and law. His experience extends not only in the technical realm but to the intricacies of U.S. Securities and Exchange laws. Mr. Walsh brings a wealth of knowledge and expertise to South Atlantic Regional Center with over thirty years of experience in marketing, development and process engineering.

## 6.2 Palm House, LLC Management

Robert V. Matthews

Robert V. Matthews is the chairman of Matthews Ventures Holdings, LLC.

MVH is a diversified holding company with interests in real estate, hotels, software, manufacturing and construction. The companies also provide funding for start up businesses, as well as the acquisition of existing businesses in various market segments. Founded in 1982, the MVH companies are comprised of seasoned professionals with extensive experience in banking, hospitality, and construction.

Matthews Ventures Holdings, based in Palm Beach, is currently working on over $600 Million worth of product under development ranging from condos to hotels both here in Florida as well as throughout the United States. In keeping with the goal of the company to develop one of kind properties in luxury destinations, all of the MVH products will be five star facilities upon completion. MVH is the principal of both HIG Acquisitions LLC, a private equity fund that is acquiring strategic international 5 star hospitality assets for re-positioning and Matthews Hospitality Group, a consortium of luxury properties under development.

As a venture capitalist Matthews was named Entrepreneur of the Year in 1993. He has controlled numerous companies over the past twenty five years including FMP, Echelon Engineering and Construction, Bentley Churchill, and Stromberg Software. He also holds minority shares in several other companies.

Ryan Black

Ryan Black began his career with Kriti Management, the U.S. office of the Vardinoyannis family, one of Europe's wealthiest families and the largest industrial group in Eastern Europe. As Executive Vice President of Kriti Management, he over saw the allocation and investment of over 200M in capital across multiple asset classes in the U.S. and South America.

In 2009, Mr. Black left Kriti to serve as the Chief Operating Officer of Jumeirah South America and to advise the Cabot family on their investments in Argentina and Brazil.  He spent a year working for the group prior to their withdrawal from the South American market.

In 2010 R. Black Global was formed to serve as an investment vehicle sourcing attractive investment opportunities for a variety of international high net worth families, funds, and corporations.

In 2012 alone, R. Black Global, on behalf of clients, has closed 3 transactions totaling 83 million dollars worth of investment.  Transactions this year to date include:

• A 500,000 square foot development parcel in New York, NY
• A portfolio of 385 improved lots in Reno, NV
• A portfolio of 24 condos in Irvine, CA

In addition to the above closed transactions, R. Black Global, through controlled entities, has in excess of 25 million in hospitality assets under contract and has a stalking horse offer in excess of 30 million, in backup position, on a large residential development opportunity outside of San Francisco, CA.

R. Black Global acts as an investment sourcing entity and operating partner for assets acquired. With substantial international equity structuring experience, we have been able carve out a substantial equity allotment from multiple sources by advising and establishing tax effective investment structures for international investors.

Eduardo V. Miranda

Mr. Miranda currently serves as a Senior Associate with Metro 1 Properties in Miami, Florida, a commercial brokerage and real estate advisory services company. There, he represents buyers and sellers in commercial real estate transactions including hotel, industrial, multi-family, and land. He also performs due diligence and financial feasibility analysis on proposed acquisitions for clients, produced and distributed offering memoranda for property dispositions, and represented retail tenants in site selection and lease execution.

Prior to that, Mr. Miranda served as the Development Manager for Oto Development, LLC, a hotel development group based in Fort Lauderdale, Florida. His duties there included directing the development efforts of Marriott, Hilton, and Hyatt branded select service hotels from site selection, due diligence, and acquisition, through design development, permitting, construction, FF&E coordination and hotel opening. He also negotiated and managed all contracts and

purchase orders, coordinated design and construction teams during project origination and implementation, collaborated with brand representatives to ensure brand standards were achieved, and developed project budgets of approximately $75 million for new hotels and evaluated feasibility of proposed projects.

Mr. Miranda also served as Acquisition and Development Consultant for Luxury Development Consultants, Inc., where he performed due diligence and financial feasibility analysis on proposed acquisitions and developments. Prior to that, he served as Vice President of Development at Boca Resorts Inc. (now LXR Luxury Resorts, an affiliate of The Blackstone Group), where he managed over $200 million in development spending on numerous resort enhancements including the renovation of existing facilities in Boca, Fort Lauderdale, and Naples, including restaurants, bars, retail outlets, pools, meeting rooms, and guest rooms, as well as new construction projects including a golf clubhouse, luxury spa, and a 112 room guestroom tower with flexible meeting space at the Boca Resort, a golf course in Naples, and a state of the art floating dock marina at Bahia Mar in Fort Lauderdale. He also served as an Operations / Financial Analyst at The Breakers Palm Beach, Inc., a luxury hotel on Palm Beach Island. His duties there included controlling the financial performance of the 670-acre Breakers West residential development and its country club operations.

Mr. Miranda earned a Master of Science in Hotel and Food Service Management from Florida International University in 1994. He also earned a Bachelor of Science in Industrial and Systems Engineering from the University of Florida in 1992. The is a Licensed Real Estate Salesperson in the state of Florida.

Gerry D. Matthews

Mr. Matthews is a Licensed Real Estate Broker at Matthews Commercial Properties, where he has served for over a decade. MCP specializes in the sales and leasing of commercial, industrial, office and retail space throughout Connecticut; it has completed over 1,000 transactions since 2001 and earned the Co-Star Power Broker Award 2003-2011 top 20 brokerage firms in Ct / Westchester county N.Y.

Prior to that, Mr. Matthews served as a Licensed Real Estate Agent with Giglio & Krasney Commercial Real Estate for 6 years, where he worked directly with clients to search, locate and procure property that met their requirements, and developed successful marketing campaigns for the disposition of clients' properties.

Before that, Mr. Matthews served as Executive Vice President at Connecticut Factors, Inc. for 13 years. There, he supervised and coordinated personnel in the renovation of commercial office, and industrial buildings, ranging in size from 25,000 to 385,000 square feet, as well as several condominium and multi-family conversion projects. He also instituted maintenance and management programs for nine commercial office buildings totaling over 700,000 square feet and six condominium conversions and multi-family projects totaling 276 units, and attained necessary materials, bids and proposals for projects.

Concurrently, Mr. Matthews also served by gubernatorial appointment as the Real Estate Commissioner with the State of Connecticut Department of Consumer Protection from 1997 to 2003. There, he was tasked to uphold, interpret and enforce the laws governing the Real Estate industry in Connecticut. His division had jurisdiction over 20,000 brokers, agents, and property managers licensed in the State of Connecticut.

### 6.3 Project Partners

ECONOMIC CONSULTANT
Dr. Michael K. Evans          EVANS, CARROLL & ASSOCIATES, INC., *Chairman*

Dr. Evans is the Chairman of Evans, Carroll & Associates (formerly Evans Economics), which has been providing economic forecasting and consulting to clients since 1981. The firm, based in Boca Raton, Florida, specializes in economic analysis for EB-5 programs, economic impact studies of development projects and new construction, models of state and local tax receipts, impact of current and proposed government legislation, and construction of econometric models for individual industries and companies. As Chief Economist for the American Economics Group from 2000 to the present, Dr. Evans has also built a comprehensive state modeling system that provides economic analysis for a variety of consulting projects. Previously Dr. Evans was founder and president of Chase Econometric Associates (1970–80), and served as Clinical Professor of Economics at Kellogg Graduate School of Management, Northwestern University (1996–99) and Assistant and Associate Professor of Economics, Wharton School, University of Pennsylvania (1964–69). Dr. Evans holds a Ph. D. in Economics from Brown University.

# 7.0 HOSPITALITY INDUSTRY

## 7.1 Market Analysis



*Hotel industry at a glance*

Executive Summary

The Hotels and Motels industry began its recovery in 2010, following a disappointing 2009 when revenue fell 9.4% due to declines in overall travel spending. Over the five years to 2011, IBISWorld expects revenue to grow at an average annual rate of 0.4% to $121.7 billion. In 2010, revenue grew by 4.4% to $114.8 billion as the economy began to improve and travel rates increased. Industry revenue is expected to continue to grow in 2011, with an estimated jump of 6.0%.

In 2009, the decline of the domestic economy and increase in unemployment forced people to become more selective in how they spent their income. As a result, they became less likely to spend money on nonessential travel. Leisure and business travel rates plummeted as households and businesses became more concerned about their finances. The industry was also affected by falling international arrivals into the United States, which declined 5.2% in 2009.

These trends negatively affected revenue for operators.

As the economy improved over the course of 2010, however, and some of the fears surrounding the state of the economy subsided, a larger number of consumers and business customers opted to take trips and stay in hotels and motels. In 2010, domestic travel rates increased marginally and are expected to continue doing so in 2011. Meanwhile, international arrivals to the United States increased 2.7% in 2010 and are expected to rise a further 4.4% in 2011.

Over the next five years, IBISWorld forecasts that the industry will begin to expand again, particularly into segments such as extended-stay hotels, boutique hotels, spa and health retreats and resorts. The industry will also make inroads into developing regions abroad, such as China, India, Eastern Europe and South America. Over the five years to 2016, revenue is projected to increase at an average annual rate of 2.9% to $140.7 billion. Industry employment is expected to grow at an average annual rate of 1.6% over the same period to 1.5 million workers, and the number of establishments will increase by 1.4% per year to 52,197.

Key External Drivers

*Domestic trips by US residents*

Trends in domestic travel demand and patterns (for any purpose, but particularly for business, conference and seminar reasons) and the total visitor nights spent away from home directly affect demand for accommodation. This driver is expected to increase slowly during 2011 and is a potential opportunity for the industry.

*Consumer sentiment index*

Changes in consumer sentiment influence decisions that individuals make concerning expenditure on entertainment and traveling, particularly during an economic recession. This driver is expected to increase during 2011.

*Consumer spending*

Consumption levels have a direct effect on travel demand; therefore, a rise in consumer spending benefits accommodation. This driver is expected to increase slowly during 2011.

*Inbound trips by non-US residents*

Trends in international visitor arrivals and their length of stay influence demand for accommodation. When inbound trips rise, this factor has a positive effect on demand for hotels and motels. This driver is expected to increase during 2011.

*Competition from Substitutes*

The industry faces increasing competition from other accommodation styles, like bed-and-breakfast establishments, which can offer a more relaxing and hospitable form of accommodation. This driver is expected to increase during 2011, reflecting a potential threat for the industry.



## Current Performance

The Hotels and Motels industry has fought declining demand over the past few years. With the onset of the recession, all forms of travel accommodation experienced revenue drops as people became more concerned about their finances and made cutbacks on luxuries, including travel. In 2009, as the recession deepened and unemployment rose, a 5.1% decline in the domestic travel rate and 5.2% fall in international travel to the United States negatively affected the industry. Since destination hotels and motels rely heavily on foreign and domestic tourists, the decline in domestic and international travel hurt the industry's bottom line. However, in 2010 arrivals from abroad increased by 2.7%, while domestic travel rates also improved throughout the course of the year. In 2011, domestic travel is expected to grow by 0.9% and international arrivals by 4.4%. The infusion of tourist dollars is expected to benefit hotels and motels and increase room rates, causing revenue to grow by 6.0% in 2011. Over the five years to 2011, industry revenue is expected to increase marginally at an average annual rate of 0.4% to $121.7 billion.

## Industry Data

| | Revenue ($m) | Industry Value Added ($m) | Establish-ments | Enterprises | Employment | Exports | Imports | Wages ($m) | Domestic Demand | Domestic Trips by US Residents (Million) |
|---|---|---|---|---|---|---|---|---|---|---|
| 2002 | 110,093 | 51,368 | 46,163 | 38,519 | 1,374,880 | -- | -- | 29,414 | N/A | 554.0 |
| 2003 | 107,762 | 48,758 | 46,625 | 38,905 | 1,340,508 | -- | -- | 28,931 | N/A | 587.7 |
| 2004 | 114,586 | 53,733 | 47,417 | 39,294 | 1,382,064 | -- | -- | 30,447 | N/A | 634.6 |
| 2005 | 118,760 | 55,634 | 47,891 | 39,687 | 1,397,266 | -- | -- | 30,951 | N/A | 660.9 |
| 2006 | 119,336 | 57,019 | 48,370 | 40,084 | 1,411,238 | -- | -- | 31,567 | N/A | 660.9 |
| 2007 | 125,163 | 58,007 | 48,757 | 40,284 | 1,425,350 | -- | -- | 32,113 | N/A | 681.9 |
| 2008 | 121,408 | 56,267 | 48,757 | 40,284 | 1,409,671 | -- | -- | 32,676 | N/A | 654.3 |
| 2009 | 109,969 | 54,128 | 47,733 | 39,881 | 1,382,887 | -- | -- | 31,957 | N/A | 620.7 |
| 2010 | 114,793 | 54,561 | 48,115 | 40,200 | 1,395,333 | -- | -- | 32,341 | N/A | 621.8 |
| 2011 | 121,729 | 57,126 | 48,740 | 40,602 | 1,426,031 | -- | -- | 33,214 | N/A | 627.4 |
| 2012 | 126,645 | 59,068 | 49,325 | 41,008 | 1,445,995 | -- | -- | 33,878 | N/A | 640.2 |
| 2013 | 129,796 | 60,545 | 49,967 | 41,459 | 1,467,685 | -- | -- | 34,590 | N/A | 663.7 |
| 2014 | 135,750 | 62,119 | 50,666 | 41,957 | 1,491,168 | -- | -- | 35,350 | N/A | 685.1 |
| 2015 | 137,562 | 63,796 | 51,426 | 42,460 | 1,516,518 | -- | -- | 36,164 | N/A | 717.7 |
| 2016 | 140,685 | 65,582 | 52,197 | 43,012 | 1,542,299 | -- | -- | 37,031 | N/A | 725.4 |
| Sector Rank | 2/12 | 1/12 | 5/12 | 4/12 | 3/12 | N/A | N/A | 2/12 | N/A | N/A |
| Economy Rank | 64/703 | 41/703 | 117/702 | 116/702 | 17/703 | N/A | N/A | 38/703 | N/A | N/A |

Industry Trends

Since the mid-1990s, technology has increased labor productivity, lowered labor costs and enhanced customer service. The industry has especially benefited from the internet over the past five years. Operators use the internet to gather information, make bookings and buy supplies, which has lowered overall costs. The information received by operators via new technology also allows them to send better-targeted promotions by e-mail, text message or other digital formats. Many firms now operate guest rewards programs to attract and hold frequent travelers. Additionally, websites such as Lastminute.com and Priceline. com, which offer advance bookings and significantly discounted room prices at the last minute have been flourishing since the early 2000s. Most operators now allocate a portion of their expected unsold rooms to these websites, since travelers have become more confident in booking through them. The websites are either corporate-owned and managed or linked to other specialist travel operators.

Hotel investment and construction experienced strong growth soon after 2005. A PricewaterhouseCoopers report indicated that in 2006, construction began on 119,000 new hotel rooms, a 45.0% increase from the previous year. This percentage was the highest level of hotel construction since 2000. The largest growth occurred in upscale hotels and mid-priced hotels, without food and beverages. However, new hotel investment and supply slowed significantly as the recession tightened its grip in 2008, and IBISWorld expects far fewer new openings to occur in 2011.

Since the mid-1990s, major operators like Starwood have formed hotel real estate investment trusts to raise funds. Investment in condominium hotels was common until the recent recession, when investment funds dried up due to the subprime mortgage crisis.

During the 2000s, major operators have restructured their operations away from direct hotel property ownership to only providing specialist services in their core area of expertise: hotel management. Though overall revenue is lower, hotel management has provided an opportunity to generate higher profit margins due to the elimination of many property-related costs. The industry is still largely property-based, however. Therefore, owners are subject to changes in

general property value cycles and economic conditions and to any localized imbalances in hotel room demand and supply influences.

<u>Industry Outlook</u>

**Annual Change**

| | Revenue (%) | Industry Value Added (%) | Establish-ments (%) | Enterprises (%) | Employment (%) | Exports (%) | Imports (%) | Wages (%) | Domestic Demand (%) | Domestic Trips by US Residents (%) |
|---|---|---|---|---|---|---|---|---|---|---|
| 2003 | -2.1 | -5.1 | 1.0 | 1.0 | -2.5 | N/A | N/A | -1.6 | N/A | 6.1 |
| 2004 | 6.3 | 10.2 | 1.7 | 1.0 | 3.1 | N/A | N/A | 5.2 | N/A | 8.0 |
| 2005 | 3.6 | 3.5 | 1.0 | 1.0 | 1.1 | N/A | N/A | 1.7 | N/A | 4.1 |
| 2006 | 0.5 | 2.5 | 1.0 | 1.0 | 1.0 | N/A | N/A | 2.0 | N/A | 0.0 |
| 2007 | 4.9 | 1.7 | 0.8 | 0.5 | 1.0 | N/A | N/A | 1.7 | N/A | 3.2 |
| 2008 | -3.0 | -3.0 | 0.0 | 0.0 | -1.1 | N/A | N/A | 1.8 | N/A | -4.0 |
| 2009 | -9.4 | -3.8 | -2.1 | -1.0 | -1.9 | N/A | N/A | -2.2 | N/A | -5.1 |
| 2010 | 4.4 | 0.8 | 0.8 | 0.8 | 0.9 | N/A | N/A | 1.2 | N/A | 0.2 |
| 2011 | 6.0 | 4.7 | 1.3 | 1.0 | 2.2 | N/A | N/A | 2.7 | N/A | 0.9 |
| 2012 | 4.0 | 3.4 | 1.2 | 1.0 | 1.4 | N/A | N/A | 2.0 | N/A | 2.0 |
| 2013 | 2.5 | 2.5 | 1.3 | 1.1 | 1.5 | N/A | N/A | 2.1 | N/A | 3.7 |
| 2014 | 4.6 | 2.6 | 1.4 | 1.2 | 1.6 | N/A | N/A | 2.2 | N/A | 3.2 |
| 2015 | 1.3 | 2.7 | 1.5 | 1.2 | 1.7 | N/A | N/A | 2.3 | N/A | 4.8 |
| 2016 | 2.3 | 2.8 | 1.5 | 1.3 | 1.7 | N/A | N/A | 2.4 | N/A | 1.1 |
| Sector Rank | 2/12 | 3/12 | 11/12 | 7/12 | 6/12 | N/A | N/A | 7/12 | N/A | N/A |
| Economy Rank | 115/703 | 225/703 | 222/702 | 224/702 | 170/703 | N/A | N/A | 259/703 | N/A | N/A |

The Hotels and Motels industry is on the road to recovery. After fighting through a decline in 2009, revenue picked up in 2010 and is expected to continue to rise in 2011, with growth rates approaching prerecession levels. Over the five years to 2016, IBISWorld forecasts that revenue will increase at an average annual rate of 2.9% to $140.7 billion, including a 4.0% increase in 2012 to bring revenue to $126.6 billion.

Travel spending is projected to increase over the next five years as the economy improves. In 2012, international arrivals will increase by 4.9%, while domestic travel will grow by 2.0%. The influx of tourist dollars will likely bolster revenue for hotels and motels. According to IBISWorld research, over the five years to 2016, international arrivals will increase at a rate of 3.5% per year, while domestic travel will increase by 2.9% per year.

The industry will also benefit as the economy improves, unemployment rates decline and consumers begin to spend money again, particularly on recreational activities like vacations and travels. Consumer spending is expected to increase by 2.9% in 2012; over the five years to 2016, it will increase at an average annual rate of 2.3%. Business spending is also forecast to increase, helping hotels and motels increase their number of business guests.

Changes in the relative price of domestic and international travel also play a large part in determining travel patterns. Other noneconomic factors include consumers' available time to travel, cultural and family links, and age. The price of gas also factors directly into travel costs, such as airline tickets and auto-related travel costs.

<u>Growth Trends</u>

Over the next five years, investment in new hotel and motel rooms will gradually accelerate because of a sustained rise in tourist accommodation demand. The projection of more solid

economic growth from 2011 to 2016 will likely cause the industry to experience stronger trading conditions and financial performance. Investment will occur at a much faster pace to compensate for the dramatic decline in investment that the industry experienced over the past few years. However, room oversupply in certain geographic areas will result in those markets experiencing a subdued recovery. Hotel investment by major operators will also increasingly be focused on opportunities in international travel markets and regions, including Russia, Eastern Europe, the Middle East, Latin America, Asia, China and India. Therefore, any domestic accommodation investment proposals will compete for funding against growing international travel markets and regions.

The hotel and motel market will also continue to segment into areas such as extended-stay, boutique hotels, resorts and spa and health retreats as guests search for more unique and hospitable accommodation experiences. The low-cost segment will also continue to expand and experience competition on the basis of price (i.e. room rates). This factor will place pressure on economy operators to hold or reduce costs.

Direct bookings to websites of major operators are increasing rapidly. For example, the share of Hilton reservations booked through its website increased from 9.0% to 17.0% over the five years to September 2005 and rose to an estimated 25.0% in 2010. In contrast, bookings made through third-party online agencies remained flat at 3.0% over the five years to 2010. Other hotel groups release their excess rooms at deep-discount prices and short notice to web-based hotel accommodation sellers and still receive bookings via web-based computer reservation systems (CRS).

IBISWorld projects that the industry will begin expanding again over the five years to 2016 as travel demand rises. The number of establishments is forecast to increase at an average annual rate of 1.4% to 52,197 in 2016. Employment will decline in the beginning of the next five years due to lower guest arrivals and from increasing use of casual employees during peak periods, but this trend will reverse when demand picks up. Over the next five years, employment is projected to grow at an average annual rate of 1.6% to about 1.5 million people. Industry profit margins are anticipated to grow over the next few years in response to the increase in demand for travel accommodations. The continued growth of higher-margin specialty hotels and hotels in new markets will also assist profitability.

<u>Products & Markets</u>

Demand for hotel and motel accommodation is derived from both the domestic and international visitors market.

*Domestic travel*

About 56% of all domestic overnight trips involve the use of hotel, motel or bed- and-breakfast accommodation. Overall, in the domestic market, 75% of trips are undertaken for leisure purposes and 14% for business purposes. The remaining 8% are combined business/pleasure trips. Automobile travel makes up 77% of all trips, while air travel makes up 18%. In general,

hotels that are major chains or are located in major cities have a greater number of business and international guests, while motels cater to domestic leisure travelers.

Demand for hotel and motel accommodation is dependent on factors that affect travel, such as changes in household disposable income (which is influenced by changes in general employment growth) as well as movements in interest and tax rates. Changes in disposable income affect the number of trips a household takes as well as its expenditures while traveling, which in turn affects the growth and economic impact of the tourism industry.

Also important is the price of fuel, which also affects household disposable income, as well as general travel demand, flows and patterns. Changes in the availability of leisure time and the recent reluctance of people in the labor market to use their holiday leave (due to work and family commitments) are also impacting the Hotels and Motels industry. Holiday expenditure is also in competition with other leisure and recreational industries and competes for a share of household disposable income.

Possibly, a longer-term influence on travel patterns is the cost of taking a domestic trip compared with an international one. The difference between the two is influenced by exchange rate movements, the availability of cheap airfares and holiday packages, and the supply of airline seats.

Finally, tourism promotions by private operators and federal and state governments (e.g. through TV programs and special sporting events) may also stimulate travel. However, individual state government promotions may influence domestic travel patterns to favor only their state, rather than the entire industry.

*Business travel*

Business travel, including trips to seminars and conferences, accounts for about 20% of total domestic household trips. This travel is greatly influenced by changes in economic growth, business confidence and profitability. Economic conditions directly affect the number of business trips taken, the length of stay and budgeted travel spending. Increasingly, technologies such as teleconferencing and conference calling can take the place of business travel.

*International tourism*

International tourism is one of the most competitive industries globally. International tourism is affected by factors similar to domestic travel as well as global economic conditions, especially changes in economic growth. Furthermore, particularly in major visitor-origin countries/regions, international tourism is affected by changes in the US dollar against other major currencies, which has an impact on the cost of travel, as well as the relative attractiveness of traveling to competing destinations.

Other factors, such as heightened geopolitical tensions including wars and terrorism (whether feared or actual), affect international travel plans. Promotional expenditures and activities, such as the holding of major or special events, on the part of governments and other organizations can

raise awareness and interest in travel. Finally, supply factors are also of critical importance, including the availability of airline flights and seats at the times people want to travel, as well as accommodations to and at their selected destination.



Approximately 28.5% of lodging customers are transient business travelers, 25.0% attend a conference or meeting, 25.7% are vacation travelers and 20.8% travel for personal, family or other reasons. In terms of rooms booked for overnight stays, an estimated 83.3% are filled by domestic travelers and 16.7% by international travelers. The relative proportion of business and conference travelers has declined over the last five years due to the cutback in business travel during the recession.

The typical business room night is occupied by a male between 35 and 54 years old, and usually in a managerial or professional occupation. These travelers tend to travel alone, make reservations and pay about $95 per room night; 36.0% stay one night and 25.0% stay two nights. The remainder stay more than two nights.

However, leisure travelers tend to comprise two adults who are similar in age to the above and also make reservations, but pay about $87 per room night. About 43.0% stay one night and 28.0% stay two nights. The remainder stay more than two nights.

<u>Industry Costs</u>



The Hotels and Motels industry has struggled recently with declining revenue and profit as demand for travel services and accommodations has fallen due to the global recession. Industry profit is determined using EBIT. Profit will vary between players depending upon the size of the hotel, hotel network, or parent company, with larger operators generally benefiting from economies of scale. Due to the competitive nature of the industry, particularly because of its fragmentation with many small operators, industry profit margin tends to be small. This results from competition in the industry being largely on a price basis (i.e. room rates). This is especially true with establishments in the same star rating classification and operating within the same geographic location. Due to the low profit margin, downturns in demand (such as has been occurring since 2008 because of the deepening domestic and international recession) rapidly translate into bottom-line financial losses for operators. IBISWorld estimates that in 2011, the industry will obtain profit equivalent to 6.0% of an average firm's revenue.

The major costs are sales (food and alcohol) purchased for resale and wages. This is a typical of the cost profile of operators in the broader hospitality industry and reflects the need for a large amount of labor input to provide the level of service required. Many hotels and motels also provide meals and liquor, either in individual rooms or in separate restaurant/dining areas. Recently, the hotel sector has experienced a significant increase in insurance premiums, particularly related to public liability and health benefit policies. In recessions, there are limits to how many adjustments a service industry can implement on labor costs before customer service standards plummet, potentially resulting in the loss of customers and revenue. In 2011, purchases are estimated to account for 38.1% of an average firm's revenue and wage costs incurred by the industry will account for 27.3% of an average firm's revenue.

## 7.2 Competitive Market Discussion

The Subject Property, the proposed 79-room Palm House, is located ½ block from the ocean and several blocks from Worth Avenue in an established area of Palm Beach one of the world's most exclusive real estate destinations. The Palm Beach market has long been a stable, high-demand real estate market and winter season tourist destination.

Selecting the competitive market set for the Subject Property was rather difficult; as discussed earlier, the Subject Property has little direct competition on Palm Beach. Nonetheless, we have gathered information from the general market and considered the Subject within the context of these rate structures. We have also considered the Subject's operating history.

The overall market considered most suitable for (broad) comparison to the Subject was researched over a three-year period. This research included property visits, studies of historic occupancy and average daily rate (ADR) performance and consultation with on-site personnel when possible and with industry professionals regarding the strengths and weaknesses of the market as they relate to the Subject Property.

Competitive Market Set

In general, this market is experiencing strong occupancy, and high ADRs, given competent and professional management. The subject will be a hybrid in the market – heretofore (Heart of Palm

Beach) more a business type hotel than the boutique properties, i.e. Chesterfield and Brazilian Court, without the ocean frontage of the larger franchised properties, such as the Four Seasons, Hilton and far less upscale than the Palm Beach institution, the Breakers. Once again, subjectivity is required in estimating market-oriented rates and occupancy structure for the Subject. Finally, the subject yields no relevant data from its historic operations due to the new construction.

<u>Competitive Analysis</u>

As might be expected, research for this market was very limited; we looked to four Palm Beach properties which in our opinion comprise the Palm Beach market for non-oceanfront properties such as the subject; the research included property visits and consultation with on-site personnel. Those hotels, their rack rates, locations and comparability to the Subject are profiled below.

We also consulted with industry professionals regarding the strengths and weaknesses of each property, their locations and respective markets and how they relate to the Subject Property. We considered the Subject's historic operating performance, however, due to the renovation, that performance is not considered relevant.

Room rates proposed for the subject for the opening season are as follows. Complete pro formas by the owner based on different occupancy scenarios are found in the Appraisal Report, Attachment B.

| Projected Rate Range | | |
|---|---|---|
| January | $595 - | $1,350 |
| February | $595 - | $1,350 |
| March | $595 - | $1,350 |
| April | $595 - | $1,350 |
| May | $430 - | $650 |
| June | $250 - | $650 |
| July | $250 - | $650 |
| August | $250 - | $650 |
| September | $250 - | $650 |
| October | $450 - | $800 |
| November | $450 - | $800 |
| December | $550 - | $1,195 |

<u>The Breakers</u>
www.thebreakers.com

Situated on 140 acres of oceanfront property in Palm Beach, Florida, The Breakers is a privately held AAA Five Diamond award-winning resort destination. The multifaceted, Italian Renaissance-style property features 540 deluxe guest rooms including 57 suites, two 18-hole championship golf courses, a 20,000-square-foot luxury spa, a Mediterranean-style beach club with 30 premium beach bungalows and cabanas for day use, two fitness centers, four swimming

pools, 10 tennis courts, a family entertainment center, nine restaurants, and an array of on-site boutiques. The Breakers completed a five-year, $80 million renovation and redesign of all guest rooms in 2011. Current rates range from $339 to $1,800 per night in the off-season, and $550 to $5,500 per night in-season.

Four Seasons
http://www.fourseasons.com/palmbeach/

Four Seasons Resort Palm Beach is a five-star hotel located at 2800 South Ocean Boulevard, The five-star resort's 210 guest rooms, which include 13 suites, feature private, furnished balconies with views of the Atlantic Ocean or the Resort's beautifully landscaped garden and/or pool area. Additional amenities include award-winning dining from three on-site restaurants, a complimentary children's program and Teen Room, a spa & salon, fitness center, an outdoor tennis court, and business center. A total renovation of this property was completed in November 2010. In-season rates range from $530 to $4,250, while off-season rates range from $380 to $2,950.

Ritz-Carlton
http://www.ritzcarlton.com/en/Properties/PalmBeach/Default.htm

The Ritz-Carlton, Palm Beach is located on the beach in Manalapan. Amenities include five restaurants, two bars, an outdoor pool, outdoor tennis courts, and a full-service health spa and fitness facility. This 5-star property also has a business center and offers small meeting rooms, secretarial services, and a technology helpdesk. 310 air-conditioned guestrooms at The Ritz-Carlton, Palm Beach range from $300 to $750 in the off-season, and $515 to $915 in-season.

Brazilian Court
http://www.thebraziliancourt.com



The Brazilian Court is an 80-room property located on Australian Avenue at Hibiscus, three blocks from the ocean. Operating as a hotel since 1926; the property underwent a condominium conversion following a $20 million + renovation over the recent past. The hotel is now in operation and is an affiliate of Leading Hotels of the World. Amenities include restaurant, lounge and spa / salon.

Set on a tree-lined street in Palm Beach, The Brazilian Court Hotel & Beach Club is adjacent to Worth Avenue.   The resort features 80 completely renovated studios, one, two and three bedroom suites. Recreational amenities include an outdoor pool and a fitness facility. The property's full-service health spa has body treatments, massage/treatment rooms, facials, and beauty services. This 4.5-star property offers small meeting rooms, secretarial services, and limo/town car service. This Palm Beach property has 255 square meters of event space consisting of banquet facilities and a ballroom. Business services, wedding services, and tour assistance are available. Rates range from $520 to $885 in-season, and $200 to $640 out of season.

### 7.3 Support for Financial Projections

The support presented below for the financial projections (see Section 4.6) is taken from the Appraisal Report attached as Attachment B. Note that the Developer has chosen to use even more conservative projections for ADR and occupancy rate than what the appraiser supported below.

In establishing estimated stabilized occupancy and ADR for our analysis we have given consideration to the competitive market set, the foregoing market analysis and discussions with industry professionals. The owner's pro forma rate structure is certainly well supported by the Palm Beach market and given the level of finish and amenities proposed may be conservative. We have utilized an ADR of $650 for Year 1 of our analysis.

The owner projects occupancy between 68% and 75% for Year 1 operations; while in our opinion a stabilized occupancy of 75% is reasonable given the small size of the property and the level of quality, we have stepped occupancy in our analysis to achieve that stability. We have utilized a 63% Year 1 occupancy increasing by Year 4 to stabilized 75% annual occupancy.

This would indicate Year 1 Rooms' Revenues of $11,807,900, calculated as follows:

Rooms x Nights = Room Nights x Occupancy = Total Rooms Consumed
Total Rooms Consumed x ADR = Revenues

Year 1 Occupied Rooms
79 x 365 = 28,835 X .63 = 18,166 Room Nights

Year 1 Rooms' Revenues
18,166 x $650 = $11,807,900

**7.4 Support for Private Club Financials**

The support presented below for the financial projections of the private club (see Section 4.6) is taken from the Appraisal Report attached as Attachment B. Note that the Developer has chosen to use even more conservative projections for membership sales than what the appraiser supported below.

The Palm House is a proposed private destination club that will afford its members access to a luxuriously appointed property in one of the most exclusive and historic locations in the world. Resort, vacation and/or destination clubs are the fastest growing segment of the luxury travel market according to Ragatz, a consulting and market research firm to the resort industry. Essentially, these clubs combine the amenities and services of a five-star hotel with the luxury of staying at a destination hotel and club also patronized by the public in some portions of the property. Some of these clubs are basically high-end timeshares offering members a choice of dozens of private homes around the world along with concierge and travel services. Club offerings to its members include the opportunity to socialize in unique events and seasonal parties organized throughout the year; private dining room, room upgrades in the hotel and all affiliated properties. Club members have full use of the hotel facilities including pool, cabaret, concierge services, spa and fitness center, without being hotel guests. Further, the club membership includes reciprocity with four other Matthews Ventures' facilities, either open or in the planning stages. Point Breeze in Nantucket opens June 19, 2008; grand opening in the Point Breeze cabaret will be celebrated with Natalie Cole, a founding club member. Other clubs in various stages of planning include locations in Stowe, Vermont, Aspen, Colorado and a full-island Caribbean facility in the Bahamas chain of islands.

The Palm House private club one-time membership is proposed by the owner to start at $200,000 and increase to $275,000 in the second year. Members also pay annual dues of $7,000. 510 total active memberships are planned.

A survey of other destination clubs with multiple locations is found below:

## Destination Club Comparables

| Club Name | # Members | Membership | Annual Dues |
|---|---|---|---|
| Exclusive Resorts 20+ Locations | 1,600 | $139,900 $479,900 | $13,900 $59,900 |
| Ultimate Escapes 50+ Locations | 1,250 | $200,000 $375,000 | $17,500 $35,000 |
| Yellowstone World Club 9 Locations | 150 | $3,000,000 | $100,000 |
| Palm House 5 Future Locations | 510 | $200,000 Current Pro Forma | $7,000 |

<u>Palm Beach Market</u>

Other private clubs on Palm Beach consist of Mara-a-Lago, the Bath & Tennis Club, the Everglades Club, the Sailfish Club, and the Palm Beach Country Club. All but Mara-a-Lago are owned by the members, and are therefore, "equity" clubs that are not-for-profit.

Mar-a-Lago opened as a private club in 1995 with a cap at 500 members and has a current membership of 436. Current memberships are $175,000 with annual dues of $10,400. The Bath and Tennis Club with 900 members, and the Everglades Club with 750 members, are sold out and memberships are passed down through generations. The Everglades Club is open by invitation only, and requires that three members vouch for any new member. The Sailfish Club, with 400 members, is more like a yacht club, with boat docks and a small restaurant and club. Membership costs $60,000 to join. The Palm Beach Country Club, with 750 members, is sold out. Every member of this club, as a condition of membership, pledges to give $1.0 million to a Jewish charity.

<u>Summary & Conclusion – Pricing</u>

Destination / multiple location club memberships range from $139,900 to $3,000,000 with annual dues from $13,900 to $100,000. It should be noted that the other destination clubs include single-family houses at some locations. Another difference is that the Yellowstone World Club facilities are exclusive to the membership, i.e., no hotel guests.

While the subject's pro forma pricing is reasonable within the context of other ultra-luxury destination clubs, the reciprocity is with one exception (Point Breeze) at unknown times in the future. We have concluded at a lower membership fee with prices starting at $150,000 and increasing by 10% following initial year sales and thereafter by 5% annually. This second year surge followed by a slowing is well supported by local historic performance, specifically at Mar-a-Lago.

Absorption

Price and absorption are naturally interrelated. Typically, as prices increase, absorption slows and vice versa. However, a flurry of initial activity is typical and was exhibited locally with Mar-a-Lago, followed by a more level pace of sales. People want to be among the first members. The owner projects a two-year sellout; in our opinion very aggressive; again, the reciprocity at this time includes only one other club; the others do not yet exist. We have projected sellout instead over a 15 year period. In the first year we have projected 75 sales followed by 65 in Year 2 and a flat pace of 30 per year thereafter.

# 8.0 REGIONAL INFORMATION

The county that comprises the Region is located in Florida, and includes the city of West Palm Beach. This area is generally defined by the U.S. Office of Management and Budget as part of the Miami Metropolitan Statistical Area (MSA).

| | | |
|---|---|---|
| Miami-Dade County Logo | Broward County Logo | Palm Beach County Logo |
| Miami-Dade County Location within Florida | Broward County Location within Florida | Palm Beach County Location within Florida |
| Population 2,496,435 2010 US Census | Population 1,748,066 2010 US Census | Population 1,320,134 2010 US Census |
| Most populous county in Florida | 2nd most populous county in Florida | 3rd most populous county in Florida |
| Created in 1836 | Created in 1915 | Created in 1909 |

## 8.1 Miami–Fort Lauderdale–Pompano Beach, FL MSA

The South Florida metropolitan area, also known as the Miami metropolitan area, and designated the Miami–Fort Lauderdale–Pompano Beach, FL Metropolitan Statistical Area for statistical purposes by the U.S. Office of Management and Budget (OMB), is the most populous metropolis in the Southeastern United States and the eighth-most populous metropolitan area in the United States, encompassing a tri-county area of the southeastern coast of the state of Florida. The metropolitan area covers the counties of Miami-Dade, Broward, and Palm Beach, the three most highly-populated counties in the state. The principal cities include Miami, Fort Lauderdale, Hollywood, Pompano Beach, Boca Raton, and West Palm Beach.

Because the population of South Florida is largely confined to a strip of land between the Atlantic Ocean and the Everglades, the Miami urbanized area (that is, the area of contiguous urban development) is about 110 miles (180 km) long (north to south), but never more than 20

miles (32 km) wide, and in some areas only 5 miles (8.0 km) wide (east to west). South Florida is longer than any other urbanized area in the United States except for the New York metropolitan area.

The combined land area of the region encompasses 5,125 square miles, with a population of 5,564,635 as of the 2010 Census. This gives a combined population density of 1,086 people per square mile; however, the majority of the land area in the region is unincorporated, much of it taken up by the Everglades.

The Miami metropolitan area consists of three distinct metropolitan divisions, subdividing the region into three divisions according to the region's three counties: Miami-Dade County, Broward County, and Palm Beach County.

| Metropolitan Divisions | 2010 Census Population | 2000 Census Population |
|---|---|---|
| **Miami**—Miami Beach—Kendall | 2,496,435 | 2,253,362 |
| **Fort Lauderdale**—Pompano Beach—Deerfield Beach | 1,748,066 | 1,623,018 |
| **West Palm Beach**—Boca Raton—Boynton Beach | 1,320,134 | 1,131,184 |
| **Miami MSA** | **5,564,635** | **5,007,564** |

Occupation, Income, and Unemployment

Occupations and Type of Employer: Among the most common occupations were: 32% were management, professional, and related occupations; 30% were sales and office occupations; 18% were service occupations; 11% were construction, extraction, maintenance and repair occupations; and 9% were production, transportation, and material moving occupations. 81% of the people employed were private wage and salary workers; 12% were federal, state, or local government workers; and 7% were self-employed.

Income & Unemployment: The median income of households in South Florida was $60,200 in 2010–2011, according to the U.S. Department of Housing and Urban Development. The unemployment rate in Florida during March 2011 was 11.1%.

**8.2 Palm Beach County**

History

Among the first residents in Palm Beach County were African Americans, many of whom were former slaves or immediate descendants of formers slaves who had escaped to Florida from slave plantations located in Alabama, Georgia, and South Carolina. Runaway African slaves started coming to what was then named Spanish Florida in the late 17th century and they found refuge among the Seminole Native Americans.

Henry Flagler, who made his home in Palm Beach, was instrumental in the county's development in the early 20th century with the extension of the Florida East Coast Railway through the county from Jacksonville to Key West.

Palm Beach County was created in 1909. It was named for its first settled community, Palm Beach, in turn named for the palm trees and beaches in the area. The County was carved out of what was then the northern portion of Dade County, comprising part of the areas now occupied by Okeechobee and Broward counties, part of Martin and all of Palm Beach County, initially including all of Lake Okeechobee. The southernmost part of Palm Beach County was separated to create the northern portion of Broward County in 1915, the northwestern portion became part of Okeechobee County in 1917, and southern Martin County was created from northernmost Palm Beach County in 1925. About three-quarters of Lake Okeechobee was removed from Palm Beach County in 1963 and divided up among Glades, Hendry, Martin and Okeechobee counties. The African American population provided significant labor for the building of the county, its hotels, houses, and Flagler's railroad.

Geography

According to the U.S. Census Bureau, the county has a total area of 2,386.33 square miles (6,180.6 km$^2$), of which 1,974.11 square miles (5,112.9 km$^2$) (or 82.73%) is land (making it the second-largest Florida county by land area, after Collier County) and 412.22 square miles (1,067.6 km$^2$) (or 17.27%) is water, much of it in the Atlantic Ocean and Lake Okeechobee.

Adjacent counties:
Martin County to the North
Broward County to the South
Hendry County to the West
Okeechobee County
Glades County

Demographics

As of the census of 2010, there were 1,320,164 people and 544,277 households residing in the county. The population density was 669 people per square mile. Approximately 41% of Palm Beach County's population resides in unincorporated areas within the county. The racial makeup of the county was 73.5% White, 17.3% Black or African American, 0.5% Native American, 2.4% Asian, 0.1% Pacific Islander, 4.0% from other races, and 2.3% from two or more races. 19.0% of the population are Hispanic or Latino of any race.

| Historical Populations | | |
|---|---|---|
| Census | Population | %± |
| 1910 | 5,577 | — |
| 1920 | 18,654 | 234.5% |
| 1930 | 51,781 | 177.6% |
| 1940 | 79,989 | 54.5% |
| 1950 | 114,688 | 43.4% |
| 1960 | 228,106 | 98.9% |
| 1970 | 348,753 | 52.9% |
| 1980 | 576,863 | 65.4% |
| 1990 | 863,518 | 49.7% |
| 2000 | 1,131,184 | 31.0% |
| 2010 | 1,320,134 | 16.7% |

Palm Beach County Communities:

The county has 38 municipalities in total.



| # | Incorporated Community | Designation | Date incorporated | Population |
|---|---|---|---|---|
| 24 | Atlantis | City | 1959 | 2,005 |
| 2 | Belle Glade | City | April 9, 1928 | 16,739 |
| 37 | Boca Raton | City | May 1925 | 86,396 |
| 30 | Boynton Beach | City | 1920 | 66,714 |
| 33 | Briny Breezes | Town | March 19, 1963 | 411 |
| 18 | Cloud Lake | Town | 1947 | 167 |
| 35 | Delray Beach | City | 1911 | 64,112 |
| 17 | Glen Ridge | Town | 1948 | 276 |
| 32 | Golf | Village | 1957 | 230 |
| 23 | Greenacres | City | 1926 | 27,569 |
| 34 | Gulf Stream | Town | 1925 | 777 |
| 16 | Haverhill | Town | 1950 | 1,454 |
| 36 | Highland Beach | Town | 1949 | 3,988 |
| 29 | Hypoluxo | Town | 1955 | 2,015 |
| 7 | Juno Beach | Town | June 4, 1953 | 3,262 |
| 6 | Jupiter | Town | February 9, 1925 | 39,328 |
| 5 | Jupiter Inlet Colony | Town | 1959 | 368 |
| 20 | Lake Clarke Shores | Town | 1957 | 3,451 |
| 10 | Lake Park | Town | 1923 | 8,721 |
| 25 | Lake Worth | City | 1912 | 36,342 |
| 27 | Lantana | Town | 1921 | 9,437 |
| 38 | Loxahatchee Groves | Town | November 1, 2006 | 3,232 |
| 28 | Manalapan | Town | 1931 | 321 |
| 13 | Mangonia Park | Town | 1947 | 1,283 |
| 9 | North Palm Beach | Village | 1956 | 12,064 |
| 31 | Ocean Ridge | Town | 1931 | 1,636 |
| 1 | Pahokee | City | 1922 | 6,617 |
| 14 | Palm Beach | Town | April 17, 1911 | 10,468 |
| 8 | Palm Beach Gardens | City | 1959 | 44,315 |
| 12 | Palm Beach Shores | Town | 1951 | 1,269 |

| 19 | Palm Springs | Village | 1957 | 11,699 |
| 11 | Riviera Beach | City | September 29, 1922 | 29,884 |
| 21 | Royal Palm Beach | Village | June 18, 1959 | 31,864 |
| 3 | South Bay | City | 1941 | 4,506 |
| 26 | South Palm Beach | Town | 1955 | 699 |
| 4 | Tequesta | Village | 1957 | 5,273 |
| 22 | Wellington | Village | December 31, 1995 | 55,584 |
| 15 | West Palm Beach | City | November 5, 1894 | 103,663 |

## 8.3 The Town of Palm Beach

The Town of Palm Beach (called Palm Beach Island or the Island of Palm Beach to differentiate between the town and the county) is an incorporated town in Palm Beach County, Florida, United States. The Intracoastal Waterway separates it from the neighboring cities of West Palm Beach and Lake Worth. As of 2000, Palm Beach had a year-round population of 10,468, with an estimated seasonal population of 30,000.

Geography

Palm Beach is the easternmost town in Florida, located on a 16-mile (26 km) long barrier island.

According to the U.S. Census Bureau, the town has a total area of 10.4 square miles (27 square kilometers). Of this, 3.9 square miles (10 square kilometers) is land and 6.5 square miles (17 square kilometers) is water. The total area is 62.45% water.

Demographics

As of the 2000 census, over half the population (52.7%) are 65 years of age or older, with a median age of 67 years. 9.4% are under the age of 18, 1.5% are from 18 to 24, 11.5% are from 25 to 44, and 25.0% from 45 to 64. For every 100 females there are 79.3 males. For every 100 females age 18 and over, there are 77.0 males.

The per capita income for the town is $109,219. Males have a median income of $71,685 versus $42,875 for females. 5.3% of the population and 2.4% of families are below the poverty line. 4.6% of those under the age of 18 and 2.9% of those 65 and older are living below the poverty line.

The racial makeup of the town is 96% Euro American (93.8% were non-Hispanic White), 2.57% Black, 0.53% Asian, 0.04% Native American, 0.02% Pacific Islander, 0.21% from other races, and 0.63% from two or more races. 2.56% of the population are Hispanic or Latino of any race.

The 10,468 people in the town are organized into 5,789 households and 3,021 families. The population density is 2,669.2 inhabitants per square mile (1,031.1/km$^2$). There are 9,948 housing units at an average density of 2,536.6 per square mile (979.8/km$^2$). 7.7% of the households have children under the age of 18 living with them, 48.1% are married couples living together, 3.3% have a female householder with no husband present, and 47.8% are non-families. 42.6% of all

households are made up of individuals and 27.6% have someone living alone who is 65 years of age or older. The average household size is 1.81 and the average family size is 2.38.

Many of Palm Beach's residents are affluent, with a median household income of $124,562 and a median family income of $137,867. The town's affluence and its "abundance of pleasures" and "strong community-oriented sensibility" were cited when it was selected in June 2003 as America's "Best Place to Live" by Robb Report magazine.

As of 2000, English was the first language of 87.81% of all residents, while French comprised 4.48%, Spanish consisted of 3.65%, German made up 2.16%, Italian speakers made up 0.45%, Yiddish made up 0.36%, Russian was at 0.30%, Arabic and Swedish at 0.25%, and Polish was the mother tongue of 0.24% of the population.

# 9.0 PARTNERSHIP INFORMATION

## 9.1 Office of the Partnership

The contact address of the Partnership is 197 S. Federal Highway, Suite 200, Boca Raton, FL 33432.

## 9.2 Structure of the Partnership

The Partnership is a Florida limited liability limited partnership formed pursuant to the laws of the State of Florida.

A limited partnership is a form of partnership similar to a general partnership, except that in addition to one or more general partners (GPs), there are one or more limited partners (LPs). It is a partnership in which only one partner is required to be a general partner.

The GPs are, in all major respects, in the same legal position as partners in a conventional firm, i.e., they have management control, share the right to use partnership property, share the profits of the firm in predefined proportions, and have joint and several liability for the debts of the partnership.

As in a general partnership, the GPs have actual authority as agents of the firm to bind all the other partners in contracts with third parties that are in the ordinary course of the partnership's business. As with a general partnership, "An act of a general partner which is not apparently for carrying on in the ordinary course the limited partnership's activities or activities of the kind carried on by the limited partnership binds the limited partnership only if the act was actually authorized by all the other partners."

Like shareholders in a corporation, LPs have limited liability, meaning they are only liable on debts incurred by the firm to the extent of their registered investment and have no management authority. The GPs pay the LPs a return on their investment (similar to a dividend), the nature and extent of which is usually defined in the partnership agreement. General Partners thus carry more liability, and in cases of financial misfortune, the GP becomes "the generous partner."

## 9.3 Advantages of a Limited Partnership

A limited partnership is a limited liability entity, much like a corporation or limited liability company. The primary advantage of a limited partnership is that the owners of limited partnership interests in a limited partnership are not personally liable for the debts or obligations of the entity.

## 9.4 Flexible Profit Distribution

A limited partnership enjoys certain flexibility regarding the distribution of profits and/or cash flow that is not necessarily the same as the ownership of interests in the Partnership.

### 9.5 Key Features

- The Partnership is a limited partnership thereby utilizing a form of business entity offering flexibility and limited liability to the limited partners.

- The profits and losses of the limited partnership flow through the partnership to each partner. Each partner will receive a Schedule K-1 from the Partnership on an annual basis. Each partner is responsible for paying taxes, if any, on distributions received.

- The General Partner of the Partnership is responsible to manage the day-to-day business affairs of the partnership and the limited partners are not obligated or entitled to participate in the management of the Partnership or the business, except to the extent set forth in the Partnership Agreement.

### 9.6 Flow-Through Taxation

All business losses, profits, and expenses flow through a limited partnership to the individual partners. There is no double taxation requiring the payment of corporate tax and individual tax because the Partnership is not a taxable entity.

Notwithstanding the foregoing, all Persons considering an investment in the Partnership are urged to consult with its/their own tax advisors regarding United States Federal, State, local, and foreign tax consequences to its/them of such investment.

### 9.7 Independent Advice

No Person should construe the contents of this Confidential Business Review or any written or oral communication from the Partnership or the employees, agents or affiliates of the Partnership, as advice of any kind, including without limitation, tax, legal, accounting or investment advice. Prospective Investors should consult its/their own independent advisors, including legal counsel, in connection with the rights and obligations relating to an investment in the Partnership.

# 10.0 EB-5 INVESTOR AND REGIONAL CENTER INFORMATION

The immigrant EB-5 Program is a highly beneficial permanent residence option for the wealthy individual. Since there is no quota waiting list in this preference category, it enables a foreign national to obtain permanent residence status more expeditiously than with most other options.

The EB-5 category requires an investment of $1 million (or $500,000 in a high unemployment or rural area) in a commercial enterprise that will employ 10 full-time US workers. Although the investor's role cannot be completely passive, he or she does not have to be involved in any way in the day-to-day management of the business unless he or she wants to do so. It is critically important that the investor be able to document the lawful source of investment funds and whether his or her own or funds were given to him or her as a gift.

The permanent residence obtained by the investor is conditional for two years and can be made permanent upon satisfying USCIS that the investment proceeds have not been withdrawn and the requisite jobs have been created at the end of the two-year period.

## 10.1 Regional Centers

The investor may invest in his or her own commercial enterprise or in a commercial enterprise owned by other parties. The investor may also choose to invest in a pre-approved "regional center." Regional centers are geographical areas for which USCIS has determined that investments will create the necessary 10 jobs per investor, whether directly or indirectly, in the regional center's approved geographical area. Virtually all of the regional centers are in geographical areas where $500,000 is the required amount of investment. Most of the regional centers involve limited partnership investments for which having the rights of a limited partner is considered sufficient to make the investor not completely passive. The business plan functions as a proposal to act as a regional center for the Region.

## 10.2 Immigrant Investors: Two Choices, One Goal

Foreign nationals seeking permanent resident status in the U.S. are relying on the investment route more frequently than ever before. Various reasons might be surmised for the increase in popularity of the investment option, including the increasing unavailability of other options under U.S. immigration laws and the significantly decreased value of the U.S. dollar. The result is that the required amount of investment—either $500,000 or $1,000,000—translates into smaller equivalent amounts to foreign nationals using currencies with greatly enhanced value in conversions to dollars.

The foreign national who wishes to use the investment option for permanent residence has two basic choices. One choice is to find his or her own individual investment vehicle in which he or she will invest and play a role in management or policy making. The second option is a government-approved "regional center" investment. Both options have advantages and disadvantages that will be discussed in further detail.

As an overview, the major advantage of the individual investment option is that the foreign national accomplishes not only an immigration purpose, but also a purpose of investing in a business that may provide significant returns as well as a source of income and a livelihood on an ongoing basis. However, there are far more immigration law hurdles to be overcome than with the regional center investment.

The regional center investment is often the quickest and most secure option (assuming the investment is made in a regional center with a strong immigration track record). The immigration process is often quicker and there are far fewer legal issues to be confronted. However, the investor is not running his or her own business and the rate of return may be lower than in a successful individual investment.

### 10.3 What is the Minimum Investment?

With either option, the amount of the investment is $1,000,000, unless the investor can prove that the investment is in a "rural area," or in an area that has experienced unemployment of at least 150% of the national average rate. If so, the amount of the required investment is $500,000. Most (but not all) of the regional centers are located in such $500,000 "targeted employment areas."

### 10.4 Job Creation Requirement

Both options require the investor to prove that his or her investment has resulted in the creation of "fulltime employment" of 10 U.S. workers. The big difference is that individual investors must prove direct employment of the 10 employees. With regional centers, U.S. Citizenship and Immigration Services (USCIS) has pre-approved the employment creation using a standard that allows a combination of direct employment and indirect employment using various accepted econometric models.

### 10.5 Role of Foreign Investors as Limited Partners

Both investment options prohibit purely passive investment. In other words, the investor must be engaged in the "management" of the enterprise. In this regard, it should be noted that most of the regional centers organize limited partnerships into which the foreign investors invest. The limited partnerships invest into an EB-5 approved enterprise, usually in the form of a loan. Pursuant to regulation, if the petitioning investor is a limited partner and the limited partnership agreement provides the petitioner with the rights, powers and duties normally granted to limited partners under the Uniform Limited Partnership Act, the investor will be considered sufficiently engaged in the management of the enterprise. As a practical and legal matter, this requirement can be met by a limited partner without the necessity of the investor committing to any specific amount of time or engaging in any day-to-day management, since such activities are performed by the general partner.

## 10.6 Potential Investment Hurdles & Risk Mitigation

One of the biggest stumbling blocks for the individual investor is proving that the investment has been made in a "new commercial enterprise." This issue can be resolved in advance if the project has been pre-approved for foreign investments through a regional center. A "new commercial enterprise" can be created by an individual investor in one of three ways:

- Establishing a brand new business,

- Acquiring an existing business and engaging in significant "restructuring or reorganization" (although this alternative is rarely used and has not been defined); or,

- Expanding an existing business.

This option requires the investor to prove not only the creation of 10 new jobs but also the expansion of either net worth or the number of employees of the business by at least 40%. If the investor invests in a "troubled business" (a business with substantial losses as quantified by the regulations), there may be an opportunity to qualify based on preserving existing employees as opposed to adding new ones.

Another significant issue for both the individual and the regional center investor is proving the "lawful source of funds." Substantial documentation is required to prove that the investor did not acquire the funds through unlawful means. If the funds are the result of a gift, this requirement must be met for the giftor as well. Similarly, if the funds are the result of a loan from an individual, this requirement is applicable to the creditor. Documentation utilized to meet this requirement may include tax returns, real estate transactions, securities transactions, inheritance documentation, stock dividends, employment records, bank records, etc.

Related to—but separate from—the lawful source of funds requirement is the requirement to trace the funds from the individual investor to the new commercial enterprise. In some cases this is as simple as a wire transfer document from an individual's bank account to the investment enterprise. In other cases involving countries with restrictions on outbound currency transfers, this can be extremely complex, often involving transfers to multiple parties. It is important to note that the investment must come from the individual investor. An investment from a corporate entity, including a wholly-owned corporate entity, will not qualify.

## 10.7 Qualifying for Green Card Status

With both the individual and the regional center investor, upon approval of the permanent resident application, the foreign national receives "conditional permanent resident status." This means that the "green card" that the investor receives is valid for two years. During the 21- to 24-month window after approval, the investor must file an application to remove conditions on residence. As part of this process, the investor must prove that the investment funds have not been withdrawn and that the requisite jobs have been created. For individual investors, this can be highly problematic if the vicissitudes of business are such that a downturn in the economy has resulted in a reduction in the workforce. For the regional center investor, although indirect

employment creation in the community is allowed and although USCIS has pre-approved the employment creation element for purposes of approval of the original investor petition, the regional center has the burden to prove two years later that the actual projected employment has occurred. For this reason, even though all of the regional centers have been pre-approved, the choice of regional center is a critical one. As of the date of this article, only a small number of the regional centers have actually gone through the entire process resulting in successful permanent green cards for their investors.

While the immigrant investor options are not the panacea for all foreign nationals seeking permanent residence status in the U.S., it has provided a solution for many during times when other traditional paths have been blocked. For the investors who choose this option, it is important to put together a team including not only the immigration lawyer, but also business, tax, and/or securities counsel, to advise on the multiplicity of issues that go into determining whether the investor option is a good decision for a particular client.

2:11 PM

05/21/14

Accrual Basis

# Leslie Robert Evans & Assoc. PA
## Account QuickReport
### All Transactions

| Type | Date | Num | Name | Memo | Amount | Balance |
|------|------|-----|------|------|--------|---------|
| **1213 · First United IOTA (Real Estate)** | | | | | | |
| **Matthews P/O Palm House1375.150** | | | | | | |
| Deposit | 04/15/2013 | | | Deposit | 3,000,000.00 | 3,000,000. |
| Check | 04/15/2013 | WIRE | JJW Consultancy and ... | Matthews P/O Pa... | -49,454.00 | 2,950,546. |
| Check | 04/15/2013 | WIRE | Matthews Commercial ... | Matthews P/O Pa... | -152,500.00 | 2,798,046. |
| Check | 04/15/2013 | WIRE | Weiss Handler & Corn... | Matthews P/O Pa... | -97,926.38 | 2,700,119. |
| Check | 05/10/2013 | WIRE | Joseph Walsh/Mirabia | Matthews P/O Pa... | -100,000.00 | 2,600,119. |
| Check | 05/20/2013 | WIRE | Weiss Handler & Corn... | Matthews P/O Pa... | -32,746.59 | 2,567,373. |
| Check | 05/24/2013 | WIRE | Edwards Wildman Pal... | Matthews P/O Pa... | -18,002.73 | 2,549,370. |
| Check | 05/24/2013 | WIRE | Presidential Leasing Inc. | Matthews P/O Pa... | -110,000.00 | 2,439,370. |
| Check | 06/03/2013 | WIRE | Connect Auto, Inc. | Matthews P/O Pa... | -45,000.00 | 2,394,370. |
| Check | 06/03/2013 | WIRE | InJet LLC | Matthews P/O Pa... | -33,754.50 | 2,360,615. |
| Check | 06/14/2013 | WIRE | JJW Consultancy and ... | Matthews P/O Pa... | -100,000.00 | 2,260,615. |
| Check | 06/26/2013 | WIRE | USREDA | Matthews P/O Pa... | -200,000.00 | 2,060,615. |
| Check | 07/01/2013 | WIRE | Matthews Commercial ... | Matthews P/O Pa... | -125,000.00 | 1,935,615. |
| Check | 07/01/2013 | WIRE | Vedder Price, P.C. | Matthews P/O Pa... | -12,500.00 | 1,923,115. |
| Check | 07/10/2013 | WIRE | Matthews Commercial ... | Matthews P/O Pa... | -192,343.00 | 1,730,772. |
| Deposit | 07/15/2013 | | | Deposit | 1,500,000.00 | 3,230,772. |
| Check | 07/17/2013 | WIRE | The Galle Law Group, ... | Matthews P/O Pa... | -2,000,000.00 | 1,230,772. |
| Check | 07/24/2013 | WIRE | Weiss Handler & Corn... | Matthews P/O Pa... | -30,000.00 | 1,200,772. |
| Check | 07/26/2013 | WIRE | Matthews Commercial ... | Matthews P/O Pa... | -60,000.00 | 1,140,772. |
| Check | 07/29/2013 | WIRE | USREDA | Matthews P/O Pa... | -250,000.00 | 890,772 |
| Deposit | 08/05/2013 | | | Deposit | 2,000,000.00 | 2,890,772 |
| Check | 08/15/2013 | WIRE | The Galle Law Group, ... | Matthews P/O Pa... | -2,000,000.00 | 890,772 |
| Check | 08/26/2013 | 9606 | Ryan Black | Matthews P/F Pal... | -500.00 | 890,272 |
| Check | 08/26/2013 | WIRE | Berlandi Nussbaum & ... | Matthews P/O Pa... | -10,000.00 | 880,272 |
| Check | 08/26/2013 | WIRE | Revere Capital Mange... | Matthews P/O Pa... | -4,500.00 | 875,772 |
| Check | 08/28/2013 | WIRE | Rogin Nassau LLC | Matthews P/F Pal... | -15,000.00 | 860,772 |
| Deposit | 08/28/2013 | | | Deposit | 2,000,000.00 | 2,860,772 |
| Deposit | 08/29/2013 | | | Deposit | 230,000.00 | 3,090,772 |
| Check | 08/29/2013 | WIRE | USREDA | Matthews P/O Pa... | -350,000.00 | 2,740,772 |
| Check | 09/03/2013 | wire | 160 Royal Palm LLC | Matthews P/F Pal... | -2,580,000.00 | 160,772 |
| Check | 09/03/2013 | WIRE | 160 Royal Palm LLC | Matthews P/F Pal... | -150,920.08 | 9,852 |
| Deposit | 09/06/2013 | | | Deposit | 1,064,858.73 | 1,074,711 |
| Deposit | 09/06/2013 | | | Deposit | 33,140.49 | 1,107,851 |
| Check | 09/11/2013 | 9666 | Leslie Robert Evans & ... | Matthews P/O Pa... | -33,000.00 | 1,074,851 |
| Check | 09/20/2013 | 9761 | Florida UCC, LLC | Matthews P/O Pa... | -38.00 | 1,074,813 |

**EXHIBIT C**

| Type | Date | Ref | Payee/Description | Memo | Amount | Balance |
|---|---|---|---|---|---|---|
| Deposit | 12/19/2013 | | | Deposit | 500,000.00 | 958,771 |
| Deposit | 12/19/2013 | | | Deposit | 2,500,000.00 | 3,458,771 |
| Deposit | 12/26/2013 | | | Deposit | 3,000,000.00 | 6,458,771 |
| Check | 12/27/2013 | 10636 | Tax Collector Palm Bea... | Property Control#... | -266,064.60 | 6,192,707 |
| Check | 12/30/2013 | WIRE | Jones Foster Johnston ... | Matthews P/O Pa... | -5,351,369.05 | 841,338 |
| Check | 12/31/2013 | WIRE | Jones Foster Johnston ... | Matthews P/O Pa... | -7,500.00 | 833,838 |
| Transfer | 01/02/2014 | | | Internal transfer fr... | 436,500.00 | 1,270,338 |
| Check | 01/06/2014 | WIRE | Connect Auto, Inc. | Matthews P/O Pa... | -15,000.00 | 1,255,338 |
| Check | 01/06/2014 | WIRE | 160 Royal Palm LLC | Matthews P/F Pal... | -85,000.00 | 1,170,338 |
| Check | 01/09/2014 | WIRE | Dovenmuehle Mortgag... | Matthews P/F Pal... | -12,452.05 | 1,157,886 |
| Check | 01/10/2014 | WIRE | 160 Royal Palm LLC | Matthews P/F Pal... | -100,000.00 | 1,057,886 |
| Check | 01/17/2014 | WIRE | 160 Royal Palm LLC | Matthews P/F Pal... | -100,000.00 | 957,886 |
| Deposit | 01/28/2014 | | | Deposit | 200,000.00 | 1,157,886 |
| Check | 01/28/2014 | WIRE | 160 Royal Palm LLC | Matthews P/F Pal... | -200,000.00 | 957,886 |
| Deposit | 02/03/2014 | | | Deposit | 2,000,000.00 | 2,957,886 |
| Check | 02/03/2014 | WIRE | Royal Palm Developme... | Matthews P/O Pa... | -2,000,000.00 | 957,886 |
| Check | 02/03/2014 | WIRE | Bendett & Mchugh, PC ... | Matthews P/O Pa... | -136,237.50 | 821,648 |
| Deposit | 02/10/2014 | | | Deposit | 500,000.00 | 1,321,648 |
| Check | 02/10/2014 | WIRE | 160 Royal Palm LLC | Matthews P/F Pal... | -300,000.00 | 1,021,648 |
| Check | 02/11/2014 | WIRE | McDonald Hopkins, LL... | Matthews P/O Pa... | -26,812.24 | 994,836 |
| Check | 03/04/2014 | WIRE | Deutsche Bank | Matthews P/O Pa... | -92,700.00 | 902,136 |
| Deposit | 03/11/2014 | | | Deposit | 500,000.00 | 1,402,136 |
| Check | 03/14/2014 | WIRE | 160 Royal Palm LLC | Matthews P/F Pal... | -350,000.00 | 1,052,136 |
| Deposit | 03/17/2014 | | | Deposit | 500,000.00 | 1,552,136 |
| Check | 03/17/2014 | WIRE | 160 Royal Palm LLC | Matthews P/F Pal... | -100,000.00 | 1,452,136 |
| Check | 03/19/2014 | WIRE | 160 Royal Palm LLC | Matthews P/F Pal... | -250,000.00 | 1,202,136 |

**2:11 PM**

**05/21/14**

**Accrual Basis**

# Leslie Robert Evans & Assoc. PA
## Account QuickReport
### All Transactions

| Type | Date | Num | Name | Memo | Amount | Balance |
|------|------|-----|------|------|--------|---------|
| Deposit | 03/27/2014 | | | Deposit | 500,000.00 | 1,702,136. |
| Check | 03/28/2014 | 11237 | Tax Collector Palm Bea... | Property Control#... | -180,460.00 | 1,521,676. |
| Check | 03/28/2014 | 11238 | Sharon R. Bock Clerk &... | Matthews P/O Pa... | -151,223.60 | 1,370,452. |
| Transfer | 03/31/2014 | | | transfer/loan from... | -50,000.00 | 1,320,452. |
| Deposit | 04/03/2014 | | | Deposit | 1,500,000.00 | 2,820,452 |
| Check | 04/09/2014 | WIRE | 160 Royal Palm LLC | Matthews P/F Pal... | -500,000.00 | 2,320,452 |
| Deposit | 04/09/2014 | WIRE | | Deposit | 500,000.00 | 2,820,452 |
| Check | 04/10/2014 | WIRE | First Bank of the Palm ... | Matthews P/O Pa... | -105,000.00 | 2,715,452 |
| Check | 04/18/2014 | WIRE | Dovenmuehle Mortgag... | Matthews P/F Pal... | -92,700.00 | 2,622,752 |
| Check | 04/18/2014 | WIRE | Dovenmuehle Mortgag... | Matthews P/F Pal... | -42,300.00 | 2,580,452 |
| Check | 04/24/2014 | 11482 | RD of Palm Beach, Inc. | Matthews loan to ... | -50,000.00 | 2,530,452 |
| Check | 04/24/2014 | WIRE | CHR Consulting Servic... | Matthews P/F Pal... | -7,500.00 | 2,522,952 |
| Deposit | 04/24/2014 | | | Deposit | 1,000,000.00 | 3,522,952 |
| Deposit | 04/29/2014 | | | Deposit | 1,000,000.00 | 4,522,952 |
| Check | 04/29/2014 | WIRE | 160 Royal Palm LLC | Matthews P/F Pal... | -1,250,000.00 | 3,272,952 |
| Deposit | 05/05/2014 | | | Deposit | 1,000,000.00 | 4,272,952 |
| Check | 05/12/2014 | WIRE | 160 Royal Palm LLC | Matthews P/F Pal... | -1,000,000.00 | 3,272,952 |

Total Matthews P/O Palm House 1375.150

3,272,952.66   3,272,952

Total 1213 · First United IOTA (Real Estate)

3,272,952.66   3,272,952

**TOTAL**

**3,272,952.66**   **3,272,952**

4,272,952.66

OPERATING AGREEMENT
OF
PALM HOUSE, LLC

THIS OPERATING AGREEMENT, dated as of the 30 day of $\text{H} \wedge \text{M}$ , 2013, by and between those persons listed as members on the attached Schedule A (collectively, "Members"). Capitalized terms used in this Operating Agreement, not defined in the body hereof, shall be defined as on Schedule B.

W I T N E S S E T H:

In consideration of the covenants and mutual agreements hereinafter set forth, the Members do hereby agree as follows:

1.      FORMATION OF LIMITED LIABILITY COMPANY.  The limited liability company (hereinafter referred to as the "Company") was formed as of December 5, 2012 pursuant to the provisions of the Delaware Limited Liability Company Act, as amended (the "Act").

2.      GENERAL PROVISIONS.

        a.      Name.  The name of the Company shall be Palm House, LLC and all business of the Company shall be conducted in that name or any other name approved by the Members.

        b.      Purpose.  The Company may carry on any lawful business, purpose or activity permitted under the Act.

        c.      Principal Office.  The principal office and place of business of the Company shall be 160 Royal Palm Way, Palm Beach, Florida 33480, or such other place as the Members may from time to time determine.

        d.      Term.  The period of duration of the limited liability company shall expire when the Company is dissolved and terminated in accordance with the provisions of Section 10 of this Agreement.

        e.      Fiscal Year.  The fiscal year of the Company shall end on December 31.

3.      CAPITAL CONTRIBUTIONS OF MEMBERS; TAX MATTERS.

        a.      Initial Capital Contributions.  The Members have made their initial Capital Contributions to the Company as set forth on Schedule A.

        b.      Additional Capital Contributions.  The Members shall not be obligated to make any additional Capital Contributions to the Company.  The Members may make additional Capital Contributions in cash or property at any time, as may be determined by the Members.

1

**EXHIBIT D**

    c. Capital Accounts.  A separate Capital Account shall be established and maintained for each Member in accordance with Treasury Regulations § 1.704-1(b)(2)(iv).  In the event that a Membership Interest is transferred, the transferee shall succeed to the Capital Account of the transferor to the extent such Capital Account relates to the transferred Membership Interest.  The Members may adjust the Capital Accounts of the Members to reflect the fair market value of the Company's property in the manner and at the times permitted under Treasury Regulations § 1.704-1(b)(2)(iv)(f).

    d. Allocations - General.  Except as otherwise provided in this Agreement, Income, Loss, and, to the extent necessary, individual items of income, gain, loss or deduction of the Company, shall be allocated among the Members and any permitted transferees as of the date an item is realized for federal income tax purposes, taking into account amounts specially allocated pursuant to Section 3.e or otherwise pursuant to this Agreement, in proportion to their respective Membership Interests.

    e. Special Allocations.  Notwithstanding any other provision of this Section 3, certain items of Income, Loss and deduction shall be allocated as follows:

      (i) Minimum Gain Chargeback.  If there is a net decrease in the amount of Company Minimum Gain during a calendar year, each Member will be allocated, before any other allocation is made under this Section 3, items of Income for such year (and, if necessary, subsequent years) in proportion to, and to the extent of, an amount equal to that Member's share of the net decrease in Company Minimum Gain (within the meaning of Treasury Regulations §1.704-2(g)(2)).  This provision is meant to satisfy the minimum gain chargeback requirement contained in Treasury Regulations § 1.704-2(f), and shall be interpreted consistently therewith.

      (ii) Qualified Income Offset.  In the event any Member, in such capacity, unexpectedly receives an Offsettable Decrease, such Member will be allocated items of income and gain (consisting of a pro rata portion of each item of partnership income and gain for such year) in an amount and manner sufficient to offset such Offsettable Decrease as quickly as possible.

      (iii) Other Special Allocations.  The Members shall make such other special allocations of items of Income and Loss as are required to comply with the rules set forth in Treasury Regulations § 1.704-2.

      (iv) Offsetting Allocations.  In the event that Income or Loss is allocated to one or more Members pursuant to subsections (i), (ii) or (iii) above, subsequent Income or Loss will first be allocated (subject to the provisions of subsections (i), (ii) and (iii)) to the Members in a manner designed to result in each Member having a Capital Account balance equal to what it would have been had the original allocation of Income or Loss pursuant to subsection (i), (ii) or (iii) not occurred.

    f. Tax Allocations.  Allocations of taxable income and loss shall generally be made in accordance with allocations of Income and Loss as described above, with allocations of

items reflecting book-tax disparities being made in a manner consistent with the principles of Section 704(c) of the Code as determined by the Members.

g.     Withdrawal.

(i)  No interest shall accrue on any contribution to the capital of the Company, and no Member shall have the right to withdraw from the Company or be repaid any contribution of capital except as otherwise specifically provided herein.

(ii)  If, notwithstanding the provisions of Section 3.g(i) hereof, a Member withdraws from the Company for any reason, such withdrawn Member shall no longer be a Member and shall have only the rights of an assignee who does not become a substitute member. In such case, the withdrawn Member shall have no right to be paid for his or its Membership Interest until dissolution of the Company.

h.     Compliance with Section 704(b) of the Code.  The provisions of this Section 3 as they relate to the maintenance of Capital Accounts are intended, and shall be construed, and, if necessary, modified to cause the allocations of profits, losses, income, gain and credit pursuant to this Agreement to have substantial economic effect under the Regulations promulgated under §704(b) of the Code, in light of the distributions made pursuant to this Agreement and the Capital Contributions made pursuant to this Agreement.  Notwithstanding anything herein to the contrary, this Agreement shall not be construed as creating a deficit restoration obligation or otherwise personally obligate any Member to make a Capital Contribution in excess of the initial capital contribution.

4.     MEMBERS' INTERESTS.

The interests ("Membership Interests") of the Members in the Company shall be the percentages set forth on Schedule A opposite their respective names.  The Manager represents and warrants to the other Member that the Membership Interests listed on Schedule A are the only membership or other equity interests of the Company, and that there are no contracts, commitments or claims of any character pursuant to which any person or entity has any right to acquire any membership or other equity interests of the Company or any interest therein.

5.     LIABILITY AND INDEMNIFICATION, ETC.

a.     Liability of Members.  The debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company; and no Member shall be personally liable, directly or indirectly, including, without limitation, by way of indemnification, contribution, assessment or otherwise, for any such debt, obligation or liability of the Company solely by reason of being a member of the Company.  The failure of the Company to observe any formalities or requirements relating to the exercise of its powers or management of its business or affairs under this agreement or the Act shall not be grounds for imposing personal liability on the Members for liabilities of the Company. *Company to use all power to defend any claim against member and assets*

*[signature]*

3

b. _Indemnification._ To the fullest extent permitted by law, the Company shall indemnify and hold harmless any Member from and against any and all claims and demands whatsoever for which such Member is not liable as provided in Section 5(a).

6. **DISTRIBUTIONS.**

a. The cash flow of the Company shall be distributed among the Members in accordance with their Membership Interests in the Company. The "cash flow" of the Company, shall be equal to the income of the Company, increased by the amount allowable as depreciation on the Company's assets, the amount of any amortization deduction and the amount of any other items deductible for federal income tax purposes in excess of actual cash payments with respect thereto, and decreased by the amount of any repayment of the principal portion of any debt of the Company, all cash expenditures not deductible for federal income tax purposes or the amount thereof in excess of the amount deductible for federal income tax purposes, and the amount of all other expenses and all reserves set aside by the Members as they shall determine are necessary or desirable to provide for actual or contingent liabilities, working capital requirements of the Company, and for any other purpose necessary or incidental to the proper management and function of the business of the Company.

b. Notwithstanding Section 6(a), but only to the extent of cash flow, the Company shall make minimum distributions to the Members in amounts equal to the Presumed Tax Liability with respect to each Member. To the extent reasonably practicable, such distributions (as estimated by the Company's accountant based on the results of such quarter) shall be made on or before those dates upon which federal estimated tax payments are required for individuals. Any amounts distributed to a Member pursuant to this paragraph shall be treated as a dollar-for-dollar advance against the first amounts otherwise distributable to such Member pursuant to Section 6(a).

7. **MANAGEMENT.**

a. _Management Rights._ The initial Manager of the Company shall be Ryan A. Black. Subject to the rights of the Members as set forth in the Act and this Agreement, the business, property and affairs of the Company shall be managed by the Manager, and the Manager shall have primary responsibility for carrying out the day-to-day decisions, operations and activities of the Company.

b. _Majority._ All Members who have not withdrawn shall be entitled to vote on any matter. Any matter shall be considered approved or consented to by the Members, or by a Majority of the Members, upon the receipt of the affirmative approval or consent, either in writing or at a meeting of the Members, of Members having Membership Interests in excess of one half of the Membership Interests of all the Members entitled to vote on a particular matter.

c. _Major Decisions._ All Members (but not assignees or Members that have withdrawn) shall be entitled to vote on the following actions (each, a "Major Decision"), which shall require the consent of the Majority of the Members, and the Manager shall have no authority to bind or take any action on behalf of the Company with respect to any Major

4

Decision unless such Major Decision has been approved by the Majority of the Members. Each of the following matters with respect to the Company or its Affiliates shall constitute a "Major Decision":

        (a)     any merger, reorganization, consolidation, liquidation, termination or dissolution and winding up of the Company, except where required by law or this Agreement;

        (b)     the sale, lease, exchange, mortgage, finance, refinance, pledge or other disposition of the Company's property;

        (c)     the purchase, lease or other acquisition of real property;

        (d)     the expenditure of, or the incurrence of any indebtedness or contractual obligation that could result in an obligation, payment, expense or charge to the Company in excess of, $5,000, individually of as part of a series of related transactions;

*Dist. to Members or related parties requires unanimos Consent*

        (e)     the creation of any lien or other encumbrance on any property or assets of the Company;

*Guy V A A*

        (f)     the commencement of any lawsuit, arbitration or other legal action, other than actions to collect accounts receivable;

        (g)     the filing by the Company of any petition for relief under the United States Bankruptcy Code or any other present or future federal or state insolvency, bankruptcy or similar law;

        (h)     lending or investing Company funds;

        (i)     determining cash flow;

        (j)     removal or designation of the Company's independent accountants, including audit accountants or tax accountants;

        (k)     the admission of transferees, substitute members and additional Members;

        (l)     making any other decision with respect to the Company that specifically requires the approval of the Members pursuant to this Agreement; and

        (m)     any other matter outside the ordinary course of business of the Company.

        d.     <u>Acts Outside Ordinary Course</u>. An act of a Member or the Manager that is not apparently for the carrying on in the usual way the business or affairs of the Company does not bind the Company unless authorized in accordance with this Agreement, at the time of the transaction or at any other time.

e.    Acts Contravening Restrictions.  An act of a Member or Manager in contravention of a restriction on authority shall not bind the Company to persons having knowledge of the restriction.

f.    Term of Office.  The Manager shall serve until the earlier of removal of the Manager in accordance with the provisions of this Agreement or the resignation of the Manager.

g.    Action of Members and Manager.

(a)    No Member, solely by reason of being a Member, is an agent of the Company or has the authority to bind the Company.

(b)    The Manager is an agent of the Company for the purpose of its business or affairs, and the act of the Manager, including, but not limited to, the execution in the name of the Company on any instrument, for apparently carrying on in the usual way the business or affairs of the Company, binds the Company, unless the Manager so acting has, in fact, no authority to act for the Company in the particular matter, and the person with whom he is dealing has knowledge of the fact that the Manager has no such authority.

h.    Removal of Manager.  The Manager may be removed as manager by the affirmative vote of a Majority of the Members.

8.    BANKING, BOOKS AND TAX RETURNS; GOOD WILL AND ANNUAL ACCOUNTING.

Opening of Bank Accounts by Managing Member only [handwritten]

a.    Funds.  The funds of the Company shall be kept on deposit with such [*without Consent*] depository or depositories as the Members shall agree from time to time, and all funds thereof [*LP*] may be drawn by check signed by ~~any~~ Member. *Managing* [handwritten] *Until such time as All debt related to the Ruvaere Loan is repaid* [handwritten]

b.    Inspection.  At all reasonable times, each Member, representative of a deceased Member, and their attorneys, shall have access to and the right to inspect and copy any book, account or record of the Company.  Each Member or representative of a deceased Member shall also have the right to employ, at his sole cost and expense, a Certified Public Accountant, to make periodic checks, tests and examinations of the books and records, and financial reports, and for that purpose, all of such records shall be made reasonably available to the accountant so employed.

c.    Tax Status and Returns.  Any provisions hereof to the contrary notwithstanding, for United States federal income tax purposes, each of the Members hereby recognizes that the Company will be subject to all provisions of Subchapter K of Chapter 1 of Subtitle A of the Code, concerning the taxation of partners and partnerships.  The Company shall prepare or cause to be prepared all tax returns and statements, if any, that must be filed on behalf of the Company with any taxing authority and shall make timely filing thereof.  Within ninety (90) days after the end of each calendar year, or as soon as practical after receipt of all necessary information by the Company, the Company shall prepare or cause to be prepared and delivered to each Member a report setting forth in reasonable detail the information with respect to the

Company during such calendar year reasonably required to enable each Member to prepare federal, state and local income tax returns in accordance with applicable law then prevailing. Gerry Matthews shall serve as the tax matters member of the Company pursuant to §6231(a)(7) of the Code. Any Member designated as tax matters member shall take such action as may be necessary to cause each other Member to become a notice member within the meaning of §6223 of the Code. No Member, including the tax matters member, may take any action contemplated by §§6222 through 6232 of the Code without the consent of the Majority of the Members.

9. ASSIGNMENT OF INTERESTS IN COMPANY. Manager's Membership Interest in the Company may not be assigned, except in accordance with the provisions of this section.

a. Assignment. The Manager may assign his interest in whole or in part provided that:

(i) Before offering such interest for sale to third parties, the Manager (the "Offering Member") notifies the other Member and offers to sell his interest to the other Member for a cash payment in the amount of two hundred twenty thousand dollars ($220,000.00). The Offering Member shall within ten (10) business days notify the other Member of his right to purchase said interest;

(ii) To the extent that the other Member has not accepted the offer within thirty (30) days following notice from the Offering Member, the Offering Member may negotiate with third parties;

(iii) The non-Offering Member shall have the opportunity to exercise the Call Option described in paragraph 9(g) if the Offering Member shall obtain an offer (the "Outside Offer") from any non-Member (the "Outside Offeror") to purchase all or part of the Offering Member's interest (the "Offered Interest"). An Outside Offer may be for any or all of the Offering Member's interest. The Offering Member shall deliver to the other Member a written notice specifying the name and address of the Outside Offeror, the Membership Interest included in the Outside Offer, and the price and other terms of the Outside Offer, including a copy of the written Outside Offer;

(iv) For ten (10) business days after receipt of the notice provided for in Section 9a(iii), the non-Offering Member may exercise the Call Option;

(v) If the non-Offering Member shall not have elected to purchase all of the Offered Interest in accordance with this Section 9, then the Offering Member shall thereupon be free to dispose of all the Offered Interest, on the terms of the Outside Offer, to the Outside Offeror, subject to the provisions set forth in this Agreement. If all of such Offered Interests are not so disposed of, in accordance with the original terms of the Outside Offer, to the Outside Offeror within a period of 120 days after the Offering Member gives the notice provided for in Section 9a(iii), then such Offered Interest may not thereafter be sold without full compliance once again with the provisions of this Section 9.

b.      Substitute Members. No assignee of a Manager's Membership Interest shall have the right to be admitted as a Substitute Member in place of the assignor unless:

(i)      the assignor shall designate in writing satisfactory to the other Member the intention that the assignee is to become a Substitute Member;

(ii)     the assignee shall agree in writing to be bound by all of the terms of this Agreement;

(iii)    the non-Offering Member consents in writing to the admission of the assignee as a Substitute Member, which consent may be withheld in his absolute discretion;

(iv)     the assignee shall execute and/or deliver such instruments as the non-Offering Member deem necessary or desirable to effect such assignee's admission as a Substitute Member and to evidence the assignee's acceptance of the terms of this Agreement; and

(v)      the assignee shall pay all reasonable expenses in connection with the assignee's admission as a Substitute Member.

c.      Rights of Assignees. An assignee who does not become a Substitute Member shall succeed only to the rights of the assignor to receive allocations and distributions from the Company and shall not have the right to vote.

d.      Donative Transfers. Notwithstanding any of the provisions of Section 9a through 9c, upon prior written notice to the other Member, the Membership Interest of any Member other than the Manager may be transferred to any child of said Member (or trust therefor) without consideration, provided such child (or trustee) executes an agreement to be bound by all the terms, covenants and conditions of this Agreement. In the event that such child (or trustee) is not admitted as a Substitute Member pursuant to Section 9b, such child (or trust) shall have no right to participate in the management of the business and affairs of the Company and shall be entitled only to receive the financial rights by way of profits and distributions to which the transferor Member would otherwise be entitled.

e.      Transfer by Death. Notwithstanding any of the provisions of Sections 9a through 9d, upon prior written notice to the other Member, any Member's interest in the Company may be transferred by will or the laws of intestacy provided such transferee executes an agreement to be bound by all the terms, covenants and conditions of this Agreement.

f.      Drag-Along Right. In the event that a Majority of the Members accept an offer to sell all of their Membership Interests to an Outside Offeror, such Majority may notify (the "Drag-Along Notice") the other Member (the "Drag-Along Seller") of the intended transfer, including the material terms and conditions thereof. Upon receipt of a Drag-Along Notice no fewer than thirty (30) days prior to any closing of such intended transfer, the Drag-Along Seller shall be obligated to (i) sell all of its Membership Interest, free and clear of any lien or encumbrance, in the transaction contemplated by the Drag-Along Notice, and (ii) otherwise take all necessary action to cause the consummation of such transaction, including voting its

Membership Interest in favor of and otherwise consenting to such transaction, as Member, Manager or otherwise.

        g.    Call Option.

        (i)    At any time, Gerry Matthews ("Matthews") may send written notice (the "Call Notice") to Manager requiring Manager to sell its Membership Interest to Matthews or his designee for a cash payment in the amount of two hundred twenty two thousand dollars ($220,000.00).

        (ii)    The closing of said sale shall occur within fifteen (15) days of the date of the Call Notice. At the closing, Manager shall sign such transfer and related documents as reasonably requested by Matthews in order to assign his Membership Interest to Matthews or its designee free and clear of all liens, claims and encumbrances.

    10.    CONTINUATION, DISSOLUTION AND TERMINATION. The Company shall be dissolved upon the first to occur of the events of dissolution provided below:

        a.    Dissolution by Consent. The Company shall be dissolved upon the consent of the Majority of the Members.

        b.    Liquidation. Upon dissolution of the Company, the Company shall be wound up in accordance with law. Notwithstanding the dissolution of the Company prior to the winding-up of the Company, the business of the Company and the rights of the Members shall continue to be governed by this Agreement. Upon dissolution of the Company, the Members, or a liquidator appointed with the consent of the Members, shall liquidate the assets of the Company, apply and distribute the proceeds thereof as contemplated by this Agreement and cause the cancellation of the Company's articles of organization.

        c.    Distributions in Liquidation. Upon the dissolution of the Company and incident to the winding-up of the Company's business and affairs, the Members (or liquidator, as applicable) shall pay or make provision for the payment of all liabilities and obligations of the Company, actual or contingent, and all expenses of liquidation. Any amounts deemed necessary by the Members (or liquidator) to provide a reserve for any unforeseen liabilities and obligations may, in the Members' (or liquidator's) discretion, be deposited in a bank or trust company upon such terms and for such period of time as the Members (or liquidator) may determine. Following the payment of or provision for the liabilities of the Company as aforesaid, the remaining assets of the Company shall be distributed in the following order of priority: (i) to the Members and permitted transferees having positive balances in their Capital Accounts in proportion to such positive balances as of the date of distribution in an amount equal to the aggregate sum of their Capital Accounts; and (ii) thereafter, to Members and any permitted transferees in accordance with their respective Membership Interests.

    11.    AMENDMENTS. An amendment shall be adopted and be effective as an amendment hereto if it receives the affirmative vote of both Members.

12.    <u>MISCELLANEOUS</u>.

a.    <u>Notices</u>.  All notices, consents, waivers and other communications required or permitted by this Agreement shall be in writing and shall be deemed given to a party when (a) delivered to the appropriate address by hand or by nationally recognized overnight courier service (costs prepaid); (b) sent by facsimile or e-mail with confirmation of transmission by the transmitting equipment; or (c) received or rejected by the addressee, if sent by certified mail, return receipt requested, in each case to the addresses, facsimile numbers or e-mail addresses listed on <u>Schedule A</u> and marked to the attention of the person (by name or title) designated thereof (or to such other address, facsimile number, e-mail address or person as a party may designate by notice to the other parties).

b.    <u>Successors and Assigns</u>.  Subject to the restrictions on transfers set forth herein, this Agreement and each and every provision hereof shall be binding upon and shall inure to the benefit of the Members, their respective successors, successors in title, heirs and assigns and each and every successor in interest to any Member shall hold such interest subject to all the terms and provisions of this Agreement.

c.    <u>Applicable Law</u>.  This Agreement and the rights of the parties hereunder shall be governed by the laws of the State of Delaware.

d.    <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, and exchanged by facsimile, email or other electronic transmission, all of which taken together shall be deemed one original instrument notwithstanding that all parties are not signatory to the same counterpart.

e.    <u>Headings</u>.  The headings used in this Agreement are used solely for convenience of reference and shall not constitute a part of this Agreement or affect its meaning, construction or effect.

f.    <u>Entire Agreement</u>.  This Agreement contains the entire agreement among the Members with respect to the subject matter hereof.

g.    <u>Amendments</u>.  The Certificate of Formation and this Agreement may be amended by the affirmative votes of the Majority of the Members.  Neither the Certificate nor this Agreement shall be amended without the consent of each Member adversely affected if such amendment would (A) modify the limited liability of a Member; or (B) alter the interest of a Member in profits, losses, or any Company distributions.

*(The next page is the signature page.)*

*(Signature page to Operating Agreement.)*

IN WITNESS WHEREOF, this Agreement has been executed by each of the Members as of the day and year first above written.

MEMBERS:

GERRY MATTHEWS

RYAN A. BLACK

## SCHEDULE A

| Initial Members and Addresses | Initial Capital Contribution and Value | Membership Interest |
|---|---|---|
| Gerry Matthews<br>134 Highland Avenue<br>Waterbury, CT  06708<br>Email address: ▓▓▓▓▓▓▓ | $_____ | 99% |
| Ryan A. Black<br>184 Sunset Avenue, Apt. 31<br>Palm Beach, FL 33480<br>Email address: ▓▓▓▓▓▓▓ | $ | 1% |

12

## SCHEDULE B

### Definitions

"Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant fiscal year, after giving effect to the following adjustments:

(i)  Credit to such Capital Account for any amounts which such Member is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to the penultimate sentence of § 1.704-2(g)(1) or § 1.704-2(i)(5) of the Regulations; and

(ii)  Debit to such Capital Account for the items described in §§1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) and 1.704-1(b)(2)(ii)(d)(6) of the Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of § 1.704-1(b)(2)(ii)(d) of the Regulations and shall be interpreted consistently therewith.

"Capital Account" means the account established for each Member and maintained in accordance with the principles set forth in the Treasury Regulations under Code Section 704, which shall generally be credited with the Capital Contributions of each Member plus the Member's distributive share of Company Income and decreased by the Member's share of Company distributions and the Member's distributive share of Company Losses.

"Capital Contribution(s)" means the aggregate of all contributions made by the Members to the Company pursuant to Sections 3.a and 3.b hereof.  Any reference to the Capital Contribution of a then Member shall include a Capital Contribution previously made by any prior Member with respect to the Membership Interest of such then Member.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Company Minimum Gain" means the aggregate of the amount of Income, if any, with respect to each nonrecourse liability of the Company that would be realized by the Company if it disposed of (in a taxable transaction) the property subject to the liability in full satisfaction thereof, determined pursuant to Treasury Regulations § 1.704-2(d).

"Income" and "Loss(es)" means taxable income or loss plus income exempt from federal income tax and reduced by any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulations §1.704-1(b)(2)(iv)(i), determined in accordance with the

accounting methods followed by the Company for federal income tax purposes, adjusted to reflect book-tax disparities as required by Treasury Regulations §1.704-1(b)(2)(iv)(g).

"Majority" has the meaning set forth in Section 7.b hereof.

"Offsettable Decrease" means any allocation that unexpectedly causes or increases an Adjusted Capital Account Deficit in a Member's Capital Account as of the end of the taxable year to which the allocation relates attributable to depletion allowances under §1.704(b)(2)(iv)(k) of the Regulations, allocations of loss and deductions under §§704(e)(2) or 706 of the Code or under §1.751-1 of the Regulations, or distributions that, as of the end of the year are reasonably expected to be made to the extent they exceed the offsetting increases to such Member's Capital Account that reasonably are expected to occur during (or prior to) the taxable years in which the such distributions are expected to be made (other than increases pursuant to a minimum gain chargeback).

"Presumed Tax Liability" means, with respect to any Member for any period, an amount equal to the product of (a) the excess, if any, of the amount of income and gain items of the Company which are reported or reportable on the Schedule K-1 (IRS Form 1065, or successor form) with respect to such Member for such period, over the sum of the deduction and loss items of the Company reported or reportable on such Schedule K-1 for such period, and (b) the highest effective marginal combined Federal, state and local income tax rate applicable to any Member for such period, taking into account (y) the deductibility of state and local income taxes for federal income tax purposes and (z) the character (e.g., long-term or short-term capital gain or ordinary or exempt) of the applicable income.

"Taxable Year" means the taxable year of the Company as determined pursuant to §706 of the Code.

"Treasury Regulations" means the regulations (including any temporary regulations) issued under the Code by the Department of the Treasury, as they may be amended from time to time, or any applicable successor regulations. Reference herein to any particular section of the Treasury Regulations shall be deemed to refer to the corresponding provision of any applicable successor regulations.

 **Document A101™ – 2007**

## *Standard Form of Agreement Between Owner and Contractor* *where the basis of payment is a Stipulated Sum*

AGREEMENT made as of the 2 day of January in the year 2013
*(In words, indicate day, month and year.)*

BETWEEN the Owner:
*(Name, legal status, address and other information)*

Palm House  160 Royal Palm LLC
160 Royal Palm Way
Palm Beach, FL 33480

and the Contractor:
*(Name, legal status, address and other information)*

Nicholas Laudano New Haven Contracting South, Inc
638 Shore Drive
Boynton Beach, FL  33435

for the following Project:
*(Name, location and detailed description)*

The Palm House Hotel
160 Royal Palm Way
Palm Beach, 33480
Complete Renovation of 160 Royal Palm Way a 79 Room Hotel, Spa, Restaurants and
Club in Palm Beach.

The Architect:
*(Name, legal status, address and other information)*

Rafael Rodriguez RAR Architect Inc.
44 Coconut Row, Unit T-6
Palm Beach, FL  33480

The Owner and Contractor agree as follows.

**ADDITIONS AND DELETIONS:**
The author of this document has added information needed for its completion. The author may also have revised the text of the original AIA standard form. An *Additions and Deletions Report* that notes added information as well as revisions to the standard form text is available from the author and should be reviewed. A vertical line in the left margin of this document indicates where the author has added necessary information and where the author has added to or deleted from the original AIA text.

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification.

AIA Document A201™–2007, General Conditions of the Contract for Construction, is adopted in this document by reference. Do not use with other general conditions unless this document is modified.

**Init.**

*I*

AIA Document A101™ – 2007. Copyright © 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, 1991, 1997 and 2007 by The American Institute of Architects. **All rights reserved. WARNING:** This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:37:29 on 01/08/2014 under Order No.4898810257_1 which expires on 11/13/2014, and is not for resale.
User Notes:                                                                                                                                (1634825320)

1

**EXHIBIT E**

**TABLE OF ARTICLES**

1 THE CONTRACT DOCUMENTS

2 THE WORK OF THIS CONTRACT

3 DATE OF COMMENCEMENT AND SUBSTANTIAL COMPLETION

4 CONTRACT SUM

5 PAYMENTS

6 DISPUTE RESOLUTION

7 TERMINATION OR SUSPENSION

8 MISCELLANEOUS PROVISIONS

9 ENUMERATION OF CONTRACT DOCUMENTS

10 INSURANCE AND BONDS

### ARTICLE 1   THE CONTRACT DOCUMENTS
The Contract Documents consist of this Agreement, Conditions of the Contract (General, Supplementary and other Conditions), Drawings, Specifications, Addenda issued prior to execution of this Agreement, other documents listed in this Agreement and Modifications issued after execution of this Agreement, all of which form the Contract, and are as fully a part of the Contract as if attached to this Agreement or repeated herein. The Contract represents the entire and integrated agreement between the parties hereto and supersedes prior negotiations, representations or agreements, either written or oral. An enumeration of the Contract Documents, other than a Modification, appears in Article 9.

### ARTICLE 2   THE WORK OF THIS CONTRACT
The Contractor shall fully execute the Work described in the Contract Documents, except as specifically indicated in the Contract Documents to be the responsibility of others.

### ARTICLE 3   DATE OF COMMENCEMENT AND SUBSTANTIAL COMPLETION
§ 3.1 The date of commencement of the Work shall be the date of this Agreement unless a different date is stated below or provision is made for the date to be fixed in a notice to proceed issued by the Owner.
*(Insert the date of commencement if it differs from the date of this Agreement or, if applicable, state that the date will be fixed in a notice to proceed.)*

If, prior to the commencement of the Work, the Owner requires time to file mortgages and other security interests, the Owner's time requirement shall be as follows:

§ 3.2 The Contract Time shall be measured from the date of commencement.

§ 3.3 The Contractor shall achieve Substantial Completion of the entire Work not later than December 31, 2014 ( 729 ) days from the date of commencement, or as follows:
*(Insert number of calendar days. Alternatively, a calendar date may be used when coordinated with the date of commencement. If appropriate, insert requirements for earlier Substantial Completion of certain portions of the Work.)*

**Init.**

**/**

**AIA Document A101™ – 2007.** Copyright © 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, 1991, 1997 and 2007 by The American Institute of Architects. **All rights reserved.** WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:37:29 on 01/08/2014 under Order No.4898810257_1 which expires on 11/13/2014, and is not for resale.
**User Notes:**                                                                                        (1634825320)

**2**

**Portion of Work**          **Substantial Completion Date**

, subject to adjustments of this Contract Time as provided in the Contract Documents.
*(Insert provisions, if any, for liquidated damages relating to failure to achieve Substantial Completion on time or for bonus payments for early completion of the Work.)*

### ARTICLE 4    CONTRACT SUM
§ 4.1 The Owner shall pay the Contractor the Contract Sum in current funds for the Contractor's performance of the Contract. The Contract Sum shall be Thirty Five Million, Seven Hundred Fifty Thousand Dollars and No Cents ($ 35,750,000.00 ), subject to additions and deductions as provided in the Contract Documents.

§ 4.2 The Contract Sum is based upon the following alternates, if any, which are described in the Contract Documents and are hereby accepted by the Owner:
*(State the numbers or other identification of accepted alternates. If the bidding or proposal documents permit the Owner to accept other alternates subsequent to the execution of this Agreement, attach a schedule of such other alternates showing the amount for each and the date when that amount expires.)*

§ 4.3 Unit prices, if any:
*(Identify and state the unit price; state quantity limitations, if any, to which the unit price will be applicable.)*

**Item**                     **Units and Limitations**      **Price Per Unit ($0.00)**

§ 4.4 Allowances included in the Contract Sum, if any:
*(Identify allowance and state exclusions, if any, from the allowance price.)*

| Item | Price |
|------|-------|
| Spa Allowance | $ 2,600,000.00 |
| Restaurant Allowance | $ 2,500,000.00 |

### ARTICLE 5    PAYMENTS
#### § 5.1 PROGRESS PAYMENTS
§ 5.1.1 Based upon Applications for Payment submitted to the Architect by the Contractor and Certificates for Payment issued by the Architect, the Owner shall make progress payments on account of the Contract Sum to the Contractor as provided below and elsewhere in the Contract Documents.

§ 5.1.2 The period covered by each Application for Payment shall be one calendar month ending on the last day of the month, or as follows:

§ 5.1.3 Provided that an Application for Payment is received by the Architect not later than the 20th  day of a month, the Owner shall make payment of the certified amount to the Contractor not later than the 1st  day of the following month. If an Application for Payment is received by the Architect after the application date fixed above, payment shall be made by the Owner not later than   ( 10  ) days after the Architect receives the Application for Payment.
*(Federal, state or local laws may require payment within a certain period of time.)*

§ 5.1.4 Each Application for Payment shall be based on the most recent schedule of values submitted by the Contractor in accordance with the Contract Documents. The schedule of values shall allocate the entire Contract Sum among the various portions of the Work. The schedule of values shall be prepared in such form and supported by such data to

**Init.**

**/**

AIA Document A101™ – 2007. Copyright © 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, 1991, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:37:29 on 01/08/2014 under Order No.4898810257_1 which expires on 11/13/2014, and is not for resale.
**User Notes:**                                                                                    (1634825320)

substantiate its accuracy as the Architect may require. This schedule, unless objected to by the Architect, shall be used as a basis for reviewing the Contractor's Applications for Payment.

§ 5.1.5 Applications for Payment shall show the percentage of completion of each portion of the Work as of the end of the period covered by the Application for Payment.

§ 5.1.6 Subject to other provisions of the Contract Documents, the amount of each progress payment shall be computed as follows:

   .1   Take that portion of the Contract Sum properly allocable to completed Work as determined by multiplying the percentage completion of each portion of the Work by the share of the Contract Sum allocated to that portion of the Work in the schedule of values, less retainage of Ten Percent percent ( 10 %). Pending final determination of cost to the Owner of changes in the Work, amounts not in dispute shall be included as provided in Section 7.3.9 of AIA Document A201™–2007, General Conditions of the Contract for Construction;

   .2   Add that portion of the Contract Sum properly allocable to materials and equipment delivered and suitably stored at the site for subsequent incorporation in the completed construction (or, if approved in advance by the Owner, suitably stored off the site at a location agreed upon in writing), less retainage of Five Percent percent ( 5 %);

   .3   Subtract the aggregate of previous payments made by the Owner; and

   .4   Subtract amounts, if any, for which the Architect has withheld or nullified a Certificate for Payment as provided in Section 9.5 of AIA Document A201–2007.

§ 5.1.7 The progress payment amount determined in accordance with Section 5.1.6 shall be further modified under the following circumstances:

   .1   Add, upon Substantial Completion of the Work, a sum sufficient to increase the total payments to the full amount of the Contract Sum, less such amounts as the Architect shall determine for incomplete Work, retainage applicable to such work and unsettled claims; and
*(Section 9.8.5 of AIA Document A201–2007 requires release of applicable retainage upon Substantial Completion of Work with consent of surety, if any.)*

   .2   Add, if final completion of the Work is thereafter materially delayed through no fault of the Contractor, any additional amounts payable in accordance with Section 9.10.3 of AIA Document A201–2007.

§ 5.1.8 Reduction or limitation of retainage, if any, shall be as follows:
*(If it is intended, prior to Substantial Completion of the entire Work, to reduce or limit the retainage resulting from the percentages inserted in Sections 5.1.6.1 and 5.1.6.2 above, and this is not explained elsewhere in the Contract Documents, insert here provisions for such reduction or limitation.)*

§ 5.1.9 Except with the Owner's prior approval, the Contractor shall not make advance payments to suppliers for materials or equipment which have not been delivered and stored at the site.

§ 5.2 FINAL PAYMENT
§ 5.2.1 Final payment, constituting the entire unpaid balance of the Contract Sum, shall be made by the Owner to the Contractor when

   .1   the Contractor has fully performed the Contract except for the Contractor's responsibility to correct Work as provided in Section 12.2.2 of AIA Document A201–2007, and to satisfy other requirements, if any, which extend beyond final payment; and

   .2   a final Certificate for Payment has been issued by the Architect.

§ 5.2.2 The Owner's final payment to the Contractor shall be made no later than 30 days after the issuance of the Architect's final Certificate for Payment, or as follows:

**Init.**

**/**

AIA Document A101™ – 2007. Copyright © 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, 1991, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:37:29 on 01/08/2014 under Order No.4898810257_1 which expires on 11/13/2014, and is not for resale.
User Notes: (1634825320)

**4**

Case 9:16-cv-81871-KAM   Document 292-1   Entered on FLSD Docket 06/12/2018   Page 201 of
243

### ARTICLE 6    DISPUTE RESOLUTION
§ 6.1 INITIAL DECISION MAKER
The Architect will serve as Initial Decision Maker pursuant to Section 15.2 of AIA Document A201–2007, unless the
parties appoint below another individual, not a party to this Agreement, to serve as Initial Decision Maker.
*(If the parties mutually agree, insert the name, address and other contact information of the Initial Decision Maker, if
other than the Architect.)*

§ 6.2 BINDING DISPUTE RESOLUTION
For any Claim subject to, but not resolved by, mediation pursuant to Section 15.3 of AIA Document A201–2007, the
method of binding dispute resolution shall be as follows:
*(Check the appropriate box. If the Owner and Contractor do not select a method of binding dispute resolution below,
or do not subsequently agree in writing to a binding dispute resolution method other than litigation, Claims will be
resolved by litigation in a court of competent jurisdiction.)*

      [ X ]    Arbitration pursuant to Section 15.4 of AIA Document A201–2007

      [  ]    Litigation in a court of competent jurisdiction

      [  ]    Other *(Specify)*

### ARTICLE 7    TERMINATION OR SUSPENSION
§ 7.1 The Contract may be terminated by the Owner or the Contractor as provided in Article 14 of AIA Document
A201–2007.

§ 7.2 The Work may be suspended by the Owner as provided in Article 14 of AIA Document A201–2007.

### ARTICLE 8    MISCELLANEOUS PROVISIONS
§ 8.1 Where reference is made in this Agreement to a provision of AIA Document A201–2007 or another Contract
Document, the reference refers to that provision as amended or supplemented by other provisions of the Contract
Documents.

§ 8.2 Payments due and unpaid under the Contract shall bear interest from the date payment is due at the rate stated
below, or in the absence thereof, at the legal rate prevailing from time to time at the place where the Project is located.
*(Insert rate of interest agreed upon, if any.)*

5   % Five

§ 8.3 The Owner's representative:
*(Name, address and other information)*

§ 8.4 The Contractor's representative:
*(Name, address and other information)*

**Init.**

**/**

AIA Document A101™ – 2007. Copyright © 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, 1991, 1997 and 2007 by The American
Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized
reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the
maximum extent possible under the law. This document was produced by AIA software at 15:37:29 on 01/08/2014 under Order No.4898810257_1 which expires
on 11/13/2014, and is not for resale.
User Notes:                                                                                                                                        (1634825320)

**5**

Nicholas Laudano
638 Shore Drive
Boynton Beach, FL 33435

§ 8.5 Neither the Owner's nor the Contractor's representative shall be changed without ten days written notice to the other party.

§ 8.6 Other provisions:

## ARTICLE 9    ENUMERATION OF CONTRACT DOCUMENTS
§ 9.1 The Contract Documents, except for Modifications issued after execution of this Agreement, are enumerated in the sections below.

§ 9.1.1 The Agreement is this executed AIA Document A101–2007, Standard Form of Agreement Between Owner and Contractor.

§ 9.1.2 The General Conditions are AIA Document A201–2007, General Conditions of the Contract for Construction.

§ 9.1.3 The Supplementary and other Conditions of the Contract:

| Document | Title | Date | Pages |
|----------|-------|------|-------|

§ 9.1.4 The Specifications:
*(Either list the Specifications here or refer to an exhibit attached to this Agreement.)*
Exhibit A

| Section | Title | Date | Pages |
|---------|-------|------|-------|

§ 9.1.5 The Drawings:
*(Either list the Drawings here or refer to an exhibit attached to this Agreement.)*
Exhibit E

| Number | Title | Date |
|--------|-------|------|

§ 9.1.6 The Addenda, if any:

| Number | Date | Pages |
|--------|------|-------|

Portions of Addenda relating to bidding requirements are not part of the Contract Documents unless the bidding requirements are also enumerated in this Article 9.

§ 9.1.7 Additional documents, if any, forming part of the Contract Documents:

.1    AIA Document E201™–2007, Digital Data Protocol Exhibit, if completed by the parties, or the following:

**Init.**

**/**

AIA Document A101™ – 2007. Copyright © 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, 1991, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:37:29 on 01/08/2014 under Order No.4898810257_1 which expires on 11/13/2014, and is not for resale.
User Notes:                                                                                                                    (1634825320)

6

.2   Other documents, if any, listed below:
*(List here any additional documents that are intended to form part of the Contract Documents. AIA Document A201–2007 provides that bidding requirements such as advertisement or invitation to bid, Instructions to Bidders, sample forms and the Contractor's bid are not part of the Contract Documents unless enumerated in this Agreement. They should be listed here only if intended to be part of the Contract Documents.)*  ·

**ARTICLE 10    INSURANCE AND BONDS**
The Contractor shall purchase and maintain insurance and provide bonds as set forth in Article 11 of AIA Document A201–2007.
*(State bonding requirements, if any, and limits of liability for insurance required in Article 11 of AIA Document A201–2007.)*

| Type of insurance or bond | Limit of liability or bond amount ($0.00) |
|---|---|
| General Liability | $2 Million |
| Workers Compensation | Per Trade Requirements |

This Agreement entered into as of the day and year first written above.

**OWNER** *(Signature)*                    **CONTRACTOR** *(Signature)*

160 Royal Palm LLC                          Nicholas Laudano  President
*(Printed name and title)*                  *(Printed name and title)*

**Init.**

**/**

**AIA Document A101™ – 2007.** Copyright © 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, 1991, 1997 and 2007 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 15:37:29 on 01/08/2014 under Order No.4898810257_1 which expires on 11/13/2014, and is not for resale.
**User Notes:**                                                                   (1634825320)

**7**

**7918 · Regions Checking**

| Type | Date | Num | Name | Split | Debit | Credit | Balance |
|---|---|---|---|---|---|---|---|
| | | | | | | | 0.00 |
| Deposit | 11/15/2013 | | | 30000 · Opening Balance Equity | 50.00 | | 50.00 |
| Deposit | 11/19/2013 | | | 10000 · USREDA | 36,200.00 | | 36,250.00 |
| Deposit | 11/26/2013 | | | 10000 · USREDA | 500,000.00 | | 536,250.00 |
| Check | 11/26/2013 | WIRE XFER | Kevin Wright | 66750 · Consultant | | 28,579.00 | 507,671.00 |
| Check | 11/26/2013 | ACH | New Haven Contracting South | -SPLIT- | | 200,000.00 | 307,671.00 |
| Check | 11/26/2013 | ACH | Regions Bank | 60400 · Bank Service Charges | | 25.00 | 307,651.00 |
| Check | 11/26/2013 | ACH | Regions Bank | 60400 · Bank Service Charges | | 15.00 | 307,636.00 |
| Check | 11/26/2013 | DEBIT | Harland Clarke | 60400 · Bank Service Charges | | 232.27 | 307,403.73 |
| Check | 11/26/2013 | 1001 | Trump International Golf Club, L.C. | 62550 · Dues and Subscriptions | | 33,320.00 | 284,083.73 |
| Check | 11/26/2013 | 1002 | The Mar-a-Lago Club, L.C. | 62550 · Dues and Subscriptions | | 13,425.13 | 270,658.60 |
| Bill Pmt -Check | 12/01/2013 | 1010 | Tax Collector, Palm Beach County | 20000 · Accounts Payable | | 160.20 | 270,498.40 |
| Bill Pmt -Check | 12/01/2013 | 1011 | Town & Country | 20000 · Accounts Payable | | 14.97 | 270,483.43 |
| Check | 12/02/2013 | Debit Card | Staples | -SPLIT- | | 71.83 | 270,411.60 |
| Check | 12/02/2013 | Debit Card | UHaul | 68500 · Postage and Delivery | | 115.75 | 270,295.85 |
| Check | 12/02/2013 | Debit Card | Microsoft Office 360 | 61750 · Software | | 150.00 | 270,145.85 |
| Check | 12/05/2013 | 1004 | Fernando Wong | 60700 · Contractor | | 7,000.00 | 263,145.85 |
| Check | 12/11/2013 | Debit Card | Staples | -SPLIT- | | 24.61 | 263,117.24 |
| Check | 12/11/2013 | Wire Xfer | HBA International | 66750 · Consultant | | 12,176.30 | 250,940.94 |
| Check | 12/11/2013 | ACH | Regions Bank | 60400 · Bank Service Charges | | 45.00 | 250,895.94 |
| Check | 12/13/2013 | 1012 | Petty Cash | 30700 · Members Draw | | 2,000.00 | 248,895.94 |
| Transfer | 12/13/2013 | | | 6045 · Regions MMA | 50,000.00 | | 198,895.94 |
| Check | 12/16/2013 | Debit Card | AT&T Mobility | 68100 · Telephone Expense | | 423.98 | 198,471.96 |
| Check | 12/16/2013 | Debit Card | Tenant Evaluation | 67110 · Managing Director | | 100.00 | 198,371.96 |
| Check | 12/18/2013 | Debit Card | Chevron | 60110 · Petrol | | 78.79 | 198,293.17 |
| Check | 12/18/2013 | Debit Card | 1-800-Flowers | 62600 · Gift | | 114.43 | 198,178.74 |
| Check | 12/19/2013 | Bank Check | City Palms | 67110 · Managing Director | | 4,365.81 | 193,812.93 |
| Check | 12/23/2013 | ACH | New Haven Contracting South | -SPLIT- | | 150,000.00 | 43,812.93 |
| Check | 12/23/2013 | Bank Check | Petty Cash | 30700 · Members Draw | | 1,000.00 | 42,812.93 |
| Check | 12/23/2013 | Debit Card | Publix | 62600 · Gift | | 321.12 | 42,491.81 |
| Check | 12/23/2013 | Debit Card | AT&T Mobility | 68100 · Telephone Expense | | 228.68 | 42,263.13 |
| Check | 12/23/2013 | Debit Card | The Breakers | 64300 · Meals and Entertainment | | 218.81 | 42,044.32 |
| Check | 12/23/2013 | Debit Card | Target | 62600 · Gift | | 216.00 | 41,828.32 |
| Check | 12/23/2013 | Debit Card | Publix | 68500 · Postage and Delivery | | 184.00 | 41,644.32 |
| Check | 12/24/2013 | Wire XFER | HIG | 66750 · Consultant | | 12,500.00 | 29,144.32 |
| Check | 12/24/2013 | ACH | Regions Bank | 60400 · Bank Service Charges | | 20.00 | 29,124.32 |
| Check | 12/24/2013 | Debit Card | Wine Country Gifts | 62600 · Gift | | 551.46 | 28,572.86 |
| Check | 12/24/2013 | ACH | Petty Cash | 30700 · Members Draw | | 500.00 | 28,072.86 |
| Check | 12/26/2013 | Debit Card | Brioni | XCHGE · Exchange Account | | 6,042.00 | 22,030.86 |
| Check | 12/26/2013 | Debit Card | Chanel | XCHGE · Exchange Account | | 736.70 | 21,294.16 |
| Check | 12/26/2013 | 1016 | James Cruse | 30700 · Members Draw | | 500.00 | 20,794.16 |
| Check | 12/26/2013 | Debit Card | Chevron | 60110 · Petrol | | 63.68 | 20,730.48 |
| Check | 12/26/2013 | Debit Card | Intelius | 66750 · Consultant | | 3.95 | 20,726.53 |
| Check | 12/26/2013 | Debit Card | Intelius | 66750 · Consultant | | 3.95 | 20,722.58 |
| Check | 12/26/2013 | Debit Card | Intelius | 66750 · Consultant | | 3.95 | 20,718.63 |
| Check | 12/26/2013 | Debit Card | Intelius | 66750 · Consultant | | 3.95 | 20,714.68 |
| Check | 12/26/2013 | Debit Card | Intelius | 66750 · Consultant | | 3.95 | 20,710.73 |
| Check | 12/26/2013 | Debit Card | Intelius | 66750 · Consultant | | 3.95 | 20,706.78 |
| Transfer | 12/27/2013 | | | 6045 · Regions MMA | 30,000.00 | | 50,706.78 |
| Deposit | 12/27/2013 | | | XCHGE · Exchange Account | 736.70 | | 51,443.48 |
| Deposit | 12/30/2013 | | | XCHGE · Exchange Account | 954.00 | | 52,397.48 |
| Check | 12/30/2013 | Debit Card | AT&T Mobility | 68100 · Telephone Expense | | 635.99 | 51,761.49 |
| Check | 12/30/2013 | Debit Card | Michael Kors | 62600 · Gift | | 529.08 | 51,232.41 |
| Check | 12/30/2013 | Debit Card | ABC | 62600 · Gift | | 39.95 | 51,192.46 |
| Deposit | 12/31/2013 | | | XCHGE · Exchange Account | 5,068.00 | | 56,260.46 |
| Check | 12/31/2013 | 1014 | HVS Consulting & Valuation | 66750 · Consultant | | 2,000.00 | 54,260.46 |

**EXHIBIT F**

| Type | Date/Num | Name | Account | | Amount | Balance |
|---|---|---|---|---|---|---|
| Bill Pmt -Check | 01/02/2014 Debit Card | Caladnas Agency Inc. | 20000 · Accounts Payable | | 154.83 | 54,125.63 |
| Bill Pmt -Check | 01/02/2014 1022 | AT&T Mobility | 20000 · Accounts Payable | | 467.22 | 53,658.41 |
| Check | 01/02/2014 ACH | New Haven Contracting South | -SPLIT- | | 30,000.00 | 23,658.41 |
| Check | 01/02/2014 Debit Card | Sunoco | 60110 · Petrol | | 72.86 | 23,585.55 |
| Check | 01/02/2014 Debit Card | Home Depot | 63560 · Supplies | | 34.92 | 23,550.63 |
| Check | 01/03/2014 Debit Card | Improv Traffic | 60120 · Tolls, Parking, Fees | | 24.70 | 23,525.93 |
| Check | 01/04/2014 Debit Card | Toll-By-Plate | 60120 · Tolls, Parking, Fees | | 200.00 | 23,325.93 |
| Check | 01/05/2014 1007 | Kevin Wright | 66750 · Consultant | | 28,579.00 | -5,253.07 |
| Deposit | 01/06/2014 | | 13400 · Retainage Receivable | 85,000.00 | | 79,746.93 |
| Check | 01/06/2014 ACH | Regions Bank | 60400 · Bank Service Charges | | 15.00 | 79,731.93 |
| Check | 01/06/2014 Debit Card | Okeechobee Petrol | 60110 · Petrol | | 66.23 | 79,665.70 |
| Check | 01/06/2014 Debit Card | Staples | 64900 · Office Supplies | | 57.22 | 79,608.48 |
| Check | 01/07/2014 Debit Card | Toll-By-Plate | 60120 · Tolls, Parking, Fees | | 200.00 | 79,408.48 |
| Check | 01/07/2014 Debit Card | Staples | 61725 · Portable Electronic Medium | | 62.52 | 79,345.96 |
| Check | 01/07/2014 ACH | New Haven Contracting South | -SPLIT- | | 50,000.00 | 29,345.96 |
| Bill Pmt -Check | 01/08/2014 1015 | Leslie Robert Evans & Associates PA | 20000 · Accounts Payable | | 525.00 | 28,820.96 |
| Check | 01/08/2014 Debit Card | Shell Oil | 60110 · Petrol | | 51.49 | 28,769.47 |
| Deposit | 01/10/2014 | | 13400 · Retainage Receivable | 100,000.00 | | 128,769.47 |
| Bill Pmt -Check | 01/10/2014 1008 | Florida Blue | 20000 · Accounts Payable | | 1,714.11 | 127,055.36 |
| Check | 01/10/2014 Debit Card | Kravis Center | 81400 · Charitable Contributions | | 725.00 | 126,330.36 |
| Check | 01/10/2014 Debit Card | Southwest Airlines | 68450 · Airline | | 993.00 | 125,337.36 |
| Check | 01/10/2014 Debit Card | Adobe | 61750 · Software | | 19.99 | 125,317.37 |
| Check | 01/10/2014 ACH | Regions Bank | 60400 · Bank Service Charges | | 15.00 | 125,302.37 |
| Check | 01/10/2014 XFER | New Haven Contracting South | -SPLIT- | | 75,000.00 | 50,302.37 |
| Check | 01/13/2014 Debit Card | Urban Outfitters | 61750 · Software | | 157.40 | 49,667.51 |
| Check | 01/13/2014 Debit Card | BP | 60110 · Petrol | | 72.62 | 49,511.54 |
| Check | 01/13/2014 Debit Card | Kravis Center | 81400 · Charitable Contributions | | 70.00 | 49,441.54 |
| Check | 01/13/2014 Debit Card | Marathon Petrol | 60110 · Petrol | | 1.55 | 49,393.47 |
| Check | 01/14/2014 Debit Card | Staples | 64900 · Office Supplies | | 110.32 | 49,270.15 |
| Check | 01/14/2014 Debit Card | Echo Limo | 68475 · Taxi, Shuttle, Limo | | 120.00 | 49,150.15 |
| Check | 01/14/2014 Debit Card | FLL Airport | 68450 · Airline | | 15.00 | 49,135.15 |
| Check | 01/14/2014 Debit Card | Image Beauty | 64700 · Miscellaneous Expense | | 51.27 | 48,883.09 |
| Bill Pmt -Check | 01/15/2014 1017 | Park Limousine | 20000 · Accounts Payable | | 292.50 | 48,590.59 |
| Bill Pmt -Check | 01/15/2014 1018 | The Mar-a-Lago Club, L.C. | 20000 · Accounts Payable | | 715.05 | 47,875.54 |
| Bill Pmt -Check | 01/15/2014 1019 | Trump International Golf Club, L.C. | 20000 · Accounts Payable | | 333.92 | 47,541.62 |
| Bill Pmt -Check | 01/15/2014 1023 | Club Colette | 20000 · Accounts Payable | | 2,122.87 | 45,418.75 |
| Bill Pmt -Check | 01/15/2014 1024 | Fraternal Order of Police Lodge 19 | 20000 · Accounts Payable | | 250.00 | 45,168.75 |
| Check | 01/16/2014 Debit Card | Walgreens | 64900 · Office Supplies | | 81.04 | 45,087.71 |
| Deposit | 01/17/2014 | | 13400 · Retainage Receivable | 100,000.00 | | 145,087.71 |
| Check | 01/17/2014 ACH | New Haven Contracting South | -SPLIT- | | 75,000.00 | 70,087.71 |
| Check | 01/17/2014 Debit Card | Chevron | 60110 · Petrol | | 78.23 | 70,009.48 |
| Check | 01/17/2014 ACH | Regions Bank | 60400 · Bank Service Charges | | 15.00 | 69,994.48 |
| Bill Pmt -Check | 01/20/2014 1025 | City of West Palm Beach | 20000 · Accounts Payable | | 158.00 | 69,836.48 |
| Bill Pmt -Check | 01/20/2014 1026 | The New York Times | 20000 · Accounts Payable | | 1.59 | 69,834.79 |
| Check | 01/20/2014 Debit Card | The UPS Store | 66500 · Postage and Delivery | | 188.00 | 69,646.79 |
| Check | 01/20/2014 Debit Card | Staples | 64900 · Office Supplies | | 33.52 | 69,613.27 |
| Check | 01/20/2014 Debit Card | Amazon | 62000 · Continuing Education | | 16.16 | 69,597.11 |
| Check | 01/21/2014 Debit Card | Sunoco | 60110 · Petrol | | 98.06 | 69,499.05 |
| Check | 01/22/2014 Debit Card | Landmark | 62000 · Continuing Education | | 545.00 | 68,954.05 |
| Check | 01/23/2014 ACH | Petty Cash | 64300 · Meals and Entertainment | | 500.00 | 68,454.05 |
| Check | 01/23/2014 1027 | Tax Collector, Palm Beach County | 60180 · Auto and Truck Expenses | | 60.50 | 68,393.55 |
| Check | 01/24/2014 1028 | Caroline Silva Gonzaga | 63550 · Cleaning Service | | 500.00 | 67,893.55 |
| Bill Pmt -Check | 01/27/2014 1029 | Angle IT Solutions, Inc. | 20000 · Accounts Payable | | 148.75 | 67,744.80 |
| Check | 01/27/2014 Debit Card | Okeechobee Petrol | 60110 · Petrol | | 66.16 | 67,678.64 |
| Deposit | 01/28/2014 | | 13400 · Retainage Receivable | 200,000.00 | | 267,678.64 |
| Check | 01/28/2014 Debit Card | Intelius | 66750 · Consultant | | 3.95 | 267,674.69 |
| Check | 01/28/2014 Debit Card | Intelius | 66750 · Consultant | | 3.95 | 267,668.74 |
| Check | 01/28/2014 ACH | Regions Bank | 60400 · Bank Service Charges | | 15.00 | 267,653.74 |

| Type | Date | Name | Account | | Amount | Balance |
|------|------|------|---------|---|--------|---------|
| Check | 01/28/2014 Debit Card | ABC | 62600 · Gift | | 39.95 | 287,613.79 |
| Check | 01/30/2014 ACH | New Haven Contracting South | -SPLIT- | | 150,000.00 | 137,613.79 |
| Bill Pmt -Check | 01/31/2014 1047 | The American Ireland Fund | 20000 · Accounts Payable | | 1,000.00 | 116,613.79 |
| Bill Pmt -Check | 02/01/2014 1045 | McWilliams Ballard Florida | 20000 · Accounts Payable | | 2,050.00 | 114,563.79 |
| Check | 02/01/2014 1046 | P&L Driving School | 62000 · Continuing Education | | 375.00 | 114,188.79 |
| Check | 02/03/2014 1048 | American Cancer Society | 61400 · Charitable Contributions | | 500.00 | 113,688.79 |
| Check | 02/03/2014 WIRE XFER | Matthews Commercial Properties | 68450 · Airline | | 8,592.40 | 105,096.39 |
| Check | 02/03/2014 ACH | Regions Bank | 68400 · Bank Service Charges | | 20.00 | 105,076.39 |
| Check | 02/03/2014 Petty Cash | Petty Cash | 64700 · Miscellaneous Expense | | 2,000.00 | 103,076.39 |
| Check | 02/03/2014 Debit Card | Chevron | 60110 · Petrol | | 75.98 | 103,000.41 |
| Check | 02/03/2014 Debit Card | Staples | 64900 · Office Supplies | | 45.70 | 102,954.71 |
| Check | 02/04/2014 Debit Card | Chés Too | 64300 · Meals and Entertainment | | 70.94 | 102,883.77 |
| Check | 02/04/2014 Debit Card | Virgin Atlantic | 68450 · Airline | | 2,071.00 | 100,812.77 |
| Check | 02/04/2014 Debit Card | Caffe Concerto | 64300 · Meals and Entertainment | | 43.67 | 100,769.10 |
| Check | 02/04/2014 Debit Card | Mandarin Oriental Hotel | 68425 · Accommodations | | 4,842.49 | 95,926.61 |
| Check | 02/04/2014 Debit Card | The London Edit | 64700 · Miscellaneous Expense | | 24.82 | 95,901.79 |
| Check | 02/05/2014 ACH | Regions Bank | 68400 · Bank Service Charges | | 0.74 | 95,901.05 |
| Check | 02/05/2014 ACH | Regions Bank | 68400 · Bank Service Charges | | 1.31 | 95,899.74 |
| Check | 02/06/2014 ACH | AT&T Mobility | 68100 · Telephone Expense | | 1,117.75 | 94,781.99 |
| Bill Pmt -Check | 02/06/2014 1053 | The New York Times | 20000 · Accounts Payable | | 33.46 | 94,748.53 |
| Check | 02/10/2014 Debit Card | Harrods Ltd. | 64700 · Miscellaneous Expense | | 52.38 | 94,693.15 |
| Check | 02/10/2014 Debit Card | 34 | 64300 · Meals and Entertainment | | 354.94 | 94,339.21 |
| Check | 02/10/2014 Debit Card | World Duty Free | 64700 · Miscellaneous Expense | | 38.41 | 94,268.80 |
| Check | 02/10/2014 Debit Card | Mandarin Oriental Hotel | 68425 · Accommodations | | 28.44 | 94,270.36 |
| Check | 02/10/2014 ACH | Adobe | 61750 · Software | | 19.99 | 94,250.37 |
| Check | 02/10/2014 Debit Card | Flagler Medical Associates | 83320 · Health Insurance | | 2,000.00 | 92,250.37 |
| Deposit | 02/10/2014 | | 13410 · Retainage Receivable | 300,000.00 | | 392,250.37 |
| Check | 02/10/2014 ACH | New Haven Contracting South | -SPLIT- | | 300,000.00 | 92,250.37 |
| Check | 02/10/2014 ACH | Regions Bank | 68400 · Bank Service Charges | | 10.65 | 92,239.72 |
| Check | 02/10/2014 ACH | Regions Bank | 68400 · Bank Service Charges | | 1.57 | 92,238.15 |
| Check | 02/10/2014 ACH | Regions Bank | 68400 · Bank Service Charges | | 1.18 | 92,236.97 |
| Check | 02/10/2014 ACH | Regions Bank | 68400 · Bank Service Charges | | 15.00 | 92,221.97 |
| Check | 02/11/2014 Debit Card | Amazon | 61725 · Portable Electronic Medium | | 94.94 | 92,127.03 |
| Bill Pmt -Check | 02/11/2014 1049 | Palm Beach Society | 20000 · Accounts Payable | | 2,750.00 | 89,339.27 |
| Check | 02/11/2014 ACH | Regions Bank | 68400 · Bank Service Charges | | 145.27 | 89,194.00 |
| Check | 02/11/2014 ACH | Regions Bank | 68400 · Bank Service Charges | | 0.85 | 89,193.15 |
| Check | 02/13/2014 Wire XFER | Kevin Wright | 66760 · Consultant | | 28,579.00 | 60,614.15 |
| Check | 02/14/2014 Debit Card | LIBreakFix | 68100 · Telephone Expense | | 95.40 | 60,518.75 |
| Check | 02/17/2014 Debit Card | Hess | 60110 · Petrol | | 67.37 | 60,451.38 |
| Check | 02/17/2014 Debit Card | Intelius | 66750 · Consultant | | 3.95 | 60,447.43 |
| Check | 02/17/2014 Debit Card | Intelius | 66750 · Consultant | | 3.95 | 60,443.48 |
| Check | 02/17/2014 Debit Card | Intelius | 66750 · Consultant | | 3.95 | 60,439.53 |
| Check | 02/17/2014 Debit Card | Musashi Thai | 64300 · Meals and Entertainment | | 120.40 | 60,319.13 |
| Check | 02/17/2014 Debit Card | Marathon Petrol | 60110 · Petrol | | 59.00 | 60,260.13 |
| Check | 02/17/2014 Debit Card | Toll-By-Plate | 60120 · Tolls, Parking, Fees | | 46.83 | 60,203.30 |
| Bill Pmt -Check | 02/17/2014 1052 | Club Colette | 20000 · Accounts Payable | | 891.67 | 59,311.63 |
| Bill Pmt -Check | 02/17/2014 1053 | Florida Blue | 20000 · Accounts Payable | | 1,714.11 | 57,597.52 |
| Bill Pmt -Check | 02/17/2014 1054 | Park Limousine | 20000 · Accounts Payable | | 297.00 | 57,300.52 |
| Bill Pmt -Check | 02/17/2014 1055 | The Breakers | 20000 · Accounts Payable | | 179.63 | 57,120.89 |
| Bill Pmt -Check | 02/17/2014 1056 | The Mar-a-Lago Club, L.C. | 20000 · Accounts Payable | | 2,020.57 | 55,100.32 |
| Check | 02/17/2014 Debit Card | Toll-By-Plate | 60120 · Tolls, Parking, Fees | | 3.28 | 55,097.04 |
| Deposit | 02/20/2014 | | 13410 · Retainage Receivable | 500,000.00 | | 555,097.04 |
| Check | 02/20/2014 ACH | Regions Bank | 68400 · Bank Service Charges | | 15.00 | 555,082.04 |
| Check | 02/21/2014 Wire XFER | New Haven Contracting South | -SPLIT- | | 440,000.00 | 115,082.04 |
| Check | 02/21/2014 Petty Cash | Petty Cash | 64300 · Meals and Entertainment | | 600.00 | 114,482.04 |
| Check | 02/24/2014 Debit Card | Staples | 63560 · Supplies | | 48.42 | 114,434.62 |
| Check | 02/24/2014 Debit Card | PB Grill | 64300 · Meals and Entertainment | | 530.34 | 114,904.28 |
| Check | 02/24/2014 Debit Card | Trump BP | 60110 · Petrol | | 71.94 | 113,833.34 |

| Type | Date | Name | Account | | | Balance |
|---|---|---|---|---|---|---|
| Deposit | 02/25/2014 | | 13400 · Retainage Receivable | 500,000.00 | | 913,933.34 |
| Check | 02/26/2014 ACH | Regions Bank | 60400 · Bank Service Charges | | 15.00 | 913,918.34 |
| Check | 02/27/2014 Debit Card | 1 & 1 Internet | 61600 · Internet | | 51.78 | 913,866.56 |
| Check | 02/27/2014 Debit Card | Cross | 62600 · Gift | | 2,029.85 | 911,836.71 |
| Check | 02/28/2014 Debit Card | ABC | 62600 · Gift | | 39.95 | 911,796.76 |
| Check | 02/28/2014 Debit Card | Sunoco | 60110 · Petrol | | 75.01 | 911,721.75 |
| Check | 02/28/2014 1059 | Parent-Child Center, Inc. | 61400 · Charitable Contributions | | 1,000.00 | 910,721.75 |
| Bill Pmt -Check | 02/28/2014 1061 | Kravis Center | 20000 · Accounts Payable | | 12,500.00 | 898,221.75 |
| Check | 02/28/2014 Wire XFER | New Haven Contracting South | -SPLIT- | | 300,000.00 | 598,221.75 |
| Check | 02/28/2014 ACH | Regions Bank | 60400 · Bank Service Charges | | 20.00 | 598,201.75 |
| Bill Pmt -Check | 03/01/2014 1059 | McWilliams Ballard Florida | 20000 · Accounts Payable | | 2,050.00 | 596,151.75 |
| Check | 03/03/2014 ACH | New Haven Contracting South | -SPLIT- | | 100,000.00 | 196,151.75 |
| Check | 03/04/2014 Debit Card | Jet Blue | 68450 · Airline | | 596.00 | 195,555.75 |
| Check | 03/04/2014 Debit Card | Staples | 64300 · Office Supplies | | 49.11 | 195,506.64 |
| Check | 03/04/2014 Debit Card | Nicker's Automotive | 60115 · Repair & Maintenance | | 566.11 | 194,940.53 |
| Bill Pmt -Check | 03/05/2014 1062 | The Seventh Art | 20000 · Accounts Payable | 0.00 | | 194,940.53 |
| Check | 03/06/2014 Debit Card | NYC Taxi | 68475 · Taxi, Shuttle, Limo | | 13.00 | 194,927.53 |
| Check | 03/06/2014 Debit Card | 55 Stan Operators | 68475 · Taxi, Shuttle, Limo | | 67.50 | 194,860.03 |
| Check | 03/06/2014 Debit Card | Trump International Hotel | 68425 · Accommodations | | 693.19 | 194,166.84 |
| Check | 03/06/2014 Debit Card | Delta Airlines | 68450 · Airline | | 258.00 | 193,908.84 |
| Check | 03/06/2014 Debit Card | Arthur Cab | 68475 · Taxi, Shuttle, Limo | | 40.83 | 193,868.01 |
| Check | 03/06/2014 Debit Card | Palm Beach Post | 60200 · Advertising and Promotion | | 300.00 | 193,568.01 |
| Check | 03/06/2014 Debit Card | Palm Beach Post | 60200 · Advertising and Promotion | | 100.00 | 193,468.01 |
| Check | 03/06/2014 Debit Card | NYC Taxi | 68475 · Taxi, Shuttle, Limo | | 67.50 | 193,400.51 |
| Check | 03/06/2014 Debit Card | Delta Airlines | 68450 · Airline | | 25.00 | 193,375.51 |
| Check | 03/07/2014 Debit Card | PBI Airport Parking | 68475 · Taxi, Shuttle, Limo | | 34.00 | 193,341.51 |
| Check | 03/07/2014 Debit Card | Trump International Hotel | 68425 · Accommodations | | 424.95 | 192,916.56 |
| Check | 03/07/2014 Transfer | Palm House PB, LLC | 60400 · Bank Service Charges | | 1,800.00 | 191,116.56 |
| Bill Pmt -Check | 03/07/2014 1063 | City of West Palm Beach | 20000 · Accounts Payable | | 156.00 | 190,959.56 |
| Bill Pmt -Check | 03/07/2014 1064 | Lucien Capehart Photography, Inc. | 20000 · Accounts Payable | | 300.00 | 190,658.56 |
| Bill Pmt -Check | 03/07/2014 1065 | The Mar-a-Lago Club, L.C. | 20000 · Accounts Payable | | 584.31 | 190,074.25 |
| Bill Pmt -Check | 03/07/2014 1056 | The Seventh Art | 20000 · Accounts Payable | | 28,000.00 | 162,074.25 |
| Check | 03/07/2014 Debit Card | NYC Taxi | 68475 · Taxi, Shuttle, Limo | | 40.83 | 162,033.42 |
| Check | 03/08/2014 ACH | AT&T Mobility | 68100 · Telephone Expense | | 1,274.78 | 160,758.64 |
| Check | 03/10/2014 Debit Card | Adobe | 61750 · Software | | 19.99 | 160,738.65 |
| Check | 03/10/2014 Debit Card | AT&T Mobility | 68100 · Telephone Expense | | 238.97 | 160,499.68 |
| Check | 03/10/2014 Debit Card | Jet Blue | 68450 · Airline | | 339.00 | 160,160.68 |
| Check | 03/10/2014 Debit Card | VSC Visual Support | 61750 · Software | | 89.25 | 160,071.43 |
| Check | 03/10/2014 Debit Card | Teleplace Service | 68100 · Telephone Expense | | 420.75 | 159,650.68 |
| Bill Pmt -Check | 03/11/2014 1030 | Bruce R. Ouelletic, DDS, PA | 20000 · Accounts Payable | | 38.00 | 159,612.68 |
| Bill Pmt -Check | 03/11/2014 1031 | Florida Blue | 20000 · Accounts Payable | | 1,714.11 | 157,920.57 |
| Check | 03/11/2014 Debit Card | Trump International Hotel | 64300 · Meals and Entertainment | | 1,246.14 | 156,652.43 |
| Check | 03/12/2014 Debit Card | Okeechobee Petrol | 60110 · Petrol | | 80.22 | 156,572.21 |
| Check | 03/13/2014 ACH | New Haven Contracting South | -SPLIT- | | 10,000.00 | 146,572.21 |
| Check | 03/13/2014 ACH | New Haven Contracting South | -SPLIT- | | 100,000.00 | 46,572.21 |
| Deposit | 03/13/2014 | | 60760 · Contractor | 10,000.00 | | 56,572.21 |
| Check | 03/13/2014 Debit Card | PB Grill | 64300 · Meals and Entertainment | | 373.64 | 56,198.57 |
| Check | 03/13/2014 Debit Card | Palm Beach Post | 60200 · Advertising and Promotion | | 100.00 | 56,098.57 |
| Check | 03/13/2014 Debit Card | Palm Beach Post | 60200 · Advertising and Promotion | | 400.00 | 55,698.57 |
| Check | 03/13/2014 Debit Card | Comerica Bank | 64700 · Miscellaneous Expense | | 503.00 | 55,195.57 |
| Check | 03/13/2014 ACH | Regions Bank | 60400 · Bank Service Charges | | 2.50 | 55,193.07 |
| Check | 03/13/2014 ACH | Regions Bank | 60400 · Bank Service Charges | | 2.50 | 55,190.57 |
| Deposit | 03/14/2014 | | 13400 · Retainage Receivable | 350,000.00 | | 405,190.57 |
| Check | 03/14/2014 ACH | New Haven Contracting South | -SPLIT- | | 350,000.00 | 55,190.57 |
| Check | 03/14/2014 Petty Cash | Petty Cash | 64300 · Meals and Entertainment | | 500.00 | 54,690.57 |
| Check | 03/14/2014 ACH | Regions Bank | 60400 · Bank Service Charges | | 15.00 | 54,675.57 |
| Check | 03/17/2014 WIRE XFER | Kevin Wright | 65750 · Consultant | | 28,579.00 | 26,096.57 |
| Bill Pmt -Check | 03/17/2014 1067 | The Plaza Theatre | 20000 · Accounts Payable | | 1,200.00 | 24,896.57 |

| Type | Date | Num | Name | Account | | Balance |
|---|---|---|---|---|---|---|
| Deposit | 03/17/2014 | | | 13400 · Retainage Receivable | 100,000.00 | 124,896.57 |
| Check | 03/17/2014 ACH | | New Haven Contracting South | -SPLIT- | 60,000.00 | 64,896.57 |
| Check | 03/17/2014 ACH | | Regions Bank | 60400 · Bank Service Charges | 20.00 | 64,876.57 |
| Check | 03/17/2014 ACH | | Regions Bank | 60400 · Bank Service Charges | 15.00 | 64,861.57 |
| Check | 03/17/2014 Debit Card | | Popeye's | 64300 · Meals and Entertainment | 15.32 | 64,846.25 |
| Check | 03/17/2014 Debit Card | | Jet Blue | 68450 · Airfare | 6.00 | 64,840.25 |
| Check | 03/17/2014 Debit Card | | LA City Parking | 68475 · Taxi, Shuttle, Limo | 1.00 | 64,839.25 |
| Check | 03/18/2014 Debit Card | | Racetrac | 60110 · Petrol | 70.16 | 64,769.09 |
| Check | 03/18/2014 Debit Card | | Avis Rent-a-Car | 68475 · Taxi, Shuttle, Limo | 381.10 | 64,387.99 |
| Check | 03/18/2014 Debit Card | | Zeidel International | 68500 · Uniforms | 58.30 | 64,329.69 |
| Check | 03/18/2014 Debit Card | | Marathon Petrol | 60110 · Petrol | 51.50 | 64,278.19 |
| Check | 03/18/2014 Debit Card | | Marathon Petrol | 60110 · Petrol | 30.00 | 64,248.19 |
| Check | 03/18/2014 Wire XFER | | Joe Walsh, Sr. | 15000 · Officers Vehicle | 65,000.00 | -751.81 |
| Bill Pmt -Check | 03/18/2014 1038 | | City of West Palm Beach | 20000 · Accounts Payable | 27.00 | -778.81 |
| Check | 03/18/2014 ACH | | Regions Bank | 60400 · Bank Service Charges | 20.00 | -798.81 |
| Check | 03/18/2014 Debit Card | | Good Karma! | 62600 · Gift | 174.95 | -973.76 |
| Deposit | 03/19/2014 | | | 13400 · Retainage Receivable | 250,000.00 | 249,026.24 |
| Check | 03/19/2014 Debit Card | | Good Karma! | 62600 · Gift | 174.95 | 248,851.29 |
| Check | 03/19/2014 Debit Card | | Good Karma! | 62600 · Gift | 95.96 | 248,755.34 |
| Check | 03/19/2014 Debit Card | | Good Karma! | 62600 · Gift | 130.95 | 248,624.39 |
| Check | 03/19/2014 Debit Card | | Good Karma! | 62600 · Gift | 130.95 | 248,493.44 |
| Check | 03/19/2014 Debit Card | | Staples | 64800 · Office Supplies | 179.53 | 248,313.91 |
| Check | 03/19/2014 ACH | | Regions Bank | 60400 · Bank Service Charges | 15.00 | 248,298.91 |
| Check | 03/20/2014 ACH | | New Haven Contracting South | -SPLIT- | 100,000.00 | 148,298.91 |
| Check | 03/20/2014 Debit Card | | Sirius XM | 81750 · Software | 229.35 | 148,069.56 |
| Check | 03/20/2014 Wire XFER | | Eduardo Miranda | 66750 · Consultant | 3,500.00 | 144,569.56 |
| Check | 03/21/2014 ACH | | Regions Bank | 60400 · Bank Service Charges | 20.00 | 144,549.56 |
| Bill Pmt -Check | 03/24/2014 1069 | | Lucien Capehart Photography, Inc. | 20000 · Accounts Payable | 150.00 | 144,399.56 |
| Bill Pmt -Check | 03/24/2014 1070 | | The New York Times | 20000 · Accounts Payable | 38.46 | 144,354.10 |
| Check | 03/24/2014 ACH | | Regions Bank | 60400 · Bank Service Charges | 15.00 | 144,339.10 |
| Deposit | 03/24/2014 | | | 13400 · Retainage Receivable | 500,000.00 | 644,339.10 |
| Check | 03/25/2014 ACH | | Chevron | 60110 · Petrol | 73.20 | 644,265.90 |
| Bill Pmt -Check | 03/25/2014 1071 | | The Parker Company | 20000 · Accounts Payable | 100,000.00 | 544,265.90 |
| Bill Pmt -Check | 03/25/2014 1072 | | The Parker Company | 20000 · Accounts Payable | 14,545.45 | 529,720.45 |
| Check | 03/25/2014 ACH | | New Haven Contracting South | -SPLIT- | 100,000.00 | 429,720.45 |
| Check | 03/27/2014 Debit Card | | ABC | 62600 · Gift | 39.95 | 429,680.50 |
| Check | 03/28/2014 ACH | | New Haven Contracting South | -SPLIT- | 225,000.00 | 204,680.50 |
| Check | 03/28/2014 Petty Cash | | Petty Cash | 84300 · Meals and Entertainment | 500.00 | 204,180.50 |
| Check | 03/31/2014 Debit Card | | Chevron | 60110 · Petrol | 47.56 | 204,132.94 |
| Bill Pmt -Check | 04/01/2014 1032 | | Delaware Secretary of State | 20000 · Accounts Payable | 250.00 | 203,882.94 |
| Bill Pmt -Check | 04/01/2014 1033 | | McWilliams Ballard Florida | 20000 · Accounts Payable | 2,050.00 | 201,832.94 |
| Check | 04/01/2014 Debit Card | | Staples | 63500 · Supplies | 60.17 | 201,772.77 |
| Check | 04/01/2014 Debit Card | | Vista Print | 60000 · Advertising and Promotion | 79.99 | 201,692.78 |
| Check | 04/02/2014 Debit Card | | Estrella Institute | 63320 · Health Insurance | 350.00 | 201,342.78 |
| Check | 04/02/2014 Debit Card | | Florida Division of Corporations | 66770 · Legal | 138.75 | 201,204.03 |
| Bill Pmt -Check | 04/02/2014 1034 | | Eduardo Miranda | 20000 · Accounts Payable | 1,500.00 | 199,704.03 |
| Bill Pmt -Check | 04/03/2014 1035 | | Jerry E. Aron, PA | 20000 · Accounts Payable | 22,000.00 | 177,704.03 |
| Check | 04/04/2014 Debit Card | | Sunoco | 60110 · Petrol | 67.27 | 177,636.76 |
| Bill Pmt -Check | 04/04/2014 1036 | | Cihón Lubitz Martens & O'Connel | 20000 · Accounts Payable | 3,500.00 | 174,136.76 |
| Check | 04/04/2014 ACH | | New Haven Contracting South | -SPLIT- | 100,000.00 | 74,136.76 |
| Bill Pmt -Check | 04/04/2014 1037 | | Florosa Blue | 20000 · Accounts Payable | 1,714.11 | 72,422.65 |
| Check | 04/07/2014 Debit Card | | Albit Miami Dor | 68425 · Accommodations | 202.27 | 72,220.38 |
| Check | 04/07/2014 Debit Card | | Chevron | 60110 · Petrol | 85.13 | 72,135.25 |
| Check | 04/07/2014 Debit Card | | Prip Mart | 60110 · Petrol | 92.77 | 72,042.48 |
| Check | 04/08/2014 Wire XFER | | Randy Kabaloti | 66770 · Legal | 7,500.00 | 64,542.48 |
| Check | 04/08/2014 ACH | | Regions Bank | 60400 · Bank Service Charges | 10.00 | 64,532.48 |
| Check | 04/09/2014 Debit Card | | AT&T Mobility | 66100 · Telephone Expense | 366.98 | 64,165.50 |
| Deposit | 04/09/2014 | | | 13400 · Retainage Receivable | 500,000.00 | 564,165.50 |

| Type | Date | Name | Account | | Amount | Balance |
|---|---|---|---|---|---|---|
| Check | 04/08/2014 ACH | Regions Bank | 60400 - Bank Service Charges | | 15.00 | 564,150.50 |
| Check | 04/09/2014 Debit Card | Daddy O Hotel | 68425 - Accommodations | | 115.78 | 564,034.72 |
| Check | 04/09/2014 Debit Card | AT&T Mobility | 68100 - Telephone Expense | | 115.49 | 563,919.23 |
| Check | 04/09/2014 Debit Card | Publix | 62600 - Gift | | 27.54 | 563,891.69 |
| Check | 04/10/2014 Debit Card | Walmart | 64300 - Meals and Entertainment | | 101.04 | 563,790.65 |
| Check | 04/10/2014 Debit Card | Hess | 60110 - Petrol | | 83.70 | 563,706.95 |
| Check | 04/10/2014 Debit Card | Chevron | 60110 - Petrol | | 73.66 | 563,633.29 |
| Check | 04/10/2014 ACH | Adobe | 81750 - Software | | 19.99 | 563,613.30 |
| Check | 04/11/2014 Wire XFER | Joe Walsh, Sr. | 16000 - Officer Vehicle | | 28,960.00 | 534,653.30 |
| Check | 04/11/2014 ACH | New Haven Contracting South | -SPLIT- | | 300,000.00 | 234,653.30 |
| Check | 04/11/2014 ACH | Regions Bank | 60400 - Bank Service Charges | | 10.00 | 234,643.30 |
| Check | 04/14/2014 1038 | CHHJ | 68500 - Postage and Delivery | | 354.00 | 234,289.30 |
| Check | 04/14/2014 Debit Card | Hotels.com | 68425 - Accommodations | | 192.85 | 234,096.95 |
| Check | 04/14/2014 Debit Card | Racetrac | 60110 - Petrol | | 74.04 | 234,022.91 |
| Check | 04/14/2014 Debit Card | Chevron | 60110 - Petrol | | 82.07 | 233,940.54 |
| Check | 04/14/2014 Debit Card | PB Grill | 64300 - Meals and Entertainment | | 508.24 | 233,432.30 |
| Bill Pmt -Check | 04/15/2014 1039 | Florida Department of Transportation | 20000 - Accounts Payable | | 3.76 | 233,428.55 |
| Bill Pmt -Check | 04/15/2014 1040 | Palm Beach Post | 20000 - Accounts Payable | | 162.60 | 233,265.95 |
| Bill Pmt -Check | 04/15/2014 1041 | The Breakers | 20000 - Accounts Payable | | 545.31 | 232,680.64 |
| Bill Pmt -Check | 04/15/2014 1042 | The Mar-a-Lago Club, L.C. | 20000 - Accounts Payable | | 1,302.00 | 231,378.64 |
| Bill Pmt -Check | 04/15/2014 1043 | Trump International Golf Club, L.C. | 20000 - Accounts Payable | | 792.46 | 230,586.18 |
| Bill Pmt -Check | 04/15/2014 1073 | Leslie Robert Evans & Associates PA | 20000 - Accounts Payable | | 455.00 | 230,131.18 |
| Bill Pmt -Check | 04/15/2014 1074 | Florida Blue | 20000 - Accounts Payable | | 342.36 | 229,788.82 |
| Bill Pmt -Check | 04/15/2014 1075 | The New York Times | 20000 - Accounts Payable | | 36.46 | 229,752.36 |
| Check | 04/15/2014 Debit Card | Google | 61600 - Internet | | 1.99 | 229,750.37 |
| Check | 04/15/2014 Debit Card | Exxon Mobil | 60110 - Petrol | | 86.39 | 229,663.98 |
| Deposit | 04/15/2014 | | 13400 - Retainage Receivable | 1,000,000.00 | | 1,229,663.98 |
| Check | 04/16/2014 ACH | Regions Bank | 60400 - Bank Service Charges | | 15.00 | 1,229,648.98 |
| Check | 04/16/2014 Debit Card | Zazzel International | 68500 - Uniforms | | 58.30 | 1,229,590.68 |
| Check | 04/17/2014 Debit Card | Natural Healthy | 64900 - Office Supplies | | 33.16 | 1,229,557.52 |
| Check | 04/17/2014 Debit Card | 1-800-Flowers | 62600 - Gift | | 94.98 | 1,229,462.54 |
| Check | 04/17/2014 Debit Card | Amazon | 15000 - Furniture and Equipment | | 1,624.99 | 1,227,837.55 |
| Check | 04/18/2014 Debit Card | Okeechobee Petrol | 60110 - Petrol | | 61.84 | 1,227,775.71 |
| Check | 04/18/2014 Debit Card | Exxon Mobil | 60110 - Petrol | | 78.24 | 1,227,697.47 |
| Check | 04/22/2014 Debit Card | Abrit Miami Dor | 68425 - Accommodations | | 131.19 | 1,227,566.28 |
| Check | 04/22/2014 Debit Card | 45th Street Station | 60110 - Petrol | | 56.08 | 1,227,510.20 |
| Check | 04/22/2014 1076 | MSOA Foundation | 62500 - Dues and Subscriptions | | 1,000.00 | 1,226,510.20 |
| Check | 04/22/2014 ACH | New Haven Contracting South | -SPLIT- | | 100,000.00 | 1,126,510.20 |
| Check | 04/22/2014 Debit Card | Staples | -SPLIT- | | 70.58 | 1,126,439.52 |
| Check | 04/24/2014 Debit Card | Cantor's Driving School | 62200 - Continuing Education | | 607.00 | 1,125,832.52 |
| Check | 04/24/2014 Debit Card | Intellut | 65750 - Consultant | | 3.95 | 1,125,828.57 |
| Check | 04/24/2014 Debit Card | Aloft Miami Dor | 68425 - Accommodations | | 0.01 | 1,125,828.56 |
| Check | 04/24/2014 Debit Card | Shell Oil | 60110 - Petrol | | 88.21 | 1,125,740.35 |
| Transfer | 04/25/2014 | | 6045 - Regions MMA | | 990,000.00 | 135,740.35 |
| Check | 04/25/2014 Petty Cash | Petty Cash | 64300 - Meals and Entertainment | | 500.00 | 135,240.35 |
| Check | 04/27/2014 ACH | 1 & 1 Internet | 61600 - Internet | | 51.78 | 135,188.57 |
| Check | 04/28/2014 Debit Card | Sunoco | 60110 - Petrol | | 62.22 | 135,126.35 |
| Check | 04/28/2014 Debit Card | ABC | 62600 - Gift | | 39.95 | 135,086.40 |
| Check | 04/28/2014 Debit Card | Chevron | 60110 - Petrol | | 74.45 | 135,011.95 |
| Bill Pmt -Check | 04/26/2014 1078 | ARCOM | 20000 - Accounts Payable | | 750.00 | 134,261.95 |
| Check | 04/29/2014 Debit Card | Checkmate | 65750 - Consultant | | 22.55 | 134,239.00 |
| Check | 04/29/2014 Debit Card | Jet Blue | 68450 - Airline | | 395.00 | 133,844.00 |
| Transfer | 04/29/2014 | | 6045 - Regions MMA | 800,000.00 | | 933,844.00 |
| Deposit | 04/29/2014 | | 13400 - Retainage Receivable | 1,250,000.00 | | 2,183,844.00 |
| Deposit | 04/29/2014 | | 13400 - Retainage Receivable | 1,000,000.00 | | 3,183,844.00 |
| Check | 04/29/2014 Wire XFER | New Haven Contracting South | -SPLIT- | | 2,650,000.00 | 533,844.00 |
| Check | 04/29/2014 ACH | Regions Bank | 60400 - Bank Service Charges | | 20.00 | 533,824.00 |
| Check | 04/29/2014 ACH | Regions Bank | 60400 - Bank Service Charges | | 15.00 | 533,809.00 |

| Type | Date | Name | Account | | | Balance |
|---|---|---|---|---|---|---|
| Check | 04/29/2014 ACH | Regions Bank | 60400 - Bank Service Charges | | 18.00 | 533,794.00 |
| Check | 04/30/2014 Debit Card | Chevron | 60110 - Petrol | | 72.06 | 533,722.03 |
| Check | 04/30/2014 Debit Card | Florida Division of Corporations | 66770 - Legal | | 138.75 | 533,583.28 |
| Check | 04/30/2014 Debit Card | Florida Division of Corporations | 66770 - Legal | | 138.75 | 533,444.53 |
| Check | 04/30/2014 Debit Card | The Company Corporation | 66790 - Registered Agent | | 50.00 | 533,394.53 |
| Check | 04/30/2014 Debit Card | Krevis Center | 61400 - Charitable Contributions | | 1,968.00 | 531,426.53 |
| Check | 04/30/2014 ACH | New Haven Contracting South | -SPLIT- | | 200,000.00 | 331,426.53 |
| Bill Pmt -Check | 05/01/2014 1077 | McWilliams Ballard Florida | 20000 - Accounts Payable | | 2,050.00 | 329,376.53 |
| Check | 05/01/2014 Debit Card | Chevron | 60110 - Petrol | | 70.85 | 329,305.68 |
| Check | 05/02/2014 Debit Card | Texaco | 60110 - Petrol | | 80.46 | 329,225.22 |
| Check | 05/05/2014 Debit Card | Exxon Mobil | 60110 - Petrol | | 66.98 | 329,158.24 |
| Check | 05/05/2014 Wire XFER | Kevin Wright | 66750 - Consultant | | 28,579.00 | 300,579.24 |
| Check | 05/05/2014 ACH | Regions Bank | 60400 - Bank Service Charges | | 10.00 | 300,569.24 |
| Check | 05/05/2014 Debit Card | Jet Blue | 68450 - Airline | | 1,102.50 | 299,466.84 |
| Check | 05/06/2014 Debit Card | Delaware Secretary of State | 66750 - Consultant | | 75.00 | 299,391.84 |
| Check | 05/07/2014 Debit Card | Exxon Mobil | 60110 - Petrol | | 78.73 | 299,313.11 |
| Check | 05/07/2014 Debit Card | New Milford Septic Services, LLC | 67203 - Repairs and Maintenance | | 150.00 | 299,163.11 |
| Check | 05/08/2014 Debit Card | Staples | 64900 - Office Supplies | | 26.90 | 299,136.21 |
| Check | 05/08/2014 Debit Card | AT&T Mobility | 63100 - Telephone Expense | | 115.52 | 299,020.69 |
| Check | 05/08/2014 Debit Card | Jet Blue | 68450 - Airline | | 650.50 | 298,370.19 |
| Check | 05/08/2014 ACH | AT&T Mobility | 88100 - Telephone Expense | | 528.33 | 297,841.86 |
| Check | 05/08/2014 ACH | New Haven Contracting South | -SPLIT- | | 200,000.00 | 97,841.86 |
| Check | 05/09/2014 Debit Card | New Milford Val | 84700 - Miscellaneous Expense | | 41.78 | 97,800.08 |
| Check | 05/09/2014 Debit Card | Circle K | 60110 - Petrol | | 74.45 | 97,725.63 |
| Check | 05/09/2014 Debit Card | Jet Blue | 68450 - Airline | | 50.00 | 97,675.63 |
| Check | 05/09/2014 Debit Card | Jet Blue | 68450 - Airline | | 910.00 | 98,765.63 |
| Check | 05/09/2014 Debit Card | Jet Blue | 68450 - Airline | | 275.00 | 96,490.63 |
| Check | 05/09/2014 ACH | Regions Bank | 50400 - Bank Service Charges | | 35.00 | 96,455.63 |
| Check | 05/12/2014 Debit Card | Adobe | 61750 - Software | | 19.99 | 96,435.64 |
| Check | 05/12/2014 Debit Card | Jet Blue | 68450 - Airline | | 50.00 | 96,385.64 |
| Check | 05/12/2014 Debit Card | Exxon Mobil | 60110 - Petrol | | 78.28 | 96,308.56 |
| Check | 05/12/2014 Debit Card | PBIA Airport Parking | 68475 - Taxi, Shuttle, Limo | | 140.00 | 96,168.56 |
| Deposit | 05/12/2014 | | 13400 - Retainage Receivable | 1,000,000.00 | | 1,096,168.56 |
| Check | 05/12/2014 Debit Card | Palm Beach Daily News | 64700 - Miscellaneous Expense | | 467.33 | 1,095,699.23 |
| Check | 05/12/2014 1079 | Lawrence A. Moens Associates Inc. | 66750 - Consultant | | 150,000.00 | 945,699.23 |
| Check | 05/12/2014 Debit Card | Walmart | 64300 - Meals and Entertainment | | 55.10 | 945,644.13 |
| Check | 05/12/2014 Wire XFER | New Haven Contracting South | -SPLIT- | | 845,000.00 | 100,644.13 |
| Deposit | 05/12/2014 | | 68450 - Airline | 50.00 | | 100,694.13 |
| Check | 05/12/2014 ACH | Regions Bank | 60400 - Bank Service Charges | | 15.00 | 100,679.13 |
| Deposit | 05/13/2014 | | 13400 - Retainage Receivable | 1,000,000.00 | | 1,100,679.13 |
| Check | 05/13/2014 Debit Card | Jet Blue | 68450 - Airline | | 525.00 | 1,100,154.13 |
| Check | 05/13/2014 ACH | Regions Bank | 60400 - Bank Service Charges | | 15.00 | 1,100,139.13 |
| Check | 05/13/2014 ACH | Regions Bank | 60400 - Bank Service Charges | | 20.00 | 1,100,119.13 |
| Check | 05/14/2014 Debit Card | Jet Blue | 68450 - Airline | | 50.00 | 1,100,069.13 |
| Bill Pmt -Check | 05/15/2014 1080 | Krevis Center | 20000 - Accounts Payable | | 12,500.00 | 1,087,569.13 |
| Bill Pmt -Check | 05/15/2014 1081 | The Mar-a-Lago Club, L.C. | 20000 - Accounts Payable | | 2,623.43 | 1,084,945.70 |
| Bill Pmt -Check | 05/15/2014 1082 | The New York Times | 20000 - Accounts Payable | | 36.48 | 1,084,909.24 |
| Check | 05/15/2014 Debit Card | The Company Corporation | 66790 - Registered Agent | | 219.00 | 1,084,690.24 |
| Check | 05/15/2014 Debit Card | Eagle Food Mart | 60110 - Petrol | | 75.00 | 1,084,615.24 |
| Bill Pmt -Check | 05/15/2014 1084 | Chris Kohlhagen | 20000 - Accounts Payable | | 125.00 | 1,084,490.24 |
| Check | 05/16/2014 Debit Card | Sunoco | 60110 - Petrol | | 33.11 | 1,084,457.13 |
| Check | 05/16/2014 Debit Card | Citgo | 60110 - Petrol | | 35.40 | 1,084,421.73 |
| Check | 05/16/2014 Debit Card | Intercontinental | 68425 - Accommodations | | 190.97 | 1,084,230.76 |
| Check | 05/16/2014 Wire XFER | Kevin Wright | 66750 - Consultant | | 28,579.00 | 1,055,651.76 |
| Check | 05/16/2014 ACH | Regions Bank | 60400 - Bank Service Charges | | 10.00 | 1,055,641.76 |
| Check | 05/19/2014 Debit Card | Staples | 64900 - Office Supplies | | 1.06 | 1,055,640.68 |
| Check | 05/19/2014 Debit Card | Google | 61800 - Internet | | 1.99 | 1,055,638.69 |
| Check | 05/19/2014 Debit Card | Jet Blue | 68450 - Airline | | 50.00 | 1,055,588.69 |

| Type | Date | Method | Name | Account | Debit | Balance |
|---|---|---|---|---|---|---|
| Check | 05/19/2014 | Debit Card | Jet Blue | 68450 · Airline | 50.00 | 1,056,538.69 |
| Check | 05/19/2014 | Debit Card | Jet Blue | 68450 · Airline | 50.00 | 1,056,488.69 |
| Check | 05/19/2014 | Debit Card | Delta Airlines | 68450 · Airline | 386.00 | 1,056,102.69 |
| Check | 05/19/2014 | Debit Card | Jet Blue | 68450 · Airline | 294.00 | 1,054,608.69 |
| Check | 05/19/2014 | Debit Card | Exxon Mobil | 60110 · Petrol | 86.25 | 1,054,722.44 |
| Check | 05/19/2014 | Debit Card | Aloft Miami Dor | 68425 · Accommodations | 121.47 | 1,054,600.97 |
| Check | 05/19/2014 | Debit Card | Popcornopolis | 62600 · Gift | 54.69 | 1,054,546.28 |
| Check | 05/20/2014 | Debit Card | Hotals.com | 68425 · Accommodations | 121.47 | 1,054,424.81 |
| Check | 05/21/2014 | Debit Card | Sun Gas BP | 60110 · Petrol | 82.98 | 1,054,341.83 |
| Bill Pmt -Check | 05/21/2014 | 1083 | Toll-By-Plate | 20000 · Accounts Payable | 5.06 | 1,054,336.77 |
| Check | 05/21/2014 | Debit Card | Pet Data | 64700 · Miscellaneous Expense | 16.95 | 1,054,319.82 |
| Check | 05/22/2014 | Debit Card | Jet Blue | 68450 · Airline | 5.00 | 1,054,314.82 |
| Check | 05/22/2014 | Debit Card | Florida Division of Corporations | 66750 · Legal | 377.50 | 1,053,937.32 |
| Check | 05/23/2014 | Debit Card | Sunrise BP | 60110 · Petrol | 72.17 | 1,053,865.15 |
| Check | 05/23/2014 | ACH | New Haven Contracting South | -SPLIT- | 200,000.00 | 853,865.15 |
| Check | 05/27/2014 | Debit Card | Palm Beach Lake | 60110 · Petrol | 71.15 | 853,794.00 |
| Check | 05/27/2014 | Debit Card | ABC | 62600 · Gift | 39.85 | 853,754.05 |
| Check | 05/27/2014 | Debit Card | Bal Harbour Qua | 64300 · Meals and Entertainment | 250.83 | 853,503.22 |
| Check | 05/27/2014 | Debit Card | Real Deal | 62500 · Dues and Subscriptions | 71.25 | 853,431.97 |
| Check | 05/27/2014 | Debit Card | The Company Corporation | 66790 · Registered Agent | 1,640.00 | 851,791.97 |
| Check | 05/27/2014 | Debit Card | Walmart | 64300 · Meals and Entertainment | 77.13 | 851,714.84 |
| Deposit | 05/27/2014 | | | 13400 · Retainage Receivable | 2,200,000.00 | 3,051,714.84 |
| Check | 05/27/2014 | ACH | Bonaventure 22, LLC | 66765 · Developer | 1,100,000.00 | 1,951,714.84 |
| Check | 05/27/2014 | ACH | Regions Bank | 60400 · Bank Service Charges | 15.00 | 1,951,699.84 |
| Check | 05/28/2014 | Debit Card | Image Beauty | 64700 · Miscellaneous Expense | 53.63 | 1,951,646.21 |
| Check | 05/29/2014 | Debit Card | Checkmate | 65750 · Consultant | 22.85 | 1,951,623.35 |
| Check | 05/29/2014 | Debit Card | Bal Harbour Qua | 68425 · Accommodations | 174.83 | 1,951,448.52 |
| Check | 05/29/2014 | Debit Card | Bal Harbour Qua | 68425 · Accommodations | 111.00 | 1,951,337.52 |
| Check | 05/29/2014 | Debit Card | L.A. Gold Leaf | 67200 · Repairs and Maintenance | 190.05 | 1,951,147.47 |
| Check | 05/29/2014 | Debit Card | The Company Corporation | 66790 · Registered Agent | 168.00 | 1,950,979.47 |
| Check | 05/29/2014 | Debit Card | The Company Corporation | 66790 · Registered Agent | 50.00 | 1,950,929.47 |
| Check | 05/30/2014 | 1096 | 140 Brazilian LLC | 15500 · Company Acquisition | 0.00 | 1,950,929.47 |
| Check | 05/30/2014 | Debit Card | Citgo | 60110 · Petrol | 74.60 | 1,950,853.87 |
| Check | 05/30/2014 | Debit Card | Bal Harbour Qua | 68425 · Accommodations | 9.95 | 1,950,843.92 |
| Bill Pmt -Check | 05/30/2014 | 1087 | IODI | 20000 · Accounts Payable | 39,750.00 | 1,911,093.92 |
| Check | 05/30/2014 | ACH | New Haven Contracting South | -SPLIT- | 255,000.00 | 1,656,093.92 |
| Check | 05/30/2014 | Petty Cash | Petty Cash | 64300 · Meals and Entertainment | 500.00 | 1,655,593.92 |
| Bill Pmt -Check | 06/01/2014 | 1035 | McWilliams Ballard Florida | 20000 · Accounts Payable | 2,050.00 | 1,653,543.92 |
| Check | 06/02/2014 | Debit Card | Contractor Classes | 62000 · Continuing Education | 1,924.71 | 1,651,619.21 |
| Check | 06/02/2014 | Debit Card | Marathon Petrol | 60110 · Petrol | 70.01 | 1,651,549.20 |
| Check | 06/02/2014 | Debit Card | Bal Harbour Qua | 68425 · Accommodations | 9.95 | 1,651,539.25 |
| Check | 06/02/2014 | Debit Card | Chevron | 60110 · Petrol | 66.26 | 1,651,772.99 |
| Check | 06/02/2014 | Debit Card | PB Grill | 64300 · Meals and Entertainment | 314.88 | 1,651,396.12 |
| Deposit | 06/02/2014 | | | 65750 · Consultant | 22.86 | 1,651,420.98 |
| Deposit | 06/03/2014 | | | 13400 · Retainage Receivable | 1,000,000.00 | 2,651,420.98 |
| Check | 06/03/2014 | ACH | New Haven Contracting South | -SPLIT- | 100,000.00 | 2,551,420.98 |
| Bill Pmt -Check | 06/03/2014 | 1089 | McDonald Hopkins LLC | 20000 · Accounts Payable | 15,973.62 | 2,535,447.36 |
| Check | 06/04/2014 | ACH | Regions Bank | 60400 · Bank Service Charges | 15.00 | 2,535,432.36 |
| Check | 06/04/2014 | Debit Card | Chevron | 60110 · Petrol | 83.89 | 2,535,362.47 |
| Bill Pmt -Check | 06/05/2014 | 1088 | McWilliams Ballard Florida | 20000 · Accounts Payable | 2,050.00 | 2,533,312.47 |
| Check | 06/05/2014 | Wire XFER | New Haven Contracting South | -SPLIT- | 845,000.00 | 1,688,312.47 |
| Check | 06/05/2014 | Debit Card | Shell Oil | 60110 · Petrol | 64.37 | 1,688,248.10 |
| Check | 06/05/2014 | ACH | Regions Bank | 60400 · Bank Service Charges | 20.00 | 1,688,228.10 |
| Bill Pmt -Check | 06/05/2014 | 1094 | AIG Private Client Group | 20000 · Accounts Payable | 36,133.35 | 1,652,094.75 |
| Bill Pmt -Check | 06/06/2014 | 1095 | City of West Palm Beach | 20000 · Accounts Payable | 158.00 | 1,651,936.75 |
| Bill Pmt -Check | 06/06/2014 | 1096 | The Mar-a-Lago Club, L.C. | 20000 · Accounts Payable | 1,843.85 | 1,650,092.80 |
| Bill Pmt -Check | 06/06/2014 | 1097 | Toll-By-Plate | 20000 · Accounts Payable | 38.70 | 1,650,054.10 |
| Bill Pmt -Check | 06/06/2014 | 1098 | Town of Palm Beach Finance Department | 20000 · Accounts Payable | 100.00 | 1,649,954.10 |

| Type | Date | Name | Account | Amount | Balance |
|---|---|---|---|---|---|
| Check | 06/09/2014 ACH | AT&T Mobility | 68180 · Telephone Expense | 788.18 | 1,649,165.92 |
| Check | 06/09/2014 Debit Card | The Scuba Club | 64300 · Meals and Entertainment | 58.29 | 1,649,107.63 |
| Check | 06/09/2014 Debit Card | AT&T Mobility | 68180 · Telephone Expense | 115.52 | 1,648,992.11 |
| Check | 06/09/2014 Debit Card | Best Buy | 15400 · Computer Hardware | 671.96 | 1,648,320.15 |
| Check | 06/09/2014 ACH | Regions Bank | 60400 · Bank Service Charges | 35.00 | 1,648,285.15 |
| Check | 06/10/2014 Debit Card | Sirus XM | 61750 · Software | 68.51 | 1,648,216.64 |
| Check | 06/10/2014 Debit Card | Walmart | 63560 · Supplies | 69.93 | 1,648,146.71 |
| Check | 06/10/2014 Debit Card | Staples | 64000 · Office Supplies | 44.08 | 1,648,102.63 |
| Check | 06/10/2014 Debit Card | Adobe | 61750 · Software | 19.99 | 1,648,082.64 |
| Check | 06/10/2014 ACH | International Yacht Collection, LLC | 15100 · TPH Club Yacht | 1,000,000.00 | 648,082.64 |
| Check | 06/12/2014 Debit Card | Chevron | 60110 · Petrol | 76.46 | 648,006.18 |
| Check | 06/13/2014 Debit Card | Hotels.com | 68425 · Accommodations | 131.19 | 647,874.99 |
| Check | 06/13/2014 Debit Card | Hyatt Place Miami | 68425 · Accommodations | 15.00 | 647,859.99 |
| Check | 06/13/2014 Debit Card | Hyatt Place Miami | 68425 · Accommodations | 91.93 | 647,768.06 |
| Check | 06/13/2014 ACH | New Haven Contracting South | -SPLIT- | 200,000.00 | 447,768.06 |
| Bill Pmt -Check | 06/15/2014 1109 | The New York Times | 20000 · Accounts Payable | 36.46 | 447,731.60 |
| Check | 06/16/2014 Debit Card | Staples | 64000 · Office Supplies | 40.17 | 447,691.43 |
| Check | 06/16/2014 Debit Card | I Drive Safely | 60120 · Tolls, Parking, Fees | 59.00 | 447,632.53 |
| Check | 06/16/2014 Debit Card | Hotels.com | 68425 · Accommodations | 114.30 | 447,518.23 |
| Check | 06/16/2014 Debit Card | Provident | 64700 · Miscellaneous Expense | 24.05 | 447,494.18 |
| Check | 06/16/2014 Debit Card | Chevron | 60110 · Petrol | 66.56 | 447,427.62 |
| Check | 06/16/2014 Debit Card | Chevron | 60110 · Petrol | 72.43 | 447,355.19 |
| Check | 06/16/2014 Debit Card | Sirus XM | 61750 · Software | 11.42 | 447,343.77 |
| Check | 06/17/2014 Debit Card | Google | 61800 · Internet | 1.99 | 447,341.78 |
| Check | 06/17/2014 Debit Card | Downtown BP | 60110 · Petrol | 38.78 | 447,303.00 |
| Check | 06/17/2014 Debit Card | The Company Corporation | 66790 · Registered Agent | 184.00 | 447,119.00 |
| Check | 06/18/2014 Debit Card | Federal BP | 60110 · Petrol | 65.25 | 447,053.75 |
| Check | 06/19/2014 Debit Card | Taco Tavern LLC | 64300 · Meals and Entertainment | 49.29 | 447,004.46 |
| Deposit | 06/19/2014 | | 13400 · Retainage Receivable | 1,000,000.00 | 1,447,004.46 |
| Check | 06/19/2014 ACH | Regions Bank | 60400 · Bank Service Charges | 15.00 | 1,446,989.46 |
| Check | 06/20/2014 Debit Card | Chevron | 60110 · Petrol | 82.52 | 1,446,906.94 |
| Check | 06/20/2014 ACH | New Haven Contracting South | -SPLIT- | 300,000.00 | 1,146,906.94 |
| Check | 06/20/2014 Debit Card | Rocco's Taco | 64300 · Meals and Entertainment | 59.29 | 1,146,847.65 |
| Bill Pmt -Check | 06/20/2014 1112 | Marine Documentation, Inc. | 20000 · Accounts Payable | 6,480.00 | 1,140,367.65 |
| Check | 06/23/2014 Debit Card | Hotels.com | 68425 · Accommodations | 108.48 | 1,140,259.17 |
| Check | 06/23/2014 Debit Card | Chevron | 60110 · Petrol | 67.06 | 1,140,192.12 |
| Check | 06/23/2014 Debit Card | Okeechobee Patrol | 60110 · Petrol | 76.21 | 1,140,115.91 |
| Check | 06/23/2014 Debit Card | Candlewood Suites | 68425 · Accommodations | 25.00 | 1,140,090.91 |
| Check | 06/23/2014 Debit Card | Waterview Dental | 63325 · Dental Insurance | 685.00 | 1,139,405.91 |
| Check | 06/23/2014 1090 | Petty Cash | 30700 · Members Draw | 2,000.00 | 1,137,405.91 |
| Check | 06/23/2014 Petty Cash | Petty Cash | 30700 · Members Draw | 5,000.00 | 1,132,405.91 |
| Check | 06/23/2014 Debit Card | British Airways | 68450 · Airfare | 10,837.88 | 1,121,568.06 |
| Check | 06/23/2014 Debit Card | British Airways | 68450 · Airfare | 10,837.88 | 1,110,730.19 |
| Check | 06/23/2014 1091 | Gerry D. Matthews | 68450 · Airfare | 10,837.86 | 1,099,892.33 |
| Check | 06/23/2014 1092 | Gerry D. Matthews | 68450 · Airfare | 12,717.46 | 1,087,174.87 |
| Bill Pmt -Check | 06/24/2014 1093 | Town of Palm Beach Marine | 20000 · Accounts Payable | 100.00 | 1,087,074.87 |
| Deposit | 06/24/2014 | | 13400 · Retainage Receivable | 750,000.00 | 1,837,074.87 |
| Check | 06/24/2014 ACH | New Haven Contracting South | -SPLIT- | 325,000.00 | 1,512,074.87 |
| Check | 06/24/2014 ACH | Regions Bank | 60400 · Bank Service Charges | 15.00 | 1,512,059.87 |
| Check | 06/25/2014 Wire XFER | Ryan Black | 10550 · Loan to Ryan Black | 50,000.00 | 1,462,059.87 |
| Check | 06/25/2014 Debit Card | Chevron | 60110 · Petrol | 80.20 | 1,461,979.67 |
| Check | 06/25/2014 Debit Card | Staples | 64000 · Office Supplies | 411.09 | 1,461,568.58 |
| Check | 06/26/2014 ACH | Regions Bank | 60400 · Bank Service Charges | 10.00 | 1,461,558.58 |
| Check | 06/26/2014 ACH | Regions Bank | 60400 · Bank Service Charges | 43.35 | 1,461,515.23 |
| Check | 06/26/2014 ACH | Regions Bank | 60400 · Bank Service Charges | 17.96 | 1,461,497.27 |
| Check | 06/26/2014 Debit Card | Easy Jet | 68450 · Airfare | 1,445.05 | 1,460,052.22 |
| Check | 06/26/2014 Debit Card | Top Shop | 62800 · Gift | 598.62 | 1,459,453.60 |
| Check | 06/27/2014 Debit Card | XO – Eileen's Travel | 68450 · Airfare | 45.00 | 1,459,408.60 |

| Type | Date/Card | Payee | Account | | | Balance |
|---|---|---|---|---|---|---|
| Check | 06/27/2014 Debit Card | XD - Edsen's Travel | 68450 - Airline | | 100.00 | 1,458,306.60 |
| Check | 06/27/2014 Debit Card | Harvey Nichols | 62600 - Gift | | 105.45 | 1,458,203.15 |
| Check | 06/27/2014 Debit Card | Harvey Nichols | 64300 - Meals and Entertainment | | 1,099.01 | 1,458,104.14 |
| Check | 06/27/2014 Debit Card | ABC | 62600 - Gift | | 39.95 | 1,458,064.19 |
| Check | 06/27/2014 Debit Card | Boots | 62600 - Gift | | 436.49 | 1,457,627.70 |
| Check | 06/27/2014 ACH | Regions Bank | 60400 - Bank Service Charges | | 3.16 | 1,457,624.54 |
| Check | 06/27/2014 ACH | Regions Bank | 60400 - Bank Service Charges | | 32.97 | 1,457,591.57 |
| Check | 06/27/2014 Debit Card | Air France | 68450 - Airline | | 201.50 | 1,457,390.07 |
| Check | 06/30/2014 Debit Card | Mandarin Oriental Hotel | 68425 - Accommodations | | 511.57 | 1,456,878.10 |
| Check | 06/30/2014 Debit Card | Mandarin Oriental Hotel | 68425 - Accommodations | | 10,654.32 | 1,446,223.78 |
| Check | 06/30/2014 Debit Card | Aklo Limusine | 68475 - Taxi, Shuttle, Limo | | 300.34 | 1,445,923.44 |
| Check | 06/30/2014 Debit Card | Capri Tiberio Hotel | 68425 - Accommodations | | 2,048.82 | 1,443,874.58 |
| Check | 06/30/2014 Debit Card | Capri Tiberio Hotel | 68425 - Accommodations | | 2,048.86 | 1,441,825.72 |
| Check | 06/30/2014 Debit Card | Cape Air | 68450 - Airline | | 717.00 | 1,441,108.72 |
| Check | 06/30/2014 ACH | Regions Bank | 60400 - Bank Service Charges | | 8.01 | 1,441,009.71 |
| Check | 06/30/2014 ACH | Regions Bank | 60400 - Bank Service Charges | | 13.09 | 1,441,068.62 |
| Deposit | 06/30/2014 | | 62600 - Gift | 160.25 | | 1,441,256.87 |
| Deposit | 06/30/2014 | | 68450 - Airline | 566.00 | | 1,441,832.87 |
| Deposit | 07/01/2014 | | 13400 - Retainage Receivable | 750,000.00 | | 2,191,832.87 |
| Check | 07/01/2014 Debit Card | British Airways | 68450 - Airline | | 1.71 | 2,191,831.16 |
| Check | 07/01/2014 Debit Card | Hotel E Ristorante D | 68425 - Accommodations | | 5,251.36 | 2,186,579.80 |
| Check | 07/01/2014 Debit Card | Don Alfonso | 68425 - Accommodations | | 61.58 | 2,186,518.22 |
| Check | 07/01/2014 Debit Card | GEBCAB | 60130 - Car Service | | 93.60 | 2,186,424.62 |
| Check | 07/01/2014 Debit Card | GESCAB | 60130 - Car Service | | 10.95 | 2,186,413.67 |
| Check | 07/01/2014 ACH | Regions Bank | 60400 - Bank Service Charges | | 61.47 | 2,186,352.20 |
| Check | 07/01/2014 ACH | Regions Bank | 60400 - Bank Service Charges | | 61.47 | 2,186,290.73 |
| Check | 07/01/2014 ACH | Regions Bank | 60400 - Bank Service Charges | | 319.63 | 2,185,971.10 |
| Check | 07/02/2014 Debit Card | Easy Jet | 68450 - Airline | | 234.74 | 2,185,736.36 |
| Check | 07/02/2014 Debit Card | Farmacia Quiss | 63320 - Health Insurance | | 90.96 | 2,186,845.40 |
| Check | 07/02/2014 Debit Card | Carthusia | 64700 - Miscellaneous Expense | | 34.25 | 2,185,611.15 |
| Check | 07/02/2014 Debit Card | Wia Transfer | 60120 - Tolls, Parking, Fees | | 164.38 | 2,185,446.77 |
| Check | 07/02/2014 Debit Card | Ristorante il G | 64300 - Meals and Entertainment | | 359.18 | 2,185,087.59 |
| Check | 07/02/2014 ACH | New Haven Contracting South | -SPLIT- | | 150,000.00 | 2,035,067.59 |
| Check | 07/02/2014 ACH | Regions Bank | 60400 - Bank Service Charges | | 1.03 | 2,035,086.56 |
| Check | 07/02/2014 ACH | Regions Bank | 60400 - Bank Service Charges | | 2.73 | 2,035,083.83 |
| Check | 07/02/2014 ACH | Regions Bank | 60400 - Bank Service Charges | | 4.93 | 2,035,078.90 |
| Check | 07/02/2014 ACH | Regions Bank | 60400 - Bank Service Charges | | 7.04 | 2,035,071.86 |
| Check | 07/02/2014 ACH | Regions Bank | 60400 - Bank Service Charges | | 10.76 | 2,035,061.08 |
| Check | 07/02/2014 ACH | Regions Bank | 60400 - Bank Service Charges | | 157.54 | 2,034,903.54 |
| Check | 07/02/2014 ACH | Regions Bank | 60400 - Bank Service Charges | | 15.00 | 2,034,888.54 |
| Check | 07/03/2014 ACH | New Haven Contracting South | -SPLIT- | | 200,000.00 | 1,834,888.54 |
| Check | 07/03/2014 Debit Card | CapGolfe DIF | 60130 - Car Service | | 54.74 | 1,834,833.80 |
| Check | 07/03/2014 Debit Card | Il Napoli | 30700 - Members Draw | | 342.12 | 1,834,491.68 |
| Check | 07/03/2014 ACH | Regions Bank | 60400 - Bank Service Charges | | 0.33 | 1,834,491.35 |
| Check | 07/03/2014 ACH | Regions Bank | 60400 - Bank Service Charges | | 1.64 | 1,834,489.71 |
| Check | 07/03/2014 ACH | Regions Bank | 60400 - Bank Service Charges | | 1.85 | 1,834,487.86 |
| Check | 07/03/2014 ACH | Regions Bank | 60400 - Bank Service Charges | | 2.81 | 1,834,485.05 |
| Check | 07/03/2014 ACH | Regions Bank | 60400 - Bank Service Charges | | 5.00 | 1,834,480.05 |
| Bill Pmt -Check | 07/04/2014 1102 | Persona Public Relations, Inc. | 20000 - Accounts Payable | | 2,500.00 | 1,831,980.05 |
| Check | 07/07/2014 Debit Card | De Paolino Ristorante | 64300 - Meals and Entertainment | | 416.89 | 1,831,563.16 |
| Check | 07/07/2014 Debit Card | Capri Tiberio Hotel | 68425 - Accommodations | | 8,266.12 | 1,823,297.04 |
| Check | 07/07/2014 Debit Card | De Lisa | 64700 - Miscellaneous Expense | | 135.13 | 1,823,160.91 |
| Check | 07/07/2014 Debit Card | Amalfi Drive SN | 64300 - Meals and Entertainment | | 653.40 | 1,822,507.51 |
| Check | 07/07/2014 Debit Card | Carthusia | 64700 - Miscellaneous Expense | | 190.56 | 1,822,316.93 |
| Check | 07/07/2014 Debit Card | Beauf Sur Tel | 64300 - Meals and Entertainment | | 319.03 | 1,821,997.90 |
| Check | 07/07/2014 Debit Card | Sari Les Marvai | 64700 - Miscellaneous Expense | | 4,764.41 | 1,817,233.44 |
| Check | 07/07/2014 Debit Card | Le Deauvila 3 | 64700 - Miscellaneous Expense | | 188.25 | 1,817,045.19 |
| Check | 07/07/2014 Debit Card | Chateau de Vara | 64700 - Miscellaneous Expense | | 43.56 | 1,817,001.63 |

| Type | Date | Name | Account | | Amount | Balance |
|---|---|---|---|---|---|---|
| Check | 07/07/2014 Debit Card | Le Lido | 64300 · Meals and Entertainment | | 1,294.16 | 1,815,707.47 |
| Check | 07/07/2014 ACH | Regions Bank | 60400 · Bank Service Charges | | 4.08 | 1,815,703.39 |
| Check | 07/07/2014 ACH | Regions Bank | 60400 · Bank Service Charges | | 5.72 | 1,815,697.67 |
| Check | 07/07/2014 ACH | Regions Bank | 60400 · Bank Service Charges | | 9.57 | 1,815,688.10 |
| Check | 07/07/2014 ACH | Regions Bank | 60400 · Bank Service Charges | | 12.51 | 1,815,675.59 |
| Check | 07/07/2014 ACH | Regions Bank | 60400 · Bank Service Charges | | 18.60 | 1,815,655.99 |
| Check | 07/07/2014 ACH | Regions Bank | 60400 · Bank Service Charges | | 142.93 | 1,815,513.06 |
| Check | 07/07/2014 ACH | Regions Bank | 60400 · Bank Service Charges | | 247.98 | 1,815,265.08 |
| Bill Pmt -Check | 07/07/2014 1103 | The Seventh Art | 20000 · Accounts Payable | | 25,000.00 | 1,790,265.08 |
| Check | 07/08/2014 ACH | New Haven Contracting South | -SPLIT- | | 450,000.00 | 1,340,265.08 |
| Check | 07/08/2014 Debit Card | Galerie Lafayette | 62600 · Gift | | 862.43 | 1,339,402.65 |
| Check | 07/08/2014 Debit Card | AT&T Mobility | 85100 · Telephone Expense | | 115.10 | 1,339,288.55 |
| Check | 07/08/2014 Debit Card | Budget | 60130 · Car Service | | 927.11 | 1,338,360.44 |
| Deposit | 07/08/2014 | | 60130 · Car Service | 120.51 | | 1,338,470.95 |
| Check | 07/08/2014 ACH | Regions Bank | 60400 · Bank Service Charges | | 1.31 | 1,338,479.64 |
| Check | 07/08/2014 ACH | Regions Bank | 60400 · Bank Service Charges | | 5.65 | 1,338,472.99 |
| Check | 07/08/2014 ACH | Regions Bank | 60400 · Bank Service Charges | | 25.87 | 1,338,447.12 |
| Check | 07/08/2014 ACH | Regions Bank | 60400 · Bank Service Charges | | 38.62 | 1,338,408.50 |
| Check | 07/08/2014 Debit Card | AT&T Mobility | 85100 · Telephone Expense | | 456.28 | 1,337,952.02 |
| Deposit | 07/08/2014 | | 67110 · Managing Director | 2,650.00 | | 1,340,602.02 |
| Check | 07/08/2014 Petty Cash | Petty Cash | 64300 · Meals and Entertainment | | 500.00 | 1,339,502.02 |
| Check | 07/08/2014 Debit Card | Galerie Lafayette | 64300 · Meals and Entertainment | | 1,341.43 | 1,338,160.59 |
| Check | 07/09/2014 Debit Card | Hotel Daniel Paris | 68425 · Accommodations | | 6,968.98 | 1,331,191.61 |
| Check | 07/09/2014 Debit Card | Air France | 68450 · Airline | | 95.56 | 1,331,096.05 |
| Check | 07/09/2014 ACH | Regions Bank | 60400 · Bank Service Charges | | 40.24 | 1,331,055.81 |
| Check | 07/09/2014 ACH | Regions Bank | 60400 · Bank Service Charges | | 35.00 | 1,331,020.81 |
| Check | 07/10/2014 Debit Card | EZE Connections | 65750 · Consultant | | 545.02 | 1,330,475.79 |
| Check | 07/10/2014 Debit Card | Adobe | 61750 · Software | | 19.99 | 1,330,455.80 |
| Deposit | 07/10/2014 | | 13460 · Retainage Receivable | 750,000.00 | | 2,080,455.80 |
| Check | 07/10/2014 Debit Card | Staples | 63500 · Janitorial Expense | | 60.75 | 2,080,395.04 |
| Check | 07/10/2014 ACH | International Yacht Collection, LLC | 15100 · TPH Club Yacht | | 1,018,030.00 | 1,062,365.04 |
| Check | 07/10/2014 Debit Card | Mr. Sishey Vcto | 65750 · Consultant | | 58.99 | 1,062,306.06 |
| Check | 07/10/2014 ACH | Regions Bank | 60400 · Bank Service Charges | | 1.77 | 1,062,304.31 |
| Check | 07/10/2014 ACH | Regions Bank | 60400 · Bank Service Charges | | 209.07 | 1,062,095.24 |
| Check | 07/10/2014 ACH | Regions Bank | 60400 · Bank Service Charges | | 15.00 | 1,062,083.24 |
| Check | 07/11/2014 Debit Card | Lord & Taylor | 63500 · Janitorial Expense | | 89.04 | 1,061,991.20 |
| Check | 07/11/2014 Debit Card | British Airways | 68450 · Airline | | 98.00 | 1,061,893.20 |
| Check | 07/11/2014 ACH | Regions Bank | 60400 · Bank Service Charges | | 2.87 | 1,061,890.33 |
| Check | 07/14/2014 Debit Card | Jet Blue | 68450 · Airline | | 393.00 | 1,061,497.33 |
| Check | 07/14/2014 Debit Card | Senequier Saint | 62600 · Gift | | 159.60 | 1,061,337.73 |
| Check | 07/14/2014 Debit Card | FAFI Villa Romana | 64300 · Meals and Entertainment | | 691.13 | 1,060,646.60 |
| Check | 07/14/2014 Debit Card | Smarte Carte | 68475 · Taxi, Shuttle, Limo | | 6.50 | 1,060,641.60 |
| Bill Pmt -Check | 07/14/2014 1101 | Overseas Insurance Agency | 20000 · Accounts Payable | | 30,615.91 | 1,030,025.69 |
| Check | 07/14/2014 ACH | Regions Bank | 60400 · Bank Service Charges | | 5.09 | 1,030,020.60 |
| Check | 07/14/2014 ACH | Regions Bank | 60400 · Bank Service Charges | | 20.43 | 1,030,000.17 |
| Check | 07/15/2014 Debit Card | Sirius XM | 61750 · Software | | 11.42 | 1,029,988.75 |
| Check | 07/15/2014 XFER | Palm House PB, LLC | 15100 · TPH Club Yacht | | 10,000.00 | 1,019,988.75 |
| Check | 07/15/2014 Debit Card | Panera | 64300 · Meals and Entertainment | | 31.55 | 1,019,957.20 |
| Check | 07/15/2014 ACH | Regions Bank | 60400 · Bank Service Charges | | 2.94 | 1,019,954.26 |
| Bill Pmt -Check | 07/15/2014 1104 | Florida Blue | 20000 · Accounts Payable | | 3,832.46 | 1,016,121.80 |
| Bill Pmt -Check | 07/15/2014 1105 | Toll-By-Plate | 20000 · Accounts Payable | | 8.37 | 1,016,112.43 |
| Bill Pmt -Check | 07/15/2014 1106 | Town & Country | 20000 · Accounts Payable | | 21.97 | 1,016,090.46 |
| Bill Pmt -Check | 07/15/2014 1107 | Florida Blue | 20000 · Accounts Payable | | 342.36 | 1,015,748.10 |
| Check | 07/15/2014 Debit Card | Nantucket Steamship Authority | 60130 · Car Service | | 535.00 | 1,015,213.10 |
| Check | 07/16/2014 ACH | Regions Bank | 60400 · Bank Service Charges | | 16.35 | 1,015,196.75 |
| Check | 07/17/2014 Debit Card | Barneys New York | 62600 · Gift | | 849.11 | 1,014,347.64 |
| Check | 07/17/2014 Debit Card | Sunoco | 60110 · Petrol | | 90.48 | 1,014,257.16 |
| Check | 07/17/2014 Debit Card | Google | 61800 · Internet | | 1.99 | 1,014,255.19 |

| Type | Date | Method | Name | Account | Amount | Balance |
|---|---|---|---|---|---|---|
| Check | 07/17/2014 Debit Card | LAZ Parking | | 60120 · Tolls, Parking, Fees | 15.00 | 1,014,240.18 |
| Check | 07/17/2014 Debit Card | Sunoco | | 50110 · Petrol | 44.64 | 1,014,195.55 |
| Check | 07/17/2014 Debit Card | BCBG | | 62500 · Gift | 151.83 | 1,014,043.72 |
| Check | 07/17/2014 Debit Card | Gulf Mart | | 64700 · Miscellaneous Expense | 33.02 | 1,014,010.70 |
| Check | 07/17/2014 Debit Card | Gulf Mart | | 64700 · Miscellaneous Expense | 27.22 | 1,013,983.48 |
| Check | 07/17/2014 Debit Card | Nantucket Steamship Authority | | 60130 · Car Service | 15.00 | 1,013,968.48 |
| Check | 07/17/2014 ACH | New Haven Contracting South | | -SPLIT- | 350,000.00 | 663,968.48 |
| Check | 07/17/2014 Debit Card | Sirius XM | | 61750 · Software | 218.64 | 663,749.84 |
| Deposit | 07/18/2014 | | | 13400 · Retonaga Receivable | 750,000.00 | 1,413,749.84 |
| Check | 07/18/2014 Debit Card | Exxon Mobil | | 50110 · Petrol | 45.42 | 1,413,704.42 |
| Check | 07/18/2014 Debit Card | Exxon Mobil | | 50110 · Petrol | 3.71 | 1,413,700.71 |
| Check | 07/18/2014 Debit Card | Intelius | | 66750 · Consultant | 3.95 | 1,413,696.76 |
| Check | 07/18/2014 Debit Card | Intelius | | 66750 · Consultant | 3.95 | 1,413,692.81 |
| Check | 07/18/2014 Debit Card | Intelius | | 66750 · Consultant | 3.95 | 1,413,688.86 |
| Check | 07/18/2014 Debit Card | Intelius | | 66750 · Consultant | 3.95 | 1,413,684.91 |
| Check | 07/18/2014 Debit Card | Intelius | | 86750 · Consultant | 3.95 | 1,413,680.96 |
| Check | 07/18/2014 Debit Card | Intelius | | 66750 · Consultant | 3.95 | 1,413,677.01 |
| Check | 07/18/2014 Debit Card | Intelius | | 66750 · Consultant | 3.95 | 1,413,673.06 |
| Check | 07/18/2014 Debit Card | Intelius | | 66750 · Consultant | 3.95 | 1,413,669.11 |
| Check | 07/18/2014 Debit Card | Nantucket Steamship Authority | | 60130 · Car Service | 73.00 | 1,413,596.11 |
| Check | 07/18/2014 Debit Card | Hy-Line Cruises | | 60130 · Car Service | 82.00 | 1,413,514.11 |
| Check | 07/18/2014 ACH | Regions Bank | | 60400 · Bank Service Charges | 15.00 | 1,413,499.11 |
| Check | 07/21/2014 Debit Card | Walmart | | 63500 · Janitorial Expense | 35.73 | 1,413,463.38 |
| Check | 07/21/2014 Debit Card | Intelius | | 66750 · Consultant | 3.95 | 1,413,459.43 |
| Check | 07/21/2014 Debit Card | Intelius | | 66750 · Consultant | 3.95 | 1,413,455.48 |
| Check | 07/21/2014 Debit Card | Intelius | | 86750 · Consultant | 3.95 | 1,413,451.53 |
| Check | 07/21/2014 Debit Card | Intelius | | 66750 · Consultant | 3.95 | 1,413,447.58 |
| Check | 07/21/2014 Debit Card | Intelius | | 66750 · Consultant | 3.95 | 1,413,443.63 |
| Check | 07/21/2014 Debit Card | Intelius | | 66750 · Consultant | 3.95 | 1,413,439.68 |
| Check | 07/22/2014 ACH | New Haven Contracting South | | -SPLIT- | 200,000.00 | 1,213,438.68 |
| Check | 07/22/2014 Wire XFER | Eadler & Co | | 66001 · PR Services | 3,867.32 | 1,209,571.66 |
| Check | 07/22/2014 ACH | Palm House PB, LLC | | 15100 · TPH Club Yacht | 10,000.00 | 1,199,571.66 |
| Check | 07/22/2014 ACH | Regions Bank | | 60400 · Bank Service Charges | 25.00 | 1,199,546.66 |
| Check | 07/23/2014 Debit Card | The UPS Store | | 66500 · Postage and Delivery | 14.53 | 1,199,532.33 |
| Check | 07/23/2014 Debit Card | Shell Oil | | 50110 · Petrol | 50.54 | 1,199,481.79 |
| Check | 07/23/2014 Debit Card | Smarte Carte | | 60475 · Taxi, Shuttle, Limo | 4.00 | 1,199,477.79 |
| Check | 07/23/2014 Debit Card | UniversalWilde | | 60020 · Marketing Materials | 20,000.00 | 1,179,477.79 |
| Check | 07/23/2014 Wire XFER | LC Palm Beach LLC | | 66787 · La Cirque | 122,000.00 | 1,057,477.79 |
| Check | 07/24/2014 Debit Card | Dune Restaurant | | 64300 · Meals and Entertainment | 423.22 | 1,057,054.57 |
| Check | 07/24/2014 Debit Card | Intelius | | 66750 · Consultant | 3.95 | 1,057,050.62 |
| Check | 07/24/2014 Debit Card | Expedia | | 68450 · Airline | 1.00 | 1,057,049.62 |
| Check | 07/24/2014 Debit Card | Travel Reservations | | 68450 · Airline | 156.07 | 1,056,893.55 |
| Check | 07/24/2014 Debit Card | United Airlines | | 68450 · Airline | 1,797.40 | 1,055,096.15 |
| Check | 07/24/2014 Debit Card | Budget | | 60130 · Car Service | 937.80 | 1,054,158.35 |
| Check | 07/24/2014 Debit Card | Hotel Cervo Sardinia | | 68425 · Accommodations | 8,369.03 | 1,045,789.32 |
| Bill Pmt -Check | 07/24/2014 1110 | Nikki Parish | | 20000 · Accounts Payable | 250.00 | 1,045,539.32 |
| Check | 07/25/2014 Debit Card | Vista South America | | 68450 · Airline | 8,963.60 | 1,036,575.72 |
| Check | 07/25/2014 ACH | New Haven Contracting South | | -SPLIT- | 110,000.00 | 926,575.72 |
| Check | 07/28/2014 Debit Card | Pizzeria Mozza | | 64300 · Meals and Entertainment | 208.31 | 926,367.41 |
| Check | 07/28/2014 Debit Card | Al Italia | | 68450 · Airline | 8,425.80 | 917,940.61 |
| Check | 07/28/2014 Debit Card | Airlines Repor | | 68450 · Airline | 98.00 | 917,844.61 |
| Check | 07/28/2014 Debit Card | Airlines Repor | | 68450 · Airline | 20.00 | 917,824.61 |
| Check | 07/28/2014 Debit Card | Meridiana | | 68450 · Airline | 420.40 | 917,404.21 |
| Check | 07/28/2014 Debit Card | Hatchs Package | | 64300 · Meals and Entertainment | 381.00 | 917,023.18 |
| Check | 07/28/2014 Debit Card | Maxfield Bleu | | 62500 · Gift | 2,691.21 | 914,331.97 |
| Check | 07/28/2014 Debit Card | United Airlines | | 68450 · Airline | 474.50 | 913,857.47 |
| Check | 07/28/2014 Debit Card | ABC | | 62560 · Gift | 39.95 | 913,817.52 |
| Check | 07/28/2014 Debit Card | Summer House | | 64300 · Meals and Entertainment | 209.06 | 913,608.46 |

| Type | Date/Num | Name | Account | Amount1 | Amount2 | Balance |
|---|---|---|---|---|---|---|
| Check | 07/28/2014 Debit Card | 1 & 1 Internet | 61800 · Internet | | 50.79 | 913,551.67 |
| Bill Pmt -Check | 07/28/2014 1111 | Marco Beno | 20000 · Accounts Payable | | 29,349.79 | 884,201.88 |
| Check | 07/28/2014 ACH | Regions Bank | 60400 · Bank Service Charges | | 251.07 | 883,950.81 |
| Deposit | 07/28/2014 | | 58450 · Airline | 92.07 | | 884,042.88 |
| Deposit | 07/28/2014 | | 58450 · Airline | 400.00 | | 884,442.88 |
| Check | 07/29/2014 Debit Card | Jet Blue | 58450 · Airline | | 282.66 | 884,160.28 |
| Check | 07/29/2014 Debit Card | Summer House | 64300 · Meals and Entertainment | | 297.71 | 883,862.57 |
| Check | 07/29/2014 ACH | New Haven Contracting South | -SPLIT- | | 200,000.00 | 683,862.57 |
| Check | 07/29/2014 Wire XFER | Luxury Attache | 66750 · Consultant | | 22,000.00 | 661,862.57 |
| Check | 07/29/2014 Debit Card | Delta Airlines | 58450 · Airline | | 765.60 | 661,106.97 |
| Check | 07/29/2014 ACH | Regions Bank | 60400 · Bank Service Charges | | 10.00 | 661,096.97 |
| Check | 07/29/2014 ACH | Regions Bank | 60400 · Bank Service Charges | | 10.00 | 661,086.97 |
| Check | 07/29/2014 ACH | Regions Bank | 60400 · Bank Service Charges | | 12.61 | 661,074.36 |
| Check | 07/30/2014 Wire XFER | Monica Venegas | 66750 · Consultant | | 10,000.00 | 651,074.36 |
| Check | 07/30/2014 ACH | Palm House PB, LLC | 15100 · TPH Club Yacht | | 10,000.00 | 641,074.36 |
| Check | 07/30/2014 Debit Card | American Eagle Embroidery | 60030 · Events | | 1,650.00 | 639,424.36 |
| Bill Pmt -Check | 07/30/2014 1113 | Palm Harbor Marina | 20000 · Accounts Payable | | 153,118.33 | 486,306.03 |
| Check | 07/30/2014 Debit Card | Braman Motorcars Palm Beach | 60115 · Repair & Maintenance | | 13,114.21 | 473,191.82 |
| Check | 07/30/2014 ACH | Regions Bank | 60400 · Bank Service Charges | | 10.00 | 473,181.82 |
| Check | 07/30/2014 ACH | Regions Bank | 60400 · Bank Service Charges | | 10.00 | 473,171.82 |
| Deposit | 07/31/2014 | | 60130 · Car Service | 500.83 | | 473,672.65 |
| Check | 05/01/2014 ACH | Palm House PB, LLC | 15100 · TPH Club Yacht | | 20,000.00 | 453,672.65 |
| Bill Pmt -Check | 08/01/2014 1114 | Bruce R. Ouellette, DDS, PA | 20000 · Accounts Payable | | 934.90 | 452,737.75 |
| Bill Pmt -Check | 08/01/2014 1109 | Persona Public Relations, Inc. | 20000 · Accounts Payable | | 2,500.00 | 450,237.75 |
| Bill Pmt -Check | 08/01/2014 1115 | The New York Times | 20000 · Accounts Payable | | 36.46 | 450,201.29 |
| Bill Pmt -Check | 08/01/2014 1116 | Town of Palm Beach Finance Department | 20000 · Accounts Payable | | 40.00 | 450,161.29 |
| Bill Pmt -Check | 08/01/2014 1124 | Kravis Center | 20000 · Accounts Payable | | 12,500.00 | 437,661.29 |
| Bill Pmt -Check | 08/01/2014 1125 | The Breakers | 20000 · Accounts Payable | | 11,517.94 | 426,143.35 |
| Bill Pmt -Check | 08/01/2014 1128 | The Company Corporation | 20000 · Accounts Payable | | 235.00 | 425,908.35 |
| Check | 08/04/2014 Wire XFER | Kevin Wright | 66750 · Consultant | | 28,579.00 | 397,329.35 |
| Deposit | 08/04/2014 | | 13400 · Ratanapa Receivable | 500,000.00 | | 897,329.35 |
| Check | 08/04/2014 Debit Card | Jet Blue | 58450 · Airline | | 568.60 | 896,760.75 |
| Check | 08/04/2014 Wire XFER | Hospitality Investors Group LLC | 56750 · Consultant | | 20,000.00 | 876,760.75 |
| Check | 08/04/2014 ACH | Regions Bank | 60400 · Bank Service Charges | | 15.00 | 876,745.75 |
| Check | 08/04/2014 ACH | Regions Bank | 60400 · Bank Service Charges | | 10.00 | 876,735.75 |
| Bill Pmt -Check | 08/04/2014 1119 | Florida Blue | 20000 · Accounts Payable | | 1,916.23 | 874,819.52 |
| Check | 08/05/2014 ACH | New Haven Contracting South | -SPLIT- | | 300,000.00 | 574,819.52 |
| Check | 08/05/2014 Debit Card | American Eagle Embroidery | 60030 · Events | | 1,685.00 | 573,134.52 |
| Check | 08/05/2014 Debit Card | Budget | 60130 · Car Service | | 201.45 | 572,933.07 |
| Check | 08/06/2014 Wire XFER | 5B Architects | 66750 · Consultant | | 10,000.00 | 562,933.07 |
| Check | 08/06/2014 Wire XFER | Hospitality Investors Group LLC | 56750 · Consultant | | 4,650.00 | 558,283.07 |
| Check | 08/06/2014 Debit Card | American Eagle Embroidery | 60500 · Postage and Delivery | | 496.00 | 557,787.07 |
| Check | 08/06/2014 Debit Card | BluWire New York | 61725 · Portable Electronic Medium | | 43.54 | 557,743.53 |
| Check | 08/06/2014 Debit Card | Budget | 60130 · Car Service | | 1.50 | 557,742.03 |
| Check | 08/06/2014 Debit Card | Image Beauty | 64700 · Miscellaneous Expense | | 50.27 | 557,685.76 |
| Check | 08/06/2014 Debit Card | Image Beauty | 64700 · Miscellaneous Expense | | 78.56 | 557,608.20 |
| Check | 08/06/2014 Debit Card | Ricon Investments (Cucina) | 64300 · Meals and Entertainment | | 45.04 | 557,563.16 |
| Check | 08/06/2014 ACH | Regions Bank | 60400 · Bank Service Charges | | 10.00 | 557,553.16 |
| Check | 08/06/2014 ACH | Regions Bank | 60400 · Bank Service Charges | | 10.00 | 557,543.16 |
| Check | 08/07/2014 ACH | New Haven Contracting South | -SPLIT- | | 150,000.00 | 407,543.16 |
| Bill Pmt -Check | 08/07/2014 1117 | Angle IT Solutions, Inc. | 20000 · Accounts Payable | | 85.00 | 407,458.16 |
| Check | 08/07/2014 Debit Card | Staples | 64400 · Office Supplies | | 66.99 | 407,391.17 |
| Bill Pmt -Check | 08/08/2014 1104 | McDonald Hopkins LLC | 20000 · Accounts Payable | | 7,965.90 | 399,425.27 |
| Check | 08/08/2014 1118 | Petty Cash | -SPLIT- | | 5,000.00 | 394,425.27 |
| Check | 08/08/2014 Debit Card | American Eagle Embroidery | 60500 · Postage and Delivery | | 343.00 | 394,082.27 |
| Check | 08/08/2014 Debit Card | PB Grill | 64300 · Meals and Entertainment | | 179.46 | 393,902.81 |
| Check | 08/08/2014 Debit Card | AT&T Mobility | 58100 · Telephone Expense | | 118.01 | 393,786.80 |
| Check | 08/09/2014 ACH | AT&T Mobility | 58100 · Telephone Expense | | 2,433.15 | 391,353.65 |

| Check | 08/10/2014 Debit Card | Ritcon Investments (Cucina) | 64300 · Meals and Entertainment | | 156.38 | 591,197.27 |
|---|---|---|---|---|---|---|
| Check | 08/10/2014 Debit Card | Cucina Del Art | 64300 · Meals and Entertainment | | 30.44 | 591,166.83 |
| Deposit | 08/11/2014 | | 13400 · Retainage Receivable | 500,000.00 | | 891,166.83 |
| Check | 08/11/2014 Debit Card | Swiss Air | 68450 · Airline | | 4,647.40 | 686,519.43 |
| Check | 08/11/2014 Debit Card | Lufthansa | 68450 · Airline | | 4,857.10 | 881,662.33 |
| Check | 08/11/2014 Debit Card | Hahn Airlines | 68450 · Airline | | 202.10 | 681,460.23 |
| Check | 08/11/2014 Debit Card | Jeff Kramer Travel | 68450 · Airline | | 60.00 | 681,400.23 |
| Check | 08/11/2014 Debit Card | Chevron | 60110 · Petrol | | 78.56 | 681,321.65 |
| Check | 08/11/2014 Debit Card | Adobe | 61750 · Software | | 19.99 | 681,301.66 |
| Check | 08/11/2014 ACH | New Haven Contracting South | -SPLIT- | | 350,000.00 | 531,301.66 |
| Check | 08/11/2014 ACH | Regions Bank | 60400 · Bank Service Charges | | 15.00 | 531,286.66 |
| Check | 08/11/2014 ACH | Regions Bank | 60400 · Bank Service Charges | | 35.00 | 531,251.66 |
| Check | 08/11/2014 Debit Card | Staples | 64000 · Office Supplies | | 85.49 | 531,166.17 |
| Check | 08/12/2014 Debit Card | Meridiana | -SPLIT- | | 430.00 | 530,736.17 |
| Check | 08/12/2014 Debit Card | Jeff Kramer Travel | 68450 · Airline | | 70.00 | 530,666.17 |
| Check | 08/12/2014 Debit Card | Bloomingdale's | 62600 · Gift | | 1,134.20 | 529,551.97 |
| Check | 08/12/2014 Debit Card | Bag'n Baggage | 64700 · Miscellaneous Expense | | 1,151.14 | 528,400.83 |
| Check | 08/12/2014 Debit Card | Malverns BP | 60110 · Petrol | | 50.57 | 528,350.26 |
| Bill Pmt -Check | 08/12/2014 1120 | Novak Druce Connolly Bove + Quigg LLP | 20000 · Accounts Payable | | 1,500.00 | 526,850.26 |
| Bill Pmt -Check | 08/12/2014 1121 | Town of Palm Beach Finance Department | 20000 · Accounts Payable | | 60.00 | 526,790.26 |
| Check | 08/12/2014 Debit Card | Staples | 64000 · Office Supplies | | 63.54 | 526,726.72 |
| Deposit | 08/12/2014 | | 64700 · Miscellaneous Expense | 63.07 | | 526,789.79 |
| Bill Pmt -Check | 08/12/2014 1122 | Town of Palm Beach Finance Department | 20000 · Accounts Payable | | 50.00 | 526,739.79 |
| Check | 08/13/2014 ACH | Palm House PB, LLC | 15100 · TPH Club Yacht | | 10,000.00 | 516,739.79 |
| Check | 08/13/2014 Petty Cash | Petty Cash | 64300 · Meals and Entertainment | | 500.00 | 516,239.79 |
| Check | 08/13/2014 ACH | Regions Bank | 60400 · Bank Service Charges | | 6.08 | 516,233.73 |
| Check | 08/14/2014 Debit Card | Vebroquin | 62600 · Gift | | 231.96 | 516,001.77 |
| Check | 08/14/2014 ACH | Regions Bank | 60400 · Bank Service Charges | | 6.45 | 515,995.32 |
| Check | 08/14/2014 ACH | Regions Bank | 60400 · Bank Service Charges | | 8.45 | 515,986.87 |
| Check | 08/14/2014 ACH | Regions Bank | 60400 · Bank Service Charges | | 8.96 | 515,981.91 |
| Deposit | 08/14/2014 | | 60130 · Car Service | 15.00 | | 515,996.91 |
| Check | 08/15/2014 ACH | New Haven Contracting South | -SPLIT- | | 100,000.00 | 415,996.91 |
| Check | 08/18/2014 Wire XFER | New Haven Contracting South | -SPLIT- | | 50,000.00 | 365,996.91 |
| Check | 08/18/2014 Debit Card | Hotal Carve Sardinia | 68425 · Accommodations | | 532.48 | 365,464.43 |
| Check | 08/18/2014 Debit Card | Sirius XM | 61750 · Software | | 83.01 | 365,381.42 |
| Check | 08/18/2014 Debit Card | Salvatore Ferragamo | 66500 · Uniforms | | 1,371.45 | 364,009.97 |
| Check | 08/18/2014 Debit Card | Loro Piana SPA | 65500 · Uniforms | | 654.39 | 363,355.58 |
| Check | 08/18/2014 Debit Card | Fendi Itale | 65500 · Uniforms | | 362.14 | 362,993.44 |
| Check | 08/18/2014 Debit Card | Google | 62800 · Internet | | 1.99 | 362,991.45 |
| Check | 08/18/2014 Debit Card | Montecutini | 68425 · Accommodations | | 665.40 | 362,326.05 |
| Check | 08/18/2014 Debit Card | Al Itala | 68450 · Airline | | 450.00 | 361,876.05 |
| Check | 08/18/2014 Debit Card | Airlines Repor | 68450 · Airline | | 45.00 | 361,831.05 |
| Check | 08/18/2014 Debit Card | ARC | 68450 · Airline | | 92.56 | 361,538.49 |
| Check | 08/18/2014 Wire XFER | New Haven Contracting South | -SPLIT- | | 50,000.00 | 311,538.49 |
| Check | 08/18/2014 Debit Card | The Company Corporation | 68780 · Registered Agent | | 164.00 | 311,374.49 |
| Check | 08/18/2014 ACH | Regions Bank | 60400 · Bank Service Charges | | 2.76 | 311,371.71 |
| Check | 08/18/2014 ACH | Regions Bank | 60400 · Bank Service Charges | | 10.86 | 311,360.85 |
| Check | 08/18/2014 ACH | Regions Bank | 60400 · Bank Service Charges | | 15.97 | 311,344.88 |
| Check | 08/18/2014 ACH | Regions Bank | 60400 · Bank Service Charges | | 25.63 | 311,319.25 |
| Check | 08/18/2014 ACH | Regions Bank | 60400 · Bank Service Charges | | 41.14 | 311,278.11 |
| Check | 08/18/2014 ACH | Regions Bank | 60400 · Bank Service Charges | | 10.00 | 311,268.11 |
| Check | 08/18/2014 ACH | Regions Bank | 60400 · Bank Service Charges | | 10.00 | 311,258.11 |
| Check | 08/19/2014 Debit Card | US Airways | 68450 · Airline | | 323.60 | 310,934.51 |
| Check | 08/19/2014 ACH | Regions Bank | 60400 · Bank Service Charges | | 19.96 | 310,914.55 |
| Check | 08/20/2014 Debit Card | Icerius | 68750 · Consultant | | 3.95 | 310,910.60 |
| Check | 08/20/2014 ACH | Palm House PB, LLC | 15100 · TPH Club Yacht | | 10,000.00 | 300,910.60 |
| Check | 08/21/2014 Debit Card | The UPS Store | 66500 · Postage and Delivery | | 174.00 | 300,736.60 |
| Check | 08/24/2014 Debit Card | PB Grill | 64300 · Meals and Entertainment | | 578.12 | 300,157.48 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Check | 08/25/2014 ACH | New Haven Contracting South | -SPLIT- | | 122,000.00 | 178,167.46 |
| Check | 08/25/2014 Debit Card | Sunoco | 60110 · Petrol | | 74.00 | 178,093.46 |
| Check | 08/25/2014 Debit Card | Cucina Dell Art | 64300 · Meals and Entertainment | | 32.50 | 178,060.96 |
| Check | 08/25/2014 Debit Card | Amazon | 60020 · Marketing Materials | | 48.17 | 178,002.81 |
| Check | 08/25/2014 Wire XFER | Monica Vanegas | 66750 · Consultant | | 10,000.00 | 168,002.81 |
| Check | 08/25/2014 Wire XFER | Sadler & Co | 60001 · PR Services | | 3,763.76 | 164,239.05 |
| Check | 08/25/2014 ACH | Regions Bank | 60400 · Bank Service Charges | | 25.00 | 164,214.05 |
| Check | 08/25/2014 ACH | Regions Bank | 60400 · Bank Service Charges | | 10.00 | 164,204.05 |
| Check | 08/26/2014 Debit Card | Office Depot | 64000 · Office Supplies | | 363.01 | 163,841.04 |
| Bill Pmt -Check | 08/26/2014 1127 | AIG Private Client Group | 20000 · Accounts Payable | | 31,541.75 | 132,299.29 |
| Check | 08/26/2014 Debit Card | The Company Corporation | 66790 · Registered Agent | | 164.00 | 132,135.29 |
| Check | 08/27/2014 Debit Card | Shell Oil | 60110 · Petrol | | 59.01 | 132,076.28 |
| Check | 08/27/2014 Debit Card | ABC | 62800 · Gift | | 39.95 | 132,036.33 |
| Check | 08/27/2014 Debit Card | The Company Corporation | 66790 · Registered Agent | | 25.00 | 132,011.33 |
| Bill Pmt -Check | 08/27/2014 1128 | Gordon Campbell Gray | 20000 · Accounts Payable | | 10,000.00 | 122,011.33 |
| Check | 08/28/2014 ACH | Palm House PB, LLC | 15100 · TPH Club Yacht | | 10,000.00 | 112,011.33 |
| Bill Pmt -Check | 08/28/2014 1129 | HVB Consulting & Valuation | 20000 · Accounts Payable | | 8,228.47 | 103,782.86 |
| Check | 08/28/2014 Debit Card | Staples | 64000 · Office Supplies | | 134.86 | 103,648.00 |
| Bill Pmt -Check | 08/29/2014 1130 | Town of Palm Beach Finance Department | 20000 · Accounts Payable | | 50.00 | 103,598.00 |
| Check | 08/29/2014 Debit Card | O & Co Nantucket | 62800 · Gift | | 59.99 | 103,538.01 |
| Check | 08/29/2014 ACH | Palm House PB, LLC | 15100 · TPH Club Yacht | | 5,000.00 | 98,538.01 |
| Check | 09/01/2014 Debit Card | Bricktops Palm Beach | 64300 · Meals and Entertainment | | 206.90 | 98,331.11 |
| Check | 09/01/2014 Debit Card | Target | 64000 · Office Supplies | | 570.67 | 97,751.44 |
| Bill Pmt -Check | 09/01/2014 1131 | Club Colette | 20000 · Accounts Payable | | 1,500.00 | 96,251.44 |
| Bill Pmt -Check | 09/01/2014 1132 | Persona Public Relations, Inc. | 20000 · Accounts Payable | | 2,530.00 | 93,751.44 |
| Bill Pmt -Check | 09/01/2014 1133 | The New York Times | 20000 · Accounts Payable | | 36.46 | 93,714.98 |
| Check | 09/03/2014 Debit Card | American Eagle Embroidery | 60020 · Marketing Materials | | 121.70 | 93,593.28 |
| Check | 09/03/2014 ACH | Palm House PB, LLC | 15100 · TPH Club Yacht | | 10,000.00 | 83,593.28 |
| Check | 09/03/2014 Debit Card | Palm Beach Daily News | 62500 · Dues and Subscriptions | | 162.60 | 83,430.68 |
| Check | 09/04/2014 Debit Card | Shell Oil | 60110 · Petrol | | 81.01 | 83,349.67 |
| **Total 7018 · Regions Checking** | | | | 18,322,089.29 | 18,237,632.95 | 83,349.67 |
| | | | | | | |
| **12600 · Construction In Progress** | | | | | | 0.00 |
| **Total 12600 · Construction In Progress** | | | | | | 0.00 |
| | | | | | | |
| **13400 · Retainage Receivable** | | | | | | 0.00 |
| Check | 12/23/2013 ACH | Palm House PB, LLC | 6046 · Regions MMA | 10,000.00 | | 10,000.00 |
| Deposit | 01/06/2014 | Leslie Robert Evans & Assoc PA | 7918 · Regions Checking | | 85,000.00 | -75,000.00 |
| Deposit | 01/10/2014 | Leslie Robert Evans & Assoc PA | 7918 · Regions Checking | | 100,000.00 | -175,000.00 |
| Deposit | 01/17/2014 | Leslie Robert Evans & Assoc PA | 7918 · Regions Checking | | 100,000.00 | -275,000.00 |
| Deposit | 01/28/2014 | Leslie Robert Evans & Assoc PA | 7918 · Regions Checking | | 200,000.00 | -475,000.00 |
| Deposit | 02/10/2014 | Leslie Robert Evans & Associates PA | 7918 · Regions Checking | | 300,000.00 | -775,000.00 |
| Deposit | 02/20/2014 | USREDA | 7918 · Regions Checking | | 500,000.00 | -1,275,000.00 |
| Deposit | 02/26/2014 | USREDA | 7918 · Regions Checking | | 500,000.00 | -1,775,000.00 |
| Deposit | 03/14/2014 | Leslie Robert Evans & Assoc PA | 7918 · Regions Checking | | 350,000.00 | -2,125,000.00 |
| Deposit | 03/17/2014 | Leslie Robert Evans & Associates PA | 7918 · Regions Checking | | 100,000.00 | -2,225,000.00 |
| Deposit | 03/18/2014 | Leslie Robert Evans & Assoc PA | 7918 · Regions Checking | | 250,000.00 | -2,475,000.00 |
| Deposit | 03/24/2014 | Leslie Robert Evans & Assoc PA | 7918 · Regions Checking | | 500,000.00 | -2,975,000.00 |
| Deposit | 04/09/2014 | Leslie Robert Evans & Assoc PA | 7918 · Regions Checking | | 500,000.00 | -3,475,000.00 |
| Deposit | 04/16/2014 | USREDA | 7918 · Regions Checking | | 1,000,000.00 | -4,475,000.00 |
| Deposit | 04/29/2014 | Leslie Robert Evans & Assoc PA | 7918 · Regions Checking | | 1,250,000.00 | -5,725,000.00 |
| Deposit | 04/29/2014 | USREDA | 7918 · Regions Checking | | 1,000,000.00 | -6,725,000.00 |
| Deposit | 05/12/2014 | Leslie Robert Evans & Assoc PA | 7918 · Regions Checking | | 1,000,000.00 | -7,725,000.00 |
| Deposit | 05/13/2014 | USREDA | 7918 · Regions Checking | | 1,000,000.00 | -8,725,000.00 |
| Deposit | 05/27/2014 | Leslie Robert Evans & Assoc PA | 7918 · Regions Checking | | 2,200,000.00 | -10,925,000.00 |
| Deposit | 06/03/2014 | USREDA | 7918 · Regions Checking | | 1,000,000.00 | -11,925,000.00 |
| Deposit | 06/19/2014 | USREDA | 7918 · Regions Checking | | 1,000,000.00 | -12,925,000.00 |
| Deposit | 06/24/2014 | USREDA | 7918 · Regions Checking | | 750,000.00 | -13,675,000.00 |

| | Type | Date | Name | Account | | | |
|---|---|---|---|---|---|---|---|
| | Deposit | 07/01/2014 | USREDA | 7918 · Regions Checking | | 750,000.00 | -14,425,000.00 |
| | Deposit | 07/10/2014 | USREDA | 7918 · Regions Checking | | 750,000.00 | -15,175,000.00 |
| | Deposit | 07/18/2014 | USREDA | 7918 · Regions Checking | | 750,000.00 | -15,925,000.00 |
| | Deposit | 08/04/2014 | Leslie Robert Evans & Assoc PA | 7918 · Regions Checking | | 500,000.00 | -16,425,000.00 |
| | Deposit | 08/11/2014 | USREDA | 7918 · Regions Checking | | 500,000.00 | -16,925,000.00 |
| Total 13400 · Retainage Receivable | | | | | 10,000.00 | 16,935,000.00 | -16,925,000.00 |
| | | | | | | | |
| 15000 · Furniture and Equipment | | | | | | | 0.00 |
| | Check | 04/17/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 1,624.99 | | 1,624.99 |
| Total 15000 · Furniture and Equipment | | | | | 1,624.99 | 0.00 | 1,624.99 |
| | | | | | | | |
| 15100 · TPH Club Yacht | | | | | | | 0.00 |
| | Check | 06/10/2014 ACH | International Yacht Collection, LLC | 7918 · Regions Checking | 1,000,000.00 | | 1,000,000.00 |
| | Bill | 06/20/2014 File:F006509 | Marine Documentation, Inc. | 20000 · Accounts Payable | 6,480.00 | | 1,006,480.00 |
| | Bill | 06/24/2014 Alba | Town of Palm Beach Marina | 20000 · Accounts Payable | 100.00 | | 1,006,580.00 |
| | Check | 07/10/2014 ACH | International Yacht Collection, LLC | 7918 · Regions Checking | 1,018,030.00 | | 2,024,610.00 |
| | Check | 07/16/2014 XFER | Palm House PB, LLC | 7918 · Regions Checking | 10,000.00 | | 2,034,610.00 |
| | Check | 07/22/2014 ACH | Palm House PB, LLC | 7918 · Regions Checking | 10,000.00 | | 2,044,610.00 |
| | Check | 07/30/2014 ACH | Palm House PB, LLC | 7918 · Regions Checking | 10,000.00 | | 2,054,610.00 |
| | Bill | 07/30/2014 Alba | Palm Harbor Marina | 20000 · Accounts Payable | 153,118.33 | | 2,207,728.33 |
| | Check | 08/01/2014 ACH | Palm House PB, LLC | 7918 · Regions Checking | 20,000.00 | | 2,227,728.33 |
| | Check | 08/13/2014 ACH | Palm House PB, LLC | 7918 · Regions Checking | 10,000.00 | | 2,237,728.33 |
| | Check | 08/20/2014 ACH | Palm House PB, LLC | 7918 · Regions Checking | 10,000.00 | | 2,247,728.33 |
| | Check | 08/28/2014 ACH | Palm House PB, LLC | 7918 · Regions Checking | 10,000.00 | | 2,257,728.33 |
| | Check | 08/29/2014 ACH | Palm House PB, LLC | 7918 · Regions Checking | 5,000.00 | | 2,262,728.33 |
| | Check | 09/03/2014 ACH | Palm House PB, LLC | 7918 · Regions Checking | 10,000.00 | | 2,272,728.33 |
| Total 15100 · TPH Club Yacht | | | | | 2,272,728.33 | 0.00 | 2,272,728.33 |
| | | | | | | | |
| 15400 · Computer Hardware | | | | | | | 0.00 |
| | Check | 06/09/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 671.96 | | 671.96 |
| Total 15400 · Computer Hardware | | | | | 671.96 | 0.00 | 671.96 |
| | | | | | | | |
| 15500 · Company Acquisition | | | | | | | 0.00 |
| | Check | 05/29/2014 1086 | 145 Brazilian LLC | 7918 · Regions Checking | 0.00 | | 0.00 |
| Total 15500 · Company Acquisition | | | | | 0.00 | 0.00 | 0.00 |
| | | | | | | | |
| 15900 · Officer Vehicle | | | | | | | 0.00 |
| | Check | 03/18/2014 Wire XFER | Mia Matthews | 7918 · Regions Checking | 65,000.00 | | 65,000.00 |
| | Check | 04/11/2014 Wire XFER | Mia Matthews | 7918 · Regions Checking | 28,960.00 | | 93,960.00 |
| Total 15900 · Officer Vehicle | | | | | 93,960.00 | 0.00 | 93,960.00 |
| | | | | | | | |
| 17000 · Accumulated Depreciation | | | | | | | 0.00 |
| Total 17000 · Accumulated Depreciation | | | | | | | 0.00 |
| | | | | | | | |
| 20000 · Accounts Payable | | | | | | | 0.00 |
| | Bill | 12/01/2013 VIN:JFISG55693H711106 | Tax Collector, Palm Beach County | 60100 · Auto and Truck Expenses | | 73.35 | -73.35 |
| | Bill | 12/01/2013 VIN:SCAB54554BUX49054 | Tax Collector, Palm Beach County | 60100 · Auto and Truck Expenses | | 86.85 | -160.20 |
| | Bill | 12/01/2013 On:1317619133048 | Town & Country | 62500 · Dues and Subscriptions | | 14.97 | -175.17 |
| | Bill Pmt -Check | 12/01/2013 1010 | Tax Collector, Palm Beach County | 7918 · Regions Checking | 160.20 | | -14.97 |
| | Bill Pmt -Check | 12/01/2013 1011 | Town & Country | 7918 · Regions Checking | 14.97 | | 0.00 |
| | Bill | 12/31/2013 INV:307 | Park Limousine | 68475 · Taxi, Shuttle, Limo | | 292.50 | -292.50 |
| | Bill | 12/31/2013 Member: 03635 | The Mar-a-Lago Club, L.C. | -SPLIT- | | 715.05 | -1,007.55 |
| | Bill | 12/31/2013 Member: 04230 | Trump International Golf Club, L.C. | 62500 · Dues and Subscriptions | | 333.92 | -1,341.47 |
| | Bill | 12/31/2013 Member: M141 | Club Colette | -SPLIT- | | 2,122.87 | -3,464.34 |
| | Bill | 01/01/2014 Quote:7530354 | Celedinas Agency Inc. | 63340 · Renters Insurance | | 164.83 | -3,629.17 |
| | Bill | 01/01/2014 2013/2014 Dues | Fraternal Order of Police Lodge 18 | 61400 · Charitable Contributions | | 250.00 | -3,869.17 |
| | Bill Pmt -Check | 01/02/2014 Debit Card | Celedinas Agency Inc. | 7918 · Regions Checking | 154.83 | | -3,714.34 |
| | Bill | 01/02/2014 ACCT:876758055 | AT&T Mobility | 66100 · Telephone Expense | | 467.22 | -4,181.56 |

| Type | Date Num | Name | Account | | | |
|---|---|---|---|---|---|---|
| Bill Pmt -Check | 01/02/2014 1022 | AT&T Mobility | 7918 · Regions Checking | 487.22 | | -3,714.34 |
| Bill | 01/08/2014 INV:20226 | Leslie Robert Evans & Associates PA | 66770 · Legal | | 525.00 | -4,239.34 |
| Bill Pmt -Check | 01/08/2014 1015 | Leslie Robert Evans & Associates PA | 7918 · Regions Checking | 525.00 | | -3,714.34 |
| Bill | 01/10/2014 INV:70525608 | Florida Blue | 63320 · Health Insurance | | 1,714.11 | -5,428.45 |
| Bill Pmt -Check | 01/10/2014 1008 | Florida Blue | 7918 · Regions Checking | 1,714.11 | | -3,714.34 |
| Bill | 01/13/2014 ACCT:892572425 | The New York Times | 62500 · Dues and Subscriptions | | 1.69 | -3,716.03 |
| Bill | 01/14/2014 NOF:1501400017665 | City of West Palm Beach | 60120 · Tolls, Parking, Fees | | 158.00 | -3,874.03 |
| Bill Pmt -Check | 01/15/2014 1017 | Park Limousine | 7918 · Regions Checking | 292.90 | | -3,581.53 |
| Bill Pmt -Check | 01/15/2014 1018 | The Mar-a-Lago Club, L.C. | 7918 · Regions Checking | 715.05 | | -2,866.48 |
| Bill Pmt -Check | 01/15/2014 1019 | Trump International Golf Club, L.C. | 7918 · Regions Checking | 333.92 | | -2,532.56 |
| Bill Pmt -Check | 01/15/2014 1023 | Club Colette | 7918 · Regions Checking | 2,122.87 | | -409.69 |
| Bill Pmt -Check | 01/15/2014 1024 | Fraternal Order of Police Lodge 19 | 7918 · Regions Checking | 250.00 | | -159.69 |
| Bill Pmt -Check | 01/20/2014 1025 | City of West Palm Beach | 7918 · Regions Checking | 158.00 | | -1.69 |
| Bill Pmt -Check | 01/20/2014 1026 | The New York Times | 7918 · Regions Checking | 1.69 | | 0.00 |
| Bill | 01/27/2014 INV:168828 | Angie IT Solutions, Inc. | 61775 · IT Consulting | | 148.75 | -148.75 |
| Bill Pmt -Check | 01/27/2014 1009 | Angie IT Solutions, Inc. | 7918 · Regions Checking | 148.75 | | 0.00 |
| Bill | 01/31/2014 2014 Contribution | The American Ireland Fund | 61400 · Charitable Contributions | | 1,000.00 | -1,000.00 |
| Bill Pmt -Check | 01/31/2014 1047 | The American Ireland Fund | 7918 · Regions Checking | 1,000.00 | | 0.00 |
| Bill | 01/31/2014 Member 03835 | The Mar-a-Lago Club, L.C. | 64300 · Meals and Entertainment | | 2,020.57 | -2,020.57 |
| Bill | 01/31/2014 ACCT:18183 (Effie) | The Breakers | 64300 · Meals and Entertainment | | 179.63 | -2,200.20 |
| Bill | 01/31/2014 Member: M141 | Club Colette | -SPLIT- | | 891.67 | -3,091.87 |
| Bill | 02/01/2014 City Palms - #236 | McWilliams Ballard Florida | 67110 · Managing Director | | 2,050.00 | -5,141.87 |
| Bill Pmt -Check | 02/01/2014 1046 | McWilliams Ballard Florida | 7918 · Regions Checking | 2,050.00 | | -3,091.87 |
| Bill | 02/04/2014 INV:70591142 | Florida Blue | 63320 · Health Insurance | | 1,714.11 | -4,805.98 |
| Bill | 02/05/2014 INV:561 (Effie) | Park Limousine | 60133 · Car Service | | 297.00 | -5,102.98 |
| Bill | 02/09/2014 ACCT:892572425 | The New York Times | 62500 · Dues and Subscriptions | | 36.46 | -5,139.44 |
| Bill Pmt -Check | 02/09/2014 1058 | The New York Times | 7918 · Regions Checking | 36.46 | | -5,102.98 |
| Bill | 02/11/2014 MOD Adverts | Palm Beach Society | 60000 · Advertising and Promotion | | 2,750.00 | -7,852.98 |
| Bill Pmt -Check | 02/11/2014 1052 | Palm Beach Society | 7918 · Regions Checking | 2,750.00 | | -5,102.98 |
| Bill Pmt -Check | 02/17/2014 1052 | Club Colette | 7918 · Regions Checking | 891.67 | | -4,211.31 |
| Bill Pmt -Check | 02/17/2014 1053 | Florida Blue | 7918 · Regions Checking | 1,714.11 | | -2,497.20 |
| Bill Pmt -Check | 02/17/2014 1054 | Park Limousine | 7918 · Regions Checking | 297.00 | | -2,200.20 |
| Bill Pmt -Check | 02/17/2014 1055 | The Breakers | 7918 · Regions Checking | 179.63 | | -2,020.57 |
| Bill Pmt -Check | 02/17/2014 1056 | The Mar-a-Lago Club, L.C. | 7918 · Regions Checking | 2,020.57 | | 0.00 |
| Bill | 02/26/2014 NTCE:1501400053902 | City of West Palm Beach | 60120 · Tolls, Parking, Fees | | 158.00 | -158.00 |
| Bill | 02/26/2014 ACCT:605200 - Feb/14 | Bruce R. Ouellette, DDS, PA | 63325 · Dental Insurance | | 36.00 | -194.00 |
| Bill | 02/28/2014 ACCT:495289 | Kravis Center | 61400 · Charitable Contributions | | 12,500.00 | -12,694.00 |
| Bill Pmt -Check | 02/28/2014 1061 | Kravis Center | 7918 · Regions Checking | 12,500.00 | | -194.00 |
| Bill | 02/28/2014 Member: 03835 | The Mar-a-Lago Club, L.C. | 64300 · Meals and Entertainment | | 584.31 | -778.31 |
| Bill | 03/01/2014 City Palms - #236 | McWilliams Ballard Florida | 67110 · Managing Director | | 2,050.00 | -2,828.31 |
| Bill | 03/01/2014 1059 | McWilliams Ballard Florida | 7918 · Regions Checking | 2,050.00 | | -778.31 |
| Bill | 03/04/2014 INV:70947167 | Florida Blue | 63320 · Health Insurance | | 1,714.11 | -2,492.42 |
| Bill Pmt -Check | 03/06/2014 1062 | The Seventh Art | 7918 · Regions Checking | 0.00 | | -2,492.42 |
| Bill | 03/06/2014 INV:56965, PO:96146 | Lucien Capehart Photography, Inc. | 61400 · Charitable Contributions | | 300.00 | -2,792.42 |
| Bill | 03/07/2014 INV:14100A (PH) | The Seventh Art | 66750 · Consultant | | 28,000.00 | -30,792.42 |
| Bill Pmt -Check | 03/07/2014 1063 | City of West Palm Beach | 7918 · Regions Checking | 158.00 | | -30,634.42 |
| Bill Pmt -Check | 03/07/2014 1064 | Lucien Capehart Photography, Inc. | 7918 · Regions Checking | 300.00 | | -30,334.42 |
| Bill Pmt -Check | 03/07/2014 1065 | The Mar-a-Lago Club, L.C. | 7918 · Regions Checking | 584.31 | | -29,750.11 |
| Bill Pmt -Check | 03/07/2014 1066 | The Seventh Art | 7918 · Regions Checking | 28,000.00 | | -1,750.11 |
| Bill | 03/09/2014 ACCT:892872425 | The New York Times | 62500 · Dues and Subscriptions | | 36.46 | -1,786.57 |
| Bill Pmt -Check | 03/11/2014 1030 | Bruce R. Ouellette, DDS, PA | 7918 · Regions Checking | 36.00 | | -1,750.57 |
| Bill Pmt -Check | 03/11/2014 1031 | Florida Blue | 7918 · Regions Checking | 1,714.11 | | -36.46 |
| Bill | 03/13/2014 Palm House Advert | The Plaza Theatre | 60000 · Advertising and Promotion | | 1,200.00 | -1,236.46 |
| Bill Pmt -Check | 03/17/2014 1067 | The Plaza Theatre | 7918 · Regions Checking | 1,200.00 | | -36.46 |
| Bill | 03/17/2014 ACCT:36164877 | Palm Beach Post | 62500 · Dues and Subscriptions | | 162.60 | -199.06 |
| Bill | 03/18/2014 CIT #X-201401736 | City of West Palm Beach | 60120 · Tolls, Parking, Fees | | 27.00 | -226.06 |
| Bill Pmt -Check | 03/18/2014 1068 | City of West Palm Beach | 7918 · Regions Checking | 27.00 | | -199.06 |
| Bill | 03/22/2014 ACCT:22810379 | Florida Department of Transportation | 60120 · Tolls, Parking, Fees | | 3.75 | -202.81 |

| Type | Date/Num | Name | Account | | | |
|---|---|---|---|---|---|---|
| Bill | 03/24/2014 INV:55985 | Lucien Capehart Photography, Inc. | 81460 · Charitable Contributions | | 159.00 | -361.81 |
| Bill Pmt -Check | 03/24/2014 1069 | Lucien Capehart Photography, Inc. | 7918 · Regions Checking | 159.00 | | -202.81 |
| Bill Pmt -Check | 03/24/2014 1070 | The New York Times | 7918 · Regions Checking | 36.46 | | -166.35 |
| Bill | 03/25/2014 INV:25553 | The Parker Company | 65740 · Procurement | | 14,545.45 | -14,711.80 |
| Bill | 03/25/2014 INV:3712 | The Parker Company | 65740 · Procurement | | 100,000.00 | -114,711.80 |
| Bill Pmt -Check | 03/25/2014 1071 | The Parker Company | 7918 · Regions Checking | 100,000.00 | | -14,711.80 |
| Bill Pmt -Check | 03/25/2014 1072 | The Parker Company | 7918 · Regions Checking | 14,545.45 | | -166.35 |
| Bill | 03/31/2014 PH Investment Memo | Eduardo Miranda | 68750 · Consultant | | 1,500.00 | -1,666.35 |
| Bill | 03/31/2014 ACCT:15183 | The Breakers | 64300 · Meals and Entertainment | | 585.31 | -2,251.66 |
| Bill | 03/31/2014 MMBR:03635 | The Mar-a-Lago Club, L.C. | 64300 · Meals and Entertainment | | 1,302.00 | -3,553.66 |
| Bill | 03/31/2014 MMBR:04230 | Trump International Golf Club, L.C. | 64300 · Meals and Entertainment | | 792.46 | -4,346.12 |
| Bill | 04/01/2014 April Rent #236 | McWilliams Ballard Florida | 67110 · Managing Director | | 2,050.00 | -6,396.12 |
| Bill | 04/01/2014 FILE:5252935 | Delaware Secretary of State | 66005 · DE LLC Tax | | 250.00 | -6,646.12 |
| Bill Pmt -Check | 04/01/2014 1032 | Delaware Secretary of State | 7918 · Regions Checking | 250.00 | | -6,396.12 |
| Bill Pmt -Check | 04/01/2014 1033 | McWilliams Ballard Florida | 7918 · Regions Checking | 2,050.00 | | -4,346.12 |
| Bill Pmt -Check | 04/02/2014 1034 | Eduardo Miranda | 7918 · Regions Checking | 1,500.00 | | -2,846.12 |
| Bill | 04/03/2014 Consulting Fee | Jerry E. Aron, PA | 66770 · Legal | | 22,000.00 | -24,846.12 |
| Bill Pmt -Check | 04/03/2014 1035 | Jerry E. Aron, PA | 7918 · Regions Checking | 22,000.00 | | -2,846.12 |
| Bill | 04/04/2014 Fee Agreement | Cklin Lubitz Martens & O'Connell | 66770 · Legal | | 3,500.00 | -6,346.12 |
| Bill Pmt -Check | 04/04/2014 1036 | Cklin Lubitz Martens & O'Connell | 7918 · Regions Checking | 3,500.00 | | -2,846.12 |
| Bill | 04/04/2014 INV:71003036 | Florida Blue | 63320 · Health Insurance | | 1,714.11 | -4,560.23 |
| Bill Pmt -Check | 04/04/2014 1037 | Florida Blue | 7918 · Regions Checking | 1,714.11 | | -2,846.12 |
| Bill | 04/04/2014 INV:20358 | Leslie Robert Evans & Associates PA | 66770 · Legal | | 455.00 | -3,301.12 |
| Bill | 04/08/2014 ACCT:892872425 | The New York Times | 62500 · Dues and Subscriptions | | 36.46 | -3,337.58 |
| Bill Pmt -Check | 04/15/2014 1039 | Florida Department of Transportation | 7918 · Regions Checking | 3.75 | | -3,333.83 |
| Bill Pmt -Check | 04/15/2014 1040 | Palm Beach Post | 7918 · Regions Checking | 162.60 | | -3,171.23 |
| Bill Pmt -Check | 04/15/2014 1041 | The Breakers | 7918 · Regions Checking | 585.31 | | -2,585.92 |
| Bill Pmt -Check | 04/15/2014 1042 | The Mar-a-Lago Club, L.C. | 7918 · Regions Checking | 1,302.00 | | -1,283.92 |
| Bill Pmt -Check | 04/15/2014 1043 | Trump International Golf Club, L.C. | 7918 · Regions Checking | 792.46 | | -491.46 |
| Bill Pmt -Check | 04/15/2014 1073 | Leslie Robert Evans & Associates PA | 7918 · Regions Checking | 455.00 | | -36.46 |
| Bill | 04/15/2014 BID:034Y34 | Florida Blue | 63325 · Dental Insurance | | 342.36 | -378.82 |
| Bill Pmt -Check | 04/15/2014 1074 | Florida Blue | 7918 · Regions Checking | 342.36 | | -36.46 |
| Bill Pmt -Check | 04/15/2014 1075 | The New York Times | 7918 · Regions Checking | 36.46 | | 0.00 |
| Bill | 04/27/2014 INV:0081 | Chris Kohlhagen | 61905 · Website | | 75.00 | -75.00 |
| Bill | 04/28/2014 Palm House | ARCOM | 81000 · Business Licenses and Permits | | 750.00 | -825.00 |
| Bill Pmt -Check | 04/28/2014 1076 | ARCOM | 7918 · Regions Checking | 750.00 | | -75.00 |
| Bill | 04/30/2014 Member:03635 | The Mar-a-Lago Club, L.C. | -SPLIT- | | 2,523.43 | -2,598.43 |
| Bill | 04/30/2014 ACCT:498269 | Kravis Center | 81460 · Charitable Contributions | | 12,600.00 | -15,198.43 |
| Bill Pmt -Check | 05/01/2014 1077 | McWilliams Ballard Florida | 7918 · Regions Checking | 2,050.00 | | -13,148.43 |
| Bill | 05/04/2014 ACCT 892872425 | The New York Times | 62500 · Dues and Subscriptions | | 36.46 | -13,184.89 |
| Bill | 05/07/2014 INV:1219014 | McDonald Hopkins LLC | 66770 · Legal | | 3,033.60 | -16,218.49 |
| Bill | 05/08/2014 May'14 Rent - #236 | McWilliams Ballard Florida | 67110 · Managing Director | | 2,050.00 | -18,268.49 |
| Bill | 05/08/2014 INV:0002 | Chris Kohlhagen | 61905 · Website | | 50.00 | -18,318.49 |
| Bill Pmt -Check | 05/15/2014 1080 | Kravis Center | 7918 · Regions Checking | 12,600.00 | | -5,818.49 |
| Bill Pmt -Check | 05/15/2014 1081 | The Mar-a-Lago Club, L.C. | 7918 · Regions Checking | 2,523.43 | | -3,195.06 |
| Bill Pmt -Check | 05/15/2014 1082 | The New York Times | 7918 · Regions Checking | 36.46 | | -3,158.60 |
| Bill Pmt -Check | 05/15/2014 1084 | Chris Kohlhagen | 7918 · Regions Checking | 125.00 | | -3,033.60 |
| Bill | 05/21/2014 INV:018576534 | Toll-By-Plate | 60120 · Tolls, Parking, Fees | | 5.06 | -3,038.66 |
| Bill Pmt -Check | 05/21/2014 1083 | Toll-By-Plate | 7918 · Regions Checking | 5.06 | | -3,033.60 |
| Bill | 05/30/2014 Retainer - Clematis | IDDI | 60760 · Interior Designer | | 39,750.00 | -42,783.60 |
| Bill Pmt -Check | 05/30/2014 1087 | IDDI | 7918 · Regions Checking | 39,750.00 | | -3,033.60 |
| Bill | 05/31/2014 Member:03635 | The Mar-a-Lago Club, L.C. | 64300 · Meals and Entertainment | | 1,843.95 | -4,877.55 |
| Bill | 06/01/2014 June'14 Rent - #236 | McWilliams Ballard Florida | 67110 · Managing Director | | 2,050.00 | -6,927.55 |
| Bill Pmt -Check | 06/01/2014 1085 | McWilliams Ballard Florida | 7918 · Regions Checking | 2,050.00 | | -4,877.55 |
| Bill | 06/01/2014 ACCT:892872425 June | The New York Times | 62500 · Dues and Subscriptions | | 36.46 | -4,914.01 |
| Bill | 06/03/2014 Client:36253 | McDonald Hopkins LLC | 66770 · Legal | | 15,973.62 | -20,887.63 |
| Bill Pmt -Check | 06/03/2014 1086 | McDonald Hopkins LLC | 7918 · Regions Checking | 15,973.62 | | -4,914.01 |
| Bill | 06/03/2014 Ticket:26000022 | Town of Palm Beach Finance Department | 60120 · Tolls, Parking, Fees | | 50.00 | -4,964.01 |

| Type | Date | Num | Name | Account | Amount | Paid | Balance |
|---|---|---|---|---|---|---|---|
| Bill | 06/03/2014 | INV:INV020111941 | Toll-By-Plate | 60120 - Tolls, Parking, Fees | | 7.56 | -4,971.57 |
| Bill | 06/05/2014 | ETF Unit 236 | McWilliams Ballard Florida | 67110 - Managing Director | | 2,050.00 | -7,021.57 |
| Bill Pmt -Check | 06/05/2014 | 1088 | McWilliams Ballard Florida | 7918 - Regions Checking | 2,050.00 | | -4,971.57 |
| Bill | 06/06/2014 | INV:INV020239634 | Toll-By-Plate | 60120 - Tolls, Parking, Fees | | 31.14 | -5,002.71 |
| Bill Pmt -Check | 06/06/2014 | 1094 | AIG Private Client Group | 7918 - Regions Checking | 30,133.35 | | 31,130.64 |
| Bill Pmt -Check | 06/06/2014 | 1095 | City of West Palm Beach | 7918 - Regions Checking | 158.00 | | 31,288.64 |
| Bill Pmt -Check | 06/06/2014 | 1096 | The Mar-a-Lago Club, L.C. | 7918 - Regions Checking | 1,643.96 | | 32,132.59 |
| Bill Pmt -Check | 06/06/2014 | 1097 | Toll-By-Plate | 7918 - Regions Checking | 38.70 | | 33,171.29 |
| Bill Pmt -Check | 06/06/2014 | 1098 | Town of Palm Beach Finance Department | 7918 - Regions Checking | 100.00 | | 33,271.29 |
| Bill | 06/10/2014 | INV.1221584 | McDonald Hopkins LLC | 68770 - Legal | | 3,153.85 | 30,117.54 |
| Bill | 06/13/2014 | NTCE:1501400143902 | City of West Palm Beach | 60120 - Tolls, Parking, Fees | | 158.00 | 29,959.54 |
| Bill | 06/14/2014 | ACCT.0004220603101 | AIG Private Client Group | 63322 - HO and Auto | | 36,133.35 | -6,173.71 |
| Bill Pmt -Check | 06/15/2014 | 1100 | The New York Times | 7918 - Regions Checking | 36.46 | | -6,137.25 |
| Bill | 06/16/2014 | INV:2014050044-1 | HVS Consulting & Valuation | 56750 - Consultant | | 8,228.47 | -14,365.72 |
| Bill | 06/18/2014 | Ticket.26000172 | Town of Palm Beach Finance Department | 60120 - Tolls, Parking, Fees | | 50.00 | -14,415.72 |
| Bill | 06/20/2014 | File.F000508 | Marine Documentation, Inc. | 15100 - TPH Club Yacht | | 6,480.00 | -20,895.72 |
| Bill Pmt -Check | 06/20/2014 | 1112 | Marine Documentation, Inc. | 7918 - Regions Checking | 6,480.00 | | -14,415.72 |
| Bill | 06/24/2014 | Abbi | Town of Palm Beach Marina | 15100 - TPH Club Yacht | | 100.00 | -14,515.72 |
| Bill Pmt -Check | 06/24/2014 | 1093 | Town of Palm Beach Marina | 7918 - Regions Checking | 100.00 | | -14,415.72 |
| Bill | 06/25/2014 | ACCT.495269 | Kravis Center | 61400 - Charitable Contributions | | 12,500.00 | -26,915.72 |
| Bill | 06/30/2014 | INV.71159458 | Florida Blue | 63320 - Health Insurance | | 1,918.23 | -28,831.95 |
| Bill | 07/03/2014 | INV.71163522 | Florida Blue | 63320 - Health Insurance | | 1,916.23 | -30,748.18 |
| Bill | 07/03/2014 | TOC06473417539 | Town & Country | 62500 - Dues and Subscriptions | | 21.97 | -30,770.15 |
| Bill | 07/03/2014 | INV020901304 | Toll-By-Plate | 60120 - Tolls, Parking, Fees | | 9.37 | -30,779.52 |
| Bill | 07/04/2014 | PR (7/7/14 - 8/7/14) | Persona Public Relations, Inc. | 60001 - PR Services | | 2,500.00 | -33,279.52 |
| Bill Pmt -Check | 07/04/2014 | 1102 | Persona Public Relations, Inc. | 7918 - Regions Checking | 2,500.00 | | -30,779.52 |
| Bill | 07/07/2014 | INV:14106D Website | The Seventh Art | 61605 - Website | | 25,000.00 | -55,779.52 |
| Bill Pmt -Check | 07/07/2014 | 1103 | The Seventh Art | 7918 - Regions Checking | 25,000.00 | | -30,779.52 |
| Bill | 07/09/2014 | INV 1223746 | McDonald Hopkins LLC | 68770 - Legal | | 1,778.65 | -32,558.17 |
| Bill | 07/11/2014 | ACT:MATTRO1-INV.7555 | Oversea Insurance Agency | 63345 - Watercraft | | 28,690.91 | -61,149.08 |
| Bill | 07/11/2014 | ACT:MATTRO1-INV.7556 | Oversea Insurance Agency | 63345 - Watercraft | | 2,025.00 | -63,174.08 |
| Bill Pmt -Check | 07/14/2014 | 1101 | Oversea Insurance Agency | 7918 - Regions Checking | 32,615.91 | | -32,558.17 |
| Bill Pmt -Check | 07/15/2014 | 1104 | Florida Blue | 7918 - Regions Checking | 3,832.46 | | -28,725.71 |
| Bill Pmt -Check | 07/15/2014 | 1105 | Toll-By-Plate | 7918 - Regions Checking | 9.37 | | -28,716.34 |
| Bill Pmt -Check | 07/15/2014 | 1106 | Town & Country | 7918 - Regions Checking | 21.97 | | -28,694.37 |
| Bill | 07/15/2014 | 034134 Matthews | Florida Blue | 63325 - Dental Insurance | | 342.36 | -29,036.73 |
| Bill Pmt -Check | 07/15/2014 | 1107 | Florida Blue | 7918 - Regions Checking | 342.36 | | -28,694.37 |
| Bill | 07/24/2014 | Mia Matthews | Nikki Parish | 60001 - PR Services | | 250.00 | -28,944.37 |
| Bill Pmt -Check | 07/24/2014 | 1110 | Nikki Parish | 7918 - Regions Checking | 250.00 | | -28,694.37 |
| Bill | 07/27/2014 | ACCT:802672425 | The New York Times | 62500 - Dues and Subscriptions | | 36.46 | -28,730.83 |
| Bill | 07/28/2014 | Pavero Golf Event | Marco Berio | 60030 - Events | | 29,349.79 | -58,080.62 |
| Bill Pmt -Check | 07/28/2014 | 1111 | Marco Berio | 7916 - Regions Checking | 29,349.79 | | -28,730.83 |
| Bill | 07/28/2014 | ACCT.T805200 | Bruce R. Ouellette, DDS, PA | 63325 - Dental Insurance | | 934.90 | -29,665.73 |
| Bill | 07/29/2014 | Tag. FL 01FL | Town of Palm Beach Finance Department | 60120 - Tolls, Parking, Fees | | 40.00 | -29,705.73 |
| Bill | 07/30/2014 | Abbi | Palm Harbor Marina | 15100 - TPH Club Yacht | | 153,118.33 | -182,824.06 |
| Bill Pmt -Check | 07/30/2014 | 1113 | Palm Harbor Marina | 7918 - Regions Checking | 153,118.33 | | -29,705.73 |
| Bill Pmt -Check | 08/01/2014 | 1114 | Bruce R. Ouellette, DDS, PA | 7918 - Regions Checking | 934.90 | | -28,770.83 |
| Bill | 08/01/2014 | INV. 08/07 - 09/07 | Persona Public Relations, Inc. | 60001 - PR Services | | 2,500.00 | -31,270.83 |
| Bill Pmt -Check | 08/01/2014 | 1109 | Persona Public Relations, Inc. | 7918 - Regions Checking | 2,500.00 | | -28,770.83 |
| Bill Pmt -Check | 08/01/2014 | 1115 | The New York Times | 7918 - Regions Checking | 36.46 | | -28,734.37 |
| Bill Pmt -Check | 08/01/2014 | 1124 | Town of Palm Beach Finance Department | 7918 - Regions Checking | 40.00 | | -28,694.37 |
| Bill | 08/01/2014 | ACCT.18163 Matthews | Kravis Center | 7918 - Regions Checking | | 12,500.00 | -16,194.37 |
| Bill | 08/01/2014 | | The Breakers | -SPLIT- | | 11,517.94 | -27,712.31 |
| Bill Pmt -Check | 08/01/2014 | 1125 | The Breakers | 7918 - Regions Checking | 11,517.94 | | -16,194.37 |
| Bill Pmt -Check | 08/01/2014 | 1126 | The Company Corporation | 7918 - Regions Checking | 235.00 | | -15,959.37 |
| Bill | 08/04/2014 | INV.71214951 | Florida Blue | 63320 - Health Insurance | | 1,916.23 | -17,875.60 |
| Bill Pmt -Check | 08/04/2014 | 1119 | Florida Blue | 7918 - Regions Checking | 1,916.23 | | -15,959.37 |
| Bill | 08/07/2014 | INV:766871 | Angle IT Solutions, Inc. | 61775 - IT Consulting | | 85.00 | -16,044.37 |

|  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|
| Bill Pmt -Check | 08/07/2014 1117 | Angie IT Solutions, Inc. | 7910 · Regions Checking | 85.00 |  | -16,959.37 |
| Bill Pmt -Check | 08/06/2014 1108 | McDonald Hopkins LLC | 7910 · Regions Checking | 7,965.90 |  | -7,993.47 |
| Bill | 08/08/2014 INV:75653237 | The Company Corporation | 60790 · Registered Agent |  | 235.00 | -8,228.47 |
| Bill | 08/12/2014 PH Logo TM Retainer | Novak Druce Connolly Bove + Quigg LLP | 66770 · Legal |  | 1,500.00 | -9,728.47 |
| Bill Pmt -Check | 08/12/2014 1120 | Novak Druce Connolly Bove + Quigg LLP | 7910 · Regions Checking | 1,500.00 |  | -8,228.47 |
| Bill | 08/12/2014 Ticket:26000673 | Town of Palm Beach Finance Department | 60120 · Tolls, Parking, Fees |  | 60.00 | -8,288.47 |
| Bill Pmt -Check | 08/12/2014 1121 | Town of Palm Beach Finance Department | 7910 · Regions Checking | 60.00 |  | -8,228.47 |
| Bill | 08/12/2014 Ticket:24000856 | Town of Palm Beach Finance Department | 60120 · Tolls, Parking, Fees |  | 50.00 | -8,278.47 |
| Bill Pmt -Check | 08/12/2014 1122 | Town of Palm Beach Finance Department | 7910 · Regions Checking | 50.00 |  | -8,228.47 |
| Bill | 08/24/2014 ACCT.982672425 | The New York Times | 62500 · Dues and Subscriptions |  | 36.46 | -8,264.93 |
| Bill | 08/26/2014 ACCT:0004220003101 | AIG Private Client Group | 63322 · HO and Auto |  | 31,541.75 | -39,806.68 |
| Bill Pmt -Check | 08/25/2014 1127 | AIG Private Client Group | 7910 · Regions Checking | 31,541.75 |  | -8,264.93 |
| Bill | 08/27/2014 August 2014 | Gordon Campbell Gray | 66750 · Consultant |  | 10,000.00 | -18,264.93 |
| Bill Pmt -Check | 08/27/2014 1128 | Gordon Campbell Gray | 7910 · Regions Checking | 10,000.00 |  | -8,264.93 |
| Bill Pmt -Check | 08/28/2014 1129 | HVS Consulting & Valuation | 7910 · Regions Checking | 8,228.47 |  | -36.46 |
| Bill | 08/28/2014 Ticket:25000687 | Town of Palm Beach Finance Department | 60120 · Tolls, Parking, Fees |  | 50.00 | -86.46 |
| Bill Pmt -Check | 08/28/2014 1130 | Town of Palm Beach Finance Department | 7910 · Regions Checking | 50.00 |  | -36.46 |
| Bill | 09/01/2014 Member.M141 | Club Colette | -SPLIT- |  | 1,500.00 | -1,536.46 |
| Bill | 09/01/2014 0807 - 10/07 | Persona Public Relations, Inc. | 60001 · PR Services |  | 2,500.00 | -4,036.46 |
| Bill Pmt -Check | 09/01/2014 1131 | Club Colette | 7910 · Regions Checking | 1,500.00 |  | -2,536.46 |
| Bill Pmt -Check | 09/01/2014 1132 | Persona Public Relations, Inc. | 7910 · Regions Checking | 2,500.00 |  | -36.46 |
| Bill Pmt -Check | 09/01/2014 1133 | The New York Times | 7910 · Regions Checking | 36.46 |  | 0.00 |
| **Total 20000 · Accounts Payable** |  |  |  | **675,045.26** | **675,045.26** | **0.00** |
|  |  |  |  |  |  |  |
| **10000 · USREDA** |  |  |  |  |  | **9.00** |
| Deposit | 11/19/2013 | Palm House PB, LLC | 7910 · Regions Checking |  | 36,200.00 | -36,200.00 |
| Deposit | 11/26/2013 | USREDA | 7910 · Regions Checking |  | 500,000.00 | -536,200.00 |
| **Total 10000 · USREDA** |  |  |  | **0.00** | **536,200.00** | **-536,200.00** |
|  |  |  |  |  |  |  |
| **10500 · Loan to NJL** |  |  |  |  |  | **0.00** |
| Check | 11/26/2013 ACH | New Haven Contracting South | 7910 · Regions Checking | 50,000.00 |  | 50,000.00 |
| Check | 12/23/2013 ACH | New Haven Contracting South | 7910 · Regions Checking | 75,000.00 |  | 125,000.00 |
| **Total 10500 · Loan to NJL** |  |  |  | **125,000.00** | **0.00** | **125,000.00** |
|  |  |  |  |  |  |  |
| **10550 · Loan to Ryan Black** |  |  |  |  |  | **0.00** |
| Check | 06/25/2014 Wire XFER | Ryan Black | 7910 · Regions Checking | 50,000.00 |  | 50,000.00 |
| **Total 10550 · Loan to Ryan Black** |  |  |  | **50,000.00** | **0.00** | **50,000.00** |
|  |  |  |  |  |  |  |
| **30000 · Opening Balance Equity** |  |  |  |  |  | **0.00** |
| Deposit | 11/15/2013 | RVM | 7910 · Regions Checking |  | 50.00 | -50.00 |
| **Total 30000 · Opening Balance Equity** |  |  |  | **0.00** | **50.00** | **-50.00** |
|  |  |  |  |  |  |  |
| **30700 · Members Draw** |  |  |  |  |  | **0.00** |
| Check | 12/13/2013 1012 | Robert V Matthews | 7910 · Regions Checking | 2,000.00 |  | 2,000.00 |
| Check | 12/23/2013 Bank Check | Robert V Matthews | 7910 · Regions Checking | 1,000.00 |  | 3,000.00 |
| Check | 12/24/2013 ACH | Robert V Matthews | 7910 · Regions Checking | 500.00 |  | 3,500.00 |
| Check | 12/28/2013 1016 | Robert V Matthews | 7910 · Regions Checking | 500.00 |  | 4,000.00 |
| Check | 06/23/2014 1090 | Robert V Matthews | 7910 · Regions Checking | 2,000.00 |  | 6,000.00 |
| Check | 06/23/2014 Petty Cash | Robert V Matthews | 7910 · Regions Checking | 5,000.00 |  | 11,000.00 |
| Check | 07/03/2014 Debit Card | Robert V Matthews | 7910 · Regions Checking | 342.12 |  | 11,342.12 |
| **Total 30700 · Members Draw** |  |  |  | **11,342.12** | **0.00** | **11,342.12** |
|  |  |  |  |  |  |  |
| **32000 · Members Equity** |  |  |  |  |  | **0.00** |
| Closing Entry | 12/31/2013 |  |  |  | 336,433.02 | 336,433.02 |
| **Total 32000 · Members Equity** |  |  |  | **336,433.02** | **0.00** | **336,433.02** |
|  |  |  |  |  |  |  |
| **60000 · Advertising and Promotion** |  |  |  |  |  | **0.00** |

**60001 · PR Services**

| | Type | Date | Memo | Account | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | | 0.00 |
| | Bill | 07/04/2014 PR (7/7/14 - 8/7/14) | Mia Matthews | 20000 · Accounts Payable | 2,500.00 | | 2,500.00 |
| | Check | 07/22/2014 Wire XFER | Sadler & Co | 7918 · Regions Checking | 3,867.62 | | 6,367.62 |
| | Bill | 07/24/2014 Mia Matthews | Mia Matthews | 20000 · Accounts Payable | 250.00 | | 6,617.62 |
| | Bill | 08/01/2014 INV 08/07 - 09/07 | Mia Matthews | 20000 · Accounts Payable | 2,500.00 | | 9,117.62 |
| | Check | 08/25/2014 Wire XFER | Sadler & Co | 7918 · Regions Checking | 3,763.76 | | 12,881.58 |
| | Bill | 09/01/2014 09/07 - 10/07 | Mia Matthews | 20000 · Accounts Payable | 2,500.00 | | 15,381.58 |
| Total 60001 · PR Services | | | | | 15,381.58 | 0.00 | 15,381.58 |

**60020 · Marketing Materials**

| | Type | Date | Memo | Account | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | | 0.00 |
| | Check | 07/23/2014 Debit Card | UniversalWilde | 7918 · Regions Checking | 20,000.00 | | 20,000.00 |
| | Check | 09/25/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 48.17 | | 20,048.17 |
| | Check | 09/02/2014 Debit Card | American Eagle Embroidery | 7918 · Regions Checking | 121.70 | | 20,169.87 |
| Total 60020 · Marketing Materials | | | | | 20,169.87 | 0.00 | 20,169.87 |

**60030 · Events**

| | Type | Date | Memo | Account | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | | 0.00 |
| | Bill | 07/26/2014 Pevero Golf Event | Marco Bono | 20000 · Accounts Payable | 29,349.79 | | 29,349.79 |
| | Check | 07/30/2014 Debit Card | American Eagle Embroidery | 7918 · Regions Checking | 1,650.00 | | 30,999.79 |
| | Check | 08/05/2014 Debit Card | American Eagle Embroidery | 7918 · Regions Checking | 1,685.00 | | 32,684.79 |
| Total 60030 · Events | | | | | 32,684.79 | 0.00 | 32,684.79 |

**60000 · Advertising and Promotion - Other**

| | Type | Date | Memo | Account | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | | 0.00 |
| | Bill | 02/11/2014 MOD Advertz | Palm Beach Society | 20000 · Accounts Payable | 2,750.00 | | 2,750.00 |
| | Check | 03/05/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 300.00 | | 3,050.00 |
| | Check | 03/06/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 100.00 | | 3,150.00 |
| | Check | 03/13/2014 Debit Card | Palm Beach Post | 7918 · Regions Checking | 100.00 | | 3,250.00 |
| | Check | 03/13/2014 Debit Card | Palm Beach Post | 7918 · Regions Checking | 400.00 | | 3,650.00 |
| | Bill | 03/13/2014 Palm House Advert | Mia Matthews | 20000 · Accounts Payable | 1,200.00 | | 4,850.00 |
| Total 60000 · Advertising and Promotion - Other | | | | | 4,850.00 | 0.00 | 4,850.00 |

| Total 60000 · Advertising and Promotion | | | | | 73,086.24 | 0.00 | 73,086.24 |

**66100 · Auto and Truck Expenses**

**66110 · Petrol**

| | Type | Date | Memo | Account | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | | 0.00 |
| | | | | | | | 0.00 |
| | Check | 01/02/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 72.86 | | 72.86 |
| | Check | 01/06/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 66.23 | | 139.09 |
| | Check | 01/08/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 51.49 | | 190.58 |
| | Check | 01/13/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 72.82 | | 263.40 |
| | Check | 01/13/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 1.55 | | 264.95 |
| | Check | 01/17/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 78.23 | | 343.18 |
| | Check | 01/21/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 98.06 | | 441.24 |
| | Check | 01/27/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 88.16 | | 509.40 |
| | Check | 02/03/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 75.98 | | 585.38 |
| | Check | 02/17/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 67.37 | | 652.75 |
| | Check | 02/17/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 68.00 | | 721.75 |
| | Check | 02/24/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 71.94 | | 793.69 |
| | Check | 02/28/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 75.01 | | 868.70 |
| | Check | 03/12/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 80.22 | | 948.92 |
| | Check | 03/18/2014 Debit Card | Mia Matthews | 7918 · Regions Checking | 70.16 | | 1,019.08 |
| | Check | 03/18/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 51.50 | | 1,070.58 |
| | Check | 03/18/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 30.00 | | 1,100.58 |
| | Check | 03/26/2014 ACH | Robert V Matthews | 7918 · Regions Checking | 73.20 | | 1,173.78 |
| | Check | 03/31/2014 Debit Card | Mia Matthews | 7918 · Regions Checking | 47.56 | | 1,221.34 |
| | Check | 04/04/2014 Debit Card | Mia Matthews | 7918 · Regions Checking | 67.27 | | 1,288.61 |
| | Check | 04/07/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 85.13 | | 1,373.74 |
| | Check | 04/07/2014 Debit Card | Mia Matthews | 7918 · Regions Checking | 92.77 | | 1,466.51 |
| | Check | 04/10/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 83.70 | | 1,550.21 |
| | Check | 04/10/2014 Debit Card | Mia Matthews | 7918 · Regions Checking | 73.56 | | 1,623.67 |

| | Check | 04/14/2014 Debit Card | Mia Matthews | 7918 · Regions Checking | 74.04 | | 1,697.91 |
|---|---|---|---|---|---|---|---|
| | Check | 04/14/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 82.07 | | 1,779.98 |
| | Check | 04/16/2014 Debit Card | Mia Matthews | 7918 · Regions Checking | 86.39 | | 1,866.37 |
| | Check | 04/18/2014 Debit Card | Mia Matthews | 7918 · Regions Checking | 61.84 | | 1,928.21 |
| | Check | 04/18/2014 Debit Card | Mia Matthews | 7918 · Regions Checking | 78.24 | | 2,006.45 |
| | Check | 04/22/2014 Debit Card | Mia Matthews | 7918 · Regions Checking | 56.08 | | 2,062.53 |
| | Check | 04/24/2014 Debit Card | Mia Matthews | 7918 · Regions Checking | 88.21 | | 2,150.74 |
| | Check | 04/28/2014 Debit Card | Mia Matthews | 7918 · Regions Checking | 62.22 | | 2,212.96 |
| | Check | 04/28/2014 Debit Card | Mia Matthews | 7918 · Regions Checking | 74.45 | | 2,287.41 |
| | Check | 04/30/2014 Debit Card | Mia Matthews | 7918 · Regions Checking | 72.06 | | 2,359.47 |
| | Check | 05/01/2014 Debit Card | Mia Matthews | 7918 · Regions Checking | 70.85 | | 2,430.32 |
| | Check | 05/02/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 80.46 | | 2,510.78 |
| | Check | 05/06/2014 Debit Card | Mia Matthews | 7918 · Regions Checking | 66.88 | | 2,577.66 |
| | Check | 05/07/2014 Debit Card | Mia Matthews | 7918 · Regions Checking | 78.73 | | 2,656.39 |
| | Check | 05/09/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 74.45 | | 2,730.84 |
| | Check | 05/12/2014 Debit Card | Mia Matthews | 7918 · Regions Checking | 79.08 | | 2,809.92 |
| | Check | 05/15/2014 Debit Card | Mia Matthews | 7918 · Regions Checking | 75.00 | | 2,884.92 |
| | Check | 05/16/2014 Debit Card | Mia Matthews | 7918 · Regions Checking | 31.11 | | 2,916.03 |
| | Check | 05/16/2014 Debit Card | Mia Matthews | 7918 · Regions Checking | 35.46 | | 2,953.43 |
| | Check | 05/18/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 85.25 | | 3,036.68 |
| | Check | 05/21/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 85.98 | | 3,122.66 |
| | Check | 05/22/2014 Debit Card | Mia Matthews | 7918 · Regions Checking | 72.17 | | 3,194.83 |
| | Check | 05/27/2014 Debit Card | Mia Matthews | 7918 · Regions Checking | 71.16 | | 3,265.89 |
| | Check | 05/30/2014 Debit Card | Mia Matthews | 7918 · Regions Checking | 74.60 | | 3,340.58 |
| | Check | 06/02/2014 Debit Card | Mia Matthews | 7918 · Regions Checking | 70.01 | | 3,410.59 |
| | Check | 06/02/2014 Debit Card | Mia Matthews | 7918 · Regions Checking | 68.26 | | 3,478.85 |
| | Check | 06/04/2014 Debit Card | Mia Matthews | 7918 · Regions Checking | 69.89 | | 3,548.74 |
| | Check | 06/06/2014 Debit Card | Mia Matthews | 7918 · Regions Checking | 64.37 | | 3,613.11 |
| | Check | 06/12/2014 Debit Card | Mia Matthews | 7918 · Regions Checking | 76.46 | | 3,689.57 |
| | Check | 06/16/2014 Debit Card | Mia Matthews | 7918 · Regions Checking | 66.56 | | 3,756.13 |
| | Check | 06/16/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 72.43 | | 3,828.56 |
| | Check | 06/17/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 38.78 | | 3,867.34 |
| | Check | 06/19/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 85.25 | | 3,952.59 |
| | Check | 06/20/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 82.62 | | 4,035.11 |
| | Check | 06/23/2014 Debit Card | Mia Matthews | 7918 · Regions Checking | 67.05 | | 4,102.16 |
| | Check | 06/23/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 76.21 | | 4,178.37 |
| | Check | 06/25/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 80.20 | | 4,258.57 |
| | Check | 07/17/2014 Debit Card | Sunoco | 7918 · Regions Checking | 90.46 | | 4,349.03 |
| | Check | 07/17/2014 Debit Card | Sunoco | 7918 · Regions Checking | 44.64 | | 4,393.67 |
| | Check | 07/18/2014 Debit Card | Mia Matthews | 7918 · Regions Checking | 45.42 | | 4,439.09 |
| | Check | 07/18/2014 Debit Card | Mia Matthews | 7918 · Regions Checking | 3.71 | | 4,442.80 |
| | Check | 07/22/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 50.54 | | 4,493.34 |
| | Check | 08/11/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 78.58 | | 4,571.92 |
| | Check | 08/12/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 50.57 | | 4,622.49 |
| | Check | 08/25/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 74.00 | | 4,696.49 |
| | Check | 08/27/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 59.01 | | 4,755.60 |
| | Check | 09/04/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 81.01 | | 4,836.51 |
| Total 60110 · Petrol | | | | | 4,836.51 | 0.00 | 4,836.51 |
| | | | | | | | |
| 60115 · Repair & Maintenance | | | | | | | 0.00 |
| | Check | 03/04/2014 Debit Card | Mia Matthews | 7918 · Regions Checking | 566.11 | | 566.11 |
| | Check | 07/30/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 13,114.21 | | 13,680.32 |
| Total 60115 · Repair & Maintenance | | | | | 13,680.32 | 0.00 | 13,680.32 |
| | | | | | | | |
| 60120 · Tolls, Parking, Fees | | | | | | | 0.00 |
| | Check | 01/03/2014 Debit Card | Improv Traffic | 7918 · Regions Checking | 24.70 | | 24.70 |
| | Check | 01/04/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 200.00 | | 224.70 |
| | Check | 01/07/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 200.00 | | 424.70 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Bill | 01/14/2014 NOT:1501400017865 | Robert V Mathews | 20000 · Accounts Payable | 158.00 | | 582.70 |
| Check | 02/17/2014 Debit Card | Robert V Mathews | 7918 · Regions Checking | 46.83 | | 629.53 |
| Check | 02/17/2014 Debit Card | Robert V Mathews | 7918 · Regions Checking | 3.28 | | 632.81 |
| Bill | 02/26/2014 NTCE:1501400053992 | Robert V Mathews | 20000 · Accounts Payable | 158.00 | | 790.81 |
| Bill | 03/18/2014 CIT #:X-201401736 | Mia Matthews | 20000 · Accounts Payable | 27.00 | | 817.81 |
| Bill | 03/22/2014 ACCT:226 10379 | Niklaus Leuenberger | 20000 · Accounts Payable | 3.75 | | 821.58 |
| Bill | 05/21/2014 INV019578934 | Niklaus Leuenberger | 20000 · Accounts Payable | 5.00 | | 826.82 |
| Bill | 06/03/2014 Ticket:26000022 | Robert V Mathews | 20000 · Accounts Payable | 50.00 | | 876.82 |
| Bill | 06/03/2014 INV:INV020111941 | Mia Matthews | 20000 · Accounts Payable | 7.56 | | 884.18 |
| Bill | 05/06/2014 INV:INV020230534 | Mia Matthews | 20000 · Accounts Payable | 31.14 | | 915.32 |
| Bill | 05/13/2014 NTCE:1501400143992 | Mia Matthews | 20000 · Accounts Payable | 158.00 | | 1,073.32 |
| Check | 06/16/2014 Debit Card | Mia Matthews | 7918 · Regions Checking | 58.90 | | 1,132.22 |
| Bill | 05/18/2014 Ticket:26000172 | Robert V Mathews | 20000 · Accounts Payable | 50.00 | | 1,182.22 |
| Check | 07/02/2014 Debit Card | Robert V Mathews | 7918 · Regions Checking | 164.38 | | 1,346.60 |
| Bill | 07/03/2014 INV020901394 | Mia Matthews | 20000 · Accounts Payable | 9.37 | | 1,355.97 |
| Check | 07/17/2014 Debit Card | LAZ Parking | 7918 · Regions Checking | 15.00 | | 1,370.97 |
| Bill | 07/29/2014 Tag: FL 01FL | Robert V Mathews | 20000 · Accounts Payable | 40.00 | | 1,410.97 |
| Bill | 08/12/2014 Ticket:26000673 | Town of Palm Beach Finance Department | 20000 · Accounts Payable | 60.00 | | 1,470.97 |
| Bill | 08/12/2014 Ticket:24000656 | Town of Palm Beach Finance Department | 20000 · Accounts Payable | 50.00 | | 1,520.97 |
| Bill | 08/26/2014 Ticket:25000682 | Robert V Mathews | 20000 · Accounts Payable | 50.00 | | 1,570.97 |
| **Total 60120 · Tolls, Parking, Fees** | | | | **1,570.97** | **0.00** | **1,570.97** |
| | | | | | | |
| **60130 · Car Service** | | | | | | 0.00 |
| Bill | 02/05/2014 INV 551 (Effie) | Park Limousine | 20000 · Accounts Payable | 297.00 | | 297.00 |
| Check | 07/01/2014 Debit Card | Robert V Mathews | 7918 · Regions Checking | 83.60 | | 380.60 |
| Check | 07/01/2014 Debit Card | Robert V Mathews | 7918 · Regions Checking | 10.95 | | 401.55 |
| Check | 07/03/2014 Debit Card | Robert V Mathews | 7918 · Regions Checking | 54.74 | | 456.29 |
| Check | 07/08/2014 Debit Card | Mia Matthews | 7918 · Regions Checking | 827.11 | | 1,383.40 |
| Deposit | 07/08/2014 | Budget | 7918 · Regions Checking | | 120.51 | 1,262.89 |
| Check | 07/16/2014 Debit Card | Mia Matthews | 7918 · Regions Checking | 535.00 | | 1,797.89 |
| Check | 07/17/2014 Debit Card | Nantucket Steamship Authority | 7918 · Regions Checking | 15.00 | | 1,812.89 |
| Check | 07/18/2014 Debit Card | Robert V Mathews | 7918 · Regions Checking | 73.00 | | 1,885.89 |
| Check | 07/18/2014 Debit Card | Robert V Mathews | 7918 · Regions Checking | 82.00 | | 1,967.89 |
| Check | 07/24/2014 Debit Card | Mia Matthews | 7918 · Regions Checking | 537.80 | | 2,505.69 |
| Deposit | 07/31/2014 | Budget | 7918 · Regions Checking | | 500.63 | 2,404.86 |
| Check | 08/05/2014 Debit Card | Mia Matthews | 7918 · Regions Checking | 201.45 | | 2,606.31 |
| Check | 08/06/2014 Debit Card | Mia Matthews | 7918 · Regions Checking | 1.50 | | 2,607.81 |
| Check | 08/08/2014 1118 | Robert V Mathews | 7918 · Regions Checking | 2,000.00 | | 4,607.81 |
| Deposit | 08/14/2014 | Nantucket Steamship Authority | 7918 · Regions Checking | | 15.00 | 4,592.81 |
| **Total 60130 · Car Service** | | | | **5,229.15** | **636.34** | **4,592.81** |
| | | | | | | |
| **60190 · Auto and Truck Expenses - Other** | | | | | | 0.00 |
| Check | 01/23/2014 1027 | Tax Collector, Palm Beach County | 7918 · Regions Checking | 60.50 | | 60.50 |
| **Total 60190 · Auto and Truck Expenses - Other** | | | | **60.50** | **0.00** | **60.50** |
| | | | | | | |
| **Total 60100 · Auto and Truck Expenses** | | | | **25,377.45** | **636.34** | **24,741.11** |
| | | | | | | |
| **60400 · Bank Service Charges** | | | | | | 0.00 |
| Check | 01/06/2014 ACH | Regions Bank | 7918 · Regions Checking | 15.00 | | 15.00 |
| Check | 01/10/2014 ACH | Regions Bank | 7918 · Regions Checking | 15.00 | | 30.00 |
| Check | 01/17/2014 ACH | Regions Bank | 7918 · Regions Checking | 15.00 | | 45.00 |
| Check | 01/28/2014 ACH | Regions Bank | 7918 · Regions Checking | 15.00 | | 60.00 |
| Check | 02/03/2014 ACH | Regions Bank | 7918 · Regions Checking | 20.00 | | 80.00 |
| Check | 02/05/2014 ACH | Robert V Mathews | 7918 · Regions Checking | 0.74 | | 80.74 |
| Check | 02/05/2014 ACH | Robert V Mathews | 7918 · Regions Checking | 1.31 | | 82.05 |
| Check | 02/10/2014 ACH | Regions Bank | 7918 · Regions Checking | 10.65 | | 92.70 |
| Check | 02/10/2014 ACH | Regions Bank | 7918 · Regions Checking | 1.57 | | 94.27 |
| Check | 02/10/2014 ACH | Regions Bank | 7918 · Regions Checking | 1.18 | | 95.45 |

| Check | 02/10/2014 ACH | Regions Bank | 7918 · Regions Checking | 15.00 | 110.45 |
|---|---|---|---|---|---|
| Check | 02/11/2014 ACH | Regions Bank | 7918 · Regions Checking | 145.27 | 255.72 |
| Check | 02/11/2014 ACH | Regions Bank | 7918 · Regions Checking | 0.85 | 256.57 |
| Check | 02/20/2014 ACH | Regions Bank | 7918 · Regions Checking | 15.00 | 271.57 |
| Check | 02/26/2014 ACH | Regions Bank | 7918 · Regions Checking | 15.00 | 286.57 |
| Check | 02/28/2014 ACH | Regions Bank | 7918 · Regions Checking | 20.00 | 306.57 |
| Check | 03/07/2014 Transfer | Palm House PB, LLC | 7918 · Regions Checking | 1,800.00 | 2,106.57 |
| Check | 03/13/2014 ACH | Mia Matthews | 7918 · Regions Checking | 2.50 | 2,109.07 |
| Check | 03/13/2014 ACH | Mia Matthews | 7918 · Regions Checking | 2.50 | 2,111.57 |
| Check | 03/14/2014 ACH | Regions Bank | 7918 · Regions Checking | 15.00 | 2,126.57 |
| Check | 03/17/2014 ACH | Regions Bank | 7918 · Regions Checking | 20.00 | 2,146.57 |
| Check | 03/17/2014 ACH | Regions Bank | 7918 · Regions Checking | 15.00 | 2,161.57 |
| Check | 03/18/2014 ACH | Mia Matthews | 7918 · Regions Checking | 20.00 | 2,181.57 |
| Check | 03/19/2014 ACH | Regions Bank | 7918 · Regions Checking | 15.00 | 2,196.57 |
| Check | 03/21/2014 ACH | Regions Bank | 7918 · Regions Checking | 20.00 | 2,216.57 |
| Check | 03/24/2014 ACH | Regions Bank | 7918 · Regions Checking | 15.00 | 2,231.57 |
| Check | 04/08/2014 ACH | Regions Bank | 7918 · Regions Checking | 10.00 | 2,241.57 |
| Check | 04/09/2014 ACH | Regions Bank | 7918 · Regions Checking | 15.00 | 2,256.57 |
| Check | 04/11/2014 ACH | Regions Bank | 7918 · Regions Checking | 10.00 | 2,266.57 |
| Check | 04/18/2014 ACH | Regions Bank | 7918 · Regions Checking | 15.00 | 2,281.57 |
| Check | 04/28/2014 ACH | Regions Bank | 7918 · Regions Checking | 20.00 | 2,301.57 |
| Check | 04/28/2014 ACH | Regions Bank | 7918 · Regions Checking | 15.00 | 2,316.57 |
| Check | 04/29/2014 ACH | Regions Bank | 7918 · Regions Checking | 15.00 | 2,331.57 |
| Check | 05/05/2014 ACH | Regions Bank | 7918 · Regions Checking | 10.00 | 2,341.57 |
| Check | 05/09/2014 ACH | Regions Bank | 7918 · Regions Checking | 35.00 | 2,376.57 |
| Check | 05/12/2014 ACH | Regions Bank | 7918 · Regions Checking | 15.00 | 2,391.57 |
| Check | 05/13/2014 ACH | Regions Bank | 7918 · Regions Checking | 15.00 | 2,406.57 |
| Check | 05/13/2014 ACH | Regions Bank | 7918 · Regions Checking | 20.00 | 2,426.57 |
| Check | 05/16/2014 ACH | Regions Bank | 7918 · Regions Checking | 10.00 | 2,436.57 |
| Check | 05/27/2014 ACH | Regions Bank | 7918 · Regions Checking | 15.00 | 2,451.57 |
| Check | 06/04/2014 ACH | Regions Bank | 7918 · Regions Checking | 15.00 | 2,466.57 |
| Check | 06/06/2014 ACH | Regions Bank | 7918 · Regions Checking | 20.00 | 2,486.57 |
| Check | 06/09/2014 ACH | Regions Bank | 7918 · Regions Checking | 35.00 | 2,521.57 |
| Check | 06/18/2014 ACH | Regions Bank | 7918 · Regions Checking | 15.00 | 2,536.57 |
| Check | 06/24/2014 ACH | Regions Bank | 7918 · Regions Checking | 15.00 | 2,551.57 |
| Check | 06/25/2014 ACH | Regions Bank | 7918 · Regions Checking | 10.00 | 2,561.57 |
| Check | 06/26/2014 ACH | Regions Bank | 7918 · Regions Checking | 43.35 | 2,604.92 |
| Check | 06/26/2014 ACH | Regions Bank | 7918 · Regions Checking | 17.96 | 2,622.88 |
| Check | 06/27/2014 ACH | Regions Bank | 7918 · Regions Checking | 3.16 | 2,626.04 |
| Check | 06/27/2014 ACH | Regions Bank | 7918 · Regions Checking | 32.97 | 2,659.01 |
| Check | 06/30/2014 ACH | Regions Bank | 7918 · Regions Checking | 9.01 | 2,668.02 |
| Check | 06/30/2014 ACH | Regions Bank | 7918 · Regions Checking | 13.09 | 2,681.11 |
| Check | 07/01/2014 ACH | Regions Bank | 7918 · Regions Checking | 61.47 | 2,742.58 |
| Check | 07/01/2014 ACH | Regions Bank | 7918 · Regions Checking | 61.47 | 2,804.05 |
| Check | 07/01/2014 ACH | Regions Bank | 7918 · Regions Checking | 319.83 | 3,123.88 |
| Check | 07/02/2014 ACH | Regions Bank | 7918 · Regions Checking | 1.03 | 3,124.71 |
| Check | 07/02/2014 ACH | Regions Bank | 7918 · Regions Checking | 2.73 | 3,127.44 |
| Check | 07/02/2014 ACH | Regions Bank | 7918 · Regions Checking | 4.93 | 3,132.37 |
| Check | 07/02/2014 ACH | Regions Bank | 7918 · Regions Checking | 7.04 | 3,139.41 |
| Check | 07/02/2014 ACH | Regions Bank | 7918 · Regions Checking | 10.78 | 3,150.19 |
| Check | 07/02/2014 ACH | Regions Bank | 7918 · Regions Checking | 157.54 | 3,307.73 |
| Check | 07/02/2014 ACH | Regions Bank | 7918 · Regions Checking | 15.00 | 3,322.73 |
| Check | 07/03/2014 ACH | Regions Bank | 7918 · Regions Checking | 0.33 | 3,323.06 |
| Check | 07/03/2014 ACH | Regions Bank | 7918 · Regions Checking | 1.64 | 3,324.70 |
| Check | 07/03/2014 ACH | Regions Bank | 7918 · Regions Checking | 1.85 | 3,326.55 |
| Check | 07/03/2014 ACH | Regions Bank | 7918 · Regions Checking | 2.81 | 3,329.36 |
| Check | 07/03/2014 ACH | Regions Bank | 7918 · Regions Checking | 5.00 | 3,334.36 |
| Check | 07/07/2014 ACH | Regions Bank | 7918 · Regions Checking | 4.08 | 3,338.44 |

| Type | Date | Name | Account | Amount | | Balance |
|------|------|------|---------|--------|--|---------|
| Check | 07/07/2014 ACH | Regions Bank | 7918 · Regions Checking | 5.72 | | 3,344.16 |
| Check | 07/07/2014 ACH | Regions Bank | 7918 · Regions Checking | 9.57 | | 3,353.73 |
| Check | 07/07/2014 ACH | Regions Bank | 7918 · Regions Checking | 12.51 | | 3,366.24 |
| Check | 07/07/2014 ACH | Regions Bank | 7918 · Regions Checking | 19.53 | | 3,385.84 |
| Check | 07/07/2014 ACH | Regions Bank | 7918 · Regions Checking | 142.93 | | 3,528.77 |
| Check | 07/07/2014 ACH | Regions Bank | 7918 · Regions Checking | 247.98 | | 3,776.75 |
| Check | 07/08/2014 ACH | Regions Bank | 7918 · Regions Checking | 1.31 | | 3,778.06 |
| Check | 07/08/2014 ACH | Regions Bank | 7918 · Regions Checking | 5.65 | | 3,783.71 |
| Check | 07/08/2014 ACH | Regions Bank | 7918 · Regions Checking | 25.87 | | 3,809.58 |
| Check | 07/08/2014 ACH | Regions Bank | 7918 · Regions Checking | 36.82 | | 3,846.40 |
| Check | 07/09/2014 ACH | Regions Bank | 7918 · Regions Checking | 42.24 | | 3,888.64 |
| Check | 07/09/2014 ACH | Regions Bank | 7918 · Regions Checking | 35.00 | | 3,923.64 |
| Check | 07/10/2014 ACH | Regions Bank | 7918 · Regions Checking | 1.77 | | 3,925.41 |
| Check | 07/10/2014 ACH | Regions Bank | 7918 · Regions Checking | 209.07 | | 4,134.48 |
| Check | 07/10/2014 ACH | Regions Bank | 7918 · Regions Checking | 15.00 | | 4,149.48 |
| Check | 07/11/2014 ACH | Regions Bank | 7918 · Regions Checking | 2.87 | | 4,152.35 |
| Check | 07/14/2014 ACH | Regions Bank | 7918 · Regions Checking | 5.09 | | 4,157.44 |
| Check | 07/14/2014 ACH | Regions Bank | 7918 · Regions Checking | 20.43 | | 4,177.87 |
| Check | 07/15/2014 ACH | Regions Bank | 7918 · Regions Checking | 2.94 | | 4,180.81 |
| Check | 07/16/2014 ACH | Regions Bank | 7918 · Regions Checking | 16.35 | | 4,197.16 |
| Check | 07/18/2014 ACH | Regions Bank | 7918 · Regions Checking | 15.00 | | 4,212.16 |
| Check | 07/22/2014 ACH | Regions Bank | 7918 · Regions Checking | 25.00 | | 4,237.16 |
| Check | 07/28/2014 ACH | Regions Bank | 7918 · Regions Checking | 251.07 | | 4,488.23 |
| Check | 07/29/2014 ACH | Regions Bank | 7918 · Regions Checking | 10.00 | | 4,498.23 |
| Check | 07/29/2014 ACH | Regions Bank | 7918 · Regions Checking | 10.00 | | 4,508.23 |
| Check | 07/29/2014 ACH | Regions Bank | 7918 · Regions Checking | 12.61 | | 4,520.84 |
| Check | 07/30/2014 ACH | Regions Bank | 7918 · Regions Checking | 10.00 | | 4,530.84 |
| Check | 07/30/2014 ACH | Regions Bank | 7918 · Regions Checking | 10.00 | | 4,540.84 |
| Check | 08/04/2014 ACH | Regions Bank | 7918 · Regions Checking | 15.00 | | 4,555.84 |
| Check | 08/04/2014 ACH | Regions Bank | 7918 · Regions Checking | 10.00 | | 4,565.84 |
| Check | 08/05/2014 ACH | Regions Bank | 7918 · Regions Checking | 10.00 | | 4,575.84 |
| Check | 08/08/2014 ACH | Regions Bank | 7918 · Regions Checking | 10.00 | | 4,585.84 |
| Check | 08/11/2014 ACH | Regions Bank | 7918 · Regions Checking | 15.00 | | 4,600.84 |
| Check | 08/11/2014 ACH | Regions Bank | 7918 · Regions Checking | 35.00 | | 4,635.84 |
| Check | 08/13/2014 ACH | Regions Bank | 7918 · Regions Checking | 6.06 | | 4,641.90 |
| Check | 08/14/2014 ACH | Regions Bank | 7918 · Regions Checking | 6.45 | | 4,648.35 |
| Check | 08/14/2014 ACH | Regions Bank | 7918 · Regions Checking | 6.45 | | 4,654.80 |
| Check | 08/14/2014 ACH | Regions Bank | 7918 · Regions Checking | 6.96 | | 4,661.76 |
| Check | 08/18/2014 ACH | Regions Bank | 7918 · Regions Checking | 2.78 | | 4,664.54 |
| Check | 08/18/2014 ACH | Regions Bank | 7918 · Regions Checking | 10.85 | | 4,675.40 |
| Check | 08/18/2014 ACH | Regions Bank | 7918 · Regions Checking | 15.97 | | 4,691.37 |
| Check | 08/18/2014 ACH | Regions Bank | 7918 · Regions Checking | 25.63 | | 4,717.00 |
| Check | 08/18/2014 ACH | Regions Bank | 7918 · Regions Checking | 41.14 | | 4,758.14 |
| Check | 08/18/2014 ACH | Regions Bank | 7918 · Regions Checking | 10.00 | | 4,768.14 |
| Check | 08/18/2014 ACH | Regions Bank | 7918 · Regions Checking | 10.00 | | 4,778.14 |
| Check | 08/19/2014 ACH | Regions Bank | 7918 · Regions Checking | 19.96 | | 4,798.10 |
| Check | 08/25/2014 ACH | Regions Bank | 7918 · Regions Checking | 25.00 | | 4,823.10 |
| Check | 08/25/2014 ACH | Regions Bank | 7918 · Regions Checking | 10.00 | | 4,833.10 |

**Total 60400 · Bank Service Charges** — 4,833.10 | 0.00 | 4,833.10

**61000 · Business Licenses and Permits**

| Type | Date | Name | Account | Amount | | Balance |
|------|------|------|---------|--------|--|---------|
| | | | | | | 0.00 |
| Bill | 04/28/2014 Palm House | ARCOM | 20000 · Accounts Payable | 750.00 | | 750.00 |

**Total 61000 · Business Licenses and Permits** — 750.00 | 0.00 | 750.00

**61400 · Charitable Contributions**

| Type | Date | Name | Account | Amount | | Balance |
|------|------|------|---------|--------|--|---------|
| | | | | | | 0.00 |
| Bill | 01/01/2014 2013/2014 Dues | Fraternal Order of Police Lodge 19 | 20000 · Accounts Payable | 250.00 | | 250.00 |
| Check | 01/10/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 725.00 | | 975.00 |
| Check | 01/13/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 70.00 | | 1,045.00 |

| Type | Date / Description | Name | Account | Amount | | Balance |
|------|------|------|------|------|------|------|
| Bill | 01/31/2014 2014 Contribution | Robert V Matthews | 20000 · Accounts Payable | 1,000.00 | | 2,045.00 |
| Check | 02/03/2014 1048 | Robert V Matthews | 7918 · Regions Checking | 500.00 | | 2,545.00 |
| Check | 02/28/2014 1060 | Robert V Matthews | 7918 · Regions Checking | 1,000.00 | | 3,545.00 |
| Bill | 02/28/2014 ACCT.498259 | Kravis Center | 20000 · Accounts Payable | 12,500.00 | | 16,045.00 |
| Bill | 03/06/2014 INV:56865; PO:B5146 | Lucien Capehart Photography, Inc. | 30000 · Accounts Payable | 300.00 | | 16,345.00 |
| Bill | 03/24/2014 INV.56945 | Robert V Matthews | 20000 · Accounts Payable | 159.00 | | 16,504.00 |
| Check | 04/30/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 1,968.00 | | 18,472.00 |
| Bill | 04/30/2014 ACCT:498259 | Robert V Matthews | 20000 · Accounts Payable | 12,500.00 | | 30,972.00 |
| Bill | 06/25/2014 ACCT:498259 | Robert V Matthews | 20000 · Accounts Payable | 12,500.00 | | 43,472.00 |
| **Total 61400 · Charitable Contributions** | | | | 43,472.00 | 0.00 | 43,472.00 |
| **61700 · Computer and Internet Expenses** | | | | | | 0.00 |
| **61725 · Portable Electronic Medium** | | | | | | 0.00 |
| Check | 01/07/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 62.52 | | 62.52 |
| Check | 02/11/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 94.94 | | 157.46 |
| Check | 06/06/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 43.54 | | 201.00 |
| **Total 61725 · Portable Electronic Medium** | | | | 201.00 | 0.00 | 201.00 |
| **61750 · Software** | | | | | | 0.00 |
| Check | 01/10/2014 Debit Card | Adobe | 7918 · Regions Checking | 19.99 | | 19.99 |
| Check | 01/13/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 157.40 | | 177.39 |
| Check | 02/10/2014 ACH | Adobe | 7918 · Regions Checking | 19.99 | | 197.38 |
| Check | 03/10/2014 Debit Card | Adobe | 7918 · Regions Checking | 19.99 | | 217.37 |
| Check | 03/10/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 88.25 | | 305.62 |
| Check | 03/20/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 229.35 | | 535.97 |
| Check | 04/10/2014 ACH | Adobe | 7918 · Regions Checking | 19.99 | | 555.96 |
| Check | 05/12/2014 Debit Card | Adobe | 7918 · Regions Checking | 19.99 | | 575.95 |
| Check | 06/10/2014 Debit Card | Mia Matthews | 7918 · Regions Checking | 68.51 | | 644.46 |
| Check | 06/10/2014 Debit Card | Adobe | 7918 · Regions Checking | 19.99 | | 664.45 |
| Check | 06/16/2014 Debit Card | Mia Matthews | 7918 · Regions Checking | 11.42 | | 675.87 |
| Check | 07/10/2014 Debit Card | Adobe | 7918 · Regions Checking | 19.99 | | 695.86 |
| Check | 07/15/2014 Debit Card | Mia Matthews | 7918 · Regions Checking | 11.42 | | 707.28 |
| Check | 07/17/2014 Debit Card | Mia Matthews | 7918 · Regions Checking | 218.64 | | 925.92 |
| Check | 08/11/2014 Debit Card | Adobe | 7918 · Regions Checking | 19.99 | | 945.91 |
| Check | 08/18/2014 Debit Card | Mia Matthews | 7918 · Regions Checking | 83.01 | | 1,028.92 |
| **Total 61750 · Software** | | | | 1,028.92 | 0.00 | 1,028.92 |
| **61775 · IT Consulting** | | | | | | 0.00 |
| Bill | 01/27/2014 INV:158526 | Angle IT Solutions, Inc. | 20000 · Accounts Payable | 148.75 | | 148.75 |
| Bill | 09/07/2014 INV:766871 | Robert V Matthews | 20000 · Accounts Payable | 85.00 | | 233.75 |
| **Total 61775 · IT Consulting** | | | | 233.75 | 0.00 | 233.75 |
| **61800 · Internet** | | | | | | 0.00 |
| Check | 02/27/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 51.78 | | 51.78 |
| Check | 04/16/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 1.99 | | 53.77 |
| Check | 04/27/2014 ACH | 1 & 1 Internet | 7918 · Regions Checking | 51.79 | | 105.56 |
| Check | 05/18/2014 Debit Card | Google | 7918 · Regions Checking | 1.99 | | 107.54 |
| Check | 05/17/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 1.99 | | 109.53 |
| Check | 07/17/2014 Debit Card | Google | 7918 · Regions Checking | 1.99 | | 111.52 |
| Check | 07/25/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 56.79 | | 168.31 |
| Check | 08/18/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 1.99 | | 170.30 |
| **Total 61800 · Internet** | | | | 170.30 | 0.00 | 170.30 |
| **61805 · Website** | | | | | | 0.00 |
| Bill | 04/27/2014 INV:0001 | Chris Kohlhagen | 20000 · Accounts Payable | 75.00 | | 75.00 |
| Bill | 05/09/2014 INV:0002 | Chris Kohlhagen | 20000 · Accounts Payable | 50.00 | | 125.00 |
| Bill | 07/07/2014 INV:14106D Website | The Seventh Art | 20000 · Accounts Payable | 25,000.00 | | 25,125.00 |
| **Total 61805 · Website** | | | | 25,125.00 | 0.00 | 25,125.00 |

**61700 · Computer and Internet Expenses – Other**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | | 0.00 |
| Total 61700 · Computer and Internet Expenses – Other | | | | | | | 0.00 |
| | | | | | | | |
| **Total 61700 · Computer and Internet Expenses** | | | | | 26,758.37 | 0.00 | 26,758.37 |

**62000 · Continuing Education**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | | 0.00 |
| | Check | 01/20/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 16.16 | | 16.16 |
| | Check | 01/23/2014 Debit Card | Landmark | 7918 · Regions Checking | 545.00 | | 561.16 |
| | Check | 02/01/2014 1046 | P&L Driving School | 7918 · Regions Checking | 375.00 | | 936.16 |
| | Check | 04/24/2014 Debit Card | Cantor's Driving School | 7918 · Regions Checking | 607.00 | | 1,543.16 |
| | Check | 06/02/2014 Debit Card | Contractor Classes | 7918 · Regions Checking | 1,624.71 | | 3,167.87 |
| Total 62000 · Continuing Education | | | | | 3,167.87 | 0.00 | 3,167.87 |

**62400 · Depreciation Expense**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Total 62400 · Depreciation Expense | | | | | | | 0.00 |
| | | | | | | | 0.00 |

**62500 · Dues and Subscriptions**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | | 0.00 |
| | Bill | 01/12/2014 ACCT:692872425 | Robert V Matthews | 20000 · Accounts Payable | 1.69 | | 1.69 |
| | Bill | 01/31/2014 Member: M141 | Club Colette | 20000 · Accounts Payable | 0.00 | | 1.69 |
| | Bill | 02/06/2014 ACCT:692872425 | Robert V Matthews | 20000 · Accounts Payable | 36.46 | | 38.15 |
| | Bill | 03/06/2014 ACCT:692872425 | Robert V Matthews | 20000 · Accounts Payable | 36.46 | | 74.61 |
| | Bill | 03/17/2014 ACCT:35184877 | Robert V Matthews | 20000 · Accounts Payable | 162.60 | | 237.21 |
| | Bill | 04/06/2014 ACCT:692872425 | Robert V Matthews | 20000 · Accounts Payable | 36.46 | | 273.67 |
| | Check | 04/22/2014 1076 | Robert V Matthews | 7918 · Regions Checking | 1,000.00 | | 1,273.67 |
| | Bill | 05/04/2014 ACCT:692872425 | Robert V Matthews | 20000 · Accounts Payable | 36.46 | | 1,310.13 |
| | Check | 05/27/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 71.25 | | 1,381.38 |
| | Bill | 06/01/2014 ACCT:692872425 June | Robert V Matthews | 20000 · Accounts Payable | 36.46 | | 1,417.84 |
| | Bill | 07/03/2014 TOC00473417838 | Mia Matthews | 20000 · Accounts Payable | 21.97 | | 1,439.81 |
| | Bill | 07/27/2014 ACCT:862572425 | Robert V Matthews | 20000 · Accounts Payable | 38.46 | | 1,478.27 |
| | Bill | 08/01/2014 ACCT:16183 Matthews | Robert V Matthews | 20000 · Accounts Payable | 10,653.60 | | 12,132.67 |
| | Bill | 08/24/2014 ACCT:692572425 | Robert V Matthews | 20000 · Accounts Payable | 36.46 | | 12,176.33 |
| | Bill | 09/01/2014 Member M141 | Robert V Matthews | 20000 · Accounts Payable | 1,500.00 | | 13,676.33 |
| | Check | 09/03/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 162.60 | | 13,838.93 |
| Total 62500 · Dues and Subscriptions | | | | | 13,838.93 | 0.00 | 13,838.93 |

**62600 · Gift**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | | 0.00 |
| | Check | 01/28/2014 Debit Card | ABC | 7918 · Regions Checking | 39.95 | | 39.95 |
| | Check | 02/27/2014 Debit Card | Cross | 7918 · Regions Checking | 2,029.45 | | 2,069.80 |
| | Check | 02/28/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 30.95 | | 2,100.75 |
| | Check | 03/18/2014 Debit Card | Mia Matthews | 7918 · Regions Checking | 174.95 | | 2,384.70 |
| | Check | 03/18/2014 Debit Card | Mia Matthews | 7918 · Regions Checking | 174.95 | | 2,459.65 |
| | Check | 03/18/2014 Debit Card | Mia Matthews | 7918 · Regions Checking | 95.95 | | 2,555.60 |
| | Check | 03/18/2014 Debit Card | Mia Matthews | 7918 · Regions Checking | 130.95 | | 2,686.55 |
| | Check | 03/18/2014 Debit Card | Mia Matthews | 7918 · Regions Checking | 130.95 | | 2,817.50 |
| | Check | 03/27/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 39.95 | | 2,857.45 |
| | Check | 04/03/2014 Debit Card | Publix | 7918 · Regions Checking | 27.54 | | 2,884.99 |
| | Check | 04/17/2014 Debit Card | Mia Matthews | 7918 · Regions Checking | 94.98 | | 2,979.97 |
| | Check | 04/28/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 39.95 | | 3,019.92 |
| | Bill | 04/30/2014 Member:00035 | Mia Matthews | 20000 · Accounts Payable | 339.36 | | 3,359.28 |
| | Check | 05/19/2014 Debit Card | Mia Matthews | 7918 · Regions Checking | 54.69 | | 3,413.97 |
| | Check | 05/27/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 39.95 | | 3,453.92 |
| | Check | 06/26/2014 Debit Card | Mia Matthews | 7918 · Regions Checking | 598.62 | | 4,052.54 |
| | Check | 06/27/2014 Debit Card | Mia Matthews | 7918 · Regions Checking | 105.45 | | 4,157.99 |
| | Check | 06/27/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 39.95 | | 4,197.94 |
| | Check | 06/27/2014 Debit Card | Mia Matthews | 7918 · Regions Checking | 436.49 | | 4,634.43 |
| | Deposit | 06/30/2014 | Boots | 7918 · Regions Checking | | 180.25 | 4,454.18 |
| | Check | 07/06/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 862.43 | | 5,316.61 |

| | | | | | | |
|---|---|---|---|---|---|---|
| | Check | 07/14/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 169.80 | 5,486.21 |
| | Check | 07/17/2014 Debit Card | Barneys New York | 7918 · Regions Checking | 849.11 | 6,335.32 |
| | Check | 07/17/2014 Debit Card | BCBG | 7918 · Regions Checking | 151.83 | 6,487.15 |
| | Check | 07/28/2014 Debit Card | Mia Matthews | 7918 · Regions Checking | 2,691.21 | 9,178.36 |
| | Check | 07/28/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 30.95 | 9,218.31 |
| | Check | 08/12/2014 Debit Card | Mia Matthews | 7918 · Regions Checking | 1,134.20 | 10,352.51 |
| | Check | 08/14/2014 Debit Card | Vilebrequin | 7918 · Regions Checking | 231.96 | 10,584.47 |
| | Check | 08/27/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 39.95 | 10,624.42 |
| | Check | 08/28/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 59.99 | 10,684.41 |
| Total 62500 · Gift | | | | | 10,684.66    180.25 | 10,684.41 |
| | | | | | | |
| 63300 · Insurance Expense | | | | | | 0.00 |
| 63310 · General Liability Insurance | | | | | | 0.00 |
| Total 63310 · General Liability Insurance | | | | | | 0.00 |
| | | | | | | |
| 63320 · Health Insurance | | | | | | 0.00 |
| | Bill | 01/10/2014 INV:70525608 | Robert V Matthews | 20000 · Accounts Payable | 1,714.11 | 1,714.11 |
| | Bill | 02/04/2014 INV:70841142 | Robert V Matthews | 20000 · Accounts Payable | 1,714.11 | 3,428.22 |
| | Check | 02/10/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 2,000.00 | 5,428.22 |
| | Bill | 03/04/2014 INV:70947167 | Mia Matthews | 20000 · Accounts Payable | 1,714.11 | 7,142.33 |
| | Check | 04/02/2014 Debit Card | Mia Matthews | 7918 · Regions Checking | 350.00 | 7,492.33 |
| | Bill | 04/04/2014 INV:71003836 | Mia Matthews | 20000 · Accounts Payable | 1,714.11 | 9,206.44 |
| | Bill | 06/30/2014 INV:71158456 | Mia Matthews | 20000 · Accounts Payable | 1,916.23 | 11,122.67 |
| | Check | 07/02/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 90.56 | 11,213.63 |
| | Bill | 07/02/2014 INV:71163522 | Mia Matthews | 20000 · Accounts Payable | 1,916.23 | 13,128.86 |
| | Bill | 08/04/2014 INV:71214951 | Mia Matthews | 20000 · Accounts Payable | 1,916.23 | 15,046.09 |
| Total 63320 · Health Insurance | | | | | 15,046.09    0.00 | 15,046.09 |
| | | | | | | |
| 63322 · HO and Auto | | | | | | 0.00 |
| | Bill | 08/14/2014 ACCT:0004220503101 | Robert V Matthews | 20000 · Accounts Payable | 36,133.35 | 36,133.35 |
| | Bill | 08/28/2014 ACCT:0004220503101 | Robert V Matthews | 20000 · Accounts Payable | 31,541.75 | 67,675.10 |
| Total 63322 · HO and Auto | | | | | 67,675.10    0.00 | 67,675.10 |
| | | | | | | |
| 63325 · Dental Insurance | | | | | | 0.00 |
| | Bill | 02/28/2014 ACCT:605200 - Feb'14 | Robert V Matthews | 20000 · Accounts Payable | 36.00 | 36.00 |
| | Bill | 04/15/2014 BID 034Y34 | Mia Matthews | 20000 · Accounts Payable | 342.35 | 378.35 |
| | Check | 05/23/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 685.00 | 1,063.35 |
| | Bill | 07/15/2014 034Y34 Matthews | Mia Matthews | 20000 · Accounts Payable | 342.38 | 1,405.72 |
| | Bill | 07/28/2014 ACCT 605200 | Robert V Matthews | 20000 · Accounts Payable | 934.90 | 2,340.62 |
| Total 63325 · Dental Insurance | | | | | 2,340.62    0.00 | 2,340.62 |
| | | | | | | |
| 63330 · Life and Disability Insurance | | | | | | 0.00 |
| Total 63330 · Life and Disability Insurance | | | | | | 0.00 |
| | | | | | | |
| 63340 · Renters Insurance | | | | | | 0.00 |
| | Bill | 01/01/2014 Quote 7530354 | Celedinas Agency Inc. | 20000 · Accounts Payable | 154.83 | 154.83 |
| Total 63340 · Renters Insurance | | | | | 154.83    0.00 | 154.83 |
| | | | | | | |
| 63345 · Watercraft | | | | | | 0.00 |
| | Bill | 07/11/2014 ACT:MATTRO1-INV 7865 | Oversea Insurance Agency | 20000 · Accounts Payable | 28,590.91 | 28,590.91 |
| | Bill | 07/11/2014 ACT:MATTRO1-INV 7866 | Oversea Insurance Agency | 20000 · Accounts Payable | 2,025.00 | 30,615.91 |
| Total 63345 · Watercraft | | | | | 30,615.91    0.00 | 30,615.91 |
| | | | | | | |
| 63300 · Insurance Expense - Other | | | | | | 0.00 |
| Total 63300 · Insurance Expense - Other | | | | | | 0.00 |
| | | | | | | |
| Total 63300 · Insurance Expense | | | | | 115,832.55    0.00 | 115,832.55 |

**63400 · Interest Expense**

| | | | | | | 0.00 |
|---|---|---|---|---|---|---|
| Total 63400 · Interest Expense | | | | | | 0.00 |

**63500 · Janitorial Expense**

| | | | | | | 0.00 |
|---|---|---|---|---|---|---|
| **63550 · Cleaning Service** | | | | | | 0.00 |
| | Check | 01/24/2014 1026 | Carolina Silva Gonzaga | 7918 · Regions Checking | 500.00 | 500.00 |
| Total 63550 · Cleaning Service | | | | | | 500.00 |
| | | | | | 500.00  0.00 | 500.00 |

**63560 · Supplies**

| | | | | | | 0.00 |
|---|---|---|---|---|---|---|
| | Check | 01/02/2014 Debit Card | Home Depot | 7918 · Regions Checking | 34.92 | 34.92 |
| | Check | 02/24/2014 Debit Card | Staples | 7918 · Regions Checking | 46.42 | 81.34 |
| | Check | 04/01/2014 Debit Card | Staples | 7918 · Regions Checking | 60.17 | 141.51 |
| | Check | 04/22/2014 Debit Card | Staples | 7918 · Regions Checking | 10.78 | 152.29 |
| | Check | 08/10/2014 Debit Card | Walmart | 7918 · Regions Checking | 69.93 | 222.22 |
| Total 63560 · Supplies | | | | | | 222.22 |
| | | | | | 222.22  0.00 | 222.22 |

**63500 · Janitorial Expense - Other**

| | | | | | | 0.00 |
|---|---|---|---|---|---|---|
| | Check | 07/10/2014 Debit Card | Staples | 7918 · Regions Checking | 60.76 | 60.76 |
| | Check | 07/11/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 89.04 | 149.80 |
| | Check | 07/21/2014 Debit Card | Walmart | 7918 · Regions Checking | 35.73 | 185.53 |
| Total 63500 · Janitorial Expense - Other | | | | | | 185.53 |
| | | | | | 185.53  0.00 | 185.53 |

| Total 63500 · Janitorial Expense | | | | | 907.75  0.00 | 907.75 |
|---|---|---|---|---|---|---|

**64400 · Meals and Entertainment**

| | | | | | | 0.00 |
|---|---|---|---|---|---|---|
| | Check | 01/23/2014 ACH | Petty Cash | 7918 · Regions Checking | 500.00 | 500.00 |
| | Bill | 01/31/2014 Member:03635 | Robert V Matthews | 20000 · Accounts Payable | 2,020.57 | 2,520.57 |
| | Bill | 01/31/2014 ACCT: 18183 (Effie) | The Breakers | 20000 · Accounts Payable | 179.63 | 2,700.20 |
| | Bill | 01/31/2014 Member: M141 | Club Colette | 20000 · Accounts Payable | 891.67 | 3,591.87 |
| | Bill | 01/31/2014 Member: M141 | Club Colette | 20000 · Accounts Payable | 0.00 | 3,591.87 |
| | Check | 02/04/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 70.94 | 3,662.81 |
| | Check | 02/04/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 43.67 | 3,706.48 |
| | Check | 02/10/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 354.94 | 4,061.42 |
| | Check | 02/17/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 120.40 | 4,181.82 |
| | Check | 02/21/2014 Petty Cash | Petty Cash | 7918 · Regions Checking | 500.00 | 4,681.82 |
| | Check | 02/24/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 530.34 | 5,212.16 |
| | Bill | 02/28/2014 Member: 03635 | Robert V Matthews | 20000 · Accounts Payable | 584.31 | 5,796.47 |
| | Check | 03/11/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 1,248.14 | 7,044.61 |
| | Check | 03/13/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 373.64 | 7,418.25 |
| | Check | 03/14/2014 Petty Cash | Petty Cash | 7918 · Regions Checking | 500.00 | 7,918.25 |
| | Check | 03/17/2014 Debit Card | Mia Matthews | 7918 · Regions Checking | 15.32 | 7,933.57 |
| | Check | 03/28/2014 Petty Cash | Petty Cash | 7918 · Regions Checking | 500.00 | 8,433.57 |
| | Bill | 03/31/2014 ACCT:18183 | The Breakers | 20000 · Accounts Payable | 585.31 | 9,018.88 |
| | Bill | 03/31/2014 MMBR:03635 | Robert V Matthews | 20000 · Accounts Payable | 1,302.00 | 10,320.88 |
| | Bill | 03/31/2014 MMBR:04230 | Robert V Matthews | 20000 · Accounts Payable | 792.48 | 11,113.34 |
| | Check | 04/10/2014 Debit Card | Walmart | 7918 · Regions Checking | 101.04 | 11,214.38 |
| | Check | 04/14/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 508.24 | 11,722.62 |
| | Check | 04/25/2014 Petty Cash | Petty Cash | 7918 · Regions Checking | 500.00 | 12,222.62 |
| | Bill | 04/30/2014 Member:03635 | Robert V Matthews | 20000 · Accounts Payable | 2,284.07 | 14,506.69 |
| | Check | 05/12/2014 Debit Card | Walmart | 7918 · Regions Checking | 55.10 | 14,561.79 |
| | Check | 05/27/2014 Debit Card | Mia Matthews | 7918 · Regions Checking | 250.83 | 14,812.62 |
| | Check | 05/27/2014 Debit Card | Walmart | 7918 · Regions Checking | 77.13 | 14,889.75 |
| | Check | 05/30/2014 Petty Cash | Petty Cash | 7918 · Regions Checking | 500.00 | 15,389.75 |
| | Bill | 05/31/2014 Member:03635 | Mia Matthews | 20000 · Accounts Payable | 1,843.95 | 17,233.70 |
| | Check | 06/02/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 314.88 | 17,548.58 |
| | Check | 06/09/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 58.29 | 17,606.87 |
| | Check | 06/18/2014 Debit Card | Mia Matthews | 7918 · Regions Checking | 49.29 | 17,656.16 |

| Type | Date | Num | Name | Split | Amount | | Balance |
|------|------|-----|------|-------|--------|---|---------|
| Check | 06/20/2014 | Debit Card | Mia Matthews | 7918 · Regions Checking | 59.29 | | 17,715.45 |
| Check | 06/27/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 1,099.01 | | 18,814.46 |
| Check | 07/02/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 359.18 | | 19,173.64 |
| Check | 07/07/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 416.89 | | 19,590.53 |
| Check | 07/07/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 653.40 | | 20,243.93 |
| Check | 07/07/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 319.08 | | 20,563.01 |
| Check | 07/08/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 1,294.16 | | 21,857.17 |
| Check | 07/09/2014 | Petty Cash | Petty Cash | 7918 · Regions Checking | 500.00 | | 22,357.17 |
| Check | 07/09/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 1,341.43 | | 23,698.60 |
| Check | 07/14/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 681.13 | | 24,379.73 |
| Check | 07/15/2014 | Debit Card | Panera | 7918 · Regions Checking | 31.55 | | 24,411.28 |
| Check | 07/24/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 423.22 | | 24,834.50 |
| Check | 07/28/2014 | Debit Card | Mia Matthews | 7918 · Regions Checking | 208.31 | | 25,042.81 |
| Check | 07/28/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 381.03 | | 25,423.84 |
| Check | 07/28/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 209.06 | | 25,632.90 |
| Check | 07/29/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 297.71 | | 25,930.61 |
| Bill | 08/01/2014 | ACCT 18183 Matthews | Robert V Matthews | 20000 · Accounts Payable | 854.34 | | 26,784.95 |
| Check | 08/05/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 48.04 | | 26,833.99 |
| Check | 08/05/2014 | 1115 | | 7918 · Regions Checking | 3,000.00 | | 29,833.99 |
| Check | 08/08/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 178.46 | | 30,012.45 |
| Check | 08/10/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 156.38 | | 30,168.83 |
| Check | 08/10/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 30.44 | | 30,197.27 |
| Check | 08/13/2014 | Petty Cash | Robert V Matthews | 7918 · Regions Checking | 500.00 | | 30,697.27 |
| Check | 08/24/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 579.12 | | 31,276.39 |
| Check | 08/25/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 32.50 | | 31,308.89 |
| Check | 09/01/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 206.90 | | 31,515.79 |
| Bill | 09/01/2014 | Member.M141 | Club Colette | 20000 · Accounts Payable | 0.00 | | 31,515.79 |
| Bill | 09/01/2014 | Member.M141 | Club Colette | 20000 · Accounts Payable | 0.00 | | 31,515.79 |
| **Total 64300 · Meals and Entertainment** | | | | | **31,515.79** | **0.00** | **31,515.79** |

**64700 · Miscellaneous Expense**

| Type | Date | Num | Name | Split | Amount | | Balance |
|------|------|-----|------|-------|--------|---|---------|
| | | | | | | | 0.00 |
| Check | 01/14/2014 | Debit Card | Image Beauty | 7918 · Regions Checking | 61.27 | | 61.27 |
| Check | 02/03/2014 | Petty Cash | Robert V Matthews | 7918 · Regions Checking | 2,000.00 | | 2,061.27 |
| Check | 02/04/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 24.82 | | 2,086.09 |
| Check | 02/10/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 52.38 | | 2,138.47 |
| Check | 02/10/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 39.41 | | 2,177.88 |
| Check | 03/13/2014 | Debit Card | Mia Matthews | 7918 · Regions Checking | 503.00 | | 2,680.88 |
| Check | 05/09/2014 | Debit Card | New Milford Val | 7918 · Regions Checking | 41.78 | | 2,722.66 |
| Check | 05/12/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 467.33 | | 3,189.99 |
| Check | 05/21/2014 | Debit Card | Mia Matthews | 7918 · Regions Checking | 18.95 | | 3,208.94 |
| Check | 05/28/2014 | Debit Card | Image Beauty | 7918 · Regions Checking | 53.63 | | 3,262.57 |
| Check | 06/10/2014 | Debit Card | Mia Matthews | 7918 · Regions Checking | 24.05 | | 3,284.62 |
| Check | 07/02/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 34.25 | | 3,318.87 |
| Check | 07/07/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 136.13 | | 3,455.00 |
| Check | 07/07/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 190.58 | | 3,645.58 |
| Check | 07/07/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 4,764.41 | | 8,409.99 |
| Check | 07/07/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 188.25 | | 8,598.24 |
| Check | 07/07/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 43.56 | | 8,641.80 |
| Check | 07/17/2014 | Debit Card | Gulf Mart | 7918 · Regions Checking | 33.02 | | 8,674.82 |
| Check | 07/17/2014 | Debit Card | Gulf Mart | 7918 · Regions Checking | 27.22 | | 8,702.04 |
| Check | 08/08/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 56.27 | | 8,758.31 |
| Check | 08/08/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 76.56 | | 8,834.87 |
| Check | 08/12/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 1,151.14 | | 9,986.01 |
| Deposit | 08/12/2014 | | Bloomingdale's | 7918 · Regions Checking | | 63.07 | 9,922.94 |
| **Total 64700 · Miscellaneous Expense** | | | | | **9,985.01** | **63.07** | **9,922.94** |

**64900 · Office Supplies**

| Type | Date | Num | Name | Split | Amount | | Balance |
|------|------|-----|------|-------|--------|---|---------|
| | | | | | | | 0.00 |
| Check | 01/06/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 57.22 | | 57.22 |

| | Type | Date | Num | Name | | Account | | Amount | | Balance |
|---|---|---|---|---|---|---|---|---|---|---|
| | Check | 01/14/2014 | Debit Card | Staples | | 7918 · Regions Checking | | 110.32 | | 167.54 |
| | Check | 01/15/2014 | Debit Card | Walgreens | | 7918 · Regions Checking | | 81.04 | | 248.58 |
| | Check | 01/20/2014 | Debit Card | Staples | | 7918 · Regions Checking | | 33.52 | | 282.10 |
| | Check | 02/03/2014 | Debit Card | Staples | | 7918 · Regions Checking | | 45.70 | | 327.80 |
| | Check | 03/04/2014 | Debit Card | Staples | | 7918 · Regions Checking | | 49.11 | | 376.91 |
| | Check | 03/19/2014 | Debit Card | Staples | | 7918 · Regions Checking | | 179.53 | | 556.44 |
| | Check | 04/17/2014 | Debit Card | Mia Matthews | | 7918 · Regions Checking | | 33.16 | | 589.60 |
| | Check | 04/22/2014 | Debit Card | Staples | | 7918 · Regions Checking | | 50.90 | | 640.50 |
| | Check | 05/08/2014 | Debit Card | Staples | | 7918 · Regions Checking | | 26.90 | | 676.40 |
| | Check | 05/19/2014 | Debit Card | Staples | | 7918 · Regions Checking | | 1.08 | | 677.48 |
| | Check | 06/10/2014 | Debit Card | Staples | | 7918 · Regions Checking | | 44.08 | | 721.56 |
| | Check | 06/16/2014 | Debit Card | Staples | | 7918 · Regions Checking | | 40.17 | | 761.73 |
| | Check | 06/25/2014 | Debit Card | Staples | | 7918 · Regions Checking | | 411.09 | | 1,172.82 |
| | Check | 08/07/2014 | Debit Card | Staples | | 7918 · Regions Checking | | 66.99 | | 1,239.81 |
| | Check | 08/11/2014 | Debit Card | Staples | | 7918 · Regions Checking | | 55.49 | | 1,305.30 |
| | Check | 08/12/2014 | Debit Card | Staples | | 7918 · Regions Checking | | 83.54 | | 1,388.84 |
| | Check | 09/26/2014 | Debit Card | Office Depot | | 7918 · Regions Checking | | 343.61 | | 1,731.85 |
| | Check | 08/26/2014 | Debit Card | Staples | | 7918 · Regions Checking | | 134.86 | | 1,866.71 |
| | Check | 09/01/2014 | Debit Card | Robert V Matthews | | 7918 · Regions Checking | | 579.67 | | 2,446.38 |
| Total 64900 · Office Supplies | | | | | | | | 2,446.38 | 0.00 | 2,446.38 |
| | | | | | | | | | | |
| 66000 · Payroll Expenses | | | | | | | | | | 0.00 |
| Total 66000 · Payroll Expenses | | | | | | | | | | 0.00 |
| | | | | | | | | | | |
| 66500 · Postage and Delivery | | | | | | | | | | 0.00 |
| | Check | 01/29/2014 | Debit Card | The UPS Store | | 7918 · Regions Checking | | 188.00 | | 188.00 |
| | Check | 04/14/2014 | 1036 | CHHU | | 7918 · Regions Checking | | 354.00 | | 542.00 |
| | Check | 07/23/2014 | Debit Card | The UPS Store | | 7918 · Regions Checking | | 14.53 | | 556.53 |
| | Check | 08/06/2014 | Debit Card | American Eagle Embroidery | | 7918 · Regions Checking | | 496.00 | | 1,052.53 |
| | Check | 08/08/2014 | Debit Card | American Eagle Embroidery | | 7918 · Regions Checking | | 343.00 | | 1,395.53 |
| | Check | 08/21/2014 | Debit Card | The UPS Store | | 7918 · Regions Checking | | 174.00 | | 1,569.53 |
| Total 66500 · Postage and Delivery | | | | | | | | 1,569.53 | 0.00 | 1,569.53 |
| | | | | | | | | | | |
| 66700 · Professional Fees | | | | | | | | | | 0.00 |
| 66750 · Consultant | | | | | | | | | | 0.00 |
| | Check | 01/06/2014 | 1007 | Kevin Wright | | 7918 · Regions Checking | | 28,579.00 | | 28,579.00 |
| | Check | 01/26/2014 | Debit Card | Intelus | | 7918 · Regions Checking | | 3.95 | | 28,582.95 |
| | Check | 01/28/2014 | Debit Card | Intelus | | 7918 · Regions Checking | | 3.85 | | 28,586.90 |
| | Check | 02/13/2014 | Wire XFER | Kevin Wright | | 7918 · Regions Checking | | 28,579.00 | | 57,165.90 |
| | Check | 02/17/2014 | Debit Card | Intelus | | 7918 · Regions Checking | | 3.95 | | 57,169.85 |
| | Check | 02/17/2014 | Debit Card | Intelus | | 7918 · Regions Checking | | 3.95 | | 57,173.80 |
| | Check | 02/17/2014 | Debit Card | Intelus | | 7918 · Regions Checking | | 3.95 | | 57,177.75 |
| | Bill | 03/07/2014 | INV:14105A (PH) | The Seventh Art | | 20000 · Accounts Payable | | 28,000.00 | | 85,177.75 |
| | Check | 03/17/2014 | WIRE XFER | Kevin Wright | | 7918 · Regions Checking | | 28,579.00 | | 113,756.75 |
| | Check | 03/20/2014 | Wire XFER | Eduardo Miranda | | 7918 · Regions Checking | | 3,500.00 | | 117,256.75 |
| | Bill | 03/31/2014 | PH Investment Memo | Eduardo Miranda | | 20000 · Accounts Payable | | 1,500.00 | | 118,756.75 |
| | Check | 04/24/2014 | Debit Card | Intelus | | 7918 · Regions Checking | | 3.95 | | 118,760.70 |
| | Check | 04/28/2014 | Debit Card | Checkmate | | 7918 · Regions Checking | | 22.86 | | 118,783.56 |
| | Check | 05/05/2014 | Wire XFER | Kevin Wright | | 7918 · Regions Checking | | 28,579.00 | | 147,362.56 |
| | Check | 05/05/2014 | Debit Card | Delaware Secretary of State | | 7918 · Regions Checking | | 75.00 | | 147,437.56 |
| | Check | 05/12/2014 | 1079 | Lawrence A. Meena Associates, Inc | | 7918 · Regions Checking | | 150,000.00 | | 297,437.56 |
| | Check | 05/15/2014 | Wire XFER | Kevin Wright | | 7918 · Regions Checking | | 28,579.00 | | 326,016.56 |
| | Check | 05/28/2014 | Debit Card | Checkmate | | 7918 · Regions Checking | | 22.86 | | 326,039.42 |
| | Deposit | 06/02/2014 | | Checkmate | | 7918 · Regions Checking | | | 22.86 | 326,016.56 |
| | Bill | 06/18/2014 | INV:2014050044-1 | HVS Consulting & Valuation | | 20000 · Accounts Payable | | 8,228.47 | | 334,245.03 |
| | Check | 07/10/2014 | Debit Card | Robert V Matthews | | 7918 · Regions Checking | | 545.02 | | 334,790.05 |
| | Check | 07/10/2014 | Debit Card | Mr. Bishay Victo | | 7918 · Regions Checking | | 59.06 | | 334,849.01 |
| | Check | 07/18/2014 | Debit Card | Intelus | | 7918 · Regions Checking | | 3.95 | | 334,852.96 |

| Type | Date | Num/Memo | Name | Account | Debit/Credit | | Balance |
|---|---|---|---|---|---|---|---|
| Check | 07/18/2014 Debit Card | | Intelius | 7918 · Regions Checking | 3.95 | | 334,856.91 |
| Check | 07/18/2014 Debit Card | | Intelius | 7918 · Regions Checking | 3.95 | | 334,852.96 |
| Check | 07/18/2014 Debit Card | | Intelius | 7918 · Regions Checking | 3.95 | | 334,864.81 |
| Check | 07/18/2014 Debit Card | | Intelius | 7918 · Regions Checking | 3.95 | | 334,858.76 |
| Check | 07/18/2014 Debit Card | | Intelius | 7918 · Regions Checking | 3.95 | | 334,876.66 |
| Check | 07/18/2014 Debit Card | | Intelius | 7918 · Regions Checking | 3.95 | | 334,872.71 |
| Check | 07/18/2014 Debit Card | | Intelius | 7918 · Regions Checking | 3.95 | | 334,882.61 |
| Check | 07/21/2014 Debit Card | | Intelius | 7918 · Regions Checking | 3.95 | | 334,884.58 |
| Check | 07/21/2014 Debit Card | | Intelius | 7918 · Regions Checking | 3.95 | | 334,888.41 |
| Check | 07/21/2014 Debit Card | | Intelius | 7918 · Regions Checking | 3.95 | | 334,892.46 |
| Check | 07/21/2014 Debit Card | | Intelius | 7918 · Regions Checking | 3.95 | | 334,896.41 |
| Check | 07/21/2014 Debit Card | | Intelius | 7918 · Regions Checking | 3.95 | | 334,900.36 |
| Check | 07/24/2014 Debit Card | | Intelius | 7918 · Regions Checking | 3.95 | | 334,904.31 |
| Check | 07/24/2014 Debit Card | | Intelius | 7918 · Regions Checking | 3.95 | | 334,908.26 |
| Check | 07/29/2014 Wire XFER | | Luxury Attache | 7918 · Regions Checking | 22,000.00 | | 356,908.26 |
| Check | 07/30/2014 Wire XFER | | Monica Venegas | 7918 · Regions Checking | 10,000.00 | | 366,908.26 |
| Check | 08/04/2014 Wire XFER | | Kevin Wright | 7918 · Regions Checking | 28,579.00 | | 395,487.26 |
| Check | 08/04/2014 Wire XFER | | Hospitality Investors Group LLC | 7918 · Regions Checking | 20,000.00 | | 415,487.26 |
| Check | 08/05/2014 Wire XFER | | SB Architects | 7918 · Regions Checking | 10,000.00 | | 425,487.26 |
| Check | 08/05/2014 Wire XFER | | Hospitality Investors Group LLC | 7918 · Regions Checking | 4,650.00 | | 430,137.26 |
| Check | 08/20/2014 Debit Card | | Intelius | 7918 · Regions Checking | 3.95 | | 430,141.21 |
| Check | 08/25/2014 Wire XFER | | Monica Venegas | 7918 · Regions Checking | 10,000.00 | | 440,141.21 |
| Bill | 08/27/2014 August 2014 | | Gordon Campbell Gray | 20000 · Accounts Payable | 10,000.00 | | 450,141.21 |
| | | | | | 450,164.07 | 22.86 | 450,141.21 |

**Total 66700 · Consultant**

**66760 · Contractor**

| | | | | | | | 0.00 |
|---|---|---|---|---|---|---|---|
| Check | 01/02/2014 ACH | | New Haven Contracting South | 7918 · Regions Checking | 30,000.00 | | 30,000.00 |
| Check | 01/07/2014 ACH | | New Haven Contracting South | 7918 · Regions Checking | 50,000.00 | | 80,000.00 |
| Check | 01/10/2014 XFER | | New Haven Contracting South | 7918 · Regions Checking | 75,000.00 | | 155,000.00 |
| Check | 01/17/2014 ACH | | New Haven Contracting South | 7918 · Regions Checking | 75,000.00 | | 230,000.00 |
| Check | 01/30/2014 ACH | | New Haven Contracting South | 7918 · Regions Checking | 150,000.00 | | 380,000.00 |
| Check | 02/10/2014 ACH | | New Haven Contracting South | 7918 · Regions Checking | 300,000.00 | | 680,000.00 |
| Check | 02/21/2014 Wire XFER | | New Haven Contracting South | 7918 · Regions Checking | 440,000.00 | | 1,120,000.00 |
| Check | 02/28/2014 Wire XFER | | New Haven Contracting South | 7918 · Regions Checking | 300,000.00 | | 1,420,000.00 |
| Check | 03/03/2014 ACH | | New Haven Contracting South | 7918 · Regions Checking | 100,000.00 | | 1,520,000.00 |
| Check | 03/12/2014 ACH | | New Haven Contracting South | 7918 · Regions Checking | 10,000.00 | | 1,530,000.00 |
| Check | 03/13/2014 ACH | | New Haven Contracting South | 7918 · Regions Checking | 100,000.00 | | 1,630,000.00 |
| Deposit | 03/13/2014 | | Regions Bank | 7918 · Regions Checking | | 10,000.00 | 1,620,000.00 |
| Check | 03/14/2014 ACH | | New Haven Contracting South | 7918 · Regions Checking | 350,000.00 | | 1,970,000.00 |
| Check | 03/17/2014 ACH | | New Haven Contracting South | 7918 · Regions Checking | 60,000.00 | | 2,030,000.00 |
| Check | 03/20/2014 ACH | | New Haven Contracting South | 7918 · Regions Checking | 100,000.00 | | 2,130,000.00 |
| Check | 03/25/2014 ACH | | New Haven Contracting South | 7918 · Regions Checking | 100,000.00 | | 2,230,000.00 |
| Check | 03/28/2014 ACH | | New Haven Contracting South | 7918 · Regions Checking | 225,000.00 | | 2,455,000.00 |
| Check | 04/04/2014 ACH | | New Haven Contracting South | 7918 · Regions Checking | 100,000.00 | | 2,555,000.00 |
| Check | 04/11/2014 ACH | | New Haven Contracting South | 7918 · Regions Checking | 300,000.00 | | 2,855,000.00 |
| Check | 04/22/2014 ACH | | New Haven Contracting South | 7918 · Regions Checking | 100,000.00 | | 2,955,000.00 |
| Check | 04/25/2014 ACH | | New Haven Contracting South | 6046 · Regions MMA | 150,000.00 | | 3,105,000.00 |
| Check | 04/29/2014 Wire XFER | | New Haven Contracting South | 7918 · Regions Checking | 2,650,000.00 | | 5,755,000.00 |
| Check | 04/30/2014 ACH | | New Haven Contracting South | 7918 · Regions Checking | 200,000.00 | | 5,955,000.00 |
| Check | 05/05/2014 ACH | | New Haven Contracting South | 7918 · Regions Checking | 200,000.00 | | 6,155,000.00 |
| Check | 05/12/2014 Wire XFER | | New Haven Contracting South | 7918 · Regions Checking | 845,000.00 | | 7,000,000.00 |
| Check | 05/23/2014 ACH | | New Haven Contracting South | 7918 · Regions Checking | 200,000.00 | | 7,200,000.00 |
| Check | 05/30/2014 ACH | | New Haven Contracting South | 7918 · Regions Checking | 255,000.00 | | 7,455,000.00 |
| Check | 06/03/2014 ACH | | New Haven Contracting South | 7918 · Regions Checking | 100,000.00 | | 7,555,000.00 |
| Check | 06/05/2014 Wire XFER | | New Haven Contracting South | 7918 · Regions Checking | 845,000.00 | | 8,400,000.00 |
| Check | 06/13/2014 ACH | | New Haven Contracting South | 7918 · Regions Checking | 200,000.00 | | 8,600,000.00 |
| Check | 06/20/2014 ACH | | New Haven Contracting South | 7918 · Regions Checking | 300,000.00 | | 8,900,000.00 |
| Check | 06/24/2014 ACH | | New Haven Contracting South | 7918 · Regions Checking | 325,000.00 | | 9,225,000.00 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Check | 07/02/2014 ACH | New Haven Contracting South | 7918 · Regions Checking | 150,000.00 | | 9,375,000.00 |
| | Check | 07/03/2014 ACH | New Haven Contracting South | 7918 · Regions Checking | 200,000.00 | | 9,575,000.00 |
| | Check | 07/08/2014 ACH | New Haven Contracting South | 7918 · Regions Checking | 450,000.00 | | 10,025,000.00 |
| | Check | 07/17/2014 ACH | New Haven Contracting South | 7918 · Regions Checking | 350,000.00 | | 10,375,000.00 |
| | Check | 07/22/2014 ACH | New Haven Contracting South | 7918 · Regions Checking | 200,000.00 | | 10,575,000.00 |
| | Check | 07/25/2014 ACH | New Haven Contracting South | 7918 · Regions Checking | 110,000.00 | | 10,685,000.00 |
| | Check | 07/29/2014 ACH | New Haven Contracting South | 7918 · Regions Checking | 200,000.00 | | 10,885,000.00 |
| | Check | 08/05/2014 ACH | New Haven Contracting South | 7918 · Regions Checking | 300,000.00 | | 11,185,000.00 |
| | Check | 08/07/2014 ACH | New Haven Contracting South | 7818 · Regions Checking | 150,000.00 | | 11,335,000.00 |
| | Check | 08/11/2014 ACH | New Haven Contracting South | 7918 · Regions Checking | 350,000.00 | | 11,685,000.00 |
| | Check | 08/15/2014 ACH | New Haven Contracting South | 7918 · Regions Checking | 100,000.00 | | 11,785,000.00 |
| | Check | 08/18/2014 Wire XFER | New Haven Contracting South | 7918 · Regions Checking | 50,000.00 | | 11,835,000.00 |
| | Check | 08/18/2014 Wire XFER | New Haven Contracting South | 7918 · Regions Checking | 50,000.00 | | 11,885,000.00 |
| | Check | 08/25/2014 ACH | New Haven Contracting South | 7918 · Regions Checking | 122,000.00 | | 12,007,000.00 |
| Total 66760 · Contractor | | | | | 12,917,000.00 | 10,000.00 | 12,007,000.00 |
| | | | | | | | |
| 66765 · Developer | | | | | | | 0.00 |
| | Check | 05/27/2014 ACH | Robert V Matthews | 7918 · Regions Checking | 1,100,000.00 | | 1,100,000.00 |
| Total 66765 · Developer | | | | | 1,100,000.00 | 0.00 | 1,100,000.00 |
| | | | | | | | |
| 66766 · Interior Designer | | | | | | | 0.00 |
| | Bill | 05/30/2014 Retainer - Clematis | Clematis Project | 20000 · Accounts Payable | 39,750.00 | | 39,750.00 |
| Total 66766 · Interior Designer | | | | | 39,750.00 | 0.00 | 39,750.00 |
| | | | | | | | |
| 66767 · Le Cirque | | | | | | | 0.00 |
| | Check | 07/23/2014 Wire XFER | LC Palm Beach LLC | 7918 · Regions Checking | 122,000.00 | | 122,000.00 |
| Total 66767 · Le Cirque | | | | | 122,000.00 | 0.00 | 122,000.00 |
| | | | | | | | |
| 66770 · Legal | | | | | | | 0.00 |
| | Bill | 01/06/2014 INV 20776 | Leslie Robert Evans & Associates PA | 20000 · Accounts Payable | 525.50 | | 525.50 |
| | Check | 04/22/2014 Debit Card | Florida Division of Corporations | 7918 · Regions Checking | 138.75 | | 663.75 |
| | Bill | 04/03/2014 Consulting Fee | Jerry E. Aron, PA | 20000 · Accounts Payable | 22,000.00 | | 22,663.75 |
| | Bill | 04/04/2014 Fee Agreement | Citkin Lubitz Martens & O'Connell | 20000 · Accounts Payable | 3,500.00 | | 26,163.75 |
| | Bill | 04/04/2014 INV 20356 | Leslie Robert Evans & Associates PA | 20000 · Accounts Payable | 455.00 | | 26,618.75 |
| | Check | 04/02/2014 Wire XFER | Robert V Matthews | 7918 · Regions Checking | 7,500.00 | | 34,118.75 |
| | Check | 04/30/2014 Debit Card | Florida Division of Corporations | 7918 · Regions Checking | 138.75 | | 34,257.50 |
| | Check | 04/30/2014 Debit Card | Florida Division of Corporations | 7918 · Regions Checking | 138.75 | | 34,396.25 |
| | Bill | 05/07/2014 INV 1219014 | Robert V Matthews | 20000 · Accounts Payable | 3,033.60 | | 37,429.85 |
| | Check | 05/22/2014 Debit Card | Florida Division of Corporations | 7918 · Regions Checking | 377.50 | | 37,807.35 |
| | Bill | 05/03/2014 Client 36253 | Robert V Matthews | 20000 · Accounts Payable | 15,973.62 | | 53,780.97 |
| | Bill | 05/10/2014 INV 1221584 | Robert V Matthews | 20000 · Accounts Payable | 3,153.65 | | 56,934.62 |
| | Bill | 07/08/2014 INV 1223746 | Robert V Matthews | 20000 · Accounts Payable | 1,778.65 | | 58,713.27 |
| | Bill | 06/12/2014 PH Logo TM Retainer | Novak Druce Connolly Bove + Quigg LLP | 20000 · Accounts Payable | 1,500.00 | | 60,213.27 |
| Total 66770 · Legal | | | | | 60,213.27 | 0.00 | 60,213.27 |
| | | | | | | | |
| 66780 · Procurement | | | | | | | 0.00 |
| | Bill | 03/25/2014 INV.25553 | The Parker Company | 20000 · Accounts Payable | 14,545.45 | | 14,545.45 |
| | Bill | 03/25/2014 INV.3712 | The Parker Company | 20000 · Accounts Payable | 100,000.00 | | 114,545.45 |
| Total 66780 · Procurement | | | | | 114,545.45 | 0.00 | 114,545.45 |
| | | | | | | | |
| 66790 · Registered Agent | | | | | | | 0.00 |
| | Check | 04/30/2014 Debit Card | The Company Corporation | 7918 · Regions Checking | 50.00 | | 50.00 |
| | Check | 05/15/2014 Debit Card | The Company Corporation | 7918 · Regions Checking | 219.00 | | 269.00 |
| | Check | 05/27/2014 Debit Card | The Company Corporation | 7918 · Regions Checking | 1,840.00 | | 1,909.00 |
| | Check | 05/29/2014 Debit Card | The Company Corporation | 7918 · Regions Checking | 166.00 | | 2,076.00 |
| | Check | 05/29/2014 Debit Card | The Company Corporation | 7918 · Regions Checking | 50.00 | | 2,126.00 |
| | Check | 06/17/2014 Debit Card | Mia Matthews | 7918 · Regions Checking | 184.00 | | 2,392.00 |
| | Bill | 08/09/2014 INV.76633237 | The Company Corporation | 20000 · Accounts Payable | 205.00 | | 2,597.00 |

| | Check | 08/18/2014 Debit Card | The Company Corporation | 7818 · Regions Checking | 164.00 | | 2,591.00 |
|---|---|---|---|---|---|---|---|
| | Check | 08/26/2014 Debit Card | Robert V Matthews | 7818 · Regions Checking | 164.00 | | 2,655.00 |
| | Check | 08/27/2014 Debit Card | The Company Corporation | 7818 · Regions Checking | 25.00 | | 2,680.00 |
| Total 66700 · Registered Agent | | | | | 2,680.00 | 0.00 | 2,680.00 |
| | | | | | | | |
| 66700 · Professional Fees - Other | | | | | | | 0.00 |
| Total 66700 · Professional Fees - Other | | | | | | | 0.00 |
| | | | | | | | |
| Total 66700 · Professional Fees | | | | | 13,906,552.79 | 10,022.86 | 13,896,529.93 |
| | | | | | | | |
| 67100 · Rent Expense | | | | | | | 0.00 |
| 67110 · Managing Director | | | | | | | 0.00 |
| | Bill | 02/01/2014 City Palms - #236 | Niklaus Leuenberger | 20000 · Accounts Payable | 2,050.00 | | 2,050.00 |
| | Bill | 03/01/2014 City Palms - #236 | Niklaus Leuenberger | 20000 · Accounts Payable | 2,050.00 | | 4,100.00 |
| | Bill | 04/01/2014 April Rent #236 | Niklaus Leuenberger | 20000 · Accounts Payable | 2,050.00 | | 6,150.00 |
| | Bill | 05/08/2014 May'14 Rent - #236 | Niklaus Leuenberger | 20000 · Accounts Payable | 2,050.00 | | 8,200.00 |
| | Bill | 06/01/2014 June'14 Rent - #236 | Niklaus Leuenberger | 20000 · Accounts Payable | 2,050.00 | | 10,250.00 |
| | Bill | 06/05/2014 ETF Unit 236 | Niklaus Leuenberger | 20000 · Accounts Payable | 2,050.00 | | 12,300.00 |
| | Deposit | 07/08/2014 | McWilliams Ballard Florida | 7818 · Regions Checking | | 2,050.00 | 10,250.00 |
| Total 67110 · Managing Director | | | | | 12,300.00 | 2,050.00 | 10,250.00 |
| | | | | | | | |
| 67100 · Rent Expense - Other | | | | | | | 0.00 |
| Total 67100 · Rent Expense - Other | | | | | | | 0.00 |
| | | | | | | | |
| Total 67100 · Rent Expense | | · | | | 12,300.00 | 2,050.00 | 10,250.00 |
| | | | | | | | |
| 67200 · Repairs and Maintenance | | | | | | | 0.00 |
| | Check | 05/07/2014 Debit Card | Robert V Matthews | 7818 · Regions Checking | 150.00 | | 150.00 |
| | Check | 05/29/2014 Debit Card | L.A. Gold Leaf | 7818 · Regions Checking | 190.05 | | 340.05 |
| Total 67200 · Repairs and Maintenance | | | | | 340.05 | 0.00 | 340.05 |
| | | | | | | | |
| 68000 · Taxes - Property | | | | | | | 0.00 |
| 68005 · DE LLC Tax | | | | | | | 0.00 |
| | Bill | 04/01/2014 FILE:5252935 | Palm House LLC | 20000 · Accounts Payable | 250.00 | | 250.00 |
| Total 68005 · DE LLC Tax | | | | | 250.00 | 0.00 | 250.00 |
| | | | | | | | |
| 68000 · Taxes - Property - Other | | | | | | | 0.00 |
| Total 68000 · Taxes - Property - Other | | | | | | | 0.00 |
| | | | | | | | |
| Total 68000 · Taxes - Property | | | | | 250.00 | 0.00 | 250.00 |
| | | | | | | | |
| 68100 · Telephone Expense | | | | | | | 0.00 |
| | Bill | 01/02/2014 ACCT.878758065 | AT&T Mobility | 20000 · Accounts Payable | 457.22 | | 457.22 |
| | Check | 02/03/2014 ACH | AT&T Mobility | 7818 · Regions Checking | 1,117.75 | | 1,564.97 |
| | Check | 02/14/2014 Debit Card | Robert V Matthews | 7818 · Regions Checking | 95.40 | | 1,660.37 |
| | Check | 03/05/2014 ACH | AT&T Mobility | 7818 · Regions Checking | 1,274.78 | | 2,935.15 |
| | Check | 03/10/2014 Debit Card | AT&T Mobility | 7818 · Regions Checking | 239.97 | | 3,195.12 |
| | Check | 03/10/2014 Debit Card | Mia Matthews | 7818 · Regions Checking | 420.75 | | 3,615.87 |
| | Check | 04/08/2014 Debit Card | AT&T Mobility | 7818 · Regions Checking | 366.98 | | 3,982.85 |
| | Check | 04/09/2014 Debit Card | AT&T Mobility | 7818 · Regions Checking | 115.49 | | 4,098.34 |
| | Check | 05/08/2014 Debit Card | AT&T Mobility | 7818 · Regions Checking | 115.52 | | 4,213.86 |
| | Check | 05/09/2014 ACH | AT&T Mobility | 7818 · Regions Checking | 528.33 | | 4,742.19 |
| | Check | 06/09/2014 ACH | AT&T Mobility | 7818 · Regions Checking | 788.18 | | 5,530.37 |
| | Check | 06/09/2014 Debit Card | AT&T Mobility | 7818 · Regions Checking | 115.52 | | 5,645.89 |
| | Check | 07/08/2014 Debit Card | AT&T Mobility | 7818 · Regions Checking | 116.10 | | 5,761.99 |
| | Check | 07/09/2014 Debit Card | AT&T Mobility | 7818 · Regions Checking | 456.28 | | 6,218.27 |
| | Check | 08/08/2014 Debit Card | AT&T Mobility | 7818 · Regions Checking | 116.01 | | 6,334.28 |

| | | Type | Date | Num | Name | Split | Amount | Balance |
|---|---|---|---|---|---|---|---|---|
| | | Check | 08/09/2014 | ACH | Robert V Matthews | 7918 · Regions Checking | 2,433.15 | 8,767.43 |
| Total 68100 · Telephone Expense | | | | | | | 8,767.43 | 0.00 | 8,767.43 |
| | | | | | | | | 0.00 |
| 68400 · Travel Expense | | | | | | | | |
| 68425 · Accommodations | | | | | | | | 0.00 |
| | | | | | | | | 0.00 |
| | | Check | 02/04/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 4,842.49 | 4,842.49 |
| | | Check | 02/10/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 28.44 | 4,870.93 |
| | | Check | 03/06/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 693.19 | 5,564.12 |
| | | Check | 03/07/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 424.95 | 5,989.07 |
| | | Check | 04/07/2014 | Debit Card | Mia Matthews | 7918 · Regions Checking | 202.27 | 6,191.34 |
| | | Check | 04/09/2014 | Debit Card | Mia Matthews | 7918 · Regions Checking | 115.78 | 6,307.12 |
| | | Check | 04/14/2014 | Debit Card | Mia Matthews | 7918 · Regions Checking | 192.66 | 6,499.77 |
| | | Check | 04/22/2014 | Debit Card | Mia Matthews | 7918 · Regions Checking | 131.19 | 6,630.96 |
| | | Check | 04/24/2014 | Debit Card | Mia Matthews | 7918 · Regions Checking | 0.01 | 6,630.97 |
| | | Check | 05/16/2014 | Debit Card | Mia Matthews | 7918 · Regions Checking | 190.97 | 6,821.94 |
| | | Check | 05/19/2014 | Debit Card | Mia Matthews | 7918 · Regions Checking | 121.47 | 6,943.41 |
| | | Check | 05/20/2014 | Debit Card | Mia Matthews | 7918 · Regions Checking | 121.47 | 7,064.88 |
| | | Check | 05/29/2014 | Debit Card | Mia Matthews | 7918 · Regions Checking | 174.83 | 7,239.71 |
| | | Check | 05/29/2014 | Debit Card | Mia Matthews | 7918 · Regions Checking | 111.00 | 7,350.71 |
| | | Check | 06/02/2014 | Debit Card | Mia Matthews | 7918 · Regions Checking | 9.95 | 7,360.66 |
| | | Check | 06/13/2014 | Debit Card | Mia Matthews | 7918 · Regions Checking | 131.19 | 7,501.80 |
| | | Check | 06/13/2014 | Debit Card | Mia Matthews | 7918 · Regions Checking | 15.00 | 7,516.80 |
| | | Check | 06/13/2014 | Debit Card | Mia Matthews | 7918 · Regions Checking | 91.93 | 7,608.73 |
| | | Check | 06/16/2014 | Debit Card | Mia Matthews | 7918 · Regions Checking | 114.30 | 7,723.03 |
| | | Check | 06/23/2014 | Debit Card | Mia Matthews | 7918 · Regions Checking | 108.48 | 7,831.51 |
| | | Check | 06/23/2014 | Debit Card | Mia Matthews | 7918 · Regions Checking | 25.00 | 7,856.51 |
| | | Check | 06/30/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 511.57 | 8,368.08 |
| | | Check | 06/30/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 10,654.32 | 19,022.40 |
| | | Check | 06/30/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 2,048.86 | 21,071.26 |
| | | Check | 06/30/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 2,048.86 | 23,120.12 |
| | | Check | 07/01/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 5,251.36 | 28,371.48 |
| | | Check | 07/01/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 61.56 | 28,433.06 |
| | | Check | 07/07/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 8,256.12 | 36,689.18 |
| | | Check | 07/09/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 6,968.98 | 43,668.16 |
| | | Check | 07/24/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 8,369.03 | 52,037.19 |
| | | Check | 08/18/2014 | Debit Card | Mia Matthews | 7918 · Regions Checking | 532.48 | 52,569.67 |
| | | Check | 08/18/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 665.40 | 53,235.07 |
| Total 68425 · Accommodations | | | | | | | 53,235.07 | 0.00 | 53,235.07 |
| 68450 · Airline | | | | | | | | 0.00 |
| | | Check | 01/10/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 993.00 | 993.00 |
| | | Check | 01/14/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 15.00 | 1,008.00 |
| | | Check | 02/03/2014 | WIRE XFER | Robert V Matthews | 7918 · Regions Checking | 8,592.40 | 9,600.40 |
| | | Check | 02/04/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 2,071.00 | 11,671.40 |
| | | Check | 03/04/2014 | Debit Card | Mia Matthews | 7918 · Regions Checking | 596.00 | 12,267.40 |
| | | Check | 03/06/2014 | Debit Card | Mia Matthews | 7918 · Regions Checking | 258.00 | 12,525.40 |
| | | Check | 03/10/2014 | Debit Card | Mia Matthews | 7918 · Regions Checking | 25.00 | 12,550.40 |
| | | Check | 03/17/2014 | Debit Card | Mia Matthews | 7918 · Regions Checking | 338.00 | 12,888.40 |
| | | Check | 03/17/2014 | Debit Card | Mia Matthews | 7918 · Regions Checking | 6.00 | 12,894.40 |
| | | Check | 04/29/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 395.00 | 13,289.40 |
| | | Check | 05/05/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 1,102.50 | 14,391.90 |
| | | Check | 05/08/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 650.50 | 15,042.40 |
| | | Check | 05/09/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 50.00 | 15,092.40 |
| | | Check | 05/09/2014 | Debit Card | Jet Blue | 7918 · Regions Checking | 910.00 | 16,002.40 |
| | | Check | 05/09/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 275.00 | 16,277.40 |
| | | Check | 05/12/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 50.00 | 16,327.40 |
| | | Deposit | 05/12/2014 | | Jet Blue | 7918 · Regions Checking | | 50.00 | 16,277.40 |

| Type | Date | | Name | Account | | Amount | |
|---|---|---|---|---|---|---|---|
| Check | 05/13/2014 | Debit Card | Mia Matthews | 7918 · Regions Checking | 525.00 | | 16,802.40 |
| Check | 06/14/2014 | Debit Card | Mia Matthews | 7918 · Regions Checking | 50.00 | | 16,852.40 |
| Check | 06/18/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 50.00 | | 16,902.40 |
| Check | 06/18/2014 | Debit Card | Mia Matthews | 7918 · Regions Checking | 50.00 | | 16,852.40 |
| Check | 06/18/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 50.00 | | 17,002.40 |
| Check | 06/18/2014 | Debit Card | Mia Matthews | 7918 · Regions Checking | 386.00 | | 17,388.40 |
| Check | 06/18/2014 | Debit Card | Mia Matthews | 7918 · Regions Checking | 294.00 | | 17,682.40 |
| Check | 05/22/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 5.00 | | 17,687.40 |
| Check | 06/23/2014 | Debit Card | Mia Matthews | 7918 · Regions Checking | 10,837.86 | | 28,525.26 |
| Check | 06/23/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 10,837.86 | | 39,363.12 |
| Check | 06/23/2014 | 1091 | Robert V Matthews | 7918 · Regions Checking | 10,837.86 | | 50,200.98 |
| Check | 06/23/2014 | 1092 | Robert V Matthews | 7918 · Regions Checking | 12,717.46 | | 62,918.44 |
| Check | 06/26/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 1,445.05 | | 64,363.49 |
| Check | 06/27/2014 | Debit Card | XD - Edent's Travel | 7918 · Regions Checking | 45.00 | | 64,408.49 |
| Check | 06/27/2014 | Debit Card | XD - Edent's Travel | 7918 · Regions Checking | 100.00 | | 64,508.49 |
| Check | 06/27/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 201.90 | | 64,710.39 |
| Check | 06/30/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 717.00 | | 65,427.39 |
| Deposit | 06/30/2014 | | Easy Jet | 7918 · Regions Checking | | 568.00 | 64,861.39 |
| Check | 07/01/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 1.71 | | 64,863.10 |
| Check | 07/02/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 234.74 | | 65,097.84 |
| Check | 07/06/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 95.56 | | 65,193.40 |
| Check | 07/11/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 98.00 | | 65,291.40 |
| Check | 07/14/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 393.00 | | 65,684.40 |
| Check | 07/24/2014 | Debit Card | Mia Matthews | 7918 · Regions Checking | 1.00 | | 65,685.40 |
| Check | 07/24/2014 | Debit Card | Mia Matthews | 7918 · Regions Checking | 156.07 | | 65,841.47 |
| Check | 07/24/2014 | Debit Card | Mia Matthews | 7918 · Regions Checking | 1,797.40 | | 67,638.87 |
| Check | 07/25/2014 | Debit Card | Vista South America | 7918 · Regions Checking | 8,983.60 | | 76,622.47 |
| Check | 07/28/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 8,426.80 | | 85,029.27 |
| Check | 07/28/2014 | Debit Card | Airlines Repor | 7918 · Regions Checking | 96.00 | | 85,125.27 |
| Check | 07/28/2014 | Debit Card | Airlines Repor | 7918 · Regions Checking | 20.00 | | 85,145.27 |
| Check | 07/28/2014 | Debit Card | Meridiana | 7918 · Regions Checking | 420.40 | | 85,565.67 |
| Check | 07/28/2014 | Debit Card | Mia Matthews | 7918 · Regions Checking | 474.50 | | 86,040.17 |
| Deposit | 07/28/2014 | | Expedia | 7918 · Regions Checking | | 92.07 | 85,948.10 |
| Deposit | 07/28/2014 | | Expedia | 7918 · Regions Checking | | 400.00 | 85,548.10 |
| Check | 07/29/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 282.60 | | 85,830.70 |
| Check | 07/29/2014 | Debit Card | Mia Matthews | 7918 · Regions Checking | 755.50 | | 86,586.30 |
| Check | 08/04/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 568.60 | | 87,154.90 |
| Check | 08/11/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 4,847.40 | | 92,002.30 |
| Check | 08/11/2014 | Debit Card | Mia Matthews | 7918 · Regions Checking | 4,657.10 | | 96,659.40 |
| Check | 08/11/2014 | Debit Card | Mia Matthews | 7918 · Regions Checking | 202.10 | | 96,861.50 |
| Check | 08/11/2014 | Debit Card | Jeff Kramer Travel | 7918 · Regions Checking | 60.00 | | 96,921.50 |
| Check | 08/12/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 215.00 | | 97,136.50 |
| Check | 08/12/2014 | Debit Card | Mia Matthews | 7918 · Regions Checking | 215.00 | | 97,351.50 |
| Check | 08/12/2014 | Debit Card | Jeff Kramer Travel | 7918 · Regions Checking | 70.00 | | 97,421.50 |
| Check | 08/18/2014 | Debit Card | Al Italia | 7918 · Regions Checking | 450.00 | | 97,871.50 |
| Check | 08/18/2014 | Debit Card | Airlines Repor | 7918 · Regions Checking | 45.00 | | 97,916.50 |
| Check | 08/18/2014 | Debit Card | ARC | 7918 · Regions Checking | 92.56 | | 98,009.06 |
| Check | 08/19/2014 | Debit Card | Mia Matthews | 7918 · Regions Checking | 323.50 | | 98,332.56 |
| **Total 66450 · Airline** | | | | | **99,440.73** | **1,108.07** | **98,332.66** |

**66475 · Taxi, Shuttle, Limo**

| | | | | | | | 0.00 |
|---|---|---|---|---|---|---|---|
| Check | 01/14/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 120.00 | | 120.00 |
| Check | 03/06/2014 | Debit Card | NYC Taxi | 7918 · Regions Checking | 13.00 | | 133.00 |
| Check | 03/06/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 87.50 | | 220.50 |
| Check | 03/06/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 40.83 | | 241.33 |
| Check | 03/06/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 67.50 | | 308.83 |
| Check | 03/07/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 34.00 | | 342.83 |
| Check | 03/07/2014 | Debit Card | Robert V Matthews | 7918 · Regions Checking | 40.83 | | 383.66 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Check | 03/17/2014 Debit Card | Mia Matthews | 7918 · Regions Checking | 1.00 | | 384.65 |
| | Check | 03/18/2014 Debit Card | Mia Matthews | 7918 · Regions Checking | 381.10 | | 765.75 |
| | Check | 05/12/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 140.00 | | 905.75 |
| | Check | 06/30/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 300.34 | | 1,206.10 |
| | Check | 07/14/2014 Debit Card | Mia Matthews | 7918 · Regions Checking | 5.00 | | 1,211.10 |
| | Check | 07/23/2014 Debit Card | Mia Matthews | 7918 · Regions Checking | 4.00 | | 1,215.10 |
| Total 68475 · Taxi, Shuttle, Limo | | | | | 1,215.10 | 0.00 | 1,215.10 |
| **68400 · Travel Expense - Other** | | | | | | | 0.00 |
| Total 68400 · Travel Expense - Other | | | | | | | 0.00 |
| Total 68400 · Travel Expense | | | | | 153,860.90 | 1,108.07 | 157,782.83 |
| | Check | 03/18/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 58.30 | | 58.30 |
| | Check | 04/16/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 58.30 | | 116.60 |
| | Check | 05/16/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 1,371.45 | | 1,488.05 |
| | Check | 09/18/2014 Debit Card | Robert V Matthews | 7918 · Regions Checking | 854.39 | | 2,342.44 |
| | Check | 08/18/2014 Debit Card | Mia Matthews | 7918 · Regions Checking | 362.14 | | 2,704.58 |
| Total 68500 · Uniforms | | | | | 2,704.58 | 0.00 | 2,704.58 |
| **TOTAL** | | | | | 17,340,973.40 | 14,060.69 | 17,326,912.81 |
| Construction | | | | | 12,007,000.00 | | |
| Expenses minus Construction | | | | | 5,319,912.81 | | |

# *State of Florida*
# *Department of State*

I certify from the records of this office that BOTTICELLI ADVISORS, LLC, is a limited liability company organized under the laws of the State of Florida, filed on January 26, 2012, effective January 26, 2012.

The document number of this company is L12000012565.

I further certify that said company has paid all fees due this office through December 31, 2014, that its most recent annual report was filed on February 7, 2014, and its status is active.

*Given under my hand and the*
*Great Seal of the State of Florida*
*at Tallahassee, the Capital, this*
*the Seventh day of February, 2014*



*Ken Detzner*

*Secretary of State*

Authentication ID: CU2588844664

To authenticate this certificate, visit the following site, enter this ID, and then follow the instructions displayed.

https://efile.sunbiz.org/certauthver.html

**EXHIBIT G**

# Electronic Articles of Organization
## For
## Florida Limited Liability Company

L12000012565
FILED 8:00 AM
January 26, 2012
Sec. Of State
gmcleod

## Article I

The name of the Limited Liability Company is:

BOTTICELLI ADVISORS, LLC

## Article II

The street address of the principal office of the Limited Liability Company is:

13501 SOUTH SHORE BOULEVARD
SUITE 103
WELLINGTON, FL.  33414

The mailing address of the Limited Liability Company is:

13501 SOUTH SHORE BOULEVARD
SUITE 103
WELLINGTON, FL.  33414

## Article III

The purpose for which this Limited Liability Company is organized is:

ANY AND ALL LAWFUL BUSINESS.

## Article IV

The name and Florida street address of the registered agent is:

CRAIG T GALLE
13501 SOUTH SHORE BOULEVARD
SUITE 103
WELLINGTON, FL.  33414

Having been named as registered agent and to accept service of process for the above stated limited liability company at the place designated in this certificate, I hereby accept the appointment as registered agent and agree to act in this capacity. I further agree to comply with the provisions of all statutes relating to the proper and complete performance of my duties, and I am familiar with and accept the obligations of my position as registered agent.

Registered Agent Signature:  CRAIG T. GALLE

## Article V

The effective date for this Limited Liability Company shall be:

01/26/2012

Signature of member or an authorized representative of a member

Electronic Signature: CRAIG T. GALLE

I am the member or authorized representative submitting these Articles of Organization and affirm that the facts stated herein are true. I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S. I understand the requirement to file an annual report between January 1st and May 1st in the calendar year following formation of the LLC and every year thereafter to maintain "active" status.

# Winning Bidder Confirmation
## Auction: O-434

| | Yes | N/A |
| Prequal | | |
| | No | N/A |
| Gatekeeper | | N/A |

| Package | Item No. | Winning Bid | Bidder No. |
|---|---|---|---|
| | NG28009 | $2,595,000.00 | 9191 |

Have you viewed the property?  ☑ Yes  ☐ No

| Winning Bid Amount: | $2,595,000.00 | ☑ SOLD SUBJECT TO SELLER CONFIRMATION |
| + 5.00% Buyers Premium: | $129,750.00 | 5% Earnest Money Deposit Required |
| = Total Purchase Price: | $2,724,750.00 | Earnest Money Deposit = $136,237.50 |

**Property Address:** 115 LOWER CHURCH HILL RD

| City: | WASHINGTON | Type: | SFR |
| State: | CT | Square Feet: | 7784 |
| Zip: | 06793 | Bed Rooms: | 7 |
| County: | Litchfield | Baths: | 6.5 |

Nicholas Laudano

Co-buyer Name: N/A

Company Name: NJL DEVELOPMENT GROUP, LLC

Mailing Address: 638 Shore Dr.

| City: | Boynton Beach | State: | Florida | Zip: | 33435 |

Home Phone: ▓▓▓▓▓           Cell Phone: ▓▓▓▓▓

Email: ▓▓▓▓▓           ☑ I will be paying cash for my purchase.

First Time Home Buyer: No   ☑ Owner Occupied   ☐ Investment   ☐ Second Home

*By signing below, buyer(s) confirm the winning bid amount and total purchase price and agree to the purchase of the subject property as set forth.*

Buyer's Signature: _____  Date: _____

Buyer's Signature: N/A   Date: N/A

| **Broker Name:** | N/A | (Only if Buyer is represented.) |

Work Phone: N/A   Email: N/A

Firm Name: N/A   License#: N/A

Broker's Signature: N/A   Date: N/A

| **Lender Name:** | Cash | (Only if Buyer is financing.) |

Loan Amount: N/A   LTV: N/A

Agent Name: N/A   Finance Type: Cash

Work Phone: N/A   Email: N/A

| Date Time: | Online Auction Designated: | Total Purchased Price Deposit Required: | Auctioneer: |
|---|---|---|---|
| 02-12-2014-06:33:35 | No | No | |

17