# EXHIBIT B

Filing # 36843503 E-Filed 01/21/2016 03:49:32 PM

**IN THE CIRCUIT COURT OF THE FIFTEENTH
JUDICIAL CIRCUIT IN AND FOR PALM BEACH COUNTY,
FLORIDA**

KK-PB FINANCIAL, LLC,

                Plaintiff,

vs.

160 ROYAL PALM, LLC and
PALM HOUSE HOTEL, LLLP,          Case No.: 502014CA011203XXXXMB

                Defendants.         Division: AN
_____/

160 ROYAL PALM, LLC.

                Counter-Plaintiff,

vs.

KK-PB FINANCIAL, LLC, and
GLENN STRAUB,

                Counter-Defendant.

_____/

## NOTICE OF FILING

    Plaintiff, KK-PB FINANCIAL, LLC, by and through its undersigned counsel, pursuant

to Rule 1.330, Florida Rules of Civil Procedure, hereby gives notice of filing a copy of:

    Transcript from the Deposition of Leslie Robert Evans held on October 19, 2015.

    Dated this 21st day of January, 2016.

                              LAW OFFICE OF
                              ALEXANDER L. DOMB, P.A.
                              *Attorneys for Plaintiff*
                              11199 Polo Club Road, Suite 1
                              Wellington, Florida 33414
                              Telephone:  (561) 578-8900
                              Facsimile:  (561) 578-8901
                              Email:        Alec@ALDLAW.ORG

Secondary:    Heather@ALDLAW.ORG


By:/s/ Alexander L. Domb
     ALEXANDER L. DOMB
     Florida Bar No.: 558362


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished via eService to:  Alan M. Burger, Esq., McDONALD HOPKINS LLC, 505 S. Flagler Drive, Suite 300, West Palm Beach, FL 33401, aburger@mcdonaldhopkins.com, mrose@mcdonaldhopkins.com, wpbpleadings@mcdonaldhopkins.com; Henry B. Handler, Esq. and David K. Friedman, Esq., WEISS, HANDLER & CORNWELL, P.A., One Boca Place, Suite 218-A, 2255 Glades Road, Boca Raton, FL 33431, hbh@weissandhandlerpa.com, jn@weissandhandlerpa.com, dkf@weissandhandlerpa.com, cb@weissandhandlerpa.com, filings@weissandhandlerpa.com; Gregg H. Glickstein, Esq., GREGG H. GLICKSTEIN, P.A., 54 S.W. Boca Raton Boulevard, Boca Raton, FL 33432, ghgpa@bellsouth.net on this 21st day of January, 2016.


     /s/ Alexander L. Domb
     ALEXANDER L. DOMB

**Page 1**

```
 1        IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
              IN AND FOR PALM BEACH COUNTY, FLORIDA
 2             CASE NO.:  502014CA011203XXXXMB
 3
   KK-PB FINANCIAL, LLC, a Limited
 4 Liability Company,
 5
        Plaintiff,
 6
 7 vs.
 8
   160 ROYAL PALM, LLC, a Limited Liability
 9 Company and PALM HOUSE HOTEL, LLLP, a
   Limited Liability Limited Partnership,
10
        Defendants.
11 _____/
12
13           DEPOSITION OF LESLIE ROBERT EVANS
14                  OCTOBER 19, 2015
15               1:30 P.M. – 3:15 P.M.
16
17            214 BRAZILIAN AVENUE, SUITE 320
18                 PALM BEACH, FLORIDA
19
20
21
22
23 Reported by Louanne Rawls
24 Notary Public, State of Florida
25 Esquire Deposition Solutions #J0223460
```

**Page 2**

```
 1 APPEARANCES:
 2 On behalf of the Plaintiff
        ALEXANDER L. DOMB, ESQUIRE
 3      Alexander L. Domb, P.A.
 4      11199 Polo Club Road
 5      Suite 1
 6      Wellington, FL 33414
 7
 8
 9 On behalf of the Defendant, 160 Royal Palm, LLC
10      ALAN M. BURGER, ESQUIRE
11      McDonald Hopkins, LLC
12      505 S. Flagler Street
13      Suite 300
14      West Palm Beach, FL 33401
15
16 On behalf of the Defendant, Palm House Hotel, LLP
17      HENRY B. HANDLER, ESQUIRE
18      Weiss, Handler & Cornwell, P.A.
19      One Boca Place, Suite 218-A
20      2255 Glades Road
21      Boca Raton, FL 33431
22
23
24
25
```

**Page 3**

```
 1                     I N D E X
 2                       - - -
 3 WITNESS:          DIRECT   CROSS   REDIRECT   RECROSS
 4
 5 LESLIE ROBERT EVANS
 6 BY MR. DOMB          4                 60
 7 BY MR. HANDLER               56
 8 BY MR. BURGER                          60
 9                       - - -
10               E X H I B I T S
11                       - - -
12 NUMBER   DESCRIPTION                              PAGE
13 PL 1     Subpoena for Deposition                    9
14 PL 2     Promissory Note with Balloon Payment      15
15 PL 3     Mortgage                                  15
16 PL 4     Closing Statement                         15
17 PL 5     Escrow Agreement                          15
18 PL 6     Specific Power of Attorney                15
19 PL 7     Account Quick Report                      25
20 PL 8     "As Is" Agreement for Purchase and Sale   34
21 PL 9     Assignment Interest in 160 Royal Palm LLC 46
22 PL 10    Wire Transfer                             52
23
24
25
```

**Page 4**

```
 1                P R O C E E D I N G S
 2                       ---
 3        Deposition taken before LOUANNE RAWLS, Digital Reporter and
 4 Notary Public in and for the State of Florida at Large, in the
 5 above cause.
 6                       ---
 7 Thereupon,
 8                LESLIE ROBERT EVANS
 9 Having been first duly sworn or affirmed, was examined and
10 testified as follows:
11        THE WITNESS:  I do.
12            DIRECT EXAMINATION
13 BY MR. DOMB:
14    Q.  Could you please state your name for the record?
15    A.  Leslie Robert Evans.
16    Q.  And, Mr. Evans, have you ever had your deposition taken
17 before?
18    A.  Yes.
19    Q.  Okay. So I'm going to dispense with the usual customary
20 description of what to do other than if you don't understand
21 anything please stop me --
22    A.  Okay.
23    Q.  -- and we'll try and make sure that you do.
24    A.  Thanks.
25    Q.  What's your occupation?
```



LESLIE ROBERT EVANS
KK PB FINANCIAL vs. 160 ROYAL PALM

October 19, 2015
5–8

Page 5

1   A.   Attorney.
2   Q.   And what states are you licensed to practice law?
3   A.   Right now just Florida. I think I'm inactive in Ohio.
4   Q.   And how long have you been licensed to practice law in
5   the state of Florida?
6   A.   Since '83, 1983. So it's 32 years.
7   Q.   And you said you were licensed to practice law
8   somewhere else?
9   A.   In Ohio.
10  Q.   And how long were you licensed to practice law there?
11  A.   About 10 years.
12  Q.   And did you give up your license in Ohio?
13  A.   I believe so. I don't even remember.
14  Q.   Are you employed?
15  A.   Yes.
16  Q.   By whom are you employed?
17  A.   By myself.
18  Q.   And the name of the firm?
19  A.   Leslie Robert Evans & Associates.
20  Q.   And who are the shareholders of Leslie Robert Evans &
21  Associates?
22  A.   Just me.
23  Q.   Who are the attorneys presently employed by Leslie
24  Robert Evans, P.A.?
25  A.   Oh, they are all of counsel except for my son.

Page 6

1   Q.   Okay.
2   A.   Would you like to know the names?
3   Q.   I just wanted to know the employees. So Jason is the
4   only employee?
5   A.   Jason is the only employee, yes.
6   Q.   Okay. And who are the other attorneys that are of
7   counsel?
8   A.   There's Robert Kesten, K-E-S-T-E-N, there is David
9   Brodt, B-R-O-D-T, there is Jason Dollard, D-O-L-L-A-R-D, there
10  is Charles Ratner, R-A-T-N-E-R, Dan Hirschman, I think it's
11  H-I-R-S-C-H-M-A-N, Michael Brennan and, let's see. Who am I
12  forgetting? Cherish Thompson.
13  Q.   I'll come back to that. For the purposes of preparing
14  yourself for this deposition today what exactly have you done?
15  What, if anything, have you done?
16  A.   I got the documents together that I had in response to
17  your subpoena, sent them to you, and I met just briefly with Mr.
18  Alan Burger who said you were going to be very nice to me.
19       MR. BURGER:  So far you're doing a good job.
20       MR. DOMB:  And -- and --
21  BY MR. DOMB:
22  Q.   Did you review your trust account records?
23  A.   Yes.
24  Q.   Did you read any of the depositions in this case?
25  A.   No.

Page 7

1   Q.   Did you review any of the exhibits to any of those
2   depositions?
3   A.   I wouldn't know what those were because I didn't see
4   the depos.
5   Q.   Other than Mr. Burger, who else did you meet with in
6   preparation for the depo?
7   A.   Just Mr. Burger.
8   Q.   What exactly did you do in order to gather the
9   depositions requested here today?
10       MR. BURGER:  Rephrase your question. You said in order
11  to gather the depositions; you meant documents.
12       MR. DOMB:  Documents.
13       MR. BURGER:  Do it again.
14  BY MR. DOMB:
15  Q.   What, if anything, did you do to gather all of the
16  documents requested in the subpoena for today's deposition?
17  A.   I looked through my doc -- my records and looked at the
18  subpoena and got the relevant documents together.
19  Q.   And who assisted you in that endeavor?
20  A.   Nobody.
21  Q.   Are your documents in paper or digital format?
22  A.   Paper.
23  Q.   Who in your office maintains these records?
24  A.   I do.
25  Q.   Do you practice in a particular area of law?

Page 8

1   A.   Real estate.
2   Q.   How long have you practiced real estate law?
3   A.   Forty years.
4       COURT REPORTER:  I'm sorry, 40?
5       THE WITNESS:  Forty.
6       COURT REPORTER:  Okay.
7       THE WITNESS:  I know I look much younger than that.
8       MR. BURGER:  You don't look a day older than 39.
9       MR. DOMB:  Don't forget you're under oath.
10  BY MR. DOMB:
11  Q.   Do you have a separate corporate title insurance
12  agency?
13  A.   No, it's part of the law firm.
14  Q.   So then Leslie Robert Evans & Associates, P.A. is
15  licensed title issuing agent?
16  A.   Yes.
17  Q.   How many title agents -- how many title insurance
18  underwriters do you have?
19  A.   Two.
20  Q.   And who are they?
21  A.   Old Republic and Fidelity.
22  Q.   How many real estate trust accounts do you maintain?
23  A.   One.
24  Q.   And is that the account that you maintained at Iberia?
25  I'm sorry, in Northern Trust?

LESLIE ROBERT EVANS
KK PB FINANCIAL vs. 160 ROYAL PALM

October 19, 2015
9–12

Page 9

1    A.   Yes. But, no, not Northern Trust. It's --

2    Q.   What bank is it?

3    A.   First United which turned into Valley National. We have

4    a new -- we're starting to switch now over to Landmark Bank but

5    during the relevant time that you're looking at it was First

6    United which turned into Valley National Bank.

7    Q.   Do you utilize a commercial real estate closing program

8    in your practice?

9    A.   Yes.

10   Q.   Which program is that?

11   A.   We use -- let me -- I just got a mental block about

12   which one it is. I can't tell you right now. It's just one of

13   the packages which we didn't use in this anyway.

14   Q.   That was my next question. Did you utilize your

15   commercial real estate closing package for this transaction?

16   A.   No, that's basically for residential.

17   Q.   Okay. I'd like to mark this as 1.

18   (THEREUPON, PLAINTIFF'S EXHIBIT NUMBER 1 WAS MARKED)

19   Q.   Okay. So I'm showing you what's been marked as exhibit

20   1 for identification and ask if you recognize it?

21   A.   Yes, I do.

22   Q.   Is that, in fact, a copy of the subpoena that you were

23   served on in this matter?

24   A.   Yes.

25   Q.   And do you have the documents that were requested in

Page 10

1    exhibit A to the subpoena?

2    A.   Yes.

3    Q.   May I take a look at those, please? And since your

4    email of Friday afternoon were you able to uncover any

5    additional documents?

6    A.   No.

7    Q.   Okay.

8    A.   Just off the record, these numbers go on the numbers

9    that you had here --

10   Q.   Okay. Great. Your email of Friday afternoon indicated

11   your number nine, that the documents relating to the inquiry of

12   number nine, were attached, however, they weren't attached to

13   the email and I don't see them here today. Do you --

14   A.   I can --

15   Q.   -- have copies of the bank statements for the bank

16   account that you utilized for this transaction?

17   A.   Yes.

18   Q.   Okay. Is there a particular reason why you haven't

19   produced them?

20   A.   My bookkeeper wasn't here Friday. She's here now but I

21   would have to redact everything that wasn't -- she just came in.

22   Her mother has been sick.

23   Q.   So then you will agree to produce the bank records or

24   the bank statements?

25   A.   Yes. Yes, I will.

Page 11

1    Q.   Okay.

2    A.   Give me a minute. I'm going to close the door. Okay.

3    Q.   Okay. So you have produced the Promissory Note with

4    Balloon Payment. That satisfies request number one; correct?

5    A.   That's correct.

6    Q.   Okay. And is this, in fact, the promissory note that

7    was executed at the closing of the transaction?

8    A.   Yes, it is.

9        MR. BURGER:  Objection. I object. Did you get my

10   objection?

11       COURT REPORTER:  Yes.

12       MR. BURGER:  I said objection.

13       COURT REPORTER:  I heard.

14       MR. BURGER:  Because you asked if it was, in fact, the

15   note but I think it's a copy of the note. That's the only

16   reason. I'm just trying to keep you honest.

17   BY MR. DOMB:

18   Q.   So let's rephrase the question and get it properly set

19   for the record. Is this a true and correct copy of the

20   promissory note that was executed at the closing on August 30th,

21   2013?

22   A.   Yes, it is.

23   Q.   And can you tell me whose signature that is on the

24   signature block on page seven?

25   A.   That's my signature signing on behalf of Ryan Black

Page 12

1    under a power of attorney.

2    Q.   And you on August 30th, 2013, you had a power of

3    attorney to sign documents for the closing?

4    A.   That's correct.

5    Q.   And did you sign this document with that power of

6    attorney?

7    A.   That's correct.

8    Q.   And did you have authority at the time of the closing

9    to execute documents with that power of attorney?

10   A.   Yes.

11   Q.   At the time that you executed the promissory note on

12   behalf of Palm House, LLC did you consider it to be a valid and

13   binding document?

14   A.   Yes.

15   Q.   You produced for item -- request number two Florida

16   Real Estate Mortgage Assignment of Leases and Rents and Security

17   Agreement. Is this the document that you produced?

18   A.   That's a copy, but yes.

19   Q.   And this is a copy of the original Real Estate Mortgage

20   that was executed at the closing on August 30th, 2013?

21   A.   Yes.

22   Q.   And on the bottom of each page on the right hand corner

23   did you place your initials?

24   A.   Yes, I'm paranoid.

25   Q.   So that the pages could not be substituted; correct?



LESLIE ROBERT EVANS
KK PB FINANCIAL vs. 160 ROYAL PALM

October 19, 2015
13—16

Page 13

1     A.   That's correct.

2     Q.   Okay. And —

3     A.   To answer your next question, I signed it as -- I
4   signed it as under a power of attorney on behalf of Ryan Black
5   who was the managing member.

6     Q.   And at the time you signed it was that pursuant to a
7   specific power of attorney?

8     A.   Yes, it was. Yes, it was.

9     Q.   And at the time you signed it on August 30th, 2013, was
10  that power of attorney in effect?

11    A.   Yes, it was.

12    Q.   And at the time you signed this document did you
13  believe it to be a valid and binding document?

14    A.   Yes.

15    Q.   And who were the parties to the document?

16    A.   The parties to the document were 160 Royal Palm, LLC
17  and KK-PB Financial, LLC.

18    Q.   And what did you know about KK-PB Financial, LLC at the
19  time you executed the document?

20         MR. DOMB:   Objection. If you can answer the question
21     without knowledge that was imparted to you by a client or
22     through your work product go ahead and answer.

23         THE WITNESS:   I didn't know anything about it.

24  BY MR. DOMB:

25    Q.   Did you know who the member of that LLC was?

Page 14

1          MR. BURGER:   Same objection.

2          THE WITNESS:   Only whether it was told and I don't even
3     remember it.

4   BY MR. DOMB:

5     Q.   Did you recognize KK-PB Financial, LLC to be an entity
6   owned or controlled by Glenn Straub?

7          MR. BURGER:   Same objection.

8          THE WITNESS:   I had no independent knowledge. It may
9     have been said that it was. I had no independent knowledge.

10  BY MR. DOMB:

11    Q.   Okay. But either in your capacity -- who did you
12  represent at the closing? Who was your client at the closing?

13    A.   160 Royal Palm, LLC.

14    Q.   And who, specifically, were you dealing with at 160
15  Royal Palm, LLC?

16    A.   Let me correct that. Actually, it was Palm House. It
17  was Palm House.

18    Q.   Okay. So Palm House, LLC was your client?

19    A.   Was my client, yes.

20    Q.   And was that an entity that was formed specifically for
21  the purpose of accepting the membership interest of 160 Royal
22  Palm, LLC?

23         MR. BURGER:   Objection. If you can answer the question
24     without going into your work product and what was discussed.

25         THE WITNESS:   I didn't form it and I don't know what

Page 15

1   was done.

2   BY MR. DOMB:

3     Q.   Okay. And just to reiterate what Mr. Burger is saying
4   here today, what I don't want you to do is I don't want you to
5   violate any attorney/client privilege. I do not want you to tell
6   me what your client told you. So whenever I ask these questions,
7   I'm not looking for what your client said to you; I'm looking
8   for information other than that. Okay?

9     A.   Understood.

10    Q.   In your capacity as the attorney for Palm House, LLC,
11  were you involved in the negotiation of any of the contracts
12  that led up to this closing?

13    A.   I was involved only up to the initial contract, itself.
14  There afterwards, there were other people who were involved.

15    Q.   Okay. Can you mark this 2, please, and this one 3?

16         (THEREUPON, PLAINTIFF'S EXHIBITS NUMBER 2 AND 3 WERE MARKED)

17         MR. BURGER:   Two is what; the note?

18         MR. DOMB:   Number 2 is the note, 3 is the mortgage. We
19     might as well do this now. Number 4 is the Closing
20     Statement.

21         (THEREUPON, PLAINTIFF'S EXHIBIT NUMBER 4 WAS MARKED)

22         MR. DOMB:   Five is the Escrow Agreement.

23         (THEREUPON, PLAINTIFF'S EXHIBIT NUMBER 5 WAS MARKED)

24         MR. DOMB:   And 6 is the Specific Power of Attorney.

25         (THEREUPON, PLAINTIFF'S EXHIBIT NUMBER 6 WAS MARKED)

Page 16

1   BY MR. DOMB:

2     Q.   So you didn't have any independent knowledge with
3   respect to who would be holding the mortgage with respect to
4   this transaction? Is that your testimony?

5     A.   I had some but limited. A lot of it was done by another
6   firm up in Connecticut.

7     Q.   And what was the name of that firm?

8     A.   Rogin Nassau.

9     Q.   Rogin? R-O --

10    A.   R-O-G-I-N, Nassau, N-A-S-S-A-U.

11    Q.   And who did Rogin Nassau represent?

12    A.   I'm not sure but it must have been Palm House, but I
13  don't know who the various parties were.

14    Q.   Okay. But you didn't form Palm House, LLC?

15    A.   No, I didn't.

16    Q.   And you don't know who the managing member was?

17    A.   I was the managing member of one. I think I was the
18  managing member of 160 Royal Palm. I'm not sure who the managing
19  member was of 160 Royal Palm. Can I look at this?

20    Q.   Sure. And in response to number four you produced the
21  Escrow Agreement which has been marked as plaintiff's 5; is that
22  correct?

23    A.   That's correct.

24    Q.   And you recognize that agreement?

25    A.   Yes, I do.



LESLIE ROBERT EVANS
KK PB FINANCIAL vs. 160 ROYAL PALM

October 19, 2015
17—20

Page 17

1   Q.   Did you draft the agreement?
2   A.   No, I didn't.
3   Q.   Do you know who drafted the agreement?
4   A.   I believe it was drafted by Craig Galle.
5   Q.   Okay. And during the course of the negotiations of the
6   contract wasn't Craig Galle supposed to be the escrow agent? Was
7   it contemplated that Craig Galle would be the escrow agent?
8   A.   I don't remember.
9   Q.   Okay.
10  A.   The closing was so convoluted.
11  Q.   But, nevertheless, this is the Escrow Agreement that
12  was executed on August 30th, 2013, in connection with this
13  transaction?
14  A.   Yes, it is.
15  Q.   Okay. And on the bottom right hand corner would those
16  be your initials?
17  A.   Yes, they are.
18  Q.   Okay. And your initials are on the bottom right hand
19  corner of every page --
20  A.   That's correct.
21  Q.   -- except the signature page; is that correct?
22  A.   That's correct.
23  Q.   And, let's see -- one, two three, four, five -- this
24  would be unmarked page six, and is that your signature for Palm
25  House, LLC?

Page 18

1   A.   Yes.
2   Q.   And you signed that with your specific power of
3   attorney?
4   A.   Yes.
5   Q.   And you had the authorization to use that power of
6   attorney to sign the documents at the closing that took place on
7   August 30th, 2013?
8   A.   Yes.
9   Q.   And did you perceive this to be a valid and binding
10  document?
11  A.   Yes.
12  Q.   And on the final page of this same document you signed
13  on behalf of Leslie Robert Evans & Associates, P.A.?
14  A.   Yes.
15  Q.   And you signed that you would be the escrow agent of
16  the transaction; is that correct?
17  A.   That's correct.
18  Q.   And what did you believe your duties to be with respect
19  to the escrow in this particular transaction?
20  A.   I was supposed to carry out the duties set forth in the
21  escrow agreement.
22  Q.   And what were the duties?
23  A.   I don't remember, specifically, but there were certain
24  funds that if they were deposited I was to hold pursuant to the
25  instructions therein. I don't remember the individual -- I

Page 19

1   skimmed it. I really didn't study it.
2   Q.   So you're not part -- are you at all familiar with the
3   $2,000.00 per day fine that was running by virtue of the
4   declaration of use agreement with the Town of Palm Beach?
5   A.   I'm familiar with it, yes.
6   Q.   Okay. And was this escrow constructed primarily to
7   handle what was to happen with respect to the $2,000.00 a day
8   fine running by the Town of Palm Beach?
9        MR. BURGER:  Objection. If you can answer the question
10       without -- independently without knowledge of client or
11       other --
12       THE WITNESS:  You can say this, that there were some
13       other undisclosed liabilities that I think was a defined
14       term in there. It not only referenced the fine but there
15       were other undisclosed liabilities.
16  BY MR. DOMB:
17  Q.   Do you recall what they were?
18  A.   I don't recall. I think there's a define section in
19  there, something like that.
20  Q.   Take a look at paragraph five if you will and tell me
21  if that helps to refresh your recollection.
22  A.   Somewhat, yes.
23  Q.   Okay. So what were the undisclosed liabilities?
24  A.   They referenced certain possible references to a
25  purchase agreement, membership purchase agreement, and that

Page 20

1   there, I think, could have been something related to any of the
2   reps and warranties of the seller.
3   Q.   Okay. And take a look, if you will, at paragraph G and
4   there's a number referenced in there. How much is that?
5   A.   It's $744,442.00.
6   Q.   And was that the amount of the escrow?
7   A.   That's the amount of what's defined as the funds.
8   Q.   That's the amount of the funds that were deposited with
9   you as the escrow agent?
10  A.   They were never deposited with me.
11  Q.   And -- well, you have an escrow agreement here;
12  correct?
13  A.   That's right.
14  Q.   And you signed that you would be responsible for
15  holding and disbursing $744,442.00; correct?
16  A.   That's correct.
17  Q.   And you've been practicing law for 40 years; correct?
18  A.   Yes.
19  Q.   Why would you sign an escrow agreement if you never
20  received $744,442.00?
21  A.   That section G says the parties agree that seller shall
22  deposit. The seller never deposited that X amount of funds.
23  Q.   Well, let's look at what you've provided in response to
24  request number 3. And this is marked as plaintiff's 4. Is this
25  the closing statement for the transaction which occurred on



LESLIE ROBERT EVANS
KK PB FINANCIAL vs. 160 ROYAL PALM

October 19, 2015
21–24

Page 21

1   August 30th, 2013?
2      A.  That's correct.
3      Q.  And who prepared that closing statement?
4      A.  I'm not sure.
5      Q.  Were you the closing agent for the transaction?
6      A.  I was but I believe that this was prepared by Craig
7   Galle.
8      Q.  Are you sure it was prepared by Craig Galle?
9      A.  I'm not sure.
10     Q.  Not sure. Are you sure that you didn't prepare it?
11     A.  The only thing I'm sure of is this is not the form that
12   I would normally use to prepare a closing statement.
13     Q.  Okay. And did you, on August 30th, 2013, have an
14   opportunity to review this closing statement?
15     A.  Yes.
16     Q.  And does the closing statement represent receipts and
17   disbursements that were supposed to have taken place at that
18   closing?
19     A.  That were supposed to have occurred; yes.
20     Q.  Okay. And is that your signature at the bottom of the
21   page?
22     A.  Yes.
23     Q.  And you signed that with your specific power of
24   attorney on behalf of Palm House, LLC?
25     A.  That's correct.

Page 22

1      Q.  And you had the authority to do so?
2      A.  Yes.
3      Q.  And you did this at the closing on August 30th, 2013?
4      A.  Yes.
5      Q.  And did you expect this to be a valid and binding
6   document with respect to the parties?
7      A.  Yes.
8      Q.  Okay. Take a look, if you would, down at the seller's
9   deductions on the left hand side of the closing statement.
10   There's a number there for $586,000.00 and it says escrow
11   $2,000.00 per day; correct?
12     A.  Yes.
13     Q.  And above that $25,000.00 escrow for AC?
14     A.  Yes.
15     Q.  And above that $133,442.00 escrow liens retainage?
16     A.  Yes.
17     Q.  Correct?
18     A.  Yes.
19     Q.  And if I were to tell you that the total of those three
20   figures represents $744,442.00 what would be your response?
21     A.  I haven't done the math right now but I would assume
22   it's correct.
23     Q.  And so who handled disbursements for the closing on
24   this transaction?
25     A.  I did.

Page 23

1      Q.  So you had these funds in your -- or should have the
2   funds in your trust account; correct?
3      A.  It says seller deductions. There's a difference between
4   a closing statement and a disbursement statement.
5      Q.  Do you, as the closing agent in this transaction, have
6   a disbursement statement?
7      A.  I don't believe there was one done in this, no.
8      Q.  Why not?
9      A.  It was a very convoluted closing, it was done late on a
10   Friday afternoon, and Mr. Straub wanted to get out of here so
11   badly a lot of things weren't done necessarily the way I
12   normally might have done them.
13     Q.  The sum due to the seller at closing, the figure on the
14   bottom, did you disburse $6,220,920.86 to the seller?
15     A.  No.
16     Q.  Why not?
17     A.  I don't remember.
18     Q.  Don't you find it odd that as the closing agent you
19   would not have disbursed the funds in this transaction in
20   accordance with the closing statement?
21     A.  Normally I would agree with you. Again, I'm having a
22   difficult time. This was more than two years ago. It was an
23   extremely convoluted closing. And I know, as a fact, that it was
24   so late on a Friday that no funds were even disbursed that day.
25   There were some wires that were sent out later, but there were

Page 24

1   no funds even disbursed that day. That's not normal at a
2   closing. That goes beyond the closing time of a normal closing
3   time.
4      Q.  Sure. But at some point did you receive a sum of money
5   from the purchaser in this transaction?
6      A.  Yes.
7      Q.  And what was that sum?
8      A.  I don't recall.
9      Q.  And do you not have any record of receiving funds from
10   the purchaser in a $36 million dollar real estate transaction?
11     A.  There was no $36 million dollars ever received. And I
12   believe when I gave you the copy of the documents, I gave you a
13   copy of the ledger that showed the funds that came in and the
14   funds that went out.
15     MR. BURGER:  If there are account numbers, Alec, can we
16   just agree that the PII's going to be redacted? You're not
17   supposed to -- the new rules say that you can't have an
18   account number or the name or an account number, you know,
19   so you can't track them if it's recorded, if the deposition
20   ends up in public records. Do you follow what I'm saying?
21     MR. DOMB:  Uh-huh.
22     MR. BURGER:  I'm not saying it well, but I think you
23   get what I'm saying.
24     MR. DOMB:  Yeah. I don't know if I have -- I'll take a
25   look and see what I've got.



**Page 25**

1    MR. BURGER:  But if there is just account numbers, we
2    just have to be cognizant of that.
3    BY MR. DOMB:
4    Q.   Let's mark this as 7 please. Okay. This QuickBooks
5    ledger transaction, is this what you provided to me? You
6    provided this to me in response to which request?
7    (THEREUPON, PLAINTIFF'S EXHIBIT NUMBER 7 WAS MARKED)
8    A.   Number eight.
9    Q.   Number eight, okay. So copies of escrow account ledgers
10   relating to the escrow funds pursuant to the escrow agreement
11   dated August 30th, 2013, and the disbursement of said funds.
12   This is your ledger account? Is this the ledger account for this
13   transaction?
14   A.   Yes, it is.
15   Q.   Do you have any other ledger accounts relating to this
16   transaction?
17   A.   No.
18   Q.   So that as of August 29th, 2013, you had -- i'm sorry.
19   As of August 28th, 2013, you had $3 million -- $3,090,000.00 in
20   that account; is that correct?
21   A.   Yes.
22   Q.   Where did the $3,090,000.00 come from?
23   A.   It came from a variety of sources. I don't remember
24   exactly where.
25   Q.   And so with respect to this transaction you had money

**Page 26**

1    in your account before the transaction took place?
2    A.   Yes.
3    Q.   Where would that money – where would that money have
4    come from?
5    A.   It would have come from the buyer.
6    Q.   Okay.
7    A.   Or from people who sent it on behalf of the buyer.
8    Q.   Okay. And closing took place on August 30th, 2013;
9    correct?
10   A.   Yes.
11   Q.   As you previously testified, it was August 30th, 2013,
12   late on a Friday afternoon?
13   A.   I think it was a Friday afternoon. It was right around
14   Labor Day. I think it was -- yeah, it was Friday because Labor
15   Day was the Monday, the first Monday in September.
16   Q.   Okay. So, for the record, August 30th, 2013, was a
17   Friday. So then the first available opportunity you had to send
18   funds in this transaction would have been Tuesday, the 3rd,
19   after the Monday, Labor Day; is that correct?
20   A.   That's correct.
21   Q.   And so on the 3rd you sent two wires in regard to this
22   transaction?
23   A.   That's correct.
24   Q.   And the first wire was for $2,580,000.00?
25   A.   That's correct.

**Page 27**

1    Q.   And that wire went to –
2    A.   160 Royal Palm, LLC.
3    Q.   So it went to the seller?
4    A.   Yes.
5    Q.   And could you show me where on exhibit number 4 the sum
6    of $2,580,000.00 appears?
7    A.   It doesn't.
8    Q.   And the next wire on September 3rd was for $150,920.08;
9    is that correct?
10   A.   That's correct.
11   Q.   And can you show me where on the closing statement the
12   amount of $150,920.08 exists?
13   A.   It doesn't.
14   Q.   So how did the seller receive $6,220,920.86?
15   A.   What that was was a group of people sitting at this
16   very table on a Friday night. There was some handwritten notes
17   that were done, basically, by Craig Galle, Mr. Glenn Straub and
18   Ryan Black, or I was representing Ryan Black on it.
19   Q.   Was Ryan Black actually in the room at the time of the
20   closing?
21   A.   I don't think he was there for the whole closing, no.
22   Q.   Was Ryan Black actually in your office during the
23   entire closing?
24   A.   I don't believe so. I don't remember. I don't believe
25   so.

**Page 28**

1    Q.   Okay. But you had full authority to act on behalf of
2    Palm House, LLC pursuant to your specific power of attorney; is
3    that correct?
4    A.   That's correct.
5    Q.   Okay. And during the course of the conversations at
6    this very table on Friday, August 30th, 2013, what, if anything,
7    was discussed with respect to the $2,000.00 a day fine accruing
8    to the Town of Palm Beach?
9    MR. BURGER:  Objection. I'm assuming you're –
10   BY MR. DOMB:
11   Q.   I'm not asking you for what your client told you.
12   MR. BURGER:  Got it. What was discussed with the client
13   --
14   MR. DOMB:  But the client wasn't in the room. So you
15   were the only person in the room so you really couldn't have
16   had a conversation with the client in this room.
17   MR. BURGER:  That's not accurate, but that's okay.
18   THE WITNESS:  That's correct. But I think it had been
19   discussed earlier when the contract was being drafted. I've
20   got a vague recollection but, again, with going back two or
21   three years that there was a fine running that, I think
22   pursuant to the agreement for purchase and sale, Mr. Straub
23   was going to try to get that settled within -- as soon as he
24   could but that he was going to be responsible for the
25   payment of that fine, whatever it was.



LESLIE ROBERT EVANS
KK PB FINANCIAL vs. 160 ROYAL PALM

October 19, 2015
29–32

Page 29

1  BY MR. DOMB:
2      Q.  And wasn't that the purpose or the basis for exhibit 5,
3  which was to put up funds in escrow to cover that eventuality in
4  that could he not negotiate away the fine with the Town of Palm
5  Beach in a timely fashion?
6      MR. BURGER:  Objection.
7      THE WITNESS:  That's part of it.  Again, if you take a
8  look at this escrow agreement in section G it says the
9  parties agree that seller, and the seller is Glenn Straub,
10 shall deposit the sum of $744,442.00 with the escrow agent.
11     MR. DOMB:  Okay.
12     THE WITNESS:  And he never gave me -- the seller never
13 gave me a check for those funds.
14 BY MR. DOMB:
15     Q.  I'm sorry, but I have a closing statement here that
16 says that this is the purchase price; correct?  This is the total
17 purchase price?
18     A.  That's correct.
19     Q.  Okay.  And that these funds were all going to be
20 deducted from the purchase price; correct?
21     A.  Yes.
22     Q.  And so that at the end when all was said and done,
23 including a $27,486,750.00 mortgage; correct?
24     A.  Correct.
25     Q.  So when all of these funds were deducted from this

Page 30

1  purchase price that the net funds to the seller would be this
2  amount; correct?
3      A.  That's what the document says but --
4      Q.  Okay.
5      A.  -- there were --
6      Q.  Well --
7      MR. BURGER:  Let him answer.
8      THE WITNESS:  That's what the document says but there
9  were some negotiations going on there between the various
10 representatives and the attorney, Craig Galle, and the
11 attorney up at Rogin Nassau that it was what it was.  I never
12 receive the $744,402.00, per se, from the seller that's
13 described in the escrow agreement from Glenn Straub.  The
14 seller here is Palm House, LLC, so there's a difference.
15 There were some side agreements and discussions amongst
16 themselves and nobody objected to any of this until
17 recently.
18 BY MR. DOMB:
19     Q.  Isn't it true that as far as this real estate
20 transaction is concerned, the funds come from the buyer to the
21 closing agent who disburses in accordance with the contract and
22 in accordance with the closing statement; correct?
23     A.  That's generally the case, yes.
24     Q.  Okay.  So then wouldn't the funds necessary to fund the
25 escrow agreement that you signed which is set forth here as

Page 31

1  $133,442.00, $25,000.00 and $586,000.00 escrow for the $2,000.00
2  per day to come from not the seller but from the buyer's cash to
3  close?
4      A.  It would see that the escrow agreement says the funds
5  would come from the seller.
6      Q.  Well, isn't it coming from the seller here in this
7  closing statement?
8      A.  It's coming from Palm House, LLC.  The seller here in
9  this document was Glenn Straub.
10     Q.  Okay.  Let me ask you this question.  Looking at the
11 signature lines on this closing statement is there a mistake
12 that's pretty evident to the naked eye as a 40 year real estate
13 attorney?
14     A.  What mistake are you talking about?
15     Q.  Who is the seller in this transaction?
16     A.  The seller would be the owner of the membership
17 interest.
18     Q.  Correct.  And did Palm House, LLC own the membership
19 interest?
20     A.  No.
21     Q.  Was Palm House, LLC the seller of this transaction?
22     A.  No.
23     Q.  So is the closing statement correct when it says that
24 the seller is Palm House, LLC?
25     A.  A lot of this, I would agree with you, it's not

Page 32

1  necessarily correct.  A lot of this I didn't do.  It was done late
2  at night and they were talking between three or four different
3  parties on the phones.  And a lot of this, the more I think about
4  this, the more it's brought up, I didn't prepare this closing
5  statement.  I think that Rogin Nassau said it's okay with them
6  and Craig Galle, that's G-A-L-L-E, and Mr. Straub said it's okay
7  to sign, I signed it.  Ryan Black was also on the phone.
8      Q.  Okay.  Let's look at the other signature line; buyer.
9  Who is the buyer in the closing statement?
10     A.  It says 160 Royal Palm, LLC.
11     Q.  Was 160 Royal Palm, LLC the buyer in this transaction?
12     A.  No.
13     Q.  Who was the buyer in the transaction?
14     A.  Palm House, LLC was.
15     Q.  So Palm House, LLC was the buyer?
16     A.  Uh-huh.
17     Q.  Once --
18     COURT REPORTER:  Is that a yes?
19     MR. DOMB:  160 Royal Palm --
20     COURT REPORTER:  Was that a yes?
21     THE WITNESS:  Yes.
22     COURT REPORTER:  Sorry.
23     MR. BURGER:  You have to answer out loud.  You've said
24 uh-huh twice.  She's --
25     MR. DOMB:  No uh-huh's.



LESLIE ROBERT EVANS                                   October 19, 2015
KK PB FINANCIAL vs. 160 ROYAL PALM                              33—36

Page 33

1   BY MR. DOMB:
2      Q.  So was 160 Royal Palm the seller?
3      A.  No.
4      Q.  Who was the seller?
5      A.  The seller was -- the seller was, I believe, Glenn
6   Straub.
7      Q.  And he advised that --
8      A.  I'm not sure because I don't know who owned the
9   membership interest.
10     Q.  Okay.
11     A.  Whoever owned the membership interest was the seller.
12     Q.  Do you know if that's Glenn Straub's signature? Were
13  you there at the time? Did you see him sign?
14     A.  Yes, I believe that's Glenn Straub's signature.
15     Q.  And that's your signature?
16     A.  That's my signature, yes.
17     Q.  But these labels are incorrect?
18     A.  That's correct. I take no pride of draftsmanship
19  because I didn't draft it.
20     Q.  Why would you sign a closing statement where you are
21  also the closing attorney if you believed that these figures
22  were not correct?
23         MR. BURGER:  Objection.
24         THE WITNESS:  The reason being is that this was being
25  directed in large part out of Connecticut. It was late at

Page 34

1   night. They said sign it, we understand what it is; sign it.
2   And I signed it.
3   BY MR. DOMB:
4      Q.  So looking at paragraph G, read it for me, please.
5      A.  The parties agree that seller shall deposit sum equal
6   to $744,442.00, defined as the funds, with escrow agent in order
7   to address the completion violation, the noise violation and
8   undisclosed liabilities, as more particularly set forth herein.
9      Q.  And what was your understanding of the completion
10  violation?
11     A.  It had to be completed by a certain date or else I was
12  going to be fined $2,000.00 per day.
13     Q.  So then it is your understanding that the completion
14  violation escrow related to the $2,000.00 a day, or $586,000.00;
15  is that correct?
16     A.  It seems so, yes.
17     Q.  What's the next; 8?
18         COURT REPORTER:  Eight.
19  BY MR. DOMB:
20     Q.  Exhibit 8. Okay. Let me have you take a look at that
21  contract and ask you if you recognize it?
22         (THEREUPON, PLAINTIFF'S EXHIBIT NUMBER 8 WAS MARKED)
23     A.  Yes, I do.
24     Q.  And that's marked exhibit 8 for identification. How do
25  you recognize it?

Page 35

1      A.  It's got my signature on it and my initials on every
2   page, as you've duly noticed before.
3      Q.  So you initialed every page?
4      A.  That's correct.
5      Q.  And on page 14 it's your signature. However in this
6   case -- however in this case you didn't execute the document
7   with your specific power of attorney, did you?
8      A.  That's correct.
9      Q.  And so on August 16th of 2013, were you the managing
10  member of Palm House PB, LLC?
11     A.  I believe I was.
12     Q.  And is Palm House PB, LLC the same as Palm House, LLC?
13     A.  I can't recall.
14     Q.  Did you form Palm House PB, LLC?
15     A.  I probably did. I can't recall.
16     Q.  So as the managing member of Palm House PB, LLC, did
17  you have authority to enter into a contract to purchase the
18  entity 160 Royal Palm, LLC?
19         MR. BURGER:  Objection.
20         THE WITNESS:  I wouldn't have done it without
21  authority.
22  BY MR. DOMB:
23     Q.  And in paragraph three, the document requires a $2
24  million dollar deposit to be delivered to the escrow agent on
25  the effective date of August 16, 2013. Did you receive $2

Page 36

1   million dollars on August 13th, 2013?
2      A.  I believe I had those funds in my escrow account.
3      Q.  Is that part of the $3,090,000.00 you must have had the
4   day before August 29th?
5      A.  I believe it is.
6      Q.  And how much more did you receive from the buyer in
7   this transaction, if you recall?
8      A.  I don't recall.
9      Q.  Let's take a look at exhibit number 7. According to
10  your ledger you received a deposit on September 6th of 2013, in
11  the amount of $1,064,858.73; correct?
12     A.  Yes.
13     Q.  And where were those funds supposed to be distributed?
14     A.  This was a general -- we had a general escrow account
15  here and there were a number of things that were put in there to
16  pay other bills, too. So it wasn't just -- nothing is earmarked.
17  There wasn't a specific escrow account for this transaction
18  solely for the purchase.
19     Q.  Okay. Well, in addition to the $2 million dollar
20  deposit, how much actual money did you receive from the buyer in
21  connection with this transaction?
22     A.  I'm not sure.
23     Q.  Well, the total amount due from the buyer, according to
24  this closing statement, is $36,776,203.13; correct?
25     A.  That's what it says, yes.



LESLIE ROBERT EVANS
KK PB FINANCIAL vs. 160 ROYAL PALM

October 19, 2015
37–40

Page 37

1    Q.   Do you have any reason to doubt that's an accurate
2  reflection of the dollars and cents in connection with this
3  transaction?
4    A.   I have some reason to doubt.
5    Q.   Okay. And please tell me why.
6    A.   Because this was one of the craziest, sloppiest
7  closings that I've ever had in 40 years and I'm not sure what
8  the hell went on with some of it. All I know is that there were
9  certain agreements between some of the principles. I sent out
10 the funds that had been agreed between them. The names don't
11 necessarily match up on here. And I never heard that there was a
12 problem with the escrow account until very recently.
13       And I understand what you're saying here, and I know I
14 shouldn't be testifying because you're not supposed to testify
15 unless a question's asked, but I'm looking here and it says here
16 seller credits, and it says sum due to seller closing
17 $6,220,000.00 and I can't tell you that I sent them
18 $6,220,920.86, that there's something missing from this which I
19 can't recall which may have been done separately and apart. But
20 I know this, that if they didn't receive the $6,220,000.00 et
21 cetera, if there wasn't some document, which I don't have, then
22 there would have been a lot of screaming a lot earlier than
23 there was with this.
24       In other words, I'm telling you that I think there may
25 be something missing here that I don't have in my files and I

Page 38

1  can't -- I'm trying to answer you as honestly as I possibly can
2  but one and one is not necessarily adding up to two. But if
3  there was a problem, if you see that the seller just got $2
4  million or $3 million dollars here, and they're supposed to get
5  $6 million dollars, I think the seller would have screamed a
6  hell of a lot more if there wasn't something else. What that is,
7  I can't tell because half the documents at closing were scooped
8  up and I didn't necessarily see all of them.
9        I did what I was told by Connecticut, in conjunction
10 with Craig Galle, and that's all I heard until a problem came
11 up, I guess, a year or two down the road. So, like I say, one
12 and one is not adding up to two. There's something missing here
13 and I'm not sure what it is. And I'm sure if I was sitting
14 closer to Alan, he would have kicked me for saying any more.
15       MR. BURGER:  I wouldn't kick anybody.
16 BY MR. DOMB:
17    Q.   Could I have you take a look at paragraph three of
18 exhibit 5 relating to the completion violation?
19    A.   Yes.
20    Q.   Okay. Please tell me what it says.
21    A.   It says that the seller may negotiate with the Town and
22 that if the completion violation is remedied within 60 days and
23 can send me confirmation of that, that the completion violation
24 is fully released, let's see -- let's see -- that they could
25 negotiate with the Town, and let's see, it will be deemed

Page 39

1  released if there's a letter from the Town that it's released
2  and fully satisfied.
3    Q.   Did you ever get a letter from anyone saying that the
4  Town was satisfied in releasing the lien?
5    A.   I don't believe so.
6    Q.   Did you ever distribute $586,000.00 to the purchaser
7  due to the failure of the seller to accomplish the task of
8  taking care of the lien within 60 days as contemplated by the
9  escrow agreement?
10       MR. BURGER:  Objection.
11       THE WITNESS:  In that 60 day period, from what I recall
12 from looking at the ledger here, there were always
13 sufficient funds to cover that through longer than the 60
14 day period.
15 BY MR. DOMB:
16    Q.   So what you're telling me is that you had funds
17 available in your account to distribute to the buyer?
18    A.   What you're doing is testifying for me.
19    Q.   What I'm doing is asking you if you had the funds in
20 your escrow account. Isn't that what you just said?
21    A.   No. What I was saying was that again, according to my
22 earlier testimony, one and one doesn't necessarily add up to two
23 here, but there was never less than $744,000.00 until way after
24 the 60 day period to get this remedied.
25    Q.   So then what you are saying is that you had the funds

Page 40

1  in your escrow account to satisfy the escrow; correct?
2        MR. BURGER:  Objection.
3        THE WITNESS:  There were funds in my escrow account
4  that would have satisfied it. Whether those were necessarily
5  earmarked for it or not, I can't answer. But there were
6  sufficient funds. Again, I'm not sure that they were
7  earmarked specifically for this completion violation, the
8  noise violation, but there were enough funds if they were
9  earmarked for that, to cover that for more than the 60 day
10 period.
11 BY MR. DOMB:
12    Q.   And did you ever receive a demand from the buyer to
13 release the funds after the 60 day period expired?
14    A.   I never received a written demand.
15    Q.   Did you ever receive a verbal demand?
16    A.   There was a discussion whereby I was told --
17       MR. BURGER:  If it's privileged --
18       THE WITNESS:  It's privileged.
19       MR. DOMB:  Well, you can tell me if a discussion was
20 held, you just can't tell me --
21       MR. BURGER:  Right. He's right.
22       THE WITNESS:  Yes, there was a discussion.
23       MR. BURGER:  Or what was -- or what was discussed.
24       MR. DOMB:  Or what your client said to you.
25       THE WITNESS:  There was a discussion held.



LESLIE ROBERT EVANS
KK PB FINANCIAL vs. 160 ROYAL PALM

October 19, 2015
41—44

---

**Page 41**

1   BY MR. DOMB:
2       Q.   Okay. And can I ask with whom?
3       A.   I can't remember exactly who it was. It may have been a
4   few people.
5       Q.   Okay. And it was a discussion specifically relating to
6   the $2,000.00 a day fine being run by the Town of Palm Beach?
7       A.   Amongst other things.
8       Q.   Okay. In those discussions did anybody ask you if you
9   had the funds in your account pursuant to the escrow agreement?
10      A.   I don't recall that they asked that. They asked how
11  much were the funds in the account, but I don't know that they
12  asked specifically was it pursuant to the escrow agreement.
13      Q.   Okay. But you never disbursed any funds to the buyer in
14  connection with the completion violation, the noise violation or
15  undisclosed liabilities?
16      A.   I never gave a check to my client for the amount of the
17  completion violation and noise violation or undisclosed
18  liabilities.
19      Q.   The "as is" contract, if you would turn to page six,
20  please, and look at paragraph nine.
21          MR. BURGER:   Objection. Do you want to go off the
22  record? We can go or not in front of the witness but we
23  should have a discussion?
24          MR. DOMB:   We should?
25          MR. BURGER:   Yeah.

---

**Page 42**

1           MR. DOMB:   It's up to you. We can go ahead and go off
2   the record.
3           COURT REPORTER:   Are we going to go off the record?
4           MR. DOMB:   Yeah, let's go off the record.
5           MR. BURGER:   Yeah.
6           (OFF THE RECORD)
7           (BACK ON THE RECORD)
8   BY MR. DOMB:
9       Q.   In your review and execution of any of the contracts
10  that were presented, and, apparently, there were several
11  variations and incarnations of this transaction, the contract to
12  this contraction almost right up until the end, did each of them
13  contain within it a disclosure regarding the existing litigation
14  between 160 Royal Palm and the Town of Palm Beach?
15      A.   I can't remember exactly. I assume it did, but I can't
16  remember exactly.
17      Q.   And did each version of the contracts that you've seen
18  and signed on behalf of Palm House, LLC or Palm House PB, LLC
19  contain a disclosure with respect to the $2,000.00 a day
20  accruing fine with the Town of Palm Beach?
21      A.   I believe so. I'm not sure.
22      Q.   Is there any doubt in your mind that the buyer of the
23  interest in 160 Royal Palm knew of the existence of the
24  $2,000.00 a day accruing fine with the Town of Palm Beach?
25      A.   The buyer knew about that, yes.

---

**Page 43**

1       Q.   And the buyer knew that as they stepped into the shoes
2   of 160 Royal Palm, LLC, by virtue of acquiring the membership
3   interest, that that fine would be accruing to 160 Royal Palm?
4           MR. BURGER:   Objection. Because you're calling -- you
5   said the buyer knew, so it calls for attorney/client
6   communication and work product and also to jump into the
7   mind of the buyer.
8   BY MR. DOMB:
9       Q.   Did you as the -- did you as the specific power of
10  attorney know of the existence of the accruing $2,000.00 a day
11  fine with the Town of Palm Beach?
12          MR. BURGER:   If you can -- objection. If you can answer
13  on your own without anything other than what you have
14  learned as an attorney go ahead and answer it.
15          THE WITNESS:   Yes.
16  BY MR. DOMB:
17      Q.   From August 30th, 2013, till the present have you ever
18  received a written demand for the release of the completion
19  violation funds that were contemplated in the escrow agreement?
20          MR. BURGER:   Objection.
21          THE WITNESS:   No.
22          MR. BURGER:   I objected. He said no.
23          MR. DOMB:   In no particular order.
24          MR. BURGER:   Right.
25  BY MR. DOMB:

---

**Page 44**

1       Q.   Is it your testimony here today that you still have
2   funds in your escrow account sufficient to resolve the escrow?
3           MR. BURGER:   Objection.
4           THE WITNESS:   No.
5   BY MR. DOMB:
6       Q.   Do you still maintain a ledger for the transaction
7   known as 160 -- or the Palm House, I should say?
8       A.   Yes.
9       Q.   You do? Does it have a balance?
10      A.   Yes.
11      Q.   Is the balance in excess of $744,442?
12      A.   No.
13      Q.   Looking at -- looking at the closing statement again it
14  shows the sum of money due from the buyer at $36,776,203.13. It
15  shows buyer credits including the mortgage of seller financing
16  totaling $29,619,828.13; correct?
17      A.   Correct.
18      Q.   The difference is $7,156,375.00. Is that the amount
19  that you received from the purchaser to close and fund this
20  transaction?
21      A.   I don't recall and I don't believe that's correct.
22      Q.   Which is it?
23      A.   I don't believe that's correct.
24      Q.   Do you -- as you sit here today can you tell me exactly
25  how much you received from the buyer to purchase the interest

---



LESLIE ROBERT EVANS
KK PB FINANCIAL vs. 160 ROYAL PALM

October 19, 2015
45–48

**Page 45**

1  that it purchased at the closing on August 30th, 2013?
2      A.   The only thing that I could tell you today is from the
3  ledger that I have. We had $2 million -- we had about $3 million
4  dollars. That's all that I can see from this ledger that I had.
5  There would have been no other funds that I knew of but that may
6  have been something done directly between the parties that was
7  outside of my purview.
8      Q.   Was there a specific discussion at the closing, at this
9  table at the closing, with respect to what was going to happen
10  to the completion escrow in the event the 60 days went by and
11  the Town of Palm Beach refused to close out the $2,000.00 a day
12  fine?
13      A.   I have a vague recollection of what went on. And I
14  believe Mr. Straub said that he was going to -- he was bringing
15  the lawsuit or brought a lawsuit that the -- because of the
16  hurricane and the economy, I believe it was, that they extended
17  the time for completion and that there was a lawsuit that there
18  was going to be more time. But I can't remember the specifics
19  but he didn't believe that he was going to lose the case and,
20  therefore, he would -- he indicated that the fine would be
21  knocked out. I can't remember too much of the specifics because
22  I was walking in and running out back and forth during the
23  closing.
24      Q.   If I could get you to take a look at the "as is"
25  purchase and sale agreement, and as we have all agreed this is

**Page 46**

1  one of various incarnations, if I could ask you to turn to page
2  seven, paragraph 13.3. There's a reference there to 160 Royal
3  Palm, LLC versus the Town of Palm Beach, case number
4  12-CA-023613-AA, Circuit Court of Palm Beach County, Florida. Is
5  that the lawsuit to which you are referring?
6      A.   I believe so.
7      Q.   And is that the same case in 13.9?
8      A.   I believe so.
9      Q.   So -- and in looking at this paragraph would you agree
10  that this paragraph was consistently disclosed throughout all of
11  the various incarnations of the purchase and sale?
12      A.   Well, it certainly was in this one. I can't see all the
13  drafts but in this draft it was.
14      Q.   Is this 9?
15      COURT REPORTER:   Yes.
16      MR. BURGER:   It's what; the assignment?
17      MR. DOMB:   The assignment, yes.
18      (THEREUPON, PLAINTIFF'S EXHIBIT NUMBER 9 WAS MARKED)
19  BY MR. DOMB:
20      Q.   All right. Let me show you what has been marked as 9
21  for identification and ask if you recognize it.
22      A.   Yes.
23      Q.   And how do you recognize it?
24      A.   I signed it as -- under a power of attorney.
25      Q.   However, the exception that proves the rule, there are

**Page 47**

1  no initials on the bottom right hand corner.
2      A.   I may not have been paranoid at the time that I signed
3  this.
4      Q.   Okay. But on the last page -- but they are out to get
5  you. On the last page, Palm House, LLC, is that your signature
6  using your specific power of attorney?
7      A.   Yes, it is.
8      Q.   And you had the authority to sign this document on
9  August 30th of 2013?
10      A.   Yes.
11      Q.   And you -- and that power hadn't been revoked or
12  removed from you?
13      A.   Not to my knowledge.
14      Q.   And you anticipated or believed this to be a valid and
15  binding document at the time you executed it?
16      A.   Yes.
17      Q.   And can you tell me what this document purports to do?
18      A.   It assigns the interest, the membership interest,
19  between one party to another party.
20      Q.   Okay. And, specifically, who are the parties to the
21  agreement?
22      A.   Glenn F. Straub was the seller and Palm House, LLC, a
23  Delaware LLC, was the purchaser.
24      Q.   Okay. And so regardless of the various incarnations of
25  agreement for sale and purchase and so on, this assignment is,

**Page 48**

1  actually, what occurred when all was said and done; correct?
2      A.   Correct.
3      Q.   And what occurred was that Glenn Straub, who
4  individually -- well, you tell me. What did Glenn Straub sell to
5  Palm House, LLC?
6      MR. BURGER:   Objection.
7      THE WITNESS:   I believe he sold his membership interest
8      in 160 Royal Palm, LLC.
9  BY MR. DOMB:
10      Q.   And at the close of the transaction what did Palm
11  House, LLC own?
12      A.   They would have owned the membership interest of Glenn
13  F. Straub.
14      Q.   Okay. And was that 100 percent of the membership
15  interest in 160 Royal Palm, LLC?
16      A.   I believe it was. It was supposed to be.
17      Q.   Okay. And take a look at paragraph 2.13.
18      MR. BURGER:   Where's the 2.13?
19      MR. DOMB:   It's 2.13.
20      THE WITNESS:   There's contingencies to litigation.
21      MR. DOMB:   Oh, 2.13.
22      MR. BURGER:   2.13.
23      MR. BURGER:   Got it. Never mind. Got it. Sorry. All
24  right.
25  BY MR. DOMB:



LESLIE ROBERT EVANS
KK PB FINANCIAL vs. 160 ROYAL PALM

October 19, 2015
49—52

Page 49

1    Q.   Okay. If you'd take a moment to look at that and tell
2    me what that meant to you as the executing party.
3    A.   That there was no contingent liabilities except for the
4    Town of Palm Beach lawsuit and any undisclosed liabilities,
5    possibly. Of course, that was tied into the agreement for
6    purchase and sale.
7    Q.   Okay. So, once again, the Town of Palm Beach was
8    disclosed to the purchaser?
9    A.   Yes.
10   Q.   And in paragraph 3, about, let's see, halfway down, 13
11   lines down where it starts the purchaser --
12   A.   Yes.
13   Q.   Okay. First of all there's a reference there to a
14   promissory note in favor of KK-PB Financial, LLC; is that
15   correct?
16   A.   Yes.
17   Q.   And so the purchaser at the time of the contemplated
18   transaction understood that the promissory note was going to be
19   in the name of KK-PB Financial, LLC and not Glenn Straub;
20   correct?
21   A.   Yes.
22   Q.   And does this indemnification and right of set-off
23   require the purchaser to supply KK-PB Financial, LLC with
24   written demand for payment against the lender before they have a
25   right to set-off and deduct payment?

Page 50

1    A.   It says after written demand for payment against lender
2    -- it's really not artful. I'm not -- I didn't draft this,
3    either.
4    Q.   Well, let me start with are you aware of Palm House,
5    LLC ever making written demand upon KK-PB Financial, LLC for any
6    indemnification or set-off?
7    A.   I'm not aware of it. That doesn't mean that it didn't
8    happen but I'm not sure. I don't believe I'm aware of any
9    written demand.
10   Q.   At the what appears to be the next to the last sentence
11   where it starts the parties acknowledge --
12   A.   Uh-huh.
13   Q.   Can you read that?
14   A.   The parties acknowledge that Glenn Straub was
15   personally liable for the representations and warranties made by
16   the company under the agreement and that all such
17   representations were made for the benefit of Palm House, LLC in
18   the exercise of its option to purchase all membership interests
19   in the company.
20   Q.   Okay. Not KK-PB Financial, LLC; correct?
21   A.   That's correct.
22   Q.   All right. Let's do a couple of housekeeping things.
23   Let me show you what's marked as exhibit 6 for identification
24   and ask if you recognize it?
25   A.   Yes, I do.

Page 51

1    Q.   How do you recognize it?
2    A.   I recognize it because I saw it then and it's got my
3    name on it.
4    Q.   Is that, in fact, the specific power of attorney that
5    you utilized in executing all of the exhibits that you supplied
6    me today and the others that have been used today and it gave
7    you the authority to execute all of the closing documents on
8    August 30th, 2013, for Palm House, LLC?
9    A.   It gave me the authority to sign all of the documents
10   that I signed on August 30th, 2013.
11   Q.   Okay.
12   MR. BURGER: I would object to the compound question
13   but it was too easy.
14   MR. DOMB: It was kind of ugly, wasn't it? I disagree
15   with you.
16   THE WITNESS: I answered it beautifully.
17   MR. BURGER: You did. The answer was spectacular to a
18   horrible question.
19   BY MR. DOMB:
20   Q.   Now you supplied in relation to the subpoena 8, copies
21   of escrow account ledgers relating to the escrow funds pursuant
22   to the escrow agreement dated August 30th, 2013. In that package
23   -- let's mark this.
24   COURT REPORTER: This will be 10?
25   MR. DOMB: Yes.

Page 52

1    (THEREUPON, PLAINTIFF'S EXHIBIT NUMBER 10 WAS MARKED)
2    MR. BURGER: Hold on. I can't see it.
3    THE WITNESS: I read better without my glasses.
4    MR. BURGER: It's going to be -- they sent it over but
5    it made it a privileged document?
6    MR. DOMB: Huh?
7    MR. BURGER: It's a privileged document.
8    MR. DOMB: Let's get to that then.
9    MR. BURGER: Okay.
10   BY MR. DOMB:
11   Q.   Let me show you what's been marked as 10 for
12   identification and ask if you recognize it.
13   A.   Yes.
14   Q.   How do you recognize it?
15   A.   Because I sent it to you.
16   Q.   Okay. And is this an email from Bob Matthews to you?
17   A.   Yes.
18   Q.   And who is Bob Matthews in connection with this
19   transaction?
20   A.   He's Gerry -- Gerry Matthews' brother.
21   Q.   And who are the members of Palm House, LLC?
22   A.   I believe Gerry Matthews and Ryan Black.
23   Q.   So Bob Matthews was not a member, manager or anything
24   relating to Palm House, LLC; is that correct?
25   MR. BURGER: Objection.



LESLIE ROBERT EVANS
KK PB FINANCIAL vs. 160 ROYAL PALM

October 19, 2015
53—56

**Page 53**

1      THE WITNESS: Not to my knowledge.
2    BY MR. DOMB:
3      Q.   So then why is Bob Matthews directing you to wire
4    $150,000.00 to NHCS?
5      A.   There were certain times that his brother would just
6    say if Bob tells you to do something, basically, go along with
7    it.
8      Q.   Okay.
9      A.   I guess you could say it was apparent authority.
10      Q.   Okay. Do you have anything in writing from Jerry
11   (phonetic) Matthews or Ryan Black directing you to disburse
12   funds in accordance with Bob Matthews' directions?
13      A.   No, but Ryan Black only owned one percent so I would
14   never have really needed anything from him. And Gerry, it's
15   Gerry, not Gerry. It's G-E-R-R-Y. It's pronounced funny. Gerry,
16   basically, was the one who called the shots. It was not uncommon
17   for his brother to -- to speak, for his brother, Bob, to speak
18   on Gerry's behalf.
19      Q.   So it was really Gerry --
20      A.   Yes.
21      Q.   -- who was the member and the client; not Bob?
22      A.   No, the client was Palm House. Gerry was the one who
23   owned the majority.
24      Q.   Wasn't -- wasn't Ryan Black the managing member?
25      A.   For a period of time he was.

**Page 54**

1      Q.   Okay. And when did that stop?
2      A.   Oh, it stopped once I became a managing member.
3      Q.   And when did you become a managing member?
4      A.   The date was August 13th -- August 30th, 2013.
5      Q.   You were the managing member of Palm House, LLC on
6    August 30th, 2013?
7      A.   Yes.
8      Q.   And why did you sign every document by Ryan Black,
9    managing member, with your power of attorney?
10      A.   I may be mistaken. I signed it as power of attorney for
11   Ryan Black.
12      Q.   Okay. So let's go back and see if we can clarify. When
13   did Ryan Black cease being the managing member of Palm House,
14   LLC?
15      A.   I can't recall.
16      Q.   When did you become the managing member of Palm House,
17   LLC?
18      A.   I became the managing member on August 30th, 2013.
19      THE WITNESS: Can we take a break for two minutes?
20      MR. BURGER: Sure.
21      COURT REPORTER: Okay. Are we off?
22      MR. BURGER: Yeah.
23      MR. DOMB: Sounds like a good idea.
24      (OFF THE RECORD)
25      (BACK ON THE RECORD)

**Page 55**

1    BY MR. DOMB:
2      Q.   All right. There are no other trust accounts that you
3    have where the purchaser would have sent you funds and you would
4    have disbursed funds, is that correct?
5      A.   On this one, that's correct.
6      Q.   And you have agreed to provide me with copies of your
7    bank statements as soon as you can that show the funds that you
8    received and the disbursements you made in connection with this
9    transaction; correct?
10      A.   Yes, but I can ask you to sort of give me a reference,
11   because there were different transactions, things came in? Can
12   you be more specific? Do you want them this August 1st to
13   -- to what date? I mean, I'd rather not go through all --
14   because there's different closings and different things that he
15   was involved with, that the parties may have been involved with
16   in this type --
17      Q.   Apparently so.
18      A.   -- of an account. So I'd just -- I'd like to try to
19   limit it.
20      Q.   I don't -- I don't -- at this time I'm not asking you
21   for that information.
22      A.   Okay.
23      Q.   Okay? I do reserve the right, however, at a later date,
24   if this doesn't get resolved, I want -- I'll want all of your
25   records, every single receipt and disbursement relating to this

**Page 56**

1    transaction. But as of right now I want you to provide me with
2    your receipt of the first funds for the deposit for this
3    transaction --
4      A.   Uh-huh.
5      Q.   -- whenever that took place, okay, up until, I would
6    say, 90 days post-closing.
7      A.   Uh-huh.
8      Q.   Okay? Relating to whether or not the funds were in your
9    account, where they were and whether or not you ever disbursed
10   any funds relating to your escrow; okay? And I'm going to limit
11   it to that for right now.
12      A.   Okay. So 90 days --
13      Q.   So that would be --
14      A.   It would be 90 days from the closing?
15      Q.   September, October -- that would be November 30th.
16      A.   Okay.
17      Q.   Okay?
18      A.   Okay.
19      MR. DOMB: I'm done.
20          CROSS-EXAMINATION
21   BY MR. HANDLER:
22      Q.   Exhibit 5, Mr. Evans, is the power of attorney, I
23   believe.
24      A.   No, it's the escrow agreement.
25      Q.   I'm sorry.



LESLIE ROBERT EVANS
KK PB FINANCIAL vs. 160 ROYAL PALM

October 19, 2015
57—60

### Page 57

1    A.   The specific power of attorney is 6.

2    Q.   Okay. What is the date of that specific power of

3   attorney?

4    A.   It's dated August 30th, 2013.

5    Q.   To your knowledge is that the only power of attorney

6   Ryan Black signed appointing you as his attorney-in-fact?

7    A.   To my knowledge, yes.

8    Q.   Was it your understanding that a limited power of

9   attorney was limited?

10    A.   I think all powers of attorney are limited.

11    Q.   By its own terms; right?

12    A.   By its terms; that's correct.

13    Q.   What are the terms -- what do you understand the terms

14   of limitation to be under that power of attorney?

15    A.   It says here the power of attorney is specifically

16   limited to the above purposes and if not executed prior to

17   September 5th, 2013, shall be revoked. So it had to do with to

18   endorse, sign and seal all of these powers that it gave you and

19   then it said that if it wasn't closed on September 5th -- by

20   September 5th, then it would be revoked.

21        So, therefore, it doesn't have a time period as the

22   closing happened before September 5th. Some powers of attorney

23   state its good up until a certain date; this doesn't have that

24   specific caveat.

25    Q.   Is it your understanding that this specific power of

### Page 58

1   attorney pertains to the transaction by which you have been

2   questioned today?

3    A.   In part, yes.

4    Q.   Can you explain what other part?

5    A.   Well, it doesn't specifically state that it's just

6   then. It says to do all these things that are required if he was

7   -- if Ryan Black was personally there. So it assumes with the

8   closing, if you take a look at the first paragraph, it says that

9   I can sign on his behalf to contract for the purchase, receive

10   and take possession of to purchase, sell, exchange, grant or

11   convey with or without warranty to mortgage, transferring trust

12   or otherwise encumber or apothacates (sic) any interest in the

13   property which was the subject -- so it's a pretty broad power

14   of attorney.

15    Q.   Did you understand this power of attorney to invest you

16   with authority to try to cure any of the inability of the seller

17   under the escrow agreement to clear paragraphs three, four or

18   five on behalf of the buyer of the property? Three, four and

19   five have to deal with curing of the disputes with regards to

20   the --

21    A.   I don't believe it gave me the authority to clear out

22   those par -- those violations, if that's what you're referring

23   to.

24    Q.   That's what I'm referring to.

25    A.   Yes.

### Page 59

1    Q.   To your knowledge did you take any action on behalf of

2   the buyer to attempt to cure the violations that were imposed by

3   the Town on the hotel?

4    A.   Formally or informally?

5    Q.   Both.

6    A.   Informally, I think I may have spoken to some of the

7   officials about the noise violation. There was an air

8   conditioning unit that was making excessive noise and I know the

9   people in Town just to see what could be done with it.

10        As far as the completion goes, I met with them with

11   some other parties to try to see what could be done. There was

12   certain things that were built, apparently, without permits and

13   I was there when there were some discussions going on. But I did

14   that no on behalf of Mr. Straub, it would have been on behalf of

15   the buyer.

16    Q.   Did those activities which you just described occur

17   post-closing?

18    A.   Post-closing.

19    Q.   Were you practicing in Palm Beach at the time?

20    A.   Yes.

21    Q.   You live in Palm Beach?

22    A.   Yes.

23    Q.   Either by your residency in Palm Beach or your practice

24   here, are you aware of any progress that Mr. Straub made on

25   curing those existing problems with the Town of Palm Beach

### Page 60

1   post-closing?

2    A.   I don't think he did anything, to my knowledge.

3        MR. HANDLER:  I have no other questions.

4            CROSS EXAMINATION

5   BY MR. BURGER:

6    Q.   I just want to make sure. Exhibit 6, which is the power

7   of attorney, you were paraphrasing but you were attempting to

8   paraphrase from the last line of the third paragraph which

9   starts with this power of attorney is specifically?

10    A.   Yes.

11    Q.   Okay. That's it. So you'll stand by as it reads?

12    A.   Yes.

13        MR. BURGER:  Okay. I have nothing further.

14        MR. DOMB:  Just one or two follow-ups.

15            RE-DIRECT EXAMINATION

16   BY MR. DOMB:

17    Q.   With respect to the violation, did you learn at some

18   point that in your investigation or your inquiries that the

19   violation of $2,000.00 a day could not be halted until a CO was

20   issued to the property?

21    A.   I'm not sure if I learned of it, but I have that

22   general understanding from working with the Town that you

23   couldn't. I'm not sure if I heard specifically, but that's my

24   understanding from working with the Town, yes.

25    Q.   To the best of your knowledge, as you sit here today,



LESLIE ROBERT EVANS
KK PB FINANCIAL vs. 160 ROYAL PALM

October 19, 2015
61–64

**Page 61**

1  has a CO ever been issued for the property?
2      A.   I'm sure a CO has been issued for the property but not
3  since -- not since the purchase, no.
4      Q.   Since August 30th, 2013 --
5      A.   No, no.
6      Q.   -- that Palm House controlled 160 Royal Palm and the
7  hotel did they ever complete construction and obtain a
8  certificate of completion or certificate of occupancy?
9      A.   To my knowledge, no.
10          MR. DOMB:  Thank you. That's it.
11          MR. HANDLER:  I just want to make sure that on the
12  record that this is without prejudice to --
13          MR. BURGER:  Our agree --
14          MR. HANDLER:  -- our agreements of having a
15  continuation if we need to or a different deposition of this
16  deponent.
17          MR. DOMB:  Absolutely.
18          MR. BURGER:  Not that we don't like or want to see you
19  again, but --
20          THE WITNESS:  This is a lot of fun.
21          COURT REPORTER:  Read or waive?
22          MR. DOMB:  Why don't you give him the --
23          COURT REPORTER:  Would you like to read or waive?
24          MR. BURGER:  I think you should read.
25          THE WITNESS:  I'll read.

**Page 62**

1   (DEPOSITION WAS ADJOURNED)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 63**

1                        CERTIFICATE OF OATH
2
3
4   THE STATE OF FLORIDA
5   COUNTY OF PALM BEACH
6
7
8       I, THE UNDERSIGNED AUTHORITY, CERTIFY THAT LESLIE ROBERT
9   EVANS PERSONALLY APPEARED BEFORE ME AND WAS DULY SWORN ON THE
10  19TH DAY OF OCTOBER, 2015.
11
12       DATED THIS 29th DAY OF OCTOBER, 2015.
13
14
15  LOUANNE RAWLS
16  NOTARY PUBLIC, STATE OF FLORIDA
17  MY COMMISSION EXPIRES: 1/25/19
18  COMMISSION NO.: FF 165101
19
20
21
22
23
24
25

**Page 64**

1                   C E R T I F I C A T E
2
3       I, LOUANNE RAWLS, Notary Public in and for the State of
    Florida at Large, do hereby certify that I was authorized to and
    did digitally report said deposition and that the foregoing
4   pages are a true and correct transcription of my notes of said
    deposition.
5
6       I further certify that said deposition was taken at the
    time and place herein above set forth and that the taking of
7   said deposition was commenced and completed as herein above set
8   out.
9
10
11      I further certify that I am not an attorney or counsel
12  of any of the parties, nor am I a relative or employee of any
13  attorney or counsel of party connected with the action, nor am I
14  financially interested in this action.
15
16
17      The foregoing certification of this transcript does not
18  apply to any reproduction of the same by any means unless under
19  the direct control and/or direction of the certifying reporter.
20
21
22  Dated this 29th day of October, 2015.
23
24
25  LOUANNE RAWLS, #J0223460



800.211.DEPO (3376)
EsquireSolutions.com

LESLIE ROBERT EVANS
KK PB FINANCIAL vs. 160 ROYAL PALM

October 19, 2015
65–66

Page 65

```
1    DEPOSITION ERRATA SHEET
2
3    Our Assignment No.  J0223460
4    KK-PB FINANCIAL, LLC
5
6    vs.
7
8    160 ROYAL PALM, LLC and PALM
9    HOUSE HOTEL, LLP
10
11              DECLARATION UNDER PENALTY OF PERJURY
12
13        I declare under penalty of perjury that I have read the
14   entire transcript of my Deposition taken in the captioned matter
15   or the same has been read to me, and the same is true and
16   accurate, save and except for changes and/or corrections, if
17   any, as indicated by me on the DEPOSITION ERRATA SHEET hereof,
18   with the understanding that I offer these changes as if still
19   under oath.
20
21        Signed on the _____ day of _____, 2015.
22                   _____
23                        LESLIE ROBERT EVANS
24
25
```

Page 66

```
1                  DEPOSITION ERRATA SHEET
2
3    Page No._____Line No._____Change to:_____
4    _____
5    Reason for change:_____
6    Page No._____Line No._____Change to:_____
7    _____
8    Reason for change:_____
9    Page No._____Line No._____Change to:_____
10   _____
11   Reason for change:_____
12   Page No._____Line No._____Change to:_____
13   _____
14   Reason for change:_____
15   Page No._____Line No._____Change to:_____
16   _____
17   Reason for change:_____
18   Page No._____Line No._____Change to:_____
19   _____
20   Reason for change:_____
21
22
23   SIGNATURE:_____DATE:_____
24            LESLIE ROBERT EVANS
25
```



# PROMISSORY NOTE
## WITH BALLOON PAYMENT

Date:  August 30, 2013                                      Date of Maturity:  August 30, 2018

      FOR VALUE RECEIVED, 160 ROYAL PALM, LLC, a Florida limited liability ("Borrower") promises to pay to the order of KK-PB FINANCIAL, LLC, a Florida limited liability company ("Lender"), at 11198 Polo Club Road Wellington, Florida 33414, or at such other place or places as the holder of this Note from time to time may designate in writing, the principal sum of TWENTY SEVEN MILLION FOUR HUNDRED SIXTY EIGHT THOUSAND SEVEN HUNDRED FIFTY AND 00/100 DOLLARS ($27,468,750.00) in lawful money of the United States (the "Loan"), together with interest in like lawful money from the date funds are advanced under this Note at the applicable annual rate set forth below, to be computed on the basis of the actual number of days elapsed and a year of 360 days.

      **1.**      **PAYMENTS.**  Borrower shall pay the interest and principal of this Note in accordance with the following:

      a.  Initial Rate.  Interest shall accrue at the Prime Rate, plus two percent (2%), per annum, but in no event less that six percent (6%) on TWENTY SEVEN MILLION FOUR HUNDRED SIXTY EIGHT THOUSAND SEVEN HUNDRED FIFTY AND 00/100 DOLLARS ($27,468,750.00). The "Prime Rate" shall mean the "prime rate" as published in www.bloomberg.com, or, if no longer published as such, the rate of interest announced from time to time by Bank of America, N.A., as its prime rate, base rate or reference rate.  If www.bloomberg.com publishes more than one "prime rate", then the Prime Rate shall be the average of such rates.  The interest rate shall be adjusted every six (6) months for the life of the Loan.

      b. Amortization of Principal and Payments.  Purchaser's loan repayments shall be calculated based upon a ten (10) year amortization schedule.  Interest shall be waived (and not accrue) for the period from August 30, 2013 through October 31, 2014 and no principal or interest payments shall be due until November 1, 2014.  Monthly principal and interest payments shall commence on November 1, 2014; and a balloon payment shall be due from Purchaser on the Maturity Date (August 30, 2018).

      c. Payments.  If any payment falls due on a day other than a day on which banks in Miami, Florida are open for business (a "Business Day"), then such payment shall instead be made on the next succeeding Business Day, and interest shall accrue accordingly.  Any payment received by Lender after 5:00 p.m. shall not be credited against the indebtedness under this Note until at least the next succeeding Business Day.

      **2.**      **SECURITY INTEREST.** As security for the payment of this Note, and any renewals, extensions or modifications hereof, and any other liabilities, indebtedness or obligations of Borrower to Lender, however or whenever created, Borrower hereby grants to Lender a security interest in any and all collateral pledged to the Lender as set forth below and any and all other collateral now or hereafter pledged to the Lender pursuant to a security agreement which provides for such security interest:

Florida Real Estate Mortgage, Assignment of Leases and Rents and Security Agreement (the "Mortgage") of even date herewith executed by Borrower, in favor of Lender encumbering real estate situate in Palm Beach County, Florida, more particularly described as follows:

> Lots 31, 32 and 33, Block F of REVISED MAP OF ROYAL PARK ADDITION TO PALM BEACH, FLORIDA, according to the Plat thereof as recorded in Plat Book 4, Page(s) 1, of the Public Records of Palm Beach County, Florida.

## 3. EXCULPATION

a. <u>Borrower's Liability to Lender.</u>    Notwithstanding anything to the contrary contained herein, and except as otherwise provided in subsections (b) and (c) below, Lender shall not enforce the liability and obligation of Borrower to perform and observe the obligations contained in this Note or the Mortgage by any action or proceeding wherein a money judgment shall be sought against Borrower, except that Lender may sell the Property under any power of sale or right of non-judicial foreclosure or bring a foreclosure action, confirmation action, action for specific performance or other appropriate action or proceeding to enable Lender to enforce and realize upon this Note, the Mortgage, the other Loan Documents, and the interest in the Property, the rents and any other collateral given to Lender created by this Note, the Mortgage and the other Loan Documents; provided, however, that any judgment in any such action or proceeding shall be enforceable against Borrower only to the extent of Borrower's interest in the Property, in the rents and in any other collateral given to Lender. Lender, by accepting this Note and the Mortgage, agrees that it shall not, except as otherwise provided in subsections (b) and (c) below, sue for, seek or demand any deficiency judgment against Borrower in any such action or proceeding, under or by reason of or under or in connection with this Note, the other Loan Documents or the Mortgage. The provisions of this Section 3 shall not, however, (i) constitute a waiver, release or impairment of any obligation evidenced or secured by this Note, the other Loan Documents or the Mortgage; (ii) impair the right of Lender to name Borrower as a party defendant in any action or suit for judicial foreclosure and sale under the Mortgage; (iii) affect the validity or enforceability of any indemnity, guaranty, master lease or similar instrument made in connection with this Note, the Mortgage, or the other Loan Documents; (iv) impair the right of Lender to obtain the appointment of a receiver; (v) impair the enforcement of the Assignment of Leases and Rents executed in connection herewith; (vi) impair the right of Lender to obtain a deficiency judgment or judgment on the Note against Borrower if necessary to obtain any insurance proceeds or condemnation awards to which Lender would otherwise be entitled under the Mortgage; provided however, Lender shall only enforce such judgment against the insurance proceeds and/or condemnation awards; or (vii) impair the right of Lender to enforce the provisions of Sections 13 & 14 of the Mortgage.

(b)

Notwithstanding the foregoing, the agreement of Lender not to pursue recourse liability as set forth in Subsection (a) above SHALL BECOME NULL AND VOID and shall be of no further force and effect (i) if the Property or any part thereof shall become an asset in (1) a voluntary bankruptcy or insolvency proceeding, or (2) an involuntary bankruptcy or insolvency proceeding (A) which is commenced by any party controlling, controlled by or under common control with Borrower (which shall include, but not be limited to, any creditor or claimant acting in concert with Borrower or any of

#2365730 v2

2

the foregoing parties) (the "Borrowing Group") or (B) in which any member of the Borrowing Group objects to a motion by Lender for relief from any stay or injunction from the foreclosure of the Mortgage or any other remedial action permitted hereunder or under the Mortgage or the other Loan Documents or (ii) if a court of competent jurisdiction holds that the granting, execution or delivery of the Mortgage or any other Loan Documents is or constitutes a fraudulent conveyance under any bankruptcy, insolvency or fraudulent conveyance law or is otherwise voidable under any such laws.

(c)     Nothing herein shall be deemed to be a waiver of any right which Lender may have under Sections 506(a), 506(b), 1111(b) or any other provisions of the U.S. Bankruptcy Code to file a claim for the full amount of the Loan or to require that all collateral shall continue to secure all of the obligations owing to Lender in accordance with this Note, the Mortgage and the other Loan Documents.

4.     **MAXIMUM INTEREST RATE.**  In no event shall any agreed or actual exaction charged, reserved or taken as an advance or forbearance by Lender as consideration for the Loan exceed the limits (if any) imposed or provided by the law applicable from time to time to the Loan for the use or detention of money or for forbearance in seeking its collection, and Lender hereby waives any right to demand such excess.  In the event that the interest provisions of this Note or any exactions provided for in this Note or any other Loan Document (as defined in Section 5 of this Note) shall result at any time or for any reason in an effective rate of interest that transcends the maximum interest rate permitted by applicable law (if any), then without further agreement or notice the obligation to be fulfilled shall be automatically reduced to such limit and all sums received by Lender in excess of those lawfully collectible as interest shall be applied against the principal of the Loan immediately upon Lender's receipt thereof, with the same force and effect as though the payor had specifically designated such extra sums to be so applied to principal and Lender had agreed to accept such extra payments(s) as a premium-free prepayment or prepayments.  During any time that the Loan bears interest at the maximum lawful rate (whether by application of this paragraph, the Default Rate provisions of this Note or otherwise), interest shall be computed on the basis of the actual number of days elapsed and the actual number of days in the respective calendar year. Pursuant to Florida Statutes, Section 687.12, the interest rate charged is authorized by Florida Statutes, Chapter 665.

5.     **EVENTS OF DEFAULT**  The entire unpaid principal balance of the Loan, together with all unpaid interest accrued thereon and any and all other sums that may be owing under this Note or any other instrument or document executed by Borrower in connection with the Loan (this Note and all such instruments and documents, including, without limitation, any guaranties, agreements, undertakings, contracts, mortgages, security agreements, assignments and other documents executed to secure the Loan being referred to in this Note as the "Loan Documents"), shall at the option of Lender become immediately due and payable without notice or demand upon the occurrence of any one or more of the following events ("Events of Default"), regardless of the cause thereof and whether within or beyond the control of Borrower:  (a) the failure of Borrower to pay any sum due under this Note within fifteen (15) days after the due date therefor, or the failure of Borrower to pay any other sum when due under any other Loan Document (and the expiration of any applicable grace period provided in such Loan Document for that payment); or (b) the occurrence of any other default (whether concerned with the payment of money or otherwise) under any Loan Document, and the expiration of any applicable grace period provided in such Loan Document for the cure of that failure or default.

6.     **LATE PENALTY AND DEFAULT RATE OF INTEREST.**   Borrower shall pay to

#2365730 v2

3

Lender a late charge of five percent (5%) of any payment not received by Lender within fifteen (15) days of its due date (excluding any payment due at maturity); provided, however, if said fifteen (15) day period ends on a day other than a Business Day, then the aforedescribed late charge shall be payable if the payment is not received by the first Business Day after said fifteen (15) day period. At Lender's sole option the entire unpaid principal balance of the Loan and any other sums owing under any Loan Document shall bear interest until paid at an augmented annual rate (the "Default Rate") from and after the occurrence and during the continuation of any Event of Default, regardless of whether Lender also elects to accelerate the maturity of the Loan; provided, however, that after judgment all such sums shall bear interest at the greater of the Default Rate or the rate prescribed by applicable law for judgments. At Lender's sole option, all interest which accrues at the Default Rate shall be due and payable on Lender's demand from time to time, but absent such demand shall be due and payable on the regularly scheduled dates for interest payments under this Note. The Default Rate shall equal ten percent (10%).

7.      **RIGHTS AND REMEDIES OF LENDER.** Subject to the limitations and provisions of Article 4, hereof, Lender shall be entitled to pursue any and all rights and remedies provided by applicable law and/or under the terms of this Note or any other Loan Document, all of which shall be cumulative and may be exercised successively or concurrently. Upon the occurrence and during the continuation of any Event of Default, Lender, at its option, may at any time declare any or all other liabilities of Borrower to Lender immediately due and payable (notwithstanding any contrary provisions thereof) without demand or notice of any kind. Lender's delay in exercising or failure to exercise any rights or remedies to which Lender may be entitled if any Event of Default occurs shall not constitute a waiver of any rights or remedies of Lender with respect to that or any subsequent Event of Default, whether of the same or a different nature, nor shall any single or partial exercise of any right or remedy by Lender preclude any other or future exercise of that or any other right or remedy. No waiver of any right or remedy by Lender shall be effective unless made in writing and signed by Lender nor shall any waiver on one occasion apply to any future occasion, but shall be effective only with respect to the specific occasion addressed in that signed writing.

8.      **WAIVER AND CONSENT.** Borrower hereby: (a) waives demand, presentment, protest, notice of dishonor, suit against or joinder of any other person, and all other requirements necessary to charge or hold Borrower liable with respect to the Loan; (b) waives any right to immunity from any such action or proceeding and waive any immunity or exemption of any property, wherever located, from garnishment, levy, execution, seizure or attachment prior to or in execution of judgment, or sale under execution or other process for the collection of debts; (c) intentionally omitted; (d) submits to the jurisdiction of the state and federal courts in the State of Florida for purposes of any such action or proceeding (de) agrees that the venue of any such action or proceeding may be laid in Palm Beach County (in addition to any county in which any collateral for the Loan is located) and waives any claim that the same is an inconvenient forum; and (ef) stipulates that service of process in any such action or proceeding shall be properly made if mailed by any form of registered or certified mail (airmail if international), postage prepaid, to the address set forth herein or then registered in Lender's records for Borrower and that any process so served shall be effective ten (10) days after mailing. No provision of this Note shall limit Lender's right to serve legal process in any other manner permitted by law or to bring any such action or proceeding in any other competent jurisdiction. Borrower hereby consents and agrees that, at any time and from time to time without notice, (i) Lender and the owner(s) of any collateral then securing the Loan may agree to release, increase, change, substitute or exchange all or any part of such collateral, and (ii) Lender and any person(s) then primarily liable for the Loan may

#2365730 v2

4

agree to renew, extend or compromise the Loan in whole or in part or to modify the terms of the Loan in any respect whatsoever, no such release, increase, change, substitution, exchange, renewal extension, compromise or modification shall release or affect in any way the liability of Borrower, and Borrower hereby waives any and all defenses and claims whatsoever based thereon. Until Lender receives all sums due under this Note and all other Loan Documents in immediately available funds, Borrower shall not be released from liability with respect to the Loan unless Lender expressly releases Borrower in a writing signed by Lender, and Lender's release of Borrower shall not release any other person liable with respect to the Loan.

9.     **COSTS, INDEMNITIES AND EXPENSES.**   Borrower agrees to pay all filing fees and similar charges and all reasonable costs incurred by Lender in collecting or securing or attempting to collect or secure the Loan and such right shall extend beyond the entry of a Final Judgment including attorneys' fees, whether or not involving litigation and/or appellate, administrative or bankruptcy proceedings. Such entitlement or attorneys' fees shall not merge with the entry of a Final Judgment and shall continue post-judgment unless and/or until any and all indebtedness due Lender is fully satisfied. Borrower agrees to pay any documentary stamp taxes, intangible taxes or other taxes (except for federal or Florida franchise or income taxes based on Lender's net income) which may now or hereafter apply to this Note or the Loan or any security therefor, and Borrower agrees to indemnify and hold Lender harmless from and against any liability, costs, attorneys' fees, penalties, interest or expenses relating to any such taxes, as and when the same may be incurred. Borrower agrees to pay on demand, and to indemnify and hold Lender harmless from and against, any and all present or future taxes, levies, imposts, deductions, charges and withholdings imposed in connection with the Loan by the laws or governmental authorities of any jurisdiction other than the State of Florida or the United States of America, and all payments to Lender under this Note shall be made free and clear thereof and without deduction therefor.

10.     **GOVERNING LAW.**   This Note shall be governed by, and construed and enforced in accordance with the laws of the State of Florida, except that federal law shall govern to the extent that it may permit Lender to charge, from time to time, interest on the Loan at a rate higher than may be permissible under applicable Florida law.

11.     **INVALIDITY.**   Any provision of this Note which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction only, be ineffective only to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction. To the extent that Borrower may lawfully waive any law that would otherwise invalidate any provision of this Note, it hereby waives the same, to the end that this Note shall be valid and binding and enforceable against Borrower in accordance with all of its terms.

12     **INTERPRETATION.**   If this Note is signed by more than one person, then the term "Borrower" as used in this Note shall refer to all such persons jointly and severally, and all promises, agreements, covenants, waivers, consents, representations, warranties and other provisions in this Note are made by and shall be binding upon each and every undersigned person, jointly and severally. The term "Lender" shall be deemed to include any subsequent holder(s) of this Note. Whenever used in this Note, the term "person" means any individual, firm, corporation, trust or other organization or association or other enterprise or any governmental or political subdivision, agency, department or

#2365730 v2

5

instrumentality thereof. Whenever used in this Note, words in the singular include the plural, words in the plural include the singular, and pronouns of any gender include the other genders, all as may be appropriate. Captions and paragraph headings in this Note are for convenience only and shall not affect its interpretation.

13.   **MISCELLANEOUS.** Time shall be of the essence with respect to the terms of this Note. This Note cannot be changed or modified orally. Except as otherwise required by law or by the provisions of this Note or any other Loan Document, payments received by Lender hereunder shall be applied first against expenses and indemnities, next against interest accrued on the Loan, next in reduction of the outstanding principal balance of the Loan. Borrower shall receive immediate credit on payments only if made in the form of either a federal wire transfer of cleared funds or a check drawn on an account maintained with Lender containing sufficient available funds. Otherwise, Borrower shall receive credit on payments after clearance, which shall be no sooner than the first Business Day after receipt of payment by Lender. For purposes of determining interest accruing under this Note, principal shall be deemed outstanding on the date payment is credited by Lender (but interest shall begin accruing on November 1, 2014). Except as otherwise required by the provisions of this Note or any other Loan Document, any notice required to be given to Borrower shall be deemed sufficient if made personally or if mailed, postage prepaid, to Borrower's address as it appears in this Note (or, if none appears, to any address for Borrower then registered in Lender's records) and shall be deemed given upon receipt or rejection. All of the terms of this Note shall inure to the benefit of Lender and its successors and assigns and shall be binding upon Borrower and its heirs, executors, administrators, personal representatives, successors and assigns, jointly and severally.

14.   **WAIVER OF JURY TRIAL.** LENDER, BY ITS ACCEPTANCE OF THIS NOTE, AND BORROWER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO TRIAL BY JURY IN RESPECT TO ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS NOTE AND ANY AGREEMENT CONTEMPLATED TO BE EXECUTED IN CONJUNCTION HEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS, (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF EITHER PARTY. BORROWER ACKNOWLEDGES THAT THIS WAIVER OF JURY TRIAL IS A MATERIAL INDUCEMENT TO THE LENDER IN EXTENDING CREDIT TO THE BORROWER, THAT THE LENDER WOULD NOT HAVE EXTENDED SUCH CREDIT WITHOUT THIS JURY TRIAL WAIVER, AND THAT BORROWER HAS BEEN REPRESENTED BY AN ATTORNEY OR HAS HAD AN OPPORTUNITY TO CONSULT WITH AN ATTORNEY IN CONNECTION WITH THIS JURY TRIAL WAIVER AND UNDERSTANDS THE LEGAL EFFECT OF THIS WAIVER.

The Borrower has subscribed its name to the respective Loan Documents (as defined in Section 5 of this Note) without condition that anyone else should sign the same or become bound thereunder, and without any other condition whatsoever. The failure of any witness to sign as witness or the failure of this Note to be notarized shall not affect the validity of this Note. This Note is signed, sealed and delivered as of the date first written above.

#2365730 v2

THE MONEY AND CREDIT RECEIVED BY BORROWER IN EXCHANGE FOR THIS NOTE IS BEING USED FOR A BUSINESS OR COMMERCIAL PURPOSE.

DOCUMENTARY STAMP TAX IN THE AMOUNT OF $ _____ HAS BEEN PAID AND AFFIXED TO THE MORTGAGE SECURING THIS PROMISSORY NOTE.

BORROWER:

160 ROYAL PALM, LLC, a Florida limited liability

By: Palm House, LLC, its sole member

By: _Ryan Block_ _by Leslie Robert Grun_ _Power of attorney_
Printed Name: Ryan Block
Title: Member
by Leslie Robert Guy
Power of Attorney

#2365730 v2

7

WILL CALL BOX NO. 211

Prepared by, xxxxxxxxxxxxx

Craig T. Galle, Esq.
THE GALLE LAW GROUP, P.A.
13501 South Shore Blvd.
Suite 103
Wellington, FL 33414

```
CFN 20140111468
OR BK 26694 PG 1420
RECORDED 03/28/2014 16:09:48
Palm Beach County, Florida
AMT 27,468,750.00
Deed Doc 96,140.80
Intang 54,937.50
Sharon R. Bock,CLERK & COMPTROLLER
Pgs 1420 - 1434; (15pgs)
```

## FLORIDA REAL ESTATE MORTGAGE, ASSIGNMENT
## OF LEASES AND RENTS AND SECURITY AGREEMENT

THIS FLORIDA REAL ESTATE MORTGAGE, ASSIGNMENT OF LEASES AND RENTS AND SECURITY AGREEMENT (the "Mortgage") is made and entered into as of the 26th day of August, 2013, 160 ROYAL PALM, LLC, a Florida limited liability company (the "Mortgagor"), whose address is 2200 Biscayne Boulevard, Miami, Florida 33137 and KK-PB FINANCIAL, LLC, a Florida limited liability company (the "Mortgagee"), whose address is: 13501 South Shore Boulevard, Suite 103, Wellington, Florida 33414.

### WITNESSETH:

WHEREAS, Mortgagor is justly and lawfully indebted to Mortgagee in the sum of TWENTY SEVEN Million FOUR HUNDRED SIXTY EIGHT Thousand SEVEN HUNDRED FIFTY and 00/100 U.S. Dollars ($27,468,750.00) (the "Loan"), as evidenced by one certain Promissory Note executed by Mortgagor payable to the order of Mortgagee (the "Note"), bearing the same date as this Mortgage and to be paid according to its terms; and

WHEREAS, Mortgagor and all makers, endorsers, sureties, guarantors, accommodation parties and all persons liable or to become liable with respect to the Loan are each included in the term "Obligor" as used in this Mortgage;

NOW, THEREFORE, to secure the payment of the Loan and such future or additional advances as may be made by Mortgagee, at its option and for any purpose, to Mortgagor or Mortgagor's permitted successor(s) in title, provided that all those advances are to be made within five (5) years from the date of this Mortgage (the total amount of indebtedness secured by this Mortgage may decrease or increase from time to time, but the total unpaid balance so secured at any one time shall not exceed twice the original principal amount of the Loan, plus interest and any disbursements made for the payment of taxes, levies or insurance on the property covered by the lien of this Mortgage with interest on those disbursements), and to secure the full and faithful performance of the covenants and agreements contained in the Note, this Mortgage and all other instruments and documents executed in connection with the Loan by Mortgagor and/or any other Obligor (the "Loan Documents"), Mortgagor hereby grants, bargains, sells, conveys, assigns, transfers, mortgages, pledges, delivers, sets over, warrants and confirms to Mortgagee, and grants Mortgagee a security interest in:

All those certain lots, pieces, or parcels of land as herein after described and lying and being in, Palm Beach County, State of Florida, (the "Property"), together with the buildings and improvements now or hereafter situated thereon, said land being legally described as follows:

Lots 31, 32 and 33, Block F of REVISED MAP OF ROYAL PARK ADDITION TO PALM BEACH, FLORIDA, according to the Plat thereof as recorded in Plat Book 4, Page(s) 1, of the Public Records of Palm Beach County, Florida.

Page 1 of 15

TOGETHER WITH all and singular the tenements, hereditaments, easements, riparian rights and other rights now or hereafter belonging or appurtenant to the Property, and the rights (if any) in all adjacent roads, ways, streams, alleys, strips and gores, and the reversion or reversions, remainder and remainders, rents, issues and profits thereof, and all the estate, right, title, interest, property, claim and demand whatsoever of Mortgagor of, in and to the same and every part and parcel thereof;

TOGETHER WITH any and all tangible property (collectively, the **"Personal Property"**) now or hereafter owned by Mortgagor and now or hereafter located at, affixed to, placed upon or used in connection with the Property or any present or future improvements thereon, including without limitation: all machinery, equipment, appliances, fixtures, conduits and systems for generating or distributing air, water, heat, air conditioning, electricity, light, fuel or refrigeration, or for ventilating or sanitary purposes, or for the exclusion of vermin or insects, or for the removal of dust, refuse, sewage or garbage, or for fire prevention or extinguishing; all motors, engines, generators, compressors, pumps, lift stations, tanks, boilers, water heaters, furnaces and incinerators; all furniture, furnishings, fixtures, appliances, installations, partitions, shelving, cabinets, lockers, vaults and wall safes; all carpets, carpeting, rugs, under padding, linoleum, tiles, mirrors, wall coverings, windows, storm doors, awnings, canopies, shades, screens, blinds, draperies and related hardware, chandeliers and light fixtures; all plumbing, sinks, basins, toilets, faucets, pipes, sprinklers, disposals, laundry appliances and equipment, and kitchen appliances and equipment; all alarm, safety, electronic, telephone, music, entertainment and communications equipment and systems; all janitorial, maintenance, cleaning, vacuuming, landscaping, and recreational equipment and supplies; and any other items of property, wherever kept or stored, if acquired by Mortgagor with the intent of incorporating them in and/or using them in connection with the Property or any improvements to the Property; together also with all additions thereto and replacements and proceeds thereof (Mortgagor hereby agreeing, with respect to all additions and replacements and proceeds, to execute and deliver from time to time such further instruments as may be requested by Mortgagee to confirm their inclusion herein; all of which foregoing items described in this paragraph are hereby declared to be part of the real estate and encumbered by this Mortgage;

TOGETHER WITH (a) any and all awards or payments, including interest thereon and the right to receive the same, growing out of or resulting from any exercise of the power of eminent domain (including the taking of all or any part of the Premises, as defined hereinafter), or any alteration of the grade of any street upon which the Property abuts, or any other injury to, taking of, or decrease in the value of the Premises or any part thereof; (b) any unearned premiums on any hazard, casualty, liability, or other insurance policy carried for the benefit of Mortgagor and/or Mortgagee with respect to the Premises (as defined hereinafter); (c) all rights of Mortgagor in and to all supplies and materials delivered to or located upon the Property or elsewhere and used or usable in connection with the construction or refurbishing of improvements on the Property; and (d) all rights of Mortgagor in, to, under, by virtue of, arising from or growing out of any and all present or future contracts, instruments, accounts, insurance policies, permits, licenses, trade names, plans, appraisals, reports, paid fees, choses-in-action, subdivision restrictions or declarations or other intangibles whatsoever now or hereafter dealing with, affecting or concerning the Property, the improvements thereto, or any portion thereof or interest therein, including but not limited to: (i) all contracts, plans and permits for or related to the Property or its development or the construction or refurbishing of improvements on the Property, (ii) any agreements for the provision of utilities to the Property, (iii) all payment, performance and/or other bonds related to the Property, (iv) any contracts now existing or hereafter made for the sale by Mortgagor of all or any portion of the Property, including any deposits paid by any purchasers (howsoever such deposits may be held) and any proceeds of such sales contracts, including any purchase-money notes and mortgages made by such purchasers, and (v) any declaration of condominium, restrictions, covenants, easements or similar documents now or hereafter recorded against the title to all or any portion of the Property.

TOGETHER WITH all of Mortgagor's rights to enter into any lease or lease agreement regarding all or any part of the Property, and all of Mortgagor's rights to encumber the Property further for debt, Mortgagor hereby (a) representing as a special inducement to Mortgagee to make the Loan that, as of the date hereof, there are no encumbrances to secure debt prior or junior to this Mortgage, and (b) covenanting that there are to be none as of the date when this Mortgage is recorded;

TO HAVE AND TO HOLD the above-described and granted property, appurtenances and rights (referred to collectively in this Mortgage as the "**Premises**") unto Mortgagee in fee simple forever.

PROVIDED, HOWEVER, that these presents are upon the condition that if Mortgagor (a) shall pay or cause to be paid to Mortgagee the principal and all interest payable in respect of the Loan and any future advance made under this Mortgage and any other sums secured by this Mortgage, at the time and in the manner stipulated in the Note or this Mortgage or any other Loan Document, all without any deduction or credit for taxes or other similar charges paid by Mortgagor, (b) shall punctually perform, keep and observe all and singular the covenants and promises in the Note and any future advance agreement(s), in any renewals, extensions or modifications thereof, and in this Mortgage or any other Loan Document expressed to be performed, kept and observed by and on the part of Mortgagor, and (c) shall not permit or suffer to occur any default under this Mortgage or any other Loan Document and not cure same within any applicable cure or notice period, then this Mortgage and all the interests and rights hereby granted, bargained, sold, conveyed, assigned, transferred, mortgaged, pledged, delivered, set over, warranted and confirmed shall cease, terminate and be void, but shall otherwise remain in full force and effect.

Mortgagor covenants and agrees with Mortgagee as follows:

1. Mortgagor shall pay all sums due Mortgagee at the time and in the manner provided in the Note, this Mortgage, any other Loan Document or any instrument evidencing a future advance, and Mortgagor shall otherwise perform, comply with and abide by each and every one of the stipulations, agreements, conditions and covenants contained in the Note, this Mortgage or any other Loan Document.

2. Mortgagor shall pay all taxes and assessments (whether general or special) levied, assessed, placed or made against all or any part of the Premises or any interest of Mortgagee therein, or against the Note, this Mortgage, any Loan Document or any obligation thereunder. Mortgagor shall make such payment in full (and shall deliver to Mortgagee the paid receipts) upon the same first becoming due and payable. If Mortgagor shall fail, neglect or refuse to pay any such taxes as and as aforesaid, then Mortgagee at its option, within thirty (30) days prior notice, may pay the same, and any funds so advanced by Mortgagee shall bear interest, shall be paid and shall be secured as provided in Paragraph 13.

3. (a) Mortgagor shall maintain property insurance with an insurance company or companies licensed in Florida, covering any and all buildings and improvements now or hereafter located on the Property, for an amount not less than $2,000,000, for the benefit of Mortgagor and Mortgagee as their interests may appear. Regardless of the types or amounts of insurance required and approved by Mortgagee, Mortgagor shall assign and deliver to Mortgagee all policies of insurance which insure against any loss or damage to the Premises or any part thereof, as collateral and further security for the payment of the Loan, with loss payable to Mortgagee pursuant to a standard mortgagee clause reasonably acceptable to Mortgagee.

(b) If Mortgagor defaults in so insuring the Premises or any part thereof or in so assigning and delivering the policies, at its option Mortgagee may, after written notice to Mortgagor and fifteen (15) days to cure, effect such insurance from year to year and pay the premiums therefore, and any such sums advanced by Mortgagee shall bear interest, shall be paid and shall be secured as provided in paragraph 12.

(c) If Mortgagee receives any money for loss or damage by reason of such insurance, then provided there is no default under this Mortgage or any of the other Loan Documents beyond any applicable cure or notice period, Mortgagee shall disburse them to Mortgagor, under such safeguards as Mortgagee reasonably deems appropriate, for the reconstruction or restoration or repair of the damaged Premises, but Mortgagee shall not be obligated to see to the proper application by Mortgagor of any such disbursement. During the continuance of any default under this Mortgage or any of the other Loan Document beyond any applicable cure or notice period, Mortgagee may apply any insurance proceeds recovered by Mortgagee toward the payment of the Loan.

(d) Mortgagor shall obtain and carry general comprehensive liability insurance with an insurance company or companies licensed in Florida and reasonably acceptable to Mortgagee, which policy shall name both Mortgagor and Mortgagee as insureds, with initial limits of not less than Two Million Dollars ($2,000,000) as to personal injury or death, and Five Hundred Thousand Dollars ($500,000) with respect to property damage (or such greater or different limits which Mortgagee may require from time to time) and on such terms, in such form and for such periods as Mortgagee shall reasonably approve from time to time. (e) In the event of a foreclosure of this Mortgage, the purchaser of the Premises shall succeed to all the rights of Mortgagor in and to all policies of insurance required under this Mortgage, including any right to unearned premiums. (f) Not less than ten (10) days prior to the expiration date of each policy required under this Mortgage, Mortgagor shall deliver to Mortgagee a renewal policy or policies marked "premium paid" or accompanied by other evidence of payment satisfactory to Mortgagee. (g) Each policy of insurance required under this Mortgage shall be non-cancelable without at least ten (10) days' advance written notice to Mortgagee.

4. Should Mortgagor ever fail to pay real estate taxes in timely manner, then at Mortgagee's option, Mortgagor, following written notice from Mortgagee, shall pay to Mortgagee, together with and in addition to each regular installment of principal and/or interest payable under the Note, an amount deemed sufficient by Mortgagee to provide Mortgagee with funds in an escrow account sufficient to pay the taxes, assessments, insurance premiums and other charges next due at least thirty (30) days before the date the same are due. In no event shall Mortgagee be liable for any interest on any such funds held in the escrow account. At least thirty (30) days before the date the same are due, Mortgagor shall furnish to Mortgagee an official statement of the amount of said taxes, assessments, insurance premiums and other charges, and Mortgagee shall pay the same, but only if sufficient funds remain in the escrow account. In the event of any deficiency in the escrow account, Mortgagor shall upon notice from Mortgagee immediately deposit with Mortgagee such additional funds as Mortgagee may deem necessary to cure the deficiency, in its sole discretion. If Mortgagee elects to pay any such taxes, assessments, insurance premiums or other charges notwithstanding the escrow account deficiency, then all sums advanced by Mortgagee in excess of the escrow account balance shall bear interest, shall be paid and shall be secured as provided in Paragraph 12. An official receipt for such sums shall be conclusive evidence of Mortgagee's payment and of the validity of the tax, assessment, insurance premium or other charge so paid. In the event of any default under the Note or this Mortgage or any other Loan Document which is not cured within any applicable cure or notice period, Mortgagee at its option may apply any or all funds in the escrow account against the Loan or any other sums secured by this Mortgage, in any order of priority Mortgagee may deem appropriate in its sole discretion. At the time of any permitted transfer of the title to all of the Premises then encumbered by this Mortgage, the balance in the escrow account shall inure to the benefit of such transferee without any specific assignment of such funds. Upon payment in full of the Loan and all other sums secured by this Mortgage, the funds remaining in the escrow account (if any) shall be paid over to the record owner of the Premises encumbered by this Mortgage as of the date of such full payment.

Page 4 of 15

5.    Mortgagor shall promptly repair, restore, replace or rebuild any part of the Premises which may be damaged or destroyed by any casualty whatsoever or which may be affected by any condemnation, alteration of grade, or other public or quasi-public taking or injury. If Mortgagor shall fail, neglect or refuse to repair the Premises as aforesaid, then Mortgagee may, after written notice to Mortgagor, undertake such repairs or maintenance, and any funds advanced therefore by Mortgagee shall bear interest, shall be paid and shall be secured as provided in paragraph 12.

6.    a.    As further security for the repayment of the Loan, Mortgagor hereby collaterally assigns and transfers to Mortgagee all rents, income, issues and profits of the Premises. Mortgagee is hereby vested with full power and authority to use all measures, legal and equitable, deemed necessary or proper by Mortgagee to enforce this assignment, Mortgagor hereby empowers Mortgagee to use and apply all such rents and other income of the Premises to the payment of the Loan and all interest thereon and any other indebtedness or liability of Mortgagor to Mortgagee, and to the payment of the costs of managing and operating the Premises, including without limitation:  (i) taxes, special assessments, insurance premiums, damage claims, and the costs of maintaining, repairing, rebuilding, restoring and making rentable any or all of the Premises;  (ii) all sums advanced by Mortgagee (with interest thereon) for the payment of such costs or for any other reason permitted by this Mortgage or any other Loan Document; and (iii) all costs, expenses and attorney's fees incurred by Mortgagee in connection with the enforcement of this Mortgage and/or any Lease; all in such order of priority as Mortgagee may deem appropriate in its sole discretion.

b.    Mortgagee shall not be obliged to press any of the rights or claims of Mortgagor assigned hereby, nor to perform or carry out any of the obligations of the landlord under any Lease, and Mortgagee assumes no duty or liability whatsoever in connection with or arising from or growing out of the covenants of Mortgagor in any Lease.  This Mortgage shall not operate to make Mortgagee responsible for the control, care, management or repair of all or any part of the Premises, nor shall it operate to make Mortgagee liable for (i) the performance or carrying out of any of the terms or conditions of any Lease, (ii) any waste of the Premises by any tenant or any other person, (iii) any dangerous or defective condition of the Premises, nor (iv) any negligence in the management, upkeep, repair or control of all or any part of the Premises resulting in loss or injury or death to any tenant, licensee, employee or stranger.  Nothing herein contained shall be construed as constituting Mortgagee a trustee or mortgagee in possession.

7.    Mortgagor shall not grant any lien or mortgage that is superior to that of Mortgagee on all or any part of the Premises or any interest therein without the prior written consent of Mortgagee, which Mortgagee may grant or withhold in its sole discretion; any such unpermitted lien or mortgage or assignment by Mortgagor shall entitle Mortgagee to accelerate the maturity of the Loan and foreclose this Mortgage.  Any such other lien or mortgage or assignment shall be junior to this Mortgage and to all permitted tenancies now or hereafter affecting the Premises or any portion thereof and shall be subject to all renewals, extensions, modifications, releases, interest rate increases, future advances, changes or exchanges permitted by this Mortgage, all without the joinder or consent of such junior lienholder or mortgagee or assignee and without any obligation on Mortgagee's part to give notice of any kind thereto. Mortgagor shall maintain in good standing any other mortgage or encumbrance to secure debt affecting any part of the Premises from time to time and shall not commit or permit or suffer to occur any default thereunder, nor shall Mortgagor accept any future advance under or modify the terms of any such mortgage or encumbrance which may then be superior to the lien of this Mortgage. Except for encumbrances permitted by Mortgagee, Mortgagor shall not commit or permit or suffer to occur any act or omission whereby any of the security represented by this Mortgage shall be impaired or threatened, or whereby any of the Premises or any interest therein shall become subject to any attachment, judgment,

lien, charge or other encumbrance whatsoever, and Mortgagor shall cause any such attachment, judgment, lien, charge or other encumbrance to be discharged or otherwise bonded or transferred to other security within fifteen (15) days of filing of same.

8.      From time to time and on demand, Mortgagor shall execute and deliver to Mortgagee any further instruments reasonably required by Mortgagee to reaffirm, correct or perfect the evidence of the obligations secured hereby and the security interest of Mortgagee in all the property intended to be mortgaged hereby, including but not limited to mortgages, security agreements, financing statements, assignments and renewal and substitution notes provided such actions shall in no way increase the liability of Mortgagor or impose any additional obligations.

9.      Upon request made either personally or by mail, Mortgagor shall certify, by a duly acknowledged writing, to Mortgagee or to any proposed assignee of this Mortgage, the amount of principal and interest and other sums then owing on the Loan and whether any offsets or defenses exist against the payment of the Loan. Mortgagor shall provide such estoppel certificate within ten (10) business days after Mortgagor's receipt of a mailed request. Mortgagor shall furnish to Mortgagee any financial or other information regarding Mortgagor or the Premises required by any Loan Document or which Mortgagee may reasonably request from time to time within fifteen (15) days of such written request.

10.     Whenever Mortgagor or Mortgagee are obliged to give notice to the other, such notice shall be in writing and shall be given personally, by overnight mail, or by prepaid certified mail (return receipt requested), in which latter case notice shall be deemed effectively made when the receipt is signed or when the attempted initial delivery is refused or cannot be made because of a change of address of which the sending party has not been notified. Until the designated addresses are changed by notice given in accordance with this paragraph, notice to either party shall be sent to the respective address set forth on the first page of this Mortgage.

11.     At Mortgagee's option, all of the principal and interest and other sums secured by this Mortgage shall immediately or at any time thereafter become due and payable with notice to any Obligor, and Mortgagee shall immediately have all the rights accorded Mortgagee by law and hereunder to foreclose this Mortgage or otherwise to enforce this Mortgage, the Note and any other Loan Document, upon the occurrence of any of the following defaults: (a) failure to pay any sum due under the Note and the expiration of the grace period (if any) provided in the Note for such payment; or (b) failure to repay any sum paid or advanced by Mortgagee under the terms of this Mortgage or any other Loan Document (with interest thereon), as provided in paragraph 12 after written notice to Mortgagor and the expiration of a fifteen (15) day cure period; or (c) failure to pay any tax or assessment after written notice to Mortgagor and the expiration of a thirty (30) day cure period; (d) any sale, transfer (whether voluntary or by operation of law), pledge, hypothecation or further encumbrancing by Mortgagor of all or any part of the Premises, or the additional assignment by Mortgagor of all or any part of the rents, income or profits arising therefrom, in either case without the prior written consent of Mortgagee, which Mortgagee may grant or withhold in its sole discretion – provided that Mortgagor may obtain secondary financing that shall at all times be inferior in position to Mortgagor's first lien and mortgage positions and may convey condominium units in accordance with the terms of Section 35 below; or (e) the dissolution or merger or consolidation or termination of existence of any other Obligor, or the failure or cessation or liquidation of the business of any Obligor, or if the person(s) controlling any Obligor which is a business entity shall take any action authorizing or leading to the same; or (f) the disposition or transfer or exchange of all or substantially all of any Obligor's assets for less than fair market value; or (g) if any Obligor shall make an assignment for the benefit of creditors, file a petition in bankruptcy, apply to or petition any tribunal for the appointment of a custodian, receiver, intervenor or trustee for such Obligor or a substantial part of such Obligor's assets, or if any Obligor shall commence any proceeding under any bankruptcy,

arrangement, readjustment of debt, dissolution or liquidation law or statute of any jurisdiction, whether now or hereafter in effect, or if any Obligor shall by act or omission approve, consent to or acquiesce in the filing of any such petition or application against such Obligor or the appointment of any such custodian, receiver, intervenor or trustee or the commencement of any such proceeding against such Obligor or the entry of an order for relief with respect to such Obligor, or if any such petition or application shall have been filed or proceeding commenced against any Obligor which remains undismissed for sixty (60) days or more or in which an order for relief is entered, or if any Obligor shall suffer any such appointment of a custodian, receiver, intervenor or trustee to continue undischarged for sixty (60) days or more; or (h) intentionally omitted; or (i) any default in the observance or performance of any other covenant or agreement of any Obligor in this Mortgage or any other Loan Document not cured following written notice from Mortgagee and the expiration of a thirty (30) day cure period except that in the event such default cannot reasonably be cured within such thirty (30) day period, such thirty (30) day cure period shall be extended to sixty (60) days, the occurrence of any other event prohibited by the terms of this Mortgage or any other Loan Document not cured within any applicable cure or notice period, or the violation of any other provision of this Mortgage or any other Loan Document not cured within any applicable cure or notice period. No consent or waiver expressed or implied by Mortgagee with respect to any default under this Mortgage shall be construed as a consent or waiver with respect to any further default of the same or a different nature; and no consent or waiver shall be deemed or construed to exist by reason of any curative action initiated by Mortgagee or any other course of conduct or in any other manner whatsoever except by a writing duly executed by Mortgagee, and then only for the single occasion to which such writing is addressed. In order to accelerate the maturity of the Loan because of Mortgagor's failure to pay any amounts required by this Mortgage, or in order to accelerate because of any other default, Mortgagee shall not be required to pay the same or to advance funds to cure the default, notwithstanding Mortgagee's option under this Mortgage or any other Loan Document to do so; no such payment or advance by Mortgagee shall be deemed or construed a waiver of Mortgagee's right to accelerate the maturity of the Loan on account of such failure or other default.

12.     In the event of any default in the performance of any of Mortgagor's covenants or agreements contained in this Mortgage or any other Loan Document not cured after written notice by Mortgagee and the expiration of any applicable cure or notice period, Mortgagee shall have the right (but in no event the obligation) at its option to cure the default or take any other action Mortgagee deems necessary or desirable to protect its security (including without limitation the payment of any taxes, assessments, insurance premiums, charges, liens or encumbrances required of Mortgagor under this Mortgage), without thereby waiving any rights or remedies otherwise available to Mortgagee. If Mortgagee shall elect to advance at any time any sum(s) for the protection of its security or for any other reason permitted or provided by any of the terms of this Mortgage or any other Loan Document, then such sum(s) shall be deemed Loan funds, shall be secured by this Mortgage and shall bear interest until paid at the "Default Rate" provided in the Note commencing on the date they are advanced by Mortgagee. If advanced by Mortgagee before the (natural or accelerated) maturity date of the Loan, such sum(s) shall be due and payable by Mortgagor on such maturity date or ten (10) days after Mortgagor first learns of the advance, whichever is earlier, but if advanced after the (natural or accelerated) maturity date, such sum(s) shall be due and payable immediately. Mortgagee's lien on the Premises for such advances shall be superior to any right or title to, interest in, or claim upon all or any portion of the Premises junior to the lien of this Mortgage. Without the prior written consent of Mortgagee, which Mortgagee may grant or withhold in its sole discretion, Mortgagor shall not file for record any notice limiting the maximum principal amount that may be secured by this Mortgage to an amount less than the limit set forth in the future advance clause on the first page of this Mortgage.

13.     In any action to foreclose this Mortgage, Mortgagee shall have the right to apply without notice for the appointment of a receiver of the Premises and the rents and profits thereof, and Mortgagee

shall be entitled to the appointment of such a receiver as a matter of right, without consideration of the value of the Premises as security for the amounts due Mortgagee or the solvency of any Obligor.

14.     The rights and remedies of Mortgagee under this Mortgage or any other Loan Document or applicable law shall be cumulative and concurrent and may be pursued separately, successively or together against any Obligor(s), the Premises, any other collateral for the Loan, or any one or more of the foregoing, all at the sole discretion of Mortgagee, and may be exercised as often as occasion therefore shall arise, all to the maximum extent permitted by law. Mortgagee's pursuit of any remedy shall not preclude pursuit of any other remedy until Mortgagee shall have recovered all sums due Mortgagee, together with the appropriate interest thereon and all costs of collection, including attorney's fees and appellate attorney's fees, with interest thereon. Neither Mortgagor nor anyone claiming through or under Mortgagor shall set up, claim or seek to take advantage of any appraisement, valuation, stay, moratorium, extension, exemption or redemption laws, now or hereafter in force, in order to prevent or hinder the enforcement or foreclosure of this Mortgage or the sale of the Premises. To the maximum extent permitted by law, the Obligors, for themselves and all who may claim through or under any of them, hereby severally waive the benefit of all such laws and waive any and all rights to have the Premises or any other collateral for the Loan marshalled upon any foreclosure of this Mortgage or any other instrument securing the Loan, and hereby severally agree that the Premises and any such other collateral may be sold as an entirety or in such parcels, in such manner and in such order as Mortgagee in its sole discretion may elect. In the event that Mortgagor should seek protection under the U.S. Bankruptcy Code, or should Mortgagor be adjudicated a Debtor thereunder, Mortgagor hereby consents to relief from the automatic stay pursuant to 11 USC 362(d) to allow Mortgagee to proceed to, and obtain, a final judgment of foreclosure of this Mortgage, to complete a foreclosure sale pursuant thereto, to cause the issuance of a certificate of title pursuant thereto, and to otherwise take all such actions as Mortgagee may elect in its sole discretion in pursuance of the other rights and remedies available to Mortgagee in the case of a default under this Mortgage. Mortgagor hereby waives any protection under 11 U.S.C. 362(a).

15.     Mortgagor shall pay any and all reasonable costs, expenses and attorney's fees actually incurred by Mortgagee (regardless of whether in connection with any action, proceeding or appeal) to sustain the lien of this Mortgage or its priority, to protect or enforce any of Mortgagee's rights under this Mortgage or under any other Loan Document, to recover any indebtedness secured hereby, to contest or collect any award or payment in connection with the taking or condemnation of all or any part of the Premises, and all such sums shall bear interest, shall be paid and shall be secured as provided in paragraph 12.

16.     Notwithstanding any taking by eminent domain, any alteration of the grade of any street, or any other injury to or decrease in value of the Premises or any portion thereof caused by any public or quasi-public authority or person, Mortgagor shall continue to pay interest on the Loan and all other sum(s) secured hereby until Mortgagee shall have actually received the award or payment for such taking or alteration or injury and shall have applied the same against the Loan. Provided there is no existing default hereunder beyond any applicable cure or notice period, Mortgagee shall disburse all or part of such award or payment to Mortgagor for the purpose of altering, restoring or rebuilding any part of the Premises which may have been altered, damaged or destroyed as a result of any such taking or alteration or injury. If all of the Property is so taken but the award or payment therefore received by Mortgagee is insufficient to pay in full all sums then secured by this Mortgage, then at Mortgagee's option the unpaid balance shall be immediately due and payable.

17.     If at any time the State of Florida shall determine that the intangible tax paid in connection with this Mortgage is insufficient or that the documentary stamps affixed hereto are insufficient, and that additional intangible tax should be paid or that additional stamps should be affixed, then Mortgagor shall pay for the same, together with any interest or penalties imposed in connection with such

determination, and Mortgagor hereby agrees to indemnify and hold Mortgagee harmless therefrom  If any such sums shall be advanced by Mortgagee, they shall bear interest, shall be paid and shall be secured as provided in paragraph 12.

18.     If any federal, state or local law shall hereafter be enacted which shall impose on Mortgagee the payment of all or any part of the taxes or assessments or charges required to be paid hereunder by Mortgagor, then upon written demand Mortgagor shall pay such taxes or assessments or charges imposed on Mortgagee or shall reimburse Mortgagee therefore.

19.     This Mortgage is a "security agreement" and creates a "security interest" in favor of Mortgagee as a "secured party" with respect to all property included in the Premises which is covered by the Uniform Commercial Code.  Upon default under the Note, this Mortgage or any other Loan Document which is not cured within any applicable notice or cure period, Mortgagee may at its option pursue any and all rights and remedies available to a secured party with respect to any portion of the Premises so covered by the Uniform Commercial Code, or Mortgagee may at its option proceed as to all or any part of the Premises in accordance with Mortgagee's rights and remedies in respect of real property.  Mortgagor and Mortgagee agree that the mention of any portion of the Premises in a financing statement filed in the records normally pertaining to personal property shall never derogate from or impair in any way their declared intention that all items of collateral described in this Mortgage are part of the real estate encumbered hereby to the fullest extent permitted by law, regardless of whether any such item is physically attached to the improvements or whether serial numbers are used for the better identification of certain items of Equipment.  Specifically, the mention in any such financing statement of (a) the rights in or the proceeds of any insurance policy, (b) any award in eminent domain proceedings for a taking or for loss of value, (c) Mortgagor's interest as lessor in any present or future lease or right to income growing out of the use or occupancy of the Property or improvements thereto, whether pursuant to lease or otherwise, or (d) any other item included in the definition of the Premises, shall never be construed to alter any of the rights of Mortgagee as determined by this Mortgage or to impugn the priority of Mortgagee's lien and security interest with respect to the Premises; such mention in a financing statement is declared to be for the protection of Mortgagee in the event any court shall hold that notice of Mortgagee's priority of interest with respect to any such portion of the Premises must be filed in the Uniform Commercial Code records in order to be effective against or to take priority over any particular class of persons, including but not limited to the federal government and any subdivision or instrumentality of the federal government.  This Mortgage or a carbon, photographic copy or other reproduction hereof or of any financing statement shall be sufficient as a financing statement.

20.     Any payment made in accordance with the terms of the Note or this Mortgage by any person at any time liable for the payment of the whole or any part of the sums now or hereafter secured by this Mortgage, by any subsequent owner of the Premises, or by any other person whose interest in the Premises might be prejudiced in the event of a failure to make such payment (or by any partner, stockholder, officer or director of any such person), shall be deemed, as between Mortgagee and all such persons who at any time may be so liable or may have an interest in the Premises, to have been made on behalf of all such persons.  Mortgagee's acceptance of any payment which is less than full payment of all amounts then due and payable to Mortgagee, even if made by one other than the person liable therefore, shall not constitute a waiver of any rights or remedies of Mortgagee.

21.     Mortgagor consents and agrees that, at any time and from time to time without notice, (a) Mortgagee and the owner(s) of any collateral then securing the Loan may agree to release, increase, change, substitute or exchange all or any part of such collateral, and (b) Mortgagee and any person(s) then primarily liable for the Loan may agree to renew, extend or compromise the Loan in whole or in part or to modify the terms of the Loan in any respect whatsoever.  Mortgagor agrees that no such release, increase, change, substitution, exchange, renewal, extension, compromise or modification, no sale of the Premises

or any part thereof, no forbearance on the part of Mortgagee, nor any other indulgence given by Mortgagee (whether with or without consideration) shall relieve or diminish in any manner the liability of any Obligor, nor adversely affect the priority of this Mortgage, nor limit or prejudice or impair any right or remedy of Mortgagee. All Obligors and all those claiming by, through or under any of them hereby jointly and severally waive any and all right to prior notice of, and any and all defenses or claims based upon, any such release, increase, change, substitution, exchange, renewal, extension, compromise, modification, sale, forbearance or indulgence.

22. This Mortgage shall be governed by, and construed and enforced in accordance with, the laws of the State of Florida, excepting only that federal law shall govern to the extent it may permit Mortgagee to charge, from time to time, interest on the Loan at a rate higher than may be permissible under applicable Florida law.

23. In no event shall any agreed to or actual exaction charged, reserved or taken as an advance or forbearance by Mortgagee as consideration for the Loan exceed the limits (if any) imposed or provided by the law applicable from time to time to the Loan for the use or detention of money or for forbearance in seeking its collection; Mortgagee hereby waives any right to demand any such excess. In the event that the interest provisions of the Note or any exactions provided for in the Note, this Mortgage or any other Loan Document shall result at any time or for any reason in an effective rate of interest that transcends the maximum interest rate permitted by applicable law (if any), then without further agreement or notice the obligation to be fulfilled shall automatically be reduced to such limit and all sums received by Mortgagee in excess of those lawfully collectible as interest shall be applied against the principal of the Loan immediately upon Mortgagee's receipt thereof, with the same force and effect as though the payor had specifically designated such extra sums to be so applied to principal and Mortgagee had agreed to accept such extra payment(s) as a premium-free prepayment or prepayments.

24. Any provision of this Mortgage which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction only, be ineffective only to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

25. At any time after default under the terms of the Note, this Mortgage or any other Loan Document which exists beyond the expiration of any applicable cure or notice period, if any of the buildings, improvements or Equipment now or hereafter located on or in the Property shall be unprotected or unguarded, or if any improved portion of the Property shall be allowed to remain vacant or deserted, then at its option Mortgagee may employ watchmen for the Property and expend any monies reasonably deemed necessary by Mortgagee to protect the Property and the buildings, improvements and Equipment thereon from waste, vandalism and other hazards, depredation or injury, and any sums expended by Mortgagee for such purpose shall bear interest, shall be paid and shall be secured as provided in paragraph 12.

26. Mortgagor agrees that the management of the Premises shall be conducted at all times by Mortgagor or by such other professional property management organization as engaged by Mortgagor. At any time after default under the Note, this Mortgage or any other Loan Document which exists beyond the expiration of any applicable cure or notice period, if Mortgagee shall determine in its reasonable discretion that the management or maintenance of the Premises is unsatisfactory, then Mortgagor shall employ as managing agent of the Premises such person(s) as Mortgagee may designate from time to time, at Mortgagor's sole expense and for the duration of the default. Any sums advanced by Mortgagee in connection with such managing agent shall bear interest, shall be paid and shall be secured as provided in paragraph 12.

27.     In the event Mortgagee shall be named as a party to any lawsuit brought at any time involving any Obligor or with respect to the Premises, this Mortgage or the Loan, or if Mortgagor shall incur any costs or expenses in connection with any lawsuit involving any Obligor or the Premises in which Mortgagee is not a party (i.e., if Mortgagee is called upon to produce documentation, information, or to provide testimony), then regardless of the type or merits of such lawsuit, Mortgagor shall defend Mortgagee and indemnify and hold Mortgagee fully harmless from, and shall reimburse Mortgagee for any and all claims, demands, damages, liabilities, judgments, losses, costs, expenses and attorney's fees incurred by Mortgagee and arising out of or resulting from any such lawsuit or any appeal in connection therewith, including all internal costs for time incurred by Mortgagee's officers and other employees calculated at Mortgagee's standard rates (which are available to Mortgagor upon Mortgagor's request). This provision shall survive the satisfaction or other termination of this Mortgage.

28.     Mortgagee is hereby subrogated (a) to the lien(s) of each and every mortgage, lien or other encumbrance on all or any part of the Premises which is fully or partially paid or satisfied out of the proceeds of the Loan, and (b) to the rights of the owner(s) and holder(s) of any such mortgage, lien or other encumbrance. The respective rights under and priorities of all such mortgages, liens or other encumbrances shall be preserved and shall pass to and be held by Mortgagee as security for the Loan, to the same extent as if they had been duly assigned by separate instrument of assignment and notwithstanding that the same may have been cancelled and satisfied of record.

29.     If Mortgagor is a corporation, partnership or other business entity, then Mortgagor hereby represents and warrants, in order to induce Mortgagee to make the Loan, that:  (a) Mortgagor is duly organized, validly existing and in good standing under the laws of the jurisdiction of its creation and the state of Florida; (b) Mortgagor has all requisite power and authority (corporate or otherwise) to conduct its business, to own its properties, to execute and deliver the Note and this Mortgage and all other Loan Documents, and to perform its obligations under the same; (c) the execution, delivery and performance of the Note, this Mortgage and all other Loan Documents have been duly authorized by all necessary actions (corporate or otherwise) and do not require the consent or approval of Mortgagor's stockholders (if a corporation) or of any other person or entity whose consent has not been obtained; and (d) the execution, delivery and performance of the Note, this Mortgage and all other Loan Documents do not and shall not conflict with any provision of Mortgagor's by-laws or articles of incorporation (if a corporation), partnership agreement (if a partnership) or trust agreement or other document pursuant to which Mortgagor was created and exists.

30.     a)     Hazardous Waste. "Hazardous Waste" as used herein shall mean and include those elements or compounds which are contained in the list of hazardous substances adopted by the United States Environmental Protection Agency (EPA) and the list of toxic pollutants designated by Congress or the EPA or defined by any other federal, state or local statute, law, ordinance, code, rule, regulation, order or decree regulating, relating to or imposing liability or standards of conduct concerning any hazardous, toxic or dangerous waste, substance or material as now or at any time in effect.

b)     Representations and Warranties. Mortgagor specifically represents and warrants that its use and operation of the Premises shall comply with all applicable environmental laws, rules and regulations, including, without limitation, the Federal Resource Conservation and Recovery Act and the Comprehensive Environmental Response Compensation and Liability Act of 1980 and all amendments and supplements thereto and Mortgagor shall continue to comply therewith at all times. Specifically, and without limiting the generality of the foregoing, Mortgagor shall not store Hazardous Waste in, upon or at the Premises in violation of applicable law, and nor from the date hereof shall there be at any time any releases or discharges of Hazardous Waste from the Premises.

c)      Indemnification. (i) Mortgagor hereby agrees to indemnify Mortgagee and hold Mortgagee harmless from and against any and all losses, liabilities, including strict liability, damages, injuries, expenses, including attorneys' fees for attorneys of Mortgagee's choice, costs of any settlement or judgment and claims of any and every kind whatsoever paid, incurred or suffered by, or asserted against, Mortgagee by any person or entity or governmental agency for, with respect to, or as a direct or indirect result of, the presence on or under, or the escape, seepage, leakage, spillage, discharge, emission or release from the Premises of any Hazardous Waste (including, without limitation, any losses, liabilities, including strict liability, damages, injuries, expenses, including attorney's fees for attorneys of Mortgagee's choice, costs of any settlement or judgment or claims asserted or arising under the Comprehensive Environmental Response, Compensation and Liability Act, any federal, state or local "Superfund" or "Superlien" laws, and any and all other statutes, laws, ordinances, codes, rules, regulations, orders or decrees regulating, with respect to or imposing liability, including strict liability, substances or standards of conduct concerning any hazardous waste), regardless of whether within Mortgagor's control. (ii)  The aforesaid indemnification and hold harmless agreement shall benefit Mortgagee from the date hereof and shall continue notwithstanding payment, release or discharge of this Mortgage or the indebtedness, and, without limiting the generality of the foregoing such obligations shall continue for the benefit of Mortgagee and any subsidiary of Mortgagee during and following any possession of the Premises hereby or any ownership of the Premises thereby, whether arising by foreclosure or deed in lieu of foreclosure or otherwise, such indemnification and hold harmless agreement to continue forever. Notwithstanding anything to the contrary contained herein, Mortgagor shall have no obligation to indemnify Mortgagee for any losses, liabilities, or damage caused by Hazardous Waste first introduced into the Premises following Mortgagor's acquisition of the Premises by foreclosure, deed in lieu of foreclosure or any other means.

d)      Notice of Environmental Complaint. If Mortgagor shall receive any notice of: (i) the happening of any material event involving the spill, release, leak, seepage, discharge or cleanup of any Hazardous Waste on the Land or Premises in connection with Mortgagor's operations thereon; or (ii) any complaint, order, citation or material notice with regard to air emissions, and soil and water discharges (an "Environmental Complaint") from any person or entity, then Mortgagor immediately shall notify Mortgagee orally and in writing of said notice.

e)      Mortgagee's Reserved Rights. In the event of receipt of an Environmental Complaint, Mortgagee shall have the right, but not the obligation (and without limitation of Mortgagee's rights under this Mortgage) after written notice to Mortgagor to enter onto the Premises or to take such other actions as it shall reasonably deem necessary or advisable to clean up, remove, resolve or minimize the impact of, or otherwise deal with, any such Hazardous Waste or Environmental Complaint following receipt of any notice from any person or entity having jurisdiction asserting the existence of any Hazardous Waste or an Environmental Complaint pertaining to the Premises or any part thereof which, if true, could result in an order, suit or other action against Mortgagor and/or which, in Mortgagee's sole opinion, could jeopardize its security under this Mortgage. All reasonable costs and expenses incurred by Mortgagee in the exercise of any such rights shall be secured by this Mortgage and shall be payable by Mortgagor upon demand.

f)      Environmental Audits. If Mortgagee shall have a good faith reason to believe that Hazardous Waste has been discharged on the Premises subsequent to the date hereof, Mortgagee shall have the right, in its reasonable discretion and by written notice to Mortgagor which notice sets for such good faith reason, to require Mortgagor to perform periodically to Mortgagee's satisfaction (but not more frequently than annually unless an Environmental Complaint shall be then outstanding), at Mortgagor's expense, an environmental audit and, if deemed necessary by Mortgagee, an environmental risk assessment of: (i) the Premises; (ii) hazardous waste management practices and/or (iii) Hazardous Waste disposal sites used by Mortgagor. Said audit and/or risk assessment must be by an environmental

consultant reasonably satisfactory to Mortgagee. Should Mortgagor fail to perform any such environmental audit or risk assessment within thirty (30) days after Mortgagee's request, Mortgagee shall have the right to retain an environmental consultant to perform such environmental audit or risk assessment. All costs and expenses incurred by Mortgagee in the exercise of such rights shall be secured by this Mortgage and shall be payable by Mortgagor upon demand.

        g)    <u>Breach</u>. Any breach of any warranty, representation or agreement contained in this Section existing beyond any applicable cure or notice period shall be an Event of Default and shall entitle Mortgagee to exercise any and all remedies provided in this instrument, or otherwise permitted by law.

        h)    <u>Acknowledgment</u>. Notwithstanding anything to the contrary contained in this Mortgage, the liability of Mortgagor under Paragraph 30 shall extend only to those matters introduced to the Premises by Mortgagor and arising after the date hereof. In addition, Mortgagor shall have no obligation to indemnify Mortgagee and hold Mortgagee harmless pursuant to Paragraph 3a(c), with respect to (1) the presence on or under the Property of any Hazardous Waste that was first introduced on or under the Property prior to the date hereof; or (2) the escape, seepage, leakage, spillage, discharge, emission or release from the Premises of any Hazardous Waste prior to the date hereof. In addition, notwithstanding anything to the contrary contained in this Mortgage, Mortgagor shall have no rights pursuant to Paragraph 30(e) in connection with Hazardous Waste that was first introduced on or under the Property prior to the date hereof or in connection with any Environmental Complaint which relates to Hazardous Waste on or under the Property that was first introduced prior to the date hereof.

    31.    Whenever the context of any provision of this Mortgage shall so require, words in the singular shall include the plural, words in the plural shall include the singular, and pronouns of any gender shall include the other genders. Captions and headings in this Mortgage are for convenience only and shall not affect its interpretation. All references in this Mortgage to Exhibits, Schedules, paragraphs and subparagraphs refer to the respective subdivisions of this Mortgage, unless the reference expressly identifies another document. Wherever used in this Mortgage, unless the context clearly indicates a contrary intention or unless this Mortgage specifically provides otherwise: (a) the term "Mortgagor" shall mean "Mortgagor or any subsequent owner or owners of the Premises"; (b) the term "Mortgagee" shall mean "Mortgagee or any subsequent holder(s) of this Mortgage"; (c) the term "Note" shall mean "the Note, any renewal notes and any additional notes hereafter to be issued and secured by this Mortgage pursuant to the future advance provision hereof"; (d) the term "Loan" shall mean "the Loan and any future or additional advances made by Mortgagee from time to time for any reason permitted or provided by the terms of this Mortgage or any other Loan Document"; and (e) the term "person" shall mean "an individual, corporation, partnership, limited partnership, unincorporated association, joint stock corporation, joint venture or other legal entity".

    32.    Time is of the essence of all provisions of this Mortgage. If Mortgagor consists of more than one person, the obligations and liabilities of each such person hereunder shall be joint and several, and wherever the term "Mortgagor" is used it shall be deemed to refer to such persons jointly and severally. If Mortgagor is a partnership, then all general partners in Mortgagor shall be liable jointly and severally for the covenants, agreements, undertakings and obligations of Mortgagor in connection with the Loan, notwithstanding any contrary provision of the partnership laws of the State of Florida. This Mortgage shall be binding upon the parties hereto and their respective heirs, personal representatives, successors and assigns, and it shall inure to the benefit of Mortgagee and its successors and assigns and to the benefit of Mortgagor and Mortgagor's heirs, personal representatives and permitted successors and assigns. This Mortgage cannot be changed except by an agreement in writing, signed by the party against whom enforcement of the change is sought.

33. MORTGAGOR AND MORTGAGEE HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO TRIAL BY JURY IN RESPECT TO ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS NOTE AND ANY AGREEMENT CONTEMPLATED TO BE EXECUTED IN CONJUNCTION HEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF EITHER PARTY. MORTGAGOR ACKNOWLEDGES THAT THIS WAIVER OF JURY TRIAL IS A MATERIAL INDUCEMENT TO THE MORTGAGEE IN EXTENDING CREDIT TO THE MORTGAGOR, THAT THE MORTGAGEE WOULD NOT HAVE EXTENDED SUCH CREDIT WITHOUT THIS JURY TRIAL WAIVER, AND THAT MORTGAGOR HAS BEEN REPRESENTED BY AN ATTORNEY OR HAS HAD AN OPPORTUNITY TO CONSULT WITH AN ATTORNEY IN CONNECTION WITH THIS JURY TRIAL WAIVER AND UNDERSTANDS THE LEGAL EFFECT OF THIS WAIVER.

34. Mortgagor and Mortgagee acknowledge and agree that the Loan is a "non-recourse" loan. Accordingly, Mortgagor shall not be personally liable upon the indebtedness under the Note, this Mortgage, or any other Loan Document securing the payment of the Note, or for the performance of any of the covenants or agreements of Mortgagor under the Note, this Mortgage, or any other Loan Document governing or pertaining to the payment of the Note, except as and to the extent of the Property and, except as expressly provided herein, no other property or assets of Mortgagor (or any of its shareholders, members, or general or limited partners, as applicable) shall be available to Mortgagee. If default occurs and continues beyond the expiration of any applicable cure or notice period, any judicial proceedings brought by Mortgagee against Mortgagor shall be limited to (a) the protection and preservation of the Property, (b) the preservation, enforcement and foreclosure of the liens, mortgages, assignments, rights and security interests now or at any time hereafter securing the payment of the obligations secured hereby (the "Obligations"), and (c) the enforcement and collection of the covenants and indebtedness for which Mortgagor remains liable as provided in this Section. In the event of a foreclosure of any such liens, mortgages, assignments, rights and security interests securing the payment of the Obligations, by judicial process, power of sale or otherwise, no judgment for any deficiency upon such indebtedness shall be sought or obtained by Mortgagee against Mortgagor (or any of its shareholders, members or general or limited partners, as applicable).

35. Mortgagee acknowledges that the Property constitutes a condominium under the laws of the state of Florida and as such, Mortgagor may desire to sell one or more condominium units from time to time. Upon five (5) days' written notice, Mortgagee shall provide an original partial release of mortgage (within said five (5) days), in a commercially reasonable and recordable form which releases the subject unit(s) (along with all of its appurtenant rights) from the lien of this Mortgage and all Loan Documents. As consideration for the partial release, Mortgagor shall pay $400,000.00 for each partial release. Mortgagor and Mortgagee shall cooperate in good faith to coordinate the payment of the partial release price and the delivery of the original partial release within said five (5) day period and shall use a mutually acceptable title company to serve as escrow agent if desired.

WITNESS the due execution hereof as of the date first above written.

Signed, sealed and delivered in  the presence of these witnesses:

MORTGAGOR:

160 ROYAL PALM LLC
By: Palm House, LLC, its sole member

Witness: _Candice L. Gordon_

Print Name: _Candice L. Gordon_

By: _Ryan Black by Leslie Robert Evans power of Attorney_

Print Name: _Ryan Black by Leslie Robert Evans under_

Title: _Managing Member_    _Power of Attorney_

Witness: _C.M. Hilgendorf_

Print Name: **C.M. Hilgendorf**

STATE OF FLORIDA            )
                           ) SS:
COUNTY OF PALM BEACH  )

by Leslie Robert Evans, under Power of Attorney

The foregoing instrument was acknowledged before me this _31st_ day of August, 2013, by _Ryan Black_ as _Managing Member_ of 160 ROYAL PALM LLC, a Florida limited liability company, and for whom and whose behalf this instrument was executed.

Personally Known _✓_ OR Produced Identification _____

[NOTARY SEAL]

_C.M. Hilgendorf_
Notary Public, State of Florida

Print Name: **C.M. Hilgendorf**

My Commission Expires: _____

Commission Number: _____

C·M HILGENDORF
Notary Public - State of Florida
My Comm. Expires Aug 18, 2017
Commission # FF 13807
Bonded Through National Notary Assn.

Page 15 of 15

CLOSING STATEMENT
August 30, 2013

| Sellers Credits | |
|---|---|
| $36,000,000.00 | Purchase Price |
| $625,000.00 | Cost Since July 8th, 2013 |
| $36,625,000.00 | Gross Purchase Price |

| Sum Due from Buyer | |
|---|---|
| $36,000,000.00 | Purchase Price |
| $625,000.00 | Cost Since July 8th, 2013 |
| $96,140.63 | DOC Stamps on Mortgage |
| $54,937.50 | Intangible Tax on Note |
| $125.00 | Recording Fees |
| $36,776,203.13 | Total Due from Buyer |

| Sellers Deductions | |
|---|---|
| $1,831,250.00 | Broker's Commission |
| $150,000.00 | Buyer's Credit DOC Stamps |
| $133,442.00 | Escrow -- Liens / Retainage |
| $25,000.00 | Escrow -- A/C |
| $586,000.00 | Escrow - $2,000.00 per Day |
| $82,374.75 | Cleary Lien |
| $5,700.95 | VCNA Prestige Gunite, Inc. |
| $121,561.44 | Prorated Real Estate Taxes |
| $27,468,750.00 | Seller Financing |
| $30,434,079.14 | Total Deductions |

| Buyer Credits | |
|---|---|
| $2,000,000.00 | Deposit |
| $27,468,750.00 | Seller Financing |
| $151,078.13 | Credit Doc Stamps |
| $29,619,828.13 | Total |

| Seller Recap | |
|---|---|
| $36,625,000.00 | Seller Credits |
| $30,434,079.14 | Seller Deductions |
| $6,220,920.86 | Sum Due to Seller at Closing |

Seller
Palm House L.L.C., a Florida Limited Liability

Buyer
160 Royal Palm, L.L.C., a Florida Limited Liability

## ESCROW AGREEMENT

THIS ESCROW AGREEMENT (this "Agreement") is made as of August 30, 2013 by and among **GLENN F. STRAUB** ("Seller"), **PALM HOUSE, LLC**, a Delaware limited liability company ("Purchaser"), and **LESLIE ROBERT EVANS & ASSOCIATES, P.A.**, a Florida professional association corporation ("Escrow Agent").

## BACKGROUND

A.      Seller, Purchaser and 160 Royal Palm, LLC ("Royal Palm") entered into that certain 'As Is' Agreement for Purchase and Sale by dated August 16, 2013 as amended by First Amendment to 'As Is' Agreement for Purchase and Sale dated as of August 30, 2013 (the "Purchase Agreement") for the purchase of one hundred percent of the membership interest in 160 Royal Palm, LLC., in which Seller and Purchaser were added as parties.

B.      Royal Palm owns the real property, personal property and fixtures which constitute the Palm Hotel, located at 160 Royal Palm Way, Palm Beach, Florida (the "Property").

C.      As of the date hereof, Purchaser has acquired from Seller one hundred per cent (100%) of the membership interest in Royal Palm (the "Membership Purchase").

D.      The Property is currently in violation of a municipal requirement that the construction taking place at the Property be completed by February 14, 2013 and, since February 15, 2013 the Town of Palm Beach has been assessing a fine in the amount of $2,000 per day (the "Completion Violation"). Notwithstanding any terms of the Purchase Agreement to the contrary, the parties have agreed that Seller is required to obtain a full release from the Town of Palm Beach of any pending and future assessments relating to the Completion Violation by October 31, 2013 in accordance with the terms hereof, time being of the essence.

E.      The Property is also in violation of a certain Town of Palm Beach Code of Ordinances relating to noise levels of air conditioning units as more specifically set forth in a notice form Town of Palm Beach Police Department to Royal Palm dated August 12, 2013 (the "Noise Violation").   The parties have agreed that Purchaser shall be permitted on behalf of itself and Royal Palm as its sole member to remedy the Noise Violation as it may determine in its sole discretion.

F.      The parties recognize that certain liabilities undisclosed in writing to Purchaser relating to the Property and Royal Palm may arise after the date hereof to the detriment of Purchaser and Royal Palm ("Undisclosed Liabilities") and therefore have agreed that the terms of this Escrow Agreement shall, in addition to any rights and remedies Purchaser and Royal Palm may have pursuant to the Purchase Agreement and other documents executed in connection with the Membership Purchase, shall govern such situations.

G.      The Parties agree that Seller shall deposit a sum equal to $744,442.⁰⁰ (the "Funds") with Escrow Agent in order to address the Completion Violation, the Noise Violation and Undisclosed Liabilities as more particularly set forth herein.

H.      The parties desire to have Escrow Agent act as an escrow agent with respect to the Funds to be held by Escrow Agent, as more particularly described below, and Escrow Agent has agreed to act in said capacity.

1

**NOW, THEREFORE,** in consideration of the foregoing, and the mutual promises, covenants and conditions hereinafter set forth, Purchaser, Purchaser and Escrow Agent hereby agree as follows:

1)    On the date hereof, Purchaser shall deliver the Funds to Escrow Agent, to be held and disbursed by Escrow Agent in accordance with the terms and conditions of this Agreement.

2)    Escrow Agent hereby acknowledges receipt of the Funds and agrees to promptly deposit the Funds in Escrow Agent's attorney's trust account

3)    <u>Completion Violation.</u>    Seller may on or before sixty (60) days from the date hereof (the "Completion Violation Deadline"), time being of the essence, negotiate with the Town of Palm Beach in order to remedy the Completion Violation. For purposes of this Section 3, the Completion Violation shall be remedied if Seller shall provide Purchaser and Escrow Agent written confirmation from the Town of Palm Beach in recordable form that (a) the Completion Violation is released and fully satisfied (in a form reasonably acceptable to Purchaser's attorney and its title company).

4)    <u>Noise Violation.</u>  Purchaser may or cause Royal Palm to, on or before the date which is ninety (90) days after the date hereof (the "Escrow Termination Date"), remedy the Noise Violation as determined in its sole discretion.  In remedying the Noise Violation (including without limitation, the payment of any fines or penalties associated therewith), Purchaser shall be permitted to use any or all of the Funds provided that this sum does not exceed $40,000.00.  Accordingly, Purchaser shall submit requisitions associated with its actions to remedy the Noise Violation to Escrow Agent and Seller. Escrow Agent shall thereafter promptly pay Purchaser in accordance with its request(s) using the Funds.

5)    <u>Undisclosed Liabilities.</u>  In addition to any other rights or remedies which Purchaser or Royal Palm may have under the Purchase Agreement or any documents executed in connection with the Membership Purchase, Purchaser shall, on or before the Escrow Termination Date, be permitted with Seller's consent to use any portion of the Funds (or cause Royal Palm) to resolve, settle, satisfy or pay any loss, liability, claim, damage (including incidental and consequential damages), expense (including costs of investigation and defense and reasonable attorneys' fees) or diminution of value, whether or not involving a third- party claim  arising out of (a) any breach or inaccuracy of any representation or warranty made by Seller or Royal Palm in the Purchase Agreement or any documents delivered at or before closing, including without limitation, the affidavit set forth in Section 5.5 of the Agreement (collectively, the "Transaction Documents"), (b) any indemnifications made by Seller or Royal Palm within or liability of Seller or Royal Palm in connection with the Transaction Documents, or (c) any liabilities not disclosed to Purchaser in writing on or before the date hereof, including without limitation mechanic's liens).  Upon Purchaser becoming aware of any matters set forth in the preceding sentence, it shall notify Seller of such fact and Seller shall have ten (10) days to remedy such issue, time being of the essence, to the reasonable satisfaction of Purchaser such that after such action by Seller, such matter shall cease to be a liability (contingent or otherwise) of Purchaser or Royal Palm.  If Seller fails to remedy such matter as aforesaid, Purchaser may submit a written request to request Escrow Agent (with a copy to Seller) requesting, in reasonable detail, a sum or sums of money which will allow Purchaser to remedy the matter.  The fact that Purchaser acquired, as of the date hereof, all membership interests in Royal Palm shall in no way limit the rights of Purchaser as more particularly set forth herein and Seller shall have no right of contribution from Royal Palm.

6) <u>Release of Funds.</u>     (a)   Upon the Escrow Termination Date, Escrow Agent shall release the following to Seller:

(i)  If the Completion Violation Conditions are satisfied by the Completion Violation Date, time being of the essence, the balance of the Funds not released pursuant to Sections 4 and 5 hereof shall be promptly released to Seller.

(b)     Upon the Escrow Termination Date, Escrow Agent shall release the following to Purchaser:

(i)     If the Completion Violation Conditions are not satisfied by the Completion Violation Date, time being of the essence, the greater of (a)[$624,000] or (b) the balance of the Funds currently being held by Escrow Agent as of the Escrow Termination Date  shall be promptly released to Purchaser.

7)     In the event of any dispute regarding disbursement of the Funds, Escrow Agent may take the following actions:

(a)     to continue to hold the Funds or any portion thereof until Escrow Agent receives a written agreement of Purchaser and Purchaser directing the disbursement of the Funds in dispute, in which event Escrow Agent shall disburse such Funds in accordance with such agreement; and/or

(b)     to take any and all such actions as Escrow Agent deems necessary or desirable, in its sole and absolute discretion, to discharge and terminate its duties under this Escrow Agreement, including (but not limited to) depositing the Escrow or any remaining portion thereof into any court of competent jurisdiction and bringing any action of interpleader or any other proceeding; and/or

(c)     in the event of any litigation between the parties relating to the disposition of the Funds, to deposit the Funds or any remaining portion thereof with the clerk of the court in which such litigation is pending.  In the event the Escrow is deposited in a court by Escrow Agent, Escrow Agent shall be entitled to rely upon the decision of such court.

8)     In the event of any dispute whatsoever among the parties with respect to the disposition of the Funds or any remaining portion thereof, the parties shall pay the reasonable attorneys fees and costs incurred by Escrow Agent (which said parties shall share equally, but for which such parties shall be jointly and severally liable) for any litigation in which Escrow Agent is named as, or becomes, a party.

9)     Escrow Agent undertakes to perform only those duties which are expressly set forth in this Agreement and acknowledge that these duties are purely ministerial in nature. Escrow Agent shall be entitled to receive reimbursement as Escrow Agent of documented reasonable attorneys' fees and other documented out-of-pocket expenses incurred by it in the performance of its duties under this Agreement, which shall be paid in equal amounts by Purchaser and Purchaser.

10)     Purchaser and Seller agree to indemnify and hold harmless Escrow Agent, its officers, shareholders, employees and agents against any and all cost, losses, claims, damages, liabilities and expenses (including reasonable costs of investigation, court costs and attorney's fees) that may be imposed upon Escrow Agent in connection with its acceptance of appointment as Escrow Agent hereunder (except those arising out of Escrow Agent's gross negligence or willful misconduct), including any litigation arising from this Agreement or involving the subject matter hereof.

11)     Escrow Agent may in its sole discretion resign by giving thirty (30) days written notice thereof to Purchaser and Purchaser.  Purchaser and Seller shall furnish to Escrow Agent written instructions for the disposition of the Funds.  If Escrow Agent shall not have received such written instructions within the thirty (30) days, Escrow Agent may petition any court of competent jurisdiction for the appointment of a successor Escrow Agent and upon such appointment deliver the Funds to such successor.  Costs and fees incurred by Escrow Agent may, at the option of Escrow Agent, be deducted from the Funds.  Purchaser and Seller reserve the right to remove Escrow Agent at any time, provided ten (10) days' prior written notice is given to Escrow Agent.  Escrow Agent neither approves nor disapproves of this transaction, nor does it recommend for or against, nor does it have an opinion as to the legality or validity of this transaction.

12)     If the Funds are at any time attached, garnished, or levied upon under any court order or if the payment or delivery of the Funds is stayed or enjoined by any court order, or if any order, judgment or decree shall be made or entered by any court affecting the Funds, Escrow Agent is authorized, in its sole discretion, to rely upon and comply with the order, writ, judgment or decree.  Escrow Agent shall not be liable to Purchaser, Seller or to any other person firm or corporation by reason of such compliance even though the order, writ, judgment or decree may be subsequently reversed modified, annulled, set aside or vacated.

13)     Escrow Agent shall not be responsible for (i) any fluctuations in the interest rate applicable to any cash held by it pursuant to or by virtue of this Agreement, or (ii) any lost earnings as a result of deposits in transit or similar delays.

14)     Purchaser and Purchaser release and waive any claims they may have against Escrow Agent, which may result from its non-negligent performance in good faith of its duties under this Agreement, including, but not limited to, a delay in the electronic wire transfer of any monies held as part of the Funds.  Escrow Agent shall be liable only for loss or damage caused directly by its acts of gross negligence or willful misconduct while performing as Escrow Agent under this Agreement.  Escrow Agent shall be entitled to rely upon the authenticity of any signature and the genuineness and validity of any writing received by Escrow Agent relating to this Agreement, so long as Escrow Agent is acting in good faith in relying thereon.  Escrow Agent shall not be bound in any way by any contract or agreement between Purchaser and Purchaser, whether or not it has knowledge of any such contract or agreement or of its terms or conditions.

15)     Purchaser and Seller are aware that the Federal Deposit Insurance Corporation (the "FDIC") coverages apply only to a cumulative maximum amount of $250,000 for each individual deposit for all depositor's accounts at the same or related institution.  Purchaser and Purchaser further understand that certain banking instruments such as, but not limited to, re-purchase agreements and letters of credit are not covered at all by FDIC insurance.  Further Purchaser and Seller understand that Escrow Agent assumes no responsibility for, nor will Purchaser or Seller hold Escrow Agent liable for any loss occurring that arises from the fact that the amount of the above account may cause the aggregate amount of any individual depositor's accounts to exceed $250,000 and that the excess amount is not insured by the FDIC or that FDIC insurance is not available on certain types of bank instruments.

16)     The parties severally agree to provide to Escrow Agent all instruments and documents within their respective powers necessary for Escrow Agent to perform its duties hereunder.

17)     Any notice, report, request or demand required, permitted, or desired to be given under this Agreement shall be given to the respective party at the addresses set forth below in writing and shall be deemed to have been properly given, for all purposes, only (i) upon receipt if personally delivered, (ii) on the next business day if sent by nationally recognized overnight courier, (iii) on the third business day if sent by registered or certified mail return receipt requested, or (iv) on the day sent if sent by confirmed facsimile.  A party's address may be changed by written notice to the other parties given in accordance with this Section.

If to Purchaser:                 Palm House, LLC

                                 Attention:
                                 Telephone:
                                 Facsimile:

If to Seller:                    Glenn F. Straub
                                 11198 Polo Club Road
                                 Wellington, Florida 33414
                                 Telephone: (561) 596-9500
                                 Facsimile:  (561) 798-7330

If to Escrow Agent:              Leslie Robert Evans & Associates, P.A.
                                 214 Brazilian Avenue, Suite 200
                                 Palm Beach, FL 33480
                                 Attention:  Leslie Robert Evans, Esq.
                                 Telephone:  (561) 832-8288
                                 Facsimile:  (561) 832-5722

18)     This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns as permitted hereunder.  No person or entity other than the parties hereto is or shall be entitled to bring any action to enforce any provision of this Agreement against any of the parties hereto, and the covenants and agreements set forth in this Agreement shall be solely for the benefit of, and shall be enforceable only by, the parties hereto or their respective successors and assigns as permitted hereunder.  No party to this Agreement may assign this Agreement or any rights hereunder without the prior written consent of the parties hereto.

19)     This Agreement may not be amended except by a writing signed by both parties nor shall observance of any term of this Agreement be waived except with the written consent of the parties benefiting from such term.  The failure by either party to enforce against the other any term or provision of this Agreement shall not be deemed to be a waiver of such party's right to enforce against the other party by the same or any other such term or provision in the future.

20)     Any judicial proceeding brought against any party in connection with, arising out of or in any way related to this Agreement may be brought in any court of competent jurisdiction in the State of Florida, and, by the execution and delivery of this Agreement, Purchaser and Purchaser each (a) shall accept, generally and unconditionally, the nonexclusive jurisdiction rendered thereby in connection with

this Agreement and (b) irrevocably waive any objection each may now or hereafter have as to the venue of any such suit, action or proceeding brought in such a court or that such court is an inconvenient forum. This Agreement shall be governed by the laws of the State of Connecticut.

21)     This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which taken together shall constitute one and the same agreement.

22)     Purchaser and Seller each warrant and represent to the other that the execution of this Agreement has been duly authorized by all necessary action and that the individual signing on its behalf is duly authorized to execute this Agreement.

23)     Any provision in this Agreement that is held to be illegal or unenforceable shall be ineffective to the extent of such illegality or unenforceability without invalidating the remaining provisions and any such illegal or unenforceable provision shall be deemed to be restated to reflect as nearly as possible the original intentions of the parties in accordance with applicable law.

24)     Each party has been represented by its own counsel in connection with the negotiation and preparation of this Agreement and, consequently, each party hereby waives the application of any rule of law that would otherwise be applicable in connection with the interpretation of this Agreement, including but not limited to any rule of law to the effect that any provision of this Agreement shall be interpreted or construed against the party whose counsel drafted that provision.

25)     The descriptive headings of the paragraphs of this Agreement are inserted for convenience only and do not constitute a part of this Agreement.

26)     This Agreement constitutes the entire agreement by and between the parties hereto and supersedes any and all previous agreements, written or oral, between the parties and affecting the matters covered herein.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date set forth above.

Witnessed:

_____          _____  MANAGER
                                          Glenn F. Straub

                                          PALM HOUSE, LLC

_____          By: _____
                                          Name: Ryan Black
                                          Title: Managing Member

LESLIE ROBERT EVANS &
ASSOCIATES, P.A.

By: _____
Name: Leslie Robert Evans
Title: President

## SPECIFIC POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS:

THAT I, RYAN BLACK, MANAGING MEMBER OF PALM HOUSE LLC, A DELAWARE LLC, have made, constituted and appointed, and by those presents do make, constitute and appoint LESLIE ROBERT EVANS, my true and lawful attorney for me and in my name, place and stead, to contract for, purchase, receive and take possession of; to purchase, sell, exchange, grant or convey with or without warranty; to mortgage, transfer in trust or other wise encumber or hypothecates any interest in the property legally described as:

Lots 31, 32 and 33, Block F of REVISED MAP OF ROYAL PARK ADDITION TO PALM BEACH, FLORIDA, according to the Plat thereof, as recorded in Plat Book 4, at Page 1, of the Public Records of Palm Beach County, Florida.

A/K/A 160 ROYAL PALM WAY, PALM BEACH, FLORIDA 33480

And to endorse, sign, seal, execute and deliver any and all mortgages, Deeds of Trust, Deed or Trust Notes, notes or bonds, financing statements, checks, drafts or othe negotiable instruments and other written instruments of whatever kind reasonably required to effectuate this transaction. Giving and granting unto my said attorney full power and authority to do and perform all and every act and thing whatsoever required and necessary to be done in and about the premises as fully, to all intents and purposes as I might or could do if personally present, withfull power of substitution and revocation, hereby reatifying and confirming all that my said attorney or his substitute shall lawfully do or cause to be done by virtue hereof.  This Power of Attorney is specifically limited to the above purposes and, if not exercised prior to September 5, 2013, shall be revoked.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 30ᵗʰ day of AUGUST, 2013.

Signed, sealed and delivered
in the presence of:

_Lorraine M Corcoran_                                   PALM HOUSE LLC, A DELAWARE LLC
Print Name: _Lorraine M Corcoran_            By: _Ryan Black_
                                                                        Ryan Black, Managing Member

_[signature]_
Print Name: _Jason Evans_

STATE OF FLORIDA
COUNTY OF PALM BEACH

THE FOREGOING INSTRUMENT was sworn to and acknowledged before me this 30 day of August, 2013 by Ryan Black, Managing Member of Palm House LLC, a Delaware LLC, who ( X) is personally known to me or who (    ) has produced _____ as identification.

_____
Lorraine M Corcoran
Notary Signature

LORRAINE M. CORCORAN
MY COMMISSION # EE 141177
EXPIRES: November 28, 2015
Bonded Thru Notary Public Underwriters

Print Name
My Commission Expires:

1:32 PM

01/17/14

Accrual Basis

## Leslie Robert Evans & Assoc. PA
## Account QuickReport
### All Transactions

| Type | Date | Num | Name | Memo | Amount | Balance |
|------|------|-----|------|------|--------|---------|
| **1213 · First United IOTA (Real Estate)** | | | | | | |
| Matthews P/O Palm House1375.150 | | | | | | |
| Check | 8/29/2013 | WIRE | USREDA | Matthews P... | -350,000.00 | 2,740,772.80 |
| Check | 9/3/2013 | wire | 160 Royal Palm LLC | Matthews P... | -2,580,000.00 | 160,772.80 |
| Check | 9/3/2013 | WIRE | 160 Royal Palm LLC | Matthews P... | -150,920.08 | 9,852.72 |
| Deposit | 9/6/2013 | | | Deposit | 1,064,858.73 | 1,074,711.45 |
| Deposit | 9/6/2013 | | | Deposit | 33,140.49 | 1,107,851.94 |
| Check | 9/11/2013 | 9666 | Leslie Robert Evans & Assoc., P.A. | Matthews P... | -33,000.00 | 1,074,851.94 |
| Check | 9/20/2013 | 9761 | Florida UCC, LLC | Matthews P... | -38.00 | 1,074,813.94 |
| Check | 10/21/2013 | 9999 | Clerk of Circuit Court | Walsh/Roy... | -18,608.90 | 1,056,205.04 |
| Check | 10/23/2013 | WIRE | New Haven Contracting South | Matthews P... | -150,000.00 | 906,205.04 |
| Deposit | 11/26/2013 | | | Deposit | 3,337,216.67 | 4,243,421.71 |

**Michele Andre**

| | |
|---|---|
| From: | 1stunitedbankwire@fundtech.com |
| Sent: | Thursday, August 29, 2013 3:56 PM |
| To: | Michele Andre |
| Subject: | [Cust Out Wire Advice – eMail] Message ID:130829153533JM01 Advice Code:OTCSADEM |

From: 1st United Bank Wire Transfer Dept.

In accordance with your instructions, we have DEBITED your account: **********▮▮▮ for
$350,000.00.

FRB Confirmation: 20130829MMQFMP96000144

Originating Routing Number:         ▮▮▮▮▮▮▮▮
Originating Bank Short Name:         1ST UNITED BANK
Originating Reference Number:  130829153533JM01

Beneficiary Institution

Party to be Paid or Credited
*********▮▮▮
USREDA  (UNITED STATES REGIONAL
ECONOMIC DEVELOPMENT AUTHORITY INC)
197 S FEDERAL HWY STE 200
BOCA RATON FL 33432

Payment Originator Information
*********▮▮▮
LESLIE ROBERT EVANS & ASSOC PA
IOTA TRUST ACCOUNT
214 BRAZILIAN AVE STE 200
PALM BEACH, FL 33480-4676

Additional Info:

Bank to Bank Info:

Our Wire Dept Phone number is 561 616-3100
Our direct Wire Fax number is 866 493-6323

1

TRANSMISSION VERIFICATION REPORT

*Confirmed*

```
TIME    : 09/03/2013 10:12
NAME    : LESLIE R EVANS ASSOC
FAX     : 561-832-5722
TEL     : 561-832-8288
SER.#   : BROF3J491593
```

```
DATE,TIME       09/03 10:11
FAX NO./NAME     18664936323
DURATION        00:00:34
PAGE(S)         02
RESULT          OK
MODE            STANDARD
                ECM
```

Fax To: 866-493-6323

Phone: 561-616-3100 or 866-493-6300

# 1st United Bank

## WIRE TRANSFER REQUEST

☐ In Person/Walk In   Date: 9/3/13   Amount: $2,580,000.00   Currency: US

### ORIGINATOR (YOUR INFORMATION)

ORIGINATOR NAME: Leslie Robert Evans & Associates, P.A.

ADDRESS: 214 Brazilian Ave., #200

CITY, STATE & ZIP: Palm Beach, Florida  33480

ORIGINATOR'S ACCOUNT NUMBER: ███████

### BENEFICIARY (RECIPIENT'S INFORMATION)

RECEIVING BANK NAME: Bank of America   ABA #: ███████

INTERMEDIARY BANK NAME(IBK): _____   SWIFT/ACCT CODE: _____
INTERMEDIARY BANK ADDRESS: _____

BENEFICIARY BANK NAME(BBK): _____   SWIFT/ACCT CODE: _____
BENEFICIARY BANK ADDRESS: _____

BENEFICIARY NAME: 160 Royal Palm LLC
ADDRESS: 11198 Polo Club Rony
ADDRESS: Wellington, FL 33414

BENEFICIARY'S ACCOUNT NUMBER: ███████

ADDITIONAL INFORMATION: SEE ATTACHED INSTRUCTIONS

AUTHORIZED SIGNATURE: _____

AUTHORIZED SIGNATURE: _____

Fax to: 866-493-6323

Phone: 561-616-3100 or 866-493-6300

# 1st United Bank

## WIRE TRANSFER REQUEST

☐ In Person/Walk In    Date: 9/3/13    Amount: $2,580,000.00    Currency: US

### ORIGINATOR (YOUR INFORMATION)

ORIGINATOR NAME: Leslie Robert Evans & Associates, P.A.

ADDRESS: 214 Brazilian Ave., #200

CITY, STATE & ZIP: Palm Beach, Florida 33480

ORIGINATOR'S ACCOUNT NUMBER: ▮▮▮▮▮

### BENEFICIARY (RECIPIENT'S INFORMATION)

RECEIVING BANK NAME: Bank of America    ABA #: ▮▮▮▮▮▮▮

INTERMEDIARY BANK NAME (IBK): _____    SWIFT/ACCT CODE: _____

INTERMEDIARY BANK ADDRESS: _____

BENEFICIARY BANK NAME (BBK): _____    SWIFT/ACCT CODE: _____

BENEFICIARY BANK ADDRESS: _____

BENEFICIARY NAME: 160 Royal Palm LLC

ADDRESS: 11198 Polo Club Road

ADDRESS: Wellington, FL 33414

BENEFICIARY'S ACCOUNT NUMBER: ▮▮▮▮▮▮

ADDITIONAL INFORMATION: SEE ATTACHED INSTRUCTION

AUTHORIZED SIGNATURE: _____

AUTHORIZED SIGNATURE: _____

### INTERNAL USE ONLY

WIRE ACCEPTED & VERIFIED BY: _____

AVAILABLE BALANCE: _____    FEE: _____

AGREEMENT VERIFIED: YES / NO

CALLBACK OVER $10,000: _____    TIME: _____
(Name of Agent verifying wire)

CALLBACK PERFORMED BY: _____    SECURITY CODE: _____

OVER LIMIT AUTHORIZATION: _____

FEDLINE INPUT & VERIFICATION PERFORMED BY:

INPUT BY: _____    POST COMPLIANCE REVIEW BY: _____

VERIFIED BY: _____

Revised 04/11

TRANSMISSION VERIFICATION REPORT

```
TIME : 09/03/2013 14:20
NAME : LESLIE R EVANS ASSOC
FAX  : 561-832-5722
TEL  : 561-832-8288
SER.# : BROF3J491593
```

```
DATE,TIME            09/03  14:19
FAX NO./NAME         18664936323
DURATION             00:00:34
PAGE(S)              02
RESULT               OK
MODE                 STANDARD
                     ECM
```

Fax to: 866-493-6323                                    Phone: 561-616-3100 or 866-493-6300

# 1st United Bank

## WIRE TRANSFER REQUEST

☐ In Person/Walk In     Date: 9/3/13     Amount: $150,920.08     Currency: US

### ORIGINATOR (YOUR INFORMATION)

ORIGINATOR NAME: Leslie Robert Evans & Associates, P.A.

ADDRESS: 214 Brazilian Ave. #200

CITY, STATE & ZIP: Palm Beach, Florida 33480

ORIGINATOR'S ACCOUNT NUMBER: ▮▮▮▮▮▮

### BENEFICIARY (RECIPIENT'S INFORMATION)

RECEIVING BANK NAME: Bank of America     ABA #: ▮▮▮▮▮▮

INTERMEDIARY BANK NAME(IBK): _____     SWIFT/ACCT CODE: _____

INTERMEDIARY BANK ADDRESS: _____

BENEFICIARY BANK NAME(BBK): _____     SWIFT/ACCT CODE: _____

BENEFICIARY BANK ADDRESS: _____

BENEFICIARY NAME: 160 Royal Palm LLC

ADDRESS: 11198 Polo Club Road

ADDRESS: Wellington, Fl 3347

BENEFICIARY'S ACCOUNT NUMBER: ▮▮▮▮▮▮

ADDITIONAL INFORMATION: SEE ATTACHED INSTRUCTIONS

AUTHORIZED SIGNATURE: _____

AUTHORIZED SIGNATURE: _____

### INTERNAL USE ONLY

WIRE ACCEPTED & VERIFIED BY: _____

AVAILABLE BALANCE: _____     FEE: _____

AGREEMENT VERIFIED: YES / NO

CALLBACK OVER $10,000: _____     TIME: _____

CALLBACK PERFORMED BY: _____     SECURITY CODE: _____

OVER LIMIT AUTHORIZATION: _____

FEDLINE INPUT & VERIFICATION PERFORMED BY:
INPUT BY: _____     POST COMPLIANCE
VERIFIED BY: _____     REVIEW BY: _____

Fax to: 866-493-6323

Phone: 561-616-3100 or 866-493-6300

# 1st United Bank

## WIRE TRANSFER REQUEST

☐ In Person/Walk In     Date: 9/3/13     Amount: $150,920.08     Currency: US

### ORIGINATOR (YOUR INFORMATION)

ORIGINATOR NAME: Leslie Robert Evans & Associates, P.A.

ADDRESS: 214 Brazilian Ave., #200

CITY, STATE & ZIP: Palm Beach, Florida 33480

ORIGINATOR'S ACCOUNT NUMBER: ▮▮▮▮▮

### BENEFICIARY (RECIPIENT'S INFORMATION)

RECEIVING BANK NAME: Bank of America     ABA #: ▮▮▮▮▮▮

INTERMEDIARY BANK NAME(IBK): _____     SWIFT/ACCT CODE: _____
INTERMEDIARY BANK ADDRESS: _____

BENEFICIARY BANK NAME(BBK): _____     SWIFT/ACCT CODE: _____
BENEFICIARY BANK ADDRESS: _____

BENEFICIARY NAME: 160 Royal Palm LLC
ADDRESS: 11198 Polo Club Road
ADDRESS: Wellington, FL 3347

BENEFICIARY'S ACCOUNT NUMBER: ▮▮▮▮▮▮▮

ADDITIONAL INFORMATION: SEE ATTACHED INSTRUCTIONS

AUTHORIZED SIGNATURE: _____
AUTHORIZED SIGNATURE:

### INTERNAL USE ONLY

WIRE ACCEPTED & VERIFIED BY: _____

AVAILABLE BALANCE: _____     FEE: _____

AGREEMENT VERIFIED:     YES / NO
                        (Name of Agent verifying wire)

CALLBACK OVER $10,000: _____     TIME: _____

CALLBACK PERFORMED BY: _____     SECURITY CODE: _____

OVER LIMIT AUTHORIZATION: _____

FEDLINE INPUT & VERIFICATION PERFORMED BY: _____
INPUT BY: _____                          POST COMPLIANCE
VERIFIED BY: _____                       REVIEW BY: _____

Revised 04/11

**160 Royal Palm LLC**
**11198 Polo Club Road**
**Wellington, Florida 33414**
Tel: (561) 798-7333/Fax (561) 798-7330

August 30, 2013

From: Sal Spano-Vice President

Re:  Account Wire Transfer Instructions for: 160 Royal Palm LLC

To: Bank of America

City/State New York, New York

ABA ██████████

To: 160 Royal Palm LLC


Account Number: ███████████


Any questions please contact Sal V. Spano, Vice President 561-798-7113 or e-mail spano@palmbeachpolo.com or Glenn F. Straub 561-596-9500

**Judy Status**

| | |
|---|---|
| **From:** | 1stunitedbankwire@fundtech.com |
| **Sent:** | Friday, September 06, 2013 3:44 PM |
| **To:** | Leslie Evans |
| **Subject:** | [Cust Inc Wire Advice - eMail] Message ID:130906153854F100 Advice Code:INCSADEM |

From:  1st United Bank Wire Transfer Dept.


This funds transfer was received on 2013-09-06, for $1,064,858.73.
The funds have been CREDITED to account # **********▇▇▇.

Sender:

```
        Name              :  BK AMER NYC
        ABA #             :  ▇▇▇▇▇▇▇▇
        Reference #       :  2013090600255201
        Received from     :  BANK OF AMERICA/FLX
        By Order Of       :  FLORIDA IOTA TRUST ACCOUNTS
```

OMAD Reference #        :  20130906MMQFMP9600013209061538FT03

Additional Funds Transfer Information:

Beneficiary: LESLIE ROBERT EVANS AND ASSOCIATES

Beneficiary Bank:

                          * * *

Originator Info: FLORIDA IOTA TRUST ACCOUNTS

Originator Bank: BANK OF AMERICA/FLX

Originator Bank Info: REF PALM HOUSE HOTEL


Bank to Bank and all other FRB info fields:

---------------
CTP Information
---------------
Local Instrument Code:
 Cover Payment Information:




Unstructured Remittance Data:

Related Remittance Information:

1

**Michele Andre**

| | |
|---|---|
| From: | 1stunitedbankwire@fundtech.com |
| Sent: | Friday, September 06, 2013 9:12 AM |
| To: | Michele Andre |
| Subject: | [Cust Inc Wire Advice - eMail] Message ID:130906085156F104 Advice Code:INCSADEM |

| | |
|---|---|
| Follow Up Flag: | Follow up |
| Flag Status: | Flagged |

```
From:  1st United Bank Wire Transfer Dept.


This funds transfer was received on 2013-09-06, for $33,140.49.
The funds have been CREDITED to account # **********▮▮▮▮.


FRB Confirmation:              20130906MMQFMP9600002109060830FT03
Originating Routing Number:    ▮▮▮▮▮▮▮▮▮
Originating Bank Short Name:   FIRST REPUBLIC BK
Originating Reference Number:  1309051424536SC
Reference for Beneficiary:


Party to be Paid or Credited:

DDA Account Number:         **********▮▮▮▮

Name and Address:
LESLIE ROBERT EVEANS & ASSOC., P.A.
IOTA MASTER CLIENT ESCROW ACCOUNT


Payment Originator Information:

Name and Address:
REVERE CAPITAL MANAGEMENT, LLC
20 KETCHUM STREET SUITE 100
WESTPORT,CT 06880-


Originating Institution Information:

Name and Address:




Originator Additional Information:


Bank to Bank Information:
```

1

**Michele Andre**

---

| | |
|---|---|
| **From:** | 1stunitedbankwire@fundtech.com |
| **Sent:** | Wednesday, October 23, 2013 3:13 PM |
| **To:** | Michele Andre |
| **Subject:** | [Cust Out Wire Advice - eMail] Message ID:131023144859SM01 Advice Code:OTCSADEM |

From: 1st United Bank Wire Transfer Dept.

In accordance with your instructions, we have DEBITED your account: **********■■■ for $150,000.00.

FRB Confirmation: 20131023MMQFMP96000108

Originating Routing Number:     ■■■■■■■■■
Originating Bank Short Name:      1ST UNITED BANK
Originating Reference Number:  131023144859SM01

Beneficiary Institution

Party to be Paid or Credited
*********■■■
NEW HAVEN CONTRACTING SOUTH
160 ROYAL PALM WAY
PALM BEACH FL 33480

Payment Originator Information
*********■■■
LESLIE ROBERT EVANS & ASSOC PA
IOTA TRUST ACCOUNT
214 BRAZILIAN AVE STE 200
PALM BEACH, FL 33480-4676

Additional Info:

Bank to Bank Info:

Our Wire Dept Phone number is 561 616-3100
Our direct Wire Fax number is 866 493-6323

```
                        TRANSMISSION  VERIFICATION  REPORT

                                      TIME   : 10/23/2013 14:42
                                      NAME   : LESLIE R EVANS ASSOC
                                      FAX    : 561-832-5722
                                      TEL    : 561-832-8288
                                      SER. # : BROF3J491593
```

```
   DATE,TIME               10/23  14:41
   FAX NO./NAME            18664936323
   DURATION               00:00:31
   PAGE(S)                02
   RESULT                 OK
   MODE                   STANDARD
                          ECM
```

Fax to: 866-493-6323                                    Phone: 561-616-3100

# 1st United Bank

### WIRE TRANSFER REQUEST

☐ In Person/Walk In   Date: _10/23/13_   Amount: $_150,000.__   Currency: _U.S._

#### ORIGINATOR (YOUR INFORMATION)

ORIGINATOR NAME: LESLIE ROBERT EVANS & ASSOCIATES, P.A.

ADDRESS: 214 BRAZILIAN AVENUE, SUITE 200

CITY, STATE & ZIP: PALM BEACH, FLORIDA 33480

ORIGINATOR'S ACCOUNT NUMBER: ▮▮▮▮▮▮

#### BENEFICIARY (RECIPIENT'S INFORMATION)

RECEIVING BANK NAME: _REGIONS BANK_ ABA #: ▮▮▮▮▮▮▮

INTERMEDIARY BANK NAME(IBK): _____ SWIFT/ACCT CODE: _____

INTERMEDIARY BANK ADDRESS: _____

BENEFICIARY BANK NAME(BBK): _REGIONS BANK_ SWIFT/ACCT CODE: _____

BENEFICIARY BANK ADDRESS: _525 Okeechobee Blvd, Ste. 100_
_West Palm Beach, FL 33401_

BENEFICIARY NAME: _NEW Haven Contracting South_

ADDRESS: _160 Royal Palm Way,_ ▮▮▮

ADDRESS: _Palm Beach, FL 33480_

BENEFICIARY'S ACCOUNT NUMBER: ▮▮▮▮▮▮▮▮▮▮

ADDITIONAL INFORMATION: _★ SEE Attached ★_

AUTHORIZED SIGNATURE: _(signature)_

AUTHORIZED SIGNATURE: _____

### INTERNAL USE ONLY

WIRE ACCEPTED & VERIFIED BY: _____

AVAILABLE BALANCE: _____   FEE: _____

AGREEMENT VERIFIED:    YES  /  NO

CALLBACK OVER $10,000: _____   TIME: _____
                        (Name of Agent verifying wire)

CALLBACK PERFORMED BY: _____   SECURITY CODE: _____

OVER LIMIT AUTHORIZATION: _____

FEDLINE INPUT & VERIFICATION PERFORMED BY:

INPUT BY: _____   POST COMPLIANCE

VERIFIED BY: _____   REVIEW BY: _____

Fax to: 866-493-6323                                                                                          Phone: 561-616-3100

# 1st United Bank

## WIRE TRANSFER REQUEST

☐ In Person/Walk In     Date: *10/23/13*     Amount: $ *150,000.—*     Currency: U.S.

### ORIGINATOR (YOUR INFORMATION)

ORIGINATOR NAME:   LESLIE ROBERT EVANS & ASSOCIATES, P.A.

ADDRESS:   214 BRAZILIAN AVENUE, SUITE 200

CITY, STATE & ZIP:   PALM BEACH, FLORIDA 33480

ORIGINATOR'S ACCOUNT NUMBER:   ███████

### BENEFICIARY (RECIPIENT'S INFORMATION)

RECEIVING BANK NAME:   *REGIONS BANK* ABA #: ███████████

INTERMEDIARY BANK NAME(IBK): _____   SWIFT/ACCT CODE: _____
INTERMEDIARY BANK ADDRESS: _____

BENEFICIARY BANK NAME(BBK):   *REGIONS BANK*   SWIFT/ACCT CODE: _____
BENEFICIARY BANK ADDRESS:   *525 Okeechobee Blvd., Ste. 100*
                            *West Palm Beach, FL 33401*
BENEFICIARY NAME:   *New Haven Contracting South*
ADDRESS:   *1600 Royal Palm Way,* ~~____~~
ADDRESS:   *Palm Beach, FL 33480*

BENEFICIARY'S ACCOUNT NUMBER:   ███████████

ADDITIONAL INFORMATION:   *✱ SEE Attached ✱*

AUTHORIZED  SIGNATURE:   *[signature]*

AUTHORIZED  SIGNATURE: _____

---

### INTERNAL USE ONLY

WIRE ACCEPTED & VERIFIED BY: _____

AVAILABLE BALANCE: _____          FEE: _____

AGREEMENT VERIFIED:        YES  /  NO

CALLBACK OVER $10,000: _____          TIME: _____
                       (Name of Agent verifying wire)

CALLBACK PERFORMED BY: _____          SECURITY CODE: _____

OVER LIMIT AUTHORIZATION: _____

FEDLINE INPUT & VERIFICATION PERFORMED BY:
INPUT BY: _____                       POST COMPLIANCE
VERIFIED BY: _____                     REVIEW BY: _____

Revised 07/12



160 ROYAL PALM WAY PALM BEACH, FL 33480

PHONE: (561) 408.3500 FAX: (561) 408.3599

Wire Instructions for Regions Bank

Account Name:     New Haven Contracting South

Account Number:  ██████████████

Bank Transit Number:  ████████

Bank Name and Address:  Regions Bank
                        525 Okeechobee Blvd
                        Suite 100
                        West Palm Beach, FL 33401

Please contact our account manager immediately, Thomas Self, at (561) 837-8100 should your encounter any difficulties.

Judy Slatus

Neu

**From:**        bob matthews [rvmatt22@gmail.com]
**Sent:**        Wednesday, October 23, 2013 11:10 AM
**To:**          Leslie Evans
**Subject:**     Fwd:
**Attachments:** Regions Bank NHCS Wire Instructions.docx

Dear Les,
Please wire NHCS $150,000.00 today.
Sincerely,
Bob

1



Leslie Robert Evans & Associates, P.A.
IOTA CLIENT ESCROW ACCOUNT
214 Brazilian Avenue  Suite 200
Palm Beach, Florida  33480
(561) 832-8288

1ST UNITED BANK
63-1466/670

9666

9/11/2013

PAY TO THE
ORDER OF    Leslie Robert Evans & Assoc., P.A.                    $ **33,000.00

Thirty-Three Thousand and 00/100*******************************                    DOLLARS

Leslie Robert Evans & Assoc., P.A.
214 Brazilian Avenue
Suite 200
Palm Beach, Florida  33480

MEMO    Matthews P/O Palm House 1376.150

09/11/2013   9666   $33,000.00

091113   3442   669254644>867014997< 1stUN 0957

Leslie Robert Evans & Associates, P.A.                                    9761
IOTA CLIENT ESCROW ACCOUNT
214 Brazilian Avenue, Suite 200
Palm Beach, Florida 33480
(561) 832-8224                                                        9/20/2013

PAY TO THE
ORDER OF    Florida UCC, LLC                              $ **38.00

Thirty-Eight and 00/100                                          DOLLARS

Florida UCC, LLC

MEMO
Matthews P/O Palm House #175,150 (Walsh 3180.10)

10/01/2013    9761    $38.00

Seq: 114
Dep: 000087
Date: 09/30/13

# 1st United Bank



10/24/2013   9999   $18,608.90