U.S. Department of Homeland Security
U.S. Citizenship and Immigration Services
*Immigrant Investor Program*
131 M Street, NE, MS 2235
Washington, DC 20529



**U.S. Citizenship and Immigration Services**

EXHIBIT M

TO:

▮

c/o Bernard Wolfsdorf, Esq.
Wolfsdorf Rosenthal LLP
1416 2nd Street
Santa Monica, CA. 90401

DATE: November 19, 2015
**Application: Form I-526**
A-Number:
File: WAC1490316853

## DECISION

Your Form I-526, Immigrant Petition by Alien Entrepreneur, filed by ▮ has been denied for the following reason(s):

**See Attachment**

If you desire to appeal this decision, or file a motion to reopen and/or reconsider, you may do so. Your notice of appeal or motion must be filed on Form I-290B, Notice of Appeal or Motion, within 33 calendar days of the date of this notice. A filing fee of $630.00 is required, payable to U.S. Department of Homeland Security, with a check or money order from a bank or other institution located in the United States. If no appeal or motion is filed within the time allowed, this decision will be the final decision in this matter. **The appeal or motion may not be filed directly with the AAO.** Initial filing of the Form I-290B should be sent to:

USCIS                                OR        USCIS Attn: I-290B
P.O. Box 660168                               2501 S. State Highway 121
Dallas, TX 75266                              Business Suite 400
(For Postal Service Delivery)                 Lewisville, TX 75067
                                              (For Express Mail/ Courier)

In support of your appeal, you may submit a brief and/or additional evidence, either with the initial filing or within 30 calendar days of the initial filing. If necessary, you may request additional time to submit a brief. Such request must also be made within 30 calendar days of filing. Note, however, that an extension of time to file the appeal may not be granted. Any brief, written statement, or other evidence not filed with Form I-290B, or any request for additional time for the submission of a brief or other material must be sent directly to the AAO at the following address:

USCIS Administrative Appeals Office
U.S. Citizenship and Immigration Services
20 Massachusetts Ave., N.W., MS 2090
Washington, DC 20529-2090

However, if you are filing a motion, any supplementary arguments or evidence **must be filed with the motion to reopen and/or reconsider.** No additional time will be permitted.

Form I-292 (revised 5/4/2015)

www.uscis.gov

WAC1490316853
Page 2

The Small Business Regulatory Enforcement and Fairness Act established the Office of the National Ombudsman (ONO) at the Small Business Administration. The ONO assists small businesses with issues related to federal regulations. If you are a small business with a comment or complaint about regulatory enforcement, you may contact the ONO at www.ombudsman.sba.gov or phone 202-205-2417 or fax 202-481-5719.

Sincerely,

Nicholas Colucci
Chief, Immigrant Investor Program

cc: Bernard Wolfsdorf, Esq.
Wolfsdorf Rosenthal LLP
1416 2nd Street
Santa Monica, CA. 90401

WAC1490316853
Page 3

## NOTICE OF DECISION

### Form I-526, Immigrant Petition by Alien Entrepreneur
### *Palm House Hotel LLLP*

### Procedural History

▆▆▆▆▆▆▆▆ ( "Petitioner") filed a Form I-526, Immigrant Petition by Alien Entrepreneur, seeking immigrant visa classification pursuant to section 203(b)(5) of the Immigration and Nationality Act ("INA") on May 29, 2014. Petitioner asserts eligibility based on an investment in South Atlantic Regional Center (the "Regional Center") pursuant to the Immigrant Investor Program.[1] The Form I-526 and the evidence presented assert that Petitioner invested $500,000 into Palm House Hotel LLLP – the new commercial enterprise (the "NCE"), on April 28, 2014. The NCE proposed to pool $39,500,000 from 79 immigrant investors and lend the entire amount to Palm House LLC – the job creating entity (the "JCE").[2] The JCE intends to renovate and develop a resort hotel in Palm Beach, Florida.

INA § 203(b)(5)(A) provides classification to qualified immigrants seeking to enter the United States for the purpose of engaging in a new commercial enterprise (including a limited partnership)-

> (i)  in which such alien has invested (after the date of the enactment of the Immigration Act of 1990) or, is actively in the process of investing, capital in an amount not less than the amount specified in subparagraph (C)[3], and
>
> (ii) which will benefit the United States economy and create full-time employment for not fewer than 10 United States citizens or aliens lawfully admitted for permanent residence or other immigrants lawfully authorized to be employed in the United States (other than the immigrant and the immigrant's spouse, sons, or daughters).

In addition to the governing regulations, notably 8 C.F.R. § 204.6, legacy Immigration and Naturalization Service published four precedent decisions regarding the EB-5 immigrant visa classification, namely: *Matter of Soffici*, 22 I&N Dec. 158 (Assoc. Comm'r 1998); *Matter of Izummi*, 22 I&N Dec. 169 (Assoc. Comm'r 1998); *Matter of Hsiung*, 22 I&N Dec. 201 (Assoc. Comm'r 1998); and *Matter of Ho*, 22 I&N Dec. 206 (Assoc. Comm'r 1998).

---

[1] Section 610 of the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1993, Pub. L. No. 102-395, 106 Stat. 1828 (1992), as amended by section 116 of Pub. L. No. 105-119, 111 Stat. 2440 (1997); section 402 of Pub. L. No. 106-396, 114 Stat. 1637 (2000); section 11037 of Pub. L. No. 107-273, 116 Stat. 1758 (2002); section 4 of Pub. L. No. 108-156, 117 Stat. 1944 (2003); and section 1 of Pub. L. No. 112-176, 126 Stat. 1325 (2012) (hereinafter "P.L. 102-395").

[2] Palm House LLC is also referred to herein as "Project Developer" and the "Developer".

[3] The amount of capital required is $1,000,000, except when making an investment in a targeted employment area, the amount necessary to make a qualifying investment is $500,000. INA § 203(b)(5)(C)(i) – (ii); 8 C.F.R. § 204.6(f)(1) – (2).

WAC1490316853
Page 4

Based upon a review of the initial record, Petitioner did not establish eligibility for the benefit sought. Accordingly, U.S. Citizenship and Immigration Services ("USCIS") issued a Notice of Intent to Deny ("NOID") on September 17, 2015. In the NOID, USCIS notified Petitioner that the following eligibility requirements needed further clarification or additional evidence:
- Job Creation

On October 20, 2015, Petitioner responded to the NOID with the submission of the following additional evidence.

- NOID Response Cover Letter dated October 15, 2015;
- Updated Business Plan with Attachments dated August 07, 2015 (the "2015 Business Plan");
- Court Order Appointing Receiver dated July 16, 2015 (Exhibit 1B to the NOID Response Cover Letter)
- Letter from Receiver dated August 3, 2015 (Exhibit IC to the NOID Response Cover Letter) and,
- New Economic Impact Report dated August 07, 2015 (Exhibit 6A to the NOID Response Cover Letter).

However, based on a review of the entire record of proceeding, USCIS concludes that Petitioner has not established eligibility for the benefit sought. Therefore, the petition is denied for the reasons discussed below.

### Analysis

As required by 8 C.F.R. § 204.6(j)(4)(i), the petition must establish that the investment of the required amount of capital in a new commercial enterprise will create full-time positions for at least ten qualifying employees within 2 years. *See also* 8 U.S.C. § 1153(b)(5)(A)(ii). For purposes of the Form I-526 adjudication and the job creation requirements, the two-year period described in 8 C.F.R. § 204.6(j)(4)(i)(B) is deemed to commence six months after the adjudication of the Form I-526.

According to 8 C.F.R. § 204.6(j)(4)(i), to show that a new commercial enterprise will create not fewer than ten (10) full-time positions for qualifying employees, the petition must be accompanied by:
(A) Documentation consisting of photocopies of relevant tax records, Forms I-9, or other similar documents for ten (10) qualifying employees, if such employees have already been hired following the establishment of the new commercial enterprise; or

(B) A copy of a comprehensive business plan showing that, due to the nature and projected size of the new commercial enterprise, the need for not fewer than ten (10) qualifying employees will result, including approximate dates, within the next two years, and when such employees will be hired.

WAC1490316853
Page 5

For a new commercial enterprise within a regional center, the full-time positions can be created either directly or indirectly by the new commercial enterprise. 8 C.F.R. §§ 204.6(e), (j)(4)(iii). Investors investing in a regional center are subject to all the same program requirements except that they may rely on indirect job creation as demonstrated through reasonable methodologies. 8 C.F.R. §§ 204.6(m)(1), (7).

1. Comprehensive Business Plan

*Matter of Ho* explained that a comprehensive business plan must be sufficiently detailed to permit USCIS to draw reasonable inferences about job-creation potential. 22 I&N Dec. at 213. Additionally, *Matter of Ho* held that a "comprehensive business plan as contemplated by the regulations should contain, at a minimum, a description of the business, its products and/or services, and its objectives." 22 I&N Dec. at 213. Elaborating on the contents of a business plan, the decision states:

> The plan should contain a market analysis, including the names of competing businesses and their relative strengths and weaknesses, a comparison of the competition's products and pricing structures, and a description of the target market/prospective customers of the new commercial enterprise. The plan should list the required permits and licenses obtained. If applicable, it should describe the manufacturing or production process, the materials required, and the supply sources. The plan should detail any contracts executed for the supply of materials and/or the distribution of products. It should discuss the marketing strategy of the business, including pricing, advertising, and servicing. The plan should set forth the business's organizational structure and its personnel's experience. It should explain the business's staffing requirements and contain a timetable for hiring, as well as job descriptions for all positions. It should contain sales, cost, and income projections and detail the basis therefore. Most importantly, the business plan must be credible. *Id.*

Upon reviewing the 2013 and 2015 Business Plans and attachments, USCIS finds that the evidence in the record does not establish that the NCE will create at least ten full-time positions for qualifying employees. Specifically, USCIS notes the following deficiencies:

## Dispute over Ownership of the Subject Property

In the NOID, USCIS noted that "the record contains no evidence demonstrating that the JCE owns the property or has an affiliate relationship with the owner of the property. The failure to address or include contracts and business agreements for key aspects of the project such as financing and ownership of the property detracts from the comprehensiveness and credibility of the business plan."

WAC1490316853
Page 6


In response, the petitioner provided an updated business plan.

Section 3.2 of the 2015 Business Plan, Project Description, indicates the JCE "(through its wholly-owned subsidiary, 160 Royal Palm LLC) already owns the subject property, having initially purchased it in August 2006." Section 4.5 of the 2015 Business Plan states "[t]he land was purchased by a company owned by the Developer in August 2006 for $29 million; the transfer was recorded in OR Book 20776, Page 1540 of the Palm Beach County land records as a non-real estate transaction with a $10 consideration.

However, this claim of clear ownership appears to be contradicted by information submitted by Petitioner and by public sources.

Section 4.3 of the 2015 Business Plan states that, "[p]ending an ownership dispute on the property and the Town of Palm Beach's decision not to approve a variance from the approved building plans, it is anticipated that a new construction company will be retained by a court-appointed Receiver to complete construction in accordance with the previously approved site plan." Moreover, according to the Receiver letter "the current ownership has been removed from any operational control or decision making processes regarding the project."

According to the Property Appraiser website, the property at 160 Royal Palm Way was purchased in August 2006 by Royal 160 LLC. The property was then sold in October 2009 to 160 Royal Palm, LLC. [4] According to contemporary news articles, the property was subsequently purchased at foreclosure auction by another real estate investor, Glenn Straub, for approximately $10 million.[5]  Other news articles indicate that another developer and former manager of the JCE, Ryan Black, [6] currently has a mortgage on the property and is involved in a foreclosure lawsuit brought by Glenn Straub.[7]

Therefore because it does not appear that the JCE has clear ownership of the property, an affiliate relationship with the owner of the property or permission to execute the project, the business plan is not credible. It is true that the Receiver is expected to finish construction of the hotel, however, it is unclear if the finished product will resemble the business plan submitted to USCIS and if it doesn't, the JCE and NCE have no control to change it to match the plan submitted to USCIS.

### Insufficient Evidence of Bridge Financing

The JCE was formed on December 5, 2012, the NCE was formed on January 9, 2013 and according to page 45 of the 2015 Business Plan the property was "reacquired by a subsidiary entity of the [JCE] in 2013". The Petitioner in his 2013 and 2015 business plans has attempted to take credit for expenditures and work completed through bank financing obtained before EB-5 funding and before the project

---

[4] *See* http://www.co.palm-beach.fl.us/papa/

[5] Kacoha, Margie. "Owner Glenn Straub continues construction work on Palm House." *Palm Beach Daily News* August 25, 2010: Web. (Accessed at http://www.palmbeachdailynews.com on April 29, 2015).

[6] Hofheinz, Darrell. "Court action filed over padlocked Palm House." *Palm Beach Daily News* October 23, 2014: Web. (Accessed at http://www.palmbeachdailynews.com on April 29, 2015).

[7] Bandell, Brian. "Palm Beach hotel in $27M foreclosure despite new mortgage." *South Florida Business Journal* October 30, 2014: Web. (Accessed at http://www.bizjournals.com on April 29, 2015).

WAC1490316853
Page 7

property was acquired in 2013. The Petitioner, however, has not established the use of interim or bridge financing in order to take credit for any expenses or work completed through bank financing obtained before EB-5 funding was received and before the project property was acquired in 2013.

As cited in the NOID, the 2013 business plan indicated that both the sources and uses of funds were $91 million, therefore it did not appear that the EB-5 capital was intended to replace the bank financing, but rather to be used in addition to the bank financing.

In response to the NOID, the petitioner submitted an updated business plan. Page 24 of the 2015 Business Plan states "Construction has been ongoing over the past several years, using a mix of developer equity, bridge financing, and EB-5 funding." Page 45 of the 2015 Business Plan further states:

> The project developer initially acquired the property in August 2006. The property was then sold, and reacquired by a subsidiary entity of the Developer in 2013. Since construction and full renovation would take several years, the Developer used a combination of its own equity and bridge loan financing to acquire the property and begin renovations, which have been ongoing.

Yet page 46 of the 2015 Business Plan shows a total investment of $104,026,765 and Page 47 of the same business plan shows a total use of funds of $104,026,765.

| Source of funds | Amount | Use of Funds | Amount |
|---|---|---|---|
| EB-5 capital | $43,500,000 | Land Acquisition | $29,000,000 |
| Developer Equity | $29,000,000 | Construction (hard costs) | $33,434,500 |
| Partnership Investment | $4,058,015 | Soft Costs | $8,946,596 |
| Bank Financing | $27,468,750 | FF&E | $4,500,000 |
| | | Interest & Carrying costs | $4,690,186 |
| | | Start-up Operational Costs | $7,924,273 |
| | | Additional Construction costs | $15,531,210 |
| Total | $104,026,765 | Total | $104,026,765 |

USCIS finds that based on the evidence provided in the 2015 Business Plan, EB-5 financing may have been contemplated before 2013, however there is insufficient evidence to demonstrate that the funds already spent were bridge financing as from the source and use of funds table it is clear that the EB-5 funds are not replacing or repaying a bridge loan, but rather are to be used for the construction of the project.

Therefore, based on the dispute of ownership on the subject property and problems regarding Petitioner's claim of bridge financing, USCIS finds Petitioner's business plan to be not credible.

WAC1490316853
Page 8

2. Economic Methodology

Under the statute and regulations, petitioners investing in an NCE within a regional center may rely on economic methodologies to demonstrate that the investment will create indirect jobs as a result of the investment in the NCE, but such methodologies must be reasonable. *See* Pub. L. No. 102-395; 8 C.F.R. §§ 204.6(e), (j)(4)(iii), (m)(7)(ii). Petitioner must provide sufficient evidence for USCIS to determine whether methodologies used are reasonable.

Indirect jobs are those that are held outside of the new commercial enterprise but are created as a result of the new commercial enterprise. They include jobs that may be considered "economically direct," such as jobs created directly by a job-creating entity that is not also the new commercial enterprise. They also include economically indirect jobs such as those further down the supply chain, or induced jobs created through increased spending.

The evidence in the record fails to demonstrate that the requisite number of jobs will be created for the following reasons:

According to the 2015 Business Plan and the 2015 Economic Analysis, there will be a total of 871 jobs created, which includes 297 during the operations phase (251 from hotel operations and 46 from membership fees) and 571 during the construction phases (505 jobs resulting from hard construction expenditures, 33 jobs resulting from soft construction expenditures and 36 jobs resulting from FF&E expenditures.) However the inputs to the economic analysis are not credible and are not consistent with other information provided in the record. Therefore the jobs created as a result of these inputs are not credible.

**A. Jobs Resulting From the Operations Phase**

The economic analysis indicates that 251.4 jobs are expected to be created as a result of hotel rental operations and 45.8 jobs from membership fees. The operating revenue of the hotel, which is the input used to calculate those jobs, is based on an assumption of average rate per room and assumes that there will be 79 rooms.

However the court order appointing a Receiver indicates that an indeterminate amount of the property is going to be developed and sold as condominium units.

Specifically, the court order appointing the Receiver indicates:

> Intervenor, Palm House Hotel, LLLP has agreed to release its rights, title and interests in and to the property, the Project or any condominium unit sold without payment or remuneration until all sums due to mortgagees ahead of it in priority are paid in full.
>
> Once all of said mortgagees are paid in full, the release price for each such unit shall be the sum which equates to the then balance due to investor, Palm House Hotel, LLLP under its note and mortgage divided by the number of condominium units unsold.

> For example, $30,000,000.00 remains unpaid to Palm House LLLP and 60 units remain unsold, the release price for the next unit shall be $500,000.00 during the term of the Receivership, the Receiver is empowered to execute such documents to effectuate such release.

While a property appraisal and analysis by Callaway & Price Inc. completed in June 2008 did mention the possibility of selling some units as condominiums, this possibility was not included in either the 2013 or 2015 business plans and the Callaway & Price document was provided 4 ½ years before the NCE was established and 5 years before the developers acquired the property.

In addition the 2015 Business Plan indicates on page 16 that "[t]he project is a luxury hotel with 79-guest rooms and a salon and spa." Page 29 of the 2015 Business Plan further indicates that "[t]he Palm House Hotel will encompass a full service hotel and private club, containing 92,546 square feet, of which 44,430 is contained in 79 guestrooms in two inter-connected buildings. " The economic analysis is predicated on the availability of 79 guest bedrooms. Therefore neither the 2015 Business Plan nor the Economic Analysis is consistent with the Receiver's plan that the project will result in the sale of condominium hotel units. As such it is unclear how any revenues calculated solely based on hotel operations or membership fees utilizing 79 rooms can be accurate or relied upon for job creation calculations. Therefore the anticipated number of jobs created as a result of operations, as reported to USCIS, is not credible.

### B. Jobs Resulting From the Construction Phase
The economic methodology for estimating jobs created during the construction phase is unreasonable. Specifically:

**i. Ineligibility of jobs resulting from expenditures from previous companies.** The economic impact analysis indicates that its employment creation projections are based in part on expenditures made by different corporate entities that predate the existence of the NCE or JCE. While public records suggest that construction has been ongoing at the site of the Palm House hotel since approximately 2006, as was discussed in the bridge financing section of this denial, the record contains no evidence demonstrating why the NCE or JCE should be entitled to receive credit for jobs created by the expenditures of other entities that predate the existence of either the NCE or JCE.

Specifically, the Petitioner has shown no reason as to why expenditures before 2013 should be credited for job creation purposes; since the JCE was formed on December 5, 2012, and the NCE was formed on January 9, 2013. Since the amount of construction expenditures used as an input for job calculations have been called into question, the construction jobs based on those inputs are not credible.

**ii. Uncertainty regarding the total amount of construction costs.** Moreover, according to the letter from the Receiver, it is unclear what the total future construction costs will be and if those costs will be eligible to be counted for job creation purposes, therefore it is unclear how many if any construction jobs going forward would be eligible.

WAC1490316853
Page 10

Yet the letter from the Receiver to USCIS dated August 3, 2015 states "There have been several meetings/discussions with Town staff and the Town attorney to produce a strategic plan that encompasses **a complete resolution of: (i) Project plans that provide a clearly defined path to a completed project** and Issuance by the Town of a Certificate of Occupancy, and (ii) settlement of all code violations and fines. I expect to have this resolution within 3-4 months, at which time we will be in a position to complete the Project, subject to securing additional construction funding that would also be predicated on the Receiver's successful resolution of the outstanding issues with the Town." (*Emphasis added*)

Therefore it is unclear what the final construction plan will look like, and if the Receiver's construction plan and anticipated hard construction, soft construction and FF&E costs will have any resemblance to the plan and costs submitted to USCIS. This in turn has cast doubt on the credibility of using those costs to calculate projected jobs during the construction phase.

### iii. Ineligibility of direct jobs due to the construction timeline.

Direct and indirect construction jobs are eligible to be counted toward the job creation requirement; however, construction jobs may be counted only if the construction jobs are expected to last at least two years. In making that determination based on reasonable methodologies, USCIS considers whether the construction period lasted or is expected to last at least two years in determining whether any model-derived construction or construction-related jobs may be included. If the construction period lasts or is expected to last less than two years, USCIS typically will only credit Petitioner with the economically indirect and induced model-derived jobs.

As USCIS noted in the NOID, the record fails to establish that the construction period lasted or is expected to last at least two years and therefore Petitioner cannot claim the economically direct model derived construction jobs created by the project.

In counsel's letter responding to the NOID, counsel states on Page 45 of the 2015 Business Plan that "The project developer initially acquired the property in August 2006. It was then sold, and reacquired by a subsidiary entity of the Developer in 2013. Since construction and full renovation would take several years, the Developer used a combination of its own equity and bridge loan financing to acquire the property and begin renovations, which have been ongoing."

The business plan then continues "Construction has already taken longer than two years (see hard costs already spent- Attachments C and F). Construction is projected to be completed in 2016, when the hotel is projected to open."

WAC1490316853
Page 11

However, as noted previously in this section, USCIS does not find it reasonable to credit job creation from expenditures incurred by a previous company. Similarly, USCIS does not find it reasonable to extend the timeline to incorporate work performed by a previous company.

From when the JCE acquired the property in 2013 to present day, it appears that the construction has been intermittent. For example, according to new articles in 2014 construction stopped while the property was locked during a property dispute.[8]

The letter from the Receiver to USCIS dated August 3, 2015, provided in response to the NOID, states "There have been several meetings/discussions with Town staff and the Town attorney to produce a strategic plan that encompasses a complete resolution of: (i) Project plans that provide a clearly defined path to a completed project and Issuance by the Town of a Certificate of Occupancy, and (ii) settlement of all code violations and fines. **I expect to have this resolution within 3-4 months, at which time we will be in a position to complete the Project**, subject to securing additional construction funding that would also be predicated on the Receiver's successful resolution of the outstanding issues with the Town." (*Emphasis added*)

USCIS' doubts on the tenuous construction timeline projections is further aggravated by page 48 of the 2015 Business Plan which states "Note that a new construction company may take over the construction of the property. An additional $15,531,210 has been conditionally budgeted for additional construction costs to transition to a new builder, align the construction to the approved plans, and complete the project."

These doubts are further increased based on page 45 of the 2015 Business Plan which states:

> much of the construction work has already been completed....Pending an ownership dispute on the property and the Town of Palm Beach's decision not to approve a variance from the approved building plans, it is anticipated that a new construction company will be retained by a court-appointed Receiver to complete construction in accordance with the previously- approved site plan.
>
> Attachment G is a construction estimate updated August 8, 2015 by McGowan Builders Inc. projecting that based on their review of the property, they can substantially complete construction and get a temporary certificate of occupancy in 8 months, with final completion in 13-14 months.

Therefore, USCIS finds the Petitioner's response insufficient. Indications are that the construction has stopped while the receiver analyzes the situation, comes up with a plan, and then hires a construction company. Therefore the construction would not be **ongoing** for 2 years.

---

[8] Hofheinz, Darrell. "Court action filed over padlocked Palm House." *Palm Beach Daily News* October 23, 2014: Web. (Accessed at http://www.palmbeachdailynews.com on April 29, 2015).

WAC1490316853
Page 12

Consequently, Petitioner has failed to establish that the NCE may claim credit for any economically direct model derived construction jobs.

Because the Petitioner has failed to establish that the NCE may claim credit for any economically direct model derived construction jobs, and has failed to establish the reasonableness of the hard construction, soft construction and FF&E expenditures used as inputs to the economic model; the construction phase jobs derived by the model are not credible.

Based on the reasons above, the inputs to the economic model to derive the jobs both from the construction phase and the operation phase have been found to be not reasonable. Therefore, based on preponderance of the evidence, Petitioner has failed to demonstrate that the project will create sufficient jobs to support all of the EB-5 investors.

## Conclusion

In summary, USCIS has determined, based on the initial evidence submitted upon filing and after consideration of all additional evidence submitted, that Petitioner has failed to establish by a preponderance of the evidence that the Form I-526 complies with applicable legal requirements. Consequently, USCIS concludes that Petitioner is ineligible for classification under INA § 203(b)(5)(A).

In visa petition proceedings, Petitioner bears the burden of establishing eligibility for the benefit sought. *See Matter of Brantigan*, 11 I&N Dec. 493 (BIA 1966). As Petitioner has not satisfied his burden of establishing eligibility, the Form I-526 is denied.

If Petitioner disagrees with this decision, or if Petitioner has additional evidence that shows this decision is incorrect, Petitioner may file a motion or an appeal to this decision by filing a completed Form I-290B, Notice of Appeal or Motion, along with the appropriate filing fee. A copy is enclosed. Petitioner may also include a brief or other written statement and additional evidence in support of the motion or appeal. The Form I-290B must be filed within 33 days from the date of this notice. If a motion or appeal is not filed within 33 days, this decision is final.

Petitioner must send the completed Form I-290B and supporting documentation with the appropriate filing fee to:

        USCIS I-290B
        P.O. Box 660168
        Dallas, TX 75266

For an appeal, Petitioner may request additional time to submit a brief within 30 calendar days of filing the appeal. Any brief, written statement, or evidence in support of an appeal that is not filed with Form I-290B must be directly sent within 30 days of filing the appeal to:

        DHS/USCIS
        Administrative Appeals Office (AAO)
        20 Massachusetts Ave., N.W., MS 2090
        Washington, DC 20529-2090

For more information about the filing requirements for appeals and motions, please see 8 C.F.R. § 103.3 or

WAC1490316853
Page 13

103.5, or visit the USCIS website at www.uscis.gov.