UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| LAN LI, et al., | ) |
| Plaintiffs, | ) |
| v. | ) Civil Action No. 16-81871-Civ-Marra |
| JOSEPH WALSH, et al., | ) |
| Defendants. | ) |
| LAN LI, et al., | ) |
| Plaintiffs, | ) |
| v. | ) Civil Action No. 19-80332-Civ-Marra |
| PNC BANK N.A. and RUBEN RAMIREZ, | ) |
| Defendants. | ) |

**PLAINTIFFS' MOTION FOR LEAVE TO AMEND SCHEDULING ORDER AND TO AMEND COMPLAINT AGAINST PNC BANK, N.A. AND RUBEN RAMIREZ**

NOW COME Plaintiffs, Lan Li, et al. ("Plaintiffs") by and through undersigned counsel, and hereby move for leave to amend the scheduling order and amend their complaint against PNC Bank, N.A. and Ruben Ramirez (together, "PNC"). Plaintiffs move for leave to amend the scheduling order under F.R.C.P. 16(b) and for leave to amend the pleadings under F.R.C.P. 15(a). Plaintiffs submit a Proposed Amended Complaint with exhibits as Exhibit 1. In addition, Plaintiffs submit a redline comparison of the Proposed Amended Complaint and the existing Complaint as Exhibit 2.

**FACTUAL BACKGROUND**

Plaintiffs commenced this action against PNC in early March 2019 in state court. Shortly thereafter, PNC removed the case to federal court. On or about March 20, 2019, the Court

1

consolidated the action against PNC with *Li, et al. v. Walsh, et al.*, Civil Action No. 16-81871-Civ-Marra ("*Li v. Walsh*"). On September 24, 2019, the Court entered a scheduling order for the PNC matter, setting February 3, 2020 as the deadline to amend pleadings or add parties. [DE 18.] The same order set January 19, 2021 as the close of discovery. [DE 18.] The parties have recently started conducting depositions, and the parties have exchanged additional written discovery. PNC has produced more than 8,300 pages of documents since the amendment deadline of February 3, 2020, the vast majority of which were produced at the very end of May 2020.

On or about March 23, 2020, the Court entered a revised scheduling order for the *Li v. Walsh* matter. The close of discovery for the *Li v. Walsh* matter was extended from March 30, 2020 to September 30, 2020. (Case No. 16-81871, DE 609.) However, due to COVID-19 restrictions, the parties have been able to conduct only limited depositions and it remains presently unresolved how and when the remaining depositions will be conducted.

Plaintiffs repeat only the necessary background here, as the facts and history of this matter and related matters are extensive. In broad strokes, Plaintiffs were investors under the EB-5 immigration program in the failed Palm House Hotel EB-5 project. Each Plaintiff invested $500,000 plus an administrative fee and attorney's fees in the Palm House Hotel EB-5 project. [Complaint, DE 1-4, at ¶¶ 51 and 52]. These funds were misappropriated and stolen by the "bad actors," as identified in the Complaint (the "Bad Actors"). [*Id.*, at ¶ 4]. The Bad Actors identified in the Complaint include Joseph Walsh Sr. ("Walsh"), Joseph Walsh Jr., JJW Consultancy, Ltd., South Atlantic Regional Center LLC ("SARC"), USREDA LLC ("USREDA"), Robert Matthews ("Matthews"), Maria a/k/a Mia Matthews, Gerry Matthews, Nicholas Laudano, KK-PB Financial LLC, 160 Royal Palm LLC, and a handful of other

individuals and entities.[1]  [*Id*.]  Again in broad strokes, Walsh, SARC and USREDA handled the EB-5 fundraising and immigration paperwork regarding the Plaintiffs and other foreign investors, and Robert Matthews served as the ostensible developer of the Palm House Hotel property, to be further developed using those EB-5 funds.  Walsh and his entities, along with Matthews and his co-conspirators, directly and indirectly misappropriated vast sums of money from the Plaintiffs' EB-5 investments into the Palm House project for personal uses.  In addition, Walsh and his entities misused and wrongfully commingled investor funds in a dizzying number of accounts all held at PNC, thus further misappropriating those funds.

In April 2019, Matthews pled guilty to three criminal counts, including violations of 18 U.S.C. § 1349 (conspiracy), 18 U.S.C. § 1957 (illegal monetary transactions), and 26 U.S.C. § 7201 (tax evasion).  [Proposed Amended Complaint, ¶ 178.]  He faces up to 30 years in prison or more, and he is awaiting sentencing.  [*Id*.]  Gerry Matthews – the brother of Robert Matthews – pled guilty to criminal charges in March 2018, and he is also awaiting sentencing.  [Complaint, DE 1-4, ¶ 180.]  Nicholas Laudano, another Bad Actor and co-conspirator with Matthews, pled guilty to criminal charges as well and is awaiting sentencing.  [*Id*. ¶ 179.]  Walsh appears to have fled the country and appears to have abandoned his defense of the Plaintiffs' claims in the *Li v. Walsh* case.

In the related bankruptcy proceeding of *In re Royal Palm LLC*, Case No. 18-19441-EPK, the debtor engaged a forensic accountant who undertook a substantial tracing of misappropriated

---

[1] Plaintiffs have reached a settlement with Ali Herischi and Herischi & Associates in the *Li v. Walsh* matter.  As a result and pursuant to the terms of settlement, Plaintiffs have omitted most allegations related to the Herischi parties from the Proposed Amended Complaint.

assets from the SARC and USREDA accounts. Plaintiffs are in the process of retaining and engaging the same forensic accountant to assist with tracing further misappropriated assets.[2]

Plaintiffs have asserted claims against PNC and Ramirez for their actions in assisting the fraudulent scheme perpetrated by the defendants named in the *Li v. Walsh* case. As stated in the Complaint, PNC and Ramirez affirmatively assisted the fraud by implementing a "workaround" strategy to prevent safeguards to the purported "escrow account" held by South Atlantic Regional Center, into which Plaintiffs transferred their investment principal. [*Id.*, at ¶¶ 3,6, 7, 21, and 22]. This "workaround" enabled the bad actors to access Plaintiffs' funds without restriction, thus facilitating the fraudulent theft of those funds. Generally on these grounds, Plaintiffs asserted six claims against PNC and Ramirez in the Complaint: (1) aiding and abetting fraud; (2) aiding and abetting fraudulent inducement; (3) aiding and abetting breach of fiduciary duty; (4) unjust enrichment; (5) equitable accounting; and (6) aiding and abetting conversion. PNC was very familiar with the EB-5 program and knew the specialized purpose of the SARC/USREDA accounts, including that the accounts were used to hold investor money from overseas for a particular purpose. PNC further knew that EB-5 money was held in a fiduciary capacity, as it was to be released and used only for limited purposes and was to be returned if certain conditions were not met.

---

[2] In addition to the outright theft of the Plaintiffs' investment money for uses unrelated to the Palm House Hotel development project, all of Plaintiffs' investments were misappropriated when the Bad Actors failed to return the funds upon denial of the Plaintiffs' I-526 petitions. The Plaintiffs' investment terms entitled them to the return of their money from SARC/USREDA if their I-526 immigration petitions were denied. All of the Plaintiffs' I-526 petitions were denied for project-related reasons, and therefore all of the Plaintiffs were entitled to the return of their investment capital. However, the funds were not returned and were therefore misappropriated.

On May 28, 2020, PNC produced a privilege log identifying more than 200 alerts and related documents concerning the bank accounts at issue in this case (the "Accounts"). Between May 27, 2020 and May 28, 2020, PNC produced about 6,500 pages of documents related to these alerts and the Accounts. These recently-produced materials demonstrate PNC's knowledge of the fraudulent activities in the SARC and USREDA accounts, beyond the information previously available to Plaintiffs regarding PNC's knowledge of misappropriation of funds by Walsh and the other Bad Actors (as defined in the Complaint).[3] Upon receiving and reviewing PNC's production of the alerts, the privilege log, and related documentation, Plaintiffs now move promptly to amend their complaint against PNC to incorporate a claim based upon this new information showing that PNC had knowledge of the misappropriation of Plaintiffs' funds by the Bad Actors. As identified and discussed further below, Plaintiffs seek leave to amend their complaint to include a claim for negligence.

Plaintiffs now move under Rule 16(b) to amend the scheduling order to extend the deadline for amending the complaint, and under Rule 15(a) for leave to file an amended complaint.

**ARGUMENT**

Plaintiffs move to amend the scheduling order under F.R.C.P. 16(b) to extend the scheduling order to permit them to file an amended complaint, and for leave to file an amended complaint under F.R.C.P. 15(a). As noted above, the existing scheduling order in this matter set

---

[3] Plaintiffs have identified a significant number of apparent deficiencies and over-redactions in the production of alerts and related documents from PNC, which they have raised with PNC. The parties are in the process of meeting-and-conferring on this issue. Plaintiffs anticipate that any further information produced by PNC regarding the alerts will further support their allegation that PNC had knowledge of misappropriation from the accounts held by SARC, USREDA, and Walsh at PNC.

February 3, 2020, as the deadline for amendments to the complaint. Because that date has passed, Plaintiffs must first demonstrate "good cause" for amending the scheduling order under Rule 16(b), before satisfying the liberal standard for amendment of pleadings under Rule 15(a). "If a motion for leave to amend survives scrutiny under Rule 16, the Court may consider whether amendment is proper under Rule 15(a)." *Jacob v. Korean Air Lines Co.*, No. 12-62384-CIV, 2014 U.S. Dist. LEXIS 9813, at *12-13 (S.D. Fla. Jan. 13, 2014). Plaintiffs satisfy the standard for good cause to amend the scheduling order, as they recently obtained highly probative material from PNC that was not previously available and moved diligently to amend thereafter. Amendment of the complaint to incorporate a claim for negligence does not alter the scope of discovery, and therefore will not impose prejudice or delay on PNC.

As discussed further below, Plaintiffs move to amend their Complaint to add a claim for negligence against PNC. Under applicable law, banks such as PNC owe duties to non-customers in limited circumstances. *See Chang v. JP Morgan Case Bank*, 845 F.3d 1087 (11th Cir. 2017). "Florida, like other jurisdictions, recognizes that as a general matter, a bank does not owe a duty of care to a noncustomer with whom the bank has no direct relationship." *Id*. at 1094 (quotation omitted). "But there is an exception to this rule: a bank may be liable to a noncustomer for its customer's misappropriation when a fiduciary relationship exists between the customer and the noncustomer, the bank knows or ought to know of the fiduciary relationship, and the bank has actual knowledge of its customer's misappropriation." *Id*. at 1094-95. The newly produced documents from PNC have provided Plaintiffs with sufficient basis to allege specifically that PNC had actual knowledge of its customer's misappropriation of Plaintiffs' investment funds. Accordingly, under the standard for bank negligence articulated within *Chang*, Plaintiffs are now moving to amend their complaint against PNC to include a claim for negligence.

6

Prior to production of the alert-related documents and the privilege log by PNC, Plaintiffs lacked sufficient information to allege that PNC had actual knowledge of misappropriation by the holders of the Accounts at PNC. This recent production of documents provided Plaintiffs with the information they needed to properly allege the third element of a claim for negligence against PNC, and Plaintiffs have moved promptly to amend their Complaint. This information had been previously withheld by PNC under an erroneous assertion of privilege, and Plaintiffs did not previously have access to this new and revelatory discovery information.

I. **Plaintiffs Demonstrate Sufficient Good Cause to Amend the Scheduling Order under Rule 16(b) to Permit Amendment of their Complaint.**

Plaintiffs demonstrate sufficient good cause for modification of the scheduling order, which will in turn permit the amendment of their complaint against PNC. As previously noted, because the deadline for amendment to pleadings has passed, Plaintiffs must first satisfy the good cause standard of Rule 16(b). *See* F.R.C.P. 16(b)(4) ("A schedule may be modified only for good cause and with the judge's consent.").

The standard for "good cause" under Rule 16(b) is generally understood as requiring a showing of diligence by the party seeking the extension. "This good cause standard precludes modification unless the schedule cannot 'be met despite the diligence of the party seeking the extension.'" *Sosa v. Airprint Sys.*, 133 F.3d 1417, 1418 (11th Cir. 1998) (quoting Fed. R. Civ. P. 16 advisory committee's note). A motion to amend the scheduling order must be brought promptly. "[E]ven if the opposing party would not be prejudiced by the modification of a scheduling order, good cause is not shown if the amendment could have been timely made." *Donahay v. Palm Beach Tours & Transp., Inc.*, 243 F.R.D. 697, 699 (S.D. Fla. 2007). In this case, Plaintiffs have proceeded diligently and only very recently obtained the necessary information from PNC indicating PNC's actual knowledge of misappropriation by the bank's

7

customer. The alerts and alert-related documents show that PNC was engaged with the transactions of these accounts on a regular basis through the entire relevant time period of misappropriation by the Bad Actors, which is more than sufficient to support an allegation of actual knowledge. Further, as noted, Plaintiffs are pursuing additional alert-related disclosures from PNC that have been redacted or withheld, which Plaintiffs anticipate will further bolster this allegation of knowledge.

Courts generally consider three factors in assessing whether a party has been diligent in moving to amend a scheduling order. "Courts consider three factors in assessing diligence: (1) whether the movant failed to ascertain facts prior to filing the pleading or failed to acquire information during the discovery period, (2) whether the information supporting the proposed amendment was available to the movant, and (3) whether the movant delayed in requesting leave to amend even after acquiring the information." *Havana Docks Corp. v. Royal Caribbean Cruises, Ltd.*, No. 19-CV-23590, 2020 WL 1905219, at *13 (S.D. Fla. Apr. 17, 2020)

Plaintiffs easily satisfy this standard. This motion is filed only a few months after expiration of the deadline for amendments to pleadings. *See* DE 18 (setting February 3, 2020 as deadline to amend pleadings). During that time, business operations for Plaintiffs' counsel and for others have been disrupted by the COVID-19 pandemic. Nevertheless, Plaintiffs and their counsel have continued diligently pursuing this matter. In April 2020, PNC agreed for the first time to produce alerts and related documentation, which it had previously withheld under erroneous claims of privilege. At the very end of May 2020, PNC first produced these highly probative materials, which strongly support the conclusion that PNC had actual knowledge and awareness of misappropriation within the Accounts. These materials were not previously available to Plaintiffs, as PNC had withheld it from production upon erroneous assertions of

privilege.  These documents total more than 6,500 individual pages, and Plaintiffs worked quickly to review and assess the voluminous production.

Upon receipt of these materials, Plaintiffs have moved promptly to amend the Complaint to add a claim for negligence based upon this additional information.  This motion is brought within several weeks of production of the alerts and related materials by PNC.  Further, Plaintiffs are still within the original discovery period.  The close of discovery is currently set for January 2021 in this action.  The parties have just recently started depositions in this action and the consolidated *Li v. Walsh* matter.  Depositions have been delayed due to widespread COVID-19 disruption but the parties are cooperating to commence depositions on a remote basis, and several depositions have occurred recently.  However, to date, PNC has refused to permit fully remote depositions of their witnesses, thus further delaying the discovery process.  Particularly when combined with PNC's delayed production of the revelatory alert documents, any claim of prejudice from this proposed amendment to the complaint must be rejected.

As noted, the Proposed Amended Complaint adds a claim for negligence.  The information necessary for Plaintiffs to allege this claim was not available to Plaintiffs until the recent production of alerts and the related privilege log in late May 2020.  Under the standard articulated in *Chang v. JP Morgan Case Bank NA*, 845 F.3d 1087 (11th Cir. 2017), a bank "may be liable to a noncustomer for its customer's misappropriation when a fiduciary relationship exists between the customer and the noncustomer, the bank knows or ought to know of the fiduciary relationship, and the bank has actual knowledge of its customer's misappropriation."  *Id*. at 1094-95.

Although Plaintiffs previously had sufficient evidence to allege that account holders at PNC owed a fiduciary duty to them, and that PNC knew of this fiduciary duty,[4] Plaintiffs lacked evidence to allege with sufficient certainty that PNC knew about the misappropriation from those accounts by their customer account-holders. This final element has been filled in by the production of the alert documents and related materials by PNC at the very end of May 2020.

Specifically, the alerts demonstrate that PNC looked at accounts at issue hundreds of times during the relevant time period. PNC has produced more than 90 alerts regarding the relevant cluster of accounts, and PNC has also produced documents related to its own materials generated by PNC in conjunction with reviewing those alerts. During the period of 2011 through 2017, between the alerts themselves and the documents generated by PNC in conjunction with reviewing the alerts, PNC looked numerous times at accounts held by SARC (at least 60+ times), USREDA (at least 65+ times), PHH LLLP (2 times) and other entities controlled by Joseph Walsh (e.g., JE Penses, at least 49 times). As a further example of PNC's knowledge of the relevant accounts, in the month of December 2014 alone, PNC reviewed transaction alerts on SARC accounts at least 10 separate times. Additional evidence received by Plaintiffs demonstrates that much of the misappropriation of funds occurred during that time period. In

---

[4] As alleged in the Complaint, the customers of PNC – Walsh, SARC, and USREDA – owed fiduciary duties to Plaintiffs, as Plaintiffs invested funds in the Palm House Hotel EB-5 project in reliance on certain representations. Key among those representations was that the funds were invested to be used solely in conjunction with creating 10 or more jobs to satisfy the requirements of the EB-5 visa program. The PNC customers at issue – Walsh, SARC, and USREDA – were not free to use the investors' funds in any way they chose, and therefore owed the Plaintiffs a fiduciary duty with regards to these funds. PNC knew of this fiduciary duty because it was aware that Walsh, SARC, and USREDA obtained funds from overseas investors in conjunction with an EB-5 project. Under the terms of an EB-5 project, a regional center such as SARC obtains investors' funds for the limited purpose identified above. *See* original Complaint, ¶¶ 45-50 and 122-129 (alleging fiduciary duty to Plaintiffs by PNC customers and knowledge of fiduciary duty by PNC.)

addition, in the short period of April 2015 to June 2015, PNC reviewed transaction alerts on SARC accounts at least 9 separate times. Further, USREDA accounts began triggering alerts as early as July 2011, and continued steadily generating transaction alerts until at least 2016. In addition, PNC has now produced supporting materials related to those alerts, including research done by their analysts in conjunction with the transaction alerts. Those materials demonstrate that PNC employees investigated the purpose of the accounts at issue, and that the researchers investigated the businesses of their customer account-holders, including research into the nature of the EB-5 program. It would have been clear to PNC that numerous transactions out of the relevant accounts constituted misappropriation of funds held under a fiduciary duty, both due to outright theft for unrelated purposes and due to unexplained commingling of funds in the multitude of accounts. Although PNC has heavily redacted the alert-related documents, the information visible is sufficient to support this conclusion, and the strong inference to be drawn from the immense breadth of redactions supports this conclusion as well.

Throughout the relevant period of time, the Bad Actors misappropriated millions of dollars of funds from the Accounts. Although the alert-related documents are heavily redacted, the information produced is sufficient to support the allegation of PNC's actual knowledge of misappropriation. As a further example of apparent misappropriation, the alerts identify multiple transactions between the SARC/USREDA accounts into which the Plaintiffs' money flowed for investment into the Palm House Hotel EB-5 project, and JE Penses, an account held by Walsh. At various times throughout the provided alerts, PNC analysts describe JE Penses as a luxury ship builder, or as a transportation and warehousing business, or as a means for Walsh to pay for his travel expenses. There was no legitimate business purpose for SARC/USREDA investment funds to be diverted to JE Penses under any of those business descriptions, whether for Walsh's

yacht, payments to an unrelated transportation and warehousing business or to pay for Walsh's purported travel expenses. This revolving door of descriptions for the JE Penses account further supports a conclusion of misappropriation of funds by the Bad Actors and that PNC was aware of this misappropriation in real time. Further, Plaintiffs have reviewed alert documentation detailing the flow of funds from USREDA/SARC accounts into the personal bank accounts of unrelated third parties, seeming to be individuals to whom Walsh diverted misappropriated funds. Accordingly, given the recent date of the productions and volume of alerts and related materials within these productions, Plaintiffs are only now able to assert a claim for negligence and move to amend their complaint in this way.

Moreover, Plaintiffs have also examined internal communications contained within the recent productions of materials, between PNC employees which, in combination with the trove of alerts themselves, only further contribute to the inference of knowledge of misappropriation by PNC. As early as 2011, PNC employees discussed the risks and dangers of the EB-5 program. In the spring of 2016, PNC hosted a USCIS EB-5 Program presentation at one of PNC's corporate locations detailing the best practices for the intersection of the EB-5 Program and Anti-Money Laundering Statute compliance by a bank. Finally, there is an email chain from 2015 wherein PNC employees acknowledge the use by the Bad Actors of PNC's logo on Palm House marketing materials distributed to prospective foreign investors and that this acknowledgement required additional compliance review. This email chain was first produced on or about May 28, 2020. Despite this evidence of institutional knowledge and discussion surrounding the dangers of the EB-5 program generally, the SARC EB-5 regional center specifically, and repeated alerts generated by accounts held by Walsh, SARC, and USREDA, PNC took no steps to halt the free flow of funds between Walsh entity accounts. All of these

communications were not available to Plaintiffs until very recently. They were finally produced by PNC along with 6,500 other pages of documents on May 28, 2020.

Courts in the Eleventh Circuit regularly grant motions to amend a scheduling order to permit amendment to a complaint, upon a showing of requisite good cause, including when a party timely moves after obtaining information that was not previously available. *See, e.g., Kahn v. Cleveland Clinic Fla. Health Sys.*, No. 0:16-cv-61994-O'SULLIVAN, 2017 WL 7803838, at *2 (S.D. Fla. Oct. 10, 2017) (amending scheduling order to permit amendment of complaint six months after expiration of the deadline to amend pleadings, where depositions revealed unknown information and motion to amend was filed shortly thereafter); *Pearl v. Ont. Sys., LLC*, No. 11-00428-KD-M, 2012 U.S. Dist. LEXIS 94484, at *4 (S.D. Ala. July 6, 2012) (facts supporting new claims could not have been discovered before deadline, because facts did not exist before deadline, thus permitting amendment to scheduling order and amended complaint); *Autumn Vista Holdings, LLC v. Timbercreek Autumn Vista, L.P.*, No. 1:17-cv-03038, 2019 U.S. Dist. LEXIS 143539, at *17 (N.D. Ga. Aug. 23, 2019) (granting amendment to scheduling order because "Timbercreek's efforts to settle the case constitute good cause."). *See also Southpoint Condo. Ass'n, Inc. v. Lexington Ins. Co.*, No. 19-cv-61365, 2020 WL 639400, at *4 (S.D. Fla. Feb. 11, 2020) (good cause is satisfied where the motion to amend was brought within weeks of a party discovering the documents and records at issue); *Allegheny Cas. Co. v. Archer-W./Demaria Joint Venture III*, No. 8:13-CV-128-T-24-TGW, 2014 WL 10915507, at *3 (M.D. Fla. June 16, 2014) (finding good cause for delay in seeking leave to amend affirmative defenses where the information was revealed in discovery after the answer and affirmative defenses had initially been filed and the motion was made within four weeks of learning the new information).

In addition, other courts outside this circuit have likewise concluded that Rule 16(b) is satisfied when a plaintiff learns new information through discovery. *See, e.g., Wheatridge Office, LLC v. Auto-Owners Ins. Co.*, No. 19-CV-00487-RM-MEH, 2020 WL 1433502, at *3 (D. Colo. Mar. 24, 2020) ("Rule 16's good cause requirement may be satisfied, for example, if a plaintiff learns new information through discovery") (citation omitted); *see id*. at *4 (granting leave to file amended counterclaim and noting that the court "do[es] not fault Defendant for proceeding cautiously in asserting counterclaims until sufficient evidence is generated in discovery to justify such claims.").

Accordingly, Plaintiffs have demonstrated sufficient good cause to amend the scheduling order pursuant to Rule 16(b), to permit Plaintiffs to file an amended complaint with a single additional claim for negligence.

**II.     Plaintiffs Satisfy the Standard for Amendment under Rule 15(a).**

After satisfying the good cause standard of Rule 16(b), Plaintiffs also satisfy the liberal standard for amendment of a complaint under Rule 15(a). Under Rule 15(a), leave to amend shall be freely given. *See* Rule 15(a)(2) ("The court should freely give leave when justice so requires."). The Court follows a well-established standard for reviewing motions for leave to amend under Rule 15(a). "Unless a motion to amend is made in bad faith or for undue delay, constitutes dilatory conduct, or will prejudice a non-movant, leave to amend should be given freely." *Kahn,* 2017 WL 7803838, at *2. In addition, if the proposed amendment would be futile, the Court may deny the motion for leave to amend. *See, e.g., Burger King Corp. v. Weaver*, 169 F.3d 1310, 1320 (11th Cir.1999) ("This court has found that denial of leave to amend is justified by futility when the complaint as amended is still subject to dismissal.").

There is no showing of bad faith, undue delay, dilatory conduct, or prejudice to PNC or any party to the consolidated *Walsh* case.  Moreover, amendment will not be futile, as Plaintiffs can now more than adequately allege the necessary facts to support a claim for negligence against PNC.

Plaintiffs file this motion not long after expiration of the deadline for amending the complaint.  Plaintiffs did not receive the documents necessary for their motion to amend to allege a claim for negligence until the very end of May 2020.  In late May, Plaintiffs received a production of more than 6,500 pages of documents from PNC, including highly probative alert-related documents.  The new claims do not add to the discovery needed in this case.  The new claims arise from the same general factual circumstances as the existing claims but are predicated on a different legal theory and premised upon newly-discovered evidence regarding PNC's repeated interaction with the relevant accounts.  Thus, factual discovery will not change much as a result of the proposed amended claim.  Written discovery between the parties is ongoing and Plaintiffs do not anticipate serving additional written discovery demands related specifically to the amended complaint, although the parties are still working out disagreements over the apparent deficiencies in some discovery produced so far by PNC.  As noted above, some depositions of Plaintiffs have recently begun on a remote basis.  Although Plaintiffs served deposition notices for witnesses of PNC on or about May 13, 2020, PNC has so far refused to make any of their witnesses available for deposition due to the COVID-19 restrictions currently in place.  The parties have continued to discuss this issue, but to date, no depositions of PNC witnesses have occurred or been scheduled due to PNC's refusal. Accordingly, there is no prejudice to PNC.  There is no prejudice to the defendants in the consolidated *Li v. Walsh* action either, as the new claim does not affect the causes of action against the defendants in that action.

The new proposed claim against PNC is not futile. The standard for futility under Rule 15(a) is essentially the same as a motion to dismiss under Rule 12(b)(6). *See, e.g., Chang*, 845 F.3d at 1094 ("a district court may properly deny leave to amend the complaint under Rule 15(a) when such amendment would be futile, such as when the complaint as amended is still subject to dismissal because, for example, it fails to state a claim for relief") (internal quotations and citations omitted). At this stage in the case, the Plaintiffs need not prove that they would prevail on a claim for negligence, but rather need only to show that such a claim is adequately pleaded. In their Proposed Amended Complaint, Plaintiffs have more than adequately alleged the requisite elements for a claim of negligence by a bank to a non-customer. For purposes of amendment, a claim must be adequately alleged, not substantively proven, to be permitted. *See, e.g., Langlo v. Balboa Ins. Co.*, No. 811CV2559T24TGW, 2012 WL 12906575, at *1 (M.D. Fla. Feb. 13, 2012) ("Balboa argues that this claim is futile, because Langlo cannot *prove* that he made payments to Balboa. However, because Langlo alleges in his proposed amended complaint that he made the payments to Balboa, Balboa's futility argument is not sufficient at this juncture to prevent leave to amend.") (emphasis in original).

Particularly as to the issue of knowledge, the evidence demonstrating knowledge will be in the possession of PNC and therefore Plaintiffs are entitled to rely upon a solid inference based on existing evidence. The alerts and other related documents recently produced by PNC now demonstrate that PNC engaged actively with the accounts at issue in this matter on a repeated basis. At this stage, Plaintiffs need not prove knowledge conclusively based upon existing evidence. Plaintiffs have sufficiently alleged, based on newly-identified information, that PNC had actual knowledge of the misappropriation from the accounts by the Bad Actors. *See Klingensmith v. Paradies Shops, Inc.*, No. 1:07-CV-1677-ODE, 2007 WL 9710586, at *2 (N.D.

Ga. Nov. 2, 2007) ("Defendant argues that Plaintiffs have not produced and cannot produce any evidence that Defendant had actual knowledge, and that this makes their amendment futile. . . . Whether Plaintiffs can produce evidence to support their allegations goes to the merits of Plaintiffs' claims, not to whether the complaint states a claim. Therefore, Plaintiffs' ability to factually prove their claim of actual knowledge is not material to futility at this point in the litigation."). Moreover, Plaintiffs are engaging expert witnesses to assist with supporting their claims against PNC. This expert witness work is not completed, nor is it required to be completed at this stage under the scheduling order. Particularly in light of the delays and turmoil created by the COVID-19 pandemic, this case against PNC remains in relatively early stages of discovery. Plaintiffs are able to plead a claim for negligence that is more than sufficient to withstand a motion to dismiss and otherwise satisfies the standard under Rule 15(a) and therefore request leave to file their Proposed Amended Complaint.

As articulated in the *Chang* decision, although non-customers generally are not owed a duty by a bank, a bank can be liable for negligence to non-customers under certain circumstances. *See Chang*, 845 F.3d at 1094-97 (identifying and applying elements for negligence claim against bank by non-customers). Plaintiffs here have adequately pleaded the necessary elements of a claim for negligence against PNC in the proposed Amended Complaint, based upon existing allegations in the Complaint and the new information obtained in discovery. The original Complaint against PNC adequately alleged the existence of a fiduciary duty owed by certain PNC customers – i.e., Walsh, SARC, and USREDA – and knowledge of that fiduciary duty by PNC. [DE 1-4, at ¶¶ 117 – 129, and 151 - 156]. In addition, Plaintiffs already alleged misappropriation of their EB-5 investment funds by the Bad Actors, including Walsh, SARC, and USREDA. [*Id.* at ¶¶ 41 - 50]. In their proposed Amended Complaint, Plaintiffs have added

allegations for the third and final element of a claim for negligence against a bank, which is actual knowledge of that misappropriation by the bank. Based upon the alerts and supporting internal documentation recently produced by PNC, Plaintiffs now, finally, have more than sufficient grounds to support this allegation of actual knowledge. Accordingly, the proposed amendment is not futile and Plaintiffs have satisfied the liberal standard for amendment of pleadings under Rule 15(a).

## CONCLUSION

Accordingly, Plaintiffs request that the Court amend the scheduling order under F.R.C.P. 16(b) and grant them leave to amend their Complaint under F.R.C.P. 15(a), and that the Court permit the filing of Plaintiffs' Amended Complaint against PNC Bank, N.A., and Ruben Ramirez, attached hereto as Exhibit 1.

## CERTIFICATION UNDER LOCAL RULE 7.1(a)(3)

Plaintiffs conferred with PNC to seek their consent to this motion. PNC did not consent.

Dated: July 2, 2020

Respectfully submitted,

By: /s/Katherine Burghardt Kramer
Katherine Burghardt Kramer, Esq.
(Pro Hac Vice)
RongPing Wu (pro hac vice)
Joshua Levin-Epstein (pro hac vice)
DAI & ASSOCIATES, P.C.
1500 Broadway; 22nd Floor
New York, NY 10036
Tel. No.: (212) 730-8880

18

Email: kkramer@daiassociates.com
*Attorneys for 40 Represented Plaintiffs*


Matthew Fornaro
Matthew Fornaro, P.A.
11555 Heron Bay Blvd; Ste. 200
Coral Springs, FL 33076
Tel: (954) 324-3651
*Co-counsel for Represented Plaintiffs*


**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on July 2, 2020, the foregoing document is being served this day on all counsel of record or pro se parties through the Court's ECF system on all registered ECF users and that a true paper copy was served by first class mail on all non-registered parties.

By: /s/ Matthew Fornaro
Matthew Fornaro