# EXHIBIT 1

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| **LAN LI; YING TAN; TAO  XIONG;** ) | |
| **JUNQIANG FENG; RAN CHEN; XIANG** ) | |
| **SHU; HAO LOU; XIANG CHUNHUA;** ) | |
| **KUANG YAOPING; BEI ZHU; QIONG** ) | |
| **DENG; QIONGFANG ZHU; ZHILING GAN;** ) | |
| **CUILIAN LI; YULONG TANG; LILI** ) | |
| **ZHANG; SHUANGYUN WANG; WENHAO** ) | |
| **ZHANG; SHA SHI; YAJUN KANG;** ) | |
| **DONGSHENG ZHU; RUJING WEI;** ) | |
| **CHAOHUI LI; JUEWEI ZHOU; MIN LI;** ) | |
| **CHUNNING YE; HONGRU PAN; YUANBO** ) | |
| **WANG; SHU JIANG; YING FEI; LI** ) | |
| **DONGSHENG; XIAONAN WANG;** ) | |
| **CHENGYU GU; YAN CHEN; TANG CHEOK** ) **Civil Action No. 19-80332-Civ-Marra** | |
| **FAI; MOHAMMAD ZARGAR; SHAHRIAR** ) | |
| **EBRAHIMIAN; REZA SIAMAK NIA; ALI** ) | |
| **ADAMPEYRA;MOHAMMADREZA** ) | |
| **SEDAGHAT; and HALIL ERSEVEN,** ) | |
| ) | |

**Plaintiffs,**

**v.**

**PNC BANK N.A. and RUBEN RAMIREZ,**

**Defendants.**

---

## [PROPOSED] FIRST AMENDED COMPLAINT

Plaintiffs, LAN LI, YING TAN, TAO XIONG, JUNQIANG FENG, RAN CHEN, XIANG

SHU, HAO LOU, XIANG CHUNHUA, KUANG YAOPING, BEI ZHU, QIONG DENG,

QIONGFANG ZHU, ZHILING GAN, CUILIAN LI, YULONG TANG, LILI ZHANG,

SHUANGYUN WANG, WENHAO ZHANG, SHA SHI, YAJUN KANG, DONGSHENG ZHU,

RUJING WEI, CHAOHUI LI, JUEWEI ZHOU, MIN LI, CHUNNING YE, HONGRU PAN, ,

YUANBO WANG, SHU JIANG, YING FEI, LI DONGSHENG, XIAONAN WANG,

CHENGYU GU; YAN CHEN and TANG CHEOK FAI;  (collectively, the "Chinese Victims"),

along with MOHAMMAD ZARGAR, SHAHRIAR EBRAHIMIAN, REZA SIAMAK NIA, ALI

ADAMPEYRA and MOHAMMADREZA SEDAGHAT (collectively, the "Iranian Victims") and

1

HALIL ERSEVEN (the "Turkish Victim") (collectively, the Chinese Victims, the Iranian Victims and the Turkish Victim will be collectively referred to as "<u>Plaintiffs</u>"), sue Defendants, PNC BANK, N.A., a National Association ("PNC") and   RUBEN RAMIREZ, individually ("RAMIREZ") and say:

## **INTRODUCTION AND HOW THE FRAUD WAS IMPLEMENTED**

**<u>Introduction</u>**

1.      PNC's General Counsel Gregory B. Jordan calls PNC a company "Focused on doing the right thing and acting with integrity and ethics." If that were true, this case would be wholly unnecessary.

2.      Plaintiffs are EB-5 Investors who were some of the unwitting victims of a $50 million fraud, theft and conspiracy, aided and abetted by PNC.  Plaintiffs are all foreign nationals desirous of leaving their home countries, whether it be China, Iran or Turkey, to provide themselves and their families with the opportunity for a better life in the United States by a program, known as the EB-5 Immigrant Investor Program (the "EB-5 program"), designed to promote both foreign investment and the creation of jobs for United States citizens. Plaintiffs, thanks to the assistance of and creation of a fake escrow account by PNC, were induced to make investments in the "Palm House Hotel," that was offered as a project in the EB-5 program.  The specifics of the EB-5 program are described more fully in Paragraphs 60 through 82 below.

3.      Instead, Plaintiffs' pursuit of the "American Dream" was shattered by those who promised them the world but lied and took everything from them.  RAMIREZ and PNC directly enabled that fraud by suggesting a "workaround" that allowed Plaintiffs' investments monies to be stolen.

4.      To be clear, the willful acts of RAMIREZ and PNC enabled Plaintiffs to be defrauded by Joseph Walsh ("Walsh"), Joseph Walsh, Jr.("Walsh Jr."), J. Marcus Payne ("Payne"), South Atlantic Regional Center, LLC ("SARC"), USREDA, LLC ("USREDA"), JJW

Consultancy, Ltd., Robert Matthews, Maria a/k/a Mia Matthews, Gerry Matthews, Palm House, LLC, 160 Royal Palm, LLC, Palm House PB, LLC, Mirabia, LLC, Bonaventure 22, LLC, Alibi, LLC, Alibi Ltd., Nicolas Laudano, New Haven Contracting South, Inc., Botticelli Advisors, LLC, NJL Development Group LLC, and KK-PB Financial, LLC (collectively, the "Bad Actors"), along with Leslie Robert Evans, and Leslie Robert Evans & Associates, P.A. (the "Evans Bad Actors) and Palm House Hotel, LLLP.

5.      Various of the Bad Actors, aided and abetted by RAMIREZ and PNC, conspired to fraudulently induce Plaintiffs to each invest $500,000, plus a $40,000 - $60,000 "administrative fee," into a purportedly first class, five-star Palm Beach, Florida, real estate project, known as the "Palm House Hotel" (the "Project").   Anything but first class or five-star, the Project remains incomplete, abandoned and deteriorating, and it has become clear that the Project was nothing more than a façade behind which Plaintiffs' funds were stolen and distributed among the Bad Actors and the Evans Bad Actors.  Indeed, 160 Royal Palm, LLC is in bankruptcy and the Project is scheduled to be sold on March 8, 2019. *See, In Re: 160 Royal Palm, LLC, Case No. 18-19441-EPK, United States Bankruptcy Court Southern District of Florida, West Palm Beach Division.*

6.      Plaintiffs' funds, EB-5 investment monies, were supposed to be held in an escrow account unless and until the United States government made its initial evaluation of the Project's prospects and signaled its approval by granting the I-526 immigration petitions (the "I-526's") filed by each Plaintiff.  These representations regarding the existence of an escrow account (which were made repeatedly both orally and in writing) were critical to the fraud.  Those lies misled Plaintiffs into believing their money would be absolutely secure and untouched until the I-526's were approved and were material in helping convince Plaintiffs to invest in the Project.  Plaintiffs specifically relied on the creation and existence of a legitimate and secure escrow account before investing and would not have invested if they had known that there was no escrow account.  There

was, however a fake escrow account, created at the suggestion of RAMIREZ and PNC, that afforded no protection for their investments, but created the appearance of the promised protection.

7.      **At RAMIREZ and PNC's suggestion and with RAMIREZ and PNC's help, only a fake escrow account was created**, (the "Fake Escrow Account") not a real one that would protect Plaintiffs' interests. As described below, RAMIREZ and PNC played an essential role in allowing Plaintiffs to be defrauded by allowing the creation of a false appearance that a legitimate EB-5 escrow account had been created when it had not been.  PNC and RAMIREZ then stood by through at least May 2017 and did nothing while the Fake Escrow Account was looted, and the Bad Actors took all of Plaintiffs' money.  Indeed, RAMIREZ and PNC suggested, created and implemented the very circumstances that enabled the circumvention of all escrow requirements and gave unfettered access to Plaintiffs' money without regard for whether the Plaintiffs' investments were stolen. Not a single Plaintiff had an I-526 approved by the United States government yet every penny of Plaintiffs' money was taken from the Fake Escrow Account set-up by RAMIREZ and PNC. To make matters worse, both PNC and RAMIREZ benefitted from the creation of the Fake Escrow Account.

8.      Had Plaintiffs' I-526's ever been approved, the only legally permitted use of the funds would have been to create at least 10 full-time jobs (per investor) for qualifying U.S. workers, in this case by:

(a)     finishing the renovation and development of an existing luxury hotel structure in Palm Beach (i.e., the Project);

(b)     serving Palm Beach County by seeking to create jobs and increase U.S. exports by developing an upscale resort hotel; and

(c)     creating at least 790 direct and indirect jobs to support the EB-5 guidelines and the number of investors Plaintiffs were misleadingly told were being sought (while in reality some 91 EB-5 Investors were duped into investing).

9.      On information and belief, the Bad Actors, by and through Walsh, SARC and USREDA originally turned to SunTrust Bank and opened a legitimate escrow account to deposit other EB-5 Investors' (i.e., not the Plaintiffs here) fraudulently obtained investment monies from

4

other EB-5 projects. The SunTrust escrow account was used prior to the time the Chinese Victims, Iranian Victims and Turkish Victim were fraudulently induced to invest in the Project. However, SunTrust's EB-5 escrow compliance requirements were too "cumbersome" for the Bad Actors (i.e., the Bad Actors could not convert and steal the defrauded investors' money easily enough), so Walsh, SARC and USREDA decided to move the EB-5 investment monies to another bank that would make it easier for them to get their hands on it. That's when the Bad Actors first turned to RAMIREZ and PNC.

10.     In order to help facilitate the fraud, Walsh was insistent upon finding another bank that would essentially cut through the "obstacles and red tape" that existed at SunTrust. Eliminating the "obstacles and red tape" would give Walsh, SARC, USREDA, the BAD ACTORS and Evans Bad Actors access to the investors' fraudulently obtained investment monies (including, eventually, Plaintiffs' EB-5 investment monies) without having to comply with SunTrust's stringent escrow requirements as well as the requirements of the EB-5 program.

11.     Anthony "Tony" Reitz worked with Walsh from approximately January 2011 through February 2015. Reitz was employed as the Chief Financial Officer of SARC and USREDA, and while he worked for those companies, he took orders directly from and reported to Walsh.

12.     Finding the right bank and breaking free of the shackles of the escrow requirements at SunTrust (as well as the fraudulent misrepresentations that they would keep Plaintiffs' money in escrow until their I-526's were approved) were critical aspects of the fraud.

13.     Reitz had a prior long-standing banking relationship with PNC, especially with his friend, RAMIREZ, a business banker and Vice-President at one of PNC's Boynton Beach locations.

14.     In order to satisfy Walsh's repeated demands to find a new bank, Reitz offered to introduce Walsh, SARC and USREDA to RAMIREZ and PNC.

15.     PNC and RAMIREZ agreed to meet with Reitz, as the representative of Walsh, SARC and USREDA, and the initial meeting took place at Walsh's offices in Delray Beach, FL. The initial meeting was also attended by RAMIREZ and a person whose name, on information and belief, is Daniel Osaba ("Osaba"), a member of PNC's Treasury Department.

16.     When Reitz met with RAMIREZ and Osaba on behalf of Walsh, SARC and USREDA, he explained the nature of Walsh/SARC and USREDA's EB-5 business in great detail. Reitz also explained to Osaba and RAMIREZ that Walsh/SARC wanted to open an escrow account and specifically disclosed the following, among other things, to RAMIREZ and PNC:

(a)     Walsh, SARC and USREDA were working on EB-5 projects and were bringing in investors from China (at that time no Iranian or Turkish investors had been signed up yet);

(b)     there would be investors from other countries in the future;

(c)     each Chinese EB-5 investor was investing $500,000 plus an administrative fee of between $40,000 and $60,000;

(d)     there would be tens of millions of dollars running through any new accounts opened by RAMIREZ at PNC;

(e)     the EB-5 investment monies were subject to escrow agreements;

(f)     the relationship between Walsh, SARC and USREDA, because Walsh was in charge of the EB-5 projects and was making the decisions with respect to the EB-5 Investors' money;

(g)     Walsh and SARC already had an existing escrow account at SunTrust Bank;

(h)     Walsh was frustrated by what he felt were "obstacles and red tape" he was facing at SunTrust; and

(i)     Walsh, SARC and USREDA wanted a PNC escrow account that removed and/or eliminated the "obstacles and red tape" they were facing at Sun Trust.

17.     Reitz also discussed with RAMIREZ and Osaba PNC's requirements and procedures applicable to opening and maintaining an escrow account.

18.     After his initial meeting with RAMIREZ and Osaba, Reitz was told that PNC and SARC would have to sign an escrow administration agreement before PNC would open an escrow account for SARC.  Reitz was also told PNC would do the same thing as SunTrust if there was an

6

escrow administration agreement and an escrow account was opened at PNC- that is, strictly adhere to the terms of the administration agreement.

19.     Walsh was extremely disappointed and unhappy at this news because such requirements would limit his ability to gain unrestricted access to the EB-5 Investors' investment monies.

20.     Reitz then specifically told RAMIREZ and PNC that signing an escrow administration agreement was not what Walsh was looking for.

21.     **RAMIREZ** and **PNC** then made the suggestion of a "workaround," opening a **business checking account** offering all of PNC's escrow services modules (the "Escrow Service Modules"), **as if the business checking account was a real escrow account, but it would not be an actual and real escrow account**.

22.     According to RAMIREZ, PNC would treat the account as a business checking account but Walsh and SARC could use the Escrow Service Modules as if the business checking account was an actual and real escrow account, thus making it appear to EB-5 Investors as though their money was being held in a bona fide escrow account. In reality RAMIREZ and PNC created the Fake Escrow Account and they, along with Walsh, SARC and USREDA, knew it was a fake and bogus account. One of RAMIREZ' jobs was to open up new business, so he stood to and did personally benefit from all of the business he and PNC did with Walsh, SARC and USREDA, at the expense of the EB-5 Investors. RAMIREZ told Reitz that "if you need functionality of an escrow account, we can provide the escrow service modules with this type of business checking account."

23.     On information and belief RAMIREZ and PNC's "workaround" (the "Workaround") violated its own Treasury Department rules and other internal rules, regulations and policies.

24.     RAMIREZ and PNC (because they both wanted the new business and the tens of millions of dollars of deposits – and substantial fees and interest– that came with it), offered the perfect Workaround solution. RAMIREZ and PNC suggested, engineered and implemented the Workaround as a way for Walsh/SARC and USREDA to circumvent PNC's own internal escrow account policies and quickly unlock the vault to Plaintiffs' investment monies, which the Bad Actors took for themselves, leaving Plaintiffs with virtually nothing.

25.     In the first step of the Workaround, RAMIREZ and PNC engineered the opening of an Analysis Business Checking Account in the name of South Atlantic Regional Center LLC – Royal Palm Town Center IV, LLLP (ending in 7626).  This Fake Escrow Account remained in the name of South Atlantic Regional Center LLC – Royal Palm Town Center IV, LLLP from January 18, 2011 through January 31, 2011.

26.     In the second step of the Workaround, in order to create the illusion that the Analysis Business Checking Account was really an escrow account, PNC changed the name of the Fake Escrow Account from South Atlantic Regional Center LLC – Royal Palm Town Center IV, LLLP to South Atlantic Regional Center LLC – Royal Palm Town Center **Escrow Account**. By so doing, RAMIREZ and PNC knowingly made the Fake Escrow Account look like a legitimate escrow account with specific knowledge that while it was not one, it would appear like one and be used like one. This occurred on January 31, 2011, before any of the Plaintiffs were defrauded into wiring money into the Fake Escrow Account.  Throughout the existence of the Fake Escrow Account, PNC received fees for the services it provided to Walsh, SARC and USREDA (and indirectly to the Bad Actors and the Evans Bad Actors) in connection with the Fake Escrow Account. In addition, PNC was able to invest the tens of millions of dollars that ran through the Fake Escrow Account, for its own benefit, while the money was held in the Fake Escrow Account.

27.     Likewise, RAMIREZ earned substantial income from PNC, which income increased and was enhanced as a result of the creation of the Fake Escrow Account and the tens of

millions of dollars that ran through it.  In addition, RAMIREZ' reputation within PNC grew as a result of opening of the Fake Escrow Account, which was a feather in his cap.

28.     The third step of the Workaround to circumvent the "obstacles and red tape" associated with legitimate escrow accounts was to offer Walsh, SARC and USREDA the ability to add PNC's Escrow Services Modules to the Fake Escrow Account. RAMIREZ and PNC then actually added the Escrow Services Modules to the Fake Escrow Account to complete the false impression that the Fake Escrow Account was real. On information and believe this also overtly violated PNC's internal policies and procedures.  The Escrow Services Modules were not supposed to be added to Analysis Business Checking Accounts.  Even the training module for the Escrow Services Modules, on its face, makes clear that the Escrow Service Modules are meant for legitimate escrow accounts.

29.     The critical importance of this decision by RAMIREZ and PNC was that by connecting the Escrow Services Modules to the Fake Escrow Account, it gave the Fake Escrow Account the same outside appearance, manageability and functionality of one of PNC's legitimate escrow accounts.  However, it allowed Walsh, SARC and USREDA (and by extension the Bad Actors and Evans Bad Actors) to exercise illegal dominion and control over where the EB-5 Investors' money went. It also unlocked the Fake Escrow Account (without approval of even a single I-526) such that Walsh, SARC, USREDA, the Bad Actors and the Evans Bad Actors took the money without having to comply with any escrow agreements or any "obstacles or red tape" previously imposed by SunTrust on the Bad Actors and usually (absent the Workaround) imposed by PNC on legitimate escrow accounts.

30.     The impact of the totality of the Workaround was to create an account that was called "escrow," looked like a legitimate "escrow" account, had the ability to function like a real "escrow" account but was fake in every material aspect and imposed no escrow restrictions, all to the direct financial detriment of the EB-5 Investors. RAMIREZ and PNC helped cause the loss of

tens of millions of dollars.  In addition, because the money was stolen and no jobs were created, Plaintiff's lost the ability to obtain permanent green cards and come to the United States for a better life for themselves and their families.

31.     PNC is well-versed in the EB-5 program and has specific institutional knowledge of how it works.  For example, in approximately June 2017, PNC's website included an article entitled "PNC Assists Ironstate Development in Rebuilding the Waterfront" a copy of which is attached as **Exhibit "A"** (the "EB-5 Article").  In the EB-5 Article, PNC brags about and markets its involvement, through PNC Capital Markets, LLC, as the "sole lead arranger of the [$100 million] credit facility" for the Navy Pier Court EB-5 Project in Staten Island, NY. The EB-5 Article also admits that the $161 million project included a "$25 million EB-5 Preferred Equity Investment" with PNC serving as "Administrative Agent." PNC provided the credit facility in 2013. So PNC clearly knows what the EB-5 program is, how it works and the fiduciary obligations that surround it.

32.     Walsh, SARC, and USREDA owed fiduciary duties to the EB-5 investors pursuant to the EB-5 program.  Walsh, SARC, and USREDA promised investors that their funds would be held safely in an escrow account.  Walsh, SARC, and USREDA expressly promised the EB-5 investors that their funds would be protected by safeguards.

33.     PNC knew that Walsh, SARC, and USREDA owed fiduciary duties to the EB-5 investors, and that Walsh, SARC, and USREDA held investor funds pursuant to those fiduciary duties.

34.     PNC was involved in the Navy Pier Court EB-5 Project until well after the fraud in this case began.  Specifically, PNC's Navy Pier Court credit facility was in place through February 2019 when it was refinanced. See https://rew-online.com/staten-island-urby-refinanced-with-133M-fannie-mae-loan

10

35.     PNC also markets itself to the EB-5 investments marketplace, as evidenced by the posting dated April 18, 2016 on the website called "EB-5 Investments-The EB-5 Investment Marketplace." Thus, PNC cannot feign ignorance as to the impact and importance of the Workaround or how critical it is to an EB-5 Investor to know that her/his money will be held safely in an escrow account pending I-526 approval.

36.     Once the Workaround was fully implemented, there were no further impediments to convincing the Chinese Victims, the Iranian Victims and the Turkish Victim that their EB-5 investment monies and administrative fees were being wired into a legitimate escrow account and would be kept safe and untouched pending the approval of their I-526's. The creation of the Fake Escrow Account became the conduit that fed the Bad Actors' fraud machine and was a proximate cause of Plaintiffs' losses.

37.     In reliance upon the existence of the Fake Escrow Account, the Chinese Victims, the Iranian Victims and the Turkish Victim each wired their respective $500,000 EB-5 investments and $40,000 - $60,000 administrative fees into what they believed was a legitimate, completely safe escrow account.

38.     The Workaround, and the resulting Fake Escrow Account, was utilized by Walsh, SARC, USREDA and the Bad Actors to collect all of the funds that they later misappropriated from the Chinese Victims, the Iranian Victims and the Turkish Victim.

39.     In addition to the Workaround, PNC provided additional substantial assistance to Walsh, SARC, USREDA and the rest of the fraudsters, further empowering them to take Plaintiffs' EB-5 investment monies by creating yet another enabling account, this time a Business Enterprise Checking Account called Palm House Hotel LLLP Checking Operating Account (ending in 8336) (the "Clearing Account").

40.     As described above, RAMIREZ and PNC had specific knowledge that the monies that would be deposited into the Fake Escrow Account would be EB-5 monies, as well as the legal

implications of that fact.  Despite the fact that none of Plaintiffs' EB-5 investment monies were legally permitted to be used for any reason until their I-526's were approved, and the Plaintiffs were entitled to receive a full refund of their investment monies if their I-526's were denied, PNC and RAMIREZ did absolutely nothing to: (a) prevent the Bad Actors from taking Plaintiffs' money from the Fake Escrow Account; (b) prevent the Bad Actors from moving the money stolen from the Fake Escrow Account into the Clearing Account; (c) prevent the Bad Actors from wiring money out of the Clearing Account to various other companies, individuals, or accounts controlled by the Bad Actors; (d) close the Fake Escrow Account until, on information and belief, May 2017; (e) close the Clearing Account until, on information and belief, May 2017; (f) inform the Chinese Victims the Iranian Victims or the Turkish Victim of the Bad Actors fraudulent acts; (g) inform the Chinese Victims, the Iranian Victims or the Turkish Victim of the misappropriation of their EB-5 investment monies from the Fake Escrow Account; or (h) inform the Chinese Victims, the Iranian Victims or the Turkish Victim of the further transfer of the EB-5 investment monies out of the Clearing Account.

41.     Once Plaintiffs' investment monies were deposited into the Fake Escrow Account, the majority of Plaintiffs' funds were improperly transferred from the Fake Escrow Account to the Clearing Account and pillaged for the personal pleasure of the Bad Actors and Evans Bad Actors. The remaining Plaintiffs' funds that were not improperly transferred to the Clearing Account were, on information and belief, transferred from the Fake Escrow Account into other accounts for the personal pleasure of the Bad Actors and the Evans Bad Actors.

42.     Virtually none of Plaintiffs' EB-5 investment funds were used to develop the Project, no jobs were created, and no EB-5 visas were issued to any of the Plaintiffs.  Accordingly, the defrauded foreign EB-5 Investors are now unable to leave their respective countries and have lost all the money they invested, and their dreams for a better life here in the United States for them and their families have been decimated.

43.     Instead, the Bad Actors and Evans Bad Actors stole Plaintiffs' funds and used them to, among other things:

(a)     purchase multiple homes, investment properties, a 151-foot yacht that cost almost $6,000,000, payoff millions of dollars of personal debt (including more than $266,000 in personal back taxes), purchase luxury cars, vacations and other accoutrements of a life of luxury;

(b)     grease all the wheels that furthered the fraudulent scheme, including using licensed attorneys who had fiduciary duties, to help fraudulently induce investments.

44.     While it was the Bad Actors who masterminded the fraud against Plaintiffs, RAMIREZ and PNC, by offering what turned out to be the perfect solution to gaining access to Plaintiffs' investment monies without a single I-526 being approved, also played a substantial and essential role in the fraud.  RAMIREZ and PNC were a proximate cause of the damages that were incurred by Plaintiffs by facilitating the conversion of their funds and giving the Bad Actors a key element to bolster and legitimize their most critical misrepresentations.  RAMIREZ and PNC are jointly and severally liable for the Plaintiffs' damages.

45.     PNC and RAMIREZ aided and abetted the Bad Actors': (A) conversion of Plaintiffs' EB-5 investment monies; (B) fraud in the inducement; (C) fraud; and (D) breach of their fiduciary duties owed to Plaintiffs.

46.     PNC and RAMIREZ were also unjustly enriched by their roles in the fraudulent scheme.

**How The Fraud Was Implemented**

47.     The fraudulent scheme operated as follows:

(a)     The Bad Actors preyed on Chinese, Iranian and Turkish investors seeking a path to United States residency for themselves and their minor children.

(b)     The Bad Actors fraudulently obtained $500,000 in EB-5 investment monies, plus $40,000 - $60,000 in administrative fees from each foreign investor, through the sale of alleged equity interests in Palm House Hotel, LLLP, a Florida limited liability limited partnership ("Palm House, LLLP") that would be involved in the development of the Project, claiming that the investment would qualify them under the EB-5 program administered by United States Citizenship and Immigration Services (the 'USCIS").

13

(c)     The Bad Actors materially, indeed crucially, represented, among other things, that:

(i)     There was a 100% guaranty for the return of each Plaintiff's investment and fees in the event their I-526's were denied;

(ii)    100% of Plaintiffs' funds **would be held in escrow** until their I-526's were approved by the United States government;

(iii)   A "limited number" of 79 equity interests would be sold in Palm House Hotel, LLLP at the price of $500,000 each, plus $40,000 - $60,000 in administrative fees;

(iv)    Plaintiffs' funds would be exclusively invested in the Project to create jobs by helping to finish the renovation and development, which was near completion;

(v)     The Project would be open for business by the "Season" of 2013/2014, and was 80-90% completed prior to Plaintiffs' investments;

(vi)    The funds would create 930 jobs, more than the required 790 full-time jobs (i.e., 10 per EB-5 investor);

(vii)   Plaintiffs' funds would be the third and final source of funds.  The EB-5 funds were in addition to an equity investment by Robert Matthews (an accused felon) in excess of $22,000,000 and a bank loan (by a bank that had done full due diligence justifying such a loan) in excess of $29,000,000.  Accordingly, Plaintiffs' funds constituted less than 50% of the Project funding;

(viii)  Plaintiffs' funds **would be held in escrow**, and were not yet needed, because Robert Matthews' investment in excess of $22,000,000 and a bank loan in excess of $29,000,000 were being used for construction and renovation;

(ix)    Plaintiffs' funds **would not be taken from the escrow account**, and would not be used, unless and until the developer's investment in excess of $22,000,000 and the bank funds in excess of $29,000,000 had been used at the Project;

(x)     The real property at issue was currently worth $110,000,000-$137,000,000 before completion, which made the investment "one of the safest EB-5 offerings from a Job Creation and Investment position."

(xi)    I-526's for the Project had already been approved by the United States government for the initial investors;

(xii)   An insurance policy was purchased by the Developer that guaranteed that construction of the Project would be completed;

(xiii)    The local government guaranteed that construction of the Project would be completed, and that this would be the last 5-star hotel property they would allow on Palm Beach;

(xiv)    The developer, Robert Matthews, was a famous real estate developer in the United States;

(xv)    Each investor's investment would be fully secured by the real property at issue and a UCC-3 (which EB-5 Investors were told was like a mortgage) filed in the State of Florida.  As there would be 79 rooms and 79 investors, each investor would be given a UCC-3 security interest in an individual room; and

(xvi)    Donald Trump and Bill Clinton (among other "rich and famous" dignitaries) would serve on the Palm House Hotel advisory board, would assist with any issues related to construction and would also play a key role in recruiting celebrities and dignitaries to the club. Celebrities such as Tony Bennett, Celine Dion, Bill Koch and Eric Schmidt purportedly were already members of the hotel club.

(d)    The Bad Actors targeted investors with children between the ages of 18 and 21 because, under the EB-5 program, applicants have the right to apply for a green card for themselves, their spouse, and unmarried children under 21.  Once the investor's funds were stolen and time continued to pass without the issuance of an I-526 approval, the Bad Actors would use the fact that the investor's child had "aged out" to silence the investor, perpetrate the continuing fraud, and prevent the investor from seeking redress or judicial assistance.  The Bad Actors threatened the investors that, if the Project was interfered with or terminated, because the investor's child was no longer under 21, they would no longer be able to obtain a green card through their parent and would need to obtain their own EB-5 visa through at an additional cost of $500,000 plus administrative fees.

(e)    Later on in the fraud, as to any Plaintiff brave enough to question or demand the return of their investment, they were fraudulently told that, that additional appeals of the application process were in place, the country's foremost immigration attorney had been hired to prosecute the appeals, and all was well with the construction of the hotel, thereby further lulling Plaintiffs and falsely allowing the Bad Actors to deny any rights to reimbursement.  In truth, of course, the money was gone, no jobs were created, the federal government had closed the appeals, the immigration attorney was not retained to prosecute any appeals, and the I-526's were never issued.

48.    The representations made to induce Plaintiffs' investments into the Project were mostly lies, calculated to induce investments by those seeking to send their children to the United States for an education and the chance to pursue a life with more opportunities than those afforded to them in China, Iran and Turkey.

49.   Plaintiffs' I-526's were all denied, yet their funds were never returned.

50.   **There was no escrow account**.  There was only the Fake Escrow Account, an "escrow account" in name only, thanks to RAMIREZ and PNC.  Instead of holding Plaintiffs' funds in escrow until their I-526's were approved, which would have kept the funds completely safe, the funds were diverted from the Fake Escrow Account, with RAMIREZ and PNC's assistance, knowledge and consent, into either the Clearing Account (and then to the Bad Actors, the Evans Bad Actors, and/or to individuals or entities or family members they controlled) or distributed among the conspirators, and used for their self-indulgences.

51.   Given unlimited access by RAMIREZ and PNC, Plaintiffs' funds were misappropriated and were used for unlawful purposes.

52.   PNC was aware of the misappropriation of Plaintiffs' funds by the Bad Actors.  PNC received nearly 100 alerts on the accounts held by or associated with Walsh, SARC, and USREDA during the relevant period, which PNC reviewed carefully and for which PNC generated additional substantiating material related to Walsh, SARC, USREDA and accounts held by them and other Bad Actors.  Upon information and belief, the banking alerts were generated by patterns of irregular activity in the Fake Escrow Account and other related accounts.  Upon information and belief, some of these transactions were obviously not related to the Palm House EB-5 project.  PNC knew the purpose of Plaintiffs' deposits to the SARC and USREDA accounts and therefore knew that the funds had been misappropriated.

53.   Enabled by PNC's Workaround, the Bad Actors did not use Plaintiffs' funds to create 10 full-time jobs for (U.S. workers) for each EB-5 investor, which was the only legitimate purpose for the funds to come to the United States, and the only lawful use for the funds once the I-526's were approved (which they never were).

**PARTIES, JURISDICTION, AND VENUE**

54.     This action involves, among other things, RAMIREZ and PNC's aiding and abetting breach of fiduciary duty, aiding and abetting conversion, aiding and abetting fraud in the inducement, aiding and abetting fraud, and unjust enrichment, each of which were perpetrated on Plaintiffs to obtain each of their EB-5 investments and "administrative fees" of $500,000 and $40,000 - $60,000, respectively.

55.     Plaintiffs are foreign nationals residing in China, Iran and Turkey that were fraudulently induced to each invest $500,000, plus $40,000 - $60,000 in administrative fees, based on the representations made by the Bad Actors and bolstered and facilitated by the use of the Workaround and the creation of the FAKE ESCROW ACCOUNT.  Plaintiffs were damaged by the fraud, which could not have been accomplished without the Workaround and Fake Escrow Account, as well as RAMIREZ and PNC's other actions and omissions.  RAMIREZ and PNC knowingly created, engineered and implemented the Workaround, as well as the Fake Escrow Account and the Clearing Account, which enhanced the Bad Actors' ability to convert and distribute their ill-gotten gains.

56.     Defendant PNC BANK, N.A. is a National Association with its headquarters and principal place of business at The Tower at PNC Plaza, 300 5th Ave, Pittsburgh, PA 15222.  PNC conducts business throughout the State of Florida. Among other things, PNC is engaged in the business of providing retail banking services to millions of customers, including customers in the State of Florida.  PNC is subject to personal jurisdiction in Florida because it operates, conducts, engages in, carries on a business or a business venture in Florida and/or committed a tortious act within Florida and/or is engaged in substantial activity within Florida. The Fake Escrow Account and Clearing Account at issue herein were opened in Boynton Beach, Florida. PNC is subject to the personal jurisdiction of this Court pursuant to, *inter alia*, Section 48.193 of the Florida Statutes

because it is a foreign corporation actually conducting business in the State of Florida. Additionally, the causes of action alleged herein accrued in the State of Florida.

57.     RUBEN RAMIREZ is an individual who resides in Palm Beach County, Florida. RAMIREZ is or was a business banker and is or was employed by PNC as a Vice-President.  At all times relevant hereto, RAMIREZ worked at a PNC branch or branches in Boynton Beach, Palm Beach County, Florida and is otherwise *sui juris*. Additionally, RAMIREZ committed tortious acts within Palm Beach County, Florida and the causes of action herein accrued in Palm Beach County, Florida.

58.     This is an action for damages in excess of $75,000.00 exclusive of interest, attorneys' fees and costs.

59.     This Court has jurisdiction over PNC and RAMIREZ pursuant to 28 U.S.C. § 1441, under which this action was removed from state court into this Court, and 28 U.S.C. § 1332, based upon diversity jurisdiction.

60.     Venue is proper in Palm Beach County, Florida, because a substantial part of the acts, transactions and events giving rise to the claims occurred in Palm Beach County, Florida. In addition, PNC maintains offices and does business in Palm Beach County, Florida.  Moreover, RAMIREZ works and resides in Palm Beach County, Florida.

61.     All conditions precedent to this action have been performed, have occurred or have been waived.

62.     Plaintiffs have retained the undersigned counsel to represent them in this action and have agreed and are obligated to pay a reasonable fee for their services.

## GENERAL ALLEGATIONS

### EB-5 Visa Program in General

63.     The Immigrant Investor Program, more commonly known as the EB-5 program, was created by the Immigration Act of 1990.  Congress established the EB-5 program to stimulate the U.S. economy by giving immigrant investors the opportunity to permanently live and work in

the United States after they have invested in a new commercial enterprise ("NCE"). In the case of an NCE that is located in a Targeted Employment Area ("TEA"), *i.e.,* either a rural area or an area beset by high unemployment, the required equity investment need only be $500,000.

64.     In 1993, Congress created the Immigrant Investor Pilot Program to increase interest in the EB-5 visa program. This new pilot program established EB-5 Regional Centers ("Regional Centers"), which are entities that receive special designation from the USCIS to administer EB-5 investments and create jobs.  Public and private entities may apply to the USCIS for approval as an EB-5 Regional Center.

65.     EB-5 visa programs administered by a Regional Center provide more flexibility, because the immigrant investor who invests in such a program is permitted to take credit not only for direct jobs created in the NCE but also "indirect jobs" created outside the NCE in a job creating enterprise ("JCE"). An example is such as a construction contracting firm that builds an improvement for the NCE.  In addition, the immigrant investor need not handle the day-to-day management of the NCE or even necessarily live in the region where the NCE is located.

66.     By necessity, investments into an EB-5 program are "closed-ended," available only to a specified number of investors, and that number is tied to the number of direct or indirect jobs created by the investment. If too few jobs are created with the money invested, the immigrant investor will not be able to become a permanent resident in the United States.

**EB-5 Practice and Procedure**

67.     Under the EB-5 program, the immigrant investor first applies for an immigrant visa by submitting an I-526, Immigrant Petition for Alien Entrepreneur.  USCIS' approval of the Form I-526 is conditioned upon the immigrant's investment of the requisite amount of money in an NCE that satisfies the applicable legal requirements.  Upon approval of the Form I-526 petition, the immigrant investor may either: (1) file the appropriate form to adjust their status to a conditional permanent resident within the United States; or (2) file an application to obtain an EB-5 visa for

admission to the United States.  Upon the approval of the application or upon entry into the United States with an EB-5 immigrant visa, the EB-5 investor and derivative family members will be granted conditional permanent residency for a two-year period.

68.     To remove the conditional resident status, the immigrant investor must file a Form I-829, Petition by Entrepreneur to Remove Conditions, (an "I-829") ninety days before the two-year anniversary of the granting of the EB-5 investor's conditional resident status. USCIS' approval of the I-829 is conditioned upon proof that the immigrant investor's investment has created at least ten full-time jobs in the NCE or JCE.  If an insufficient number of jobs were created, the foreign national is subject to removal from the United States.

**EB-5 Program at the Palm House Hotel**

69.     SARC held itself out as an EB-5 Regional Center, headquartered in Palm Beach County, Florida, and claimed to specialize in investment-based immigration services.

70.     SARC was approved by USCIS to serve as a Regional Center, which allowed EB-5 Investors to take credit for direct and indirect jobs and not be involved in the day-to-day operation of the NCE.

71.     SARC was originally operated and controlled by Walsh, Walsh, Jr., and Payne.

72.     USREDA was an entity that claimed to specialize in providing legal immigration services regarding the EB-5 Visa program, held itself out as a law firm, and required clients to sign engagement letters for its services.  It charged clients $15,000.00 to file an I-526 and an additional $5,000.00 to file an I-829.

73.     USREDA was originally operated and controlled by Walsh, Walsh, Jr. and Payne.

74.     Beginning in 2013, Walsh and Walsh Jr., together with their agents, went to China to solicit the Chinese Victims regarding the EB-5 program at the Palm House Hotel.

75.     SARC, USREDA, Walsh, Walsh, Jr., Payne, and Robert Matthews retained Attorney Ali Herischi to help them sell the Palm House Hotel project to the Iranian Victims.

76.     Eric Nan Nur is a South Florida real estate broker and is a prominent member of the Turkish-American community in Florida.  Nur is former President of the Florida Turkish American Chamber of Commerce, former President of the Florida Turkish Center Foundation, Inc., former President of the Florida Turkish American Association, former Vice-President of the Federation of Turkish American Associations, and former Vice-President of the Assembly of Turkish American Associations.  Nur served as a key agent for Walsh, Walsh Jr., Payne, SARC, USREDA and Robert Matthews, making substantial material, false representations that were integral in inducing the Turkish Victim to provide his investment.  One of the most critical representations was the promised escrow account coupled with the representation that the investments would be held and safe unless and until the I-526's were granted.  Nur speaks fluent Turkish and was the "mouthpiece" for the fraudulent statements made to the Turkish Victim.

77.     During the Palm House Hotel solicitations, Plaintiffs were provided with three (3) items:

(a)     Frequently Asked Questions (the "FAQ").  True and correct copies of the FAQ provided to the Chinese Victims and Iranian Victims are attached as **Exhibits "B" and "C"** respectively**;**

(b)     Sales Brochure (the "Sales Brochure").  True and correct copies of the Sales Brochures provided to the Chinese Victims and Iranian Victims are attached as **Exhibits "D" and "E,"** respectively; and

(c)     Signature Booklet (the "Signature Booklet").  True and correct copies of the Signature Booklets provided to the Chinese Victims and Iranian Victims is attached as **Exhibits "F" and "G,"** respectively.  Collectively, the FAQ, Sales Brochure, and Signature Booklet will be referred to as the "Offering Documents."

78.     While the Signature Booklet contained signature pages for a Private Placement Memorandum (the "PPM") and a Palm House limited partnership agreement (the "Palm House Limited Partnership Agreement"), Plaintiffs were not provided with copies of the full documents in their native languages.  In the event EB-5 Investors asked questions about the full documents, they were referred back to the FAQ and Sales Brochure and told that all of their questions were

answered there.  Copies of the English version of the Full PPM and Limited Partnership Agreement are attached as **Exhibits "H" and "I,"** respectively.

79.     Additionally, during the Palm House Hotel solicitations, the Chinese Victims were provided with a writing claiming that an I-526 petition for an early Palm House Hotel investor had been approved by USCIS, thereby assuring the Chinese Victims that, if they invested in the Project, they too would soon obtain approval (the "USCIS Approval"), a true and accurate copy is attached as **Exhibit "J."**

80.     The representations in the Offering Documents, the PPM, the Palm House Limited Partnership Agreement, and the USCIS Approval were originally made by Walsh, Walsh Jr. and Payne on behalf of their companies, SARC and USREDA.

81.     JJW Consultancy Ltd. and its agents adopted and sold the representations in the Offering Documents and the USCIS Approval when selling the Project to the Chinese Victims.

82.     Nur adopted and sold the representations in the Offering Documents when selling the Project to the Turkish Victim.

**The Misrepresentations Used by The Bad Actors to Induce Plaintiffs to Invest Millions**

83.     SARC, USREDA, Walsh, Walsh Jr., Payne, JJW Consultancy Ltd., Nur, Robert Matthews and their agents each made material, knowingly false representations to induce Plaintiffs to invest in the Project.

84.     Further, SARC, USREDA, Walsh, Walsh Jr., Payne, JJW Consultancy Ltd., Nur, Robert Matthews and their agents each withheld material information they had a duty to disclose.

85.     Each limited partnership unit in Palm House required a minimum EB-5 investment of $500,000, plus an administrative fee of $40,000 - $60,000.

86.     Any subscription funds received from Plaintiffs were to be held in a special escrow account that, as described above, as a result of the Workaround, ended up being the Fake Escrow Account.

87.     Among the many misrepresentations, Plaintiffs were promised that their EB-5 monies would be held in a special escrow account and released only if and when their I-526's were approved by USCIS (the "Fraudulent Escrow Representation").

88.     The Fraudulent Escrow Representation was made to Plaintiffs several times, and in several documents.

89.     The Fraudulent Escrow Representation was made to Plaintiffs in the PPM.  See Exhibit G at p. 15, 37, 38 and 41.

90.     The Fraudulent Escrow Representation was made to Plaintiffs in the Limited Partnership Agreement.  **See Exhibit H** at p. 6.

91.     The Fraudulent Escrow Representation was made in the loan agreement between Palm House and Palm House LLC (the "Loan Documents," attached as **Exhibit "K"),** where Palm House, LLC, on the one hand, and Walsh, SARC, and Palm House, on the other hand, agreed that the loan was dependent on USCIS' approval of Plaintiffs' I-526's.  See **Exhibit J** at p.1.

92.     The creation of the Fake Escrow Account by RAMIREZ and PNC helped sell and legitimize the Fraudulent Escrow Representation to Plaintiffs.

93.     If an investor's I-526 was denied by USCIS, the investor was promised that they would receive their money back within 90 days of the official denial notice, thus providing additional promises of safeguards for the Plaintiffs' monies.

94.     There were many other knowingly false representations in the Offering Documents, including but not limited to:

(a)     There was a 100% guaranty for the return of Plaintiffs' EB-5 investment and fees in the event their I-526's were denied;

(b)     There would be a maximum of 79 limited partnership units offered in Palm House;

(c)     They were seeking, in total, a $39,500,000.00 investment into Palm House, which was equal to the maximum of 79 limited partnership units being offered at $500,000 each;

(d)     USREDA guaranteed the approval of any I-526 it completed and the return of all service fees in the event of denial;

23

(e)     SARC was the general partner of Palm House;

(f)     The developer had already invested $22,000,000 of its own equity into the Project;

(g)     There was a bridge loan from a bank, in the amount of $29,500,000, to allow continuation of the construction while the EB-5 money was raised;

(h)     The EB-5 investment represented only 43% of the total investment in the Project;

(i)     The Project was in progress, "very near completion," and would be complete for "Season" of 2013/2014;

(j)     The Palm House Hotel would be the last 5-star hotel to be approved by the local government on Palm Beach;

(k)     Investors need not worry about any potential delays in building or regulatory issues;

(l)     Bill Clinton, Donald Trump, Celine Dion, Bill Koch, and Eric Schmidt would be a part of the Palm House Hotel advisory board;

(m)     The real property at issue, on which the Palm House Hotel was being renovated, was presently worth over $110,000,000 before completion.  "This makes the Palm House Hotel one of the safest EB-5 offerings from a Job Creation and Investment position."

(n)     The job count for the Palm House Project is 953 jobs, while the Project needs only 790 jobs, so over 20% more jobs will be created than required by law;

(o)     The investor's visa would be approved in less than 6 months; and

(p)     "The investor need not worry if the Project will perform and meet the rigid standards required by the USCIS."

95.     Armed with the Offering Documents, the USCIS Approval, the Fraudulent Escrow Representation, the Fake Escrow Account **created by RAMIREZ and PNC,** presentations, and whatever other oral representations they deemed necessary for a sale, SARC, USREDA, Walsh, Walsh Jr., Payne, JJW Consultancy, Ltd., Nur, Robert Matthews and their agents sold the fraud that is the Project.

**The Chinese Investors Are Duped**

96.     Beginning in 2013, SARC, USREDA, Walsh, Walsh Jr., Payne, JJW Consultancy, Ltd., Robert Matthews and their agents fraudulently induced the Chinese Victims (directly and/or through their immigration agents) to provide their investments and wire their $500,000 EB-5

investment monies plus $40,000 - $60,000 in administrative fees into the Fake Escrow Account **created by RAMIREZ and PNC**.

97.     In China, SARC, USREDA, Walsh, Walsh Jr., JJW Consultancy, Ltd., and their agents made presentations to the Chinese Victims (directly and/or through their immigration agents) using the Offering Documents, the USCIS Approval, the Fraudulent Escrow Representation, presentation materials, and oral statements.

98.     In China, SARC, USREDA, Walsh, Walsh Jr., JJW Consultancy, Ltd., and their agents used a PowerPoint presentation (the "PowerPoint Presentation") that contained knowingly false representations to fraudulently induce the Chinese Victims (directly and/or through their immigration agents) A true and correct copy of the PowerPoint Presentation is attached as **Exhibit "L."**

99.     SARC, USREDA, Walsh, Walsh Jr., JJW Consultancy, Ltd., and their agents represented to the Chinese Victims (directly and/or through their immigration agents) that the statements in the Offering Documents were true and accurate.

100.     SARC, USREDA, Walsh, Walsh Jr., JJW Consultancy, Ltd., and their agents also made oral, materially false statements to the Chinese Victims (directly and/or through their immigration agents), including the Fraudulent Escrow Representation.

101.     In their solicitations to the Chinese Victims (directly and/or through their immigration agents), SARC, USREDA, Walsh, Walsh Jr., JJW Consultancy, Ltd., and their agents stated that:

    (a)    There was a 100% guaranty for the return of Plaintiffs' investment and fees in the event their I-526's were denied;

    (b)    100% of Plaintiffs' funds would be **held in escrow** until their I-526's were approved by the United States government;

    (c)    Plaintiffs' funds would be **held in escrow**, and were not yet needed, because the developer's investment in excess of $22,000,000 and a bank loan in excess of $29,000,000 was being used for construction;

(d)     Plaintiffs' funds **would not be taken from the escrow account**, and would not be used, unless and until the developer's investment in excess of $22,000,000 and the bank funds in excess of $29,000,000 had been used at the Project; and

(e)     If an investor's application was denied by USCIS, they would receive their money back immediately.

102.    SARC, USREDA, Walsh, Walsh Jr., JJW Consultancy, Ltd., and their agents made representations to the Chinese Victims' immigration agents with the understanding and intent that they would relay the representations to the Chinese Victims and that the Chinese Victims would rely upon those representations, because that was the nature of the trusting relationship between the Chinese investors and their immigration agents. That is exactly what happened.

103.    After the presentations in China, the Chinese Victims' immigration agents came to Palm Beach, Florida, to inspect the Project and meet with Robert Matthews and his agent.

104.    In Palm Beach, Robert Matthews and his agent reiterated that the Chinese Victims' funds **would remain in escrow** until their I-526's were approved.

**The Iranian Investors Are Duped**

105.    Beginning in 2013, SARC, USREDA, Walsh, Walsh Jr., Payne, and their agents fraudulently induced the Iranian Victims to transfer their $500,000 EB-5 investment monies plus $40,000 - $60,000 in administrative fees into the Fake Escrow Account **created by RAMIREZ and PNC**.

106.    In the Middle East and in Washington, DC, Walsh, SARC, and their agents made presentations to the Iranian Victims using the Offering Documents, the Fraudulent Escrow Representation, presentation materials, and oral statements.

107.    Walsh, SARC, and their agents represented to the Iranian Victims that the statements in the Offering Documents were true and accurate.

108.    Walsh, SARC, and his agents also made oral, materially false statements to the Iranian Victims, including the Fraudulent Escrow Representation, which statements were relied upon by the Iranian investors.

109.    In their solicitations to the Iranian Victims, Walsh and his agents stated that:

(a)    There was a 100% guaranty for the return of their Plaintiffs' investment and fees in the event their I-526's were denied;

(b)    100% of Plaintiffs' funds would be **held in escrow** until their I-526's were approved by the United States government;

(c)    Plaintiffs' funds would be **held in escrow**, and were not yet needed, because the developer's investment in excess of $22,000,000 and a bank loan in excess of $29,000,000 was being used for construction; and

(d)    If an investor's application was denied by USCIS, they would receive their money back immediately.

**The Turkish Investor Is Duped**

110.    Beginning in 2012, Nur solicited the Turkish Victim regarding the EB-5 program at the Palm House Hotel.

111.    In South Florida, Nur made presentations to the Turkish Victim using the Offering Documents, the Fraudulent Escrow Representation presentation materials, and oral statements, which were relied upon by the Turkish investor.

112.    Nur represented to the Turkish Victim that the statements in the Offering Documents were true and accurate.

113.    Nur also made oral, materially false statements to the Turkish Victim.

114.    In solicitations to the Turkish Victim, Nur stated that:

(a)    There was a 100% guaranty for the return of investment and fees in the event the I-526 petition is denied;

(b)    100% of the investment funds would be **held in escrow** until the Form I-526 immigration petition was approved by the United States government;

(c)    Investment funds would be **held in escrow**, and were not yet needed, because the developer's investment in excess of $22,000,000 and a bank loan in excess of $29,000,000 was being used for construction; and

(d)    If an investor's application was denied by USCIS, they would receive their money back immediately.

115.    After the presentations, the Turkish Victim came to Palm Beach, Florida, to inspect the project and meet with Robert Matthews. The Turkish Victim transferred his $500,000

investment plus $60,000.00 in administrative fees into the Fake Escrow Account created by RAMIREZ and PNC.

116.    In Palm Beach, Robert Matthews reiterated that the Turkish Victim's funds would **remain in escrow** until his I-526 petition was approved.

**Plaintiffs are Fraudulently Induced to Invest in the Palm House EB-5 Offering**

117.    Plaintiffs were provided with wiring instructions which included information provided by RAMIREZ and PNC (the "Wiring Instructions").  A true and correct copy of the Wiring Instructions are attached as **Exhibit "M"**.  The title of the Wiring Instructions is "Escrow Bank Wire Transfer Instructions" and "Wiring Instructions for Depositing Funds into Escrow Bank."  PNC is then identified as the "Escrow Bank."  Significantly, the name of the Fake Escrow Account is identified as "Palm House, LLLP Escrow Account – Account # XXXXXX7626," which is not the actual name of the Fake Escrow Account.  Based upon the Wiring Instructions, which on information and belief RAMIREZ saw and approved of (as well as because of PNC's extensive institutional knowledge of the EB-5 industry), RAMIREZ and PNC knew or should have known of the Bad Actors' fraud.  Of course, RAMIREZ and PNC knew or should have known of the Bad Actors' fraud from the date of the proposal of the Workaround and the creation of the Fake Escrow Account because of the Workaround, which RAMIREZ and PNC conceived of, engineered and implemented.

118.    The actual name of the Fake Escrow Account was South Atlantic Regional Center LLC – Royal Palm Town Center IV, LLLP Escrow Account.

119.    In reliance on the Offering Documents, the existence of the Fraudulent Escrow Representation, the Fake Escrow Account and the oral representations described above, each of the Chinese Victims provided a $500,000 EB-5 investment for a limited partnership unit in the Palm House Hotel, LLLP, along with an administrative fee of $40,000 - $60,000, which were wired into the Fake Escrow Account in accordance with the Wiring Instructions.

120.    In reliance on the Offering Documents, the Fraudulent Escrow Representation, the existence of the Fake Escrow Account and the oral representations described above, each of the Iranian Victims provided a $500,000 EB-5 investment for a limited partnership unit in Palm House Hotel, LLLP, along with an administrative fee of $40,000 - $60,000, which were wired into the Fake Escrow Account in accordance with the Wiring Instructions.

121.    In reliance on the Offering Documents, the Fraudulent Escrow Representation, the existence of the Fake Escrow Account and the oral representations described above, the Turkish Victim provided a $500,000 EB-5 investment for a limited partnership unit in Palm House Hotel, LLLP, along with an administrative fee of $60,000, which were wired into the Fake Escrow Account in accordance with the Wiring Instructions.

122.    Because Plaintiffs were provided the Wiring Instructions (which contained information created by RAMIREZ and PNC) telling them to wire their $500,000 EB-5 investments into the Fake Escrow Account, Plaintiffs instructed their respective banks to do just that.  A sample of a Remittance Application Form instructing that a wire be sent to the misnamed Palm House Hotel, LLLP Escrow Account (i.e. the Fake Escrow Account) is attached hereto as **Exhibit "N"**. Despite these obvious issues and red flags, PNC nevertheless deposited the $500,000 EB-5 investment from this wire into the Fake Escrow Account.

123.    Many of the Plaintiffs also paid USREDA a legal fee of $15,000-$20,000.

124.    Each of the Plaintiffs received confirmation receipts with PNC's logo on them (the "Wire Deposit Confirmations") that their $500,000 EB-5 investment and/or $40,000 - $60,000 administrative fee had been received by PNC.  An example of a Wire Deposit Confirmation is attached hereto as **Exhibit "O"**.  As a result, Plaintiffs believed that their EB-5 investment monies were being safely held in a special escrow account and that they would not be withdrawn, diverted or otherwise touched until such time as their I-526's were approved by the USCIS.

125.     Thus, the Workaround, as well as the creation of the Fake Escrow Account and the Clearing Account, directly contributed to and was a proximate cause of Plaintiffs' losses by enabling the Bad Actors to take Plaintiffs' EB-5 investment monies and use them illegally. Plaintiffs' receipt of Wire Deposit Confirmations further lulled them into the false sense of security that their money was safe in the **"escrow account" RAMIREZ and PNC conceived of, created and implemented**.

126.     In providing their money, Plaintiffs relied upon the representation that there was a 100% guaranty for the return of their investment and fees in the event their I-526's were denied.

127.     In providing their money, Plaintiffs relied upon the existence of the Fake Escrow Account and the Fraudulent Escrow Representation, and understood that **their money would be held in escrow** unless and until USCIS approved their I-526's.  RAMIREZ and PNC's acts and omissions not only enabled the Bad Actors to defraud Plaintiffs, but RAMIREZ and PNC were also a proximate cause of Plaintiffs' losses.

128.     In providing their money, Plaintiffs relied upon the representation that **their funds would be held in escrow**, and were not yet needed, because the developer's investment in excess of $22,000,000 and a bank loan in excess of $29,000,000 were being used for construction.

129.     In providing their money, Plaintiffs relied upon the representation that **their funds would not be taken from the escrow account**, and would not be used, unless and until the developer's investment in excess of $22,000,000 and the bank funds in excess of $29,000,000 had been used at the Project.  All of these various "escrow account" representations were bolstered, facilitated and legitimized by the creation of the Fake Escrow Account by RAMIREZ and PNC. Plaintiffs also anticipated and understood and their investment funds would be returned if their I-526 petitions were denied.

**Plaintiffs' I-526's are Denied by USCIS and Plaintiffs Demand Their Money**

130.    Plaintiffs' I-526's were denied by USCIS for failure to establish by a preponderance of the evidence that the I-526's complied with the applicable legal requirements.  A copy of an example of such a denial is attached as **Exhibit "P."**

131.    USCIS cited the following deficiencies: (1) inconsistencies in the documents from Palm House Hotel, LLLP; (2) insufficient number of full-time positions created by the Project; (3) dispute over ownership of the Project's property; and (4) insufficient evidence of bridge financing.

132.    The deficiencies cited by USCIS were based on actions taken and documents provided by Palm House Hotel, LLLP, and over which Plaintiffs had no control.

133.    Plaintiffs demanded the return of their funds, but they were never returned.  PNC aided and abetted and allowed the Bad Actors to take the Chinese Victims', the Iranian Victims' and the Turkish Victim's money, and failed to do anything at all to stop it.  RAMIREZ and PNC knew or should have known of the fraud and were a proximate cause of Plaintiffs' losses.

134.    Plaintiffs' demands, however, fell on deaf ears.  Because of RAMIREZ and PNC's actions and inactions, no funds were returned to Plaintiffs because they were already long gone.  Moreover, RAMIREZ and PNC did nothing to stop the fraud, and continued to host the Fake Escrow Account and the Clearing Account, allowing the fraud to continue until, on information and belief, May 2017.   During this period, PNC reviewed nearly 100 alerts triggered by irregularities in the accounts held by Walsh, SARC, USREDA, and related Bad Actors.  Sadly, RAMIREZ and PNC could have closed the Fake Escrow Account and the Clearing Account with the mere click of a button, sparing the EB-5 Investors from losing both their investment monies and any hopes of obtaining their permanent green cards.  Instead, all they did was watch the money and dreams disappear and collect PNC's interest, fees and costs.

**The Fraud and Theft are Discovered**

135.    Upon investigation, Plaintiffs discovered that a seemingly endless laundry list of fraudulent representations were perpetrated upon them in furtherance of obtaining and stealing their money.

136.    Palm House was not a legitimate EB-5 project, but rather a façade and vehicle pursuant to which a group of conspirators stole over $50 million from over 90 foreign nationals seeking EB-5 visas and a better life for their families in the United States.

137.    Plaintiffs have discovered that their funds were not held in a proper and legitimate escrow account.  Plaintiffs now know that the Workaround was implemented and their investment monies were instead held in the Fake Escrow Account, and that RAMIREZ and PNC changed the name of the Analysis Business Checking Account, labeled it an "escrow account," and attached its Escrow Services Modules to it, such that it looked like an escrow account to the unwitting outside world, but it was not created as and has never been a legitimate escrow account.  What Plaintiffs don't know is why RAMIREZ and PNC would help the Bad Actors take all of their money. Plaintiffs never would have wired their money into the Fake Escrow Account had they known it was not real.

138.    Instead, contrary to all written and oral representations, Plaintiffs' EB-5 investment funds, with the knowledge, consent and assistance of RAMIREZ and PNC, were transferred from the Fake Escrow Account to the Clearing Account and to other accounts and pillaged for the personal pleasure of the Bad Actors, the Evans Bad Actors and the conspirators.

139.    Virtually none of Plaintiffs' funds were used at the Project, and no jobs were created.

140.    Plaintiffs have learned that, with the knowledge, consent and assistance of RAMIREZ and PNC, their funds were wrongfully moved from the Fake Escrow Account to the Clearing account, and to other accounts, and then disbursed and distributed among the conspirators and used to, among other things:

    (a)    purchase multiple homes, investment property, a 151-foot yacht that cost almost $6,000,000, a luxury car, vacations, and other accoutrements of a life of luxury;

    (b)    pay personal debts, including more than $266,000 in personal back taxes; and

    (c)    grease all the wheels that furthered the fraudulent scheme, including a licensed attorney that helped fraudulently induce the victims' investments.

141.    Each of the representations described hereinabove were knowingly false or misleading.

142.    Most of the representations within the Offering Documents were knowingly false or misleading.

143.    The representations that there was a 100% guaranty for the return of Plaintiffs' EB-5 investments and fees in the event their I-526's were denied were knowingly false.

144.    The Fraudulent Escrow Representation was knowingly false.

145.    The representations that Plaintiffs' funds **would be held in the escrow** unless and until USCIS approved their I-526's were knowingly false, but Plaintiffs fell for it, in part, because RAMIREZ and PNC created the Fake Escrow account, which tricked them into thinking their money would be safe.

146.    The representations that Plaintiffs would receive their money back upon an official denial of their I-526's by USCIS were knowingly false.

147.    The representations that Plaintiffs' funds **would be held in escrow**, and were not yet needed, because construction was being funded by the developer's investment and the bank loan, were knowingly false.  With RAMIREZ and PNC's knowledge, consent and assistance, after the implementation of the Workaround, the funds were removed from the Fake Escrow Account.

148.    In sum, the Palm House Hotel was a systemic fraud, based on myriad, intentional, material misrepresentations intended to dupe unsuspecting foreign investors looking for better lives for themselves and their families in the United States.  The Bad Actors and the Evans Bad Actors, emboldened and empowered by the Workaround, literally stole the American Dream from the Chinese Victims, the Iranian Victims and the Turkish Victim.

149.   The Palm House Hotel was a necessary façade, used to enable the fraudulent scheme that bilked foreign investors with the promise of EB-5 visas and security for their investments.

**PNC's Substantial Role in Causing Plaintiffs' Losses**

150.   Plaintiffs have determined, by investigating the money trail, that SARC, USREDA, Walsh, Walsh Jr., Payne, JJW Consultancy Ltd., and their agents were parties to a fraudulent scheme to steal Plaintiffs' funds with several persons involved with the Project, including Robert Matthews, Maria a/k/a Mia Matthews, Gerry Matthews, Nicholas Laudano and entities that they own and/or control.

151.   PNC and RAMIREZ aided and abetted in the fraud (and other tortious acts) by, among other things: (a) suggesting, engineering and implementing the Workaround; (b) creating the Analysis Business Checking Account; (c) changing the name on the Fake Escrow Account, (on information and belief, in violation of its own internal policies for creating escrow accounts) (d) creating the Clearing Account; (e) allowing the Bad Actors to systematically misappropriate the money from the Fake Escrow Account into the Clearing Account and other accounts; (f) failing to inform Plaintiffs that the Fake Escrow Account was not really a legitimate escrow account; (g) failing to inform Plaintiffs that the Bad Actors were looting the Fake Escrow Account (h) failing to inform Plaintiffs that their money was being transferred from the Fake Escrow Account to the Clearing Account and to other accounts; and (i) failing and refusing to close the Fake Escrow Account and the Clearing Account until, on information and belief, May 2017.  PNC and RAMIREZ did all of this despite their intimate knowledge of the EB-5 program and the circumstances of the fraud.  As a result, PNC and RAMIREZ were a proximate cause of Plaintiffs' losses and are jointly and severally liable for them.  RAMIREZ and PNC's acts and omissions directly negatively impacted Plaintiffs, causing them substantial damages.  PNC also breached its duty of care to the Plaintiffs, proximately causing damage to Plaintiffs.

152.     Clearly, the misrepresentations regarding the escrow account and the creation and use of the Fake Escrow Account, aided and abetted by RAMIREZ and PNC's use of the Workaround, were critical aspects of the fraud, and were used to fraudulently induce Plaintiffs into investing in the Project.  So much so that these underlying acts form the basis for a variety of securities fraud claims brought by the United States Securities and Exchange Commission (the "SEC") against Walsh, SARC, Matthews and Palm House Hotel, LLLP, in which PNC is mentioned by name.

153.     On information and belief, PNC told anyone who called and asked if the Fake Escrow Account was an escrow account that it was.  In other words, even when asked directly by investors, PNC failed to disclose the Fake Escrow Account was fake.

154.     Plaintiffs wired their money into what they believed was a real escrow account, relying on the representations that it was a legitimate EB-5 escrow account and that their money would be safe until such time as their I-526 visa applications were approved.  The Fake Escrow Account was none of those things.

155.     The Bad Actors conspired to and moved Plaintiffs' money from the Fake Escrow Account to either the Clearing Account or to other accounts owned and/or controlled by the Bad Actors.  These transfers violated the rules and regulations of the EB-5 program and were illegal because they did not utilize Plaintiffs' EB-5 investment monies to create jobs, the only legal use for EB-5 investments.  RAMIREZ and PNC were fully informed by Walsh, SARC and USREDA, through Reitz, that the monies to be deposited into any account opened by them at PNC would be part of the EB-5 program.  PNC is intimately familiar with the EB-5 program, finances EB-5 projects, knows what the EB-5 program is, what EB-5 money may be used for and why creating, engineering and implementing the Workaround was illegal.  Indeed, RAMIREZ and PNC were specifically told that the reason Walsh, SARC and USREDA wanted to work with them was to circumvent SunTrust's "obstacles and red tape."

156.    RAMIREZ and PNC, by virtue of their various acts and omissions, eliminated those "obstacles and red tape" and damaged Plaintiffs to the tune of tens of millions of dollars.  As such, RAMIREZ and PNC are also jointly and severally liable to Plaintiffs for the damages they incurred as a result of these various illegal transfers.

157.    Once Plaintiffs' funds were moved to the Clearing Account, SARC, USREDA, Walsh, Walsh Jr., Payne, JJW Consultancy Ltd., and their agents transferred the funds to other accounts and used them for non-allowable purposes, siphoning off tens of millions of dollars for personal expenses and investments.  RAMIREZ and PNC, by virtue of their various acts and omissions, are also jointly and severally liable to Plaintiffs for the damages they incurred as a result of these various illegal transfers.

158.    Once Plaintiffs' funds were moved to the Clearing Account, SARC, USREDA, Walsh, Walsh Jr., Payne, JJW Consultancy Ltd., and their agents used the funds to pay off participants in the fraudulent scheme.  PNC and RAMIREZ, by virtue of their various acts and omissions, are also liable to Plaintiffs for the damages they incurred as a result of these various illegal transfers.

159.    From the Clearing Account, the Bad Actors conspired to and illegally moved Plaintiffs' money to accounts belonging to, among others:

(a)     Leslie Robert Evans;

(b)     KK-PB Financial LLC;

(c)     Galle Law Group;

(d)     New Haven Contracting South, Inc.;

(e)     USREDA;

(f)     160 Royal Palm LLC; and

(g)     Palm House, LLC.

160.    Once Plaintiffs' funds were moved to the Palm House, LLC account, Gerry Matthews, Robert Matthews, Maria a/k/a Mia Matthews, and Nicholas Laudano, among others,

transferred the funds to other accounts and used them for non-allowable purposes, siphoning off millions of dollars for personal expenses and investments.

161.   Once Plaintiffs' funds were moved to the Leslie Robert Evans Escrow Account, upon information and belief, Gerry Matthews, Robert Matthews, Maria a/k/a Mia Matthews and Nicholas Laudano used the funds to pay off other participants in the fraudulent scheme.

162.   As purported owners and/or managers and/or agents of Palm House LLC, Gerry Matthews, Robert Matthews, and Maria a/k/a Mia Matthews, knew that none of Plaintiffs' funds could be used unless and until Plaintiffs' I-526's had been approved by USCIS and then only for the lawful purpose of creating 10 jobs per EB-5 investor.

163.   While none of Plaintiffs' I-526's were approved, Palm House LLC, Gerry Matthews, Robert Matthews and Maria a/k/a Mia Matthews, among others, took Plaintiffs' money anyway, further demonstrating their fraudulent intent.  They were able to do this only because RAMIREZ and PNC allowed them to.

164.   Further, SARC, USREDA and Walsh owed Plaintiffs duties of care and loyalty, duties to exercise reasonable skill and ordinary diligence and a fiduciary duty to protect their funds, and not allow their release, unless and until Plaintiffs' I-526's were approved by USCIS and then only for the lawful purpose of creating 10 jobs per EB-5 investor.  SARC, USREDA and Walsh expressly promised to protect the EB-5 investors' funds in a fiduciary capacity.  SARC, USREDA and Walsh also expressly promised to return the EB-5 investors' funds if their I-526 applications were denied.  Plaintiffs each understood that their investment would be held safely by Walsh, SARC and/or USREDA pursuant to the agreed terms and only to be invested under specific terms and for a particular purpose  RAMIREZ and PNC specifically knew that SARC, USREDA and Walsh owed Plaintiffs a fiduciary duty to protect their funds by virtue of Reitz' initial meeting with RAMIREZ and Osaba, wherein Reitz disclosed the following, among other things, to PNC:

(a)  Walsh, SARC and USREDA were working on EB-5 projects and were bringing in investors from China (at that time no Iranian or Turkish investors had been signed up yet);

(b)  there would be investors from other countries in the future;

(c)  each Chinese EB-5 investor was investing $500,000 plus an administrative fee of between $40,000 and $60,000;

(d)  there would be tens of millions of dollars running through any new accounts opened at PNC;

(e)  the EB-5 investment monies were subject to escrow agreements;

(f)  the relationship between Walsh, SARC and USREDA, because Walsh was in charge of the EB-5 projects and was making the decisions with respect to the EB-5 Investors' money;

(g)  Walsh and SARC already had an existing escrow account at SunTrust Bank;

(h)  Walsh was frustrated by what he felt were "obstacles and red tape" he was facing at SunTrust; and

(i)  Walsh, SARC and USREDA wanted a PNC escrow account that removed and/or eliminated the "obstacles and red tape" they were facing at Sun Trust.

165.  PNC received significant fees and costs for operating the Fake Escrow Account and the Clearing Account and was able to invest the tens of millions of dollars held in them for substantial profits.

166.  RAMIREZ earned substantial income from PNC, some of which was a direct result of the opening of the Fake Escrow Account and the Clearing Account. RAMIREZ was supremely motivated to earn Walsh, SARC and USREDA's business for this very reason which led him and PNC to create the Workaround.

167.  Other persons received improper transfers or were unjustly enriched as a result of the misappropriation of Plaintiffs' funds.  These include Leslie Robert Evans and his law firm, Leslie Robert Evans & Associates, P.A., who paid themselves compensation from Plaintiffs' funds while they assisted the Bad Actors in their misappropriation and dissipation of the funds.

**PNC's Acts and Omissions Violated Banking Laws and Regulations**

168.    PNC violated the Bank Secrecy Act, 31 USC §5311, and the USA PATRIOT Act, 31 USC §5318, by aiding and abetting the fraud and by knowingly allowing itself to be used as an instrument of that fraud by

a)  suggesting, engineering and implementing the Workaround;

b)  opening the Fake Escrow Account without the proper restrictions after knowing the purpose of the account;

c)  improperly naming the Fake Escrow Account as an escrow account when it was not;

d)  on information and belief, ignoring alerts that were generated by the bank's automated account monitoring system to identify suspicious activity;

e)  ignoring the indicia of fraud when wire transfers were deposited into the Fake Escrow Account with different names on the wiring instructions than that of the Fake Escrow Account;

f)  failing to identify the suspicious activity taking place in the Fake Escrow Account and Clearing Account; and

g)  failing to halt the fraud and close the Fake Escrow and Clearing Account until on information and belief, May 2017.

**Where Things Stand Now**

169.    Subsequent to the misappropriation and distribution of Plaintiffs' funds, the Bad Actors brought lawsuits against each other, asserting weak and/or neutered claims, with the goal of creating yet another façade -- that they were actually attempting to pursue the claims, recoup the stolen money, and make Plaintiffs whole.

170.    Meanwhile, the Palm House Hotel is a wasting property and, in the words of the Court-appointed receiver, "circling the drain."  The Project is scheduled to be sold on March 8, 2019.

171.    On November 6, 2017, Robert Matthews filed bankruptcy in the United States Bankruptcy Court, Southern District of Florida, Case No. 17-23426-MAM.

172.    No Plaintiff has received an EB-5 visa, or an I-526 petition approval, and is unable to do so in the future.

173.    SARC, Walsh and Walsh, Jr. continue in their fraudulent conduct, seeking additional victims for their EB-5 schemes.  Walsh fled the United States and is hiding in Australia and Hong Kong, spending rotating 90-day periods in each location.

174.    Plaintiffs ask the Court for all necessary and appropriate relief, in law and equity, so that they may attempt to recover their stolen funds and begin rebuilding their lives.

 **The Plea Agreements and Indictments**

175.    On March 14, 2018 in the case *United States v. Robert v. Matthews and Leslie R. Evans*, Criminal Case No. 3:18-CR-48-SRU, United States District Court, District of Connecticut, Robert Matthews was indicted on 20 counts of Wire Fraud, Bank Fraud, Conspiracy to Commit Wire Fraud and Bank Fraud, Illegal Monetary Transactions Using Wire Fraud Proceeds and Illegal Monetary Transactions Using Bank Fraud Proceeds in connection with his fraudulent conduct.

176.    On March 14, 2018 in the case *United States v. Robert v. Matthews and Leslie R. Evans*, Criminal Case No. 3:18-CR-48-SRU, United States District Court, District of Connecticut, Leslie Robert Evans was indicted on 11 counts of Wire Fraud, Bank Fraud, Conspiracy to Commit Wire Fraud and Bank Fraud, and Illegal Monetary Transactions Using Wire Fraud Proceeds. A copy of the indictment with respect to Robert Matthews and Leslie Robert Evans is attached as **Exhibit "R".**

177.    On August 29, 2018 in the case *United States v. Robert v. Matthews and Leslie R. Evans*, Criminal Case No. 3:18-CR-48-SRU, United States District Court, District of Connecticut, a Superseding Indictment was issued which added a count of Tax Evasion against Robert

Matthews and Maria a/k/a Mia Matthews.  A copy of the Superseding Indictment is attached as **Exhibit "S"**.

178.    On April 25, 2019, Robert Matthews pled guilty to three counts, including violations of 18 U.S.C. § 1349 (conspiracy), 18 U.S.C. § 1957 (illegal monetary transactions), and 26 U.S.C. § 7201 (tax evasion).  He is facing up to 30 years in prison or more, and he is awaiting sentencing.

179.    On March 13, 2018 in the case *United States of America v. Nicholas Laudano*, Criminal Case No. 3:18-CR-47-VAB, United States District Court, District of Connecticut, Nicholas Laudano pled guilty to 1 count of Conspiracy to Commit Bank Fraud and 1 count of Illegal Monetary Transaction and is facing up to 30 years in prison in connection with his fraudulent conduct. A copy of the information and plea agreement are attached as composite **Exhibit "T".**

180.    On March 13, 2018 in the case *United States of America v. Gerry Matthews*, Criminal Case No. 3:18-CR-43-VAB, United States District Court, District of Connecticut, Gerry Matthews pled guilty to 1 count of Conspiracy to Commit Wire Fraud and is facing up to 20 years in prison in connection with his fraudulent conduct. A copy of the information and plea agreement are attached as composite **Exhibit "U".**  Gerry Matthews is awaiting sentencing.

181.    On August 3, 2018, in the case of *Securities and Exchange Commission v. Palm House Hotel, LLLP et al,* Case No. 9:18-cv-81038-XXXX, United States District Court, Southern District of Florida, the SEC sued Palm House Hotel, LLLP, SARC, Walsh, and Matthews alleging claims for: (1) Violations of Section 17(a)(1) of the Securities Act, Violations of Section 17(a)(2) of the Securities Act; (3) Violations of Section 17(a)(3) of the Securities Act; (4) Violations of Section 10(b) and Rule 10b-5(a) of the Exchange Act; (5) Violations of Section 10(b) and Rule 10b-5(b) of the Exchange Act; (6) Violations of Section 10(b) and Rule 10b-5(c) of the Exchange Act; (7)  Aiding and Abetting Violations of Section 17(a)(2) of the Securities Act; and (8) Aiding

41

and Abetting Violations of Section 10(b) and Rule 10b-5(b) of the Exchange Act (the "SEC Complaint"). A copy of the SEC Complaint is attached hereto as **Exhibit "V".**

182.    With respect to PNC, the SEC Complaint stated:

**Misrepresentations Regarding Escrow Requirements and the Return of Investor Funds**

30. Between November 2012 and at least June 2014, PHH's offering materials contained material misrepresentations regarding PHH's use of an escrow account for investor funds. PHH falsely and fraudulently claimed that investor funds would be held in an escrow account at PNC Bank, pursuant to an escrow agreement between PHH, SARC, and PNC Bank, through at least the filing of the investor's I-526 petition. Contrary to these representations, no escrow account even existed for investor funds. Prior to the PHH offering, the former CFO for SARC and USREDA informed Walsh that the account receiving investor funds would not even be administered by PNC Bank.

183.    All of the money utilized by Robert Matthews, Leslie Robert Evans, Nicholas Laudano and Gerry Matthews in connection with the transactions that culminated in the criminal prosecutions set forth above was accessed as a result of the Workaround. PNC and RAMIREZ gave these alleged criminals and now convicted felons the proverbial "keys to the vault" which they then emptied to the profound detriment of the EB-5 Investors.

**PNC's Knowledge of Misappropriation of Plaintiffs' Funds by the Bad Actors.**

184.    PNC was aware of significant problematic activity in the Fake Escrow Account and other accounts held by USREDA, SARC, and the Bad Actors at PNC Bank. During the period of July 2011 to March 2017, the PNC account monitoring system generated approximately ninety (90) "transaction monitoring alerts" on this cluster of accounts, along with an equal volume of documents generated internally by PNC and supporting or regarding those alerts.

185.    There were at least 49 alerts generated on accounts held by SARC.

186.    There were at least 14 alerts generated on accounts held by USREDA.

187.    There were at least 25 alerts generated on accounts held by JE Penses, an account owned and controlled by Walsh, Sr.

188.    Under the Bank Secrecy Act, PNC has withheld information about the nature of these alerts and subsequent actions taken or not taken by PNC.  However, the alerts individually and in the aggregate indicate that PNC was aware of the misappropriation of Plaintiffs' investment funds from the Fake Escrow Account and other accounts held by Walsh, USREDA and the Bad Actors.

## COUNT I - Aiding and Abetting Fraud

189.    Plaintiffs adopt and re-allege the allegations set forth in paragraphs 1 through 188 as if fully stated fully herein.

190.    As specifically described above, SARC, USREDA, Walsh, Walsh Jr., Payne, JJW Consultancy Ltd., Nur, and their agents committed a massive and far-reaching fraud against Plaintiffs.

191.    As a result of all of the information that was provided by Walsh, SARC and USREDA, via Reitz, regarding both the SunTrust escrow account and the intended use of the accounts they wished to open at PNC, combined with PNC's knowledge of the EB-5 program, PNC had specific knowledge or should have known that a fraud was being and had been committed upon Plaintiffs.

192.    PNC and RAMIREZ provided substantial assistance to advance the commission of the fraud against Plaintiffs by conceiving of, suggesting and implementing the Workaround, thus giving the Bad Actors unfettered access to Plaintiffs' EB-5 investment monies, which they promptly stole.

193.    Substantial assistance occurs when a defendant affirmatively assists, helps conceal or fails to act when required to do something, thereby enabling a fraud to occur.  PNC and RAMIREZ did this here by conceiving of, suggesting and implementing the Workaround. PNC and RAMIREZ assisted the Bad Actors to legitimize their misrepresentations regarding the safety of an escrow account by creating the Fake Escrow Account for them.

194.     PNC and RAMIREZ provided substantial assistance through its actions and inaction.  Because PNC offered, created and implemented the Workaround, it knew the Bad Actors were holding Plaintiffs EB-5 investment funds in the Fake Escrow Account and about their ongoing fraud.  Under these particular circumstances, PNC's failure to warn Plaintiffs or stop the Bad Actors' fraud is substantial assistance.

195.     PNC and RAMIREZ therefore knowingly aided and abetted the commission of the fraud against Plaintiffs.

196.     Plaintiffs were severely damaged by PNC's actions and omissions.

WHEREFORE, Plaintiffs demand judgment against PNC and RAMIREZ, jointly and severally, for damages, costs, interest, prejudgment interest and such other relief as the Court deems proper.

## COUNT II – Aiding and Abetting Fraudulent Inducement

197.     Plaintiffs adopt and re-allege the allegations set forth in paragraphs 1 through 188 as if fully stated fully herein.

198.     As specifically described above, SARC, USREDA, Walsh, Walsh Jr., Payne, JJW Consultancy Ltd. Nur and their agents made knowingly false statements concerning material facts in the Offering Document.

199.     As specifically described above, SARC, USREDA, Walsh, Walsh, Jr., Payne JJW Consultancy Ltd, Nur and their agents, when marketing the project to the Plaintiffs (either directly or by and through their immigration agents), made knowingly false statements of material facts.

200.     Additionally, as specifically described above, Robert Matthews made knowingly false oral statements concerning materials facts when he sold the project to the Chinese Victims and the Turkish Victim in Palm Beach.

201.     SARC, USREDA, Walsh, Matthews, Walsh, Jr., Payne JJW Consultancy Ltd, Nur and their agents knew that their representations were false and intended the Plaintiffs to rely upon the representations and be induced by them to invest their money into Palm House Hotel, LLLP.

202.     Walsh made knowingly false oral statements concerning material facts when they sold the Palm House Hotel project to the Iranian Victims.

203.     Nur also failed to disclose to his client, the Turkish Victim, that he received a secret, undisclosed kickback for delivering the Turkish Victim into the Palm House Hotel project.

204.     The notion of an escrow account was intended to enable the fraud and theft by giving the Chinese Victims, the Iranian Victims and the Turkish Victim the assurance that their money was safe, and that it would only be used if and when their I-526 were approved.

205.     Instead, using the Workaround and the Fake Escrow Account, Plaintiffs' EB-5 Investment monies were stolen, no EB-5 jobs were created, let alone the 10 jobs per investor necessary to get their permanent visas.  Moreover, after their I-526's were properly denied, Plaintiffs got not one cent of their money back.

206.     Plaintiffs relied upon these representations and have been damaged.

207.     PNC and RAMIREZ, as a result of all the information that was provided by Walsh, SARC and USREDA, via Reitz, regarding both the SunTrust escrow account and the intended use of the account they wished to open at PNC, combined with PNC's knowledge of the EB-5 program, had specific knowledge or should have known that Plaintiffs had been fraudulently induced into investing in the Project.

208.     PNC and RAMIREZ provided substantial assistance to advance the commission of the fraud in the inducement or encouraged it or enabled it against Plaintiffs by conceiving of, suggesting and implementing the Workaround, thus giving the Bad Actors unfettered access to Plaintiffs' EB-5 investment monies, which they promptly stole.

209.    Substantial assistance occurs when a defendant affirmatively assists, helps conceal or fails to act when required to do something, thereby enabling a fraud in the inducement to occur. PNC and RAMIREZ did this here by conceiving of, suggesting and implementing the Workaround. PNC assisted the Bad Actors to legitimize their misrepresentations regarding the safety of an escrow account by creating the Fake Escrow Account for them.

210.    PNC and RAMIREZ provided substantial assistance through its actions and inaction. Because PNC and RAMIREZ offered, created and implemented the Workaround, they knew that the Bad Actors were holding Plaintiffs EB-5 investment funds in the Fake Escrow Account and about their ongoing fraud in the inducement. Under these particular circumstances, RAMIREZ and PNC's failure to warn Plaintiffs or stop the Bad Actors' fraud is substantial assistance.

211.    PNC and RAMIREZ therefore knowingly aided and abetted the commission of the fraud in the inducement against Plaintiffs.

212.    Plaintiffs were severely damaged by RAMIREZ and PNC's actions and omissions.

WHEREFORE, Plaintiffs demand judgment against RAMIREZ and PNC, jointly and severally, for damages, costs, interest, prejudgment interest, and such other relief as the Court deems just and proper.

## COUNT III – Aiding and Abetting Breach of Fiduciary Duty

213.    Plaintiffs adopt and re-allege the allegations set forth in paragraphs 1 through 188 as if fully stated fully herein.

214.    Walsh, SARC and USREDA owed Plaintiffs fiduciary duties. RAMIREZ and PNC knew Walsh, SARC and USREDA owed fiduciary duties to Plaintiffs. This is because of the very detailed and specific knowledge provided by Walsh, SARC and USREDA, through Reitz, regarding the SunTrust escrow account and the intended use of the accounts they wished to open at PNC, combined with PNC's knowledge of the EB-5 program. PNC had specific knowledge or

46

should have known that a breach of fiduciary duty was being and had been committed upon Plaintiffs.

215.    Walsh, SARC and USREDA breached their fiduciary duties to Plaintiffs.

216.    PNC and RAMIREZ had knowledge that Walsh, SARC and USREDA breached their fiduciary duties to Plaintiffs, including the duty to hold Plaintiffs' funds in the Fake Escrow Account.

217.    PNC and RAMIREZ knowingly aided and abetted the commission of the breach of fiduciary duties against Plaintiffs by conceiving of, suggesting and implementing the Workaround, thus giving the Bad Actors limitless access to Plaintiffs' EB-5 investment monies, which they promptly stole.

218.    PNC and RAMIREZ substantially assisted or encouraged SARC, Walsh, and USREDA to breach their fiduciary duties by conceiving of, suggesting and implementing the Workaround, thus giving the Bad Actors unfettered access to Plaintiffs' EB-5 investment monies, which they promptly stole.

219.    Plaintiffs were severely damaged by the actions of PNC and RAMIREZ.

WHEREFORE, Plaintiffs demand judgment against RAMIREZ and PNC, jointly and severally, for damages, costs, interest, prejudgment interest, and such other relief as the Court deems just and proper.

## COUNT IV – Unjust Enrichment

220.    Plaintiffs adopt and re-allege the allegations set forth in paragraphs 1 through 188 as if fully stated fully herein.

221.    As a result of the unlawful actions of the Bad Actors, RAMIREZ and PNC, Plaintiffs have directly or indirectly (by the Bad Actors use of their EB-5 investment monies) conferred a benefit on PNC in the form of (a) monthly account fees paid to PNC with respect to the Fake Escrow Account and the Clearing Account; (b) wiring fees paid to PNC in connection

with the Fake Escrow Account and the Clearing Account; and (c) interest earned on the tens of millions of dollars in EB-5 investment monies held in the Fake Escrow Account and the Clearing Account.

222.    PNC was aware of the benefits conferred on it by Plaintiffs and have been unjustly enriched by the benefits.

223.    PNC voluntarily accepted and retained the benefits conferred on it by Plaintiffs.

224.    The circumstances are such that it would be inequitable for PNC to retain the benefits obtained by it as a result of the actions of the Bad Actors, RAMIREZ and PNC itself.

WHEREFORE, Plaintiffs demand judgment against PNC, for damages, costs, interest, prejudgment interest, and such other relief as the Court deems just and proper.

### COUNT V – Equitable Accounting

225.    Plaintiffs adopt and re-allege the allegations set forth in paragraphs 1 through 188 as if fully stated fully herein.

226.    A fiduciary relationship existed between Plaintiffs and Walsh, SARC and USREDA.

227.    PNC and RAMIREZ asked about and were fully informed of the fiduciary relationship that existed and exists between Plaintiffs and Walsh, SARC and USREDA. See paragraphs 16, 20, 155 and 164 above. Walsh, SARC and USREDA breached their fiduciary duties to Plaintiffs.

228.    PNC and RAMIREZ had specific or should have known that the Bad Actors breached their fiduciary duties to Plaintiffs, including the duty to hold Plaintiffs' funds in escrow.

229.    PNC and RAMIREZ knowingly aided and abetted the Bad Actors' commission of the breach of fiduciary duties against Plaintiffs by conceiving, offering and implementing the Workaround.

230.    RAMIREZ and PNC substantially assisted and enabled SARC, Walsh, and USREDA to breach their fiduciary duties.

231.    Further, the fraud and breach of fiduciary duties perpetrated upon Plaintiffs was an extremely extensive, complex transaction, whereby Plaintiffs' funds were transferred between and among many accounts, laundered through numerous entities, and ultimately used for personal, inappropriate and unlawful purposes.

232.    Plaintiffs' funds, which were transferred from the Fake Escrow Account and Clearing Account without any authorization from Plaintiffs, and the subsequent unauthorized transfers and transactions involving these funds, are so involved and complicated that a remedy at law is insufficient to administer complete justice.

233.    Plaintiffs are entitled to receive information regarding transactions involving any of the funds traceable to them.

234.    Plaintiffs have requested information on the transfers of their funds, transactions involving their funds, and the present location of their funds, which has not been provided.

WHEREFORE, Plaintiffs respectfully request that this Court order PNC to provide a full and complete accounting of its finances, operations, and transactions involving any funds traceable to Plaintiffs, including but not limited to the Fake Escrow Account and the Clearing Account, provide Plaintiffs with the location and amount of all accounts containing any funds traceable to Plaintiffs, impose a constructive trust over all amounts and profits to which Plaintiffs are determined to be entitled to, and to grant such other and further relief as the Court deems just and proper.

## COUNT VI – Aiding and Abetting Conversion

235.    Plaintiffs adopt and re-allege the allegations set forth in paragraphs 1 through 188 as if fully stated fully herein.

236.     The Bad Actors and the Evans Bad Actors' improper taking and retention of property and payments which belong to Plaintiffs give rise to a claim for conversion.  The Bad Actors and the Evans Bad Actors have, without authorization, asserted dominion and control over the funds which are the specifically identifiable property of Plaintiffs and are or were the property of Plaintiffs and which were owned or payable to Plaintiffs.  The Bad Actors and Evans Bad Actors' conversion is inconsistent with Plaintiffs' rights and ownership to said property.

237.     The payments and property wrongfully converted by the Bad Actors and the Evans Bad Actors are specific and identifiable.

238.     By virtue of the Bad Actors and Evans Bad Actors' repeated and continued misappropriation and conversion of Plaintiffs' property, they have caused Plaintiffs substantial economic harm.

239.     Many of Plaintiffs have made a demand for the return of their property, but the funds have not been returned.  Moreover, a demand for the return of Plaintiffs' funds would be futile.  The Bad Actors and the Evans Bad Actors have been confronted with the fact that they converted Plaintiffs' property but have failed to return all of the property to Plaintiffs.

240.     PNC and RAMIREZ had specific knowledge or should have known that Plaintiffs' property from the Fake Escrow Account was converted, as the Fake Escrow Account was created for that very purpose (i.e., to avoid SunTrust's "obstacles and red tape").

241.     PNC and RAMIREZ therefore knowingly aided and abetted the conversion of Plaintiffs' EB-5 investment monies by the conception, creation and implementation of the Workaround.

242.     PNC and RAMIREZ substantially assisted or enabled the conversion of Plaintiffs' EB-5 investment monies from the Fake Escrow Account.

243.     Plaintiffs were severely damaged by the actions of RAMIREZ and PNC.

WHEREFORE, Plaintiffs demand judgment against PNC and RAMIREZ, jointly and severally for damages, costs, interest, prejudgment interest, and such other relief as the Court deems just and proper.

## COUNT VII – Negligence

244.     The Plaintiffs reallege and incorporate by reference the allegations set forth above in paragraphs 1 through 188 as if fully set forth herein.

245.     The Plaintiffs had a fiduciary relationship with Walsh, SARC, and USREDA. Under the EB-5 program, Walsh, SARC, and USREDA held the Plaintiffs' investment funds pursuant to a fiduciary relationship.   Under that fiduciary relationship, Walsh, SARC, and USREDA were required to use Plaintiffs' funds in limited and specific ways, to satisfy the purpose of Plaintiffs' investments and the EB-5 program.

246.     PNC and Ramirez were aware of this fiduciary relationship.  PNC and Ramirez were familiar with the EB-5 program in general and also with regards to the Palm House Hotel project in particular.

247.     Each of the Plaintiffs' investment monies in connection with the Project were deposited at PNC (the "Escrow Funds").

248.     The Plaintiffs' investment monies were deposited into the Fake Escrow Account.

249.     The Plaintiffs' investment monies were transferred from the Fake Escrow Account into the Clearing Account.

250.     PNC knew that a fiduciary relationship existed between the Bad Actors and the Plaintiffs.

251.     Ramirez knew that a fiduciary relationship existed between the Bad Actors and the Plaintiffs.

252.     PNC knew that the Escrow Funds were misappropriated immediately and over time from the accounts held by Walsh, SARC, and USREDA.  PNC knew that Escrow Funds were

transferred out of the Royal Palm Town Center Escrow Account into the Clearing Account.  PNC further knew that the Escrow Funds were misappropriated from the Clearing Account for personal use and other unauthorized use by the Bad Actors, in violation of the fiduciary duty owed by the Bad Actors to the Plaintiffs.

253.    PNC knew the purpose of the Fake Escrow Account – which was ostensibly to hold Plaintiffs' investment funds pursuant to the EB-5 program, to be released for specific uses and to be returned in the investors' I-526 petitions were denied – and knew that the funds were misappropriated by Walsh and/or other Bad Actors.

254.    PNC reviewed more than 90 alerts generated on the accounts held by SARC, USREDA, Walsh, and other Bad Actors, and PNC generated internal documents related to each of those alerts as well in which PNC investigated the nature of the entities at issue and the nature of the transactions.  The information contained within these alerts and the supporting documents created by PNC were sufficient to notify PNC that funds were misappropriated from the Fake Escrow Account in violation of the Bad Actors' fiduciary duties to Plaintiffs.

255.    PNC therefore breached its duty of care to Plaintiffs.

WHEREFORE, Plaintiffs demand judgment against PNC and RAMIREZ, jointly and severally for damages, costs, interest, prejudgment interest, and such other relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury on all issues so triable.


Dated this 2nd day of July, 2020.



Respectfully submitted,

By: /s/Katherine Burghardt Kramer

Katherine Burghardt Kramer, Esq.
(Pro Hac Vice)
RongPing Wu (pro hac vice)
Joshua Levin-Epstein (pro hac vice)
DAI & ASSOCIATES, P.C.
1500 Broadway; 22nd Floor
New York, NY 10036
Tel. No.: (212) 730-8880
Email: kkramer@daiassociates.com
*Attorneys for 40 Represented Plaintiffs*


Matthew Fornaro
Matthew Fornaro, P.A.
11555 Heron Bay Blvd; Ste. 200
Coral Springs, FL 33076
Tel: (954) 324-3651
*Co-counsel for Represented Plaintiffs*



EXHIBIT "A"

Case 9:16-cv-81871-KAM Document 657-1 Entered on FLSD Docket 07/06/2020 Page 56 of
150
Case 9:16-cv-81871-KAM Document 1-57 Entered on FLSD Docket 03/10/2019 Page 2 of 3



# PNC Assists Ironstate Development in Rebuilding the Waterfront

Innovative Staten Island Property Offers a Mix of Market-Rate and Affordable Units

**Although Staten Island is growing faster than any other New York City borough, Navy Pier Court is the first new large-scale residential project to be built on the island in nearly 40 years.**

Located on New York Bay on a 7.5 acre site of a former decommissioned U.S. naval base, it offers spectacular waterfront views of Manhattan, the Statue of Liberty and the Verrazano Narrows Bridge. Working with award-winning Dutch architecture firm Concrete, the design is a celebration of its surroundings — meeting the needs of the community and its residents. Benefiting from New York's 421-A Tax Abatement Program, Navy Pier Court will reserve 20% of its units for affordable housing.

Consisting of studio, 1 and 2-bedroom apartments, Navy Pier Court will be LEED certified and the first large-scale development to incorporate Ironstate's URL® (Urban Ready Living®) design.  The architectural design is a direct expression of the brand, with a focus on space, ease, innovation and connection.

Built-in furnishings, stainless steel appliances, lighting and other elements are carefully designed into each unit. The building offers common areas where people can work, play, and move — with a courtyard looking out to the waterfront, a café, community garden, fitness center, swimming pool and bike storage. Navy Court Pier will also include 27,000 square feet of retail space, and the city of New York is injecting $33 million in improvements to provide green space, roads and an iconic promenade along the waterfront.

The total project cost is $161 million. The Borrower will contribute $61 million in up-front equity inclusive of a $25 million EB-5 Preferred Equity investment. PNC Bank serves as Administrative Agent and has underwritten a $100 million senior secured credit facility consisting of a $23.7 million Letter of Credit back-stopping the New York HFA's bond issuance that will finance the project's affordable component coupled with a $76.3 million conventional construction loan. PNC Capital Markets LLC is sole lead arranger of the credit facility.

Despite the area's breathtaking views and historic waterfront, it has gone undeveloped since the naval base was decommissioned in 1995, cutting off the community from all waterfront views and access. This will all change with the construction of Navy Pier Court, a part of the Waterfront Redevelopment Plan conceived by former New York City Mayor Bloomberg.  Ironstate is working with the Staten Island Borough President to transform the area into a vibrant, mixed use community that will once again connect residents and visitors to the waterfront. The project will create more than 1,100 construction jobs and 250 permanent jobs — helping to build a sustainable future for the borough.

Ironstate Development is a long term PNC Real Estate client headquartered in Hoboken, New Jersey. It is one of the premier residential developers of large scale mixed-use redevelopments in the New York metropolitan area. The company is also active in the development of hospitality properties. PNC has been the company's primary construction lender having agented nearly 40 credit facilities, in addition to being the company's major provider of treasury management services.



**Date:** November 2014
**Location:** Staten Island
**Financing Amount:** $100 million
**Financing Type:** Construction Loan/Letter of Credit
**Units:** 571

PREVIOUS SPOTLIGHT
**Fort Worth Breaking Down Barriers to Affordable Housing**

NEXT SPOTLIGHT
**Forest City Deal**

**Important Legal Disclosures and Information**

PNC General Disclosure



EXHIBIT

"B"



**South Atlantic Regional Center**

## <u>Palm House F.A.Q.</u>
## 棕榈渡假屋项目的常见问题

**Q1. Where is the Project Located?**
The project is located on the prestigious Palm Beach Island in South Florida at 160 Royal Palm Ave, Palm Beach, Florida, USA.

项目位于哪个地区？
项目是位于南佛罗里达州著名的棕榈滩岛上，皇家棕榈大道第 160 号。

**Q2. How much money will the project seek to raise?**
The Project will use a total of $91,000,000 USD. The Developer has already invested $22,000,000 USD of his own equity. There is also a Bridge Loan funding of $29,500,000 to ensure the continuation of the construction of the project as the EB5 Funding is being raised. A total of $39,500,000 USD will be sought in EB5 Funding. A summary Source of Funds can be found in the table below or in the <u>Investment Portfolio</u> on page 171.

项目需要筹集多少资金？
项目需要用到 91,000,000 美元。开发商已经运用了私人财产投资了 22,000,000 美元。此外，项目还有一个 29,500,000 美元的过桥贷款，以确保在筹集 EB5 资金的同时，项目建设的可以正常进行。项目方希望通过 EB5 筹集到共 39,500,000 美元。有关资金来源的概要，请参阅以下列表或投资组合中的第 171 页。



| Source of Funds | Amount | Percentage |
|---|---|---|
| EB5 Capital | | |
| Developer Equity | $22,000,000 | 24.2% |
| Bank Financing | | |
| TOTAL | $91,000,000 | 100% |

**Q3. When will the Palm House Project be open for business?**
Current projects have the finishing of the Palm House Hotel for "Season" of 2013. Generally "Season" in Palm Beach begins just after the Christmas Holiday. The Building also has received Permanent Certificate of Occupancy for the East and West Wings of the Hotel. This means that the project will proceed with the City of Palm Beach's approval to be open for Season 2013/2014.

NOT A CERTIFIED COPY



## South Atlantic Regional Center

棕榈渡假屋项目么时候会开始营业？
棕榈渡假屋酒店将于 2013 年的"季节"开始营业。一般而言，在棕榈滩所指的
"季节"是指圣诞假期过后。这建筑东翼与西翼的酒店已得到永久使用证书。意
味着项目会在棕榈滩市政府的批准下将于 2013/2014 年季节开始营业。

### Q4. Does the Palm House Project have a TEA Approval?
Yes, please see the attached Palm House TEA Approval Letter or click here.

棕榈渡假屋项目是否有目标就业区的批准？
是，请参阅附件棕榈渡假屋项目的目标就业区批准书或点击这里。



### Q5. Is the Palm House Project Approved by the USCIS?
Yes the Palm House Project is approved by the USCIS through South Atlantic
Regional Center's NAICS Code approvals. The Palm House Project falls under
these listings. *Evidence of this can be discovered at USCIS.gov and searching
SARC. NAICS Codes for the Palm House Project can be found by opening the
attached Econometric Analysis file or beginning at page 414 of the Investment
Portfolio.*

棕榈渡假屋项目是否已通过美国移民局的批准？
是，棕榈渡假屋项目已透过南大西洋区域中心的北美行业分类系统 NAICS 行
业代码而通过美国移民局的批准。棕榈渡假屋项目是属于以下的分类。相关证
据可于 USCIS.gov 网站搜索 SARC 南大西洋区域中心找到。而有关棕榈渡假屋
项目的北美行业分类系统 NAICS 代码详情请参阅附件中的经济分析报告或投
资组合的第 414 页。

| Table B-1. NAICS Codes for Each Type of Activity | |
|---|---|
| 2362 | Nonresidential Building Construction |
| 5413 | Architectural, Engineering, and Related Services |
| 7211 | Traveler Accommodation |



## South Atlantic Regional Center

Many NEW REGIONAL CENTERS in the market claim Project Approval by the UCSIS. What this truly means is that the USCIS approved the Regional Center to offer projects in a particular NAICS Code. Being that these Regional Centers have never marketed an EB5 Project before, they claim Project Approval to make themselves seem stronger in the market place. What this really means is that they are newly approved and most likely inexperienced in EB5 Project Management.

在市场上，有许多新的区域中心指出他们的项目得到美国移民局的批准。其实，真正的意思是代表美国移民局批准该区域中心在北美行业分类系统 NAICS 行业代码的批准范围下推出某些特定的项目。所以这代表那些区域中心之前并没有于市场上推过 EB5 项目，可是他们坚称项目已被审批，使项目在市场上看似更稳健。其实真正的意思是代表他们是新被批准及很有可能是欠缺管理 EB5 项目的经验。

Whereas, South Atlantic Regional Center has among the highest number of approved NAICS Codes for any USCIS Approved Regional Center, and has already successfully sold out their Royal Palm Town Center IV Project. With 92% of their clients approved and 8% still undergoing USCIS Processing.

然而，南大西洋区域中心是拥有美国移民局批准最多北美行业分类系统 NAICS 行业代码的区域中心，并已经成功地出售完皇家棕榈镇中心 IV 项目。当中有 92%的客户已获批准和 8%的客户仍于美国移民局处理当中。

**Q6. Can a copy of the Appraisal Report that values the Palm House Hotel at $137,500,000 USD be provided?**
A copy of the Appraisal Report, completed by Callaway & Price, INC., can be found on page 248 of the Investment Portfolio.

可否提供棕榈渡假屋值 137,500,000 美元的评估报告？
有关 Callaway & Price, INC.完成的评估报告可参阅投资组合的第 248 页。

It is important to note that the building at present is worth over $110,000,000 USD before completion. This makes the Palm House Hotel one of the safest EB5 offerings from a Job Creation and Investment position.

重要注意事项：以目前建设（未完成整个建设）的市价已值经超过 110,000,000 美元。这使棕榈渡屋酒店是其中一个最安全的 EB5 项目，能创造足够的就业机会和稳健的投资状况。

197 S. Federal Highway | Boca Raton | Florida | 33432
561.900.7077 | 561.282.6102
Sarceb5.com

Case 9:16-cv-81871-KAM   Document 657-1   Entered on FLSD Docket 07/06/2020   Page 63 of
Case 9:19-cv-80332-KAM   Document 1-5   Entered on FLSD Docket 03/10/2019   Page 9 of 293
150



## South Atlantic Regional Center

### Q7. How many jobs will the Palm House create?

Dr. Michael Ivans completed the Rims II Economic Analysis of the Palm House Project. His findings resulted in a total of 953 Jobs created. The full report can be viewed on page 414 of the Investment Portfolio.

### 棕榈渡假屋项目会创造了多少个就业机会？

迈克尔·埃文博士运用了 RIMS II"区域投入支出模型系统"对棕榈渡假屋项目完成了经济分析。他的研究显示项目可创造 953 个职位。详细报告请参阅投资组合的第 414 页。

| Table A.  Summary of Employment and Revenue Estimates | | | |
|---|---|---|---|
| Activity | Expenditure/ Revenues ($ million) | Final Demand Multiplier | Total Jobs |
| Hard Construction Costs | 32.293 | 17.5636 | 567.2 |
| Soft Costs | 6.188 | 16.315 | 101.0 |
| Purchases of FF&E * | 2.5 | 7.9957 | 20.0 |
| Hotel Operations | 14.36 | 17.5069 | 251.4 |
| Membership Fees * | 2.0 | 7.046 | 14.1 |
| Total | 75.413 | | 953.7 |

\* Indirect and Induced effects only
All figures calculated from unrounded numbers

### Q8. How many rooms are there in the Palm House Hotel?  What are the sizes of the Hotel?

There are a total of 79 Hotel Condo Rooms in Palm House Hotel.  Their sizes range from 379 SqFt to 1,054 SqFt, as indicated in the table below. Additional information on room sizes can be found on pages 157 – 159 of the Investment Portfolio.

### 棕榈渡假屋酒店有多少个房间？酒店房间的大小是？

棕榈渡假屋酒店共有 79 间公寓客房。正如下表所显示，它们的大小由 379 平方英尺到 1,054 平方英尺不等。房间大小的详细资料请参阅投资组合的第 157 -159 页。

Case 9:16-cv-81371-KAM   Document 657-1   Entered on FLSD Docket 07/26/2020   Page 64 of 3
Case 9:19-cv-80932-KAM   Document 157-1   Entered on FLSD Docket 03/20/2019   Page 10 of 233
150



## South Atlantic Regional Center

**Hotel Units SF**

| Unit # | QT. | Unit Description | SF per Unit | Total SF |
|---|---|---|---|---|
| | | *First floor* | | |
| A | 1 | Large One Bedroom | 943 | 943 |
| B | 1 | Studio | 473 | 473 |
| E1 | 1 | One Bedroom | 734 | 734 |
| CR | 1 | One Bedroom | 539 | 539 |
| D | 1 | One Bedroom | 870 | 870 |
| E | 5 | Studio | 475 | 2,375 |
| E3 | 1 | Studio | 475 | 475 |
| | | | | |
| F | 2 | One Bedroom | 782 | 1,564 |
| F1 | 1 | One Bedroom | 782 | 782 |
| G | 8 | Studio | 379 | 3,032 |
| G1 | 2 | Studio | 379 | 758 |
| C2 | 1 | Studio | 413 | 413 |
| | | *Second floor* | | |
| A | 1 | Large One Bedroom | 943 | 943 |
| B | 1 | Studio | 475 | 475 |
| CL | 1 | One Bedroom | 734 | 734 |
| CR | 1 | One Bedroom | 688 | 688 |
| | | | | |
| E | 5 | Studio | 475 | 2,375 |
| E1 | 1 | Studio | 475 | 475 |
| N | 1 | One Bedroom plus den | 960 | 960 |
| F | 3 | One Bedroom | 792 | 2,376 |
| F1 | 1 | One Bedroom | 782 | 782 |
| G | 8 | Studio | 379 | 3,032 |
| G1 | 2 | Studio | 379 | 758 |
| H | 1 | Studio | 575 | 575 |
| | | *Third floor* | | |
| J | 1 | Studio | 653 | 653 |
| K | 5 | Large Studio | 579 | 3,474 |
| | | | | |
| M1 | 1 | One Bedroom | 676 | 676 |
| | | | | |
| M2 | 1 | One Bedroom | 943 | 943 |
| G | 8 | Studio | 379 | 3,032 |
| G1 | 2 | Studio | 379 | 758 |
| F | 3 | One Bedroom | 792 | 2,376 |
| F1 | 1 | One Bedroom | 796 | 782 |
| F2 | 1 | One Bedroom | 722 | 722 |
| **Total SQ. FT** | | | | **34,468** |

*Breakdown of guestroom types and square footage*

**Q9. What would happen if the Palm House Project couldn't raise 79 investors?**
The agreements submitted to the USICS allow for a minimum of 2 investors and a maximum of 79. Therefore if less than 79 investors become a part of the project before the offering is closed there will be no effect on the immigration of the clients.

**如果棕榈渡假屋项目不能筹集79个投资者将会发生什么事情？**
在已递交至美国移民局的协议当中，清楚列明这个项目允许最少2名至最多79名的投资者。因此，即使这个项目在停止接受EB5申请时不能筹集到79名投资者，对客户的移民申请是没有影响。

Depending on the amount of funds raised through EB5 Investment, other domestic sources can be used to supply any additional funds needed. These funds can be acquired through Private Equity or Bank Loans against the already increased value of the project. The near completed state of the project offers great flexibility to find other sources of investment beyond EB5 Investment should it be required. This is not currently sought after to project the Return of Investment Position of the EB5 Investors.



## South Atlantic Regional Center

项目会根据 EB5 筹集资金的进度和情况，可以寻求其他的本地资金来源应付额外的费用。其他的资金来源可以透过私人投资或银行贷款的方法应付已增值的项目。在项目接近完成的阶段，寻找 EB5 投资之外的资金来源应该是有更大的灵活性。但这不是目前项目所追求用来归还给 EB5 投资者投资款项的方法。

**Q10. What is the evidence that the Developer has invested the $22,000,000 USD?**
A detailed listing of the Developers' investment into the project can be found in the following Developer's Funds attachment or from pages 392-413 of the Investment Portfolio. Note that there is a total of over $22,000,000 USD represented. The total invested into the Project by the Developer cannot all count towards Job Creation. Therefore, only the funding that can be attributed to actual work on the Project is represented in the $22,000,000 to ensure an accurate Job Creation result.

有任何的证明文件显示开发商已投资22,000,000美元吗？
开发商投资到项目的详细清单，请参阅以下的开发商资金附件或参阅投资组合的第 392-413 页。请注意，开发商已投资超过 22,000,000 美元。由于不能把所有由开发商投资到项目的金额全部计入创造就业人数当中。所以只计算当中 22,000,000 美元这笔真正能归纳为项目可创造就业人数的资金，以确保计算出准确就业人数的结果。

As demonstrated in the Valuation Report, the EB5 Money and Private Equity Loan account for 50% of the present valuation of the Palm House Hotel ($110,000,000 USD Present Valuation). This means that the EB5 Investor is very secure from a monetary standpoint.

从估值报告中显示出，EB5 的资金与私人直接投资占整个棕榈渡假屋项目的 50%（现时估值 110,000,000 美元）。从估值立场来看，这意味着 EB5 投资是非常安全的。

**Q11. The Palm House Hotel utilizes a Bridge Loan Financing in the Business Plan. Who provided this Bridge Loan, and how will the loan repaid?**
The USCIS Adjudication Policy Memorandum details how an EB5 Project may receive Bridge Loan Financing in order to ensure the progress a project makes while raising EB5 Funding (See excerpt from the USCIS website page 15 below). So long as the EB5 Funds are used to repay the Bridge Financing there is no effect on Job Creation.



### South Atlantic Regional Center

棕榈渡假屋项目在商业计划中显示采用了银行过桥贷款。谁问谁提供过桥贷款，以及如何偿还贷款？

美国移民局评审致策忘录详细介绍了 EB5 项目可以透过过桥贷款，以确保在筹集 EB5 资金的同时，项目建设的可以正常进行。（请看在美国移民局网站下载第 15 页摘要）。只要 EB5 资金会用于偿还给过桥贷款，这对创造就业机会是没有影响。

---

4 8 C.F.R § 204.6(j)(4)(i).

Since it is the commercial enterprise that creates the jobs, the developer or the principal of the new commercial enterprise, either directly or through a separate job-creating entity, may utilize interim, temporary or bridge financing – in the form of either debt or equity – prior to receipt of EB-5 capital. If the project commences based on the interim or bridge financing prior to the receipt of the EB-5 capital and subsequently replaces it with EB-5 capital, the new commercial enterprise may still receive credit for the job creation under the regulations. Generally, the replacement of bridge financing with EB-5 investor capital should have been contemplated prior PM-602-0083: EB-5 Adjudications Policy Page 16 to acquiring the original non-EB-5 financing. However, even if the EB-5 financing was not contemplated prior to acquiring the temporary financing, as long as the financing to be replaced was contemplated as short-term temporary financing which would be subsequently replaced, the infusion of EB-5 financing could still result in the creation of, and credit for, new jobs. For example, the non EB-5 financing originally contemplated to replace the temporary financing may no longer be available to the commercial enterprise as a result of changes in availability of traditional financing. Developers should not be precluded from using EB-5 capital as an alternative source to replace temporary financing simply because it was not contemplated prior to obtaining the bridge or temporary financing.

USCIS Policy Memorandum; May 30, 2013; pp. 15-16.

---

The Palm House elected to proceed in this manner due to the safety and security that it afforded the EB5 Investor. A Bridge Loan of $29,500,000 USD was obtained from a Wealthy Private Equity Source. These funds along with Mr. Matthews' Equity Investment were used to bring the Palm House Hotel to the present and continuous development position. A portion of the $39,500,000 EB5 Investment will be used as repayment of this Bridge Loan.

棕榈渡假屋项目选用这种方式以确保 EB5 投资者的安全性。29,500,000 美元的过桥贷款是来自一个富裕者的私人投资。这过桥贷款与马修斯先生的私人投资共同用在过去、现在及未来棕榈渡假屋的建设，使项目得以持续进行。部份来自 EB5 的 39,500,000 美元的投资将用作偿还这过桥贷款。

### Q12. When does the USCIS allow for Job Count to begin?

Utilizing the Rims II Economic Analysis, as performed by Dr. Michael Evans, a final demand multiplier was created for Expenditure and Revenue applied to each NAICS Industry Code. The Final Demand Multiplier figure generated by Rims II represents a combined Direct and Indirect number of jobs created per $1,000,000 USD in Project Expenditure or Revenues Generated depending on



## South Atlantic Regional Center

the NAICS Code. As a result of the Bridge Loan and Developer Equity, the USCIS allows for any funds spent on actual work performed on the building to be accounted towards these numbers. Therefore, Job Count begins from the date that funds were first spent on work towards the development of the project. Details for these amounts can be found in the attached Econometric Study, or beginning at page 414 in the Investment Portfolio.

美国移民局什么时候开始计算项目所创造的就业人数？
迈克尔·埃文博士利用 RIMS II"区域投入支出模型系统"的经济分析，一个以最终需求乘数开支及收入的算式，应用于每个北美行业分类系统 NAICS 行业代码的模式计算出项目所创造的就业人数。RIMS II"区域投入支出模型系统"计算每 1,000,000 美元的项目支出或收入，乘以北美行业分类系统 NAICS 行业代码计算出成直接和间接创造并起来的就业人数。所以，美国移民局容许以透过过桥贷款和开发商私人投资花费在实际建设项目上任何的资金作为计算就业人数。因此，计算就业人数是于这些资金花费在项目兴建时开始。有关运用这些资金的详细信息，请参阅附件的经济分析报告，或投资组合中第 414 页开始。

**Q13. Can we provide documentation showing the Project owns the land?**
Current titling of the property is registered to 160 Royal, LLC. This is the company registered to the Private Equity Lender who made the Bridge Loan available. Official Public Record can be found at PCBGOV.com with a satellite picture of the property.

能够提供文件显示项目拥有该土地权吗？
目前物业是以皇家160，有限责任公司注册。这家公司是以私人投资形式向项目提供过桥贷款的贷方。官方公共记录可于网站 PCBGOV.com 查看。当中还有配备了卫星图片的功能，可显示到棕榈渡假屋。

Further evidence can be found in the Business Plan located on page 171 of the Investment Portfolio.
进一步的证据，可以参阅商业计划书中投资组合的第 171 页。

### Land Acquisition Cost

The land was purchased by a company owned by the Developer in August 2006 for $29,000,000; the transfer was recorded in OR Book 20776, Page 1540 of the Palm Beach County land records at a non-real estate transaction with a $10 consideration. (See Palm House Hotel & Private Club Appraisal, by Callaway & Price, Inc., attached as Attachment B, page 3L)



## South Atlantic Regional Center

As well as in the Appraisal Report located on page 285 of the <u>Investment Portfolio</u>.

以及在投资组合中第 285 页的评估报告。

<u>Property History</u>

The current owner, Royal 160 LLC acquired the property in August 2006 for $29,000,000; the transfer was recorded in OR Book 20776, Page 1540 of the Palm Beach County land records as a non-real estate transaction with a $10 consideration.

### Q14. How will the Palm House Project Make Money?

Highly conservative revenue estimation for the operation of the Hotel forecasts a 5-year combined generated revenue of $76,888,165 USD at only 61% occupancy rate. Details can be found in the attached proforma income statements table below or in the <u>Investment Portfolio</u> from pages 176 – 180.

棕榈渡假屋项目将如何赚钱？

根据经营该酒店的保守估计，以只有 61% 的入住率计数预测到 5 年会有 76,888,165 美元的收入。详情可参阅以下的利润表或投资组合的第 176 - 180 页。

*Palm House Hotel 5-year pro forma financial projections.*

197 S. Federal Highway | Boca Raton | Florida | 33432
561.900.7077 | 561.282.6102
Sarcreb5.com



### South Atlantic Regional Center

In addition to Hotel Revenue the Palm House Club will generate revenue through Club Membership. These fees will be between $200,000 USD and $250,000 to become a member. An exclusive limited offering of 500 memberships will be made available. Resulting in a $100,000,000 USD to $125,000,000 USD to be collected for Membership Positions.

除了酒店收入外，棕榈渡假屋项目的会员俱乐部在收取会员费用上亦可产生收益。每位会员的会员费用将会收取 200,000 美元至 250,000 美元，会籍将限量发售 500 名。因此，在收取会籍上有高达 100,000,000 美元至$125,000,000 美元的收入。

Due largely in part to Mr. Matthews' strong connections with the City of Palm Beach Officials, the Palm House Project received special approval to sell portions of the Palm House Hotel as condos. With a total Valuation of $137,500,000 USD there is a range of profits that can be earned from the sale of parts of the Hotel as condos. This flexibility has already peaked the interested of some individuals in Palm Beach, including Clothing Mogul Tommy Hilfiger who has been in talks with the Developer regarding turning the Palm House Hotel into a Tommy Hilfiger Branded Hotel.

此外，由于在马修斯先生与棕榈滩市的官员有良好的关系，棕榈渡假屋项目获得特别批准，容许出售棕榈滩酒店作为公寓。根据 137,500,000 美元的估值，部分的收益可从出售酒店作为公寓所获得。这种灵活性的批准已经引起一些在棕榈滩上的人士及单位感到兴趣，当中包括 Tommy Hilfiger 的服装大亨品牌，他们一直与开发商谈判，希望把酒店转成 Tommy Hilfiger 的品牌酒店。

**Q15. What is the security offered by the Palm House for the investment?**
Investor members become a Limited Partner ("LP") when they invest into the Palm House Project. The Project and the LP have binding agreements stipulating the intended return of invested capital after 5 years time.

**棕榈渡假屋项目为投资者提供了什么投资保障？**
当投资者投资到棕榈渡假屋项目时，会成为有限合伙人（"LP"）。项目方和有限合伙人之间是有约束力的协议，规定项目方在 5 年之后有意向地归还其资本。

In addition to these agreements each LP will receive an UCC-3 Filing stating that in the event that funds are not returned beyond the 5 years, the LP has a right to all assets of the Palm House Hotel. This document only registers the terms of the Investment Agreements found in the Investment Portfolio with the State of Florida. This is done to place the LP in a secure position for their investment. Much like a US Bank would do when lending money for a Home Mortgage in the USA. Please see the attached sample copy of the UCC-3 Filing.



**South Atlantic Regional Center**

除了协议外，每位有限合伙人都会收到一份 UCC-3 的文件，说明投资若在超过 5 年后未经归还，有限合伙人有权取得棕榈渡假屋项目的所有资产。这份文件是根据投资组合中同意的投资条款，于佛罗里达州注册。提供 UCC-3 文件是为了把投资者放置在一个安全的位置，确保他们投资安全。就像在美国，当你向银行借贷款时，银行会以房屋作抵押贷款的道理一样。请参阅附件 UCC-3 文件的样板。



**Q16. Can a list of names be provided for the future members of the Palm House Club?**

Due to the exclusive nature of the Palm House Club no list of names can be furnished.  The Rich and Famous want privacy and we must facilitate their desire as such.

**可提供棕榈渡假屋项目未来会员具乐部的名单列表吗？**

由于关乎富商和名人的隐私问题，棕榈渡假屋项目必须要尊重他们，不能对外提供会员具乐部的名单列表。

However, we do know that such luminaries as Multi-Billionaire Bill Koch, of Koch Industries; Eric Schmidt, Chairman of Google; Tony Bennett, of song and stage; Celine Dion, one of the most famous signers in the world; and President Bill Clinton will be a part of the club.

不过，我们知道亿万富翁科克工业集团 – 比尔科赫；谷歌董事长 – 埃里克·施密特，著名舞台歌手 – 托尼·贝内特；在世界上最有名歌手之一 – 席琳·迪翁；前总统 – 比尔克林顿；都将成为具乐部的会员。



## South Atlantic Regional Center

This is due in part to the Fame of Mia Matthews, the Developer Bob Matthews' wife. Mia Matthews is a Famous Signer and Entertainer in the USA. Attached is a photo of the Billboard of Mia Matthews in Times Square, New York City, when she was in town performing.

能吸引这么多名人想成为具乐部会员的部分原因是因为开发商－ 飽勃·马修斯的妻子－ 米娅马修斯的关系。她在美国是一位著名歌手和艺人。以下为米亚·马修斯在纽约时代广场的广告牌，当时她在纽约市镇作表演。



### Q17. If the Investor's I-526 Application is denied, when does the Investor receive their funds back?

In the case that an I-526 Application is denied without cure, the Investor will receive their Investment, Administrative Fees, and Legal Fees within 90 days from the time the official denial notice is received from the USCIS.

### 如果投资者I-526申请被拒绝，投资者会在什么时候取回资金？

若投资者 I-526 申请在经过团队努力的情况下依然被拒绝，投资者将在收到美国移民局官方通知申请被拒的 90 天内取回投资款项、行政费用和法律费用。

Case 9:18-cv-80821-KAM Document 657-1 Entered on FLSD Docket 07/26/2020 Page 72 of
150
Case 9:18-cv-80821-KAM Document 657-1 Entered on FLSD Docket 03/10/2019 Page 26 of 223

## South Atlantic Regional Center

NOTE: Currently South Atlantic Regional Center has maintained higher than
99% approval rating for I-526 Submissions of it's projects.

注意：目前南大西洋区域中心提交 I-526 的申请一直保持高于 99%的批准率 。

**Q18. What occurs if an Investor does not pass the I-829 Stage?**
Before becoming a participant in the EB5 Program each potential Investor must
understand the every project has an amount of risk to it. There can be no
guarantee offered on any project if that project is to meet the strict standards
set forth by the US Congress and USCIS. To offer such a guarantee would mean
immediate failure of the I-526 Application.

如果投资者不通过I-829阶段，将会发生什么事情？
每个潜在投资者在参与 EB5 计划前都必须要明白，每个项目都有一定程度的
投资风险。 如果该项目是达到由美国移民局设定的严格标准，任何项目都不
能提供任何保证。如提供保证，即意味着 I-526 的申请会立即失败 。

With this understanding in place, a potential Investor can analyze the level of
risk they take with their chosen project. In the case of the Palm House Hotel the
project is very near completion, due in part to the Developer's Investment and
Bridge Loan Financing put in place. The Project also has received Permanent
Certificate of Occupancy for the East and West Wings of the Hotel. This means
that the project will proceed with the City of Palm Beach's approval to be open
for Season 2013/2014.

明白了以上的概念，潜在投资者可以自行对所选择的项目作出分析，评估项目
的风险水平。现时，棕榈渡假屋项目距离完成十分接近，部分原因是由于开发
商的私人投资和过桥贷款融资落实到位。项目的东翼与西翼的酒店亦已得到永
久使用证节。意味着项目会在棕榈滩市政府的批准下将于 2013/2014 年季节
开始营业。

All of this means that an Investor does not have to worry about potential delays
in building or regulator issues. These unique Palm House Hotel strengths
coupled with a current 2013 national average of 95% I-829 approvals by the
USCIS mean that there is very little risk of an I-829 denial.

以上所有事情意味着，投资者不必担心项目会因为建筑或监管问题导致延误的
潜在可能性。这些独特棕榈渡假屋酒店的优势，再加上现时美国移民局 2013
年全国 I-829 批准平均水平是 95% ，投资者只有十分少的风险会在 I-829 阶段
被拒绝。

197 S. Federal Highway | Boca Raton | Florida | 33432
561.900.7077 | 561.282.6102
Sarceb5.com

# EXHIBIT "C"

NOT A CERTIFIED COPY

Case 9:16-cv-81371-KAM Document 657-1 Entered on FLSD Docket 07/26/2020 Page 74 of 3
Case 9:19-cv-80932-KAM Document 65-7 Entered on FLSD Docket 09/10/2019 Page 20 of 233
150



**THE PALM HOUSE**

A Luxury Condominium Hotel and Spa in Palm Beach

NOT A CERTIFIED COPY

دستور العمل ثبت نام در پالم و شروع روند پرونده مهاجرت

۱- لطفا این صفحات را امضا کنید: ۱۲ و ۱۸ و ۲۴ و ۲۵ و ۲۶ و ۳۰ و ۳۵.

۲- کلیه سوالات این فرم ها را پر کنید. اگر سوالی در این باره دارید حتما با ما مکاتبه کنید. احتیاجی به پر کردن فرم صفحه ۲۷ - ۳۰ نمیباشد.

۳- برای فرستادن پول سرمایه گذاری (پانصد هزار دلار) از اطلاعات صفحه ۱۰ استفاده کنید

۴- برای فرستادن هزینه ثبت نام در موسسه پالم از اطلاعات صفحه ۸ استفاده کنید (۴۲۵۰۰ دلار)

۵- برای فرستادن هزینه های حقوقی از اطلاعات صفحه ۳۶ استفاده کنید (۱۷۵۰۰ هزار دلار)

۶- مدارک نشان دادن صحت و تمیزی مبلغ سرمایه گذاری را به دفتر حقوقی هریسچی بفرستید.

Case 9:16-cv-80321-KAM   Document 657-1   Entered on FLSD Docket 07/26/2020   Page 75 of 233
Case 9:15-cv-80932-KAM   Document 165-7   Entered on FLSD Docket 09/10/2019   Page 21 of 23
150



**THE PALM HOUSE**
A Luxury Condominium Hotel and Spa on Palm Beach

NOT A CERTIFIED COPY

پروژهٔ پالم یکی از مطمئن ترین پروژه‌های ای بی ۵ میباشد که در جزیره پالم در فلوریدای آمریکا واقع شده است. این پروژه در حال اجرا است و در فاز نهایی می باشد. این یکی از دلایلی است که به سرمایه گذار اطمینان خاطر میدهد که سرمایه او در حال استفاده است و پروژه در حال اجرا است و به زودی درآمد خواهد داشت.

کل مساحت این پروژه ۱۱٬۹۰۰ متر مربع میباشد که شامل ۷۹ سوئیت لوکس میباشد. طرحی این پروژه بسیار مجلل و منحصر به فرد است. فضاهای داخلی با ظرافت و دقت خاصی طراحی شده اند تا اقامتی مجلل و راحت را برای میهمانان در جزیره پالم فراهم آورد.

این هتل آخرین هتل در جزیره میباشد و این از اهمیت خاصی برخوردار است، هتل در مرکز جزیره پالم واقع شده. و دسترسی به تمام نقاط شهر، فرودگاه و دیگر مراکز تفریحی را آسان میکند. جزیره‌ی پالم همیشه یکی از نقاطی بوده است که افراد ثروتمند و سرشناس به آن سفر میکنند. با توجه به این که این هتل آخرین هتل جزیره میباشد، توجه بیشتری به خود جلب خواهد کرد.

**تیم مشاوره:**
پالم توسط گروه مشاورانی اداره میشود، که متشکل از سیاست‌مداران و مدیران برجستهٔ دنیا می‌باشند. گروه مشاوران، کمک میکنند تا پالم را به عنوان نامی برجسته و شناخته شده معرفی کنند. آنان سعی میکنند تا پالم را به عنوان یک جاذبه توریستی برای ثروتمندان معرفی کنند.

NOT A CERTIFIED COPY

**سرمایه گذاری:**

بودجه این پروژه از منابع مختلف تهیه میشود، فقط بخشی از آن توسط سرمایه گذاری ای بی ۵ تامین میشود که این مورد ریسک سرمایه گذاری را پائین می آورد. بودجه این پروژه به ۳ طریق زیر تامین مشود:

| | |
|---|---|
| ای بی ۵ | ۳۹،۵۰۰،۰۰۰ |
| سرمایه صاحبان پروژه | ۲۲،۰۰۰،۰۰۰ |
| وام بانکی | ۲۹،۰۰۰،۰۰۰ |

همانطور که در بالا ذکر شد سرمایه گذاران ای بی ۵، ۴۵% از کُل سرمایه گذاری را تامین میکند. بقیهٔ سرمایه توسط صاحبان پروژه و وام بانکی تامین میشود. به همین دلیل صاحبان پروژه تمامی سعی خود را میکنند تا این پروژه به بهترین وجه ممکن اجرا و به بهره برداری برسد.

**ارزش پروژه:**

قیمت برآورد شدهٔ هتل ۱۳۷،۵۰۰،۰۰۰ دلار میباشد که که ۴۷،۰۰۰،۰۰۰ دلار سود پروژه خواهد بود. به این ترتیب قیمت هر کدام از ۷۹ واحد، ۱،۷۳۴،۱۷ دلار میباشد. این به این معنا است که هر سرمایه گذار (که در مجموع ۷۹ نفر میباشند) پشتوانه ارزشمندی و بیش از مقدار سرمایه گذاری شده دارد.

**تعداد کار و قوانین ادارهٔ مهاجرت:**

با توجه به حجم پروژه این پروژه ۹۵۳ کار ایجاد خواهد کرد. با توجه به موارد مورد نیاز ای بی۵ که برای هر سرمایه گذاری، پروژه باید ۱۰ کار تولید کند، تعداد کار مورد نیاز ۷۹۰ (۱۰x۷۹) میباشد. این تعداد، ۲۰% بیشتر از تعداد مورد نیاز از طرف ادارهٔ مهاجرت میباشد. این یکی دیگر از خوبیهای این پروژه میباشد که گرفتن گرین کارت دائم را را تضمین میکند.

**امنیت سرمایه گذاری:**

در کنار تمامی محسنات این پروژه که ذکر شد به هر سرمایه گذار، فرم یو سی سی ۳ (UCC3) توسط ایالت فلوریدا داده میشود که امنیت و صحت سرمایه گذاری شرکت پلم توسط ایالت فلوریدا تائید گردیده است. این فرم وقتی فایل میشود که سرمایه گذار گرین کارت دریافت میکند. در اصل ایالت فلوریدا سند هر کدام از سوییتها را به عنوان پشتوانه هر سرمایه گذاری گرو میگیرد.

Case 9:16-cv-80331-KAM Document 657-1 Entered on FLSD Docket 07/26/2020 Page 77 of
150
Case 9:15-cv-80532-KAM Document 157-1 Entered on FLSD Docket 03/10/2019 Page 26 of 233

پروژه و مرکز منطقه‌ای تضمین ۱۰۰% میدهد که در صورت عدم قبولی، کلیه پول به همراه هزینه‌ها به شما برگشت داده شود.

سرمایه‌گزاری:

| | |
|---|---|
| سرمای نقصی برای ۵ سال | $۵۰۰٬۰۰۰ |
| هزینه‌های دفتری پروژه | $۴۰٬۰۰۰ |
| هزینه‌های قانونی و وکلتی (شامل هزینه های اداره مهاجرت) | $۲۰٬۰۰۰ |

---

$۵۶۰٬۰۰۰

از پرونده های فایل شده توسط این موسسه تا کنون ۹۹% از فرمهای ۵۲۶ تأیید شده اند و ۹۷% از فرمهای ۸۲۹ تأیید شده اند. کیفیت و آرامش در سرمایه گذاری از اهداف ما است و امیدواریم که با سرمایه گذاری در پروژه پالم مهاجرت بدون دردسر و شروع زندگی جدیدی را در آمریکا آغاز بکنید.

لطفا برای اطلاعات بیشتر در مورد ای بی ۵ به صفحهٔ فارسی سوالات مطرح شده مراجعه کنید.

تلفن تماس: ۳۲۱-۳۸۵-۷۲۵۶
WWW.SARCEB5.com

NOT A CERTIFIED COPY

# EXHIBIT "D"

NOT A CERTIFIED COPY



THE PALM HOUSE

Luxury Condominium Hotel and Spa on Palm Beach

棕榈渡假屋

坐落于棕榈滩奢华共管式公寓酒店及水疗会馆

NOT A CERTIFIED COPY







◆ 128,000 Square Foot
128,000平方英尺

◆ 79 Key Condominium
Boutique Hotel

79家会员各持钥匙的
共管式公寓精品酒店

◆ Directly on Palm Beach Island
直接座落在棕榈滩岛上

◆ The last hotel to be
approved on the island

岛上最后一家被批核兴建的酒店

◆ Home to the World's Rich
and Famous

世界级富豪及名流之住所

◆ Presently being built
现已开始动工

# THE PALM HOUSE

A Luxury Condominium Hotel and Spa on Palm Beach

棕榈滩寓屋

坐落于棕榈滩奢华共管式公寓酒店及水疗会馆

NOT A CERTIFIED COPY



## Safe EB5 Investment
## EB5 – 安全投资

The Palm House project is very safe beacuse the construction is already in progress with a substantial equity investment from the developer. The investor need not worry if the project will perform and meet the rigid standards required by the USCIS.

棕榈渡假屋项目是十分安全的，因为这项目已由一个稳健可靠的开发商注入大量资本并且已经开始动工。投资者无须担心这项目绝对符合美国移民局的严格标准。

## Luxurious & Exclusiv
## 奢华与尊贵

Each of the interior finishes has been carefully selected to provide the most luxurious and comfortable stay on the Island of Palm Beach

每个室内装潢都经过精心设计，目的是为客人提供一个在棕榈滩上最豪华及舒适的逗留

♦ The Palm House project presently is being built!

棕榈渡假项目现已开始动工！

♦ The Palm House will be completed before the 2013 Season

棕榈渡假屋将于 2013年前建成



THE PALM HOUSE
A Luxury Condominium Hotel and Spa on Palm Beach
棕榈度假屋
坐落于棕榈滩奢华共管式公寓酒店及水疗会馆

Beautiful Finishes
华丽装潢

Royal Palm Way                1784                Royal Palm Way

TOWN OF PALM BEACH

Aerial View of the Palm House
棕榈渡假屋的鸟瞰图

City Approvals



Economic Impact of Developing and Operating the Palm Hotel, located in Palm Beach, FL, Palm Beach County, as Part of the South Atlantic Regional Center

Prepared for:
South Atlantic Regional Center
137 South Federal Highway
Boca Raton, FL

Prepared by:
Michael K. Evans
Evans, Carroll & Associates, Inc.
2785 NW 26th St.
Boca Raton, FL 33134
561-473-0035
mevans@evanscarrol.com

November 29, 2012

Dr. Michael Evans is the most respected Economist in America doing EB5 Econometric Models.
迈克尔．埃文博士在美国是一位受人尊敬的
经济学家專門研究EB5。
Michael has written 10 books dealing with international economies.
He has over 300 approved job studies.
迈克尔博士写了10本有关全球经济的书籍，
他有超过300已被确定的工作研究。

## The Security of The Investment
投资保障

## Job Count
## USCIS Requirements
就业数目美国移民局所需要求

The JOB COUNT
for the Palm House is:

### 953 Jobs
棕桐渡假屋的就业数目是
**953个职位**

The project needs:

### 790 Jobs
整个项目需要:
**790个职位**

This means that **over 20%** more jobs will be created than is required by law
这意味着此项目可创造
比法律规定
超过多20%的职位空缺

## UCC-3 Filing
UCC-3文件存档

Each investor is provided with a UCC-3 filing with the State of Florida, so their security interest in the capital is registered with the state. This is filed when the investor receives their Green Card.

每位投资者可得到由佛罗里达州政府
发出的UCC-3文件，他们的资金保障利息
会在州政府建立档案注册，当投资者获得绿卡时
档案便会有纪录。

NOT A CERTIFIED COPY



# THE PALM HOUSE

A Luxury Condominium Hotel and Spa on Palm Beach

棕榈渡假屋

坐落于棕榈滩奢华共管式公寓酒店及水疗会馆

| | |
|---|---|
| **EB5 INVESTMENT**<br>EB5投资额美金 | $39,500,000 |
| **DEVELOPER EQUITY**<br>开发商资产净值美金 | $22,000,000 |
| **FINANCING**<br>筹措资金美金 | $29,500,000 |
| **TOTAL INVESTMENT**<br>总投资额美金 | **$91,000,000** |

The Investment
投资额

The EB5 Investment represents 43% of the total investment

EB5 投资额占项目总投资额43%

The investment is very secure because 57% of the investment comes from developer equity and financing.

投资额是十分安全, 因为57%的投资是来自开发商的资产及筹措资金。

Valuation Appraisal
估价 评估

The Appraisal for the hotel is:

## $137,500,000

酒店的估价是美金 $137,500,000

Once the property is completed the appraisal values the property at over 40% more than the initial investment

一旦完成该物业评估其财产会比原本投资的多40%



NOT A CERTIFIED COPY

*GUARANTEE*

EB5 Petition

EB5 Petition and South Atlantic Regional Center offers a 100% Full Refund of all fees and investment if your I-526 is not approved!

若您的I526申请不被接纳，EB5与南大西洋区域中心会100％全数退还已缴费用！

## EB5 Advantages
### EB5优点

◆ NO REQUIREMENT for Age, Business Experience, Education, or Language Skills

没有年龄、营商经验、学历背景、语言技能的限制

■ EASY TO DOCUMENT: Preparation 4 times faster than a Canadian Application

文件准备简易：申请文件预备比加拿大申请还要快4倍

■ FREE EDUCATION: In the American Public School System

免费教育：享有美国公立学校系统免费教育

◆ NO RESIDENCE REQUIREMENT: Must enter the USA only once every 6 months

没有居留限制：只需每6个月进入美国境内1次

● FAST: Visa approved in less than six months. It is the quickest program to immigrate to the USA!

火速批核：签证批核时间少于6个月，这是移民到美国最快捷的计划!

SARC has received Approvals in as little as 22 Days on projects

美国移民局会在递交申请后的短短22天批核

The USCIS officially suggests that it will take approximately 6-9 months to approve your I-526 petition.

美国移民局的官方说法是I526申请过程需6至9个月



# WORLD RENOWN ADVISORY BOARD
## 世界知名顾问委员会

Our Advisory Board will assist in branding the Palm House as a desired destination hotel and frequented by the wealthy around the world. The Palm House will be governed by an advisory board consisting of Political and Business leaders with worldwide experience

我们的顾问委员会协力把棕榈渡假屋
打造成为一个令人向往的最终目的地酒店
及全球富豪常去的地方，棕榈渡假屋
是由一队拥有环球经验的政治
及商业领导组成的顾问委员会所管理。

# The Palm House Club
## 棕榈渡假屋会所

A significantly discounted membership of 50% in the Very Exclusive Palm House Club is available to all investors!

所有投资者可尊享
棕榈渡假屋会所
的 50% 超级折扣会籍

○ Hawker Jet 850 XP
• 霍克850XP喷射机

○ Rolls Royce
• 劳斯莱斯房车

○ 100' Yacht
• 100呎 游艇

Some of the member facilities and amenities
另外有其他会员设施及服务





## Your Immigration Paperwork
## We Offer a 100% Guarantee
## 我们100%保证您申请移民时的所需文件



### GUARANTEE

*When you file your I-526 application through us you can be assured that we will process the application expeditiously. You can have confidence that our experienced staff will address any areas that may cause a deficiency or regulatory issue. Each petition is carefully examined and fully vetted before we submit the individual case. Our worldwide staff works with all the stakeholders to provide a consistent and predictable outcome.*

*For these reasons we are delighted to offer a FULL REFUND in the unlikely event the Immigration Service denies a submission.*

*Simply stated, "You get approved, or your money back!"*

*Speak to one of our representatives to discuss the details of our exclusive guarantee.*



South Atlantic Regional Center, LLC
197 South Federal Highway
Boca Raton, FL 33432 USA

USA • HONG KONG • BEIJING • LONDON • SRI LANKA • MACAU
美国 • 香港 • 北京 • 伦敦 • 斯里兰卡 • 澳门

NOT A CERTIFIED COPY

Case 9:19-cv-80932-KAM   Document 105-7   Entered on FLSD Docket 09/10/2019   Page 91 of 293

# EXHIBIT "E"

NOT A CERTIFIED COPY



THE PALM HOUSE

NOT A CERTIFIED COPY





THE PALM HOUSE

A Luxury Condominium Hotel and Spa on Palm Beach

پالم هاوس (خانه نخل)

Beautiful Finishes

ظرافت کاری های زیبا

Aerial View of the Palm House

جلوه ای از نمای هوایی از پالم هاوس

City Approvals

موافقت شهرداری

NOT A CERTIFIED COPY



NOT A CERTIFIED COPY





Economic Impact of Developing and Operating the Palm Hotel, located in Palm Beach, FL, Palm Beach County, as Part of the South Atlantic Regional Center

Prepared for:
South Atlantic Regional Center
157 South Federal Highway
Boca Raton, FL

Prepared by:
Michael K. Evans
Evans, Carroll & Associates, Inc.
2785 NW 27th St.
Boca Raton, FL 33434
561-470-9035
mevans@evanscarroll.com

November 23, 2012

Dr. Michael Evans is the most respected Economist in America using EB5 Econometric Models.

Michael has written 10 books dealing with international economics relevant to 300 approved job studies.

# Job Count
## USCIS Requirements

شرایط مشاغل مقرره اداره مهاجرت ایالات متحده

The JOB COUNT
for the Palm House is:
### 953 Jobs

تعداد مشاغل مقرر برای پالم هاوس:
953 شغل

The project needs:
### 790 Jobs

میزان نیاز پروژه:
790 شغل

This means that **over 20%**
more jobs will be created than
is required by law

این بدان معنی است که بیش از 20% شغل بیشتر
به میزان شغلی که طبق قانون حوزه نیاز است
ایجاد خواهد شد.



## The Security of The Investment

امنیت سرمایه گذاری

# UCC-3 Filing

ثبت کردن یا ماده 3 قانون تجارت

Each investor is provided with a
UCC-3 filing with the State of Florida
so their security interest in the capital
is registered with the state. This is
filed when the investor receives their

به هر سرمایگذار تضمینی از طرف شرکت با یک
ثبت مالکیت سرمایه گذاری طبق ماده 3 قانون داده
می شود که شرکت ثبت خواهد شد.

# THE PALM HOUSE

## A Luxury Condominium Hotel and Spa on Palm Beach

پالم هاوس ( خانه نخل )

هتل آپارتمان و لبنای مجلل جزیره پالم

| | |
|---|---|
| **EB5 INVESTMENT** | $39,500,000 |
| سرمایه‌گذاری خارجی EB-5 | |
| **DEVELOPER EQUITY** | $22,000,000 |
| سرمایه گذاری توسط سازنده پروژه | |
| **FINANCING** | $29,500,000 |
| وام | |
| **TOTAL INVESTMENT** | $91,000,000 |
| سرمایه گذاری کلی | |

The investment is very secure because 57% of the investment comes from developer equity and financing

این سرمایه گذاری بسیار مختر است ، چون 57 %
از سرمایه توسط سازنده و وام تامین می‌شود

The Appraisal for
the hotel is:

## $137,500,000

قیمت ارزیابی شده برای هتل عبارت است از
137،500،000 دلار آمریکا

Once the property is completed the appraisal values the property at over 40% more than the initial investment

زمانی که ملک به اتمام رسید، ارزش ارزیابی شده ملک بالغ بر
40 % بیش از سرمایه گذاری اولیه خواهد بود.

The Investment

سرمایه گذاری

The EB5 Investment
represents 43%
of the total investment

سرمایه‌گذاری خارجی،43 %
از کل را در بر میگیرد

## Valuation Appraisal

ارزیابی ارزش

NOT A CERTIFIED COPY





ضمانت

EB5 Petition and South Atlantic Regional Center offers a 100% Full Refund of all fees and investment if your I-526 is not approved.

مرکز منطقه‌ای آتلانتیک جنوبی تضمین 100% میکند که در صورت عدم قبولی فرم 526 کلیه پول به سرمایه‌گذار برمیگردد

# EB5
## Advantages
### مزایای EB5

* **NO REQUIREMENT for** Age, Business Experience, Education, or Language Skills
  * هیچ شرطی برای سن، تجربه تجاری، آموزشی ویا مهارت های زبانی وجود ندارد

* **EASY TO DOCUMENT:** Preparation 4 times faster than a Canadian Application
  * بروشی آسان مدارک آماده سازی مدارک 4 برابر سریعتر است از آنچه که برای کانادا لازم است

* **FREE EDUCATION:** In the American Public School System
  * آموزش رایگان در سیستم مدارس دولتی آمریکایی

* **NO RESIDENCE REQUIREMENT:** Must enter the USA only once every 6 months
  * عدم نیاز به استقرار در اینجا تنها هر 6 ماه یک بار وارد خاک ایالات متحده آمریکا شد

* **FAST:** Visa approved in less than six months. It is the quickest program to immigrate to the USA!
  * مراحل ویزا کمتر از 6 ماه انجام میشود این سریعترین راه برای مهاجرت به ایالت متحده آمریکا میباشد

**SARC has received Approvals in as little as 22 Days on projects.**

مرکز منطقه ای آتلانتیک جنوبی کمتر از 22 روز موافقت پروژه را بدست آورده است.



The USCIS officially suggests that it will take approximately 6-9 months to approve your I-526 petition.

اداره مهاجرت آمریکا اعلام کرده که معمولاً 6 تا 9 ماه طول میکشد



## WORLD RENOWN ADVISORY BOARD

شورای مشورتی مشهور جهانی

Our Advisory Board will assist in branding the Palm House as a desired destination hotel and frequented by the wealthy around the world. The Palm House will be governed by an advisory board consisting of Political and Business leaders with worldwide experience.

شورای مشورتی ها برای به شهرت رساندن هتل ها به عنوان مقصدی مطلوب برای متمولین در سرتاسر جهان و استفاده مکرر از آن در تلاش خواهد بود. پالم هاوس توسط یک شورای مشورتی شامل مدیران سیاسی و تجاری با سابقه جهانی اداره خواهد شد.

## The Palm House Club

باشگاه پالم هاوس

A significantly discounted membership of 50% in the Very Exclusive Palm House Club is available to all investors!

جهت عضویت در باشگاه ... برای تمامی سرمایه گذاران

• Hawker Jet 850 XP
• 850 XP جت شخصی

• Rolls Royce

مدل ...

Some of the member facilities and amenities

بخشی از تسهیلات رفاهی اعضا

100' yacht

...100



## Bonus Program For the Investor

برنامه تشویقی برای سرمایه گذار



*Each Investor will receive:*

## 1 FREE *Week Yearly*
stay @ The Palm House

هر سرمایه گذارسالی یک هفته اقامت رایگان در پالم هاوس دریافت خواهد کرد.

*Fully Disclosed Portfolio & Signatory Package*

تعدد سیالم کاملا شتارت و بسته امضایی



An investor will receive and additional 5% of their original investment ($25,000) if the project sells for more than $110,000,000 USD.

اگر فروش پروژه بیش از 110،000،000 دلار امریکایی باشد سرمایه گذار مبلغی % میزان اصلی سرمایه گذاری دریافت خواهد کرد.(25،000 دلار امریکایی)

## Sales Reward For the Investor

جایزه فروش برای سرمایه گذار

If the Project sells for more than $130,000,000 USD then the investor will receive a total of 10% of their original investment ($50,000)

چنانچه پروژه بیش از 130،000،000 دلار امریکایی فروش داشته باشد، سرمایه گذار مبلغی برابر 10% مقدار اصلی سرمایه گذاری دریافت خواهد کرد (50،000 دلار امریکایی)

Each Investor may receive an additional reward based on the sales price of the project.

هر میزان گذار ممکن است جایزه ای اضافه بر میزان فروش پروژه دریافت نماید.

NOT A CERTIFIED COPY



## Your Immigration Paperwork
## We Offer a 100% Guarantee

تشریفات اداری مهاجرت شما

ما به شما ضمانت 100% می دهیم



## ضمانت

وقتی شما فایل 526-I خود را از طریق ما ارسال مینمائید میتوانید اطمینان داشته باشید که پرونده شما با سرعت بررسی میگردد. شما میتوانید مطمئن باشید که پرسنل با تجربه ما به هر بخش که مساله قانونی و یا نقص ایجاد نماید اشاره خواهند نمود. هر درخواست برای هر شخص قبل از ارسال کاملا بازبینی و بررسی میشود. پرسنل جهانی ما یا کلیه نمایندگان همکاری مینمایند تا یک نتیجه ثابت و قابل پیش بینی را ارائه نمایند. با توجه به دلایل معروض، مفتخریم در صورتیکه "بعید" به هر شکل پرونده شما توسط اداره مهاجرت مردود شد کلیه مبالغ پرداخت شده توسط شما را مسترد نمائیم یا به عبارتی دیگر" یا شما قبول میشوید و یا کل پولتان مسترد میگردد!"



South Atlantic Regional Center, LLC
197 South Federal Highway
Boca Raton, FL 33432 USA

Case 9:16-cv-81871-KAM   Document 57-1   Entered on FLSD Docket 07/06/2020   Page 104 of
150
Case 9:19-cv-80332-KAM   Document 1-5   Entered on FLSD Docket 03/10/2019   Page 90 of 233

EXHIBIT
"F"

NOT A CERTIFIED COPY



# THE PALM HOUSE
## A Luxury Condominium Hotel and Spa on Palm Beach

## FULL SIGNATORY PACKAGE



Petitioner Name:

Petitioner ID Number:

NOT A CERTIFIED COPY



# WIRE INSTRUCTIONS
## ADMINISTRATIVE FEES





## ⊙ PNC

## INCOMING INTERNATIONAL WIRING

Receiving Bank: **PNC Bank**
SWIFT CODE: **PNCCUS33**

**BENEFICIARY:** South Atlantic Regional Center, LLC.
197 S. Federal Highway Suite 200
Boca Raton, Florida
USA, 33432

### Beneficiary Account Numbers:

**ACCOUNT NAME:** Palm House Hotel, LLLP

**ACCOUNT NUMBER:** ▆▆▆ (Checking Account)

**PNC Bank ABA Number:** ▆▆▆

*For tracking purposes, please fax or email a copy of the bank wire receipt to our office.*

Note: Should you wish to include additional information with the payment (e.g. the remitter's name), you may include it in the *Originator to Beneficiary Field* (also referred to as Field Tag 6000), which contains 140 characters for additional remittance information.

FOR ASSISTANCE FROM PNC BANK PLEASE CALL:
(877) 287-2654



## Palm House Hotel, LLLP
428 Main Street
South Pilgrims Mall
Woodbury, CT06798



**WIRE INSTRUCTIONS**

**ESCROW ACCOUNT**

NOT A CERTIFIED COPY



## ESCROW BANK WIRE TRANSFER INSTRUCTIONS

### WIRING INSTRUCTIONS
### FOR DEPOSITING FUNDS
### INTO ESCROW ACCOUNT

[INBOUND WIRING INSTRUCTIONS]

**$500,000.00 USD | ESCROW FUNDS**

Escrow Bank: PNC Bank

LLLP: Palm House Hotel, LLP

Subscriber Representative:
South Atlantic Regional Center, LLC
Funds should be wired directly pursuant to the following instructions:

To: PNC Bank
9875 Jog Road
Boynton Beach, FL 33437 USA

ABA # ▮▮▮▮▮

SWIFT Code: PNCCUS33

Credit To:

**Palm House Hotel, LLLP Escrow Account**
Account # ▮▮▮▮

Subscriber info: _____
                    (Name of Subscriber for Account)

CONFIDENTIALITY NOTE: The information contained in this document is legally privileged and confidential information intended only for the addressee(s) named above. If the reader of this document is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of the document is strictly prohibited. If you have received this document in error, please immediately notify us by telephone and return the document to us at the address below via US Mail. We will reimburse any reasonable cost you incur in notifying us and returning the document to us. Thank you.

PALM HOUSE HOTEL, LLLP   © 2012 • SOUTH ATLANTIC REGIONAL CENTER

NOT A CERTIFIED COPY

Palm House Hotel, LLLP                                    *Strictly Confidential*



# Palm House Hotel, LLLP

### Private Placement Memorandum



**NOTE TO PROSPECTIVE SUBSCRIBERS**

By accepting this document you agree to maintain in confidence the information set forth in this document, together with any other non-public information regarding the Partnership, obtained from the Partnership or its agents, during the course of the proposed offering and to return this document to the Partnership in the event that you do not elect to participate in the offering.

Palm House Hotel, LLLP                                                    *Strictly Confidential*

# Private Placement Memorandum

This document serves as a record of my receipt of the Private Placement Memorandum dated 12/02/2012, for Palm House Hotel, LLLP, a Florida Limited Liability Limited Partnership (the "Partnership"). I received a copy of the Private Placement Memorandum, containing an investment summary, business summary, accredited investor questionnaire and subscription agreement.

I understand that this offering has not been registered with the Florida division of securities, the U.S. Securities and Exchange Commission ("SEC") or any other foreign securities agency and is not required to be so registered.

I agree to maintain in confidence the information set forth in this document, together with any other non-public information regarding the Partnership, obtained from the Partnership or its agents, during the course of the proposed offering and to return this document to the Partnership in the event that I do not elect to participate in the offering.

_____
Investor Name

_____
Investor Signature

_____
Date



# LIMITED PARTNERSHIP AGREEMENT



## LIMITED PARTNERSHIP AGREEMENT
### OF
### PALM HOUSE HOTEL, LLLP

*a Florida Limited Liability Limited Partnership*
County of Palm Beach

Dated 11/30/2012

Palm House Hotel, LLLP
197 S. Federal Highway, Suite 200
Boca Raton, FL 33432
Telephone: (561) 282-6102

NOT A CERTIFIED COPY

IN WITNESS WHEREOF, each party has executed this Limited Partnership Agreement on the day and year written below.

GENERAL PARTNER

_____          Date: _____
Joseph J. Walsh
For South Atlantic Regional Center, LLC

LIMITED PARTNER

_____          Date: _____
(Signature)

_____
(Written Name)

NOT A CERTIFIED COPY

Case 9:16-cv-81871-KAM   Document 157-1   Entered on FLSD Docket 03/10/2019   Page 114 of
150
Case 9:19-cv-80332-KAM   Document 1-57   Entered on FLSD Docket 07/26/2020   Page 60 of 236



## SUBSCRIPTION AGREEMENT

SUBSCRIBER: _____

Palm House Hotel, LLLP
a Florida Partnership
197 S. Federal Highway, Suite 200, Boca Raton, FL 33432

RE:   Offering by Palm House Hotel, LLLP of Partnership Interests

    The undersigned Subscriber hereby subscribes to and agrees to purchase an equity interest in Palm House Hotel, LLLP, a Florida limited liability Partnership ("Partnership") consisting of a $500,000 equity investment in Partnership ("Investment") as set forth below on the signature page hereof. The investment in Partnership, and indirectly in the Hotel Project ("Project") is described in the Private Placement Memorandum ("Memorandum"). The Partnership will be managed by South Atlantic Regional Center, LLC ("General Partner"). All capitalized terms not otherwise defined herein shall have the meaning specified in the Memorandum.

    In addition to the $500,000 investment, each Subscriber will pay concurrently to General Partner an organizational and administration fee of $40,000, as described in the Memorandum and LP Agreement. Upon General Partner's acceptance of the Subscription, the entire $540,000 shall be wired into an Escrow.

    Subscriber, by executing this Subscription Agreement, does hereby certify and agree as follows:

    1.    I have had a personal Interview (the "Interview") with the representative of General Partner. During the course of the Interview, we discussed the information concerning the Partnership, General Partner, and their business in great detail and I had the opportunity to obtain any additional information I believed I needed in order to evaluate the risks and merits of the investment. I have also been provided with the Memorandum that provides certain

SUBSCRIPTION AGREEMENT
Palm House Hotel, LLLP

dealing ... in property or interests in property blocked ... is prohibited, any transaction ... that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in this order is prohibited, and any conspiracy formed to violate any of the prohibitions set forth in this order is prohibited. The phrase following persons (hereinafter referred to as Terrorists) is generally defined in the Order as meaning terrorists, including a specified list or persons and organizations. I hereby represent and warrant that I am not a Terrorist as described above.

**23.** I am a resident of: _____
(list U.S. state or province/country).

**24.** I AM AN ACCREDITED INVESTOR! I am aware that the investment is being offered to accredited investors only. I acknowledge and warrant that I am an accredited investor because (check appropriate category):

a. [  ] My individual net worth (without any exclusions), or joint net worth together with my spouse (if any), is in excess of $1,000,000 (exclusive of my or my spouse's primary residence).

b. [  ] My individual income was in excess of $200,000 in each of the past two years (excluding my spouse's income), or my joint income with my spouse was in excess of $300,000 in each of the past two years, and I expect to have an income in excess of that amount in the current year.

**25.** I hereby provide you with the following information and representations:

1. Employer and Position: _____

2. Business Address and Telephone Number: _____

3. Business or professional education and degrees: _____

4. Prior Employment (5 Years):

| EMPLOYER | NATURE OF DUTIES | DATES OF EMPLOYMENT |
|---|---|---|
| | | |
| | | |

5. Prior Investments of Purchaser (cumulative amount):

Real Estate: None: [ ]  Up to $100,000: [ ]  Over $100,000: [ ]

Oil and Gas: None: [ ]  Up to $100,000: [ ]  Over $100,000: [ ]

Other: None: [ ]  Up to $100,000: [ ]  Over $100,000: [ ]

NOT A CERTIFIED COPY

THE INFORMATION CONTAINED IN THIS SUBSCRIPTION AGREEMENT WILL BE TREATED CONFIDENTIALLY. However, I agree that you may present this Subscription Agreement to such parties as you deem appropriate if the Partnership is called upon to establish that the proposed offer and sale of the Investment is exempt from registration under the Act, or meets the requirements of applicable state securities laws.

IN WITNESS WHEREOF, the undersigned has executed this Subscription Agreement.

Signature: _____

Date: _____ , 20____

Amount of Investment: $500,000

Ownership interest to be vested in the name(s) as follows:

Name Typed or Printed: _____

Social Security Number:_____

Phone Number:_____ Email:_____

Street Mailing Address:_____

City: _____     State or Province: _____

Country: _____     Zip / Postal Code: _____

The initial $40,000 check will be deposited into escrow and should be made payable to:

"PNC Bank, as Escrow Agent for Palm House Hotel, LLLP."

**If your subscription is not accepted, please indicate your beneficiary bank to return your investment:**
Wire Instructions for payments to Beneficiary Bank:
Beneficiary Name: _____
Beneficiary Address:_____
Beneficiary Bank Account Number:_____
Beneficiary Phone Number: _____
Beneficiary ID (Passport Number):_____
Beneficiary Bank Name:_____
Beneficiary Bank Address:_____
Branch SWIFT Code: _____

*If required* Intermediary Bank Name: _____
*If required* Intermediary Bank Address: _____
*If required* Intermediary Bank SWIFT Code: _____



NOT A CERTIFIED COPY

Date: _____
Total Pages 4:

## I-526 Immigration Petition
### LEGAL SERVICE AGREEMENT

Between: Mr./Mrs. _____ and USREDA, Inc.
("United States Regional Economic Development Authority, Inc.") ("USREDA").

**RE: Preparation & filing of I-526 Immigrant Petition by Alien Entrepreneur to USCIS**
*Retainer Agreement:*

*USREDA will provide you services through our legal services department. Our team of
Attorneys and Para-legal assistants will help you and your family with the following:*

(1) The preparation and filing with the U.S. Citizenship & Immigration Service ("USCIS") the
    I-526 petition to classify you as an alien entrepreneur.

(2) The preparation and filing of immigrant visa processing (Packet 3 & 4) with the National
    Visa Center and U.S. Consulate. (Please note that no attorney will accompany you or your
    dependents at the interview for your immigrant visa application – for conditional status at the
    U.S. Consulate. This is not allowed by law.).

(3) Attorney Fees

    Your attorney's fee of $15,000 is included in the initial $55,000 USD Fee. This total is
    payable and due upon execution of this agreement.

    An additional filing fee will be assessed when all of the submission forms are completed
    (presently the USCIS charges $1,435 for this submission fee). This check will be written
    directly to the USCIS.

    A Fee of $750.00 will be required for each additional household member applying.

    NO EXTRA FEE will be required for each response to any RFE (Request for Evidence)
    that the USCIS (United States Citizen and Immigration Service) may request.

    Your I-829 Permanent Visa Application is NOT INCLUDED in this agreement. You will
    be charged an additional $5,000 USD to complete this submission when applicable.

SARC Legal Services Agreement © 2012
1



In addition, an alien who overstays the period of authorized stay can subject herself/himself to Section 222(g) of INA, which became effective on the date of enactment, September 30, 1996 and applies to any alien seeking admission on or after that date. Upon overstay of status, the alien's non-immigrant visa will be void.

You and your dependents must maintain legal status in the U.S. at all times. You understand that it is your responsibility to maintain legal status in the U.S. at all times.

(13) Change of Address

Please be advised that Section 265(a) of the INA requires that every alien who is within the U.S. must notify USCIS of each change of address, and provide their new address within 10 days of such change. Please check www.uscis.gov to download Form AR-11 and instructions.

(14) Return of Documents

Upon the completion of this case, it is your responsibility to request for the return of the documents from our office and notify our office in writing of any situation that might affect the alien's legal status. USREDA and the specific attorney assigned to your case keep a "Digital Reference Copy" of documents relating to your case. We will make these available to you at anytime via written notice of your desire to receive them.

It is your responsibility to be aware of any expiration date for the legal status of the alien and each dependent, and send us a request in writing for any further representation in any other immigration matter. In the event that we do not hear from you 40 months from the date of this letter, you have authorized us to dispose the file without further notice to you.

Summation and Agreement:

If this Legal Service Agreement reflects our understanding, kindly sign and return the SIGNED ORIGINAL to us at your earliest convenience.

I HAVE FULLY READ AND UNDERSTAND THIS AGREEMENT AND ACCEPT IT IN ITS ENTIRETY.

Date: _____

Signature: _____

Print Name: _____

SARC Legal Services Agreement © 2012                                                                  4



### THE PALM HOUSE
A Luxury Condominium Hotel and Spa on Palm Beach

## ACCREDITED INVESTOR
## IMMIGRATION QUESTIONNAIRE
### INVESTOR ELIGIBILITY QUESTIONNAIRE

This questionnaire is NOT an offer to sell or a sale of securities. Each prospective investor must complete this questionnaire and return it by e-mail, standard mail, or fax to Palm House Hotel, LLLP ("Company"). The Company will us the responses to this questionnaire to qualify prospective investors for purposes of federal and state securities law.

The prospective investor will be given access to information upon determination of suitable investor eligibility based upon the facts disclosed in this questionnaire and any other facts about the prospective investor known by the Company.

All questions must be answered. If the answer to any question below is "none" or "not applicable", then please indicate such a response in the applicable field.

The Signer of this document ("Signer") agrees that the Company may present this questionnaire to such parties as the Company deems appropriate to establish the availability of exemptions from registration under federal and state securities laws or to otherwise comply with governmental or regulatory authorities. The Signer represents that the information furnished in this questionnaire is true and correct of their own knowledge, and acknowledges that the Company and its counsel are relying on the truth and accuracy of such information to comply with federal and state securities laws. The Signer agrees to notify the Company promptly of any changes in the foregoing information that may occur prior to the investment.

_____
(Signature)

_____
(Print or Type Name)

_____
(Date)



PALM HOUSE, LLLP
197 SOUTH FEDERAL HIGHWAY
SUITE 200
BOCA RATON, FL 33432

Palm House, LLLP – Investor Questionnaire

1

NOT A CERTIFIED COPY

Name _____
          (Exact, full legal name of the individual buying the securities)

_____

Current Residence Address _____

Home Telephone _____

E-mail Address _____

Date of Birth _____

Place of Birth (city, state, country)_____

Country of Citizenship _____

## 2. BUSINESS INFORMATION

Occupation _____

Number of Years _____

Present Employer _____

Position/Title _____

Business Address _____

Business Telephone _____

Business Facsimile _____

## 3. INVESTOR ELIGIBILITY

Please answer ALL the questions on the following page.

NOT A CERTIFIED COPY

CHECK THE APPROPRIATE BOX

(ALL QUESTIONS MUST BE ANSWERED)

X   YES
☐   NO

**1.** I certify that I am not a "U.S. Person" as defined in Rule 902 of Regulation S under the Securities Act of 1933, as amended (the "Act"), and agree to resell the securities of the Company received in connection herewith only in accordance with the provisions of Regulation S, pursuant to registration under the Act or pursuant to an available exemption from registration, and agree not to engage in hedging transactions with regard to the securities unless in compliance with the Act.


YES
NO

**2A.** I am an "accredited investor" as defined in Rule 501(a) of Regulation D under the Act because I have a net worth (or joint net worth with my spouse) in excess of USD $1,000,000. For purposes of this question, "net worth" means the excess of total assets over total liabilities.

YES
NO

**2B.** I am an "accredited investor" as defined in Rule 501(a) of Regulation D under the Act because I have had individual income in excess of USD $200,000 (excluding my spouse) in each of the two most recent years (or joint income with my spouse in excess of USD $300,000 in each of those years), and have a reasonable expectation of reaching the same income level in the current year.


YES
NO
(If YES, please complete lines to the right.)

**3A.** I have the capacity to evaluate the merits and risks of the prospective investment and to otherwise protect my own interests in connection with the prospective investment by reason of my own business and/or financial experience. If I answered "YES" to this question, I support my reply with the following education and/or business and/or financial experience:*(Please provide as much detail as possible)*_____

_____
_____
_____

*(Add additional pages as necessary)*



Palm House, LLP – Investor Questionnaire

3

YES
NO

(If YES, please complete lines to the right.)

3B. I have hired a professional advisor, and by reason of the business and/or financial experience of such professional advisor, I have the capacity to evaluate the merits and risks of the prospective investment and to otherwise protect my own interests in connection with the prospective investment. I understand that the professional advisor will be required to fill out and certify a questionnaire. My professional advisor is:

Name: _____
Occupation: _____
Firm: _____
Contact Info: _____

4. I am purchasing the securities offered for my own account and for investment purposes only. If answered "NO" to this question, the following is the person for whose account I am purchasing the offered securities and/or the reason for investing: (Please provide as much detail as possible)

YES
NO

(If no, please complete lines to the right)

_____
_____
_____
_____
_____
_____

5. I have a pre-existing personal or business relationship with the Company or any of its officers, directors, or controlling persons. If I answered "YES" to this question, I explain my reply with the following description of my affiliation with that person or those persons: *(Please provide as much detail as possible)*

YES
NO

(If YES, please complete lines to the right.)

_____
_____
_____
_____
_____
_____

NOT A CERTIFIED COPY

Palm House, LLP – Investor Questionnaire

· 4

IMPORTANT NOTICE CONCERNING U.S. IMMIGRATION

Your U.S. immigration application could be denied for reasons such as health conditions, criminal offenses and national security. This is not a comprehensive listing of the possible grounds of ineligibility. You should consult your attorney to determine your eligibility.

Please answer the following questions for purposes of our initial assessment of eligibility:

Part A

A.1. Have you been arrested, charged, convicted, fined or imprisoned for violating any law (excluding traffic violations)?

Yes [ ] No [ ]

A.2. Have you been a member of, or in any way affiliated with, the Communist Party?

Yes [ ] No [ ]

A.3. Have you been a member of, or in any way affiliated with, a terrorist organization?

Yes [ ] No [ ]

A.4. Have you, by willful misrepresentation of a material fact, ever applied for or obtained a visa, an immigration benefit, or entry in to the United States?

Yes [ ] No [ ]

A.5. Have you been deported or removed from the United States?

Yes [ ] No [ ]

A.6. Have you been in the past, or are you presently, in the United States without lawful immigration status or worked without employment authorization?

Yes [ ] No [ ]

A.7. Health grounds: Do you have a communicable disease of public health significance; or a physical or mental disorder that is a threat to the safety of others; or are you a drug abuser?

Yes [ ] No [ ]

A.8. Have you received public assistance in the United States, or are you likely to receive public assistance in the future?

Yes [ ] No [ ]

Palm House, LLP – Investor Questionnaire

5

Case 9:16-cv-81871-KAM   Document 657-1   Entered on FLSD Docket 07/06/2020   Page 124 of
150
Case 9:19-cv-80332-KAM   Document 1-5   Entered on FLSD Docket 03/10/2019   Page 90 of 233

If you answered "yes" to any of the questions above, you may be ineligible to immigrate to the United States. You should consult with an attorney expert in U.S. immigration law.

A.9 Will your spouse or any of your children be included in your EB-5 visa application?

Yes [     ] No [     ]

If yes, how many total family members will be applying (including yourself)? _____

Name of spouse: _____
(LAST)   (FIRST)   (MIDDLE)

Place of Birth: _____
(CITY)   (STATE)   (COUNTRY)

Date of Birth:_____/_____/_____ Country of Citizenship: _____
(MONTH/DAY/YEAR)

Child #1: _____
(LAST)   (FIRST)   (MIDDLE)

Place of Birth: _____
(CITY)   (STATE)   (COUNTRY)

Date of Birth:_____/_____/_____ Country of Citizenship: _____
(MONTH/DAY/YEAR)

Child #2: _____
(LAST)   (FIRST)   (MIDDLE)

Place of Birth: _____
(CITY)   (STATE)   (COUNTRY)

Date of Birth:_____/_____/_____ Country of Citizenship: _____
(MONTH/DAY/YEAR)

Child #3: _____
(LAST)   (FIRST)   (MIDDLE)

Place of Birth: _____
(CITY)   (STATE)   (COUNTRY)

Date of Birth:_____/_____/_____ Country of Citizenship: _____
(MONTH/DAY/YEAR)

NOT A CERTIFIED COPY



Upon submission of your immigration application we may will require some additional follow-up contact information and green card information in order to comply with USCIS requirements. This information will also be used to maintain contact with the limited partners regarding their investment.

Part B

B.1. Are you able to provide documentation that traces your investment from your account to the account of the U.S. investment enterprise?

Yes [ ]   No [ ]

B.2. Are you able to provide documentation that explains how you accumulated the funds used to make the investment?

Yes [ ]   No [ ]

B.3. Are your investment funds from a lawful source?

Yes [ ]   No [ ]

B.4. Do you have the capacity to participate in the U.S. investment enterprise as a limited partner?

Yes [ ]   No [ ]

If you answered "no" to any of the questions in Part B above, you will not be eligible for U.S. immigration based on investment.

# EXHIBIT C

NOTE: Please include a photocopy of your Passport along with this questionnaire.

INDIVIDUAL(S) SIGN HERE:

Subscriber: _____

_____
(Signature)

Date: _____



NOT A CERTIFIED COPY



## IMMIGRATION
## APPLICATION
## CHECKLIST

NOT A CERTIFIED COPY





**EB-5 FOREIGN INVESTMENT IMMIGRATION APPLICATION CHECKLIST**
EB-5 外国企业家投资移民（I-526投资移民申请）申请材料准备清单

| For Internal Use Only : 仅限内部使用 | |
|---|---|
| Name of Primary Applicant (PA):申请人姓名： | |
| Date of Review 审核日期： | Client ID No. 客户 ID 号码： |
| Name of Reviewer 审核人姓名： | |

*IMPORTANT: All non-English documents must have a complete copy of notarized English translation*
所有非英语文件必须有公证的完整英文翻译

**ESSENTIAL DOCUMENTS:**
基本必需文件：

*Received Missing Problem*
已收到　待补　有疑问

| 已收到 | 待补 | 有疑问 | |
|---|---|---|---|
| ☐ | ☐ | ☐ | Application fee for Homeland Security - $1,500 USD bank draft 美国国家安全局的申请费：$1500 美金银行汇票 |
| ☐ | ☐ | ☐ | Remittance of $500,000 USD to escrow account 证明$500,000 美金汇入托管账户的汇款单 |
| ☐ | ☐ | ☐ | I-526 form signed 已签名的 I-526 表格 |
| ☐ | ☐ | ☐ | G-28 form signed 已签名的 G-28 表格 |
| ☐ | ☐ | ☐ | I-829 form signed 已签名的 I-829 表格 |
| ☐ | ☐ | ☐ | W-8BEN form signed 已签名的 W-8BEN 表格 |
| ☐ | ☐ | ☐ | Operating Agreement of program signed 已签名的项目运营协议 |
| ☐ | ☐ | ☐ | Subscription Agreement signed 已签名的认购协议 |
| ☐ | ☐ | ☐ | Subscription to Escrow Agreement signed 已签名的托管账户认购协议 |
| ☐ | ☐ | ☐ | Investor Eligibility Questionnaire signed (must be "accredited investor") 已签名的投资者资格调查问卷（必须是合格的投资者） |
| ☐ | ☐ | ☐ | Original of Non-Disclosure and Non-Circumvention agreement signed 已签名的保密和反欺诈协议 |
| ☐ | ☐ | ☐ | Lawyer Agency Agreement signed 已签名的律师代理协议 |
| ☐ | ☐ | ☐ | Notarized English translations of all documents submitted 已公证的所有提交文件的英文翻译件 |



**EB-5 FOREIGN INVESTMENT IMMIGRATION APPLICATION CHECKLIST**
EB-5 外国企业家投资移民（I-526 投资移民申请）申请材料准备清单

## IDENTIFICATION DOCUMENTS:
身份证明资料：

Received Missing Problem
已收到　持朴　有疑问

☐ ☐ ☐ Copy of passports of PA and family member(s) (all pages)
申请人及其家庭成员的护照复印件（所有页）

☐ ☐ ☐ Notarized birth certificates of PA and family member(s)
已公证的申请人及其家庭成员的出生证明

☐ ☐ ☐ If applying with spouse, Notarized Marriage Certificate
如随申请配偶，已公证的结婚证明

☐ ☐ ☐ Resident ID cards of PA and family member(s)
申请人及其家庭成员的身份证复印件

☐ ☐ ☐ Copy of PA and family's Household Register
申请人及其家庭成员的户口薄复印件

☐ ☐ ☐ Notarized criminal background check of PA and any family member(s) over the age of 16 years old.
已公证的申请人及其 16 岁以上家庭成员无犯罪纪律的证明

NOT A CERTIFIED COPY

Client ID No. 客户 ID号码: _____　　Rev. Date 02/27/12 I-526 Document Checklist (I-526 文件清单)　2-



**EB-5 FOREIGN INVESTMENT IMMIGRATION APPLICATION CHECKLIST**
EB-5外国企业家投资移民（I-526投资移民申请）申请材料准备清单

NOT A CERTIFIED COPY

**SOURCE OF FUNDS:**
资金来源的证明资料：

| Received | Missing | Problem | |
|----------|---------|---------|---|
| 已收到 | 待补 | 有疑问 | |
| ☐ | ☐ | ☐ | Provide narrative on source of funds and path of $500,000 USD investment, as detailed below<br>关于用来投资的$500,000 美金的来源及路径概要 |
| ☐ | ☐ | ☐ | Resume of applicant<br>申请人的简历 |

*If Through Employment Income:*
如果资金的来源是工资收入：

| Received | Missing | Problem | |
|----------|---------|---------|---|
| 已收到 | 待补 | 有疑问 | |
| ☐ | ☐ | ☐ | Proof of income used to make investment (resume is not enough)<br>用来投资的工资收入证明（仅仅有简历是不够的） |
| ☐ | ☐ | ☐ | - Pay stubs -工资表 |
| ☐ | ☐ | ☐ | - Income tax returns -个税缴税证明 |
| ☐ | ☐ | ☐ | - Work income certificate from employer -公司出具的收入证明 |
| ☐ | ☐ | ☐ | - Board minutes or company statement re: salary / bonuses paid to PA<br>工资/奖金发给申请人的董事会会议记录或者公司证明 |
| ☐ | ☐ | ☐ | - Company Info: business license; registration, permits, taxes paid, audits, PA ownership percentage<br>-公司资料：营业执照、税务登记证、经营许可证、缴税证、审计报告、申请人所占的股份证明 |
| ☐ | ☐ | ☐ | Bank statements showing PATH of funds earned above<br>所有上述相关收入的银行交易记录 |



**EB-5 FOREIGN INVESTMENT IMMIGRATION APPLICATION CHECKLIST**
**EB-5 外国企业家投资移民（I-526 投资移民申请）申请材料准备清单**

*If Through Real Estate Sale, Mortgage, or Lease:*
如果资金的来源是房地产的出售，抵押或者租赁：

Received Missing Problem
己收到　待补　有疑问

| | | | |
|---|---|---|---|
| ☐ | ☐ | ◯ | Proof of income used to purchase the Real Estate<br>购买房产的资金证明 |
| ☐ | ☐ | ☐ | Proof of Real Estate purchase (amount and date of purchase)<br>房产的购买证明 (购买的时间和金额) |
| ☐ | ☐ | ☐ | Deeds, mortgage, appraisals, tax payments, etc. showing purchase/ownership<br>房产证、贷款证、房产评估报告、缴税证明等等，证明房屋的购买/产权的文件 |
| ☐ | ☐ | ☐ | If sale, proof of Real Estate sale (amount of date of sale)<br>如果资金的来源是房产出售，需要房产出售的证明　（出售的金额以及时间). |
| ☐ | ☐ | ☐ | If mortgage/loan based on Real Estate owned, provide mortgage documents<br>如果资金的来源是房产抵押，需要相关的贷款文件 |
| ☐ | ☐ | ☐ | If rental property, lease agreement showing amount of rent received<br>如果资金的来源是房产租赁，需要租约证明租金的金额 |
| ☐ | ☐ | ☐ | Bank statements showing PATH of funds used to purchase house & receipt from sale/mortgage<br>所有上述资金的银行交易记录（如银行对账单，显示购买/出售/贷款的金额） |

Client ID No. 客户 ID 号码: _____　　Rev. Date 02/27/12 I-526 Document Checklist (I-526 文件清单)　　4

NOT A CERTIFIED COPY



### EB-5 FOREIGN INVESTMENT IMMIGRATION APPLICATION CHECKLIST
### EB-5 外国企业家投资移民（I-526 投资移民申请）申请材料准备清单

*If Through Other Investment Income:*
如果资金的来源是投资回报。

| Received | Missing | Problem | |
|---|---|---|---|
| 已收到 | 待补 | 有疑问 | |
| ☐ | ☐ | ☐ | Proof of income used to purchase investment assets<br>用来购买投资产品的资金证明 |
| ☐ | ☐ | ☐ | Proof of asset(s) purchased (amount and date of purchase)<br>购买投资产品的证明（购买的金额以及时间） |
| ☐ | ☐ | ☐ | Deeds, stock certificates, statements, etc. showing purchase/ownership<br>认购书，股票证明书等等，证明投资产品的购买和所有权 |
| ☐ | ☐ | ☐ | If sale, proof of asset(s) sale (amount and date of sale)<br>如果资金的来源是投资产品的出售，需要出售的相关文件（出售的金额和时间） |
| ☐ | ☐ | ☐ | If loan based on asset(s) owned, provide loan documents.<br>如果资金的来源是投资产品的抵押，需要抵押贷款的相关文件 |
| ☐ | ☐ | ☐ | Bank statements showing PATH of funds used to purchase asset(s) & receipt from sale/loan<br>所有上述资金的银行交易记录（如银行对账单，显示购买/出售/抵押贷款的金额） |

Client ID No: 客户 ID 号码:                Rev. Date 02/27/12 I-526 Document Checklist (I-526 文件清单)     5

NOT A CERTIFIED COPY



**EB-5 FOREIGN INVESTMENT IMMIGRATION APPLICATION CHECKLIST**
EB-5 外国企业家投资移民（I-526 投资移民申请）申请材料准备清单

*If Through Loan:*
如果资金的来源是贷款：

| Received 己收到 | Missing 待补 | Problem 有疑问 | |
|---|---|---|---|
| ☐ | ☐ | ◯ | Loan agreement contract, or statement of person or company providing loan<br>贷款合同、借款人陈述、或者公司提供的贷款声明 |
| ☐ | ☐ | ☐ | If from person, legal source of funds of the person providing the loan (see sections above)<br>如果贷款是由个人提供的，需要借款人提供资金合法来源证明（可以参考上述资料） |
| ☐ | ☐ | ☐ | If from company, legal source of capital invested into the company by PA (see sections above)<br>如果贷款是由公司提供的，需要申请人提供公司注册资本的来源证明 （可以参考上述资料） |
| ☐ | ☐ | ☐ | – Board minutes or company statement re: Loan provided to PA<br>-董事会会议记录或者公司声明：证明提供贷款给申请人<br>– Company Info: business license, registration, permits, taxes paid, audits, PA Ownership<br>-公司资料：营业执照、税务登记证、经营许可证、缴税证明、审计报告、申请人所占的股份证明 |
| ☐ | ☐ | ☐ | Bank statements showing PATH of funds received<br>所有上述资金的银行交易记录 |

NOT A CERTIFIED COPY



**EB-5 FOREIGN INVESTMENT IMMIGRATION APPLICATION CHECKLIST**
EB-5 外国企业家投资移民（I-526 投资移民申请）申请材料准备清单

*If Through Gift:*
如果资金的来源是赠与:

| Received<br>已收到 | Missing<br>待补 | Problem<br>有疑问 | |
|---|---|---|---|
| ☐ | ☐ | ☐ | Statement of person(s) providing gift<br>赠与人的陈述证明 |
| ☐ | ☐ | ☐ | Legal source of funds of person(s) providing the gift (see sections above)赠与人资金的合法来源证明 (可参考上述资料) |
| ☐ | ☐ | ☐ | If gift is Real Estate, provide documentation of transfer of ownership to PA<br>如果赠与的是房产，需要相关产权转让的证明文件 |
| ☐ | ☐ | ☐ | Bank statements showing PATH of funds received<br>所有上述资金的银行交易记录 |

*If Through Inheritance, Lawsuit, Other Sources:*
如果资金的来源是遗产，诉讼，或者其他途径:

| Received<br>已收到 | Missing<br>待补 | Problem<br>有疑问 | |
|---|---|---|---|
| ☐ | ☐ | ◯ | If through inheritance, documentation of will or court order<br>如果资金来源是遗产，需要提供遗嘱或者法庭颁令 |
| ☐ | ☐ | ☐ | If through lawsuit or divorce proceedings, copy of court order<br>如果资金来源是诉讼或者离婚后财产，需要提供法庭颁令 |
| ☐ | ☐ | ☐ | If through other, proof of lawful source<br>如果资金来源是其他途径，需要提供相关的合法来源证明 |
| ☐ | ☐ | ☐ | Bank statements showing PATH of funds received<br>所有上述资金的银行交易记录 |

NOT A CERTIFIED COPY



**EB-5 FOREIGN INVESTMENT IMMIGRATION APPLICATION CHECKLIST**
EB-5 外国企业家投资移民（I-526 投资移民申请）申请材料准备清单

**PATH OF FUNDS:**
资金路径的证明文件：

Received Missing Problem
已收到　待补　有疑问
☐ ☐ ☐
Wire Transfer / bank statements showing remittance of $500,000 USD to escrow account
电汇单/银行对账单证明$500,000 美金汇入托管账户

*Path of Funds for all sources above:*
上述所有资金的资金路径：

Received Missing Problem
已收到　待补　有疑问
☐ ☐ ☐
Path of funds from money earned to bank account used to make $500,000 USD investment
申请人获得的用来投资的$500,000 美元的银行交易记录

*Path of Funds for Currency Exchange / Capital Exchange:*
货币/外币资金转换声明：

Received Missing Problem
已收到　待补　有疑问
☐ ☐ ☐
Declaration of third party members with list of names, personal ID numbers, and signatures
声明中需列出所有第三方人员的姓名，身份证号码，以及所有人员的签名

☐ ☐ ☐
Bank statements documenting transfer of funds from PA's account to third party accounts
申请人将资金转给第三方人员的银行文件
Personal remittance vouchers from each friend or relative back to PA's account
每位朋友或亲戚将换得的外币转回给申请人的银行存折交易明细

☐ ☐ ☐
Copy of deposit slips totaling $500,000 USD into PA's individual account
申请人的个人账户显示收到$500,000 美金存款单的复印件

Client: ID No. 客户 ID 号码：　　　　　　　　Rev. Date 02/27/12 I-526 Document Checklist (I-526 文件清单)　　8



**EB-5 FOREIGN INVESTMENT IMMIGRATION APPLICATION CHECKLIST**
EB-5 外国企业家投资移民（I-526 投资移民申请）申请材料准备清单

OTHER DOCUMENTS:
其他：

*Received Missing Problem*
己收到　待补　有疑问

☐　☐　◯　If business name changes, documentation of name changes and prior names
如果公司的名字有变更过，需要提供曾用名和名字变更的证明文件

☐　☐　☐　If adopted children, notice of adoption
如果孩子是收养的，需要提供收养的证明文件

NOT A CERTIFIED COPY

| Form **W-8BEN** | Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding | |
|---|---|---|
| (Rev. February 2006) Department of the Treasury Internal Revenue Service | ▶ Section references are to the Internal Revenue Code. ▶ See separate instructions. ▶ Give this form to the withholding agent or payer. Do not send it to the IRS. | OMB No. 1545-1621 |

**Do not use this form for:**  Instead, use Form:
- A U.S. citizen or other U.S. person, including a resident alien individual . . . . . . . . . . . . . . . . . . . . W-9
- A person claiming that income is effectively connected with the conduct of a trade or business in the United States . . . . . . . . . . . . . . . . . . . . . . . . W-8ECI
- A foreign partnership, a foreign simple trust, or a foreign grantor trust (see instructions for exceptions) . . . . . . W-8ECI or W-8IMY
- A foreign government, international organization, foreign central bank of issue, foreign tax-exempt organization, foreign private foundation, or government of a U.S. possession that received effectively connected income or that is claiming the applicability of section(s) 115(2), 501(c), 892, 895, or 1443(b) (see instructions) . . . . . . . . W-8ECI or W-8EXP

**Note:** These entities should use Form W-8BEN if they are claiming treaty benefits or are providing the form only to claim they are a foreign person exempt from backup withholding.
- A person acting as an intermediary . . . . . . . . . . . . . . . . . . . . . . . . W-8IMY

**Note:** See instructions for additional exceptions.

| **Part I** | **Identification of Beneficial Owner** (See instructions.) | | |
|---|---|---|---|

1  Name of individual or organization that is the beneficial owner

2  Country of incorporation or organization

3  Type of beneficial owner:  ☐ Individual  ☐ Corporation  ☐ Disregarded entity  ☐ Partnership  ☐ Simple trust
☐ Grantor trust  ☐ Complex trust  ☐ Estate  ☐ Government  ☐ International organization
☐ Central bank of issue  ☐ Tax-exempt organization  ☐ Private foundation

4  Permanent residence address (street, apt. or suite no., or rural route). Do not use a P.O. box or in-care-of address.

City or town, state or province. Include postal code where appropriate.  Country (do not abbreviate)

5  Mailing address (if different from above)

City or town, state or province. Include postal code where appropriate.  Country (do not abbreviate)

6  U.S. taxpayer identification number, if required (see instructions)  ☐ SSN or ITIN  ☐ EIN

7  Foreign tax identifying number, if any (optional)

8  Reference number(s) (see instructions)

| **Part II** | **Claim of Tax Treaty Benefits** (if applicable) |
|---|---|

9  I certify that (check all that apply):
a ☐ The beneficial owner is a resident of ............................................. within the meaning of the income tax treaty between the United States and that country.
b ☐ If required, the U.S. taxpayer identification number is stated on line 6 (see instructions).
c ☐ The beneficial owner is not an individual, derives the item (or items) of income for which the treaty benefits are claimed, and, if applicable, meets the requirements of the treaty provision dealing with limitation on benefits (see instructions).
d ☐ The beneficial owner is not an individual, is claiming treaty benefits for dividends received from a foreign corporation or interest from a U.S. trade or business of a foreign corporation, and meets qualified resident status (see instructions).
e ☐ The beneficial owner is related to the person obligated to pay the income within the meaning of section 267(b) or 707(b), and will file Form 8833 if the amount subject to withholding received during a calendar year exceeds, in the aggregate, $500,000.

10  Special rates and conditions (if applicable—see instructions): The beneficial owner is claiming the provisions of Article .............of the treaty identified on line 9a above to claim a ................% rate of withholding on (specify type of income): ..................................... . Explain the reasons the beneficial owner meets the terms of the treaty article: ......................................................
......................................................................................................................................
......................................................................................................................................

| **Part III** | **Notional Principal Contracts** |
|---|---|

11 ☐ I have provided or will provide a statement that identifies those notional principal contracts from which the income is not effectively connected with the conduct of a trade or business in the United States. I agree to update this statement as required.

| **Part IV** | **Certification** |
|---|---|

Under penalties of perjury, I declare that I have examined the information on this form and to the best of my knowledge and belief it is true, correct, and complete. I further certify under penalties of perjury that:
1 I am the beneficial owner (or am authorized to sign for the beneficial owner) of all the income to which this form relates,
2 The beneficial owner is not a U.S. person,
3 The income to which this form relates is (a) not effectively connected with the conduct of a trade or business in the United States, (b) effectively connected but is not subject to tax under an income tax treaty, or (c) the partner's share of a partnership's effectively connected income, and
4 For broker transactions or barter exchanges, the beneficial owner is an exempt foreign person as defined in the instructions.
Furthermore, I authorize this form to be provided to any withholding agent that has control, receipt, or custody of the income of which I am the beneficial owner or any withholding agent that can disburse or make payments of the income of which I am the beneficial owner.

**Sign Here** ▶

Signature of beneficial owner (or individual authorized to sign for beneficial owner)  Date (MM-DD-YYYY)  Capacity in which acting

For Paperwork Reduction Act Notice, see separate instructions.  Cat. No. 25047Z  Form **W-8BEN** (Rev. 2-2006)

⊕ Printed on Recycled Paper

NOT A CERTIFIED COPY



# Notice of Entry of Appearance
## as Attorney or Accredited Representative
### Department of Homeland Security

**Form G-28**
OMB No. 1615-0105
Expires 02/29/2016

---

## Part 1.  Information About Attorney or Accredited Representative

Name and Address of Attorney or Accredited Representative

**1.a.** Family Name
*(Last Name)*

**1.b.** Given Name
*(First Name)*

**1.c.** Middle Name

**2.** Name of Law Firm or Recognized Organization

**3.** Name of Law Student or Law Graduate

**4.** State Bar Number

**5.a.** Street Number

**5.b.** Street Name

**5.c.** Apt. ☐   Ste. ☐   Flr. ☐

**5.d.** City or Town

**5.e.** State        **5.f.** Zip Code

**5.g.** Postal Code

**5.h.** Province

**5.i.** Country

**6.** Daytime Phone Number ( ) -

**7.** E-Mail Address of Attorney or Accredited Representative

## Part 2.  Eligibility Information For Attorney or Accredited Representative

*(Check applicable items(s) below)*

**1.** ☐ I am an attorney eligible to practice law in, and a member in good standing of, the bar of the highest court(s) of the following State(s), possession(s), territory(ies), commonwealth(s), or the District of Columbia.

**1.a.**

**1.b.** I *(choose one)* ☐ *am not* ☐ *am*
subject to any order of any court or administrative agency disbarring, suspending, enjoining, restraining, or otherwise restricting me in the practice of law. (If you are subject to any order(s), explain fully in the space below.)

**1.b.1.**

**2.** ☐ I am an accredited representative of the following qualified nonprofit religious, charitable, social service, or similar organization established in the United States, so recognized by the Department of Justice, Board of Immigration Appeals pursuant to 8 CFR 292.2. Provide the name of the organization and the expiration date of accreditation.

**2.a.** Name of Recognized Organization

**2.b.** Date Accreditation expires
*(mm/dd/yyyy)* ▶

**3.** ☐ I am associated with

**3.a.**

the attorney or accredited representative of record who previously filed Form G-28 in this case, and my appearance as an attorney or accredited representative is at his or her request. If you check this item, also complete **number 1 (1.a. - 1.b.1.) or number 2 (2.a. - 2.b.)** in **Part 2** *(whichever is appropriate)*.

**4.** ☐ I am a law student or law graduate working under the direct supervision of the attorney or accredited representative of record on this form in accordance with the requirements in 8 CFR 292.1(a)(2)(iv).

NOT A CERTIFIED COPY

---

NOT A CERTIFIED COPY

**Part 3. Notice of Appearance as Attorney or Accredited Representative**

This appearance relates to immigration matters before (select one):

1. ☐ USCIS - List the form number(s)
1.a. _____

2. ☐ ICE - List the specific matter in which appearance is entered
2.a. _____

3. ☐ CBP - List the specific matter in which appearance is entered
3.a. _____

I hereby enter my appearance as attorney or accredited representative at the request of:

4. Select only one: ☐ Applicant ☐ Petitioner
☐ Respondent (ICE, CBP)

Name of Applicant, Petitioner, or Respondent

5.a. Family Name (Last Name) _____
5.b. Given Name (First Name) _____
5.c. Middle Name _____
5.d. Name of Company or Organization, if applicable _____

NOTE: Provide the mailing address of Petitioner, Applicant, or Respondent and not the address of the attorney or accredited representative, **except when a safe mailing address is permitted** on an application or petition filed with Form G-28.

6.a. Street Number and Name _____
6.b. Apt. ☐ Ste. ☐ Flr. ☐ _____
6.c. City or Town _____
6.d. State _____ 6.e. Zip Code _____

7. Provide A-Number and/or Receipt Number
_____

Pursuant to the Privacy Act of 1974 and DHS policy, I hereby consent to the disclosure to the named Attorney or Accredited Representative of any record pertaining to me that appears in any system of records of USCIS, ICE, or CBP.

8.a. Signature of Applicant, Petitioner, or Respondent
_____

8.b. Date (mm/dd/yyyy) ▶ _____

**Part 4. Signature of Attorney or Accredited Representative**

I have read and understand the regulations and conditions contained in 8 CFR 103.2 and 292 governing appearances and representation before the Department of Homeland Security. I declare under penalty of perjury under the laws of the United States that the information I have provided on this form is true and correct.

1. Signature of Attorney or Accredited Representative
_____

2. Signature of Law Student or Law Graduate
_____

3. Date (mm/dd/yyyy) ▶ _____

**Part 5. Additional Information**

1. _____

Case 9:19-cv-80332-KAM Document 1-5 Entered on FLSD Docket 03/10/2019 Page 85 of 233

Department of Homeland Security
U.S. Citizenship and Immigration Services

OMB No. 1615-0026; Exp. 05/31/2013

# Form I-526, Immigrant Petition by Alien Entrepreneur

Do Not Write in This Block - For USCIS Use Only (Except G-28 Block Below)

| Classification | Action Block | Fee Receipt |
|---|---|---|
| Priority Date | | To be completed by Attorney or Representative, if any<br>G-28 is attached<br>Attorney's State License No. |
| Remarks: | | |

NOT A CERTIFIED COPY

START HERE - Type or print in black ink.

## Part 1. Information About You

Family Name | Given Name | Middle Name

In care of Street Number and Name:

Address: | Apt. Number

City | State or Province | Country | Zip/Postal Code

Date of Birth (mm/dd/yyyy) | Country of Birth | Social Security # (if any) | A # (if any)

If you are in the United States, provide the following information: | Date of Arrival (mm/dd/yyyy) | I-94 #

Current Nonimmigrant Status | Date Current Status Expires (mm/dd/yyyy) | Daytime Phone # with Area Code

## Part 2. Application Type *(Check one)*

a. X This petition is based on an investment in a commercial enterprise in a targeted employment area for which the required amount of capital invested has been adjusted downward.

b. This petition is based on an investment in a commercial enterprise in an area for which the required amount of capital invested has been adjusted upward.

c. This petition is based on an investment in a commercial enterprise that is not in either a targeted area or in an upward adjustment area.

## Part 3. Information About Your Investment

Name of commercial enterprise in which funds are invested *(Required Field - Do Not Leave Blank)*

Street Address

Phone # with Area Code | Business organized as (corporation, partnership, etc.)

Kind of business (e.g. furniture manufacturer) | Date established (mm/dd/yyyy) | IRS Tax #

RECEIVED: ______ RESUBMITTED: ______ RELOCATED: SENT ______ REC'D ______

## Part 3. Information About Your Investment. *(Continued)*

| | | | |
|---|---|---|---|
| Date of your initial investment (mm/dd/yyyy) | | Amount of your initial investment $ | |
| Your total capital investment in the enterprise to date $ | | Percentage of the enterprise you own | |

If you are not the sole investor in the new commercial enterprise, list on separate paper the names of all other parties (natural and non-natural) who hold a percentage share of ownership of the new enterprise and indicate whether any of these parties is seeking classification as an alien entrepreneur. Include the name, percentage of ownership, and whether or not the person is seeking classification under section 203(b)(5). NOTE: A "natural" party would be an individual person, and a "non-natural" party would be an entity such as a corporation, consortium, investment group, partnership, etc.

If you indicated in Part 2 that the enterprise is in a targeted employment area or in an upward adjustment area, name the county and State:

| County | | State | |
|---|---|---|---|

## Part 4. Additional Information About the Enterprise

Type of Enterprise (check one):

X  New commercial enterprise resulting from the creation of a new business.

   New commercial enterprise resulting from the purchase of an existing business.

   New commercial enterprise resulting from a capital investment in an existing business.

Composition of the Petitioner's Investment:

| | | |
|---|---|---|
| Total amount in U.S. bank account ......................................................................... | $ | |
| Total value of all assets purchased for use in the enterprise........................... | $ | |
| Total value of all property transferred from abroad to the new enterprise........................... | $ | |
| Total of all debt financing........................................................ | $ | |
| Total stock purchases.......................................... | $ | |
| Other (explain on separate paper)............................. | $ | |
| Total | $ | |

Income:

| | | | | | |
|---|---|---|---|---|---|
| When you made the investment......... | Gross | $ | | Net | $ |
| Now......................................... | Gross | $ | | Net | $ |

Net worth:

| | | | | | |
|---|---|---|---|---|---|
| When you made investment.............. | Gross | $ | | Now | $ |

NOT A CERTIFIED COPY

**Part 5. Employment Creation Information**

Number of full-time employees in the enterprise in U.S. (excluding you, your spouse, sons, and daughters)

| When you made your initial investment? | | Now | | Difference | |

How many of these new jobs were created by your investment?

How many additional new jobs will be created by your additional investment?

What is your position, office, or title with the new commercial enterprise?

Briefly describe your duties, activities, and responsibilities.

What is your salary? $

What is the cost of your benefits? $

**Part 6. Processing Information**

Check One:

☐ The person named in Part 1 is now in the United States, and an application to adjust status to permanent resident will be filed if this petition is approved.

☐ If the petition is approved and the person named in Part 1 wishes to apply for an immigrant visa abroad, complete the following for that person:

Country of nationality:

Country of current residence or, if now in the United States, last permanent residence abroad:

If you provided a United States address in Part 1, print the person's foreign address:

If the person's native alphabet is other than Roman letters, write the foreign address in the native alphabet:

Are you in deportation or removal proceedings?          Yes (Explain on separate paper)     X  No

Have you ever worked in the United States without permission?     Yes (Explain on separate paper)     X  No

**Part 7. Signature.** *Read the information on penalties in the instructions before completing this section.*

I certify, under penalty of perjury under the laws of the United States of America, that this petition and the evidence submitted with it is all true and correct. I authorize the release of any information from my records that U.S. Citizenship and Immigration Services needs to determine eligibility for the benefit I am seeking.

Signature                                                                                    Date

NOTE: *If you do not completely fill out this form or fail to the submit the required documents listed in the instructions. you may not be found eligible for the immigration benefit you are seeking and this petition may be denied.*

**Part 8. Signature of Person Preparing Form, If Other Than Above (Sign below)**

I declare that I prepared this application at the request of the above person, and it is based on all information of which I have knowledge.

Signature                          Print Your Name                                Date

Firm Name                                              Daytime phone # with area code

Address

Form I-526 (05/10/12) Y Page 3

FOIA CERTIFIED COPY

OMB No. 1615-0045; Expires 07/31/2012

**Department of Homeland Security**
U.S. Citizenship and Immigration Services

**I-829, Petition by Entrepreneur to Remove Conditions**

| Do not write in this block - For USCIS use only (Except G-28 Block Below) | | |
|---|---|---|
| ☐ Applicant Interviewed | **Action Block** | Fee Receipt |
| | | **To be completed by Attorney or Representative, if any**<br>☐ G-28 is attached<br>Attorney's State License No. |
| Remarks: | | |

**START HERE – Type or print in black ink.**

## Part 1.    Information About You

A # (if any) [                    ]    Form I-526 Receipt Number [                    ]

Family Name [                    ]    Given Name [                    ]    Middle Name [                    ]

Address:

In care of [                    ]

Number and Street [                    ]    Apt. # [      ]

City [                    ]    State or Province [                    ]

Country [                    ]    Zip/Postal Code [                    ]    Daytime Phone # [                    ]

Date of Birth (mm/dd/yyyy) [                    ]    Country of Birth [                    ]    U.S. Social Security # (if any) [                    ]

Since becoming a conditional permanent resident, have you ever been arrested, cited, charged, indicted, convicted, fined, or imprisoned for breaking or violating any law or ordinance (excluding traffic regulations), or committed any crime for which you were not arrested?

☐ Yes    ☐ No    (If yes, explain on separate sheet(s) of paper, including disposition, if any.)

## Part 2. Basis for Petition    (Check one)

a. ☐ My conditional permanent residence is based on an investment in a commercial enterprise.

b. ☐ Reserved.

c. ☐ Reserved.

d. ☐ I am a conditional permanent resident spouse or child of an entrepreneur, and I am unable to be included in a Petition by Entrepreneur to Remove Conditions (Form I-829) filed by my conditional resident spouse or parent.

e. ☐ I am a conditional permanent resident spouse or child of an entrepreneur who is deceased.

## Part 3. Information About Your Husband or Wife

Family Name [                    ]    Given Name [                    ]    Middle Name [                    ]

Gender ☐ Male ☐ Female    Date of Birth (mm/dd/yyyy) [                    ]    Date of Marriage (mm/dd/yyyy) [                    ]

Other names used (including maiden name or aliases) [                    ]

A# (If any) [                    ]    Current Immigration Status [                    ]    Is your current immigration status based on the petitioner's current status?    ☐ Yes   ☐ No

RECEIVED: _____  RESUBMITTED: _____  RELOCATED: SENT _____  REC'D _____



Form I-829 07/30/11 Y

## Part 4. Children  *(List all your children. Attach another sheet(s) of paper, if necessary.)*

| Family Name | | Given Name | | Middle Name | | |
|---|---|---|---|---|---|---|
| A# (if any) | | Current Immigration Status | | Date of Birth (mm/dd/yyyy) | | Living with you? ☐ Yes ☐ No |

| Family Name | | Given Name | | Middle Name | | |
|---|---|---|---|---|---|---|
| A# (if any) | | Current Immigration Status | | Date of Birth (mm/dd/yyyy) | | Living with you? ☐ Yes ☐ No |

| Family Name | | Given Name | | Middle Name | | |
|---|---|---|---|---|---|---|
| A# (if any) | | Current Immigration Status | | Date of Birth (mm/dd/yyyy) | | Living with you? ☐ Yes ☐ No |

| Family Name | | Given Name | | Middle Name | | |
|---|---|---|---|---|---|---|
| A# (if any) | | Current Immigration Status | | Date of Birth (mm/dd/yyyy) | | Living with you? ☐ Yes ☐ No |

| Family Name | | Given Name | | Middle Name | | |
|---|---|---|---|---|---|---|
| A# (if any) | | Current Immigration Status | | Date of Birth (mm/dd/yyyy) | | Living with you? ☐ Yes ☐ No |

| Family Name | | Given Name | | Middle Name | | |
|---|---|---|---|---|---|---|
| A# (if any) | | Current Immigration Status | | Date of Birth (mm/dd/yyyy) | | Living with you? ☐ Yes ☐ No |

## Part 5. Information About Your Commercial Enterprise

**Type of Enterprise** *(Check one):*

☐ New commercial enterprise resulting from the creation of a new business.

☐ New commercial enterprise resulting from the reorganization of an existing business.

☐ New commercial enterprise resulting from a capital investment in an existing business.

**Kind of Business** *(Be as specific as possible):*

**Date Business Established** *(mm/dd/yyyy)*                  Amount of Initial Investment

**Date of Initial Investment** *(mm/dd/yyyy)*                  % of Enterprise You Own

**Number of full-time employees in enterprise in United States (excluding you, your spouse, sons, and daughters):**

At the time of your initial investment:              Presently:              Difference:

**How many of these new jobs were created by your investment?**

Form I-829  07/30/11 Y Page 2

NOT A CERTIFIED COPY

## Part 5. Information About Your Commercial Enterprise    (continued)

**Subsequent Investment in the Enterprise:**

| Date of Investment | Amount of Investment | Type of Investment |
|---|---|---|
| | | |
| | | |
| | | |

Provide the gross and net incomes generated annually by the commercial enterprise since your initial investment.  Include all income generated up to date during the present year.

| Year | Gross Income | Net Income |
|---|---|---|
| | | |
| | | |
| | | |

Has your commercial enterprise filed for bankruptcy, ceased business operations, or have any changes in its business organization or ownership occurred since the date of your initial investment?    ☑ Yes (Explain on separate sheet)    ☐ No

Has your commercial enterprise sold any corporate assets, shares, property, or had any capital withdrawn since the date of your initial investment?    ☐ Yes (Explain on separate sheet)    ☐ No

## Part 6. Signature (Read the information on penalties in the instructions before completing this section.)

I certify, under penalty of perjury under the laws of the United States of America, that this petition and the evidence submitted with it is all true and correct.  I further certify that the investment was made in accordance with the laws of the United States and was not for the purpose of evading United States immigration laws.  I also authorize the release of any information from my records that the U.S. Citizenship and Immigration Services needs to determine eligibility for the benefit being sought.

| Signature of Applicant | Print Name | Date |
|---|---|---|
| | | |

**NOTE:  If you do not completely fill out this form or fail to submit any required documents listed in the instructions, you may not be found eligible for the requested benefit and this petition may be denied.**

## Part 7. Signature of Person Preparing Form, If Other Than Above

I declare that I prepared this petition at the request of the above person and it is based on all information of which I have knowledge.

| Signature | Print Name | Date |
|---|---|---|
| | | |

Firm Name and Address  (Include Telephone Number with Area Code and E-Mail Address.)

Form I-829  07/30/11 Y Page 3



### USREDA / SARC Service Agreement

**THIS SERVICE AGREEMENT** (the "Agreement") is made and entered into as of this _____ day of _____, 20____ by and between USREDA, LLC, d/b/a EB5 Petition ("EB5 Petition"); a Delaware company with principal place of business in Palm Beach County, Florida, and _____ ("Client"), a _____ with the purpose of providing legal immigration services as it applies to the United States EB-5 Visa program.

This Service Agreement pertains to the _____ Project (the "Project"), under the South Atlantic Regional Center ("Regional Center"), a USCIS-approved regional center.

**WHEREAS,** EB5 Petition was formed to enable individuals to become eligible for admission to the United States of America under the EB-5, fifth employment-based visa preference program (8 U.S.C. 1153(b)(5)), and seeks to offer services with regards to all aspects of the EB-5 program.

**NOW THEREFORE,** in consideration of the mutual covenants contained herein, and intending to be legally bound, the parties hereto agree as follows:

### 1. Definitions:

**EB5 Petition:** EB5 Petition or its affiliated entity USREDA, LLC, and all agents and employees thereof.

**I-526:** The USCIS application for conditional permanent residency in the United States.

**I-485:** The USCIS application form to "Adjust Status" from non-immigrant visa to permanent residence for aliens lawfully present in the United States and otherwise eligible for adjustment.

**DS-230:** The U.S. Department of State application package for determining an applicant's "admissibility" to the United States for aliens unable to adjust status.

**I-829:** The USCIS application form for removal of conditional residency status and transition into permanent residency status.

USREDA / SARC Service Agreement © 2013         rev. 09/20/2013



## USREDA / SARC Service Agreement

**I-131:** The USCIS application for travel document used to apply for a reentry permit into the U.S., refugee travel document, or advance parole travel document.

**INVESTOR:** An individual that qualifies (along with their immediate family) for the EB-5 Immigration Program offered by the USCIS.

**USCIS:** United States Citizenship and Immigration Services.

**CLIENT:** A person that contracts EB5 Petition for services rendered in the legal consulting or processing of EB-5 documents, which will include individual EB-5 Investors, Brokers, and Consultants.

**2. SPIRIT OF THE AGREEMENT:** It is the intent of EB5 Petition to provide legal consulting and processing service specialized in the EB-5 Visa Program. Services offered will include the collection of required immigration documentation from the Client and Investor for USCIS applications, and the comprehensive completion of an I-526 application and a corresponding I-485 or DS-230 application for the Investor under the Regional Center. EB5 Petition will collect the information and documentation required by the USCIS (these documents include the Business Plan, Economic Analysis, PPM, Limited Partnership Agreement, Loan Documents, Escrow Agreement, and Subscription Agreement, along with personal information, financial information, and source and path of funds documentation for the Investor). EB5 Petition will help prepare the Investor for Consular Interview.

The I-829 and other documents that may be necessary for completion of the Investor's application and permanent status will be billed separately. Client may choose these services at the time of application. Please see APPENDIX B for details.

EB5 Petition reserves the right to accept or reject the client at the time of the submission to our offices. We will review the documentation provided and determine the viability of the Investor Petition. EB5 Petition will have 30 days to review the documents.

**3. COMMITMENT OF EB5 PETITION:** During the term of this Contract, EB5 Petition agrees to perform following services:

    a. Gather information required for USCIS applications
    b. Prepare the complete I-526 application of the Investor for submission to the USCIS
    c. Prepare the complete I-485 or DS-230 application of the Investor for submission to the appropriate agency (after I-526 approval).



USREDA / SARC Service Agreement

EB5 Petition guarantees completion of all the required materials and documents within 45 days of the receipt of the documents from the Client. EB5 Petition will provide detailed information regarding any RFEs ("Request For Evidence") that may be forthcoming from the USCIS regarding the submission. In the event of such a request, it will be the Client's responsibility to provide EB5 Petition the required information requested. EB5 Petition's staff will send the request to the Client in an expeditious manner. Since the RFE requests have specific time limits for a response, it is essential that all parties handle these requests in a timely manner. EB5 Petition will make every effort to inform and indicate the manner of information that may be requested. Often these requests are related to project specific attributes and source of funds requirements. EB5 Petition will provide guidance throughout the process. Failure to provide timely response or the information requested by the USCIS will void the EB5 Petition Guarantee.

**4. FEE STRUCTURE:** The fee for an I-526 and I-485/DS-230 application is indicated in APPENDIX B. This fee will be a "Money Back Guaranteed" performance-based charge, returnable only if a denial of the I-526 is issued by USCIS with no "cure."

Fees are to be paid via Check or Wire Transfer (see APPENDIX A). EB5 Petition fees do not include USCIS or NVC filing fees.

**I-526 GUARANTEE:** EB5 Petition guarantees the approval of any I-526 application it completes. If any such I-526 application is denied without possible cure, then EB5 Petition will return any service fees charged.

This guarantee does not apply in the case of fraud on the part of the Client or Investor, or if the Client or Investor furnishes EB5 Petition with false, misleading, or incomplete information.

This guarantee covers the approval of the I-526, and any I-485 or DS-230 applications. It does NOT cover the approval of any I-829 application.

**5. TERM:** The term of this partnership shall remain in effect until work is completed and the applicant is accepted or denied by the USCIS.

**6. EXPENSES:** EB5 Petition agrees to be responsible for reasonable out-of-pocket expenses related to performing services on behalf of the Client. Such expenses typically might include, but are not limited to: phone calls, postage, shipping, messengers, travel, meals and lodging. All items that EB5 Petition expects to be reimbursed for will be preapproved by the Client before the expense is paid. EB5 Petition fully expects to incur **NO** expenses. However, if any unexpected expenses arise, the Client will be under no obligation to repay those expenses unless agreed to by both parties before the expense occurs.



### USREDA / SARC Service Agreement

**7. INFORMATION:** The Client acknowledges that EB5 Petition will rely on information furnished by the Client concerning the Client's personal information, background information, and source of funds without independent certification and the Client represents that such information will be materially complete and correct.

**8. CONFIDENTIALITY:** Except in the course of the performance of its duties hereunder, EB5 Petition agrees that it shall not disclose any trade secrets, know-how, or other proprietary information not in the public domain, learned as a result of this Agreement unless and until such information becomes generally known, unless EB5 Petition comes under direct subpoena to disclose this information to a court.

All documents will be considered confidential in nature. Only EB5 Petition's trained staff will handle the documents. Client may provide EB5 Petition a list of other personnel and interested parties that will have the right to access to the documents. This will be provided in the form of a facsimile release or email release.

All filings remain the property of Client and are provided in digital PDF format for Client's review.

Our systems provide the Client with complete digital files of all submissions, USCIS responses and RFEs (if any). During the course of the contract, Client may request files via either email (registered by case number and access code) or by mail or facsimile.

**9. SCOPE OF ENGAGEMENT:** EB5 Petition and its agents and employees will advise only as to U.S. immigration matters necessary to the filing of your I-526, I-485, DS-230, and I-829 petitions. EB5 Petition has not and will not advise on:

- Which regional center or project to invest in. Such a determination should be made by the Investor, with the assistance of other qualified counsel, before engaging EB5 Petition.
- The security of your investment, timing of return of your investment, or any tax or financial aspects of your investment.
- The accuracy of the business plan, economic analysis, private placement memorandum, or other project documents, or any attachments thereto.
- Foreign country currency laws and restrictions.
- Immigration matters arising prior to the I-526 petition, such as non-immigrant visas, unlawful presence, inadmissibility, and immigration strategy generally.
- Immigration matters arising outside the limited scope of engagement, such as naturalization, removal defense, or criminal matters.

USREDA / SARC Service Agreement © 2013            rev. 09/20/2013



**USREDA / SARC Service Agreement**

By signing this Agreement, you agree that you have been advised to seek independent advice on these matters from a financial advisor, business advisor, business or securities lawyer, accountant, or immigration lawyer for matters outside the limited scope of representation.

Once the USCIS or NVC petitions contracted for (I-526, I-485 if applicable, DS-230 if applicable, and optional I-829, if specified in APPENDIX B) are adjudicated (approved or denied without cure), services under this Agreement will terminate.

**10. JOINT REPRESENTATION AND CONFLICTS OF INTEREST:** EB5 Petition will represent you to the best of our ability with respect to processing your immigration matter. However, EB5 Petition is also called upon to represent the interests of the Regional Center in connection with your EB-5 petition, as well as other investors involved in the same project. By asking us to process your EB-5 petition, you agree that you intend a joint representation of you, other investors, and the Regional Center, where appropriate.

We believe that the interests of all parties involved are sufficiently aligned to undertake joint representation. However, because of this joint representation, there is potential for conflicts of interest to arise. We can only undertake this representation upon your certifying, by signing this Agreement, that you are aware of these potential conflicts of interest and, if applicable, you knowingly waive them. You should not ask us to represent you if you are aware at the outset of the matter that any of your interests are inconsistent with those of the Regional Center or any other investor in a project under that Regional Center, and you must let us know if you come to believe that any potential conflicts develop after our representation begins. If significant conflicts develop, we may have to stop representing you or some of our clients in a particular matter, with the result that you or some of our clients may need to hire new counsel at that time.

In connection with your decision to utilize EB5 Petition to process your immigrant petition, you should be aware of the following:

- Attorney-Client privilege only extends to members of the legal staff and the protection thus afforded does not extend to communications you may receive from the Regional Center.
- In the event of a dispute between joint clients, the attorney-client privilege will not protect against the disclosure to all joint clients of information shared during the joint representation.
- The legal staff receives compensation for services paid directly by EB5 Petition.
- Issues of timing for purposes of petition filing between joint investors will be resolved on a first-come, first served basis.

NOT A CERTIFIED COPY

Case 9:15-cv-80332-KAM   Document 1-5   Entered on FLSD Docket 03/10/2015   Page 96 of 236



**USREDA / SARC Service Agreement**

**11. ASSIGNMENT:** This Agreement shall not be assignable by either party.

**12. GOVERNANCE:** This contract will be governed by the laws of the State of Florida (Palm Beach County), USA.

Dated: _____10/09/2013_____          Dated: _____

_____          _____
EBS Petition                                          CLIENT

Joseph Walsh
**Printed Name / Position**          **Printed Name / Position**

NOT A CERTIFIED COPY