Case 9:16-cv-81871-KAM Document 657-2 Entered on FLSD Docket 07/06/2020 Page 1 of 263
Case 9:13-cv-60332-KAM Document 1-57 Entered on FLSD Docket 03/10/2013 Page 37 of 263
150



**USREDA / SARC Service Agreement**

### APPENDIX A

WIRE INSTRUCTIONS

This is the wire instruction for South Atlantic Regional Center.

The amount due is:

> **USD $15,000** (I-526 only)
> or
> **USD $20,000** (I-526 and I-829)

Beneficiary:

South Atlantic Regional Center, LLC
197 S. Federal Highway, Suite 200
Boca Raton, FL 33432 USA

The wire instructions are as follows:

Bank Name: **PNC Bank**
Bank Address: 9875 Jog Road, Boynton Beach, FL 33437 USA
Bank Phone Number: (877) 287-2654

Bank ABA Number: ███████

SWIFT Code: **PNCCUS33**

Bank Account Number: ███████
(checking account)

NOT A CERTIFIED COPY

Case 9:16-cv-81871-KAM Document 657-2 Entered on FLSD Docket 07/06/2020 Page 2 of 263
Case 9:13-cv-80332-KAM Document 1-57 Entered on FLSD Docket 03/10/2013 Page 98 of 263
150



**USREDA / SARC Service Agreement**

### APPENDIX B

**Compensation:** EB5 Petition shall be required to perform the specified services at the agreed price of fifteen thousand USD ($15,000) for completion of all documents required for a USCIS I-526 application and an I-485 or DS-230 application, excluding USCIS or NVC filing fees, for the Investor named herein.

Fees are due and payable before EB5 Petition will begin the work product.

**Optional I-829 Application:** The services described above only include the I-526 and I-485 or DS-230 applications. At your election, EB5 Petition can also gather information for, process, and file an I-829 application for the Investor covered hereunder. The additional fee for this service is currently five thousand USD ($5,000), plus USCIS filing fees. Should you wish to elect to add I-829 processing at this time, please sign below:

_____                    _____
SIGNATURE                                           DATE

NOT A CERTIFIED COPY

# EXHIBIT "G"

NOT A CERTIFIED COPY



# THE PALM HOUSE

A Luxury Condominium Hotel and Spa on Palm Beach

## FULL SIGNATORY PACKAGE



Petitioner Name:

Petitioner ID Number:

NOT A CERTIFIED COPY



# WIRE INSTRUCTIONS
# ADMINISTRATIVE FEES


NOT A CERTIFIED COPY



# ⊙ PNC

## INCOMING INTERNATIONAL WIRING

Receiving Bank: PNC Bank
SWIFT CODE: PNCCUS33

**BENEFICIARY: South Atlantic Regional Center, LLC.**
197 S. Federal Highway Suite 200
Boca Raton, Florida
USA, 33432

## Beneficiary Account Numbers:

**ACCOUNT NAME:**      **Palm House Hotel, LLLP**

**ACCOUNT NUMBER:** ▮▮▮▮ (Checking Account)

**PNC Bank ABA Number:** ▮▮▮▮

*For tracking purposes, please fax or email a copy of the bank wire receipt to our office.*

Note: Should you wish to include additional information with the payment (e.g. the remitter's name), you may include it in the *Originator to Beneficiary Field* (also referred to as Field Tag 6000), which contains 140 characters for additional remittance information.

FOR ASSISTANCE FROM PNC BANK PLEASE CALL:
(877) 287-2654



## Palm House Hotel, LLLP
428 Main Street
South Pilgrims Mall
Woodbury, CT06798

NOT A CERTIFIED COPY



**WIRE INSTRUCTIONS**

**ESCROW ACCOUNT**

NOT A CERTIFIED COPY



**ESCROW BANK WIRE TRANSFER INSTRUCTIONS**

**WIRING INSTRUCTIONS
FOR DEPOSITING FUNDS
INTO ESCROW ACCOUNT**

[INBOUND WIRING INSTRUCTIONS]

**$500,000.00 USD | ESCROW FUNDS**

Escrow Bank: PNC Bank

LLLP: Palm House Hotel, LLP

Subscriber Representative:
South Atlantic Regional Center, LLC
Funds should be wired directly pursuant to the following instructions:

To: PNC Bank
9875 Jog Road
Boynton Beach, FL 33437 USA

ABA # ▮▮▮▮▮▮

SWIFT Code: PNCCUS33

Credit To:

Palm House Hotel, LLLP Escrow Account
Account # ▮▮▮▮▮▮

Subscriber info: _____
(Name of Subscriber for Account)

CONFIDENTIALITY NOTE: The information contained in this document is legally privileged and confidential information intended only for the addressee(s) named above. If the reader of this document is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of the document is strictly prohibited. If you have received this document in error, please immediately notify us by telephone and return the document to us at the address below via US Mail. We will reimburse any reasonable cost you incur in notifying us and returning the document to us. Thank you.

NOT A CERTIFIED COPY

Palm House Hotel, LLLP

*Strictly Confidential*



# Palm House Hotel, LLLP

### Private Placement Memorandum



### *NOTE TO PROSPECTIVE SUBSCRIBERS*

By accepting this document you agree to maintain in confidence the information set forth in this document, together with any other non-public information regarding the Partnership, obtained from the Partnership or its agents, during the course of the proposed offering and to return this document to the Partnership in the event that you do not elect to participate in the offering.

Palm House Hotel, LLLP *Strictly Confidential*

# Private Placement Memorandum

This document serves as a record of my receipt of the Private Placement Memorandum dated 12/02/2012, for Palm House Hotel, LLLP, a Florida Limited Liability Limited Partnership (the "Partnership"). I received a copy of the Private Placement Memorandum, containing an investment summary, business summary, accredited investor questionnaire and subscription agreement.

I understand that this offering has not been registered with the Florida division of securities, the U.S. Securities and Exchange Commission ("SEC") or any other foreign securities agency and is not required to be so registered.

I agree to maintain in confidence the information set forth in this document, together with any other non-public information regarding the Partnership, obtained from the Partnership or its agents, during the course of the proposed offering and to return this document to the Partnership in the event that I do not elect to participate in the offering.

_____

Investor Name

_____

Investor Signature

_____

Date

NOT A CERTIFIED COPY



# LIMITED PARTNERSHIP AGREEMENT



## LIMITED PARTNERSHIP AGREEMENT
### OF
### PALM HOUSE HOTEL, LLLP

*a Florida Limited Liability Limited Partnership*
County of Palm Beach

Dated 11/30/2012

Palm House Hotel, LLLP
197 S. Federal Highway, Suite 200
Boca Raton, FL 33432
Telephone: (561) 282-6102

LIMITED PARTNERSHIP AGREEMENT
Palm House Hotel, LLLP

11/30/2012

NOT A CERTIFIED COPY

IN WITNESS WHEREOF, each party has executed this Limited Partnership Agreement on the day and year written below.

GENERAL PARTNER

_____     Date: _____
Joseph J. Walsh
For South Atlantic Regional Center, LLC

LIMITED PARTNER

_____     Date: _____
(Signature)

_____
(Written Name)

NOT A CERTIFIED COPY



## SUBSCRIPTION AGREEMENT

SUBSCRIBER: _____

Palm House Hotel, LLLP
a Florida Partnership
197 S. Federal Highway, Suite 200, Boca Raton, FL 33432

RE:    Offering by Palm House Hotel, LLLP of Partnership interests

The undersigned Subscriber hereby subscribes to and agrees to purchase an equity interest in Palm House Hotel, LLLP, a Florida limited liability Partnership ("Partnership") consisting of a $500,000 equity investment in Partnership ("Investment") as set forth below on the signature page hereof. The investment in Partnership, and indirectly in the Hotel Project ("Project") is described in the Private Placement Memorandum ("Memorandum"). The Partnership will be managed by South Atlantic Regional Center, LLC ("General Partner"). All capitalized terms not otherwise defined herein shall have the meaning specified in the Memorandum.

In addition to the $500,000 investment, each Subscriber will pay concurrently to General Partner an organizational and administration fee of $40,000, as described in the Memorandum and LP Agreement. Upon General Partner's acceptance of the Subscription, the entire $540,000 shall be wired into an Escrow.

Subscriber, by executing this Subscription Agreement, does hereby certify and agree as follows:

1.    I have had a personal interview (the "Interview") with the representative of General Partner. During the course of the Interview, we discussed the information concerning the Partnership, General Partner, and their business in great detail and I had the opportunity to obtain any additional information I believed I needed in order to evaluate the risks and merits of the investment. I have also been provided with the Memorandum that provides certain

SUBSCRIPTION AGREEMENT
11/24/2012                                Palm House Hotel, LLLP                                I

dealing ... in property or interests in property blocked ... is prohibited, any transaction ... that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in this order is prohibited, and any conspiracy formed to violate any of the prohibitions set forth in this order is prohibited. The phrase following persons (hereinafter referred to as Terrorists) is generally defined in the Order as meaning terrorists, including a specified list or persons and organizations. I hereby represent and warrant that I am not a Terrorist as described above.

**23.** I am a resident of: _____
(list U.S. state or province/country).

**24.** I AM AN ACCREDITED INVESTOR! I am aware that the investment is being offered to accredited investors only. I acknowledge and warrant that I am an accredited investor because (check appropriate category):

a. [  ]    My individual net worth (without any exclusions), or joint net worth together with my spouse (if any), is in excess of $1,000,000 (exclusive of my or my spouse's primary residence).

b. [  ]    My individual income was in excess of $200,000 in each of the past two years (excluding my spouse's income), or my joint income with my spouse was in excess of $300,000 in each of the past two years, and I expect to have an income in excess of that amount in the current year.

**25.** I hereby provide you with the following information and representations:

1. Employer and Position: _____

2. Business Address and Telephone Number: _____
_____

3. Business or professional education and degrees: _____
_____

4. Prior Employment (5 Years):

| EMPLOYER | NATURE OF DUTIES | DATES OF EMPLOYMENT |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

5. Prior Investments of Purchaser (cumulative amount):

| | | | |
|---|---|---|---|
| Real Estate: | None: [  ] | Up to $100,000: [  ] | Over $100,000: [  ] |
| Oil and Gas: | None: [  ] | Up to $100,000: [  ] | Over $100,000: [  ] |
| Other: | None: [  ] | Up to $100,000: [  ] | Over $100,000: [  ] |

NOT A CERTIFIED COPY

THE INFORMATION CONTAINED IN THIS SUBSCRIPTION AGREEMENT WILL BE TREATED CONFIDENTIALLY. However, I agree that you may present this Subscription Agreement to such parties as you deem appropriate if the Partnership is called upon to establish that the proposed offer and sale of the Investment is exempt from registration under the Act, or meets the requirements of applicable state securities laws.

IN WITNESS WHEREOF, the undersigned has executed this Subscription Agreement.

Signature: _____

Date: _____ _____, 20____

Amount of Investment: $500,000

Ownership interest to be vested in the name(s) as follows:

Name Typed or Printed: _____

Social Security Number: _____

Phone Number: _____    Email: _____

Street Mailing Address: _____

City: _____    State or Province: _____

Country: _____    Zip / Postal Code: _____

The initial $40,000 check will be deposited into escrow and should be made payable to:

"PNC Bank, as Escrow Agent for Palm House Hotel, LLLP."

**If your subscription is not accepted, please indicate your beneficiary bank to return your investment:**
Wire Instructions for payments to Beneficiary Bank:
Beneficiary Name: _____
Beneficiary Address: _____
Beneficiary Bank Account Number: _____
Beneficiary Phone Number: _____
Beneficiary ID (Passport Number): _____
Beneficiary Bank Name: _____
Beneficiary Bank Address: _____
Branch SWIFT Code: _____

*If required* Intermediary Bank Name: _____
*If required* Intermediary Bank Address: _____
*If required* Intermediary Bank SWIFT Code: _____

NOT A CERTIFIED COPY



# THE PALM HOUSE
### A Luxury Condominium Hotel and Spa on Palm Beach

## ACCREDITED INVESTOR
## IMMIGRATION QUESTIONNAIRE
### INVESTOR ELIGIBILITY QUESTIONNAIRE

This questionnaire is NOT an offer to sell or a sale of securities. Each prospective investor must complete this questionnaire and return it by e-mail, standard mail, or fax to Palm House Hotel, LLLP ("Company"). The Company will us the responses to this questionnaire to qualify prospective investors for purposes of federal and state securities law.

The prospective investor will be given access to information upon determination of suitable investor eligibility based upon the facts disclosed in this questionnaire and any other facts about the prospective investor known by the Company.

All questions must be answered. If the answer to any question below is "none" or "not applicable", then please indicate such a response in the applicable field.

The Signer of this document ("Signer") agrees that the Company may present this questionnaire to such parties as the Company deems appropriate to establish the availability of exemptions from registration under federal and state securities laws or to otherwise comply with governmental or regulatory authorities. The Signer represents that the information furnished in this questionnaire is true and correct of their own knowledge, and acknowledges that the Company and its counsel are relying on the truth and accuracy of such information to comply with federal and state securities laws. The Signer agrees to notify the Company promptly of any changes in the foregoing information that may occur prior to the investment.

_____
(Signature)

_____
(Print or Type Name)

_____
(Date)



PALM HOUSE, LLLP
197 SOUTH FEDERAL HIGHWAY
SUITE 200
BOCA RATON, FL 33432

Palm House, LLP - Investor Questionnaire

1

Name _____
(Exact, full legal name of the individual buying the securities)

_____

Current Residence Address _____

Home Telephone _____

E-mail Address _____

Date of Birth _____

Place of Birth (city, state, country) _____

Country of Citizenship _____

2. BUSINESS INFORMATION

Occupation _____

Number of Years _____

Present Employer _____

Position/Title _____

Business Address _____

Business Telephone _____

Business Facsimile _____

3. INVESTOR ELIGIBILITY

Please answer ALL the questions on the following page.

NOT A CERTIFIED COPY

**CHECK THE APPROPRIATE BOX**

(ALL QUESTIONS MUST BE ANSWERED)

X  YES
☐  NO

1. I certify that I am not a "U.S. Person" as defined in Rule 902 of Regulation S under the Securities Act of 1933, as amended (the "Act"), and agree to resell the securities of the Company received in connection herewith only in accordance with the provisions of Regulation S, pursuant to registration under the Act or pursuant to an available exemption from registration, and agree not to engage in hedging transactions with regard to the securities unless in compliance with the Act.

☐  YES
☐  NO

2A. I am an "accredited investor" as defined in Rule 501(a) of Regulation D under the Act because I have a net worth (or joint net worth with my spouse) in excess of USD $1,000,000. For purposes of this question, "net worth" means the excess of total assets over total liabilities.

☐  YES
☐  NO

2B. I am an "accredited investor" as defined in Rule 501(a) of Regulation D under the Act because I have had individual income in excess of USD $200,000 (excluding my spouse) in each of the two most recent years (or joint income with my spouse in excess of USD $300,000 in each of those years); and have a reasonable expectation of reaching the same income level in the current year.

☐  YES
☐  NO

3A. I have the capacity to evaluate the merits and risks of the prospective investment and to otherwise protect my own interests in connection with the prospective investment by reason of my own business and/or financial experience. If I answered "YES" to this question, I support my reply with the following education and/or business and/or financial experience:(Please provide as much detail as possible):_____

(If YES, please complete lines to the right.)

_____
_____
_____

(Add additional pages as necessary)

Palm House, LLP – Investor Questionnaire

3

NOT A CERTIFIED COPY

☐ YES
☐ NO

(If YES, please complete lines to the right.)

3B. I have hired a professional advisor, and by reason of the business and/or financial experience of such professional advisor, I have the capacity to evaluate the merits and risks of the prospective investment and to otherwise protect my own interests in connection with the prospective investment. I understand that the professional advisor will be required to fill out and certify a questionnaire. My professional advisor is:

Name: _____
Occupation: _____
Firm: _____
Contact Info: _____

4. I am purchasing the securities offered for my own account and for investment purposes only. If answered "NO" to this question, the following is the person for whose account I am purchasing the offered securities and/or the reason for investing: (Please provide as much detail as possible)

☐ YES
☐ NO

(If no, please complete lines to the right.)

_____
_____
_____
_____
_____
_____

5. I have a pre-existing personal or business relationship with the Company or any of its officers, directors, or controlling persons. If I answered "YES" to this question, I explain my reply with the following description of my affiliation with that person or those persons: *(Please provide as much detail as possible)*

☐ YES
☐ NO

(If YES, please complete lines to the right.)

_____
_____
_____
_____
_____
_____

Palm House, LLP – Investor Questionnaire

4

NOT A CERTIFIED COPY

## IMPORTANT NOTICE CONCERNING U.S. IMMIGRATION

Your U.S. immigration application could be denied for reasons such as health conditions, criminal offenses and national security. This is not a comprehensive listing of the possible grounds of ineligibility. You should consult your attorney to determine your eligibility.

Please answer the following questions for purposes of our initial assessment of eligibility:

### Part A

A.1. Have you been arrested, charged, convicted, fined or imprisoned for violating any law (excluding traffic violations)?

Yes [ ]   No [ ]

A.2. Have you been a member of, or in any way affiliated with, the Communist Party?

Yes [ ]   No [ ]

A.3. Have you been a member of, or in any way affiliated with, a terrorist organization?

Yes [ ]   No [ ]

A.4. Have you, by willful misrepresentation of a material fact, ever applied for or obtained a visa, an immigration benefit, or entry in to the United States?

Yes [ ]   No [ ]

A.5. Have you been deported or removed from the United States?

Yes [ ]   No [ ]

A.6 Have you been in the past, or are you presently, in the United States without lawful immigration status or worked without employment authorization?

Yes [ ]   No [ ]

A.7. Health grounds: Do you have a communicable disease of public health significance; or a physical or mental disorder that is a threat to the safety of others; or are you a drug abuser?

Yes [ ]   No [ ]



A.8. Have you received public assistance in the United States, or are you likely to receive public assistance in the future?

Yes [ ]   No [ ]

Palm House, LLP – Investor Questionnaire

5

If you answered "yes" to any of the questions above, you may be ineligible to immigrate to the United States. You should consult with an attorney expert in U.S. immigration law.

A.9 Will your spouse or any of your children be included in your EB-5 visa application?

Yes: [ ]  No: [ ]

    If yes, how many total family members will be applying (including yourself)?_____

Name of spouse:_____
           (LAST)  (FIRST)  (MIDDLE)

Place of Birth:_____
           (CITY)  (STATE) (COUNTRY)

Date of Birth:_____/_____/_____ Country of Citizenship:_____
        (MONTH/DAY/YEAR)

Child #1:_____
      (LAST)  (FIRST)  (MIDDLE)

Place of Birth:_____
          (CITY)  (STATE) (COUNTRY)

Date of Birth:_____/_____/_____ Country of Citizenship:_____
        (MONTH/DAY/YEAR)

Child #2:_____
     (LAST)  (FIRST)  (MIDDLE)

Place of Birth:_____
          (CITY)  (STATE) (COUNTRY)

Date of Birth:_____/_____/_____ Country of Citizenship:_____
        (MONTH/DAY/YEAR)

Child #3:_____
     (LAST)  (FIRST)  (MIDDLE)

Place of Birth:_____
          (CITY)  (STATE) (COUNTRY)

Date of Birth:_____/_____/_____ Country of Citizenship:_____
        (MONTH/DAY/YEAR)



Upon submission of your immigration application we may will require some additional follow-up contact information and green card information in order to comply with USCIS requirements. This information will also be used to maintain contact with the limited partners regarding their investment.

Palm House, LLP – Investor Questionnaire

6

Case 9:19-cv-80732-KAM Document 55-5 Entered on FLSD Docket 03/10/2019 Page 13 of 253

Part B

B.1. Are you able to provide documentation that traces your investment from your account to the account of the U.S. investment enterprise?

Yes ☐ No ☐

B.2. Are you able to provide documentation that explains how you accumulated the funds used to make the investment?

Yes ☐ No ☐

B.3. Are your investment funds from a lawful source?

Yes ☐ No ☐

B.4. Do you have the capacity to participate in the U.S. investment enterprise as a limited partner?

Yes ☐ No ☐

If you answered "no" to any of the questions in Part B above, you will not be eligible for U.S. immigration based on investment.

# EXHIBIT C

NOTE: Please include a photocopy of your Passport along with this questionnaire.

INDIVIDUAL(S) SIGN HERE:

Subscriber: _____

_____
(Signature )

Date: _____



Form **W-8BEN**
(Rev. February 2006)
Department of the Treasury
Internal Revenue Service

**Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding**

▶ Section references are to the Internal Revenue Code. ▶ See separate instructions.
▶ Give this form to the withholding agent or payer. Do not send to the IRS.

OMB No. 1545-1621

**Do not use this form for:** — Instead, use Form:
- A U.S. citizen or other U.S. person, including a resident alien individual . . . . . . . . . . . . . . . . . . W-9
- A person claiming that income is effectively connected with the conduct of a trade or business in the United States . . . . . . . . . . . . . . . . . . . . . . . . . W-8ECI
- A foreign partnership, a foreign simple trust, or a foreign grantor trust (see instructions for exceptions) . . . . . . W-8ECI or W-8IMY
- A foreign government, international organization, foreign central bank of issue, foreign tax-exempt organization, foreign private foundation, or government of a U.S. possession that received effectively connected income or that is claiming the applicability of section(s) 115(2), 501(c), 892, 895, or 1443(b) (see instructions) . . . . . . . W-8ECI or W-8EXP

Note: These entities should use Form W-8BEN if they are claiming treaty benefits or are providing the form only to claim they are a foreign person exempt from backup withholding.
- A person acting as an intermediary . . . . . . . . . . . . . . . . . . . . . . . . W-8IMY

Note: See instructions for additional exceptions.

**Part I — Identification of Beneficial Owner** (See instructions.)

1 Name of individual or organization that is the beneficial owner

2 Country of incorporation or organization

3 Type of beneficial owner: ☐ Individual ☐ Corporation ☐ Disregarded entity ☐ Partnership ☐ Simple trust
☐ Grantor trust ☐ Complex trust ☐ Estate ☐ Government ☐ International organization
☐ Central bank of issue ☐ Tax-exempt organization ☐ Private foundation

4 Permanent residence address (street, apt. or suite no., or rural route). **Do not use a P.O. box or in-care-of address.**

City or town, state or province. Include postal code where appropriate.

Country (do not abbreviate)

5 Mailing address (if different from above)

City or town, state or province. Include postal code where appropriate.

Country (do not abbreviate)

6 U.S. taxpayer identification number, if required (see instructions)
☐ SSN or ITIN ☐ EIN

7 Foreign tax identifying number, if any (optional)

8 Reference number(s) (see instructions)

**Part II — Claim of Tax Treaty Benefits** (if applicable)

9 I certify that (check all that apply):

a ☐ The beneficial owner is a resident of .................................. within the meaning of the income tax treaty between the United States and that country.

b ☐ If required, the U.S. taxpayer identification number is stated on line 6 (see instructions).

c ☐ The beneficial owner is not an individual, derives the item (or items) of income for which the treaty benefits are claimed, and, if applicable, meets the requirements of the treaty provision dealing with limitation on benefits (see instructions).

d ☐ The beneficial owner is not an individual, is claiming treaty benefits for dividends received from a foreign corporation or interest from a U.S. trade or business of a foreign corporation, and meets qualified resident status (see instructions).

e ☐ The beneficial owner is related to the person obligated to pay the income within the meaning of section 267(b) or 707(b), and will file Form 8833 if the amount subject to withholding received during a calendar year exceeds, in the aggregate, $500,000.

10 Special rates and conditions (if applicable—see instructions): The beneficial owner is claiming the provisions of Article .............. of the treaty identified on line 9a above to claim a .............% rate of withholding on (specify type of income): ................................ .
Explain the reasons the beneficial owner meets the terms of the treaty article: ...............................................................
................................................................................................................................................

**Part III — Notional Principal Contracts**

11 ☐ I have provided or will provide a statement that identifies those notional principal contracts from which the income is not effectively connected with the conduct of a trade or business in the United States. I agree to update this statement as required.

**Part IV — Certification**

Under penalties of perjury, I declare that I have examined the information on this form and to the best of my knowledge and belief it is true, correct, and complete. I further certify under penalties of perjury that:
1 I am the beneficial owner (or am authorized to sign for the beneficial owner) of all the income to which this form relates,
2 The beneficial owner is not a U.S. person,
3 The income to which this form relates is (a) not effectively connected with the conduct of a trade or business in the United States, (b) effectively connected but is not subject to tax under an income tax treaty, or (c) the partner's share of a partnership's effectively connected income, and
4 For broker transactions or barter exchanges, the beneficial owner is an exempt foreign person as defined in the instructions.
Furthermore, I authorize this form to be provided to any withholding agent that has control, receipt, or custody of the income of which I am the beneficial owner or any withholding agent that can disburse or make payments of the income of which I am the beneficial owner.

**Sign Here** ▶

Signature of beneficial owner (or individual authorized to sign for beneficial owner) — Date (MM-DD-YYYY) — Capacity in which acting

For Paperwork Reduction Act Notice, see separate instructions. — Cat. No. 25047Z — Form **W-8BEN** (Rev. 2-2006)

Printed on Recycled Paper

NOT A VERIFIED COPY

Case 9:16-cv-81871-KAM Document 657-2 Entered on FLSD Docket 07/06/2020 Page 24 of
Case 9:19-cv-80732-KAM Document 55-2 Entered on FLSD Docket 03/10/2019 Page 24 of
150



## Notice of Entry of Appearance
## as Attorney or Accredited Representative
### Department of Homeland Security

**DHS**
**Form G-28**
OMB No. 1615-0105
Expires 02/29/2016

NOT A CERTIFIED COPY

### Part 1. Information About Attorney or Accredited Representative

Name and Address of Attorney or Accredited Representative

**1.a.** Family Name *(Last Name)*

**1.b.** Given Name *(First Name)*

**1.c.** Middle Name

**2.** Name of Law Firm or Recognized Organization

**3.** Name of Law Student or Law Graduate

**4.** State Bar Number

**5.a.** Street Number

**5.b.** Street Name

**5.c.** Apt. ☐ Ste. ☐ Flr. ☐

**5.d.** City or Town

**5.e.** State            **5.f.** Zip Code

**5.g.** Postal Code

**5.h.** Province

**5.i.** Country

**6.** Daytime Phone Number (          ) 　　　 - 　　　

**7.** E-Mail Address of Attorney or Accredited Representative

### Part 2. Eligibility Information For Attorney or Accredited Representative

*(Check applicable items(s) below)*

**1.** ☐ I am an attorney eligible to practice law in, and a member in good standing of, the bar of the highest court(s) of the following State(s), possession(s), territory(ies), commonwealth(s), or the District of Columbia.

**1.a.**

**1.b.** I *(choose one)* ☐ *am not* ☐ *am* subject to any order of any court or administrative agency disbarring, suspending, enjoining, restraining, or otherwise restricting me in the practice of law. (If you are subject to any order(s), explain fully in the space below.)

**1.b.1.**

**2.** ☐ I am an accredited representative of the following qualified nonprofit religious, charitable, social service, or similar organization established in the United States, so recognized by the Department of Justice, Board of Immigration Appeals pursuant to 8 CFR 292.2. Provide the name of the organization and the expiration date of accreditation.

**2.a.** Name of Recognized Organization

**2.b.** Date Accreditation expires
*(mm/dd/yyyy)* ▶

**3.** ☐ I am associated with

**3.a.**

the attorney or accredited representative of record who previously filed Form G-28 in this case, and my appearance as an attorney or accredited representative is at his or her request. If you check this item, also complete **number 1 (1.a. - 1.b.1.) or number 2 (2.a. - 2.b.)** in **Part 2** *(whichever is appropriate)*.

**4.** ☐ I am a law student or law graduate working under the direct supervision of the attorney or accredited representative of record on this form in accordance with the requirements in 8 CFR 292.1(a)(2)(iv).

**Part 3.  Notice of Appearance as Attorney or Accredited Representative**

This appearance relates to immigration matters before (select one):

1. ☐ USCIS - List the form number(s)

1.a. [                    ]

2. ☐ ICE - List the specific matter in which appearance is entered

2.a. [                    ]

3. ☐ CBP - List the specific matter in which appearance is entered

3.a. [                    ]

I hereby enter my appearance as attorney or accredited representative at the request of:

4.  Select only one:  ☐ Applicant   ☐ Petitioner
☐ Respondent (ICE, CBP)

Name of Applicant, Petitioner, or Respondent

5.a.  Family Name
      (Last Name)        [                    ]
5.b.  Given Name
      (First Name)       [                    ]
5.c.  Middle Name        [                    ]
5.d.  Name of Company or Organization, if applicable
      [                    ]

NOTE: Provide the mailing address of Petitioner, Applicant, or Respondent and not the address of the attorney or accredited representative, **except when a safe mailing address is permitted** on an application or petition filed with Form G-28.

6.a.  Street Number
      and Name           [                    ]
6.b.  Apt. ☐  Ste. ☐  Flr. ☐  [                    ]
6.c.  City or Town       [                    ]
6.d.  State [      ]  6.e.  Zip Code [          ]

7.  Provide A-Number and/or Receipt Number

[                    ]

Pursuant to the Privacy Act of 1974 and DHS policy, I hereby consent to the disclosure to the named Attorney or Accredited Representative of any record pertaining to me that appears in any system of records of USCIS, ICE, or CBP.

8.a.  Signature of Applicant, Petitioner, or Respondent

[                    ]

8.b.  Date       (mm/dd/yyyy)  ▶  [          ]

**Part 4.  Signature of Attorney or Accredited Representative**

I have read and understand the regulations and conditions contained in 8 CFR 103.2 and 292 governing appearances and representation before the Department of Homeland Security. I declare under penalty of perjury under the laws of the United States that the information I have provided on this form is true and correct.

1.  Signature of Attorney or Accredited Representative

[                    ]

2.  Signature of Law Student or Law Graduate

[                    ]

3.  Date       (mm/dd/yyyy)  ▶  [          ]

**Part 5.  Additional Information**

1.  _____
    _____
    _____
    _____
    _____
    _____
    _____
    _____
    _____
    _____
    _____
    _____

NOT ACCREDITED COPY

OMB No. 1615-0026; Exp. 05/31/2013

Department of Homeland Security
U.S. Citizenship and Immigration Services

**Form I-526, Immigrant Petition**
**by Alien Entrepreneur**

| Do Not Write in This Block - For USCIS Use Only (Except G-28 Block Below) | | |
|---|---|---|
| Classification | Action Block | Fee Receipt |
| Priority Date | | To be completed by Attorney or Representative, if any<br>☐ G-28 is attached<br>Attorney's State License No. |
| Remarks: | | |

START HERE - Type or print in black ink.

## Part 1.  Information About You

| Family Name | | Given Name | | Middle Name |
|---|---|---|---|---|
| | | | | |

In care of Street Number and Name:

| Address: | | | | Apt. Number |

| City | State or Province | Country | Zip/Postal Code |

| Date of Birth (mm/dd/yyyy) | Country of Birth | Social Security # (if any) | A # (if any) |

If you are in the United States, provide the following information: | Date of Arrival (mm/dd/yyyy) | I-94 #

| Current Nonimmigrant Status | Date Current Status Expires (mm/dd/yyyy) | Daytime Phone # with Area Code |

## Part 2.  Application Type *(Check one)*

a. **X**  This petition is based on an investment in a commercial enterprise in a targeted employment area for which the required amount of capital invested has been adjusted downward.

b.  This petition is based on an investment in a commercial enterprise in an area for which the required amount of capital invested has been adjusted upward.

c.  This petition is based on an investment in a commercial enterprise that is not in either a targeted area or in an upward adjustment area.

## Part 3.  Information About Your Investment

| Name of commercial enterprise in which funds are invested *(Required Field - Do Not Leave Blank)* | |

| Street Address | |

| Phone # with Area Code | Business organized as (corporation, partnership, etc.) |

| Kind of business (e.g. furniture manufacturer) | Date established (mm/dd/yyyy) | IRS Tax # |

RECEIVED: _____  RESUBMITTED: _____  RELOCATED: SENT _____  RECD _____



Form I-526 (05/10/12) Y

## Part 3. Information About Your Investment *(Continued)*

| | | | |
|---|---|---|---|
| Date of your initial investment (mm/dd/yyyy) | | Amount of your initial investment | $ |
| Your total capital investment in the enterprise to date $ | | Percentage of the enterprise you own | |

If you are not the sole investor in the new commercial enterprise, list on separate paper the names of all other parties (natural and non-natural) who hold a percentage share of ownership of the new enterprise and indicate whether any of these parties is seeking classification as an alien entrepreneur. Include the name, percentage of ownership, and whether or not the person is seeking classification under section 203(b)(5). NOTE: A "natural" party would be an individual person, and a "non-natural" party would be an entity such as a corporation, consortium, investment group, partnership, etc.

If you indicated in Part 2 that the enterprise is in a targeted employment area or in an upward adjustment area, name the county and State:  County ⬚  State ⬚

## Part 4. Additional Information About the Enterprise

Type of Enterprise (check one):

X  New commercial enterprise resulting from the creation of a new business.

☐  New commercial enterprise resulting from the purchase of an existing business.

☐  New commercial enterprise resulting from a capital investment in an existing business.

Composition of the Petitioner's Investment:

Total amount in U.S. bank account ...................................................................  $ ⬚

Total value of all assets purchased for use in the enterprise..........................  $ ⬚

Total value of all property transferred from abroad to the new enterprise............................  $ ⬚

Total of all debt financing........................................................................  $ ⬚

Total stock purchases..............................................................................  $ ⬚

Other (explain on separate paper)..............................................................  $ ⬚

Total  $ ⬚

Income:

When you made the investment.........  Gross  $ ⬚  Net  $ ⬚

Now.....................................  Gross  $ ⬚  Net  $ ⬚

Net worth:

When you made investment...............  Gross  $ ⬚  Now  $ ⬚

NOT A CERTIFIED COPY

## Part 5. Employment Creation Information

Number of full-time employees in the enterprise in U.S. (excluding you, your spouse, sons, and daughters)

When you made your initial investment? [ ]  Now [ ]  Difference [ ]

How many of these new jobs were created by your investment? [ ]

How many additional new jobs will be created by your additional investment? [ ]

What is your position, office, or title with the new commercial enterprise?

Briefly describe your duties, activities, and responsibilities.

What is your salary? $ [ ]  What is the cost of your benefits? $ [ ]

## Part 6. Processing Information

Check One:

[ ] The person named in Part 1 is now in the United States, and an application to adjust status to permanent resident will be filed if this petition is approved.

[ ] If the petition is approved and the person named in Part 1 wishes to apply for an immigrant visa abroad, complete the following for that person:

Country of nationality: [ ]

Country of current residence or, if now in the United States, last permanent residence abroad: [ ]

If you provided a United States address in Part 1, print the person's foreign address:

If the person's native alphabet is other than Roman letters, write the foreign address in the native alphabet:

Are you in deportation or removal proceedings?  ☐ Yes (Explain on separate paper)  X No

Have you ever worked in the United States without permission?  ☐ Yes (Explain on separate paper)  X No

## Part 7. Signature  *Read the information on penalties in the instructions before completing this section.*

I certify, under penalty of perjury under the laws of the United States of America, that this petition and the evidence submitted with it is all true and correct. I authorize the release of any information from my records that U.S. Citizenship and Immigration Services needs to determine eligibility for the benefit I am seeking.

Signature [ ]  Date [ ]

NOTE: *If you do not completely fill out this form or fail to the submit the required documents listed in the instructions, you may not be found eligible for the immigration benefit you are seeking and this petition may be denied.*

## Part 8. Signature of Person Preparing Form, If Other Than Above  (Sign below)

I declare that I prepared this application at the request of the above person, and it is based on all information of which I have knowledge.

Signature [ ]  Print Your Name [ ]  Date [ ]

Firm Name [ ]  Daytime phone # with area code [ ]

Address [ ]

Form I-526 (05/10/12) Y Page 3

NOT A CERTIFIED COPY



HERISCHI & ASSOCIATES

Protect Rights
Advance Interests
Maximize Opportunities

Ali Herischi Esq. (MD Bar)     7201 Wisconsin Ave, suite 450     www.ahhlaw.com   info@ibhlaw.com
Bethesda, MD 20814     Tel 301-363-1540  Fax:301-363-4538

## ENGAGEMENT LETTER

Date: _____

To: _____

Re: EB-5 Immigrant visa by investment

Dear: _____,

Pursuant to our conferences on or before _____, our firm's agreed to represent you and your relative(s) in connection with your immigration application. This letter will confirm the terms of our representation. Our work will begin upon receipt of a signed copy of this letter..

Herischi & Associates LLC will provide legal services to client and the scope of services we will render, the manner of calculating, billing and collecting legal fees, and other aspects of the proposed representation are mutually agreed to be set in this agreement.

### Scope of Engagement

Herischi & Associates LLC will provide the following legal services to client;

1- If required, apply to acquire a license from Office of Foreign Asset Control (OFAC) for an Iranian to invest in a Regional Center.

2- Open necessary bank accounts to accommodate the money transfer, including an escrow account.

3- File applicable USCIS forms for the applicant and his/her family in regards to the EB-5 application. Client has chosen South Atlantic Regional Center for his investment.

4- Facilitate the return of the investment to the investor upon the distribution by the Regional Center.

Page 1/5     Herischi & Associates LLC

NOT A CERTIFIED COPY

5- The total cost including legal fee and application fees are $17,500 payable to the law firm of Herischi & Associates LLC. In addition there is the Regional Center's Registration fee of $42,500. This fee does not cover any fee you have to pay at the embassy

Note. This Engagement letter **does not** cover the removal of condition after two years of residency.

We will strive to represent you professionally, effectively, and efficiently.

### *Our Responsibilities*

We will keep you informed of all developments in this case. We will copy you on all correspondence and on all pleadings we generate and receive. We strive to return telephone calls the same day they are received but are sometimes unable to do so. We will always return your phone calls within one business day of receiving them unless circumstances beyond our control prevent us from doing so. Please understand that because I handle matters in addition to yours, I am not always immediately available.

The firm is not retained to provide investment advice. We are working with Client to evaluate the Regional Center business opportunity, but limited to the Immigration laws governing the EB-5 application. Our scope of engagement does not cover any investment advice or evaluation of an investment opportunity. We are not responsible for Client's business decisions. The firm does not and never have guaranteed any investment outcome. In addition, the Eb-5 application's approval is also not guaranteed by our firm.

While we will make recommendations on the outcome of your case, ultimate decisions belong to you. We do reserve the right, however, to make strategic decisions that in our judgment best advance the case to reach the outcome you desire.

### *Client's Responsibilities*

You have certain responsibilities that need to be fulfilled in order for us to achieve a successful outcome. You agree to keep us informed of any changes in your address and living

Herischi & Associates LLC

situation. You will make yourself reasonably available for telephone consultations, office conferences, and any formal appearances that are required in pursing your matter.

### *SCHEDULE OF FEES AND PROCESS*

1- START (one week)
   a. Sign this engagement letter.
   b. Transfer $10,000 to Herischi & Associates LLC's account, for legal fee. Fill and sign the registration forms for EB-5 Regional Center.
   c. Gather required documents from the Client;
      i. The checklist will be provided to the client.
   d. Executing the Regional Center's registration contracts
   e. Pay Regional Center's registration fee of $42,500.

2- APPLICATION submission (2-3 weeks)
   a. Transfer $500,000 for the investment to the Regional Center's escrow account.
   b. Transfer the remaining $7,500 legal fee to Herischi & Associates LLC.
   c. Issuance of partnership documents, shareholders' agreements, and other relevant financial documentation.
   d. File USCIS forms for EB-5 application.

3- Application APPROVAL process (6-8 months)
   a. Waiting for the approval, following up with USCIS, responding to the USCIS's requests or questions.
   b. Approval of the application
   c. Transfer $500,000 from the Escrow account to the Regional Center's bank account
   d. Upon approval, Client's case will be sent to a proper US embassy for an interview.
   e. Gathering required documents for the Embassy interview
   f. Client will attend the interview after completing the required steps.
   g. Immigrant Visa will be issued by the Embassy.

NOT A CERTIFIED COPY

Herischi & Associates LLC

Case 9:16-cv-81871-KAM  Document 657-2 Entered on FLSD Docket 07/06/2020  Page 32 of
153
Case 9:19-cv-80732-KAM  Document 55-2 Entered on FLSD Docket 03/10/2019  Page 28 of
150

4- ARRIVAL

    a.  Receive the Green Card  (actual card)

      There is no other cost associated to this case. This Firm is not responsible for the risk associated with this investment and the client selected this investment and the firm is only hired to provide legal services stated in this Agreement.

**Arbitration**

      Any dispute or claim relating to our fees, charges, legal services, obligations reflected in this letter, or any other aspect of our representation shall be resolved through a confidential, binding arbitration, in the state of Maryland, before a single arbitrator under Commercial Rules then in effect of American Arbitration Association, and judgment on the award rendered may be entered in any court having jurisdiction. You agree that commitment here to arbitrate any and all disputes relinquishes any right to bring an action in court and that you are waiving right to a jury trial.

**Attorney's Fees**

      If any dispute or claim arising out of or relating to our fees, charges, legal services, obligations reflected in this letter, or any aspect of our representation, arises, the firm will be entitled to recover from the client all costs and expenses it incurs in bringing and prosecuting and defending any litigation or arbitration, including reasonable attorneys' fees and costs at trial and appeal. In any event the firm is not responsible for attorney's fees and expenses of the client.

**Client's Right to Terminate of Representation**

      You may terminate this representation at any time with or without cause by notifying us in writing of your desire to do so.  Upon receipt of the notice to terminate representation, we will stop all legal work on your behalf immediately.  You are responsible for the legal fee that has been paid to us. The legal fee considered earned and we are not going to refund any legal fee received in this matter. If by any chance the case is denied due to the Regional Center's issue, then, you are only responsible for nonrefundable fee of $15,000. (The total risk) In other hand, if the case is denied due to the client's security background check, or failure to satisfy other elements of the case such as

                                   Herischi & Associates LLC

the legal acquisition of the invested fund, then you have to pay all the legal fees and expenses in this case.

On behalf of the firm, we appreciate the opportunity to represent you in this matter. If you have questions, please feel free to call me at 301-363-4540.

Very truly yours,

Ali Herischi, Esq.
Principal Attorney
Herischi & Associates LLC

I have read and consent to it.

_____                          _____

Client name:                                              Date

NOT A CERTIFIED COPY

Herischi & Associates LLC

Case 9:16-cv-81871-KAM Document 657-2 Entered on FLSD Docket 07/06/2020 Page 34 of
Case 9:19-cv-80832-KAM Document 55-2 Entered on FLSD Docket 03/10/2019 Page 34 of
150
253



Ali Herischi, Esq. (MD Bar)          7201 Wisconsin Ave, suite 450          www.ibhlaw.com   info@ibhlaw.com
                                     Bethesda, MD 20814                     Tel: 301-363-4540  Fax:301-363-4538

**Protect Rights
Advance Interests
Maximize Opportunities**

## Bank information for Herischi & Associates LLC

Account name: Herischi & Associates LLC
ACC #: ▮▮▮▮▮▮▮
Routing: ▮▮▮▮▮▮
SWIFT: BOFAUS3N
Wire transfer: ▮▮▮▮593

*Bank Information*

Bank of America
7316 Wisconsin Avenue,
Bethesda, MD 20814
(301) 951-8280

***Please notify the firm of any payments that you have made, so we can accurately follow up with
the bank.

NOT A CERTIFIED COPY

# EXHIBIT "H"

NOT A CERTIFIED COPY

Case 9:16-cv-81871-KAM Document 657-2 Entered on FLSD Docket 07/06/2020 Page 36 of
153
Case 9:19-cv-80732-KAM Document 55-2 Entered on FLSD Docket 03/10/2019 Page 35 of
153

Palm House Hotel, LLLP

*Strictly Confidential*



# Palm House Hotel, LLLP

### Private Placement Memorandum



*NOTE TO PROSPECTIVE SUBSCRIBERS*

By accepting this document you agree to maintain in confidence the information set forth in this document, together with any other non-public information regarding the Partnership, obtained from the Partnership or its agents, during the course of the proposed offering and to return this document to the Partnership in the event that you do not elect to participate in the offering.

Case 9:16-cv-81871-KAM Document 657-2 Entered on FLSD Docket 07/06/2020 Page 37 of
253
Case 9:19-cv-80732-KAM Document 55-3 Entered on FLSD Docket 03/10/2019 Page 33 of
53

Palm House Hotel, LLLP                                    *Strictly Confidential*

# Private Placement Memorandum

This document serves as a record of my receipt of the Private Placement Memorandum dated 12/02/2012, for Palm House Hotel, LLLP, a Florida Limited Liability Limited Partnership (the "Partnership"). I received a copy of the Private Placement Memorandum, containing an investment summary, business summary, accredited investor questionnaire and subscription agreement.

I understand that this offering has not been registered with the Florida division of securities, the U.S. Securities and Exchange Commission ("SEC") or any other foreign securities agency and is not required to be so registered.

I agree to maintain in confidence the information set forth in this document, together with any other non-public information regarding the Partnership, obtained from the Partnership or its agents, during the course of the proposed offering and to return this document to the Partnership in the event that I do not elect to participate in the offering.

_____

Investor Name

_____

Investor Signature

_____

Date

NOT A CERTIFIED COPY

Palm House Hotel, LLLP                                          *Strictly Confidential*

# Private Placement Memorandum Summary

**FOR PALM HOUSE HOTEL, LLLP**

## $39,500,000.00

| | |
|---|---|
| Securities Offered: | 79 Limited Partnership Units |
| Unit Price: | $500,000.00 |
| Offering: | $39,500,000.00 |
| Administrative Fee: | $40,000.00 |



The Partnership is offering (the "Offering") to sell limited partner units in the Partnership ("Units") to Investors for $39,500,000. The Minimum Investment is $500,000. The administrative fee is $40,000.

Neither the Florida division of securities or the U.S. Securities and Exchange Commission, nor any other regulatory body, whether U.S. or foreign, has approved or disapproved these Units or passed upon the accuracy or adequacy of this Memorandum. Any representation to the contrary is a criminal offense.

This Memorandum does not constitute an offer or solicitation of Units in any jurisdiction in which such offer or solicitation is not authorized. No action has been taken to permit the distribution of this Memorandum in any jurisdiction other than countries determined by the General Partner. Accordingly, this Memorandum may not be used for the purpose of, and does not constitute, an offer or solicitation by anyone in any jurisdiction or in any circumstances in which such offer or solicitation is not authorized or to any person to whom it is unlawful to make such offer or solicitation.

Neither the delivery of this Memorandum nor the placing, allotment, or issue, of any Units shall, under any circumstances create any implication or constitute any representation that the information given in this Information Memorandum is correct as of any time subsequent to the date hereof. This Memorandum provides a summary of information relevant to investing in the Partnership.

THESE ARE SPECULATIVE UNITS WHICH INVOLVE A HIGH DEGREE OF RISK. ONLY THOSE INVESTORS WHO CAN BEAR THE LOSS OF THEIR ENTIRE INVESTMENT SHOULD INVEST IN THESE UNITS.

Case 9:16-cv-81871-KAM Document 657-2 Entered on FLSD Docket 07/06/2020 Page 39 of
Case 9:19-cv-80732-KAM Document 55-2 Entered on FLSD Docket 03/10/2019 Page 39 of
153

Palm House Hotel, LLLP                                    *Strictly Confidential*

# Table of Contents

Private Placement Memorandum ........................................................................ 1

Private Placement Memorandum ........................................................................ 2

Private Placement Memorandum Summary ......................................................... 3

Table of Contents ............................................................................................. 4

Limited Partner Units ("Units") ......................................................................... 5

Jurisdictional Notes .......................................................................................... 8

Statement to EB5 Investors ............................................................................. 10

Summary of the Business ................................................................................ 12

THE OFFERING TERM SHEET ........................................................................... 14

Investor Suitability Standards .......................................................................... 19

Use of Proceeds .............................................................................................. 22

Return on Investment ...................................................................................... 23

Management of the Partnership ........................................................................ 26

Summary of the General Risk Factors ............................................................... 30

Summary of Loan Terms .................................................................................. 37

Summary of Limited Partnership Agreement ...................................................... 38

Availability of Additional Information ................................................................. 42

Business Plan Summary ................................................................................... 43

### ATTACHMENTS

Business Plan
Economic Analysis
Limited Partnership Agreement
Loan Documents
Investor Questionnaire and Subscription Agreement
Escrow Agreement
Operations & Marketing Plan

NOT A CERTIFIED COPY

## Palm House Hotel, LLLP

# Limited Partner Units ("Units")

THIS PRIVATE PLACEMENT MEMORANDUM (THIS "MEMORANDUM") IS PROVIDED ON A CONFIDENTIAL BASIS SOLELY FOR THE INFORMATION OF THE RECIPIENT NAMED ABOVE SO THAT SUCH RECIPIENT MAY CONSIDER AN INVESTMENT IN THE UNITS OF THE PARTNERSHIP, IT IS NOT INTENDED FOR USE BY ANY OTHER PERSON.

THIS MEMORANDUM MAY NOT BE REPRODUCED OR PROVIDED TO OTHERS WITHOUT THE PRIOR WRITTEN PERMISSION OF THE GENERAL PARTNER OF THE PARTNERSHIP. BY ACCEPTING DELIVERY OF THIS MEMORANDUM, EACH PROSPECTIVE INVESTOR AGREES TO KEEP CONFIDENTIAL ALL OF THE INFORMATION CONTAINED IN THIS MEMORANDUM THAT IS NOT ALREADY IN THE PUBLIC DOMAIN AND TO USE THIS MEMORANDUM SOLELY FOR PURPOSES OF EVALUATING A POSSIBLE INVESTMENT IN THE PARTNERSHIP. NO PROSPECTIVE INVESTOR MAY DISCUSS THE CONTENTS OF THE MEMORANDUM WITH ANY PERSON OTHER THAN ITS PROFESSIONAL ADVISERS.

THIS MEMORANDUM DOES NOT PURPORT TO BE ALL-INCLUSIVE OR TO CONTAIN ALL THE INFORMATION THAT A PROSPECTIVE INVESTOR MAY DESIRE IN EVALUATING THE PARTNERSHIP. PROSPECTIVE INVESTORS SHOULD NOT CONSTRUE THE CONTENTS OF THIS MEMORANDUM AS LEGAL, TAX, INVESTMENT OR OTHER ADVICE. EACH INVESTOR SHOULD MAKE ITS OWN INQUIRIES AND CONSULT ITS OWN ADVISERS AS TO THE PARTNERSHIP AND THIS OFFERING AND AS TO LEGAL, TAX AND RELATED MATTERS CONCERNING THIS INVESTMENT. THE PARTNERSHIP, THE GENERAL PARTNER OR ANY OF THEIR RESPECTIVE AFFILIATES IS NOT MAKING ANY REPRESENTATION OR WARRANTY REGARDING THE LEGALITY OF AN INVESTMENT IN THE UNITS BY ANY INVESTOR OR ABOUT THE INCOME OR OTHER TAX CONSEQUENCES OF SUCH AN INVESTMENT.

IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE ENTITY CREATING THE UNITS OFFERED AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS OF AN INVESTMENT IN THE UNITS. THE UNITS OFFERED HEREBY HAVE NOT BEEN RECOMMENDED BY THE U.S. SECURITIES AND EXCHANGE COMMISSION, ANY STATE SECURITIES COMMISSION OR ANY OTHER SECURITIES COMMISSION OR REGULATORY AUTHORITY OF ANY JURISDICTION IN ANY COUNTRY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE UNITS OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR SECURITIES AUTHORITY IN OTHER JURISDICTION AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE ACT AND SUCH LAWS. THE UNITS OFFERED HEREBY ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE ACT, PURSUANT TO REGISTRATION THEREUNDER OR EXEMPTION THEREFROM, AND AS PERMITTED UNDER OTHER APPLICABLE SECURITIES LAWS. THE TRANSFERABILITY OF UNITS IS FURTHER RESTRICTED UNDER THE PARTNERSHIP'S PARTNERSHIP AGREEMENT (AS MAY BE AMENDED, MODIFIED, SUPPLEMENTED OR RESTATED FROM TIME TO TIME, THE "PARTNERSHIP AGREEMENT").

## ADDITIONAL CONSIDERATIONS

AN INVESTOR GENERALLY WILL NOT BE PERMITTED TO RESIGN OR OTHERWISE WITHDRAW, IN WHOLE OR IN PART, FROM THE PARTNERSHIP. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF AN INVESTMENT IN THE UNITS FOR AN EXTENDED PERIOD OF TIME.

INVESTMENT IN THE UNITS WILL INVOLVE RISKS DUE TO, AMONG OTHER THINGS, THE NATURE OF THE PARTNERSHIP'S INVESTMENTS AND BUSINESS ACTIVITIES. INVESTORS SHOULD HAVE THE FINANCIAL ABILITY, SOPHISTICATION AND WILLINGNESS TO ACCEPT THE RISKS AND LACK OF LIQUIDITY, WHICH ARE CHARACTERISTICS OF THE INVESTMENT DESCRIBED IN THIS MEMORANDUM.

CERTAIN INFORMATION CONTAINED IN THIS MEMORANDUM HAS BEEN OBTAINED BY THE GENERAL PARTNER FROM SOURCES DEEMED RELIABLE BY THE GENERAL PARTNER. HOWEVER, THE GENERAL PARTNER CANNOT GUARANTEE THE ACCURACY OF SUCH INFORMATION AND HAS NOT INDEPENDENTLY VERIFIED SUCH INFORMATION.

SUCH INFORMATION NECESSARILY INCORPORATES SIGNIFICANT ASSUMPTIONS AND ESTIMATES AS WELL AS FACTUAL MATTERS. THE GENERAL PARTNER WILL PROVIDE TO EACH PROSPECTIVE INVESTOR, OR SUCH PROSPECTIVE INVESTOR'S AGENT, DURING THIS OFFERING AND PRIOR TO THE SALE OF ANY UNITS OFFERED HEREBY TO SUCH PROSPECTIVE INVESTOR, THE OPPORTUNITY TO ASK QUESTIONS OF THE GENERAL PARTNER CONCERNING ANY ASPECT OF THE INVESTMENT AND TO OBTAIN ANY ADDITIONAL INFORMATION, TO THE EXTENT THE GENERAL PARTNER POSSESSES SUCH INFORMATION OR CAN ACQUIRE IT WITHOUT UNREASONABLE EFFORT OR EXPENSE.

CERTAIN STATEMENTS MADE THROUGHOUT THIS DOCUMENT THAT ARE NOT HISTORICAL FACTS MAY CONTAIN FORWARD-LOOKING STATEMENTS REGARDING THE PARTNERSHIP'S FUTURE PLANS, OBJECTIVES AND EXPECTED PERFORMANCE. SUCH FORWARD-LOOKING STATEMENTS INCLUDE STATEMENTS THAT USE FORWARD-LOOKING TERMINOLOGY SUCH AS "MAY", "WILL", "SHOULD", "EXPECT", "ANTICIPATE", "PROJECT", "ESTIMATE", "INTEND", "CONTINUE", OR "BELIEVE", OR THE NEGATIVES THEREOF, OR OTHER VARIATIONS THEREON, OR COMPARABLE TERMINOLOGY.

FORWARD-LOOKING STATEMENTS ARE BASED ON ASSUMPTIONS THAT THE GENERAL PARTNER BELIEVES ARE REASONABLE, BUT ARE SUBJECT TO A WIDE RANGE OF RISKS AND UNCERTAINTIES. ACTUAL RESULTS MAY DIFFER FROM THOSE EXPRESSED OR IMPLIED BY SUCH FORWARD-LOOKING STATEMENTS.

INFORMATION RESPECTING PRIOR PERFORMANCE OF OTHER INVESTMENTS IS NOT NECESSARILY INDICATIVE OF ACTUAL RESULTS TO BE OBTAINED BY THE PARTNERSHIP. NOTHING CONTAINED HEREIN IS, OR SHOULD BE RELIED ON AS, A PROMISE OR REPRESENTATION AS TO THE FUTURE PERFORMANCE OF THE PARTNERSHIP.

Palm House Hotel, LLLP                                    *Strictly Confidential*

### CONSIDERATION CONCLUSION

THIS MEMORANDUM IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE SUBSCRIPTION AGREEMENT RELATED THERETO, THE PARTNERSHIP AGREEMENT AND ALL OTHER RELEVANT AGREEMENTS (IF ANY) PERTAINING TO AN INVESTMENT IN, OR THE OPERATION OF, THE PARTNERSHIP, IN EACH CASE AS MAY BE AMENDED, MODIFIED, SUPPLEMENTED OR RESTATED FROM TIME TO TIME. COPIES OF SUCH DOCUMENTS WILL BE MADE AVAILABLE UPON REQUEST AND SHOULD BE REVIEWED PRIOR TO PURCHASING ANY UNIT. NO PERSON HAS BEEN AUTHORIZED IN CONNECTION WITH THIS OFFERING TO GIVE ANY INFORMATION OTHER THAN AS CONTAINED IN THIS MEMORANDUM. NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

STATEMENTS IN THIS MEMORANDUM ARE MADE AS OF 12/02/2012, UNLESS STATED OTHERWISE. NEITHER THE DELIVERY OF THIS MEMORANDUM AT ANY TIME NOR ANY SALE HEREUNDER SHALL UNDER ANY CIRCUMSTANCES CREATE AN IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AS OF ANY OTHER TIME SUBSEQUENT TO SUCH DATE. THE GENERAL PARTNER AND ITS AFFILIATES RESERVE THE RIGHT TO MODIFY ANY OF THE TERMS OF THE OFFERING AND THE UNITS DESCRIBED HEREIN.

THE UNITS ARE OFFERED SUBJECT TO THE RIGHT OF THE GENERAL PARTNER TO REJECT ANY SUBSCRIPTION IN WHOLE OR IN PART. IF THE GENERAL PARTNER REJECTS A SUBSCRIPTION, THE PROSPECTIVE INVESTOR WILL BE NOTIFIED AS SOON AS PRACTICAL.

THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER OR SOLICITATION IN ANY COUNTRY, STATE OR OTHER JURISDICTION IN WHICH SUCH AN OFFER OR SOLICITATION IS UNLAWFUL.

ALL "$" AND "DOLLAR" REFERENCES IN THIS MEMORANDUM ARE TO U.S. DOLLARS.

* * * * *

FOR MORE INFORMATION PLEASE CONTACT THE PARTNERSHIP.

* * * * *

Please direct all inquiries regarding the Partnership to:

Palm House Hotel, LLLP

197 S. Federal Highway, Suite 200
Boca Raton, FL 33432
Telephone: (561) 282-6102

Strictly Confidential

# Jurisdictional Notes

Prospective Investors are not to construe the contents of this document or any prior subsequent communications from the Offeror as legal or tax advice. Each Investor must rely on his own representative for legal, income tax and related matters concerning this investment.

This document is Confidential and contains proprietary information. It is intended for the exclusive use of the recipient.

PROJECTIONS MAY BE CONTAINED IN THIS MEMORANDUM AND ANY OTHER PROJECTIONS THAT DO NOT CONFORM TO THOSE IN THIS OFFERING DOCUMENT SHOULD BE DISREGARDED.

EVERY INVESTOR SHOULD BE AWARE THAT THE PARTNERSHIP HAS NO OBLIGATION, NOR DOES IT INTEND TO REPURCHASE THE UNITS FROM INVESTORS IN THE EVENT THAT, FOR ANY REASON, AN INVESTOR WISHES TO TERMINATE THE INVESTMENT.

### FOREIGN (NON-USA) JURISDICTION

THESE UNITS HAVE NOT BEEN REGISTERED, FILED WITH, OR OTHERWISE APPROVED BY ANY FOREIGN (NON-USA) REGULATORY AGENCY. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

A non-US person or entity considering an investment in the Partnership should consult his/her or its own tax advisors with respect to the specific tax consequences to such person of such an investment under United States federal, state and local income tax laws, and with respect to the treatment of income and gain from such investment under the tax laws of any foreign jurisdiction in which such person or entity is subject to tax.

THIS CONFIDENTIAL OFFERING MEMORANDUM DOES NOT SET FORTH COMPLETE INFORMATION RELATING TO THE TAX EFFECTS OF AN INVESTMENT IN THE PARTNERSHIP. EACH PROSPECTIVE INVESTOR SHOULD CONSULT WITH ITS OWN COUNSEL, ACCOUNTANTS OR OTHER ADVISORS AS TO THE US FEDERAL (AS WELL AS STATE AND LOCAL) TAX CONSEQUENCES OF ITS INVESTMENT IN THE PARTNERSHIP, WHICH MAY DIFFER SUBSTANTIALLY FOR DIFFERENT TYPES OF TAXPAYERS (INDIVIDUALS, CORPORATIONS, ETC.) IN PARTICULAR, INVESTMENT IN THE PARTNERSHIP BY ENTITIES SUBJECT TO ERISA AND BY OTHER TAX-EXEMPT ENTITIES REQUIRES SPECIAL CONSIDERATION. TRUSTEES OR ADMINISTRATORS OF SUCH ENTITIES ARE URGED TO CAREFULLY REVIEW THE MATTERS DISCUSSED IN THIS MEMORANDUM.

### NOTICE TO RESIDENTS OF ALL STATES

THE UNITS OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE ACT OR THE SECURITIES LAWS OF ANY STATE AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE ACT AND APPLICABLE STATE LAWS. THE UNITS ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE ACT AND APPLICABLE STATE LAWS PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. THE UNITS HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SEC, ANY STATE SECURITIES COMMISSION OR OTHER REGULATORY AUTHORITY, NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING OR THE ACCURACY OR ADEQUACY OF THIS OFFERING MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

Palm House Hotel, LLLP                                      *Strictly Confidential*

### CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING STATEMENTS

The Memorandum includes "forward-looking statements" within the meaning of Section 27A of the Act and Section 21E of the Securities Exchange Act of 1934 which represent our expectations or beliefs concerning future events that involve risks and uncertainties, including those associated with our ability to obtain financing for our current and future operations. All statements other than statements of historical facts included in the Memorandum including, without limitation, the statements under "Business" and elsewhere herein, including the Documents incorporated by reference, are forward-looking statements

Although we believe that the expectations reflected in such forward-looking statements are reasonable, we cannot assure you that such expectations will prove to have been correct. Important factors that could cause actual results to differ materially from our expectations ("Cautionary Statements") are disclosed in the Memorandum, including without limitation, in connection with the forward-looking statements included in the Memorandum. All subsequent written and oral forward-looking statements attributable to us or persons acting on its behalf are expressly qualified in their entirety by the Cautionary Statements.

THE FORWARD LOOKING STATEMENTS INCLUDED HEREIN ARE ALSO BASED ON CERTAIN CURRENT BUDGETING CONSIDERATIONS AND OTHER ASSUMPTIONS RELATING TO THE PARTNERSHIP'S ABILITY TO OBTAIN RETURNS FOR ITS INVESTORS, SUCCESSFULLY MARKET ITS SERVICES, PROCURE SUFFICIENT CAPITAL TO EXPAND OPERATIONS AND MAINTAIN STRICT REGULATORY PROCEDURES WHILE CONDUCTING BUSINESS. ASSUMPTIONS RELATING TO THE PROCEEDING AND FOREGOING INFORMATION INVOLVE JUDGMENTS THAT ARE DIFFICULT TO PREDICT ACCURATELY AND ARE SUBJECT TO NUMEROUS FACTORS WHICH MAY MATERIALLY AFFECT THE PARTNERSHIP'S RESULTS.

BUDGETING, INVESTMENT AND OTHER MANAGERIAL DECISIONS ARE SUBJECTIVE AND ARE THUS SUSCEPTIBLE TO INTERPRETATIONS AND PERIODIC REVISIONS BASED ON ACTUAL EXPERIENCE AND BUSINESS DEVELOPMENTS, THE IMPACT OF WHICH MAY CAUSE THE PARTNERSHIP TO ALTER BUDGETS AND AMEND STRATEGIES, ANY OR ALL OF WHICH MAY MATERIALLY AFFECT THE PARTNERSHIP'S RESULTS.

THE FOREGOING CONSIDERATIONS, AS WELL AS A VARIETY OF OTHER FACTORS NOT SET FORTH HEREIN, COULD CAUSE THE PARTNERSHIP'S ACTUAL RESULTS AND EXPERIENCE TO DIFFER WIDELY OR MATERIALLY FROM THE ANTICIPATED RESULTS OR OTHER EXPECTATIONS IN THE PARTNERSHIP'S FORWARD LOOKING STATEMENTS.



Case 9:16-cv-81871-KAM Document 657-2 Entered on FLSD Docket 07/06/2020 Page 45 of
Case 9:19-cv-80732-KAM Document 55-2 Entered on FLSD Docket 03/10/2019 Page 45 of
153

Palm House Hotel, LLLP                                                    *Strictly Confidential*

# Statement to EB5 Investors

1) The Project will be located in Florida, within one or more Targeted Employment Areas (TEAs). Therefore, pursuant to EB-5 guidelines, EB-5 Investors must invest a minimum amount of $500,000.00.

2) The management and staffing projections for the Project show that the Project will create sufficient new direct and indirect jobs to support the number of investors sought. Please refer to the attached business plan and economic analysis for further information.

3) EB-5 guidelines require the investment to be at risk. Investors should consult their own counsel and/or independent advisor for recommendations about this investment.

---

IF YOU LIVE OUTSIDE THE UNITED STATES, IT IS YOUR RESPONSIBILITY TO FULLY OBSERVE THE LAWS OF ANY RELEVANT TERRITORY OR JURISDICTION OUTSIDE THE UNITED STATES CONNECTED WITH ANY PURCHASE OF UNITS, INCLUDING OBTAINING REQUIRED GOVERNMENTAL OR OTHER CONSENTS OR OBSERVING ANY OTHER REQUIRED LEGAL FORMALITIES IN RELATION TO THE PARTNERSHIP.

## *EB-5 VISA: CASE PROCESSING PROCEDURES*

For applicants outside the United States:

- The applicant first makes a qualifying investment
- The applicant files a Form I-526 petition (and supporting documents) with USCIS.
- The U.S. Department of State's National Visa Center processes the EB-5 Immigrant visa through the local U.S. consular post with jurisdiction over the place of residence.
- The applicant uses the EB-5 Immigrant visa to enter the United States, which commences the two-year conditional lawful permanent resident status.
- Approximately 21 months later, the applicant must file a Form I-829 to remove the conditional status.
- The applicant must provide supporting documents to establish that they have satisfied all EB-5 qualifying conditions.
- Upon approval, a new ten-year unconditional green card is issued.

For applicants having lawful non-immigrant status within USA and staying in USA:

- The applicant first makes a qualifying investment
- The applicant files a Form I-526 petition (and supporting documents) with USCIS.
- On approval of Form I-526, the applicant files a Form I-485 (Application to Register Permanent Residence or Adjust Status).
- Upon approval of the Form I-485, the applicant is granted a conditional lawful permanent resident status, which is valid for two years.
- Approximately 21 months later, the applicant must file a Form I-829 to remove the conditional status.
- The applicant must provide supporting documents to establish that they have satisfied all EB-5 qualifying conditions.
- Upon approval, a new ten-year unconditional green card is issued.

NOT A CERTIFIED COPY

Case 9:16-cv-81871-KAM Document 657-2 Entered on FLSD Docket 07/06/2020 Page 46 of
153
Case 9:19-cv-80732-KAM Document 55-2 Entered on FLSD Docket 03/10/2019 Page 146 of
253

### *PATRIOT ACT RIDER*

EACH POTENTIAL INVESTOR HEREBY REPRESENTS AND WARRANTS THAT IT: (i) IS NOT, NOR IS IT ACTING AS AN AGENT, REPRESENTATIVE, INTERMEDIARY OR NOMINEE FOR, A PERSON IDENTIFIED ON THE LIST OF BLOCKED PERSONS MAINTAINED BY THE OFFICE OF FOREIGN ASSETS CONTROL, U.S. DEPARTMENT OF TREASURY; AND (ii) HAS COMPLIED WITH ALL APPLICABLE U.S. LAWS, REGULATIONS, DIRECTIVES, AND EXECUTIVE ORDERS RELATING TO ANTI-MONEY LAUNDERING , INCLUDING BUT NOT LIMITED TO THE FOLLOWING LAWS; (1) THE UNITING AND STRENGTHENING AMERICA BY PROVIDING APPROPRIATE TOOLS REQUIRED TO INTERCEPT AND OBSTRUCT TERRORISM ACT OF 2001, PUBLIC LAW 107-56, AND (2) EXECUTIVE ORDER 13224 (BLOCKING PROPERTY AND PROHIBITING TRANSACTIONS WITH PERSONS WHO COMMIT, THREATEN TO COMMIT, OR SUPPORT TERRORISM) OF SEPTEMBER 23, 2001.

NOT A CERTIFIED COPY

# Summary of the Business

The Partnership offers its Investors projected returns with yearly distributions.

1. The General Partner of the Partnership is South Atlantic Regional Center, LLC ("General Partner"). The Managers of the General Partner have a successful history of commercial development, construction, retail, and management experience.

2. Timeline for acquisition of funding is anticipated for early 2013. Construction has commenced using bridge financing, and EB-5 funding is required to complete remodeling work on the facility.

3. The Partnership anticipates that the Project will be open for business by the end of 2014.

4. Anticipated project costs will be $91,000,000. See "Use of Proceeds."

5. The Project shall provide substantial benefits to the regional economy that exceeds the strict USCIS requirements for job creation that will allow a foreign Investor to qualify for an EB-5 Immigration Visa.

6. The Offering provides the Investors with a projected annual dividend.

## SUMMARY OF PARTNERSHIP AND HOTEL PROJECT

The Hotel Project will seek to accomplish the following:

1. The Partnership will loan funds to the Borrower, with such funds derived from either: (i) foreign Investors through the EB-5 program; or (ii) U.S. Investors. The Borrower will develop and build the Project (please review the Business Plan Summary herein for more details).

2. The Project will serve the greater Florida primary market area (Palm Beach County) by seeking to create jobs and increase U.S. exports by developing a high-end resort hotel.

3. A more detailed description of the Project is included in the full business plan.

4. The Partnership, through investment in the Project, offers the foreign and U.S. Investor excellent projected returns with yearly cash distributions. The Investors shall collectively own 99% of the Partnership, and the General Partner shall own 1% of the Partnership.

5. The Partnership is projecting a five (5) year ROI based upon: a one-quarter of one percent (0.25%) preferred non-cumulative annual dividend. These ROI calculations show an annualized rate of return of 0.25%, with an overall ROI of 1.25%. Please review the Return on Investment section in the full business plan for details of the anticipated distributions.

6. Projected dividends and net profits will be distributed to the Investors not less frequently than annually.

7. As determined by the General Partner of the Partnership, in its sole discretion, between the end of the fifth year and seventh year of the operation of the Project, the Partnership will either: (i) market the Project for sale, and the pro rata share of the profits realized from the sale (if any) will

NOT A CERTIFIED COPY

*Strictly Confidential*

be distributed to the Partners of the Partnership (including the Investors up to the amount of their then-current investment); or (ii) the General Partner or Partnership may repurchase the interests of each EB-5 Investor for an amount equal to the net capital invested by each EB-5 Investor, if the General Partner has sufficient funds to do so.

8. Upon sale of all of the assets of the Partnership and/or liquidation of the Partnership, the net proceeds (after normal and customary costs of sale) shall be distributed as follows: (i) the Investors shall each receive a pro rata share of the net proceeds, up to a maximum of the net sums invested by each of them in the Partnership; (ii) to the extent there are excess proceeds, such proceeds shall be distributed to the General Partner.

NOT A CERTIFIED COPY

Case 9:16-cv-81871-KAM Document 657-2 Entered on FLSD Docket 07/06/2020 Page 49 of
153
Case 9:19-cv-80332-KAM Document 55-2 Entered on FLSD Docket 03/10/2019 Page 49 of
153

NOT A CERTIFIED COPY

Palm House Hotel, LLLP                                    *Strictly Confidential*

# THE OFFERING TERM SHEET

*This summary of certain provisions of this Memorandum is intended only for convenient reference. It is not intended to be complete and is qualified in its entirety by the more detailed information contained elsewhere in this Memorandum and in the Exhibits hereto. The full text of this Memorandum, and the Exhibits, should be read in detail and understood by each potential Investor. The term "Investor" shall mean persons or entities receiving this Memorandum.*

| | |
|---|---|
| **THE PARTNERSHIP:** | The Partnership is a Florida Limited Liability Limited Partnership. Its principal office is located at: 197 S. Federal Highway, Suite 200, Boca Raton, FL  33432; Telephone: (561) 282-6102. The Partnership is offering for sale Units of limited partnership interests to Accredited Investors pursuant to the EB-5 Program. |
| **SECURITIES:** | Units of limited partnership interests in the Partnership shall be issued to Investors in this Offering, with one (1) Unit issued for each $500,000 investment. The Offering hereunder is 79 Units. |
| **THE GENERAL PARTNER:** | South Atlantic Regional Center, LLC is the general partner of the Partnership. The initial Managers of the General Partner and summary background information regarding the Managers of the General Partner appears in the section entitled "Management Team,"  The General Partner shall provide overall management and supervision of the Partnership. |
| **BORROWER:** | Palm House, LLC ("Borrower") is a Delaware limited liability company. Borrower seeks financing from the Partnership in order to operate a business involving the renovation and development of a high-end resort hotel. See "Use of Proceeds" below. |
| **EB-5 REGIONAL CENTER SPONSORSHIP:** | The Project is sponsored by South Atlantic Regional Center (SARC) (the "Regional Center"), a Florida limited liability company. The Regional Center has been approved by the U.S. Citizenship and Immigration Services ("USCIS") to serve as an approved regional center under the EB-5 Immigrant Investor Pilot Program to establish and solicit investment from foreign investors in U.S. businesses for the purposes of creating U.S. jobs. |
| **COMPOSITION OF PARTNERSHIP:** | The Partnership will be composed of: (i) the General Partner, which will own a 1% interest in the Partnership and (ii) Limited Partners, which will collectively own a 99% interest in the Partnership. |

Palm House Hotel, LLLP                                                    *Strictly Confidential*

| | |
|---|---|
| **UNITS OFFERED:** | One (1) Limited Partnership Unit (i.e. 1%) will be owned by affiliates of the individuals or Persons who are the Managers of the General Partner ("Promoter Limited Partnership Units"), and 79 Limited Partnership Units (i.e. 99%) (all rounded to the nearest one percent (1%)) will be offered to Investors. |
| | The Partnership is offering for sale up to 79 Limited Partnership Units, for a total offering of $39,500,000. Payment for Units of the Partnership must be paid in cash, upon subscription. |
| **MINIMUM INVESTMENT:** | $500,000.00, for one (1) Unit. |
| **USE OF PROCEEDS:** | The Partnership will loan ("Loan") the proceeds of this Offering to the Borrower to partially finance the acquisition, development, and operation of the Project. The Partnership will make the Loan to Borrower on the terms set forth in the Loan Documents attached hereto. See Capital Requirements and Estimated Use of Proceeds and Summary of Loan Terms below. |
| **TERMS OF THE OFFERING:** | All subscription funds received from Investors will be paid to a special escrow account ("Escrow Account") maintained by a reputable bank ("Escrow Bank") under the control of the bank or another entity ("Escrow Agent") as defined in the Escrow Agreement. The Escrow Agent may invest the subscription funds in investment grade debt instruments of the United States government. All interest earned on the Escrow Account will be the property of the Partnership unless the Offering is unsuccessful, in which event each potential Investor will receive its pro rata share of the income earned, less administrative and other similar costs. |
| | To maintain complete security in the payment process for the investor and the partnership, subscription funds will be wired into the Escrow Bank and held in Escrow under the terms set forth in the Escrow Agreement. Separately, the $40,000 administration fee is also wired to the Escrow Bank. The Escrow Account will be released to the Partnership at such time as (a) the Investor's I-526 application is approved by the USCIS, or (b) as defined in the Escrow Agreement. In the event that a subscription is not accepted, the subscription funds paid by such potential Investor, together with interest earned thereon, if any, shall be promptly returned to the potential Investor. |
| **TERM PERIOD:** | The term of the existence of the Partnership will be as set forth in the Partnership Agreement. |
| **DISTRIBUTIONS / DIVIDENDS:** | The General Partner will determine, in its sole discretion, the amount, timing (not less than annually) and form of distributions by the Partnership, if any. |
| | The Partnership may not make any distributions: (1) in |

NOT A CERTIFIED COPY

**Strictly Confidential**

violation of the Partnership Agreement; (2) If after the distribution: (a) it would not be able to pay its debts as they become due in the ordinary course of it's activities; or (b) its total assets would be less than the sum of its total liabilities plus the amount that would be needed, if it was dissolved, wound up and terminated at the time of the distribution to satisfy the preferential rights upon dissolution, winding up and termination of partners whose preferential rights are superior to those of persons receiving the distribution.

The Partnership may base a determination that a distribution is not prohibited under subsection (2) on financial statements prepared on the basis of accounting practices and principles that are reasonable in the circumstances or on a fair valuation or other method that is reasonable in the circumstances.

Distributions of funds from operations of the Partnership shall be made in the following order of priority:

1. To the EB-5 Investors until the annual distributions to those Investors equals one-quarter of one percent (0.25%) of the capital invested by each EB-5 Investor ("EB-5 Preferred Return").

2. The balance to the General Partner.

It is the intention of the Partnership to refinance the project after the fifth year of operations. In such event, the Partnership and/or the General Partner or their designees may repurchase the interests of each EB-5 Investor for an amount equal to the net capital invested by each EB-5 Investor, if they have sufficient funds to do so.

The rules and regulations governing the EB-5 Pilot Program prohibit the return of an EB-5 Investor's investment prior to the approval of the Investor's I-829 petition. See "EB-5 Immigration Disclosures and Risk Factors" and "Risk Factors."

***RESTRICTIONS ON RESALE:***
The Investor(s) who purchase any Units pursuant to this Offering will be restricted from selling, transferring, pledging or otherwise disposing of any Units due to restrictions under securities laws and the Partnership Agreement.

***HOW TO INVEST:***
Each Investor must execute and deliver the Subscription Agreement attached hereto.

***WHO MAY INVEST:***
The Units of the Partnership are being offered pursuant to this Memorandum solely to persons who are "accredited investors" as defined in Regulation D promulgated under the Act. See the Accredited Investor Suitability Questionnaire attached hereto.

NOT A CERTIFIED COPY

Palm House Hotel, LLLP                                    *Strictly Confidential*

**INVESTOR SUITABILITY:**

This Offering will be made pursuant to exemptions from registration provided by Section 4(2) of the Act, Regulation D promulgated thereunder, and exemptions available under applicable state securities laws and regulations. Persons desiring to invest in the Partnership will be required to make certain representations and warranties regarding their financial condition in the Subscription Agreement attached hereto. Such representations include, but are not limited to, certification that the Investor is an accredited Investor under SEC regulations. The Partnership reserves the right to reject any Subscription in whole, or in part, in its sole discretion. See "Suitability Standards."

THE SUBSCRIPTION AGREEMENT INCLUDES CERTAIN REPRESENTATIONS AND WARRANTIES OF THE INVESTOR ON WHICH THE PARTNERSHIP WILL RELY IN DETERMINING WHETHER TO ACCEPT THE SUBSCRIPTION. PROSPECTIVE INVESTORS ARE URGED TO READ THE SUBSCRIPTION AGREEMENT CAREFULLY AND, TO THE EXTENT THEY DEEM APPROPRIATE, TO DISCUSS THE SUBSCRIPTION AGREEMENT, THIS MEMORANDUM AND THEIR PROPOSED INVESTMENT IN THE UNITS WITH THEIR LEGAL OR OTHER ADVISORS.

**ADMINISTRATIVE FEES:**

EB-5 participants will be required to pay a $40,000 administrative fee. Any other administrative or other fees paid to any party in connection with the sale of Units pursuant to this Offering shall not be paid out of the proceeds of Capital Contributions of EB-5 participants. This administrative fee is in addition to any fees paid by Investors for the preparation of USCIS applications, forms, or paperwork.

**RISK FACTORS:**

The Units offered hereby involve a high degree of risk. See "Risk Factors" set forth in the Memorandum.

**TAX RISKS:**

Investment in the Partnership involves substantial tax risks. Although the primary motive of Investors should be for current income and/or long-term appreciation, state and federal legislatures and tax authorities may alter and change the permissible deductions that may be taken with respect to the Project and its income, and may change the tax rates to less favorable rates. In addition, the state and federal tax authorities may be more likely to audit taxpayers with higher incomes or partnership income or loss. Since Investors generally fall into this category, the Partnership also has an increased risk of being audited. Such an examination could result in adjustments to items that are related to the Partnership. Investors and/or the Partnership may incur legal or other professional expenses in connection with such audit or the adjustments resulting from such audit. The Partnership has not obtained a legal opinion or ruling from any tax authority regarding any tax aspects of the Project, the Partnership or its business. The

Palm House Hotel, LLLP                                                    *Strictly Confidential*

tax risks include, without limitation, the following: (i) Changes in federal income tax laws; (ii) Partnership status; (iii) Taxable income in excess of distributions; (iv) Allocation of tax items among Limited Partners; (v) Allocation of purchase price; (vi) Partnership termination; (vii) At risk limitations; (viii) Risk of audit; (ix) Profit objective; and (x) Limitations on passive losses. This tax discussion is not tax advice to Investors. Each Investor is advised to consult with his or her own tax advisor regarding the tax consequences of investing in the Partnership. See "Risk Factors" below.

*RESIDENCY RISKS:*

Neither the Partnership nor the General Partner guarantees that any EB-5 participant will be granted conditional or permanent residency in the United States as a result of their purchase of Units of the Partnership. Each Investor must evaluate and accept the risk that he/she may not be granted residency in the United States after making their capital contribution and being admitted as a Limited Partner of the Partnership.

*SUBSCRIPTIONS:*

Investors who wish to subscribe for the Units may do so by executing the Subscription Agreement attached hereto and delivering the completed materials and payment for the Units to the Partnership. A subscription may not be considered for acceptance unless it is completely filled out and properly executed and is accompanied by payment in full for the Units which are being purchased. **Subscriptions accompanied by payment in the form of a personal check, if accepted, will be so accepted conditioned upon and subject to clearance of the check and the Units will not be delivered until the check clears.** Funds accompanying any subscription not accepted by the Partnership will be promptly returned to the Investor without interest thereon or deduction therefrom.

*AVAILABILITY OF FUNDS:*

All proceeds from the sale of Units once the escrow conditions have been satisfied will be delivered directly to the Partnership and be available for use by the Partnership for Partnership purposes, at its discretion.

*RESALE OF UNITS:*

There is no market for the Units. It is not anticipated or intended that one will develop. This is a non-liquid investment. (See "Risk Factors" — there is no market for the Partnership's Units.) Further, there are substantial restrictions on private and/or public resale.

*REPORTS TO LIMITED PARTNER:*

The Partnership will furnish financial statements to Limited Partners annually.

Case 9:16-cv-81871-KAM Document 657-2 Entered on FLSD Docket 07/06/2020 Page 54 of
Case 9:19-cv-80732-KAM Document 55-2 Entered on FLSD Docket 03/10/2019 Page 54 of
153

Palm House Hotel, LLLP · *Strictly Confidential*

# Investor Suitability Standards

INVESTMENT IN THE UNITS OF Palm House Hotel, LLLP INVOLVES A HIGH DEGREE OF RISK AND IS SUITABLE ONLY FOR THOSE INVESTORS WHO HAVE SUBSTANTIAL FINANCIAL RESOURCES IN RELATION TO THEIR INVESTMENT AND WHO UNDERSTAND THE PARTICULAR RISK FACTORS OF THIS INVESTMENT. IN ADDITION, INVESTMENT IN THE UNITS IS SUITABLE ONLY FOR AN INVESTOR WHO DOES NOT NEED LIQUIDITY IN THE INVESTMENT AND IS WILLING TO ACCEPT RESTRICTIONS ON THE TRANSFER OF THE UNITS.

<u>No Registration or Secondary Market</u>
The Units have not been registered under the Act but are being offered and sold in reliance upon exemptions from registration contained in Sections 4(2) and 4(6) of the Act as interpreted by the Securities and Exchange Commission (the "Commission") and in Rule 506 of Regulation D promulgated thereunder ("Regulation D"). See "STATUS OF UNITS UNDER SECURITIES LAWS; RESTRICTED UNITS".

There will be no secondary market for the Units subsequent to this Offering. See "RISK FACTORS". For the foregoing and other reasons, a purchase of Units is suitable only for investors of substantial net worth who (I) are willing to purchase a high risk investment, (ii) can afford to hold their Units for an indefinite period and do not anticipate that they will be required to sell their Units in the foreseeable future, and (iii) have sufficient net worth to sustain a total loss of their investment in the Partnership in the event that such loss should occur.

<u>Investor Suitability</u>

Subject to the right of the Partnership to sell Units to Accredited Investors, Units will be sold only to those Investors who submit an Offeree Questionnaire in the form attached hereto establishing to the satisfaction of the Partnership that:

1.      The Investor is an "Accredited Investor," as defined as follows:

      (i)      a natural person who, either individually or jointly with his/or her spouse, has a minimum net worth of $1,000,000 (net worth shall be determined exclusive of primary residence), or who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year.

      (ii)     any other Accredited Investor, as defined by Regulation D or the SEC.

2.      The Accredited Investor has such knowledge and experience in financial and business matters that he/she/it is able to evaluate the merits and risks of an investment in the Units.

3.      The Accredited Investor has the financial ability to bear the economic risk of an investment in the Units, adequate means of providing for his current needs and personal contingencies, and no need for liquidity in an investment in the Units.

4.      The Accredited Investor is acquiring the Units for his own account for investment and not with a view to resale or distribution.

Investor Suitability (Regulation S)

The Company's Units will also only be offered to those investors who are not a "U.S. person" as defined by Rule 902(k) under Regulation S, which include:

(i) Any natural person resident in the United States;

(ii) Any partnership or corporation organized or incorporated under the laws of the United States;

(iii) Any estate of which any executor or administrator is a U.S. person;

(iv) Any trust of which any trustee is a U.S. person;

(v) Any agency or branch of a foreign entity located in the United States;

(vi) Any non-discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary for the benefit or account of a U.S. person;

(vii) Any discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary organized, incorporated, or (if an individual) resident in the United States; and

(viii) Any partnership or corporation if:

(A) Organized or incorporated under the laws of any foreign jurisdiction; and

(B) Formed by a U.S. person principally for the purpose of investing in securities not registered under the Act, unless it is organized or incorporated, and owned, by accredited investors (as defined in Rule 501(a)) who are not natural persons, estates or trusts.

Please study the terms of the Subscription Agreement, this Memorandum and all related documents carefully before you decide to subscribe for Units.

The Partnership will review all subscription documents and will not accept subscriptions from any person or entity who does not represent that he/it complies with the applicable standards specified above.





PROSPECTIVE INVESTORS ARE NOT TO CONSTRUE THE CONTENTS OF THIS MEMORANDUM OR ANY OTHER COMMUNICATIONS FROM THE PARTNERSHIP OR ANY OF ITS MANAGERS, EMPLOYEES, ACCOUNTANTS OR LEGAL COUNSEL AS LEGAL OR TAX ADVICE. EACH INVESTOR SHOULD CONSULT HIS OR HER OWN COUNSEL AND ACCOUNTANT AS TO LEGAL AND TAX MATTERS AND RELATED MATTERS CONCERNING HIS OR HER INVESTMENT.

The Partnership reserves the right to reject the subscription of any prospective Investor at any time prior to acceptance and to refund, without interest thereon and without any deduction there from, any funds paid to the Partnership by such prospective Investor.

### STATUS OF UNITS UNDER SECURITIES LAWS; RESTRICTED UNITS

Investors will have no right to require registration of the Units comprising their Units under the 1933 Act or any state securities laws, and such registration is neither contemplated nor likely. In addition, the Partnership will not make public such information as would permit an Investor to transfer his or her Units pursuant to the provisions of Rule 144 promulgated under the 1933 Act.

The Units are "restricted" as that term is defined in Rule 144 under the Act and, as a result, are subject to substantial restrictions upon transfer or resale. The Units may, absent registration, in the future be sold only in compliance with Rule 144 or other exemption from registration under the Act, the availability of which must be established to the satisfaction of the Partnership, unless the Units are covered by an effective registration statement under the Act.

Prospective Investors will be required to represent to the Partnership that they understand that:

a) The Units have not been registered under the Act or under the securities laws of any state. They will not be able to sell or transfer any of the Units unless they are registered or sold pursuant to an exemption from registration under the Act and under applicable state securities laws, the availability of which exemptions may never occur and, if they do, are to be established to the satisfaction of the Partnership;

b) Neither the Partnership nor any affiliate has made any representation concerning future registration of the Units, except for compliance with an exemption from registration;

c) Since the Units cannot be readily sold, Investors must be prepared to bear the economic risk of the Investment indefinitely;

Palm House Hotel, LLLP                                          *Strictly Confidential*

# Use of Proceeds

The net proceeds to be received by the Partnership from the sale of the Units offered hereby, after deducting the anticipated expenses of the Offering, are estimated to be $39,500,000.00, assuming the maximum sale of the Units offered hereby, of which there can be no assurance.

The amounts actually expended for each purpose may vary significantly depending upon a number of factors. The Partnership reserves the right to reallocate the proceeds of this Offering in response to a variety of factors and related contingencies.

## ESTIMATED USE OF NET PROCEEDS

Although the Partnership has broad discretion to adjust the application and allocation of the net proceeds of this Offering in order to address changed circumstances and opportunities, the Partnership intends to loan the proceeds of this Offering to Borrower for the uses described in this Offering Memorandum.

In order to achieve its objectives as described herein, the Borrower seeks financing to operate a business involving the renovation and development of a high-end resort hotel.

As further described in the Summary of Loan Terms below, Borrower is required to create 10 new full-time direct, indirect, and induced jobs for each $500,000 advanced under the Loan within two and one half years of the First Advance.

NOT A CERTIFIED COPY

Palm House Hotel, LLLP                                              *Strictly Confidential*

# Return on Investment

The Partnership has prepared the following projections based upon projected revenue and the return on investment which may be paid to an EB-5 Investor ("ROI").

For illustration purposes, the following table shows the ROI for an EB-5 Investor based upon a $500,000.00 investment.

The ROI projections concerning the estimated operating results of the Partnership have been prepared by the management of the General Partner. These projections are based on certain assumptions which may, or may not, prove to be inaccurate and which are subject to future conditions that may be beyond the control of the Partnership, such as the general industry and market conditions. The Partnership may experience unanticipated costs or lower revenues than forecast. There is no assurance that the results which are illustrated in the ROI projections will, in fact, be realized by the Partnership.

| ASSUMPTIONS | |
|---|---|
| Total Initial Investment | $500,000.00 |
| Annual Preferred Dividend to EB-5 Investor | 0.25% |
| Equity of EB-5 Investor | 1.25% |

The Partnership is projecting a five (5) year ROI based upon: (i) a one-quarter of one percent (0.25%) preferred dividend for the first five years; (ii) annual distributions of cash flow from operations; and (iii) the distribution to be paid to the EB-5 Investor upon the refinancing of the Project at the end of the fifth (5th) year of operations of the Project.

The projected ROI of an EB-5 Investor is as follows:

(i)     *0.25% annual return.* Each Investor will be entitled to receive a 0.25%, non-cumulative, annual preferred distribution based on their initial investment of $500,000.00. The preferred return shall be paid prior to calculating and making any additional distributions and/or dividends to the other Investors and/or Partners. The annual preferred dividend to be paid to all of the Investors (based upon a total investment of $39,500,000 00) is $21,250 per year or $1,250 per Investor per year. The non-cumulative preferred return will begin to accrue on the first day that the Project is open for business to the public and will be paid annually until the assets of the Partnership are sold. The total projected preferred return for an EB-5 Investor making a $500,000.00 investment is $6,250.

(ii)    *Bonus Distribution.* Each Investor shall have the opportunity to participate in the profitability of the commercial enterprise funded by this Offering. Should Palm House, LLC (the "Borrower") achieve certain performance goals, Investors shall receive bonus distributions. Specifically, (a) if the Project is commercially successful enough that Palm House, LLC is able to sell the Project for $110,000,000 or more before repayment of Investor contributions, then Investors shall be entitled to an additional bonus distribution totaling 5% of the amount invested, or (b) if the Project is commercially successful enough that Palm House, LLC is able to sell the Project for $130,000,000 or more before repayment of Investor contributions, then Investors shall be entitled to an additional bonus distribution totaling 10% of the amount invested.

NOT CERTIFIED COPY

*Strictly Confidential*

(iii)　**Bonus Benefits.** In addition to the distributions discussed herein, Investors shall additionally be entitled to certain benefits related to the Project. Once the hotel is operational, and subject to availability, Investors will be entitled to receive a complimentary one week hotel stay each year during the term of the investment. This hotel stay benefit accrues only to each Investor, and is not transferrable. As an additional bonus benefit, once the hotel's membership club is operational, Investors shall be entitled to join that membership club, and shall receive a discount of 50% off the normal price of membership. This benefit is subject to the terms of the Membership Club Rules. Exercise of these bonus benefits is at each Investor's option.

(iv)　**Annual Distribution.** After the payment of the annual preferred return to the EB-5 Investors, the net cash flow from operations will be distributed to the General Partner.

(v)　**Distribution upon Sale or Liquidation.** It is contemplated that the Project will be refinanced after the fifth year of operations, and Units repurchased from Limited Partners at that time.

Upon sale of all of the assets of the Partnership and/or liquidation of the Partnership, the net proceeds (after normal and customary costs of sale) shall be distributed as follows: (i) the Investors shall each receive a pro rata share of the net proceeds, up to a maximum of the net sums invested by each of them in the Partnership; (ii) to the extent there are excess proceeds, such proceeds shall be distributed to the General Partner.

The General Partner shall own 1% of the Partnership. The Investors shall collectively own 99% of the Partnership (rounded to the nearest one percent).

The following total ROI is based on an EB-5 investment of $500,000.00 and is in addition to the potential return of the $500,000.00 initial investment.

| Individual ROI | |
|---|---|
| 0.25% preferred non-cumulative annual dividend | $6,250 |
| Annual Additional Distributions | - |
| Property Sale | - |
| **TOTAL ROI** | **$6,250** |

The total ROI is based on a 0.25% preferred non-cumulative annual dividend. These ROI calculations show an annualized rate of return of 0.25%, with an overall ROI of 1.25%.

## ROI DISCLOSURES

Profits of the Borrower, if any, will be used first to pay operating expenses and service debts and obligations of the Borrower. Any remaining profits will be used to establish reserves required by law, in addition to those deemed necessary by the General Partner in its sole discretion, for maintenance, capital improvements, and structural repairs to the Project. Any remaining profits may be available for distribution to Partners in accordance with the LP Agreement (attached).

NOT A CERTIFIED COPY

Palm House Hotel, LLLP                                                    *Strictly Confidential*

Proceeds of this Offering do not include Administrative Fees. Offering Expenses, commissions, and fees incurred in connection with this Offering shall be paid from the proceeds of Administrative Fees and not from EB-5 Capital Contributions.

The General Partner determines in its sole discretion the amount, if any, timing and form of any distribution of profits by the Partnership.

The Partnership shall not make a distribution (i) if after such distribution liabilities of the Partnership, other than liabilities to Partners on account of their Partnership Interests (as defined in the LP Agreement), exceed the fair value of the assets of the Partnership, (ii) to EB-5 Limited Partners, other than distributions from Available Cash Flow, prior to the fifth anniversary date of the EB-5 Limited Partner's admission as a Partner of the Partnership. After the fifth anniversary date of the EB-5 Limited Partner's admission as a Partner, the foregoing restriction shall no longer apply, to the extent such distribution is prohibited under the Act. See Summary of Limited Partnership Agreement below.

The rules and regulations governing the Pilot Program prohibit the return of an EB-5 Investor's investment prior to the approval of the Investor's I-829 application. Accordingly, it is possible that neither Preferred Returns nor return of capital will be made to any EB-5 Limited Partner of the Partnership prior to the end of the fifth year after the closing of this Offering or his/her investment, whichever is later. See EB-5 Immigration Disclosures and Risk Factors above.

An EB-5 Limited Partner's interest in the Partnership shall automatically terminate without further action upon repayment of his/her Capital Contribution and all accrued Preferred Returns. See LP Agreement.

**Refinance, Repayment and Extension of the Loan.** The terms of the Loan require the Borrower to use commercially reasonable efforts to refinance and repay the Loan after the end of the fifth year from the First Advance (as defined in the Loan Documents) thereunder. If Borrower is unable to refinance the Loan, it may extend the term of the Loan for one or more additional five year terms during which it shall continue to make principal and interest payments to the Partnership on the balance of the Loan. See Summary of Loan Terms below.

NOT A CERTIFIED COPY

Case 9:16-cv-81871-KAM Document 653-2 Entered on FLSD Docket 07/06/2020 Page 61 of
Case 9:19-cv-80732-KAM Document 55-2 Entered on FLSD Docket 03/10/2019 Page 151 of
150

# Management of the Partnership

### SARC MANAGEMENT

PRINCIPAL:

Joseph J. Walsh                    **South Atlantic Regional Center, LLC,** *Managing Member*

Joseph J. Walsh was born and raised in Chicago. Mr. Walsh has managed and owned both public and
private corporations in the US, Canada and the UK. Mr. Walsh started his career in Marketing and
Advertising, though he was formally educated as an Electrical Engineer. He founded and served as
President and CEO of several startup computer and graphics firms that he brought to the public markets
in the late 1990s and early 2000s. He subsequently managed several successful mergers of public
companies and has extensive experience in merger and acquisition strategy and law. His experience
extends not only in the technical realm but to the intricacies of U.S. Securities and Exchange laws. Mr.
Walsh brings a wealth of knowledge and expertise to South Atlantic Regional Center with over thirty
years of experience in marketing, development and process engineering.

### PALM HOUSE, LLC MANAGEMENT

Robert V. Matthews

Robert V. Matthews is the chairman of Matthews Ventures Holdings, LLC.

MVH is a diversified holding company with interests in real estate, hotels, software, manufacturing and
construction. The companies also provide funding for start up businesses, as well as the acquisition of
existing businesses in various market segments.  Founded in 1982, the MVH companies are comprised of
seasoned professionals with extensive experience in banking, hospitality, and construction.

Over the past several years, like many U.S. Developers, Matthews' companies were battered by the
financial collapse.  The group has weathered the storm and returned with an organization that is much
more agile and refined.  The exposure has produced an organization that is well educated in navigating
the distressed asset financial process and this knowledge has allowed us access to a substantial number
of undervalued assets.

Matthews Ventures Holdings, based in Palm Beach, is currently working on over $600 Million worth of
product under development ranging from condos to hotels both here in Florida as well as throughout
the United States.  In keeping with the goal of the company to develop one of kind properties in luxury
destinations, all of the MVH products will be five star facilities upon completion. MVH is the principal of
both HIG Acquisitions LLC, a private equity fund that is acquiring strategic international 5 star hospitality
assets for re-positioning and Matthews Hospitality Group, a consortium of luxury properties under
development.

Palm House Hotel, LLLP                                                    *Strictly Confidential*

As a venture capitalist Matthews was named Entrepreneur of the Year in 1993. He has controlled numerous companies over the past twenty five years including FMP, Echelon Engineering and Construction, Bentley Churchill, and Stromberg Software. He also holds minority shares in several other companies.

Ryan Black

Ryan Black began his career with Kriti Management, the U.S. office of the Vardinoyannis family, one of Europe's wealthiest families and the largest industrial group in Eastern Europe. As Executive Vice President of Kriti Management, he over saw the allocation and investment of over 200M in capital across multiple asset classes in the U.S. and South America.

In 2009, Mr. Black left Kriti to serve as the Chief Operating Officer of Jumelrah South America and to advise the Cabot family on their investments in Argentina and Brazil. He spent a year working for the group prior to their withdrawal from the South American market.

In 2010 R. Black Global was formed to serve as an investment vehicle sourcing attractive investment opportunities for a variety of international high net worth families, funds, and corporations.

In 2012 alone, R. Black Global, on behalf of clients, has closed 3 transactions totaling 83 million dollars worth of investment. Transactions this year to date include:

- A 500,000 square foot development parcel in New York, NY
- A portfolio of 385 improved lots in Reno, NV
- A portfolio of 24 condos in Irvine, CA

In addition to the above closed transactions, R. Black Global, through controlled entities, has in excess of 25 million in hospitality assets under contract and has a stalking horse offer in excess of 30 million, in backup position, on a large residential development opportunity outside of San Francisco, CA.

R. Black Global acts as an investment sourcing entity and operating partner for assets acquired. With substantial international equity structuring experience, we have been able carve out a substantial equity allotment from multiple sources by advising and establishing tax effective investment structures for international investors.

Eduardo V. Miranda

Mr. Miranda currently serves as a Senior Associate with Metro 1 Properties in Miami, Florida, a commercial brokerage and real estate advisory services company. There, he represents buyers and sellers in commercial real estate transactions including hotel, industrial, multi-family, and land. He also performs due diligence and financial feasibility analysis on proposed acquisitions for clients, produced

Palm House Hotel, LLLP.                                                *Strictly Confidential*

and distributed offering memoranda for property dispositions, and represented retail tenants in site selection and lease execution.

Prior to that, Mr. Miranda served as the Development Manager for Oto Development, LLC, a hotel development group based in Fort Lauderdale, Florida. His duties there included directing the development efforts of Marriott, Hilton, and Hyatt branded select service hotels from site selection, due diligence, and acquisition, through design development, permitting, construction, FF&E coordination and hotel opening. He also negotiated and managed all contracts and purchase orders, coordinated design and construction teams during project origination and implementation, collaborated with brand representatives to ensure brand standards were achieved, and developed project budgets of approximately $75 million for new hotels and evaluated feasibility of proposed projects.

Mr. Miranda also served as Acquisition and Development Consultant for Luxury Development Consultants, Inc., where he performed due diligence and financial feasibility analysis on proposed acquisitions and developments. Prior to that, he served as Vice President of Development at Boca Resorts Inc. (now LXR Luxury Resorts, an affiliate of The Blackstone Group), where he managed over $200 million in development spending on numerous resort enhancements including the renovation of existing facilities in Boca, Fort Lauderdale, and Naples, including restaurants, bars, retail outlets, pools, meeting rooms, and guest rooms, as well as new construction projects including a golf clubhouse, luxury spa, and a 112 room guestroom tower with flexible meeting space at the Boca Resort, a golf course in Naples, and a state of the art floating dock marina at Bahia Mar in Fort Lauderdale. He also served as an Operations / Financial Analyst at The Breakers Palm Beach, Inc., a luxury hotel on Palm Beach Island. His duties there included controlling the financial performance of the 670-acre Breakers West residential development and its country club operations.

Mr. Miranda earned a Master of Science in Hotel and Food Service Management from Florida International University in 1994. He also earned a Bachelor of Science in Industrial and Systems Engineering from the University of Florida in 1992. The is a Licensed Real Estate Salesperson in the state of Florida.

### Gerry D. Matthews

Mr. Matthews is a Licensed Real Estate Broker at Matthews Commercial Properties, where he has served for over a decade. MCP specializes in the sales and leasing of commercial, industrial, office and retail space throughout Connecticut; it has completed over 1,000 transactions since 2001 and earned the Co-Star Power Broker Award 2003-2011 top 20 brokerage firms in Ct / Westchester county N.Y.

Prior to that, Mr. Matthews served as a Licensed Real Estate Agent with Giglio & Krasney Commercial Real Estate for 6 years, where he worked directly with clients to search, locate and procure property that met their requirements, and developed successful marketing campaigns for the disposition of clients' properties.

Palm House Hotel, LLLP                                                      *Strictly Confidential*

Before that, Mr. Matthews served as Executive Vice President at Connecticut Factors, Inc. for 13 years. There, he supervised and coordinated personnel in the renovation of commercial office, and industrial buildings, ranging in size from 25,000 to 385,000 square feet, as well as several condominium and multi-family conversion projects. He also instituted maintenance and management programs for nine commercial office buildings totaling over 700,000 square feet and six condominium conversions and multi-family projects totaling 276 units, and attained necessary materials, bids and proposals for projects.

Concurrently, Mr. Matthews also served by gubernatorial appointment as the Real Estate Commissioner with the State of Connecticut Department of Consumer Protection from 1997 to 2003. There, he was tasked to uphold, interpret and enforce the laws governing the Real Estate industry in Connecticut. His division had jurisdiction over 20,000 brokers, agents, and property managers licensed in the State of Connecticut.

### PROJECT PARTNERS

ECONOMIC CONSULTANT

Dr. Michael K. Evans            Evans, Carroll & Associates, Inc., *Chairman*

Dr. Evans is the Chairman of Evans, Carroll & Associates (formerly Evans Economics), which has been providing economic forecasting and consulting to clients since 1981. The firm, based in Boca Raton, Florida, specializes in economic analysis for EB-5 programs, economic impact studies of development projects and new construction, models of state and local tax receipts, impact of current and proposed government legislation, and construction of econometric models for individual industries and companies. As Chief Economist for the American Economics Group from 2000 to the present, Dr. Evans has also built a comprehensive state modeling system that provides economic analysis for a variety of consulting projects. Previously Dr. Evans was founder and president of Chase Econometric Associates (1970–80), and served as Clinical Professor of Economics at Kellogg Graduate School of Management, Northwestern University (1996–99) and Assistant and Associate Professor of Economics, Wharton School, University of Pennsylvania (1964–69). Dr. Evans holds a Ph. D. in Economics from Brown University.

NOT A CERTIFIED COPY

*Strictly Confidential*

# Summary of the General Risk Factors

Before investing in the Units, prospective Investors should be aware that there are risks, including those described below, which may affect the Partnership's business, financial condition or results of operations. Prospective Investors should consider carefully these risk factors together with all of the other information included in this Memorandum before deciding to purchase any Units.

An investment in the Units involves a certain degree of risk, including, but not limited to the following. For a more detailed description of the risks involved in an investment in the Units see RISK FACTORS below.

• The Units are illiquid and should only be purchased if the Investor is willing to hold the Units for an indefinite period of time.

• Identifying, completing, and realizing profits in the target market has from time to time been highly competitive, and involves a high degree of uncertainty.

• Many of the Partnership's competitors for investments are far larger than the Partnership, may have greater financial resources than the Partnership, and may have management personnel with more experience than the Managers of the General Partner.

• The Partnership's business or services may fail to perform as expected, and capital expenditures may exceed estimates.

• The Partnership may be forced to alter the design of, and services rendered at, the Project after expending resources to determine feasibility.

• The Partnership's revenues are subject to changes in regional economic conditions, including levels of employment and discretionary disposable income, consumer confidence, and may be affected by changes in legislation.

## *EB-5 IMMIGRATION DISCLOSURES AND RISK FACTORS*

The U.S. Congress created the employment-based fifth preference ("EB-5") Immigrant visa category in 1990 for immigrants who invest in and manage U.S. commercial enterprises that benefit the U.S. economy. Each investment needs to create or save at least 10 full-time jobs for U.S. workers.

A description of the requirements and processes of the EB-5 Program are based on information obtained by the Partnership from third parties who the Partnership believes are reliable. However, there can be no assurance that such information is accurate or current or that it includes all of the risks relating to U.S. immigration laws or the EB-5 Program (see below).

Investors in this Offering who have subscribed for Units with the intention of applying for a U.S. green card through investment in the Partnership should be aware of certain risk factors relating to immigration to the United States, the EB-5 Program and its administration. An Investor who purchases Units with the intention of obtaining a conditional and permanent green card is encouraged, along with his or her advisors, to make his or her own independent review of the EB-5 Program and the various immigration risk factors relating to the process in obtaining a conditional and permanent residency status to determine if an investment in the Units is a suitable approach for him/her.

THE PARTNERSHIP MAKES NO REPRESENTATION OR WARRANTY OF ANY KIND CONCERNING WHETHER AN INVESTMENT IN THE PARTNERSHIP WILL MEET THE REQUIREMENTS OF THE EB-5 PROGRAM OR OTHER U.S. IMMIGRATION REQUIREMENTS. NO ASSURANCES CAN BE GIVEN THAT AN INVESTMENT IN THE PARTNERSHIP WILL RESULT IN AN IMMIGRANT INVESTOR RECEIVING AN EB-5 VISA OR CONDITIONAL OR PERMANENT RESIDENT STATUS.

NOT A CERTIFIED COPY

*Strictly Confidential*

## RISKS RELATED TO THE EB-5 PROGRAM

### General Immigration Risks

Congress and/or USCIS may change the law, regulations, or interpretations of the law, including the EB-5 Program, without notice and in a manner that may be detrimental to an Investor and/or the Partnership. Investors who obtain conditional or permanent residence status must intend to make the United States their primary residence. Permanent residents who continue to live abroad risk revocation of their conditional or permanent residence status. The process of obtaining conditional and permanent resident status involves numerous factors and circumstances that are not within the control of the Partnership. These include an Immigrant Investor's history and quotas established by the United States government limiting the number of immigrant visas available to qualified individuals seeking conditional or permanent resident status under the EB-5 Program.

### Job Allocation Among EB-5 Foreign Investors

The Partnership shall take such action to meet the objective of allocating to each Investor a minimum number of ten (10) direct and/or indirect and/or induced full-time equivalent positions for qualifying employees created by the Project due to the Partnership's investment in the Project on the following basis: The assignment of full-time equivalent positions for qualifying employees created by the Project shall be allocated to members of the Partnership based on the sequential order of the date that each member entered the United States on an EB-5 Visa.

### Use of Immigration Attorney and Processing Time

The filing of an I-526 Petition by an Investor with the USCIS should be done by a qualified U.S. immigration attorney. As of the date of this document, the USCIS is taking approximately six months to approve (or deny) an I-526 Petition. It is impossible to predict USCIS processing times. Once approved, the case will be forwarded to the U.S. State Department's National Visa Center and then to a U.S. Consulate selected by the Investor for processing or, if the Investor is already in the U.S., the Investor may adjust his or her status to that of conditional permanent resident. It may, however, take an additional six months or longer for a U.S. Consulate to process the I-526 Petition, or for the USCIS to adjust an Investor's status, and issue a conditional green card. Investors should not physically move to the United States until their visa has been issued.

Management estimates that the Project will create a sufficient number of direct jobs. Each Investor in the Partnership who will petition for permanent residency in the U.S. under the EB-5 Program must demonstrate that the Project created at least 10 direct jobs in order to qualify for permanent residency status under the EB-5 Program.

There is no assurance that the assumptions upon which the job creation totals are based are accurate or that the actual number of direct employees will be close to the number predicted. Depending upon the disparity there may be insufficient employment to remove conditional visa status, resulting in a delay or denial of permanent residency for any Investor.

### Proving Lawful Source of Funds

As part of the I-526 Petition, an Investor must present to the USCIS clear documentary evidence of the source of the funds invested and that the funds belong to the Investor. Generally, the Investor can satisfy the source of funds requirements by submitting documents showing that he or she has a level of income from legal sources that would yield sufficient funds for the investment. The USCIS generally requires copies of income tax returns to satisfy the source of funds requirement. For Investors who do not have such records, there may be other records that can be provided to the USCIS by an Investor to demonstrate that the investment funds came from legal sources. All such matters regarding the Investor's I-526 Petition should be discussed with his or her immigration counsel.

### Policymaking Position

The EB-5 Program requires an Investor to hold a policymaking or management position within the Partnership. The Partnership believes that each Investor, as a limited partner of the Partnership, is provided with the powers and duties under the Partnership Agreement sufficient to meet the USCIS requirement that an Immigrant Investor is actively participating in policymaking or management of a new commercial enterprise.

### Chinese Governmental Action.

The government of the People's Republic of China ("PRC") (the expected home country source of Investors) may restrict or suspend entirely participation by its nationals in the EB-5 Program as violative of (a) the PRC's Securities Laws, (b) the PRC's foreign exchange controls, and/or (c) the current prohibition on Chinese nationals investing overseas in an individual capacity, rather than through enterprises. Moreover, the PRC may promulgate new laws or regulations in the future that restrict or prohibit participation in the EB-5 Program. Finally, the PRC has not approved this private placement; although in the past it has been assumed that a lack of action on particular offerings by the PRC is tantamount to their tacit approval, in the future, it cannot be assured that the PRC will not restrict or prohibit foreign private placements in general or the Offering in particular. Similar political risks apply to any other country from which a prospective Investor who seeks to transfer funds is a citizen, lawful permanent resident, or is otherwise domiciled.

### Targeted Employment Area Designation.

The Partnership believes that the Project is located in a "TEA." The Partnership bases this belief on the TEA Designation Memorandum, attached hereto. While USCIS may rely on the TEA Designation Memorandum, USCIS may also choose to defer to state governmental authorities for an ultimate decision on whether the Project is located in a TEA. In such an event, the Partnership believes that the state would consider the Project to be in a TEA based on the evidence supported by the TEA Designation Memorandum, but that is not certain. Moreover, even if USCIS determines that the Project is currently located in a TEA, demographic shifts could cause the loss of TEA status to the census tract where the Project is located. If the Project is not in a TEA, then Investors in Interests seeking a green card pursuant to the Pilot Program would have to invest a minimum of one million dollars ($1,000,000). Therefore, if the census tract's "TEA" status is lost, it could become difficult or impossible for the Partnership to raise additional funds from EB-5 Investors. If the Partnership is unable to raise sufficient funds, the risk factor "Risks Due to Failure to Raise Adequate Capital" will also apply.

### At-Risk Investment

An Investor's investment must be at risk to qualify for the EB-5 Program. As part of the green card application, an Investor must show evidence that he or she has placed the required amount of capital at risk for the purpose of generating a return on the capital placed at risk. The Partnership believes that an investment in the Units will place an Investor's investment in the Partnership at risk because there is no assurance that the business of the Partnership will be able to return any Investor's investments in the Units at any time, or ever. Purchase of a Unit does not guarantee conditional or permanent residency in the United States. Furthermore, no assurance can be given that conditions to residency under the EB-5 Program will be removed.

THE PARTNERSHIP MAKES NO REPRESENTATION OR WARRANTY OF ANY KIND CONCERNING WHETHER AN INVESTMENT IN THE PARTNERSHIP WILL MEET THE REQUIREMENTS OF THE EB-5 PROGRAM OR OTHER U.S. IMMIGRATION REQUIREMENTS. NO ASSURANCES CAN BE GIVEN THAT AN INVESTMENT IN THE PARTNERSHIP WILL RESULT IN ANY INVESTOR RECEIVING A VISA OR CONDITIONAL OR PERMANENT RESIDENT STATUS.

### Timing of Investment

The EB-5 program procedures requires an investor to <u>first</u> make a qualifying investment, and <u>then</u> file a Form I-526 petition (and supporting documents) with USCIS. The applicant must thus be prepared for situations where—if the application is denied—he or she would have incurred irrecoverable expenses on

foreign exchange transfer and then getting the investment returned. The investor might also have disposed of some valuable asset to arrange liquid funds in the first place and would be required to look for new investment assets. The investor should factor in expenses and costs and losses that he or she might incur while going through sale and purchase of assets. From the time that the investor makes the investments and time he or she receives the money back, the investor will need to factor in the lost interest in the process.

## OTHER RISK FACTORS

### RISKS RELATED TO OUR BUSINESS AND INDUSTRY

#### General Economic Conditions

The investment strategy of the Partnership is based in large part upon the success and results of the markets in general. Changes in the general economic conditions (including economic downturns), securities markets, and changes in tax codes and other governmental regulations may affect the value of the Partnership's investments.

#### Operating History

Palm House Hotel, LLLP has no operating history. As a result, we have no operating history to aid in assessing our future prospects. We will encounter risks and difficulties as an early-stage Partnership in a rapidly evolving, and often volatile, investment market. We may not be able to successfully address these risks and difficulties, which could materially harm our business and operating results.

The Partnership is a new business with no operating history upon which Investors may base an evaluation of its potential future performance. As a result, there can be no assurance that it will be able to develop consistent revenue sources, or that its operations will become profitable even if it is able to allocate the funds raised in this Offering in accordance with its business plan. The Partnership and its prospects must be considered in light of the risks, expenses and difficulties frequently encountered by entities in an early stage of development. Such risks include, but are not limited to, an evolving business model, developing the business plan and the management of its growth, property acquisition and development, the successful operating and maintaining of a commercial real estate Project. The Partnership must, among other things, locate investment assets, purchase investment assets at reasonable values, develop investment assets on a profitable basis, respond to economic and market variables outside the control of the Partnership, conduct adequate due diligence, respond to competitive developments and continue to attract, retain and motivate qualified employees and operate and maintain its facilities. There can be no assurance that the Partnership will be successful in meeting these challenges and addressing such risks and the failure to do so could have a materially adverse effect on the Partnership's business, results of operations and financial condition.

#### Management of Growth

The Project will experience growth in its operations, which will place significant demands on our management, operational, and financial infrastructure. If the Partnership does not effectively manage growth, the quality of services could suffer, which could negatively affect the Project and its operating results. To effectively manage growth, the Partnership will need to continue to improve its operational, financial and management controls and its reporting systems and procedures. These systems enhancements and improvements may require significant capital expenditures and management resources. Failure to implement these improvements could hurt the Project's ability to manage growth and its financial condition.

#### Competition

The Partnership will compete for investments with numerous other investments, many of which have substantially greater financial resources, research and marketing capabilities, operating histories and

NOT A CERTIFIED COPY

Palm House Hotel, LLLP                                                    *Strictly Confidential*

greater name recognition than does the Partnership;

### Construction Risks

The Project may involve construction and/or renovation of existing buildings. Construction and renovation costs may exceed projected levels; similarly, the time for construction and renovation may exceed projections. Such cost overruns or delays may imperil the timing and profitability of the project. Further, necessary permits may take longer than anticipated to acquire, or may be denied entirely. For existing units, the condition of those units may be worse than expected, the units may contain asbestos, or they may require extensive work or even demolition and reconstruction.

### Natural Disasters; Weather

Construction, development, leasing, or operation may be delayed, prevented, or adversely affected by inclement weather or other acts of God. Florida is located in an area at high risk for hurricanes and other natural disasters and natural disaster-related damage. Buildings, fixtures, and other Project assets may be damaged or destroyed by natural disasters.

### Government Regulation Risks

The hospitality industry is regulated by both state and federal governments. Adverse changes in government regulations, taxes, or incentive programs could impact the feasibility, profitability, or even the legality of the project.

### Hospitality Industry Risks

The business operations of the Borrower involve the operations of a luxury hotel facility, including high-end ancillary services. The profitability of such an enterprise is dependent upon the tourism market in the area, as well as the general economy and consumer spending patterns. Furthermore, the ultimate profitability of the project may be influenced by the South Florida real estate market, which may be volatile. These macroeconomic factors are outside of Management's control.

### RISKS RELATED TO MANAGEMENT

### Reliance on Management

The General Partner has sole responsibility and authority for all decisions in connection with the management of and investments made by the Partnership. Limited Partners will have a limited right to participate in the management of the Partnership. The capital required by the Partnership to commence operations and carry on its business is being sought entirely from the proceeds of the Offering.

**The Partnership's success is highly dependent on the experience and industry knowledge of the management team, which members have limited experience in the operation of a Project of this type or with the EB-5 program.**

The General Partner was only recently formed and has no operational history to date. The Partnership is dependent entirely on the efforts of the management team of the General Partner for strategic business direction. The principals of the General Partner have limited experience in managing a Project of this type, and as a result, their ability to be effective managers, or otherwise operate the business in a manner that maximizes profitability for the Partnership is questionable. None of the Investors will have the right to vote on or approve any of the investments or business decisions to be made by the Partnership. Prospective Investors who are unwilling to delegate sole discretion to the General Partner in this manner should not invest in the Partnership.

Because the General Partner will have sole discretion in structuring the Partnership's business model, the risk profile and exposure of this Partnership will ultimately be determined by the General Partner. The Partnership's success depends on the General Partner's ability to execute its business model and plan.

Palm House Hotel, LLLP · *Strictly Confidential*

The General Partner, and consequently the Partnership, is currently dependent on the continued service and active advisory efforts of the principals of the General Partner (see "Management Team"). If any of their services with the General Partner were to cease or lapse for any reason, the Partnership may be adversely affected if such services were not otherwise provided by Persons of equal or greater talent or experience.

### Potential Conflicts of Interest

Certain conflicts of interest may arise from the fact that the Managers of the General Partner will continue to be involved in business pursuits which require their time, attention and energies and which may conflict with the business of the Partnership. The Managers of the General Partner may also act in management and advisory capacities for other entities. Therefore, conflicts of interest may arise in the allocation of their time to the management and administration of the Partnership and such other entities.

### RISKS RELATED TO THIS OFFERING

### No Assurance of Liquidity; Restrictions on Transfer

There is currently no market for the Units, and a market in the Units is not expected to develop in the future. The Units are not redeemable and cannot be assigned, transferred, pledged, encumbered or otherwise disposed of without the consent of the General Partner and in compliance with applicable provisions of the Partnership Agreement and applicable securities laws. As a result, purchasers must bear the economic risk of their investments for the life of the Partnership. A purchase of Units should be considered only by sophisticated and accredited Investors financially able to maintain their investment and who can afford to lose all or a substantial part of their investment.

Transferability of the Units is restricted and Investors will not be able to liquidate their investment in the event of an emergency. Additionally, the Units may not be readily acceptable as collateral for loans (to the extent permitted by the Partnership Agreement). Accordingly, purchase of the Units must be considered a long-term, illiquid investment.

### Private Offering Exemption

The Units are being offered in reliance upon a non-public offering exemption provided under the Act, Regulation D promulgated thereunder. The Partnership has used its best efforts to assure compliance with the requirements of these various registration and qualification exemptions. Since compliance with the securities statutes is highly technical and often difficult, there is no assurance that a court reviewing the facts and circumstances of the Offering might not determine later that one or more of the applicable exemption provisions was not properly complied with. Should it be determined that the Partnership failed to comply with the requirements of the Act or any applicable exemption and a sufficient number of Investors were to seek rescission, the Partnership could face financial demands which could adversely affect its ability to continue to conduct business which, in turn, could result in adverse consequences to both rescinding and non-rescinding Investors.

### Liability and Indemnification of the General Partner

The General Partner is in a fiduciary relationship with the Limited Partners of the Partnership. As such, the General Partner is required to exercise good faith and integrity in their conduct of the Partnership's affairs. However, their responsibility is limited by provisions of the Subscription Agreement and Partnership Agreement which exculpate the General Partner and their affiliates from liability to the Partnership where the General Partner act (or fail to act) not in violation of the Subscription Agreement and Partnership Agreement and without gross negligence, fraud or willful violation of law. As a result, a Limited Partner may have a more limited right of action than it would have had in the absence of such provisions. The Subscription Agreement and Partnership Agreement also provides that the Partnership will indemnify the General Partner and their respective affiliates from any liability or loss suffered by virtue of the General Partner acting in such capacity, except in the case of violation of the Subscription Agreement and Partnership Agreement or of gross negligence, fraud or willful violation of law.

NOT FOR RESALE COPY

*Strictly Confidential*

### Projections; Forward Looking Information

Management has prepared projections regarding Palm House Hotel, LLLP's anticipated financial performance. The Partnership's projections are hypothetical. Financial projections concerning the estimated operating results of the Partnership have been prepared by the Partnership's management. These projections may be based on certain assumptions which may prove to be inaccurate and which are subject to future conditions that may be beyond the control of the Partnership, such as the general industry conditions. The Partnership may experience unanticipated costs or lower revenues than forecasted. There is no assurance that the results which may be illustrated in financial projections would in fact be realized by the Partnership. The financial projections have been prepared by management of the Partnership in consultation with experts in the field and the Partnership's independent certified public accountants. However, since the financial projections are based upon numerous assumptions, which may or may not prove to be true, neither the independent experts or the independent certified public accountants or counsel to the Partnership can provide any level of assurance with respect to them.

Many of these risks are described elsewhere herein. For all of the foregoing reasons, actual results may vary materially from the Forward Looking Statements and there is no assurance that the assumptions used are necessarily the most likely. Additionally, when used in this memorandum, the words "believes," "anticipates," "intends," "expects," "plans," as well as similar words are intended to identify forward-looking statements. All such statements are based on the Partnership's expectations and are subject to a number of risks and uncertainties, many of which are beyond the Partnership's control. In light of these risks and uncertainties, there can be no assurance that the forward-looking statements contained herein will in fact occur. The Partnership does not undertake any obligation to publicly release the results of any revisions to these forward-looking statements that may be made to reflect any future events or circumstances.

### Risks Due to Failure to Raise Adequate Capital

Management intends to close this Offering with the requisite number of investors to achieve the full offering amount. However, this can not be guaranteed. A failure to secure full funding could endanger the success of the Project. Failure of the Partnership to raise the full offering amount could negatively impact the Project Company's ability to finance and develop the Project. If the Partnership fails to raise the full offering amount and is therefore unable to loan such amount to the Project Developer, to secure the balance of any funds required for the Project, the Project Developer will be required to seek a larger than expected amount from alternative capital sources, including institutional investors and non EB-5 investors, among others. Furthermore, it is possible that the Project Developer will fail to raise the additional capital, or that, even if the Partnership succeeds in raising the full offering amount and loans such amount to the Project Developer, such proceeds, plus any additional capital raised, will be inadequate to satisfy all capital requirements, or that such financing may be untimely procured, requiring the Project Developer to obtain alternative financing, including short- and long-term debt financing, or equity financing. In addition to the Partnership's loan to the Project Developer The terms of such alternative financing may be better or worse for the Project Developer than the terms of the loan from the Partnership, and may result in subsequent investors in the Project Developer having superior rights to those of the Partnership.

Palm House Hotel, LLLP ·      *Strictly Confidential*

# Summary of Loan Terms

**Purpose.** Prior to the closing of the first Unit offered hereunder, the Partnership will enter into a Loan Agreement (the "Loan") with Borrower. The proceeds of the Loan will be used to partially finance the acquisition, development and operation by Borrower of the Project.

**Amount.** The Loan amount will be up to $39,500,000, depending upon the number of Units sold in this Offering. Whether or not the maximum Loan amount is advanced, the Borrower may seek alternative and additional financing.

**Term; Repayment.** The balance of all Advances and all accrued unpaid interest on the Loan shall be repaid as follows: Upon and after the First Advance hereunder, Borrower shall make payments of interest only on the outstanding principal balance of all Advances at the rate per annum of 0.25% until expiration of 5 years from the First Advance (the "Initial Term"). Upon the expiration of the Initial Term, the outstanding principal balance of all Advances and all accrued interest then outstanding shall be due. Borrower shall make commercially reasonable efforts to repay the outstanding principal balance of all Advances and all accrued unpaid interest thereon after the expiration of the Initial Term. If Borrower cannot refinance such amounts on commercially reasonable terms prior to the end of the Initial Term, Borrower may extend the term of this Note for one or more additional five year periods (each an "Extension Period"), provided Borrower is not in default. During each Extension Period (a) the interest rate shall remain at 0.25%, and (b) Borrower shall make principal and interest payments on the outstanding principal balance of all Advances and all accrued unpaid interest thereon then outstanding, calculated by amortizing the outstanding balance thereof over 15 years at the rate of interest set forth below. Interest shall be computed on the basis of a 365 day year and actual days elapsed. Upon default or after judgment has been rendered on this Note, the unpaid principal of all Advances shall bear interest at a rate which is two (2%) percent per annum greater than that which would otherwise be applicable.

The Borrower may not, without the Partnership's prior express written consent, prepay the Note prior to the expiration of five years from the First Advance. Thereafter, Borrower may prepay this Note, in whole or in part, at any time, without penalty or premium, and without prior written consent of the Partnership.

**Disbursement.** Disbursements of Loan proceeds will be made to Borrower from time to time upon approval of Investor I-526 Petitions and in accordance with the Escrow Agreement. It shall be a condition of each advance that as of such time there shall not have been a material adverse change in the operations, assets or financial condition of the Borrower and its subsidiaries, taken as a whole.

**Promissory Note and Loan Collateral.** The Borrower will issue a Promissory Note with full recourse to the Borrower. The Loan may be secured by a lien on collateral of Borrower.

**Senior Debt.** Borrower may incur other debt and in connection therewith, grant security interests senior to those granted to the Partnership under the Loan Agreement.

**Loan Documents.** The Partnership has issued a Commitment Letter to Borrower, a copy of which is available upon request. The Promissory Note and Loan and Security Agreement to be executed by each Borrower are available for review upon request.

# Summary of Limited Partnership Agreement

The rights and obligations of the Partners of the Partnership will be governed by the Limited Partnership Agreement ("LP Agreement"), attached to this Offering Memorandum. It is recommended that each prospective investor read the entire LP Agreement. The following is a brief summary of some of the provisions of the LP Agreement. The summary below and all statements made elsewhere in this Offering Memorandum relating to the LP Agreement are qualified in their entirety by reference to the LP Agreement.

## *PURPOSES (ARTICLE 1, LP AGREEMENT)*

The purposes of the Partnership shall be to engage in any lawful acts or activities for which limited liability companies may be formed under the Act, including for the purpose of investing in Qualifying Investments under the EB-5 Pilot Program.

## *CAPITAL CONTRIBUTIONS (ARTICLE 2, LP AGREEMENT)*

Each Limited Partner's capital contribution must be paid at the time such Limited Partner subscribes to purchase Units in this Offering and shall be paid in USD cash. Each Investor's Capital Contribution will be credited to his/her Capital Account. Terms governing the maintenance of Capital Accounts are set forth in the LP Agreement. An EB-5 Limited Partner shall be conditionally accepted to the Partnership upon receipt by the Partnership of his/her Capital Contribution and the Administrative Fee. The Capital Contribution shall be released from escrow and delivered to the Partnership upon the USCIS approval of the I-526 Petition for such conditionally accepted EB-5 Limited Partner, in accordance with the Escrow Agreement. Upon release of the Capital Contribution to the Partnership, an EB-5 Limited Partner shall be admitted to the Partnership.

## *ALLOCATION OF PROFITS AND LOSSES (ARTICLE 3, LP AGREEMENT)*

Profits and Losses for each fiscal year shall be allocated as follows: (a) first, to the Partners in accordance with their Adjusted Capital Contributions, payable in proportion to the unpaid amounts thereof; and (b) the balance, to the Partners in accordance with the Percentage Interests.

## *DISTRIBUTIONS (ARTICLE 3, LP AGREEMENT)*

Available Cash Flow, if any, shall be distributed annually as follows: (a) to Partners in payment of Mandatory Distributions (See Section 3.6 of the LP Agreement); (b) then to EB-5 Limited Partners pro rata in accordance with each EB-5 Limited Partner's Adjusted Capital Contribution in an amount up to each EB-5 Limited Partner's Preferred Return, less amounts due to the Partnership; (c) then to EB-5 Limited Partners pro rata in accordance with each EB-5 Limited Partner's Adjusted Capital Contribution in an amount up to each EB-5 Limited Partner's Adjusted Capital Contribution; (d) then to Partners pro rata in accordance with each Partner's Adjusted Capital Contribution in an amount up to each Partner's Adjusted Capital Contribution; and (e) then to Partners in accordance with their Percentage Interests in the Partnership.

The rules and regulations governing the Pilot Program prohibit the return of an EB-5 investor's investment prior to the approval of the Investor's I-829. Accordingly, the Partnership shall not make distributions to EB-5 Limited Partners, other than distributions from Available Cash Flow in amounts not exceeding their

NOT A CERTIFIED COPY

respective EB-5 Minimum Capital Requirement prior to that time. After such date the foregoing restriction shall no longer apply.

## MANAGEMENT (ARTICLE 4, LP AGREEMENT)

the Partnership operates under the direction of a General Partner. The General Partner has full and complete authority, power and discretion to manage and control the business and affairs, including the management and operation of the Partnership, to make all decisions regarding the business and affairs of the Partnership, in its sole discretion, and to perform any and all other acts incident to or customary for the business. Limited Partners have limited rights to take part in the management of, or to bind, the Partnership.

## TAX WITHHOLDING (ARTICLE 4, LP AGREEMENT)

The General Partner is authorized to withhold any sums required by the Internal Revenue Code even if such withholding conflicts with any of the terms and conditions of this Agreement or otherwise affects distributions, allocations or payments to the Partners. In the event that the General Partner learns of a withholding obligation subsequent to the distribution to which the withholding obligation relates, the General Partner will issue an invoice to the Partner. If the invoice is not paid within sixty (60) days, the General Partner will charge the amount against the Partner's Capital Account.

## INDEMNIFICATION (ARTICLE 5, LP AGREEMENT)

The Partnership may indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, or investigative, including all appeals (other than an action, suit or proceeding by or in the right of the Partnership) by reason of the fact that he is or was a partner, officer or employee of the Partnership, or is or was serving at the request of the Partnership as a Partner, trustee, officer or employee of another company, partnership, joint venture, trust or other enterprise, against expenses, judgments, decrees, fines, penalties and amounts paid in settlement actually and reasonably incurred by him in connection with such action, suit or proceeding if he acted in good faith and in a manner which he reasonably believed to be in or not opposed to the best interests of the Partnership and, with respect to any criminal action or proceeding, had no reasonable cause to believe his conduct was unlawful. Expenses of each person indemnified may be paid by the Partnership in advance of the final disposition of such action, suit or proceeding as authorized by the General Partner upon receipt of an undertaking to repay such amount unless it shall ultimately be determined that he is entitled to be indemnified by the Partnership.

## VOTING (ARTICLE 7, LP AGREEMENT)

On any matter presented to the Partners for their vote, each Limited Partner shall have one vote for each Unit owned by him. The following actions shall require the approval of Limited Partners holding a majority of the then outstanding Units: (i) any modification to this LP Agreement materially changing the rights of the Limited

Partners; and (ii) dissolution of the Partnership prior to the end of the fifth year after admission of the last EB-5 Limited Partner.

## TRANSFER RESTRICTIONS (ARTICLE 8, LP AGREEMENT).

No EB-5 Limited Partner may voluntarily transfer any interest or rights in his/her Units without consent of the General Partner. Additional restrictions on transfer of Units are described in the LP Agreement. No Limited Partner shall have the right or power to Voluntarily Withdraw from the Partnership. If any Partner intends to transfer his or her Units or any part thereof to any person or entity, after obtaining required

NOT A CERTIFIED COPY

Case 9:16-cv-81871-KAM  Document 657-2  Entered on FLSD Docket 07/06/2020  Page 75 of
Case 9:19-cv-80832-KAM  Document 65-2  Entered on FLSD Docket 03/10/2019  Page 75 of
150

| Palm House Hotel, LLLP | *Strictly Confidential* |

approval, such Partner shall give written notice to the Partnership of his intention so to transfer. Thereupon, the Partnership, then the General Partners, then the Limited Partners shall have an option to purchase such Units at Fair Market Value (as defined in the LP Agreement).

### TERMINATION OF INTEREST (ARTICLE 9, LP AGREEMENT)

The Partnership Interest of each EB-5 Limited Partner shall be terminated by (a) dissolution of the Partnership as provided in the LP Agreement and distribution of the proceeds of liquidation to EB-5 Limited Partners in accordance herewith; (b) the Agreement of an EB-5 Limited Partner, or his/her personal representative, and the General Partner; (c) the return of the Capital Contributions and payment of all accrued Preferred Returns to such EB-5 Limited Partner.

### DISSOLUTION AND TERMINATION (ARTICLE 10, LP AGREEMENT).

The Partnership shall be terminated and dissolved upon the first to occur of the following: If the Partnership then has any EB-5 Partners (a) upon vote of a Majority-In-Interest of the Partners; or (b) upon the sale of all or substantially all the assets of the Partnership; and if there are then no EB-5 Partners of the Partnership (a) upon vote of the General Partner, or (b) upon sale of all or substantially all of the assets of the Partnership.

### INCOME TAX CONSIDERATIONS

Each Investor is responsible for obtaining his or her own tax advice with respect to the federal, state and local income and other possible tax consequences of his/her investment in the Partnership, and no tax advice will be provided hereunder or at any time in the future. However, as a general rule, a resident alien of the United States will be taxed on all of his or her worldwide income and will be required to file a United States income tax return. In addition, if an alien is not a resident of the United States but has United States source income he or she generally will be subject to taxation in the United States on such income, and such income may be subject to withholding and/or reporting on a United States income tax return. All Investors in this Offering should seek professional tax advice prior to investing in this Offering.

### SUBSCRIPTION PROCEDURE AND PLAN OF DISTRIBUTION

#### SUBSCRIPTION PROCEDURE

To subscribe to purchase Units in this Offering, a subscriber must transmit the following to the Partnership prior to the termination of this Offering, as follows:

1.     Subscriptions Funds for Units ($500,000 per Unit subscribed for) shall be paid by a wire transfer to the Partnership Escrow Account established by each subscriber of Units with the Partnership according to the wire instructions provided by the Partnership.

2.     Administrative Fees ($40,000 per Investor) shall be paid by wire transfer to the Partnership according to the wire instructions provided by the Partnership.

3.     Executed counterpart signature page to the Partnership EB-5 Escrow Agreement (attached hereto);

4.     Executed counterpart signature page to the LP Agreement (attached hereto);

Palm House Hotel, LLLP         *Strictly Confidential*

5.      Executed complete Subscription Agreement (attached hereto);

6.      Executed and complete Investor Questionnaire.

The subscription period will begin on the date of this Offering Memorandum and will continue until the Offering is sold or the Offering is terminated by the Partnership.

All subscription proceeds received from subscribers for Units shall be deposited in the Partnership Escrow Account established for subscription funds pending filing of subscriber I-526 Petitions. Upon notice of approval of each subscriber's I-526 Petition, his/her subscription funds will be transferred to the Partnership and advanced to Borrower as part of the Loan. A subscriber of Units shall have no right to revoke or withdraw his/her subscription after filing of his/her I-526 Petition.

If a subscriber's I-526 Petition is denied by USCIS for reasons within the control of the Partnership, then subscriber's subscription proceeds shall be returned to subscriber without interest or deduction. If a subscriber's I-526 Petition is denied by USCIS for reasons beyond the control of the Partnership or due to subscriber providing false or misleading information to USCIS or the Partnership, then subscriber's subscription proceeds shall not be returned to subscriber but shall remain committed to the Project in accordance with this Offering. In such case, subscriber will be admitted as a Limited Partner of the Partnership and will be issued Units subject to the terms of the LP Agreement as if his/her I-526 Petition was approved. All interest accrued on funds deposited in the Partnership Escrow Account belong to the Partnership.

### PLAN OF DISTRIBUTION

The Units will be offered to prospective investors by the Partnership, and/or its duly authorized agents. Fees and commissions of such agents may be paid by the Partnership from Administrative Fees. Prospective investors are limited to qualified non-U.S. citizens seeking permanent residence in the United States through the EB-5 Program who are Accredited Investors (as defined in the Act). The Units are offered subject to the Partnership's rights to withdraw the Offering at any time without notice and/or to reject any subscription. This Offering may be terminated if events have occurred, which in the General Partner's sole judgment, make it impracticable or inadvisable to proceed with, continue or consummate the Offering described herein. There is no assurance that all or any of the Units will be sold. If the Offering is terminated the Partnership Escrow Agreement provides for the prompt return to the investors of their subscription funds, without interest. Administrative Fees are not refundable for any reason.

Case 9:16-cv-81871-KAM Document 653-2 Entered on FLSD Docket 07/06/2020 Page 77 of
Case 9:19-cv-80732-KAM Document 55-2 Entered on FLSD Docket 03/10/2019 Page 73 of
153

Palm House Hotel, LLLP                                    *Strictly Confidential*

# Availability of Additional Information

EACH PROSPECTIVE INVESTOR WILL BE GIVEN AN OPPORTUNITY TO ASK QUESTIONS OF AND
RECEIVE ANSWERS FROM MANAGEMENT OF THE PARTNERSHIP CONCERNING THE TERMS
AND CONDITIONS OF THIS OFFERING AND TO OBTAIN ANY ADDITIONAL INFORMATION, TO THE
EXTENT THE PARTNERSHIP POSSESSES SUCH INFORMATION OR CAN ACQUIRE IT WITHOUT
UNREASONABLE EFFORTS OR EXPENSE, NECESSARY TO VERIFY THE ACCURACY OF THE
INFORMATION CONTAINED IN THIS MEMORANDUM. IF YOU HAVE ANY QUESTIONS
WHATSOEVER REGARDING THIS OFFERING, OR DESIRE ANY ADDITIONAL INFORMATION OR
DOCUMENTS TO VERIFY OR SUPPLEMENT THE INFORMATION CONTAINED IN THIS
MEMORANDUM, PLEASE WRITE OR CALL THE PARTNERSHIP.

Palm House Hotel, LLLP

197 S. Federal Highway, Suite 200
Boca Raton, FL 33432
Telephone: (561) 282-6102

NOT A CERTIFIED COPY



# SECTION II

## Business Plan Summary

NOT A CERTIFIED COPY

Case 9:16-cv-81871-KAM Document 653-2 Entered on FLSD Docket 07/06/2020 Page 79 of
153
Case 9:19-cv-80732-KAM Document 55-2 Entered on FLSD Docket 03/10/2019 Page 79 of
153

## EXECUTIVE SUMMARY

### THE PROJECT OVERVIEW

The Borrower, Palm House, LLC, intends to secure a Loan from the Limited Partnership, using such funding to serve as Developer for the job-creating enterprise known as the Hotel Project. To that end, the Limited Partnership is soliciting investors under the EB-5 Immigrant Investor Program (EB-5 Program), which grants lawful conditional and permanent resident status in the United States to foreign investors who make qualifying Investments (Qualifying Investments) under the provisions of 8 U.S.C. 1153 (b) (5) (A) (i)-(iii), (C) (the "Act"). In order to take advantage of the EB-5 Program, foreign investors must invest in the Limited Partnership and complete the required immigration procedures. All Qualifying Investments must be invested in projects structured to create at least 10 full time direct jobs for qualified U.S. workers, as set forth in the EB-5 Program.

### PROJECT SUMMARY

The Project developer seeks financing to operate a business involving the renovation and development of a high-end resort hotel.

The Project developer will focus on extensively renovating and refurbishing an existing hotel structure on the island of Palm Beach in South Florida. The hotel will be remodeled as a 79-room, high-end resort hotel offering ancillary services (such as food and beverage, spa, salon, membership club, etc.).

Of course, the EB-5 program's primary focus is job creation. Palm House Hotel, LLLP is excited to be an important factor in investing in the creation of new jobs. The project described herein will provide a beneficial impact to the community, provide jobs, and provide a boost to the local and national economies.

### EMPLOYMENT

The economic analysis conducted, using the latest USCIS-approved complex software programs and diagnostic models available (RIMS II), justifies the feasibility of the project by proving the economic benefits of the Hotel Project to all areas of the local economy and confirms that the Hotel Project not only meets but exceeds the United States employment generation requirements of the USCIS:

| Table A. Summary of Employment and Revenue Estimates | | | |
|---|---|---|---|
| Activity | Expenditure/Revenues ($ million) | Final Demand Multiplier | Total Jobs |
| Hard Construction Costs | 32.297 | 17.5636 | 567.2 |
| Soft Costs | 6.188 | 16.315 | 101.0 |
| Purchases of FF&E * | 2.5 | 7.9957 | 20.0 |
| Hotel Operations | 14.36 | 17.5069 | 251.4 |
| Membership Fees * | 2.0 | 7.046 | 14.1 |
| Total | 75.413 | | 953.7 |

* Indirect and Induced effects only

NOT A CERTIFIED COPY

*Strictly Confidential*

The econometric analysis quantifying the Hotel Project benefits to the state and local economy is a project specific analysis validating the Hotel Project opportunity and is included with the business plan.

*FINANCES*

| | |
|---|---|
| Number of rooms | 79 |
| Available room-nights | 28,835 |
| Occupancy rate | 61.0% |
| Occupied room-nights | 17,589 |
| Average Daily Rate | $522.50 |
| RevPAR | $318.73 |
| Room Revenue | $9,190,435 |
| | |
| Ancillary Revenue (F&B, etc.) | $5,169,620 |
| | |
| Total Revenue | $14,360,055 |
| | |
| Total Expenses | $8,497,550 |
| | |
| EBITDA | $5,862,505 |

NOT A CERTIFIED COPY

The above summation of the projected Year 2 (stabilized) income and expenses of the Hotel Project indicates that the Developer is well managed in the proper uses of cash flow to grow the concern through the judicious monitoring of variable and fixed costs resulting in profitability within a short time frame, allowing the Hotel Project to provide the projected return on investment to the investor/limited partner. Please see the full Business Plan and its attachments for the 5 year Pro Forma detail supporting the projections.

The foreign investor can have confidence that the Hotel Project will create the necessary number of jobs and economic benefits to assure the foreign investor that their application for residence status is and will continue in good standing.

The Hotel Project has the expertise and experience of Palm House, LLC's management to further validate the high level of confidence that the goals and projections will be realized (please see the profiles in the Management section of the business plan).

Case 9:16-cv-81871-KAM Document 657-2 Entered on FLSD Docket 07/06/2020 Page 81 of
Case 9:19-cv-80932-KAM Document 55-5 Entered on FLSD Docket 03/10/2019 Page 174 of
153

# EXHIBIT

# "I"

NOT A CERTIFIED COPY

Case 9:16-cv-81871-KAM Document 657-2 Entered on FLSD Docket 07/06/2020 Page 82 of
Case 9:19-cv-80732-KAM Document 55-2 Entered on FLSD Docket 03/10/2019 Page 78 of
153



# LIMITED PARTNERSHIP AGREEMENT

NOT A CERTIFIED COPY



**LIMITED PARTNERSHIP AGREEMENT**

OF

**PALM HOUSE HOTEL, LLLP**

*a Florida Limited Liability Limited Partnership*
County of Palm Beach

Dated 11/30/2012

Palm House Hotel, LLLP
197 S. Federal Highway, Suite 200
Boca Raton, FL 33432
Telephone: (561) 282-6102

NOT A CERTIFIED COPY

## PALM HOUSE HOTEL, LLLP
## LIMITED PARTNERSHIP AGREEMENT

This Limited Partnership Agreement ("Agreement") is entered into and effective on 11/30/2012 by and between the undersigned listed as partners on Schedule A hereto (hereafter, the "General Partner", "Limited Partners", or collectively, the "Partners"), as amended from time to time; WHEREAS, the Partners have caused a Certificate of Limited Partnership to be filed with the Florida Secretary of State forming a limited partnership under the name "Palm House Hotel, LLLP" (the "Partnership"); WHEREAS, the Partnership is formed for the purpose of investing in Qualifying Investments under the EB-5 Pilot Program; and WHEREAS, the parties hereto desire to set forth certain understandings and agreements among them with respect to the affairs of the Partnership and the conduct of its business; NOW, THEREFORE, in consideration of the mutual covenants and promises set forth herein, the parties hereby agree as follows:

### DEFINITIONS

Capitalized terms used in this Agreement shall have the meaning set forth below. Other terms defined throughout this Agreement shall have the meanings respectively ascribed to them.

*"Offering"* means that certain private offering of Units of limited partnership interest in the Partnership described in the Partnership's Private Offering Memorandum dated 11/30/2012.

*"Project"* means development and operation by Palm House, LLC, a Delaware limited liability company, of the Hotel Project described in the accompanying Business Plan.

*"Adjusted Capital Contribution"* means, with respect to each Partner, the aggregate capital contributed to the Partnership by such Partner reduced, from time to time, (i) by any return of a Capital Contribution made pursuant to this Agreement, and (ii) by the aggregate distributions of Net Proceeds from a Capital Event made to such Partner pursuant to this Agreement.

*"Affiliate"* means, with respect to any Partner, any Person: (i) which owns more than 50% of the voting interests in the Member; or (ii) in which the Partner owns more than 50% of the voting interests; or (iii) in which more than 50% of the voting interests are owned by a Person who has a relationship with the Partner described in clause (i) or (ii) above, or (iv) who otherwise controls, is controlled by, or under common control with, another Person.

*"Agent"* means any officer, director, employee, trustee, partner, agent or representative of a Partner acting for or on behalf of such Partner or the Partnership.

*"Available Cash Flow"* means funds provided from operation of the Partnership, without deductions for depreciation, but after deducting funds used to pay all expenses and debts of the Partnership, including administrative operational expenses, debt payments, capital improvements, and less the amount set aside by the General Partner, in the exercise of its sole discretion, for reserves.

"*Bankruptcy"* means, with respect to any Partner: (i) an assignment for the benefit of creditors; (ii) a voluntary petition in bankruptcy; (iii) adjudication as bankrupt or insolvent; (iv) the filing of a petition or answer seeking any reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, regulation or law; (v) the filing of an answer or other pleading admitting or failing to contest the material allegations of a petition filed against

the Partner in any proceeding of this nature; (vi) seeking, consenting to, or acquiescing in the appointment of a trustee, receiver, or liquidator of such Partner's properties or of all or any substantial part of the Partner's properties; or (vii) any proceeding against the Partner seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation, that continues for one hundred twenty (120) days after the commencement thereof, or the appointment of a trustee, receiver, or liquidator for the Partner or all or any substantial part of the Partner's properties without the Partner's agreement or acquiescence, which appointment is not vacated or stayed for one hundred twenty (120) days or, if the appointment is stayed, for one hundred twenty (120) days after the expiration of the stay during which period the appointment is not vacated.

*"Capital Contribution"* means the total amount of cash and the fair market value of any other assets contributed (or deemed contributed under Regulation Section 1.704-1(b)(2)(iv)(d)) to the Partnership by a Partner, net of liabilities assumed or to which the assets are subject.

*"Capital Event"* means the refinance, sale, exchange or other disposition of Partnership Property or any portion thereof.

*"Code"* means the Internal Revenue Code of 1986, as amended, or any corresponding provision of any succeeding law or any corresponding provision, and all applicable Treasury Regulations.

*"Deficit Capital Account"* means the situation whereby the Partnership has made distributions to a Partner in excess of such Partner's Capital Account.

*"EB-5 Limited Partners"* means Limited Partners admitted to the Partnership as a result of Capital Contributions made into a Qualifying Investment, including the Offering (defined herein), under the EB-5 Pilot Program.

*"EB-5 Minimum Capital Requirement"* means the minimum capital investment required of EB-5 investors by USCIS to be at-risk under the EB-5 Pilot Program. The EB-5 Minimum Capital Requirement for the Project is $500,000.

*"EB-5 Pilot Program"* means the program adopted by the U.S. Congress creating the EB-5 Regional Center Pilot Program.

*"Economic Interest"* means a Person's share of the Profits and Losses of, and the right to receive distributions from, the Partnership.

*"General Partner"* means South Atlantic Regional Center, LLC.

*"Incapacity"* means (i) the entry of a judgment by a court of competent jurisdiction to the effect that a Partner who is an individual is incompetent to manage such Partner's affairs, or the appointment of a guardian ad litem by a court of competent jurisdiction to manage such Partner's affairs; or (ii) the incapacity of a Partner who is an individual to perform his or her duties as a Partner as determined by (a) the vote of at least a majority of the Units not held by such Partner, and if such Partner is not in agreement with such determination, the certification of a physician selected by mutual agreement between such Partner and the holders of at least a majority of the Units not held by such Partner, or (b) the certification of a physician selected by the Partner and, if the holders of at least a majority of the Units not held by the Partner are not in agreement with such certification, the certification of a physician selected by mutual agreement between the Partner and the holders of at least a majority of the Units not held by such Partner.

*"Interest Holder"* means any Person who holds an Economic Interest, whether as a Partner or an un-admitted assignee of a Partner.

*"Involuntary Withdrawal"* means, with respect to any Partner, the occurrence of any of the following events: (i) the Bankruptcy of a Partner; (ii) if the Partner is an individual, the Partner's death or Incapacity; (iii) if the Partner is acting as a Partner by virtue of being a trustee of a trust, the termination of the trust; (iv) if the Partner is a partnership or limited liability company, the dissolution and commencement of winding up of the partnership or limited liability company; (v) if the Partner is a corporation, the dissolution of the corporation or the revocation of its charter; or (vi) if the Partner is an estate, the distribution by the fiduciary of the estate's entire interest in the Partnership.

*"Limited Partner"* means each Person who is admitted as a Limited Partner of the Partnership.

*"Majority-In-Interest"* means Partners holding a majority of all Partners' or Interest Holders', as the case may be, Economic Interests in the Partnership.

*"Net Proceeds from a Capital Event"* means the net proceeds derived by the Partnership from a Capital Event after payment or allowance for the expenses incurred in connection with such Capital Event and after payment or allowance for existing indebtedness (but not including any outstanding Secured Debt), the discharge of any other expenses or liabilities of the Partnership and the establishment of appropriate reserves, all as determined by the Managing General Partner, in its sole discretion.

*"Partner"* or *"Partners"* means each Person who has signed this Agreement and any Person who subsequently is admitted as a Partner of the Partnership.

*"Partnership Interest"* means all of the rights of a Partner in the Partnership, including a Partner's: (i) Economic Interest; and (ii) right to participate in the management of the Partnership as provided in this Agreement.

*"Percentage"* or *"Percentage Interest"* means, as to a Partner, the percentage set forth after the Partner's name on Schedule A, as amended from time to time, and as to an Interest Holder who is not a Partner, the Percentage of the Partner whose Economic Interest has been acquired by such Interest Holder, to the extent the Interest Holder has succeeded to that Partner's Economic Interest.

*"Person"* means and includes an individual, corporation, partnership, association, limited liability company, trust, estate, or other entity.

*"Preferred Return"* means the cumulative annual preferred distribution of Profits to EB-5 Limited Partners in an amount equal to 0.25% of each EB-5 Limited Partner's initial Capital Contribution. If Available Cash Flow is insufficient to pay all amounts due as Preferred Return hereunder at the end of any year, the unpaid balance thereof shall continue to accrue until the end of the next year, and from year to year until there is Available Cash Flow sufficient for payment in full of the Preferred Return. The ability of the Partnership to pay the Preferred Return is reliant upon the performance of the Partnership's investments and is therefore not guaranteed.

*"Profits"* and *"Losses"* mean, for each fiscal year, an amount equal to the Partnership's taxable income or loss for such year, determined in accordance with Code Section 703(a) (including all items required to be stated separately) with the following adjustments: (a) Any income exempt from federal income tax shall be included; and (b) Any expenditures of the Partnership described

LIMITED PARTNERSHIP AGREEMENT
Palm House Hotel, LLLP

Case 9:16-cv-81871-KAM Document 657-2 Entered on FLSD Docket 07/06/2020 Page 86 of
153
Case 9:19-cv-80732-KAM Document 55-2 Entered on FLSD Docket 03/10/2019 Page 182 of
253

in Code Section 705(a)(2)(B) (including expenditures treated as such pursuant to Treas. Reg.
Section 1.704-1(b)(2)(iv)(i)) shall be subtracted.

*"Property"* or the *"Partnership Property"* means all real and personal property of the
Partnership.

*"Qualifying Investment"* means an investment that will generate full-time employment
positions, either directly or indirectly, for not fewer than ten U.S. workers per EB-5 Limited
Partner whose Capital Contributions have been so applied.

*"Regional Center"* means South Atlantic Regional Center, a Florida limited liability company
of 197 S. Federal Highway, Suite 200, Boca Raton, FL 33432. The Regional Center is an entity
that has been approved by the USCIS as a designated regional center under the EB-5 Pilot
Program, and is the sponsor of the Project.

*"Regulations"* or *"Treas. Reg."* means the income tax regulations promulgated under the Code
as amended from time to time (including corresponding provisions of succeeding regulations).

*"Transfer"* means — when used as a noun — any sale, hypothecation, pledge, assignment, gift,
bequest, attachment, or other transfer, including transfers by operation of law, and — when used
as a verb — means to sell, hypothecate, pledge, assign, give, bequeath, or otherwise transfer.

*"Units"* means limited partnership units representing each Partner's undivided interest in the
capital of the Partnership.

*"USCIS"* means the United States Citizenship and Immigration Services.

*"Voluntary Withdrawal"* means a Partner's disassociation with the Partnership by means other
than a Transfer or an Involuntary Withdrawal.

## ARTICLE 1
## FORMATION OF THE PARTNERSHIP

1.1     **Formation of Limited Partnership.** The Partners have organized the Partnership
pursuant to the provisions of the Florida Limited Partnership Act, as amended from time to time
(the "Act"), under the name "Palm House Hotel, LLLP", intending the Partnership to be a limited
partnership under the Act. Except as otherwise provided herein, all rights, liabilities and
obligations of the Partners shall be as provided in the Act.

1.2     **Principal Place of Business and Agent for Service.** The principal place of business of
the Partnership shall be 197 S. Federal Highway, Suite 200, Boca Raton, FL 33432, or at such
other place in the State of Florida as may be designated by the General Partner. The Agent for
Service of Process of the Partnership in the State of Florida is Joseph J. Walsh until otherwise
determined by the General Partner.

1.3     **Purposes.** The purposes of the Partnership shall be to engage in any lawful acts or
activities for which limited liability companies may be formed under the Act. Without limiting
the foregoing, the Partnership was for formed for the purpose of investing in Qualifying
Investments under the EB-5 Pilot Program.

Case 9:16-cv-81871-KAM Document 65-2 Entered on FLSD Docket 07/06/2020 Page 87 of
Case 9:19-cv-80732-KAM Document 55-2 Entered on FLSD Docket 03/10/2019 Page 187 of
253

1.4 **Duration of the Partnership.** The Partnership shall commence on the date on which its Certificate of Limited Partnership was accepted and filed by the Florida Secretary of State, and shall continue in perpetuity until dissolved in accordance with this Agreement.

## ARTICLE 2
## CAPITALIZATION

2.1 **Units; Initial Capital Contributions.**

2.1.1 Each Partner's undivided interest in the capital of the Partnership shall be represented by Units. Each Limited Partnership Unit shall represent an interest in the capital of the Partnership and shall be identical in all respects to every other Limited Partnership Unit. Notwithstanding the foregoing, only EB-5 Limited Partners shall be entitled to Preferred Returns. Each General Partnership Unit shall represent an interest in the capital of the Partnership and shall be identical in all respects to every other General Partnership Unit. General Partnership Units and Limited Partnership Units shall have the relative rights and preferences accorded General Partners and Limited Partners set forth in this Agreement and the Act.

2.1.2 The Partnership shall be capitalized by each Partner contributing his or her Capital Contribution set forth on <u>Schedule A</u> attached hereto, with such Partner receiving, in exchange therefor, the Units set forth therein. The Capital Contribution of EB-5 Limited Partners shall be placed in escrow in accordance with that certain escrow agreement signed by EB-5 Limited Partners simultaneously herewith ("Escrow Agreement").

2.1.3 Together with his/her Capital Contribution, each EB-5 Limited Partner shall also concurrently make a Forty Thousand Dollar (US $40,000.00) payment to the Partnership as an administrative fee (the "Administrative Fee") to pay the costs and expenses incurred in connection with the organization of the Partnership, negotiation of the Loan, and placement of the Units. The Administrative Fee shall not be considered a Capital Contribution to the Partnership.

2.1.4 An EB-5 Limited Partner shall be conditionally accepted to the Partnership upon receipt by the Partnership of his/her Capital Contribution and the Administrative Fee. The Capital Contribution shall be released from escrow and delivered to the Partnership upon the USCIS approval of the Form I-526 petition for such conditionally accepted EB-5 Limited Partner, in accordance with the Escrow Agreement. Upon release of the Capital Contribution to the Partnership, an EB-5 Limited Partner shall be admitted to the Partnership.

2.1.5 A Partner shall not have the right to demand or receive the return of such Partner's Capital Contribution except as otherwise expressly provided herein. The Partners shall have no obligation to make additional Capital Contributions. The Partners may make an additional Capital Contribution to the Partnership upon consent of the General Partner. No interest shall be paid on Capital Contributions.

2.1.6 Interest will be charged by the Partnership to a Partner on the sum of any deemed distributions charged to such Partner's Capital Account from obligations to the Partnership

arising under Section 4.8 concerning federal income tax withholding. The interest charged will be computed on a calendar year compounded basis at a rate equal to two percent above the prime rate of interest from time to time announced by Bank of America, or its successors, to be its "prime rate," such interest to be collected by reduction of any distributions payable to the Partner immediately following the calculation of the year's interest by the General Partner. To the extent that there are no distributions against which the interest can be applied, then the interest will be charged to the Partner's Capital Account. This Section 2.1.4 will survive the termination of a Partner's status as a Partner.

2.1.7 No Partner shall have any right to withdraw or make a demand for the withdrawal of any of such Partner's Capital Contribution (or the capital interest reflected in such Partner's Capital Account) until the full and complete winding up and liquidation of the Partnership. No Partner shall have the right to demand Partnership Property.

2.1.8 Loans or advances by any Partner to the Partnership can only be made after and in addition to a Partner's initial Capital Contribution. Loans or advances by any Partner to the Partnership shall not be considered additional Capital Contributions and shall not increase the Capital Account of the lending or advancing Partner. No Partner shall be required to lend any cash or property to the Partnership.

## 2.2    Capital Accounts.

2.2.1 The Partnership shall establish and maintain Capital Accounts ("Capital Accounts") for each Partner in accordance with the Code, applicable Regulations, and the provisions hereof. Except as required by the Code, the Capital Account of each Partner shall consist of his Capital Contribution, as increased by any contribution of capital subsequent to his original Capital Contribution, and by such Partner's share of Partnership income and gain allocated after the date hereof to such Partner, and as decreased by the amount of all cash and the fair market value of all property and assets distributed to such Partner, the amount of all losses allocated after the date hereof to such Partner, and any amounts charged under Section 4.8 to such Partner.

2.2.2 The provisions of this Article 2 as they relate to the maintenance of Capital Accounts are intended, and shall be construed, and, if necessary, modified to cause the allocations of profits, losses, income, gain and credit to have substantial economic effect under the Regulations promulgated under the Code, in light of the distributions and the Capital Contributions made pursuant hereto. All allocations of items that cannot have economic effect (including credits and nonrecourse deductions) shall be allocated to the Partners in accordance with their respective Percentage Interests. Notwithstanding anything herein to the contrary, this Agreement shall not be construed as creating a deficit restoration obligation.

2.2.3 The Capital Account of a transferring Partner shall become the Capital Account of the transferee to the extent it relates to the Units transferred.

## ARTICLE 3
## ALLOCATIONS AND DISTRIBUTIONS

3.1     **Allocation of Profits and Losses.** Profits and Losses for each fiscal year shall be allocated among Partners in the following order and priority: (a) First, to Partners in accordance with their Adjusted Capital Contributions, payable in proportion to the unpaid amounts thereof; and (b) The balance, to Partners in accordance with their respective Percentage Interests.

To the extent the allocations of profits and losses otherwise provided under this Agreement are not made in accordance with a Member's Interest in the Company within the meaning of Code Section 704, the allocations shall be made to the appropriate Members in the necessary and required amounts in order to comply with Code Section 704(b). The General Partner shall be authorized to make appropriate amendments to the allocations of items pursuant to this Section 3.1 if necessary, in the discretion of the General Partner, in order to comply with Code Section 704 or applicable Regulations thereunder; provided that no such change shall have a material adverse effect upon the amount distributable to any Member hereunder.

In the event Members are admitted to the Company pursuant to this Agreement on different dates, the Company Profits (or Company Losses) allocated to the Members for each Fiscal Year during which Members are so admitted shall be allocated among the Members in proportion to their Percentage Interests during such Fiscal Year in accordance with Section 706 of the Code, using any convention permitted by law and selected by the Manager.

3.2     **Limitation on Allocation of Losses.** Notwithstanding the foregoing, the Losses allocated pursuant hereto shall not exceed the maximum amount of Losses that can be so allocated without causing any Partner to have a Deficit Capital Account at the end of any fiscal year. In the event some but not all of the Partners would have a Deficit Capital Account as a consequence of an allocation of Losses pursuant hereto, the limitation set forth in this Section 3.2 shall be applied on a Partner by Partner basis so as to allocate the maximum permissible Losses to each Partner under Regulation Section 1.704-1(b)(2)(ii)(d).

3.3.    **Deficit Capital Accounts at Liquidation.** Partners shall have no liability to the Partnership, to the Partners, or to the creditors of the Partnership on account of any deficit balance in their Capital Accounts upon liquidation of the Partnership, provided, however, that any Partner for whom any charges have been made to his Capital Account by reason of the obligations described in Section 4.8 is required to pay to the Partnership the amount of any negative balance in his Capital Account, but such payment shall not exceed the obligations under Section 4.8. This Section 3.3 will survive the termination of a Partner's status as a Partner. A Partner must also pay any attorneys' or accountants' fees actually and reasonably incurred by the Partnership or the General Partner in collecting amounts under this provision from any Partner.

3.4     **Distributions.** The General Partner shall determine the timing, amount, if any, and form (cash or property) of all distributions to Partners in its sole discretion and notwithstanding any other provision of this Agreement.

Case 9:16-cv-81871-KAM Document 65-2 Entered on FLSD Docket 07/06/2020 Page 90 of
153
Case 9:19-cv-80732-KAM Document 55-2 Entered on FLSD Docket 03/10/2019 Page 180 of
253

3.4.1   **Available Cash Flow.** Subject to the limitations set forth in Section 3.5, Available Cash
Flow shall be distributed on an annual basis, as follows:

(a)     to Partners in amounts required by Section 3.6, Mandatory Distributions;

(b)     then to EB-5 Limited Partners pro rata in accordance with each EB-5 Limited
Partner's Adjusted Capital Contribution in an amount up to each EB-5 Limited Partner's
accrued unpaid Preferred Return, less any amounts then due and owing by such EB-5
Limited Partner to the Partnership, including his/her Additional Administrative Fees;

(c)     then to EB-5 Limited Partners pro rata in accordance with each EB-5 Limited
Partner's Adjusted Capital Contribution in an amount up to each EB-5 Limited Partner's
Adjusted Capital Contribution;

(d)     then to Partners other than EB-5 Limited Partners pro rata in accordance with
such Partners' Adjusted Capital Contribution in an amount up to each such Partner's
Adjusted Capital Contribution; and

(e)     then to the General Partners in accordance with their respective Percentage
Interests.

3.4.2   **Net Proceeds from a Capital Event or from Dissolution.** The Net Proceeds from a
Capital Event and/or a distribution resulting from the dissolution of the Partnership shall be
distributed in the same manner as Available Cash Flow, as set forth in 3.4.1 above. Net Proceeds
from a Capital Event and/or a distribution from the dissolution of the Partnership shall be
distributed to Partners within 120 days of such Capital Event or dissolution of the Partnership.

3.5     **Limitation on Distributions.** Notwithstanding any other provision of this Article 3, the
Partnership shall not make a distribution:

3.5.1   To the extent that at the time of the distribution, after giving effect to the distribution, all
liabilities of the Partnership, other than liabilities to Partners on account of their Partnership
Interests, exceed the fair value of the assets of the Partnership.

3.5.2   To EB-5 Limited Partners to the extent that such distributions result in their
Capital Accounts being less than the EB-5 Minimum Capital Requirement. After the approval of
any individual EB-5 Limited Partner's I-829 application by USCIS, the foregoing restriction
shall no longer apply.

3.5.3   To the extent that such distribution is prohibited under the Act.

3.6     **Mandatory Distributions.** The Partnership shall make distributions from Available Cash
Flow to Partners for the payment of taxes incurred by such Partner as a result of allocation of
Profits to such Partner by the Partnership. The amount distributable with respect to any year shall
be equal to the aggregate amount of U.S. Federal, state and local income taxes payable by the
Partners with respect to the taxable income of the Partnership, assuming, for purposes of

NOT A CERTIFIED COPY

determining the amount of such distribution, that each Partner will be taxed on the net amount set forth in the Partner's respective K-1 at the highest marginal individual Federal income tax rate for such year, and at the highest marginal individual state and local income tax rates applicable to any Partner for each such taxable year. Such distributions shall be made within 90 days of the end of the Partnership's fiscal year or such other time or times as may be determined by the General Partner.

3.7 **Record Date.** All items of Partnership income, gain, loss and deduction shall be allocated, and all distributions shall be made, to the Persons shown on the records of the Partnership to have been Partners as of the last day of the taxable year for which the allocation or distribution is to be made. Notwithstanding the foregoing, if any Units in the Partnership shall be transferred during a taxable year, items of Partnership income, gain, loss and deduction for such period shall be allocated among the original Partners and the successor on the basis of the number of days each was a Partner during such period; provided, however, that if the Partnership has any extraordinary non-recurring items for the taxable year in which the transfer of Units occurs, such period shall be segregated into two or more segments in order to account for income, gain, loss, deductions or proceeds attributable to such extraordinary non-recurring items of the Partnership.

## ARTICLE 4
## MANAGEMENT

**4.1 The General Partner.** The business and the affairs and all powers of the Partnership shall be exercised exclusively by the General Partner. The General Partner may resign at any time. In the event of resignation of the General Partner, the remaining Partners shall elect one or more new General Partners by the vote of a Majority-In-Interest of the remaining Partners. If the General Partner is an individual, upon the death or incapacity of the General Partner, the personal representative of the General Partner shall appoint a new General Partner. If the General Partner is a legal entity, upon the liquidation or termination of the General Partner the remaining Partners shall elect one or more new General Partners by the vote of a Majority-In-Interest of the remaining Partners.

**4.2 Authority and Powers of the General Partner.** The General Partner shall have the exclusive right and power to manage, operate and control the Partnership and to do all things and make all decisions necessary or appropriate to carry on the business and affairs of the Partnership. In addition to the specific rights and powers herein granted to the General Partner, the General Partner shall possess and enjoy and may exercise all the rights and powers of a General Partner under the Act, including the full and exclusive power and authority to act for and to bind the Partnership. The scope of the General Partner's power and authority shall encompass all matters connected with or incident to the business of the Partnership, including but not limited to the power and authority:

4.2.1 To spend and or invest the capital and revenue of the Partnership to maximize return to the Partnership, including the acquisition of the Partnership Property;

LIMITED PARTNERSHIP AGREEMENT
Palm House Hotel, LLLP

4.2.2 To manage, sell, develop, purchase, mortgage, improve, operate and dispose of Partnership Property;

4.2.3 To employ persons, firms and/or corporations for the sale, operation, management, syndication and development of Partnership Property, including but not limited to sales agents, broker-dealers, attorneys and accountants;

4.2.4 To employ agents, attorneys, accountants, engineers and other consultants or contractors who may be Affiliates of a Partner or the General Partner; however, any employment of such persons must be on terms not less favorable to the Partnership than those offered by unaffiliated persons for comparable services in the same area;

4.2.5 To acquire and or sell Partnership Property or property in which the Partnership has an interest, lease real property, borrow on a secured or unsecured basis in the name of the Partnership, grant Partnership Property as security for a loan to the Partnership;

4.2.6 To hire and fire employees, and appoint agents/representatives to manage the day-to-day operations of the Partnership;

4.2.7 To execute, acknowledge and deliver any and all instruments to effectuate any of the foregoing powers and any other powers granted to the General Partner under the laws of the State of Florida or other provisions of this Agreement, and to take all other acts necessary, appropriate, or helpful for the operation of the Partnership business;

4.2.8 To enter into such agreements and contracts with parties and to give such receipts, releases and discharges, with respect to the business of the Partnership, which the General Partner, in its sole discretion, deems necessary or appropriate to own, sell, improve, operate and dispose of Partnership Property or to effectively and properly perform its duties or exercise its powers hereunder;

4.2.9 To purchase, at the expense of the Partnership, such liability and other insurance as the General Partner, in its sole discretion, deems advisable to protect the Partnership's assets and business; however, the General Partner shall not be liable to the Partnership or the other Partners for failure to purchase any insurance, including earthquake insurance, unless such act or omission constitutes gross negligence or willful misconduct;

4.2.10 To sue and be sued, complain, defend, settle, and/or compromise, with respect to any claim in favor of or against the Partnership, in the name and on behalf of the Partnership; and

4.2.11 To grant Partnership Property as security for a loan to the Partnership, and sign all documents required to grant such security interests in Partnership property, without the signatures or consents of the Partners provided that such borrowing is in furtherance of the purpose of the Partnership.

4.3 **Liability of the General Partner.** A General Partner shall not have any liability to the Partnership or to any Partner for any mistakes or errors in judgment, or for any act or omission

believed in good faith to be within the scope of authority conferred by this Agreement. A General Partner shall be liable only for acts and/or omissions involving intentional wrongdoing. Actions or omissions taken in reliance upon the advice of legal counsel that they are within the scope of a General Partner's authority hereunder shall be conclusive evidence of good faith; provided, however, a General Partner shall not be required to procure such advice to be entitled to the benefit of this subparagraph.

4.4    **Time Devoted to Partnership; Other Ventures.** The General Partner shall devote so much of their time to the business of the Partnership as in its judgment the conduct of the Partnership's business reasonably requires. The General Partner may engage in business ventures and activities of any nature and description independently or with others, whether or not in competition with the business of the Partnership, and neither the Partnership nor any of the other Partners shall have any rights in and to such independent ventures and activities or the income or profits derived therefrom by reason of the acquisition of Units.

4.5    **Books and Records.**

(a) The General Partner shall maintain or cause to be maintained complete and accurate books of account (containing such information as shall be necessary to record allocations and distributions), and make such records and books of account available for inspection by any Partner, or any Partner's duly authorized representative, during regular business hours and at the principal office of the Partnership, upon reasonable notice and for any purpose related to his or her ownership of Units.

(b) Within sixty (60) days after the end of each calendar year, there shall be prepared and distributed to all Partners reasonable tax-reporting information, in sufficient detail to enable such Partner to prepare such Partner's federal, state and local income tax returns.

(c) Within ninety (90) days after the end of each calendar year, there shall be prepared and distributed to each Partner, a balance sheet, and a report of the receipts, disbursements, net profits and losses, and cash flow of the Partnership, and the share of the net profits and losses and cash flow of each Partner for such calendar year. Such balance sheet and report shall be prepared by the Partnership's accountant in accordance with the method of accounting used by the Partnership for tax purposes.

4.6    **Tax Returns.** The taxable year of the Partnership shall be the calendar year. The General Partner shall, at Partnership expense, cause the Partnership to prepare and file all tax returns required to be filed by the law for each fiscal year of the Partnership.

4.7    **Tax Elections and Adjustments.** The General Partner is authorized to cause the Partnership to make, forego or revoke such elections or adjustments for federal income tax purposes as it deems necessary or advisable in its sole discretion, provided such elections or adjustments are consistent with federal income tax rules and principles, including but not limited to, in the event of a transfer of all or part of the Units of any Partner, an election pursuant to Section 754 of the Code to adjust the basis of the assets of the Partnership or any similar

provision enacted in lieu thereof. The Partners will, upon request, supply any information necessary to properly give effect to any such election or adjustment.

4.8     **Federal Income Tax Withholding.** The General Partner is authorized to withhold any sums required by the Internal Revenue Code even if such withholding conflicts with any of the terms and conditions of this Agreement or otherwise affects distributions, allocations or payments to the Partners. In the event that the General Partner learns of a withholding obligation subsequent to the distribution to which the withholding obligation relates, the General Partner will issue an invoice to the Partner. If the invoice is not paid within sixty (60) days, the General Partner will charge the amount against the Partner's Capital Account. This Section will survive the termination of a Partner's status as a Partner.

## ARTICLE 5
## INDEMNIFICATION

5.1     **Third Party Actions.** The Partnership may indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, or investigative, including all appeals (other than an action, suit or proceeding by or in the right of the Partnership) by reason of the fact that he is or was a partner, officer or employee of the Partnership, or is or was serving at the request of the Partnership as a partner, trustee, officer or employee of another company, partnership, joint venture, trust or other enterprise, against expenses (including attorneys' fees), judgments, decrees, fines, penalties and amounts paid in settlement actually and reasonably incurred by him in connection with such action, suit or proceeding if he acted in good faith and in a manner which he reasonably believed to be in or not opposed to the best interests of the Partnership and, with respect to any criminal action or proceeding, had no reasonable cause to believe his conduct was unlawful. The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the person did not act in good faith and in a manner which he reasonably believed to be in or not opposed to the best interest of the Partnership and, with respect to any criminal action or proceeding, had reasonable cause to believe that his conduct was unlawful.

5.2     **Derivative Actions.** The Partnership may indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit, including all appeals, by or in the right of the Partnership to procure a judgment in its favor by reason of the fact that he is or was a limited partner or general partner, officer or employee of the Partnership, or is or was serving at the request of the Partnership as a member, General Partner, trustee, officer or employee of another company, partnership, joint venture, trust or other enterprise, against expenses (including attorneys' fees) actually and reasonably incurred by him in connection with the defense or settlement of such action or suit if he acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Partnership, except that no indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been finally adjudged to be liable for negligence or misconduct in the performance of his duty to the Partnership unless and only to the extent that the court in which such action or suit was brought shall determine upon application that, despite the adjudication of

NOT A CERTIFIED COPY

liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses as the court shall deem proper.

5.3     **Rights After Successful Defense.** To the extent that a Partner, General Partner, officer or employee has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in Section 5.1 or 5.2, or in defense of any claim, issue or matter therein, he shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by him in connection therewith.

5.4     **Other Determination of Rights.** Except in a situation governed by Section 5.3, any indemnification under Section 5.1 or 5.2 (unless ordered by a court) shall be made by the Partnership only as authorized in the specific case upon a determination that indemnification of the Partner, General Partner, officer or employee is proper in the circumstances because he has met the applicable standard of conduct set forth in Section 5.1 or 5.2. Such determination shall be made by the General Partner.

5.5     **Advances of Expenses.** Expenses of each person indemnified hereunder incurred in defending a civil, criminal, administrative or investigative action, suit or proceeding (including all appeals), or threat thereof, may be paid by the Partnership in advance of the final disposition of such action, suit or proceeding as authorized by the General Partner upon receipt of an undertaking by or on behalf of the Partner, General Partner, officer or employee, to repay such amount unless it shall ultimately be determined that he is entitled to be indemnified by the Partnership.

5.6     **Nonexclusiveness; Heirs.** The indemnification provided by this Article shall not be deemed exclusive of any other rights to which those seeking indemnification may be entitled as a matter of law or under the Certificate of Limited Partnership, or any agreement, any insurance purchased by the Partnership, or otherwise, both as to action in his official capacity and as to action in another capacity while holding such office, and shall continue as to a person who has ceased to be a Partner, General Partner, officer or employee and shall inure to the benefit of the heirs, executors and administrators of such a person.

5.7     **Purchase of Insurance.** The Partnership may purchase and maintain insurance on behalf of any person who is or was a Partner, General Partner, officer or employee of the Partnership, or is or was serving at the request of the Partnership as a General Partner, officer or employee of another company, partnership, joint venture, trust or other enterprise against any liability asserted against him and incurred by him in any such capacity, or arising out of his status as such, whether or not the Partnership would have the power to indemnify him against such liability under the provisions of this Article or of the Act.

## ARTICLE 6
## EXPENSES

6.1     **Partnership Expenses.** The Partnership shall pay all costs and expenses related to the conduct of its business, including those relating to investing in Qualifying Investments, which may include, but are not limited to: (1) All costs of personnel employed by the Partnership or

NOT A CERTIFIED COPY

performing services for the Partnership; (2) All costs of borrowed money including repayment of advances to the Partnership made by a Partner; (3) All administrative costs, including fees charged by the Regional Center in connection with administration of the Project, legal, audit, accounting, brokerage and other fees; (4) Printing and other expenses and taxes incurred in connection with the issuance, distribution, transfer, registration and recording of documents evidencing ownership of Units of the Partnership or in connection with the business of the Partnership; (5) Fees and expenses paid to contractors, mortgage bankers, brokers and services, leasing agents, consultants, on-site General Partners, real estate brokers, insurance brokers and other agents, including Affiliates of the Partnership, the General Partner or any Partner; (6) Expenses in connection with the acquisition, preparation, operation, improvement, development, disposition, replacement, alteration, repair, remodeling, refurbishment, leasing and financing and refinancing of Partnership property; (7) The cost of insurance obtained in connection with the business of the Partnership; (8) Expenses of organizing, revising, amending, converting, modifying or terminating the Partnership; (9) Expenses in connection with distributions made by the Partnership to, and communications and bookkeeping and clerical work necessary in maintaining relations with, Partners; (10) Expenses in connection with preparing and mailing reports required to be furnished to Partners for required tax reporting, or other purposes which the General Partner deems appropriate; (11) Costs incurred in connection with any litigation, including any examination or audits by regulatory agencies; and (12) Costs of preparation and dissemination of informational material and documentation relating to potential sale, refinancing or other disposition of Partnership property.

## ARTICLE 7
## PARTNERS

7.1     **Partners.** The General Partner shall at all times maintain a current and a past list setting forth (in alphabetical order) the full name, last known mailing address (including full street number), the class and number of Units, and Percentage Interest of each current and former Partner of the Partnership. The names, full residential addresses, number of Units, and Percentage Interest of the initial Partners of the Partnership are as reflected on Schedule A of this Agreement and are hereby made a part hereof. With each change in the Partnership's Partners (or any information on Schedule A), the Partnership shall revise such list to reflect such changes. Partners shall have only the rights and powers set forth in this Agreement unless otherwise provided by the Act.

7.2     **General Partners.** The Partnership shall at all times have at least one General Partner, as defined by the Act, that is subject to the liabilities of a partner in a partnership without limited partners to persons other than the partnership and other partners. The sole initial General Partner shall be listed in Schedule A as amended from time to time.

7.3     **Limited Partners.** The Partnership shall at all times have at least one limited partner as defined by the Act. The Limited Partners of the Partnership shall be listed in Schedule A, as amended from time to time. The Partnership shall have two classes of limited partners unless and until one or more additional classes are authorized by the General Partner. EB-5 Limited Partners shall constitute a class of Limited Partners that shall have all of the rights of a Limited Partner set forth herein in addition to the right to Preferred Returns.

NOT A CERTIFIED COPY

7.4    **Meetings.** Meetings of the Partners may be called only by the General Partner. Not less than seven or more than sixty days before the date fixed for a meeting of Partners, written notice stating the time and place of the meeting, and in the case of a special meeting the purposes of such meeting, shall be given by or at the direction of the General Partner. The notice shall be given by personal delivery or by mail to each Partner entitled to notice of the meeting who is of record as of the day next preceding the day on which notice is given or, if a record date therefor is duly fixed, of record as of said date; if mailed, the notice shall be addressed to the Partners at their respective addresses as they appear on the records of the Partnership. Notice of the time, place and purposes of any meeting of Partners may be waived in writing, either before or after the holding of such meeting, by any Partners, which writing shall be filed with or entered upon the records of the meeting. The attendance of any Partners at any such meeting without protesting the lack of proper notice, prior to or at the commencement of the meeting, shall be deemed to have waived notice of such meeting.

7.5    **Quorum; Adjournment.** At any meeting of Partners, whether present in person or by proxy, a Majority-In-Interest of Partners shall constitute a quorum for such meeting; provided, however, that no action required by law or by the Certificate of Limited Partnership to be authorized or taken by a designated proportion of the Percentage Interests of the Partnership, or a particular class thereof, may be authorized or taken by a lesser proportion; and provided, further, that the holders of a majority of the Percentage Interests represented thereat, whether or not a quorum is present, may adjourn such meeting from time to time; if any meeting is adjourned, notice of such adjournment need not be given if the time and place to which such meeting is adjourned are fixed and announced at such meeting. If permitted by the General Partner, Partners may participate in any meeting through telephonic or similar communications equipment by means of which all persons participating in the meeting can hear one another, and such participation shall constitute presence in person at such meeting.

7.6    **Voting of Limited Partners.** On any matter presented by the General Partner, in its sole discretion, to the Limited Partners or any class thereof for their vote, each Limited Partner shall have one vote for each Unit owned by him. Limited Partners entitled to vote or to act with respect to Units in the Partnership may vote or act in person or by proxy. The person appointed as proxy need not be a Limited Partner. Unless the writing appointing a proxy otherwise provides, the presence at a meeting of the person having appointed a proxy shall not operate to revoke the appointment. Notice to the Partnership, in writing or in open meeting, of the revocation of the appointment of a proxy shall not affect any vote or act previously taken or authorized. The following actions shall require the approval of Limited Partners holding a majority of the then outstanding Units held by Limited Partners: (i) any modification to this Agreement materially changing the rights of the Limited Partners; and (ii) dissolution of the Company prior to the end of the fifth year after admission of the last EB-5 Limited Partner.

7.7    **Action Without a Meeting.** Any action which may be authorized or taken at a meeting of Partners may be authorized or taken without a meeting in a writing or writings signed by all of the Partners entitled to vote on such matter, which writing or writings shall be filed with or entered upon the records of the Partnership. A facsimile, photographic, photostatic or similar

NOT A CERTIFIED COPY

Case 9:16-cv-81871-KAM Document 657-2 Entered on FLSD Docket 07/06/2020 Page 98 of
153
Case 9:19-cv-80732-KAM Document 55-2 Entered on FLSD Docket 03/10/2019 Page 99 of
153

transmission or reproduction of a writing signed by a Partner, shall be regarded as signed by the
Partner for purposes of this Section.

## ARTICLE 8
## RESTRICTIONS ON TRANSFER

8.1    **Transfers.** No EB-5 Limited Partner may voluntarily Transfer all, or any portion of, or
any interest or rights in, his/her Partnership Interest. Each EB-5 Limited Partner acknowledges
the reasonableness of this prohibition in view of the purposes of the Partnership and the
relationship of the Partners. The voluntary Transfer of any Partnership Interests, including
Economic Interests, in violation of the prohibition contained in this Section 8.1 shall be deemed
invalid, null and void, and of no force or effect. Any Person to whom Partnership Interests are
attempted to be transferred in violation of this Section 8.1 shall not be entitled to vote, receive
distributions from the Partnership, or have any other rights in or with respect to the Partnership
Interests. All Partners other than EB-5 Limited Partners may freely transfer his/her Units with
consent of the General Partner.

8.2    **Voluntary Withdrawal.** No Limited Partner shall have the right or power to Voluntarily
Withdraw from the Partnership. Any Voluntary Withdrawal in violation of this Agreement shall
entitle the Partnership to damages for breach, which may be offset against the amounts otherwise
distributable to such Limited Partner.

8.3    **Involuntary Withdrawal.** Immediately upon the occurrence of an Involuntary
Withdrawal, the successor of the withdrawing Partner shall thereupon become an Interest Holder,
but shall not become a Partner. The successor Interest Holder shall have all the rights of an
Interest Holder, but shall not be entitled by reason of the withdrawal to receive in liquidation of
the Partnership Interest, the fair market value of the withdrawing Partner's Economic Interest.

8.4    **Right of First Refusal.**

8.4.1  **Voluntary Transfer.** If any EB-5 Limited Partner intends to transfer his or her Units or
any part thereof to any person or entity, after obtaining approval required hereunder, such Partner
shall give written notice to the Partnership of his intention so to transfer. The notice, in addition
to stating the fact of the intention to transfer a Partnership Interest, shall describe (i) the
Partnership Interest to be transferred, (ii) the name, business and residence address of the
proposed transferee, (iii) whether or not the transfer is for valuable consideration, and (iv) if so,
the amount of the consideration and the other terms of the sale. The Partnership shall promptly
send a copy of such notice to all other Partners.

8.4.2  **Partnership Option.** Within thirty (30) days after the receipt by the Partnership of the
notice of intention to transfer Units, the Partnership may exercise an option, which is hereby
granted by the Partner intending to Transfer his or her Units, to purchase the Units proposed to
be transferred, for the price and upon the other terms hereinafter provided. The Partnership may,
at its election, terminate its option period by giving a notice to the selling Partner and all other
Partners that the Partnership has elected not to exercise its option granted in this Section 8.4.2.

Case 9:16-cv-81871-KAM Document 657-2 Entered on FLSD Docket 07/06/2020 Page 99 of
153
Case 9:19-cv-80732-KAM Document 55-2 Entered on FLSD Docket 03/10/2019 Page 199 of
253

8.4.3   **General Partner Option.** In the event that the option granted to the Partnership in Section 8.4.2 is not exercised in its entirety, then the remaining General Partner(s) of the Partnership may, within the earlier of (i) sixty (60) days from receipt of notice of intention to transfer from the transferring General Partner, or (ii) thirty (30) days from receipt of notice that the Partnership has elected not to exercise its option, exercise an option which is hereby granted, to purchase all of the Units for the price and upon the other terms hereinafter provided. If more than one General Partner exercises the option hereunder, such General Partners (hereinafter, the **"Participating General Partners"**) shall be entitled to purchase a proportion of the Units proposed to be transferred determined by a fraction, the numerator of which shall be equal to the Units owned by each such Participating General Partner and the denominator of which shall be equal to the aggregate Units owned by all Participating General Partners, or such other proportion of such Units as shall be agreed upon in writing by all Participating General Partners. The option granted to the General Partners in this Section 8.4.3 shall expire at the end of the option period herein granted if options for all of the Units are not exercised by the last date of such option period.

8.4.4   **Limited Partner Option.** In the event that the option granted to the Partnership in Section 8.4.2 is not exercised in its entirety, and the option granted to the General Partner in Section 8.4.3 is not exercised in its entirety, then the remaining Limited Partners of the Partnership may, within the earlier of:

    (i)   seventy five (75) days from receipt of notice of intention to transfer from the transferring Partner, or

    (ii)   thirty (30) days from receipt of notice that the General Partners have elected not to exercise their option, exercise an option which is hereby granted, to purchase all of the Units for the price and upon the other terms hereinafter provided. If more than one Limited Partner exercises the option hereunder, such Limited Partners (hereinafter, the **"Participating Limited Partners"**) shall be entitled to purchase a proportion of the Units proposed to be transferred determined by a fraction, the numerator of which shall be equal to the Units owned by each such Participating Limited Partner and the denominator of which shall be equal to the aggregate Units owned by all Participating Limited Partners, or such other proportion of such Units as shall be agreed upon in writing by all Participating Limited Partners. The option granted to the Limited Partners in this Section 8.4.4 shall expire at the end of the option period herein granted if options for all of the Units are not exercised by the last date of such option period.

8.4.5   **Involuntary Transfer.** If a Partner's Units are transferred by operation of law to any person (such as, but not limited to, a deceased Partner's estate, a Partner's trustee in bankruptcy, a purchaser at any creditor's or court sale or the guardian or conservator of an incompetent Partner), the Partnership within forty-five (45) days of the receipt by it of actual notice of the transfer may exercise its option, which is hereby granted, and, if not exercised by the Partnership, the General Partners within sixty (60) days of the receipt of actual notice of the transfer may exercise their respective options, which are hereby granted, and if not exercised by the General Partner, the Limited Partners within seventy-five (75) days of receipt of actual notice of the transfer may exercise their respective options, which are hereby granted to purchase the

NOT A CERTIFIED COPY

LIMITED PARTNERSHIP AGREEMENT
Palm House Hotel, LLLP

Units so transferred for the price determined pursuant to Section 8.4.9 below and in the same manner as provided in Sections 8.4.2, 8.4.3 and 8.4.4 with respect to Units proposed to be transferred.

8.4.6 **Exercise of Options.** The purchase options granted in this Section 8.4 shall be exercised by delivery of written notice of exercise within the time periods provided in said section to the transferring Partner and/or the proposed transferee in the case of a transfer pursuant to Section 8.4.2, 8.4.3 or 8.4.4, as the case may be.

8.4.7 **Failure to Exercise Option.** If the purchase options are not exercised in compliance with this Section 8.4, then the Units may be transferred to the proposed transferee named in the notice required by Section 8.4.1, and upon the terms therein stated, or to the transferee in the case of an Involuntary Withdrawal, within thirty (30) days after the expiration of the option period granted in Section 8.4.4. In the case of a Transfer as the result of an Involuntary Withdrawal, unless otherwise prohibited therein, the Units, after the expiration of the option periods set forth therein shall, in the hands of the transferee, be subject to the provisions of this Agreement. A subsequent transferee under Section 8.4 shall thereafter be subject to the terms of this Agreement as if such transferee had originally executed it. Unless and until admitted as a Partner, any transferee of any Partnership Interest or portion thereof, shall be merely an Interest Holder and subject to the terms of this Agreement.

8.4.8 **Transfers Not in Compliance with this Section.** If a Transfer is not upon the terms or is not to the transferee stated in the notice required of the transferring Partner by Section 8.4.1, or is not within the time periods provided, or the transferor, after the transfer, reacquires the transferred Partnership Interest, the Partnership Interest transferred shall remain subject to this Partnership Agreement as if no transfer had been made.

8.4.9 **Fair Market Value.**

8.4.9.1 The value of each Unit to be purchased and sold upon exercise of the option granted in Section 8.4.5 shall be its Fair Market Value determined pursuant to an independent appraisal performed by an independent appraisal firm qualified in valuing interests in comparable companies in the same industry to determine the Fair Market Value and to prepare a written appraisal of any Units to be repurchased upon exercise of the option granted in Section 8.4.5. Without limiting the appraiser's consideration of any particular relevant fact in preparing its appraisal, the appraiser shall take into account (i) the criteria discussed in the previous sentence in determining the Fair Market Value of any Units (or portion thereof), (ii) the fact that only the Economic Interest is being transferred, if applicable, and (iii) in such a case, the transferring Partner's death. The Fair Market Value of the Units shall be determined as of the last day of the month preceding the month in which the transfer of the Partnership Interest occurred, unless the transfer shall have occurred within three (3) months prior to or within three (3) months after the end of a fiscal year of the Partnership, in which case Fair Market Value shall be determined as of the last day of such fiscal year.

8.4.9.2 In the event the transferee disagrees with the Fair Market Value determined by the independent appraiser pursuant to Section 8.4.9.1, such transferee shall notify the remaining

Partners in writing within thirty (30) days after such transferee receives the notice from remaining Partners of the determination of Fair Market Value prescribed in Section 8.4.8.1 above. If the remaining Partners and such transferee cannot agree on such Fair Market Value within thirty (30) days after the receipt by the remaining Partners of the transferee's notice disagreeing with such determination, then the issue shall be referred to two (2) appraisers, one of which shall be the remaining Partner's existing appraiser and one of which shall be selected by the transferee. If such appraisers cannot agree upon a Fair Market Value within thirty (30) days after they are appointed as provided for above, then the issue shall be referred to an appraiser selected by the appraisers selected by the remaining Partners and the transferee. The parties to the dispute shall cause such additional appraiser to render within thirty (30) days after its appointment a decision regarding the Fair Market Value, such decision shall be binding on the parties to the dispute for the purpose of this Section 8.4.9.

8.4.9.3 The Partnership shall bear the fees and expenses of the appraiser selected by the remaining Partner under Section 8.4.9.1. The Partnership shall also bear the fees and expenses of the appraiser selected by the transferee and the additional appraiser selected under Section 8.4.9.2 in the event the Fair Market Value finally determined pursuant to Section 8.4.9.2 is more than 10% greater than the Fair Market Value initially proposed by the remaining Partners (or an appraiser chosen by the General Partner under Section 8.4.9.2); and, provided, further, however, that if the Fair Market Value of the Units of more than one transferring Partner is the subject of any appraiser's determination under this Section 8.4.9, then each transferee shall pay his or her pro rata share (based upon the Fair Market Value of all such transferees' interests) of the fees and expenses, if any, required to be borne by such transferees under this Section 8.4.9.

8.4.9.4 Notwithstanding anything to the contrary herein, no payment of the purchase price under this Article 8 may be made to any selling Partner or his or her legal representatives to the extent the remaining Partners determine that (a) such payment would cause an event of default or potential event of default to occur under the terms of any credit agreement to which the Partnership is a party, (b) the Partnership is unable to fund such payment out of available cash or secure reasonable financing to make such payment, or (c) such payment would otherwise have a materially negative impact on the Partnership or its business. In such circumstance, the Partnership agrees that it shall use its good- faith efforts to (a) have such default or potential event of default waived with respect to such payment, (b) secure such reasonable financing, or (c) pay that portion of such payment that does not cause a materially negative impact on the Partnership or its business and pay the remainder of any such payment as soon as practicable without causing such a materially negative impact. In addition, each selling Partner hereby agrees and acknowledges that the right to receive any payment of purchase price shall be forfeited by such selling Partner if prior to the making of such payment the remaining Partners determine that the selling Partner has breached the terms of this Partnership Agreement (which breach remains uncured).

8.4.10 **Purchase Price.** The price of each Unit to be purchased and sold under this Agreement shall be as follows:

8.4.10.1 A purchase of Units pursuant to the options granted under Sections 8.4.2, 8.4.3 or 8.4. shall be the consideration set forth in the notice required of a selling Partner by Section 8.4.1.

8.4.10.2  Subject to 8.4.10.3, a purchase of Units pursuant to the option granted under Section 8.4.5 shall be for a price equal to one hundred (100%) percent of the Fair Market Value of Units established under Section 8.4.9.

8.4.10.3  Notwithstanding the foregoing, or any other terms of this Agreement, a purchase of Units of an EB-5 Limited Partner pursuant to the option granted under Section 8.4.5 shall be for a price equal to the sum of such EB-5 Limited Partner's Adjusted Capital Contribution and accrued unpaid Preferred Returns less any amounts due to the Partnership by the EB-5 Limited Partner.

8.4.11  **Closing; Payment of the Purchase Price.** The purchase price for Units shall be paid in cash. Unless otherwise agreed by the parties, the closing of the sale and purchase of Units shall take place on the later of thirty (30) days after the delivery to the selling Partner or the transferee of the written notice by the Partnership of its exercise of the option to purchase the selling Partner's Units or thirty (30) days after the date on which Fair Market Value is determined pursuant to Section 8.4.9 above.

8.5  **Effect of Assignment.** A Partner shall cease to be a Partner of the Partnership and to have the power to exercise any rights or powers of a Partner upon transfer of all of the Partner's Units in the Partnership.

8.6  **Rights of Interest Holders.** Interest Holders have no voting rights in the Partnership and are only entitled to the Economic Interest attributable to the Units transferred, subject to the terms and conditions of this Agreement.

8.7  **Admission of Additional Partners.** A Person may be admitted as a Partner and, upon such admission, shall be admitted to all the rights of a Partner upon approval of the General Partner. The General Partner may grant or withhold the approval of such admission in their sole and absolute discretion. If so admitted, such newly admitted Partner shall have all the rights and powers and be subject to all the restrictions and liabilities of the Partnership Interest assigned. The admission of an Interest Holder to Partnership, without more, shall not release the Partner originally assigning the Partnership Interest from any liability to the Partnership that may have existed prior to the admission of the Interest Holder as a Partner of the Partnership. No Partners admitted after the date of this Agreement shall be entitled to any retroactive allocation of losses, income or expense deductions incurred by the Partnership. The General Partner may, at the time a Partner is admitted, close the books and records of the Partnership (as though the Fiscal Year had ended) or make pro rata allocations of loss, income and expense deductions to such Partner for that portion of the Fiscal Year in which such Partner was admitted in accordance with the Code.

## ARTICLE 9
## TERMINATION

9.1  **Termination of Interest.** The Partnership Interest of each EB-5 Limited Partner shall be terminated by (a) dissolution of the Partnership as provided in this Agreement and distribution of

the proceeds of liquidation in accordance herewith; (b) the Agreement of an EB-5 Limited Partner, or his/her personal representative, and the General Partners; or (c) the return of the Capital Contributions and payment of all accrued unpaid Preferred Returns to such EB-5 Limited Partner.

## ARTICLE 10
## DISSOLUTION AND WINDING UP

10.1    **Termination of the Partnership.** The Partnership shall be terminated and dissolved upon the first to occur of the following: If the Partnership then has any EB-5 Partners (a) upon vote of a Majority-In-Interest of the Partners; or (b) upon the sale of all or substantially all the assets of the Partnership; and if there are then no EB-5 Partners of the Partnership (a) upon vote of the General Partner, or (b) upon sale of all or substantially all of the assets of the Partnership.

10.2    **Winding Up.** Upon the termination of the Partnership pursuant to Section 10.1 above, a full and general accounting shall be taken of the Partnership's business, and the affairs of the Partnership shall be wound up. Any profits earned or losses incurred since the last previous accounting shall be allocated among, or borne by, the Partners in accordance with the provisions of Section 3.1 above. The General Partner shall wind up and liquidate the Partnership by selling the Partnership's assets, or by distributing such assets in kind, subject to the Partnership's liabilities, or by a combination thereof, as determined by the General Partner. The proceeds of such liquidation shall be applied and distributed in the following order of priority, by the end of the taxable year during which the liquidation occurs (or, if later, within ninety (90) days after the date of the liquidation): (a) to the payment of any debts and liabilities of the Partnership; (b) to the setting up of any reserve which the General Partner shall reasonably deem necessary to provide for any contingent or unforeseen liabilities or obligations of the Partnership, with any excess in such reserve remaining after such liabilities are satisfied to be distributed as soon as practicable in the manner hereinafter set forth; and (c) thereafter, the balance of the proceeds, if any, shall be distributed in the same manner as Available Cash Flow, after taking into account all capital account adjustments for the Partnership's taxable year during which such liquidation occurs. For purposes of this subsection, a liquidation of the Partnership shall mean a liquidation as defined in Section 1.704-1(b)(2)(ii)(g) of the Regulations.

10.3    **Statement.** The Partners shall be furnished with a statement prepared by the Partnership's accountants, which shall set forth the assets and liabilities of the Partnership as of the date of complete liquidation.

10.4    **Return of Capital Contributions.** Notwithstanding anything in this Agreement to the contrary, neither the General Partner nor any other Partner shall be personally liable for the return of the Capital Contributions of any Partner, or any portion thereof, it being expressly understood that any such return of the Capital Contributions of the Partners shall be made solely from Partnership assets.

## ARTICLE 11
### DISCLOSURES AND REPRESENTATIONS

11.1  **Disclosure by Partnership.** In connection with the offer and sale of Units to Limited Partners hereunder, the Partnership hereby discloses that the Units have not been registered under the Federal Securities Act of 1933, as amended (the **"Securities Act"),** and are being offered and sold by the Partnership pursuant to one or more exemptions from registration under the Securities Act, including the exemption provided by Section 4(2) of the Securities Act, Regulation D promulgated thereunder, and exemptions available under applicable state securities laws and regulations.

11.2  **Representations and Warranties of the Limited Partners.** In connection with a Limited Partner's purchase of Units in the Partnership, each Limited Partner represents and warrants, which representations and warranties shall survive the consummation of the Limited Partner's purchase of such Units, as follows: (a) the Limited Partner's principal residence is located within the country, state/province and at the address listed in Schedule A hereto; (b) the Limited Partner is aware that no market exists for the resale of Units; (c) the Limited Partner is purchasing the Units for investment and not for the distribution; (d) the Limited Partner is aware of all restrictions imposed by the Partnership on the sale or transfer of the Units, including, but not limited to, any restrictive legends appearing on the certificate(s) and/or other document(s) evidencing the Units; (e) the Limited Partner acknowledges and understands that the Partnership has been organized with the intention that it qualify for taxation as a partnership for U.S. federal income tax purposes. The Limited Partner acknowledges that the provisions of Subchapter K of the Code, and the Regulations promulgated thereunder will apply to the Partnership, and intend that the allocations of taxable income and loss, distributions to the Limited Partners and maintenance of Capital Accounts all conform to the requirements of the Code and the applicable Regulations; (f) the Limited Partner has full legal capacity to execute and agree to this Agreement and to perform his obligations hereunder; (g) the Limited Partner has duly executed and delivered this Agreement; (h) the Limited Partner's authorization, execution, delivery and performance of this Agreement do not conflict with any other material agreement or arrangement to which that Limited Partner is a party or by which he is bound or with any law or regulation to which that Limited Partner is subject; and (i) this Agreement constitutes the valid, binding and enforceable agreement of that Limited Partner, except to the extent such enforceability may be limited by the effect of bankruptcy, insolvency, reorganization, moratorium and similar laws from time to time in effect relating to the rights and remedies of creditors, as well as general principles of equity (regardless of whether considered in a proceeding in equity or in law).

## ARTICLE 12
### MISCELLANEOUS

12.1  **Endorsement.** Upon the execution of this Agreement, any certificate or certificates evidencing the Units in the Partnership shall be endorsed, as follows:

*"The Units represented by this certificate are subject to the terms and conditions of a Limited Partnership Agreement dated as of 11/30/2012, among the original owner of record and the other partners of the Partnership. Any purchaser or*

*transferee of these Units is bound by the agreement and shall be considered a party to the agreement. The Partnership will mail to the holder of this certificate, without charge, a copy of such agreement within five (5) days after receiving a written request therefor."*

The foregoing endorsement shall also include such other legends and notices as the General Partner deems necessary and appropriate.

After endorsement, the certificate or certificates shall be delivered to the Partners who shall, subject to the terms of this Agreement, be entitled to exercise all rights of ownership of such Partnership Units. The Partnership agrees that it will cause a similar endorsement to be placed on all certificates hereafter issued by it and which are subject to the provisions of this Agreement.

12.2     **Tax Matters.** The General Partner shall direct Tax Matters of the Partnership, as provided in Regulations issued pursuant to Section 6231 of the Code. Each Partner, by the execution of this Agreement, consents to such designation and agrees to execute, certify, acknowledge, deliver, swear to, file and record at the appropriate public offices such documents as may be necessary or appropriate to evidence such consent. The Partnership shall indemnify and reimburse the General Partner for all expenses, including legal and accounting fees, claims, liabilities, losses and damages incurred in connection with any administrative or judicial proceeding with respect to the tax liability of the Partners. The payment of all such expenses shall be made before any distributions to Partners are made by the Partnership. The taking of any action and the incurring of any expense by the General Partner in connection with any such proceeding, except to the extent required by law, is a matter in the sole discretion of the General Partner.

12.3     **Amendments.** Except as provided herein, this Agreement may be amended only with the written approval of all of the Partners.

12.4     **Notices.** All notices, consents or other instruments hereunder shall be in writing and mailed by United States mail, postage prepaid, and shall be directed to the parties hereto at the last addresses of the parties furnished by them in writing to the Partnership, and to the Partnership at its principal office. The Partnership and/or any Partner shall have the right to designate a new address for receipt of notices by notice addressed to the Partners and the Partnership and mailed as aforesaid. Such notices shall be made a permanent part of the Partnership records.

12.5     **Obligations and Rights of Transferees.** Any person who acquires in any manner whatsoever any interest in the Partnership, irrespective of whether such person has accepted and assumed in writing the terms and provisions of this Agreement, shall be deemed by the acceptance of the benefit of the acquisition thereof to have agreed to be subject to, and to be bound by, all the obligations of this Agreement with the same force and effect as any predecessor in interest of such person.

12.6 **Benefit and Binding Effect.** This Agreement shall inure to the benefit of, and be binding upon, the parties hereto and their respective next of kin, legatees, administrators, executors, legal representatives, nominees, successors and permitted assigns.

12.7 **Integration.** This Agreement constitutes the entire agreement among the parties hereto pertaining to the subject matter hereof, and supersedes all prior and contemporaneous agreements and understandings of the parties in connection therewith.

12.8 **Governing Law.** This Agreement and the rights of all parties hereunder shall be governed by, and construed in accordance with, the laws of the State of Florida, without regard to the conflicts of laws principles thereof.

12.9 **Counterparts.** This Agreement may be executed in several counterparts, each of which shall be considered an original when executed by one or more of the Partners.

12.10 **Reports to Limited Partners.** As soon as reasonably practicable after the date when an Limited Partner has made his/her Capital Contribution to the Partnership in full and has otherwise complied with its obligations under this Agreement, the Partnership shall provide such Limited Partner or its designated immigration counsel with the copies of the following information: (a) A copy of the USCIS letter of designation of South Atlantic Regional Center as a regional center under the EB-5 Pilot Program; (b) A copy of the approved regional center narrative proposal and business plan submitted to USCIS by the Regional Center; (c) A copy of approved econometric reports which, taken together, conclude that the investments to be made by the Partnership from the Capital Contributions of the Limited Partners are Qualified Investments - they will generate full-time employment positions, either directly or indirectly, for not fewer than ten U.S. workers per EB-5 Limited Partner whose Capital Contributions have been so applied; (d) Documented evidence that the location of the Partnership's investment of an EB-5 Limited Partner's Capital Contribution is within a "targeted employment area" as defined by the USCIS; and (e) A copy of the Partnership's Limited Partnership Agreement, including the Schedules thereto, evidencing that the EB-5 Limited Partner has invested at least the EB-5 Minimum Capital Requirement and that such investment is "at risk."

12.11 **Severability.** If any provision of this Agreement is declared by any court of competent jurisdiction to be invalid or unenforceable such invalidity or unenforceability shall not affect the remaining provisions of this Agreement. If such invalidity or unenforceability is due to the court's determination that the provision's scope is excessively broad or restrictive under applicable law then in effect, the parties hereby jointly request that such provision be construed by modifying its scope so as to be enforceable to the fullest extent of applicable law then in effect. If any provision is held to be invalid or unenforceable with respect to a particular circumstance, such provision shall nevertheless remain in full force and effect in all other circumstances.

12.12 **No Waiver.** The waiver by any party hereto of any breach of any provision of this Agreement shall not be deemed a continuing waiver, and shall not affect any subsequent breach of the same or different provisions of this Agreement.

12.13  **Further Assurances.** Subject to the terms and conditions herein provided, each of the parties hereto agrees to use all commercially reasonable efforts to take, or cause to be taken, all action and to do, or cause to be done, all things necessary, proper or advisable to consummate and make effective as promptly as practicable the transactions contemplated by this Agreement, including using all commercially reasonable efforts to remove any legal impediment to the consummation or effectiveness of such transactions and to obtain any consents and approvals required under this Agreement.

12.14  **Neutral Construction.** The construction and interpretation of any clause or provision of this Agreement shall be construed without regard to the identity of the party that prepared this Agreement, and no presumption shall arise as a result that this Agreement was prepared by one party or the other.

12.15  **Attorneys' Fees.** In the event a dispute arises regarding this Agreement, the prevailing party shall be entitled to recover all attorneys' fees and expenses incurred.

12.16  **Injunctive Relief.** Without intending to limit the remedies available to either party, each party hereby acknowledges that a breach of any of the restrictive covenants contained in this Agreement may result in material and irreparable injury to the other party for which there is no adequate remedy at law, and that it may not be possible to measure damages for such injuries with reasonable certainty. In the event of such a breach or threat thereof, a party shall be entitled to obtain a temporary restraining order and/or a preliminary injunction restraining any other party from engaging in activities prohibited by this Agreement or such other relief as may be required to specifically enforce any of the covenants in this Agreement. The parties expressly agree that it shall not be a defense in such an injunction action that a party had previously breached this Agreement.

12.17  **Representation of Counsel.** All parties acknowledge that prior to executing this Agreement, they have been advised to seek independent legal counsel. In executing this Agreement, all parties represent and warrant that they relied exclusively upon the advice of their respective independent legal counsel and are not entering into this Agreement based upon any representation of any other party or any other party's counsel.

12.18  **Jurisdiction.** Any and all legal proceedings to enforce this Agreement, or to enforce or vacate any judgment or award rendered therein, whether in contract, tort, equity or otherwise, shall be brought in the state or federal courts sitting in the district encompassing Palm Beach County, Florida, the parties hereto hereby waiving any claim or defense that such forum is not convenient or proper. Each party hereby agrees that any such court shall have in personam jurisdiction over it, and agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner specified by law.

12.19  **Force Majeure.** Neither party shall be liable for any failure or delay in performance under this Agreement (other than for delay in the payment of money due and payable hereunder) to the extent said failures or delays are proximately caused by causes beyond that party's reasonable control and occurring without its fault or negligence, including, without limitation,

failure of suppliers, subcontractors, and carriers, or party to substantially meet its performance obligations under this Agreement, provided that, as a condition to the claim of nonliability, the party experiencing the difficulty shall give the other prompt written notice, with full details following the occurrence of the cause relied upon. Dates by which performance obligations are scheduled to be met will be extended for a period of time equal to the time lost due to any delay so caused.

12.20 **Notice.** All notices, requests, and other communications under this Agreement shall be in writing and shall be deemed to have been duly given (a) on the date of service, if personally served; (b) on the day of facsimile over telephone lines with same day first class mailing of both the original of the documents and a proof of transmission; (c) on the day after mailing if sent by express overnight air courier guaranteeing next day delivery with written evidence of delivery; or (d) five (5) days after the date of mailing if mailed by registered or certified mail, return receipt requested, postage prepaid, and addressed to the parties at the addresses listed above. Each party is required to notify the other party in the above manner of any change in address.

[SIGNATURE PAGE FOLLOWS]

NOT A CERTIFIED COPY

IN WITNESS WHEREOF, each party has executed this Limited Partnership Agreement on the day and year written below.

GENERAL PARTNER

_____     Date: _____

Joseph J. Walsh
For South Atlantic Regional Center, LLC

LIMITED PARTNER

_____     Date: _____

(Signature)

_____

(Written Name)

EXHIBIT

"J"

NOT A CERTIFIED COPY

Department of Homeland Security
U.S. Citizenship and Immigration Services

**I-797, Notice of Action**

| RECEIPT NUMBER WAC-12-904-60496 | CASE TYPE I526 IMMIGRANT PETITION BY ALIEN ENTREPRENEUR |
|---|---|
| NOTICE DATE September 13, 2013 | PAGE 1 of 1 | |

DAVID FERRICO
197 S FEDERAL HWY STE 200
BOCA RATON FL 33432

Notice Type: Approval Notice
Section: Investor - Target employment area;
203(b)(5)(C)(ii) INA

The above petition has been approved.

We have sent it to the Department of State National Visa Center (NVC), 32 Rochester Avenue, Portsmouth, NH 03801-2909. The petitioner has approved immigrant visa petitions that need consular action and also determines which consular post is the appropriate consulate to complete visa processing. The NVC will then forward the approved petition to that consulate.

This completes all USCIS action on this petition. You should allow a minimum of 30 days for Department of State processing before contacting the NVC. If you have not received any correspondence from the NVC within 30 days, you may contact the NVC by e-mail at NVCINQUIRY@state.gov. You will need to enter the USCIS receipt number from this approval notice in the subject line in order to receive information about your petition. You will need to include the Petitioner's name and date of birth, and the Applicant's name and date of birth, in the body of the e-mail.

The NVC will contact the person for whom you are petitioning to schedule further immigrant visa processing steps.

Please read the back of this form carefully for more information.

The approval of this visa petition does not in itself grant any immigration status and does not guarantee that the alien beneficiary will subsequently be found to be eligible for a visa, for admission to the United States, or for an extension, change, or adjustment of status.

THIS FORM IS NOT A VISA NOR MAY IT BE USED IN PLACE OF A VISA.

The Small Business Regulatory Enforcement and Fairness Act established the Office of the National Ombudsman (ONO) at the Small Business Administration. The ONO assists small businesses with issues related to federal regulations. If you are a small business with a comment or complaint about regulatory enforcement, you may contact the ONO at www.sba.gov/ombudsman or phone 202-205-2417 or fax.

NOTICE: Although this application/petition has been approved, USCIS and the U.S. Department of Homeland Security reserve the right to verify the information submitted in this application, petition and/or supporting documentation to ensure conformity with applicable laws, rules, regulations, and other authorities. Methods used for verifying information may include, but are not limited to, the review of public information and records, contact by correspondence, the internet, or telephone, and site inspections of businesses and residences. Information obtained during the course of verification will be used to determine whether revocation, rescission, and/or removal proceedings are appropriate. Applicants, petitioners, and representatives of record will be provided an opportunity to address derogatory information before any formal ...

Please see the additional information on the back. You will be notified separately about any other cases you filed.
U.S. CITIZENSHIP & IMMIGRATION SVC
CALIFORNIA SERVICE CENTER
P. O. BOX 30111
LAGUNA NIGUEL CA 92607-0111
Customer Service Telephone: (800) 375-5283

Form I-797 (Rev. 08/31/05) N

# EXHIBIT

# "K"

NOT A CERTIFIED COPY



NOT A CERTIFIED COPY

# LOAN DOCUMENTS

Palm House, LLC
214 Brazilian Ave., Suite 200
Palm Beach, FL 33480
(561) 832-8288

Dear Sirs,

We are pleased to inform you that Palm House Hotel, LLLP ("Lender") has approved your loan request. The loan ("Loan") is being made to Palm House, LLC, a Delaware limited liability company of 214 Brazilian Ave., Suite 200, Palm Beach, FL 33480 ("Borrower") to assist in the establishment of its commercial for-profit business within the Regional Center Territory (defined below) pursuant to the U.S. EB-5 Immigrant Investor Program ("Program").

The Borrower understands that the making of the Loan described herein is dependent upon the successful offering of Units of limited partnership interests by the Lender pursuant to the Program, including approval by the United States Citizenship and Immigration Services ("USCIS") of Alien Entrepreneur Petitions (I-526) pursuant to Section 203(b)(5) of the Immigration and Nationality Act, as amended. Lender agrees to make a Loan, subject to such conditions, and on the following terms and conditions:

Regional Center Territory:   Palm Beach County, Florida, USA.

Borrower:                    Palm House, LLC, a Delaware limited liability company of 214
                             Brazilian Ave., Suite 200, Palm Beach, FL 33480.

| | |
|---|---|
| Principal Loan Amount: | Minimum Loan Amount of $500,000<br>Maximum Loan Amount of $39,500,000 |
| Closing and First Advance: | The Loan shall be closed ("Closing Date") upon the date that the Minimum Loan Amount is available for advance (also referred to herein as the "First Advance"). |
| Term: | 5 years from the First Advance ("Maturity"). |
| Interest Rate: | Four and 22/100ths percent (4.22%) per annum. Interest shall be computed on the basis of a 365 day year and actual days elapsed. Upon default or after judgment has been rendered on this Note, the unpaid principal of all Advances shall bear interest at a rate which is two (2%) percent per annum greater than that which would otherwise be applicable. |
| Payment: | The balance of all Advances and all accrued unpaid interest thereon shall be repaid as follows: |



(1)    Borrower shall make interest only payments monthly on the balance of all Advances until the expiration of five years from the First Advance;

(2)    Upon Maturity, Borrower shall pay the then outstanding balance of all Advances and all accrued unpaid interest thereon.

(3)    Borrower shall make commercially reasonable efforts to repay the outstanding principal balance of all Advances and all accrued unpaid interest thereon upon Maturity (the "Initial Term"). If Borrower cannot refinance such amounts on commercially reasonable terms, or at all, within 30 days of the expiration of the Initial Term, or any Extension Period (as defined below), Borrower may, upon written notice to Lender, and in its sole discretion, extend the Maturity date for an additional one year period (each an "Extension Period"). During each Extension Period, Borrower shall make principal and interest payments on the outstanding principal balance of all Advances and all accrued unpaid interest thereon then outstanding. Principal and interest payments shall be calculated by amortizing the balance of all Advances and all accrued unpaid interest thereon over 15 years at the Interest Rate set forth above.

(4)    Borrower's obligation to make commercially reasonable efforts to repay the outstanding principal balance of all Advances and all accrued unpaid interest thereon after Maturity shall

continue thereafter until the balance of the Loan and all unpaid interest thereon is repaid in full.

| | |
|---|---|
| Estimated Use of Proceeds: | The proceeds of this Loan will be used for Palm House, LLC to develop the Project (described in the accompanying Business Plan), in Florida. |
| Pre-payment: | The Borrower may not, without Lender's prior express written consent, prepay this Note prior to Maturity. Thereafter, Borrower may prepay this Note, in whole or in part, at any time, without penalty or premium, and without prior written consent of Lender. |
| Collateral: | The Borrower shall execute in favor of the Lender a Loan and Security Agreement and Promissory Note (altogether the "Loan Documents") and provide Lender with a security interest in all assets of the Borrower as security for the satisfaction of the Loan (collectively, the "Collateral"). |
| Loan Advance: | The Loan shall be advanced to the Borrower from time to time as it becomes available to Lender and in accordance with the requirements of the Project (each an "Advance"). It shall be a condition of each advance that as of such time there shall not have been a material adverse change from the date of this commitment in the operations, assets or financial condition of the Borrower or its affiliates (considered as a whole). |
| Job Requirement: | The Borrower must create and maintain a minimum of ten (10) new full-time direct and/or indirect jobs per EB-5 investor through the end of two and one half (2.5) years from the date of the latest Advance. |
| | The total number of direct jobs will be supplied by the Borrower. The Borrower shall provide at six (6) month intervals the most recent quarterly DE-34 Employment Reports and Form I-9 Employment Eligibility Verification forms for each new employee reported. Using the direct jobs number, as verified by these documents, the total number of indirect jobs shall be calculated using the appropriate economic model (IMPLAN or RIMS II) and resulting employment multiplier, which demonstrates that for each direct job created, additional indirect jobs are created. Reference to Borrower's Economic Analysis shall confirm indirect employment creation. |
| Remedies: | If the Borrower shall fail to repay the Loan in accordance with the terms of the Loan Agreement, Lender shall have the right, at its |

NOT A CERTIFIED COPY

sole option, to declare the Loan in default and exercise remedies under the Loan Documents, including, but not limited to, foreclosure.

Reporting:                     The Borrower shall provide to Lender semi-annual unaudited statements in connection with the operations of the Borrower, no later than 30 days after the end of each semi-annual period and shall provide unaudited, accountant reviewed financial statements no later than 120 days after the Borrower's fiscal year-end. The Borrower shall provide at six (6) month intervals the most recent quarterly DE-34 Employment Reports and Form I-9 Employment Eligibility Verification forms for each new employee reported.

Satisfaction of Conditions:   The Borrower shall be obligated to draw down the Loan and shall use all reasonable best efforts to satisfy the conditions of advance thereof.

Documentation:                The Note, the documentation of the Collateral and such other documents as the Lender may require shall be in form satisfactory to the Lender and supported by such legal opinions as the Lender may require.

                              All of Lender's reasonable costs of preparing, reviewing and recording such documents shall be to the Borrower's account.

                              [SIGNATURE PAGE FOLLOWS]



Palm House Hotel, LLLP.
By South Atlantic Regional Center, LLC, its General Partner

By: _____     Dated: __1 / 21__, 20 13
     Joseph J. Walsh
     Managing Member

ACCEPTED
Palm House, LLC

By: _____     Dated: __1 / 20 /__, 20 13
Name: _Ryan Black_
Title: _Managing Member_
     _New York_

STATE OF FLORIDA:
     _New York_
COUNTY OF PALM BEACH:

On this, the _28th_ day of _January_, 20 13 before me, the undersigned officer, personally appeared _Ryan Black_ who acknowledged himself to be the President of Palm House, LLC, a Delaware limited liability company of 214 Brazilian Ave., Suite 200, Palm Beach, FL 33480, and that he as President, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of the company by himself as President. IN WITNESS WHEREOF, I have hereunto set my hand and notarial seal.

SYLVIA BLOOMFIELD
Notary Public, State of New York
No. 01BL6060027
Qualified in Queens County
Certificate filed in New York County
Commission Expires June 11, 2015

Notary Public
My Commission Expires: _June 11, 2015_

NOT A CERTIFIED COPY

LOAN DOCUMENTS
Palm House Hotel, LLLP — Palm House, LLC

5.

# LOAN AND SECURITY AGREEMENT

LOAN AND SECURITY AGREEMENT dated as of _____, 20___ between Palm House Hotel, LLLP (the "Lender") a Florida limited partnership of 197 S. Federal Highway, Suite 200, Boca Raton, FL 33432, and Palm House, LLC (the "Borrower") a Delaware limited liability company of 214 Brazilian Ave., Suite 200, Palm Beach, FL 33480. In order to induce the Lender to advance money or grant other financial accommodations on one or more occasions to the undersigned Borrower, the undersigned Borrower represents, warrants, covenants to and agrees with the Lender as follows:

**1. Definitions.** For purposes of this Agreement, unless the context clearly requires otherwise, in addition to the terms defined elsewhere herein, the following terms shall have the meanings set forth below:

*Advances* means the Borrower's Advances with the Lender referred to in Section 2.1 infra.

*Affiliate* means any person and/or entity, which directly or indirectly controls, or is controlled by, or is under common control, with the Borrower.

*Agreement* means this Loan and Security Agreement.

*Bank* means any other financial institution and/or third party providing credit or account services to Borrower in connection with the property.

*Collateral* means the Collateral described in Section 3, infra.

*Collateral Account* means the account of Borrower with the Lender established under Section 8.2 (c) infra.

*Control* shall be deemed to exist if any person, entity or corporation, or combination thereof, shall have possession, directly and/or indirectly, of the power to direct the management and/or policies of the Borrower or any person, entity, or corporation deemed to be an Affiliate of the Borrower, and shall be deemed to include any holder of 50 % or more of any stock or other interest in the Borrower or in any person, entity or corporation deemed to be an Affiliate of the Borrower, whether such holding is direct or indirect.

*Deposit* means any deposits, credits, securities, interests, participations, shares, collateral or property of the Borrower at any time now or thereafter in the possession, custody, safekeeping or control of or in transit to the Bank, or any other holder for the purpose of securing Inventory financing of Borrower, and the proceeds thereof.

*Deposit Accounts* means all deposit accounts maintained by the Borrower with the Bank for the purpose of financing renovation, expansion, furniture and fixtures of Borrower, and the proceeds thereof.

*Events of Default* shall have the meaning given such term in Section 8 of this Agreement infra.

*Indebtedness* means the total of all obligations of the Borrower to the Lender, whether current or long-term, including without limitation, guaranties, endorsements, or other arrangements whereby responsibility is assumed for the obligations of others.

*Inventory* means all inventory, including, without limitation, all inventory in the possession of others or in transit, all goods held for sale or lease or to be furnished under contracts for service or which have been so furnished, and completed and unshipped merchandise, and all products and proceeds (including insurance and condemnation proceeds) of the foregoing, as defined by the Uniform Commercial Code of the State of Florida, whether presently owned or hereafter acquired.

*Legal Requirements* means all applicable present and future statutes, laws, ordinances, rules and/or regulations of any governmental authority, all orders, writs, injunctions, decrees and judicial decisions and all covenants which bind or materially affect the Borrower or any part of its assets.

*Loan Account* means the accounting as to the Loans issued by the Lender pursuant to Section 2.2 infra.

*Loan Documents* means the following documents collectively: (i) This Agreement; (ii) Each Promissory Note of the Borrower to the Lender, including the Note (collectively the "Notes") evidencing the indebtedness for the Loan; (iii) All other documents and instruments heretofore or hereafter executed by the Borrower in favor of the Lender relating to the Loans, including any guaranty, pledge, security and/or subordination agreement and related Uniform Commercial Code financing statements; and (iv) In each case, the term "Loan Documents" and any reference herein to any particular Loan Document shall mean and include all amendments, modifications, replacements, renewals or extensions of any and all such documents, whenever executed.

*Loans* means: (i) Advances evidenced by the Note; and (ii) Any other loans made by the Lender to the Borrower after the date of this Agreement.

*Note* means the Borrower's Promissory Note evidencing indebtedness for Advances.

*Obligations* means all liabilities, duties and/or obligations now or hereafter owing from the Borrower to the Lender of whatever kind or nature, whether or not currently contemplated at the time of this Agreement, whether such obligations be direct or indirect, absolute or contingent or due or to become due, including all obligations of the Borrower, actual or contingent, in respect to the letters of credit or Lender's acceptances, issued by the Lender for the account of, or guaranteed by, the Borrower, including, without limitation all obligations of any partnership or joint venture as to which the Borrower, is or may become, liable, which term shall include all accrued interest and/or all costs and expenses, including reasonable attorneys' fees, costs and expenses relating to the appraisal and/or valuation of assets and all reasonable costs and expenses incurred or paid by the Lender in exercising, preserving, defending, collecting, enforcing or protecting any of its rights under the Obligations or in any litigation arising out of the transactions evidenced by the Obligations.

*Required Permits* means all permits, licenses, approvals, consents and waivers necessary pursuant to any Legal Requirement to be obtained from, or made by, any governmental authority for the ownership by the Borrower of its assets or for the conduct of its business.

*Termination Date* shall have the meaning set forth in Section 2.1 infra.

## 2. Loans.

### 2.1 Advances.

(a) Pursuant to this Agreement, and upon satisfaction of the conditions precedent in Section 5 hereof, during the period from the date hereof until the fifth anniversary of the date of the last Advance hereunder (as such date may be extended in writing from time to time, in the Lender's sole and absolute discretion, the "Termination Date"), the Lender shall make advances and the Borrower may borrow under this Agreement; provided, however, that the aggregate amount of all Advances at any one time outstanding shall not exceed $39,500,000 USD.

(b) All Advances under this Agreement shall be evidenced by the Note, shall bear interest and shall be due and payable in full on the Termination Date.

### 2.2. Loan Account.

(a) The Lender shall maintain an accounting (the "Loan Account") on its books to record: (i) all Loans; (ii) all payments made by the Borrower; and (iii) all other appropriate debits and credits as provided in this Agreement with respect to the Obligations. All entries in the Loan Account shall be made in accordance with the Lender's customary accounting practices as in effect from time to time. Borrower irrevocably waives the right to direct the application of any and all payments at any time or times thereafter received by the Lender from or on behalf of Borrower; and the Borrower hereby irrevocably agrees that the Lender shall have the continuing exclusive right to apply and to reapply any and all payments received at any time or times after the occurrence and during the continuance of an Event of Default against the Obligations in such manner as the Lender may deem advisable.

(b) The balance in the Loan Account, as set forth on the Lender's most recent printout or other written statement, shall be presumptive evidence of the amounts due and owing to the Lender by Borrower; provided, however, that any failure to so record or any error in so recording shall not affect the payment of the Obligations. Any periodic statement prepared by the Lender setting forth the principal balance of the Loan Account and the calculation of interest due thereon shall be subject to subsequent adjustment by the Lender but shall, absent manifest errors or omissions, be presumed final, conclusive and binding upon the Borrower, and shall constitute an account stated unless within thirty (30) days after receipt of such statement, the Borrower shall deliver to the Lender its written objection thereto specifying the error or errors, if any, contained in such statement. In the absence of a written objection delivered to the Lender as set forth above, the Lender's statement of the Loan Account shall be presumptive evidence against the Borrower of the amount of the Obligations and the burden of proof to show manifest errors or omissions shall be on the Borrower.

3.  Grant of Security Interest; Obligations Secured. The Borrower hereby grants to the Lender a subordinated security interest in all of the Borrower's present and future right, title and interest in real property, furniture and fixtures, inventory, deposit accounts and reserve bank accounts, lease reserve accounts wherever located and whether now existing or hereafter created or arising collectively called the "Collateral." Lender's security interest in the Collateral shall be subordinated only to the security interest therein of the Bank. The security interest in the Collateral granted herein is to secure the payment and performance of the Obligations. Lender is hereby authorized by Borrower to file any and all documents with the appropriate authorities as necessary to authenticate and/or perfect the security interests granted herein.

4.  Representations and Warranties. The Borrower hereby represents and warrants to the Lender (which representations and warranties will survive the delivery of this Agreement and the making of any advances of any Loan and shall be deemed to be continuing until all Loans are fully paid and this Agreement is terminated) that:

(a)  (i) The Borrower is, and will continue to be, duly organized and validly existing; the Borrower is in good standing under the laws of the State of Florida; (ii) the Borrower is qualified and in good standing to do business in all other jurisdictions in which the property owned, leased or operated by it or the nature of the business conducted by it makes such qualification necessary; (iii) the Borrower has the power to execute and deliver this Agreement and each Loan Document and to borrow hereunder; and (iv) the Borrower has all Required Permits, without unusual restrictions or limitations, to own, operate and lease its properties and to conduct the business in which it is presently engaged, all of which are in full force and effect.

(b)  The making and performance by the Borrower of this Agreement and the Loan Documents have been authorized by all necessary corporate action by its Board of Directors. The execution and delivery of this Agreement and the other Loan Documents, the consummation of the transactions herein and therein contemplated, the fulfillment of or compliance with the terms and provisions hereof and thereof, (i) are within its powers, (ii) will not violate any provision of law or of its organizational documents, or (iii) will not result in the breach of, or constitute a default under, or result in the creation of any lien, charge or encumbrance upon any property or assets of the Borrower pursuant to any indenture or Lender loan or credit agreement (other than pursuant to this Agreement and the other Loan Documents) or other agreement or instrument to which the Borrower is a party. To the Borrower's knowledge, no approval, authorization, consent or other order or registration or filing with any governmental body is required in connection with the making and performance of this Agreement.

(c)  Subject to any limitations stated, therein or in connection therewith, all information furnished, or to be furnished, by the Borrower pursuant to the terms hereof is, or will be at the time the same is furnished, accurate and complete in all material respects necessary to make the information furnished, in the light of the circumstances under which such information is furnished, not misleading.

(d)  The Borrower is in material compliance with all Legal Requirements applicable to it, its property or the conduct of its business, including, without limitation, those pertaining to or concerning the employment of labor, employee benefits, public health, safety and the environment.

(e) No proceedings by or before any private, public or governmental body, agency or authority and no litigation is pending, or, so far as is known to the Borrower, its officers or directors, or threatened against the Borrower, except such as are disclosed in any addendums attached hereto.

(f) No Event of Default has occurred and no event has occurred, or is continuing, which, pursuant to the provisions of Section 8, with the lapse of time and/or the giving of a notice specified therein, would constitute such an Event of Default..

(g) The Borrower shall use the proceeds of each Advance hereunder for purposes set forth in its business plan, including general commercial purposes related to job creation, purchase of the building, and furniture, fixtures, and equipment, provided that no part of such proceeds will be used, in whole or in part, for the purpose of purchasing or carrying any "margin stock" as such term is defined in Regulation U of the Board of Governors of the Federal Reserve System.

(h) This Agreement and all other Loan Documents, upon the execution and delivery thereof, will be legal, valid, binding and enforceable obligations of the Borrower as the case may be, in accordance with the terms of each; provided, however; that the Borrower's representation as to enforceability is qualified to the extent that enforcement of the rights and remedies created by this Agreement and the Loan Documents may be subject to applicable bankruptcy, insolvency, reorganization or similar laws affecting the rights of creditors and secured parties generally; and does not apply with respect to the availability of the remedy of specific performance, injunctive relief or any other equitable remedy.

(i) The Borrower has good and marketable title to its properties and assets, including all of the Collateral, subject to no mortgage, pledge, lien, security interest, encumbrance or other charge which is not set forth in any addendums attached hereto.

(j) The Borrower has filed all tax returns and reports required to be filed by it with all federal, state or local authorities and has paid in full, or made adequate provision for the payment of, all taxes, interest, penalties, assessments or deficiencies shown to be due or claimed to be due on or in respect of such tax returns and reports.

(k) The Borrower conducts its business solely in its own name without the use of a trade name or the intervention of, or through, any other entity of any kind, other than as disclosed on any addendums attached hereto. All books and records relating to the assets of the Borrower are located at the Borrower's chief executive office and its other places and locations where its assets are located.

(l) The Borrower and any of the Borrower's tenants have not given, nor have they received, any notice that: (i) there has been a release, or there is a threat of release, of toxic substances, oil or hazardous wastes on or from any real property owned or operated by the Borrower; (ii) the Borrower or any tenants may be, or is, liable for the costs of cleaning up or responding to a release of any toxic substances, oil or hazardous wastes; or (iii) any of such real property is subject to a lien for any liability arising from costs incurred in response to a release of toxic substances, oil or hazardous wastes.

**5. Conditions Precedent.**

**5.1  Conditions to Initial Advance.** In addition to any other conditions contained in this Agreement, the initial advance shall be subject to the following conditions precedent:

(a) *Proof of Action.* The Lender shall have received such documents evidencing the Borrower's power to execute and deliver this Agreement and the other Loan Documents as the Lender or its counsel shall request.

(b) *The Notes and Loan Documents.* The Borrower shall have delivered to the Lender the Notes, this Agreement, the other Loan Documents and such other documents as the Lender may request.

(c) *Liens to be Discharged.* The Lender shall be satisfied with arrangements made to pay, discharge and terminate debt owed, and security interests granted by, the Borrower to non-permitted debt and security interest holders.

**5.2  Conditions to Every Advance.** In addition to all other conditions contained in this Agreement, every advance shall be subject to the following conditions precedent that:

(a) *No Event of Default.* No Event of Default has occurred and no event shall have occurred, or be continuing, which, pursuant to the provisions of Section 8, with the lapse of time and/or the giving of a notice as specified therein, would constitute an Event of Default.

(b) *No Material Adverse Change.* There shall have been no material adverse change (as determined by the Lender) in the assets, liabilities, financial condition or business of the Borrower since the date of any financial statements delivered to the Lender before or after the date of this Agreement.

(c) *Representations and Warranties.* That the representations and warranties contained in Section 4 hereof and in each other Loan Document shall be true and correct in all material respects. Any request for a borrowing shall be deemed a certification by the Borrower as to the truth and accuracy in all material respects of the representations and warranties contained in Section 4 infra and in each other Loan Document as of the date of such request.

**6. Affirmative Covenants.** The Borrower covenants and agrees that from the date hereof until payment in full of all Loans and the performance of all Borrower's obligations hereunder, and under all other Loan Documents, is complete and this Agreement shall have terminated, unless the Lender otherwise consents in writing, the Borrower shall:

(a) Comply with all terms and conditions of this Agreement and the other Loan Documents and pay all material debts of the Borrower before the same shall become delinquent.

(b) The Borrower shall deliver to the Lender: (i) within 30 days after the close of each fiscal year, a balance sheet of the Borrower as of the close of each fiscal year and statements of income and retained earnings for that portion of the fiscal year-to-date then ended, prepared in conformity with GAAP; (ii)(1) within 90 days after the close of each fiscal year of the Borrower, in accountant-prepared draft form, and (2) within 30 days of completion, in final, unaudited

NOT A CERTIFIED COPY

accountant reviewed form, financial statements ("Financial Statements"), including, a balance sheet as of the close of such year and statements of income and retained earnings and cash flows for the year then ended, prepared in conformity with GAAP, applied on a basis consistent with that of the preceding year or containing disclosure of the effect on financial position or results of operations of any change in the application of accounting principles during the year; (iii) the other financial reports, if any, delivered to the owners of the Borrower, and upon request, such other information about the financial condition, business and operations of the Borrower, as the Lender may from time to time, reasonably request; and (iv) promptly upon becoming aware of any Event of Default, or any event which with the giving of notice or the passage of time would constitute an Event of Default, notice thereof, in writing. The Lender may modify or waive the performance of this section (b) in its sole discretion.

(c) (i) Keep its properties insured against fire and other hazards (so called "All Risk" coverage) in amounts and with companies satisfactory to the Lender to the same extent and covering such risks as is customary in the same or a similar business, but in no event in an amount less than the full insurable value thereof, which policies shall name the Lender as additional insured as its interest may appear, (ii) maintain public liability coverage against claims for personal injuries or death, and (iii) maintain all worker's compensation, employment or similar insurance as may be required by applicable law. Such All Risk property insurance coverage shall provide for a minimum of 30 days' written notice to the Lender of cancellation or modification. The Borrower agrees to deliver copies of all of the aforesaid insurance policies to the Lender. In the event of any loss or damage to any of its assets, including any collateral securing any Loan, the Borrower shall give prompt written notice to the Lender and to Borrower's insurers of such loss or damage and shall promptly file proofs of loss with said insurers.

(d) Comply with all Legal Requirements, including without limitation, those pertaining to or concerning the employment of labor, employee benefits, public health, safety and the environment. The Borrower shall pay all taxes, assessments, governmental charges or levies, or claims for labor, supplies, rent and other obligations made against the Borrower or any of its properties which, if unpaid, might become a lien or charge against it or any of its properties, except liabilities being contested in good faith with the prior written consent of the Lender and against which, if requested by the Lender, the Borrower shall maintain reserves in amount and in form (book, cash, bond or otherwise) satisfactory to the Lender.

(e) Maintain its chief executive office, principal places of business and locations of assets at the locations set forth in this Agreement. The Borrower shall promptly give the Lender written notice of any change in any of such addresses. All business records of the Borrower, including those pertaining to all Collateral, shall be kept at the said chief executive office of the Borrower, unless prior written consent of the Lender is obtained to a change of location.

(f) Allow the Lender, by or through any of its officers, agents, attorneys, or accountants designated by it, for the purpose of ascertaining whether or not each and every provision hereof and of any other Loan Document is being performed and for the purpose of examining and appraising the assets of the Borrower and the records relating thereto, to enter the offices of the Borrower to examine or inspect any of the properties, books and records or extracts therefrom and to make copies thereof and to discuss the affairs, finances and accounts thereof with the

Borrower and its accountants, at such reasonable times with advance notice to Borrower and as often as the Lender may reasonably determine. The Borrower will reimburse the Lender for all costs associated with its examination, appraisals and audits.

(g) Promptly advise the Lender of the commencement, or threat of litigation, including arbitration proceedings and any proceedings before any governmental agency, which might have a material adverse effect upon the assets, liabilities, financial condition or business of the Borrower.

(h) Promptly notify the Lender in writing of (i) any enforcement, cleanup, removal or other action instituted or threatened against the Borrower by any federal, state, county or municipal authority or agency pursuant to any public health, safety or environmental laws, rules, ordinances and regulations, (ii) any and all claims made or threatened by any third party against the Borrower or any real property owned or operated by any of them relating to the existence of, or damage, loss or injury from any toxic substances, oil or hazardous wastes or any other conditions constituting actual or potential violations of such laws, rules, ordinances or regulations and (iii) any enforcement or compliance action, instituted or threatened or claim made or threatened by any federal or state authority relating to the employment of labor or employee benefits.

(i) Continue to conduct the business of the Borrower as presently conducted, maintain its existence and maintain its properties in good repair, working order and operating condition. The Borrower shall promptly notify the Lender of any event causing material loss or unusual depreciation in the value of the business assets of the Borrower and the amount of same.

(j) The Borrower will notify the Lender promptly upon Borrower's entry into any transaction with any federal, state or local governmental entity which would give rise to an account receivable which would be subject to the Federal Assignment of Claims Act, or any other comparable federal, state or local legal requirement (herein a "Government Account") and the Borrower will execute all such instruments and take all such action as may be reasonably requested by the Lender so that all moneys due, or to become due, thereunder will be effectively assigned to the Lender and notice thereof given to such account debtor in accordance with the Federal Assignment of Claims Act, or any other comparable federal, state or local legal requirement.

(k) (i) The Borrower will keep the Collateral in good order and repair, will not waste or destroy the Collateral or any part thereof and will not knowingly use the Collateral in violation of any applicable Legal Requirement or any policy of insurance thereon. The Borrower will notify the Lender in writing promptly upon its learning of any event, condition, loss, damage, litigation, administrative proceeding or other circumstance which may materially and adversely affect the assets, liabilities, financial condition or business of the Borrower or the Lender's security interest in the Collateral. In the event that the Lender shall reasonably determine that there has been any loss, damage or material diminution in the value of the Collateral, the Borrower will, whenever the Lender requests, pay to the Lender such amount as the Lender shall have reasonably determined represents such loss, damage or material diminution in value (any such payment not to affect the Lender's security interest in such Collateral). (ii) Without limiting the generality of

the foregoing, the Borrower shall notify the Lender promptly of any claim or dispute that may materially affect the value of the Borrower's Accounts.

(l) The Borrower will, at such intervals as the Lender may request, notify the Lender, in a form satisfactory to the Lender, of all Collateral which has come into existence since the date hereof or the date of the last such notification, whichever is later.

(m) At its option, but without obligation to do so, the Lender may discharge taxes, liens, security interests or other encumbrances at any time levied or placed on the Collateral; may place and pay for insurance on the Collateral; may order and pay for the repair, maintenance and preservation of the Collateral; and may pay any fees for filing or recording such instruments or documents as may be necessary or desirable to perfect the security interest granted herein. The Borrower agrees to reimburse the Lender on demand for any payment made, or any expense incurred, by the Lender pursuant to the foregoing authorization, and all such payments and expenses shall constitute part of the principal amount of Obligations hereby secured and shall bear interest at the highest rate payable on the Obligations of the Borrower to the Lender.

(n) Deliver to Lender, and or its nominee(s), all information requested by it, or them, in connection with their reporting obligations to the U.S. Citizenship and Immigration Services and reasonably related to compliance with the EB-5 Immigrant Investor Pilot Program.

**7. Negative Covenants.** The Borrower covenants and agrees that until payment is made in full on all Loans, the performance of all Borrower's obligations hereunder and under all other Loan Documents is complete and this Agreement shall have terminated, unless the Lender otherwise consents in writing, the Borrower shall not directly or indirectly:

(a) Sell, lease, pledge, transfer or otherwise dispose of all or any of its assets (other than the disposition of inventory in the ordinary course of its business as presently conducted, or the sale of obsolete equipment or equipment no longer usable in the conduct of the Borrower's business), whether now owned or hereafter acquired except for liens or encumbrances required or permitted hereby or by any Loan Document.

(b) Make or consent to a material change in the ownership or capital structure of the Borrower, or make a material change in the management of the Borrower or in the manner in which the business of the Borrower is conducted.

**8. Events of Default; Remedies.**

**8.1 Events of Default.** The occurrence of any of the following events, for any reason whatsoever, shall constitute an "Event of Default" hereunder:

(a). (i) Failure to make due payment of principal and/or interest on any Loan provided such failure continues for a period of five (5) business days or (ii) failure by the Borrower, or any Affiliate, to make due payment of any other liability or obligation owing by the Borrower, or any Affiliate, to the Lender, now existing or hereafter incurred, whether direct or contingent (herein, "Other Lender Debt"); provided such failure continues for a period of five (5) business days; or

(b) Failure by the Borrower to observe or perform any covenant contained in (i) this Agreement, or any of their respective obligations under any other Loan Document or (ii) any document or instrument evidencing, securing or otherwise relating to any Other Lender Debt provided that if said failure is curable, it continues for a period of ten (10) days; or

(c) Any representation or warranty made by the Borrower to the Lender or any statement, certificate or other data furnished by any of them in connection herewith or with any other Loan Document proves at any time to be incorrect in any material respect; or

(d) A judgment or judgments for the payment of money shall be rendered against the Borrower, which shall remain unsatisfied and in effect for a period of sixty (60) days without a stay of execution; or

(e) Any levy, seizure, attachment, execution or similar process shall be issued or levied on any of the Borrower's property, which process could have a material adverse effect on the business of the Borrower in the Lender's reasonable judgment; or

(f) The Borrower shall (i) apply for or consent to the appointment of a receiver, conservator, trustee or liquidator of all or a substantial part of any of its assets; (ii) be unable, or admit in writing its inability, to pay its debts as they mature; (iii) file or permit the filing of any petition, case, arrangement, reorganization, or the like under any insolvency or Bankruptcy law, or the adjudication of it as Bankrupt, or the making of an assignment for the benefit of creditors or the consenting to any form of arrangement for the satisfaction, settlement or delay of debt or the appointment of a receiver for all or any part of its properties; or (iv) take any action for the purpose of effecting any of the foregoing; or

(g) An order, judgment or decree shall be entered, or a case shall be commenced, against the Borrower, without the application, approval or consent of the Borrower by, or in, any court of competent jurisdiction, approving a petition or permitting the commencement of a case seeking reorganization or liquidation of the Borrower or appointing a receiver, trustee, conservator or liquidator of the Borrower, or of all or a substantial part of its assets and the Borrower, by any act, indicates its approval thereof, consent thereto, or acquiescence therein, or, in any event, such order, judgment, decree or case shall continue unstayed, or undismissed, and in effect for any period of ninety (90) consecutive days; or

(h) The Borrower shall dissolve or liquidate, or be dissolved or liquidated, or cease to exist legally, or merge or consolidate with, or be merged or consolidated with or into any other entity; or

(i) Failure by the Borrower to pay or perform any other Obligation, whether contingent or otherwise, or if any such other Obligation shall be accelerated, or if there exists any event of default under any instrument, document or agreement governing, evidencing or securing such other Obligation; or

(j) The Lender reasonably believes that any material adverse change in the assets, liabilities, financial condition or business of the Borrower has occurred since the date before or after the date of this Agreement; or

(k) The Borrower sells, liquidates, transfers or otherwise disposes of an asset not in strict accordance with the terms of this Loan Agreement; or

(l) If at any time the Lender reasonably believes in good faith that the prospect of payment of any Obligation or the performance of any agreement of the Borrower is materially impaired, or that there is such a change in the assets, liabilities, financial condition or business of the Borrower as the Lender believes in good faith materially impairs the Lender's security or increases its risk of non-collection, or the Borrower fails to create (i) the required number of jobs under the commitment letter of even date herewith (the "Commitment Letter") or (ii) the conditions required for such job creation have not been satisfied, if the Borrower is not required to create direct jobs.

**8.2 Remedies.**

(a) Upon the occurrence of any Event of Default, and at any time thereafter, the availability of advances hereunder shall, at the option of the Lender, be deemed to be automatically terminated and the Lender, at its option, may declare one or more, or all, of the Loans outstanding hereunder, together with accrued interest thereon and all applicable late charges and surcharges and all other liabilities and obligations of the Borrower to the Lender, to be forthwith due and payable, whereupon the same shall become forthwith due and payable; all of the foregoing without presentment or demand for payment, notice of non-payment, protest or any other notice or demand of any kind, all of which are expressly waived by the Borrower;

(b) The Lender shall have the following additional rights and remedies:

(i) All of the rights and remedies of a secured party under the Uniform Commercial Code or any other applicable law or at equity, all of which rights and remedies shall be cumulative and non-exclusive, to the extent permitted by law, in addition to any other rights and remedies contained in this Agreement, any other Loan Document or in any document, instrument or agreement evidencing, governing or securing the Obligations.

(ii) The right to (1) take possession of the Collateral, without resort to legal process and without prior notice to Borrower, and for that purpose Borrower hereby irrevocably appoints the Lender its attorney-in-fact to enter upon any premises on which the Collateral or any part thereof may be situated and remove the Collateral therefrom, or (2) require the Borrower to assemble the Collateral and make it available to the Lender in a place to be designated by the Lender, in its sole discretion, or (3) instruct the Bank, without further consent of Borrower, to transfer the balance of all deposit accounts of Borrower to Lender and to thereafter treat

Lender as the owner of such deposit accounts and the Bank's customer with respect to such deposit account. The Borrower shall make available to the Lender all premises, locations and facilities necessary for the Lender's taking possession of the Collateral or for removing or putting the Collateral in saleable form.

(iii) The right to sell or otherwise dispose of all or any part of the Collateral by one or more public or private sales. The Lender will give the Borrower at least five (5) business days' prior written notice of the time and place of any public sale thereof, or of the time after which any private sale or any other intended disposition (which may include, without limitation, a public sale or lease of all or part of the Collateral) is to be made. The Borrower agrees that five (5) business days is a reasonable time for any such notice. The Lender, its employees, attorneys and agents may bid and become purchasers at any such sale, if public, and may purchase at any private sale any of the Collateral that is of a type customarily sold on a recognized market or which is subject to widely distributed standard price quotations. Any public or private sale shall be free from any right of redemption, which the Borrower hereby waives and releases. If there is a deficiency after such sale and the application of the net proceeds from such sale, the Borrower shall be responsible for the same, with interest.

(iv) The right, after an Event of Default shall have occurred (and Borrower irrevocably appoints the Lender as attorney-in-fact for the Borrower for this purpose, such appointment being coupled with an interest), upon notice to Borrower and without resort to legal process, to notify the persons liable for payment of all accounts (as defined in the Uniform Commercial Code) at any time and direct such persons to make payments directly to the Lender, and to perform all acts the Borrower could take to collect on such accounts, including, without limitation, the right to notify postal authorities to change the address for delivery, open mail, endorse checks, bring collection suits, and realize upon Collateral securing such accounts. At the Lender's request, all bills and statements sent by the Borrower to the persons liable for payments of such accounts shall state that they have been assigned to, and are solely payable to, the Lender, and Borrower shall direct persons liable for the payment of such accounts to pay directly to the Lender any sums due or to become due on account thereof.

(v) The right from and after an Event of Default, from time to time without demand or notice, and without being required to look first to any other Collateral to apply and set off any or all of the Deposits against any and all Obligations even though such Obligations are unmatured.

(c) Collateral Account. Upon an Event of Default:

(i) The Borrower shall direct each of its creditors and/or customers that all payments or other distributions of whatever kind made to the Borrower shall be made to a post office box designated by the Lender (the "Lock Box"). The Lender shall have sole access to the Lock-Box, and is hereby authorized by the Borrower to open all mail addressed to the Lock Box, and to apply all proceeds received therein, as herein provided. If Borrower should receive itself any such payments, the Borrower shall hold all such collections in trust for the Lender without commingling the same with other funds of the Borrower and will promptly, on the day of receipt thereof, transmit such collections to the Lender in the identical form in which

they were received by the Borrower, with such endorsements as may be appropriate, accompanied by a report, in a form approved by the Lender, showing the amount of such collections and such other information as the Lender may require.

(ii) All collections in the form of cash, checks or other demand remittances so received by, or transmitted to, the Lender shall upon receipt by the Lender be credited to the Collateral Account established hereunder, subject to subsection (c) below. Each such credit shall be conditional upon final payment to the Lender of all items giving rise to such credit, and, if any item is not so paid, the credit for such item shall be reversed whether or not the item has been returned and the amount thereof, in the Lender's discretion may be charged to any operating account of Borrower with the Lender. All collections in the form of notes, drafts, acceptances or other instruments not payable on demand shall be delivered by the Borrower to the Lender. When such items are collected, the amount thereof shall be credited by the Lender to the Collateral Account, with appropriate notice to the Borrower. Until such items are collected, the Borrower will not, without the consent of the Lender, make any entry on its books or records indicating that the same were received in payment of the receivable giving rise thereto.

(iii) At such intervals as the Lender may deem appropriate, the Lender shall charge and apply the full amount then on deposit in the Collateral Account in reduction or payment of Borrower's Loan Account, such application to be subject to the final payment in cash of all items theretofore credited to such Collateral Account.

9. **Lien and Set Off.** The Borrower hereby gives the Lender a lien and right of set off for all of Borrower's liabilities and obligations to the Lender upon and against all Collateral now or hereafter in the possession, custody, safekeeping or control of the Lender or in transit to it.

10. **Miscellaneous.**

10.1 **Certain Waivers.** Borrower hereby waives diligence, demand, presentment for payment, notice of nonpayment, protest and notice of dishonor, and hereby agrees to any extension or delay in the time for payment or enforcement, to renewal of any Loan and to any substitution or release of any Collateral, all without notice and without any effect on their liabilities. Any delay on the part of the Lender in exercising any right hereunder, or under any other Loan Document which may secure any Loan, shall not operate as a waiver of any such right, and any waiver granted for one occasion shall not operate as a waiver in the event of a subsequent default. The Lender may revoke any permission or waiver previously granted to Borrower, such revocation to be effective prospectively when given, whether given orally or in writing. The rights and remedies of the Lender shall be cumulative and not in the alternative, and shall include all rights and remedies granted herein, in any other Loan Document and under all applicable laws.

LENDER AND BORROWER IRREVOCABLY WAIVE ALL RIGHTS TO A TRIAL BY JURY IN ANY PROCEEDING HEREAFTER INSTITUTED BY OR AGAINST THE LENDER OR BORROWER IN RESPECT TO THIS AGREEMENT, THE NOTES OR ANY OTHER LOAN DOCUMENT.

BORROWER (i) ACKNOWLEDGES THAT THE TRANSACTION OF WHICH THIS AGREEMENT IS A PART IS A COMMERCIAL TRANSACTION AND (ii) TO THE EXTENT PERMITTED BY ANY STATE OR FEDERAL LAW, WAIVES ANY RIGHT TO PRIOR NOTICE OF, AND A HEARING ON, THE RIGHT OF ANY HOLDER OF THE NOTES, TO ANY REMEDY OR COMBINATION OF REMEDIES THAT ENABLES SAID HOLDER, BY WAY OF ATTACHMENT, FOREIGN ATTACHMENT, GARNISHMENT OR REPLEVIN, TO DEPRIVE THE BORROWER OF ANY OF THEIR PROPERTY, AT ANY TIME, PRIOR TO FINAL JUDGMENT IN ANY LITIGATION INSTITUTED IN CONNECTION WITH THIS AGREEMENT.

10.2  Notices. All notices, requests or demands to or upon a party to this Agreement shall be given or made by the other party hereto in writing, in person or by depositing in the mail, postage prepaid, return receipt requested, addressed to the addressee at the address set forth herein as the Borrower's chief executive office or to such other addresses as such addressee may have designated in writing to the other party hereto.

10.3  Expenses; Additional Documents. The Borrower will pay all taxes levied or assessed upon the principal sum of the advances made against the Lender, all fees of the Lender for its Lock-Box services and all other fees provided herein, and all expenses arising out of the preparation, amendment, waiver, modification, protection, collection and/or other enforcement of this Agreement, or any other Loan Document, or of any Collateral or security interest now or hereafter granted to secure the Loans or mortgage, security interest or lien, granted hereunder or under any other Loan Document (including, without limitation, attorneys' fees). The Borrower will, from time to time, at its sole expense, execute and deliver to the Lender all such other and further instruments and documents, and take or cause to be taken all such other and further action, as the Lender shall request in order to effect and confirm or vest more securely all rights contemplated by this Agreement or any other Loan Document.

10.4  Addendums. Any Addendums that are attached hereto are and shall constitute a part of this Agreement.

10.5  Governing Law; Consent to Jurisdiction. This Agreement, the other Loan Documents and the rights and obligations of the parties hereunder, and thereunder, shall be construed and interpreted in accordance with the laws of the State of Florida, USA. The Borrower agrees that the execution of this Agreement and the other Loan Documents, and the performance of the Borrower's obligations hereunder, and thereunder, shall be deemed to have a Florida situs and the Borrower shall be subject to the personal jurisdiction of the courts of Florida with respect to any action the Lender or its successors or assigns may commence hereunder or thereunder. Accordingly, the Borrower hereby specifically and irrevocably consents to the jurisdiction of the courts of Florida with respect to all matters concerning this Agreement, the other Loan Documents, the Notes or the enforcement of any of the foregoing.

10.6  Survival of Representations. All representations, warranties, covenants and agreements herein contained or made in writing in connection with this Agreement shall survive the execution and delivery of the Loan Documents and shall continue in full force and effect until all amounts payable on account of all Loans, the Loan Documents and this Agreement shall have been paid in full and this Agreement has been terminated.

**10.7 Integration; Severability; Successors.** This Agreement is the final, complete and exclusive statement of the terms governing this Agreement. If any provision of this Agreement shall to any extent be held invalid or unenforceable, then only such provision shall be deemed ineffective and the remainder of this Agreement shall not be affected. The provisions of this Agreement shall bind the heirs, executors, administrators, assigns and successors of the Borrower and shall inure to the benefit of the Lender, its successors and assigns.

**10.8 Determinations as to Compliance.** All documents and assurances of any type related to the fulfillment of any condition or compliance with any provision hereof or of any other Loan Document and all other matters related to the Loans are subject to the prior approval and satisfaction of the Lender, its counsel and other consultants.

**10.9 Termination of this Agreement.** This Agreement shall terminate upon the written agreement of the parties hereto to the termination of any privilege of the Borrower to take advances and/or full and final payment of all amounts with respect to all Loans or amounts otherwise due hereunder and under the other Loan Documents.

**10.10 Attorney's Fees.** Lender shall be entitled to recover all reasonable attorney's fees and expenses incurred by it in connection with enforcement of this Loan Agreement, including costs of collection.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the undersigned executes this Agreement as an instrument under seal as of the date first set forth above.

LENDER
Palm House Hotel, LLLP
By South Atlantic Regional Center, LLC, its General Partner.

By: _____          Dated: __1__/ 21 ____, 20 13.
    Joseph J. Walsh
    Managing Member

BORROWER
Palm House, LLC

By: _____          Dated: 1/20/ ____, 20 13.
Name: Ryan Black
Title: Managing Member

LOAN DOCUMENTS
Palm House Hotel, LLLP — Palm House, LLC

NOT A CERTIFIED COPY

# PROMISSORY NOTE

_____, 20___

For value received, **Palm House, LLC** (the "Borrower"), a Delaware limited liability company of 214 Brazilian Ave., Suite 200, Palm Beach, FL 33480, hereby promises to pay to the order of **Palm House Hotel, LLLP,** a Florida limited partnership of 197 S. Federal Highway, Suite 200, Boca Raton, FL 33432 (the "Lender"); or at such other address as the holder hereof may designate, the principal amount of all advances made by the Lender to the Borrower hereunder, in lawful money of the United States. This Note evidences the Borrower's indebtedness under a Loan and Security Agreement with Lender (the "Loan Agreement"), as may be amended from time to time. During the period from the date hereof until the fifth anniversary ("Termination Date"), of the date of the first Advance hereunder ("First Advance"), the Lender may make advances ("Advances") from time to time thereunder and the Borrower may borrow; provided, however, that the aggregate amount of all advances at any one time outstanding shall not exceed $39,500,000 USD; and provided, further, that the Lender's obligation to make advances and the Borrower's right to borrow are subject to the terms, conditions and limitations contained in this Note and the Loan Agreement.

The outstanding principal of all Advances hereunder will bear interest at the rate per annum of 4.22%. Interest shall be computed on the basis of a 365 day year and actual days elapsed. Upon default or after judgment has been rendered on this Note, the unpaid principal of all Advances shall bear interest at a rate which is two (2%) percent per annum greater than that which would otherwise be applicable.

The balance of all Advances and all accrued unpaid interest thereon shall be repaid as follows. Upon and after the First Advance hereunder, Borrower shall make payments of interest only on the outstanding principal balance of all Advances at the rate set forth above and until expiration of 5 years from the First Advance hereunder (the "Initial Term").

Upon the Termination Date, and within 30 days thereafter, the outstanding principal balance of all Advances and all accrued interest then outstanding shall be due. Borrower shall make commercially reasonable efforts to repay the outstanding principal balance of all Advances and all accrued unpaid interest thereon after the Termination Date. If Borrower cannot sell or refinance such amounts on commercially reasonable terms, or at all, prior to the end of the Initial Term, Borrower may, upon written notice to Lender and in Borrower's sole discretion, extend the term of this Note for an additional one year period (each an "Extension Period") subject to all other terms of this Note and the Loan Agreement and provided Borrower is not otherwise in default hereunder. During each Extension Period, Borrower shall make interest payments on the outstanding principal balance of all Advances and all accrued unpaid interest thereon then outstanding.

All payments hereunder shall be applied first to the payment of interest on the unpaid principal of all Advances outstanding under this Note, and then to the balance on account of the principal of all Advances due under this Note.

Borrower shall pay Lender a late charge of five (5%) percent of any amount due to the Lender which is not paid or reimbursed by the Borrower within 5 business days of the due date thereof to defray the extra cost and expense involved in handling such delinquent payment and the increased risk of non-collection. The minimum late charge shall be $100.00.

If at any time, the rate of interest, together with all amounts which constitute interest and which are reserved, charged or taken by the Lender as compensation for fees, services or expenses incidental to the making, negotiating or collection of any advance evidenced hereby, shall be deemed by any competent court of law, governmental agency or tribunal to exceed the maximum rate of interest permitted to be charged by the Lender to the Borrower, then, during such time as such rate of interest would be deemed excessive, that portion of each sum paid attributable to that portion of such interest rate that exceeds the maximum rate of interest so permitted shall be deemed a voluntary prepayment of principal.

The Borrower may not, without Lender's prior express written consent, prepay this Note prior to the expiration of the Initial Term. Thereafter, Borrower may prepay this Note, in whole or in part, at any time, without penalty or premium, and without prior written consent of Lender.

Upon the happening of any Event of Default (as defined in the Loan Agreement), all Advances outstanding hereunder, together with accrued interest thereon, shall, at the option of the Lender, accelerate and become immediately due and payable and any privilege of the Borrower to take or request advances hereunder shall terminate without demand or notice of any kind. Failure to exercise such option shall not constitute a waiver of the right to exercise the same in the event of any subsequent default. This Note has been executed and delivered in accordance with the Loan Agreement of even date herewith between the Borrower and the Lender, incorporated herein by reference, which sets forth further terms and conditions upon which the entire unpaid principal hereof and all interest hereon may become due and payable prior to the Termination Date, and generally as to further rights of the Lender and duties of the Borrower. All advances made by the Lender to the Borrower shall be evidenced by the books and records of the Lender which shall be conclusive, absent manifest error.

The Borrower agrees to pay all taxes levied or assessed upon the outstanding principal against any holder of this Note and to pay all reasonable costs, including attorneys' fees, costs relating to the appraisal and/or valuation of assets and all other costs for expenses incurred in the collection, protection, defense, preservation, and/or enforcement of this Note or any endorsement of this Note or in any litigation arising out of the transactions of which this Note or any endorsement of this Note is a part.

The Borrower hereby gives the Lender a lien and right of set off for all of Borrower's liabilities and obligations subject to any priority liens of record upon and against all the deposits, credits, collateral and property of the Borrower, now or hereafter in the possession, custody, safekeeping or control of the Lender or in transit to it. At any time, without demand or notice, and without being required to look first to any other security, the Lender may set off the same, or any part thereof, and apply the same to any obligation of the Borrower even though unmatured.

THE LENDER AND THE BORROWER IRREVOCABLY WAIVE ALL RIGHT TO A TRIAL BY JURY IN ANY PROCEEDING HEREAFTER INSTITUTED BY OR AGAINST THE LENDER OR THE BORROWER IN RESPECT TO THIS NOTE OR ARISING OUT OF ANY DOCUMENT, INSTRUMENT OR AGREEMENT EVIDENCING, GOVERNING OR SECURING THIS NOTE, INCLUDING THE AFORESAID AGREEMENT.

THE BORROWER(1) ACKNOWLEDGES THAT THE LOAN EVIDENCED BY THIS NOTE IS PART OF A COMMERCIAL TRANSACTION AND (2) TO THE EXTENT PERMITTED BY ANY STATE OR FEDERAL LAW, WAIVES THE RIGHT BORROWER MAY HAVE TO PRIOR NOTICE, OF AND A HEARING ON, THE RIGHT OF ANY HOLDER OF THIS NOTE TO ANY REMEDY OR COMBINATION OF REMEDIES THAT ENABLES SAID HOLDER, BY WAY OF ATTACHMENT, FOREIGN ATTACHMENT, GARNISHMENT OR REPLEVIN, TO DEPRIVE THE BORROWER OF ANY OF BORROWER'S PROPERTY, AT ANY TIME, PRIOR TO FINAL JUDGMENT IN ANY LITIGATION INSTITUTED IN CONNECTION WITH THIS NOTE.

The Borrower hereby waives diligence, demand, presentment for payment, notice of nonpayment, protest and notice of protest, and notice of any renewals or extensions of this Note, and all rights under any statute of limitations, and agrees that the time for payment of this Note may be changed and extended at the Lender's sole discretion, without impairing the Borrower's liability hereon, and further consents to the release of all, or any part, of the security for the payment hereof at the discretion of the Lender. Any delay on the part of the Lender in exercising any right hereunder shall not operate as a waiver of any such right, and any waiver granted for one occasion shall not operate as a waiver in the event of any subsequent default.

The making of an advance at any time shall not be deemed a waiver of, or consent, agreement or commitment to or by the Lender to the making of any future advance to the Borrower.

If any provision of this Note shall, to any extent, be held invalid or unenforceable, then only such provision shall be deemed ineffective and the remainder of this Note shall not be affected.

This Note shall bind the heirs, executors, administrators, successors and assigns of the Borrower and shall inure to the benefit of the Lender, its successors and assigns.

This Note is secured in accordance with the terms of the Loan Agreement of even date herewith between the Lender and the Borrower, and by other security.

This Note is executed as a sealed instrument and shall be governed by, and construed in accordance with, the laws of the State of Florida, USA.

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, the undersigned executes this Agreement as an instrument under seal as of the date first set forth above.

LENDER:
Palm House Hotel, LLLP
By South Atlantic Regional Center, LLC, its General Partner

By: _____     Dated: 1/20, 2013.
Joseph J. Walsh
Managing Member

BORROWER
Palm House, LLC

By: Ryan Black     Dated: January 20, 20 13
Name: Ryan Black
Title: Managing Member

                    New York

STATE OF FLORIDA ::
                    New York
COUNTY OF PALM BEACH:

On this, the 20th day of January, 2013 before me, the undersigned officer, personally appeared Ryan Black who acknowledged himself to be the President of Palm House, LLC, a Delaware limited liability company of 214 Brazilian Ave., Suite 200, Palm Beach, FL 33480, and that he as President, being authorized to do so, executed the foregoing instrument freely and voluntarily for the purposes therein contained by signing the name of the company in his capacity as President. IN WITNESS WHEREOF, I have hereunto set my hand and notarial seal.

SYLVIA BLOOMFIELD
Notary Public, State of New York
No. 01BL6060027
Qualified In Queens County
Certificate filed in New York County
Commission Expires June 11, 2015

Notary Public
My Commission Expires: June 11, 2015

NOT A CERTIFIED COPY





# THE PALM HOUSE
### A Luxury Condominium Hotel and Spa on Palm Beach



棕榈滩公馆

棕榈滩岛上最后一座批准的酒店

NOT CERTIFIED



# THE PALM HOUSE

# 目录

1. 地理位置及优势 .................................... P3 – P6
2. 岛上名流及地产 .................................... P7 – P10
3. 项目介绍 ............................................... P11 – P35
   a 简介 .................................................... P11 – P12
   b 开发商 ................................................ P13 – P23
   c 建筑商 ................................................ P24
   d 设计师 ................................................ P25 – P26
   e 酒店总经理 ......................................... P27
   f 律师团队 ............................................. P28
*** g 资金结构 ............................................. P29 – P30
*** h 投资明细 ............................................. P31 – P32
*** i 退出机制 ............................................. P33
*** j 创造就业机会 ..................................... P34
   k 投资者奖励 ......................................... P35
4. 评估报告 ............................................... P36 – P38
5. 工程文件及图片 .................................... P39 – P43

标榜建华公馆一誉华会所，标榜后一栋投建的酒店

NOT A CERTIFIED COPY

# THE PALM HOUSE

*A Palm Beach Residential Hotel Inspired By ...*

倍俪棕美国东海岸的奢华之地



1. 2011年彭博社评对其以美国最富富裕的地区；

2. 3万人口，都是富人、退休富人及其佣人；

3. 27个10亿级富豪的住所；

4. 美国东海岸富人家庭的居住和度假去处，强大的豪宅及豪华酒店需求。



德俪德美棕一高奢生会所 棕榈格调 玉兰惠玉丽













NOT A CERTIFIED COPY

THE PALM HOUSE
A luxury Condominium Hotel and Spa on Palm Beach









NOT A CERTIFIED











THE PALM HOUSE

A Luxury Condominium Hotel and Spa in Palm Beach

模擬建築公開一實景全所 標相隔島上幕后一面約建約酒店

高宅不是相限相限公值

NOT AN OFFICIAL COPY

NOT A CERTIFIED COPY














NOT A CERTIFIED COPY





THE PALM HOUSE
*A Hotel Philanthropic Bed and Spa vacation Resort*

德福雅上多层安全到民众富豪

億萬富翁公寓一富豪年会所 佛州棕榈岛上最令人羡慕的豪华西洋楼



Donald Trump's Mansion $9500万

1236 Ocean Blvd
$8150万 前高盛合伙人



$5200万 Howard Stern电台主播

150 South Ocean Blvd, $2600万
David Koch of Koch Industries
(美国第二大私人企业，2012年福布斯第17位富豪)



Case 9:16-cv-80831-KAM Document 157-2 Entered on FLSD Docket 03/10/2019 Page 12 of 60
150
Case 9:16-cv-80831-KAM Document 157-2 Entered on FLSD Docket 07/26/2020 Page 149 of 160





项目介绍

NOT A CERTIFIED COPY

THE PALM HOUSE
A luxury Condominium Located Near Palm Beach

棕榈滩公馆

棕榈滩公馆—豪华会馆—坐落于棕榈滩岛上最后一部份的建筑酒店



# THE PALM HOUSE

棕榈滩公馆项目介绍

- 128000平方英尺；
- 79个单位的共管式奢华会所酒店；
- 坐落于棕榈滩岛上；
- 顶级富豪私密会所；
- 世界级富豪和名人的家；
- 工程完成85%，施工正在稳步进行；
- 岛上最后一个被批准修建的酒店。





棕榈滩公馆一管华会所 棕榈滩岛上最后一座预议建酒店



NOT A CERTIFIED