





# 1998年美国年度企业地产知名地产商 THE PARAMHOUSE



## Robert V. Matthews
### Matthews Ventures Holdings, LLC主席

**过去25年他曾控股的著名企业**
a. Matthews Hospitality Group, LLC
b. Echelon Engineering & Construction, Inc.
c. Stromberg, LLC
d. Bentley Churchill Acquisitions, LLC
e. Fabricated Metal Products, Inc.
f. Palm Beach Marina Holding Corp.
g. Matthews Ventures Holdings, LLC

**他旗下的慈善项目**
a. American Cancer Society
b. American Indian Archaeological Institute
c. American Ireland Fund
d. Children's Home Society
e. Dana-Farber Cancer Institute
f. Foundation for the Advancement of Catholic Schools
g. March of Dimes

**闻名美国地产界的著名案例：**
1994年收购New Haven一幢30万平方尺的写字楼，一年时间将其出租率从18%提升至93%
用50万美金收购New Haven天治大街300号一幢56万平方尺的写字楼，两年后用55倍的价格出售

**Matthews Ventures Holdings**目前在全美持有6亿美元的豪华公寓和酒店资产组合

MVH 是HIG Acquisitions LLC主要控股股东,该私募基金致力于收购全球的5星级酒店资产以重新定位；
Matthews Hospitality Group，一家致力于收购豪华物业以改善其经营的基金.Matthews 刚完成其家族慈善基金Matthews family foundation 的募集.

德捃顶洜澐一臀华会所 德拥洜澐一幢顶级私洜澐酒店

NOT A CERTIFIED COPY

Case 9:13-cv-80337-KAM Document 1-57 Entered on FLSD Docket 03/07/2013 Page 16 of 160

1993年美国年度企业家知名地产商 — THE PALM BEACH POST



















Entrepreneur rides in to rescue aging factory

Money talks

樱桃湖别墅会所一会所将会所 樱桃湖湖岛最长一届北湖的墅店

NOT THE UNITED COPY





THE PALM HOUSE

a Luxury Condominium Hotel on West Palm Beach

Point Breeze on Nantucket Island











DOCKET ALARM



NOT A CERTIFIED COPY

THE PALM HOUSE

Four Seasons French Polynesia, Bora Bora















THE PALM HOUSE
A Luxury Condominium Hotel and Spa on Palm Beach

Hyatt Regency Cartagena Hotel and Residences







CERTIFIED COPY













THE PALM HOUSE
A Luxury Condominium located at 90 on Palm Beach

Cartagena Bodegon Boutique

我交两顺下的环球英华酒店

模拟雅建会馆·睿睿华会所·徐博坞岛上最后一座坞律的酒店

AQUA CERTIFIED COPY

NOT A CERTIFIED COPY





THE PALM HOUSE
Natural conservation built and preservation.

Galapagos Eco-Luxury Resort Santa Cristobal Island

開發商旗下的環球渡假酒店









樓侗漾公偏一書華會所 依傍遊弋上岸后一屋挨挨建的酒店





# THE PALM HOUSE
A Phase Condominium Residential Resort Palm Beach

亦交而媲下顿环球豪华酒店

## Casi Cielo Panama





标准建筑公寓一手华会所 标准建别墅 巴厘上 里内 似 进口 道理

NOT A CERTIFIED COPY





# THE PALM HOUSE

A luxury and romantic hotel in Spa on Palm Beach







**Delano Hotel Mars de Indias Cartagena/Greg Norman Golf-Delano Luxury Resort-commence summer 2014 Mexico**

NOT A CERTIFIED COPY





THE PALM HOUSE

A luxury Condominium Hotel on the Palm Beach



Marriott Courtyard Hotel (Chelsea, NY), the newest Courtyard in Manhattan
Just completed



NOT CERTIFIED COPY



# THE PALM HOUSE

NOT CERTIFIED COPY

## 建筑商 NHCS

### 专业从事高档酒店及住宅市场



**GENERAL CONTRACTORS**

**商业零售项目**
- Angles Restaurant at The Ritz Carlton
- Nick's New Haven Style Pizzeria and Bar
- Sky Salon and Spa
- Botega Guilliama Bar & Club
- Ann Taylor
- Bal Harbour Shops
- Quizno's Subs
- Starbucks
- Cold Stone Creamery
- CVS



Nantucket Inn/Point Breeze Inn







The Clarion,Hamden, Connecticut   Ritz Carlton,Manalapan, Florida

**高端住宅项目**
- Chapel Square Tower,
- Strouse Adler,
- The Metropolitan,
- Granby Mills,
- 55 Trumbell,
- Chapel Square Mall,
- 27 Jackson Street,
- 901 Main Street

徐锦汉公司一旁年会所设相关建筑上最后一座相关建筑工程

Case 9:16-cv-80932-KAM Document 167 Entered on FLSD Docket 03/10/2019 Page 26 of 100




# HBA 全球最大的酒店设计事务所

## THE PALM HOUSE
*A luxury condominium located on West Palm Beach*


Extreme Wow Suite A W Singapore


Hyatt Regency Chongqing


The Alpina Gstaad, Switzerland


Four Seasons Hotel Guangzhou




Luxury Collection Hotel Alana Cristini

Hotel Alfonso XIII, Seville



Grand Hyatt Shenyang

InterContinental London Park Lane

## 棕榈滩公馆由IngeMoore 2013年全球最佳酒店设计师设计

棕榈滩公馆拥有一套豪华会所，棕榈滩私岛与最后一座湖滨建筑的酒店



**HBA**

Inge Moore Named Designer of the Year + Six Nods for HBA in the 2013 Gold Key Awards

NOT A CERTIFIED COPY



NOT A CERTIFIED COPY

NOT A CERTIFIED COPY







# 酒店总经理 by Niklaus Leuenberger  THE PALM 卓美亚棕榈岛

- 2011-2013 The Alpha Gstaad 董事总经理
- 2010-2011 Resort Development Company COO
- 2007-2009 The New York Palace 董事总经理
- 2004-2007 半岛酒店北美副主席
- 2003-2007 半岛酒店集团管理委员会办公行委员
- 1999-2003 半岛酒店美国区域经理
- 1992-2007 纽约半岛酒店总经理
- 1988-1992 乌尼拉半岛酒店总经理
- 1987-1988 香港九龙酒店总经理
- 1984-1987 广州花园酒店总经理
- 1982-1984 香港半岛酒店执行助理经理
- 1981-1982 北京建国饭店副总经理
- 1981 香港可波罗酒店筹备经理
- 1980-1981 乌尼拉半岛酒店餐饮经理

## 30年超豪华酒店高层

德姆斯雅建公馆-督华半岛会所，德姆斯雅岛上最后一座规划建的酒店



## THE PALM HOUSE

# 移民律师--Bernard Wolfsdorf

## 连续4年全球排名第一移民律师

- 全球最大的移民律师事务所
- Bernard Wolfsdorf 是美国移民律师协会前主席
- 20年EB5移民律师从业经验
- 连续4年评为全球最好的移民律师

WHO'SWHOLEGAL **2013**
Corporate Immigration Lawyer of the Year
Bernard P.Wolfsdorf

WHO'SWHOLEGAL **2012**
Corporate Immigration Lawyer of the Year
Bernard P.Wolfsdorf

WHO'SWHOLEGAL **2011**
Corporate Immigration Lawyer of the Year
Bernard P.Wolfsdorf

WHO'SWHOLEGAL **2010**
Corporate Immigration Lawyer of the Year
Bernard P.Wolfsdorf

**Bernard Wolfsdorf**

WOLFSDORF
Immigration Law Group

棕榈滩公馆--香水会所 : 得得避免会上最后一座投建的酒店

NOT A CERTIFIED COPY



THE PALM HOUSE

投资结构

# Source of Funds

| Source of Funds | Amount | Percentage |
| --- | --- | --- |
| EB-5 (79位投资者) | $39,500,000 | 43.4% |
| 私募贷款 | $29,500,000 | 32.4% |
| 项目方出资 | $22,000,000 | 24.2% |
| 总投资额 | $91,000,000 | 100% |

德州巴达维亚-喜来登会所（德州休斯敦上最近十一座奢华排场酒店

NOT A CERTIFIED COPY



THE PALM HOUSE

A luxury boutique hotel and resort on Palm Beach Island.

投资结构

→ 项目方，即南大西洋区域中心(SARC)

**South Atlantic RC**
The RC oversees and advises the Project, the EB-5 process, and the associated entities.

→ SARC与79位EB5投资者组成有限合伙人 (Palm House Hotel, LLLP)

**Palm House Hotel LLLP**
General Partner: SARC
Limited Partners: EB-5 Investors
The Partnership loan money to the Company for job-creating purposes.

**Lend money to**

→ 将这79位EB5投资者募集的资金借给棕榈滩公馆项目的持有者 (Palm House, LLC)

**Palm House, LLC**
("The Company")
Owner and Developer of the Project
Uses $39.5M in EB5 funds and other funding to develop the Project

**Palm House Hotel**
A 70-room ultra-luxury hotel and resort located on Palm Beach Island, Florida.

棕榈滩公馆一署华会所，将成为滩岛上最后一座独栋的酒店

NOT A CERTIFIED COPY



监管银行：PNC BANK THE PALM HOUSE

候鸟移民公司-管理委员会所得利润将用于偿还海岛上最后一届业主的房产

| 投资明细 | |
|---|---|
| 本金 | 50万美金 |
| 发行费 | 4万美金 |
| 律师费 | 1.5万美金 |
| 投资收益 | 每年0.25%借款利息 |
| 投资周期 | 5年（****如果还款延至第6年，投资者可得额外8%利息赔偿；如果还款延至第7年，可得额外13%利息赔偿；最迟第七年还款给投资者—《PPM》） |

NOT A CERTIFIED COPY



NOT A CERTIFIED COPY

NOT A CERTIFIED COPY



# 退出机制

## THE PALM BEACH
Palm Beach Confidential and Proprietary Law

模拟酒店公寓-客房华尔道夫 微波炉岛台及后一面洗涤层的通后

### 退出机制（还款保证）：

1）再融资－48%的负债比率，再融资非常便利

2）经营的盈利现金流－预估每年720万的利润

3）出售酒店－79个酒店房间可单独出售



图例：估值（万）　负债（万）　回负债比率

Y轴：16000 14000 12000 10000 8000 6000 4000 2000 0

Case 9:15-cv-80532-KAM Document 167-7 Entered on FLSD Docket 03/10/2019 Page 25 of 100



## 可丽 PALM 别墅

- 由EB5就业报告权威Michael Evans编写
- 施工已于2012年9月开始，主体工程已经结束
- 棕榈滩公馆的创造就业机会是953.7个，美国移民局要求创造的790个就业机会多出20%。



| RIMS II 模型新增就业机会数据 | | |
|---|---|---|
| 建筑 | 688.2 | 688.2 |
| 酒店--运营 | 265.5 | 265.5 |
| | 总计 | **953.7** |

就业机会--影响保证

NOT A CERTIFIED COPY





NOT A CERTIFIED COPY

# THE PALM HOUSE

投资者若认购份额将获得会籍会员航空舱50%优惠

## 会籍会员的福利包括：

- Hawker Jet 850 X P 私人飞机
- 100' Yacht 游艇
- Rolls Royce Ghost劳斯莱斯接送
- 24小时管家服务，代客泊车
- 传统欧洲spa，健身中心和游泳池
- 收藏世界各酒的温控红酒窖
- 雪茄吧和保温箱
- 小时商务及会议中心

## 投资奖励计划：

投资期内每个投资者会免费获得：

**每年1周免费住宿**

以及提前预定的各项优惠

棕榈殿公馆一套半会所，您将拥有位于最后一座棕榈岛酒店



# THE PALM HOUSE
### A Luxury Condominium Hotel and Spa on Palm Beach



# Callaway & Price, Inc.
### Real Estate Appraisers And Consultants
*Licensed Real Estate Brokers*

79个单位的平均价值
## $1,734,177

整个项目第五年估值
## $137,500,000

为EB5借款的3.48倍



Mr. Peter Kampus
Group Sixth
June 10, 2009
Page Two

It should be noted that hospitality operation is a very management intensive venture, the reported values are conditioned upon competent, professional management by those experienced in high-end, ultra-luxury hotel operations in a resort market. Absent such management, the value conclusions herein may well change.

**Palm House Summary of Values as of February 7, 2008**

A. Prospective Future Values as of August 2 & 3, 2009

| As Stabilized Conventional Hotel | | |
|---|---|---|
| August-09 | $ | $127,500,000 |
| Costs to Complete | | |
| February-08 | | ($11,447,497) |
| Conventional Hotel Less Costs to Complete | | |
| August-09 | $102,600,000 | |
| Discount 18 Mos. For Construction @ 34.4% | | 0.675x |
| @ 9% Factor | | ($31,652,323) |
| | | $90,000,000 |
| As Is Value - Conventional Hotel | | |
| August-08 | | |
| Unreported Revenue of Condo Units (cash consumer) | | $33,100,000 |
| August-09 | | $5,010,000 |
| Developer Profit from Re-Sale of Condo Units (76%) | | |
| As Stabilized Condo Hotel after Re-Sale | | |
| August-09 | $ | $118,000,000 |
| Tenant remodeling @ FF&E | | |
| Furnishings, Fixtures & Equipment | | $4,000,000 |
| August-08 | | |
| Discounted Re-Sale of Club Memberships | | $61,500,000 |
| August-09 | | |




NOT A CERTIFIED COPY




顶尖 保值 增值酒店

评估报告①-By Callaway & Price, Inc

评估报告②-By HVS

# Callaway & Price, Inc.

Real Estate Appraisers And Consultants
Licensed Real Estate Brokers

*Income Approach – Conventional Hotel*

## Consolidated Revenues

### Room Revenue

Base room revenue is a function of multiplying the room nights by the occupancy rate and by the average daily rate (ADR). Occupancy is the number of those rooms sold over a given period, expressed as a percentage (#rooms sold ÷ #rooms available). The average daily rate (ADR) is a reflection of the total guest room revenue for a given period of time divided by the total number of occupied rooms for that same time period. The room nights or rooms available are simply the total number of rooms available multiplied by 365 (nights in the year). Therefore, the total number of room nights available for the Subject Property is to 28,835 (79 rooms x 365).

### Occupancy & ADR

In establishing estimated stabilized occupancy and ADR for our analysis we have given consideration to the competitive market set, the foregoing market analysis and discussions with industry professionals. The owner's pro forma rate structure is certainly well supported by the Palm Beach market and given the level of finish and amenities proposed may be conservative. We have utilized an ADR of $650 for Year 1 of our analysis.

The owner projects occupancy between 68% and 75% for Year 1 operations; while in our opinion a stabilized occupancy of 75% is reasonable given the small size of the property and the level of quality, we have stepped occupancy in our analysis to achieve that stability. We have utilized a 65% Year 1 occupancy increasing by Year 4 to stabilized 75% annual occupancy.

---

According to HVS, "As a rule of thumb, in a typical commercial market, where demand is high Monday through Thursday and drops considerably on weekends, a strong stabilized level of occupancy would be 70 percent. Under such circumstances, an areawide occupancy rate of 70 percent would probably produce a significant amount of unaccommodated demand. If, on the other hand, most of the lodging facilities in the area were operating with an occupancy level of around 60 percent, the unaccommodated demand would probably be negligible." Source: page 8-14 of the HVS Hotel Investments Handbook, written by Steven Rushmore, founder of HVS.

A final factor to be considered is that space is extremely limited on Palm Beach Island, and it is very unlikely that any more hotels will be built in the city. As a result, occupancy rates are likely to be relatively high in the coming years, with little or no chance of other hotels being opened right in the city.

We thus consider the following factors in counting the operating jobs from the hotel and ancillary facilities.

1. The developer will operate the hotel. It will not be leased to a "flagship" name.
2. The occupancy rate for Select Palm Beach hotels is near 100% in the peak months.
3. No more hotel rooms will be built in the city of Palm Beach in the foreseeable future.

Hence we are fully justified in counting the operating jobs even if the stated rate of occupancy is only 61% to 2015.

...rates for these four levels seem at an average in excess of per week will that figure is somewhat misleading for two reasons: only a relatively few rooms in each hotel are available at the lowest rate, and rooms during high season (January-March) are generally available only at much higher prices. For example, a search of the website for the Breakers and the Four Seasons Hotel in Palm Beach on November 21, 2012, for a wide variety of dates during the first quarter of 2013 revealed either that no rooms were available at all, or that the minimum quoted rates were all above $1,000. For this reason, the first year price of $522.50 per night for the Palm House Hotel is quite conservative; it also takes into account the fact that rates are usually about $100 per night lower during the summer months.)

Case 9:16-cv-81871-KAM Document 657-3 Entered on FLSD Docket 07/26/2020 Page 26 of
147
Case 9:19-cv-80932-RKA Document 1-57 Entered on FLSD Docket 09/10/2019 Page 39 of 100



THE PALM BEACH

NOT A CERTIFIED COPY

The next question is the issue of the occupancy rate, which the developer has assumed to be 61%. This is a very conservative figure, as the occupancy rate for Palm Beach hotels, according to Smith Travel Research and the Palm Beach County Tourism Department (see below) is usually 70% on an annual basis. This figure is well below the 78% figure that is generally considered to indicate a shortage of hotel rooms. However, the seasonal swings for Palm Beach County are much wider than most locations, as shown next in Table 9-2 (note: no separate figures are available for 5-star hotels in Palm Beach). While the average annual rate is 70%, the rate rises above 86% in February and March; and as already noted, as of November 2012, the 5-star hotels in Palm Beach are almost completely sold out for February and March 2013.

Table 9-2. Hotel Occupancy Rates by Month, Palm Beach County, 5-Year Average

| Month | Rate |
|---|---|
| October | 65.8 |
| November | 72.9 |
| December | 67.5 |
| January | 76.9 |
| February | 86.2 |
| March | 86.6 |
| April | 75.1 |
| May | 67.4 |
| June | 66.9 |
| July | 62.7 |
| August | 59.1 |
| September | 54.3 |

Source: Report on Palm Beach County Tourism









NOT A CERTIFIED COPY



GMAX 合同与完工保修 2014年展会工 THE PALM HOUSE 棕榈酒店公寓管理体制工作分配任务计划图表

®AIA® Document A101™ – 2007

**Standard Form of Agreement Between Owner and Contractor where the basis of payment is a Stipulated Sum**

AGREEMENT made as of the 2 day of January, in the year 2013
*(In words, indicate day, month and year.)*

BETWEEN the Owner:
*(Name, legal status, address and other information)*

Palm House 160 Royal Palm LLC
160 Royal Palm Way
Palm Beach, FL 33480

and the Contractor:
*(Name, legal status, address and other information)*

Nicholas Laudano New Haven Contracting South, Inc
638 Shore Drive
Boynton Beach, FL 33435

for the following Project:
*(Name, location and detailed description)*

The Palm House Hotel
160 Royal Palm Way
Palm Beach, FL 33480
Completes Renovation of 160 Royal Palm Way a 79 Room Hotel, Spa, Restaurant and Club in Palm Beach.

The Architect:
*(Name, legal status, address and other information)*

Rafael Bodirlaure RAIL Architect Inc.
44 Cheshnut Bevy, Unit TA6
Palm Beach, FL 33480

The Owner and Contractor agree as follows.

**ADDITIONS AND DELETIONS:**
The author of this document has added information needed for its completion. The author may also have revised the text of the original AIA standard form. An Additions and Deletions Report that notes added information as well as revisions to the standard form text is available from the author and should be reviewed. A vertical line in the left margin of this document indicates where the author has added necessary information and where the author has added to or deleted from the original AIA text.

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification.

AIA Document A101™ – 2007. General Conditions of the Contract for Construction, is adopted in this document by reference. Do not use with other general conditions unless this document is modified.

AIA Document A101™ — 1915, Copyright © 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, 1991, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 10:37:35 on 03/08/2013 under Order No.4866131816_1 which expires on 11/19/2014, and is not for resale.

(1624525329)

Init.













NOT AN ENTIRE COPY











NOT A CERTIFIED COPY

Case 9:16-cv-80371-KAM Document 657-3 Entered on FLSD Docket 07/26/2020 Page 44 of 160





















NOT A CERTIFIED COPY



# THE PALM HOUSE
## A Luxury Condominium Hotel and Spa on Palm Beach



棕榈滩公馆--奢华会所

棕榈滩岛上最后一座批准的酒店

NOT A CERTIFIED COPY

Case 9:19-cv-80932-KAM   Document 1-67   Entered on FLSD Docket 03/10/2019   Page 46 of 160

# EXHIBIT
# "M"

NOT A CERTIFIED COPY



## ESCROW BANK WIRE TRANSFER INSTRUCTIONS

### WIRING INSTRUCTIONS FOR DEPOSITING FUNDS INTO ESCROW ACCOUNT

[INBOUND WIRING INSTRUCTIONS]

**$500,000.00 USD | ESCROW FUNDS**

Escrow Bank: PNC Bank

LLLP: Palm House Hotel, LLP

Subscriber Representative:
South Atlantic Regional Center, LLC
Funds should be wired directly pursuant to the following instructions:

To: PNC Bank
9875 Jog Road
Boynton Beach, FL 33437 USA

ABA # ▮▮▮▮▮▮

SWIFT Code: PNCCUS33

Credit To:

Palm House Hotel, LLLP Escrow Account
Account # ▮▮▮▮ 7626

Subscriber info: _____
                (Name of Subscriber for Account)

NOT A CERTIFIED COPY

CONFIDENTIALITY NOTE: The information contained in this document is legally privileged and confidential information intended only for the addressee(s) named above. If the reader of this document is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of the document is strictly prohibited. If you have received this document in error, please immediately notify us by telephone and return the document to us at the address below via US Mail. We will reimburse any reasonable cost you incur in notifying us and returning the document to us. Thank you.

PALM HOUSE HOTEL, LLLP  © 2012 • SOUTH ATLANTIC REGIONAL CENTER



# EXHIBIT

# "N"

(Translation)

## APPLICATION FOR FUNDS TRANSFERS (OVERSEAS)

TO: BANK OF CHINA

No. of Application for Funds Transfers: 0V12891140000241

Date: Apr. 25, 2014

| | | ☑T/T ☐D/D ☐M/T | Priority | ☑Normal | ☐Urgent | |
|---|---|---|---|---|---|---|
| | BOP Reporting No. | ☐☐☐☐☐☐ ☐☐☐☐ ☐☐ ☐☐☐☐☐☐ ☐☐☐☐ | | | | |
| 20 | Bank Transac Ref. No. | CMTT12891140001580 | Receiver/Drawn on | | | |
| 32A | Currency & Interbank Settlement Amount | CNY 3,170,517.02 | Amount in Words | | RMB Three Million One Hundred and Seventy Thousand Five Hundred and Seventeen Yuan Two Fen | |
| Of Which | Amount in FX | 0.00 | Account No./Credit Card No. | | | |
| | Amount of Purchase | 0.00 | Account No./Credit Card No. | | | |
| | Amount of Others | 3,170,517.02 | Account No./Credit Card No. | | ▆▆▆▆ | |
| 50a | Remitter's Name & Address | GU CHENGYU ▆▆▆▆▆▆▆▆▆ | | | | |
| ☐For Public | Unit Code ☐☐☐☐☐☐☐☐-☐ | | ☑ For Private | Individual ID No. ▆▆▆▆▆ ☑Resident Individual ☐Non-Resident Individual | | |
| 54/56a | Correspondent of Beneficiary's Bank Name & Address | | | | | |
| 57a | Beneficiary's Bank Name & Address | Bene's Bank A/C No. PNCC▆▆XXX PNC BANK 9875 JOG ROAD BOYTON BEACH, FL 33437 USA | | | | |
| 59a | Beneficiary's Name & Address | Bene's A/C No.: ▆▆▆▆▆ PALM HOUSE HOTEL, LLLP ESCROW ACCOUNT 197 S. FEDERAL HIGHWAY SUITE 200 BOCA RATON, FLORIDA USA, 33432 | | | | |
| 70 | Remittance Information | Not Exceeding 140 Characters GU CHENGYU | 71A | All Bank's Charges If Any Are To Be Borne By ☐OUR ☐BEN ☑SHA | | |
| Resident Country/Region Name & Code | | USA | | 8▆0 | | |
| Please Select: | ☐Advance Payment | ☐Payment Against Delivery | ☐Refund | ☐Others | | |
| BOP Transac. Code | ▆▆▆▆▆▆ ☐☐☐☐☐☐ | Currency & Amount | USD 3,170,517.02 | Transac. Remark | Expense for Personal Overseas Immigration | |
| Payment Under Import Approval or Not | | ☐Yes ☐No | Contract No. | | Invoice No. | |
| Approval Document of SAFE / Archiving Form / Business No. | | | | | | |

| For Bank Use Only | | Applicant's Signature | Bank's Signature |
|---|---|---|---|
| Rate @ | | Please Effect The Upwards Remittance, Subject To The Conditions Overleaf: | (Special seal for business of Bank of China Guangzhou Dongshan Plaza Sub-branch affixed on Apr. 25, 2014) |
| RMB Equivalent | | | |
| Commission | ¥260.00 | | |
| Cable Charges | | The Application has been checked and there is no mistake. | |
| Total Charges | ¥260.00 | | |
| In Payment of the Remittance | ☐by Cash ☐by Check ☑from Account | Name of Applicant: GU Chengyu (Signed) Phone No.: ▆▆▆▆ ✓ | Authorized Person: Date: |
| Sig. Ver. | | Maker (Sealed) | Checker |

Please read the conditions and instructions overleaf before filling in this application.

| Translator | ▆▆▆▆ |
|---|---|
| Date | 2014. 5. 13 |
| Location: | Guangzhou City, The People's Republic of China |
| Firm | ▆▆▆ Services ▆▆▆ |

Bar Code   XW12

Case 9:16-cv-80321-KAM Document 657-3 Entered on FLSD Docket 07/26/2020 Page 37 of 147
Case 9:19-cv-80321-KAM Document 657-3 Entered on FLSD Docket 03/17/2019 Page 50 of 100
147

中国银行 境外汇款申请书
APPLICATION FOR FUNDS TRANSFERS (OVERSEAS)

日期 2014/04/25
Date

编号：0V12891140000241

□ 电汇 T/T  □ 票汇 D/D  □ 信汇 M/T

发电等级 □ 普通 Normal  □ 加急 Urgent
Priority

CMTTI8R14OO

| 32A | 汇款币种及金额<br>Currency & Interbank Settlement Amount | CNY3,170,517.02 | 金额大写<br>Amount in Words | 人民币叁佰壹拾柒万零伍佰壹拾柒元零贰分 |
| --- | --- | --- | --- | --- |
| | 现汇金额 Amount in FX | 0.00 | 账号 Account No./Credit Card No. | |
| | 购汇金额 Amount of Purchase | 0.00 | 账号 Account No./Credit Card No. | |
| | 其他金额 Amount of Others | 3,170,517.02 | 账号 Account No./Credit Card No. | |

| 50A | 汇款人名称及地址<br>Remitter's Name & Address | GU CHENGYU | | |
| | □ 对公 组织机构代码 Unit Code □□□□□□□□-□ | □ 对私 个人身份证件号码 Individual ID NO. | □ 中国居民个人 Resident Individual □ 中国非居民个人 Non-Resident Individual |

| 54/56a | 收款银行之代理行<br>名称及地址<br>Correspondent of Beneficiary's<br>Bank Name & Address | | | |
| 57a | 收款人开户银行<br>名称及地址<br>Beneficiary's Bank Name<br>& Address | 收款人开户银行在其代理行账号 Bene's Bank A/C No. PNBDUS33XXX<br>PNC BANK<br>9875 JOG ROAD BOYTON BEACH FL33437 USA | | |
| 59a | 收款人名称及地址<br>Beneficiary's Name & Address | 收款人账号 Bene's A/C No. 1205087628<br>PALM HOUSE HOTEL, LLLP ESROW ACCOUNT<br>197 S. FEDERAL HIGHWAY SUITE 200 BOCA RATON, FLORIDA USA 33432 | | |
| 70 | 汇款附言<br>Remittance Information | GU CHENGYU 不超过140个字符 Not Exceeding 140 Characters | 71A | 国外费用承担<br>All Bank's Charges If Any Are To Be Borne By<br>□ 汇款人 OUR □ 收款人 BEN □ 共同 SHA |

收款人常驻国家（地区）名称及代码 Resident Country/Region Name & Code 美国 USA 个人移居海外的支出

| 请选择 □ 预付货款 Advance Payment | □ 货到付款 Payment Against Delivery | □ 退款 Refund | □ 其他 Other | | 个人移居海外的支出 |
| --- | --- | --- | --- | --- | --- |
| 交易编码<br>BOP Trans.<br>Code | 5 0 0 0 6 0 | 相应币种及金额<br>Currency & Amount | CNY3170517.02 | 交易附言<br>Transac. Remark | |

本笔款项是否为保税货物项下付款 □ 是 □ 否   合同号 Contract No.   发票号 Invoice No.

外汇局批件/备案表号/业务编号

申请人签章
Applicant's Signature

| 购汇汇率<br>Rate | | 请按照贵行背页所列条款代办以上汇款并进行申报<br>Please Effect The Upwards Remittance, Subject To The<br>Conditions Overleaf | |
| --- | --- | --- | --- |
| 等值人民币<br>RMB Equivalent | | 本人已核实该笔汇款全部信息，<br>确认无误。 | |
| 手续费<br>Commission | ¥200 | | |
| 电报费<br>Cable Charges | | | |
| 合计<br>Total Charges | ¥200 | 申请人姓名<br>Name of Applicant<br>电话<br>Phone No. | 核准人 批准人<br>Authorized Person<br>日期<br>Date |
| 支付费用方式<br>In Payment of<br>the Remittance | □ 现金 by Cash<br>□ 支票 by Check<br>☑ 账户 from Account | | |

填写前请仔细阅读各背面条款及填报说明
Please read the conditions and instructions overleaf before filling in this application.

FAX / ACH PRINTED COPY

XW12




EXHIBIT

"O"

NOT A CERTIFIED COPY

# Current Day Summary and Detail Report

⊕ PNC

Account: ▮▮▮▮▮ - SARC - Escrow Account - USD

**Credits**

| Date | Account # | Account Name | Transaction | Currency | Amount | Reference # |
|------|-----------|--------------|-------------|----------|--------|-------------|
| 03/03/2014 | 1205087626 | SARC - Escrow Account | Money Transfer CR-Wire | USD | $500,000.00 | 140303012041 |

FED WIRE IN 012041 ORIGINATOR:NRS CHEN RAN [redacted] ▮▮▮▮▮▮ HSBC BANK USA NA ABA ▮▮▮▮
RFB:HK1030340V5F6400 OBI FROM CHEN RAN BENEFICIARY:SOUTH ATLANTIC REGIONAL CENTER LLC
AC/1205087625 PALM HOUSE HOTEL LLLP ESCROW/1205087626 ACCOUNT TRN:140303012041 FEDREF:01318
DATE:140303 TIME:0843

Approved Signature

NOT A CERTIFIED COPY

Case 9:15-cv-80932-KAM Document 156-7 Entered on FLSD Docket 03/10/2019 Page 54 of 100

# EXHIBIT "P"

NOT A CERTIFIED COPY

Case 9:16-cv-81871-KAM Document 657-3 Entered on FLSD Docket 07/26/2020 Page 42 of
147
Case 9:15-cv-80932-KAM Document 166-7 Entered on FLSD Docket 03/10/2019 Page 55 of 100

U.S. Department of Homeland Security
U.S. Citizenship and Immigration Services
*Immigrant Investor Program*
131 M Street, NE, MS 2235
Washington, DC 20529



**U.S. Citizenship
and Immigration
Services**

TO:

c/o Bernard Wolfsdorf, Esq.
Wolfsdorf Rosenthal LLP
1416 2nd Street
Santa Monica, CA. 90401

**DATE:** November 19, 2015

**Application: Form I-526**
**A-Number:**
**File:** WAC1490316853

## DECISION

Your Form I-526, Immigrant Petition by Alien Entrepreneur, filed by ▮▮▮ has been denied for the
following reason(s):

### See Attachment

If you desire to appeal this decision, or file a motion to reopen and/or reconsider, you may do so. Your notice of
appeal or motion must be filed on Form I-290B, Notice of Appeal or Motion, within 33 calendar days of the date of
this notice. A filing fee of $630.00 is required, payable to U.S. Department of Homeland Security, with a check or
money order from a bank or other institution located in the United States. If no appeal or motion is filed within the
time allowed, this decision will be the final decision in this matter. **The appeal or motion may not be filed directly
with the AAO.** Initial filing of the Form I-290B should be sent to:

USCIS                          OR        USCIS Attn: I-290B
P.O. Box 660168                          2501 S. State Highway 121
Dallas, TX 75266                         Business Suite 400
(For Postal Service Delivery)            Lewisville, TX 75067
                                         (For Express Mail/ Courier)

In support of your appeal, you may submit a brief and/or additional evidence, either with the initial filing or within 30
calendar days of the initial filing. If necessary, you may request additional time to submit a brief. Such request must
also be made within 30 calendar days of filing. Note, however, that an extension of time to file the appeal may not be
granted. Any brief, written statement, or other evidence not filed with Form I-290B, or any request for additional
time for the submission of a brief or other material must be sent directly to the AAO at the following address:

USCIS Administrative Appeals Office
U.S. Citizenship and Immigration Services
20 Massachusetts Ave., N.W., MS 2090
Washington, DC 20529-2090

However, if you are filing a motion, any supplementary arguments or evidence **must be filed with the motion to
reopen and/or reconsider.** No additional time will be permitted.

Form I-292 (revised 5/4/2015)

www.uscis.gov

NOT A CERTIFIED COPY

Case 9:16-cv-81871-KAM Document 657-3 Entered on FLSD Docket 07/26/2020 Page 43 of 100
Case 9:19-cv-80932-KAM Document 65-7 Entered on FLSD Docket 09/10/2019 Page 56 of 100
147

WAC1490316853
Page 2

The Small Business Regulatory Enforcement and Fairness Act established the Office of the National Ombudsman (ONO) at the Small Business Administration. The ONO assists small businesses with issues related to federal regulations. If you are a small business with a comment or complaint about regulatory enforcement, you may contact the ONO at www.ombudsman.sba.gov or phone 202-205-2417 or fax 202-481-5719.

Sincerely,

Nicholas Colucci
Chief, Immigrant Investor Program

cc:   Bernard Wolfsdorf, Esq.
      Wolfsdorf Rosenthal LLP
      1416 2nd Street
      Santa Monica, CA. 90401

WAC1490316853
Page 3

## NOTICE OF DECISION

### Form I-526, Immigrant Petition by Alien Entrepreneur
*Palm House Hotel LLLP*

#### Procedural History

███████████ ( "Petitioner") filed a Form I-526, Immigrant Petition by Alien Entrepreneur, seeking immigrant visa classification pursuant to section 203(b)(5) of the Immigration and Nationality Act ("INA") on May 29, 2014. Petitioner asserts eligibility based on an investment in South Atlantic Regional Center (the "Regional Center") pursuant to the Immigrant Investor Program.[1] The Form I-526 and the evidence presented assert that Petitioner invested $500,000 into Palm House Hotel LLLP – the new commercial enterprise (the "NCE"), on April 28, 2014. The NCE proposed to pool $39,500,000 from 79 immigrant investors and lend the entire amount to Palm House LLC – the job creating entity (the "JCE").[2] The JCE intends to renovate and develop a resort hotel in Palm Beach, Florida.

INA § 203(b)(5)(A) provides classification to qualified immigrants seeking to enter the United States for the purpose of engaging in a new commercial enterprise (including a limited partnership)-

> (i) in which such alien has invested (after the date of the enactment of the Immigration Act of 1990) or, is actively in the process of investing, capital in an amount not less than the amount specified in subparagraph (C)[3], and

> (ii) which will benefit the United States economy and create full-time employment for not fewer than 10 United States citizens or aliens lawfully admitted for permanent residence or other immigrants lawfully authorized to be employed in the United States (other than the immigrant and the immigrant's spouse, sons, or daughters).

In addition to the governing regulations, notably 8 C.F.R. § 204.6, legacy Immigration and Naturalization Service published four precedent decisions regarding the EB-5 immigrant visa classification, namely: *Matter of Soffici*, 22 I&N Dec. 158 (Assoc. Comm'r 1998); *Matter of Izummi*, 22 I&N Dec. 169 (Assoc. Comm'r 1998); *Matter of Hsiung*, 22 I&N Dec. 201 (Assoc. Comm'r 1998); and *Matter of Ho*, 22 I&N Dec. 206 (Assoc. Comm'r 1998).

---

[1] Section 610 of the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1993, Pub. L. No. 102-395, 106 Stat. 1828 (1992), as amended by section 116 of Pub. L. No. 105-119, 111 Stat. 2440 (1997); section 402 of Pub. L. No. 106-396, 114 Stat. 1637 (2000); section 11037 of Pub. L. No. 107-273, 116 Stat. 1758 (2002); section 4 of Pub. L. No. 108-156, 117 Stat. 1944 (2003); and section 1 of Pub. L. No. 112-176, 126 Stat. 1325 (2012) (hereinafter "P.L. 102-395").

[2] Palm House LLC is also referred to herein as "Project Developer" and the "Developer".

[3] The amount of capital required is $1,000,000, except when making an investment in a targeted employment area, the amount necessary to make a qualifying investment is $500,000. INA § 203(b)(5)(C)(i) – (ii); 8 C.F.R. § 204.6(f)(1) – (2).

Case 9:16-cv-80331-KAM Document 657-3 Entered on FLSD Docket 07/26/2020 Page 45 of 100
Case 9:15-cv-80332-KAM Document 166-7 Entered on FLSD Docket 03/10/2019 Page 56 of 100
147

WAC1490316853
Page 4

Based upon a review of the initial record, Petitioner did not establish eligibility for the benefit sought. Accordingly, U.S. Citizenship and Immigration Services ("USCIS") issued a Notice of Intent to Deny ("NOID") on September 17, 2015. In the NOID, USCIS notified Petitioner that the following eligibility requirements needed further clarification or additional evidence:
- Job Creation

On October 20, 2015, Petitioner responded to the NOID with the submission of the following additional evidence.

- NOID Response Cover Letter dated October 15, 2015;
- Updated Business Plan with Attachments dated August 07, 2015 (the "2015 Business Plan");
- Court Order Appointing Receiver dated July 16, 2015 (Exhibit 1B to the NOID Response Cover Letter)
- Letter from Receiver dated August 3, 2015 (Exhibit 1C to the NOID Response Cover Letter) and,
- New Economic Impact Report dated August 07, 2015 (Exhibit 6A to the NOID Response Cover Letter).

However, based on a review of the entire record of proceeding, USCIS concludes that Petitioner has not established eligibility for the benefit sought. Therefore, the petition is denied for the reasons discussed below.

**Analysis**

As required by 8 C.F.R. § 204.6(j)(4)(i), the petition must establish that the investment of the required amount of capital in a new commercial enterprise will create full-time positions for at least ten qualifying employees within 2 years. *See also* 8 U.S.C. § 1153(b)(5)(A)(ii). For purposes of the Form I-526 adjudication and the job creation requirements, the two-year period described in 8 C.F.R. § 204.6(j)(4)(i)(B) is deemed to commence six months after the adjudication of the Form I-526.

According to 8 C.F.R. § 204.6(j)(4)(i), to show that a new commercial enterprise will create not fewer than ten (10) full-time positions for qualifying employees, the petition must be accompanied by:
(A) Documentation consisting of photocopies of relevant tax records, Forms I-9, or other similar documents for ten (10) qualifying employees, if such employees have already been hired following the establishment of the new commercial enterprise; or

(B) A copy of a comprehensive business plan showing that, due to the nature and projected size of the new commercial enterprise, the need for not fewer than ten (10) qualifying employees will result, including approximate dates, within the next two years, and when such employees will be hired.

WAC1490316853
Page 5

For a new commercial enterprise within a regional center, the full-time positions can be created
either directly or indirectly by the new commercial enterprise. 8 C.F.R. §§ 204.6(e), (j)(4)(iii).
Investors investing in a regional center are subject to all the same program requirements except
that they may rely on indirect job creation as demonstrated through reasonable methodologies.
8 C.F.R. §§ 204.6(m)(1), (7).

    1.  Comprehensive Business Plan

*Matter of Ho* explained that a comprehensive business plan must be sufficiently detailed to permit USCIS
to draw reasonable inferences about job-creation potential. 22 I&N Dec. at 213. Additionally, *Matter of Ho*
held that a "comprehensive business plan as contemplated by the regulations should contain, at a minimum,
a description of the business, its products and/or services, and its objectives." 22 I&N Dec. at 213.
Elaborating on the contents of a business plan, the decision states:

> The plan should contain a market analysis, including the names of competing businesses
> and their relative strengths and weaknesses, a comparison of the competition's products
> and pricing structures, and a description of the target market/prospective customers of the
> new commercial enterprise. The plan should list the required permits and licenses
> obtained. If applicable, it should describe the manufacturing or production process, the
> materials required, and the supply sources. The plan should detail any contracts executed
> for the supply of materials and/or the distribution of products. It should discuss the
> marketing strategy of the business, including pricing, advertising, and servicing. The plan
> should set forth the business's organizational structure and its personnel's experience. It
> should explain the business's staffing requirements and contain a timetable for hiring, as
> well as job descriptions for all positions. It should contain sales, cost, and income
> projections and detail the basis therefore. Most importantly, the business plan must be
> credible. *Id.*

Upon reviewing the 2013 and 2015 Business Plans and attachments, USCIS finds that the
evidence in the record does not establish that the NCE will create at least ten full-time positions
for qualifying employees. Specifically, USCIS notes the following deficiencies:

**Dispute over Ownership of the Subject Property**

In the NOID, USCIS noted that "the record contains no evidence demonstrating that the JCE owns the
property or has an affiliate relationship with the owner of the property. The failure to address or include
contracts and business agreements for key aspects of the project such as financing and ownership of the
property detracts from the comprehensiveness and credibility of the business plan."

Case 9:16-cv-80321-KAM  Document 65-3  Entered on FLSD Docket 07/26/2020  Page 47 of 147
Case 9:15-cv-80332-KAM  Document 107-3  Entered on FLSD Docket 03/10/2019  Page 66 of 100
147

WAC1490316853
Page 6

In response, the petitioner provided an updated business plan.

Section 3.2 of the 2015 Business Plan, Project Description, indicates the JCE "(through its wholly-owned subsidiary, 160 Royal Palm LLC) already owns the subject property, having initially purchased it in August 2006." Section 4.5 of the 2015 Business Plan states "[t]he land was purchased by a company owned by the Developer in August 2006 for $29 million; the transfer was recorded in OR Book 20776, Page 1540 of the Palm Beach County land records as a non-real estate transaction with a $10 consideration.

However, this claim of clear ownership appears to be contradicted by information submitted by Petitioner and by public sources.

Section 4.3 of the 2015 Business Plan states that, "[p]ending an ownership dispute on the property and the Town of Palm Beach's decision not to approve a variance from the approved building plans, it is anticipated that a new construction company will be retained by a court-appointed Receiver to complete construction in accordance with the previously approved site plan." Moreover, according to the Receiver letter "the current ownership has been removed from any operational control or decision making processes regarding the project."

According to the Property Appraiser website, the property at 160 Royal Palm Way was purchased in August 2006 by Royal 160 LLC. The property was then sold in October 2009 to 160 Royal Palm, LLC. [4] According to contemporary news articles, the property was subsequently purchased at foreclosure auction by another real estate investor, Glenn Straub, for approximately $10 million.[5] Other news articles indicate that another developer and former manager of the JCE, Ryan Black, [6] currently has a mortgage on the property and is involved in a foreclosure lawsuit brought by Glenn Straub.[7]

Therefore because it does not appear that the JCE has clear ownership of the property, an affiliate relationship with the owner of the property or permission to execute the project, the business plan is not credible. It is true that the Receiver is expected to finish construction of the hotel, however, it is unclear if the finished product will resemble the business plan submitted to USCIS and if it doesn't, the JCE and NCE have no control to change it to match the plan submitted to USCIS.

## Insufficient Evidence of Bridge Financing

The JCE was formed on December 5, 2012, the NCE was formed on January 9, 2013 and according to page 45 of the 2015 Business Plan the property was "reacquired by a subsidiary entity of the [JCE] in 2013". The Petitioner in his 2013 and 2015 business plans has attempted to take credit for expenditures and work completed through bank financing obtained before EB-5 funding and before the project

---

[4] *See* http://www.co.palm-beach.fl.us/papa/

[5] Kacoha, Margie. "Owner Glenn Straub continues construction work on Palm House." *Palm Beach Daily News* August 25, 2010: Web. (Accessed at http://www.palmbeachdailynews.com on April 29, 2015).

[6] Hofheinz, Darrell. "Court action filed over padlocked Palm House." *Palm Beach Daily News* October 23, 2014: Web. (Accessed at http://www.palmbeachdailynews.com on April 29, 2015).

[7] Bandell, Brian. "Palm Beach hotel in $27M foreclosure despite new mortgage." *South Florida Business Journal* October 30, 2014: Web. (Accessed at http://www.bizjournals.com on April 29, 2015).

WAC1490316853
Page 7

property was acquired in 2013. The Petitioner, however, has not established the use of interim or bridge financing in order to take credit for any expenses or work completed through bank financing obtained before EB-5 funding was received and before the project property was acquired in 2013.

As cited in the NOID, the 2013 business plan indicated that both the sources and uses of funds were $91 million, therefore it did not appear that the EB-5 capital was intended to replace the bank financing, but rather to be used in addition to the bank financing.

In response to the NOID, the petitioner submitted an updated business plan. Page 24 of the 2015 Business Plan states "Construction has been ongoing over the past several years, using a mix of developer equity, bridge financing, and EB-5 funding." Page 45 of the 2015 Business Plan further states:

> The project developer initially acquired the property in August 2006. The property was then sold, and reacquired by a subsidiary entity of the Developer in 2013. Since construction and full renovation would take several years, the Developer used a combination of its own equity and bridge loan financing to acquire the property and begin renovations, which have been ongoing.

Yet page 46 of the 2015 Business Plan shows a total investment of $104,026,765 and Page 47 of the same business plan shows a total use of funds of $104,026,765.

| Source of funds | Amount | Use of Funds | Amount |
|---|---|---|---|
| EB-5 capital | $43,500,000 | Land Acquisition | $29,000,000 |
| Developer Equity | $29,000,000 | Construction (hard costs) | $33,434,500 |
| Partnership Investment | $4,058,015 | Soft Costs | $8,946,596 |
| Bank Financing | $27,468,750 | FF&E | $4,500,000 |
| | | Interest & Carrying costs | $4,690,186 |
| | | Start-up Operational Costs | $7,924,273 |
| | | Additional Construction costs | $15,531,210 |
| Total | $104,026,765 | Total | $104,026,765 |

USCIS finds that based on the evidence provided in the 2015 Business Plan, EB-5 financing may have been contemplated before 2013, however there is insufficient evidence to demonstrate that the funds already spent were bridge financing as from the source and use of funds table it is clear that the EB-5 funds are not replacing or repaying a bridge loan, but rather are to be used for the construction of the project.

Therefore, based on the dispute of ownership on the subject property and problems regarding Petitioner's claim of bridge financing, USCIS finds Petitioner's business plan to be not credible.

NOT A CERTIFIED COPY

Case 9:18-cv-80931-KAM  Document 165-7  Entered on FLSD Docket 07/26/2020  Page 49 of 100
Case 9:19-cv-80332-KAM  Document 65-7  Entered on FLSD Docket 03/10/2019  Page 62 of 100
147

WAC1490316853
Page 8

## 2. Economic Methodology

Under the statute and regulations, petitioners investing in an NCE within a regional center may rely on economic methodologies to demonstrate that the investment will create indirect jobs as a result of the investment in the NCE, but such methodologies must be reasonable. *See* Pub. L. No. 102-395; 8 C.F.R. §§ 204.6(e), (j)(4)(iii), (m)(7)(ii). Petitioner must provide sufficient evidence for USCIS to determine whether methodologies used are reasonable.

Indirect jobs are those that are held outside of the new commercial enterprise but are created as a result of the new commercial enterprise. They include jobs that may be considered "economically direct," such as jobs created directly by a job-creating entity that is not also the new commercial enterprise. They also include economically indirect jobs such as those further down the supply chain, or induced jobs created through increased spending.

The evidence in the record fails to demonstrate that the requisite number of jobs will be created for the following reasons:

According to the 2015 Business Plan and the 2015 Economic Analysis, there will be a total of 871 jobs created, which includes 297 during the operations phase (251 from hotel operations and 46 from membership fees) and 571 during the construction phases (505 jobs resulting from hard construction expenditures, 33 jobs resulting from soft construction expenditures and 36 jobs resulting from FF&E expenditures.) However the inputs to the economic analysis are not credible and are not consistent with other information provided in the record. Therefore the jobs created as a result of these inputs are not credible.

## A. Jobs Resulting From the Operations Phase

The economic analysis indicates that 251.4 jobs are expected to be created as a result of hotel rental operations and 45.8 jobs from membership fees. The operating revenue of the hotel, which is the input used to calculate those jobs, is based on an assumption of average rate per room and assumes that there will be 79 rooms.

However the court order appointing a Receiver indicates that an indeterminate amount of the property is going to be developed and sold as condominium units.

Specifically, the court order appointing the Receiver indicates:

> Intervenor, Palm House Hotel, LLLP has agreed to release its rights, title and interests in and to the property, the Project or any condominium unit sold without payment or remuneration until all sums due to mortgagees ahead of it in priority are paid in full.

> Once all of said mortgagees are paid in full, the release price for each such unit shall be the sum which equates to the then balance due to investor, Palm House Hotel, LLLP under its note and mortgage divided by the number of condominium units unsold.

NOT A CERTIFIED COPY

WAC1490316853
Page 9

For example, $30,000,000.00 remains unpaid to Palm House LLLP and 60 units remain unsold, the release price for the next unit shall be $500,000.00 during the term of the Receivership, the Receiver is empowered to execute such documents to effectuate such release.

While a property appraisal and analysis by Callaway & Price Inc. completed in June 2008 did mention the possibility of selling some units as condominiums, this possibility was not included in either the 2013 or 2015 business plans and the Callaway & Price document was provided 4 ½ years before the NCE was established and 5 years before the developers acquired the property.

In addition the 2015 Business Plan indicates on page 16 that "[t]he project is a luxury hotel with 79-guest rooms and a salon and spa." Page 29 of the 2015 Business Plan further indicates that "[t]he Palm House Hotel will encompass a full service hotel and private club, containing 92,546 square feet, of which 44,430 is contained in 79 guestrooms in two inter-connected buildings. " The economic analysis is predicated on the availability of 79 guest bedrooms. Therefore neither the 2015 Business Plan nor the Economic Analysis is consistent with the Receiver's plan that the project will result in the sale of condominium hotel units. As such it is unclear how any revenues calculated solely based on hotel operations or membership fees utilizing 79 rooms can be accurate or relied upon for job creation calculations. Therefore the anticipated number of jobs created as a result of operations, as reported to USCIS, is not credible.

**B. Jobs Resulting From the Construction Phase**
The economic methodology for estimating jobs created during the construction phase is unreasonable. Specifically:

**i. Ineligibility of jobs resulting from expenditures from previous companies.** The economic impact analysis indicates that its employment creation projections are based in part on expenditures made by different corporate entities that predate the existence of the NCE or JCE. While public records suggest that construction has been ongoing at the site of the Palm House hotel since approximately 2006, as was discussed in the bridge financing section of this denial, the record contains no evidence demonstrating why the NCE or JCE should be entitled to receive credit for jobs created by the expenditures of other entities that predate the existence of either the NCE or JCE.

Specifically, the Petitioner has shown no reason as to why expenditures before 2013 should be credited for job creation purposes; since the JCE was formed on December 5, 2012, and the NCE was formed on January 9, 2013. Since the amount of construction expenditures used as an input for job calculations have been called into question, the construction jobs based on those inputs are not credible.

**ii. Uncertainty regarding the total amount of construction costs.** Moreover, according to the letter from the Receiver, it is unclear what the total future construction costs will be and if those costs will be eligible to be counted for job creation purposes, therefore it is unclear how many if any construction jobs going forward would be eligible.

WAC1490316853
Page 10

Yet the letter from the Receiver to USCIS dated August 3, 2015 states "There have been several meetings/discussions with Town staff and the Town attorney to produce a strategic plan that encompasses **a complete resolution of: (i) Project plans that provide a clearly defined path to a completed project** and Issuance by the Town of a Certificate of Occupancy, and (ii) settlement of all code violations and fines. I expect to have this resolution within 3-4 months, at which time we will be in a position to complete the Project, subject to securing additional construction funding that would also be predicated on the Receiver's successful resolution of the outstanding issues with the Town." (*Emphasis added*)

Therefore it is unclear what the final construction plan will look like, and if the Receiver's construction plan and anticipated hard construction, soft construction and FF&E costs will have any resemblance to the plan and costs submitted to USCIS. This in turn has cast doubt on the credibility of using those costs to calculate projected jobs during the construction phase.

### iii. Ineligibility of direct jobs due to the construction timeline.

Direct and indirect construction jobs are eligible to be counted toward the job creation requirement; however, construction jobs may be counted only if the construction jobs are expected to last at least two years. In making that determination based on reasonable methodologies, USCIS considers whether the construction period lasted or is expected to last at least two years in determining whether any model-derived construction or construction-related jobs may be included. If the construction period lasts or is expected to last less than two years, USCIS typically will only credit Petitioner with the economically indirect and induced model-derived jobs.

As USCIS noted in the NOID, the record fails to establish that the construction period lasted or is expected to last at least two years and therefore Petitioner cannot claim the economically direct model derived construction jobs created by the project.

In counsel's letter responding to the NOID, counsel states on Page 45 of the 2015 Business Plan that "The project developer initially acquired the property in August 2006. It was then sold, and reacquired by a subsidiary entity of the Developer in 2013. Since construction and full renovation would take several years, the Developer used a combination of its own equity and bridge loan financing to acquire the property and begin renovations, which have been ongoing."

The business plan then continues "Construction has already taken longer than two years (see hard costs already spent- Attachments C and F). Construction is projected to be completed in 2016, when the hotel is projected to open."

WAC1490316853
Page 11

However, as noted previously in this section, USCIS does not find it reasonable to credit job creation from expenditures incurred by a previous company. Similarly, USCIS does not find it reasonable to extend the timeline to incorporate work performed by a previous company.

From when the JCE acquired the property in 2013 to present day, it appears that the construction has been intermittent. For example, according to new articles in 2014 construction stopped while the property was locked during a property dispute. [8]

The letter from the Receiver to USCIS dated August 3, 2015, provided in response to the NOID, states "There have been several meetings/discussions with Town staff and the Town attorney to produce a strategic plan that encompasses a complete resolution of: (i) Project plans that provide a clearly defined path to a completed project and Issuance by the Town of a Certificate of Occupancy, and (ii) settlement of all code violations and fines. **I expect to have this resolution within 3-4 months, at which time we will be in a position to complete the Project,** subject to securing additional construction funding that would also be predicated on the Receiver's successful resolution of the outstanding issues with the Town." (*Emphasis added*)

USCIS' doubts on the tenuous construction timeline projections is further aggravated by page 48 of the 2015 Business Plan which states "Note that a new construction company may take over the construction of the property. An additional $15,531,210 has been conditionally budgeted for additional construction costs to transition to a new builder, align the construction to the approved plans, and complete the project."

These doubts are further increased based on page 45 of the 2015 Business Plan which states:

> much of the construction work has already been completed....Pending an ownership dispute on the property and the Town of Palm Beach's decision not to approve a variance from the approved building plans, it is anticipated that a new construction company will be retained by a court-appointed Receiver to complete construction in accordance with the previously- approved site plan.

> Attachment G is a construction estimate updated August 8, 2015 by McGowan Builders Inc. projecting that based on their review of the property, they can substantially complete construction and get a temporary certificate of occupancy in 8 months, with final completion in 13-14 months.

Therefore, USCIS finds the Petitioner's response insufficient. Indications are that the construction has stopped while the receiver analyzes the situation, comes up with a plan, and then hires a construction company. Therefore the construction would not be **ongoing** for 2 years.

---

[8] Hofheinz, Darrell. "Court action filed over padlocked Palm House," *Palm Beach Daily News* October 23, 2014: Web. (Accessed at http://www.palmbeachdailynews.com on April 29, 2015).

WAC1490316853
Page 12

Consequently, Petitioner has failed to establish that the NCE may claim credit for any economically direct model derived construction jobs.

Because the Petitioner has failed to establish that the NCE may claim credit for any economically direct model derived construction jobs, and has failed to establish the reasonableness of the hard construction, soft construction and FF&E expenditures used as inputs to the economic model; the construction phase jobs derived by the model are not credible.

Based on the reasons above, the inputs to the economic model to derive the jobs both from the construction phase and the operation phase have been found to be not reasonable. Therefore, based on preponderance of the evidence, Petitioner has failed to demonstrate that the project will create sufficient jobs to support all of the EB-5 investors.

**Conclusion**

In summary, USCIS has determined, based on the initial evidence submitted upon filing and after consideration of all additional evidence submitted, that Petitioner has failed to establish by a preponderance of the evidence that the Form I-526 complies with applicable legal requirements. Consequently, USCIS concludes that Petitioner is ineligible for classification under INA § 203(b)(5)(A).

In visa petition proceedings, Petitioner bears the burden of establishing eligibility for the benefit sought. *See Matter of Brantigan*, 11 I&N Dec. 493 (BIA 1966). As Petitioner has not satisfied his burden of establishing eligibility, the Form I-526 is denied.

If Petitioner disagrees with this decision, or if Petitioner has additional evidence that shows this decision is incorrect, Petitioner may file a motion or an appeal to this decision by filing a completed Form I-290B, Notice of Appeal or Motion, along with the appropriate filing fee. A copy is enclosed. Petitioner may also include a brief or other written statement and additional evidence in support of the motion or appeal. The Form I-290B must be filed within 33 days from the date of this notice. If a motion or appeal is not filed within 33 days, this decision is final.

Petitioner must send the completed Form I-290B and supporting documentation with the appropriate filing fee to:

USCIS I-290B
P.O. Box 660168
Dallas, TX 75266

For an appeal, Petitioner may request additional time to submit a brief within 30 calendar days of filing the appeal. Any brief, written statement, or evidence in support of an appeal that is not filed with Form I-290B must be directly sent within 30 days of filing the appeal to:

DHS/USCIS
Administrative Appeals Office (AAO)
20 Massachusetts Ave., N.W., MS 2090
Washington, DC 20529-2090

For more information about the filing requirements for appeals and motions, please see 8 C.F.R. § 103.3 or

Case 9:16-cv-81871-KAM Document 657-3 Entered on FLSD Docket 07/26/2020 Page 54 of 100
Case 9:19-cv-80932-KAM Document 167-3 Entered on FLSD Docket 09/10/2019 Page 6 of 100
147

WAC1490316853
Page 13


103.5, or visit the USCIS website at www.uscis.gov.



# EXHIBIT "Q"

NOT A CERTIFIED COPY



**HERISCHI & ASSOCIATES**

bhlaw.com
bhlaw.com

7201 Wisconsin Ave, suite 450
Bethesda, MD 20814

Tel: 301-363-4540
Fax:301-363-4538

August 29, 2016

Sara Salehin
Tehran, Iran

Dear Mrs. Sara Salehin,

I feel terrible that your application for Green Card under the EB5 program has been denied and that the Palm House Hotel LLLP has failed to perform on its promises and obligations.

I write to disclose my referral agreement with the Palm. In 2013, I started a company called "Washington Marketing", with a colleague to provide marketing services to different EB-5 projects for Iranians in return for a finder's fee. This business was supposed to be separate from my law practice. However, while I was still trying to launch the company, my colleague left and I adopted the less formal practice of administering the business through my law practice.

The Palm agreed to pay me a finder fee for any EB5 investors I identified. I now realize I should have disclosed this fact to you. I regret this failure to disclose. Please know that I never put any project before your interests. For example, I offered to find you another project if the Palm project did not interest you, and I brought to your attention the opportunity to invest in North Carolina's Cold Storage facility.

I want to return to you and other clients the finder's fee I received from the Palm ($40,000). I have borrowed funds from my family to make a first installment of $20,000 and have enclosed a check in that amount. I hope to pay the balance of $20,000 soon and am working to borrow additional funds for that purpose.

Respectfully submitted,

Ali Herischi

CC: Reza Salehin

NOT A CERTIFIED COPY

Case 9:15-cv-80932-KAM   Document 1-67   Entered on FLSD Docket 03/10/2019   Page 20 of 100

# EXHIBIT "R"

NOT A CERTIFIED COPY

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| UNITED STATES OF AMERICA | CRIMINAL NO.   3:18-CR-48-SRU |
|---|---|
| v. | VIOLATION: |
| | 18 U.S.C. § 1343 (Wire Fraud) |
| ROBERT V. MATTHEWS | 18 U.S.C. § 1344 (Bank Fraud) |
| and | 18 U.S.C. § 1349 (Conspiracy) |
| LESLIE R. EVANS | 18 U.S.C. § 1957 (Illegal Monetary Transactions) |
| | 18 U.S.C. § 2 (Aiding and Abetting) |

### INDICTMENT

The Grand Jury charges:

### COUNTS ONE-EIGHT
(Wire Fraud)

At all times relevant to this Indictment:

### The Defendants

1.      Defendant ROBERT V. MATTHEWS ("R. MATTHEWS") was a real estate developer and maintained personal residences in Connecticut and Florida.

2.      Defendant LESLIE R. EVANS ("EVANS") was a real estate attorney and a resident of Florida.

### Other Relevant Individuals and Entities

3.      Nicholas Laudano ("Laudano"), who is charged separately, was a construction contractor who worked as a contractor for the Palm House Hotel in Palm Beach, Florida.   Laudano also operated multiple pizza restaurants in Florida and Connecticut.   Laudano controlled a number of entities, including New Haven Contracting South Inc., NJL Development Group, LLC, NJL Development Group Inc., and NJL Investments.

1

4.     Gerry Matthews ("G. Matthews"), who is charged separately, owned and operated a commercial real estate brokerage firm in Connecticut known as Matthews Commercial Properties, LLC ("MCP").  G. Matthews maintained a savings account for MCP at Webster Bank in Connecticut (the "MCP savings account").  G. Matthews is the brother of R. MATTHEWS.

### EB-5 Funding

5.     The EB-5 visa program ("EB-5 program") was a federal program by which foreign nationals and their families were eligible to apply for lawful permanent resident status (commonly known as a "green card") if they invested in a development project in the United States.

6.     The particulars of the EB-5 program varied by project and location, but relevant to this Indictment, an investor was entitled to apply for a green card if, among other requirements, (1) the investor made a $500,000 investment in a development project in the United States and (2) that project ultimately employed ten or more individuals.

7.     Various entities in the United States acted as middlemen between potential foreign investors and investment projects.  South Atlantic Regional Center, LLC ("SARC") was one such entity based in Palm Beach, Florida.

8.     SARC's primary function was to advertise EB-5 projects to foreign investors, collect funds from foreign investors that were earmarked for certain development projects, and make that funding available to the respective development project.

### The Palm House Hotel

9.     The Palm House Hotel ("PHH") was located at 160 Royal Palm Way, Palm Beach, Florida.

2

10. The PHH was one development project advertised by SARC to EB-5 investors in or around 2012 through in or around 2014.

11. R. MATTHEWS was the developer in charge of the PHH development project.

12. R. MATTHEWS had a lengthy history with the PHH. He originally purchased the property in August 2006. R. MATTHEWS lost the PHH in foreclosure in 2009. In August 2013, R. MATTHEWS reacquired control of the PHH through an entity called Palm House, LLC. G. Matthews, however, was listed as owning 99% of Palm House, LLC in its incorporation documents. "Minority Owner-1," whose identity is known to the Grand Jury, had secured additional financing for R. MATTHEWS and owned the remaining 1%.

13. Laudano continuously worked on the development and construction of the PHH as a contractor beginning in or around 2006 through in or around 2016.

<u>The Wire Fraud Scheme</u>

14. Beginning in or around 2012 and continuing through in or around January 2018, in the District of Connecticut and elsewhere, R. MATTHEWS, EVANS, and others known and unknown to the Grand Jury, knowingly and with intent to defraud, devised and intended to devise, and participated in, a scheme and artifice to defraud and obtain money and property from SARC, EB-5 investors, and others by means of materially false and fraudulent pretenses, representations and promises, and in furtherance of that scheme used and caused to be used interstate wires.

15. The purpose of the scheme and artifice was for R. MATTHEWS, EVANS, and others known and unknown to the Grand Jury to enrich themselves and their companies by defrauding the EB-5 investors, SARC, and others out of money and property owned by and under

3

the control of the EB-5 investors, SARC, and others by means of materially false and fraudulent pretenses, representations, and promises.

<u>Manner and Means of the Wire Fraud Scheme</u>

The manner and means by which R. MATTHEWS, EVANS, their co-conspirators, agents, and others known and unknown to the Grand Jury sought to accomplish and did accomplish the objects of the wire fraud scheme included, among others, the following:

16.     R. MATTHEWS, EVANS, their co-conspirators, agents, and others made several material misrepresentations to SARC, prospective EB-5 investors, and/or Minority Owner-1, including that (i) the proceeds of the loan from EB-5 investors would be used to develop the PHH; (ii) certain well-known individuals would be on the PHH advisory board and certain well-known entertainers, businesspeople, and politicians "will be a part of the club"; and (iii) G. Matthews was a member of the Palm House, LLC management team and was the 99% owner of Palm House, LLC.

17.     Despite those misrepresentations to the contrary, in truth, and as the defendants well knew, (i) R. MATTHEWS, EVANS, their co-conspirators, agents, and others used EB-5 funding for purposes not related to the PHH project, including for the personal gain of R. MATTHEWS and others; (ii) there was no evidence any of the proffered well-known individuals would be on the PHH advisory board or would be members of the club; and (iii) while G. Matthews was the nominal 99% owner of Palm House, LLC, R. MATTHEWS controlled that company and it belonged to G. Matthews in name only.

18.     EB-5 investors decided to invest in the PHH project by providing money to accounts controlled by SARC.  SARC, in turn, provided EB-5 money earmarked for use at the

4

PHH either (1) into an account in the name of 160 Royal Palm LLC at Regions Bank in Florida that was controlled by R. MATTHEWS, EVANS, and their agents ("160 Royal Palm Account") or (2) into EVANS' Interest on Trust Account that was used to maintain his clients' funds at First United Bank in Florida (the "EVANS IOTA Account").

19.     Despite their misrepresentations to the contrary, R. MATTHEWS, EVANS, their co-conspirators, agents, and others used this EB-5 funding for purposes not related to the PHH project, including for their own personal gain and the gain of others.

20.     To use EB-5 funding for purposes not related to the PHH project, including for their own personal gain and the gain of others, R. MATTHEWS, EVANS, their co-conspirators, agents, and others wired EB-5 funds from the 160 Royal Palm Account and the EVANS IOTA Account into and through various accounts, including the following:

      a.     G. Matthews' MCP Savings account located in Connecticut;

      b.     An account at First Bank of the Palm Beaches in Florida in the name of New Haven Contracting South, which was controlled by Laudano ("NHCS Account-1");

      c.     An account at Regions Bank in Florida in the name of New Haven Contracting South, which was controlled by Laudano ("NHCS Account-2")

      d.     An account at First Bank of the Palm Beaches in Florida in the name of NJL Development LLC, which was controlled by Laudano ("NJL Development Account-1");

      e.     An account at Wells Fargo in Florida in the name of NJL Development Group, Inc., which was controlled by Laudano ("NJL Development Account-2");

NOT A CERTIFIED COPY

5

f.      An account at Regions Bank in Florida in the name of Bonaventure 22 LLC,

which was controlled by R. MATTHEWS and others (the "Bonaventure Account");

and

g.      An account at Regions Bank in Florida in the name of Mirabia LLC, which

was controlled by R. MATTHEWS and others (the "Mirabia Account").

21.     G. Matthews, acting at R. MATTHEWS' direction, applied the EB-5 money that

had been moved into G. Matthews' MCP Savings account to the credit card debts of R.

MATTHEWS and others, or moved the money into other accounts controlled by R. MATTHEWS

and others.

22.     In or around February 2014 and April 2014, R. MATTHEWS, EVANS, their co-

conspirators, agents, and others purchased the property located at 115 Lower Church Hill Road,

Washington Depot, Connecticut out of a foreclosure auction with EB-5 money diverted from the

PHH project by using a straw company, NJL Development Group, LLC, which was under the

control of Laudano.

23.     R. MATTHEWS and others used EB-5 funds in the Bonaventure Account and the

Mirabia Account to support his own and his family's lifestyle, including but not limited to the

purchase of a property located at 105 Lower Church Hill Road, Washington Depot, Connecticut,

in or around May 2014 and June 2014.

24.     In or around June 2014, R. MATTHEWS and others purchased a one hundred and

fifty-one-foot yacht through a down payment made with EB-5 money and a loan as well as the use

of shell companies that were controlled by R. MATTHEWS and others.

6

Executions of the Wire Fraud Scheme

25. On or about the dates set forth in each count below, in the District of Connecticut and elsewhere, for the purpose of executing and attempting to execute the aforementioned scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises as described above, R. MATTHEWS and EVANS did knowingly transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, certain writings, sings, signals an sounds, each wiring as set forth below constitution a separate count of this Indictment:

| Count | Date | Description of Use of Interstate Wires |
|---|---|---|
| 1 | 2/1/14 | An email sent from R. MATTHEWS' email account in Florida to G. Matthews' email account in Connecticut forwarding login instructions to bid on the property at 115 Lower Church Hill Road. |
| 2 | 2/3/14 | A wire for $136,237.50 from the EVANS IOTA account in Florida to an account at Farmington Savings Bank in Connecticut for the purchase of 115 Lower Church Hill Road by NJL Development Group, LLC. |
| 3 | 2/5/14 | A wire in the amount of $8,592.40 of EB-5 money sent from the 160 Royal Palm Account in Florida to the MCP Savings account in Connecticut. |
| 4 | 4/29/14 | An email sent from an account in the name of an individual with the initials M.P. in Connecticut to Laudano's email account in Florida with documents related to the purchase of 115 Lower Church Hill Road, which was purchased with EB-5 funds. |
| 5 | 6/30/14 | A check in the amount of $12,717.46, which caused the use of interstate wires in moving money from the 160 Royal Palm Account in Florida to the MCP Savings account in Connecticut. |
| 6 | 6/30/14 | A check in the amount of $10,837.86, which caused use of the interstate wires in moving money to move from the 160 Royal Palm Account in Florida to the MCP Savings account in Connecticut. |
| 7 | 10/20/14 | An email sent from the account of an individual working for R. MATTHEWS in Florida to G. Matthews' email account in Connecticut, blind copying R. MATTHEWS' email account and attaching a letter relieving Minority-Owner-1 of his position as Manager of Palm House, LLC. |

NOT A CERTIFIED COPY

| Count | Date | Description of Use of Interstate Wires |
|-------|------|----------------------------------------|
| 8 | 10/21/14 | An email sent from G. Matthews' email account in Connecticut to EVANS' email account, appointing EVANS as the managing member of Palm House LLC. |

All in violation of Title 18, United States Code, Section 1343.

COUNT NINE
(Bank Fraud)

26.      Paragraphs 1 through 25 of this Indictment are reincorporated as if fully set forth herein.

Background on 115 Lower Church Hill Road

27.      R. MATTHEWS purchased two properties in or around January 2001 for $3,900,000: 115 Lower Church Hill Road and 101 Lower Church Hill Road, both in Washington Depot, Connecticut.   These purchases were initially financed with a $2,000,000 mortgage and two lines of credit worth $400,000 and $375,000.

28.      On or about May 24, 2004, R. MATTHEWS refinanced 115 Lower Church Hill Road with Washington Mutual Bank for $3,600,000.   That loan was later assigned to JPMorgan Chase Bank NA ("JPMC"), a bank whose deposits were insured by the Federal Deposit Insurance Corporation.

29.      In or about September 2013, JPMC foreclosed on the loan and took ownership of 115 Lower Church Hill Road.   That property was then placed for foreclosure sale at auction by Ten-x d/b/a Auction.com (hereinafter "Auction.com").

8

NOT A CERTIFIED COPY

Case 9:15-cv-80321-KAM Document 167-3 Entered on FLSD Docket 03/10/2019 Page 29 of 100
147
Case 9:16-cv-81871-KAM Document 657-3 Entered on FLSD Docket 07/26/2020 Page 66 of 100

NOT A CERTIFIED COPY

### The Bank Fraud Scheme

30.     Beginning in or about 2012 and continuing through in or about April 2016, in the District of Connecticut and elsewhere, R. MATTHEWS, EVANS, and others known and unknown to the Grand Jury, knowingly and with intent to defraud devised and intended to devise, and participated in, a scheme and artifice to defraud JPMC, a federally insured financial institution, and to obtain moneys, funds, credits, assets, and other property owned by or under the custody or control of JPMC, by means of materially false and fraudulent pretenses representations, and promises, and by means of omissions of material fact.

31.     The purpose of the bank fraud scheme was to deceive JPMC, which had foreclosed on R. MATTHEWS' property at 115 Lower Church Hill Road, into re-selling the property to R. MATTHEWS, through a straw purchaser, at a significant loss, thereby permitting R. MATTHEWS and others to continue to live there and act as owners of the property.

### Manner and Means of the Bank Fraud Scheme

The manner and means by which R. MATTHEWS, EVANS, their co-conspirators, agents, and others known and unknown to the Grand Jury sought to accomplish and did accomplish the objects of the bank fraud scheme included, among others, the following:

32.     R. MATTHEWS, EVANS, their co-conspirators, agents and others entered into an arrangement among themselves and with Laudano whereby:

a.      Laudano would purchase out of foreclosure, through a shell company, the property at 115 Lower Church Hill Road from JPMC at a significant discount, using EB-5 money from R. MATTHEWS that R. MATTHEWS had diverted from the PHH project;

9

b.   R. MATTHEWS would continue to live at the property with his family and to act as owner of the property; and

c.   R. MATTHEWS, EVANS, and Laudano would conceal from JPMC the fact that Laudano was purchasing 115 Lower Church Hill Road with money provided by R. MATTHEWS and that R. MATTHEWS would control the property through Laudano, knowing that JPMC would not have sold the property to Laudano if they knew of the source of the funds and Laudano's relationship with R. MATTHEWS.

33.   On or about February 3, 2014, R. MATTHEWS, EVANS, Laudano, their co-conspirators, agents, and others established NJL Development Group, LLC in the state of Delaware under the control of Laudano, with the intent to use NJL Development Group, LLC as a shell company to conceal R. MATTHEWS' involvement and the source of funds in the purchase of 115 Lower Church Hill Road.

34.   In or around February 2014, R. MATTHEWS, EVANS, Laudano, their co-conspirators, agents, and others in fact arranged the purchase of 115 Lower Church Hill Road from JPMC through the straw entity NJL Development Group, LLC, which was controlled by Laudano, to conceal R. MATTHEWS' involvement in the transaction as well as the source of funds.

35.   In or around February 2014, Laudano executed a sales agreement with JPMC to purchase 115 Lower Church Hill Road.   On page 5 of the sales agreement under section 5(i), the parties to the sales contract agreed that JPMC had the right to terminate the agreement if the buyer (Laudano and NJL Development Group, LLC) was the former mortgagor (R. MATTHEWS) of the property whose interest was foreclosed/acquired by a deed-in-lieu of foreclosure, or is related to or affiliated in any way with the former mortgager, and the buyer has not disclosed this fact to

10

the seller (JPMC) in writing prior to the seller's acceptance of the agreement. Notwithstanding this provision, neither Laudano nor R MATTHEWS disclosed to JPMC their relationship or the source of the purchase funds.

36.     On or about February 3, 2014, R. MATTHEWS, EVANS, Laudano, their co-conspirators, agents and others sent and caused to be sent a letter from EVANS to Auction.com. In the letter, EVANS falsely and fraudulently represented to Auction.com that Laudano and his company NJL Development Group, LLC had provided $2,750,000.00 to EVANS, from which the down payment for the property at 115 Lower Church Hill Road would be drawn.  In fact, at no point did either Laudano or NJL Development Group, LLC provide $2,750,000.00 to EVANS. Instead, the down payment for the property came from comingled client funds in the EVANS IOTA Account.

37.     On or about February 3, 2014, R. MATTHEWS, EVANS, their co-conspirators, agents and others wired and caused to be wired $136,237.50 from the EVANS IOTA Account in Florida to an account at Farmington Savings Bank in Connecticut for the down payment on the property at 115 Lower Church Hill Road.

38.     On or about April 2, 2014, Laudano opened NHCS Account-1.

39.     On or about April 30, 2014, Laudano opened NJL Development Account-1.

40.     On or about April 29, 2014, R. MATTHEWS, EVANS, Laudano their co-conspirators, agents and others diverted $2,650,000 of EB-5 money (earmarked for the PHH) from the 160 Royal Palm Account to NHCS Account-1.

11

Case 9:16-cv-80131-KAM   Document 1657-3   Entered on FLSD Docket 07/26/2020   Page 69 of 147
Case 9:15-cv-80532-KAM   Document 166-7   Entered on FLSD Docket 03/10/2019   Page 82 of 100
147

41.     On or about April 30, 2014, R. MATTHEWS, EVANS, Laudano, their co-conspirators, agents and others transferred, and caused the transfer of, $2,655,000 from NHCS Account-1 to NJL Development Account-1.

42.     On or about April 30, 2014, R. MATTHEWS, EVANS, Laudano, their co-conspirators, agents and others wired, and caused the wiring of, $2,601,646 from NJL Development Account-1 to a bank account in Connecticut to purchase the property at 115 Lower Church Hill Road.

In violation of Title 18, United States Code, Sections 1344 and 2.

## COUNT TEN
(Conspiracy to Commit Wire Fraud and Bank Fraud)

43.     Paragraphs 1 through 42 of this Indictment are reincorporated as if fully set forth herein.

44.     Beginning in or about 2012 through in or about January 2018, in the District of Connecticut and elsewhere, R. MATTHEWS and EVANS, together with others known and unknown to the Grand Jury, did knowingly combine, conspire, confederate, and agree together and with each other, to commit offenses against the United States as follows:

        a.      to devise and intend to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises and for the purpose of executing and attempting to execute the scheme and artifice to knowingly transmit, and cause to be transmitted, by means of wire communication in interstate and foreign commerce, certain writings, signs, signals and sounds, in violation of Title 18, United States Code, Section 1343; and

12

b.    to devise and intend to devise a scheme and artifice to defraud JPMC, a
federally insured financial institution, and to obtain money, funds, credits, assets, and other
property owned by and under the custody and control of JPMC, by means of materially
false and fraudulent, pretenses, representations, and promises, in violation of Title 18,
United States Code Sections 1344(1) and (2).

All in violation of Title 18, United States Code, Section 1349.

COUNTS ELEVEN-SIXTEEN
(Illegal Monetary Transactions Using Wire Fraud Proceeds)

45.    Paragraphs 1 through 44 of this Indictment are reincorporated as if fully set forth
herein.

46.    On or about the dates set forth in each count below, in the District of Connecticut
and elsewhere, the defendant named in each count did knowingly engage, and aided and abetted
and caused others to engage, in monetary transactions in criminally derived property of a value
greater than $10,000 involving financial institutions that are engaged in, and the activities of which
affect, interstate commerce, such property having been derived from a specified unlawful
activity—namely wire fraud in violation of Title 18, United States Code, Section 1343—as
follows:

| Count | Date | Defendant Charged | Charged Monetary Transaction | Origin of Funds |
|---|---|---|---|---|
| 11 | 1/8/14 | R. MATTHEWS | A $25,000 wire from NHCS Account-2 to G. Matthews' MCP Savings account. | A transfer of $50,000 of EB-5 money from the 160 Royal Palm Account into NHCS Account-2 on or about January 7, 2014. |

13

| Count | Date | Defendant Charged | Charged Monetary Transaction | Origin of Funds |
|-------|------|-------------------|------------------------------|-----------------|
| 12 | 4/30/14 | R. MATTHEWS and EVANS | A $2,601,646.32 wire from NJL Development Account-1 to an account at Webster Bank in Connecticut. | A wire of $2,650,000 of EB-5 money from the 160 Royal Palm Account to NHCS Account-1 on or about April 29, 2014, and then a subsequent transfer of $2,655,000 from NHCS Account-1 to NJL Development Account-1 on or about April 30, 2014. |
| 13 | 5/2/14 | R. MATTHEWS | A $50,000 wire from NJL Development-1 Account to G. Matthews' MCP Savings account. | |
| 14 | 5/27/14 | R. MATTHEWS | A $100,000 wire from the Bonaventure Account to a Webster Bank account in Woodbury, Connecticut for the purchase of the property at 105 Lower Church Hill Road, Washington Depot, Connecticut. | A transfer of $1,100,000 of EB-5 money from the 160 Royal Palm Account to the Bonaventure Account on or about May 27, 2014. |
| 15 | 6/23/14 | R. MATTHEWS | A $454,715.53 wire from the Bonaventure Account to a Webster Bank account in Woodbury, Connecticut for the purchase of the property at 105 Lower Church Hill Road, Washington Depot, Connecticut. | |
| 16 | 6/23/14 | R. MATTHEWS | A $300,000 wire from the Bonaventure Account to G. Matthews' MCP Savings account. | |

All in violation of Title 18, United States Code, Sections 1957 and 2.

14

COUNTS SEVENTEEN-TWENTY
(Illegal Monetary Transactions Using Bank Fraud Proceeds)

47.     Paragraphs 1 through 46 of this Indictment are reincorporated as if fully set forth herein.

48.     In or about November 2014, several months following the purchase of 115 Lower Church Hill Road from JPMC through straw buyer NJL Development Group, LLC, R. MATTHEWS, his co-conspirators, agents, and others took out a loan secured by 115 Lower Church Hill Road from an individual with the initials K.M.

49.     On or about November 23 and 24, 2014, the loan proceeds were transferred from an account at Webster Bank, which is a federally insured financial institution in Connecticut, to various accounts controlled by Laudano, and then to several other accounts, all at the direction of R. MATTHEWS, Laudano and other co-conspirators.

Transactions in Criminally Derived Proceeds

50.     On or about the dates set forth in each count below, R. MATTHEWS did knowingly engage, and aided and abetted and caused others to engage, in monetary transactions in criminally derived property of a value greater than $10,000 involving financial institutions that are engaged in, and the activities of which affect, interstate commerce, such property having been derived from a specified unlawful activity—namely bank fraud in violation of Title 18, United States Code, Section 1344—as follows:

15

| Count | Date | Monetary Transaction | Origin of Funds |
|-------|------|---------------------|-----------------|
| 17 | 11/24/14 | A $140,00 wire from an account at Webster Bank in Connecticut to NHCS Account-1. | Proceeds from the loan secured by 115 Lower Church Hill Road ("loan proceeds"). |
| 18 | 11/24/14 | A $1,034,712.91 wire from an account at Webster Bank in Connecticut to NJL Development Account-2. | |
| 19 | 11/28/14 | A $100,000 wire from the Mirabia Account to an account at TD Bank located in Connecticut. | A November 25, 2014 wire of $825,000 in loan proceeds into the Mirabia account. |
| 20 | 11/28/14 | A $211,864.58 wire from the Mirabia Account to an account at TD Bank located in Connecticut. | |

In violation of Title 18, United States Code, Sections 1957 and 2.

A TRUE BILL

/s/
_____
FOREPERSON

UNITED STATES OF AMERICA

_____
MICHAEL J. GUSTAFSON
FIRST ASSISTANT UNITED STATES ATTORNEY

_____
JOHN T. PIERPONT, JR.
ASSISTANT U.S. ATTORNEY

NOT A CERTIFIED COPY

16

# EXHIBIT

# "S"

NOT A CERTIFIED COPY

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

Grand Jury N-18-2

UNITED STATES OF AMERICA       CRIMINAL NO.   3:18-CR-48 (VAB)

    v.

ROBERT V. MATTHEWS,
LESLIE R. EVANS, and
MARIA MATTHEWS,
   also known as "Mia Matthews"

VIOLATION:
18 U.S.C. § 1343 (Wire Fraud)
18 U.S.C. § 1344 (Bank Fraud)
18 U.S.C. § 1349 (Conspiracy)
18 U.S.C. § 1957 (Illegal Monetary Transactions)
26 U.S.C. § 7201 (Tax Evasion)
18 U.S.C. § 2 (Aiding and Abetting)

SUPERSEDING INDICTMENT

The Grand Jury charges:

COUNTS ONE THROUGH EIGHT
(R. MATTHEWS and EVANS)
(Wire Fraud)

At all times relevant to this indictment:

The Defendants

1.     Defendant ROBERT V. MATTHEWS ("R. MATTHEWS") was a real estate developer and maintained personal residences in Connecticut and Florida.

2.     Defendant LESLIE R. EVANS ("EVANS") was a real estate attorney and a resident of Florida.

3.     Defendant MARIA MATTHEWS, also known as Mia Matthews ("M. MATTHEWS"), was married to R. MATTHEWS. M. MATTHEWS was an actress and maintained personal residences in Connecticut and Florida with R. MATTHEWS.

1

### Other Relevant Individuals and Entities

4.      Nicholas Laudano ("Laudano"), who is charged separately, was a construction contractor who worked as a contractor for the Palm House Hotel in Palm Beach, Florida.    Laudano also operated multiple pizza restaurants in Florida and Connecticut.   Laudano controlled a number of entities, including New Haven Contracting South Inc., NJL Development Group, LLC, NJL Development Group Inc., and NJL Investments.

5.      Gerry Matthews ("G. Matthews"), who is charged separately, owned and operated a commercial real estate brokerage firm in Connecticut known as Matthews Commercial Properties, LLC ("MCP").   G. Matthews maintained a savings account for MCP at Webster Bank in Connecticut (the "MCP savings account").   G. Matthews is the brother of R. MATTHEWS.

### EB-5 Funding

6.      The EB-5 visa program ("EB-5 program") was a federal program by which foreign nationals and their families were eligible to apply for lawful permanent resident status (commonly known as a "green card") if they invested in a development project in the United States.

7.      The particulars of the EB-5 program varied by project and location, but relevant to this Indictment, an investor was entitled to apply for a green card if, among other requirements, (1) the investor made a $500,000 investment in a development project in the United States and (2) that project ultimately employed ten or more individuals.

8.      Various entities in the United States acted as middlemen between potential foreign investors and investment projects.   South Atlantic Regional Center, LLC ("SARC") was one such entity based in Palm Beach, Florida.

2

Case 9:16-cv-81371-KAM   Document 657-3   Entered on FLSD Docket 07/26/2020   Page 77 of 100
Case 9:19-cv-80932-KAM   Document 106-7   Entered on FLSD Docket 03/10/2019   Page 90 of 160
147

9.      SARC's primary function was to advertise EB-5 projects to foreign investors, collect funds from foreign investors that were earmarked for certain development projects, and make that funding available to the respective development project.

<u>The Palm House Hotel</u>

10.     The Palm House Hotel ("PHH") was located at 160 Royal Palm Way, Palm Beach, Florida.

11.     The PHH was one development project advertised by SARC to EB-5 investors in or around 2012 through in or around 2014.

12.     R. MATTHEWS was the developer in charge of the PHH development project.

13.     R. MATTHEWS had a lengthy history with the PHH.   He originally purchased the property in August 2006.   R. MATTHEWS lost the PHH in foreclosure in 2009.   In August 2013, R. MATTHEWS reacquired control of the PHH through an entity called Palm House, LLC.   G. Matthews, however, was listed as owning 99% of Palm House, LLC in its incorporation documents.   "Minority Owner-1," whose identity is known to the Grand Jury, had secured additional financing for R. MATTHEWS and owned the remaining 1%.

14.     Laudano continuously worked on the development and construction of the PHH as a contractor beginning in or around 2006 through in or around 2016.

<u>The Wire Fraud Scheme</u>

15.     Beginning in or around 2012 and continuing through in or around January 2018, in the District of Connecticut and elsewhere, R. MATTHEWS, EVANS, and others known and unknown to the Grand Jury, knowingly and with intent to defraud, devised and intended to devise, and participated in, a scheme and artifice to defraud and obtain money and property from SARC,

NOT A CERTIFIED COPY

3

EB-5 investors, and others by means of materially false and fraudulent pretenses, representations and promises, and in furtherance of that scheme used and caused to be used interstate wires.

16.    The purpose of the scheme and artifice was for R. MATTHEWS, EVANS, and others known and unknown to the Grand Jury to enrich themselves and their companies by defrauding the EB-5 investors, SARC, and others out of money and property owned by and under the control of the EB-5 investors, SARC, and others by means of materially false and fraudulent pretenses, representations, and promises.

### Manner and Means of the Wire Fraud Scheme

The manner and means by which R. MATTHEWS, EVANS, their co-conspirators, agents, and others known and unknown to the Grand Jury sought to accomplish and did accomplish the objects of the wire fraud scheme included, among others, the following:

17.    R. MATTHEWS, EVANS, their co-conspirators, agents, and others made several material misrepresentations to SARC, prospective EB-5 investors, and/or Minority Owner-1, including that (i) the proceeds of the investment from EB-5 investors would be used to develop the PHH; (ii) certain well-known individuals would be on the PHH advisory board and certain well-known entertainers, businesspeople, and politicians "will be a part of the club"; and (iii) G. Matthews was a member of the Palm House, LLC management team and was the 99% owner of Palm House, LLC.

18.    Despite those misrepresentations to the contrary, in truth, and as R. MATTHEWS and EVANS well knew, (i) R. MATTHEWS, EVANS, their co-conspirators, agents, and others used EB-5 funding for purposes not related to the PHH project, including for the personal gain of R. MATTHEWS and others; (ii) none of the proffered well-known individuals would be on the

4

Case 9:16-cv-80831-KAM   Document 657-3   Entered on FLSD Docket 07/26/2020   Page 79 of 100
Case 9:19-cv-80932-KAM   Document 160-7   Entered on FLSD Docket 03/10/2019   Page 92 of 100
147

PHH advisory board or would be members of the club; and (iii) while G. Matthews was the nominal 99% owner of Palm House, LLC, R. MATTHEWS controlled that company and it belonged to G. Matthews in name only.

19.     EB-5 investors invested in the PHH project by providing money to accounts controlled by SARC.  SARC, in turn, provided EB-5 money earmarked for use at the PHH either (1) into an account in the name of 160 Royal Palm LLC at Regions Bank in Florida that was controlled by R. MATTHEWS, EVANS, and their agents ("160 Royal Palm Account") or (2) into EVANS' Interest on Trust Account that was used to maintain his clients' funds at First United Bank in Florida (the "EVANS IOTA Account").

20.     To use EB-5 funding for purposes not related to the PHH project, including for their own personal gain and the gain of others, R. MATTHEWS, EVANS, their co-conspirators, agents, and others wired EB-5 funds from the 160 Royal Palm Account and the EVANS IOTA Account into and through various accounts, including the following:

    a.    G. Matthews' MCP Savings account located in Connecticut;

    b.    An account at First Bank of the Palm Beaches in Florida in the name of New Haven Contracting South, which account was controlled by Laudano (the "NHCS First Bank Account");

    c.    An account at Regions Bank in Florida in the name of New Haven Contracting South, which account was controlled by Laudano (the "NHCS Regions Account");

5

NOT A CERTIFIED COPY

  d.  An account at First Bank of the Palm Beaches in Florida in the name of NJL Development LLC, which account was controlled by Laudano (the "NJL Development First Bank Account");

  e.  An account at Wells Fargo in Florida in the name of NJL Development Group, Inc., which account was controlled by Laudano (the "NJL Development Wells Fargo Account");

  f.  An account at Regions Bank in Florida in the name of Bonaventure 22 LLC, which account was controlled by R. MATTHEWS and M. MATTHEWS (the "Bonaventure Regions Account"); and

  g.  An account at Regions Bank in Florida in the name of Mirabia LLC, which account was controlled by R. MATTHEWS and M. MATTHEWS (the "Mirabia Regions Account").

  21.  G. Matthews, acting at R. MATTHEWS' direction, used the diverted EB-5 funds in G. Matthews' MCP Savings account for the benefit of R. MATTHEWS and G. MATTHEWS, including by paying the credit card debts of R. MATTHEWS and M. MATTHEWS and moving the money into other accounts controlled by R. MATTHEWS and M. MATTHEWS.

  22.  In or around February 2014 and April 2014, R. MATTHEWS, EVANS, their co-conspirators, agents, and others purchased the property located at 115 Lower Church Hill Road, Washington Depot, Connecticut out of a foreclosure auction with EB-5 money diverted from the PHH project by using a straw company, NJL Development Group, LLC, which was under the control of Laudano.

23.    R. MATTHEWS and M. MATTHEWS used EB-5 funds in the Bonaventure Regions Account and the Mirabia Regions Account to support their own and their family's lifestyle, including but not limited to the purchase of a property located at 105 Lower Church Hill Road, Washington Depot, Connecticut, in or around May 2014 and June 2014.

24.    In or around June 2014, R. MATTHEWS and others purchased a one hundred and fifty-one-foot yacht through a down payment made with EB-5 money and a loan as well as the use of companies that were controlled by R. MATTHEWS and others.

Executions of the Wire Fraud Scheme

25.    On or about the dates set forth in each count below, in the District of Connecticut and elsewhere, for the purpose of executing and attempting to execute the aforementioned scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises as described above, R. MATTHEWS and EVANS did knowingly transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, certain writings, sings, signals an sounds, each wiring as set forth below constitution a separate count of this Indictment:

| Count | Date | Description of Use of Interstate Wires |
|---|---|---|
| 1 | 2/1/14 | An email sent from R. MATTHEWS' email account in Florida to G. Matthews' email account in Connecticut forwarding login instructions to bid on the property at 115 Lower Church Hill Road. |
| 2 | 2/3/14 | A wire for $136,237.50 from the EVANS IOTA account in Florida to an account at Farmington Savings Bank in Connecticut for the purchase of 115 Lower Church Hill Road by NJL Development Group, LLC. |
| 3 | 2/5/14 | A wire in the amount of $8,592.40 of EB-5 money sent from the 160 Royal Palm Account in Florida to the MCP Savings account in Connecticut. |

NOT A CERTIFIED COPY

| Count | Date | Description of Use of Interstate Wires |
|-------|------|----------------------------------------|
| 4 | 4/29/14 | An email sent from an account in the name of an individual with the initials M.P. in Connecticut to Laudano's email account in Florida with documents related to the purchase of 115 Lower Church Hill Road, which was purchased with EB-5 funds. |
| 5 | 6/30/14 | A check in the amount of $12,717.46, which caused the use of interstate wires in moving money from the 160 Royal Palm Account in Florida to the MCP Savings account in Connecticut. |
| 6 | 6/30/14 | A check in the amount of $10,837.86, which caused use of the interstate wires in moving money to move from the 160 Royal Palm Account in Florida to the MCP Savings account in Connecticut. |
| 7 | 10/20/14 | An email sent from the account of an individual working for R. MATTHEWS in Florida to G. Matthews' email account in Connecticut, blind copying R. MATTHEWS' email account and attaching a letter relieving Minority-Owner-1 of his position as Manager of Palm House, LLC. |
| 8 | 10/21/14 | An email sent from G. Matthews' email account in Connecticut to EVANS' email account, appointing EVANS as the managing member of Palm House LLC. |

All in violation of Title 18, United States Code, Section 1343.

COUNT NINE

(R. MATTHEWS and EVANS)

(Bank Fraud)

26.    Paragraphs 1 through 25 of this Indictment are reincorporated as if fully set forth

herein.

Background on 115 Lower Church Hill Road

27.    R. MATTHEWS purchased two properties in or around January 2001 for

$3,900,000: 115 Lower Church Hill Road and 101 Lower Church Hill Road, both in Washington

Depot, Connecticut.   These purchases were initially financed with a $2,000,000 mortgage and two

lines of credit worth $400,000 and $375,000.

8

28.     On or about May 24, 2004, R. MATTHEWS refinanced 115 Lower Church Hill Road with Washington Mutual Bank for $3,600,000. That loan was later assigned to JPMorgan Chase Bank NA ("JPMC"), a bank whose deposits were insured by the Federal Deposit Insurance Corporation.

29.     In or about September 2013, JPMC foreclosed on the loan and took ownership of 115 Lower Church Hill Road. That property was then placed for foreclosure sale at auction by Ten-x d/b/a Auction.com (hereinafter "Auction.com").

### The Bank Fraud Scheme

30.     Beginning in or about 2012 and continuing through in or about April 2016, in the District of Connecticut and elsewhere, R. MATTHEWS, EVANS, and others known and unknown to the Grand Jury, knowingly and with intent to defraud devised and intended to devise, and participated in, a scheme and artifice to defraud JPMC, a federally insured financial institution, and to obtain moneys, funds, credits, assets, and other property owned by or under the custody or control of JPMC, by means of materially false and fraudulent pretenses representations, and promises, and by means of omissions of material fact.

31.     The purpose of the bank fraud scheme was to deceive JPMC, which had foreclosed on R. MATTHEWS' property at 115 Lower Church Hill Road, into re-selling the property to R. MATTHEWS, through a straw purchaser, at a significant loss, thereby permitting R. MATTHEWS, M. MATTHEWS, and others to continue to live there and act as owners of the property.

NOT A CERTIFIED COPY

Case 9:15-cv-80931-KAM   Document 657-3   Entered on FLSD Docket 07/26/2020   Page 84 of 100
Case 9:16-cv-81371-KAM   Document 155-7   Entered on FLSD Docket 03/20/2019   Page 9 of 100
147

<u>Manner and Means of the Bank Fraud Scheme</u>

The manner and means by which R. MATTHEWS, EVANS, their co-conspirators, agents, and others known and unknown to the Grand Jury sought to accomplish and did accomplish the objects of the bank fraud scheme included, among others, the following:

32.    R. MATTHEWS, EVANS, their co-conspirators, agents and others entered into an arrangement among themselves and with Laudano whereby:

a.    Laudano would purchase out of foreclosure, through a shell company, the property at 115 Lower Church Hill Road from JPMC at a significant discount, using EB-5 money from R. MATTHEWS that R. MATTHEWS had diverted from the PHH project;

b.    R. MATTHEWS would continue to live at the property with his family and to act as owner of the property; and

c.    R. MATTHEWS, EVANS, and Laudano would conceal from JPMC the fact that Laudano was purchasing 115 Lower Church Hill Road with money provided by R. MATTHEWS and that R. MATTHEWS would control the property through Laudano, knowing that JPMC would not have sold the property to Laudano if they knew of the source of the funds and Laudano's relationship with R. MATTHEWS.

33.    On or about February 3, 2014, R. MATTHEWS, EVANS, Laudano, their co-conspirators, agents, and others established NJL Development Group, LLC in the state of Delaware under the control of Laudano, with the intent to use NJL Development Group, LLC as a shell company to conceal R. MATTHEWS' involvement and the source of funds in the purchase of 115 Lower Church Hill Road.

10

NOT A CERTIFIED COPY

34. In or around February 2014, R. MATTHEWS, EVANS, Laudano, their co-conspirators, agents, and others in fact arranged the purchase of 115 Lower Church Hill Road from JPMC through the straw entity NJL Development Group, LLC, which was controlled by Laudano, to conceal R. MATTHEWS' involvement in the transaction as well as the source of funds.

35. In or around February 2014, Laudano executed a sales agreement with JPMC to purchase 115 Lower Church Hill Road. On page 5 of the sales agreement under section 5(i), the parties to the sales contract agreed that JPMC had the right to terminate the agreement if the buyer (Laudano and NJL Development Group, LLC) was the former mortgagor (R. MATTHEWS) of the property whose interest was foreclosed/acquired by a deed-in-lieu of foreclosure, or is related to or affiliated in any way with the former mortgagor, and the buyer has not disclosed this fact to the seller (JPMC) in writing prior to the seller's acceptance of the agreement. Notwithstanding this provision, neither Laudano nor R MATTHEWS disclosed to JPMC their relationship or the source of the purchase funds.

36. On or about February 3, 2014, R. MATTHEWS, EVANS, Laudano, their co-conspirators, agents and others sent and caused to be sent a letter from EVANS to Auction.com. In the letter, EVANS falsely and fraudulently represented to Auction.com that Laudano and his company NJL Development Group, LLC had provided $2,750,000.00 to EVANS, from which the down payment for the property at 115 Lower Church Hill Road would be drawn. In fact, at no point did either Laudano or NJL Development Group, LLC provide $2,750,000.00 to EVANS. Instead, the down payment for the property came from comingled client funds in the EVANS IOTA Account.

11

37.    On or about February 3, 2014, R. MATTHEWS, EVANS, their co-conspirators, agents and others wired and caused to be wired $136,237.50 from the EVANS IOTA Account in Florida to an account at Farmington Savings Bank in Connecticut for the down payment on the property at 115 Lower Church Hill Road.

38.    On or about April 2, 2014, Laudano opened the NHCS First Bank Account.

39.    On or about April 30, 2014, Laudano opened the NJL Development First Bank Account.

40.    On or about April 29, 2014, R. MATTHEWS, EVANS, Laudano their co-conspirators, agents and others diverted $2,650,000 of EB-5 money (earmarked for the PHH) from the 160 Royal Palm Account to the NHCS First Bank Account.

41.    On or about April 30, 2014, R. MATTHEWS, EVANS, Laudano, their co-conspirators, agents and others transferred, and caused the transfer of, $2,655,000 from the NHCS First Bank Account to the NJL Development First Bank Account.

42.    On or about April 30, 2014, R. MATTHEWS, EVANS, Laudano, their co-conspirators, agents and others wired, and caused the wiring of, $2,601,646 from the NJL Development First Bank Account to a bank account in Connecticut to purchase the property at 115 Lower Church Hill Road.

All in violation of Title 18, United States Code, Sections 1344 and 2.

NOT A CERTIFIED COPY

Case 9:16-cv-81871-KAM  Document 657-3  Entered on FLSD Docket 07/06/2020  Page 87 of
Case 9:19-cv-80732-KAM  Document 56-3 Entered on FLSD Docket 03/10/2019  Page 107 of
147
160

COUNT TEN
(R. MATTHEWS and EVANS)
(Conspiracy to Commit Wire Fraud and Bank Fraud)

43.     Paragraphs 1 through 42 of this Indictment are reincorporated as if fully set forth herein.

44.     Beginning in or about 2012 through in or about January 2018, in the District of Connecticut and elsewhere, R. MATTHEWS and EVANS, together with others known and unknown to the Grand Jury, did knowingly combine, conspire, confederate, and agree together and with each other, to commit offenses against the United States as follows:

        a.      to devise and intend to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises and for the purpose of executing and attempting to execute the scheme and artifice to knowingly transmit, and cause to be transmitted, by means of wire communication in interstate and foreign commerce, certain writings, signs, signals and sounds, in violation of Title 18, United States Code, Section 1343; and

        b.      to devise and intend to devise a scheme and artifice to defraud JPMC, a federally insured financial institution, and to obtain money, funds, credits, assets, and other property owned by and under the custody and control of JPMC, by means of materially false and fraudulent, pretenses, representations, and promises, in violation of Title 18, United States Code Sections 1344(1) and (2).

All in violation of Title 18, United States Code, Section 1349.

13

Case 9:16-cv-81871-KAM Document 657-3 Entered on FLSD Docket 07/06/2020 Page 88 of
Case 9:19-cv-80732-KAM Document 56-3 Entered on FLSD Docket 03/10/2019 Page 108 of
160

### COUNTS ELEVEN THROUGH SIXTEEN
### (R. MATTHEWS and EVANS)
### (Illegal Monetary Transactions Using Wire Fraud Proceeds)

45.    Paragraphs 1 through 44 of this Indictment are reincorporated as if fully set forth herein.

46.    On or about the dates set forth in each count below, in the District of Connecticut and elsewhere, the defendant named in each count did knowingly engage, and aided and abetted and caused others to engage, in monetary transactions in criminally derived property of a value greater than $10,000 involving financial institutions that are engaged in, and the activities of which affect, interstate commerce, such property having been derived from a specified unlawful activity—namely wire fraud in violation of Title 18, United States Code, Section 1343—as follows:

| Count | Date | Defendant Charged | Charged Monetary Transaction | Origin of Funds |
|-------|------|-------------------|------------------------------|-----------------|
| 11 | 1/8/14 | R. MATTHEWS | A $25,000 wire from the NHCS Regions Account to G. Matthews' MCP Savings account. | A transfer of $50,000 of EB-5 money from the 160 Royal Palm Account into the NHCS Regions Account on or about January 7, 2014. |
| 12 | 4/30/14 | R. MATTHEWS and EVANS | A $2,601,646.32 wire from the NJL Development First Bank Account to an account at Webster Bank in Connecticut. | A wire of $2,650,000 of EB-5 money from the 160 Royal Palm Account to the NHCS First Bank Account on or about April 29, 2014, and then a subsequent transfer of $2,655,000 from the NHCS First Bank Account to the NJL Development First Bank Account on or about April 30, 2014. |
| 13 | 5/2/14 | R. MATTHEWS | A $50,000 wire from NJL Development-1 Account to G. Matthews' MCP Savings account. | |

14

| Count | Date | Defendant Charged | Charged Monetary Transaction | Origin of Funds |
|-------|------|-------------------|------------------------------|------------------|
| 14 | 5/27/14 | R. MATTHEWS | A $100,000 wire from the Bonaventure Regions Account to a Webster Bank account in Woodbury, Connecticut for the purchase of the property at 105 Lower Church Hill Road, Washington Depot, Connecticut. | A transfer of $1,100,000 of EB-5 money from the 160 Royal Palm Account to the Bonaventure Regions Account on or about May 27, 2014. |
| 15 | 6/23/14 | R. MATTHEWS | A $454,715.53 wire from the Bonaventure Regions Account to a Webster Bank account in Woodbury, Connecticut for the purchase of the property at 105 Lower Church Hill Road, Washington Depot, Connecticut. | |
| 16 | 6/23/14 | R. MATTHEWS | A $300,000 wire from the Bonaventure Regions Account to G. Matthews' MCP Savings account. | |

All in violation of Title 18, United States Code, Sections 1957 and 2.

COUNTS SEVENTEEN THROUGH TWENTY
(R. MATTHEWS)
(Illegal Monetary Transactions Using Bank Fraud Proceeds)

47.     Paragraphs 1 through 46 of this Indictment are reincorporated as if fully set forth herein.

48.     In or about November 2014, several months following the purchase of 115 Lower Church Hill Road from JPMC through straw buyer NJL Development Group, LLC, R.

15

NOT A CERTIFIED COPY

MATTHEWS, his co-conspirators, agents, and others took out a loan secured by 115 Lower Church Hill Road from an individual with the initials K.M.

49.     On or about November 23 and 24, 2014, the loan proceeds were transferred from an account at Webster Bank, which is a federally insured financial institution in Connecticut, to various accounts controlled by Laudano, and then to several other accounts, all at the direction of R. MATTHEWS, Laudano and other co-conspirators.

Transactions in Criminally Derived Proceeds

50.     On or about the dates set forth in each count below, R. MATTHEWS did knowingly engage, and aided and abetted and caused others to engage, in monetary transactions in criminally derived property of a value greater than $10,000 involving financial institutions that are engaged in, and the activities of which affect, interstate commerce, such property having been derived from a specified unlawful activity—namely bank fraud in violation of Title 18, United States Code, Section 1344—as follows:

| Count | Date | Monetary Transaction | Origin of Funds |
|-------|------|----------------------|-----------------|
| 17 | 11/24/14 | A $140,000 wire from an account at Webster Bank in Connecticut to the NHCS First Bank Account. | Proceeds from the loan secured by 115 Lower Church Hill Road ("loan proceeds"). |
| 18 | 11/24/14 | A $1,034,712.91 wire from an account at Webster Bank in Connecticut to the NJL Development Wells Fargo Account. | |
| 19 | 11/28/14 | A $100,000 wire from the Mirabia Regions Account to an account at TD Bank located in Connecticut. | A November 25, 2014 wire of $825,000 in loan proceeds into the Mirabia Regions Account. |
| 20 | 11/28/14 | A $211,864.58 wire from the Mirabia Regions Account to an account at TD Bank located in Connecticut. | |

All in violation of Title 18, United States Code, Sections 1957 and 2.

NOT A CERTIFIED COPY

## COUNT TWENTY-ONE
### (R. MATTHEWS and M. MATTHEWS)
#### (Tax Evasion)

51.     Paragraphs 1 through 50 are reincorporated as if fully set forth herein.

52.     On May 16, 2014, Mirabia LLC was formed as a limited liability company under the laws of the State of Delaware ("Mirabia Delaware").  Mirabia Delaware was formed at the direction of R. MATTHEWS with one member, with initials "J.Y."  J.Y. worked as R. MATTHEWS' assistant.  The same day, again at R. MATTHEWS' direction, J.Y. executed a transfer of Mirabia Delaware to M. MATTHEWS, who then became its sole member.  Mirabia Delaware was controlled by R. MATTHEWS and M. MATTHEWS.

53.     From in or about 2009 through in or about March 2017, in the District of Connecticut and elsewhere, R. MATTHEWS and M. MATTHEWS willfully attempted to evade and defeat the payment of income tax due and owing by them to the United States of America, for the calendar years 2005 and 2007, and aided and abetted each other to do the same, by committing the following affirmative acts, among others:

a.      From in or about 2012 through in or about 2016, R. MATTHEWS and G. Matthews used the MCP Savings Account to pay R. MATTHEWS' and M. MATTHEWS' personal expenses.

b.      In or about October 2013 and May 2014, R. MATTHEWS used EB-5 investor funds that did not pass through an account in his name to pay back a personal loan he owed to an individual with the initials L.M.

17

c.  From in or about February 2014 through in or about April 2014, R. MATTHEWS, EVANS and others conspired to purchase 115 Lower Church Hill Road out of foreclosure through the use of NJL Development Group, LLC.

d.  From in or about December 2013 through in or about March 2014, R. MATTHEWS used funds from the EVANS IOTA Account to make mortgage and tax payments associated with his personal residence in Palm Beach, Florida.

e.  In or around May and June 2014, R. MATTHEWS and M. MATTHEWS purchased a property located at 105 Lower Church Hill Road, Washington Depot, Connecticut, in the name of Mirabia Delaware.

f.  In or around November 2014, R. MATTHEWS and M. MATTHEWS executed documents to obtain a loan secured by 115 Lower Church Hill Road from an individual with the initials K.M.  The proceeds of the loan were disbursed into the Mirabia Regions Account where they were used for personal expenses of R. MATTHEWS and M. MATTHEWS.

g.  In or around March 2015, R. MATTHEWS and M. MATTHEWS executed documents to obtain a loan secured by 105 Lower Church Hill Road, Washington Depot, Connecticut from Highland Financial Associates in Connecticut.  The proceeds of the loan were disbursed into the Mirabia Regions Account where they were used for personal expenses of R. MATTHEWS and M. MATTHEWS.

h.  On or about August 23, 2016, R. MATTHEWS and M. MATTHEWS received notice from the IRS that a failure to pay their delinquent income tax liabilities by September 2, 2016, would result in the seizure of all of their assets.  On or about

18

September 2, 2016, R. MATTHEWS sold a Mercedes for $82,000 and, after paying off a lien, cause the proceeds of the sale to be wired into the EVANS IOTA Account.

All in violation of Title 26, United States Code, Section 7201, and Title 18, United States Code, Section 2.

A TRUE BILL

/s/

FOREPERSON

UNITED STATES OF AMERICA

JOHN H. DURHAM
UNITED STATES ATTORNEY

JOHN T. PIERPONT, JR.
ASSISTANT U.S. ATTORNEY

DAVID E. NOVICK
ASSISTANT U.S. ATTORNEY

NOT A CERTIFIED COPY

Case 9:19-cv-80932-KAM Document 55-6 Entered on FLSD Docket 03/10/2019 Page 107 of
147

# EXHIBIT "T"

NOT A CERTIFIED COPY

Case 9:16-cv-81871-KAM Document 657-3 Entered on FLSD Docket 07/06/2020 Page 95 of
Case 9:19-cv-80732-KAM Document 56-3 Entered on FLSD Docket 03/10/2019 Page 105 of
160

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA        CRIMINAL NO.   3:18-CR-47(VAB)

v.                       VIOLATIONS:
                                  18 U.S.C. § 1349 (Conspiracy to Commit
                                           Bank Fraud)

NICHOLAS LAUDANO             18 U.S.C. § 1957 (Illegal Monetary Transactions)

INFORMATION

The United States Attorney charges:

COUNT ONE
(Conspiracy to Commit Bank Fraud)

At all times relevant to this Information:

The Defendant

1.     Defendant NICHOLAS LAUDANO ("LAUDANO") was a resident of Connecticut and Florida.

2.     LAUDANO was a construction contractor who worked as a contractor for the Palm House Hotel in Palm Beach, Florida.. LAUDANO also operated multiple pizza restaurants in Florida and Connecticut. LAUDANO controlled a number of entities, including New Haven Contracting South Inc., NJL Development Group, LLC, NJL Development Group Inc., and NJL Investments.

NOT A CERTIFIED COPY

1

Case 9:16-cv-81871-KAM Document 657-3 Entered on FLSD Docket 07/06/2020 Page 96 of
Case 9:19-cv-80732-KAM Document 56-3 Entered on FLSD Docket 03/10/2019 Page 109 of
160

### EB-5 Funding

3.      The EB-5 visa program ("EB-5 program") was a federal program by which foreign nationals and their families were eligible to apply for lawful permanent resident status (commonly known as a "green card") if they invested in a development project in the United States.

4.      The particulars of the EB-5 program varied by project and location, but relevant to this information, an investor was entitled to apply for a green card if, among other requirements, (1) the investor made a $500,000 investment in a development project in the United States and (2) that project ultimately employed ten or more individuals.

5.      Various entities in the United States acted as middlemen between potential foreign investors and investment projects.   South Atlantic Regional Center, LLC ("SARC") was one such entity based in Palm Beach, Florida.

6.      SARC's primary function was to advertise EB-5 projects to foreign investors; collect funds from foreign investors that were earmarked for certain development projects, and make that funding available to the respective development project.

### The Palm House Hotel

7.      The Palm House Hotel ("PHH") was located at 160 Royal Palm Way, Palm Beach, Florida.

8.      The PHH was one development project advertised by SARC to EB-5 investors in or around 2012 through in or around 2014.

9.      "Developer-1," whose identity is known to the United States Attorney, was the developer in charge of the PHH development project.

Case 9:16-cv-81871-KAM   Document 657-3   Entered on FLSD Docket 07/06/2020   Page 97 of
160
Case 9:19-cv-80732-KAM   Document 56-3   Entered on FLSD Docket 03/10/2019   Page 97 of
160

NOT A CERTIFIED COPY

10.     Developer-1 had a lengthy history with the PHH. He originally purchased the property in August 2006. Developer-1 lost the PHH in foreclosure in 2009. In August 2013, Developer-1 reacquired control of the PHH through an entity called Palm House, LLC. "Majority Owner-1," whose identity is known to the United States Attorney, however, was listed as owning 99% of Palm House, LLC in its incorporation documents. Another individual, who is known to the United States Attorney and referred to herein as "Minority Owner-1," had secured additional financing for Developer-1 and owned the remaining 1%.

11.     LAUDANO continuously worked on the development and construction of the PHH as a contractor beginning in or around 2006 through in or around 2016.

12.     Despite representations that EB-5 money would be used to fund the PHH project, Developer-1, his co-conspirators, agents, and others frequently diverted large portions of the EB-5 money for personal purposes, including buying a personal residence out of foreclosure, as described below.

## 115 Lower Church Hill Road

13.     Developer-1 purchased two properties in or around January 2001 for $3,900,000: 115 Lower Church Hill Road and 101 Lower Church Hill Road, both in Washington Depot, Connecticut. These purchases were initially financed with a $2,000,000 mortgage and two lines of credit worth $400,000 and $375,000.

14.     On or about May 24, 2004, Developer-1 refinanced 115 Lower Church Hill Road with Washington Mutual Bank for $3,600,000. That loan was later assigned to JPMorgan Chase Bank NA ("JPMC"), a bank whose deposits were insured by the Federal Deposit Insurance Corporation.

15.    In or around September 2013, JPMC foreclosed on the loan and took ownership of 115 Lower Church Hill Road,. That property was then placed for foreclosure sale at auction by Ten-x d/b/a Auction.com.

<u>The Conspiracy</u>

16.    Beginning in or around 2012 through in or around April 2016, in the District of Connecticut and elsewhere, LAUDANO and Developer-1, together with others known and unknown to the United States Attorney, did knowingly and with intent to defraud combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, that is; to devise and participate in a scheme and artifice to defraud JPMC, a federally insured financial institution, and to obtain moneys, funds, credits, assets, and other property owned by and under the custody or control of JPMC, by means of materially false and fraudulent pretenses representations, and promises, and by means of omissions of material fact, in violation of Title 18, United States Code, Section 1344.

17.    The purpose of the conspiracy was to deceive JPMC, which had foreclosed on Developer-1's property at 115 Lower Church Hill Road, into re-selling the property to Developer-1, through a straw purchaser, at a significant loss, thereby permitting Developer-1 and others to continue to live there and act as owners of the property.

<u>The Manner and Means of the Conspiracy</u>

The manner and means by which LAUDANO, Developer-1, their co-conspirators, agents, and others known and unknown to the United States Attorney sought to accomplish and did accomplish the objects of the conspiracy included, among others, the following:

4

18. LAUDANO, Developer-1, their co-conspirators, agents, and others entered into an arrangement among themselves whereby:

a. LAUDANO would purchase out of foreclosure, through a shell company, the property at 115 Lower Church Hill Road from JPMC at a significant discount, using EB-5 money from Developer-1 that Developer-1 had diverted from the PHH project;

b. Developer-1 would continue to live at the property with his family and to act as owner of the property; and

c. LAUDANO, Developer-1, their co-conspirators, agents, and others would conceal from JPMC the fact that LAUDANO was purchasing 115 Lower Church Hill Road with money provided by Developer-1 and that Developer-1 would control the property through LAUDANO, knowing that JPMC would not have sold the property to LAUDANO if it had known the source of the funds and LAUDANO's relationship with Developer-1.

19. On or about February 3, 2014, LAUDANO, Developer-1, their co-conspirators, agents, and others, established NJL Development Group, LLC in the state of Delaware under the control of LAUDANO, with the intent to use NJL Development Group, LLC as a shell company to conceal Developer-1's involvement and the source of funds in the purchase of 115 Lower Church Hill Road.

20. In or around February 2014, LAUDANO, Developer-1, their co-conspirators, agents, and others in fact arranged the purchase of 115 Lower Church Hill Road from JPMC through the straw entity NJL Development Group, LLC, which was controlled by LAUDANO, to conceal Developer-1's involvement in the transaction as well as the source of funds.

5

21.    In or around February 2014, LAUDANO executed a sales agreement with JPMC to purchase 115 Lower Church Hill Road.  On page 5 of the sales agreement under section 5(i), the parties to the sales contract agreed that JPMC had the right to terminate the agreement if the buyer (LAUDANO and NJL Development Group LLC) was the former mortgagor (Developer-1) of the property whose interest was foreclosed/acquired by a deed-in-lieu of foreclosure, or was related to or affiliated in any way with the former mortgagor, and the buyer has not disclosed this fact to the seller in writing prior to the seller's acceptance of the agreement.  Notwithstanding this provision, neither LAUDANO nor Developer-1 disclosed to JPMC their relationship or the source of the purchase funds.

22.    On or about February 3, 2014, LAUDANO, Developer-1, their co-conspirators, agents, and others sent and caused to be sent a letter from Developer-1's attorney to Auction.com. In the letter, Developer-1's attorney falsely and fraudulently represented to Auction.com that LAUDANO and his company NJL Development Group, LLC had provided $2,750,000.00 to the attorney, from which the down payment for the property at 115 Lower Church Hill Road would be drawn.  In fact, at no point did either LAUDANO or NJL Development Group, LLC provide $2,750,000 to Developer-1's attorney.  Instead, the down payment for the property came from comingled client funds in the Interest on Trust Account ("IOTA") operated by Developer-1's attorney.

23.    On or about February 3, 2014, Developer-1 and others wired and caused to be wired $136,237.50 from his attorney's IOTA in Florida to an account at Farmington Savings Bank in Connecticut for the down payment on the property at 115 Lower Church Hill Road.

6

NOT A CERTIFIED COPY

24.    On or about April 29 and 30, 2014, Developer-1 and others arranged for $2,650,000 of EB-5 money (earmarked for the PHH) to be diverted from a PHH project account in Florida to a bank account controlled by LAUDANO in Florida, who then transferred $2,655,000 to another account he controlled in the name of NJL Development Group, LLC, and then transferred $2,601,646 to a bank account in Connecticut to purchase 115 Church Hill Road.

All in violation of Title 18, United States Code, Section 1349.

COUNT TWO
(Illegal Monetary Transaction)

25.    The allegations in Paragraphs 1 through 24 of this Information are incorporated by reference.

Loan Secured by 115 Lower Church Hill Road

26.    In or around November 2014, several months following the purchase of 115 Lower Church Hill Road from JPMC through straw buyer NJL Development Group, LLC, LAUDANO, Developer-1, their co-conspirators, agents, and others took out a loan secured by the property at 115 Lower Church Hill Road from an individual with the initials K.M.

27.    On or about November 23 and 24, 2014, loan proceeds were transferred from an account under the control of K.M.'s agent at Webster Bank, which is a federally insured financial institution in Connecticut, to an account in Florida in the name of LAUDANO's company New Haven Contracting South, and then to several other accounts, all at the direction of LAUDANO, Developer-1, their co-conspirators, agents, and others.

Transaction in Criminally Derived Proceeds

28.    On or about November 24, 2014, defendant LAUDANO did knowingly engage and attempt to engage in a monetary transactions in criminally derived property of a value greater than

7

NOT A CERTIFIED COPY

$10,000 involving financial institutions that are engaged in, and the activities of which affect, interstate commerce, such property having been derived from a specified unlawful activity—namely bank fraud in violation of Title 18, United States Code, Section 1344—that is, the transfer $1,034,712.91 of loan proceeds secured by the property at 115 Lower Church Hill Road from an account under the control of K.M.'s agent located at Webster Bank in Connecticut to a First Bank of the Palm Beaches account in Florida in the name of LAUDANO's company NJL Development Group Inc.

All in violation of Title 18, United States Code, Section 1957.


UNITED STATES OF AMERICA

MICHAEL J. GUSTAFSON
FIRST ASSISTANT UNITED STATES ATTORNEY


JOHN T. PIERPONT, JR.
ASSISTANT U.S. ATTORNEY

NOT A CERTIFIED COPY

8



**U.S. Department of Justice**

*United States Attorney*
*District of Connecticut*

Connecticut Financial Center        (203)821-3700
157 Church Street, 25ᵗʰ Floor        Fax (203) 773-5376
New Haven, Connecticut 06510        www.justice.gov/usao/ct

March 12, 2018

Robert M. Casale, Esq.
The Law Offices of Robert M. Casale
1944 Route 77
Guilford, CT 06437

Re:  United States v. Nicholas Laudano
     Criminal No. 3:18-CR- 4기 (WWE)

Dear Attorney Casale:

        This letter confirms the plea agreement between your client, Nicholas Laudano (the "defendant"), and the United States Attorney's Office for the District of Connecticut (the "Government") concerning the referenced criminal matter.

**THE PLEAS AND OFFENSES**

        The defendant agrees to waive his right to be indicted and to plead guilty to a two-count information charging violations of 18 U.S.C. §§ 1349 (conspiracy to commit bank fraud) and 1957 (illegal monetary transactions).

        The defendant understands that, to be guilty of conspiracy to commit bank fraud under 18 U.S.C. § 1349, the following essential elements of the offense must be satisfied:

        1.        Two or more persons, in some way or manner, agreed to try to accomplish a common and unlawful plan to commit bank fraud as charged in the information; and

        2.        The defendant knew the unlawful purpose of the plan and willfully joined in it.

        The defendant understands that, to be guilty of illegal monetary transactions under 18 U.S.C. § 1957, the following essential elements of the offense must be satisfied:

        1.        The defendant knowingly engaged in a monetary transaction;

*March 12, 2018 Letter to Robert M. Casale, Esq.*
*Page 2*

2.    The monetary transaction involved criminally derived proceeds of a value greater than $10,000;

3.    The monetary transaction involved criminally derived property, which was derived from specified unlawful activity;

4.    The defendant knew that the monetary transaction involved criminally derived property; and

5.    The monetary transaction took place within the United States.

## THE PENALTIES

### Imprisonment

Conspiracy to commit bank fraud under 18 U.S.C. § 1349 carries a maximum penalty of 30 years of imprisonment.

Illegal monetary transactions under 18 U.S.C. § 1957 carries a maximum penalty of 10 years of imprisonment.

### Supervised Release

In addition, for the conspiracy to commit bank fraud charge, the Court may impose a term of supervised release of not more than five years to begin after any term of imprisonment. 18 U.S.C. § 3583. The defendant understands that, should he violate any condition of supervised release imposed for the bank fraud conspiracy charge, he may be required to serve a further term of imprisonment of up to three years per violation pursuant to 18 U.S.C. § 3583 with no credit for time already spent on supervised release.

For the illegal monetary transactions charge, the Court may impose a term of supervised release of not more than three years to begin after any term of imprisonment. 18 U.S.C. § 3583. The defendant understands that, should he violate any condition of supervised release imposed for the illegal monetary transaction charge, he may be required to serve a further term of imprisonment of up to two years per violation pursuant to 18 U.S.C. § 3583 with no credit for time already spent on supervised release.

### Fine

The offense of conspiracy to commit bank fraud carries a maximum fine of $1,000,000. The offense of illegal monetary transactions carries a maximum fine of $250,000. The defendant is also subject to the alternative fine provision of 18 U.S.C. § 3571. Under this section, the maximum fine that may be imposed on the defendant is the greatest of the following amounts: (1) twice the gross gain to the defendant resulting from the offense; (2) twice the gross loss resulting from the offense; (3) $250,000; or (4) the amount specified in the section defining the offense, which is $1,000,000 for bank fraud conspiracy charge.

NOT A CERTIFIED COPY

March 12, 2018 Letter to Robert M. Casale, Esq.
Page 3

### Special Assessment

In addition, the defendant is obligated by 18 U.S.C. § 3013 to pay a special assessment of $100 on each count of conviction, for a total of $200. The defendant agrees to pay the special assessment to the Clerk of the Court on the day the guilty pleas are accepted.

### Restitution

In addition to the other penalties provided by law, the Court must also order that the defendant make restitution under 18 U.S.C. § 3663A, and the Government reserves its right to seek restitution on behalf of victims consistent with the provisions of § 3663A. The scope and effect of the order of restitution are set forth in the attached Rider Concerning Restitution. Restitution is payable immediately unless otherwise ordered by the Court.

### Interest, penalties and fines

Unless otherwise ordered, should the Court impose a fine or restitution of more than $2,500 as part of the sentence, interest will be charged on the unpaid balance of the fine or restitution not paid within 15 days after the judgment date. 18 U.S.C. § 3612(f). Other penalties and fines may be assessed on the unpaid balance of a fine or restitution pursuant to 18 U.S.C. § 3572(h), (i) and § 3612(g).

### Forfeiture

The defendant agrees that by virtue of his pleas of guilty he waives any rights or cause of action to claim that he is a "substantially prevailing party" for the purpose of recovery of attorney fees and other litigation costs in any related forfeiture proceeding pursuant to 28 U.S.C. § 2465(b)(1).

## THE SENTENCING GUIDELINES

### Applicability

The defendant understands that the Court is required to consider any applicable Sentencing Guidelines as well as other factors enumerated in 18 U.S.C. § 3553(a) to tailor an appropriate sentence in this case and is not bound by this plea agreement. The defendant agrees that the Sentencing Guideline determinations will be made by the Court, by a preponderance of the evidence, based upon input from the defendant, the Government, and the United States Probation Office. The defendant further understands that he has no right to withdraw his guilty pleas if his sentence or the Guideline application is other than he anticipated, including if the sentence is outside any of the ranges set forth in this agreement.

*March 12, 2018 Letter to Robert M. Casale, Esq.*
*Page 4*

Acceptance of Responsibility

At this time, the Government agrees to recommend that the Court reduce by two levels the defendant's adjusted offense level under § 3E1.1(a) of the Sentencing Guidelines, based on the defendant's prompt recognition and affirmative acceptance of personal responsibility for the offense. Moreover, should the defendant qualify for a decrease under § 3E1.1(a) and his offense level determined prior to the operation of subsection (a) is level 16 or greater, the Government will file a motion with the Court pursuant to § 3E1.1(b) which recommends that the Court reduce the defendant's Adjusted Offense Level by one additional level based on his prompt notification of his intention to enter a plea of guilty. The defendant understands that the Court is not obligated to accept the Government's recommendations on the reductions.

The above-listed recommendations are conditioned upon the defendant's affirmative demonstration of acceptance of responsibility, by (1) truthfully admitting the conduct comprising the offense(s) of conviction and truthfully admitting or not falsely denying any additional relevant conduct for which the defendant is accountable under § 1B1.3 of the Sentencing Guidelines, and (2) truthfully disclosing to the United States Attorney's Office and the United States Probation Office personal information requested, including the submission of a complete and truthful financial statement detailing the defendant's financial condition. The defendant expressly authorizes the United States Attorney's Office to obtain a credit report concerning the defendant.

In addition, the Government expressly reserves the right to seek denial of the adjustment for acceptance of responsibility if the defendant engages in any acts, unknown to the Government at the time of the signing of this agreement, which (1) indicate that the defendant has not terminated or withdrawn from criminal conduct or associations (§ 3E1.1 of the Sentencing Guidelines); (2) could provide a basis for an adjustment for obstructing or impeding the administration of justice (§ 3C1.1 of the Sentencing Guidelines); or (3) constitute a violation of any condition of release. Moreover, the Government reserves the right to seek denial of the adjustment for acceptance of responsibility if the defendant seeks to withdraw his guilty pleas or takes a position at sentencing, or otherwise, which, in the Government's assessment, is inconsistent with affirmative acceptance of personal responsibility. The defendant understands that he may not withdraw his pleas of guilty if, for the reasons explained above, the Government does not make one or both of the recommendations or seeks denial of the adjustment for acceptance of responsibility.

Waiver of Right to Appeal or Collaterally Attack Conviction and Sentence

The defendant acknowledges that under certain circumstances he is entitled to challenge his conviction and sentence. The defendant agrees not to appeal or collaterally attack his conviction in any proceeding, including but not limited to a motion under 28 U.S.C. § 2255 and/or § 2241. Nor will he pursue such an appeal or collateral attack to challenge the sentence imposed by the Court if that sentence does not exceed 360 months of imprisonment, a 5-year term of supervised release, a $100 special assessment, a $1,000,000 fine, and restitution in any amount imposed by the Court. The Government and the defendant agree that this waiver applies regardless of whether the term of imprisonment is imposed to run consecutively to or

*March 12, 2018 Letter to Robert M. Casale, Esq.*
*Page 5*

concurrently with, in whole or in part, the undischarged portion of any other sentence that has been imposed on the defendant at the time of sentencing in this case. The defendant acknowledges that he is knowingly and intelligently waiving these rights. Furthermore, the parties agree that any challenge to the defendant's sentence that is not foreclosed by this provision will be limited to that portion of the sentence that is inconsistent with (or not addressed by) this waiver. Nothing in the foregoing waiver of appellate and collateral review rights shall preclude the defendant from raising a claim of ineffective assistance of counsel in an appropriate forum.

### Information to the Court

The Government reserves its right to address the Court with respect to an appropriate sentence to be imposed in this case. Moreover, the Government will discuss the facts of this case, including information regarding the defendant's background and character, 18 U.S.C. § 3661, with the United States Probation Office and will provide the Probation Officer with access to material in its file, with the exception of grand jury material.

## WAIVER OF RIGHTS

### Waiver of Right to Indictment

The defendant understands that he has the right to have the facts of this case presented to a federal grand jury, consisting of between sixteen and twenty-three citizens, twelve of whom would have to find probable cause to believe that he committed the offense set forth in the information before an indictment could be returned. The defendant acknowledges that he is knowingly and intelligently waiving his right to be indicted.

### Waiver of Trial Rights and Consequences of Guilty Pleas

The defendant understands that he has the right to be represented by an attorney at every stage of the proceeding and, if necessary, one will be appointed to represent him.

The defendant understands that he has the right to plead not guilty or to persist in that plea if it has already been made, the right to a public trial, the right to be tried by a jury with the assistance of counsel, the right to confront and cross-examine the witnesses against him, the right not to be compelled to incriminate himself, the right to testify and present evidence, and the right to compel the attendance of witnesses to testify in his defense. The defendant understands that by pleading guilty he waives those rights and that, if the pleas of guilty are accepted by the Court, there will not be a further trial of any kind.

The defendant understands that, if he pleads guilty, the Court may ask him questions about each offense to which he pleads guilty, and if he answers those questions falsely under oath, on the record, and in the presence of counsel, his answers may later be used against him in a prosecution for perjury or making false statements.

*March 12, 2018 Letter to Robert M. Casale, Esq.*
*Page 6*

<u>Waiver of Statute of Limitations</u>

The defendant agrees that, should the convictions following defendant's guilty pleas be vacated for any reason, then any prosecution that is not time-barred by the applicable statute of limitations on the date of the signing of this plea agreement (including any indictment or counts the Government has agreed to dismiss at sentencing pursuant to this plea agreement) may be commenced or reinstated against the defendant, notwithstanding the expiration of the statute of limitations between the signing of this plea agreement and the commencement or reinstatement of such prosecution. The defendant agrees to waive all defenses based on the statute of limitations with respect to any prosecution that is not time-barred on the date the plea agreement is signed.

## ACKNOWLEDGMENT OF GUILT AND VOLUNTARINESS OF PLEAS

The defendant acknowledges that he is entering into this agreement and is pleading guilty freely and voluntarily because he is guilty. The defendant further acknowledges that he is entering into this agreement without reliance upon any discussions between the Government and him (other than those described in the plea agreement letter), without promise of benefit of any kind (other than the concessions contained in the plea agreement letter), and without threats, force, intimidation, or coercion of any kind. The defendant further acknowledges his understanding of the nature of the offenses to which he is pleading guilty, including the penalties provided by law. The defendant also acknowledges his complete satisfaction with the representation and advice received from his undersigned attorney. The defendant and his undersigned counsel are unaware of any conflict of interest concerning counsel's representation of the defendant in the case.

## SCOPE OF THE AGREEMENT

The defendant acknowledges that this agreement is limited to the undersigned parties and cannot bind any other federal authority, or any state or local authority. The defendant acknowledges that no representations have been made to him with respect to any civil or administrative consequences that may result from these pleas of guilty because such matters are solely within the province and discretion of the specific administrative or governmental entity involved. Finally, the defendant acknowledges that this agreement has been reached without regard to any civil tax matters that may be pending or which may arise involving him.

## COLLATERAL CONSEQUENCES

The defendant understands that he will be adjudicated guilty of each offense to which he has pleaded guilty and will be deprived of certain rights, such as the right to hold public office, to serve on a jury, to possess firearms and ammunition, and in some states, the right to vote. Further, the defendant understands that if he is not a citizen of the United States, a plea of guilty may result in removal from the United States, denial of citizenship, and denial of admission to the United States in the future. The defendant understands that pursuant to section 203(b) of the Justice For All Act, the Federal Bureau of Prisons or the United States Probation Office will collect a DNA sample from the defendant for analysis and indexing. Finally, the defendant

*March 12, 2018 Letter to Robert M. Casale, Esq.*
*Page 7*

understands that the Government reserves the right to notify any state or federal agency by which he is licensed, or with which he does business, as well as any current or future employer of the fact of his conviction.

## SATISFACTION OF FEDERAL CRIMINAL LIABILITY; BREACH

The defendant's guilty pleas, if accepted by the Court, will satisfy the federal criminal liability of the defendant in the District of Connecticut as a result of his conduct underlying Counts One and Two of the Information.

The defendant understands that if, before sentencing, he violates any term or condition of this agreement, engages in any criminal activity, or fails to appear for sentencing, the Government may void all or part of this agreement. If the agreement is voided in whole or in part, defendant will not be permitted to withdraw his guilty pleas.

NOT A CERTIFIED COPY

Case 9:16-cv-81871-KAM Document 65-3 Entered on FLSD Docket 07/06/2020 Page 110 of
Case 9:19-cv-80332-KAM Document 15-3 Entered on FLSD Docket 09/10/2019 Page 123 of
140

*March 12, 2018 Letter to Robert M. Casale, Esq.*
*Page 8*

## NO OTHER PROMISES

      The defendant acknowledges that no other promises, agreements, or conditions have been entered into other than those set forth in this plea agreement, and none will be entered into unless set forth in writing, signed by all the parties.

      This letter shall be presented to the Court, in open court, and filed in this case.

                        Very truly yours,

                        JOHN H. DURHAM
                        UNITED STATES ATTORNEY

                        JOHN T. PIERPONT, JR.
                        ASSISTANT UNITED STATES ATTORNEY

      The defendant certifies that he has read this plea agreement letter and its attachment(s) or has had it read or translated to him, that he has had ample time to discuss this agreement and its attachment(s) with counsel and that he fully understands and accepts its terms.

NICHOLAS LAUDANO             3-12-18
The Defendant                 Date

      I have thoroughly read, reviewed and explained this plea agreement and its attachment(s) to my client who advises me that he understands and accepts its terms.

ROBERT M. CASALE, ESQ.       3-12-18
Attorney for the Defendant       Date

DTA CERTIFIED COPY

NOT A CERTIFIED COPY

*March 12, 2018 Letter to Robert M. Casale, Esq.*
*Page 9*

## RIDER CONCERNING RESTITUTION

The Court shall order that the defendant make restitution under 18 U.S.C. § 3663A as follows:

1. If the offense resulted in damage to or loss or destruction of property of a victim of the offense:

    A. Return the property to the owner of the property or someone designated by the owner; or

    B. If return of the property is impossible, impracticable, or inadequate, pay an amount equal to:

       The greater of -
       (I) the value of the property on the date of the damage, loss, or destruction; or

       (II) the value of the property on the date of sentencing, less the value as of the date the property is returned.

2. In the case of an offense resulting in bodily injury to a victim –

    A. Pay an amount equal to the costs of necessary medical and related professional services and devices related to physical, psychiatric, and psychological care; including non-medical care and treatment rendered in accordance with a method of healing recognized by the law of the place of treatment;

    B. Pay an amount equal to the cost of necessary physical and occupational therapy and rehabilitation; and

    C. Reimburse the victim for income lost by such victim as a result of such offense;

3. In the case of an offense resulting in bodily injury that results in the death of the victim, pay an amount equal to the cost of necessary funeral and related services; and

4. In any case, reimburse the victim for lost income and necessary child care, transportation, and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense.

The order of restitution has the effect of a civil judgment against the defendant. In addition to the Court-ordered restitution, the Court may order that the conditions of its order of restitution be made a condition of probation or supervised release. Failure to make restitution as ordered may result in a revocation of probation, 18 U.S.C. § 3565, or a modification of the conditions of supervised release, 18 U.S.C. § 3583(e). Failure to pay restitution may also result in the defendant being held in contempt, or the defendant's re-sentencing to any sentence which might originally have been imposed by the Court. *See* 18 U.S.C. §§ 3613A, 3614. The Court

*March 12, 2018 Letter to Robert M. Casale, Esq.*
*Page 10*

may also order that the defendant give notice to any victim(s) of his offense under 18 U.S.C. §
3555.



NOT A CERTIFIED COPY

Case 9:19-cv-80332-KAM Document 52-3 Entered on FLSD Docket 09/10/2019 Page 126 of 160

# EXHIBIT "U"

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| UNITED STATES OF AMERICA | CRIMINAL NO.   3:18-CR-43(VAB) |
|---|---|
| v. | VIOLATION: |
| GERRY MATTHEWS | 18 U.S.C. § 1349 (Conspiracy) |

### INFORMATION

The United States Attorney charges:

### COUNT ONE
(Conspiracy to Commit Wire Fraud)

At all times relevant to this Information:

### The Defendant

1.     Defendant GERRY MATTHEWS ("G. MATTHEWS") was a resident of Connecticut.

2.     G. MATTHEWS owned and operated a commercial real estate brokerage firm in Connecticut known as Matthews Commercial Properties, LLC ("MCP").   G. MATTHEWS maintained a savings account for MCP at Webster Bank in Connecticut (the "MCP savings account").

### EB-5 Funding

3.     The EB-5 visa program ("EB-5 program") was a federal program by which foreign nationals and their families were eligible to apply for lawful permanent resident status (commonly known as a "green card") if they invested in a development project in the United States.

1

4.      The particulars of the EB-5 program varied by project and location, but relevant to this Information, an investor was entitled to apply for a green card if, among other requirements, (1) the investor made a $500,000 investment in a development project in the United States and (2) that project ultimately employed ten or more individuals.

5.      Various entities in the United States acted as middlemen between potential foreign investors and investment projects.   South Atlantic Regional Center, LLC ("SARC") was one such entity based in Palm Beach, Florida.

6.      SARC's primary function was to advertise EB-5 projects to foreign investors, collect funds from foreign investors that were earmarked for certain development projects, and make that funding available to the respective development project.

### The Palm House Hotel

7.      The Palm House Hotel ("PHH") was located at 160 Royal Palm Way, Palm Beach, Florida.

8.      The PHH was one development project advertised by SARC to EB-5 investors in or around 2012 through in or around 2014.

9.      "Developer-1," whose identity is known to the United States Attorney, was the developer in charge of the PHH development project.

10.      Developer-1 had a lengthy history with the PHH.  He originally purchased the property in August 2006.  Developer-1 lost the PHH in foreclosure in 2009.  In August 2013, Developer-1 reacquired control of the PHH through an entity called Palm House, LLC.  G. MATTHEWS, however, was listed as owning 99% of Palm House, LLC.  Another individual,

2

who is known to the United States Attorney and referred to herein as "Minority Owner-1," had

secured additional financing for Developer-1 and owned the remaining 1%.

The Conspiracy

11.     Beginning in or about 2012 and continuing through in or about January 2018, in

the District of Connecticut and elsewhere, Developer-1, together with others known and unknown

to the United States Attorney, did willfully and knowingly combine, conspire, confederate, and

agree together and with each other, to commit offenses against the United States, that is, to devise

and participate in a scheme and artifice to defraud and to obtain money and property by means of

materially false and fraudulent pretenses, representations, and promises, and for the purpose of

executing and attempting to execute the scheme and artifice to knowingly transmit, and cause to

be transmitted, by means of wire communication in interstate and foreign commerce, certain

writings, signs, signals and sounds, in violation of Title 18, United States Code, Section 1343.

12.     The purpose of the conspiracy was for Developer-1, and others known and

unknown to the United States Attorney, to obtain money, funds, and assets and to enrich

themselves and their companies by defrauding the EB-5 investors, SARC, and others out of money

and property owned by and under the control of the EB-5 investors, SARC, and others by means

of materially false and fraudulent pretenses, representations, and promises made to EB-5 investors,

SARC, and others.

13.     G. MATTHEWS knowingly joined the conspiracy described in paragraphs 11 and

12 at least by in or about October 2014.

3

The Manner and Means of the Conspiracy

The manner and means by which G. MATTHEWS, Developer-1, their co-conspirators, their agents, and others known and unknown to the United States Attorney sought to accomplish and did accomplish the objects of the conspiracy included, among others, the following:

14. Developer-1, his co-conspirators, agents, and others made several material misrepresentations to SARC, prospective EB-5 investors, and/or Minority Owner-1, including that (i) the proceeds of the loan from EB-5 investors would be used to develop the PHH; (ii) certain well-known individuals would be on the PHH advisory board and certain well-known entertainers, businesspeople, and politicians "will be a part of the club"; and (iii) G. MATTHEWS was a member of the Palm House, LLC management team and was the 99% owner of the Palm House, LLC.

15. Despite those misrepresentations to the contrary, (i) Developer-1, his co-conspirators, agents, and others used EB-5 funding for purposes not related to the PHH project, including for the personal gain of Developer-1 and others; (ii) there was no evidence any of the proffered well-known individuals would be on the PHH advisory board or would be members of the club; and (iii) while G. MATTHEWS was the nominal 99% owner of Palm House, LLC, Developer-1 controlled that company and it belonged to G. MATTHEWS in name only.

16. Developer-1, his co-conspirators, agents, and others wired EB-5 funding from accounts located in Florida to various accounts located in Connecticut, including into G. MATTHEWS' MCP savings account. For example, on or about February 5, 2014, Developer-1, his co-conspirators, agents, and others wired $8,592.40 of EB-5 funding from an account in Florida into MATTHEWS' MCP savings account.

4

17. G. MATTHEWS applied the money that had been moved into his account to Developer-1 and others' credit card debts, or moved the money into other accounts controlled by Developer-1, his co-conspirators, agents, and others.

18. In or about October 2014, Minority Owner-1 and the general partner of SARC met with G. MATTHEWS and informed him of his 99% ownership of Palm House, LLC, and that Developer-1 had been stealing money from the PHH project.

19. Following the October 2014 meeting, G. MATTHEWS furthered the conspiracy by taking certain steps to help Developer-1 maintain control of the PHH and its money, including:

a. executing a power of attorney on or about October 20, 2014 so that Developer-1 could continue to act in G. MATTHEWS's name in control of Palm House, LLC;

b. approving a letter sent on or about October 20, 2014 in G. MATTHEWS's name meant to oust Minority Owner-1 from his position in Palm House, LLC; and

c. sending an email on or about October 21, 2014 to adjust the management structure of Palm House, LLC.

5

All in violation of Title 18, United States Code, Section 1349.

UNITED STATES OF AMERICA

JOHN H. DURHAM
UNITED STATES ATTORNEY

CRIMINAL CHIEF

JOHN T. PIERPONT, JR.
ASSISTANT U.S. ATTORNEY

NOT A CERTIFIED COPY

6



**U.S. Department of Justice**

*United States Attorney*
*District of Connecticut*

*Connecticut Financial Center*  (203)821-3700
*157 Church Street, 25th Floor*  Fax (203) 773-5376
*New Haven, Connecticut 06510*  www.justice.gov/usao/ct

March 7, 2018

George G. Mowad II, Esq
83 Bank Street
Waterbury, CT 06702

     Re:    United States v. Gerry Matthews
           Case No. 3:18-CR- 43(VAB)

Dear Attorney Mowad:

      This letter confirms the plea agreement between your client, Gerry Matthews (the "defendant"), and the United States Attorney's Office for the District of Connecticut (the "Government") concerning the referenced criminal matter.

## THE PLEA AND OFFENSE

      The defendant agrees to waive his right to be indicted and to plead guilty to a single-count information charging a violation of 18 U.S.C. § 1349.

      The defendant understands that, to be guilty of this offense, the following essential elements of the offense must be satisfied:

1.     Two or more persons, in some way or manner, agreed to try to accomplish a common and unlawful plan to commit wire fraud as charged in the information; and

2.     The defendant knew the unlawful purpose of the plan and willfully joined in it.

*March 7, 2018 letter to George G. Mowad II, Esq*
*Page 2*

## THE PENALTIES

### Imprisonment

This offense carries a maximum penalty of 20 years of imprisonment.

### Supervised Release

In addition, the Court may impose a term of supervised release of not more than 3 years to begin after any term of imprisonment. 18 U.S.C. § 3583.

The defendant understands that, should he violate any condition of supervised release, he may be required to serve a further term of imprisonment of up to 2 years per violation pursuant to 18 U.S.C. § 3583 with no credit for time already spent on supervised release.

### Fine

This offense carries a maximum fine of $250,000. The defendant is also subject to the alternative fine provision of 18 U.S.C. § 3571. Under this section, the maximum fine that may be imposed on the defendant is the greatest of the following amounts: (1) twice the gross gain to the defendant resulting from the offense; (2) twice the gross loss resulting from the offense; or (3) $250,000.

### Special Assessment

In addition, the defendant is obligated by 18 U.S.C. § 3013 to pay a special assessment of $100 on each count of conviction. The defendant agrees to pay the special assessment to the Clerk of the Court on the day the guilty plea is accepted.

### Restitution

In addition to the other penalties provided by law, the Court must also order that the defendant make restitution under 18 U.S.C. § 3663A, and the Government reserves its right to seek restitution on behalf of victims consistent with the provisions of § 3663A. The scope and effect of the order of restitution are set forth in the attached Rider Concerning Restitution. Restitution is payable immediately unless otherwise ordered by the Court.

Regardless of the amount of restitution that may be ordered by the Court, the defendant reserves his right to move the Court to apportion restitution among this defendant and other separately charged liable defendants in a manner other than jointly and severally, pursuant to 18 U.S.C. § 3664(h). The Government agrees to respond to any such motion consistent with the facts underlying the conspiracy.

NOT A CERTIFIED COPY

*March 7, 2018 letter to George G. Mowad II, Esq*
*Page 3*

### Interest, penalties and fines

Unless otherwise ordered, should the Court impose a fine or restitution of more than $2,500 as part of the sentence, interest will be charged on the unpaid balance of the fine or restitution not paid within 15 days after the judgment date. 18 U.S.C. § 3612(f). Other penalties and fines may be assessed on the unpaid balance of a fine or restitution pursuant to 18 U.S.C. § 3572(h), (*i*) and § 3612(g).

### Forfeiture

The defendant agrees that by virtue of his plea of guilty he waives any rights or cause of action to claim that he is a "substantially prevailing party" for the purpose of recovery of attorney fees and other litigation costs in any related forfeiture proceeding pursuant to 28 U.S.C. § 2465(b)(I).

## THE SENTENCING GUIDELINES

### Applicability

The defendant understands that the Court is required to consider any applicable Sentencing Guidelines as well as other factors enumerated in 18 U.S.C. § 3553(a) to tailor an appropriate sentence in this case and is not bound by this plea agreement. The defendant agrees that the Sentencing Guideline determinations will be made by the Court, by a preponderance of the evidence, based upon input from the defendant, the Government, and the United States Probation Office. The defendant further understands that he has no right to withdraw his guilty plea if his sentence or the Guideline application is other than he anticipated, including if the sentence is outside any of the ranges set forth in this agreement.

### Acceptance of Responsibility

At this time, the Government agrees to recommend that the Court reduce by two levels the defendant's adjusted offense level under § 3E1.1(a) of the Sentencing Guidelines, based on the defendant's prompt recognition and affirmative acceptance of personal responsibility for the offense. Moreover, should the defendant qualify for a decrease under § 3E1.1(a) and his offense level determined prior to the operation of subsection (a) is level 16 or greater, the Government will file a motion with the Court pursuant to § 3E1.1(b) which recommends that the Court reduce the defendant's Adjusted Offense Level by one additional level based on his prompt notification of his intention to enter a plea of guilty. The defendant understands that the Court is not obligated to accept the Government's recommendations on the reductions.

The above-listed recommendations are conditioned upon the defendant's affirmative demonstration of acceptance of responsibility, by (1) truthfully admitting the conduct comprising the offense(s) of conviction and truthfully admitting or not falsely denying any additional relevant conduct for which the defendant is accountable under § 1B1.3 of the Sentencing Guidelines, and (2) truthfully disclosing to the United States Attorney's Office and the United States Probation Office personal information requested, including the submission of a complete

and truthful financial statement detailing the defendant's financial condition. The defendant expressly authorizes the United States Attorney's Office to obtain a credit report concerning the defendant.

In addition, the Government expressly reserves the right to seek denial of the adjustment for acceptance of responsibility if the defendant engages in any acts, unknown to the Government at the time of the signing of this agreement, which (1) indicate that the defendant has not terminated or withdrawn from criminal conduct or associations (§ 3E1.1 of the Sentencing Guidelines); (2) could provide a basis for an adjustment for obstructing or impeding the administration of justice (§ 3C1.1 of the Sentencing Guidelines); or (3) constitute a violation of any condition of release. Moreover, the Government reserves the right to seek denial of the adjustment for acceptance of responsibility if the defendant seeks to withdraw his guilty plea or takes a position at sentencing, or otherwise, which, in the Government's assessment, is inconsistent with affirmative acceptance of personal responsibility. The defendant understands that he may not withdraw his plea of guilty if, for the reasons explained above, the Government does not make one or both of the recommendations or seeks denial of the adjustment for acceptance of responsibility.

<u>Waiver of Right to Appeal or Collaterally Attack Conviction and Sentence</u>

The defendant acknowledges that under certain circumstances he is entitled to challenge his conviction and sentence. The defendant agrees not to appeal or collaterally attack his conviction in any proceeding, including but not limited to a motion under 28 U.S.C. § 2255 and/or § 2241. Nor will he pursue such an appeal or collateral attack to challenge the sentence imposed by the Court if that sentence does not exceed 240 months of imprisonment, a 3-year term of supervised release, a $100 special assessment, a $250,000 fine, and restitution in any amount ordered by the Court. The Government and the defendant agree that this waiver applies regardless of whether the term of imprisonment is imposed to run consecutively to or concurrently with, in whole or in part, the undischarged portion of any other sentence that has been imposed on the defendant at the time of sentencing in this case. The defendant acknowledges that he is knowingly and intelligently waiving these rights. Furthermore, the parties agree that any challenge to the defendant's sentence that is not foreclosed by this provision will be limited to that portion of the sentence that is inconsistent with (or not addressed by) this waiver. Nothing in the foregoing waiver of appellate and collateral review rights shall preclude the defendant from raising a claim of ineffective assistance of counsel in an appropriate forum.

<u>Information to the Court</u>

The Government reserves its right to address the Court with respect to an appropriate sentence to be imposed in this case. Moreover, the Government will discuss the facts of this case, including information regarding the defendant's background and character, 18 U.S.C. § 3661, with the United States Probation Office and will provide the Probation Officer with access to material in its file, with the exception of grand jury material.

*March 7, 2018 letter to George G. Mowad II, Esq*
*Page 5*

## WAIVER OF RIGHTS

### Waiver of Right to Indictment

The defendant understands that he has the right to have the facts of this case presented to a federal grand jury, consisting of between sixteen and twenty-three citizens, twelve of whom would have to find probable cause to believe that he committed the offense set forth in the information before an indictment could be returned. The defendant acknowledges that he is knowingly and intelligently waiving his right to be indicted.

### Waiver of Trial Rights and Consequences of Guilty Plea

The defendant understands that he has the right to be represented by an attorney at every stage of the proceeding and, if necessary, one will be appointed to represent him.

The defendant understands that he has the right to plead not guilty or to persist in that plea if it has already been made, the right to a public trial, the right to be tried by a jury with the assistance of counsel, the right to confront and cross-examine the witnesses against him, the right not to be compelled to incriminate himself, the right to testify and present evidence, and the right to compel the attendance of witnesses to testify in his defense. The defendant understands that by pleading guilty he waives those rights and that, if the plea of guilty is accepted by the Court, there will not be a further trial of any kind.

The defendant understands that, if he pleads guilty, the Court may ask him questions about each offense to which he pleads guilty, and if he answers those questions falsely under oath, on the record, and in the presence of counsel, his answers may later be used against him in a prosecution for perjury or making false statements.

### Waiver of Statute of Limitations

The defendant agrees that, should the conviction following defendant's guilty plea be vacated for any reason, then any prosecution that is not time-barred by the applicable statute of limitations on the date of the signing of this plea agreement (including any indictment or counts the Government has agreed to dismiss at sentencing pursuant to this plea agreement) may be commenced or reinstated against the defendant, notwithstanding the expiration of the statute of limitations between the signing of this plea agreement and the commencement or reinstatement of such prosecution. The defendant agrees to waive all defenses based on the statute of limitations with respect to any prosecution that is not time-barred on the date the plea agreement is signed.

## ACKNOWLEDGMENT OF GUILT AND VOLUNTARINESS OF PLEA

The defendant acknowledges that he is entering into this agreement and is pleading guilty freely and voluntarily because he is guilty. The defendant further acknowledges that he is entering into this agreement without reliance upon any discussions between the Government and him (other than those described in the plea agreement letter), without promise of benefit of any

kind (other than the concessions contained in the plea agreement letter), and without threats, force, intimidation, or coercion of any kind. The defendant further acknowledges his understanding of the nature of the offense to which he is pleading guilty, including the penalties provided by law. The defendant also acknowledges his complete satisfaction with the representation and advice received from his undersigned attorney. The defendant and his undersigned counsel are unaware of any conflict of interest concerning counsel's representation of the defendant in the case.

## SCOPE OF THE AGREEMENT

The defendant acknowledges that this agreement is limited to the undersigned parties and cannot bind any other federal authority, or any state or local authority. The defendant acknowledges that no representations have been made to him with respect to any civil or administrative consequences that may result from this plea of guilty because such matters are solely within the province and discretion of the specific administrative or governmental entity involved. Finally, the defendant acknowledges that this agreement has been reached without regard to any civil tax matters that may be pending or which may arise involving him.

## COLLATERAL CONSEQUENCES

The defendant understands that he will be adjudicated guilty of each offense to which he has pleaded guilty and will be deprived of certain rights, such as the right to hold public office, to serve on a jury, to possess firearms and ammunition, and in some states, the right to vote. Further, the defendant understands that if he is not a citizen of the United States, a plea of guilty may result in removal from the United States, denial of citizenship, and denial of admission to the United States in the future. The defendant understands that pursuant to section 203(b) of the Justice For All Act, the Federal Bureau of Prisons or the United States Probation Office will collect a DNA sample from the defendant for analysis and indexing. Finally, the defendant understands that the Government reserves the right to notify any state or federal agency by which he is licensed, or with which he does business, as well as any current or future employer of the fact of his conviction.

## SATISFACTION OF FEDERAL CRIMINAL LIABILITY; BREACH

The defendant's guilty plea, if accepted by the Court, will satisfy the federal criminal liability of the defendant in the District of Connecticut as a result of his conduct underlying Count One of the Information.

The defendant understands that if, before sentencing, he violates any term or condition of this agreement, engages in any criminal activity, or fails to appear for sentencing, the Government may void all or part of this agreement. If the agreement is voided in whole or in part, defendant will not be permitted to withdraw his guilty plea.

*March 7, 2018 letter to George G. Mowad II, Esq*
*Page 7*

## NO OTHER PROMISES

The defendant acknowledges that no other promises, agreements, or conditions have been entered into other than those set forth in this plea agreement, and none will be entered into unless set forth in writing, signed by all the parties.

This letter shall be presented to the Court, in open court, and filed in this case.

Very truly yours,

JOHN H. DURHAM
UNITED STATES ATTORNEY

JOHN T. PIERPONT, JR.
ASSISTANT UNITED STATES ATTORNEY

The defendant certifies that he has read this plea agreement letter and its attachment(s) or has had it read or translated to him, that he has had ample time to discuss this agreement and its attachment(s) with counsel and that he fully understands and accepts its terms.

GERRY MATTHEWS                    March 07, 2018
The Defendant                     Date

I have thoroughly read, reviewed and explained this plea agreement and its attachment(s) to my client who advises me that he understands and accepts its terms.

GEORGE G. MOWAD II, ESQ.          3/7/2018
Attorney for the Defendant        Date

*March 7, 2018 letter to George G. Mowad II, Esq*
*Page 8*

## RIDER CONCERNING RESTITUTION

The Court shall order that the defendant make restitution under 18 U.S.C. § 3663A as follows:

1. If the offense resulted in damage to or loss or destruction of property of a victim of the offense:

   A. Return the property to the owner of the property or someone designated by the owner; or

   B. If return of the property is impossible, impracticable, or inadequate, pay an amount equal to:

      The greater of -
      (I) the value of the property on the date of the damage, loss, or destruction; or

      (II) the value of the property on the date of sentencing, less the value as of the date the property is returned.

2. In the case of an offense resulting in bodily injury to a victim –

   A. Pay an amount equal to the costs of necessary medical and related professional services and devices related to physical, psychiatric, and psychological care; including non-medical care and treatment rendered in accordance with a method of healing recognized by the law of the place of treatment;

   B. Pay an amount equal to the cost of necessary physical and occupational therapy and rehabilitation; and

   C. Reimburse the victim for income lost by such victim as a result of such offense;

3. In the case of an offense resulting in bodily injury that results in the death of the victim, pay an amount equal to the cost of necessary funeral and related services; and

4. In any case, reimburse the victim for lost income and necessary child care, transportation, and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense.

The order of restitution has the effect of a civil judgment against the defendant. In addition to the Court-ordered restitution, the Court may order that the conditions of its order of restitution be made a condition of probation or supervised release. Failure to make restitution as ordered may result in a revocation of probation, 18 U.S.C. § 3565, or a modification of the conditions of supervised release, 18 U.S.C. § 3583(e). Failure to pay restitution may also result in the defendant being held in contempt, or the defendant's re-sentencing to any sentence which might originally have been imposed by the Court. *See* 18 U.S.C. §§ 3613A, 3614. The Court

*March 7, 2018 letter to George G. Mowad II, Esq*
*Page 9*

may also order that the defendant give notice to any victim(s) of his offense under 18 U.S.C. § 3555.



Case 9:16-cv-81871-KAM Document 65-3 Entered on FLSD Docket 07/06/2020 Page 129 of
Case 9:15-cv-80332-KAM Document 57-3 Entered on FLSD Docket 09/10/2019 Page 142 of
160

# EXHIBIT "V"

NOT A CERTIFIED COPY

Case 9:16-cv-81871-KAM Document 65-3 Entered on FLSD Docket 07/06/2020 Page 130 of
160
Case 9:19-cv-80332-KAM Document 57-3 Entered on FLSD Docket 03/10/2020 Page 130 of
160

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: _____

SECURITIES AND EXCHANGE COMMISSION,

     Plaintiff,

v.

PALM HOUSE HOTEL LLLP,
SOUTH ATLANTIC REGIONAL CENTER, LLC,
JOSEPH J. WALSH, SR., and
ROBERT V. MATTHEWS,

     Defendants, and

160 ROYAL PALM, LLC and
UNITED STATES REGIONAL ECONOMIC DEVELOPMENT AUTHORITY LLC
D/B/A/ EB5 PETITION,

     Relief Defendants.

_____/

## COMPLAINT

Plaintiff Securities and Exchange Commission alleges:

**I.   INTRODUCTION**

    1.   The Commission brings this action against Palm House Hotel LLLP ("PHH"),

South Atlantic Regional Center, LLC ("SARC"), Joseph J. Walsh, Sr., and Robert V. Matthews

("Defendants") for violating the antifraud provisions of the federal securities laws.

    2.   Since 2012, Walsh, his entities, and Matthews defrauded investors participating in

the Immigrant Investor Program ("EB-5 Program") administered by the United States

Citizenship and Immigration Services ("USCIS"). The EB-5 Program provides foreign nationals

the opportunity to qualify for permanent residency in the United States through an investment of

NOT A CERTIFIED COPY

money in projects in the United States which, among other things, create a certain number of jobs.

     3.    From November 2012 to March 2015, PHH offered and sold at least $43,991,458 in PHH securities to at least 88 foreign investors through the EB-5 Program. The offering materials provided to investors represented that PHH would loan investor funds to Palm House LLC ("Palm House") to acquire, develop, and operate the Palm House Hotel ("Hotel") located in Palm Beach, Florida. Instead, Walsh and Matthews misappropriated a significant portion of the investor funds. Walsh, PHH, and SARC also made false and materially misleading statements regarding: (1) the use of investor funds; (2) the use of an escrow account to hold investor funds prior to disbursement to Palm House; (3) the existence of conditions precedent to the advancement of loan disbursements to Palm House; (4) the guaranteed return of investors' funds if their I-526 petitions (Immigrant Petition by Alien Entrepreneur) were denied; (5) Walsh and Matthews' backgrounds; (6) the preparation and periodic disclosure to investors of PHH financial reports; (7) Palm House's repayment of the loan in monthly installments; and (8) Palm House's purported ownership of and investment in the Hotel prior to the commencement of the PHH offering.    Matthews participated in the scheme and, with the exception of misrepresentations (2), (4) and (6) above, aided and abetted Walsh and his entities in making these material misrepresentations and omissions. To date, the Hotel has not been completed and is subject to a foreclosure suit and receivership.

     4.    By engaging in this conduct, (a) PHH, SARC, and Walsh violated Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a), and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5; and (b) Matthews violated Sections 17(a)(1) and (a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(1) and (a)(3), and Section 10(b) of the Exchange Act, 15

NOT A CERTIFIED COPY

-2-

U.S.C. § 78j(b), and Exchange Act Rules 10b-5(a) and (c), 17 C.F.R. §§ 240.10b-5(a) and (c), and aided and abetted PHH, SARC, and Walsh's violations of Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2), and Section10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5(b), 17 C.F.R. § 240.10b-5(b).

5.   Unless restrained and enjoined, Defendants are reasonably likely to continue to violate the federal securities laws.

## II.   DEFENDANTS AND RELIEF DEFENDANTS

### A.   Defendants

6.   **PHH** is a Florida limited liability limited partnership located in Royal Palm Beach, Florida. PHH offered limited partnership interests to investors in $500,000 increments. Investor funds were to be loaned to Palm House to acquire, develop, and operate the Hotel. SARC is the general partner of PHH. Walsh, through his control of SARC, controlled PHH.

7.   **SARC** is a Florida limited liability company located in Royal Palm Beach, Florida. SARC is a USCIS designated Regional Center. From its inception in June 2010 to at least April 2016, Walsh was the manager of SARC. Thereafter, USREDA Holdings LLC, another Walsh managed and controlled company, became the manager of SARC.

8.   **Walsh** is a resident of Royal Palm Beach, Florida. During the relevant time, Walsh was the manager of SARC and United States Regional Economic Development Authority LLC d/b/a/ EB5 Petition ("USREDA"), the managing member of USREDA Holdings LLC, and controlled each of these entities and PHH.

9.   **Matthews** is a resident of Palm Beach, Florida. Matthews controlled Palm House and 160 Royal Palm, LLC ("160 Royal"), the entity that owns the Hotel, and controlled the day-to-day operations of the Hotel. Matthews also controlled two other entities that he used, respectively, to purchase real estate with misappropriated investor funds and to title and pay for

NOT A CERTIFIED COPY

expenses associated with a 151-foot yacht. In addition, Matthews also directed the transfer of investor funds that, through a series of transactions, were used to purchase his former home in Connecticut out of foreclosure or otherwise benefit the home. In November 2017, Matthews filed for Chapter 11 bankruptcy. In re Matthews, No. 17-23426 (Bankr. S.D. Fla. filed Nov. 6, 2017). In March 2018, a federal grand jury returned an indictment against Matthews, charging him with, among other things, wire and bank fraud in connection with his activities related to PHH and Palm House. United States v. Matthews, No. 3:18-cr-00048-SRU (D. Conn. filed Mar. 14, 2018).

**B.    Relief Defendants**

10.    **160 Royal** is a Florida limited liability company located in Palm Beach, Florida. 160 Royal owns the Hotel. A real estate developer ("Developer") owned 100% of the membership interest in 160 Royal until August 30, 2013, when he assigned his interest to Palm House in exchange for 160 Royal granting Developer a $27,468,750 mortgage on the Hotel. Subsequent to this transaction, Matthews controlled 160 Royal through his control of Palm House. 160 Royal received investor funds, some of which were misappropriated by Matthews.

11.    **USREDA** is a Delaware limited liability company located in Royal Palm Beach, Florida. Walsh controlled and was the manager of USREDA from its inception in August 2012 until April 2016, when USREDA Holdings LLC became the manager of USREDA. USREDA handles business activities and USCIS petition work for PHH and other SARC-associated offerings. USREDA received investor funds which were fraudulently obtained by Walsh and his entities.

-4-

### III.     JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1), and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d)(1), and 77v(a); and Sections 21(d)(1) and 27(a) of the Exchange Act, 15 U.S.C. §§ 78u(d)(1) and 78aa(a).

13.     The court has personal jurisdiction over Defendants and Relief Defendants and venue is proper in the Southern District of Florida because Defendants and Relief Defendants reside or transact business in this district and/or participated in the offer or sale of securities in this District, and many of the acts and transactions constituting violations of the Securities Act and the Exchange Act alleged in this Complaint occurred in this District. In addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the Commission's claims occurred here.

14.     In connection with the conduct alleged in this Complaint, Defendants, directly and indirectly, singly or in concert with others, have made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation and communication in interstate commerce, and the mails.

### IV.     THE EB-5 PROGRAM

15.     Congress created the EB-5 Program in 1990 in an effort to boost the United States economy. The EB-5 program provides a prospective immigrant the opportunity to become a permanent resident by investing in the United States.

16.     To qualify for an EB-5 visa, a foreign applicant must invest $500,000 or %1 million (depending on the type of investment) in a commercial enterprise approved by the U.S Citizenship and immigration Service ("Immigration Service"). Once the foreign applicant has invested, he or she may apply for a conditional green card, which is good for two years. If the investment creates or preserves at least ten jobs during those two years, the foreign applicant

may apply to have the conditions removed from his or her green card. The applicant can then live and work in the United States permanently.

17.     A certain number of EB-5 visas are set aside for prospective immigrants who invest through a Regional Center, such as SARC. An applicant only has to invest $500,000 if he or she invests through a Regional Center, such as SARC.

## V.     FACTUAL BACKGROUND

### A.     The Hotel

18.     In August 2006, Matthews purchased the Hotel through his ownership of an entity. In 2009, that entity lost the Hotel via foreclosure and Developer acquired it through his ownership of 100% of the membership interest in 160 Royal. On August 30, 2013, Developer assigned his 100% membership interest in 160 Royal to Palm House. Matthews' brother, Gerry Matthews ("G. Matthews") assumed a 99% membership interests in Palm House as nominee for Matthews, who actually controlled Palm House. Another individual, "R.B.," assumed a 1% membership interest in Palm House.

### B.     PHH's EB-5 Securities Offering

19.     From November 2012 until March 2015, PHH raised at least $43,991,458 in investor funds from at least 88 foreign investors through an EB-5 offering of PHH limited partnership interests. The offering materials provided to investors represented that PHH would loan investor funds to Palm House to acquire, develop, and operate the Hotel.

20.     Walsh, PHH, and SARC disseminated at least three versions of PHH's EB-5 offering documents and marketing materials (collectively, "offering materials") to investors over the years. Each version included a private placement memorandum ("PPM"), to which a business plan, loan documents between PHH and Palm House ("loan documents"), a subscription agreement, a limited partnership agreement, and an escrow agreement were attached. PHH

NOT ACCEPTED COPY

combined these materials into a multi-hundred page investment portfolio. The investment portfolio also contained an "EB-5 Investor Documents & Process Guide," a fee agreement, and a USREDA/SARC Service Agreement. To streamline and expedite the closing of an investment, PHH provided a booklet which contained only the signature pages of the documents necessary for investors to make their investments and file their I-526 petitions with the USCIS.

21.     PHH's offering materials also included various versions of a project brochure that was translated into Chinese and Farsi ("brochures") and a document titled "EB5 Petition" that explained the EB-5 process. PHH's offering materials appeared under some combination of PHH, Palm House, SARC, and USREDA's names, and the Hotel and SARC's logos.

22.     PHH, through Walsh and others, solicited investors through sales agents. PHH provided the sales agents with an email that included links to its investment portfolio, the brochure, and the "EB5 Petition" document. Each investor or the sales agent for the investor received a copy of the relevant offering documents prior to investing.

23.     Walsh and USREDA's in-house counsel each participated in creating PHH's offering materials. The in-house counsel drafted PHH's PPMs, business plans, loan documents and subscription, limited partnership, and escrow agreements with information provided by Walsh and Matthews. Walsh reviewed and approved all of these documents. Walsh also signed some of these documents, including the "EB5 Investor Documents & Process Guide" as president and managing partner of SARC and USREDA, the fee agreement as president of SARC, and at least one version of the USREDA/SARC Service Agreement on behalf of USREDA. Further, Walsh edited, reviewed, and approved various versions of the brochure and "EB5 Petition," and signed a letter included in the EB5 Petition as "C.E.O./President USREDA, Inc."

24.     Matthews directly and indirectly provided information to Walsh and the in-house counsel that was included in PHH's PPMs and business plans, and received and reviewed drafts of other documents included in the offering materials provided to investors, including the brochure.

25.     As the control person of Palm House, Matthews directed R.B. to sign one version of the loan documents as managing member of Palm House because Matthews did not want to sign them himself.

26.     Matthews also met with sales agents, investors, and prospective investors multiple times regarding the Hotel project.

C.     **Material Misrepresentations and Omissions to PHH Investors**

    1.     **Misappropriation of Investor Funds by Walsh, PHH, SARC, and Matthews**

27.     Between November 2012 and at least December 2014, the offering materials misrepresented that investor funds would be loaned to Palm House to acquire, develop and operate the Hotel. In reality, PHH, SARC, and Walsh misappropriated approximately $13,578,000 of investor funds. First, Walsh kept at least $8,078,000 of investor funds earmarked for the Hotel project. Walsh co-mingled these funds with other funds he controlled for his own use and to pay expenses unrelated to the Hotel project. Second, in December 2013, Walsh loaned Matthews at least $5.5 million of investor funds to save Matthews' personal Palm Beach, Florida mansion from foreclosure. The loan, which was undocumented, was never disclosed to investors. In March 2014, Matthews sent Walsh an email expressing his "gratitude" for Walsh "saving [his] house."

28.     Between approximately June 2014 and December 2014, Matthews misappropriated at least $3.4 million of investor funds to obtain title for and pay expenses

associated with a 151-foot yacht and a piece of property located next to the Hotel. Both were titled in the names of entities owned and controlled by a member of Matthews' family. Matthews' use of investor funds in this manner was neither permitted by the offering materials nor disclosed to investors.

29.    Between February 2014 and June 2014, Matthews also directed the transfer of approximately $4.5 million of investor funds that, through a series of transactions, were used to purchase his former home in Connecticut out of foreclosure and for other related expenses. Matthews then extracted $1.2 million from the Connecticut home through a business purpose loan secured by the property, from which he and his family received $825,000.

### 2.    Misrepresentations Regarding Escrow Requirements and the Return of Investor Funds

30.    Between November 2012 and at least June 2014, PHH's offering materials contained material misrepresentations regarding PHH's use of an escrow account for investor funds. PHH falsely and fraudulently claimed that investor funds would be held in an escrow account at PNC Bank, pursuant to an escrow agreement between PHH, SARC, and PNC Bank, through at least the filing of the investor's I-526 petition. Contrary to these representations, no escrow account even existed for investor funds. Prior to the PHH offering, the former CFO for SARC and USREDA informed Walsh that the account receiving investor funds would not even be administered by PNC Bank.

31.    PHH's offering materials also contained material misrepresentations regarding the return of funds paid by investors. PHH's PPMs falsely and fraudulently stated that if an investor's I-526 petition were denied by the USCIS for reasons "within the control" of PHH, the investor's funds would be returned without deduction. The offering materials and SARC's own website also falsely, fraudulently, and repeatedly stated that investors' funds would be returned if

NOT A CERTIFIED COPY

-9-

their I-526 petitions were denied generally or without "cure." For example, the brochures stated that "[USREDA] and South Atlantic Regional Center offers a 100% Full Refund of all fees and investment if your I-526 is not approved." Some of these documents and SARC's website falsely and fraudulently referred to the promise of a return of the funds as a money back "guarantee."

32.     PHH, SARC, and Walsh knew or recklessly disregarded that USREDA and SARC would not be able to repay investors whose petitions were denied because they misappropriated for their own use millions of dollars of investor funds, and never escrowed investor funds prior to their release to Palm House. To date, the USCIS has denied all of the investor I-526 petitions except one, for which it has issued a Notice of Intent to Deny. The USCIS denied the I-526 petitions because, among other reasons, investors failed to demonstrate that the Hotel project would create sufficient jobs given the uncertainty of the project's future. PHH never returned any money to investors.

### 3.     Misrepresentations and Omissions Regarding Walsh and Matthews' Backgrounds

33.     PHH's PPMs and business plans contained misrepresentations and omissions regarding the backgrounds of Walsh and Matthews, who are both described in a section on "Management." The description of Walsh's background, which he drafted, stated that he "has extensive experience in merger and acquisition strategy and law" and experience with "the intricacies of U.S. Securities and Exchange laws." Walsh did not have any such merger and acquisition or securities law experience.

34.     Matthews was described as the chairman of Matthews Ventures Holdings, LLC ("MVH"), a diversified holding company with interests in, among other things, real estate, hotels, and construction. However, PHH's PPMs and business plans materially omitted that in

-10-

2009, one of Matthews' companies, PB Realty Holdings LLC, was placed into involuntary bankruptcy with subcontractors obtaining approximately $2 million in judgments against Matthews, and that Matthews had lost to foreclosure both his own home, as well as the very Hotel in which investors were purportedly investing. Matthews provided his biography to the in-house counsel for inclusion in the PPMs.

35.    The offering materials also included a section on G. Matthews but did not disclose that he was a nominee for Matthews in the ownership of the Hotel because of Matthews' financial problems, a material omission. Walsh knew G. Matthews was a nominee for Matthews because of Matthews' financial problems.

### 4.    Other Misrepresentations to PHH Investors

36.    PHH's offering materials also materially misrepresented the conditions under which investor funds would be loaned to Palm House. In particular, the PPMs stated, "it shall be a condition of each advance that as of such time there shall not have been a material adverse change in the operations, assets, or financial condition of the [b]orrower and its subsidiaries, taken as a whole." The loan documents made similar representations and stated that the determination as to material adverse changes would be made by PHH. Walsh and PHH—which loaned at least $30,413,462 of investor funds to Palm House—never ascertained whether Palm House met these pre-conditions for any loan advance.

37.    Matthews' misappropriation of approximately $7.9 million dollars of investor funds represented material and adverse changes in the operations, assets, and financial condition of Palm House, 160 Royal, and the Hotel, all of which he controlled. Despite being granted the authority by the loan documents to access Palm House's financial statements and the right to inspect its books and records, PHH never exercised this authority.

NOT A CERTIFIED COPY

38.     The offering materials also materially misrepresented that PHH would provide audited financial statements or other financial information to investors on an annual or quarterly basis. PHH never prepared audited financial statements and did not provide audited statements, or any other financial reports, to investors.

39.     The offering materials also misrepresented that Palm House would make monthly interest payments to PHH on its loan for five years. Palm House did not make any monthly interest payments to PHH.

40.     In order to bolster investor confidence in PHH's securities offering, PHH's business plans and brochures also made materially misleading statements suggesting that Palm House had substantial funds at stake in the Hotel, and that investor funds were only part of an already well-financed development project. Based on information provided in part by Matthews, PHH's business plans falsely and fraudulently represented that Palm House had $22 million in equity in the Hotel, and the brochures fraudulently stated the project was "very safe" based in part on a substantial equity investment from Palm House. In reality, Palm House acquired the Hotel on August 30, 2013 through a $27,468,750 mortgage on the Hotel, with no pre-existing equity in the Hotel.

**D.     Relief Defendants**

41.     Matthews controlled 160 Royal and its bank accounts through his control of Palm House. During the course of the fraudulent scheme, PHH, Walsh, and SARC advanced millions of dollars of investor funds to 160 Royal. During this same time period, Matthews diverted millions of dollars of investor funds from 160 Royal to other accounts he controlled.

42.     Walsh controlled and was the manager of USREDA, which handled business activities and USCIS petition work for PHH and other SARC-associated offerings. USREDA

received millions of dollars of investor funds which were fraudulently obtained by Walsh and his entities.

## VI.    CLAIMS FOR RELIEF

### Count I
### Violations of Section 17(a)(1) of the Securities Act
### (Against PHH, SARC, Walsh, and Matthews)

43.    The Commission repeats and realleges paragraphs 1 through 42 of this Complaint.

44.    From no later than November 2012 through March 2015, PHH, SARC, Walsh, and Matthews, in the offer or sale of securities by use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, knowingly or recklessly employed any device, scheme or artifice to defraud.

45.    By reason of the foregoing, PHH, SARC, Walsh, and Matthews violated and, unless enjoined, are reasonably likely to continue to violate Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1).

### Count II
### Violations of Section 17(a)(2) of the Securities Act
### (Against PHH, SARC, and Walsh)

46.    The Commission repeats and realleges paragraphs 1 through 42 of this Complaint.

47.    From no later than November 2012 through March 2015, PHH, SARC, and Walsh, in the offer or sale of securities by use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, negligently obtained money or property by means of untrue statements of material facts and omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

NOT A CERTIFIED COPY

48.    By reason of the foregoing, PHH, SARC, and Walsh violated and, unless enjoined, are reasonably likely to continue to violate Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2).

## Count III
### Violations of Section 17(a)(3) of the Securities Act
### (Against PHH, SARC, Walsh, and Matthews)

49.    The Commission repeats and realleges paragraphs 1 through 42 of this Complaint.

50.    From no later than November 2012 through March 2015, PHH, SARC, Walsh, and Matthews, in the offer or sale of securities by use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, negligently engaged in transactions, practices, or courses of business which operated or would have operated as a fraud or deceit.

51.    By reason of the foregoing, PHH, SARC, Walsh, and Matthews violated and, unless enjoined, are reasonably likely to continue to violate Section 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(3).

## Count IV
### Violations of Section 10(b) and Rule 10b-5(a) of the Exchange Act
### (Against PHH, SARC, Walsh, and Matthews)

52.    The Commission repeats and realleges paragraphs 1 through 42 of this Complaint.

53.    From no later than November 2012 through March 2015, PHH, SARC, Walsh, and Matthews, directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly employed any device, scheme or artifice to defraud in connection with the purchase or sale of any security.

54.    By reason of the foregoing, PHH, SARC, Walsh, and Matthews violated and, unless enjoined, are reasonably likely to continue to violate Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5(a), 17 C.F.R. § 240.10b-5(a).

## Count V
### Violations of Section 10(b) and Rule 10b-5(b) of the Exchange Act
### (Against PHH, SARC, and Walsh)

55.     The Commission repeats and realleges paragraphs 1 through 42 of this Complaint.

56.     From no later than November 2012 through March 2015, PHH, SARC, and Walsh, directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in connection with the purchase or sale of any security.

57.     By reason of the foregoing, PHH, SARC, and Walsh violated and, unless enjoined, are reasonably likely to continue to violate Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5(b), 17 C.F.R. § 240.10b-5(b).

## Count VI
### Violations of Section 10(b) and Rule 10b-5(c) of the Exchange Act
### (Against PHH, SARC, Walsh, and Matthews)

58.     The Commission repeats and realleges paragraphs 1 through 42 of this Complaint.

59.     From no later than November 2012 through March 2015, PHH, SARC, Walsh, and Matthews, directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, in connection with the purchase or sale of any security, knowingly or recklessly engaged in acts, practices, and courses of business which operated or would have operated as a fraud or deceit upon any person.

60.     By reason of the foregoing, PHH, SARC, Walsh, and Matthews violated and, unless enjoined, are reasonably likely to continue to violate Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5(c), 17 C.F.R. § 240.10b-5(c).

## Count VII
### Aiding and Abetting Violations of Section 17(a)(2) of the Securities Act
(Against Matthews)

61.     The Commission repeats and realleges paragraphs 1 through 42 of this Complaint.

62.     From no later than November 2012 through March 2015, PHH, SARC, and Walsh, in the offer or sale of securities by use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, negligently obtained money or property by means of untrue statements of material facts and omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and by reason of the foregoing violated Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2).

63.     From no later than November 2012 through August 2014, Matthews knowingly or recklessly provided substantial assistance to PHH, SARC, and Walsh's violations of Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2), and is in violation of this provision to the same extent as PHH, SARC, and Walsh.

64.     By reason of the foregoing, Matthews aided and abetted, and unless enjoined, is reasonably likely to continue to aid and abet violations of Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2).

## Count VIII
### Aiding and Abetting Violations of Section 10(b) and Rule 10b-5(b) of the Exchange Act
(Against Matthews)

65.     The Commission repeats and realleges paragraphs 1 through 42 of this Complaint.

66.     From no later than November 2012 through March 2015, PHH, SARC, and Walsh, directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances

-16-

under which they were made, not misleading in connection with the purchase or sale of any security, and by reason of the foregoing violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5(b), 17 C.F.R. § 240.10b-5(b).

67.     From no later than November 2012 through August 2014, Matthews knowingly or recklessly provided substantial assistance to PHH, SARC, and Walsh's violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5(b), 17 C.F.R. § 240.10b-5(b), and is in violation of these provisions to the same extent as PHH, SARC, and Walsh.

68.     By reason of the foregoing, Matthews aided and abetted, and unless enjoined, is reasonably likely to continue to aid and abet violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5(b), 17 C.F.R. § 240.10b-5(b).

## VII.   RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests the Court find the Defendants committed the violations alleged, and:

### A.     Permanent Injunctive Relief

Issue a Permanent Injunction restraining and enjoining Defendants, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them from violating the federal securities laws alleged in this Complaint.

### B.     Disgorgement

Issue an Order directing Defendants and Relief Defendants to disgorge all ill-gotten gains, including prejudgment interest, resulting from the acts or courses of conduct alleged in this Complaint.

C.    **Civil Penalty**

Issue an Order directing Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d).

D.    **Further Relief**

Grant such other and further relief as may be necessary and appropriate.

## VIII.    RETENTION OF JURISDICTION

The Commission respectfully requests that the Court retain jurisdiction over this action and over Defendants and Relief Defendants in order to implement and carry out the terms of all orders and decrees that it may enter, or to entertain any suitable petition or motion by the Commission for additional relief within the jurisdiction of this Court.

## IX.    DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury in this action of all issues so triable.

Dated: August 3, 2018

Respectfully submitted,

By: _____

Alejandro O. Soto
Senior Trial Counsel
Florida Bar No. 172847
Direct Dial: (305) 982-6313
Email: sotoal@sec.gov
Lead Attorney for Plaintiff
**SECURITIES AND EXCHANGE COMMISSION**
801 Brickell Avenue, Suite 1800
Miami, Florida 33131
Telephone: (305) 982-6300
Facsimile: (305) 536-4154

NOT A CERTIFIED COPY